**No. 2023-1805**

_____

# United States Court of Appeals for the Federal Circuit

_____

UNITED THERAPEUTICS CORPORATION,

*Appellant,*

– v. –

LIQUIDIA TECHNOLOGIES, INC.,

*Appellee.*

_____

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL & APPEAL BOARD, IPR2021-00406

_____

**UNITED THERAPEUTICS CORPORATION'S OPPOSITION TO LIQUIDIA'S MOTION TO EXPEDITE BRIEFING AND ORAL ARGUMENT**

_____

**UNITED THERAPEUTICS CORPORATION**
Shaun R. Snader
1735 Connecticut Ave. NW,
2nd Floor, Washington, DC 20009
(202) 304 1701
ssnader@unither.com

**GOODWIN PROCTER LLP**
William Jackson
1900 N St. NW,
Washington, DC 20036
(202) 346 4216
wjackson@goodwinlaw.com

**MCDERMOTT WILL & EMERY LLP**
Douglas H. Carsten
Arthur P. Dykhuis
18565 Jamboree Road Suite 250
Irvine, CA 92612-2565
(949) 851 0633
dcarsten@mwe.com
adykhuis@mwe.com

Adam W. Burrowbridge
500 North Capitol Street, NW
Washington, DC 20001-1531
(202) 756 8797
aburrowbridge@mwe.com

*Counsel for Appellant* United Therapeutics Corporation

FORM 9. Certificate of Interest                                                     Form 9 (p. 1)
                                                                                   March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**  2023-1805

**Short Case Caption**  United Therapeutics Corporation v. Liquidia Technologies,Inc. ⊞

**Filing Party/Entity**  United Therapeutics Corporation

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/30/2023            Signature:    /s/ Douglas H. Carsten

                            Name:         Douglas H. Carsten

| 1. Represented Entities.<br>Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest.<br>Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders.<br>Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| United Therapeutics Corporation | N/A | BlackRock Inc. |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Stephen B. Maebius<br>Foley & Lardner | Michael Houston<br>Foley & Lardner | Judy Mohr, Ph.D.<br>McDermott Will & Emery |
| George Quillin<br>Foley & Lardner | April E. Weisbruch<br>McDermott Will & Emery | Mandy Kim<br>McDermott Will & Emery |
| Jason N. Mock<br>Foley & Lardner | | |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| N/A | | |
| | | |

United Therapeutics ("UTC") submits its opposition to Liquidia Technology Inc.'s ("Liquidia") motion to expedite briefing and oral argument ("Motion") pursuant to Federal Circuit Rule 27(b) and this Court's May 23, 2023, Order (Dkt. 11).

## INTRODUCTION

Liquidia has failed to show good cause to drastically shorten the time UTC would otherwise have under the rules for briefing. Liquidia itself seems to be in no hurry having waited nearly four weeks to file its Motion rather than "immediately after docketing" as the Court's rules direct. Fed. Cir. R. 27, Practice Note.

First, the alleged "harm" from treating this case like any other is merely the circumstance that all losing Hatch-Waxman defendants face: an order under 35 U.S.C. §271(e)(4)(A) setting the earliest date on which FDA may approve Liquidia's proposed product. This routine scenario—absent exigent circumstances—does not justify relief that is "not routinely granted." Fed. Cir. R. 27, Practice Note. When Liquidia appealed from the district court decision, it also moved to expedite briefing, and the Court denied that request. Nothing has changed. The Court should do the same this second time around.

Second, UTC is not to blame for the purported delays in adjudicating the patent at issue, as Liquidia suggests. Liquidia could have sought *inter partes* review ("IPR") of U.S. Patent No. 10,716,793 ("the '793 Patent") earlier but chose to wait months before filing an IPR. Liquidia could have also advanced its prior-art invalidity arguments at trial in March 2022 but abandoned those arguments on the second day of trial. Thus, the timing of this appeal is driven by Liquidia's strategic decisions, not by UTC's actions. And Liquidia's grumbles about "delay[s]" in "adjudication of this IPR" appear to simply be dissatisfaction with the PTAB's procedures, *e.g.*, the availability of reconsideration and review by the Precedential Opinion Panel ("POP"). Liquidia omits that on rehearing directed by the POP, the original panel acknowledged its legal error and fundamentally changed the final written decision as a result of UTC's request for review.

Third, Liquidia's suggestion that patients are prevented from accessing life-saving therapy is meritless. UTC has served for decades, and will continue to serve, those patients with its existing products. It was UTC that brought first-of-their-kind treprostinil therapies to market, including Tyvaso (treprostinil) Inhalation Solution, which Liquidia relied upon in its § 505(b)(2) application, and Tyvaso DPI (treprostinil) Inhalation Powder. Liquidia offers no argument or factual

basis to believe that the introduction of Liquidia's product, Yutrepia, will substantively change the therapies patients receive. Indeed, Liquidia has repeatedly told courts that it is an "innovator," not a generic, and has never claimed it will offer Yutrepia at prices more affordable than UTC's competing drug product. *See* Mot. at 2, 5. Thus, because Liquidia offered no facts to support Yutrepia being a superior or more affordable product, permitting UTC to brief its appeal on the standard schedule does not disadvantage PAH patients.

The statutory framework has already permitted Liquidia "prompt resolution" of the Hatch-Waxman district court case and the opportunity to get to market far quicker than otherwise possible. Mot. at 6. Liquidia is free to self-expedite its own brief, and, while UTC does not believe expedited oral argument is warranted, UTC will appear at the Court's convenience. But Liquidia has not come close to offering sufficient justification to force UTC to file its opening brief by July 5, 2023—immediately following a federal holiday—and to file its reply brief on August 7, 2023, merely 13 days (and only 9 business days) after Liquidia's Responsive Brief. The time Liquidia proposes to allow UTC to prepare its reply is particularly prejudicial given the importance of this appeal to UTC and the unavailability of its lead counsel due to pre-planned and pre-paid international vacation during 12 of the 13 days

Liquidia proposes for UTC to reply. The Court should maintain the standard briefing schedule defined in Rule 31.

## BACKGROUND AND PROCEDURAL HISTORY

This is the third appeal before this Court relating to the dispute between UTC and Liquidia. This Court has denied Liquidia's requests to shorten UTC's briefing schedule in each of the two prior appeals because Liquidia "ha[d] not made a sufficient showing." *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 22-2133, Dkt. 26 at 2 (Fed. Cir.) (Ex. 1); *Id.,* No. 22-2217, Dkt. 18 at 2 (Ex. 2). Liquidia's current three-page argument offers nothing new.

UTC brought a patent-infringement suit because Liquidia plans to market an inhalation powder that has since been found to infringe UTC's '066 and '793 Patents.[1] Liquidia sought to expedite its approval by using the § 505(b)(2) pathway relying on FDA's prior approval of UTC's Tyvaso product. As a result, Liquidia certified that UTC's Tyvaso Orange Book patents were invalid or not infringed, triggering district court litigation

---

[1] The district court found that Liquidia's process and resulting pharmaceutical composition infringed U.S. Patent No. 9,593,066 ("the '066 Patent") claims 1, 2, 3, and 6, but did not infringe claims 8 and 9. This district court also found claims 1, 2, 3, 6, and 9 invalid. UTC appealed the adverse decisions in Case No. 23-1021, currently pending before the Court.

in accordance with the Hatch-Waxman framework. *See* Mot. at 1. Liquidia initially advanced its invalidity and noninfringement arguments in the district court litigation, *see, e.g.*, *United Therapeutics Corp. v. Liquidia Tech., Inc.*, C.A. No. 20-755 (RGA) (JLH), Dkt. No. 365 (D. Del.) (Ex. 3), and later brought successive IPR petitions challenging three UTC patents, *see* PTAB Case Nos. IPR2020-00769, IPR2020-00770, IPR2021-00406. Liquidia filed IPR petitions on U.S. Patent No. 9,604,901 ("the '901 Patent") and the '066 Patent on March 30, 2020. The '793 Patent issued and was asserted in the Delaware litigation on July 22, 2020, but Liquidia waited five months before filing the IPR petition challenging the '793 Patent, the proceeding giving rise to this appeal.[2] *See* Nos. IPR2020-00769 Dkt. No. 1 (Ex. 4), IPR2020-00770 Dkt. No. 1 (Ex. 5), IPR2021-00406 Dkt. No. 2 (Ex. 6). The PTAB declined review of the '066 Patent and instituted reviews on the '901 and '793 Patents.

With respect to the '793 Patent, Liquidia's invalidity defenses in the district court included obviousness and anticipation. Ex. 3 at 161-185 (advancing these arguments in final pretrial submissions). Liquidia

---

[2] Because the '901 Patent IPR began eight months earlier than the '793 Patent IPR, the '901 Patent IPR appeal is before the Court, fully briefed, and awaiting oral argument. *See United Therapeutics Corp. v. Liquidia Technologies, Inc*., Nos. 2022-2133, 2022-2174 (Fed. Cir.).

argues, without citation, that "Liquidia did not present its successful PTAB obviousness arguments at trial, due to the district court's indication at the pre-trial conference that it would apply IPR estoppel." Mot. at 7 n.2. This is not the whole story. Judge Andrews made clear that there was no final written decision, and that "by law, [Liquidia] can present whatever it wants to in terms of the '793 patent." Ex. 7 at 10. Liquidia's lead counsel agreed: "The estoppel is based on the final decision. There's none in the '793, so we agree with you. That's our position." *Id.*

But then, on the second day of trial, Liquidia dropped these arguments, choosing to use more time at trial for its written description and enablement arguments and opting for the lower burden of proof for its prior art arguments in the IPR. Of course, had Liquidia prioritized speed in obtaining a ruling on its anticipation and obviousness challenges, it could have pursued its prior art arguments in district court rather than the IPR. Accordingly, its statement that "Liquidia has acted diligently to bring all the relevant issues between the parties to this Court *as quickly as possible*" is not the full story. Mot. at 7 (emphasis added).

The district court found that Liquidia will infringe claims 1, 4, 6, 7, and 8 of the '793 Patent and that Liquidia had not shown by clear and

convincing evidence that the patent was invalid for lack of enablement or adequate written description. *See* Liquidia Ex. 5 (D. Del. Final Judgment) at 2. Because Liquidia had abandoned its anticipation and obviousness challenges in the district court, the district court made no findings on either ground for the '793 Patent. The district court subsequently entered final judgment. *See id.* Consistent with 35 U.S.C. §271(e)(4)(A), the court "ordered that the effective date of any final approval by the FDA of Liquidia's [product] shall be a date which is not earlier than the expiration date of the '793 patent." Liquidia Ex. 5 at 2. Liquidia appealed the district court's judgment as to the '793 Patent, and this Court heard oral argument on May 3, 2023.

Meanwhile, in the '793 Patent IPR, the PTAB issued a final written decision ("FWD") finding that the claims of the '793 Patent are obvious. Liquidia Ex. 1. UTC filed requests for rehearing and for review of that decision by the PTAB's POP. *See Liquidia Techs., Inc. v. United Therapeutics Corp.*, Case No. IPR2021-00406, Papers 79-80 (Ex. 8-9). The POP agreed that the Board's analysis was legally deficient and directed the panel to explicitly make certain findings regarding public accessibility of purported prior art references. *See* No. IPR2021-00406, Paper 81 (Ex. 10). After further consideration, and despite expressly recognizing that it had made mistakes in its previous decision, the Board

denied UTC's request for rehearing of the FWD, offering completely different grounds for finding public accessibility than those adopted in its initial decision or even argued by Liquidia. *See Liquidia Techs., Inc. v. United Therapeutics Corp.*, Case No. IPR2021-00406, Paper 82 (Ex. 11). On April 5, 2023, UTC filed a Notice of Appeal to this Court. *Id.*, Paper 83 (Ex. 12). The Notice of Appeal was docketed on April 26, 2023. Dkt. 1. Liquidia filed its Motion twenty-six days after the appeal was docketed.

## ARGUMENT

Liquidia's motion should be denied because it fails to establish good cause for expediting and because expediting would unduly prejudice UTC.

## I. UTC should not have to expedite when Liquidia has repeatedly prioritized other strategic considerations.

This Court should not order expedited proceedings—a form of relief that is "not routinely granted" (Fed. Cir. R. 27, Practice Note)—solely to save Liquidia from the consequences of its own strategic decisions. Liquidia delayed filing the '793 Patent IPR until 5 months after that patent issued, abandoned its prior art defenses in the district court during trial knowing that an IPR appeal would take longer than a district court final judgment, and delayed filing its Motion until 47 days after

UTC filed its notice of appeal. These strategic litigation choices, which prioritized other considerations over speedy resolution, undercut Liquidia's newfound sense of urgency.

Although "not routinely granted," a "motion for expedited proceedings is the procedural vehicle to request accelerated consideration of an appeal or petition for review, and *it should be filed immediately after docketing*." Fed. Cir. R. 27, Practice Note (emphasis added). Here, the Notice of Appeal was docketed in the Federal Circuit on April 26, 2023. Dkt. 1. Liquidia insists an expedited briefing and oral argument schedule is imperative but waited *twenty-six (26) days* after the appeal was docketed to file its Motion. *See id.*, Dkt. 10. Moreover, Liquidia had 21 days between UTC filing its notice of appeal and docketing to prepare its Motion—or at least inform UTC that it intended to expedite these proceedings. *See* Ex. 12; Dkt. 1 (Notice of Appeal filed in this Court on April 5, 2023). If expediting briefing was an immediate concern, and it wanted to minimize prejudice to UTC, Liquidia would have abided by Fed. Cir. R. 27 to ensure that its Motion was filed at the earliest possible opportunity.

This is not the first time Liquidia has delayed filing a Motion to Expedite. In a prior related litigation between Liquidia and UTC before this Court, Liquidia filed its Motion to Expedite 40 days after the appeal

was docketed. *See United Therapeutics Corp. v. Liquidia Technologies, Inc.*, No. 22-2133 (Fed. Cir.), ECF No. 1, 20, 22. This Court denied Liquidia's motion to expedite, *see id.*, ECF No. 26 (Ex. 1), and the Court should deny Liquidia's Motion here.

Liquidia blames "adjudicatory delay" as the reason for why its "drug is being kept off the market." Mot. at 2, 6. Liquidia's real gripe is that UTC sought rehearing—timely and appropriately. Moreover, Liquidia misleadingly skips over the actual outcome of UTC's rehearing request— a fundamental change in the PTAB's decision. Upon considering UTC's petition to reevaluate the final written decision, the POP determined that "the Board's Final Written Decision did not address adequately whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art," Ex. 10 at 2, and thus, directed the Board "to clearly identify whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art." *Id.* at 3. These two references were critical to the three-reference combination the Board relied on to find the '793 Patent unpatentable. And when the Board finally issued its decision on reconsideration, it agreed that its initial decision had made errors, and it completely changed its rationale for finding public accessibility. Ex. 11 at 6-7 ("Reconsideration of the record shows that the research aids did not establish the prior-art status of Voswinckel JESC and Voswinckel JAHA

… We agree with Patent Owner.") (cleaned-up).  Ultimately, there was no "delay," adjudicatory or otherwise, in either the judicial process or UTC's actions.  Liquidia's assertion to the contrary is baseless.

Liquidia asserts that it will "self-expedite the deadlines it controls." Mot. at 7.  History tells a different story.  In the past, after its motions to expedite were denied, Liquidia did not meaningfully expedite the deadlines it controlled.  In Case No. 22-217, Liquidia's proposed schedule allotted it 20 days to file its reply brief, but Liquidia ultimately filed its reply brief 40 days after UTC's responsive brief.  *See United Therapeutics Corp.*, No. 22-2217, ECF No. 7, 21, 29, 30, 32.  Similarly, in Case No. 22-2133, Liquidia again proposed filing its responsive brief in 20 days, but Liquidia filed its responsive brief after 39 days instead. *See United Therapeutics Corp.*, No. 22-2133 at ECF 20, 26, 32, 36.

The current schedule—standard for all cases absent exceptional circumstances—is a result of the natural and foreseeable consequences of Liquidia's strategic choices.  And no good cause exists to burden UTC and the Court by artificially compressing UTC's briefing deadlines and moving this case ahead of others for argument.

11

## II.  The grounds that Liquidia has offered for expediting this appeal do not withstand scrutiny.

Liquidia argues that it "cannot launch its product, thereby preventing PAH patients from having access to its innovative, life-saving drug Yutrepia." Mot. at 5.[3]  Notably, Liquidia neither represents that it is ready to launch nor contends that its product will be superior to or cheaper than UTC's.  Liquidia's unsupported assertions regarding the alleged benefits from a commercial launch do not justify the relief sought here.  As in its prior motions to expedite, "Liquidia has not made a sufficient showing … to shorten the time for United Therapeutics." Ex. 1 (order denying expediting UTC's briefing schedule).  Liquidia's arguments concerning market "launch," unsupported by facts offered by a competent declarant or otherwise, present no urgency other than to Liquidia's shareholders, and the grounds that Liquidia has offered for expediting this appeal do not withstand scrutiny.

Similarly, Liquidia's suggestion that, absent action from this Court, patients will be prevented from access to life-saving therapy is

---

[3] Liquidia's claim that Yutrepia is "life-saving" is puffery, at best. Liquidia has made no showing that Yutrepia offers a mortality benefit, and FDA, according to Liquidia, granted tentative approval for Yutrepia to reduce disease symptoms, not extend life.  *See* Liquidia Ex. 6 at 153, 157 (Yutrepia label).

unfounded.  Mot. at 5.  UTC has served the PAH patient population for decades and brought first-of-their-kind treprostinil therapies to market. UTC continues to serve this market.  Specifically, UTC is already serving PAH patients with its innovative Tyvaso DPI drug product, which launched in 2022.[4]  Liquidia relied on UTC's treprostinil studies to expedite approval of its drug product and represented that its product was "equivalent" to UTC's Tyvaso.  Liquidia Ex. 6 at 164 (Yutrepia label). Liquidia also fails to allege, much less establish, that Yutrepia is somehow superior to Tyvaso or that it will increase market access by offering its therapy at lower prices than Tyvaso.  *See* Mot. at 2, 5.

Liquidia says that "[a] basic tenet of Hatch-Waxman proceedings is to promote competition by permitting prompt resolution of patent infringement," but this is an IPR appeal, not a Hatch-Waxman proceeding.  And, as discussed, Liquidia strategically decided not to pursue the arguments at-issue in this appeal in its co-pending Hatch-Waxman district court litigation, opting instead for a lower burden of

---

[4] *See* United Therapeutics Corporation, *Form 10-K (2022)*, available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1082554/00010825542 3000005/uthr-20221231.htm (Ex. 13) at 4 (following approval in May 2022, UTC "launched this product [Tyvaso DPI] commercially in the United States in June 2022.").

proof in exchange for a PTAB decision that does not have effect unless and until after affirmance on appeal.

Even if considered Hatch-Waxman adjacent, the proceedings here were no more exceptional than any other Hatch-Waxman proceeding—except that Liquidia makes no argument that it will bring more affordable medicines to patients. Liquidia's assertion that Hatch-Waxman policy considerations make expediting this appeal "particularly warranted" is inapt. Mot. at 6. Nothing about this case justifies departing from the Court's standard practice or imposing shortened deadlines on UTC.

At bottom, Liquidia provides no basis to conclude that PAH patients will be in a substantially different position by shortening UTC's briefing schedule.

## III.  Liquidia's proposed schedule is prejudicial to UTC.

At the very least, the Court certainly should not adopt the lopsided and prejudicial briefing deadlines that Liquidia has proposed. Liquidia proposes not only that UTC's opening brief time be cut in half, but also that it would be due just after a federal holiday, on July 5, 2023. Liquidia also proposes that UTC have only 13 days to file its reply brief. Even if Liquidia showed cause to expedite, that does not provide a basis to prejudice UTC.

Liquidia's argument that "UTC does not have a reasonable basis for being unable to meet Liquidia's proposed deadlines" is pure conjecture. *See* Mot. at 8. UTC's lead counsel has significant conflicts throughout the limited briefing periods proposed by Liquidia. For example, during the compressed opening brief period, counsel has several district court deadlines, briefing due to this Court in a different matter on July 10, and pre-paid international vacation scheduled for June 20-July 1. Carsten Decl. ¶3. Moreover, during the extremely compressed 13 days Liquidia proposes for UTC to respond, lead counsel has a pre-paid international vacation scheduled from July 26-August 6, *i.e.*, 12 of the 13 days Liquidia proposes that UTC draft its reply brief. Under no circumstances does Liquidia establish urgency sufficient to expedite UTC's time to reply to Liquidia's brief.

## CONCLUSION

The Court should deny Liquidia's motion.

Respectfully submitted,

/s/ *Douglas H. Carsten*
Douglas H. Carsten
Adam W. Burrowbridge
Arthur P. Dykhuis
William Jackson
Shaun R. Snader

*Attorneys for Appellant*
United Therapeutics Corporation

Dated: May 30, 2023

# ADDENDUM

# TABLE TO ADDENDUM

| Exhibit | Description |
|---|---|
| | Declaration of Douglas H. Carsten in Support Of UTC's Opposition To Liquidia's Motion to Expedite Briefing and Oral Argument |
| 1. | Order Denying Liquidia's Motion to Expedite in *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 22-2133 |
| 2. | Order Denying Liquidia's Motion to Expedite in *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 22-2217 |
| 3. | Proposed Joint Pretrial Order in *United Therapeutics Corp. v. Liquidia Techs., Inc.*, C.A. No. 20-755 (RGA) (JLH) (D. Del.) (Excerpted) |
| 4. | Petition for Inter Partes Review of U.S. Patent No. 9,593,066 (Excerpted) |
| 5. | Petition for Inter Partes Review of U.S. Patent No. 9,604,901 (Excerpted) |
| 6. | Petition for Inter Partes Review of U.S. Patent No. 10,716,793 |
| 7. | Pretrial Hearing Transcript in *United Therapeutics Corp. v. Liquidia Techs., Inc.*, D. Del. 20-755-RGA (Excerpted) |
| 8. | Patent Owner's Request for Rehearing |
| 9. | Notification of Receipt of Precedential Opinion Panel (POP) Request |
| 10. | Order denying the patent owner's request for a Precedential Opinion Panel review |
| 11. | Decision Denying Patent Owner's Request on Rehearing of Final Written Decision 37 C.F.R. § 42.71(d) |
| 12. | Patent Owner's Notice of Appeal |
| 13. | UTC's Form 10-K for the fiscal year ended December 31, 2022 (Excerpted) |

**No. 2023-1805**

# United States Court of Appeals for the Federal Circuit

UNITED THERAPEUTICS CORPORATION,

*Appellant,*

– v. –

LIQUIDIA TECHNOLOGIES, INC.,

*Appellee.*

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL & APPEAL BOARD, IPR2021-00406

**DECLARATION OF DOUGLAS H. CARSTEN IN SUPPORT OF UTC'S OPPOSITION TO LIQUIDIA'S MOTION TO EXPEDITE BRIEFING AND ORAL ARGUMENT**

**UNITED THERAPEUTICS CORPORATION**
Shaun R. Snader
1735 Connecticut Ave. NW,
2nd Floor, Washington, DC 20009
Tele: +1 202 304 1701
ssnader@unither.com

**GOODWIN PROCTER LLP**
William Jackson
1900 N St. NW,
Washington, DC 20036
Tele: +1 202 346 4216
wjackson@goodwinlaw.com

**MCDERMOTT WILL &  EMERY LLP**
Douglas H. Carsten
Arthur P. Dykhuis
18565 Jamboree Road Suite 250
Irvine, CA 92612-2565
Tele: +1 949 851 0633
dcarsten@mwe.com
adykhuis@mwe.com

Adam W. Burrowbridge
500 North Capitol Street, NW
Washington, DC 20001-1531
Tele:  +1 202 756 8797
aburrowbridge@mwe.com

*Counsel for Appellant* United Therapeutics Corporation

I, Douglas H. Carsten, declare as follows:

1.    I am a partner of the law firm of McDermott Will & Emery LLP, counsel for Appellant United Therapeutic's Corporation ("UTC"), and I have personal knowledge of the matters set forth herein.

2.    I submit this declaration in support of UTC's Opposition to Liquidia Technologies, Inc's ("Liquidia") Motion to Expedite Briefing and Oral Argument.

3.    Undersigned Counsel has significant responsibility for, among other things, the following commitments:

- Initial Disclosures in *Nespresso USA, Inc. v K-fee System GmbH*, Central District of California No. 22-cv-09295, due on June 1, 2023.

- Patent Owner Preliminary Response in *Nespresso USA, Inc. v K-fee System GmbH*, IPR2023-00502, due on June 16, 2023.

- Patent Owner Preliminary Response in *Nespresso USA, Inc. v K-fee System GmbH*, IPR2023-00485, due on June 16, 2023.

- Infringement Contentions in *Nespresso USA, Inc. v K-fee System GmbH*, Central District of California No. 22-cv-09295, due on June 20, 2023.

- Patent Owner's Response to Petition in *Nespresso USA, Inc. v K-fee System GmbH*, IPR2022-01574, due on July 7, 2023.

- Petition for Rehearing in *Sanofi-Aventis Deutschland GmbH v. Biocon Biologics Inc.*, Fed. Cir. 2021-1981, due on July 10, 2023.

- Personal pre-paid international vacation travel June 20 – July 1.

- Personal pre-paid international vacation travel July 26 – August 6.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

*/s/ Douglas H. Carsten*

Douglas H. Carsten
*Attorney for Appellant*
United Therapeutics Corporation

Dated: May 30, 2023

# EXHIBIT 1

NOTE: This order is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**UNITED THERAPEUTICS CORPORATION,**
*Appellant*

**v.**

**LIQUIDIA TECHNOLOGIES, INC.,**
*Cross-Appellant*

———————————

2022-2133, 2022-2174

———————————

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2020-00770.

--------------------------------------------------

**UNITED THERAPEUTICS CORPORATION,**
*Plaintiff - Cross-Appellant*

**v.**

**LIQUIDIA TECHNOLOGIES, INC.,**
*Defendant-Appellant*

———————————

2022-2217, 2023-1021

———————————

Appeals from the United States District Court for the District of Delaware in No. 1:20-cv-00755-RGA-JLH, Judge Richard G. Andrews.

————————————

## ON MOTION

————————————

## O R D E R

Liquidia Technologies, Inc. moves to expedite briefing and oral argument in the above-captioned appeals. United Therapeutics Corporation opposes the motions.

Liquidia may self-expedite the appeals by filing its respective briefs early. Liquidia has not made a sufficient showing, however, to shorten the time for United Therapeutics. The cases will be placed on the next available oral argument calendar after briefing is complete.

Accordingly,

IT IS ORDERED THAT:

The motions are denied.

FOR THE COURT

October 12, 2022
Date

/s/ Peter R. Marksteiner
Peter R. Marksteiner
Clerk of Court

# EXHIBIT 2

NOTE:  This order is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

_____

**UNITED THERAPEUTICS CORPORATION,**
*Appellant*

**v.**

**LIQUIDIA TECHNOLOGIES, INC.,**
*Cross-Appellant*

_____

2022-2133, 2022-2174

_____

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2020-00770.

--------------------------------------------------

**UNITED THERAPEUTICS CORPORATION,**
*Plaintiff - Cross-Appellant*

**v.**

**LIQUIDIA TECHNOLOGIES, INC.,**
*Defendant-Appellant*

_____

2022-2217, 2023-1021

_____

2          UNITED THERAPEUTICS CORPORATION v. LIQUIDIA
                                    TECHNOLOGIES, INC.

Appeals from the United States District Court for the District of Delaware in No. 1:20-cv-00755-RGA-JLH, Judge Richard G. Andrews.

————————————————

**ON MOTION**

————————————————

**O R D E R**

Liquidia Technologies, Inc. moves to expedite briefing and oral argument in the above-captioned appeals. United Therapeutics Corporation opposes the motions.

Liquidia may self-expedite the appeals by filing its respective briefs early. Liquidia has not made a sufficient showing, however, to shorten the time for United Therapeutics. The cases will be placed on the next available oral argument calendar after briefing is complete.

Accordingly,

IT IS ORDERED THAT:

The motions are denied.

FOR THE COURT

October 12, 2022                 /s/ Peter R. Marksteiner
        Date                     Peter R. Marksteiner
                                 Clerk of Court

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS | ) | |
| CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 20-755 (RGA) |
| v. | ) | |
| | ) | **REDACTED - PUBLIC VERSION** |
| LIQUIDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## **PROPOSED JOINT PRETRIAL ORDER**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mflynn@morrisnichols.com

*Attorneys for Plaintiff United Therapeutics
Corporation*

SHAW KELLER LLP
Karen E. Keller (No. 4489)
Jeff Castellano (No. 4837)
Nathan R. Hoeschen (No. 6232)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 298-0702
kkeller@shawkeller.com
jcastellano@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Defendant
Liquidia Technologies, Inc.*

**Original Filing Date: February 28, 2022**
**Redacted Filing Date: March 18, 2022**

**EXHIBIT 3**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 20-755-RGA-JLH |
| v. | ) |
| | ) **HIGHLY CONFIDENTIAL** |
| LIQUIDIA TECHNOLOGIES, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

<u>**DEFENDANT'S STATEMENT OF CONTESTED FACTS**</u>

showed the exact same improvements on NYHA and 6MWD without any side effects. (*Compare* DTX438 at Results *with* DTX259 at Methods and Findings.)

> 2. **Claims 1, 4, and 6-8 Would Have Been Obvious over the '212 Patent in View of Voswinckel JESC and Voswinckel JAHA**

>> a. **Motivation to Combine the '212 Patent with Voswinckel JESC and Voswinckel JAHA with a Reasonable Expectation of Success**

459.   A POSA as of May 2006 would have been motivated to combine and would have had a reasonable expectation of success in combining, the '212 patent with Voswinckel JESC and Voswinckel JAHA.

460.   The '212 patent describes methods of delivering benzindene prostaglandin (particularly a treprostinil salt in the form of UT-15) by inhalation to treat pulmonary hypertension. (DTX253 at Abstract, 4:38-51.)

461.   The '212 patent demonstrates, in sheep, that inhaled treprostinil can attenuate hemodynamic variables measured in pulmonary hypertension. (*Id.* at Examples I-IV; *id.* at Figs. 2, 7, 9, 13, 14, 15, 16.) The '212 patent notes, and as was commonly understood by POSAs at the time, that sheep were used as models for pulmonary arterial hypertension in humans, and that positive results in sheep provided useful information for moving to human trials. (*Id.*; Anticipated testimony of Dr. Hill.) The '212 patent further describes, in sheep, that inhaled treprostinil can reduce pulmonary vascular resistance. (DTX253 at 10:47-50, 11:45-49, Fig. 9.) A POSA would have understood that these sheep experiments were relied upon to support claims directed to treating pulmonary arterial hypertension in mammals via inhaled solutions and powder formulations of treprostinil. (*Id.* at claims 6 and 9; Anticipated testimony of Dr. Hill.)

462.   Based on the above disclosures in the '212 patent, a POSA would have sought out further experimentation of inhaled treprostinil in humans. (Anticipated testimony of Dr. Hill.) A

POSA would have been led to Voswinckel JESC and Voswinckel JAHA, which put into practice the teachings of the '212 patent.  (*Id.*)

463.   Voswinckel JESC discloses human clinical trials using inhaled treprostinil in dosages that fall within the 15 to 90 μg range of claim element 1[c] of the '793 patent.  (DTX447.) Voswinckel JESC discloses doses of 16, 32, 48, and 64 μg/mL delivered for 6 minutes, (*id.* at Methods), and a POSA would have reasonably assumed that at least 1 mL of treprostinil solution was administered.  (Anticipated testimony of Dr. Hill and Dr. Gonda.)  Voswinckel JESC explains that the lowest dose of 16 μg produces "significant long-lasting pulmonary vasodilatation." (DTX447 at Conclusion.)  Accordingly, a POSA would have had a reasonable expectation of successfully treating pulmonary hypertension in humans with inhaled treprostinil based on the combination of the '212 patent and Voswinckel JESC.  (Anticipated testimony of Dr. Hill.)

464.   Based on known issues with patient compliance for inhaled therapies with long administration times (*see* ¶¶ 420-421 above), a POSA would have been motivated to further decrease the 6-minute administration time in Voswinckel JESC.  Several studies indicated that reducing administration time or the number of breaths required for therapy could improve adherence rates.  (*Id.*)  The state of the art in 2006 further demonstrated breaths and/or administration time could be reduced without sacrificing therapeutic efficacy.  (*See* DTX023 at [0063], [0067]; DTX293 at Abstract; DTX261, DTX347 at 298.)

465.   A POSA in 2006 would have understood that treatment with lower administration time could still produce positive effects in patients by increasing the concentration of inhaled treprostinil used.  (Anticipated testimony of Dr. Hill.)  Voswinckel JAHA confirms this teaching as it describes inhaled treprostinil administered in three breaths at a concentration of 600 μg/mL. (DTX438 at Methods.)

466.    Given the motivation to reduce administration time, the fact that all of the authors on Voswinckel JESC are also authors on Voswinckel JAHA (in addition to others), and the fact that the '212 patent, Voswinckel JESC, and Voswinckel JAHA all disclose the use of inhaled treprostinil for pulmonary hypertension, a POSA in 2006 would have found and relied on Voswinckel JAHA.  (Anticipated testimony of Dr. Hill.)  Voswinckel JAHA discloses an inhalable treprostinil regimen delivered to patients with pulmonary hypertension in just 3 single breaths that is still effective in reducing pulmonary vascular resistance.  (DTX438 at Methods, Results.)  A POSA would thus have had a reasonable expectation of successfully treating pulmonary hypertension in humans using inhaled treprostinil in doses of 15-90 µg in 1 to 3 breaths, as taught by the '212 patent and Voswinckel JESC in combination with Voswinckel JAHA.  (Anticipated testimony of Dr. Hill.)

467.    UTC argues Voswinckel JESC's disclosure of side effects weighs against any motivation to combine the '212 patent, Voswinckel JESC, and Voswinckel JAHA.  Voswinckel JESC, however, confirms that the claimed dose of 16 µg had no adverse side effects while side effects at higher doses were "mild and transient."  (DTX447 at Results, Conclusion.)  It further discloses that side effects *may* occur for higher doses.  (*Id.* at Conclusion.)  Similarly, Voswinckel JAHA disclosed that "[n]o side effects have been observed by patients during long-term treatment."  (DTX438 at Results.)  A POSA thus would not have been deterred from relying on Voswinckel JESC's or Voswinckel JAHA's teachings.   (Anticipated testimony of Dr. Hill; Anticipated testimony of Dr. Waxman.)

468.    Furthermore, even the '793 patent discloses side effects resulting from treprostinil treatment like flushing, transient cough, bronchoconstriction, and headache that are similar to those described in the prior art like Voswinckel JESC.  (JTX3 at 16:6-11.)  The same is true for Tyvaso®,

Remodulin®, and Ventavis®—the labels for these drugs disclose side effects similar to, or more severe than, those in Voswinckel JESC. (DTX366, DTX653 at 1, 4, 5; DTX264 at 4-5, 6; DTX345 at 6-8, 9.) Therefore, a POSA would not have been discouraged by the mild and transient side effects disclosed in the prior art, and instead would have been motivated to administer the claimed dosing regimen to achieve the reported clinical benefits. (Anticipated testimony of Dr. Hill.)

469. Moreover, potential side effects are always weighed against potential clinical benefit. Pulmonary arterial hypertension is a serious, life-threatening disease where patients and physicians are willing to tolerate side effects, particularly mild and transient ones, to obtain clinical benefit. (Anticipated testimony of Dr. Hill.)

### b. Independent Claim 1

470. Each of the limitations of claim 1 are disclosed and rendered obvious by the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA. The limitations of claim 1 are reproduced as follows:

> **(1) Claim Element 1[a]: "A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof"**

471. The '212 patent discloses claim element 1[a] of the '793 patent.

472. As explained in Section IV.C.1.a, the '212 patent describes an invention for administering a therapeutically effective amount of benzindene prostaglandin or a pharmaceutically acceptable salt thereof, and delivering benzindene prostaglandin to treat pulmonary hypertension, including PAH. (DTX253 at 2:16-18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24, claims 1-12.)

473. The '212 patent specifically discloses administering by inhalation explaining "benzindene prostaglandin is delivered by inhalation to a patient in need thereof in a 'therapeutically effective amount.'" (*Id.* at 6:56-58.)

474. The '212 patent explains UT-15 as the most preferred benzindene prostaglandin. (*Id.* at 4:38.) A POSA would have understood that UT-15 is treprostinil sodium. (Anticipated testimony of Dr. Hill; Anticipated testimony of Dr. Gonda.)

475. The '212 patent further discloses that a therapeutically effective amount is an "amount that has therapeutic effects on the condition intended to be treated or prevented," (DTX253 at 6:58-61), and notes that "[t]he precise amount that is considered effective for a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor." (*Id.* at 6:66-7:2.) Finally, the '212 patent specifically claims treating pulmonary hypertension in humans with an effective amount of inhaled treprostinil. (*Id.*, claim 6.)

476. Voswinckel JESC also discloses claim element 1[a] of the '793 patent. The abstract describes a clinical study where, using an OptiNeb® ultrasonic nebulizer, patients received a dose of treprostinil for 6 minutes at a concentration of 16, 32, 48, or 64 μg/ml. (DTX447 at Methods.)

477. Voswinckel JESC further discloses that at the lowest concentration, "near maximal pulmonary vasodilatation is achieved without adverse effects." (*Id.* at Conclusion.) As such, Voswinckel JESC confirms, in humans, the teachings of the '212 patent.

478. Voswinckel JAHA discloses treating patients with pulmonary hypertension by administering treprostinil sodium through inhalation. (DTX438 at Objective, Methods.) The Voswinckel JAHA study examines the safety, tolerability, and clinical efficacy of inhaled treprostinil sodium on 17 patients with pulmonary hypertension and reports treprostinil sodium

produces "sustained, highly pulmonary selective vasodilatation." (*Id.* at Methods, Results.) Thus, like Voswinckel JESC, Voswinckel JAHA confirms the teachings of the '212 patent.

479. Finally, Voswinckel JESC describes a study investigating "the acute hemodynamic response to inhaled treprostinil," in which patients with pulmonary hypertension were administered nebulized treprostinil solution in a single event dose over 6 minutes, resulting in "significant long-lasting pulmonary vasodilatation" with "near maximal pulmonary vasodilatation is achieved without adverse effects." (DTX447 at Background, Methods, Conclusion.) Voswinckel JAHA describes treating "patients with severe pulmonary hypertension" with "Inhaled Treprostinil Sodium (TRE)" with a single event dose of "3 single breaths" of "TRE solution 600 µg/ml," resulting in "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." (DTX438 at Title, Methods, Conclusion.) It further notes two patients with idiopathic pulmonary arterial hypertension showed improvements on NYHA and 6MWD (*id.* at Results) and explains "[n]o side effects have been observed by the patients during long-term treatment." (*Id.* at Results.)

### (2) Claim Element 1[b]: "with an inhalation device,"

480. The '212 describes nebulizers and inhalers, which are inhalation devices. Specifically, the '212 patent explains that "'[i]nhalation' delivery . . . refers to the delivery of the active ingredient or combination of active ingredients through a respiratory passage . . . ." (DTX253 at 4:41-43.) The '212 patent further explains "[p]referably, a nebulizer, inhaler, atomizer, or aerosolizer is used which forms droplets from a solution or liquid containing the active ingredient(s)." (*Id.* at 5:30-33.) And the '212 patent claims "treating pulmonary hypertension" with inhaled treprostinil, which would require an inhalation device. (*Id.*, claim 6.)

481.   Voswinckel JESC and Voswinckel JAHA also used inhalation devices.  (DTX447 at Methods ("OptiNeb ultrasound [sic] nebulizer"); DTX438 at Methods (same).)  Nebulizers and inhalers were frequently used before 2006 to deliver therapeutics to patients via an inhalation route. (Anticipated testimony of Dr. Hill.)  Accordingly, a POSA in 2006 would have easily appreciated that nebulizers and inhalers are inhalation devices.

> **(3)    Claim Element 1[c]: "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof"**

482.   The '212 patent in combination with Voswinckel JESC renders obvious claim element 1[c] of the '793 patent.

483.   The '212 patent discloses and claims administering a therapeutically effective single event dose of UT-15 to treat pulmonary hypertension.  (DTX253 at 2:66-3:5, 4:38, claims 6, 9.)  In some examples, the '212 patent compares aerosolized and intravenous delivery of UT-15 on pulmonary hypertension in a sheep model.  (*Id.* at Examples IV-V.)[21]  Compared to intravenous delivery, the '212 patent discloses aerosolized UT-15 "has a greater potency . . . since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly."  (*Id.* at 8:8-12.)  A POSA reading this disclosure would have inferred that a lower dose of inhaled UT-15 may be used to treat pulmonary hypertension in a manner similar to that produced with intravenous delivery.

---

[21] To the extent UTC argues a POSA would not rely on the disclosures of the '212 Patent because the '212 Patent describes sheep, UTC is wrong.  The '212 Patent is not strictly limited to sheep; the claims expressly recite methods of treating a mammal which includes a human.  (DTX253 at claims 1, 5; Anticipated testimony of Dr. Hill.)  As well, UTC's argument ignores the fact that the '212 Patent is a UTC patent.  Thus UTC, relying on sheep data, included claims for mammals, which obviously includes humans.

484.    A POSA as of May 2006 would be motivated by the above disclosure to determine a more precise dose of inhaled treprostinil for humans.  As explained in paragraphs 461-462 above, a POSA would have been motivated to look for examples of administration of inhaled treprostinil to human, since the '212 patent discloses examples of successful administration in sheep and claims administering, via inhalation, an effective amount of treprostinil.

485.    Because Voswinckel JESC describes such a study in humans, a POSA would have readily found Voswinckel JESC.  Voswinckel JESC describes, in humans, a clinical study in which patients with pulmonary hypertension were treated with a single dose of inhaled treprostinil. (DTX447 at Methods, Results.)  The single dose produced "significant long-lasting pulmonary vasodilatation."  (*Id.* at Conclusion.)

486.    A POSA would have arrived at reliable estimates of the doses provided in Voswinckel JESC and Voswinckel JAHA—doses which overlap with the dose range claimed in the '793 patent.  (Anticipated testimony of Dr. Hill and Dr. Gonda.)

487.    *First*, patients in the Voswinckel JESC study inhaled single doses of 16, 32, 48, or 64 µg/mL of treprostinil solution delivered using the OptiNeb® ultrasonic nebulizer.  (DTX447 at Methods.)  The solution was delivered for 6 minutes.  (*Id.*)  Voswinckel JESC further discloses "near maximal pulmonary vasodilatation" was achieved with the 16 µg/mL dose.  (*Id.* at Conclusion.)  As explained above in ¶¶ 435-436, a POSA would have expected that the patients in the Voswinckel JESC study received between at least 16, 32, 48, or 64 µg (based on the baseline, common sense expectation of a POSA that at least 1 mL[22] of solution would be nebulized over 6

---

[22] To the extent UTC argues "numerous variables" are allegedly needed to calculate a single event dose, UTC is wrong.  Even if true, a POSA would have expected that the authors of Voswinckel JESC—part of the highly respected and experienced Giessen Group—would have accounted for these variables.  (Anticipated testimony of Dr. Hill.)

minutes, regardless of nebulizer, and concentrations of 16, 32, 48, or 64 µg/mL were administered).[23]  These doses are within the 15-90 µg range disclosed by the '793 patent.  Based on the dosage disclosed and the fact that patients showed significant pulmonary vasodilatation after treatment, a POSA reading the '212 patent in combination with Voswinckel JESC would have a reasonable expectation of successfully treating pulmonary hypertension in humans by administering, via inhalation, 15-90 µg of treprostinil.

488.  A POSA could have also calculated a therapeutically effective dose of inhaled treprostinil based on the '212 patent's disclosure that the inhalation dose is only a fraction (10-50%) of the intravenous dose.  Intravenous dosages for treprostinil were well-known at the time of the '793 patent.  For example, in 2004, the FDA approved intravenously delivered treprostinil under the brand name Remodulin® for treatment of pulmonary hypertension.  (DTX264.)  The Remodulin® label prescribes a daily dose of 1.25 ng/kg/min for a patient between 60-65 kg.  (*Id.* at 10-11.)  Based on the below calculation, the Remodulin® label prescribes a dosage of 108 to 117 µg of treprostinil:

- 1.25 ng/kg/min*60kg*(24*60)min*0.001 ug/ng = 108 µg

- 1.25 ng/kg/min*65kg*(24*60)min*0.001 ug/ng = 117 µg

A POSA would have multiplied the 108 to 117 µg range by the 10-50% fraction disclosed by the '212 patent as follows:

---

[23] Even if more than 1 mL of solution was used, the calculated dose would still fall within the 15-90 µg range.  For example, the OptiNeb® device used before 2006 delivered solution at 0.6 ml/min. (DTX348 at 28; *see also* DTX349.)  Voswinckel JESC describes administering inhaled treprostinil in concentrations of 16, 32, 48, and 64 µg/mL.  (DTX447 at Methods).  At 0.6 mL/min and continuous administration of solution across 6 minutes then, a patient may receive approximately 3.6 ml of solution (0.6 mL/min * 6 min).  At the 16 µg/ml dose in Voswinckel JESC, the patient would accordingly receive 57.6 µg (16 µg/mL * 0.6 mL/min * 6 min).  As noted in ¶ 435 above, furthermore, if 3-5 mL of solution was delivered, doses delivered would still fall within the claimed range.

- For the lowest end: 108 µg * 10% = 10.8 µg

- For the highest end: 117 µg * 50% = 58.5 µg[24]

489.    UTC contends the second calculation does not render obvious the 15-90 µg single event dose in claim 1[c] because the '212 patent describes a daily dose while Voswinckel JAHA teaches dividing the daily dose by 4.  Thus, according to UTC, dividing the doses of 10.8 µg and 58.5 µg would render the doses outside claim 1[c].

490.    The Remodulin® label teaches that 1.25 ng/kg/min is a starter dose and further teaches a POSA to up-titrate the dose by 1.25 ng/kg/min per week.  (DTX264 at 7.)  Up-titrating just in a single week would result in 2.50 ng/kg/min and, based on the calculations above and dividing by 4, would result in a dose of at least 29.25 µg (117 µg daily dose divided by 4) for a 65 kg patient, well within the claimed 15-90 µg range.  (Anticipated testimony of Dr. Hill.)

491.    To the extent UTC contends that the prior art discloses "initial concentrations of pre-aerosolized drug," but not the disclose the dose administered to a patient, UTC is wrong.

492.    The '212 Patent and Voswinckel JESC describe delivering treprostinil to a patient, as opposed to an amount of drug that is deposited in the lungs or an amount loaded into an

---

[24]This is consistent with the dosages disclosed in the '212 patent. The '212 patent describes an inhalation dosage for treating peripheral vascular disease that "should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg; typically from 0.5 µg to 2.5 mg, preferably from 7 µg to 285 µg, per day per kilogram bodyweight." (DTX253 at 5:59-62.)  The '212 patent further describes "aerosolized UT-15 has a greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." (*Id.* at 8:9-12.)  Reading these disclosures, a POSA would have been motivated to deliver an effective daily dose of 2.5. µg to 125 mg of inhaled treprostinil (based on a calculation of 10-50% of the 25 µg to 250 mg daily infusion dose). This range encompasses the entire range claimed in the '793 patent. Because the '212 patent is directed to treating peripheral vascular disease and pulmonary hypertension (*id.* at 13:26-14:29, claims 1, 6, and 9), a POSA would have had a reasonable expectation that the 2.5 µg to 125 mg dosage range disclosed in the '212 patent would be used to treat pulmonary hypertension.  A POSA would have understood that dosing for peripheral vascular disease and pulmonary arterial hypertension are similar.  (Anticipated testimony of Dr. Hill.)

inhalation device. For example, the '212 Patent states "the dosage for inhalation, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, should be sufficient to deliver an amount that is equivalent to a daily infusion dose . . . (DTX253 at 5:56-62; *see also* 9:7-14.) Voswinckel JESC, too, expressly discloses that patients "inhaled . . . treprostinil . . . in concentrations of 16, 32, 48, and 64 µg/ml," (DTX447 at Methods) which a POSA would understand is the concentration of treprostinil actually inhaled. (Anticipated testimony of Dr. Hill.) A POSA, furthermore, would have assumed the concentrations in Voswinckel JESC were average values that already accounted for variables such as type of inhalation device, gas (air) flow, pressure, and density, fill and dead volumes, humidity, temperature, patient breathing patterns, and inhalation device interface. (Anticipated testimony of Dr. Hill.)

493. Even if the concentrations disclosed in Voswinckel JESC refer to concentrations of the drug in the pre-aerosolized solution, the claimed range of 15-90 µg would still have been obvious. Assuming for the sake of argument that the 16, 32, 48, and 64 µg/ml concentrations provided in Voswinckel JESC refer to 1 mL concentrations loaded into the nebulizer, and a large percentage (*e.g.*, 50%) of the loaded dose was lost between the device reservoir and the mouthpiece, this still results in inhaled doses of 8, 16, 24, and 32 µg, respectively, which includes doses in the claimed 15-90 µg range. Indeed, even a loss of 75% would still result in a dose within the claimed range (64 µg/mL * 1 mL * 0.25 = 16 µg dose). (Anticipated testimony of Dr. Hill and Dr. Gonda.)

494. Moreover, UTC is also wrong to the extent it argues the prior art does not account for numerous variables needed to calculate dose (*e.g.*, temperature, humidity, patient breathing patterns amongst other variables). As noted in the immediately preceding paragraphs, a POSA

would have understood that Voswinckel JESC discloses the concentrations inhaled by the patient at the mouthpiece, removing any need to account for variability.  (Anticipated testimony of Dr. Hill and Dr. Gonda.)  Clinicians, furthermore, did not regularly account for these variables in clinical practice because each variable was already inherent in the management of medication and was accounted for to ensure uniform dosing among patients. (*Id.*)  A POSA would have recognized the authors of the prior art were experts in the field (and were conducting studies supported by UTC or its subsidiary Lung Rx), particularly because the authors were members of the well-known Giessen group and had previously published respected articles on inhaled therapies for treating pulmonary arterial hypertension.  (*See e.g.* DTX336.)  Accordingly, a POSA would have expected the authors would have accounted for the variables.  (Anticipated Testimony of Dr. Hill and Dr. Gonda.)

495.    Thus, a POSA in 2006 would have readily arrived at an effective single event inhalation doses within the range of the claimed dosage range of 15-90 µg.  (Anticipated testimony of Dr. Hill and Dr. Gonda.)

### (4)    Claim Element 1[d]: "delivered in 1 to 3 breaths"

496.    The '212 patent in combination with Voswinckel JAHA renders obvious claim element 1[d] of the '793 patent.

497.    Given known issues with patient nonadherence to inhalation therapies (*see supra* Section IV.B.3), a POSA would have sought out disclosures that reduced the overall number of breaths or administration time for inhalable treprostinil, while still being effective.  A subset of the Voswinckel JESC authors had in fact published the results of another study that did exactly this (DTX438), and thus, a POSA would have been motivated to look at that study in combination with the '212 patent and Voswinckel JESC.

498.    Voswinckel JAHA describes a study where patients received treprostinil salt inhalation "by use of the pulsed OptiNeb® ultrasound [sic] nebulizer"[25] in "(3 single breaths, TRE solution 600 μg/ml)."  (DTX438 at Methods.)  Voswinckel reports this 3-breath dose "resulted in a sustained, highly pulmonary selective vasodilatation over 120 minutes."  (*Id.* at Results.)  In order to maintain dosage but in a shorter duration time, it is, and would have been in 2006, common practice to increase the concentration of drug delivered in a particular time window.  Voswinckel JAHA confirms this as it discloses a 600 μg/ml concentration.  (*Id.* at Methods.)  Patients showed excellent tolerability at the high concentration and short inhalation time.  (*Id.* at Conclusion.)

499.    A POSA would have applied the teachings of Voswinckel JAHA to the disclosures in the '212 patent and Voswinckel JESC with a reasonable expectation of success.  The '212 patent teaches delivering a benzindene prostaglandin to a patient in need thereof in a "therapeutically effective amount."  The '212 patent further discloses the "precise amount that is considered effective for a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor[,]" and "[t]itration to effect may be used to determine proper dosage."  (DTX253 at 6:56-7:3.)  And the '212 patent explicitly claims administering an "effective amount" of treprostinil via inhalation for the treatment of pulmonary hypertension.  (*Id.* at claim 6.)  By 2006, the state of the art recognized that titration to effect was important in patients with pulmonary disease.  (Anticipated testimony of Dr. Hill.)  A POSA would have understood the specific circumstances of the patient include maintaining adherence to a treatment regimen and accordingly reduce the number of inhaled breaths to 3, as disclosed in Voswinckel JAHA.  (*Id.*)

---

[25] A POSA would have reasonably concluded that the authors of Voswinckel JAHA properly instructed patients on how to use the pulsed nebulizer.  (Anticipated testimony of Dr. Hill.)

500.    To the extent UTC contends that Voswinckel JAHA discloses only pre-aerosolized concentration and does not account for variables needed to determine single event dose or teach a patient how to coordinate breaths, its argument fails for the same reasons noted in paragraphs 491-495.

### c.    Dependent Claim 4

501.    Dependent claim 4 recites: "The method of claim 1, wherein the inhalation device is a dry powder inhaler."  The '212 patent in combination with Voswinckel JESC and Voswinckel JAHA discloses dependent claim 4 of the '793 patent.

502.    The '212 Patent discloses that an "inhaler" may be used to deliver the treprostinil salt and specifies that "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention."  (DTX253 at 5:30-39.)  The '212 Patent also claims administering a dry powder formulation for the treatment of pulmonary hypertension and, accordingly, a POSA would understand that a dry powder inhaler would be used.  (*See id.*, claim 9.)  As such, a POSA would understand the '212 Patent to disclose the use of a dry powder inhaler to deliver the "powder" treprostinil formulation.

503.    And because the '212 Patent discloses inhalation of a treprostinil "powder" via an "inhaler," a POSA would have been motivated to deliver a treprostinil powder via a dry powder inhaler with a reasonable expectation of success.  (DTX253 at 5:30-39; *see also id.* at claim 9.)

### d.    Dependent Claim 6

504.    Dependent claim 6 recites: "The method of claim 4, wherein the formulation is a powder."  The '212 patent in combination with Voswinckel JESC and Voswinckel JAHA discloses dependent claim 6 of the '793 patent.

505.    The '212 Patent discloses and claims inhalation of a "powder" treprostinil formulation.  (DTX253 at 5:37-39 ("Alternatively, solid formulations, usually in the form of a

powder, may be inhaled in accordance with the present invention."), claim 9 ("The method of claim 6, wherein said [treprostinil] is inhaled in powder form . . . .").) For the reasons stated above (*see supra* Section IV.C.2.c), a POSA would have been motivated to pursue the delivery of a "powder" formulation to PH patients as disclosed in the '212 Patent with a reasonable expectation of success.

### e. Dependent Claim 7

506. Dependent claim 7 recites: "The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter." The '212 patent in combination with Voswinckel JESC and Voswinckel JAHA discloses dependent claim 7 of the '793 patent.

507. The '212 patent specifically claims particle size less than 10 micrometers, (DTX253 at claim 9), and discloses "more preferably, less than 5 micrometers in diameter." (*Id.* at 5:40-41.)

508. A POSA furthermore would have known to use a powder with particle size less than 5 micrometers. (Anticipated testimony of Dr. Hill.) POSAs generally did not prescribe inhalation therapies for lung diseases with particles larger than 10 micrometers as larger particles impacted on the upper airways. Conversely, to reach areas of gas exchange, it was known that particles needed to be 2 to 3 micrometers. (*Id.*)

### f. Dependent Claim 8

509. Dependent claim 8 recites: "The method of claim 1, wherein the formulation contains no metacresol." The '212 patent in combination with Voswinckel JESC and Voswinckel JAHA further discloses dependent claim 8 of the '793 patent.

510. The '212 patent discloses administration of treprostinil containing no metacresol because it contains no disclosure requiring the presence of metacresol in the described formulation. (*See generally* DTX253.) Indeed, the use of preservatives in inhalation products was strongly

discouraged by 2006, and inhaled products were known to explicitly not include preservatives. (DTX340 at 137-38; DTX341 at 1, 3; DTX345 at Description.)

511.    Moreover, the '212 patent describes a "more preferred" formulation that contains no metacresol.  (*See* DTX253 at 5:25-29.)  Specifically, the patent states, "[a] more preferred solution is prepared by mixing 0.125 grams of UT-15, 1.25 grams hydrous sodium citrate, 0.125 grams of anhydrous citric acid, 0.05 grams of sodium hydroxide, and approximately 250 ml of water for injection." (*Id*.)  Additionally, the '212 patent discloses steps of preparing a treprostinil inhalation solution that does not include metacresol.  (*Id*. at 8:39-44 ("Inhalation solutions were prepared by combining 1.25 grams of Sodium Citrate (Hydrous), 0.125 Citric Acid (Anhydrous), 0.05 grams of Sodium Hydroxide (NF/BP), 0.125 grams of UT-15, and approximately 250 ml of Water for Injection according to the following steps.").)  Accordingly, a POSA would know from the '212 patent that treprostinil formulations containing no metacresol could be administered by inhalation, and were actually "more preferred," in May 2006.  (Anticipated testimony of Dr. Gonda.)

512.    Additionally, Voswinckel JAHA discloses administration of a treprostinil solution containing no metacresol.  Specifically, Voswinckel JAHA states that the subjects received a "preservative free solution of inhaled TRE." (DTX438 at Methods.)  Because metacresol was a known preservative in May 2006 (*see* JTX3 at 15:40-41), a POSA would understand that the treprostinil solution described in Voswinckel JAHA contained no metacresol.

3. **Claims 1, 4, and 6-8 Are Obvious Over the '212 Patent in Combination with Voswinckel JESC**

a. **Motivation to Combine the '212 Patent with Voswinckel JESC**

513.    A POSA would have been motivated to combine the '212 patent with Voswinckel JESC with a reasonable expectation of success for the reasons detailed above. (*See supra* § IV.C.2.a).

b. **Independent Claim 1**

(1)    **Claim Elements 1[a]-1[c]: "A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof"**

514.    As explained in Sections IV.C.2.b(1)-IV.C.2.b(2), the '212 patent discloses claim elements 1[a] and 1[b].  As further explained above, the '212 patent in combination with Voswinckel JESC discloses element 1[c].  (*See supra* Section IV.C.2.b(3).)

(2)    **Claim Element 1[d]: "delivered in 1 to 3 breaths"**

515.    In view of the general state of knowledge in 2006, a POSA would have understood that the '212 patent and Voswinckel JESC render obvious claim element 1[d] of the '793 patent.

516.    The '212 patent describes "[t]he precise amount [of prostaglandin benzindene] that is considered effective for a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor." (DTX253 at 6:66-7:2.)  It further discloses titrating to determine proper dosage of inhaled UT-15.  (*Id.* at 7:3.)

517. Voswinckel JESC describes administering treprostinil by inhalation over a period of 6 minutes in concentrations of 16, 32, 48, and 64 µg/ml. (DTX447 at Methods.) Due to known problems with patient adherence by 2006 (*see supra* ¶¶ 420-421), a POSA in 2006 reading the '212 patent and Voswinckel JESC would have been motivated to minimize the number of breaths required for administration of treprostinil by inhalation. (Anticipated testimony of Dr. Hill.)

518. The general state of knowledge in the field as of May 2006 teaches that delivery by inhalation could still be safe and effective when delivered in a few breaths. For example, Geller 2003 describes treating cystic fibrosis with a dose of rhDNase delivered in "three inhalations in a single sitting." (DTX293 at Abstract.) And both Voswinckel JAHA and Voswinckel 2006 taught doing so for treprostinil. (DTX438 at Methods; DTX259 at 150.) Based on the state of the field, a POSA in 2006 reading the '212 patent and Voswinckel JESC then would have had a reasonable expectation of success in reducing the number of breaths required for administration of inhalable treprostinil.

519. A POSA would have accordingly been motivated to titrate to effect, as taught in the '212 patent, down to a few breaths. Optimization of dosing time, frequency, and concentration is routine practice in pulmonary medicine and was routine in 2006. (*See* DTX316 at 1867 (explaining that, in a pulmonary hypertension study using inhaled iloprost, some patients received an increased dose when their symptoms did not improve after three months of treatment on the initial dose); DTX318 at 962 (explaining that aerosolized prostacyclin therapy in patients with adult respiratory distress syndrome may need to be titrated for individual patients "to produce selective vasodilation in well-ventilated lung areas").)

520. Physicians in 2006 commonly altered administration time to deliver treatment that would be safe and effective in light of a patient's age, stage of disease, reaction to other medication,

and previous level of compliance. (Anticipated testimony of Dr. Hill.) Physicians would begin with a short administration time (to increase adherence and minimize side effects) and high concentration (to maintain effectiveness), and then would further optimize the time and dose based on the patient's response. (*Id.*) Accordingly, a POSA relying on the teachings of the '212 patent and Voswinckel JESC as well as routine practice would have delivered inhaled treprostinil in 1 to 3 breaths.

### c.   Dependent Claims 4 and 6-8

521. For the reasons described in Sections IV.C.2.c–IV.C.2.f above, the '212 patent and Voswinckel JESC disclose dependent claims 4, 6, 7 and 8 of the '793 patent.

### 4.   Claim 1 is Anticipated by Ghofrani

522. Each limitation of claim 1 is disclosed and therefore anticipated by Ghofrani.

> **a.   Claim Element 1[a]: "A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof"**

523. Ghofrani discloses claim element 1[a] of the '793 patent.

524. Ghofrani describes a clinical trial in which "17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil (15 mcg/inhalation)." (DTX261, DTX347 at 298.)

525. Ghofrani further discloses the administered treprostinil was used in treating a human with pulmonary hypertension and in a therapeutically effective manner. Ghofrani explains, "[i]nitial trials [showed] proof of efficacy of inhaled treprostinil for the effective reduction of the pulmonary vascular resistance . . . ." (*Id.*) It further explains that inhaled treprostinil led to a major reduction in pulmonary selective pressure and resistance. (*Id.*)

526.    A single event dose is also disclosed in Ghofrani.  Patients were administered inhaled treprostinil in "15 mcg/inhalation." (*Id.* at 298.)  Ghofrani also suggests "it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring." (*Id.*)  A POSA would have understood the per inhalation and inhalation exercise language discloses a single event dose.  Thus, the 15 mcg to 90 mcg dosing range described in Ghofrani directly discloses the dose claimed in element 1[a] of the '793 patent.

### b.    Claim Element 1[b]: "with an inhalation device,"

527.    Ghofrani discloses an inhalation device. Ghofrani states that patients "were administered inhaled treprostinil (15 mcg/inhalation)." (*Id.* at 298.)  Ghofrani further notes "the inhalation period can be reduced to < 1 min. by selecting a suitable device." (*Id.*)  A POSA would have understood by common sense logic that inhaled treprostinil requires an inhalation device, because, without a device, inhaled treprostinil could not be delivered.  (Anticipated testimony of Dr. Hill.)  A POSA would have further understood that a suitable device for administration by inhalation is an inhalation device. (*Id.*)  To deliver drugs by inhalation, clinicians in 2006 regularly used inhalation devices, including nebulizers and inhalers. (*Id.*)  Thus, a POSA would have understood Ghofrani to disclose use of an inhalation device.

### c.    Claim Element 1[c]: "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil of a pharmaceutically acceptable salt thereof"

528.    Ghofrani discloses inhaled treprostinil delivered in a 15 mcg/inhalation dosage. (DTX261, DTX347 at 298.)  Ghofrani also suggests "it is possible to increase the dosage up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring." (*Id.*)  The 15 mcg to 90 mcg dosing range disclosed in Ghofrani corresponds to the entire 15 to 90 microgram dosage claimed in element 1[c] of the '793 patent.

#### d.      Claim Element 1[d]: "delivered in 1 to 3 breaths."

529.    Ghofrani discloses claim element 1[d] by stating that "the initial data shows that it is technically feasible for there to be only one to two breaths in an application." (*Id.*)

530.    Accordingly, a POSA would have understood Ghofrani to directly disclose every element of claim 1, and therefore anticipate claim 1.

### 5.      Claim 1 is Anticipated by Voswinckel 2006

531.    Each limitation of claim 1 is disclosed in and therefore anticipated by Voswinckel 2006.

#### a.      Claim Element 1[a]: "A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof"

532.    Voswinckel 2006 discloses administering inhaled treprostinil to three patients with severe pulmonary hypertension.  (DTX259 at 150.)

533.    Voswinckel 2006 further describes a single event dose.  The three patients in the study were administered "a single 15-μg dose of treprostinil, inhaled in 3 breaths through a modified OptiNeb ultrasonic inhalation device . . . ." (*Id.*)

534.    Voswinckel 2006 reports "single applications of inhaled treprostinil induced highly pulmonary selective and sustained vasodilatation. The drug was clinically effective, safe, and well tolerated when 15 μg [of treprostinil] was inhaled in 3 breaths 4 times daily." (*Id.*)  It further describes 2 patients treated over 3 months whose functional status "improved dramatically." (*Id.*)  Accordingly, Voswinckel 2006 discloses claim element 1[a].

### b. Claim Element 1[b]: "with an inhalation device,"

535.    Voswinckel 2006 describes "administration of a single 15-µg dose of treprostinil, inhaled in 3 breaths through a modified OptiNeb ultrasonic **inhalation device** . . . ." (*Id.* (emphasis added).)  Voswinckel 2006 thus discloses claim element 1[b].

### c. Claim Element 1[c]: "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil of a pharmaceutically acceptable salt thereof"

536.    Voswinckel 2006 describes "administration of a single 15-µg dose of treprostinil," (*id.*), a dose that matches the 15-µg dose claimed in element 1[c] of the '793 patent.  Voswinckel 2006 thus discloses claim element 1[c].

### d. Claim Element 1[d]: "delivered in 1 to 3 breaths."

537.    Patients in the Voswinckel 2006 were administered treprostinil, "inhaled **in 3 breaths** . . . ." (*Id.* (emphasis added).)  Accordingly, Voswinckel 2006 discloses claim element 1[d].

## 6. No Secondary Considerations of Non-Obviousness Support the Validity of the '793 Patent's Asserted Claims

538.    UTC does not provide sufficient evidence to demonstrate secondary consideration of non-obviousness support the validity of the Asserted Claims of the '793 patent.

539.    UTC may first argue that Tyvaso® is a commercial embodiment of the '793 patent, and that Tyvaso satisfies a long-felt unmet need because (1) Tyvaso® is safer and easier to administer than other therapies; and (2) Tyvaso® can be used to treat a broader range of pulmonary hypertension patients.

540.    Tyvaso® is not a commercial embodiment of the '793 patent.  It is not administered as a "therapeutically effective single event dose," as required by the Asserted Claims of the '793 patent.  Instead, Tyvaso® is administered chronically in "4 separate, equally spaced treatment

sessions per day," each "approximately 4 hours apart." (DTX388 at 2.) The clinical studies supporting the approval of Tyvaso® did not examine therapeutic effectiveness after a single dose session; they only examined therapeutic effectiveness after multiple weeks of regular repeated administration of Tyvaso®. *(Id.* at 10 (stating that the primary efficacy endpoint of the TRIUMPH I trial was "the change in 6-Minute Walk Distance (6MWD) relative to baseline at 12 weeks."); *see also id.* at 12 (stating that the primary efficacy endpoint of the INCREASE study was "the change in 6MWD measured at peak exposure (between 10 and 60 minutes after dosing) from baseline to Week 16.").) Thus, there is no "therapeutically effective single event dose" of Tyvaso®. (Anticipated testimony of Dr. Hill.) Second, even if a single event dose of Tyvaso® was therapeutically effective (it is not), Tyvaso® is not "delivered in 1 to 3 breaths," which is also required by the Asserted Claims. Rather, the target maintenance dose for Tyvaso® is "9 to 12 breaths per treatment session, 4 times daily," with a minimum maintenance dose of 54 µg per "treatment session." (DTX388 at 1, 2; *see also id.* at 8.) The "9 to 12 breaths" for Tyvaso® plainly exceeds the claimed "1 to 3 breaths." (JTX3 at claims 1, 4, 6-8.) Accordingly, Tyvaso® does not have the required nexus to the Asserted Claims. UTC's arguments concerning safer and easier use are thus irrelevant.

541. Furthermore, Tyvaso® was never a first-line therapy. (Anticipated testimony of Dr. Hill.) Instead, Tyvaso® is a "bridge medication," "add-on therapy," and/or "niche drug" that is used for a limited period of time in patients with mild to moderate (but not severe) symptoms. (*Id.*) PAH is a progressive disease with severity increasing over time. Patients with mild symptoms start treatment with dual therapy including an endothelin receptor antagonist (*e.g.*, ambrisentan) and a PDE-5 inhibitor (*e.g.*, sildenafil). (*Id.*) A subset of these patients may also receive Tyvaso®. (*Id.*) As the disease progresses, Tyvaso® is discontinued and patients move to

infusion therapies, such as Remodulin®. Of these patients treated by clinicians, only about 5-10% receive Tyvaso® at any given time. (*Id.*) Thus, the '793 patent does not meet a long felt, unmet need.

542. Additionally, there is no nexus between UTC's argument that Tyvaso® can be used to treat a broader range of patients with pulmonary hypertension. UTC argues the claims of the '793 patent cover pulmonary arterial hypertension, but not other groups of pulmonary hypertension and notably not Group 3 PH-ILD (for which Tyvaso® is also approved). (Anticipated testimony of Dr. Waxman.) UTC's argument that Tyvaso® can treat a broader range of patients is not relevant to the extent UTC argues that the claims of the '793 patent are limited only to pulmonary arterial hypertension. Further, even if the claims of the '793 patent cover a broader range of pulmonary hypertension, Tyvaso® was only approved for treating interstitial lung disease in 2021—not by May 2006, and UTC has not shown that the '793 patent describes treatment of patients with PH-ILD. (DTX388 at 1; *see also* DTX578.) And as described further below, Tyvaso® is not approved to treat Group 2, 4, or 5 pulmonary hypertension. Thus, no nexus between the '793 patent claims and treating other forms of pulmonary hypertension.

543. Furthermore, the fact that the '793 patent issued in July 2020, over 10 years after Tyvaso® was approved in July 2009, undermines UTC's argument that Tyvaso®, much less the invention claimed in the '793 patent, satisfied a long-felt but unmet need in July 2009. (*See* DTX366; *see generally* JTX3.)

544. UTC further argues that the invention in the '793 patent showed unexpected results because the inventors showed treprostinil could be delivered in high doses over a short period of time with fewer side effects. (Anticipated testimony of Dr. Waxman.) UTC's argument in part, however, relies on a false comparison of inhaled therapies to intravenous therapies and to non-

treprostinil therapies like iloprost.  (Anticipated testimony of Dr. Waxman).  A POSA in 2006 would have expected local delivery of a drug by inhalation to be less toxic, and produce fewer side effects, compared to systemic delivery by intravenous infusion, as evidenced by Voswinckel JESC, which disclosed that the side effects upon local administration were mild and transient in nature. (DTX447 at Results.)  Second, a POSA would not have been discouraged from administering the claimed dosing regimen due to side effects associated with iloprost, because prior art specific to inhaled treprostinil reported no side effects at the claimed doses below 16 μg, and only potential "mild and transient" side effects at higher doses (with one exception).  (DTX447 at Results; *see also* DTX438 at Results ("No side effects have been observed by the patients during long-term treatment.").)

### D. The Asserted Claims of the '793 Patent Are Also Invalid For Lack of Written Description Support and Lack of Enablement

#### 1. Lack of Written Description Support for and Enablement of the "Method of Treating Pulmonary Hypertension" Recited in Claims 1, 4, and 6-8 of the '793 Patent

##### a. The Inventors Were Not in Possession of a "Method of Treating Pulmonary Hypertension"

545.   The '793 patent lacks adequate written description of the "method of treating pulmonary hypertension" claimed in claims 1, 4, 6-8 of the '793 patent.

546.   As noted, in ¶ 394 above,  pulmonary hypertension is not a single condition, but is classified into five separate groups.  In particular, Group 1 pulmonary hypertension describes pulmonary arterial hypertension and Group 2 describes pulmonary venous hypertension, including hypertension associated with left heart disease.  (Anticipated testimony of Dr. Hill.)  A POSA would have understood that the term "pulmonary hypertension" encompasses all five Groups and that is confirmed in the specification of the '793 patent.  (*Id.*)  Further, a POSA would have

# EXHIBIT 4

Petition for *Inter Partes Review* of
U.S. Patent No. 9,593,066 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

LIQUIDIA TECHNOLOGIES, INC.,

Petitioner

v.

UNITED THERAPEUTICS CORPORATION,

Patent Owner

U.S. Patent No. 9,593,066

Issue Date: March 14, 2017

Title: Process to Prepare Treprostinil, the Active Ingredient in Remodulin®

_____

**PETITION FOR *INTER PARTES* REVIEW**

**OF U.S. Patent No. 9,593,066**

Petition for *Inter Partes* Review of
Patent No. 9,593,066 B2

|  |  |
|---|---|
| | Respectfully submitted, |
| Dated:  March 30, 2020 | |
| | **COOLEY LLP** |
| COOLEY LLP | |
| ATTN: Patent Group | By:     */Ivor R. Elrifi/* |
| 1299 Pennsylvania Ave., NW, Suite 700 | Ivor R. Elrifi |
| Washington, DC 20004 | Reg. No. 39,529 |
| Tel:  (212) 479-6840 | *Counsel for Petitioner* |
| Fax: (212) 479-6275 | |

72

# EXHIBIT 5

Petition for *Inter Partes Review* of
U.S. Patent No. 9,604,901 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

―――――――――――

BEFORE THE PATENT TRIAL AND APPEAL BOARD

―――――――――――

LIQUIDIA TECHNOLOGIES, INC.,

Petitioner

v.

UNITED THERAPEUTICS CORPORATION,

Patent Owner

U.S. Patent No. 9,604,901

Issue Date: March 28, 2017

Title: Process to Prepare Treprostinil, the Active Ingredient in Remodulin®

―――――――――――

**PETITION FOR *INTER PARTES* REVIEW**

**OF U.S. Patent No. 9,604,901**

Petition for *Inter Partes Review* of
U.S. Patent No. 9,604,901 B2

explanation under independent claim 1 and dependent claim 5. (Sections X.C.1

and X.C.4.) *See also* Winkler Decl., ¶¶236-238.

## XI.    NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS EXIST

Patent Owner has not identified any evidence of secondary indicia of non-

obviousness for the '901 patent. Accordingly, there is no objective evidence of non-

obviousness that might warrant a finding that the Petitioned Claims are patentable.

## XII.    CONCLUSION

Petitioner respectfully requests that the Board institute *inter partes* review of

claims 1–9 of the '901 patent.

Respectfully submitted,

Dated: March 30, 2020

**COOLEY LLP**

COOLEY LLP
ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
Tel: (212) 479-6840
Fax: (212) 479-6275

By:    */Ivor R. Elrifi/*
Ivor R. Elrifi
Reg. No. 39,529
*Counsel for Petitioner*

# EXHIBIT 6

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

LIQUIDIA TECHNOLOGIES, INC.,

Petitioner

v.

UNITED THERAPEUTICS CORPORATION,

Patent Owner

————————————

IPR2021-00406
U.S. Patent No. 10,716,793 B2
Issue Date: July 21, 2020

Title: Treprostinil Administration by Inhalation

————————————

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. Patent No. 10,716,793 B2**

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

addition, Tyvaso®, a solution of treprostinil, is approved for oral inhalation through

a pulsed ultrasonic delivery device, and therefore does not practice any claims

directed to a soft mist inhaler, dry powder, DPI or MDI. *Id.*, 2 (Section 2.1). In sum,

any evidence of Tyvaso®'s **commercial success** lacks the required nexus to the

claims.

Accordingly, the secondary considerations of non-obviousness do not warrant

a finding that the Petitioned Claims are patentable.

## XVII. CONCLUSION

Petitioner respectfully requests that the Board institute *inter partes* review of

claims 1–8 of the '793 Patent.

Dated: January 7, 2021

COOLEY LLP
ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
Tel: (212) 479-6840
Fax: (212) 479-6275

Respectfully submitted,

**COOLEY LLP**

By: */Ivor R. Elrifi/*
Ivor R. Elrifi
Reg. No. 39,529
*Counsel for Petitioner*

# EXHIBIT 7

```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF DELAWARE

 3

 4    UNITED THERAPEUTICS CORPORATION,)
                                      )
 5                    Plaintiff,      )
                                      ) C.A. No. 20-755-RGA
 6    v.                              )
                                      )
 7    LIQUIDIA TECHNOLOGIES, INC.,    )
                                      )
 8                    Defendant.      )

 9
                                      J. Caleb Boggs Courthouse
10                                    844 North King Street
                                      Wilmington, Delaware
11
                                      Friday, March 4, 2022
12                                    9:51 a.m.
                                      Pretrial Conference
13

14    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15    APPEARANCES:

16              MORRIS NICHOLS ARSHT & TUNNELL LLP
                BY:  MICHAEL J. FLYNN, ESQUIRE
17
                         -and-
18
                GOODWIN PROCTER LLP
19              BY:  WILLIAM JACKSON, ESQUIRE
                BY:  HUIYA WU, ESQUIRE
20
                         -and-
21
                McDERMOTT WILL & EMERY
22              BY:  DOUGLAS H. CARSTEN, ESQUIRE
                BY:  ADAM BURROWBRIDGE, ESQUIRE
23              BY:  ART P. DYKHUIS, ESQUIRE

24                                  For the Plaintiff

25
```

1

2

3     APPEARANCES CONTINUED:

4             SHAW KELLER, LLP
              BY:  NATHAN R. HOESCHEN, ESQUIRE
5
                      -and-
6
              COOLEY LLP
7             BY:  SANYA SUKDUANG, ESQUIRE
              BY:  JONATHAN R. DAVIES, ESQUIRE
8             BY:  DOUG CHEEK, ESQUIRE
              BY:  BRITTANY CAZAKOFF, ESQUIRE
9             BY:  ROBERT J. MINN, ESQUIRE

10                              For the Defendant

11    Also Present:

12        Mr. Rusty Schundler
09:46:23
09:46:23 13
09:46:23                 ***  PROCEEDINGS  ***
09:51:09 14

09:51:09 15           DEPUTY CLERK:  All rise.  Court is now in

09:51:11 16    session.  The Honorable Richard G. Andrews presiding.

09:51:19 17           THE COURT:  All right.  Please be seated.

09:51:22 18           This is the pretrial conference in *United*

09:51:26 19    *Therapeutics vs. Liquidia Technologies*, Civil Action Number

09:51:29 20    20-755.

09:51:35 21           And so, for the Plaintiff, Mr. Flynn, good

09:51:40 22    morning.

09:51:41 23           MR. FLYNN:  Good morning, Your Honor.

09:51:42 24           THE COURT:  Who's sitting at the table with you?

09:51:43 25           MR. FLYNN:  Sure.  I have William Jackson and

| | |
|---|---|
| 10:03:40 1 | MR. JACKSON: Yeah. |
| 10:03:41 2 | THE COURT: Okay. All right. |
| 10:03:47 3 | So, then there was a question about the |
| 10:03:51 4 | statutory estoppel on the '793 patent which is at Pages 19 |
| 10:04:00 5 | and 20 of the Pretrial Order. And so, as I understand it, |
| 10:04:05 6 | there's no final written description at the PTAB. So, by |
| 10:04:12 7 | law, Defendant can present whatever it wants to in terms of |
| 10:04:17 8 | the '793 patent; right? |
| 10:04:21 9 | MR. SUKDUANG: Yes, Your Honor. If you're |
| 10:04:22 10 | following the '901, then the similar applies to '793. |
| 10:04:25 11 | There's no statutory estoppel. |
| 10:04:27 12 | THE COURT: Well, there's no final written |
| 10:04:30 13 | decision, so it's the same thing; right? |
| 10:04:32 14 | MR. SUKDUANG. Right. The estoppel is based on |
| 10:04:33 15 | the final decision. There's none in the '793, so we agree |
| 10:04:36 16 | with you. That's our position. |
| 10:04:37 17 | THE COURT: Sorry. I didn't get what you -- |
| 10:04:39 18 | what about you? |
| 10:04:39 19 | MR. JACKSON: So, Your Honor, Axinn agreed |
| 10:04:41 20 | there's no final written decision, so estoppel would not |
| 10:04:45 21 | apply. To the degree if this would extend beyond August |
| 10:04:49 22 | 11th, I believe the date is, I recall the Court in another |
| 10:04:53 23 | case had the circumstance where the PTAB issued a final |
| 10:04:55 24 | written decision after trial, but before the decision. And |
| 10:04:58 25 | we just wanted to identify that there's the possibility that |

11:34:56  1    Pretrial Order has argument about things that are being

11:34:58  2    decided by Judge Hall or by me later on on objections to

11:35:06  3    Judge Hall, you know, identify that as an issue or problem

11:35:10  4    with a motion or whatever it is, but not to have the legal

11:35:13  5    argument in the Pretrial Order.

11:35:15  6              MR. FLYNN:  Understood, Your Honor.

11:35:17  7              THE COURT:  Okay.  So, it may take -- do you

11:35:20  8    think the parties can meet, confer and figure this out by,

11:35:24  9    say, the end of next week?

11:35:26 10              MR. FLYNN:  I think so, Your Honor.  I think the

11:35:27 11    transcript will be very helpful in getting that done.

11:35:30 12              THE COURT:  Okay.  Well, thank you everyone for

11:35:32 13    your time today.  We'll be in recess.

11:35:34 14              DEPUTY CLERK:  All rise.

         15              (Court was recessed at 11:35 a.m.)

         16              I hereby certify the foregoing is a true and

         17    accurate transcript from my stenographic notes in the

         18    proceeding.

         19              /s/ Heather M. Triozzi
                         Certified Merit and Real-Time Reporter
         20              U.S. District Court

         21

         22

         23

         24

         25

# EXHIBIT 8

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

———————————

Inter Partes Review No. IPR2021-00406
U.S. Patent No. 10,716,793 B2

———————————

**PATENT OWNER'S REQUEST FOR REHEARING**

# TABLE OF CONTENTS

I.    Introduction and Background ........................................................................1

II.   Legal Standard .............................................................................................3

III.  Argument .....................................................................................................3

    A.    Liquidia failed to demonstrate that the Voswinckel abstracts are prior art ...................................................................................................4

    B.    The Board's conclusion that Voswinckel JESC and Voswinckel JAHA are prior art conflicts with settled legal principles.....................7

    C.    But for the Board's legal error, the challenged claims would have been upheld ..............................................................................12

IV.   Conclusion .................................................................................................14

4855-7660-5999.1

# TABLE OF AUTHORITIES

**Cases:**

*Argentum Pharm. LLC v. Research Corp. Tech., Inc.*,
    IPR2016-00204, Paper 19 (P.T.A.B. May 23, 2016) ........................................11

*Blue Calypso, LLC v. Groupon, Inc.*,
    815 F.3d 1331 (Fed. Cir. 2016) ......................................................................7, 8

*Caterpillar Inc. v. Wirtgen Am., Inc.*,
    IPR2017-02185, Paper 48 (P.T.A.B. July 11, 2019) ............................................3

*Constant v. Advanced Micro-Devices, Inc.*,
    848 F.2d 1560 (Fed. Cir. 1988) ...........................................................................7

*Handi Quilter, Inc. v. Bernina International AG*,
    IPR2013-00364, Paper 39 (P.T.A.B. Sept. 25, 2014).........................................12

*Kyocera Wireless Corp. v. ITC*,
    545 F.3d 1340 (Fed. Cir. 2008) ...........................................................................8

*In re Lister*,
    583 F.3d 1307 (Fed. Cir. 2009) ......................................................................2, 8

*Minnesota Min. & Mfg. Co. v. Chemque, Inc.*,
    303 F.3d 1294 (Fed. Cir. 2002) ...........................................................................1

*Samsung Elecs. Co. v. Infobridge Pte. Ltd.*,
    929 F.3d 1363 (Fed. Cir. 2019) .........................................................................10

*Teoxane S.A. v. Allergan*,
    IPR2017-01906, Paper 15 (P.T.A.B. Mar. 9, 2018)...................................2, 7, 10

**Statutes:**

35 U.S.C. §102(a) ...............................................................................6, 7, 12, 13

35 U.S.C. §102(b) ................................................................ 1, 2, 6, 8, 9, 10, 11, 12

**Regulations:**

37 C.F.R. §42.71 ...................................................................................................3

4855-7660-5999.1

IPR2021-00406
U.S. Patent No. 10,716,793 B2

37 C.F.R. §42.104(b)(2) ............................................................................ 12

**Other Authorities:**

M.P.E.P. §2127 ............................................................................................ 8

iii

Patent Owner United Therapeutics Corporation (UT) respectfully requests that the Board reconsider its Final Written Decision (Paper 78) (FWD) finding claims 1–8 of U.S. Patent No. 10,716,793 unpatentable.

## I.    Introduction and Background

The Board ruled that all eight claims of the '793 patent are obvious, relying in part on two references: Voswinckel JESC (Ex. 1007) and Voswinckel JAHA (Ex. 1008).  The Final Written Decision concluded that these references qualify as prior art under pre-AIA 35 U.S.C. §102(b) because research aids made them publicly accessible.  FWD at 8–12.  But that prior-art determination rests on a substantial legal error, because the supposed research aids were published *after* the critical §102(b) date of May 15, 2005.

Public accessibility prior to the critical date is the defining feature of a §102(b) "printed publication."  *See, e.g.*, *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002).  The Board did not find that Liquidia proved that either Voswinckel abstract was *itself* publicly accessible, such as if they had been indexed and catalogued in public libraries more than a year before the priority date. Instead, the Board reasoned that two references the Board described as "research aids"—Ghofrani (Ex. 1010) and Sulica (Ex. 1104)—provided a skilled artisan with a roadmap to the Voswinckel abstracts.  FWD at 10–12.

That ruling contravenes settled legal principles.  Where a research aid is relied

1

upon as a "roadmap" to establish public accessibility to a skilled artisan under §102(b), the date of public accessibility is *the date of the research aid*, not *the date of the underlying reference*. *See In re Lister*, 583 F.3d 1307, 1312 (Fed. Cir. 2009) (holding that the date of accessibility through a searchable index was the effective date of an asserted reference). That is because "[t]he touchstone of public accessibility is whether an ordinary artisan exercising reasonable diligence would have been able to locate the document prior to the critical date." *Teoxane S.A. v. Allergan*, IPR2017-01906, Paper 15, at 11 (P.T.A.B. Mar. 9, 2018) (quotation marks omitted). Ghofrani was clearly published within a year of the priority date (*see* Ex. 1121, at 1; Paper 55, at 9), and Liquidia provided no evidence that Sulica was published outside that one-year window (*see* Ex. 1104, at 1; Paper 55, at 9). Thus, even assuming Ghofrani and Sulica provide a skilled artisan with the requisite "roadmap" to find the Voswinckel abstracts (*see* FWD at 11), neither could have led the skilled artisan to the relevant abstract more than one year before the priority date. The Final Written Decision erred in failing to address this critical distinction and allowing Liquidia to use research aids published within a year of the applicable date to establish the Voswinckel abstracts as publicly accessible more than a year before the applicable date.

With this error corrected, the obviousness conclusion falls apart. Aside from Voswinckel JESC and Voswinckel JAHA, the Board found *no* evidence that either

the claimed drug quantity (15 to 90 micrograms) or the claimed delivery duration (one to three breaths) was disclosed in the prior art. None of Liquidia's other asserted obviousness grounds are viable, either. Each of the other grounds relies on Voswinckel JESC, Voswinckel JAHA, or another reference that the Board concluded does not constitute prior art. *See* FWD at 3–4.

For these reasons, the Board should grant rehearing, vacate the Final Written Decision, and issue a new decision upholding the challenged claims.

## II.    Legal Standard

A party dissatisfied with a final written decision of the Board may file one rehearing request, without prior authorization, within 30 days of the Board's decision. 37 C.F.R. §42.71. The requesting party "must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, a reply, or a sur-reply." *Id.* The Board reviews its decision for abuse of discretion, which occurs when "the decision is based on an erroneous interpretation of law, if a factual finding is not supported by substantial evidence, or if an unreasonable judgment is made in weighing relevant factors." *Caterpillar Inc. v. Wirtgen Am., Inc.*, IPR2017-02185, Paper 48, at 2 (P.T.A.B. July 11, 2019).

## III.    Argument

A long-established legal principle governs the Voswinckel abstracts' status as

prior art: if a skilled artisan must rely on a research aid to provide a roadmap to access an underlying reference, then the *underlying reference* cannot have been publicly accessible until the *research aid* was. The Final Written Decision contravenes this principle by allowing Liquidia to use two later-published research aids (Ghofrani and Sulica) to smuggle those earlier, otherwise-inaccessible abstracts into the record as prior art. But for this legal error, the Board would have been required to uphold the asserted claims.

## A. Liquidia failed to demonstrate that the Voswinckel abstracts are prior art

Liquidia's Petition contained only the most conclusory evidence that Voswinckel JESC and Voswinckel JAHA were prior art. The Petition asserted that the abstracts were published in 2004 (*see* Paper 2, at 22, 24), and an accompanying expert declaration speculated that the abstracts likely would have been received, catalogued, and indexed by libraries by late 2004—without providing any evidence that they actually were. *See* Ex. 1036 ¶¶59–75.

As UT explained in the Patent Owner Response, this cursory showing did not come close to satisfying Liquidia's burden of proof. Liquidia's Petition failed to demonstrate that any library actually received either abstract, let alone more than a year before the priority date. *See* Paper 29, at 12–14. And the Petition further failed to show that any library had indexed or catalogued the abstracts or even the supplements in which they appeared before that date. *See id.* at 14–18.

4

Evidently recognizing the threadbare nature of its prior submissions, Liquidia shifted stances and sought to rely on new evidence and arguments in its Reply. As relevant here, Liquidia argued for the first time that Voswinckel JESC "was cited in the June 2005 Ghofrani article in the journal *Herz*," and that a skilled artisan "would have relied on Ghofrani's disclosures to … access the JESC abstract." Paper 44, at 3–4. Liquidia advanced effectively the same argument for Voswinckel JAHA, contending that a skilled artisan "would have been able to access JAHA with Sulica as a research aid." *Id.* at 7–8. Finally, Liquidia suggested that Sulica's citation to Voswinckel JAHA itself demonstrated public accessibility of that reference, because it showed that "[t]he Sulica authors were able to access" it. *Id.* at 7.

UT explained in its Surreply that Liquidia failed to show that either Voswinckel abstract was prior art. Instead, Liquidia's "belated argument establishe[d], at best, that a POSA may have been able to find the Abstract as of the date the alleged 'research aids' became available." Paper 55, at 9. Crucially, "Ghofrani bears a July 2005 date-stamp, while Sulica shows only the year 2005" without any actual evidence demonstrating the March 2005 date that Liquidia asserted. *Id.* (citations omitted); *see id.* at 9 n.4.

UT further explained that the mere fact that Sulica and Ghofrani contain citations to the Voswinckel abstracts cannot establish that the abstracts were publicly accessible to persons of ordinary skill in the art more than a year before the priority

5

date. The Sulica and Ghofrani authors are not persons of ordinary skill with respect to the Voswinckel abstracts because the Voswinckel abstracts' authors had a close affiliation with the supposed research aids' authors: Voswinckel JESC and the relevant portions of Ghofrani shared coauthors (Dr. Voswinckel and Dr. Seeger), Paper 29, at 46–47 (citing Ex. 2066 at 3, ¶7); Paper 55, at 10, and Dr. Sulica was a principal investigator in the TRIUMPH study group (there, too, along with Dr. Seeger) who participated in the clinical trials reported in the Voswinckel publications, Paper 55, at 10. Thus, the fact that the authors of Sulica and Ghofrani had access to and could cite the Voswinckel abstracts, given their affiliation with those abstracts, is irrelevant to whether a person of ordinary skill could have publicly accessed them, much less accessed them more than a year before the priority date. *See* Paper 55, at 10.

As UT explained, "if the Abstracts only became publicly accessible (via these alleged 'research aids') after May 15, 2005, they do not qualify as prior art under 35 U.S.C. §102(b)." *Id.* at 10. "And if the Abstracts are not Section 102(b) prior art, they are not prior art at all because they are not 'by another' under Section 102(a), given Patent Owner's showing that the subject matter of both Abstracts is the

inventors' own work." *Id.*[1]

## B.     The Board's conclusion that Voswinckel JESC and Voswinckel JAHA are prior art conflicts with settled legal principles

The Board erroneously concluded that Voswinckel JESC and Voswinckel JAHA were prior art.  According to the Final Written Decision, because "both the Ghofrani article and the Sulica article" cite the Voswinckel abstracts, they are research aids that serve as "roadmaps" to establish public accessibility of those abstracts.  FWD at 11–12 (citing *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1350 (Fed. Cir. 2016)).  That conclusion conflicts with settled legal principles.

As the Board has previously explained, "[t]he touchstone of public accessibility is whether an ordinary artisan exercising reasonable diligence would have been able to locate the document prior to the critical date." *Teoxane*, IPR2017-01906, Paper 15, at 11 (quotation marks omitted).  Indeed, the decisions of both the

---

[1] This showing was uncontested.  Liquidia did not object to or move to exclude any of Exhibits 2003, 2061, and 2071, which were first filed with the Patent Owner Response (Paper 29) and later cited in the Surreply (Paper 55, at 10) to show that the abstracts were not §102(a) prior art.  Furthermore, Liquidia declined the opportunity to depose Dr. Seeger in the IPR in relation to Exhibits 2003 and 2071 following their submission with the Patent Owner Response, and it made no request to submit any rebuttal evidence on this issue following the Surreply.

Federal Circuit and this Board have repeatedly underscored the point: what matters is public accessibility as of the critical date. *See, e.g.*, *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1568 (Fed. Cir. 1988) ("The statutory phrase 'printed publication' has been interpreted to mean that before the critical date the reference must have been sufficiently accessible to the public interested in the art[.]"); *In re Lister*, 583 F.3d 1307, 1312 (Fed. Cir. 2009) (analyzing whether a reference was "publicly accessible as of the critical date"); *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1350 (Fed. Cir. 2008) (similar).

These principles apply with equal force regardless of whether a reference is publicly accessible on its own or instead becomes publicly accessible only by way of a "research aid."  As the Federal Circuit has explained, "the presence of a 'research aid' can … establish public accessibility" by "provid[ing] a skilled artisan with a sufficiently definite roadmap leading to … the potentially invalidating reference." *Blue Calypso*, 815 F.3d at 1350.   By simple logic, that roadmap can "lead[] to … the potentially invalidating reference" only if and when it becomes publicly accessible—before then, there is nothing to guide the skilled artisan to the underlying reference. *See Lister*, 583 F.3d at 1312 (for a reference that becomes publicly accessible through a searchable index, the relevant date is the date of indexing); *cf.* M.P.E.P. §2127 ("An abandoned patent application may become evidence of prior art only when it has been appropriately disclosed, as, for example,

when the abandoned patent application is referenced in the disclosure of another patent, in a publication, or by voluntary disclosure[.]" (brackets omitted)).  The key issue in this case is therefore when *the research aid* providing the roadmap became publicly accessible, and whether that was before the §102(b) critical date.

The Final Written Decision did not address that question and overlooked UT's arguments doing so.  Even assuming that "the Ghofrani article and the Sulica article provide roadmaps directing a person of ordinary skill in the art … straight to Voswinckel JESC or Voswinckel JAHA" (FWD at 11–12), the question is when those roadmaps became available to an ordinary artisan in this field.  The answer: not before the critical May 15, 2005, §102(b) date.  Ghofrani is an article from the June 2005 issue of *Herz*; the exhibit in the record bears a July 2005 date-stamp.  *See* Ex. 1121, at 1.  And Sulica bears a "2005" date with no indication of when in 2005 it was published—much less when it became publicly accessible.[2]  *See* Ex. 1104, at 2.

---

[2] Liquidia asserted that Sulica is a "March 2005 article" (Paper 44, at 7), and the Final Written Decision quoted that statement (FWD at 11).  But there is no evidence that it appeared in any publication in March 2005.  The document itself, Exhibit 1104, only references the year "2005" and offers no other date information.  Paper 55, at 9.  And there was no other evidence supporting Liquidia's March 2005 date.

In short, neither of the alleged research aids were shown to have been publicly accessible before the critical §102(b) date. And Liquidia essentially conceded this point—it argued, for example, that Ghofrani would have provided a roadmap to an ordinary skilled artisan to locate Voswinckel JESC "*before May 15, 2006.*" Paper 44, at 4 (emphasis added); *accord id.* at 7–8 (arguing that Sulica would have allowed an ordinary skilled artisan exercising reasonable diligence to access Voswinckel JAHA "*before 2006*" (emphasis added)). In nevertheless concluding that Sulica and Ghofrani establish the Voswinckel abstracts as prior art under §102(b), the Board effectively blessed an end-run around the principle that a reference must be publicly accessible before the critical date. That legal error infected the Board's decision, and warrants rehearing.

Furthermore, to the extent the Board concluded that Ghofrani and Sulica's mere citations to the Voswinckel abstracts demonstrated that those references were publicly accessible because it demonstrated that the authors of Ghofrani and Sulica were able to access the abstracts—as Liquidia argued in its Reply (Paper 44, at 7)— that conclusion is equally erroneous. Section 102(b) requires prior-art references to be "publicly accessible" to an "ordinary" skilled artisan. *Teoxane*, IPR2017-01906, Paper 15, at 11; *Samsung Elecs. Co. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1369 (Fed. Cir. 2019) (whether "persons of ordinary skill in the art" were able to locate the abstracts through the exercise of "reasonable diligence"). The authors of

Ghofrani and Sulica were not ordinary skilled artisans with respect to the Voswinckel abstracts. Rather, they were coauthors of one Voswinckel abstract (citing their own prior work) and a principal investigator of the team conducting the clinical work described in the other abstract; they therefore would naturally have known about (and had access to) those documents irrespective of their public accessibility. Paper 55, at 10.

In other words, if a petitioner is relying on a research aid to establish public accessibility of a reference by a hypothetical person of ordinary skill, it is not enough for a petitioner to point to the mere existence of a citation in a research aid authored by someone affiliated with the cited reference. Doing so simply demonstrates that the research aid's author was aware of the work he or she contributed to—not that the public (or an ordinary skilled artisan) had access to it. *Argentum Pharm. LLC v. Research Corp. Tech., Inc.*, IPR2016-00204, Paper 19 at 11 (P.T.A.B. May 23, 2016) (concluding that references citing a disputed prior-art thesis, authored either by the student who wrote the thesis or by the student's thesis advisor, only indicated that the authors "had personal knowledge regarding the cited thesis").[3]   Nor, of

---

[3] Although the Board mentioned Liquidia's argument that Voswinckel JESC was publicly presented, *see* FWD at 10, the Board did not adopt that argument, and Liquidia offered no evidence of what was presented or to whom. Nor did Liquidia

course, does it demonstrate that an affiliated author who published *after* the critical §102(b) date had access to the reference *before* that date.

### C. But for the Board's legal error, the challenged claims would have been upheld

For the foregoing reasons, the Board erred in concluding that Voswinckel JESC and Voswinckel JAHA are prior art under §102(b). And without that erroneous conclusion, the Board's decision cannot stand.

Nor would there have been any basis for concluding that the two Voswinckel abstracts are prior art under §102(a). First, it would be improper for the Board to entertain the Voswinckel abstracts as §102(a) prior art because the Petition alleges them only to be §102(b) art. *Compare* Paper 2, at 22, 24 (addressing the abstracts and identifying §102(b)), *with id.* at 25, 27 (addressing Ghofrani and Voswinckel 2006 as prior art under §102(a)). The Board has held that belated conversion from §102(a) to §102(b) is not permitted. *See Handi Quilter*, Paper 39, at 6; *see also SAS Inst. v. Iancu*, 138 S. Ct. 1348, 1356 (2018) (holding that an *inter partes* review must

---

anywhere argue or explain how any public presentation could have served as a "research aid" that establishes any specific date of public accessibility sufficient to render JESC a §102(b) reference, especially given that the only reference of record which actually cites JESC (Ghofrani) was published less than a year before the priority date.

12

proceed "in accordance with or in conformance to the petition"); 37 C.F.R. §42.104(b)(2) (providing that a petition must state "[t]he specific statutory grounds under 35 U.S.C. 102 or 103 on which the challenge to the claim is based and the patents or printed publications relied upon for each ground."). Second, even if Liquidia had raised a §102(a) argument, the argument would have failed on the merits. Section 102(a) applies only to printed publications by "others"—*i.e.*, individuals other than the inventors. As already explained, Voswinckel JESC and Voswinckel JAHA are not by "others": they reflect the inventors' own work. *See* Paper 55, at 10; Ex. 2003 ¶27; Ex. 2061 ¶¶12–13; Ex. 2071¶¶6–8; *supra*, pp. 5–6, 10.

There is also no basis for adopting any of the other obviousness grounds in the Petition. Ground 2 also relies on Voswinckel JESC. FWD at 3. Ground 3 relies on Ghofrani, which the Board correctly found not to constitute prior art because it was not by "others." *See id.* at 37–40. Ground 4 relies on Voswinckel JESC and Ghofrani. *Id.* at 3. And Grounds 5 and 6 rely on Voswinckel 2006, *see id.* at 3–4, which the Board correctly found not to constitute prior art because it was not by others, *see id.* at 40–41.

In short, the Board's erroneous conclusion that Ghofrani and Sulica could establish public accessibility—without any proof that those sources provided a roadmap to the Voswinckel abstracts before the critical date—was an outcome-

4855-7660-5999.1

determinative error.

## IV.    Conclusion

The Board should grant rehearing, vacate its prior final written decision, and enter a revised final written decision confirming that Liquidia has not shown that claims 1–8 of the '793 patent are unpatentable.

August 18, 2022                              Respectfully submitted.

                                             /Stephen B. Maebius/
                                             Stephen B. Maebius (Reg. No. 35,264)
                                             FOLEY & LARDNER LLP
                                             3000 K Street, NW
                                             Washington, DC 20007
                                             Telephone: (202) 672-5569
                                             Facsimile: (202) 672-5399

                                             *Counsel for Patent Owner*
                                               *United Therapeutics Corporation*

14

# CERTIFICATION OF SERVICE

The undersigned hereby certifies that a copy of the foregoing "Patent Owner's Request for Rehearing" was served on August 18, 2022, via e-mail on the following counsel of record for the Petitioner:

> zLiquidiaIPR@cooley.com
> ielrifi@cooley.com
> emilch@cooley.com
> dkannappan@cooley.com
> ssukduang@cooley.com

August 18, 2022

/Stephen B. Maebius/
Stephen B. Maebius (Reg. No. 35,264)
FOLEY & LARDNER LLP
3000 K Street, NW
Washington, DC 20007
Telephone: (202) 672-5569
Facsimile: (202) 672-5399

*Counsel for Patent Owner*
*United Therapeutics Corporation*

# EXHIBIT 9

Trials@uspto.gov                                                    Paper No. 80
571.272.7822                                                 Filed: August 22, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

_____

IPR2021-00406
Patent 10,716,793

_____

Before Jamilah Sultan, *Trial Paralegal*

NOTIFICATION OF RECEIPT OF POP REQUEST

The Office has received a request for Precedential Opinion Panel (POP) review of an issue raised in this case. *See* Ex. 3003. The request is under review. The Office will provide another notification after a decision on the request has been made.

IPR2021-00406
Patent 10,716,793

For PETITIONER:

Ivor R. Elrifi
Erik B. Milch
Deepa Kannappan
Sanya Sukduang
Lauren Krickl
Douglas Cheek
Jonathan Davies
COOLEY LLP
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com
lkrickl@cooley.com
dcheek@cooley.com
jdavies@cooley.com

For PATENT OWNER:

Stephen B. Maebius
George Quillin
Jason N. Mock
Michael Houston
FOLEY & LARDNER LLP
smaebius@foley.com
gquillin@foley.com
jmock@foley.com
mhouston@foley.com

Shaun R. Snader
UNITED THERAPEUTICS CORP.
ssnader@unither.com

Douglas Carsten
April E. Weisbruch
Judy Mohr, Ph.D.
Jiaxiao Zhang
Mandy Kim
Arthur Dykhuis
Amy Mahan

IPR2021-00406
Patent 10,716,793

MCDERMOTT WILL & EMERY LLP
dcarsten@mwe.com
aweisbruch@mwe.com
jmohr@mwe.com
jazhang@mwe.com
mhkim@mwe.com
adykhuis@mwe.com
amahan@mwe.com

# EXHIBIT 10

Trials@uspto.gov                                                    Paper 81
571-272-7822                                        Date October 26, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

_____

IPR2021-00406
Patent 10,716,793 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office*, SCOTT R. BOALICK, *Chief Administrative Patent Judge*, and JACQUELINE WRIGHT BONILLA, *Deputy Chief Administrative Patent Judge.*

PER CURIAM.

ORDER

IPR2021-00406
Patent 10,716,793 B2

The Office received a request for Precedential Opinion Panel (POP) review of issues raised in the Board's Final Written Decision. Ex. 3003; *see* Paper 78. In the request, Patent Owner argues that the Board improperly determined that the Voswinckel JESC (Ex. 1007) and Voswinckel JAHA (Ex. 1008) references were publicly accessible and therefore qualify as prior art under pre-AIA 35 U.S.C. § 102(b) because a person of ordinary skill in the art would have been able to find them with the benefit of certain research aids. Paper 79, 1–3; *see* Paper 78, 8–12. The request was referred to the POP panel referenced above.

We have reviewed the request, the Board's Final Written Decision, the Papers, and the Exhibits in the above-listed proceeding. We determine that the Board's Final Written Decision did not address adequately whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art. *See* Paper 78, 8–12. Specifically, the Board's analysis did not consider whether the research aids themselves were available prior to the critical date, such that a person of ordinary skill in the art would have used them to find Voswinckel JESC and Voswinckel JAHA. *Id.* at 12. Further, the Board's analysis did not address whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library. Paper 78, 8–12; *see In re Klopfenstein*, 380 F.3d 1345, 1350–52 (Fed. Cir. 2004) ("The determination of whether a reference is a 'printed publication' under 35 U.S.C. § 102(b) involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public.").

2

IPR2021-00406
Patent 10,716,793 B2

However, because the record has been fully developed on these issues, the Board panel is best suited to make the appropriate factual findings for this analysis in its decision on rehearing. Accordingly, we deny Patent Owner's request for POP review of the Final Written Decision. With this denial of POP review, authority over all issues in this case — including consideration of Patent Owner's pending rehearing request — is returned to the original panel. We direct the Board, in its consideration on rehearing, to clearly identify whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art. Such analysis shall clarify whether the relied upon research aids were available prior to the critical date and whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library.

Accordingly, based on the foregoing, it is:

ORDERED that the request for POP review is denied;

FURTHER ORDERED that the original panel maintains authority over all matters, including considering the submitted rehearing request in view of the complete record; and

FURTHER ORDERED that the Board, on rehearing, shall clearly identify whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art.

3

IPR2021-00406
Patent 10,716,793 B2
For PETITIONER:

Ivor R. Elrifi
Erik B. Milch
Deepa Kannappan
Sanya Sukduang
Lauren Krickl
Douglas Cheek
Jonathan Davies
COOLEY LLP
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com
lkrickl@cooley.com
 dcheek@cooley.com
jdavies@cooley.com


For PATENT OWNER:

Stephen B. Maebius
George Quillin
Jason N. Mock
Michael Houston
FOLEY & LARDNER LLP
smaebius@foley.com
gquillin@foley.com
jmock@foley.com
mhouston@foley.com


Shaun R. Snader
UNITED THERAPEUTICS CORP.
ssnader@unither.com


Douglas Carsten
April E. Weisbruch
Judy Mohr, Ph.D.
Jiaxiao Zhang

4

IPR2021-00406
Patent 10,716,793 B2

Mandy Kim
Arthur Dykhuis
Amy Mahan
MCDERMOTT WILL & EMERY LLP
dcarsten@mwe.com
aweisbruch@mwe.com
jmohr@mwe.com
jazhang@mwe.com
mhkim@mwe.com
adykhuis@mwe.com
amahan@mwe.com

# EXHIBIT 11

Trials@uspto.gov                                                    Paper 82
Tel: 571-272-7822                              Entered: February 2, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

IPR2021-00406
Patent 10,716,793 B2

Before ERICA A. FRANKLIN, CHRISTOPHER M. KAISER,
and DAVID COTTA, *Administrative Patent Judges.*

KAISER, *Administrative Patent Judge.*

DECISION
Denying Patent Owner's Request on Rehearing of Final Written Decision
*37 C.F.R. § 42.71(d)*

IPR2021-00406
Patent 10,716,793 B2

## INTRODUCTION

Liquidia Technologies, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1–8 of U.S. Patent No. 10,716,793 B2 (Ex. 1001, "the '793 patent"). United Therapeutics Corporation ("Patent Owner") filed a Preliminary Response. Paper 13 ("Prelim. Resp.").

On August 11, 2021, we instituted *inter partes* review of claims 1–8 of the '793 patent on all grounds set forth in the Petition. Paper 18 ("Inst. Dec."). After institution of trial, Patent Owner filed a Response (Paper 29, "PO Resp."), Petitioner filed a Reply (Paper 44), and Patent Owner filed a Sur-Reply (Paper 55). In addition, both parties filed Motions to Exclude Evidence (Papers 65 and 66), Oppositions to their respective opponents' Motions to Exclude (Papers 68 and 69), and Replies in support of their own Motions to Exclude (Papers 71 and 72). At the request of both parties, we held an oral hearing, the transcript of which was entered into the record. Paper 77 ("Tr.").

On July 19, 2022, we issued a Final Written Decision determining that Petitioner had proven by a preponderance of evidence that all the challenged claims were unpatentable. Paper 78 ("Final Dec."). On August 18, 2022, Patent Owner requested rehearing and filed a request that rehearing be conducted by the Precedential Opinion Panel. Paper 79 ("Req. Reh'g"); Paper 80. The request for rehearing by the Precedential Opinion Panel was denied, returning jurisdiction to us to consider the rehearing request itself. Paper 81.

For the reasons discussed below, we deny Patent Owner's Request for Rehearing. Where the present decision differs from the Final Written

IPR2021-00406
Patent 10,716,793 B2

Decision, the present decision controls. Otherwise, the Final Written Decision remains in force.

ANALYSIS

*A. The Final Written Decision*

Petitioner asserted the unpatentability of the challenged claims on six separate grounds. Final Dec. 3–4. Four of those grounds relied on references referred to as Voswinckel 2006 and Ghofrani, both of which we determined did not qualify as prior art. *Id.* at 3–4, 36–41. The remaining two grounds both relied on a reference referred to as Voswinckel JESC, and one of the grounds also relied on a reference referred to as Voswinckel JAHA. *Id.* at 3.

Patent Owner argued during the trial that Petitioner had not proven that either Voswinckel JESC or Voswinckel JAHA had been made publicly accessible early enough to qualify as prior art in the way that Petitioner argued they did. PO Resp. 11–18; Sur-Reply 2–11. Petitioner countered these arguments with several arguments for the public accessibility of Voswinckel JESC and Voswinckel JAHA. Reply 2–9. In particular, Petitioner argued that each of these references was cited in a publicly available journal article that could have served as a research aid to help a person of ordinary skill in the art locate the references. *Id.* at 3–4 (arguing that Voswinckel JESC was cited in Ghofrani), 7–8 (arguing that Voswinckel JAHA was cited in Sulica).

In the Final Written Decision, we were persuaded by Petitioner's argument regarding these research aids. Final Dec. 10–12. Based in part on our determination that these research aids established the public accessibility of Voswinckel JESC and Voswinckel JAHA, we determined that Petitioner

IPR2021-00406
Patent 10,716,793 B2

had proven by a preponderance of the evidence that each of the challenged claims would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.  *Id.* at 12–35.

### B.  *The Rehearing Request*

Patent Owner seeks rehearing of our Final Written Decision on the ground that we overlooked Patent Owner's argument that the Ghofrani and Sulica research aids had been "published *after* the critical §102(b) date of May 15, 2005." Req. Reh'g 1 (emphasis in original).  Patent Owner notes that this argument appeared in the Sur-Reply.  *Id.* at 5 (citing Sur-Reply 9). According to Patent Owner, had we not overlooked this argument, we would have determined that Petitioner had not shown that Voswinckel JESC and Voswinckel JAHA were publicly accessible in the way necessary to treat them as prior art to the '793 patent.  *Id.* at 5–14.

When it requested rehearing, Patent Owner also requested that the rehearing be conducted by the Precedential Opinion Panel.  Ex. 3003.  The Precedential Opinion Panel denied that request and directed us to consider Patent Owner's rehearing request.  Paper 81, 3.  The Precedential Opinion Panel directed us, "in [our] consideration on rehearing, to clearly identify whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art" and specified that "[s]uch analysis shall clarify whether the relied upon research aids were available prior to the critical date and whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library."  *Id.*

IPR2021-00406
Patent 10,716,793 B2

### C. Standard of Review

A request for rehearing of an institution decision is reviewed under the abuse of discretion standard. 37 C.F.R. § 42.71(c). "The burden of showing a decision should be modified lies with the party challenging the decision." 37 C.F.R. § 42.71(d). "The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, reply, or a sur-reply." *Id.* An abuse of discretion may be found where a decision "(1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) involves a record that contains no evidence on which the Board could rationally base its decision." *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 442 (Fed. Cir. 2015) (quoting *Abrutyn v. Giovanniello*, 15 F.3d 1048, 1050–51 (Fed. Cir. 1994) (citation omitted)).

### D. We Overlooked Patent Owner's Argument

Patent Owner is correct that its argument that the Ghofrani and Sulica research aids were dated after May 15, 2005, appeared in the Sur-Reply. Sur-Reply 9–11. Patent Owner also is correct that we overlooked this argument in relying on these research aids as supporting that Petitioner had established that Voswinckel JESC and Voswinckel JAHA were prior art to the '793 patent. Final Dec. 11–12; Paper 81, 2 ("the Board's analysis did not consider whether the research aids themselves were available prior to the critical date").

### E. Reconsideration of the Record Shows that the Research Aids Did Not Establish the Prior-Art Status of Voswinckel JESC and Voswinckel JAHA

Petitioner argued that Voswinckel JESC and Voswinckel JAHA were "prior art to the '793 Patent under at least 35 U.S.C. § 102(b)." Pet. 22, 24. In the Final Written Decision, we determined that Petitioner had shown that these references were prior art based on the existence of research aids. Final Dec. 10–12. As noted above, that determination overlooked Patent Owner's argument that the research aids themselves were published too late for their mention of Voswinckel JESC and Voswinckel JAHA to render those references prior art under § 102(b). We now consider that argument.

To qualify as prior art under § 102(b), a reference must have been publicly accessible "more than one year prior to the date of application for patent in the United States." 35 U.S.C. § 102(b) (2006). Here, the parties agree that the application that ultimately led to the issuance of the '793 patent was filed May 15, 2006. Pet. 12; PO Resp. 5. Thus, to qualify as § 102(b) prior art, Voswinckel JESC and Voswinckel JAHA must have been publicly accessible before May 15, 2005.

Petitioner argues that Voswinckel JESC "was cited in the June 2005 Ghofrani article in the journal *Herz* . . . , an article that was publicly accessible." Reply 3 (citing Ex. 1010, 298, 301). Patent Owner argues that "Ghofrani bears a July 2005 date-stamp." Sur-Reply 9 (citing Ex. 1121, 1). Petitioner does not explain its characterization of Ghofrani as a "June 2005" article. The pages of Ghofrani cited by Petitioner do not indicate a June 2005 publication date. Ex. 1010, 298, 301. The same article appears, however, as Exhibit 1121, which bears a date of July 7, 2005. *Compare* Ex. 1010, *with* Ex. 1121. Accordingly, Patent Owner's characterization of

IPR2021-00406
Patent 10,716,793 B2

Ghofrani as having been published in July 2005 is better supported by the evidence of record than is Petitioner's characterization of Ghofrani as having been published in June 2005. Even if the evidence of record supported Petitioner's June 2005 publication date, that date is still later than May 15, 2005, so the citation of Voswinckel JESC in Ghofrani does not show that Voswinckel JESC was prior art under § 102(b).

Petitioner argues that Voswinckel JAHA "was cited by a March 2005 article authored by Roxana Sulica et al. in the *Expert Review of Cardiovascular Therapy*." Reply 7 (citing Ex. 1104, 359). Patent Owner argues that the Sulica article "shows only the year 2005." Sur-Reply 9 (citing Ex. 1104, 347). We agree with Patent Owner. The Sulica article bears a 2005 copyright date but otherwise does not indicate when it was published. Ex. 1104, 347. The 2005 copyright date does not support a finding that the Sulica article was published before May 15, 2005, so the citation of Voswinckel JAHA in the Sulica article does not show that Voswinckel JAHA was prior art under § 102(b).

### F. *Reexamination of the Record Shows that Voswinckel JESC and Voswinckel JAHA Were Prior Art to the '793 Patent Due to Distribution at Conferences*

The Precedential Opinion Panel directed us, "in [our] consideration on rehearing, to clearly identify whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art" and specified that "[s]uch analysis shall clarify . . . whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library." Paper 81, 3. Accordingly, we consider below whether the evidence of record establishes the prior-art status of Voswinckel JESC and Voswinckel

IPR2021-00406
Patent 10,716,793 B2

JAHA due to presentation and/or inclusion in distributed materials. We answer this question in the affirmative.

"Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touch-stone in determining whether a reference constitutes a 'printed publication.'" *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1356 (Fed. Cir. 2018) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). A reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it." *Id.* at 1355–56 (citing *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)). Under at least some circumstances, a reference may be a printed publication under § 102(b) if it was "displayed to the public," even if it "was not later indexed in any database, catalog, or library." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). There are several factors relating to whether such a display is sufficient to constitute a printed publication, including "the length of time the display was exhibited, the expertise of the target audience, the existence (or lack thereof) of reasonable expectations that the material displayed would not be copied, and the simplicity or ease with which the material displayed could have been copied." *Id.* In addition, distribution of a reference at a professional conference may, under at least some circumstances, constitute sufficient dissemination to show public accessibility. *Nobel Biocare Services AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375–80 (Fed. Cir. 2018); *Medtronic, Inc. v. Barry*, 891 F.3d 1368, 1380–83 (Fed. Cir. 2018).

IPR2021-00406
Patent 10,716,793 B2

> ### 1. *Voswinckel JESC Was Sufficiently Distributed at a Conference to be Publicly Accessible as of the Conference Date*

A reference may be "[a] printed publication ' . . . if it was sufficiently disseminated at the time of its publication.'" *Medtronic*, 891 F.3d at 1381 (quoting *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1365 (Fed. Cir. 2014)). Several factors are relevant to the determination of whether distribution of a reference at a conference constitutes such sufficient dissemination. *Id.* at 1381–82. These include "the size and nature of the meetings and whether they are open to people interested in the subject matter of the material disclosed," as well as "whether there is an expectation of confidentiality between the distributor and the recipients of the materials." *Id.* at 1382. "The expertise of the target audience can [also] be a factor in determining public accessibility." *Id.* To the extent that these factors are addressed via testimonial evidence, corroboration of that evidence may be necessary. *Nobel Biocare*, 903 F.3d at 1377–78. "Corroborating evidence may include documentary or testimonial evidence," and "[c]ircumstantial evidence can be sufficient corroboration." *Id.* (citing *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1301 (Fed. Cir. 2016)).

Voswinckel JESC is an abstract contained in "Volume 25 Abstract Supplement August/September 2004" of "European Heart Journal," with a subtitle indicating that the journal is the "Journal of the European Society of Cardiology" and that the supplement relates to "ESC Congress 2004," held "28 August – 1 September" in "Munich, Germany." Ex. 1007, 1; *see also* Ex. 1089, 1. The Table of Contents organizes abstracts into categories, including "Epidemiology and treatment of pulmonary arterial hypertension," with each category associated with an entry corresponding to a day of the

IPR2021-00406
Patent 10,716,793 B2

conference, such as "Day 2—Sunday 29 August 2004." *Id.* at 2. Each of these categories points to a page or pages in the supplement, with those pages containing abstracts that report the "Background," "Methods," "Results," and "Conclusion" of studies. *Id.* at 7.

The conference with which Voswinckel JESC is associated "is the largest medical congress in Europe and among the top three cardiology meetings in the world," and "it has become an established forum for the exchange of science as much as education." Ex. 1105, 19. Attendees of the conference include "basic scientists, nurses and allied professionals working in the field of cardiovascular care of patients." *Id.* At the 2004 conference, there were "24,527 attendees," including "18,413 professionals, 4,715 exhibitors, 636 journalists and 763 accompanying persons." *Id.* Both Petitioner's declarant, Dr. Nicholas Hill, and Patent Owner's declarant, Dr. Aaron Waxman, testify that anyone who paid to attend the ESC Congress 2004 would have received a copy of the abstract book from which Voswinckel JESC is excerpted, either at the meeting itself or as a distribution before the meeting. Ex. 1106 ¶ 28; Ex. 1108, 105:16–108:1.

Thus, the evidence of record shows that Voswinckel JESC was distributed to more than twenty thousand people before or at the time of the ESC Congress 2004 in late August and early September of 2004. Those twenty thousand recipients included both highly skilled professionals, including scientists, nurses, and other clinicians, as well as journalists and those who accompanied the professionals and the journalists. That the recipients included journalists and "accompanying persons" suggests very strongly that there was no expectation that the contents of Voswinckel JESC would be kept confidential. Moreover, Drs. Hill and Waxman corroborate

10

IPR2021-00406
Patent 10,716,793 B2

one another's testimony, and their testimony is further corroborated by the contents of both Voswinckel JESC itself and Exhibit 1105. The distribution of Voswinckel JESC to over twenty thousand recipients, including thousands of experts in the field of cardiology, with no expectation of confidentiality, establishes that Voswinckel JESC was a printed publication as of the date of the conference at which that distribution occurred. Because that conference occurred in August and September 2004, more than one year before the May 15, 2006 application date of the '793 patent, Voswinckel JESC was a printed publication early enough to qualify as prior art under 35 U.S.C. § 102(b).

> 2.   *Voswinckel JAHA Was Sufficiently Distributed at a Conference to be Publicly Accessible as of the Conference Date*

Like Voswinckel JESC, Voswinckel JAHA is associated with a professional conference. Ex. 1008. It is an abstract that has been extracted from a document headed "Supplement to Circulation," subtitled "Journal of the American Heart Association" and "Abstracts from Scientific Sessions 2004," indicating that those sessions occurred "November 7–10." *Id.* at 1. The abstract in question appears in a section titled "Pulmonary Arterial Hypertension: New Therapies," subtitled "Subspecialty: Integrative Biology" and indicating that the session occurred on "Wednesday" in "Hall I2" of the "Ernest N Morial Convention Center." *Id.* at 3. We take official notice that the range of dates from November 7, 2004, to November 10, 2004, includes Wednesday, November 10, 2004.

Both Dr. Hill and Dr. Waxman agree that attendance at the Scientific Sessions 2004 conference was large. Ex. 1106 ¶ 22 ("a [person of ordinary skill in the art] would have attended the Scientific Sessions 2004

IPR2021-00406
Patent 10,716,793 B2

Conference, as it is one of the principal conferences on the circulatory system and diseases and conditions affecting circulation"); Ex. 1108, 116:4–21 (testifying that attendance at Scientific Sessions 2004 was likely larger than the 18,000 professionals who attended ESC Congress 2004). Dr. Hill testifies that the conference was "attended by physicians and researchers working on and studying the cardiovascular system, including pulmonary circulation." *Id.* Both Dr. Hill and Dr. Waxman also agree that a copy of the abstract book from which Voswinckel JAHA is excerpted would have been provided to all attendees at Scientific Sessions 2004. Ex. 1106 ¶ 23; Ex. 1108, 108:3–20. We have not been directed to any evidence of record indicating there was any expectation of confidentiality. The distribution of thousands of copies of Voswinckel JAHA at the conference is strong evidence that Voswinckel JAHA was a printed publication as of the date of the conference. Because that conference occurred in November 2004, more than one year before the May 15, 2006 application date of the '793 patent, Voswinckel JAHA was a printed publication early enough to qualify as prior art under 35 U.S.C. § 102(b).

### 3.  Conclusion

As instructed by the Precedential Opinion Panel, we have considered "whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art" and in particular "whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference." Paper 81, 3. As discussed above, we find that both references were distributed sufficiently at professional conferences to be publicly accessible at the time of those conferences. By virtue of this public accessibility, both Voswinckel

12

IPR2021-00406
Patent 10,716,793 B2

JESC and Voswinckel JAHA were printed publications early enough to qualify as prior art under 35 U.S.C. § 102(b).

### G. Asserted Obviousness over '212 Patent, Voswinckel JESC, and Voswinckel JAHA

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA. Pet. 30–46. As discussed above, Petitioner has shown by a preponderance of the evidence that both Voswinckel JESC or Voswinckel JAHA qualify as prior art. Accordingly, we do not disturb the obviousness analysis in the Final Written Decision, which relies on the prior-art status of Voswinckel JESC and Voswinckel JAHA. Final Dec. 12–35.

### H. Remaining Grounds

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent and Voswinckel JESC. Pet. 46–50. We do not disturb the determination in the Final Written Decision that we need not reach this ground "[b]ecause Petitioner has shown by a preponderance of the evidence that all of the challenged claims would have been obvious over the similar combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA." Final Dec. 36.

Petitioner argues that claim 1 was anticipated by Ghofrani; that claims 1, 3, and 8 would have been obvious over the combination of Voswinckel JAHA and Ghofrani; that claims 1 and 3 were anticipated by Voswinckel 2006; and that claims 2 and 4–8 would have been obvious over the combination of Voswinckel 2006 and the '212 patent. Pet. 50–64. These grounds fail for the reasons discussed in the Final Written Decision. Final Dec. 36–41.

13

IPR2021-00406
Patent 10,716,793 B2

CONCLUSION[1]

For the reasons discussed above, Patent Owner has shown that we overlooked its argument regarding the date of availability of the research aids that Petitioner argued showed that Voswinckel JESC and Voswinckel JAHA qualified as prior art. A proper consideration of that argument shows that the research aids do not establish the prior-art status of Voswinckel JESC and Voswinckel JAHA, but there is no change to the outcome with respect to Petitioner's asserted grounds of unpatentability, because the distribution of Voswinckel JESC and Voswinckel JAHA at professional conferences proves the prior-art status of those references. Accordingly, we deny Patent Owner's request for rehearing.

When all arguments are properly considered, Petitioner has shown by a preponderance of the evidence that claims 1–8 of the '793 patent are unpatentable.

Outcome of Decision on Rehearing:

| Claims | 35 U.S.C § | Reference(s)/Basis | Denied | Granted |
|--------|-----------|--------------------|--------|---------|
| 1–8 | 103(a) | '212 patent, Voswinckel JESC, Voswinckel JAHA | 1–8 | |
| **Overall Outcome** | | | 1–8 | |

[1] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

IPR2021-00406
Patent 10,716,793 B2

Final Outcome of Final Written Decision after Rehearing:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–8 | 103(a) | '212 patent, Voswinckel JESC, Voswinckel JAHA | 1–8 | |
| 1–8 | 103(a) | '212 patent, Voswinckel JESC[2] | | |
| 1 | 102(a) | Ghofrani | | 1 |
| 1, 3, 8 | 103(a) | Voswinckel JAHA, Ghofrani | | 1, 3, 8 |
| 1, 3 | 102(a) | Voswinckel 2006 | | 1, 3 |
| 2, 4–8 | 103(a) | Voswinckel 2006, '212 patent | | 2, 4–8 |
| **Overall Outcome** | | | 1–8 | |

ORDER

It is hereby

ORDERED that Patent Owner's Request for Rehearing is denied;

FURTHER ORDERED that the determination in the Final Written

Decision that the research aids relied on by Petitioner show the prior-art

status of Voswinckel JESC and Voswinckel JAHA is overturned and

replaced with the determination in the present decision that the distribution

---

[2] Neither the Final Written Decision nor this Rehearing Decision reaches this ground because Petitioner has proven all challenged claims are unpatentable based on obviousness over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.

IPR2021-00406
Patent 10,716,793 B2

of Voswinckel JESC and Voswinckel JAHA at professional conferences establishes the prior-art status of those references;

FURTHER ORDERED that, based on the preponderance of the evidence, claims 1–8 of the '793 patent have been shown to be unpatentable;

FURTHER ORDERED that all other rulings in the Final Written Decision remain undisturbed; and

FURTHER ORDERED that parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2021-00406
Patent 10,716,793 B2

For PETITIONER:

Ivor R. Elrifi
Erik B. Milch
Deepa Kannappan
Sanya Sukduang
Lauren Krickl
Douglas Cheek
Jonathan Davies
COOLEY LLP
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com
lkrickl@cooley.com
dcheek@cooley.com
jdavies@cooley.com

For PATENT OWNER:

Stephen B. Maebius
George Quillin
Jason N. Mock
Michael Houston
FOLEY & LARDNER LLP
smaebius@foley.com
gquillin@foley.com
jmock@foley.com
mhouston@foley.com

Shaun R. Snader
UNITED THERAPEUTICS CORP.
ssnader@unither.com

Douglas Carsten
April E. Weisbruch
Judy Mohr
Jiaxiao Zhang
Mandy Kim

IPR2021-00406
Patent 10,716,793 B2

Arthur Dykhuis
Amy Mahan
MCDERMOTT WILL & EMERY LLP
dcarsten@mwe.com
aweisbruch@mwe.com
jmohr@mwe.com
jazhang@mwe.com
mhkim@mwe.com
adykhuis@mwe.com
amahan@mwe.com

# EXHIBIT 12

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

# LIQUIDIA TECHNOLOGIES, INC.,

*Petitioner*,

v.

# UNITED THERAPEUTICS CORPORATION,

*Patent Owner*.

_____

Case No.  IPR2021-00406
Patent No.  10,716,793 B2

_____

# PATENT OWNER'S NOTICE OF APPEAL

## <u>NOTICE OF APPEAL TO THE FEDERAL CIRCUIT</u>

Notice is hereby given, pursuant to 35 U.S.C. §§ 141, 142, and 319 and 37 C.F.R. §§ 90.2 and 90.3(a)(1) that United Therapeutics Corporation ("Patent Owner") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision entered on July 19, 2022 (Paper 78), the Decision on Request for Rehearing entered on February 2, 2023 (Paper 82), and from all underlying orders, decisions, rulings, and opinions, regarding the *inter partes* review of U.S. Patent No. 10,716,783 ("the '793 Patent") in Case No. IPR2021-00406. This appeal is timely under 35 U.S.C. § 142 and 37 C.F.R. § 90.3.

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner further states that the issues on appeal are anticipated to include, but are not limited to:

(1)    Whether the Board erred in concluding that two references, Voswinckel JESC (Ex. 1007)[1] and Voswinckel JAHA (Ex. 1008)[2], qualify as prior art under 35 U.S.C. § 102(b);

---

[1] Voswinckel, R., et al., Abstract 218: "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal 25:22 (2004).

[2] Robert Voswinckel, Beate Enke, Andre Kreckel, Frank Reichenberger, Stefanie Krick, Henning Gall, Tobias Gessier, Thomas Schmehl, Markus G. Kohstall, Friedrich Grimminger, Hossein A. Ghofrani, Werner Seeger, and Horst Olschewski, Abstract 1414: "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension," Abstracts from the 2004 Scientific Sessions of the American Heart Association, Circulation, 110(17 Suppl.):III-295 (October 26, 2004).

(2)     Whether the Board erred in analyzing whether a skilled artisan would have been motivated to combine the asserted references in the manner recited in the challenged claims, and whether a skilled artisan would have had a reasonable expectation of success in doing so;

(3)     Whether the Board erred in rejecting objective indicia of nonobviousness;

(4)     Whether the Board erred in concluding that claims 1-8 are unpatentable as obvious over Voswinckel JESC, Voswinckel JAHA, and U.S. Patent No. 6,521,212 B1 (Ex. 1006);

(5)     Whether, in arriving at its decisions, the Board acted in a manner that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, was in excess of statutory limitations and without observance of procedure required by law, or was based on findings unsupported by substantial evidence;

(6)     Whether the Board erred in any finding or determination supporting or related to those issues, as well as all other issues decided adversely to Patent Owner in any orders, decisions, rulings, and opinions;

(7)     Whether the Board violated the Administrative Procedure Act in rendering its Final Written Decision.

Concurrently with this submission, in accordance with 37 C.F.R. § 90.2(a) and Federal Circuit Rule 15(a)(1), a copy of this Notice of Appeal is being filed with

the Patent Trial and Appeal Board, and a copy is being filed electronically with the

United States Court of Appeals for the Federal Circuit along with the required

docketing fee.

Dated:  April 5, 2023                    Respectfully submitted,


By: /Stephen B. Maebius/
Stephen B. Maebius
Registration No. 35,264

*Counsel for Patent Owner*

IPR2021-00406
Patent 10,716,793

## CERTIFICATE OF SERVICE AND FILING

The undersigned hereby certifies that a true and correct copy of the

foregoing **PATENT OWNER'S NOTICE OF APPEAL** was served on April 5,

2023, via email, to attorneys for Petitioner at the following addresses:

| | |
|---|---|
| ssukduang@cooley.com | dkannappan@cooley.com |
| zLiquidiaIPR@cooley.com | lkrickl@cooley.com |
| ielrifi@cooley.com | dcheek@cooley.com |
| emilch@cooley.com | jdavies@cooley.com |

The undersigned certifies that, in addition to being filed electronically

through the Patent Trial and Appeal Board Case Tracking System (P-TACTS)

system on April 5, 2023, a true and correct copy of the foregoing **PATENT**

**OWNER'S NOTICE OF APPEAL** was filed on April 5, 2023, with the Director

of the United States Patent and Trademark Office at the following address:

Director of the United States Patent and Trademark Office
c/o Office of the General Counsel
Madison Building East, 10B20
600 Dulany Street
Alexandria, VA 22314-5793

The undersigned also certifies that a true and correct copy of the foregoing

**PATENT OWNER'S NOTICE OF APPEAL** was filed electronically on April 5,

2023, with the United States Court of Appeals for the Federal Circuit.

/Stephen B. Maebius/
Stephen B. Maebius
Registration No. 35,264
Counsel for Patent Owner

# EXHIBIT 13

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-K

(Mark One)

☒     ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.

For the fiscal year ended December 31, 2022

OR

☐     TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.

For the transition period from     to    

Commission file number 0-26301

# United Therapeutics Corporation

(Exact Name of Registrant as Specified in Its Charter)

| | |
|---|---|
| Delaware | 52-1984749 |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| 1040 Spring Street, Silver Spring,     MD | 20910 |
| (Address of Principal Executive Offices) | (Zip Code) |

(301) 608-9292

Registrant's Telephone Number, Including Area Code

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $.01 per share | UTHR | Nasdaq Global Select Market |

Securities registered pursuant to Section 12(g) of the Act:

None

(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

The aggregate market value of the Common Stock held by non-affiliates of the registrant, based on the closing price on June 30, 2022, as reported by the Nasdaq Global Select Market was approximately $10,532,340,521.

The number of shares outstanding of the issuer's common stock, par value $0.01 per share, as of February 15, 2023, was 46,301,656.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive proxy statement for the registrant's 2023 annual meeting of shareholders scheduled to be held on June 26, 2023, are incorporated by reference in Part III of this Form 10-K.

# PART I

## Item 1. Business

### Overview

We build on the strength of our research and development expertise and a distinctive, entrepreneurial culture that encourages diversity, innovation, creativity, sustainability, and, simply, fun. Since inception, our mission has been to find a cure for pulmonary arterial hypertension (**PAH**) and other life-threatening diseases. Toward this goal we have successfully obtained approval from the U.S. Food and Drug Administration (**FDA**) for several medicines, we are always conducting new clinical trials, and we are working to create an unlimited supply of manufactured organs for transplantation.

We are the first publicly-traded biotech or pharmaceutical company to take the form of a public benefit corporation (**PBC**). Our public benefit purpose is *to provide a brighter future for patients through (a) the development of novel pharmaceutical therapies; and (b) technologies that expand the availability of transplantable organs.* At the same time, we seek to provide our shareholders with superior financial performance and our communities with earth-sensitive energy utilization.

We market and sell the following commercial therapies in the United States to treat PAH: Tyvaso® (treprostinil) Inhalation Solution (**Tyvaso**), which includes the Tyvaso Inhalation System; Tyvaso DPI® (treprostinil) Inhalation Powder (**Tyvaso DPI**); Remodulin® (treprostinil) Injection (**Remodulin**); Orenitram® (treprostinil) Extended-Release Tablets (**Orenitram**); and Adcirca® (tadalafil) Tablets (**Adcirca**). Tyvaso and Tyvaso DPI are also approved to treat pulmonary hypertension associated with interstitial lung disease (**PH-ILD**). In the United States, we market and sell an oncology product, Unituxin® (dinutuximab) Injection (**Unituxin**), which is approved for treatment of high-risk neuroblastoma, and the Remunity® Pump for Remodulin (**Remunity**). Outside the United States, we generate revenues from the sale of Tyvaso, Remodulin, and Unituxin.

We are actively advancing a pipeline of research and development projects that includes new indications, formulations, and delivery devices for our existing products, as well as new products to treat PAH and other conditions.

Our principal executive offices are located at 1040 Spring Street, Silver Spring, Maryland 20910 and at 55 T.W. Alexander Drive, Research Triangle Park, North Carolina 27709. Unless the context requires otherwise or unless otherwise noted, all references in this Annual Report on Form 10-K (this **Report**) to "**United Therapeutics**" and to the "**company**", "**we**", "**us**" or "**our**" are to United Therapeutics Corporation and its subsidiaries.

## Our Commercial Products

Our commercial product portfolio consists of the following:

| Product | Mode of Delivery | Indication | Current Status | Our Territory |
|---|---|---|---|---|
| Tyvaso | Inhaled solution via ultrasonic nebulizer | PAH and PH-ILD | Commercial sales in the U.S., Argentina, and Israel* | Worldwide |
| Tyvaso DPI | Inhaled dry powder via pre-filled, single-use cartridges | PAH and PH-ILD | Commercial sales in the U.S. | Worldwide |
| Remodulin | Continuous subcutaneous | PAH | Commercial sales in the U.S., most of Europe**, Argentina, Canada, Chile, Columbia, Israel, Japan, Mexico, Peru, South Korea, and Venezuela | Worldwide |
| Remodulin | Continuous intravenous | PAH | Commercial sales in the U.S., most of Europe**, Argentina, Canada, Columbia, Israel, Japan, Mexico, Peru, Saudi Arabia, and South Korea | Worldwide |
| Remunity Pump for Remodulin | Continuous subcutaneous via pre-filled and patient-filled cassettes | PAH | Commercial sales in the U.S. | Worldwide |
| Orenitram | Oral | PAH | Commercial sales in the U.S. | Worldwide |
| Unituxin | Intravenous | High-risk neuroblastoma | Commercial sales in the U.S., Canada, and Japan | Worldwide |
| Adcirca | Oral | PAH | Commercial sales in the U.S. | United States |

\*    Tyvaso is only approved for PAH in Argentina. Tyvaso was also approved to treat PAH in Japan in late 2022, and we anticipate that our distributor will launch commercial sales in Japan during the second half of 2023. Tyvaso's label was expanded in Israel in late 2022 to add the PH-ILD indication.

\*\*    Remodulin is marketed and sold in most of the major European markets other than the United Kingdom.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel for United Therapeutics Corporation certifies that this brief:

(i)    complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 3,145 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2007 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: May 30, 2023                    */s/ Douglas H. Carsten*
                                            Douglas H. Carsten

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on May 30, 2023, the foregoing document was filed using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.


Dated: May 30, 2023             */s/ Douglas H. Carsten*
                                Douglas H. Carsten