**No. 2023-1805**

United States Court of Appeals
for the Federal Circuit

UNITED THERAPEUTICS CORPORATION,

*Appellant,*

v.

LIQUIDIA TECHNOLOGIES, INC.,

*Appellee.*

*Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2021-00406*

**APPELLEE'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO
EXPEDITE BRIEFING AND ORAL ARGUMENT**

SANYA SUKDUANG
JONATHAN R. DAVIES
COOLEY LLP
1299 Pennsylvania Ave NW
Washington, DC 20004
Telephone: (202) 842-7800

DEEPA KANNAPPAN
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: (650) 843-5000

*Counsel for Appellee
Liquidia Technologies, Inc.*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1805

**Short Case Caption** United Therapeutics Corporation v. Liquidia Technologies, Inc.

**Filing Party/Entity** Liquidia Technologies, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/02/2023

Signature: /s/ Sanya Sukduang

Name: Sanya Sukduang

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Liquidia Technologies, Inc. | | Liquidia Corporation |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐     Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Sanya Sukduang, Cooley LLP | Erik B. Milch, Cooley LLP | Ivor R. Elrifi, Cooley LLP |
| Jonathan Davies, Cooley LLP | Deepa Kannappan, Cooley LLP | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below)    ☐ No    ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

I.  **LIQUIDIA'S PRODUCT IS SUPERIOR AND UTC'S PRODUCT IS INADEQUATE TO MEET PATIENT NEED**

Liquidia was the first to formulate a dry powder inhaler version of treprostinil, to much patient and practitioner acclaim.  *See* Ex. 13 (district court trial transcript excerpts), 711:12-20, 717:25-718:25, 722:10-19;   Ex. 14 (Given its size, the pulmonary arterial hypertension patient community is well-informed on the availability of new treatments for their disease and are advocating for access to YUTREPIA™ to "'live' a quality life[,]" because they "have very few [drugs] and not every one works for every patient."); Ex. 15 (Patient testimonial putting the issue into perspective in terms of the number of expected deaths due to pulmonary arterial hypertension ("PAH") that may occur during the pendency of the appeals, stating "There are approximately 40,000 people in the U.S. with PAH. The average three-year death rate of this disease is 21%. This means that in the three years that Yutrepia will have been caught up in litigation, 8,400 people will die from PAH."); Ex. 16 (a nurse and PH Support Group Leader treating PH patients for over 20 years wants access to YUTREPIA™ for her patients "as the more treatment options available, the more it brings HOPE to these patients that are dealing with this horrible disease.").  Contrary to UTC's contention, these communications from PAH patients and caregivers demonstrate the strong public interest in obtaining access to YUTREPIA™ because of the drug's ability to improve patient treatment, quality of life, and convenience over existing therapies.

YUTREPIA™ is convenient to use, patient adherence to a regiment of dosing several times a day went up significantly, and YUTREPIA™'s formulation itself was more effective at treating pulmonary hypertension. *See, e.g.*, Ex. 17 (INSPIRE Trial Poster) (clinically meaningful physical and emotional improvements in Quality of Life (QoL) were seen when assessing in patients who either started on YUTREPIA™ (naive) or transitioned from Tyvaso®,); Ex. 18 at *9, Nicholas S. Hill et al., *INSPIRE: Safety and tolerability of inhaled Yutrepia (treprostinil) in pulmonary arterial hypertension (PAH)*, 12 PULMONARY CIRCULATION e12119 (2022) ("The favorable safety profile and patient preference ratings as well as the exploratory efficacy analyses suggest that the profile of Yutrepia represents an important advance in inhaled prostacyclin therapy for patients with PAH either in the setting of transitioning from current nebulized prostacyclin therapy or the initiation of therapy. The administration of Yutrepia with an easy-to-use dry-powder inhaler offers clinicians an inhaled PAH therapy that may be preferred by many patients based on its added convenience and potential to facilitate a more active lifestyle.").) Liquidia received FDA approval (tentative over pending litigation) for YUTREPIA™ on November 5, 2021, and was the first dry powder formulation of treprostinil to get FDA approval.

While Liquidia was working to get YUTREPIA™ approved, UTC was busy suing Liquidia (filing suit in summer 2020 (*see* ECF No. 10, Exs. 9-10)) and racing

to develop its own product, which it launched as Tyvaso DPI (i.e., _d_ry _p_owder _i_nhaler).  UTC received FDA approval for its DPI product May 2022—27 months after Liquidia filed its NDA, 23 months after UTC filed suit against Liquidia, and 6 months after Liquidia received FDA approval.

Since Tyvaso DPI's market launch in June 2022, UTC has had supply chain issues.  Ex. 19 at 1 (In the first quarter of 2023, "there was a draw down of Tyvaso nebulizer inventory, but not a draw up of Tyvaso DPI due to manufacturing constraints . . . . [UTC] do[es]n't expect to see a stock up of DPI until more meaningful capacity comes online late this year or early 2024.").  YUTREPIA™ exists as an alternative but is unable to launch.

## II.    ONE ATTORNEY'S CONFLICTS ARE NOT ENOUGH FOR UTC TO DEMONSTRATE PREJUDICE

UTC's opposition appears to stem from scheduling conflicts of its "principal" counsel (ECF No. 7 at 1), issues it could have raised when Liquidia contacted UTC's counsel regarding an expedited motion schedule.  At that time, Liquidia indicated that it was "open to a discussion."  _See_ Ex. 20 (05/11/2023 Email from D. Kannappan).  Correspondence was exchanged between the parties, but it wasn't until 7 days later that UTC indicated it would oppose.  _Id._ (5/17/2023 Email from W. Jackson).  Even during the time-period the parties were discussing an expedited schedule, UTC identified no prejudice or conflict.  _Id._  Indeed, Liquidia offered to

cooperate with UTC on deadlines that would work for their team, but UTC simply said no. *Id.*

UTC now relies on scheduling conflicts for its principal counsel, Douglas Carsten, as a basis to oppose Liquidia's motion. ECF No. 7 at 1; ECF No. 12 at 14-15. But there are at least three other lawyers—all partners—who are "Counsel for Appellant" that appear on UTC's opposition including William Jackson, the partner that communicated with Liquidia on this motion (*see* Ex. 20). *See also* ECF No. 7 at 1-2. No conflicts have been cited for any of these attorneys. There are also additional UTC lawyers on the same email thread regarding this motion (*see* Ex. 20), as well as dozens of other lawyers that have worked on this case across three law firms: two firms appearing in this appeal, and one firm that worked on the underlying '793 IPR (Foley & Lardner). In sum, UTC is not represented by one attorney. Mr. Carsten should feel free to take vacation, but his conflicts alone cannot constitute sufficient prejudice to UTC to deny this motion.

## III.   LIQUIDIA HAS BEEN DILIGENT AND TOOK REASONABLE TIME TO TRY TO COME TO AN AGREEMENT WITH UTC BEFORE FILING THIS MOTION

UTC faults Liquidia for not filing this motion "immediately after docketing" (ECF No. 12 at 1), but conveniently leaves out that (1) the parties had oral argument *on the same '793 patent* within a week of the notice of docketing (ECF No. 1, 04/26/2023 Notice of Docketing; *United Therapeutics Corp. v. Liquidia Techs., Inc.,*

Case Nos. 22-2217, 23-1021, Oral Arg. (May 3, 2023), *available at* https://cafc.uscourts.gov/home/oral-argument/listen-to-oral-arguments/), and (2) Liquidia reached out to UTC the week after that argument, engaging in a good faith, seven day, back and forth with UTC to resolve the issue without need for an opposed and briefed motion (*see* Ex. 20). As stated in Liquidia's opening brief, Liquidia filed this motion three business days after UTC indicated its intent to oppose.

## IV.    THE TIMING OF THIS APPEAL IS DRIVEN BY UTC'S DECISIONS AND TRIBUNAL DECISIONS FLOWING THEREFROM

Additionally, UTC's allegation that "the timing of this appeal is driven by Liquidia's strategic decisions, not by UTC's actions" is deliberately misleading. ECF No. 12 at 2. Below is the full context of how this case reached appeal at this time, as opposed to earlier, with each of UTC's actions (and consequences thereof) bolded.

On July 22, 2020, **UTC added the '793 patent** to the district court case after the case had already been pending. *See* ECF No. 10, Ex. 10. Liquidia answered by asserting invalidity of the '793 patent as a counterclaim. *See* Ex. 21 at ¶¶36-43. However, on August 26, 2020, **UTC filed a motion to dismiss Liquidia's '793 patent invalidity counterclaim based on assignor estoppel**. Ex. 22. On November 3, 2020, **the district court denied UTC's motion** to dismiss but indicated that assignor estoppel could be raised at a later stage of the case. Ex. 23.

5

Based on UTC's litigation strategy, Liquidia turned to the PTAB as a forum to assess invalidity, since assignor estoppel cannot be raised in an IPR proceeding. *Arista Networks, Inc. v. Cisco Sys., Inc.*, 908 F.3d 792, 804 (Fed. Cir. 2018) ("[A]ssignor estoppel has no place in IPR proceedings.").  Liquidia prepared its IPR petition within two months, during COVID and over the holidays, and filed its '793 IPR Petition on January 7, 2021, more than 6 months before Liquidia's statutory deadline to do so.  *See* Ex. 24 ('793 IPR Pet.) at 4.

And Liquidia was right to do so: **UTC continued to assert assignor estoppel** all the way through pre-trial briefing, including it in its pre-trial statement of law (*see* Ex. 25 at ¶¶136-140, 145), **only to "abandon[] those arguments"** (ECF No. 12 at 2) **mid-trial** with no notice to Liquidia other than to close its affirmative case at trial without addressing the issue.

While UTC contends here that Liquidia should have presented its obviousness arguments before the district court (ECF No. 12 at 2, 7, 8), UTC pursued IPR estoppel in the district court proceeding.  Expecting the '793 Final Written Decision ("FWD") before the district court's decision, **UTC contended in the Pre-Trial Order that IPR estoppel would apply to the '793 patent before issuance of the '793 FWD**.  Ex. 25 at ¶146.  During the pretrial conference, the district court indicated that it would wait for the PTAB decision and apply IPR estoppel even if Liquidia raised obviousness of the '793 patent at trial.  Ex. 26 (Pretrial Conference

Transcript) at 10-11 ("I have zero interest in racing the PTAB to a decision here. . . . [Y]ou [Liquidia] can put your case on. There's no guarantee that I will actually decide it. But, and to the extent you have, of course, non, you know, 112 or defenses or something else, you can obviously put them on because the PTAB won't decide because they're not barred and PTAB won't rule on those.").)  Following the district court's guidance, Liquidia pursued only written description and enablement invalidity theories with respect to the '793 patent at trial to avoid wasting the district court's and parties' time on obviousness arguments that the district court would eventually preclude due to IPR estoppel. 35 U.S.C. § 315(e)(2).[1]

Thus, far from the timing of this appeal being driven by Liquidia's strategic decisions, the IPR and subsequent appeal was driven by UTC's decision to assert the '793 patent after the district court case had started, to assert assignor estoppel through trial (only to abandon it at trial), and to assert IPR estoppel before the '793 FWD had even issued.  Now, despite invalidating the claims of the '793 patent at the PTAB, Liquidia faces an inequitable outcome precipitated by UTC's threat of an unfounded assignor estoppel defense—an order staying final FDA approval of YUTREPIA™ until 2027, when the belatedly issued and already invalidated '793 patent claims expire.  ECF No. 10, Ex. 5 at ¶ 4.

---

[1] The district court applied IPR estoppel to the '901 patent, indicating estoppel applies to both successful and unsuccessful IPRs.  Ex. 27 at 1-2.

## V.    THIS APPEAL IS NOT ROUTINE

Liquidia is not facing the same circumstance that "all losing Hatch-Waxman defendants face[.]"  ECF No. 12 at 1.  The '793 patent has been invalidated in a different tribunal, so the validity issues do not rise and fall with the infringement issues in one forum (the district court), which is usually the case with Hatch-Waxman litigation.  Liquidia is in the extraordinary, and uncommon, situation of being enjoined from obtaining final FDA approval solely based on a patent that has been invalidated.  *See* Fed. Cir. R. 27, Practice Notes (Motion to Expedite "is appropriate where the normal briefing and disposition schedule may adversely affect one of the parties, as in appeals involving preliminary or permanent injunctions . . . .").  Because of the unique nature of this appeal, and its impact on Liquidia's FDA approval, expedition is warranted.

## VI.    CIRCUMSTANCES HAVE CHANGED SINCE EXPEDITION REQUESTS IN RELATED APPEALS

UTC acknowledges that Liquidia filed a motion to expedite the district court and '901 appeals (which were consolidated at the time).  *See* ECF No. 12 at 1.  In opposing Liquidia's motion there, UTC actually argued that expedition did not make sense there because the '793 IPR was still making its way through the PTAB and to this Court.  Ex. 28 (Case No. 22-2217, ECF No. 14) at 3 ("Obviousness will come up, if at all, only in a potential future appeal from the PTAB's final written decision on the '793 Patent—which no party can even bring until the PTAB acts on UT's

rehearing request.").  Now that the PTAB's '793 FWD is on appeal here, UTC still does not want to seek expedited resolution, and instead maintain the status quo, which includes keeping YUTREPIA™ off the market.  And while UTC contends Liquidia did not expedite briefing in appeal No. 22-2217, Liquidia did, in fact, file its opening brief on 10/21/2022, **twenty-five** days before the original 11/15/2022 due date.

## VII.    EXPEDITION IS WARRANTED HERE

The invalid '793 patent is the sole basis enjoining an FDA-approved product from launching for what will be well over a year without expedition.  Now, the parties are at the last appeal—the delay of which has caused the above incongruous policy outcome.  Liquidia seeks to shorten the schedule by just 60 days (as UTC itself computed, *see* Ex. 20) to offset this effect.  Liquidia's motion is primarily based on how much longer it took for the PTAB's '793 FWD to become appealable here (delayed from July 19, 2022 to February 2, 2023), because of UTC's decision to unsuccessfully request rehearing and Precedential Opinion Panel ("POP") review.  The Federal Circuit has expressed significant frustration over the PTAB's delay in deciding such rehearing requests.  *See, e.g.*, Ex. 29, Transcription of Oral Argument, *BTG Int'l Ltd. v. Amneal Pharms. LLC*, No. 2019-1147 (Fed. Cir. Mar. 14, 2019) at 32:23-33:8 ("The Board issued all three IPRs in the final written decision in January of 2018. . . . I can think of [no] good reason the Board lollygagged and took 10 full

months before it issued its—the [re]hearing decisions in December of 2018."),
34:22-35:1 ("Wouldn't that seem to significantly undermine Congress' goal to have
an expeditious and fully resolved IPR proceeding within the PTO to avoid
unnecessary duplicative district court litigation?").

As for the merits of the PTAB's rehearing decision, UTC conveniently wants
the Court to ignore that the PTAB reaffirmed its original decision. *See* ECF No. 10,
Ex. 3; *cf.* ECF No. 12 at 8, 10-11. The context is substantive, thus Liquidia did not
provide detail in its Motion, but as this Court will see in the parties' full merits
briefing, the PTAB twice rejected UTC's argument that two abstracts presented to
thousands of conference attendees, published in well-known journals that were
indexed and catalogued in libraries worldwide, and cited by others in the field, were
not publicly available. The PTAB's rehearing decision did nothing but strengthen
the factual underpinnings leading to the PTAB's decision that the two abstracts
qualify as prior art.

While the law allows UTC to continue to exhaust all possible avenues or
reconsideration, rehearing and appeals, this Court has the discretion to curtail that
extended period of time by expediting briefing. Liquidia respectfully asks the Court
to do so here. The fact remains that the '793 patent has been invalid since July 19,
2022, and is still invalid now. Liquidia asks this Court to use the system levers
within its control to minimize the harmful policy effects of an invalid patent keeping

a life-saving drug off the market: Liquidia asks that the Court grant its motion to expedite.

Dated:  June 2, 2023                    Respectfully submitted,

                                        */s/ Sanya Sukduang*
                                        Sanya Sukduang
                                        Jonathan R. Davies
                                        COOLEY LLP
                                        1299 Pennsylvania Ave., NW
                                        Suite 700
                                        Washington, DC 20004
                                        Telephone: (202) 842-7800
                                        Facsimile:  (202) 842-7899

                                        Deepa Kannappan
                                        COOLEY LLP
                                        3175 Hanover Street
                                        Palo Alto, CA 94304
                                        Telephone: (650) 843-5000
                                        Facsimile:  (650) 849-7400

                                        *Counsel for Appellee*
                                        *Liquidia Technologies, Inc.*

## CERTIFICATE OF COMPLIANCE

The foregoing filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d) and 32(a) and has been prepared using a proportionally-spaced typeface and includes 2,495 words.


Dated:  June 2, 2023                    */s/  Sanya Sukduang*
                                        Sanya Sukduang
                                        Cooley LLP

                                        *Counsel for Appellee*
                                        *Liquidia Technologies, Inc.*

# LIST OF EXHIBITS[2]

| Ex. 1 | *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2021-00406, Paper 78, Final Written Decision (P.T.A.B. Jul. 19, 2022) |
|---|---|
| Ex. 2 | *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2021-00406, Paper 81, POP Review Denial (P.T.A.B. Oct. 26, 2022) |
| Ex. 3 | *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2021-00406, Paper 82, Rehearing Denial (P.T.A.B. Feb. 2, 2023) |
| Ex. 4 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, ECF No. 433, Trial Opinion (D. Del. Aug. 31, 2022) |
| Ex. 5 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, ECF No. 436, Final Judgment (D. Del. Sept. 9, 2022) |
| Ex. 6 | Tentative Approval Letter for New Drug Application No. 213005 (Nov. 5, 2021) |
| Ex. 7 | *Liquidia Techs., Inc. v. United Therapeutics Corp.*, IPR2020-00770, Paper 45, Final Written Decision (P.T.A.B. Oct. 8, 2021) |
| Ex. 8 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, ECF No. 278, Stipulation of Partial Judgment of Non-Infringement and Order (D. Del. Jan. 3, 2022) |
| Ex. 9 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, ECF No. 1, Complaint (D. Del. June 4, 2020) |
| Ex. 10 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, ECF No. 16, First Amended Complaint (D. Del. July 22, 2020) |
| Ex. 11 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, Nos. 22-2217, 23-1021, ECF No. 21, Liquidia's Opening Brief (Fed. Cir. Oct. 21, 2022) |

---

[2] Exhibits 1-12 were filed with Liquidia's Motion to Expedite Briefing and Oral Argument (ECF No. 10).

| Ex. 12 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 22-2217,23-1021, ECF No. 32, Liquidia's Reply Brief (Fed. Cir. Feb. 1, 2023) |
|---|---|
| Ex. 13 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, ECF No. 404, Bench Trial Transcript, Vol. III (D. Del. March 30, 2022) (excerpted) |
| Ex. 14 | Patient Testimonial on YUTREPIA™, dated Sep. 8, 2022, filed in *United Therapeutics Corp. v. Liquidia Techs., Inc.* (D. Del.), No. 20-755, ECF No. 439, Ex. Y |
| Ex. 15 | Patient Testimonial on YUTREPIA™, dated Sep. 9, 2022, filed in *United Therapeutics Corp. v. Liquidia Techs., Inc.* (D. Del.), No. 20-755, ECF No. 439, Ex. Q |
| Ex. 16 | Medical Provider (Registered Nurse) Testimonial on YUTREPIA™, dated Sep. 8, 2022, filed in *United Therapeutics Corp. v. Liquidia Techs., Inc.* (D. Del.), No. 20-755, ECF No. 439, Ex. Z |
| Ex. 17 | *Quality of Life (QoL) in Patients Receiving an Inhaled Dry Powder Treprostinil (LIQ861) in the INSPIRE Study* Trial Poster, filed in *United Therapeutics Corp. v. Liquidia Techs., Inc.* (D. Del.), No. 20-755, ECF No. 439, Ex. P |
| Ex. 18 | Nicholas S. Hill et al., *INSPIRE: Safety and tolerability of inhaled Yutrepia (treprostinil) in pulmonary arterial hypertension (PAH)*, 12 PULMONARY CIRCULATION e12119 (2022), filed in *United Therapeutics Corp. v. Liquidia Techs., Inc.* (D. Del.), No. 20-755, ECF No. 439, Ex. O |
| Ex. 19 | Morgan Stanley Research Report, United Therapeutics Corp., *Takeaways from management meeting* (May 25, 2023) |
| Ex. 20 | May 2023 email correspondence between counsel |
| Ex. 21 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, ECF No. 23, Defendant Liquidia Technologies Inc.'s Answer to First Amended Complaint and Counterclaims (D. Del. Aug. 5, 2020) |

| Ex. 22 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, ECF No. 29, Plaintiff United Therapeutics Corporation's Opening Brief in Support of its Motion to Dismiss Defendant's Counterclaims (D. Del. Aug. 26, 2020) |
|---|---|
| Ex. 23 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, ECF No. 45, Memorandum Order (D. Del. Nov. 3, 2020) |
| Ex. 24 | *Liquidia Technologies, Inc. v. United Therapeutics Corp.*, IPR2021-00406, Paper 2, Petition for *Inter Partes* Review (P.T.A.B. Jan. 7, 2021) |
| Ex. 25 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, ECF No. 365, Plaintiff United Therapeutics Corporation's Statement of Contested Issues of Law (D. Del. Mar. 18, 2022) (excerpted) |
| Ex. 26 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, ECF No. 367, Pretrial Conference (D. Del. Mar. 4, 2022) (excerpted) |
| Ex. 27 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, No. 20-755, ECF No. 335, Order on Motions in Limine (D. Del. Mar. 4, 2022) |
| Ex. 28 | *United Therapeutics Corp. v. Liquidia Techs., Inc.*, Nos. 22-2217, 23-1021, ECF No. 14, United Therapeutics Corp.'s Opposition to Liquidia's Motion to Expedite Briefing and Oral Argument (Fed. Cir. Oct. 4, 2022) |
| Ex. 29 | Transcription of Oral Argument, *BTG Int'l Ltd. v. Amneal Pharms. LLC*, No. 2019-1147 (Fed. Cir. Mar. 14, 2019) (excerpted) |

# Exhibit 13

1                   IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF DELAWARE

3

4    UNITED THERAPEUTICS CORPORATION,)
                                     )
5                     Plaintiff,     )
                                     ) C.A. No. 20-755-RGA-JLH
6    v.                              )
                                     ) Volume III
7    LIQUIDIA TECHNOLOGIES, INC.,    )
                                     )
8                     Defendant.     )

9
                                     J. Caleb Boggs Courthouse
10                                   844 North King Street
                                     Wilmington, Delaware
11
                                     Wednesday, March 30, 2022
12                                   8:30 a.m.
                                     Bench Trial
13

14   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15   APPEARANCES:

16

17             MORRIS NICHOLS ARSHT & TUNNELL LLP
               BY:  JACK B. BLUMENFELD, ESQUIRE
18             BY:  MICHAEL J. FLYNN, ESQUIRE
               BY:  SARAH E. SIMONETTI, ESQUIRE
19
                       -and-
20
               GOODWIN PROCTER LLP
21             BY:  WILLIAM C. JACKSON, ESQUIRE
               BY:  HUIYA WU, ESQUIRE
22             BY:  IAN B. BROOKS, ESQUIRE
               BY:  JOEL BROUSSARD, ESQUIRE
23             BY:  HARRISON GUNN, ESQUIRE
               BY:  ERIC LEVI, ESQUIRE
24

25                     - and -

1    APPEARANCES CONTINUED:

2

3              McDERMOTT WILL & EMERY LLP
               BY:  DOUGLAS H. CARSTEN, ESQUIRE
4              BY:  ADAM W. BURROWBRIDGE, ESQUIRE
               BY:  KATHERINE PAPPAS, ESQUIRE
5              BY:  TIMOTHY M. DUNKER, ESQUIRE
               BY:  ART P. DYKHUIS, ESQUIRE
6              BY:  AMY MAHAN, ESQUIRE
               BY:  JOSHUA REVILLA, ESQUIRE
7              BY:  JIAXIAO ZHANG, ESQUIRE

8                                    For the Plaintiffs

9

10             SHAW KELLER LLP
               BY:  KAREN E. KELLER, ESQUIRE
11             BY:  NATHAN R. HOESCHEN, ESQUIRE
               BY:  EMILY DiBENEDETTO, ESQUIRE
12
                        -and-
13
               COOLEY LLP
14             BY:  SANYA SUKDUANG, ESQUIRE
               BY:  ADAM M. PIVOVAR, ESQUIRE
15             BY:  BRITTANY CAZAKOFF, ESQUIRE
               BY:  DOUGLAS W. CHEEK, ESQUIRE
16             BY:  JONATHAN R. DAVIES, ESQUIRE
               BY:  IVOR ELRIFI, ESQUIRE
17             BY:  DEEPA KANNAPPAN, ESQUIRE
               BY:  LAUREN KRICKL, ESQUIRE
18             BY:  ERIK B. MILCH, ESQUIRE
               BY:  KYUNG TAECK MINN, ESQUIRE
19
                                     For the Defendants
20

             ***  PROCEEDINGS  ***
21

22             DEPUTY CLERK:  All rise.  Court is now in

23   session.  The Honorable Richard G. Andrews presiding.

24             THE COURT:  All right.  Good morning, please be

25   seated.

10:44:05 1  efficacy data to support the approval of Liquidia's product;

10:44:08 2  right?

10:44:09 3  A.    Yes.

10:44:10 4  Q.    And you agree that TYVASO and Liquidia and LIQ861

10:44:15 5  involve the same molecule; right?

10:44:17 6  A.    They do.

10:44:18 7  Q.    And you would agree with me that you would be

10:44:19 8  surprised if LIQ 861 was significantly different than TYVASO

10:44:24 9  for the reduction of pulmonary arterial pressure and

10:44:27 10  pulmonary vascular resistance; correct?

10:44:30 11  A.    I would expect them to be quite similar, yeah.

10:44:32 12  Q.    And you would agree -- and you would agree that you

10:44:36 13  would be surprise by any differences because the molecules

10:44:39 14  are the same; right?

10:44:40 15  A.    Well, the formulation is quite different.  And TYVASO

10:44:48 16  was liquid.  The LIQ861 is a dry-powder, and exactly how

10:44:55 17  they behave might be different.  This is why this INSPIRE

10:45:00 18  study was done, to establish, especially for the FDA, that

10:45:06 19  there was safety and tolerability of this different

10:45:08 20  formulation.

10:45:09 21  Q.    Would you agree with me that you would be surprised

10:45:11 22  -- strike that.

10:45:12 23        You agree with me that you would be surprised by

10:45:15 24  any differences because the molecules of TYVASO and LIQ are

10:45:20 25  the same; right?

Gonda - Direct

10:50:05 1    Q.    Can we bring up DDX 5.1, please.  Is this a

10:50:08 2    demonstrative you prepared?

10:50:09 3    A.    Yes, it is.

10:50:10 4    Q.    So can you just describe what, generally, this

10:50:13 5    demonstrative shows?

10:50:14 6    A.    So, this demonstrative shows the four fundamental

10:50:20 7    types of inhaled devices and formulations.  So the first one

10:50:27 8    is a nebulizer, which is a device that they take

10:50:33 9    formulations of the typically water which are placed in the

10:50:37 10   nebulizer, and the power to form the aerosol comes from

10:50:40 11   compressed air from a compressed air cylinder composition

10:50:46 12   similar to the one on the top.  And that energy is used to

10:50:50 13   disperse the liquid into fine droplets and push the aerosol

10:50:55 14   out of the device into the mouthpiece from which the patient

10:50:58 15   is inhaling.

10:51:01 16   Q.    And with respect to the nebulizer and the liquid

10:51:05 17   formulation on the top left, does TYVASO use a nebulizer?

10:51:09 18   A.    Yes, TYVASO uses a nebulizer.

10:51:13 19   Q.    On the top right, you have pressurized metered dose

10:51:17 20   inhaler.  What kind of -- can you describe how a pressurized

10:51:20 21   metered dose inhaler works?

10:51:22 22   A.    Sure.  So the energy to get the aerosol out of the

10:51:28 23   device and disperse it into small particles comes from the

10:51:32 24   compressed air which comes liquified inside the cartridge

10:51:36 25   that goes into the device and then the patient actuates this

10:51:41 1    device.  The compressed air will push the dose out of the

10:51:45 2    device, and it will also disperse the energy, disperse it

10:51:50 3    into small droplets that will be inhaled by the patient.

10:51:53 4    Q.    What type of formulation is used within a pressurized

10:51:57 5    metered-dose inhaler.

10:51:58 6    A.    It's a liquid.

10:51:59 7    Q.    Okay.  And is the, like, a typical asthma inhaler an

10:52:03 8    example of when a pressurized metered-dose inhaler would be?

10:52:07 9    A.    Yes, a typical asthma inhaler would be a typical

10:52:11 10   device.

10:52:11 11   Q.    On the bottom left side, have you a soft mist

10:52:14 12   inhaler.  Could you describe how that soft mist inhaler

10:52:16 13   works.

10:52:17 14   A.    Yes, I can.  So the energy for that device comes

10:52:22 15   typically from a compressed spring, and when the patient

10:52:27 16   actuates the device, the spring will expand to push a liquid

10:52:31 17   typically against a water solution of the drug.  So through

10:52:35 18   some form orifice which will form the fine droplets, and the

10:52:39 19   energy of that will also push the aerosol out of the device

10:52:42 20   and then the patient will inhale the aerosol.

10:52:45 21   Q.    And what type of formulation is used within a soft

10:52:49 22   mist inhaler?

10:52:50 23   A.    It is typically an aqueous solution.  It's a liquid

10:52:54 24   of the drug in water.

10:52:57 25   Q.    And then the last device on the right-hand side, I

10:53:00 1    know we've talked about that earlier, but in the case, what

10:53:03 2    is a dry-powder inhaler and how does that work?

10:53:06 3    A.      So, a dry-powder inhaler is quite different in at

10:53:11 4    least two respects from the other inhalers.  It uses a

10:53:16 5    dry-powder formulation.  It doesn't use the liquids.  And

10:53:19 6    also the energy to get the dose out of the inhaler and

10:53:24 7    disperse it into small particles that would be suitable for

10:53:28 8    inhalation comes from the patient's ability to -- from the

10:53:30 9    energy of the patients, the muscles in the lungs to create

10:53:35 10   the air flow that will then get the dose out of the device

10:53:39 11   and disperse into particles of small size.

10:53:42 12   Q.      And again, what type of formulation was used in the

10:53:45 13   dry-powder inhaler?

10:53:46 14   A.      It's a dry-powder formulation.

10:53:49 15   Q.      Could you use a liquid in a dry-powder formulation?

10:53:52 16           Excuse me.  Can you use a liquid formulation in

10:53:54 17   a dry-powder inhaler?

10:53:55 18   A.      No, you could not.

10:53:57 19   Q.      Could you use a powder formulation in a nebulizer?

10:54:00 20   A.      No, you could not.

10:54:03 21   Q.      Would it be fair to say that the dry-powder inhaler

10:54:06 22   is the only inhalation device that uses a patient's own

10:54:11 23   power to bring the drug into the body?

10:54:14 24   A.      As far as I know, it's the only device of that

10:54:20 25   nature, yes.

10:54:20  1    Q.    Are you aware of any papers that discuss the energy

10:54:26  2    needed by a patient in order to use a dry-powder inhaler?

10:54:30  3    A.    Yes, I am.

10:54:32  4    Q.    Could we turn to DTX 268, please.  And is this one of

10:54:39  5    the publications you considered?

10:54:40  6    A.    Yes, it is.

10:54:42  7    Q.    And what's the title of the publication?

10:54:43  8    A.    It's called Medical Aerosol Inhalers:  Past, present

10:54:47  9    and future.

10:54:48 10    Q.    Okay.  And who is the author?

10:54:50 11    A.    It's A. R. Clark.

10:54:52 12    Q.    And is he is one of UT's expert in his this case?

10:54:55 13    A.    Yes, I believe he is.

10:54:57 14    Q.    And when was this paper published?

10:54:59 15    A.    It was published in 1995.

10:55:02 16              MR. SUKDUANG:  Your Honor I'd like to enter DTX

10:55:04 17    268 into evidence.

10:55:05 18              MR. CARSTEN:  No objection, Your Honor.

10:55:06 19              THE COURT:  Admitted without objection.

10:55:07 20              (DTX Exhibit No. 268 was admitted into

10:55:08 21    evidence.)

10:55:08 22    BY MR. SUKDUANG:

10:55:08 23    Q.    Could we -- could you turn to Page 12 of 19 for me.

10:55:11 24    And there's a paragraph that begins paradoxically.

10:55:15 25              Did you consider this paragraph?

10:55:17 1   A.    Yes.

10:55:17 2   Q.    And what does this passage state?

10:55:20 3   A.    This was a very profound statement that the world

10:55:24 4   follows.  And it says in 1995, all currently available DPIs

10:55:29 5   utilize the energy in the patient's inspiration as the power

10:55:32 6   source for aerosol generation.  Therefore, their delivery

10:55:36 7   and dispersion performance and, hence, the dose which they

10:55:40 8   deliver to the lung is affected by a patient's ability to

10:55:43 9   inhale at a suitably high flow rate.

10:55:46 10  Q.    What does "inspiration" mean in the context of

10:55:50 11  dry-powder inhalers?

10:55:51 12  A.    Well, as I mentioned, in dry-powder inhalers, it's

10:55:55 13  the patient's inspiration is the inhalation through the

10:56:00 14  dry-powder inhaler.  It's the ability to have adequate

10:56:03 15  inspiration for it at any specific volume that is required

10:56:07 16  for dry-powder inhalers.

10:56:09 17  Q.    So, in laymen's terms what is this -- what is the

10:56:12 18  Clark paper telling persons of ordinary skill in the art to

10:56:16 19  do with respect to dry-powder inhalers?

10:56:19 20  A.    Well, it says that you have to pick the device that

10:56:23 21  your target population of patients, in this case, pulmonary

10:56:27 22  arterial hypertension patients, a device and test it whether

10:56:30 23  the patients can use it, how can they use it, and whether

10:56:33 24  it's going to be the right combination of the patient's

10:56:36 25  disease with the device and the formulation to get the

Gonda - Direct

10:56:40 1   adequate dose and the adequate particle size distribution.

10:56:45 2           Sorry.  If you can't follow me.  Just --

10:56:48 3   Q.    She'll let you know.  She's fantastic.  If she can't

10:56:50 4   get you, she'll -- she'll tell you, Dr. Gonda.

10:56:54 5           So let's turn to the drugs -- the drug that's

10:56:57 6   involved in this case, Treprostinil.  Are you aware that

10:56:59 7   Treprostinil is used in Liquidia's LIQ861 product?

10:57:03 8   A.    Yes, I am.

10:57:05 9   Q.    Are there any inhaled Treprostinil products in the

10:57:08 10  market?  Inhaled Treprostinil products --

10:57:11 11  A.    Yes.

10:57:11 12  Q.    -- in the market?

10:57:12 13          And what is that?

10:57:12 14  A.    It's TYVASO.

10:57:14 15  Q.    And who markets TYVASO?

10:57:16 16  A.    United Therapeutics.

10:57:20 17  Q.    Today, are there any dry-powder formulations of

10:57:23 18  Treprostinil on the market?

10:57:25 19  A.    No.

10:57:27 20  Q.    Are you are you aware of any companies that are

10:57:29 21  develop developing dry-powder inhalers?

10:57:31 22  A.    Yes, I am.

10:57:34 23  Q.    And what are those companies?

10:57:35 24  A.    They are Mannkind and Liquidia, Mannkind and

10:57:39 25  Liquidia.

Gonda - Direct

10:57:39  1   Q.     With respect to Mannkind, how do they make their

10:57:43  2   dry-powder formulation of Treprostinil?

10:57:45  3   A.     So, MannKind takes Treprostinil and they use the

10:57:51  4   proprietary technology -- in fact, two proprietary

10:57:54  5   technologies.  They use the Technosphere, which a propriety

10:57:59  6   technology, to make particles suitable for inhalation.  And

10:58:04  7   then they use the proprietary inhaler called Dreamboat which

10:58:08  8   they combine together to form the product of Treprostinil

10:58:13  9   dry-powder inhaler.

10:58:15 10   Q.     Does Liquidia use a proprietary process to make their

10:58:19 11   dry-powder formulation?

10:58:20 12   A.     Yes.  Liquidia uses a proprietary process which is

10:58:25 13   called PRINT, and in the process, they take Treprostinil.

10:58:29 14   They take a particular type of salt, Treprostinil salt.

10:58:33 15   They dissolve the salt.  They form the solution of that salt

10:58:38 16   with other materials.  Then they power that solution into

10:58:43 17   the PRINT technology equipment.  They evaporate the solution

10:58:46 18   to form the small particles, and then they dry the particles

10:58:50 19   and store them in appropriate conditions.

10:58:54 20   Q.     Do you understand that Liquidia filed a new drug

10:58:56 21   application for their Liquidia LIQ861 product?

10:59:00 22   A.     Yes, I do.

10:59:01 23   Q.     Have you seen a press release relating to that?

10:59:04 24   A.     Yes, I have.

10:59:05 25   Q.     Can we bring up DTX 369, please.

1            I hereby certify the foregoing is a true and

2    accurate transcript from my stenographic notes in the

3    proceeding.        /s/ Heather M. Triozzi
                        Certified Merit and Real-Time Reporter
4                        U.S. District Court

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 14

**From:** Shirley Craig <Phnomore@att.net>
**Sent:** Thursday, September 8, 2022 1:47 PM
**To:** Scott Moomaw <Scott.Moomaw@liquidia.com>; Shirley Craig <Phnomore@att.net>
**Subject:** Yutrepia

---

**EXTERNAL MESSAGE**

---

TO WHOM THIS MAY CONCERN:

My name is Shirley Craig: I was diagnosed with Primary Pulmonary Hypertension secondary to Eisenmenger's Syndrome  December 1990.  There were NO medications at that time to treat it so I lived on oxygen for the next 18 years until I was able to receive a heart/lung transplant.

 But after nine years, I entered a study and the medication really helped to get me to transplant.  I was put on other medications along the way as they were developed. It was scary knowing there was not much out there to help me-- and there still aren't compared to many diseases even today.

So, having a known medication-- **Yutrepia**--a dry powder inhaled Treprostinil that is simple, approved, and easy to use (made by Liquidia) needs to be made available to patients now.

'PHers' need every medication to be able to 'live' a quality life.  We have very few and not every one works for every patient.

Respectfully,
Shirley J Craig
phnomore@att.net
832-418-1405

Houston PH Support Group Leader

# EXHIBIT 15

From: Melly Meadows <mellymeadows@aol.com>
Sent: Friday, September 9, 2022 1:28 AM
To: Scott Moomaw <Scott.Moomaw@liquidia.com>
Subject: Yutrepia for PAH

EXTERNAL MESSAGE


To Whom it may Concern,

I have Pulmonary Arterial Hypertension. I live in fear of the unknown and the harsh reality that I have a disease that has a deadly prognosis. I don't want to die! I want to be alive and yet I am afraid of suffocating slowly. Pause for a moment please and really think about this … I don't know when my breath will end.

Pulmonary Arterial Hypertension (PAH) is a disease that you can not imagine how it must feel. You can't image what it is like to feel like you can't breathe! This disease is not as well understood as breast cancer or even lupus (which I also have). This diagnosis and disease process are literally like sucking the air out of a room and leaving the patient with no escape.

I was first diagnosed with PAH in November of 2006. I was newly married and wanted to have children. However, when I was diagnosed with Pulmonary Arterial Hypertension, I was told that most people with this diagnosis only live about five years. That meant I would never be a mother. I would never have a child. For five years, I stopped living and I waited to die. Every day I wondered what my death was going to be like and how intense the suffering and pain would be. Newer drugs and treatments were coming on the market and after five years, I was still alive! I realized then that I had just lost five years of life because I feared death. I had to learn how to live again and how to face life with courage. And that is what I am doing. My story is on YouTube: "Ballerina with Lupus".

There is a new drug that is proven to help treat PAH, called Yutrepia. It is more portable than the other drugs that are similar, and the dosing of the medication is more predictable and easier to adjust. However, this drug treatment is being pushed to the sideline because of patent litigation. This means that lawyers are fighting over what drug is made available and when, to people like me with a deadly disease.

Let me put this into perspective. The new drug, Yutrepia, is more convenient than the other "like" drugs and it has the potential to treat people with PAH as well as other lung diseases. There are approximately 40,000 people in the U.S. with PAH. The average three-year death rate of this disease is 21%. This means that in the three years that Yutrepia will have been caught up in litigation, 8,400 people will die from PAH. That is over eight thousand individual people who have a story like mine who will never have been given the option or the choice of a life-changing medication because of bureaucracy. I respect patent laws and intellectual property. However, when it comes down to basic life and death of people with a fatal disease, shouldn't the right to have ALL treatment options be made available? And shouldn't quality of life and healthCARE take precedence over petty litigation?

On behalf of the people with PAH, our families, and our future, I implore that you please grant approval of the drug Yutrepia. We, the patients, need treatment options because this gives us hope!


Most Sincerely,
Melly Meadows McCutcheon

# EXHIBIT 16

**From:** Tracey Considine <Tracey.Considine@sphp.com>
**Sent:** Thursday, September 8, 2022 3:07 PM
**To:** Scott Moomaw <Scott.Moomaw@liquidia.com>
**Subject:** Yutrepia

You don't often get email from tracey.considine@sphp.com. Learn why this is important

**EXTERNAL MESSAGE**

Hi, my name is Tracey Considine. I am an Registered Nurse in the Albany, New York Tri-city area that has been treating pts with PH for over 20 years. I also the PH Support Group Leader in my area, and Nurse Liaison for patients. I would appreciate Yutrepia getting approved, and be available for patients, as the more treatment options available, the more it brings HOPE to these  patients that are dealing with this horrible disease.
Thank You,
Tracey Considine

Confidentiality Notice:
This e-mail, including any attachments is the property of Trinity Health and is intended for the sole use of the intended recipient(s). It may contain information that is privileged and confidential.  Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please delete this message, and reply to the sender regarding the error in a separate email.

# EXHIBIT 17



**LIQ861 Dry-Powder Formulation**

LIQ861 particles are 1.3 µm in size with trefoil shape

# Quality of Life (QoL) in PAH Patients Receiving an Inhaled Dry Powder Treprostinil (LIQ861) in the INSPIRE Study

Martha Kingman[a] and Savan Patel[b]

[a]University of Texas Southwestern Medical Center at Dallas, Dallas, TX; [b]Liquidia Technologies, Morrisville, NC.



**RS00 Model 8 Dry-Powder Inhaler**

Compact, disposable inhaler previously approved by the FDA and EMEA

## Background[1,3]

- Health-related QoL is severely impaired in patients with PAH, with better quality-of-life outcomes reported for patients administered therapies that improve functional outcomes, such as exercise capacity[1]
- Liquidia has developed LIQ861, a dry-powder formulation of treprostinil utilizing PRINT® Technology, designed to enhance deep-lung delivery and enable QID delivery of doses in 2 breaths per capsule via a convenient, palm-sized dry-powder inhaler (DPI). PRINT® Technology produces drug particles that are precise in size, shape, and composition[1]

### Minnesota Living With Heart Failure® Questionnaire[3]

- The MLHFQ is a HRQoL questionnaire widely used by patients with HF. The MLHFQ is an instrument used to investigate HRQoL and evaluate patients' daily lives and well-being, which cannot be obtained directly from clinical endpoints
- The MLHFQ contains questions to determine how heart failure affects patients' well-being and other standard physical and social functions. The total score of the MLHFQ comprises scores provided from two dimensions, physical and emotional
- Patients respond to the MLHFQ on a scale from 0 (No) to 5 (Very Much) whether heart failure prevented them from living as they wanted during the past 4 weeks across a range of situations
- The 21 situations surveyed include:
  - Causing swelling in your ankles or legs
  - Making you sit or lie down to rest during the day
  - Making your relating to or doing things with your friends or family difficult
- Scan the QR code below to view the MLHFQ

©1986 Regents of the University of Minnesota, All rights reserved. Do not copy or reproduce without permission. LIVING WITH HEART FAILURE® is a registered trademark of the Regents of the University of Minnesota.



## INSPIRE Study Design[1,2]

- The INSPIRE trial was a Phase 3, open-label, multicenter trial (LTI-301) that enrolled patients with PAH ≥18 years of age who transitioned to LIQ861 from nebulized treprostinil or added LIQ861 to ≤2 non-prostacyclin oral therapies
- The MLWHFQ was administered at baseline, 2 months, and 4 months during the trial

| Treatment Phase for Primary Endpoint Was Followed by Evaluation for Safety and Tolerability | |
|---|---|
| Subjects Overview | • WHO Group I (PAH) NYHA Class II, III, and IV; N≥100<br>• Divided into 2 groups |
| Prostanoid-Naïve (PCY-Naïve) ≤2 non-PCY oral PAH Rx | • Initiate LIQ861 26.5 µg capsule strength dose<br>• Increase in 26.5 µg increments weekly to tolerance and symptom relief |
| Transitions from Tyvaso® Stable doses ≥3 mo. | • Initiate with comparable dose of LIQ861<br>• Titrate in 26.5 µg incremental doses to tolerance and symptom relief |
| Primary Objective | • Incidence of AEs and SAEs |

| Demographics and Baseline Characteristics | | Transitions (n=55) | PCY Naïve (n=66) | Overall (n=121) |
|---|---|---|---|---|
| Sex | Female | 47 (85.5%) | 52 (78.8%) | 99 (81.8%) |
| Age (years) | Mean ± SD | 53 ± 14.1 | 55 ± 14.6 | 54 ± 14.3 |
| BMI (kg/m²) | Mean ± SD | 30.07 ± 7.9 | 29.31 ± 7.8 | 29.66 ± 7.8 |
| NYHA Functional Class at Screening | Class II | 43 (78.2%) | 37 (56.1%) | 80 (66.1%) |
| | Class III | 12 (21.8%) | 29 (43.9%) | 41 (33.9%) |
| PAH Duration (years) | Mean ± SD | 7.25 ± 5.1 | 4.71 ± 5.1 | 5.87 ± 5.2 |
| PAH Therapy at Screening | PDE5i alone | 8 (14.5%) | 12 (18.2%) | 20 (16.5%) |
| | PGI2 alone | 6 (10.9%) | - | 6 (10.9%) |
| | ERA alone | 5 (9.1%) | 3 (4.5%) | 8 (6.6%) |
| | sGC alone | - | 2 (3%) | 2 (3%) |
| | ERA + PDE5i | 35 (63.6%) | 46 (69.7%) | 81 (66.9%) |
| | ERA + sGC | 1 (1.8%) | 3 (4.5%) | 4 (3.3%) |

## Results[1]

### All Domains From MLWHFQ Improved at Month 4
Clinically meaningful improvement is defined as a >5 point reduction

#### Transitions (n=49)



Emotional Dimension
CFB=-2.4, P<0.001



Physical Dimension
CFB=-5, P<0.001



Total Score[a]
CFB=-11.4, P<0.001

#### PCY-Naïve (n=53)



Emotional Dimension
CFB=-2.9, P<0.001



Physical Dimension
CFB=-4.1, P=0.003



Total Score[a]
CFB=-9.1, P<0.001

- By month 4 (N=104), there was a clinically meaningful improvement[a] in the total MLWHFQ score for all patients from baseline. Overall, the mean score of 36.0 at baseline decreased to 25.8
- At month 4 (N=104), both physical and emotional dimension scores decreased from 16.2 to 11.8 and 7.8 to 5.2, respectively. Improvements were seen in both the Transition and Naïve patient groups

## Conclusions[1]

### Clinical Implication

Treatment with LIQ861 may help improve HRQoL, which has been shown to be impaired in PAH patients.



[a]Clinically meaningful improvement is defined as a >5 point reduction.

1. Liquidia Technologies. Data on file. 2. Investigation of the Safety and Pharmacology of Dry Powder Inhalation of Treprostinil (INSPIRE). ClinicalTrials.gov. Accessed May 6, 2022. https://clinicaltrials.gov/ct2/show/NCT03399604. 3. Rector TS, Kubo SH, Cohn JN. Patients' Self-Assessment of Their Congestive Heart Failure: Content, Reliability and Validity of a New Measure, the Minnesota Living With Heart Failure Questionnaire. Heart Failure 1987;3:198-209

AE, adverse event; BMI, body mass index; CFB, change from baseline; EMEA, European Medicines Evolution Agency; ERA, endothelin-1 receptor antagonist; FDA, Food and Drug Administration; HF, heart failure; HRQoL, health-related quality of life; MLWHFQ, Minnesota Living With Heart Failure Questionnaire; NYHA, New York Heart Association; PAH, pulmonary arterial hypertension; PCY naïve, prostanoid naïve; PDE5i, phosphodiesterase 5 inhibitor; PGI2, prostaglandin; PK, pharmacokinetic; QID, 4 times daily; Rx, prescription; SAE, serious adverse event; SD, standard deviation; sGC, soluble guanylate cyclase. © 2022 Liquidia Technologies, Inc. Tyvaso® is a registered trademark of United Therapeutics Corp.

# EXHIBIT 18

DOI: 10.1002/pul2.12119

RESEARCH ARTICLE



# INSPIRE: Safety and tolerability of inhaled Yutrepia (treprostinil) in pulmonary arterial hypertension (PAH)

**Nicholas S. Hill**[1] | **Jeremy P. Feldman**[2] | **Sandeep Sahay**[3] |
**Raymond L. Benza**[4] | **Ioana R. Preston**[1] | **David Badesch**[5] | **Robert P. Frantz**[6] |
**Savan Patel**[7] | **Ashley Galloway**[7] | **Todd M. Bull**[5] | the INSPIRE study investigators

[1]Tufts Medical Center, Boston, Massachusetts, USA

[2]Arizona Pulmonary Specialists, Ltd, Phoenix, Arizona, USA

[3]Weill Cornell Medicine, Houston Methodist Lung Center, Houston Methodist, Houston, Texas, USA

[4]The Ohio State University, Columbus, Ohio, USA

[5]Anschutz Medical Campus, University of Colorado Denver, Aurora, Colorado, USA

[6]Mayo Clinic, Rochester, Minnesota, USA

[7]Liquidia Technologies, Morrisville, North Carolina, USA

**Correspondence**
Nicholas S. Hill, Tufts Medical Center, Pulmonary Division, 800 Washington St, Suite 257, Boston, MA 02111, USA.
Email: nhill@tuftsmedicalcenter.org

**Funding information**
Liquidia Technologies INC.

## Abstract

The INSPIRE trial was a Phase 3, open-label, multicenter trial (LTI-301) that enrolled patients with pulmonary arterial hypertension (PAH) ≥ 18 years of age who transitioned to Yutrepia from nebulized treprostinil (Transition) or added Yutrepia to prostacyclin naïve patients on ≤2 nonprostacyclin oral therapies. The objectives of the trial were to evaluate the safety and tolerability of Yutrepia (dry-powder formulation of treprostinil) in patients with PAH. The primary safety measures were the incidence of adverse events (AEs) and serious AEs. Exploratory efficacy measures were also assessed during the trial. Transition patients initiated Yutrepia at a dose comparable to their nebulized treprostinil dose while prostacyclin naïve patients received 26.5-mcg QID; up-titration in 26.5-mcg increments was permitted for both groups. A total of 121 patients were enrolled, of which 29 patients discontinued from the trial, with the most common reason being AEs. Eighty percent of the Transition group and 96% of the prostacyclin naïve group titrated to a dose ≥79.5 mcg QID at Day 360, respectively, with one patient achieving a dose of 212-mcg QID. The most common AEs were cough, headache, upper respiratory tract infection, dyspnea, dizziness, throat irritation, diarrhea, chest discomfort, fatigue, and nasopharyngitis. Most of these events were considered treatment-related though mild to moderate in severity and expected for prostacyclin therapy administered by inhalation. In an evaluation of exploratory efficacy measures, patients remained stable or improved over the 1 year of treatment. Yutrepia was found to be a convenient, safe, and well-tolerated inhaled prostacyclin treatment option for PAH patients.

**KEYWORDS**
combination therapy, dry-powder inhaler, prostacyclin, pulmonary arterial hypertension, treprostinil

This is an open access article under the terms of the Creative Commons Attribution-NonCommercial License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited and is not used for commercial purposes.
© 2022 The Authors. *Pulmonary Circulation* published by John Wiley & Sons Ltd on behalf of Pulmonary Vascular Research Institute.

# INTRODUCTION

Prostacyclin therapy has long been considered a mainstay for the treatment of mid- and late-stage PAH by virtue of its vasodilatory, antiproliferative, antithrombotic, and anti-inflammatory effects.[1–3] Currently, approved prostacyclins can be delivered by the intravenous,[4,5] subcutaneous,[4] inhaled,[6,7] or oral[8] routes. However, many patients fail to receive optimal prostacyclin therapy to help them achieve and maintain low-risk status.[9–11] Only 34.1% of patients enrolled in the REVEAL Registry™ received a prostacyclin analog,[12] and only 56% of patients with a PAH-related death were treated with intravenous prostacyclin before death.[9]

Clinical challenges associated with up-titration, side effects, and the risks associated with different routes of administration are factors that limit the use of prostacyclin therapy.[13–18] The inhaled route offers an advantage of direct delivery into the airways and nearby tissues and cells thereby increasing local drug concentrations and minimizing systemic toxicity.[19–22] However, inhaled prostacyclins are subject to dosing errors due to variations in breathing patterns, have up-titration ceilings that may limit efficacy, and require frequent administration using multiple breaths delivered by cumbersome devices, all of which impose a significant burden on patients and may contribute to treatment nonadherence or discontinuation.[23]

Yutrepia is a novel, inhaled, dry-powder formulation of treprostinil designed using the proprietary PRINT® technology that enables the development of drug particles that are precise and uniform in size (1.5 microns), shape (trefoil), and composition (Supporting Information: Figure S1). Particles are engineered to achieve optimal aerosolization and deposition in the lungs. Yutrepia is dosed four times daily (QID), delivering treprostinil doses in 2 breaths per capsule via a convenient, dry-powder inhaler, the Plastiape RS00 Model 8 device (Supporting Information: Figure S2). A Phase 1 trial (LTI-102) demonstrated that 79.5 mcg dose of Yutrepia resulted in similar systemic exposure to treprostinil as seen with nine breaths of treprostinil inhalation solution.[24] The absorption of Yutrepia is rapid, with a median Tmax of 0.18 to 0.31 h across all dose levels studied (LTI-101). Treprostinil plasma concentrations dropped below the limit of quantification in cohorts with doses up to 75 mcg by 3.5 h postdose, and by 6 h postdose in higher dose cohorts (up to 150 mcg).[25]

The present Phase 3 trial (Investigation of the Safety and Pharmacology of Dry Powder Inhalation of Treprostinil [INSPIRE], LTI-301) was performed in consultation with the Federal Drug Administration to evaluate the safety and tolerability of Yutrepia in PAH patients who were transitioned from a stable dose of nebulized treprostinil or were receiving no more than two approved background oral PAH therapies. Patients enrolled in the INSPIRE trial were allowed to roll over into an open-label safety extension trial at varying times, (LTI-302) between 8 and 18 months after enrolling into the LTI-301 trial. This publication reports outcomes through the end of the INSPIRE Phase 3 study with a mean treatment duration of approximately 1 year.

# METHODS

## Study design

The INSPIRE study was a Phase 3, open-label, multicenter trial (https://clinicaltrials.gov/ct2/show/NCT03399604; NCT03399604) conducted to support the New Drug Application submission for Yutrepia under section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act. The study protocol was approved by the institutional review board or ethics committee at each participating site. Liquidia Technologies performed data collection, management, and analysis according to a prespecified statistical analysis plan. Additional details about the study design can be found in the Supporting Information.

## Study eligibility

Eligible patients were ≥18 years of age, World Health Organization (WHO) Group 1 PAH classified and receiving stable doses for ≥3 months of nebulized treprostinil (Transition) or two or fewer nonprostacyclin oral therapies (Prostacyclin naïve). Additional inclusion criteria were New York Heart Association (NYHA) Functional Class (FC) II–IV, 6-min walk distance (6MWD) ≥ 150 m, forced expiratory volume in 1 s ($FEV_1$) ≥ 60%, and $FEV_1$/forced vital capacity ratio ≥60%. Key exclusion criteria were WHO Groups 2–5 pulmonary hypertension or Group 1 porto-pulmonary hypertension or PAH associated with schistosomiasis; current treatment with an oral or intravenous prostacyclin analog or agonist; hemodynamically significant left-sided heart disease; and recent initiation of a new PAH therapy. All patients provided written informed consent. For full Inclusion and Exclusion Criteria, please see Supporting Information.

## Study procedures

Patients in both groups were trained on the proper use of the RS00 Model 8 dry-powder inhaler device (Plastiape

S.p.A.) and received their first dose of Yutrepia at the baseline visit. The initial dose for Transition patients was comparable to their prescribed dose of nebulized treprostinil; 85% of patients had been prescribed nine or more breaths of nebulized treprostinil (Supporting Information: Table S1). Prostacyclin naïve patients initiated Yutrepia at 26.5 mcg QID. Up-titration in 26.5-mcg weekly increments to a maximum of 212 mcg QID in both groups was allowed.

Scheduled visits occurred at screening, baseline (Day 1), Week 2, Month 1, Month 2, Month 4, Month 8, and Month 12. Adverse events (AEs) and serious adverse events (SAEs) were recorded throughout the treatment period, with continued assessment every 4 months beginning at Month 6 until study termination. Among patients who discontinued study participation, follow-up visits occurred 4 months following the last dose of Yutrepia or until all AEs resolved or stabilized.

## Outcome measures

The primary safety measures evaluated the incidence of AEs and SAEs during the trial. Additional safety measures evaluated included the incidence of drug/device-related AEs, clinical laboratory results, physical exam findings, and vital signs. Exploratory efficacy measures assessed during the trial included changes from baseline in 6MWD, NYHA FC, N-terminal pro-B-type natriuretic peptide (NT-proBNP) levels, Minnesota Living with Heart Failure Questionnaire (MLHFQ) score, and risk assessment based on 6MWD, FC, and NT-proBNP.[26] An additional exploratory endpoint for Transition only was patient-reported satisfaction with the Yutrepia inhaler device compared to the nebulized treprostinil inhalation system.

## Statistical analysis

A target of 130 patients was planned to be enrolled to ensure that at least 100 patients completed 2 months of therapy for assessment of safety endpoints. The primary safety measure analysis summarized the frequency, severity, and relatedness of all AEs and SAEs. The study was not designed or powered to evaluate a specific efficacy-related hypothesis. Change from baseline in 6MWD, NYHA FC, NT-proBNP, MLHFQ total and dimension scores, and PAH risk score was summarized for each group at visits where these tests were performed. Satisfaction with the Yutrepia device was also summarized.

## RESULTS

### Patients

Of the 146 patients screened, 121 were enrolled, including 55 in the Transition group and 66 in the prostacyclin naïve group (Supporting Information: Figure S3). The most common reasons for screen failures were due to stopping of enrollment due to achieving enrollment goal, not meeting PFT criteria, or use of unallowed PAH medication. The Month 12 visit was completed by 69 patients (29 Transition and 40 prostacyclin naïve) with another 25 patients reaching 12 months in the open-label extension trial LTI-302 (whose data are not included in the INSPIRE trial analyses). Twenty-nine patients discontinued from the trial (9 Transition and 20 prostacyclin naïve) with the most common reason being AEs (13 patients). This discontinuation rate of 24% is favorable, considering discontinuation rates of another inhaled treprostinil study (41%) and of inhaled iloprost (43%).[27,28]

Most patients were female, white, and non-Hispanic with a mean age of 54.2 years (Table 1). Approximately, two-thirds of the patients were in NYHA FC II with the rest in NYHA FC III. A higher percentage of patients in the prostacyclin naïve group was NYHA FC III (43.9%) compared with 21.8% of patients in the Transition group. The mean duration of disease was 4.6 years for prostacyclin naïve and 7.2 years for the Transition. Most patients were receiving background PAH medications with a majority of patients in the Transition and prostacyclin naïve groups receiving a combination of endothelin receptor antagonist and phosphodiesterase 5 inhibitor or soluble guanylate cyclase agonists (Table 1).

### Exposure

The initial Yutrepia treprostinil dose for the Transition group was based on the nebulized treprostinil dose before study enrollment and ranged from 26.5 to 106 mcg QID. The starting dose was 26.5 mcg QID for patients in the prostacyclin naïve group. Dose increases were permitted in 26.5-mcg increments weekly to symptom relief in both cohorts. A total of 43 (78%) Transition group patients up-titrated from their starting dose. At Day 60, 78% of the Transition group achieved a dose ≥79.5 mcg QID and 71% of patients in the prostacyclin naïve group up titrated to ≥79.5 mcg QID. For those patients on study at Day 360 this dose, this was achieved by 80% of the Transition group and 96% of the prostacyclin naïve group. The distribution of doses in the Transition and prostacyclin naïve groups is shown in Figure 1.

**TABLE 1**    Baseline demographic and clinical characteristics: Safety population[a]

| | Transitions (n = 55) | Prostacyclin naïve (n = 66) | Overall (N = 121) |
|---|---|---|---|
| Sex, n (%) | | | |
| Female | 47 (85.5) | 52 (78.8) | 99 (81.8) |
| Male | 8 (14.5) | 14 (21.2) | 22 (18.2) |
| Race, n (%) | | | |
| American Indian or Alaska Native | 1 (1.8) | 2 (3.0) | 3 (2.5) |
| Asian | 3 (5.5) | 3 (4.5) | 6 (5.0) |
| Black | 11 (20.0) | 4 (6.1) | 15 (12.4) |
| White | 40 (72.7) | 56 (84.8) | 96 (79.3) |
| Other | 0 (0.0) | 1 (1.5) | 1 (0.8) |
| Ethnicity, n (%) | | | |
| Hispanic | 10 (18.2) | 10 (15.2) | 20 (16.5) |
| Non-Hispanic | 45 (81.8) | 56 (84.8) | 101 (83.5) |
| Age (years) | | | |
| Mean (SD) | 53.3 (14.1) | 55.0 (14.6) | 54.2 (14.3) |
| BMI (kg/m²) | | | |
| Mean (SD) | 29.5 (7.5) | 29.3 (7.8) | 29.4 (7.6) |
| NYHA Functional Class, n (%) | | | |
| II | 43 (78.2) | 37 (56.1) | 80 (66.1) |
| III | 12 (21.8) | 29 (43.9) | 41 (33.9) |
| PAH duration (years) | | | |
| Mean (SD) | 7.2 (5.1) | 4.6 (5.1) | 5.8 (5.2) |
| Median | 5.7 | 2.2 | 4.4 |
| Oral PAH Therapy at screening, n (%) | | | |
| None | 5 (9.1) | 0 | 5 (4.1) |
| One (ERA, PDE-5i, or sGC) | 13 (23.6) | 17 (25.8) | 30 (24.8) |
| Two (ERA + PDE-5i, or sGC) | 37 (67.3) | 49 (74.2) | 86 (71.1) |

Abbreviations: BMI, body mass index; ERA, endothelin receptor antagonist; NYHA, New York Heart Association; PAH, pulmonary arterial hypertension; PDE5i, phosphodiesterase 5 inhibitor; PGI2, prostacyclin; SD, standard deviation; sGC, soluble guanylate cyclase.

[a]The safety population included all patients who received at least 1 dose of Yutrepia.

## Safety endpoints

Overall, 99.2% of patients experienced at least 1 AE, and 79.3% experienced at least 1 AE related to treatment (Table 2). Most patients reported mild (n = 34; 28.1%) or moderate (n = 58; 47.9%) AEs, with 28 (23.1%) patients having experienced severe AEs. A higher percentage of prostacyclin naïve than Transition patients experienced a treatment-related AE (84.8% vs. 72.7%), and an AE that was considered moderate or severe (81.8% vs. 58.1%). Fifteen (12.4%) patients experienced AEs that resulted in the withdrawal of Yutrepia or discontinuation from the

study, with 11 (9.1%) of these patient events considered related to treatment. Overall, 21 (17.4%) patients experienced SAEs. Twenty-eight SAEs resulted in hospitalization due to accidents, comorbidities, and viral infections (e.g., COVID-19). None of the SAEs were considered treatment-related by the medical monitor. No SAEs lead to death in this study.

The most common AEs considered to be related to Yutrepia and reported in ≥10% of patients are shown in Table 3. With few exceptions, AEs were mild or moderate in severity in both patient groups. Four patients experienced a severe treatment-related AE during the



**FIGURE 1**  Mean Yutrepia dose. All patients in the Transition group initiated Yutrepia at a dose comparable to their nebulized treprostinil dose. All patients in the prostacyclin naïve group initiated Yutrepia at 26.5 mcg QID. Naïve, prostacyclin naïve.

**TABLE 2**  Overall summary of TEAEs[a]: Safety population[b]

|  | Transitions (*n* = 55) | Prostacyclin Naïve (*n* = 66) | Overall (*N* = 121) |
|---|---|---|---|
| TEAE, *n* (%) |  |  |  |
| Any | 54 (98.2) | 66 (100) | 120 (99.2) |
| Any treatment-related | 40 (72.7) | 56 (84.8) | 96 (79.3) |
| Any resulting in study drug withdrawal or study discontinuation | 4 (7.3) | 11 (16.7) | 15 (12.4) |
| Treatment-related resulting in study drug withdrawal or study discontinuation | 3 (5.5) | 8 (12.1) | 11 (9.1) |
| Any TEAE by maximum severity, *n* (%) |  |  |  |
| Mild | 22 (40.0) | 12 (18.2) | 34 (28.1) |
| Moderate | 24 (43.6) | 34 (51.5) | 58 (48.0) |
| Severe | 8 (14.5) | 20 (30.3) | 28 (23.1) |
| Treatment-related TEAE by maximum severity, *n* (%) |  |  |  |
| Mild | 30 (54.5) | 28 (42.4) | 58 (47.9) |
| Moderate | 9 (16.4) | 25 (37.9) | 34 (28.1) |
| Severe | 1 (1.8) | 3 (4.5) | 4 (3.3) |
| SAE, *n* (%) |  |  |  |
| Any | 6 (10.9) | 15 (22.7) | 21 (17.4) |
| Treatment-related assessed by medical monitor | 0 (0.0) | 0 (0.0) | 0 (0.0) |
| SAE resulting in death, *n* (%) | 0 (0.0) | 0 (0.0) | 0 (0.0) |

Abbreviations: SAE, serious adverse event; TEAE, treatment-emergent adverse event.

[a]Treatment-related TEAEs were those considered as at least possibly related to study drug by the Investigator.

[b]The safety population included all patients who received at least 1 dose of Yutrepia.

**TABLE 3**    Treatment-Emergent Adverse Events[a] reported for ≥10% of all patients: Safety population

| | Transitions (n = 55) | | | | Prostacyclin naïve (n = 66) | | | | Overall (N = 121) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | No. (%) patients | No. and severity of events | | | No. (%) patients | No. and severity of events | | | No. (%) patients | No. and severity of events | | |
| | | Mild | Mod | Sev. | | Mild | Mod | Sev. | | Mild | Mod | Sev. |
| Cough | 23 (41.8) | 20 | 3 | 0 | 41 (62.1) | 31 | 10 | 0 | 64 (52.9) | 51 | 13 | 0 |
| Headache | 18 (32.7) | 14 | 4 | 0 | 23 (34.8) | 15 | 6 | 2 | 41 (33.9) | 29 | 10 | 2 |
| Upper respiratory tract infection | 10 (18.2) | 9 | 1 | 0 | 18 (27.3) | 13 | 5 | 0 | 28 (23.1) | 22 | 6 | 0 |
| Dyspnea | 13 (23.6) | 5 | 7 | 1 | 10 (15.2) | 5 | 4 | 1 | 23 (19.0) | 10 | 11 | 2 |
| Dizziness | 10 (18.2) | 9 | 1 | 0 | 13 (19.7) | 11 | 2 | 0 | 23 (19.0) | 20 | 3 | 0 |
| Throat irritation | 8 (14.5) | 8 | 0 | 0 | 14 (21.2) | 13 | 1 | 0 | 22 (18.2) | 21 | 1 | 0 |
| Diarrhea | 7 (12.7) | 5 | 2 | 0 | 15 (22.7) | 9 | 6 | 0 | 22 (18.2) | 14 | 8 | 0 |
| Chest discomfort | 11 (20.0) | 9 | 2 | 0 | 7 (10.6) | 6 | 1 | 0 | 18 (14.9) | 15 | 3 | 0 |
| Fatigue | 4 (7.3) | 1 | 2 | 1 | 10 (15.2) | 7 | 2 | 1 | 14 (11.6) | 8 | 4 | 2 |
| Nasopharyngitis | 6 (10.9) | 5 | 1 | 0 | 6 (9.1) | 5 | 1 | 0 | 12 (9.9) | 10 | 2 | 0 |
| Nausea | 6 (10.9) | 4 | 1 | 1 | 6 (9.1) | 4 | 1 | 1 | 12 (9.9) | 8 | 2 | 2 |

Abbreviations: Mod, moderate; no, number; sev, severe; TEAE, treatment-emergent adverse event.

[a]The safety population included all patients who received at least 1 dose of Yutrepia.

trial. One patient in the Transition group experienced a decrease in oxygen saturation on Day 36 that was not serious and did not result in study drug discontinuation. One patient in the prostacyclin naïve group experienced vomiting on Day 1, and Yutrepia was discontinued. A second patient in the prostacyclin naïve group developed headache and nausea on Day 1, with the headache resolving after 32 days and nausea continuing for the duration of therapy. A third patient in the prostacyclin naïve group developed oropharyngeal pain on Day 124, which continued for the duration of the therapy. Neither of these two latter events resulted in a change in dose or study discontinuation. There were no device-related AEs in either patient group or changes in clinical labs, vital signs, or physical exam attributed to Yutrepia treatment.

## Exploratory endpoints

At baseline, the overall mean 6MWD was 401 m. Notably, the Transition group did not deteriorate in mean 6MWD. There was a slight increase in the walk distance during the trial in both groups, with larger increases evident in the Transition group compared to the prostacyclin naïve group, especially at the Month 2 time point (Figure 2).

The percentage of patients in FCs I and II improved compared with baseline in both the Transition and prostacyclin naïve groups. This improvement was observed at Month 2 and maintained through Month 12 Figure (S4).

The mean changes from baseline in the NT-proBNP were variable during 12 months in the Transition group with no clear trends over time, whereas there appeared to be a progressive decline in the NT-proBNP in the prostacyclin naïve group during the trial (Figure 3).

Overall, there was a clinically meaningful improvement from baseline to Month 2 and Month 4 in the MLHFQ total score, defined as a >5-point reduction (mean change, −10.2 at Months 2 and 4), with decreases in both emotional and physical dimension scores (Figure 4) and in both the Transition and prostacyclin naïve groups.

A higher percentage of patients had two or more low risk criteria at Months 2, 4, 8, and 12, compared with baseline with a larger change occurring in the prostacyclin naïve group. At Month 2, the percentage of patients with 2 or 3 low-risk criteria increased from 41.6% at baseline to 66.0% in the prostacyclin naïve group versus 61.8% to 63.8% in the Transition group. At Month 12, the percentage of patients meeting 2 or 3 low-risk criteria was 59.0% in the prostacyclin naïve group and 67.8% in the Transition group.

Responses to the patient satisfaction survey at Week 2 indicated that 98.2% of patients in the Transition group preferred or strongly preferred the RS00 Model 8 dry-powder inhaler device compared to their previously used device, the nebulized treprostinil inhalation system (Figure 5). No patients preferred the nebulized treprostinil inhalation system, and one patient reported no preference. This preference was maintained in the survey



**FIGURE 2**  Mean change from baseline in 6MWD: Efficacy population*. *The efficacy population included all those who received at least one dose and completed at least one efficacy assessment. 6MWD, 6-min walk distance; CFB, change from baseline; Naïve, prostacyclin naïve.



**FIGURE 3**  Mean change from baseline in NT-proBNP (ng/L): Efficacy population. The efficacy population included all those who received at least one dose and completed at least one efficacy assessment. CFB, change from baseline; Naïve, prostacyclin naïve; NT-proBNP, N-terminal pro-B-type natriuretic peptid.

at Month 4, with all patients preferring or strongly preferring the RS00 device.

## DISCUSSION

The present study reports the safety and tolerability of Yutrepia in patients with PAH. Patients receiving stable doses of nebulized treprostinil successfully transitioned

to Yutrepia with no significant safety concerns, and the addition of Yutrepia to background oral therapy was also well tolerated. Not surprisingly, the incidence of AEs was less on patients transitioning from nebulized treprostinil relative to those initiating treprostinil therapy. While nearly all patients experienced treatment-related AEs consistent with the known side effects seen with inhaled treprostinil therapy (cough, throat irritation, and oro-pharyngeal pain) as well as the characteristic side effect



**FIGURE 4** Change* from baseline in Minnesota Living with Heart Failure Questionnaire scores: Efficacy population†. *A clinically meaningful improvement from baseline was defined as a 5-point reduction.[35] †The efficacy population included all those who received at least 1 dose and completed at least 1 efficacy assessment. CFB, change from baseline; M, month; Naïve, prostacyclin naïve.



**FIGURE 5** Dry-powder inhaler device (RS00 Model 8) satisfaction scores at Week 2 and Month 4: Transition patients

profile of the prostacyclin class, including headache, dizziness, diarrhea, chest discomfort, nausea, dyspnea, and flushing, these were mostly mild to moderate in severity and generally did not hinder patients ability to continue therapy and titrate to higher doses as needed. Overall, 21 patients experienced SAEs with none of the events considered to be treatment-related by the medical monitor. No SAEs led to death in this study. The overall safety profile of Yutrepia was reassuring, with no unexpected safety concerns noted.

Since patients in the INSPIRE trial were allowed to transition to an open-label safety extension trial LTI-302, the number of patients remaining in the trial declined over time. Of the 121 enrolled patients, 69 (29 Transition and 40 prostacyclin naïve) completed Month 12, and another 25 patients reached 12 months during the open label safety extension trial LTI-302. Twenty-nine patients withdrew from the INSPIRE trial. This level of withdrawals from a 1-year trial is not unexpected considering the severity of patients' underlying disease and associated comorbidities.[22,27]

Patients treated with Yutrepia were able to increase their mean inhaled treprostinil doses during the trial. Eighty percent of patients in the Transition group and 96% of those in the prostacyclin naïve group achieved a dose ≥79.5 mcg QID at Day 360, with one patient receiving a dose of 212 µg four times daily. This dose is comparable to approximately 24 breaths of nebulized treprostinil administered four times daily and suggests that Yutrepia may allow patients to be titrated to effective doses more easily than can be accomplished with current options. The clinical benefits of using higher inhaled doses of treprostinil are supported by a real-world effectiveness analysis which found that patients treated with more than nine breaths of treprostinil inhalation solution had a lower incidence of mortality and need for parenteral prostacyclin therapy compared to those treated with nine or less breaths.[29]

Despite the advantages of the inhaled route for delivery of PAH medications, currently approved inhaled prostacyclin therapies have notable limitations such as the need for multiple inhalations and cumbersome inhalation systems that require daily time and maintenance.[20,30,31] These limitations become more pronounced for working individuals or those needing to be away from home. Yutrepia overcomes many of these limitations with an inhaled formulation that delivers an optimal dose in two breaths in a simple, easy-to-use compact dry-powder device that the patient can easily conceal. In the present trial, most patients preferred using Yutrepia versus their prior nebulized treprostinil inhalation system, indicating that a more convenient, less bulky system that requires minimal maintenance is desirable to patients. A more conveniently delivered inhaled therapy such as Yutrepia offers patients and clinicians the benefits of established efficacy of the drug class with a favorable tolerability profile and may lead to long-term treatment adherence. In some patients, a better tolerated inhaled option could be preferable, even when compared with oral medications.[32]

Health-related quality of life is severely impaired in patients with PAH,[33–37] with better quality-of-life outcomes reported for patients administered therapies that improve functional outcomes, such as exercise capacity. While the primary purpose of the INSPIRE trial was to assess the safety of Yutrepia treatment in PAH patients, analysis of the exploratory efficacy endpoints revealed that functional and quality-of-life outcomes were stable or modestly improved over the duration of the trial following initiation of Yutrepia in patients who were naïve to prostacyclin therapy, as well as in those who transitioned from nebulized treprostinil. The apparent improvements in clinical disease are noteworthy considering that most patients were already receiving two oral PAH therapies. The improvements observed in patients' quality of life scores (over 10 points) suggest that clinically meaningful improvements occur when PAH patients are switched to Yutrepia or initiate it as add-on therapy.

## Study limitations

These results must be considered within the context of some study design limitations. First, this was an open-label trial, hence definitive conclusions about efficacy cannot be made. Furthermore, the study design did not include a comparison with another inhaled prostacyclin such as nebulized treprostinil or iloprost. However, Yutrepia is being developed under Section 505(b)(2) of the Federal Food, Drug, and Cosmetic Act, which relies on previous research and reports that have established the safety and efficacy of nebulized treprostinil, the selected reference-listed drug, to treat PAH.

While the INSPIRE trials provide approximately 1 year's safety data, data from an ongoing open-label extension study (LTI-302) for patients who participated in the current study and wished to continue treatment with Yutrepia will provide up to 3 years of long-term safety and clinical effectiveness information of Yutrepia in PAH (NCT03992755).[36]

## CONCLUSIONS

The favorable safety profile and patient preference ratings as well as the exploratory efficacy analyses suggest that the profile of Yutrepia represents an important advance in inhaled prostacyclin therapy for patients with PAH either in the setting of transitioning from current nebulized prostacyclin therapy or the initiation of therapy. The administration of Yutrepia with an easy-to-use dry-powder inhaler offers clinicians an inhaled PAH therapy that may be preferred by many patients based on its added convenience and potential to facilitate a more active lifestyle.

### AUTHOR CONTRIBUTIONS
All authors contributed to the acquisition, analysis, and interpretation of data; reviewed and revised the manuscript; gave final approval for submission; and agreed to be accountable for all aspects of the work in ensuring that questions related to the accuracy or integrity of any part of the work are appropriately investigated and resolved.

### ACKNOWLEDGMENTS
The authors would like to thank the participating patients and their families. In addition, the authors would like to

thank decile.ten communications for providing editorial support. Support for this study and the development of this manuscript were provided by Liquidia Technologies INC. The authors were not compensated for the development of the manuscript.

## CONFLICTS OF INTEREST

N. S. H.: Liquidia and Aerovate, consulting fees; Altavant, lectures, presentations, speakers bureaus, manuscript writing, and/or educational events; Liquidia, expert testimony; Liquidia, support for attending meetings and/or travel; Merck and United Therapeutics, data safety monitoring board or advisory board. J. P. F.: Liquidia, advisory board. S. S.: ACCP CHEST and United Therapeutics, research grants; Liquidia, steering committee; Gossamer Bio, United Therapeutics, and Bayer, advisor; Bayer, United Therapeutics, and Johnson & Johnson, speaker; Johnson & Johnson, planned patent; Bayer, advisory board; GSK, endpoint adjudication committee. R. L. B.: Bayer, Abbot, United Therapeutics, Abbott, Gossamer Bio, and Acceleron, consulting fees; Society of Heart and Lung Transplantation and the Pulmonary Vascular Disease Institute, leadership and/or fiduciary role. I. R. P.: Janssen, United Therapeutics, PhaseBio, and Tenax, research grants and/or contracts; Altavant, Janssen, United Therapeutics, and Liquidia, consulting fees; Medscape and Med on the Go, lectures, presentations, speakers bureaus, manuscript writing and/or educational events; Bayer, expert testimony; Altavant, Janssen, United Therapeutics, and Liquidia, data safety monitoring or advisory board; ISHLT, leadership or fiduciary role. D. B.: Acceleron, Arena/United Therapeutics, Altavant, Acte-lion/Janssen/Johnson & Johnson, Ikaria, Reata, Complexa Liquidia, and Merck, research grants; Acceleron, Altavant, Bayer, Merck, and Liquidia, consulting fees; Practice Point Communications, lectures, presentations, speakers bureaus, manuscript writing and/or educational events; Bayer, expert testimony; United Therapeutics, data safety or advisory board; USPHSR (United States Pulmonary Hypertension Scientific Registry), leadership or fiduciary role; Johnson & Johnson, stock or stock options. R. P. F.: NHLBI, research grant; Up to Date, royalties or licenses; Janssen, Liquidia, Shouti, Altavant, Gossamer Bio, Bayer, and Tenax, consulting fees; United Therapeutics, France Foundation, and Janssen, lectures, presentations, speakers bureaus, manuscript writing and/or educational events; Janssen and Liquidia, data safety or advisory board; Tenax, stock or stock options. S. P.: Liquidia, employee, attending meetings and/or travel patents, and stock or stock options. A. G.: Liquidia, employee, attending meetings and/or travel patents, and stock or stock options. T. M. B.: Bayer, research grant; Liquidia and Bayer, steering committee and consulting fees; NHLBI and MESA, data safety and/or advisory board.

## ETHICS STATEMENT

The study protocol was approved by the institutional review board or ethics committee at each participating site.

## ORCID

*Nicholas S. Hill* 🄳 https://orcid.org/0000-0002-8242-8339
*Sandeep Sahay* 🄳 https://orcid.org/0000-0002-0672-1680

## REFERENCES

1. Badlam JB, Bull TM. Steps forward in the treatment of pulmonary arterial hypertension: latest developments and clinical opportunities. Ther Adv Chronic Dis. 2017;8(2-3):47–64.
2. Barnes H, Yeoh HL, Fothergill T, Burns A, Humbert M, Williams T. Prostacyclin for pulmonary arterial hypertension. Cochrane Database Syst Rev. 2019;5(5):CD012785.
3. Gomberg-Maitland M, Olschewski H. Prostacyclin therapies for the treatment of pulmonary arterial hypertension. Eur Respir J. 2008;31(4):891–901.
4. Remodulin (treprostinil injection) [package insert]. Research Triangle Park, North Carolina: United Therapeutics Corp.; 2018.
5. Veletri (epoprostenol) [package insert]. South San Francisco, California: Actelion Pharmaceuticals US Inc.; 2018.
6. Tyvaso (treprostinil) [package insert]. Research Triangle Park, North Carolina: United Therapeutics Corp.; 2017.
7. Ventavis (iloprost) [package insert]. South San Francisco, California: Actelion Pharmaceuticals US Inc.; 2017.
8. Orenitram (oral treprostinil) [package insert]. Research Triangle Park, North Carolina: United Therapeutics Corp.; 2019.
9. Farber HW, Miller DP, Meltzer LA, McGoon MD. Treatment of patients with pulmonary arterial hypertension at the time of death or deterioration to functional class IV: insights from the REVEAL Registry. J Heart Lung Transplant. 2013;32(11):1114–22.
10. McGoon MD, Miller DP. REVEAL: a contemporary US pulmonary arterial hypertension registry. Eur Respir Rev. 2012;21(123):8–18.
11. McLaughlin VV, Gaine SP, Howard LS, Leuchte HH, Mathier MA, Mehta S, Palazzini M, Park MH, Tapson VF, Sitbon O. Treatment goals of pulmonary hypertension. J Am Coll Cardiol. 2013;62:D73–81.
12. Badesch DB, Raskob GE, Elliott CG, Krichman AM, Farber HW, Frost AE, Barst RJ, Benza RL, Liou TG, Turner M, Giles S, Feldkircher K, Miller DP, McGoon MD. Pulmonary arterial hypertension: baseline characteristics from the REVEAL Registry. Chest. 2010;137(2):376–87.
13. Del Pozo R, Hernandez Gonzalez I, Escribano-Subias P. The prostacyclin pathway in pulmonary arterial hypertension: a clinical review. Expert Rev Respir Med. 2017;11(6):491–503.
14. Farber HW, Gin-Sing W. Practical considerations for therapies targeting the prostacyclin pathway. Eur Respir Rev. 2016;25(142):418–30.
15. Kingman M, Archer-Chicko C, Bartlett M, Beckmann J, Hohsfield K, Lombardi S. Management of prostacyclin side effects in adult patients with pulmonary arterial hypertension. Pulm Circ. 2017;7(3):598–608.
16. Lang IM, Gaine SP. Recent advances in targeting the prostacyclin pathway in pulmonary arterial hypertension. Eur Respir Rev. 2015;24(138):630–41.

17. LeVarge B. Prostanoid therapies in the management of pulmonary arterial hypertension. Ther Clin Risk Manag. 2015;11:535–47.

18. Picken C, Fragkos KC, Eddama M, Coghlan G, Clapp LH. Adverse events of prostacyclin mimetics in pulmonary arterial hypertension: a systematic review and meta-analysis. J Clin Med. 2019;8(4):481.

19. Gessler T, Seeger W, Schmehl T. The potential for inhaled treprostinil in the treatment of pulmonary arterial hypertension. Ther Adv Respir Dis. 2011;5(3):195–206.

20. Hill NS, Cawley MJ, Heggen-Peay CL. New therapeutic paradigms and guidelines in the management of pulmonary arterial hypertension [review]. J Manag Care Spec Pharm. 2016;22(3 Suppl A):S3–21.

21. Kumar P, Thudium E, Laliberte K, Zaccardelli D, Nelsen A. A comprehensive review of treprostinil pharmacokinetics via four routes of administration. Clin Pharmacokinet. 2016; 55(12):1495–505.

22. McLaughlin VV, Benza RL, Rubin LJ, Channick RN, Voswinckel R, Tapson VF, Robbins IM, Olschewski H, Rubenfire M, Seeger W. Addition of inhaled treprostinil to oral therapy for pulmonary arterial hypertension: a randomized controlled clinical trial. J Am Coll Cardiol. 2010;55(18):1915–22.

23. Hill NS, Preston IR, Roberts KE. Inhaled therapies for pulmonary hypertension. Respir Care. 2015;60(6):794–805.

24. Roscigno RF, Vaughn T, Parsley E, Hunt T, Eldon MA, Rubin LJ. Comparative bioavailability of inhaled treprostinil administered as LIQ861 and Tyvaso® in healthy subjects. Vascul Pharmacol. 2021;138:106840.

25. Roscigno R, Vaughn T, Anderson S, Wargin W, Hunt T, Hill NS. Pharmacokinetics and tolerability of LIQ861, a novel dry-powder formulation of treprostinil. Pulm Circ. 2020;10(4):2045894020971509. https://doi.org/10.1177/2045894020971509

26. Galiè N, Humbert M, Vachiery JL, Gibbs S, Lang I, Torbicki A, Simonneau G, Peacock A, Noordegraaf A, Beghetti A, Ghofrani M, Sanchez MAG, Hansmann G, Klepetko W, Lancellotti P, Matucci M, McDonagh T, Pierard LA, Trindade PT, Zompatori M, Hoeper M, ESC Scientific Document Group. 2015 ESC/ERS guidelines for the diagnosis and treatment of pulmonary hypertension: The Joint Task Force for the Diagnosis and Treatment of Pulmonary Hypertension of the European Society of Cardiology (ESC) and the European Respiratory Society (ERS): endorsed by: Association for European Paediatric and Congenital Cardiology (AEPC), International Society for Heart and Lung Transplantation (ISHLT). Eur Heart J. 2016;37:67–119.

27. Benza RL, Seeger W, McLaughlin VV, Channick RN, Voswinckel R, Tapson VF, Robbins IM, Olschewski H, Rubin LJ. Long-term effects of inhaled treprostinil in patients with pulmonary arterial hypertension: the treprostinil sodium inhalation used in the management of pulmonary arterial hypertension (TRIUMPH) study open-label extension. J Heart Lung Transplant. 2011;30(12):1327–33.

28. Olschewski H, Hoeper MM, Behr J, Ewert R, Meyer A, Borst MM, Winkler J, Pfeifer M, Wilkens H, Ghofrani HA, Nikkho S, Seeger W. Long-term therapy with inhaled iloprost in patients with pulmonary hypertension. Respir Med. 2010;104(5):731–40. https://doi.org/10.1016/j.rmed.2010.01.008

29. Shapiro S, Mandras S, Restrepo-Jaramillo R, Shen E, Broderick M, Rao Y, Lee D, Nelsen AC. Survival and drug persistence in patients receiving inhaled treprostinil at doses greater than 54 μg (nine breaths) four times daily. Pulm Circ. 2021;11(4):20458940211052228.

30. Lindegaard Pedersen M, Krüger M, Grimm D, Infanger M, Wehland M. The prostacyclin analogue treprostinil in the treatment of pulmonary arterial hypertension. Basic Clin Pharmacol Toxicol. 2020;126(1):32–42.

31. Torres F, Rubin LJ. Treprostinil for the treatment of pulmonary arterial hypertension. Expert Rev Cardiovasc Ther. 2013;11(1):13–25.

32. AbuHalimeh BJ, Parambil JG, Tonelli AR. Different efficacy of inhaled and oral medications in pulmonary hypertension. Heart Lung. 2017;46(4):334–7.

33. Pfeuffer E, Krannich H, Halank M, Wilkens H, Kolb P, Jany B, Held M. Anxiety, depression, and health-related QOL in patients diagnosed with PAH or CTEPH. Lung. 2017;195(6):759–68.

34. Reis A, Santos M, Vicente M, Furtado I, Cruz C, Melo A, Carvalho L, Gonçalves F, Sa-Couto P, Almeida L. Health-related quality of life in pulmonary hypertension and its clinical correlates: a cross-sectional study. BioMed Res Int. 2018;2018:3924517.

35. Shafazand S, Goldstein MK, Doyle RL, Hlatky MA, Gould MK. Health-related quality of life in patients with pulmonary arterial hypertension. Chest. 2004;126(5):1452–9.

36. US National Library of Medicine. Extension study for participants in LIQ861 trials to evaluate the long-term safety of dry powder inhalation of treprostinil [Internet]. Bethesda, Maryland: US National Library of Medicine; 2021 [updated 2021 Aug 30; cited 2022 Mar 31]. Available from: https://clinicaltrials.gov/ct2/show/NCT03992755

37. Rector TS, Cohn JN. Assessment of patient outcome with the Minnesota Living with Heart Failure questionnaire: reliability and validity during a randomized, double-blind, placebo-controlled trial of pimobendan. Pimobendan Multicenter Research Group. Am Heart J. 1992;124(4):1017–25.

## SUPPORTING INFORMATION

Additional supporting information can be found online in the Supporting Information section at the end of this article.

**How to cite this article:** Hill NS, Feldman JP, Sahay S, Benza RL, Preston IR, Badesch D, Frantz RP, Patel S, Galloway A, Bull TM. INSPIRE: Safety and tolerability of inhaled Yutrepia (treprostinil) in pulmonary arterial hypertension (PAH). Pulm Circ. 2022;12:e12119. https://doi.org/10.1002/pul2.12119

# EXHIBIT 19

# Morgan Stanley | RESEARCH



*May 25, 2023 04:01 AM GMT*

### United Therapeutics Corp | North America

# Takeaways from management meeting

📈 Stock Rating
**Overweight**

👁 Industry View
**Attractive**

◎ Price Target
**$316.00**

We recently had the opportunity to meet with UTHR management including the CFO and head of IR. The discussion covered both the near and longer-term outlook, Tyvaso ILD/DPI launch, manufacturing expansion, and capital allocation.

**At a high level UTHR expressed confidence in the strength of the business, including the ability to deliver on the company's 25x25 guidance.** UTHR noted that the majority of growth will come from Tyvaso ILD indication and they continue to see an opportunity to broaden the prescriber base (majority still academics).

**Management reviewed 1Q dynamics,** where there was a draw down of Tyvaso nebulizer inventory, but not a draw up of Tyvaso DPI due to manufacturing constraints (LINK). They don't expect to see a stock up of DPI until more meaningful capacity comes online late this year or early 2024. However, they continue to expect to be able to meet patient demand.

**The company discussed details regarding near and medium term steps they and partner MannKind (not covered) are taking to ensure a continuous supply of Tyvaso DPI.** They expect near-term MannKind capacity improvements to go into effect in June/July as a second spray dryer comes online following validation batches. Separately MannKind is also working on process/yield improvements. Later this year UTHR will install a high speed kitting line in RTP (shifting away from CMO), which can handle 25k capacity when it fully comes online in 1H24. Beyond that UTHR has invested $500mn into a new DPI manufacturing facility in North Carolina to support 50k patients annually with the ability to expand to 75k patients. By 2H of the decade UTHR plans to have DPI manufacturing capacity between 75-100k patient annually in order to support current PAH/PH-ILD market as well as a future indications if approved.

**UTHR does not see the entry of MRK's Sotatercept as a headwind to its PAH franchise** given the likelihood of combination use with prostacyclins, including most likely Tyvaso DPI. This was reinforced by the company's recent discussions with KOLs at the ATS conference. But they noted that based on prior history physician's like to try new options in PAH.

**Management reiterated the company's capital allocation priorities,** including internal investment (R&D and capex) as well as business development (mainly

MORGAN STANLEY & CO. LLC

**Terence C Flynn, Ph.D.**
EQUITY ANALYST
Terence.Flynn@morganstanley.com     +1 212 761-2230

**Justin H Phillips**
RESEARCH ASSOCIATE
Justin.Phillips@morganstanley.com     +1 212 761-1928

**Robert Ruzic**
RESEARCH ASSOCIATE
Robert.Ruzic@morganstanley.com     +1 212 761-2414

**Alexander Yevdokimov, Ph.D.**
RESEARCH ASSOCIATE
Alexander.Yevdokimov@morganstanley.com     +1 212 761-2167

**Maxwell Skor**
EQUITY ANALYST
Maxwell.Skor@morganstanley.com     +1 212 761-4804

**Chris Yu, J.D., Ph.D.**
EQUITY ANALYST
Chris.L.Yu@morganstanley.com     +1 212 761-2535

**United Therapeutics Corp ( UTHR.O, UTHR US )**

Biotechnology / **United States of America**

| | |
|---|---|
| **Stock Rating** | **Overweight** |
| **Industry View** | **Attractive** |
| **Price target** | **$316.00** |
| Shr price, close (May 23, 2023) | $216.19 |
| Mkt cap, curr (mm) | $10,815 |
| 52-Week Range | $283.09-188.81 |

| Fiscal Year Ending | 12/22 | 12/23e | 12/24e | 12/25e |
|---|---|---|---|---|
| ModelWare EPS ($) | 15.00 | 17.53 | 13.12 | 18.40 |
| Prior ModelWare EPS ($) | - | - | - | - |
| P/E | 18.5 | 12.3 | 16.5 | 11.7 |
| EPS ($)§ | 16.88 | 18.34 | 20.31 | 23.45 |
| Div yld (%) | - | - | - | - |

Unless otherwise noted, all metrics are based on Morgan Stanley ModelWare framework
§ = Consensus data is provided by Refinitiv Estimates
e = Morgan Stanley Research estimates

| **QUARTERLY MODELWARE EPS ($)** | | | | |
|---|---|---|---|---|
| Quarter | 2022 | 2023e Prior | 2023e Current | 2024e Prior | 2024e Current |
| Q1 | 5.03 | - | 4.86a | - | - |
| Q2 | 2.41 | - | 4.17 | - | - |
| Q3 | 4.91 | - | 5.42 | - | - |
| Q4 | 2.67 | - | 3.07 | - | - |

e = Morgan Stanley Research estimates, a = Actual Company reported data

Morgan Stanley does and seeks to do business with companies covered in Morgan Stanley Research. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of Morgan Stanley Research. Investors should consider Morgan Stanley Research as only a single factor in making their investment decision.

For analyst certification and other important disclosures, refer to the Disclosure Section, located at the end of this report.

1

Morgan Stanley | RESEARCH 

within cardio-pulmonary). Our sense was share repo represents a distant third.

Morgan Stanley | RESEARCH



Morgan Stanley | RESEARCH 

# Valuation Methodology and Risks

**United Therapeutics Corp (UTHR.O)**

Our DCF-based price target of $316 includes ~$3.2bn in risk-adjusted revenue in 2030. We derive our price target from a discounted cash flow (DCF) analysis using a 10% discount rate and 0% terminal growth.

**Risks to Upside**

- Tyvaso growth is above expectations and the majority of the franchise is converted to DPI
- Ralinepag receives FDA approval for PAH and contributes to outer year growth
- Tyvaso '793 patent is upheld

**Risks to Downside**

- Tyvaso growth is below expectations and a minority of the franchise is converted to DPI
- Ralinepag is unsuccessful in Phase 3 trials
- Liquidia invalidates Tyvaso '793 patent
- Remodulin erosion accelerates

**Morgan Stanley | RESEARCH**



# Disclosure Section

The information and opinions in Morgan Stanley Research were prepared by Morgan Stanley & Co. LLC, and/or Morgan Stanley C.T.V.M. S.A., and/or Morgan Stanley Mexico, Casa de Bolsa, S.A. de C.V., and/or Morgan Stanley Canada Limited. As used in this disclosure section, "Morgan Stanley" includes Morgan Stanley & Co. LLC, Morgan Stanley C.T.V.M. S.A., Morgan Stanley Mexico, Casa de Bolsa, S.A. de C.V., Morgan Stanley Canada Limited and their affiliates as necessary.

For important disclosures, stock price charts and equity rating histories regarding companies that are the subject of this report, please see the Morgan Stanley Research Disclosure Website at www.morganstanley.com/researchdisclosures, or contact your investment representative or Morgan Stanley Research at 1585 Broadway, (Attention: Research Management), New York, NY, 10036 USA.

For valuation methodology and risks associated with any recommendation, rating or price target referenced in this research report, please contact the Client Support Team as follows: US/Canada +1 800 303-2495; Hong Kong +852 2848-5999; Latin America +1 718 754-5444 (U.S.); London +44 (0)20-7425-8169; Singapore +65 6834-6860; Sydney +61 (0)2-9770-1505; Tokyo +81 (0)3-6836-9000. Alternatively you may contact your investment representative or Morgan Stanley Research at 1585 Broadway, (Attention: Research Management), New York, NY 10036 USA.

## Analyst Certification

The following analysts hereby certify that their views about the companies and their securities discussed in this report are accurately expressed and that they have not received and will not receive direct or indirect compensation in exchange for expressing specific recommendations or views in this report: Terence C Flynn, Ph.D.; Maxwell Skor; Chris Yu, J.D., Ph.D..

.

## Global Research Conflict Management Policy

Morgan Stanley Research has been published in accordance with our conflict management policy, which is available at www.morganstanley.com/institutional/research/conflictpolicies. A Portuguese version of the policy can be found at www.morganstanley.com.br

## Important Regulatory Disclosures on Subject Companies

As of April 28, 2023, Morgan Stanley beneficially owned 1% or more of a class of common equity securities of the following companies covered in Morgan Stanley Research: 2seventy Bio Inc, Acadia Pharmaceuticals Inc, Alector Inc, Amgen Inc., Amicus Therapeutics Inc., argenx SE, Bicycle Therapeutics Plc, Editas Medicine, Exelixis Inc., Fate Therapeutics Inc, Gilead Sciences Inc., Halozyme Therapeutics, Inc, Horizon Therapeutics Plc, Immunocore Holdings Ltd, Intellia Therapeutics Inc, Kodiak Sciences Inc, Mirati Therapeutics, Moderna Inc, Neurocrine Biosciences Inc, ProKidney Corp, Sarepta Therapeutics Inc, Schrodinger Inc..

Within the last 12 months, Morgan Stanley managed or co-managed a public offering (or 144A offering) of securities of Akero Therapeutics Inc, Alpine Immune Sciences Inc, Amgen Inc., Arcutis Biotherapeutics, Inc., Certara Inc, Fusion Pharmaceuticals Inc, Iveric Bio Inc, Legend Biotech Corp, Prelude Therapeutics Inc, Prime Medicine Inc, Rocket Pharmaceuticals Inc, Sarepta Therapeutics Inc, Silence Therapeutics Plc, Tenaya Therapeutics Inc, Third Harmonic Bio Inc.

Within the last 12 months, Morgan Stanley has received compensation for investment banking services from ADC Therapeutics SA, Akero Therapeutics Inc, Akili Inc, Alpine Immune Sciences Inc, Amgen Inc., Arcus Biosciences Inc., Arcutis Biotherapeutics, Inc., Axsome Therapeutics, Disc Medicine Inc, Exelixis Inc., Fusion Pharmaceuticals Inc, Iveric Bio Inc, Legend Biotech Corp, Prelude Therapeutics Inc, Prime Medicine Inc, ProKidney Corp, Recursion Pharmaceuticals Inc, Rhythm Pharmaceuticals Inc, Rocket Pharmaceuticals Inc, Sarepta Therapeutics Inc, Silence Therapeutics Plc, Tenaya Therapeutics Inc, Third Harmonic Bio Inc, **United Therapeutics Corp**, Ventyx Biosciences.

In the next 3 months, Morgan Stanley expects to receive or intends to seek compensation for investment banking services from Acadia Pharmaceuticals Inc, Adagene Inc., ADC Therapeutics SA, Akero Therapeutics Inc, Akili Inc, Alector Inc, AlloVir Inc, Alnylam Pharmaceuticals Inc, Alpine Immune Sciences Inc, Amgen Inc., Amicus Therapeutics Inc., Arcus Biosciences Inc., Arcutis Biotherapeutics, Inc., argenx SE, Arrowhead Pharmaceuticals Inc, Arvinas Inc, Ascendis Pharma A/S, Atea Pharmaceuticals Inc, Axsome Therapeutics, BeiGene Ltd, Bicycle Therapeutics Plc, Biogen Inc, Biomarin Pharmaceutical Inc, BioNTech SE, Blueprint Medicines Corporation, Bolt Biotherapeutics, Inc., Cabaletta Bio Inc, Centessa Pharmaceuticals, Inc, Cerevel Therapeutics Holdings Inc, Certara Inc, CRISPR Therapeutics AG, Cullinan Oncology Inc, Cyteir Therapeutics, Inc., Cytokinetics Inc, Denali Therapeutics Inc, Disc Medicine Inc, Editas Medicine, Erasca, Inc., Evelo Biosciences Inc, Exelixis Inc., Exscientia PLC, Foghorn Therapeutics, Fusion Pharmaceuticals Inc, Galapagos NV, Genmab A/S, Gilead Sciences Inc., Graphite Bio, Inc., Halozyme Therapeutics, Inc, Hookipa Pharma Inc, Horizon Therapeutics Plc, IGM Biosciences Inc, Immuneering Corporation, Incyte Corp, Insmed Inc, Intellia Therapeutics Inc, Intra-Cellular Therapies Inc, Inviyd Inc, IO Biotech, Ionis Pharmaceuticals Inc, Iveric Bio Inc, Kodiak Sciences Inc, Kymera Therapeutics Inc, Legend Biotech Corp, Lyell Immunopharma, Inc., Mirati Therapeutics, Moderna Inc, Neurocrine Biosciences Inc, Pharvaris N.V., Prelude Therapeutics Inc, Prime Medicine Inc, ProKidney Corp, PTC Therapeutics, Recursion Pharmaceuticals Inc, Regeneron Pharmaceuticals Inc., Regenxbio Inc, Repare Therapeutics Inc, Revance Therapeutics Inc, Rhythm Pharmaceuticals Inc, Rocket Pharmaceuticals Inc, Sana Biotechnology, Inc, Sarepta Therapeutics Inc, Schrodinger Inc., Seagen Inc, Silence Therapeutics Plc, Talaris Therapeutics, Tenaya Therapeutics Inc, Third Harmonic Bio Inc, Tscan Therapeutics Inc, Ultragenyx Pharmaceutical Inc, **United Therapeutics Corp**, Vaccitech Plc, Ventyx Biosciences, Vertex Pharmaceuticals, Vigil Neuroscience Inc, Vir Biotechnology Inc, Xlio Therapeutics Inc, Y-mABs Therapeutics Inc., Zentalis Pharmaceuticals Inc.

Within the last 12 months, Morgan Stanley has received compensation for products and services other than investment banking services from Amgen Inc., Biogen Inc, Gilead Sciences Inc., Horizon Therapeutics Plc, Moderna Inc.

Within the last 12 months, Morgan Stanley has provided or is providing investment banking services to, or has an investment banking client relationship with, the following company: Acadia Pharmaceuticals Inc, Adagene Inc., ADC Therapeutics SA, Akero Therapeutics Inc, Akili Inc, Alector Inc, AlloVir Inc, Alnylam Pharmaceuticals Inc, Alpine Immune Sciences Inc, Amgen Inc., Amicus Therapeutics Inc., Arcus Biosciences Inc., Arcutis Biotherapeutics, Inc., argenx SE, Arrowhead Pharmaceuticals Inc, Arvinas Inc, Ascendis Pharma A/S, Atea Pharmaceuticals Inc, Axsome Therapeutics, BeiGene Ltd, Bicycle Therapeutics Plc, Biogen Inc, Biomarin Pharmaceutical Inc, BioNTech SE, Blueprint Medicines Corporation, Bolt Biotherapeutics, Inc., Cabaletta Bio Inc, Centessa Pharmaceuticals, Inc, Cerevel Therapeutics Holdings Inc, Certara Inc, CRISPR Therapeutics AG, Cullinan Oncology Inc, Cyteir Therapeutics, Inc., Cytokinetics Inc, Denali Therapeutics Inc, Disc Medicine Inc, Editas Medicine, Erasca, Inc., Evelo Biosciences Inc, Exelixis Inc., Exscientia PLC, Foghorn Therapeutics, Fusion Pharmaceuticals Inc, Galapagos NV, Genmab A/S, Gilead Sciences Inc., Graphite Bio, Inc., Halozyme Therapeutics, Inc, Hookipa Pharma Inc, Horizon Therapeutics Plc, IGM Biosciences Inc, Immuneering Corporation, Incyte Corp, Insmed Inc, Intellia Therapeutics Inc, Intra-Cellular Therapies Inc, Inviyd Inc, IO Biotech, Ionis Pharmaceuticals Inc, Iveric Bio Inc, Kodiak Sciences Inc, Kymera Therapeutics Inc, Legend Biotech Corp, Lyell Immunopharma, Inc., Mirati Therapeutics, Moderna Inc, Neurocrine Biosciences Inc, Pharvaris N.V., Prelude Therapeutics Inc, Prime Medicine Inc, ProKidney Corp, PTC Therapeutics, Recursion Pharmaceuticals Inc, Regeneron Pharmaceuticals Inc., Regenxbio Inc, Repare Therapeutics Inc, Revance Therapeutics Inc, Rhythm Pharmaceuticals Inc, Rocket Pharmaceuticals Inc, Sana Biotechnology, Inc, Sarepta Therapeutics Inc, Schrodinger Inc., Seagen Inc, Silence Therapeutics Plc, Talaris Therapeutics, Tenaya Therapeutics Inc, Third Harmonic Bio Inc, Tscan Therapeutics Inc, Ultragenyx Pharmaceutical Inc, **United Therapeutics Corp**, Vaccitech Plc, Ventyx Biosciences, Vertex Pharmaceuticals, Vigil Neuroscience Inc, Vir Biotechnology Inc, Xlio Therapeutics Inc, Y-mABs Therapeutics Inc., Zentalis Pharmaceuticals Inc.

Within the last 12 months, Morgan Stanley has either provided or is providing non-investment banking, securities-related services to and/or in the past has entered into an agreement to provide services or has a client relationship with the following company: Amgen Inc., Biogen Inc, Biomarin Pharmaceutical Inc, Cytokinetics Inc, Genmab A/S, Gilead Sciences Inc., Horizon Therapeutics Plc, Moderna Inc, Regeneron Pharmaceuticals Inc., Vertex Pharmaceuticals.

Morgan Stanley & Co. LLC makes a market in the securities of 2seventy Bio Inc, Acadia Pharmaceuticals Inc, ADC Therapeutics SA, Akero Therapeutics Inc,

# Morgan Stanley | RESEARCH



Alector Inc, AlloVir Inc, Alnylam Pharmaceuticals Inc, Alpine Immune Sciences Inc, Amgen Inc., Amicus Therapeutics Inc., Arcus Biosciences Inc., Arcutis Biotherapeutics, Inc., Arrowhead Pharmaceuticals Inc, Arvinas Inc, Atea Pharmaceuticals Inc, Bicycle Therapeutics Plc, Biogen Inc, Biomarin Pharmaceutical Inc, Bluebird Bio Inc, Blueprint Medicines Corporation, Bolt Biotherapeutics, Inc., C4 Therapeutics, Cabaletta Bio Inc, Centessa Pharmaceuticals, Inc, Cerevel Therapeutics Holdings Inc, Certara Inc, Cullinan Oncology Inc, Cytokinetics Inc, Denali Therapeutics Inc, Disc Medicine Inc, Erasca, Inc., Evelo Biosciences Inc, Exelixis Inc., Foghorn Therapeutics, Fusion Pharmaceuticals Inc, Gilead Sciences Inc., Graphite Bio, Inc, Halozyme Therapeutics, Inc, Horizon Therapeutics Plc, IGM Biosciences Inc, Immuneering Corporation, Incyte Corp, Insmed Inc, Intra-Cellular Therapies Inc, Inviyd Inc, IO Biotech, Ionis Pharmaceuticals Inc, Iveric Bio Inc, Karyopharm Therapeutics Inc, Kodiak Sciences Inc, Kymera Therapeutics Inc, Legend Biotech Corp, Mirati Therapeutics, Moderna Inc, Neurocrine Biosciences Inc, Nurix Therapeutics Inc., Pharvaris N.V., Prelude Therapeutics Inc, PTC Therapeutics, Recursion Pharmaceuticals Inc, Regeneron Pharmaceuticals Inc., Regenxbio Inc, Repare Therapeutics Inc, Revance Therapeutics Inc, Rhythm Pharmaceuticals Inc, Rocket Pharmaceuticals Inc, SAGE Therapeutics Inc, Sana Biotechnology, Inc, Schrodinger Inc., Seagen Inc, Sigilon Therapeutics Inc, Talaris Therapeutics, Tenaya Therapeutics Inc, Third Harmonic Bio Inc, Tscan Therapeutics Inc, Ultragenyx Pharmaceutical Inc, Vaccitech Plc, Vertex Pharmaceuticals, Vigil Neuroscience Inc, Vir Biotechnology Inc, Y-mAbs Therapeutics Inc., Zentalis Pharmaceuticals Inc.

The equity research analysts or strategists principally responsible for the preparation of Morgan Stanley Research have received compensation based upon various factors, including quality of research, investor client feedback, stock picking, competitive factors, firm revenues and overall investment banking revenues. Equity Research analysts' or strategists' compensation is not linked to investment banking or capital markets transactions performed by Morgan Stanley or the profitability or revenues of particular trading desks.

Morgan Stanley and its affiliates do business that relates to companies/instruments covered in Morgan Stanley Research, including market making, providing liquidity, fund management, commercial banking, extension of credit, investment services and investment banking. Morgan Stanley sells to and buys from customers the securities/instruments of companies covered in Morgan Stanley Research on a principal basis. Morgan Stanley may have a position in the debt of the Company or instruments discussed in this report. Morgan Stanley trades or may trade as principal in the debt securities (or in related derivatives) that are the subject of the debt research report.

Certain disclosures listed above are also for compliance with applicable regulations in non-US jurisdictions.

## STOCK RATINGS

Morgan Stanley uses a relative rating system using terms such as Overweight, Equal-weight, Not-Rated or Underweight (see definitions below). Morgan Stanley does not assign ratings of Buy, Hold or Sell to the stocks we cover. Overweight, Equal-weight, Not-Rated and Underweight are not the equivalent of buy, hold and sell. Investors should carefully read the definitions of all ratings used in Morgan Stanley Research. In addition, since Morgan Stanley Research contains more complete information concerning the analyst's views, investors should carefully read Morgan Stanley Research, in its entirety, and not infer the contents from the rating alone. In any case, ratings (or research) should not be used or relied upon as investment advice. An investor's decision to buy or sell a stock should depend on individual circumstances (such as the investor's existing holdings) and other considerations.

### Global Stock Ratings Distribution

(as of April 30, 2023)

The Stock Ratings described below apply to Morgan Stanley's Fundamental Equity Research and do not apply to Debt Research produced by the Firm. For disclosure purposes only (in accordance with FINRA requirements), we include the category headings of Buy, Hold, and Sell alongside our ratings of Overweight, Equal-weight, Not-Rated and Underweight. Morgan Stanley does not assign ratings of Buy, Hold or Sell to the stocks we cover. Overweight, Equal-weight, Not-Rated and Underweight are not the equivalent of buy, hold, and sell but represent recommended relative weightings (see definitions below). To satisfy regulatory requirements, we correspond Overweight, our most positive stock rating, with a buy recommendation; we correspond Equal-weight and Not-Rated to hold and Underweight to sell recommendations, respectively.

| STOCK RATING CATEGORY | COVERAGE UNIVERSE | | INVESTMENT BANKING CLIENTS (IBC) | | | OTHER MATERIAL INVESTMENT SERVICES CLIENTS (MISC) | |
|---|---|---|---|---|---|---|---|
| | COUNT | % OF TOTAL | COUNT | % OF TOTAL IBC | % OF RATING CATEGORY | COUNT | % OF TOTAL OTHER MISC |
| **Overweight/Buy** | **1357** | 37% | 269 | 42% | 20% | 599 | 39% |
| **Equal-weight/Hold** | **1660** | 45% | 307 | 47% | 18% | 721 | 47% |
| **Not-Rated/Hold** | **5** | 0% | 1 | 0% | 20% | 1 | 0% |
| **Underweight/Sell** | **639** | 17% | 70 | 11% | 11% | 228 | 15% |
| **TOTAL** | **3,661** | | **647** | | | **1549** | |

Data include common stock and ADRs currently assigned ratings. Investment Banking Clients are companies from whom Morgan Stanley received investment banking compensation in the last 12 months. Due to rounding off of decimals, the percentages provided in the "% of total" column may not add up to exactly 100 percent.

### Analyst Stock Ratings

Overweight (O). The stock's total return is expected to exceed the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Equal-weight (E). The stock's total return is expected to be in line with the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Not-Rated (NR). Currently the analyst does not have adequate conviction about the stock's total return relative to the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Underweight (U). The stock's total return is expected to be below the average total return of the analyst's industry (or industry team's) coverage universe, on a risk-adjusted basis, over the next 12-18 months.

Unless otherwise specified, the time frame for price targets included in Morgan Stanley Research is 12 to 18 months.

### Analyst Industry Views

Attractive (A): The analyst expects the performance of his or her industry coverage universe over the next 12-18 months to be attractive vs. the relevant broad market benchmark, as indicated below.

**Morgan Stanley** | RESEARCH 

In-Line (I): The analyst expects the performance of his or her industry coverage universe over the next 12-18 months to be in line with the relevant broad market benchmark, as indicated below.

Cautious (C): The analyst views the performance of his or her industry coverage universe over the next 12-18 months with caution vs. the relevant broad market benchmark, as indicated below.

Benchmarks for each region are as follows: North America - S&P 500; Latin America - relevant MSCI country index or MSCI Latin America Index; Europe - MSCI Europe; Japan - TOPIX; Asia - relevant MSCI country index or MSCI sub-regional index or MSCI AC Asia Pacific ex Japan Index.

## Stock Price, Price Target and Rating History (See Rating Definitions)



United Therapeutics Corp (UTHR.O) – As of 5/23/23 in USD
Industry : Biotechnology

Stock Rating History: 5/1/18 : NA/I; 10/11/22 : O/I; 11/5/22 : O/A

Price Target History: 10/11/22 : 288; 11/2/22 : 322; 12/6/22 : 330; 2/22/23 : 320; 4/10/23 : 316

Source: Morgan Stanley Research    Date Format : MM/DD/YY    Price Target :—◆—    No Price Target Assigned (NA)
Stock Price (Not Covered by Current Analyst) —    Stock Price (Covered by Current Analyst) ■—
Stock and Industry Ratings (abbreviations below) appear as ◆ Stock Rating/Industry View
Stock Ratings: Overweight (O)  Equal-weight (E)  Underweight (U)  Not-Rated (NR)  No Rating Available (NA)
Industry View: Attractive (A)  In-line (I)  Cautious (C)  No Rating (NR)
Effective January 13, 2014, the stocks covered by Morgan Stanley Asia Pacific will be rated relative to the analyst's industry (or industry team's) coverage.
Effective January 13, 2014, the industry view benchmarks for Morgan Stanley Asia Pacific are as follows: relevant MSCI country index or MSCI sub-regional index or MSCI AC Asia Pacific ex Japan Index.

## Important Disclosures for Morgan Stanley Smith Barney LLC & E*TRADE Securities LLC Customers

Important disclosures regarding the relationship between the companies that are the subject of Morgan Stanley Research and Morgan Stanley Smith Barney LLC or Morgan Stanley or any of their affiliates, are available on the Morgan Stanley Wealth Management disclosure website at www.morganstanley.com/online/researchdisclosures. For Morgan Stanley specific disclosures, you may refer to www.morganstanley.com/researchdisclosures.

Each Morgan Stanley research report is reviewed and approved on behalf of Morgan Stanley Smith Barney LLC and E*TRADE Securities LLC. This review and approval is conducted by the same person who reviews the research report on behalf of Morgan Stanley. This could create a conflict of interest.

## Other Important Disclosures

Morgan Stanley & Co. International PLC and its affiliates have a significant financial interest in the debt securities of Alnylam Pharmaceuticals Inc, Amgen Inc., Ascendis Pharma A/S, Biogen Inc, Biomarin Pharmaceutical Inc, Cytokinetics Inc, Gilead Sciences Inc., Halozyme Therapeutics, Inc, Incyte Corp, Insmed Inc, Ionis Pharmaceuticals Inc, Revance Therapeutics Inc, Sarepta Therapeutics Inc.

Morgan Stanley Research policy is to update research reports as and when the Research Analyst and Research Management deem appropriate, based on developments with the issuer, the sector, or the market that may have a material impact on the research views or opinions stated therein. In addition, certain Research publications are intended to be updated on a regular periodic basis (weekly/monthly/quarterly/annual) and will ordinarily be updated with that frequency, unless the Research Analyst and Research Management determine that a different publication schedule is appropriate based on current conditions.

Morgan Stanley is not acting as a municipal advisor and the opinions or views contained herein are not intended to be, and do not constitute, advice within the meaning of Section 975 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

Morgan Stanley produces an equity research product called a "Tactical Idea." Views contained in a "Tactical Idea" on a particular stock may be contrary to the recommendations or views expressed in research on the same stock. This may be the result of differing time horizons, methodologies, market events, or other factors. For all research available on a particular stock, please contact your sales representative or go to Matrix at http://www.morganstanley.com/matrix.

Morgan Stanley Research is provided to our clients through our proprietary research portal on Matrix and also distributed electronically by Morgan Stanley to clients. Certain, but not all, Morgan Stanley Research products are also made available to clients through third-party vendors or redistributed to clients through alternate electronic means as a convenience. For access to all available Morgan Stanley Research, please contact your sales representative or go to Matrix at http://www.morganstanley.com/matrix.

Any access and/or use of Morgan Stanley Research is subject to Morgan Stanley's Terms of Use (http://www.morganstanley.com/terms.html). By accessing and/or using Morgan Stanley Research, you are indicating that you have read and agree to be bound by our Terms of Use (http://www.morganstanley.com/terms.html). In addition you consent to Morgan Stanley processing your personal data and using cookies in accordance with our Privacy Policy and our Global Cookies Policy (http://www.morganstanley.com/privacy_pledge.html), including for the purposes of setting your preferences and to collect readership data so that we can deliver better and more personalized service and products to you. To find out more information about how Morgan Stanley processes personal data, how we use cookies and how to reject cookies see our Privacy Policy and our Global Cookies Policy (http://www.morganstanley.com/privacy_pledge.html).

If you do not agree to our Terms of Use and/or if you do not wish to provide your consent to Morgan Stanley processing your personal data or using cookies please do not access our research.

Morgan Stanley Research does not provide individually tailored investment advice. Morgan Stanley Research has been prepared without regard to the

Morgan Stanley | RESEARCH 

circumstances and objectives of those who receive it. Morgan Stanley recommends that investors independently evaluate particular investments and strategies, and encourages investors to seek the advice of a financial adviser. The appropriateness of an investment or strategy will depend on an investor's circumstances and objectives. The securities, instruments, or strategies discussed in Morgan Stanley Research may not be suitable for all investors, and certain investors may not be eligible to purchase or participate in some or all of them. Morgan Stanley Research is not an offer to buy or sell or the solicitation of an offer to buy or sell any security/instrument or to participate in any particular trading strategy. The value and income from your investments may vary because of changes in interest rates, foreign exchange rates, default rates, prepayment rates, securities/instruments prices, market indexes, operational or financial conditions of companies or other factors. There may be time limitations on the exercise of options or other rights in securities/instruments transactions. Past performance is not necessarily a guide to future performance. Estimates of future performance are based on assumptions that may not be realized. If provided, and unless otherwise stated, the closing price on the cover page is that of the primary exchange for the subject company's securities/instruments.

The fixed income research analysts, strategists or economists principally responsible for the preparation of Morgan Stanley Research have received compensation based upon various factors, including quality, accuracy and value of research, firm profitability or revenues (which include fixed income trading and capital markets profitability or revenues), client feedback and competitive factors. Fixed Income Research analysts', strategists' or economists' compensation is not linked to investment banking or capital markets transactions performed by Morgan Stanley or the profitability or revenues of particular trading desks.

The "Important Regulatory Disclosures on Subject Companies" section in Morgan Stanley Research lists all companies mentioned where Morgan Stanley owns 1% or more of a class of common equity securities of the companies. For all other companies mentioned in Morgan Stanley Research, Morgan Stanley may have an investment of less than 1% in securities/instruments or derivatives of securities/instruments of companies and may trade them in ways different from those discussed in Morgan Stanley Research. Employees of Morgan Stanley not involved in the preparation of Morgan Stanley Research may have investments in securities/instruments or derivatives of securities/instruments of companies mentioned and may trade them in ways different from those discussed in Morgan Stanley Research. Derivatives may be issued by Morgan Stanley or associated persons.

With the exception of information regarding Morgan Stanley, Morgan Stanley Research is based on public information. Morgan Stanley makes every effort to use reliable, comprehensive information, but we make no representation that it is accurate or complete. We have no obligation to tell you when opinions or information in Morgan Stanley Research change apart from when we intend to discontinue equity research coverage of a subject company. Facts and views presented in Morgan Stanley Research have not been reviewed by, and may not reflect information known to, professionals in other Morgan Stanley business areas, including investment banking personnel.

Morgan Stanley Research personnel may participate in company events such as site visits and are generally prohibited from accepting payment by the company of associated expenses unless pre-approved by authorized members of Research management.

Morgan Stanley may make investment decisions that are inconsistent with the recommendations or views in this report.

To our readers based in Taiwan or trading in Taiwan securities/instruments: Information on securities/instruments that trade in Taiwan is distributed by Morgan Stanley Taiwan Limited ("MSTL"). Such information is for your reference only. The reader should independently evaluate the investment risks and is solely responsible for their investment decisions. Morgan Stanley Research may not be distributed to the public media or quoted or used by the public media without the express written consent of Morgan Stanley. Any non-customer reader within the scope of Article 7-1 of the Taiwan Stock Exchange Recommendation Regulations accessing and/or receiving Morgan Stanley Research is not permitted to provide Morgan Stanley Research to any third party (including but not limited to related parties, affiliated companies and any other third parties) or engage in any activities regarding Morgan Stanley Research which may create or give the appearance of creating a conflict of interest. Information on securities/instruments that do not trade in Taiwan is for informational purposes only and is not to be construed as a recommendation or a solicitation to trade in such securities/instruments. MSTL may not execute transactions for clients in these securities/instruments.

Morgan Stanley is not incorporated under PRC law and the research in relation to this report is conducted outside the PRC. Morgan Stanley Research does not constitute an offer to sell or the solicitation of an offer to buy any securities in the PRC. PRC investors shall have the relevant qualifications to invest in such securities and shall be responsible for obtaining all relevant approvals, licenses, verifications and/or registrations from the relevant governmental authorities themselves. Neither this report nor any part of it is intended as, or shall constitute, provision of any consultancy or advisory service of securities investment as defined under PRC law. Such information is provided for your reference only.

Morgan Stanley Research is disseminated in Brazil by Morgan Stanley C.T.V.M. S.A. located at Av. Brigadeiro Faria Lima, 3600, 6th floor, São Paulo - SP, Brazil; and is regulated by the Comissão de Valores Mobiliários; in Mexico by Morgan Stanley México, Casa de Bolsa, S.A. de C.V which is regulated by Comision Nacional Bancaria y de Valores. Paseo de los Tamarindos 90, Torre 1, Col. Bosques de las Lomas Floor 29, 05120 Mexico City; in Japan by Morgan Stanley MUFG Securities Co., Ltd. and, for Commodities related research reports only, Morgan Stanley Capital Group Japan Co., Ltd; in Hong Kong by Morgan Stanley Asia Limited (which accepts responsibility for its contents) and by Morgan Stanley Bank Asia Limited; in Singapore by Morgan Stanley Asia (Singapore) Pte. (Registration number 199206298Z) and/or Morgan Stanley Asia (Singapore) Securities Pte Ltd (Registration number 200008434H), regulated by the Monetary Authority of Singapore (which accepts legal responsibility for its contents and should be contacted with respect to any matters arising from, or in connection with, Morgan Stanley Research) and by Morgan Stanley Bank Asia Limited, Singapore Branch (Registration number T14FC0118J); in Australia to "wholesale clients" within the meaning of the Australian Corporations Act by Morgan Stanley Australia Limited A.B.N. 67 003 734 576, holder of Australian financial services license No. 233742, which accepts responsibility for its contents; in Australia to "wholesale clients" and "retail clients" within the meaning of the Australian Corporations Act by Morgan Stanley Wealth Management Australia Pty Ltd (A.B.N. 19 009 145 555, holder of Australian financial services license No. 240813, which accepts responsibility for its contents; in Korea by Morgan Stanley & Co International plc, Seoul Branch; in India by Morgan Stanley India Company Private Limited having Corporate Identification No (CIN) U22990MH1998PTC115305, regulated by the Securities and Exchange Board of India ("SEBI") and holder of licenses as a Research Analyst (SEBI Registration No. INH000001105); Stock Broker (SEBI Stock Broker Registration No. INZ000244438), Merchant Banker (SEBI Registration No. INM000011203), and depository participant with National Securities Depository Limited (SEBI Registration No. IN-DP-NSDL-567-2021) having registered office at 18th Floor, Tower 2, One World Center, Plot- 841, Jupiter Textile Mill Compound, Senapati Bapat Marg, Lower Parel, Mumbai 400013, India Telephone no. +91-22-61181000; Compliance Officer Details: Mr. Anil Shenoy, Tel. No.: +91-22-61181000 or Email: Anil.Shenoy@morganstanley.com; Grievance officer details: Mr. Anil Shenoy, Tel. No.: +91-22-61181000 or Email: msic-compliance@morganstanley.com; in Canada by Morgan Stanley Canada Limited; in Germany and the European Economic Area where required by Morgan Stanley Europe S.E., authorised and regulated by Bundesanstalt fuer Finanzdienstleistungsaufsicht (BaFin) under the reference number 149169; in the US by Morgan Stanley & Co. LLC, which accepts responsibility for its contents. Morgan Stanley & Co. International plc, authorized by the Prudential Regulatory Authority and regulated by the Financial Conduct Authority and the Prudential Regulatory Authority, disseminates in the UK research that it has prepared, and approves solely for the purposes of section 21 of the Financial Services and Markets Act 2000, research which has been prepared by any of its affiliates. RMB Morgan Stanley Proprietary Limited is a member of the JSE Limited and A2X (Pty) Ltd. RMB Morgan Stanley Proprietary Limited is a joint venture owned equally by Morgan Stanley International Holdings Inc. and RMB Investment Advisory (Proprietary) Limited, which is wholly owned by FirstRand Limited. The information in Morgan Stanley Research is being disseminated by Morgan Stanley Saudi Arabia, regulated by the Capital Market Authority in the Kingdom of Saudi Arabia , and is directed at Sophisticated investors only.

The information in Morgan Stanley Research is being communicated by Morgan Stanley & Co. International plc (DIFC Branch), regulated by the Dubai Financial Services Authority (the DFSA), and is directed at Professional Clients only, as defined by the DFSA. The financial products or financial services to which this research relates will only be made available to a customer who we are satisfied meets the regulatory criteria to be a Professional Client. A distribution of the different MS Research ratings or recommendations, in percentage terms for Investments in each sector covered, is available upon request from your sales representative.

# Morgan Stanley | RESEARCH



The information in Morgan Stanley Research is being communicated by Morgan Stanley & Co. International plc (QFC Branch), regulated by the Qatar Financial Centre Regulatory Authority (the QFCRA), and is directed at business customers and market counterparties only and is not intended for Retail Customers as defined by the QFCRA.

As required by the Capital Markets Board of Turkey, investment information, comments and recommendations stated here, are not within the scope of investment advisory activity. Investment advisory service is provided exclusively to persons based on their risk and income preferences by the authorized firms. Comments and recommendations stated here are general in nature. These opinions may not fit to your financial status, risk and return preferences. For this reason, to make an investment decision by relying solely to this information stated here may not bring about outcomes that fit your expectations.

The trademarks and service marks contained in Morgan Stanley Research are the property of their respective owners. Third-party data providers make no warranties or representations relating to the accuracy, completeness, or timeliness of the data they provide and shall not have liability for any damages relating to such data. The Global Industry Classification Standard (GICS) was developed by and is the exclusive property of MSCI and S&P.

Morgan Stanley Research, or any portion thereof may not be reprinted, sold or redistributed without the written consent of Morgan Stanley.

Indicators and trackers referenced in Morgan Stanley Research may not be used as, or treated as, a benchmark under Regulation EU 2016/1011, or any other similar framework.

The issuers and/or fixed income products recommended or discussed in certain fixed income research reports may not be continuously followed. Accordingly, investors should regard those fixed income research reports as providing stand-alone analysis and should not expect continuing analysis or additional reports relating to such issuers and/or individual fixed income products.

Morgan Stanley may hold, from time to time, material financial and commercial interests regarding the company subject to the Research report.

Registration granted by SEBI and certification from the National Institute of Securities Markets (NISM) in no way guarantee performance of the intermediary or provide any assurance of returns to investors. Investment in securities market are subject to market risks. Read all the related documents carefully before investing.

INDUSTRY COVERAGE: Biotechnology

| COMPANY (TICKER) | RATING (AS OF) | PRICE* (05/23/2023) |
|---|---|---|
| **Jeffrey Hung** | | |
| Acadia Pharmaceuticals Inc (ACAD.O) | E (10/14/2021) | $25.54 |
| ADC Therapeutics SA (ADCT.N) | E (09/09/2022) | $2.55 |
| Alector Inc (ALEC.O) | E (09/09/2022) | $7.75 |
| Amicus Therapeutics Inc. (FOLD.O) | E (09/09/2022) | $11.75 |
| Bicycle Therapeutics Plc (BCYC.O) | E (02/14/2022) | $24.54 |
| Bluebird Bio Inc (BLUE.O) | U (11/08/2021) | $3.70 |
| Centessa Pharmaceuticals, Inc (CNTA.O) | U (08/12/2022) | $4.47 |
| Cerevel Therapeutics Holdings Inc (CERE.O) | O (06/18/2021) | $33.27 |
| Cullinan Oncology Inc (CGEM.O) | O (04/27/2021) | $9.14 |
| Cyteir Therapeutics, Inc. (CYT.O) | U (02/03/2023) | $2.24 |
| Cytokinetics Inc (CYTK.O) | O (04/09/2020) | $39.01 |
| Denali Therapeutics Inc (DNLI.O) | O (01/02/2018) | $31.96 |
| Disc Medicine Inc (IRON.O) | O (04/20/2023) | $33.20 |
| Erasca, Inc. (ERAS.O) | O (02/03/2023) | $2.99 |
| Exelixis Inc. (EXEL.O) | ++ | $19.33 |
| Graphite Bio, Inc. (GRPH.O) | E (03/21/2022) | $2.92 |
| Immuneering Corporation (IMRX.O) | E (04/18/2023) | $6.97 |
| Immunocore Holdings Ltd (IMCR.O) | O (09/09/2022) | $57.41 |
| Insmed Inc (INSM.O) | O (10/19/2021) | $19.16 |
| Intra-Cellular Therapies Inc (ITCI.O) | O (04/20/2023) | $61.83 |
| Neurocrine Biosciences Inc (NBIX.O) | O (02/03/2023) | $93.64 |
| Prelude Therapeutics Inc (PRLD.O) | E (09/09/2022) | $5.45 |
| PTC Therapeutics (PTCT.O) | E (09/09/2022) | $58.41 |
| Repare Therapeutics Inc (RPTX.O) | E (02/03/2023) | $10.74 |
| Rhythm Pharmaceuticals Inc (RYTM.O) | E (11/19/2021) | $16.54 |
| Ultragenyx Pharmaceutical Inc (RARE.O) | O (03/27/2019) | $51.42 |
| Vigil Neuroscience Inc (VIGL.O) | E (02/01/2022) | $9.97 |
| **Maxwell Skor** | | |
| Adagene Inc. (ADAG.O) | O (03/07/2021) | $1.48 |
| Atea Pharmaceuticals Inc (AVIR.O) | U (01/06/2022) | $4.93 |
| Bolt Biotherapeutics, Inc. (BOLT.O) | E (01/06/2022) | $1.95 |
| Inviyd Inc (IVVD.O) | U (01/06/2022) | $1.70 |
| Pharvaris N.V. (PHVS.O) | E (08/22/2022) | $8.75 |
| Vaccitech Plc (VACC.O) | O (05/25/2021) | $2.50 |
| **Michael E Ulz** | | |

**Morgan Stanley** | RESEARCH



| | | |
|---|---|---|
| Akero Therapeutics Inc (AKRO.O) | O (01/27/2023) | $44.34 |
| AlloVir Inc (ALVR.O) | O (08/24/2020) | $4.29 |
| Alnylam Pharmaceuticals Inc (ALNY.O) | E (09/09/2022) | $191.83 |
| Alpine Immune Sciences Inc (ALPN.O) | O (01/19/2023) | $10.51 |
| Arrowhead Pharmaceuticals Inc (ARWR.O) | E (09/09/2022) | $36.28 |
| Blueprint Medicines Corporation (BPMC.O) | E (10/30/2020) | $58.50 |
| Cabaletta Bio Inc (CABA.O) | O (01/27/2023) | $10.77 |
| Fate Therapeutics Inc (FATE.O) | E (08/26/2021) | $5.47 |
| Fusion Pharmaceuticals Inc (FUSN.O) | O (07/21/2020) | $4.26 |
| Galapagos NV (GLPG.O) | E (09/09/2022) | $44.46 |
| Horizon Therapeutics Plc (HZNP.O) | ++ | $100.10 |
| IGM Biosciences Inc (IGMS.O) | E (12/13/2021) | $12.01 |
| IO Biotech (IOBT.O) | O (11/30/2021) | $2.08 |
| Ionis Pharmaceuticals Inc (IONS.O) | E (12/21/2022) | $42.28 |
| Iveric Bio Inc (ISEE.O) | E (05/01/2023) | $38.00 |
| Karyopharm Therapeutics Inc (KPTI.O) | E (11/19/2021) | $2.59 |
| Kodiak Sciences Inc (KOD.O) | E (11/16/2020) | $6.79 |
| Mirati Therapeutics (MRTX.O) | E (08/26/2021) | $45.70 |
| Rocket Pharmaceuticals Inc (RCKT.O) | O (02/01/2023) | $22.24 |
| Sarepta Therapeutics Inc (SRPT.O) | O (03/01/2023) | $146.91 |
| Senti Biosciences Inc (SNTI.O) | E (10/07/2022) | $0.95 |
| Sigilon Therapeutics Inc (SGTX.O) | E (12/29/2020) | $7.31 |
| Silence Therapeutics Plc (SLN.O) | O (05/08/2023) | $6.04 |
| Tenaya Therapeutics Inc (TNYA.O) | E (08/24/2021) | $7.60 |
| Third Harmonic Bio Inc (THRD.O) | E (12/15/2022) | $5.20 |
| Vir Biotechnology Inc (VIR.O) | E (01/27/2023) | $26.73 |
| Xilio Therapeutics Inc (XLO.O) | O (11/16/2021) | $3.05 |
| Y-mAbs Therapeutics Inc. (YMAB.O) | U (01/27/2023) | $9.87 |
| Zentalis Pharmaceuticals Inc (ZNTL.O) | O (10/19/2021) | $26.74 |

**Terence C Flynn, Ph.D.**

| | | |
|---|---|---|
| Amgen Inc. (AMGN.O) | ++ | $224.44 |
| Arcus Biosciences Inc. (RCUS.N) | O (10/11/2022) | $18.05 |
| Arvinas Inc (ARVN.O) | E (04/06/2022) | $23.77 |
| Biogen Inc (BIIB.O) | O (07/27/2020) | $303.15 |
| BioNTech SE (BNTX.O) | E (12/16/2021) | $116.30 |
| C4 Therapeutics (CCCC.O) | U (10/11/2022) | $3.16 |
| CRISPR Therapeutics AG (CRSP.O) | U (10/11/2022) | $67.20 |
| Editas Medicine (EDIT.O) | U (01/19/2021) | $9.58 |
| Gilead Sciences Inc. (GILD.O) | E (01/06/2022) | $78.58 |
| Intellia Therapeutics Inc (NTLA.O) | O (10/11/2022) | $43.45 |
| Moderna Inc (MRNA.O) | E (12/16/2020) | $137.75 |
| Nurix Therapeutics Inc (NRIX.O) | E (10/11/2022) | $10.24 |
| Prime Medicine Inc (PRME.O) | E (11/14/2022) | $14.20 |
| Regeneron Pharmaceuticals Inc. (REGN.O) | O (09/09/2022) | $748.56 |
| Revance Therapeutics Inc (RVNC.O) | E (10/11/2022) | $31.47 |
| Seagen Inc (SGEN.O) | E (03/15/2023) | $196.49 |
| United Therapeutics Corp (UTHR.O) | O (10/11/2022) | $216.19 |
| Vertex Pharmaceuticals (VRTX.O) | E (05/03/2022) | $333.51 |

**Vikram Purohit**

| | | |
|---|---|---|
| 2seventy Bio Inc (TSVT.O) | O (11/08/2021) | $12.01 |
| Akili Inc (AKLI.O) | E (12/28/2022) | $1.31 |
| Arcutis Biotherapeutics, Inc. (ARQT.O) | O (11/19/2021) | $9.47 |
| argenx SE (ARGX.O) | O (05/03/2022) | $413.62 |
| Ascendis Pharma A/S (ASND.O) | E (04/04/2023) | $90.22 |
| Axsome Therapeutics (AXSM.O) | E (08/10/2021) | $71.82 |
| BeiGene Ltd (BGNE.O) | O (01/17/2020) | $239.33 |
| Biomarin Pharmaceutical Inc (BMRN.O) | O (04/25/2022) | $91.99 |
| Certara Inc (CERT.O) | E (01/05/2021) | $21.01 |
| Evelo Biosciences Inc (EVLO.O) | E (10/19/2021) | $0.14 |
| Exscientia PLC (EXAI.O) | E (10/26/2021) | $7.61 |
| Foghorn Therapeutics (FHTX.O) | E (08/23/2022) | $6.97 |
| Genmab A/S (GMAB.O) | U (09/07/2021) | $41.80 |
| Halozyme Therapeutics, Inc (HALO.O) | O (12/21/2022) | $34.01 |
| Hookipa Pharma Inc (HOOK.O) | E (11/11/2021) | $1.45 |
| Incyte Corp (INCY.O) | E (04/29/2020) | $65.08 |
| Kymera Therapeutics Inc (KYMR.O) | E (09/15/2020) | $29.30 |
| Legend Biotech Corp (LEGN.O) | O (01/31/2022) | $66.54 |
| Lyell Immunopharma, Inc. (LYEL.O) | E (11/14/2022) | $2.88 |
| ProKidney Corp (PROK.O) | E (11/10/2022) | $10.43 |
| Recursion Pharmaceuticals Inc (RXRX.O) | E (05/22/2023) | $9.25 |
| Regenxbio Inc (RGNX.O) | O (10/19/2021) | $20.39 |
| SAGE Therapeutics Inc (SAGE.O) | E (11/16/2020) | $52.44 |
| Sana Biotechnology Inc (SANA.O) | O (03/01/2021) | $7.09 |
| Schrodinger Inc. (SDGR.O) | E (11/19/2021) | $38.52 |
| Talaris Therapeutics (TALS.O) | E (07/05/2022) | $2.91 |
| Tscan Therapeutics Inc (TCRX.O) | O (08/10/2021) | $2.57 |
| Ventyx Biosciences (VTYX.O) | O (11/17/2022) | $36.28 |

Stock Ratings are subject to change. Please see latest research for each company.

# Morgan Stanley | RESEARCH



* Historical prices are not split adjusted.

© 2023 Morgan Stanley

# EXHIBIT 20

**Kannappan, Deepa**

---

| | |
|---|---|
| **From:** | Jackson, William C <WJackson@goodwinlaw.com> |
| **Sent:** | Wednesday, May 17, 2023 5:56 PM |
| **To:** | Kannappan, Deepa; Cochran, Mary Ann; UT-793; Zhang, Jenny; Santos, Jaime; Adykhuis@mwe.com; Shaun Snader; Tashima, Rohini; Jay, William M; Burrowbridge, Adam |
| **Cc:** | z/Liquidia v UTC 308970-201; Dcarsten@mwe.com |
| **Subject:** | RE: 23-1805 (CAFC): Motion to Expedite |

**[External]**

Deepa:

UTC has considered the request and does not think expedition is necessary or appropriate in this case.  So UTC intends to oppose Liquidia's motion to expedite.

**William C Jackson**



Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
o  +1 202 346 4216
m +1 202 270 6622
f   +1 202 478 0819
WJackson@goodwinlaw.com



---

**From:** Kannappan, Deepa <dkannappan@cooley.com>
**Sent:** Tuesday, May 16, 2023 1:25 PM
**To:** Jackson, William C <WJackson@goodwinlaw.com>; Cochran, Mary Ann <MCochran@foley.com>; UT-793 <UT-793@foley.com>; Zhang, Jenny <JZhang@goodwinlaw.com>; Santos, Jaime <JSantos@goodwinlaw.com>; Adykhuis@mwe.com; Shaun Snader <ssnader@unither.com>; Tashima, Rohini <RTashima@goodwinlaw.com>; Jay, William M <WJay@goodwinlaw.com>; Burrowbridge, Adam <Aburrowbridge@mwe.com>
**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: 23-1805 (CAFC): Motion to Expedite

***EXTERNAL***
Counsel,

Following up on the below.

Thanks,
Deepa

---

**From:** Kannappan, Deepa <dkannappan@cooley.com>
**Sent:** Friday, May 12, 2023 12:20 PM
**To:** 'Jackson, William C' <WJackson@goodwinlaw.com>; Cochran, Mary Ann <MCochran@foley.com>; UT-793 <UT-793@foley.com>; Zhang, Jenny <JZhang@goodwinlaw.com>; Santos, Jaime <JSantos@goodwinlaw.com>;

Adykhuis@mwe.com; Shaun Snader <ssnader@unither.com>; Tashima, Rohini <RTashima@goodwinlaw.com>; Jay, William M <WJay@goodwinlaw.com>; Burrowbridge, Adam <Aburrowbridge@mwe.com>
**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: 23-1805 (CAFC): Motion to Expedite

Hi William,

Correct, and we would ask for oral argument at the next available date after briefing is complete.

Best,
Deepa

---

**From:** Jackson, William C <WJackson@goodwinlaw.com>
**Sent:** Friday, May 12, 2023 12:12 PM
**To:** Kannappan, Deepa <dkannappan@cooley.com>; Cochran, Mary Ann <MCochran@foley.com>; UT-793 <UT-793@foley.com>; Zhang, Jenny <JZhang@goodwinlaw.com>; Santos, Jaime <JSantos@goodwinlaw.com>; Adykhuis@mwe.com; Shaun Snader <ssnader@unither.com>; Tashima, Rohini <RTashima@goodwinlaw.com>; Jay, William M <WJay@goodwinlaw.com>; Burrowbridge, Adam <Aburrowbridge@mwe.com>
**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** RE: 23-1805 (CAFC): Motion to Expedite

**[External]**

Deepa:

As we understand it, your proposal is as follows:

| Event | Date | LIQ Revised Date |
|---|---|---|
| UTC Opening Brief | 60 days after Certified List | 30 days after Certified List |
| LIQ Response Brief | 40 days after UTC Opening Brief | 20 days after UTC Opening Brief |
| UTC Reply Brief | 21 days after LIQ Response Brief | 11 days after LIQ Response Brief |

Do we have that correct?  In essence, LIQ's proposal would shorten the schedule by 60 days, correct?

**William C Jackson**



Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
o  +1 202 346 4216
m +1 202 270 6622
f   +1 202 478 0819
WJackson@goodwinlaw.com



---

**From:** Kannappan, Deepa <dkannappan@cooley.com>
**Sent:** Thursday, May 11, 2023 1:51 PM
**To:** Jackson, William C <WJackson@goodwinlaw.com>; Cochran, Mary Ann <MCochran@foley.com>; UT-793 <UT-

793@foley.com>; Zhang, Jenny <[JZhang@goodwinlaw.com](mailto:JZhang@goodwinlaw.com)>; Santos, Jaime <[JSantos@goodwinlaw.com](mailto:JSantos@goodwinlaw.com)>; [Adykhuis@mwe.com](mailto:Adykhuis@mwe.com); Shaun Snader <[ssnader@unither.com](mailto:ssnader@unither.com)>; Tashima, Rohini <[RTashima@goodwinlaw.com](mailto:RTashima@goodwinlaw.com)>; Jay, William M <[WJay@goodwinlaw.com](mailto:WJay@goodwinlaw.com)>; Burrowbridge, Adam <[Aburrowbridge@mwe.com](mailto:Aburrowbridge@mwe.com)>
**Cc:** z/Liquidia v UTC 308970-201 <[zLiquidiavUTC308970201@cooley.com](mailto:zLiquidiavUTC308970201@cooley.com)>
**Subject:** RE: 23-1805 (CAFC): Motion to Expedite

***EXTERNAL***
Hi William,

Liquidia proposes shortening the briefing times by half, but is open to a discussion if UTC is amenable.

Best,
Deepa

---

**From:** Jackson, William C <[WJackson@goodwinlaw.com](mailto:WJackson@goodwinlaw.com)>
**Sent:** Thursday, May 11, 2023 5:29 AM
**To:** Kannappan, Deepa <[dkannappan@cooley.com](mailto:dkannappan@cooley.com)>; Cochran, Mary Ann <[MCochran@foley.com](mailto:MCochran@foley.com)>; UT-793 <[UT-793@foley.com](mailto:UT-793@foley.com)>; Zhang, Jenny <[JZhang@goodwinlaw.com](mailto:JZhang@goodwinlaw.com)>; Santos, Jaime <[JSantos@goodwinlaw.com](mailto:JSantos@goodwinlaw.com)>; [Adykhuis@mwe.com](mailto:Adykhuis@mwe.com); Shaun Snader <[ssnader@unither.com](mailto:ssnader@unither.com)>; Tashima, Rohini <[RTashima@goodwinlaw.com](mailto:RTashima@goodwinlaw.com)>; Jay, William M <[WJay@goodwinlaw.com](mailto:WJay@goodwinlaw.com)>; Burrowbridge, Adam <[Aburrowbridge@mwe.com](mailto:Aburrowbridge@mwe.com)>
**Cc:** z/Liquidia v UTC 308970-201 <[zLiquidiavUTC308970201@cooley.com](mailto:zLiquidiavUTC308970201@cooley.com)>
**Subject:** RE: 23-1805 (CAFC): Motion to Expedite

**[External]**

---

Deepa:

Thank you for your email.  Could you identify what Liquidia proposes in terms of expedition?   Thanks.

**William C Jackson**



Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036
o  +1 202 346 4216
m +1 202 270 6622
f  +1 202 478 0819
[WJackson@goodwinlaw.com](mailto:WJackson@goodwinlaw.com)



---

**From:** Kannappan, Deepa <[dkannappan@cooley.com](mailto:dkannappan@cooley.com)>
**Sent:** Wednesday, May 10, 2023 6:29 PM
**To:** Cochran, Mary Ann <[MCochran@foley.com](mailto:MCochran@foley.com)>; UT-793 <[UT-793@foley.com](mailto:UT-793@foley.com)>; Jackson, William C <[WJackson@goodwinlaw.com](mailto:WJackson@goodwinlaw.com)>; Zhang, Jenny <[JZhang@goodwinlaw.com](mailto:JZhang@goodwinlaw.com)>; Santos, Jaime <[JSantos@goodwinlaw.com](mailto:JSantos@goodwinlaw.com)>; [Adykhuis@mwe.com](mailto:Adykhuis@mwe.com); Shaun Snader <[ssnader@unither.com](mailto:ssnader@unither.com)>; Tashima, Rohini <[RTashima@goodwinlaw.com](mailto:RTashima@goodwinlaw.com)>; Jay, William M <[WJay@goodwinlaw.com](mailto:WJay@goodwinlaw.com)>; Burrowbridge, Adam <[Aburrowbridge@mwe.com](mailto:Aburrowbridge@mwe.com)>

**Cc:** z/Liquidia v UTC 308970-201 <zLiquidiavUTC308970201@cooley.com>
**Subject:** 23-1805 (CAFC): Motion to Expedite

***EXTERNAL***
Counsel,

Liquidia intends to file a motion to expedite briefing and oral argument on the '793 IPR appeal (Federal Circuit Case No. 2023-1805).  Please let us know if you oppose.

Best,
Deepa

Deepa Kannappan
Cooley LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
+1 650 843 5673 office
+1 650 849 7400 fax
dkannappan@cooley.com

www.cooley.com/dkannappan
www.cooley.com/litigation
https://www.cooley.com/landing/racial-justice

Twitter | Facebook | LinkedIn

Cooley is one of Fortune's **100 Best Companies to Work For**

Cooley GO > **Start and build your business**

---

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

*************************************************************
This message was sent from Goodwin Procter LLP and is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.
*************************************************************

---

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

---

This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message. If you are the intended recipient, please be advised that the content of this message is subject to access, review and disclosure by the sender's Email System Administrator.

# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 20-755-RGA |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) | |

## DEFENDANT'S ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS

Defendant Liquidia Technologies, Inc. ("Liquidia" or "Defendant") hereby files its answer, defenses, and counterclaims ("Answer") to the First Amended Complaint filed by Plaintiff United Therapeutics Corporation ("UTC" or "Plaintiff"). Each of the paragraphs below corresponds to the same numbered paragraphs in the First Amended Complaint. In responding to the First Amended Complaint, Liquidia has kept Plaintiff's headings for ease of reference, but in so doing, Liquidia is not admitting to the accuracy of any statements made or agreeing with any characterizations made in such headings. Liquidia denies all allegations in the First Amended Complaint, whether express or implied, that are not specifically admitted below. Liquidia further denies that Plaintiff is entitled to the relief requested in the First Amended Complaint, or to any other relief.

## NATURE OF THE ACTION

1. Liquidia admits that the First Amended Complaint purports to assert a patent infringement action. Liquidia admits that U.S. Patent No. 9,593,066 (the "'066 patent") and U.S. Patent No. 9,604,901 (the "'901 patent") each bear the title "Process to Prepare Treprostinil, the

Active Ingredient in Remodulin®," and that U.S. Patent No. 10,716,793 (the "'793 patent") bears the title "Treprostinil Administration by Inhalation".  Liquidia admits that Exhibits A, B and C attached to the First Amended Complaint appear to be copies of the '066, '901 and '793 patents.  Liquidia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 1, and therefore denies them.

2.      Liquidia admits that it submitted New Drug Application No. 213005 under § 505(b)(2) of the Federal Food, Drug and Cosmetic Act ("Liquidia's NDA") to the United States Food and Drug Administration ("FDA") seeking approval to engage in the commercial manufacture, use and/or sale of LIQ861 (treprostinil) inhalation powder (the "Liquidia Product" or "LIQ861 Product").  Liquidia denies the remaining allegations in paragraph 2.

## THE PARTIES

3.      Liquidia is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3, and therefore denies them.

4.      Liquidia admits the allegations in paragraph 4.

5.      Liquidia admits that it purchases treprostinil from Yonsung Fine Chemicals Co., LTD.  Liquidia denies the remaining allegations in paragraph 5.

6.      Liquidia admits that the Liquidia Product delivers treprostinil through a dry powder inhaler ("DPI") that is manufactured by Plastiape SpA ("Plastiape").  Liquidia denies the remaining allegations in paragraph 6.

## JURISDICTION AND VENUE

7.      Liquidia admits that this Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a), provided that standing and other requirements are met.  Liquidia denies that the Plaintiff's claims in its First Amended Complaint have any merit or that Plaintiff is entitled to any relief.  Liquidia denies the remaining allegations in paragraph 7.

8.      Liquidia admits that venue is proper for purposes of this case.

9.      Liquidia admits that this Court has personal jurisdiction over Liquidia for purposes of this case.  Liquidia denies the remaining allegations in paragraph 9.

## **BACKGROUND**

10.     Liquidia admits that UTC is identified as the holder of New Drug Application No. 022387, which has been approved for TYVASO® (treprostinil) Inhalation Solution, 0.6 mg/ml. Liquidia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 10, and therefore denies them.

11.     Liquidia admits that TYVASO® was approved by the FDA in the United States on July 20, 2009, and, according to the TYVASO® prescribing information, is indicated "for the treatment of pulmonary arterial hypertension (WHO Group I) in patients with NYHA Class III symptoms, to increase walk distance."  Liquidia denies the remaining allegations in paragraph 11.

12.     Liquidia admits that TYVASO®, according to its prescribing information, is a sterile solution for oral inhalation: 2.9 mL ampule containing 1.74 mg treprostinil (0.6 mg per mL).

13.     Liquidia admits that the '066 patent is entitled "Process to prepare treprostinil, the active ingredient in Remodulin®," was issued by the United States Patent and Trademark Office on March 14, 2017, and names as inventors Hitesh Batra, Sudersan M. Tuladhar, Raju Penmasta, and David A. Walsh.  Liquidia denies the remaining allegations in paragraph 13.

14.     Liquidia is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14, and therefore denies them.

15.     Liquidia admits that the '901 patent is entitled "Process to prepare treprostinil, the active ingredient in Remodulin®," was issued by the United States Patent and Trademark Office on March 28, 2017, and names as inventors Hitesh Batra, Sudersan M. Tuladhar, Raju Penmasta, and David A. Walsh.  Liquidia denies the remaining allegations in paragraph 15.

16.    Liquidia is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16, and therefore denies them.

17.    Liquidia admits that the '793 patent is entitled "Treprostinil Administration by Inhalation," was issued by the United States Patent and Trademark Office on July 21, 2020, and names as inventors Horst Olschewski, Robert Roscigno, Lewis J. Rubin, Thomas Schmehl, Werner Seeger, Carl Sterritt, and Robert Voswinckel.  Liquidia denies the remaining allegations of paragraph 17.

18.    Liquidia is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18, and therefore denies them.

19.    Liquidia admits that the '066, '901 and '793 patents are listed in the Orange Book (FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* publication) in connection with TYVASO®.  Liquidia denies the remaining allegations in paragraph 19.

## [ALLEGED] ACTS GIVING RISE TO THIS ACTION

20.    Liquidia admits that it notified UTC by letter dated April 24, 2020 ("Liquidia's Notice Letter") that it had submitted Liquidia's NDA to the FDA seeking approval to engage in the commercial manufacture, use and/or sale of the Liquidia Product.  Liquidia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 20, and therefore denies them.

21.    Liquidia admits that its Notice Letter included a detailed statement of the present factual and legal basis that the claims of the '066 and/or '901 patents are invalid, unenforceable and/or are not, and will not, be infringed by the Liquidia Product.  Liquidia denies the remaining allegations in paragraph 21.

22.    Liquidia admits that it submitted its NDA to the FDA seeking approval to engage in the commercial manufacture, use and/or sale of the Liquidia Product.  Liquidia denies the

remaining allegations of paragraph 22.

23.     Liquidia admits that UTC filed its Complaint on June 4, 2020.

24.     Liquidia admits that the Liquidia Product contains treprostinil.  Liquidia denies the remaining allegations in paragraph 24.

25.     Liquidia admits that its NDA seeks approval from the FDA to market Liquidia's Product for the treatment of pulmonary arterial hypertension (PAH) (WHO Group 1) to improve exercise ability in patients with NYHA Functional Class II-III symptoms.  Liquidia denies the remaining allegations in paragraph 25.

26.     Liquidia admits that it filed its NDA, which is in compliance with all relevant statutory sections.  Liquidia denies the remaining allegations in paragraph 26.

27.     Liquidia admits that it submitted its NDA to the FDA seeking approval to engage in the commercial manufacture, use and/or sale of the Liquidia Product.  Liquidia denies the remaining allegations in paragraph 27.

28.     Liquidia admits that its NDA contains Paragraph IV Certifications that the '066 patent and '901 patent are not infringed by Liquidia's Proposed Product and/or are invalid and/or unenforceable.

29.     Liquidia admits that its Notice Letter refers to 21 U.S.C. § 355(b)(3)(D)(ii) and 21 C.F.R. § 314.52(c)(6).

30.     Liquidia admits that its Notice Letter contained an Offer of Confidential Access Pursuant to 21 U.S.C. § 355(c)(3)(D)(i)(III) ("OCA").  Liquidia further admits that Liquidia negotiated the terms of confidential access in good faith in order to permit UTC access to information contained within Liquidia's NDA.  Liquidia denies the remaining allegations in paragraph 30.

31.     Liquidia admits that 21 U.S.C. § 355(c)(3)(D)(i)(III) states an "offer of confidential access shall contain such restrictions as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for the purpose of protecting trade secrets and other confidential business information."

32.     Liquidia admits that it attempted to negotiate the terms of its OCA with UTC. Liquidia's OCA contained provisions that would apply to protective orders.  For example, Liquidia's OCA contained reasonable access restrictions on attorneys representing UTC and in-house counsel and the staff of such counsel that were present in the protective order entered into by UTC in *United Therapeutics Corp. v. Watson Labs., Inc.*, No. 3:15-cv-05723-PGS-LHG, Dkt. No. 36 at 6-7 (D.N.J. Jan. 13, 2016), which is a prior litigation concerning TYVASO®.  Liquidia admits that UTC unilaterally rejected Liquidia's OCA.  Liquidia denies the remaining allegations in paragraph 32.

33.     Liquidia is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33, and therefore denies them.

34.      The allegations in this paragraph state a legal conclusion to which no response is required.  To the extent a response is deemed to be required, Liquidia admits that its clinical trials of the LIQ861 Product showed safe dosing of treprostinil.  Except as expressly admitted, Liquidia denies the remaining allegations in paragraph 34.

## COUNT 1: [ALLEGED] INFRINGEMENT OF THE '066 PATENT UNDER 35 U.S.C. § 271(e)

35.     Liquidia incorporates by reference its responses to Paragraphs 1 through 34 of the First Amended Complaint.

36.     Liquidia denies the allegations of paragraph 36.

37.     Liquidia admits that Liquidia's NDA included a Paragraph IV certification with

respect to the '066 patent.

38.     Liquidia denies the allegations of paragraph 38.

39.     Liquidia denies the allegations of paragraph 39.

40.     Liquidia denies the allegations of paragraph 40.

41.     Liquidia denies the allegations of paragraph 41.

## COUNT 2: [ALLEGED] INFRINGEMENT OF THE '066 PATENT
## UNDER 35 U.S.C. §§ 271(a)-(c) and (g)

42.     Liquidia incorporates by reference its responses to Paragraphs 1 through 41 of the
First Amended Complaint.

43.     Liquidia denies the allegations of paragraph 43.

44.     Liquidia denies the allegations of paragraph 44.

45.     Liquidia denies the allegations of paragraph 45.

46.     Liquidia denies the allegations of paragraph 46.

47.     Liquidia denies the allegations of paragraph 47.

48.     Liquidia denies the allegations of paragraph 48.

49.     Liquidia denies the allegations of paragraph 49.

50.     Liquidia denies the allegations of paragraph 50.

51.     Liquidia denies the allegations of paragraph 51.

## COUNT 3: [ALLEGED] INFRINGEMENT OF THE '901 PATENT
## UNDER 35 U.S.C. § 271(e)

52.     Liquidia incorporates by reference its responses to Paragraphs 1 through 51 of the
First Amended Complaint.

53.     Liquidia denies the allegations of paragraph 53.

54.     Liquidia admits that Liquidia's NDA included a Paragraph IV certification with
respect to the '901 patent.

55.     Liquidia denies the allegations of paragraph 55.

56.     Liquidia denies the allegations of paragraph 56.

57.     Liquidia denies the allegations of paragraph 57.

58.     Liquidia denies the allegations of paragraph 58.

**COUNT 4: [ALLEGED] INFRINGEMENT OF THE '901 PATENT**
**UNDER 35 U.S.C. §§ 271(a)-(c) and (g)**

59.     Liquidia incorporates by reference its responses to Paragraphs 1 through 58 of the

First Amended Complaint.

60.     Liquidia denies the allegations of paragraph 60.

61.     Liquidia denies the allegations of paragraph 61.

62.     Liquidia denies the allegations of paragraph 62.

63.     Liquidia denies the allegations of paragraph 63.

64.     Liquidia denies the allegations of paragraph 64.

65.     Liquidia denies the allegations of paragraph 65.

66.     Liquidia denies the allegations of paragraph 66.

67.     Liquidia denies the allegations of paragraph 67.

68.     Liquidia denies the allegations of paragraph 68.

**COUNT 5: [ALLEGED] INFRINGEMENT OF THE '793 PATENT**
**UNDER 35 U.S.C. § 271(e)**

69.     Liquidia incorporates by reference its responses to Paragraphs 1 through 68 of the

First Amended Complaint.

70.     Liquidia denies the allegations of paragraph 70.

71.     Liquidia denies the allegations of paragraph 71.

72.     Liquidia denies the allegations of paragraph 72.

73.     Liquidia denies the allegations of paragraph 73.

74.     Liquidia denies the allegations of paragraph 74.

## COUNT 6: [ALLEGED] INFRINGEMENT OF THE '793 PATENT
## UNDER 35 U.S.C. §§ 271(a)-(c)

75.     Liquidia incorporates by reference its responses to Paragraphs 1 through 74 of the

First Amended Complaint.

76.     Liquidia denies the allegations of paragraph 76.

77.     Liquidia denies the allegations of paragraph 77.

78.     Liquidia denies the allegations of paragraph 78.

79.     Liquidia denies the allegations of paragraph 79.

80.     Liquidia denies the allegations of paragraph 80.

81.     Liquidia denies the allegations of paragraph 81.

82.     Liquidia denies the allegations of paragraph 82.

83.     Liquidia denies the allegations of paragraph 83.

## RESPONSE TO PLAINTIFF'S PRAYER FOR RELIEF

Liquidia incorporates by reference all preceding paragraphs of this Answer as if fully set

forth herein.  Liquidia denies any and all allegations of patent infringement alleged in the First

Amended Complaint.  Liquidia denies all allegations that Plaintiff is entitled to any relief requested

in paragraphs 1 – 7 of the First Amended Complaint's Prayer for Relief, or any other relief.

## AFFIRMATIVE DEFENSES

Pursuant to Federal Rule of Civil Procedure 8(c), and without altering any applicable

burdens of proof, Liquidia asserts the following defenses to the First Amended Complaint and

reserves its rights to assert additional defenses.

## FIRST DEFENSE – FAILURE TO STATE A CLAIM

Plaintiff fails to state a claim upon which relief can be granted.

## SECOND DEFENSE – NON-INFRINGEMENT

Liquidia does not infringe, has not infringed and will not infringe, directly or indirectly, any valid claim of the '066, '901, and '793 patents.

## THIRD DEFENSE – INVALIDITY

One or more claims of the '066, '901, and '793 patents are invalid for failure to satisfy the conditions of patentability in 35 U.S.C. §§ 101 *et seq.*, including, but not limited to §§ 101, 102, 103, and/or 112.  By way of example only: (1) all claims of the '066 patent are invalid under §§ 102 and/or 103 at least over prior art PCT Application No. WO2005/007081 ("Phares"), alone or in combination with the 2004 Journal of Organic Chemistry article entitled "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)" by R.M. Moriarty, et al. ("Moriarty"); (2) all claims of the '901 patent are invalid under § 103 at least over prior art Phares, alone or in combination with Moriarty; (3) claims 1-7 of the '066 patent are invalid under § 112 as indefinite and lacking written description and enablement support at least with respect to "impurities resulting from prior alkylation and hydrolysis steps," and at least with respect to "whereby the level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition;" (4) at least claim 3 of the '066 patent is invalid under § 112 as indefinite and lacking written description and enablement support for reciting only *sodium*, *potassium*, and *calcium*, when sodium, potassium, and calcium on their own are not bases and are instead counterions that result from treatment of the treprostinil acid with the corresponding bases; (5) all claims of the '901 patent are invalid under § 112 as indefinite and lacking written description and enablement support at least with respect to the pharmaceutical batch consisting of "impurities"; (6) the claims of the '793 patent are invalid under §§ 102 and/or 103 at least over

Plaintiff's prior art patents and publications, including U.S. Patent Nos. 6,756,033 and 6,521,212, disclosing methods for treating pulmonary hypertension by administering a single event dose of a 15 to 90 microgram inhalation formulation of treprostinil, including liquid and powder formulations of treprostinil, in 1 to 3 breaths; (7) at least claims 1, 4, and 6-8 of the '793 patent are invalid under § 112 as indefinite and lacking written description and enablement support at least with respect to administration of a "powder"; and (8) the claims of the '793 patent are invalid for obviousness-type double patenting over Plaintiff's prior issued patents, including U.S. Patent Nos. 6,756,033 and 6,521,212, disclosing and claiming methods for treating pulmonary hypertension by administering a single event dose of a 15 to 90 microgram inhalation formulation of treprostinil, including liquid and powder formulations of treprostinil, in 1 to 3 breaths.

## FOURTH DEFENSE – PROSECUTION HISTORY ESTOPPEL

Plaintiff's claims are barred or limited from recovery, in whole or in part, by the doctrine of prosecution history estoppel.

## RESERVATION OF RIGHTS

Liquidia hereby reserves the right to amend its Answer and reserves all defenses set out in Rule 8(c) of the Federal Rules of Civil Procedure, the Patent Laws of the United States, and other defenses, at law or in equity, which become applicable after the substantial completion of discovery or otherwise in the course of litigation.

## LIQUIDIA'S COUNTERCLAIMS

For its counterclaims against Plaintiff United Therapeutics Corporation ("UTC"), Counterclaim Plaintiff Liquidia Technologies, Inc. ("Liquidia") alleges as follows:

## PARTIES

1.      Liquidia is a biopharmaceutical company focused on the development and commercialization of innovative therapeutics using its proprietary PRINT® technology to

transform the lives of patients.

2.  Liquidia's proposed LIQ861 Product, a dry powder formulation of treprostinil was designed using Liquidia's proprietary PRINT® technology to enhance deep-lung delivery using a convenient, palm-sized, disposable dry powder inhaler (DPI) for the treatment of pulmonary arterial hypertension (PAH). Liquidia's proprietary PRINT® technology allows for LIQ861 particles of a precise size and highly uniform shape.

3.  LIQ861 has the potential to maximize the therapeutic benefits of treprostinil in treating PAH by safely delivering higher doses into the lungs compared to currently approved conventional inhaled therapies, including TYVASO®.  LIQ861 is also more convenient to use than currently approved inhaled therapies, including TYVASO® as LIQ861 is more conveniently administered and contained in a small carrying pouch as opposed to a nebulizer.

4.  Liquidia's clinical trials of the LIQ861 Product showed safe dosing of treprostinil to more than twice the maximum recommended dosage of TYVASO®, thereby providing physicians a broader dosing range to treat toward symptom relief with fewer tolerance issues than with TYVASO®, while also providing patients a more convenient treatment option, if approved. As a result of Liquidia's investment into the development of novel treatments for PAH, resulting in LIQ861, Liquidia filed New Drug Application No. 213005 under § 505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("Liquidia's NDA").

5.  Liquidia is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at 419 Davis Drive, Suite 100, Morrisville, NC 27560.

6.  Upon information and belief based solely on paragraph 3 of the First Amended Complaint, UTC is a corporation organized and existing under the laws of the State of Delaware and having a place of business at 1040 Spring Street, Silver Spring, Maryland 20910.

## JURISDICTION

7.     Liquidia incorporates by reference paragraphs 1-6 of its Counterclaims above.

8.     These counterclaims arise under the patent laws of the United States, Title 35, United States Code.  The jurisdiction of this Court is proper under at least 35 U.S.C. § 271 *et seq.*, and 28 U.S.C. §§ 1331, 1338, 1367, and 2201-02.

9.     UTC has consented to the personal jurisdiction of this Court at least by commencing its action for patent infringement in this District, as set forth in its Complaint.

10.     Based solely on the filing of this action, venue is proper in this District pursuant to at least 28 U.S.C. § 1400(b).

## COUNT I – DECLARATION OF INVALIDITY OF THE '066 PATENT

11.     Liquidia incorporates by reference paragraphs 1-10 of its Counterclaims above.

12.     UTC alleges ownership of U.S. Patent No. 9,593,066 (the '066 patent") and has brought claims against Liquidia alleging infringement of the '066 patent including under 35 U.S.C. § 271(e) based upon the submission of Liquidia's NDA to the United States Food and Drug Administration ("FDA") seeking approval to engage in the commercial manufacture, use and/or sale of LIQ861 (treprostinil) inhalation powder (the "Liquidia Product" or "LIQ861 Product").

13.     Based on the filing of UTC's First Amended Complaint for patent infringement, an actual controversy has arisen and now exists between the parties as to the validity the '066 patent.

14.     All asserted claims of the '066 patent are invalid for failure to satisfy the conditions of patentability in 35 U.S.C. §§ 101 *et seq.*, including, but not limited to §§ 101, 102, 103, and/or 112.

15.     By way of example only, all claims of the '066 patent are invalid under §§ 102 and/or 103 at least over prior art PCT Application No. WO2005/007081 ("Phares"), alone or in combination with the 2004 Journal of Organic Chemistry article entitled "The Intramolecular

Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)" by R.M. Moriarty, et al. ("Moriarty").

16.     By way of example only, claims 1-7 of the '066 patent are invalid under § 112 as indefinite and lacking written description and enablement support at least with respect to "impurities resulting from prior alkylation and hydrolysis steps," and at least with respect to "whereby the level of one or more impurities found in the starting batch of treprostinil is lower in the pharmaceutical composition;"

17.     By way of example only, at least claim 3 of the '066 patent is invalid under § 112 as indefinite and lacking written description and enablement support for reciting only sodium, potassium, and calcium, when sodium, potassium, and calcium on their own are not bases and are instead counterions that result from treatment of the treprostinil acid with the corresponding bases.

18.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Liquidia requests a declaration by the Court that the claims of the '066 patent are invalid for failure to comply with one or more of the conditions of patentability in 35 U.S.C. §§ 101 *et seq.*, including, but not limited to §§ 101, 102, 103, and/or 112.

## COUNT II – DECLARATION OF NON-INFRINGEMENT OF THE '066 PATENT

19.     Liquidia incorporates by reference paragraphs 1-18 of its Counterclaims above.

20.     UTC alleges ownership of the '066 patent and has brought claims against Liquidia alleging infringement of the '066 patent including under 35 U.S.C. § 271(e) based upon the submission of Liquidia's NDA to the FDA seeking approval to engage in the commercial manufacture, use and/or sale of the Liquidia Product.

21.     Based on the filing of UTC's First Amended Complaint for patent infringement, an actual controversy has arisen and now exists between the parties as to whether the manufacture,

use, or sale of the Liquidia Product would infringe any valid and enforceable claim of the '066 patent.

22.     The manufacture, use, or sale of the Liquidia Product would not infringe any valid and enforceable claim of the '066 patent, either directly or indirectly.

23.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Liquidia requests a declaration by the Court that the manufacture, use, or sale of the Liquidia Product would not infringe any valid and enforceable claim of the '066 patent.

### COUNT III – DECLARATION OF INVALIDITY OF THE '901 PATENT

24.     Liquidia incorporates by reference paragraphs 1-23 of its Counterclaims above.

25.     UTC alleges ownership of U.S. Patent No. 9,604,901 ("the '901 patent") and has brought claims against Liquidia alleging infringement of the '901 patent including under 35 U.S.C. § 271(e) based upon the submission of Liquidia's NDA to the FDA seeking approval to engage in the commercial manufacture, use and/or sale of the Liquidia Product.

26.     Based on the filing of UTC's First Amended Complaint for patent infringement, an actual controversy has arisen and now exists between the parties as to the validity of the '901 patent.

27.     All asserted claims of the '901 patent are invalid for failure to satisfy the conditions of patentability in 35 U.S.C. §§ 101 *et seq.*, including, but not limited to §§ 101, 102, 103, and/or 112.

28.     By way of example only, all claims of the '901 patent are invalid under § 103 at least over prior art Phares, alone or in combination with Moriarty.

29.     By way of example only, all claims of the '901 patent are invalid under § 112 as indefinite and lacking written description and enablement support at least with respect to the pharmaceutical batch consisting of "impurities."

30.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Liquidia requests a declaration by the Court that the claims of the '901 patent are invalid for failure to comply with one or more of the conditions of patentability in 35 U.S.C. §§ 101 *et seq.*, including, but not limited to §§ 101, 102, 103, and/or 112.

### COUNT IV – DECLARATION OF NON-INFRINGEMENT OF THE '901 PATENT

31.     Liquidia incorporates by reference paragraphs 1-30 of its Counterclaims above.

32.     UTC alleges ownership of the '901 patent and has brought claims against Liquidia alleging infringement of the '901 patent including under 35 U.S.C. § 271(e) based upon the submission of Liquidia's NDA to the FDA seeking approval to engage in the commercial manufacture, use and/or sale of the Liquidia Product.

33.     Based on the filing of UTC's First Amended Complaint for patent infringement, an actual controversy has arisen and now exists between the parties as to whether the manufacture, use, or sale of the Liquidia Product would infringe any valid and enforceable claim of the '901 patent.

34.     The manufacture, use, or sale of the Liquidia Product would not infringe any valid and enforceable claim of the '901 patent, either directly or indirectly.

35.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Liquidia requests a declaration by the Court that the manufacture, use, or sale of the Liquidia Product would not infringe any valid and enforceable claim of the '901 patent.

### COUNT V – DECLARATION OF INVALIDITY OF THE '793 PATENT

36.     Liquidia incorporates by reference paragraphs 1-35 of its Counterclaims above.

37.     UTC alleges ownership of U.S. Patent No. 10,716,793 ("the '793 patent") and has brought claims against Liquidia alleging infringement of the '793 patent including under 35 U.S.C. § 271(e) based upon the submission of Liquidia's NDA to the FDA seeking approval to engage in

the commercial manufacture, use and/or sale of the Liquidia Product.

38.     Based on the filing of UTC's First Amended Complaint for patent infringement, an actual controversy has arisen and now exists between the parties as to the validity of the '793 patent.

39.     All asserted claims of the '793 patent are invalid for failure to satisfy the conditions of patentability in 35 U.S.C. §§ 101 *et seq.*, including, but not limited to §§ 101, 102, 103, and/or 112, and are invalid for obviousness-type double patenting.

40.     By way of example only, the claims of the '793 patent are invalid under §§ 102 and/or 103 at least over Plaintiff's prior art patents and publications, including U.S. Patent Nos. 6,756,033 and 6,521,212, disclosing methods for treating pulmonary hypertension by administering a single event dose of a 15 to 90 microgram inhalation formulation of treprostinil, including liquid and powder formulations of treprostinil, in 1 to 3 breaths.

41.     By way of example only, at least claims 1, 4, and 6-8 of the '793 patent are invalid under § 112 as indefinite and lacking written description and enablement support at least with respect to administration of a "powder."

42.     By way of example only, the claims of the '793 patent are invalid for obviousness-type double patenting over Plaintiff's prior issued patents, including U.S. Patent Nos. 6,756,033 and 6,521,212, disclosing and claiming methods for treating pulmonary hypertension by administering a single event dose of a 15 to 90 microgram inhalation formulation of treprostinil, including liquid and powder formulations of treprostinil, in 1 to 3 breaths.

43.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Liquidia requests a declaration by the Court that the claims of the'793 patent are invalid for failure to comply with one or more of the conditions of patentability in 35 U.S.C. §§ 101 *et seq.*, including,

but not limited to §§ 101, 102, 103, and/or 112, and are invalid for obviousness-type double patenting.

## COUNT VI – DECLARATION OF NON-INFRINGEMENT OF THE '793 PATENT

44.     Liquidia incorporates by reference paragraphs 1-43 of its Counterclaims above.

45.     UTC alleges ownership of the '793 patent and has brought claims against Liquidia alleging infringement of the '793 patent including under 35 U.S.C. § 271(e) based upon the submission of Liquidia's NDA to the FDA seeking approval to engage in the commercial manufacture, use and/or sale of the Liquidia Product..

46.     Based on the filing of UTC's First Amended Complaint for patent infringement, an actual controversy has arisen and now exists between the parties as to whether the manufacture, use, or sale of the Liquidia Product would infringe any valid and enforceable claim of the '793 patent.

47.     The manufacture, use, or sale of the Liquidia Product would not infringe any valid and enforceable claim of the '793 patent, either directly or indirectly.

48.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Liquidia requests a declaration by the Court that the manufacture, use, or sale of the Liquidia Product would not infringe any valid and enforceable claim of the '793 patent.

## COUNT VII – IMPROPER PATENT LISTING OF THE '066 PATENT

49.     Liquidia incorporates by reference paragraphs 1-48 of its Counterclaims above.

50.     Upon information and belief, UTC, as the holder of New Drug Application No. 022387, caused the '066 patent to be listed in the FDA's Approved Drug Products with Therapeutic Equivalence Evaluations publication ("Orange Book") for TYVASO® Treprostinil Inhalation Solution 0.6mg/ml.

51.     The Orange Book is a publication disseminated by the FDA containing, inter alia,

a listing of patents that purportedly claim drug products that have been approved for use by the FDA.

52. At the time it submitted its NDA seeking approval to market the Liquidia Product, Liquidia was required by statute to submit a certification as to the '066 patent because it is listed in the Orange Book for drug substance TYVASO® Treprostinil Inhalation Solution 0.6mg/ml.

53. Liquidia submitted a Paragraph IV certification with respect to the '066 patent under 21 U.S.C. § 355(b)(2) as part of its NDA, because Liquidia believes that the Liquidia Product would not infringe the '066 patent and/or that the '066 patent is invalid and/or unenforceable.

54. Liquidia was required to provide UTC with notice that it had filed its NDA with a Paragraph IV certification as to the '066 patent.

55. After receiving that notice, UTC instituted this action, suing Liquidia for alleged infringement of the '066 patent.

56. Because UTC has instituted this action for alleged infringement of patents listed in the Orange Book, FDA approval of Liquidia's NDA is stayed for the shorter of 30 months from the date UTC received notice of Liquidia's Paragraph IV certification or the dismissal of this case.

57. Pursuant to 21 C.F.R. § 314.53(b)(1), a patent containing only process claims may not be listed in the Orange Book.

58. Pursuant to 21 C.F.R. § 314.53(c)(2)(i)(L) and 21 C.F.R. § 314.53(c)(2)(ii)(M), a patent containing only product-by-process claims or a combination of process and product-by-process claims may only be listed in the Orange Book if one or more of the products claimed in the product-by-process claims is novel.

59. Upon information and belief, UTC certified to the FDA that the '066 patent is a product-by-process patent, and that the product claimed in the '066 patent is novel, resulting in the

listing of the '066 patent in the Orange Book.

60.     The claims of the '066 patent are all process or product-by-process claims.  Claims 1 and 8 of the '066 patent are independent claims.  Claims 8 and 10 of the '066 patent are process claims.  The remaining eight claims of the '066 patent are product-by-process claims.

61.     Claim 1 of the '066 patent recites "[a] pharmaceutical composition comprising treprostinil or a pharmaceutically acceptable salt thereof, said composition prepared by a process comprising" several steps.

62.     Claim 8 of the '066 patent recites "[a] process of preparing a pharmaceutical product comprising treprostinil or a pharmaceutically acceptable salt thereof."

63.     PCT Application No. WO2005/007081 ("Phares") is titled "Compounds and Methods for Delivery of Prostacyclin Analogs."  The named inventors are Ken Phares and David Mottola.  Phares was published January 27, 2005, more than two years before the earliest U.S. application to which the '066 patent can claim priority.  Phares describes "compounds and methods for inducing prostacyclin-like effects in a subject or patient," including treprostinil and derivatives thereof.

64.     The article titled "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)" was authored by R.M. Moriarty, et al.  ("Moriarty").  It was published in 2004 in the Journal of Organic Chemistry, Volume 69, No. 6, pp. 1890-1902, more than two years before the earliest U.S. application to which the '066 patent can claim priority.

65.     The product of the '066 patent is not novel because a pharmaceutical batch comprising treprostinil as claimed in the '066 patent was disclosed in the prior art, including Phares and Moriarty.

66. UTC listed the '066 patent in the Orange Book on March 14, 2017. On March 31, 2017, UTC was made aware that the product claimed in the '066 patent was not novel, as the Patent Trial and Appeal Board issued its Final Written Decision in IPR2016-00006 involving UTC's U.S. Patent No. 8,497,393, finding that the product claimed in the '393 patent was not novel over the prior art. That decision was affirmed by the Federal Circuit. The '393 and '066 patents share the same specifications and disclose and claim the same product.

67. UTC improperly listed the '066 patent in the Orange Book for TYVASO® because the '066 patent only consists of process claims and product-by-process claims directed to a non-novel product.

68. UTC has knowingly maintained the improper listing of the '066 patent in the Orange Book.

69. FDA approval of the Liquidia Product should not be delayed as a result of the improper listing of the '066 patent.

70. Pursuant to 21 U.S.C. § 355(j)(5)(C)(ii), UTC should be ordered to delete or delist the '066 patent from the Orange Book's listing for TYVASO®.

### COUNT VIII – IMPROPER PATENT LISTING OF THE '901 PATENT

71. Liquidia incorporates by reference paragraphs 1-70 of its Counterclaims above.

72. Upon information and belief, UTC, as the holder of New Drug Application No. 022387, caused the '901 patent to be listed in the Orange Book for TYVASO® Treprostinil Inhalation Solution 0.6mg/ml.

73. The Orange Book is a publication disseminated by the FDA containing, inter alia, a listing of patents that purportedly claim drug products that have been approved for use by the FDA.

74. At the time it submitted its NDA seeking approval to market the Liquidia Product,

- 21 -

Liquidia was required by statute to submit a certification as to the '901 patent because it is listed in the Orange Book for drug substance TYVASO® Treprostinil Inhalation Solution 0.6mg/ml.

75.     Liquidia submitted a Paragraph IV certification with respect to the '901 patent under 21 U.S.C. § 355(b)(2) as part of its NDA, because Liquidia believes the Liquidia Product would not infringe the '901 patent and/or that the '901 patent is invalid and/or unenforceable.

76.     Liquidia was required to provide UTC with notice that it had filed its NDA with a Paragraph IV certification as to the '901 patent.

77.     Upon receiving that notice, UTC instituted this action, suing Liquidia for alleged infringement of the '901 patent.

78.     Pursuant to 21 C.F.R. § 314.53(b)(1), a patent containing only process claims may not be listed in the Orange Book.

79.     Pursuant to 21 C.F.R. § 314.53(c)(2)(i)(L) and 21 C.F.R. § 314.53(c)(2)(ii)(M), a patent containing only product-by-process claims or a combination of process and product-by-process claims may only be listed in the Orange Book if one or more of the products claimed in the product-by-process claims is novel.

80.     Upon information and belief, UTC certified to the FDA that the '901 patent is a product-by-process patent, and that the product claimed in the '901 patent is novel, resulting in the '901 patent being listed in the Orange Book.

81.     The claims of the '901 patent are all process or product-by-process claims.  Claim 1 is the sole independent claim.  Claims 1, 2, 3, 4, and 5 of the '901 patent are product-by-process claims.  Claims 6, 7, 8 and 9 of the '901 patent are process claims.

82.     Claim 1 of the '901 patent recites "[a] A pharmaceutical batch consisting of treprostinil or a salt thereof and impurities resulting from" several process steps of "(a) alkylating

a benzindene triol, (b) hydrolyzing the product of step (a) to form a solution comprising treprostinil, (c) containing the solution comprising treprostinil from step (b) with a base to form a salt of treprostinil, (d) isolating the salt of treprostinil, and (e) optionally reacting the salt of treprostinil with an acid to form treprostinil." Claims 2, 3, 4, and 5 recite products that depend from claim 1.

83.     Claims 6 and 8 of the '901 patent recite "[a] method of preparing a pharmaceutical product from a pharmaceutical batch as claimed in claim 1" and "[a] method of preparing a pharmaceutical batch as claimed in claim 1." Claims 7 and 9 depend from claims 6 and 8, respectively.

84.     PCT Application No. WO2005/007081 ("Phares") is titled "Compounds and Methods for Delivery of Prostacyclin Analogs." The named inventors are Ken Phares and David Mottola. Phares was published January 27, 2005, more than two years before the earliest U.S. application to which the '901 patent can claim priority. Phares describes "compounds and methods for inducing prostacyclin-like effects in a subject or patient," including treprostinil and derivatives thereof.

85.     The article titled "The Intramolecular Asymmetric Pauson-Khand Cyclization as a Novel and General Stereoselective Route to Benzindene Prostacyclins: Synthesis of UT-15 (Treprostinil)" was authored by R.M. Moriarty, et al. ("Moriarty"). It was published in 2004 in the Journal of Organic Chemistry, Volume 69, No. 6, pp. 1890-1902, more than two years before the earliest U.S. application to which the '901 patent can claim priority.

86.     The product of the '901 patent is not novel because a pharmaceutical batch consisting of treprostinil as claimed in the '901 patent was disclosed in the prior art, including Phares and Moriarty.

87.     UTC listed the '901 patent in the Orange Book on March 28, 2017.  On March 31, 2017, UTC was made aware that the product claimed in the '901 patent was not novel, as the Patent Trial and Appeal Board issued its Final Written Decision in IPR2016-00006 involving UTC's U.S. Patent No. 8,497,393, finding that the product claimed in the '393 patent was not novel over the prior art.  That decision was affirmed by the Federal Circuit.  The '393 and '901 patents share the same specifications and disclose and claim the same product.

88.     UTC improperly listed the '901 patent in the Orange Book for TYVASO® because the '901 patent only consists of process claims and product-by-process claims directed to a non-novel product.

89.     UTC has knowingly maintained the improper listing of the '901 patent in the Orange Book.

90.     FDA approval of the Liquidia Product should not be delayed as a result of the improper listing of the '901 patent.

91.     Pursuant to 21 U.S.C. § 355(j)(5)(C)(ii), UTC should be ordered to delete or delist the '901 patent from the Orange Book's listing for TYVASO®.

## PRAYER FOR RELIEF

**WHEREFORE**, Liquidia prays that this Court grant the following relief:

A.     A judgment dismissing UTC's First Amended Complaint, in its entirety, with prejudice;

B.     A judgment declaring that all asserted claims of the '066, '901 and '793 patents are invalid;

C.     A judgment declaring that the Liquidia Product has not directly or indirectly infringed, and is not now directly or indirectly infringing, any valid and enforceable

claim of the '066, '901 and '793 patents under any subsection of 35 U.S.C. § 271;

D.      An order directing UTC to delete or delist the '066, '901 and '793 patents from the

        Orange Book;

E.      An order enjoining UTC, their officers, agents, servant, employees, attorneys, and

        representatives and any successors and assigns thereof, from charging or asserting

        infringement of any claim of the '066, '901 and '793 patents against Liquidia, or

        anyone in privy with Liquidia;

F.      A judgment declaring that this case stands out from others and as such is an

        exceptional case pursuant to 35 U.S.C. § 285 and ordering UTC to pay Liquidia's

        costs and reasonable attorneys' fees incurred in this action;

G.      An award of costs and expense in this action to Liquidia; and

H.      Such further and other relief as the Court deems just and proper.


OF COUNSEL:                                    /s/ Jeff Castellano
Sanya Sukduang                                 Karen E. Keller (No. 4489)
Jonathan Davies                                Jeff Castellano (No. 4837)
COOLEY LLP                                     Nathan R. Hoeschen (No. 6232)
1299 Pennsylvania Avenue, NW, Suite 700        SHAW KELLER LLP
Washington, DC 20004-2400                      I.M. Pei Building
(202) 842-7800                                 1105 North Market Street, 12th Floor
                                               Wilmington, DE 19801
Erik Milch                                     (302) 298-0700
COOLEY LLP                                     kkeller@shawkeller.com
11951 Freedom Drive, 14th Floor                jcastellano@shawkeller.com
Reston, VA 20190-5640                          nhoeschen@shawkeller.com
(703) 546-8000                                 *Attorneys for Defendant Liquidia*
                                               *Technologies, Inc*
Ivor Elrifi
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

Lauren Krickl
Deepa Kannappan
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000

Dated: August 5, 2020

# EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 20-755 (RGA) |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) ) | |

**PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS
MOTION TO DISMISS DEFENDANT'S COUNTERCLAIM**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

*Attorneys for Plaintiff United Therapeutics Corporation*

OF COUNSEL:

Douglas H. Carsten
Joshua Mack
WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real
San Diego, CA 92130
(858) 305-2300

Adam W. Burrowbridge
WILSON SONSINI GOODRICH & ROSATI
1700 K Street NW, Fifth Floor
Washington, DC 20006
(202) 973-8800

William C. Jackson
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
(202) 237-2727

August 26, 2020

# **TABLE OF CONTENTS**

**Page**

I.      NATURE AND STAGE OF PROCEEDINGS .................................................. 1

II.     SUMMARY OF THE ARGUMENT .............................................................. 1

III.    STATEMENT OF FACTS .............................................................................. 2

IV.     ARGUMENT .................................................................................................. 6

      A.      Legal Standards........................................................................................ 6

      B.      Liquidia's Invalidity Counterclaim and Defense Should be Dismissed for Failure to State a Claim under Rule 12(b)(6)........................................................ 10

      C.      Alternatively, Liquidia's Invalidity Counterclaim Defense Should be Dismissed for Lack of Jurisdiction under Rule 12(b)(1) ..................................... 13

V.      CONCLUSION.............................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*BASF Corp. v. Aristo Inc.*,
  872 F. Supp. 2d 758 (N.D. Ind. 2012) .............................................................8

*Cedars-Sinai Med. Ctr. v. Watkins*,
  11 F.3d 1573 (Fed. Cir. 1993)........................................................................13

*Diamond Sci. Co. v. Ambico, Inc.*,
  848 F.2d 1220 (Fed. Cir. 1988).................................................................1, 6, 7

*Hologic, Inc. v. Minerva Surgical, Inc.*,
  957 F.3d 1256 (Fed. Cir. 2020).......................................................................7

*HTC Corp. v. IPCom GmbH & Co.*,
  671 F. Supp. 2d 146 (D.D.C. 2009) .................................................................8

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*,
  153 F.3d 1318 (Fed. Cir. 1998)...................................................................9, 14

*In re NAHC, Inc. Sec. Litig.*,
  306 F.3d 1314 (3d Cir. 2002)...........................................................................9

*In re Wellbutrin SR/Zyban Antitrust Litig.*,
  281 F. Supp. 2d 751 (E.D. Pa. 2003) ...............................................................8

*Intel Corp. v. U.S. Int'l Trade Comm'n*,
  946 F.2d 821 (Fed. Cir. 1991)..................................................................7, 8, 13

*Juniper Networks, Inc. v. Palo Alto Networks, Inc.*,
  15 F. Supp. 3d 499 (D. Del. 2014)...............................................................7, 13

*Kos Pharm., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004).............................................................................8

*Lamson v. U.S.*,
  101 Fed. Cl. 280 (Fed. Cl. 2011) ...............................................................9, 13, 14

*Leading Tech. Composites v. MV2, LLC*, No. CCB-19-1256,
  2020 WL 790601 (D. Md. Feb. 18, 2020) ........................................................8

*LifeScan Scotland, Ltd. v. Shasta Tech, LLC*, No. 11-cv-04494 EJD,
  2012 WL 2979028 (N.D. Cal. July 19, 2012)....................................................9

*Mag Aerospace Indus., Inc. v. B/E Aerospace, Inc.*,
  816 F.3d 1374 (Fed. Cir. 2016).................................................................7, 11, 12

*Oneida Indian Nation of N.Y. v. Cnty. of Oneida*,
  414 U.S. 661 (1974)........................................................................................9

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000) ................................................................. 9

*Port-A-Pour, Inc. v. Peak Innovations, Inc.*, No. 13-cv-01511-WYD-BNB,
    2015 WL 292913 (D. Colo. Jan. 20, 2015) ........................................... 8

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014) ................................................................. 9

*Shamrock Techs., Inc. v. Medical Sterilization, Inc.*,
    903 F.2d 789 (Fed. Cir. 1990) ........................................................ 7, 12

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ......................................................................... 9, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .............................................................................. 8

*Wells v. Kessler Corp.*, No. 17-cv-02709-AGF,
    2018 WL 1251928 (E.D. Mo. Mar. 12, 2018) ...................................... 8

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
    868 F. Supp. 2d 376 (D. Del. 2012) ..................................................... 6

## RULES

17 C.F.R. § 240.3b-7 ................................................................................. 10

Fed. R. Civ. P. 12(b)(1) ......................................................................... 1, 2

Fed. R. Civ. P. 12(b)(6) .................................................................... 1, 2, 6

Plaintiff United Therapeutics Corporation ("UT") moves under Fed. R. Civ. P. 12(b)(6), or, alternatively, under Fed. R. Civ. P. 12(b)(1), to dismiss Defendant Liquidia Technologies, Inc.'s ("Liquidia") counterclaim for a declaration of invalidity of U.S. Patent No. 10,716,793 (the "'793 patent") and related defenses (*see* D.I. 23 at pp. 10-11, 16-18) under the doctrine of assignor estoppel.

## I.     NATURE AND STAGE OF PROCEEDINGS

On June 4, 2020, UT filed a complaint for patent infringement ("Complaint") against Liquidia based on the notice of paragraph IV certification letter that UT received from Liquidia on or about April 27, 2020. D.I. 1 ¶¶ 18-19. UT amended its Complaint on July 22, 2020 to add infringement claims for the newly issued '793 patent. D.I. 16. On August 5, 2020, Liquidia filed an Answer to the Amended Complaint and Counterclaims. D.I. 23.

## II.    SUMMARY OF THE ARGUMENT

Assignor estoppel bars Liquidia from asserting that the '793 patent is invalid because Dr. Robert Roscigno, a named inventor on the '793 patent who assigned his rights in the patent to UT, is in privity with Liquidia by virtue of his role as Liquidia's Senior Vice President, Product Development and his substantial equity interest in Liquidia. Assignor estoppel is "an equitable doctrine that prevents one who has assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity … [and] operates to bar other parties in privity with the assignor…." *Diamond Sci. Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988). This case presents the classic assignor estoppel scenario.

The Court should dismiss Liquidia's invalidity counterclaims and defenses directed to the '793 patent under Federal Rule of Civil Procedure 12(b)(6). In the alternative, if the Court chooses not to take judicial notice of the additional facts that demonstrate assignor estoppel for the motion

-1-

to dismiss under Rule 12(b)(6), UT requests the Court to dismiss the counterclaims directed to invalidity of the '793 patent under Federal Rule of Civil Procedure 12(b)(1), which permits the Court to look outside the pleadings and dismiss a claim for lack of subject matter jurisdiction if the claim is insubstantial, implausible, or frivolous. Here, in light of the assignor estoppel doctrine, it is plain that Liquidia will never be able to prevail on its assertion that the '793 patent is invalid, and its counterclaim and defense to that effect should be dismissed.

## III.    STATEMENT OF FACTS

On June 4, 2020, UT filed a complaint for patent infringement against Liquidia based on the notice of paragraph IV certification letter that UT received from Liquidia on or about April 27, 2020. D.I. 1 ¶¶ 18-19. Liquidia seeks to obtain FDA approval and market its infringing product prior to patent expiration for UT's product, Tyvaso® (treprostinil) Inhalation Solution. *Id.* ¶¶ 2, 18-20. Because UT filed the Complaint within 45 days after receipt of Liquidia's notice letter, FDA will stay approval of Liquidia's infringing product for 30 months until October 24, 2022. *See id.* ¶ 21; D.I. 20, Ex. A at 2. Liquidia requested an extension to answer the Complaint and answered the Complaint and asserted counterclaims against UT on July 16, 2020. D.I. 11.

On July 21, 2020, the United States Patent & Trademark Office ("USPTO") issued the '793 patent to UT. D.I. 16-1, Ex. C. The '793 patent lists seven inventors, including Dr. Robert Roscigno. *Id.* Dr. Roscigno, along with all the other co-inventors of the '793 patent, assigned his interest in the '793 patent to UT. *Id.*; *see also* RJN No. 1 at REEL: 021148 FRAME: 005.[1] Specifically, Dr. Roscigno assigned all his interest in the parent application of the '793 patent, U.S. Patent Application No. 11/748,205, to UT on June 18, 2007. RJN No. 1 at REEL: 021148

---

[1] RJN Nos. 1-9 are documents included with UT's Motion for Judicial Notice and the Declaration of Joshua Mack, filed concurrently with this Motion to Dismiss.

FRAME: 005. Accordingly, the '793 patent is assigned to UT, as is shown on the face of the patent. D.I. 16-1, Ex. C.; *see also* D.I. 16 ¶ 18. The day after the '793 patent issued, UT filed its First Amended Complaint, alleging that Liquidia's product also infringes claims of that patent. *See generally* D.I. 16 ¶¶ 69-83.

On August 5, 2020, Liquidia filed an Answer to the Amended Complaint and Counterclaims. D.I. 23. Included in the Answer and Counterclaims are allegations by Liquidia that the '793 patent is invalid. Liquidia alleges that "[o]ne or more claims of the '066, '901, and '793 patents are invalid for failure to satisfy the conditions of patentability in 35 U.S.C. §§ 101 *et seq.,* including, but not limited to §§ 101, 102, 103, and/or 112." *Id.* at p. 10. Liquidia specifically alleges:

> **the claims of the '793 patent are invalid under §§ 102 and/or 103** at least over Plaintiff's prior art patents and publications, including U.S. Patent Nos. 6,756,033 and 6,521,212, disclosing methods for treating pulmonary hypertension by administering a single event dose of a 15 to 90 microgram inhalation formulation of treprostinil, including liquid and powder formulations of treprostinil, in 1 to 3 breaths; (7) **at least claims 1, 4, and 6-8 of the '793 patent are invalid under § 112** as indefinite and lacking written description and enablement support at least with respect to administration of a "powder"; and (8) the claims of **the '793 patent are invalid for obviousness-type double patenting** over Plaintiff's prior issued patents, including U.S. Patent Nos. 6,756,033 and 6,521,212, disclosing and claiming methods for treating pulmonary hypertension by administering a single event dose of a 15 to 90 microgram inhalation formulation of treprostinil, including liquid and powder formulations of treprostinil, in 1 to 3 breaths.

*Id.* at pp. 10-11 (emphasis added). Liquidia's Answer and Counterclaims to the Amended Complaint further requests a declaratory judgment that the '793 patent is invalid. *Id.* at pp. 16-18, 24.

Dr. Robert Roscigno was once the President and Chief Operating Officer at Lung Rx., Inc., a wholly owned subsidiary of Plaintiff United Therapeutics Corporation ("UT") and instrumental in the development of a UT product, Tyvaso® (treprostinil) Inhalation Solution ("Tyvaso®"). In

connection with that work, Dr. Roscigno is a listed inventor on a number of patents related to Tyvaso®, including the '793 patent. As an employee of Lung Rx, Dr. Roscigno assigned to UT his ownership in the '793 patent. Dr. Roscigno switched teams and until quite recently was the Senior Vice President, Product Development for Liquidia with a significant equity interest in Liquidia.[2] *E.g.*, RJN No. 3 at 6 (listing Dr. Roscigno as Liquidia's Senior Vice President, Product Development).  Liquidia charged Dr. Roscigno with developing the accused product in this case, a product intended to directly compete with Tyvaso® and piggyback on Tyvaso®'s FDA approval. In the public stock offering prospectus issued by Liquidia on March 20, 2019 (the "Prospectus"), Liquidia describes the role of Dr. Roscigno at Liquidia and also references his work at UT on Tyvaso®:

> Dr. Robert Roscigno[] previously served as the executive vice president of GeNO, LLC, where he led the clinical development team working on a novel nitric oxide delivery system, and before that **he served as the president and chief operating officer of Lung Rx, Inc., where he was part of the team responsible for bringing Tyvaso through Phase 3 development**, and he previously served in multiple leadership positions at United Therapeutics and its subsidiaries, contributing to the successful development and worldwide commercialization of Remodulin™, which is treprostinil administered through subcutaneous or intravenous infusion, for the treatment of PAH.

*Id.* (emphasis added). The Prospectus further describes the role of Dr. Roscigno at both UT and Liquidia:

> **Dr. Robert Roscigno has been our Senior Vice President, Product Development since December 2017. He served as our Senior Vice President, Research and Development from March 2016 until**

---

[2] Public sources indicate that Dr. Roscigno remains a Liquidia employee, but in preparing the letter filed with the Court on August 21, 2020 (D.I. 26), Liquidia stated that Dr. Roscigno is no longer employed at Liquidia. For this motion, this is irrelevant for two reasons. First, that purported fact is not part of the record. Second, even assuming that Dr. Roscigno has departed, assignor estoppel is an equitable doctrine, and Liquidia cannot escape the consequences of leveraging the benefits of Dr. Roscigno's expertise to design and develop its product by terminating his employment on the eve of anticipated approval.

> **December 2017 and our Vice President, Research and Development from September 2015 until March 2016. From January 2009 to September 2015**, Dr. Roscigno served as the executive vice president, global clinical affairs of GeNO, LLC, a pharmaceutical company in the field of inhaled nitric oxide drug products. From July 2007 to January 2009, Dr. Roscigno provided scientific consulting for various companies in the pharmaceutical industry and also worked as a subject matter expert in PAH. **From March 2005 to July 2007, Dr. Roscigno was the president and chief operations officer of Lung Rx, Inc., a subsidiary of United Therapeutics Corporation. Prior to Lung Rx, Inc., Dr. Roscigno served in multiple leadership positions at United Therapeutics Corporation**. Dr. Roscigno graduated from Trinity College with a Bachelor of Science in Biology. He also holds a Doctor of Philosophy in Cell and Molecular Biology from Duke University.

*Id.* at 130 (emphasis added). In fact, despite only starting at Liquidia in September 2015, Liquidia filed a patent application on May 5, 2016, directed to the use of dry powder treprostinil to treat pulmonary hypertension that listed Dr. Roscigno as an inventor. *See id.*; RJN No. 9. By October 2016, Dr. Roscigno and Liquidia had successfully conducted a toxicity study of the infringing product, LIQ861. RJN No. 8 at 99. And by March 2017, Dr. Roscigno and Liquidia had successfully completed a Phase 1 trial of the infringing product in 57 healthy volunteers. *Id.* at 88.

The Prospectus also describes a substantial Liquidia stock grant to Dr. Roscigno:

> On March 7, 2018, we granted incentive stock options to purchase shares of our common stock under the 2016 Plan, with an exercise price equal to $9.31 per share, to each of the following officers . . . Dr. Robert Roscigno, our Senior Vice President, Product Development, for 35,656 shares . . . .

RJN No. 3 at 145. Indeed, Liquidia's S-1 Registration Statement, S-3 and S-4 Statements disclose the significant interest that Dr. Roscigno owns in Liquidia. RJN No. 2 (disclosing the award of 33,333 stock options to Dr. Roscigno, and the award of 8,333 restricted stock units); RJN No. 5 (disclosing the award of 36,000 stock options to Dr. Roscigno); RJN No. 7 (disclosing the award of 25,553 stock options to Dr. Roscigno on September 28, 2016, and the award of 35,656 stock options on March 7, 2019).

In Liquidia's 8-K, dated March 8, 2019, Liquidia included Phase 1 results for LIQ861, which were described as being presented as a poster at the PVRI Annual World Congress in January 2018 by Dr. Roscigno. RJN. No. 4 at 13.

Liquidia's 8-K, dated January 7, 2019, listed Dr. Roscigno as part of Liquidia's "[s]easoned team with relevant commercial and disease area expertise." RJN No. 6 at 8. That 8-K included an extended quote from Dr. Roscigno:

> "Patient demographics and baseline characteristics in the trial suggest that LIQ861 may be attractive across disease severity and may have utility as a first-line prostacyclin," added Robert Roscigno, PhD, Liquidia's Senior Vice President of Product Development and LIQ861 Program Lead. "Interestingly, enrollment of the safety portion of the trial was driven primarily by stronger than anticipated interest from New York Heart Association Functional Class II add-on patients, which may imply that dry-powder delivery could be an alternative to oral delivery in prostacyclin naïve patients. We are pleased with these findings and believe they support the therapeutic potential and versatility of LIQ861 among patients across different functional classes."

*Id.* at 35-36.

## IV. ARGUMENT

### A. Legal Standards

Under Federal Rule of Civil Procedure 12(b)(6), a counterclaim can be dismissed if it fails "to state a claim upon which relief can be granted." In determining whether to dismiss a counterclaim under Rule 12(b)(6), the Court accepts the non-movant's factual statements in the counterclaim as true and determines whether the counterclaimant can make a "plausible claim for relief." *XpertUniverse, Inc. v. Cisco Sys., Inc.*, 868 F. Supp. 2d 376, 378-79 (D. Del. 2012) (citation omitted).

Assignor estoppel is "an equitable doctrine that prevents one who has assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity . . . [and] operates to bar other parties in privity with the assignor, such as a corporation founded by

the assignor." *Diamond Sci.*, 848 F.2d at 1224. The Federal Circuit explained that assignor estoppel

prevents "an injustice against the assignee to allow the assignor to make that representation at the

time of the assignment (to his advantage) and later to repudiate it (again to his advantage)."

*Hologic, Inc. v. Minerva Surgical, Inc.*, 957 F.3d 1256, 1265 (Fed. Cir. 2020) (quoting *Diamond*

*Sci.*, 848 F.2d at 1224) (internal quotations omitted).

For assignor estoppel to apply, Dr. Roscigno—who assigned his interest in the '793

patent—needs to be in privity with Liquidia, the party challenging the patent. *Id.* The Federal

Circuit identified factors to consider when determining whether privity exists for assignor estoppel

in *Shamrock Technologies, Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789 (Fed. Cir. 1990):

> (1) the assignor's leadership role at the new employer; (2) the assignor's
> ownership stake in the defendant company; (3) whether the defendant
> company changed course from manufacturing non-infringing goods to
> infringing activity after the inventor was hired; (4) the assignor's role in the
> infringing activities; (5) whether the inventor was hired to start the
> infringing operations; (6) whether the decision to manufacture the
> infringing product was made partly by the inventor; (7) whether the
> defendant company began manufacturing the accused product shortly after
> hiring the assignor; and (8) whether the inventor was in charge of the
> infringing operation.

*Mag Aerospace Indus., Inc. v. B/E Aerospace, Inc.*, 816 F.3d 1374, 1380 (Fed. Cir. 2016) (citing

*Shamrock*); *see also Shamrock Techs.*, 903 F.2d at 794 (finding privity between employer and

inventor hired as Vice President with responsibilities for developing accused product); *Juniper*

*Networks, Inc. v. Palo Alto Networks, Inc.*, 15 F. Supp. 3d 499, 508 (D. Del. 2014) (finding privity

between employer and employee granted title of "founder").

Further, privity exists between an assigning inventor and a party infringing a patent when

"the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct

infringement." *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 839 (Fed. Cir. 1991) (quoting

*Shamrock Techs.*, 903 F.2d at 794). Indeed, even consultants or contractors will be found to be in

privity with the infringer when that consultant or contractor plays a "significant role" in the infringing product. *BASF Corp. v. Aristo Inc.*, 872 F. Supp. 758, 776 (N.D. Ind. 2012); *Leading Tech. Composites v. MV2, LLC*, No. CCB-19-1256, 2020 WL 790601, at *4 (D. Md. Feb. 18, 2020) (finding privity and, thus, assignor estoppel between accused infringer and its "contractor" where the accused infringer "availed itself of [the contractor's] knowledge and assistance to conduct the allegedly infringing operations."). The "critical time" to look at to determine privity is when the infringing product was developed. *Intel*, 946 F.2d at 839 (quoting determination of ALJ).

The '793 Patent is identified in and attached as an exhibit to the First Amended Complaint. D.I. 16; D.I. 16-1, Ex. C. As such, it is appropriate for the Court to rely on the patent when ruling on a motion to dismiss. *E.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Courts can also take judicial notice of other documents that are matters of public record, like filings with the USPTO. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 705 n.5 (3d Cir. 2004) (taking judicial notice of public records available on the USPTO and FDA websites); *HTC Corp. v. IPCom GmbH & Co.*, 671 F. Supp. 2d 146, 150 n.3 (D.D.C. 2009) ("The Court takes judicial notice of the PTO pleadings. A court may take judicial notice of court documents and other public records."); *see also In re Wellbutrin SR/Zyban Antitrust Litig.*, 281 F. Supp. 2d 751, 754 n.2 (E.D. Pa. 2003) (taking judicial notice of information from FDA website). Accordingly, the Court can take judicial notice of patent assignments. *E.g.*, *Port-A-Pour, Inc. v. Peak Innovations, Inc.*, No. 13-cv-01511-WYD-BNB, 2015 WL 292913, at *2 (D. Colo. Jan. 20, 2015); *see also Wells v. Kessler Corp.*, No. 17-cv-02709-AGF, 2018 WL 1251928, at *3 (E.D. Mo. Mar. 12, 2018) (taking judicial notice of USPTO records).

Similarly, the Court can take judicial notice of a company's filings with the SEC. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014); *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (taking judicial notice of SEC filings); *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (noting that the court may consider on a motion to dismiss documents filed with the SEC). Indeed, when a litigant cannot reasonably dispute a fact, it is appropriate for the court to take judicial notice of that fact. *See, e.g.*, *LifeScan Scotland, Ltd. v. Shasta Tech, LLC*, No. 11-cv-04494 EJD, 2012 WL 2979028, at *6 n.1 (N.D. Cal. July 19, 2012) ("[I]n their objection to LifeScan's request for judicial notice, Instacare and Pharmatech object generally to its SEC filings, websites, and press releases being used to prove the truth of the statements they contain as hearsay. . . . As a party to this action, Instacare's admissions are not hearsay.").

Alternatively, "frivolous claims may also be dismissed under [Rule] 12(b)(1) on jurisdictional grounds so long as jurisdictional dismissals for frivolousness are confined to cases that are very plain." *Lamson v. U.S.*, 101 Fed. Cl. 280, 287 n.6 (Fed. Cl. 2011) (internal quotations omitted, citations omitted). Indeed, the Supreme Court has held that dismissing a claim for lack of subject matter jurisdiction is appropriate "when the claim is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation of N.Y. v. Cnty. of Oneida*, 414 U.S. 661, 666 (1974) (internal quotations omitted)). "'[W]holly insubstantial and frivolous' claims do not merit federal jurisdiction. A 'question may be plainly unsubstantial ... because it is obviously without merit.'" *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1328 (Fed. Cir. 1998) (citations omitted).

## B.     Liquidia's Invalidity Counterclaim and Defense Should be Dismissed for Failure to State a Claim under Rule 12(b)(6)

It is beyond dispute that (a) Dr. Roscigno is one of the '793 patent named inventors, and (b) Dr. Roscigno assigned all his rights in the patent to UT. The only issue is whether Liquidia is in privity with Dr. Roscigno such that assignor estoppel also bars Liquidia from challenging the validity of the '793 patent. Liquidia is, in fact, in privity with Dr. Roscigno given his pivotal role in developing Liquidia's product intended to compete with Tyvaso®, his executive-level position, and his substantial equity stake in Liquidia.

As Liquidia's securities filings state, Dr.  Roscigno is Liquidia's Senior Vice President, Product Development, or at least was until days ago. RJN No. 3 at 6; *see supra* n.2. Liquidia's SEC filings tout Dr. Roscigno's previous experience with treprostinil while at UT. *Id.* (stating that Dr. Roscigno "served as the president and chief operating officer of Lung Rx, Inc., where he was part of the team responsible for bringing Tyvaso® through Phase 3 development"). Indeed, by publicly disclosing Dr. Roscigno as one of the company's executive officers under federal securities law, Liquidia represented that Dr. Roscigno was an "officer who performs a policy making function or any other person who performs similar policy making functions for the registrant." 17 C.F.R. § 240.3b-7; *see also* RJN Nos. 2 & 5 (SEC Form 4 submissions identifying Dr. Roscigno in Box 5 as a Liquidia "officer"); RJN No. 3 at 129-130 (listing Dr. Roscigno as one of Liquidia's six "executive officers.").

Liquidia's emphasis on Dr. Roscigno's prior experience with Tyvaso® at UT is not surprising because it dovetails with his vital role in developing a competing product for Liquidia. Dr. Roscigno is described by Liquidia as the "LIQ861 Program Lead," which is the infringing product in this action. Liquidia filed a patent application, naming Dr. Roscigno as an inventor, that is directed to dry powder treprostinil to treat pulmonary hypertension within eight months of Dr.

Roscigno's start at Liquidia. RJN No. 9. Five months after filing this patent application, in October 2016, Dr. Roscigno and Liquidia successfully conducted a preclinical study of infringing product LIQ861. RJN No. 8 at 99. And by March 2017, Dr. Roscigno and Liquidia had successfully completed a Phase 1 trial of the infringing product in 57 healthy volunteers. *Id.* at 88. Indeed, Dr. Roscigno presented the results of the Phase 1 trial of the infringing product at a scientific conference. RJN No. 4 at 13; RJN No. 8 at 88. Thus, Liquidia made Dr. Roscigno a highly placed executive officer, touted his experience developing Tyvaso®, and placed him in charge of developing the infringing product at issue here. As such, Dr. Roscigno played a key role in the development of the infringing product.

Dr. Roscigno also has a significant ownership interest in Liquidia, as stated in Liquidia's SEC filings. Liquidia is a publicly traded company, and Liquidia has granted Dr. Roscigno significant equity. Liquidia has disclosed several grants of equity stakes in Liquidia to Dr. Roscigno. RJN No. 2 (option to purchase 33,333 shares and award of 8,333 restricted shares); RJN No. 5 (option to purchase 36,000 shares); RJN No. 7 (option to purchase 25,553 shares awarded on September 28, 2016, option to purchase 35,656 shares awarded on March 7, 2019). Thus, Liquidia enticed Dr. Roscigno with a significant ownership interest in Liquidia. This ownership interest is entirely consistent with Dr. Roscigno's role at Liquidia—an executive officer critical in developing Liquidia's infringing product.

Such an executive position in Liquidia, with responsibility for development of the infringing product, and a significant ownership in Liquidia, is sufficient to meet the test for similar executives to be in privity with their employers. For example, in *Mag Aerospace*, the Federal Circuit found an accused infringer in privity with an inventor it hired to develop the accused product based, in part, on his prior experience in the area:

> [T]he district court noted that B/E used Mr. Pondelick's knowledge to conduct the activities that are now alleged to be infringing; that he was hired specifically to develop the toilets that are accused of infringement; and that he was the Director of Engineering for B/E during his time as a consultant and later became Vice President and General Manager of B/E EcoSystems, the division that manufactured the accused toilets. Based on the extent of Mr. Pondelick's involvement in the alleged infringing activity and the fact that B/E "availed itself of [Mr. Pondelick's] knowledge and assistance" to conduct the alleged infringement, we cannot say that the district court abused its discretion in finding that assignor estoppel applies.

816 F.3d at 1380 (internal citation omitted). Here too, Dr. Roscigno is the "LIQ861 Program Lead," the product at issue in this litigation, and Liquidia has "availed itself" of Dr. Roscigno's expertise gained in developing Tyvaso®. *See* RJN No. 3 at 6; *see also* D.I. 23 at p. 2 ("Liquidia admits that it submitted New Drug Application No. 213005 under § 505(b)(2) of the Federal Food, Drug and Cosmetic Act ('Liquidia's NDA') to the United States Food and Drug Administration ('FDA') seeking approval to engage in the commercial manufacture, use and/or sale of LIQ861 (treprostinil) inhalation powder (the 'Liquidia Product' or 'LIQ861 Product')."). Indeed, Liquidia "availed itself" of Dr. Roscigno's expertise right away, filing a patent application related to its infringing product within eight months of Dr. Roscigno starting at Liquidia. RJN No. 9.

*Shamrock Technologies* is also instructive. The *Shamrock* court explained that privity requires evaluating the relationship between the inventor and employer:

> Privity, like the doctrine of assignor estoppel itself, is determined upon a balance of the equities. If an inventor assigns his invention to his employer company A and leaves to join company B, whether company B is in privity and thus bound by the doctrine will depend on the equities dictated by the relationship between the inventor and company B in light of the act of infringement. The closer that relationship, the more the equities will favor applying the doctrine to company B.

903 F.2d at 793. *Shamrock* concluded that there was no genuine issue of material fact that privity existed where, *inter alia*, the inventor in question left his prior employer to take a Vice President position at the accused infringer, the infringer granted 50,000 shares of stock to the inventor, and the accused infringer tasked the inventor with developing the accused processes. *Id*. at 794; *see*

*also Juniper Networks*, 15 F. Supp. 3d at 509 (applying estoppel and noting that "the query is whether [the inventor] was closely involved in the development of products and with the [accused infringer]"). Here too, Liquidia leveraged Dr. Roscigno's "knowledge and experience" in developing Tyvaso® to develop the infringing product and rewarded him handsomely for his efforts. *See Intel*, 946 F.2d at 839. Liquidia cannot now distance itself from Dr. Roscigno and his prior work, including his role as an inventor of the '793 patent.

Liquidia cannot reasonably deny Dr. Roscigno's role in the leadership at Liquidia and his role in the development of the infringing product, LIQ861. As such, Liquidia is in privity with Dr. Roscigno, and is estopped from contending that the '793 patent is invalid. Liquidia's defenses and counterclaims directed to invalidity of the '793 patent must be dismissed.

### C.     Alternatively, Liquidia's Invalidity Counterclaim Defense Should be Dismissed for Lack of Jurisdiction under Rule 12(b)(1)

If the Court should choose not to take judicial notice of the publicly available records discussed above, the Court should still dismiss the invalidity counterclaim and defense related to the '793 patent due to lack of jurisdiction. This Court can dismiss a claim under 12(b)(1) when it is insubstantial, implausible, or frivolous. *See Steel Co.*, 523 U.S. at 89;[3] *Lamson*, 101 Fed. Cl. at 287 n.6. And the Court can look outside the pleadings when determining whether to grant a motion to dismiss under Rule 12(b)(1). *E.g.*, *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993) ("a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony.").

---

[3] In *Steel Co.*, the Supreme Court was addressing a circuit split between the Sixth and Seventh Circuits regarding the interpretation of the Emergency Planning and Community Right–To–Know Act of 1986 (EPCRA). 523 U.S. at 88. Because the Supreme Court found that the statute was ambiguous, and that the respondent prevailed on its claim under one interpretation of EPCRA, the Supreme Court held that the claim was not "frivolous or immaterial," and should not be dismissed under Rule 12(b)(1). *Id.* at 88-89.

In *Lamson*, the plaintiff alleged a Fifth Amendment taking through grant funding. 101 Fed. Cl. at 281. The U.S. government moved to dismiss this claim under Rules 12(b)(1) and 12(b)(6) as being foreclosed based on Supreme Court and Federal Circuit precedent holding that any alleged patent infringement by the U.S. government does not give rise to a cause of action under the Fifth Amendment. *Id.* at 284. The Court of Federal Claims agreed, holding that "Count 2 of plaintiff's complaint—alleging an unconstitutional taking under the Fifth Amendment for patent infringement—should be dismissed for lack of subject matter jurisdiction." *Id.* Because the Court of Federal Claims dismissed the claims under Rule 12(b)(1), it did not reach the parties' arguments regarding 12(b)(6). *Id.* at 287 n.6.  The Federal Circuit has affirmed dismissals under Rule 12(b)(1) where it has found the claim to be "entirely insubstantial." *Hunter Douglas*, 153 F.3d at 1328.

Here, Liquidia's defense and counterclaim for invalidity of the '793 patent are "entirely insubstantial" because Federal Circuit precedent on assignor estoppel bars Liquidia from asserting that the '793 patent is invalid. As discussed above, Liquidia cannot reasonably contest that Dr. Roscigno assigned the '793 patent to UT. Nor can Liquidia reasonably contest that Dr. Roscigno is in privity with Liquidia, given his significant role in developing the infringing product, his position as project leader for the infringing product, his leadership position in the company, and his equity stake in the company. Liquidia's defense and counterclaims simply cannot stand in view of controlling precedent and must be dismissed.

## V.   <u>CONCLUSION</u>

Because Dr. Roscigno is an inventor on the '793 patent, assigned his interest in that patent to UT, and is in privity with Defendant Liquidia, Liquidia is estopped from challenging the validity of the '793 patent. Liquidia's defenses and counterclaims for invalidity of the '793 patent should be dismissed.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Michael J. Flynn*

_____

OF COUNSEL:

Douglas H. Carsten
Joshua Mack
WILSON SONSINI GOODRICH & ROSATI
12235 El Camino Real
San Diego, CA 92130
(858) 305-2300

Adam W. Burrowbridge
WILSON SONSINI GOODRICH & ROSATI
1700 K Street NW, Fifth Floor
Washington, DC 20006
(202) 973-8800

William C. Jackson
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue NW
Washington, DC 20005
(202) 237-2727

August 26, 2020

Jack B. Blumenfeld (#1014)
Michael J. Flynn (#5333)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
mflynn@mnat.com

*Attorneys for Plaintiff United Therapeutics
Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2020, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on August 26, 2020, upon the following in the manner indicated:

Karen E. Keller, Esquire                                    *VIA ELECTRONIC MAIL*
Jeff Castellano, Esquire
David M. Fry, Esquire
Nathan R. Hoeschen, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Sanya Sukduang, Esquire                                    *VIA ELECTRONIC MAIL*
Jonathan Davies, Esquire
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Erik Milch, Esquire                                         *VIA ELECTRONIC MAIL*
COOLEY LLP
11951 Freedom Drive, 14th Floor
Reston, VA 20190-5640
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Ivor Elrifi, Esquire                                        *VIA ELECTRONIC MAIL*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*

Lauren Krickl, Esquire                                    *VIA ELECTRONIC MAIL*
Deepa Kannappan, Esquire
COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
*Attorneys for Defendant Liquidia*
*Technologies, Inc.*



                              */s/ Michael J. Flynn*

                              _____
                              Michael J. Flynn (#5333)

# EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED THERAPEUTICS
CORPORATION,
                    Plaintiff,

        v.                                          Civil Action No. 20-cv-755-RGA

LIQUIDIA TECHNOLOGIES, INC.,

                    Defendant.

MEMORANDUM ORDER

Before me is Plaintiff's motion to dismiss Defendant's counterclaims pursuant to Rule
12(b)(6) or alternatively Rule 12(b)(1) of the Federal Rules of Civil Procedure. (D.I. 28). The
motion is briefed. (D.I. 29, 37, 38). For the following reasons, Plaintiff's motion is denied.

Plaintiff United Therapeutics filed a complaint for patent infringement against Defendant
Liquidia on June 4, 2020. (D.I. 1). The complaint was amended on July 22, 2020 to add
infringement claims for a third patent, the newly issued U.S. Patent No. 10,716,793 (the
"'793 patent"). (D.I. 16). Defendant filed an answer to Plaintiff's amended complaint with
counterclaims, including counterclaim count V, which alleges invalidity of the '793 patent. (D.I.
23). Plaintiff filed a motion to dismiss Defendant's counterclaim and related defenses based on
assignor estoppel as one of seven named inventors of the '793 patent – Dr. Robert Roscigno – is
(or was) "Senior Vice President, Product Development" of Defendant and therefore in privity
with Defendant. (D.I. 28). He had previously assigned his interest in the patent to Plaintiff.
(*Id*.).

A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). "Rule 12(b)(1) allows a defendant to attack the allegations in the complaint and submit contrary evidence in its effort to show that the court lacks jurisdiction." *Davis v. Wells Fargo*, 824 F.3d 333, 349 (Fed. Cir. 2016). However, "[t]he Supreme Court has authorized courts to dismiss under Rule 12(b)(1) for lack of jurisdiction due to merits-related defects in only narrow categories of cases . . . 'where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial . . . or where such a claim is wholly insubstantial and frivolous.'" *Id.* at 349-50 (quoting Bell v. Hood, 327 U.S. 678, 682–83 (1946)). The doctrine of "[a]ssignor estoppel also prevents parties in privity with an estopped assignor from challenging the validity of the patent. Whether two parties are in privity depends on the nature of their relationship in light of the alleged infringement. 'The closer that relationship, the more the equities will favor applying the doctrine' of assignor estoppel. Assessing a relationship for privity involves evaluation of all direct and indirect contacts." *Mentor Graphics Corp. v. Quickturn Design Sys.*, 150 F.3d 1374, 1379 (Fed. Cir. 1998) (quoting *Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990)) (internal citations omitted).

Plaintiff asserts that Defendant's counterclaim for a declaration of invalidity of the '793 patent and the related defenses should be dismissed based on assignor estoppel. (D.I. 29 at 1). Plaintiff is correct that assignor estoppel will apply to persons or entities in privity with the inventor. *See Diamond Sci. Co. v. Ambico, Inc.*, 848 F.2d 1220 (Fed. Cir. 1988). And it does not

appear that there is any contested issue about whether Dr. Roscigno made an assignment of his rights in the patent.

Determining whether privity exists, however, is more difficult.  In order to apply assignor estoppel based on privity requires assessing the relationship between the inventor and the associated entity.  *See Shamrock*, 903 F.2d at 793.  Even accepting Plaintiff's assertions as true, it is unclear at this stage whether sufficient privity exists to apply assignor estoppel.  A determination that Defendant is in privity with a named inventor of the '793 patent will require a fact intensive evaluation of their relationship and a balancing of the equities.  *See Mentor Graphics*, 150 F.3d at 1379.  As a result, the finding of privity required for the Court to apply assignor estoppel and dismiss Defendant's counterclaim cannot appropriately be made in the present posture, when the Court must consider the allegations in the light most favorable to the nonmoving party.  *See Twombly*, 550 U.S. at 558.  Further, there is no indication that the counterclaims at issue are "wholly insubstantial and frivolous" in order to warrant dismissal under Rule 12(b)(1) for lack of subject-matter jurisdiction.  *Bell*, 327 U.S. at 682–83.

For the reasons set forth above, I deny Plaintiff's motion to dismiss Defendant's counterclaim.

IT IS SO ORDERED this 3rd day of November 2020.


   _/s/ Richard G. Andrews___
   United States District Judge

# EXHIBIT 24

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

LIQUIDIA TECHNOLOGIES, INC.,

Petitioner

v.

UNITED THERAPEUTICS CORPORATION,

Patent Owner

————————————

IPR2021-00406
U.S. Patent No. 10,716,793 B2
Issue Date: July 21, 2020

Title: Treprostinil Administration by Inhalation

————————————

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. Patent No. 10,716,793 B2**

# TABLE OF CONTENTS

I.      MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1) ......................1

    A.      Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1) ...........................1

    B.      Related Matters Under 37 C.F.R. § 42.8(b)(2) ....................................1

    C.      Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3) .................2

    D.      Service Information ........................................................................2

    E.      Power of Attorney .........................................................................3

II.     PAYMENT OF FEES - 37 C.F.R. § 42.103 .................................................3

III.    REQUIREMENTS UNDER 37 C.F.R. §§ 42.104 AND 42.108 AND
    CONSIDERATIONS UNDER §§ 314(A) AND 325(D).............................3

    A.      Grounds for Standing Under 37 C.F.R. § 42.104(a).........................3

    B.      Identification of Challenge Under 37 C.F.R. § 42.104(b) and
        Statement of Precise Relief Requested .................................................3

    C.      Threshold Requirement for *Inter Partes* Review 37 C.F.R.
        § 42.108(c)........................................................................................4

    D.      Considerations under 35 U.S.C. § 314(a) ............................................4

    E.      Considerations under 35 U.S.C. § 325(d) ...........................................6

IV.     SUMMARY OF THE '793 PATENT ...........................................................11

    A.      Brief Description of the '793 Patent ....................................................11

    B.      Summary of the Prosecution History of the '793 Patent ..................12

V.      CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(B)(3)................12

VI.     OVERVIEW OF THE GROUNDS................................................................13

VII.    PERSON OF ORDINARY SKILL IN THE ART .........................................13

VIII.   TECHNICAL BACKGROUND ....................................................................14

    A.      History of Inhalation Therapy .............................................................15

    B.      Inhaled Treprostinil and Its Analogues .............................................15

    C.      Well Known Considerations for Inhalation Therapies .....................17

IX.     OVERVIEW OF THE PRIOR ART .............................................................19

# TABLE OF CONTENTS

A.    '212 Patent ................................................................19

B.    Voswinckel JESC ......................................................22

C.    Voswinckel JAHA .....................................................24

D.    Ghofrani ...................................................................25

E.    Voswinckel 2006 .......................................................27

X.    GROUND 1: CLAIMS 1-8 ARE RENDERED OBVIOUS UNDER
35 U.S.C. § 103(A) OVER THE '212 PATENT IN COMBINATION
WITH VOSWINCKEL JESC AND VOSWINCKEL JAHA .....................30

A.    Motivation to Combine '212 Patent with Voswinckel JESC and
Voswinckel JAHA With a Reasonable Expectation of Success ........30

B.    The '212 Patent in combination with Voswinckel JESC and
Voswinckel JAHA renders obvious claims 1-8 .................................35

    1.    Independent Claim 1 ...................................................35

    2.    Dependent Claim 2 .....................................................41

    3.    Dependent Claim 3 .....................................................43

    4.    Dependent Claim 4 .....................................................43

    5.    Dependent Claim 5 .....................................................44

    6.    Dependent Claim 6 .....................................................45

    7.    Dependent Claim 7 .....................................................45

    8.    Dependent Claim 8 .....................................................45

XI.   GROUND 2: CLAIMS 1-8 ARE RENDERED OBVIOUS UNDER
35 U.S.C. § 103(A) OVER THE '212 PATENT IN COMBINATION
WITH VOSWINCKEL JESC .........................................................46

A.    Motivation to Combine With a Reasonable Expectation of
Success ...................................................................46

B.    The '212 Patent in combination with Voswinckel JESC renders
obvious claims 1-8 ...................................................47

    1.    Independent Claim 1 ...................................................47

**TABLE OF CONTENTS**

    2.    Dependent Claims 2-8................................................49

XII.  GROUND 3: CLAIM 1 IS ANTICIPATED BY GHOFRANI...................50

    A.    Ghofrani Discloses Claim Element 1[a] ............................................50

    B.    Ghofrani Discloses Claim Element 1[b] ............................................51

    C.    Ghofrani Discloses Element 1[c] ............................................51

    D.    Ghofrani Discloses Claim Element 1[d] ............................................52

XIII.  GROUND 4: CLAIMS 1, 3, AND 8 ARE RENDERED OBVIOUS UNDER 35 U.S.C. § 103(A) OVER VOSWINCKEL JAHA IN COMBINATION WITH GHOFRANI..........................................................52

    A.    Motivation to Combine With A Reasonable Expectation of Success ............................................52

    B.    Voswinckel JAHA in combination with Ghofrani renders obvious claims 1, 3, and 8 ...............................................54

        1.    Independent Claim 1 ................................................54

        2.    Dependent Claim 3 ................................................56

        3.    Dependent Claim 8 ................................................57

XIV.  GROUND 5: CLAIMS 1 AND 3 ARE ANTICIPATED BY VOSWINCKEL 2006................................................57

    A.    Independent Claim 1 ................................................57

        1.    Voswinckel 2006 discloses claim element 1[a]......................57

        2.    Voswinckel 2006 discloses claim element 1[b]......................58

        3.    Voswinckel 2006 discloses claim element 1[c]......................58

        4.    Voswinckel 2006 discloses claim element 1[d]......................58

    B.    Claim 3 ................................................59

XV.  GROUND 6: CLAIMS 2 AND 4-8 ARE OBVIOUS OVER VOSWINCKEL 2006 IN COMBINATION WITH THE '212 PATENT ................................................59

**TABLE OF CONTENTS**

    A.    Motivation to Combine With a Reasonable Expectation of Success .................................................................................59

    B.    Voswinckel 2006 in combination with the '212 Patent renders obvious claims 2 and 4-8.................................................60

        1.    Dependent Claim 2 ..............................................60

        2.    Dependent Claim 4 ..............................................61

        3.    Dependent Claim 5 ..............................................62

        4.    Dependent Claim 6 ..............................................63

        5.    Dependent Claim 7 ..............................................64

        6.    Dependent Claim 8 ..............................................64

XVI.  NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS EXIST .................................................................................64

XVII. CONCLUSION..............................................................68

iv

**EXHIBITS**

| Exhibit No. | Description of Document |
|---|---|
| **1001** | U.S. Patent No. 10,716,793 B2 to Olschewski, et al. ("'793 Patent") |
| **1002** | Declaration of Dr. Nicholas Hill ("Hill Decl.") |
| **1003** | *Curriculum Vitae* of Dr. Nicholas Hill |
| **1004** | Declaration of Dr. Igor Gonda ("Gonda Decl.") |
| **1005** | *Curriculum Vitae* of Dr. Igor Gonda |
| **1006** | U.S. Patent No. 6,521,212 B1 to Cloutier, et al. ("'212 patent") |
| **1007** | Voswinckel, R., et al., Abstract 218: "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," *European Heart Journal* 25:22 (2004) ("Voswinckel JESC") |
| **1008** | Robert Voswinckel, Beate Enke, Andre Kreckel, Frank Reichenberger, Stefanie Krick, Henning Gall, Tobias Gessier, Thomas Schmehl, Markus G. Kohstall, Friedrich Grimminger, Hossein A. Ghofrani, Werner Seeger, and Horst Olschewski, Abstract 1414: "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension," Abstracts from the 2004 Scientific Sessions of the American Heart Association, *Circulation*, 110(17 Suppl.):III-295 (October 26, 2004) ("Voswinckel JAHA") |
| **1009** | Robert Voswinckel, Hossein A. Ghofrani, Friedrich Grimminger, and Werner Seeger, "Clinical Observations" on "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," "Letters" Section of the *Annals of Internal Medicine*, 144(2):149-50 (January 2006) ("Voswinckel 2006") |
| **1010** | Hossein Ardeschir Ghofrani, Robert Voswinckel, et al., Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie, 30(4) HERZ, 30(4):296–302 (June 2005) ("Ghofrani") (Foreign article and English translation attached) |
| **1011** | First Amended Complaint filed in *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA (D. Del.) |
| **1012** | United Therapeutics Corporation's Answer to Defendant Liquidia Technologies, Inc.'s Counterclaims filed in *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA (D. Del.) |
| **1013** | United Therapeutics Corporation's Opening Brief in Support of its Motion to Dismiss Defendant's Counterclaim filed in *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. |

**EXHIBITS**

| Exhibit No. | Description of Document |
|---|---|
| | 1:20-cv-00755-RGA (D. Del.) |
| 1014 | Memorandum Order denying United Therapeutics Corporation's Motion to Dismiss Defendants Counterclaim filed in *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA (D. Del.) |
| 1015 | 10,716,793 Patent Prosecution History |
| 1016 | 10,376,525 Patent Prosecution History (excerpted) |
| 1017 | 9,339,507 Patent Prosecution History (excerpted) |
| 1018 | Remodulin® 2004 Label (authenticated by EX1036, ¶¶56-58) |
| 1019 | Stein, S.W., et al., "The History of Therapeutic Aerosols: A Chronological Review," *Journal of Aerosol Medicine and Pulmonary Drug Delivery*, 30(1):20-41 (2017) ("Stein") |
| 1020 | Clark, A.R., "Medical Aerosol Inhalers: Past, Present, and Future," *Aerosol Science and Technology*, 22:374-91 (1995) ("Clark") |
| 1021 | Ruan, C.-H., et al., "Prostacyclin Therapy for Pulmonary Arterial Hypertension," *Texas Heart Institute Journal*, 37(4):391-99 (2010) ("Ruan") |
| 1022 | Walmrath, D., et al., "Direct Comparison of Inhaled Nitric Oxide and Aerosolized Prostacyclin in Acute Respiratory Distress Syndrome," *American Journal of Respiratory Critical Care Medicine*, 153:991-96 (1996) ("Walmrath 1996") |
| 1023 | Olschewski, H., et al., "Inhaled Prostacyclin and Iloprost in Severe Pulmonary Hypertension Secondary to Lung Fibrosis," *American Journal of Respiratory Critical Care Medicine*, 160:600-07 (1999) ("Olschewski 1999") |
| 1024 | Haché, M., et al., "Inhaled epoprostenol (prostacyclin) and pulmonary hypertension before cardiac surgery," *Journal of Thoracic and Cardiovascular Surgery*, 125:642-49 (2003) ("Hache") |
| 1025 | De Wet, C.J., et al., "Inhaled prostacyclin is safe, effective, and affordable in patients with pulmonary hypertension, right heart dysfunction, and refractory hypoxemia after cardiothoracic surgery," *Journal of Thoracic and Cardiovascular Surgery*, 127:1058-67 (2004) ("De Wet") |
| 1026 | Denver, J. and Dyche, T., "The Adaptive Aerosol Delivery (AAD) Technology: Past, Present, and Future," *Journal of Aerosol Medicine and Pulmonary Drug Delivery*, 23(1 suppl):S-1-S10 (2010) ("Denver |

**EXHIBITS**

| Exhibit No. | Description of Document |
|---|---|
| | and Dyche") |
| 1027 | U.S. Patent No. 6,242,482 B1 to Shorr, et al. ("Shorr") |
| 1028 | U.S. Patent Application Publication No. US 2004/0265238 A1 to Chaudry ("Chaudry") |
| 1029 | Ventavis® Label 2004 |
| 1030 | Newman, S.P., "Aerosols", Chapter from *Encyclopedia of Respiratory Medicine* pp. 58-64 (2006) ("Newman") |
| 1031 | Geller, D.E., "Comparing Clinical Features of the Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler," *Respiratory Care*, 50(10):1313-21 (2005) ("Geller 2005") |
| 1032 | Bender, B., et al., "Nonadherence in asthmatic patients: is there a solution to the problem?" *Annals of Allergy, Asthma & Immunology*, 79:177-86 (1997) ("Bender 1997") |
| 1033 | Rau, J.L., "Determinants of Patient Adherence to an Aerosol Regimen," Respiratory Care 50(10):1346-56 (2005) ("Rau 2005") |
| 1034 | Geller, D., et al., "Bolus Inhalation of rhDNase with the AERx System in Subjects with Cystic Fibrosis," *Journal of Aerosol Medicine*, 16(2):175-82 (2003) ("Geller 2003") |
| 1035 | Chattaraj, S.C., "Treprostinil sodium Pharmacia," *Current Opinion in Investigational Drugs*, 3(4):582-86 (Apr. 2002), *available at* https://pubmed.ncbi.nlm.nih.gov/12090728/ ("Chattaraj") |
| 1036 | Declaration of Sylvia Hall-Ellis, Ph.D. ("Hall-Ellis Decl.") |
| 1037 | English translation of OptiNeb® User Manual 2005 |
| 1038 | Atkins, P.J., "Dry Powder Inhalers: An Overview," *Respiratory Care*, 50(10):1304-12 (2005) ("Atkins") |
| 1039 | Frijlink, H.W. and De Boer, A.H., "Dry powder inhalers for pulmonary drug delivery," Expert Opinion on Drug Delivery, 1(1):67-86 (2004) ("Frijlink and De Boer") |
| 1040 | Chew N. and Chan H.-K., "Pharmaceutical Dry Powder Aerosol Delivery," KONA, No. 19, pp. 46-56 (2001) ("Chew and Chan") |
| 1041 | *Reserved* |
| 1042 | January 27, 2020 Press Release, "Liquidia Submits New Drug Application for LIQ861 (Treprostinil) Inhalation Powder to U.S. Food And Drug Administration for the Treatment of Pulmonary Arterial Hypertension (PAH)," *available at* https://investors.liquidia.com/news-releases/news-release- |

**EXHIBITS**

| Exhibit No. | Description of Document |
|---|---|
| | details/liquidia-submits-new-drug-application-liq861-treprostinil |
| 1043 | 2009 Tyvaso® Label, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/022387s015lbl.pdf |
| 1044 | 9,358,240 Patent Prosecution History (excerpted) |
| 1045 | *Reserved* |
| 1046 | U.S. Patent No. 9,358,240 to Olschewski, et al. ("'240 Patent") |
| 1047 | Hoeper, M.M., et al., "Long-Term Treatment of Primary Pulmonary Hypertension with Aerosolized Iloprost, a Prostacyclin Analogue," *N Engl J Med*, 342:1866-70 (2000) ("Hoeper") |
| 1048 | Walmrath, D., et al., "Aerosolised prostacyclin in adult respiratory distress syndrome," *Lancet*, 342:961-62 (1993) ("Walmrath 1993") |
| 1049 | April 8, 2020 Press Release, "Liquidia Announces FDA Acceptance of New Drug Application for LIQ861 (Treprostinil) Inhalation Powder for the Treatment of Pulmonary Arterial Hypertension," *available at* https://investors.liquidia.com/news-releases/news-release-details/liquidia-announces-fda-acceptance-new-drug-application-liq861 |
| 1050 | Pulmozyme® Label |
| 1051 | Farber, H.W. and Loscalzo, J., "Pulmonary Arterial Hypertension," *N Engl J Med*, 351:1655-65 (2004) ("Farber and Loscalzo") |
| 1052 | Rubin, L.J. and Badesch, D.B., "Evaluation and Management of the Patient with Pulmonary Arterial Hypertension," *Ann Intern Med.*, 143:282-92 (2005) ("Rubin and Badesch") |
| 1053 | Flolan® Label |
| 1054 | Gonda, I., "A semi-empirical model of aerosol deposition in the human respiratory tract for mouth inhalation," *J. Pharm. Pharmacol.*, 33:692-96 (1981) ("Gonda 1981") |
| 1055 | Gonda, I., "Study of the effects of polydispersity of aerosols on regional deposition in the respiratory tract," *J. Pharm. Pharmacol.*, 33 (Suppl.) 52P (1981) ("Gonda 1981b") |
| 1056 | Telko, M.J. and Hickey, A.J., "Dry Powder Inhaler Formulation," *Respiratory Care*, 50(9):1209-27 (2005) ("Telko and Hickey") |
| 1057 | October 24, 2005 Press Release, "Aradigm Corporation And United Therapeutics Corporation Sign Development and Commercialization Agreement Targeting Pulmonary Hypertension," *available at* |

# EXHIBITS

| Exhibit No. | Description of Document |
|---|---|
| | https://www.biospace.com/article/releases/aradigm-corporation-and-united-therapeutics-corporation-sign-development-and-commercialization-agreement-targeting-pulmonary-hypertension-/ |
| 1058 | Ziegler, J. and Wachtel, H., "Comparison of Cascade Impaction and Laser Diffraction for Particle Size Distribution Measurements," *Journal of Aerosol Medicine*, 18(3):311-24 (2005) ("Ziegler and Wachtel") |
| 1059 | Nauser, T.D., "Pulmonary Hypertension: New Perspectives," *CHF*, 9:155-62 (2003) ("Nauser 2003") |
| 1060 | Pitcairn, G., et al., "Deposition of Corticosteroid Aerosol in the Human Lung by Respimat® Soft Mist™ Inhaler Compared to Deposition by Metered Dose Inhaler or by Turbuhaler® Dry Powder Inhaler," *Journal of Aerosol Medicine*, 18(3):264-72 (2005) ("Pitcairn") |
| 1061 | Dalby, R., et al., "A review of the development of Respimat® Soft Mist™ Inhaler," *International Journal of Pharmaceutics*, 283:1-9 (2004) ("Dalby") |
| 1062 | Gessler, T., et al., "Ultrasonic *versus* jet nebulization of iloprost in severe pulmonary hypertension," *Eur Respir J*, 17:14-19 (2001) ("Gessler") |
| 1063 | *Reserved* |
| 1064 | Dolovich, M.B., et al., "Device Selection and Outcomes of Aerosol Therapy: Evidence-Based Guidelines," *CHEST*, 127:335-71 (2005) ("Dolovich") |
| 1065 | Olschewski, H., et al., "Inhaled Iloprost for Several Pulmonary Hypertension," *N Engl J Med*, 347(5):322-29 (2002) ("Olschewski 2002") |
| 1066 | AccuNeb® Label |
| 1067 | Anderson, P.J., "History of Aerosol Therapy: Liquid Nebulization to MDIs to DPIs," *Respiratory Care*, 50(9):1139-49 (2005) ("Anderson 2005") |
| 1068 | Vachiéry, J.-L., et al., "Transitioning From IV Epoprostenol to Subcutaneous Treprostinil in Pulmonary Arterial Hypertension," *CHEST*, 121:1561-65 (2002) ("Vachiéry 2002") |
| 1069 | Zierenberg, B. and Eicher, J., Chapter 78 "The Respimat, a New Soft Mist Inahler for Delivering Drugs to The Lungs," MODIFIED- |

# EXHIBITS

| Exhibit No. | Description of Document |
|---|---|
| | RELEASE DRUG DELIVERY TECHNOLOGY (2002) pp.925-933 ("Zierenberg") |
| 1070 | Beasley, R., et al., "Preservatives in Nebulizer Solutions: Risks without Benefit," *Pharmacotherapy*, 18(1):130-39 (1998) ("Beasley") |
| 1071 | Prober, C.G., et al., "Technical Report: Precautions Regarding the Use of Aerosolized Antibiotics," *Pediatrics*, 106(6):1-6 (2000) ("Prober") |
| 1072 | *Reserved* |
| 1073 | Aradigm Corporation Form 10-Q for the quarterly period ended June 30, 2009, *available at* https://www.sec.gov/Archives/edgar/data/1013238/00009501230903 1361/f53244e10vq.htm |
| 1074 | Orenitram® Label, *available at* https://www.orenitram.com/pdf/Orenitram-Prescribing-Information.pdf |
| 1075 | November 17, 2008 Press Release, "Eli Lilly and Company Licenses U.S. Rights for Tadalafil PAH Indication to United Therapeutics Corporation," *available at* https://www.fiercebiotech.com/biotech/eli-lilly-and-company-licenses-u-s-rights-for-tadalafil-pah-indication-to-united |
| 1076 | October 23, 2017 Press Release, "United Therapeutics Announces FDA Approval Of Third Generation Nebulizer For The Tyvaso® Inhalation System," *available at* https://www.prnewswire.com/news-releases/united-therapeutics-announces-fda-approval-of-third-generation-nebulizer-for-the-tyvaso-inhalation-system-300540953.html |
| 1077 | Boyle, M.P., "So Many Drugs, So Little Time. The Future Challenge of Cystic Fibrosis Care," *CHEST*, 123(1):3-5 (2003) ("Boyle 2003") |
| 1078 | Azmacort® Label 2003 |
| 1079 | Hill, N.S., et al., "Inhaled Therapies for Pulmonary Hypertension," *Respiratory Care*, 60(6):794-805 (2015) ("Hill 2015") |

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

This is a petition for *Inter Partes* Review of claims 1-8 of U.S. Patent No. 10,716,793 B2 (EX1001) (the "'793 Patent"). The '793 Patent is directed to a method of treatment of pulmonary hypertension via inhalation of 15 to 90 micrograms of treprostinil in 1 to 3 breaths, through various inhalation devices. Treprostinil products have been on the market for almost two decades, and the initial, actually innovative patents have expired. In contrast, the '793 Patent was issued in July 2020, over 14 years after the application to which it claims priority. The '793 Patent is Patent Owner ("PO") United Therapeutics Corporation's ("UTC") latest attempt to evergreen their way into blocking fair competition, and should be invalidated based on the numerous prior art references disclosing its claim limitations before 2006.

## I.   MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

### A.   Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1)

Petitioner Liquidia Technologies, Inc. ("Liquidia") is the real party-in-interest.

### B.   Related Matters Under 37 C.F.R. § 42.8(b)(2)

UTC has alleged infringement of the '793 Patent by Liquidia Technologies, Inc. in *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, 1:20-cv-00755-RGA, in the United States District Court for the District of Delaware.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

### C.  Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3)

Petitioner provides the following designation of counsel.

| LEAD COUNSEL | BACK-UP COUNSEL |
|---|---|
| Ivor R. Elrifi (Reg. No. 39,529)<br>ielrifi@cooley.com<br>zLiquidiaIPR@cooley.com<br>zpatdocketing@cooley.com<br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Avenue NW, Suite 700<br>Washington, DC 20004<br>Tel:  (212) 479-6840<br>Fax: (212) 479-6275 | Erik B. Milch (Reg. No. 42887)<br>emilch@cooley.com<br>zLiquidiaIPR@cooley.com<br>zpatdocketing@cooley.com<br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Avenue NW, Suite 700<br>Washington, DC 20004<br>Tel:  (703) 456-8573<br>Fax: (703) 456-8100<br><br>Deepa Kannappan<br>(*pro hac vice* to be filed)<br>dkannappan@cooley.com<br>zLiquidiaIPR@cooley.com<br>zpatdocketing@cooley.com<br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Avenue NW, Suite 700<br>Washington, DC 20004<br>Tel:  (650) 843-5673<br>Fax: (650) 849-7400 |

### D.  Service Information

The Petition is being served by FEDERAL EXPRESS to the current

correspondence address for the '793 Patent, Foley & Lardner LLP, 3000 K Street

N.W., Suite 600, Washington, DC 20007-5109.  Petitioner may be served by e-mail

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

at the addresses provided above for lead and back-up counsel.

### E.    Power of Attorney

Filed concurrently with this petition per 37 C.F.R. § 42.10(b).

## II.    PAYMENT OF FEES - 37 C.F.R. § 42.103

This Petition requests review of claims 1-8 of the '793 Patent (8 claims) and
is accompanied by a payment of $41,500.  37 C.F.R. § 42.15.  This Petition meets
the fee requirements of 35 U.S.C. § 312(a)(1).  The undersigned further authorizes
the United States Patent and Trademark Office, including the Patent Trial and
Appeal Board, to charge any additional fee that might be due or required to Deposit
Account No. 50-1283.

## III.    REQUIREMENTS UNDER 37 C.F.R. §§ 42.104 AND 42.108 AND CONSIDERATIONS UNDER §§ 314(A) AND 325(D)

### A.    Grounds for Standing Under 37 C.F.R. § 42.104(a)

Petitioner certifies that the '793 Patent is eligible for *inter partes* review, and
Petitioner is not barred or estopped from requesting *inter partes* review.

### B.    Identification of Challenge Under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested

Petitioner requests the Board institute *inter partes* review of claims 1-8 of the
'793 Patent based on these grounds:

| Ground | '793 Claim(s) | Basis for Challenge |
|--------|--------------|---------------------|
| 1.     | 1-8          | Obvious over U.S. Patent No. 6,521,212 (EX1006), Voswinckel JAHA (EX1008), and |

3

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

|     |        |                                              |
|-----|--------|----------------------------------------------|
|     |        | Voswinckel JESC (EX1007)                     |
| 2.  | 1-8    | Obvious over '212 Patent and Voswinckel JESC |
| 3.  | 1      | Anticipated by Ghofrani                      |
| 4.  | 1, 3, 8 | Obvious over Voswinckel JAHA and Ghofrani (EX1010) |
| 5.  | 1, 3   | Anticipated by Voswinckel 2006 (EX1009)      |
| 6.  | 2, 4-8 | Obvious over Voswinckel 2006 and '212 Patent |

Sections X to XV of this Petition detail why the challenged claims are invalid. This Petition is supported by accompanying Declarations of Dr. Nicholas Hill (EX1002) and Dr. Igor Gonda (EX1004), qualified experts in their fields. *See* EX1003; EX1005 (*Curriculum Vitae*).

### C.    Threshold Requirement for *Inter Partes* Review 37 C.F.R. § 42.108(c)

*Inter partes* review of claims 1-8 should be instituted because this Petition establishes a reasonable likelihood that Petitioner will prevail with respect to each of the challenged claims.  35 U.S.C. § 314(a).

### D.    Considerations under 35 U.S.C. § 314(a)

Petitioner diligently filed this Petition.  PO asserted the '793 Patent against Petitioner for the first time on July 22, 2020 (EX1011, 15-17), and identified claims 1, 4, and 6-8 as the asserted claims in infringement contentions served October 16, 2020.   This Petition is filed within three months of receiving infringement contentions and over six months before the one-year bar.

4

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

The Board should not discretionarily deny this Petition because UTC filed a motion in the district court litigation to prevent Petitioner from contesting the validity of the '793 Patent under the doctrine of assignor estoppel, based on one of the inventors, Robert Roscigno, being a former Liquidia employee.   EX1013. Although the district court denied UTC's original motion (EX1014), UTC indicated it intends to further pursue its assignor estoppel allegations in district court.   *See, e.g.*, EX1012, 13. Should UTC ultimately prevail on the issue of assignor estoppel in district court, Petitioner would be foreclosed from raising invalidity of the '793 Patent in that forum.   Under this scenario, this Petition would be Petitioner's only available means for challenging validity of the claims, because "assignor estoppel has no place in IPR proceedings." *Arista Networks, Inc. v. Cisco Sys., Inc.*, 908 F.3d 792, 804 (Fed. Cir. 2018).   Accordingly, the pending district court litigation should not be a basis for discretionary denial.

Further, the *Fintiv* factors do not weigh in favor of discretionary denial.   First, this Petition includes claims not at issue in the district court litigation, namely claims 2, 3, and 5—just under half of the total claims challenged in this petition.   Second, the parties have just begun claim construction proceedings in the district court litigation, have not yet taken any depositions, and have conducted only the initial minimum required discovery.   Third, the merits of this Petition are strong, as exemplified by the Board's institution of petitions involving two of the references

5

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

here against similar claims in IPR2017-01621 and IPR2017-01622 (brought by a different petitioner),[1] as well as the fact that this Petition asserts five grounds to challenge independent claim 1 and at least three different grounds for each of the seven dependent claims.

Finally, previous IPRs filed on related patents 9,358,240 (IPR2017-01621) and 9,339,507 (IPR2017-01622) do not warrant discretionary denial. The prior IPRs were filed by Watson Laboratories, Inc., an unrelated party, prior to PO suing Petitioner. *Alphatec Holdings, Inc. v. Nuvasive, Inc.*, IPR2019-00361, Paper 19 at 10 (P.T.A.B. July 9, 2019). The prior IPRs were instituted, but terminated before final decision due to settlement between the parties. *Watson Labs., Inc. v. United Therapeutics, Corp.*, IPR2017-01621, Paper 64 (P.T.A.B. Aug. 27, 2018); IPR2017-01622, Paper 64 (P.T.A.B. Aug. 27, 2018).

## E.     Considerations under 35 U.S.C. § 325(d)

This Petition does not present a scenario in which "the same or substantially the same prior art or arguments previously were presented to the Office." 35 U.S.C. § 325(d).

---

[1] There is no evidence that the '793 Examiner substantively considered the institution decisions in the prior IPRs.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

The art presented in this petition was listed in PO's Information Disclosure Statement, but in the absence of additional evidence of "consideration" by the Examiner, discretionary denial under § 325(d) is not warranted. *See Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH,* IPR2019-01469, Paper 6 at 7-8 (P.T.A.B Feb. 13, 2020) (precedential) (art in IDS may be considered "[p]reviously presented"); *but see, e.g.*, *Microsoft Corp. v. Parallel Networks Licensing, LLC*, IPR2015-00483, Paper 10 at 15 (P.T.A.B. July 15, 2015) ("[W]hile [a reference] was listed on a lengthy Information Disclosure Statement initialed by the Examiner, the reference was not applied against the claims and there is no evidence that the Examiner considered the particular disclosures cited . . . in the Petition."). There is no evidence in the '793 Prosecution History that the Examiner substantively considered the art or arguments presented in this Petition. The Examiner erred in not doing so, and an analysis under the *Becton* factors confirms why discretionary denial is not appropriate here.[2]

---

[2] The *Becton* factors are six, non-exclusive factors that are to be considered in the § 325(d) analysis: (1) the similarities and material differences between the asserted art and the prior art involved during examination; (2) the cumulative nature of the

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

The Patent Office only issued one substantive rejection during prosecution —

for obviousness-type double patenting over U.S. Patent Nos. 10,376,525; 9,358,240;

and 9,339,507.  EX1015, 24-28.  Because no prior art was substantively relied on

during examination, under *Becton* factor 3, the "record of the [Patent] Office's

previous consideration of the art is . . . silent," and the threshold for Petitioner to

show the Office erred is lower:   Petitioner must simply show the Office

"overlook[ed] something persuasive" under *Becton* factors 5 and 6.   *Advanced

Bionics*, IPR2019-01469, Paper 6 at 10.  As to *Becton* factor 5, Petitioner details

_____

asserted art and the prior art evaluated during examination; (3) the extent to which

the asserted art was evaluated during examination; (4) the extent of the overlap

between the arguments made during examination and the manner in which a

petitioner relies on the prior art or a patent owner distinguishes the prior art; (5)

whether a petitioner has pointed out sufficiently how the Office erred in evaluating

the asserted prior art; and (6) the extent to which additional evidence and facts

presented in the petition warrant reconsideration of the prior art or arguments.  Trial

Practice Guide Update (July 2019), 29-30 (citing *Becton Dickinson & Co. v. B.

Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17–18 (P.T.A.B. Dec. 15, 2017)

(informative)).

8

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

below five persuasive grounds (four based on combinations) that the Examiner overlooked even though they disclose every element of the claims and are directed to the same disease (pulmonary hypertension), drug (treprostinil), and mode of administration (inhalation). As to *Becton* factor 6, Petitioner provides two expert declarations, as well as background art not listed in the Information Disclosure Statement, demonstrating how much was already known in the art and how that art would be understood by a person of ordinary skill in the art, as additional evidence and facts that warrant reconsideration of the prior art—and consideration for the first time of arguments involving the particular grounds and combinations presented here.

Further, the prosecution histories of the patents to which the '793 Patent was terminally disclaimed (U.S. Patent Nos. 10,376,525; 9,358,240; and 9,339,507) are not applicable to this Petition, because they do not contain the arguments (i.e., the particular grounds) presented here, and any overlapping prior art was applied against different claims and combinations and/or considered by a different Examiner and cancelled.

- For the '525 patent, certain claims to a treprostinil solution and kit with a different breath disclosure were rejected over the '212 Patent under § 102(b) and Voswinckel JAHA in combination with Chaudry under § 103(a), but, tellingly, those claims were cancelled and did not issue. EX1016, 33-42. Those claims were replaced by claims requiring a "opto-acoustical" trigger on a pulsed ultrasonic nebulizer, at different

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

concentrations and breaths than the '793 Patent claims.  *Id.*

- For the '240 patent, a different Examiner (Townsley, rather than the '793 Patent's Examiner Schmitt) considered those claims and rejected them over art in combination with the '212 patent asserted here.  EX1044, 7-23. However, that rejection was overcome by an affidavit that overcame the other art (i.e., the Sandifer reference) not asserted here, and the later rejections did not involve the art presented here.  *Id.*

- For the '507 patent, a different Examiner (again, Townsley, rather than Schmitt) rejected the claims to nebulizer kits over Voswinckel 2006 in combination with Chaudry, and applicants submitted an affidavit by Dr. Werner Seeger that Voswinckel 2006 was not prior art because it was not "by others" under pre-AIA § 102(a).  EX1017, 50, 35-36.  Despite the affidavit, the Applicant cancelled the rejected claims after conducting a telephonic interview with the Examiner and applied for new, different claims, which the Examiner allowed without rejection or addressing whether Voswinckel 2006 was proper prior art.  *Id.*, 28-31.

*See NRG Energy, Inc. v. Midwest Energy Emissions Corp.*, IPR2020-00926, Paper 19 at 20-21 (P.T.A.B. Dec. 2, 2020) (rejecting relevance of related patent's prosecution history where it did "not appear that the same or substantially the same arguments [i.e. combinations] predicated on [the prior art] were before the Office"); *Unified Patents v. B# On Demand, LLC*, IPR2020-00995, Paper 20 at 56 (P.T.A.B. Dec. 8, 2020) (finding that a related patent application's claims "shed[] little light on how the Examiner would have applied those references to the materially different" claims of the petitioned patent).

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

For these reasons, this Petition does not present a scenario in which discretionary denial is warranted under 35 U.S.C. § 325(d).

## IV.    SUMMARY OF THE '793 PATENT

### A.    Brief Description of the '793 Patent

The '793 Patent is entitled "Treprostinil Administration by Inhalation" and is directed to methods of treating pulmonary hypertension where a single event dose of 15 micrograms to 90 micrograms of a treprostinil formulation are delivered by inhalation in 1 to 3 breaths. EX1001, Abstract, claims 1-8. Claim 1 is the only independent claim.

Dependent claims 2, 3, and 5 claim various types of inhalers that the '793 Patent specification describes as already well-known and on the market. *See, e.g.*, *id.*, 7:15-21; 7:27-39 (listing multiple soft mist inhalers and citing to M. Hindle, The Drug Delivery Companies Report, Autumn/Winter 2004, pp. 31-34, for "a review of soft mist inhaler technology"); 12:58-59; 14:35-37 (describing use of a pulsed ultrasonic nebulizer OPTINEB® by Nebutec).

Dependent claims 4, 6, and 7 relate to the use of a dry powder (as opposed to liquid) formulation of treprostinil and a dry powder inhaler. The '793 Patent's sole description to support these claims is the following two sentences:

The inhalation device can be also a dry powder inhaler. In such case, the respiratory drug is inhaled in solid formulation, usually in the form

11

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

> of a powder with particle size less than 10 micrometers in diameter or
> less than 5 micrometers in diameter.

*Id.*, 7:22-26.

Finally, dependent claim 8 requires the absence of the preservative metacresol

sometimes used in formulations.  *Id.*, 15:38-41; 16:11-17; 17:36-37.

### B.    Summary of the Prosecution History of the '793 Patent

The '793 Patent issued July 21, 2020, ***just six months*** after application No.

16/778,662 was filed on January 31, 2020.  EX1001, 1.  Application No. 16/778,662

is a continuation and divisional of several patent applications, including applications

that resulted in U.S. Patent Nos. 10,376,525, 9,339,507, and 9,358,240.  *Id.*  The

patent's provisional application, No. 60/800,016, was filed on May 15, 2006.  *Id.*

For purposes of this Petition, Petitioner assumes the relevant priority date for the

'793 Patent is May 15, 2006.

After responding to missing parts, the applicants added **Thomas Schmehl** as

an inventor (*id.*, 64-65, 58), and the PTO issued one substantive rejection:

obviousness-type double patenting over U.S. Patent Nos. 10,376,525; 9,358,240;

and 9,339,507, which was overcome by terminal disclaimer.  *Id.*, 24-30, 50-51.

## V.    CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(b)(3)

For purposes of resolving this IPR, Petitioner does not believe construction of

any claim term is required.  All terms should be given their plain and ordinary

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

meaning in the art as of May 15, 2006. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-

1313 (Fed. Cir. 2005); 37 C.F.R. § 42.100(b).

## VI.   OVERVIEW OF THE GROUNDS

Given the state of the art and the knowledge of a person of ordinary skill in

the art as of May 15, 2006, all claims are unpatentable under 35 U.S.C. §§ 102(b)

and 103.   The grounds presented here rely on the '212 Patent, Voswinckel JESC,

Voswinckel JAHA, Ghofrani, and Voswinckel 2006 prior art references as follows:

1. **Ground 1, Claims 1-8**: Obvious over '212 Patent and Voswinckel JESC
   and Voswinckel JAHA;

2. **Ground 2, Claims 1-8**: Obvious over '212 Patent and Voswinckel JESC;

3. **Ground 3, Claim 1**: Anticipated by Ghofrani;

4. **Ground 4, Claims 1, 3, and 8**: Obvious over Voswinckel JAHA and
   Ghofrani;

5. **Ground 5, Claims 1 and 3**: Anticipated by Voswinckel 2006; and

6. **Ground 6, Claims 2, 4-8**: Obvious over Voswinckel 2006 and the '212
   Patent.

## VII.   PERSON OF ORDINARY SKILL IN THE ART

The challenged claims are directed to a method of treating pulmonary

hypertension by administering an inhaled formulation of treprostinil.   As such, the

challenged claims cover multiple disciplines.   With respect to the method of treating

pulmonary hypertension, a person of ordinary skill in the art ("skilled artisan" or

13

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

"POSA"), at the time of the alleged invention would have a medical degree with a
specialty in pulmonology or cardiology, plus at least two years of experience treating
patients with pulmonary hypertension as an attending, including with inhaled
therapies, or equivalent degree or experience. EX1002, ¶¶17-19. With respect to
inhaled formulations used in the method to treat pulmonary hypertension, a POSA
would be a Ph.D. in pharmaceutical science or a related discipline like chemistry or
medicinal chemistry, plus two years of experience in pharmaceutical formulations,
including inhaled products, or equivalent (*e.g.*, an M.S. in the same fields, plus 5
years of experience). EX1004, ¶¶9-11.

## VIII. TECHNICAL BACKGROUND

The petitioned claims are not directed, generally, to treating pulmonary
hypertension ("PH") with treprostinil, since the compound itself, and methods of
using the compound to treat PH were known, patented, and FDA approved for both
subcutaneous injection and intravenous administration by 2004. *See* EX1018;
EX1002, ¶¶29-30; EX1004, ¶19. Rather, the claims are directed to methods of
treating PH by the administration of *inhaled* treprostinil formulations, such that the
relevant technical background for this Petition is the state of inhalation therapy art
as of 2006.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

### A.    History of Inhalation Therapy

Formulation POSA Dr. Gonda provides a history of inhalation therapy from ancient times to 2006, explaining that nebulizers, meter dosed inhalers ("MDI"), and dry powder inhalers ("DPI") were well-known by the mid-1990s and FDA-approved by 2006.  EX1004, ¶¶21-25.

### B.    Inhaled Treprostinil and Its Analogues

Dr. Gonda and clinician POSA Dr. Hill also explain that treprostinil is similar to iloprost, both chemical compounds are analogues of epoprostenol, and all three compounds were known to treat patients with pulmonary arterial hypertension ("PAH") by 2006.  EX1021, 392 ("Epoprostenol, a synthetic prostacyclin, and iloprost and treprostinil, synthetic prostacyclin analogues, are currently used to treat patients with PAH."); EX1004, ¶¶26-33; EX1002, ¶¶40-44.  Dr. Gonda and Hill also explain that numerous patents and patent publications on inhaled epoprostenol, iloprost, and treprostinil existed by 2006.  *Id.*; *see, e.g.*, EX1027, Figs. 1-5 (depicting effects of intravenous and aerosolized UT15/treprositinil and derivatives); EX1028, Abstract, [0010], [0012], [0017], [0026], [0097], Claim 44 (directed to "inhalable formulation[s] for the treatment of pulmonary hypertension" where the formulation comprises a "hypertension-reducing agent" including a "vasodilator," such as "the

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

prostacyclin analog **treprostinil sodium**").[3]   The '212 Patent, detailed in the

"Overview of the Prior Art" section below, discloses use of inhaled treprostinil for

treatment of pulmonary hypertension.   EX1006, Abstract, 3:1-5, 2:16-18, 2:66-3:5,

4:10-13, 4:41-54, 7:18-24.

As both Dr. Gonda and Dr. Hill explain, the benefits of inhalation over other

forms of administration, such as intravenous delivery, were also well-known by

2006.   EX1004, ¶¶32-33; EX1002, ¶¶31-33.   For example, Chaudry disclosed that

"[c]ontinuous intravenous prostacyclin is far from ideal as a treatment for pulmonary

hypertension, . . . because the agent is available only in limited supply, it is very

costly, and optimal management requires that the intravenous therapy with

prostacyclin be started in specialized centers familiar with the technique, equipment,

and dose ranging. . . .   Further, because the agent is delivered systemically with only

a small percentage of the agent actually absorbed by the pulmonary system, it must

be administered in high dosages."   EX1028, [0011].   Chaudry disclosed that

"therapeutically effective amount[s] of a hypertension-reducing agent" may include

various ranges, such as from "about 0.001 mg/ml to about 20 mg/ml" and provided

extensive disclosure regarding the use of nebulizing devices for inhalation.   *Id.*,

---

[3] All emphasis added unless otherwise noted.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

[0037]-[0038], [0061]-[0066].  The '212 Patent similarly disclosed inhaled delivery

was known to be more "potent" than intravenous delivery.  EX1006, 8:9-17.

In fact, iloprost had already been approved for inhaled use to treat pulmonary

arterial hypertension in 2004, under the brand name Ventavis®.  "Ventavis is

breathed (inhaled) into your lungs" and "[o]ne treatment session will usually last

about 4 to 10 minutes."  EX1029, 4, 15; EX1002, ¶42; EX1004, ¶33.  Ventavis®

(iloprost) is indicated for treatment of pulmonary arterial hypertension (EX1029 at

8) and has a maximum daily dose of 45 micrograms (*id.*, 11).  *Id.*

### C.    Well Known Considerations for Inhalation Therapies

By 2006, it was well-known that inhalation drug particles needed to be a

certain size.  For example, from modern use of inhalation therapy for asthma in the

1990s, it was well known "to avoid inertial impaction in the oropharyngeal cavity

and reach the lung," aerosol particles needed to be 7 micrometers or less.  EX1020,

374; EX1002, ¶35; EX1004, ¶34.  If those particles needed to reach the peripheral

lung, they needed to be closer to 2-3 micrometers.  *Id.*  A 2006 Encyclopedia of

Respiratory Medicine confirms that it was generally known that "inhaler devices

should deliver particles smaller than approximately 5 µm in diameter in order to

enter the lungs."  EX1030, 58.  The '212 Patent also discloses particles "preferably,

less than 5 micrometers in diameter."  EX1006, 5:40-41.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Similarly, by 2006, there was extensive literature on pros and cons of various inhalation devices, particularly around patient adherence concerns. *See, e.g.*, EX1031, 1313 ("Comparing clinical features of the Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler"); EX1002, ¶¶34, 36-39; EX1004, ¶36.

Patient adherence was a recognized problem with inhaled medications. EX1002, ¶¶36-39. A 1997 article discusses the challenges of patient adherence to inhaled medications, and found that patients "on average [only] take about 50% of prescribed medication," and that adherence (or nonadherence) was linked to treatment outcome. EX1032, Abstract, 179-80. Skilled artisans understood the burden of therapy, i.e., the effort a patient needs to make to take their medication, was one of the factors impacting adherence with the prescribed dosage regimen. *See, e.g.*, EX1033, Abstract (noting that a factor "related to patient adherence" was the "complexity of the inhalation regiment (dosing frequency, number of drugs)"); EX1004, ¶40; EX1002, ¶¶36-39.

By 2006, it was well-understood that patient adherence could be improved by reducing the number of breaths and overall duration of administration required for adequate dosing with inhalation devices. *See, e.g.* EX1033 at Abstract (noting that a factor "related to patient adherence" was the "complexity of the inhalation regimens (dosing frequency, number of drugs)"); EX1034, Abstract (emphasizing the efficiency benefit of reducing the duration of therapy from 10-20 minutes on a

18

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

nebulizer to just 3 breaths from a soft mist inhaler AERx); EX1002, ¶¶ 37-38;

EX1004, ¶40.

Thus, reducing the duration of the inhaled dose administration of treprostinil

was a common goal by 2006, and one that had met with success.  Chaudry disclosed

that inhalation of its treprostinil formulation "may take about . . . 3 minutes"

(EX1028, [0067]), while Voswinckel JAHA and Voswinckel 2006, detailed below,

disclosed reductions in treprostinil administration duration to 3 breaths.  *See also*

EX1004, ¶¶40-42; EX1002, ¶39.

## IX.    OVERVIEW OF THE PRIOR ART

### A.    '212 Patent

The '212 Patent issued on February 18, 2003, and therefore is prior art to the

'793 Patent under at least 35 U.S.C. §§ 102(a), (b), and (e).

The '212 Patent discloses "a method of treating pulmonary hypertension by

administering an effective amount of a benzindene[4] prostaglandin" (including

treprostinil, referred to as "UT-15") "by inhalation."  EX1006, Abstract, 3:1-5, 2:16-

18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24.  A POSA in May 2006 would have known

---

[4] Some references spell this compound as "benzindene" and others as "benzidine."

For purposes of this Petition, both spellings refer to the same compound.

19

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

that "UT-15" is synonymous with treprostinil sodium.[5]  The '212 Patent discloses

that an "inhaler" may be used to deliver the UT-15.  *Id.*, 5:30; EX1004, ¶¶50-54;

EX1002, ¶¶53-61.

The '212 Patent discloses, in the same fashion as the '793 Patent, that powder

formulations may be used.  *Compare* EX1006, 5:30-32, 5:37-41 ("Alternatively,

solid formulations, usually in the form of a powder, may be inhaled in accordance

with the present invention.  In such case, the particles are preferably less than 10

micrometers in diameter, and more preferably, less than 5 micrometers in

diameter."), *with* EX1001, 7:22-26.  Further, claim 9 is directed to a method of

treating pulmonary hypertension in a mammal, which would include humans, by the

administration of an inhaled powder formulation of treprostinil.  EX1006, claim 9;

EX1002, ¶60.

_____

[5] *See, e.g.,* EX1035 ("United Therapeutics Corp (UTC) is developing treprostinil

sodium (Remodulin, UT-15), a stable structural analog of prostacyclin

[prostaglandin I2 or PGI$_2$], for the potential treatment of primary pulmonary

(arterial) hypertension (PAH), peripheral vascular disease (PVD) and other

cardiovascular conditions. . ."); *see also* EX1046 ("U.S. Pat No[]. 6,521,212 . . .

describe[s] administration of treprostinil by inhalation for treatment of pulmonary

hypertension, peripheral vascular disease and other diseases and conditions.").

20

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

As for dosage, the '212 Patent states "[i]n the case of treating peripheral vascular disease by inhalation of a benzindene prostaglandin of the present invention, the dosage for inhalation . . . should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg; typically from 0.5 tg [sic] to 2.5 mg, preferably from 7 µg to 285 µg, per day per kilogram bodyweight." EX1006, 5:54-62; *see also id.*, Figs. 16, 18.

For treating pulmonary hypertension, the '212 Patent states that aerosolized (i.e., inhaled) UT-15 "has a greater potency as compared to intravascularly administered UT-15" and teaches the "actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.*, 8:9-17. The '212 Patent then discloses multiple examples of administering treprostinil to sheep. Sheep were "the animal model of choice" for many reasons, including, in relevant part, "sheep have been utilized for several years as an animal model of pulmonary arterial hypertension." *Id.*, 9:14-27.

The '212 Patent relies on its disclosed sheep experiments to claim treatment of mammals, including humans (*see id.*, 14:7-8, claims 5, 6, 9), and to support the overall aim of its invention—treprostinil "delivered by inhalation to a patient in need thereof in a 'therapeutically effective amount,'" where a "'therapeutically effective amount' . . . refers to that amount in which the effects from pulmonary hypertension, and particularly, pulmonary arterial pressure (PAP), are reduced towards a normal

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

level relative to hypertensive levels, or maintained at normal levels." *Id.*, 6:56-66.

The '212 Patent then explains that POSAs can readily determine the appropriate

single event dose "upon the specific circumstances of the patient being treated and

the magnitude of effect desired by the patient's doctor," and "[t]itration to effect . . .

to determine proper dosage." *Id.*, 6:66-7:3; EX1004, ¶35 (explaining that such

titration was well-known). Such UT-15 formulations can be "given in high doses

without significant non-lung effects" and are described "for human medical use."

*Id.*, 10:51-57, 7:4-5.

### B.    Voswinckel JESC

Voswinckel JESC is an abstract presented at the European Society of

Cardiology (JESC) Congress from August 28 to September 1, 2004 in Munich,

Germany and published in the European Heart Journal on October 15, 2004—more

than a year before May 15, 2006—and is therefore prior art to the '793 Patent under

at least 35 U.S.C. § 102(b). EX1036, ¶¶ 68-75; EX1004, ¶55.

Voswinckel JESC describes a study investigating "the acute hemodynamic

response to inhaled treprostinil." EX1007, Background. The study enrolled 29

patients: 8 received placebo and 21 were administered 16, 32, 48, and 64 µg/mL

treprostinil solutions for 6 minutes via the OptiNeb ultrasound nebulizer, then

produced by the company Nebu-tec in Germany. *Id.*, Methods. Of the 29 patients,

10 had "idiopathic PAH". *Id.*, Results. The results showed that "[t]reprostinil

22

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

inhalation results in a significant long-lasting pulmonary vasodilatation" and that, at 16 µg/mL, "near maximal pulmonary vasodilatation is achieved without adverse effects." *Id.*, Conclusion.

As Dr. Hill explains, a POSA would have expected at least 1 mL of the treprostinil solution was used over 6 minutes of inhalation, and thus would understand, therefore, at least **16, 32, 48, or 64 µg** of treprostinil were delivered to different dosing groups in this study. EX1002, ¶65. Such dosages would make sense to a POSA for patients being administered treprostinil for the first time. *Id.* This understanding is further confirmed by Dr. Gonda, who explains that the numerous nebulizers used at the time were known and expected to deliver more than 1mL of solution. EX1004, ¶56 (citing several inhalation therapies delivering 1-5mL of solution via nebulizers). In fact, a POSA would have expected the OptiNeb® device used at the time (before 2006) to nebulize (i.e., turned liquid to aerosol) at a rate of 0.6 mL of solution per minute. EX1002, ¶67 (citing EX1037, 28.) Assuming continuous administration over 6 minutes, the administered volume would have been as much as 0.6 x 6, or 3.6mL. *Id.* Thus, at 16 µg/mL, which is what Voswinckel JESC recommends as the concentration at which "near maximal pulmonary vasodilatation is achieved without adverse side effects" (EX1007, Conclusion), the administered single event dose could be as high as 0.6 mL/min x 16 µg/mL x 6 min = **57.6** µg. *Id.*

23

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

In sum, a skilled artisan would have understood at least 16, 32, 48, or 64 μg of treprostinil were delivered to patients with PAH in this study, and that understanding would have been confirmed by the volume of solution a POSA would have expected to be nebulized by the device used in the study, as well as the nebulizers known in the art.  EX1002, ¶¶65-67; EX1004, ¶56.

### C.    Voswinckel JAHA

Voswinckel JAHA is an abstract published in the Journal of the American Heart Association on October 26, 2004—more than a year before May 15, 2006—and is therefore prior art to the '793 Patent under at least 35 U.S.C. § 102(b). EX1036, ¶¶59-67; EX1004, ¶58.

Voswinckel JAHA describes a study in which 17 patients with "severe pulmonary hypertension" received a treprostinil inhalation by use of the "pulsed OptiNeb® ultrasound nebulizer" in "3 single breaths" of a "600 μg/ml" treprostinil solution.  EX1008, Methods.  The study found that treprostinil "inhalation resulted in a sustained, highly pulmonary selective vasodilatation over 120 minutes," showing "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." *Id.*, Methods, Conclusion.  Voswinckel JAHA also teaches that "[t]olerability [of treprostinil] is excellent even at high drug concentrations and short inhalation times (3 breaths)" with "very promising" long term treatment effects. *Id.*, Conclusion.  This description has been confirmed by the

24

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Board in its Institution Decisions in IPR2017-01621 and IPR2017-01622.  IPR2017-01621, Paper 10 at 23; IPR2017-01622, Paper 9 at 23.

### D.     Ghofrani

Ghofrani is a prior printed publication under 35 U.S.C. § 102(a) because it was published before May 15, 2006.  It was published in the June 2005 issue of *Herz* and a translation, with a declaration attesting the accuracy of the translation, is provided as EX1010.  *See also* EX1036, ¶¶47-55.

Ghofrani describes the use of inhaled treprostinil to treat pulmonary hypertension.  EX1010, 297-98.  Ghofrani states the following:

> Initial trials in Giessen have shown proof of efficacy of *inhaled* treprostinil for the effective reduction of the pulmonary vascular resistance (PVR) [6]. In this first study, 17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil (***15 mcg/inhalation***). This led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min. In direct comparison with inhaled iloprost, inhaled treprostinil showed a stronger pulmonary selectivity, so that ***it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring*** [6]. Due to these unique properties (pronounced pulmonary selectivity and long duration of action after an individual inhalation), it is possible to reduce the number inhalations necessary to up to four per day; the inhalation period can be reduced to < 1 min. by selecting a suitable device.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Additionally, the initial data shows that ***it is technically feasible for there to be only one to two breaths in an application***.

*Id.*, 298.[6]

Ghofrani is prior art "by others" under judicial interpretations of pre-AIA § 102(a), because there are inventors listed on the '793 Patent that are not listed as authors on Ghofrani, and vice versa.  *In re Katz*, 687 F.2d 450, 454 (C.C.P.A. 1982). The Ghofrani authors that are not '793 inventors are **Ghofrani, Reichenberger, and Grimminger**.  *Compare* EX1010, 1, *with* EX1001, 1.  PO encountered this issue in IPR2017-01621 and IPR2017-01622 and submitted an affidavit attesting that these authors did not contribute to the relevant portion of Ghofrani.  *See* IPR2017-01621; Paper 10 at 12-14; IPR2017-01622, Paper 9 at 12-15.

But there are also individuals identified as inventors of the '793 Patent that are not included as authors of Ghofrani:  **Olschewski, Roscigno, Rubin, Schmehl, and Sterritt**.  EX1001, 1.  In IPR2017-01621/IPR2017-01622, PO put forth a self-serving affidavit by one of the inventors, Dr. Seeger, as to how "any study that formed the basis of our discussion of inhaled treprostinil" was "performed by [him in] collaboration with Dr. Voswinckel, Olschewski, Rubin, Schmehl, Sterritt, and

---

[6] Quotations to Ghofrani are from the English-language translation of Ghofrani.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Roscigno."  IPR2017-01621/01622, EX2098 at ¶ 8.  But Dr. Seeger fails to explain

why Drs. Olschewski, Rubin, Schmehl, Sterritt, and Roscigno were not listed as

authors on the Ghofrani article, a concurrent fact that supports the inference that they

did not make any contribution to Ghofrani's disclosure.  Dr. Seeger's affidavit also

does not explain if and how any inventor contributed to the use of the various

inhalation devices and formulations specifically claimed in the '793 Patent.  Where

there are disputed facts, and Petitioner has not had a chance to depose declarant Dr.

Seeger, a preliminary determination that Ghofrani is by another is appropriate,[7] and

the issue should not impede institution.  *Varian Med. Sys., Inc. v. William Beaumont

Hosp.*, IPR2016-00163, Paper 14 at 13-15 (P.T.A.B. May 6, 2016).

**E.**     **Voswinckel 2006**

Voswinckel 2006 is prior art under at least 35 U.S.C. § 102(a), because it was

published in the Annals of Internal Medicine on January 17, 2006, before May 15,

2006.  EX1036, ¶¶77-84.

_____

[7] Petitioner is entitled to a presumption that "any factual dispute created by

testimonial evidence that is material to the institution decision will be resolved in

favor of the petitioner . . . for purposes of determining whether to institute."  81 FR

18755 (April 1, 2016).

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Voswinckel 2006 discloses a patient trial to "characterize the effects of inhaled treprostinil with special regard to safety, tolerability, and efficacy in patients with severe pulmonary arterial hypertension." EX1009 (Voswinckel 2006), 149-50. Three patients with "severe pulmonary hypertension" were given a "single 15-μg dose of treprostinil, inhaled in 3 breaths through a modified OptiNeb ultrasonic inhalation device." *Id.*, 150. One patient had a "favorable vasodilator response" and the other two patients were given "long-term inhaled treprostinil therapy . . . consisting of 4 daily 15-μg doses" over 3 months, resulting in "dramatic[]" functional improvement without side effect. *Id.* The authors concluded that treprostinil was "clinically effective, safe, and well tolerated when 15 μg was inhaled in 3 breaths 4 times daily." *Id.*

Voswinckel 2006 is "by others" under judicial interpretations of pre-AIA § 102(a). *In re Katz*, 687 F.2d at 454. Voswinckel 2006 authors **Ghofrani and Grimminger** are not listed as inventors on the '793 Patent. *Compare* EX1009, 150, *with* EX1001, 1. During prosecution of the related 9,339,507 patent, PO submitted an affidavit that these two authors "are properly listed as co-authors on the Voswinckel article because of their contributions to the Voswinckel article" but "did not contribute to conception of the presently claimed invention." EX1017, 35-36. But this affidavit fails to establish that Ghofrani and Grimminger did not contribute to the testing of the safety and efficacy of inhaled treprostinil (dosing and breaths)

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

used in the patient study of Voswinckel 2006 relied on in this Petition.[8]  In fact, PO

would be hard pressed to identify different contributions for these authors because

the entire Voswinckel 2006 publication is only 1 page, all of which this Petition

relies on.

Further, **Olschewski, Roscigno, Rubin, Schmehl, and Sterritt** are identified

as inventors of the '793 Patent, but are not authors of Voswinckel 2006.  *Compare*

EX1009, 150, *with* EX1001, 1.  No evidence exists in the record of the proceedings,

before the Board or before the PTO, to indicate these inventors contributed to

Voswinckel 2006.  The fact that they are not authors on Voswinckel 2006 supports

the inference they did not make any contribution to that disclosure.  *Accord*

*EmeraChem Holdings*, 859 F.3d at 1345-48.  Further, PO specifically added

Schmehl as inventor in February 2020, so, at the very least, PO cannot reasonably

claim that Schmehl somehow contributed to the Voswinckel 2006 article published

***14 years prior***.  *See* EX1015, 64-65, 58.

---

[8] Also, despite the affidavit, PO cancelled the rejected claims and applied for new,

different claims, which the Examiner allowed without addressing whether

Voswinckel 2006 was prior art.  EX1017, 28-31.  Thus, the issue has not been

resolved or evaluated by the Patent Office for either the '507 or '793 patents.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Thus, the Voswinckel 2006 publishing entity is different than the '793 Patent

inventive entity. *In re Land*, 368 F.2d at 877. In these circumstances, a preliminary

determination that Voswinckel 2006 is by another is appropriate and the issue should

not impede institution. *Varian Med. Sys., Inc.*, IPR2016-00163, Paper 14 at 13-15.

## X. GROUND 1: CLAIMS 1-8 ARE RENDERED OBVIOUS UNDER 35 U.S.C. § 103(A) OVER THE '212 PATENT IN COMBINATION WITH VOSWINCKEL JESC AND VOSWINCKEL JAHA

### A. Motivation to Combine '212 Patent with Voswinckel JESC and Voswinckel JAHA With a Reasonable Expectation of Success

A POSA would have been motivated to combine the '212 Patent with

Voswinckel JESC and Voswinckel JAHA to arrive at the claims of the '793 Patent.

EX1002, ¶¶75-83. All three publications are directed to solving the same problem

(treatment of pulmonary hypertension) via the same means (inhaled treprostinil).

*See, e.g.,* EX1006, Abstract (disclosing "[a] method of delivering benzindene

prostaglandins to a patient by inhalation" for the treatment of "pulmonary

hypertension"); EX1007, Background, Results (investigating "inhaled treprostinil"

on patients with "idiopathic PAH"); EX1008 (titled "Inhaled Treprostinil Sodium

(TRE) For the Treatment of Pulmonary Hypertension").

A POSA starting with the '212 Patent would understand that it discloses use

of inhaled treprostinil sodium (UT-15, *see supra* n.5) for the treatment of pulmonary

hypertension, discloses a dosage range for intravascular administration of

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

treprostinil for the treatment of pulmonary vascular disease, and discloses that only

10-50% of the dosage delivered intravascularly would be needed via inhalation to

have the same therapeutic effect.  EX1006, Abstract, 6:1-2 (disclosing "[a] method

of delivering benzindene prostaglandins" "including UT-15" "to a patient by

inhalation" for the treatment of "pulmonary hypertension"); 5:54-62 ("daily infusion

dose in the range of 25 µg to 250 mg; typically from 0.5 tg [sic] to 2.5 mg, preferably

from 7 µg to 285 µg, per day per kilogram bodyweight"), 8:9-17 (the "actual amount

of UT-15 delivered via aerosolization delivery" need only be "a fraction (10-50%)

of the dosage delivered intravascularly").

A POSA would also understand the '212 Patent discloses experiments in

sheep and explains sheep are a model of pulmonary arterial hypertension in humans.

EX1006, 9:14-27; Examples I-V and accompanying Figs.  A POSA would further

understand these sheep experiments were relied upon to support claims directed to

treating pulmonary hypertension in mammals, which include humans, via inhaled

solutions and powder formulations of treprostinil.  *Id.*, claims 6, 9; EX1002, ¶77.

Given these teachings, a POSA would have been motivated to further investigate

inhaled treprostinil as a treatment for PH in humans and would have looked to the

results of Voswinckel JESC and Voswinckel JAHA, which report on this very issue.

*Id.*, ¶¶78.

31

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Voswinckel JESC, published after issuance of the '212 Patent, confirms the

results of the '212 Patent that inhaled treprostinil is a safe and effective means for

treating PH in humans.  EX1002, ¶79.  Voswinckel JESC discloses the effective

administration of inhaled treprostinil for human patients with PAH via a nebulizer

for 6 minutes.  EX1007, Methods.  As detailed above at Section IX.B, a POSA would

understand Voswinckel JESC to disclose delivery of at least 16 to 64 µg of inhaled

treprostinil to achieve this effectiveness.   A POSA would have a reasonable

expectation of success in combining the '212 Patent's disclosure with the dosage of

Voswinckel JESC, because Voswinckel JESC's results showed that "[t]reprostinil

inhalation results in significant long-lasting pulmonary vasodilatation" and that

"near maximal pulmonary vasodilatation is achieved without adverse effects."  *Id.*,

Conclusion; EX1002, ¶79.

Having established via the '212 Patent and Voswinckel JESC that inhaled

treprostinil can be used to safely and effectively treat PH, a POSA would have been

further motivated to reduce the duration of treatment to increase patient convenience

and adherence—from the 6 minutes disclosed in Voswinckel JESC to 3 breaths, as

disclosed in Voswinckel JAHA.  EX1002, ¶80.  As explained above, the problem of

patient nonadherence to inhaled medications was well-understood, and a POSA in

May 2006 would have readily appreciated reducing the number of breaths for drug

delivery would increase patient adherence and, in turn, treatment outcome.  *See*

32

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

*supra*, Section VIII.C.; EX1002, EX1002, ¶¶80-81. A POSA would also have

understood that reducing the duration of treatment would require increasing the

concentration of the administered treprostinil solution, which is confirmed by

Voswinckel JAHA's use of a 600 mcg/mL solution. EX1002, ¶82 (citing EX1008,

Methods).

A POSA would have a reasonable expectation of success with this

combination, because Voswinckel JAHA teaches that "[t]olerability is excellent

even at high drug concentrations[9] and short inhalation times (3 breaths)" with

"strong pulmonary selective vasodilatory efficacy with a long duration of effect

following single acute dosing." EX1008, Conclusion; EX1002, ¶83. Additionally,

the relevant scientific literature taught safe and effective administration of high

dosages of inhaled therapeutics in short durations. *See, e.g.,* EX1010, 298

(disclosing administration of inhaled treprostinil at a dose of "15 mcg/inhalation"

and that "it is possible to increase the dosage to up to 90 mcg" and that "it is

technically feasible for there to be only one to two breaths in an application.");

---

[9] Voswinckel JAHA's results confirm the conclusions reached in the '212 Patent

that "aerosolized UT-15 can be given in high doses without significant non-lung

effects, i.e., heart rate, cardiac output." EX1006, 10:51-57.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

EX1034, 177 (delivery 0.45mg of drug in 3 breaths).  In sum, a POSA would have

expected to succeed in reducing the number of breaths when delivering 15-90μg of

inhaled treprostinil, due to the general state of the art regarding the safety and

efficacy of such dosages of inhaled therapeutics, the known problem of patient

noncompliance, and Voswinckel JAHA's explicit disclosure that administration of

treprostinil was successful.

A POSA would expect Voswinckel JESC's dosage and Voswinckel JAHA's

breaths to be a therapeutically effective dosing regimen for PH, and would be

motivated by the '212 Patent's disclosure that "solid formulations, usually in the

form of a powder" could also "be inhaled in accordance with the ['212 Patent's]

invention" to create a dry powder that provided the same single event dosage as

Voswinckel JESC and breath limitations of Voswinckel JAHA with a reasonable

expectation of success.  EX1006, 5:30-32, 5:37-41, claims 6, 9; EX1004, ¶¶78-80.

Therefore, a POSA would have been motived to and had a reasonable

expectation of success in combining the teachings of the '212 Patent with the dosage

of Voswinckel JESC and the breaths of Voswinckel JAHA, the combination of

which renders all claims invalid, as explained below.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

**B.    The '212 Patent in combination with Voswinckel JESC and Voswinckel JAHA renders obvious claims 1-8**

**1.    Independent Claim 1**

**a.    The '212 Patent discloses claim element 1[a]**

| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
|------|---|

The '212 Patent describes methods of delivering a therapeutically effective amount of benzindene prostaglandin (also known as "UT-15") by inhalation to treat pulmonary hypertension in a single dose event. EX1006, Abstract, 2:16-18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24.[10]   A POSA as of May 2006 would have readily

---

[10] Voswinckel JESC and Voswinckel JAHA additionally disclose this limitation. Voswinckel JAHA describes treating "patients with severe pulmonary hypertension" with "Inhaled Treprostinil Sodium (TRE)" with a single event dose of "3 single breaths" of "TRE solution 600 µg/ml," resulting in "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." EX1008, Title, Methods, Conclusion. Voswinckel JESC describes a study investigating "the acute hemodynamic response to inhaled treprostinil," in which

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

understood that "UT-15" is synonymous with treprostinil sodium, and that

treprostinil is an analog of benzindene prostaglandin.[11]

Specifically, the '212 Patent discloses and claims "a method of treating

pulmonary hypertension by inhalation of a benzindene prostaglandin" (*id.*, 7:18-20)

or a "pharmaceutically acceptable salt" thereof (*id.*, 4:11-12). *Id.*, claims 6, 9. The

'212 Patent further states that the "benzindene prostaglandin is delivered by

inhalation to a patient in need thereof in a 'therapeutically effective amount.'" *Id.*,

6:56-58. "A 'therapeutically effective amount' refers to that amount that has

therapeutic effects on the condition intended to be treated or prevented." *Id.*, 6:58-

61. The '212 Patent explains that "[t]he precise amount that is considered effective

for a particular therapeutic purpose will, of course, depend upon the specific

circumstances of the patient being treated and the magnitude of effect desired by the

patient's doctor." *Id.*, 6:66-7:2. Dr. Hill confirms that a POSA would have the above

---

patients with pulmonary hypertension were enrolled and administered nebulized

treprostinil solution for 6 minutes, resulting in "significant long-lasting pulmonary

vasodilatation" with "near maximal pulmonary vasodilatation is achieved without

adverse effects." EX1007, Background, Methods, Conclusion.

[11] *See infra* note 5.

36

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

understanding.  EX1002, ¶¶85-92.

### b.     The '212 Patent discloses claim element 1[b]

| 1[b] | with an inhalation device |
|------|---------------------------|

The '212 Patent discloses that an inhaler may be used to deliver the benzindene prostaglandin.  EX1006, 5:30-32 ("Preferably, a nebulizer, **inhaler**, atomizer or aerosolizer is used[,] which forms droplets from a solution or liquid containing the active ingredient(s).").  A POSA as of May 2006 would have readily understood that an inhaler is an inhalation device.[12]  EX1002, ¶¶93-94.

### c.     Voswinckel JESC renders obvious claim element 1[c]

| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
|------|---------------------------|

The '212 Patent discloses that "[i]t has been discovered that aerosolized UT-15 has both greater potency and efficacy" for "attenuating chemically induced pulmonary hypertension" as compared to intravascular delivery.  EX1006, 8:5-8.  The '212 Patent quantifies this potency, teaching that "aerosolized UT-15 has a

---

[12] Voswinckel JESC and Voswinckel JAHA additionally disclose this limitation, as both use the pulsed OptiNeb® ultrasound nebulizer as the inhalation device.  EX1007, Methods; EX1008, Methods.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.*, 8:8-12.

Given these teachings, the successful sheep data, and the claims of the '212 Patent, a POSA would have been motivated to look for data administering inhaled treprostinil in humans with PH and the doses used therein. EX1002, ¶¶96-98. A POSA would have been readily led to Voswinckel JESC, which discloses the effective administration of inhaled treprostinil for human patients with pulmonary arterial hypertension for 6 minutes on the OptiNeb® nebulizer of treprostinil solution at a concentrations of 16 to 64 µg/mL. EX1007, Methods.

As explained above at Section IX.B., a skilled artisan would have understood at least 16, 32, 48, or 64 µg of treprostinil were delivered to patients with PAH in this study, and that understanding would have been confirmed by the volume of solution a POSA would have expected to be nebulized by the OptiNeb® device used in the study, as well as the nebulizers known in the art. EX1002, ¶99; EX1004, ¶56.

This understanding is confirmed by the intravascular dosing of UT-15 to treat pulmonary hypertension approved by the FDA in 2004 for intravascular treatment of pulmonary hypertension at a dosage of 1.25 ng/kg/min. EX1018. The label provides calculations based on a 60kg and 65kg patient. *Id.*, 10. Accordingly, a POSA administering Remodulin would have known he was giving his patients a

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

daily treprostinil dose of 1.25ng x 60kg x (24x60)min to 1.25ng x 65kg x (24x60)min, which is to *108 to 117 micrograms*. EX1002, ¶100. A POSA would apply the '212 Patent's 10-50% adjustment between intravascular and inhaled dosing (EX1006, 8:5-12) and understand the '212 Patent to be teaching that an FDA-approvable effective dosage of aerosolized treprostinil for the treatment of pulmonary hypertension would be **10.8 to 58.5 micrograms**. *Id.* This range covers over half of the claimed 15 to 90 µg dosage.[13]

---

[13] In addition, the '212 Patent discloses that "[i]n the case of treating peripheral vascular disease . . . [,] the dosage for inhalation . . . should be sufficient to deliver an amount that is equivalent to a daily [intravascular] infusion dose in the range of 25µg to 250mg." EX1006, 5:54-62; *see also id.*, Figs. 16, 18. By teaching that only 10-50% is needed for inhalation (*id.*, 8:5-12), the '212 Patent discloses that the effective dosage of inhaled treprostinil for treating peripheral vascular disease would be 2.5µg (micrograms) to 125mg (milligrams). This encompasses the full 15 to 90 micrograms claimed by the '793 Patent. Accordingly, given the fact that the '212 Patent is directed to methods of treating both pulmonary hypertension and peripheral vascular disease (*see id.*, 13:26-14:29, claims 6 and 9), a POSA would understand

39

Accordingly, a POSA would understand the ’212 Patent in combination with Voswinckel JESC to disclose an inhaled dosage range of 15 to 90 μg of treprostinil as claimed.

**d. Voswinckel JAHA discloses claim element 1[d]**

| 1[d] | *delivered in 1 to 3 breaths.* |
|---|---|

As explained above in Sections X.A and VIII. C., a POSA would have known to increase patient compliance and convenience, it would be desirable to reduce the number of breaths required for delivery of treprostinil by inhalation. A POSA who understood the necessary amount of dosing for aerosolized delivery of treprostinil would then look to the art for the fewest number of breaths in which that delivery could occur. EX1002, ¶102.

Voswinckel JAHA discloses a low number of breaths for the aerosolized delivery of treprostinil *specifically for treatment of pulmonary hypertension*. Thus, a POSA would understand the ’212 Patent and Voswinckel JESC’s dosage teachings would be readily applicable to the breath disclosure of Voswinckel JAHA. *Id.*, ¶¶102, 104 (also explaining that a “subset of the Voswinckel JESC authors”

---

that an inhaled dosage of 15 to 90 micrograms of treprostinil for treatment of pulmonary hypertension would be equally possible. EX1002, ¶100n4.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

published Voswinckel JAHA, additionally motivating a POSA to look at

Voswinckel JAHA in combination with the '212 Patent and Voswinckel JESC).

In particular, Voswinckel JAHA states "[p]atients received a TRE [inhaled

treprostinil sodium] by use of the pulsed OptiNeb® ultrasound nebulizer (**3 single**

**breaths**, TRE solution 600 µg/ml)" and further observes that "[t]olerability is

excellent even at high drug concentrations and short inhalation times (**3 breaths**)"

with "strong pulmonary selective vasodilatory efficacy with a long duration of affect

following single acute dosing." *See* EX1008, Methods, Conclusion.  A POSA

therefore would have applied the 3-breath delivery disclosure of Voswinckel JAHA

to the teachings of the '212 Patent to improve patient adherence to treatment.

EX1002, ¶¶103, 104.

Accordingly, a POSA reading the '212 Patent and Voswinckel JESC and

applying Voswinckel JAHA's teachings to increase patient compliance and ease of

use would have thought it obvious to administer treprostinil via inhalation in 3

breaths, thereby rendering 1[d] obvious.

### 2.    Dependent Claim 2

| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
|---|---|

The '212 Patent discloses use of an "inhaler," (EX1006, 5:30-32), and soft

mist inhalers were known as of 2004.  The '793 Patent itself acknowledges that

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

multiple soft mist inhalers were already known in the prior art and on the market,

including "the Respimat® Inhaler (Boehringer Ingelheim GmbH), the AERx®

Inhaler (Aradigm Corp.), the Mystic™ Inhaler (Ventaira Pharmaceuticals, Inc) and

the Aira™ Inhaler (Chrysalis Technologies Incorporated)." EX1001, 7:33-39 (also

citing to M. Hindle, The Drug Delivery Companies Report, Autumn/Winter 2004,

pp. 31-34, for "a review of soft mist inhaler technology"); *see also* EX1034, Abstract

(demonstrating successful use of the AERx soft mist inhaler for treatment of

pulmonary exacerbations in cystic fibrosis).

A POSA would find it obvious that the treprostinil disclosed in the '212 Patent

could be used in such soft mist inhalers and be motivated to do so. EX1002, ¶¶106-

110; EX1004, ¶¶66-71. As Dr. Gonda explains, a POSA would have known that the

aqueous solution described in the '212 Patent would be suitable for soft mist

inhalation in 3 breaths, and would have been motivated to develop/found it obvious

to try using a soft mist inhaler because "soft mist inhalers were known to offer

numerous advantages," particularly "repeatable and consistent" drug delivery

"regardless of ambient temperature (T = 15-30°C), pressure, or humidity" without

the use of propellants. EX1004, ¶¶68-69 (citing EX1069, 932). A POSA would

have a reasonable expectation of success in delivering 15 to 90 micrograms of

treprostinil in 1 to 3 breaths with a soft mist inhaler, because Voswinckel JAHA

successfully delivered treprostinil in 3 breaths and because soft mist inhalers

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

approved for market use were well characterized as suitable for inhaled delivery of

drugs at similar dosages in one or a small number of breaths. *Id.*, ¶70.

Accordingly, to a POSA, the '212 Patent in combination with Voswinckel

JESC and Voswinckel JAHA renders this claim obvious.

### 3.    Dependent Claim 3

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|---|

The '212 Patent discloses use of an ultrasonic nebulizer, teaching that "[o]ne

preferred nebulizer is the AM-601 MEDICATOR AEROSOL DELIVERY

SYSTEM$^{TM}$ (a nebulizer manufactured by Healthline Medical in Baldwin Park,

Calif.)."   EX1006, 5:33-36.   Voswinckel JESC discloses use of the "OptiNeb

ultrasound nebulizer", and Voswinckel JAHA use of the "pulsed OptiNeb®

ultrasound nebulizer."    EX1007, Methods; EX1008, Methods.    Also, pulsed

ultrasonic nebulizers were well-known and already on the market by 2006. *See, e.g.*,

EX1001, 12:58-59, 14:35-37 (describing use of a pulsed ultrasonic nebulizer

OPTINEB® by Nebutec).   Thus, to a POSA, the '212 Patent in combination with

Voswinckel JESC and Voswinckel JAHA renders this claim obvious.   EX1002,

¶¶112-114; EX104, ¶¶73-75.

### 4.    Dependent Claim 4

| 4 | The method of claim 1, wherein the inhalation device is a dry powder |
|---|---|

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

| | |
|---|---|
| | inhaler. |

Claim 4 is disclosed in the '212 Patent, which discloses an "inhaler" may be used to deliver the benzindene prostaglandin. EX1006, 5:30-32. The '212 Patent further states "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention." *Id.*, 5:37-39. And finally, claim 9 of the '212 Patent is specifically directed to an inhaled powder formulation of treprostinil. Accordingly, a POSA would have readily understood the "inhaler" disclosed in the '212 Patent could be used as a "dry powder inhaler," as claimed, to deliver powder formulations. EX1004, ¶¶77-80; EX1002, ¶¶116-117. Such dry powder inhalers were well known and "widely accepted" as of 2006. *See id.*; EX1038, 1311 (October 2005 "Dry Powder Inhalers: An Overview").

### 5.    Dependent Claim 5

| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
|---|---|

The '793 Patent defines a pressurized metered dose inhaler as "a device which produces the aerosol clouds for inhalation from solutions and/or suspensions of respiratory drugs in chlorofluorocarbon (CFC) and/or hydrofluoroalkane (HFA) solutions." EX1001, 7:17-21. The '212 Patent discloses use of an "inhaler," (EX1006, 5:30-32), and pressurized metered dose inhalers were well-known as of 2004, offered the advantage of being "reasonably efficient" while being "inherently

44

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

portable and very convenient to use" and were readily available, well understood, and offered for "[n]early all major respiratory drugs. *See* EX1004, ¶¶82-85 (citing EX1020, 379; EX1019, 29, 32); EX1002, ¶119.

### 6.    Dependent Claim 6

| 6 | The method of claim 4, wherein the formulation is a powder. |
|---|---|

Claim 6 is disclosed in the '212 Patent, which discloses and specifically claims that powder formulations may be used to treat pulmonary hypertension. EX1006, 5:37-39 ("Alternatively, solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention."), claim 9.

### 7.    Dependent Claim 7

| 7 | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
|---|---|

Claim 7 is disclosed in the '212 Patent, which expressly discloses and claims that "the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter." EX1006, 5:39-41, claim 9.

### 8.    Dependent Claim 8

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

Claim 8 is disclosed in the '212 Patent, which has no disclosure requiring the presence of metacresol in the described formulation. EX1006, 5:25-29 (disclosing formulation of a "more preferred solution" that does not include metacresol), 8:39-

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

44 (disclosing steps of formulating treprostinil inhalation solution that do not include

metacresol).   A POSA would thus understand the '212 Patent to disclose a

formulation of UT-15 (*i.e.*, treprostinil) that contains no metacresol.  EX1004, ¶¶92-

93 (explaining that "use of preservatives in inhalation products was strongly

discouraged by 2006").

Voswinckel JAHA also specifically states that a "preservative free solution of

inhaled TRE" was used (Voswinckel JAHA at Methods), which a POSA would

understand to mean that the solution contained no metacresol, because metacresol

was known in 2006 to be a preservative.  EX1004, ¶94; *see also* EX1001, 15:40-41

(referring to a "metacresol preservative" in "treprostinil solution").

Accordingly, a POSA would have understood the combination of the '212

Patent, Voswinckel JESC, and Voswinckel JAHA to render this claim obvious.

EX1002, ¶123.

## XI.    GROUND 2: CLAIMS 1-8 ARE RENDERED OBVIOUS UNDER 35 U.S.C. § 103(a) OVER THE '212 PATENT IN COMBINATION WITH VOSWINCKEL JESC

### A.    Motivation to Combine With a Reasonable Expectation of Success

A POSA would have been motivated to combine the '212 Patent with

Voswinckel JESC, because both disclose use of the same drug (treprostinil/UT-15)

for the same disease (pulmonary arterial hypertension) through the same route of

administration (inhalation of solution of treprostinil).  The first four paragraphs of

46

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Section X.A. explain why a POSA would have been motivated to combine these

references with a reasonable expectation of success.

> **B.    The '212 Patent in combination with Voswinckel JESC renders obvious claims 1-8**

>> **1.    Independent Claim 1**

>>> **a.    The '212 Patent in combination with Voswinckel JESC renders obvious claim elements 1[a], 1[b], and 1[c]**

| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
|------|------|
| 1[b] | with an inhalation device |
| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |

As explained above at Sections X.B.1.a to X.B.1.c, the '212 Patent discloses

elements 1[a] and 1[b], and the '212 Patent in combination with Voswinckel JESC

discloses element 1[c].

>>> **b.    Claim element 1[d] is obvious via routine optimization**

| 1[d] | delivered in 1 to 3 breaths. |
|------|------|

Element 1[d] would have been obvious over the '212 Patent and Voswinckel

JESC in view of a POSA's general knowledge in the field and/or by applying routine

optimization.

47

A POSA reading the '212 Patent and Voswinckel JESC would have been motivated to minimize the number of breaths required for administration of treprostinil by inhalation, to increase patient compliance and convenience. *See* EX1002, ¶¶128, 130. In addition, by May 2006, the general state of the art had established the safety and efficacy of high dosages of inhaled therapeutics delivered over a small number of breaths. *See, e.g., id.*, ¶129; EX1034, 177 (delivery of 0.45mg of drug in 3 breaths); EX1010, 298 ("[I]t is technically feasible for there to be only one to two breaths in an application."); EX1008, Methods (administration of 600 µg/mL treprostinil in 3 breaths); EX1009, 150 (administration of 15µg treprostinil in 3 breaths). Further, claim 9 of the '212 Patent is specifically directed to an inhaled powder formulation of treprostinil, which is commonly delivered by dry powder inhalers. EX1006, claim 9. Dry powder inhalers are breath-actuated as opposed to delivering doses over a set period of time. EX1039, 81 ("Advantages such as the potential ability to generate high FPFs and a relatively high lung deposition, fast and easy administration, the ability to prepare stable formulations (compared with solutions), and the fact that DPIs are breath-actuated and easily portable, justify their existence."). Therefore, a POSA would have been encouraged to and found it obvious to modify the teachings of the '212 Patent and Voswinckel JESC to deliver inhaled treprostinil in 1 to 3 breaths. EX1002, ¶¶126-131.

Relying on the '212 Patent and Voswinckel JESC to deliver inhaled

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

treprostinil in 1 to 3 breaths would have amounted to mere routine optimization. *See, e.g., Genzyme Therapeutic Prods. L.P. v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1365, 1373 (Fed. Cir. 2016) (affirming decision finding dosing claims obvious when "the claimed dosing schedule would have been arrived at by routine optimization"); *see also Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1329-31 (Fed. Cir. 2014) (affirming decision finding dosing claims obvious because "[a] relatively infrequent dosing schedule has long been viewed as a potential solution to the problem of patient compliance"); *see also Merck & Co., Inc. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364, 1373 (Fed. Cir. 2005) (reversing decision to find claims obvious that covered slightly different dosages from those of the prior art).  In fact, the '212 Patent itself contemplates dose optimization as a matter of routine.  EX1006, 6:56-7:3 ("Titration to effect may be used to determine proper dosage."), 7:25-33; *see also generally id.*, 1:10-2:64.  Such titration to effect was well known in similar aerosolized prostacyclin therapy.  EX1004, ¶35 (citing EX1047, EX1048); EX1002, ¶127, 130.  A POSA therefore would have understood the benzindene prostaglandin (*i.e.*, treprostinil) disclosed in the '212 Patent and Voswinckel JESC could be "delivered in 1 to 3 breaths."

### 2.    Dependent Claims 2-8

| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
|---|---|

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|---|
| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
| 6 | The method of claim 4, wherein the formulation is a powder. |
| 7 | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 | The method of claim 1, wherein the formulation contains no metacresol. |

The additional limitations of dependent claims 2-8 are disclosed in the '212

Patent, as explained above in Sections X.B.2 to X.B.8.  Further, for claim 3,

Voswinckel JESC specifically teaches use of the "OptiNeb® ultrasound nebulizer,"

which the '793 patent confirms is pulsed.  EX1007, Methods; EX1001, 14:35-37.

## XII.  GROUND 3: CLAIM 1 IS ANTICIPATED BY GHOFRANI

Ghofrani explicitly discloses every element of claim 1.

### A.  Ghofrani Discloses Claim Element 1[a]

| 1[a] | A method of treating pulmonary hypertension, comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
|---|---|

Element 1[a] is disclosed by Ghofrani, which teaches the recited method of

treating pulmonary hypertension.  Ghofrani, in relevant part, discloses the efficacy

50

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

of "inhaled treprostinil" for 17 patients with "pulmonary hypertension" at a dosage

of "15mcg/inhalation" for total dosage of "up to 90mcg . . . without adverse effects

occurring."  EX1010, 298; EX1002, ¶¶136-138.  Ghofrani further discloses that

"initial data shows that it is technically feasible for there to be only one to two

breaths in an application."  EX1010, 298.

### B.    Ghofrani Discloses Claim Element 1[b]

| 1[b] | with an inhalation device |
|------|---------------------------|

Element 1[b] is disclosed by Ghofrani, which states patients were

administered "inhaled treprostinil," which would require an inhalation device.

EX1010, 298.  Ghofrani further discloses that "it is possible to reduce the number

[of] inhalations necessary to up to four per day; the inhalation period can be reduced

to <1min. by selecting **a suitable device**." *Id*.  A POSA as of May 2006 would have

readily understood such a "suitable device" to be an inhalation device.  EX1002,

¶139.

### C.    Ghofrani Discloses Element 1[c]

| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
|------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------|

Ghofrani discloses a study in which patients "were administered [a single

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

event dose of] inhaled treprostinil (15 mcg[14]/inhalation)."  EX1010 (Ghofrani), 298.

That dose "led to a major reduction in pulmonary selective pressure and resistance

with an overall duration of action of >180 min."  *Id*.  Ghofrani further discloses "it

is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per

inhalation exercise) without adverse effects occurring."  *Id.*  Ghofrani thus discloses

a per inhalation exercise (i.e., single event dose) that covers the claimed dosage

range.  EX1002, ¶140.

### D.    Ghofrani Discloses Claim Element 1[d]

| 1[d] | delivered in 1 to 3 breaths. |
|------|------------------------------|

Ghofrani discloses that "it is technically feasible for there to be only one to

two breaths in an application" of the claimed dosage, disclosing element 1[d] to a

POSA.  EX1010, 298; EX1002, ¶141-142.

## XIII.  GROUND 4: CLAIMS 1, 3, AND 8 ARE RENDERED OBVIOUS UNDER 35 U.S.C. § 103(A) OVER VOSWINCKEL JAHA IN COMBINATION WITH GHOFRANI

### A.    Motivation to Combine With A Reasonable Expectation of Success

The Board has found that "Voswinckel [2004] references a 17 patient study

that appears to be the same as the 17 patent study discussed in the relevant portions

of Ghofrani."  IPR2017-01621, Paper 10 at 14.  Dr. Hill agrees and explains why a

---

[14] A POSA would have understood that "mcg" and "μg" refer to micrograms.

52

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

POSA would have expected the disclosures of Ghofrani to apply to Voswinckel

JAHA. EX1002, ¶¶143-144.

Even if not the same study, every author of Ghofrani is also an author of

Voswinckel JAHA, motivating a POSA to look at Ghofrani for additional details

after reviewing the Voswinckel JAHA Abstract. *Compare* EX1010, with EX1008;

EX1002, ¶145. Since Voswinckel JAHA does not expressly provide the total dose

administered in its single event dose of 1 to 3 breaths, a POSA would have been

motivated to look to Ghofrani for the optimal dosing range in Voswinckel JAHA's

breath range. Ghofrani discloses a study in which patients "were administered

inhaled treprostinil (15 mcg/inhalation)," teaches that "it is possible to increase the

dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without

adverse effects occurring," and discloses that "it is technically feasible for there to

be only one to two breaths in an application" with these dose ranges. EX1010, 298.

Thus, a POSA would have been motivated to combine Voswinckel JAHA with the

15-90 mcg dosage disclosure of Ghofrani. EX1002, ¶145.

A POSA would have had a reasonable expectation of success in combining

the two, because both references teach successful safety and efficacy of inhaled

treprostinil at their respective breath and dosage levels. EX1002, ¶145. Voswinckel

JAHA teaches that its "inhalation resulted in a sustained, highly pulmonary selective

vasodilatation over 120 minutes," showing "strong pulmonary selective vasodilatory

53

efficacy with a long duration of effect following single acute dosing" with "[n]o side effects." EX1008, Methods, Conclusion. Ghofrani teaches that its dosing "led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of >180 min . . . without adverse effects occurring." EX1010, 298.

**B.    Voswinckel JAHA in combination with Ghofrani renders obvious claims 1, 3, and 8**

**1.    Independent Claim 1**

**a.    Voswinckel JAHA and Ghofrani disclose claim element 1[a]**

| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
|------|-----------------------------------------------------------------------------|

Element 1[a] is disclosed by Voswinckel JAHA, which teaches the recited method of treating pulmonary hypertension. Voswinckel JAHA describes treating "17 patients with severe pulmonary hypertension" with "Inhaled Treprostinil Sodium (TRE)." EX1008, Title, Methods. Voswinckel JAHA also describes a single event dose of "3 single breaths" of "TRE solution 600 μg/ml" having "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." *Id.*, Methods, Conclusion.

Ghofrani also discloses element 1[a]. *See supra* Section XII.A.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

      **b.**      **Voswinckel JAHA and Ghofrani disclose claim element 1[b]**

| 1[b] | with an inhalation device |
|------|---------------------------|

Element 1[b] is disclosed by Voswinckel JAHA, which expressly discloses "inhaled TRE" through the "use of the pulsed OptiNeb® ultrasound nebulizer." *Id.*, Methods. A POSA as of May 2006 would have readily understood that this nebulizer is an inhalation device. EX1002, ¶150.

Ghofrani also discloses element 1[b]. *See supra* Section XII.B.

      **c.**      **Voswinckel in combination with Ghofrani discloses element 1[c]**

| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
|------|---------------------------|

Element 1[c] would have been obvious over Voswinckel JAHA in combination with Ghofrani. Because Voswinckel does not expressly provide the total dose administered in its single event dose, a POSA would have looked to Ghofrani to fill in the optimal single event dosing range, since "both references disclose that inhaled administration of treprostinil at these doses in 1-3 breaths was an effective treatment for pulmonary hypertension." EX1002, ¶155. In Ghofrani, patients "were administered inhaled treprostinil (15 mcg/inhalation)." EX1010, 298. Ghofrani further discloses that "it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring."

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

*Id.* Ghofrani further discloses that "it is technically feasible for there to be only one to two breaths in an application." *Id.* Thus, a POSA would have understood that Ghofrani was disclosing a 15 to 90 μg single event dose—the entire claimed range— in the same 1-3 breath range as Voswinckel JAHA. EX1002, ¶154. A POSA administering treprostinil in accordance with the teachings of Voswinckel JAHA would have been motivated to use the range of doses disclosed by Ghofrani because such doses "led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min . . . without adverse effects occurring," i.e. a POSA would understand that this dose was therapeutically effective and safe. EX1010, 298; EX1002, ¶¶153-154.

> **d.    Voswinckel JAHA and Ghofrani disclose claim element 1[d]**

| 1[d] | delivered in 1 to 3 breaths. |
|------|------------------------------|

Element 1[d] is disclosed by Voswinckel JAHA, which discloses treating patients with a single event dose of "3 single breaths." EX1008, Methods. Ghofrani further discloses that "it is technically feasible for there to be only one to two breaths in an application" of the claimed dosage. EX1010, 298. Thus, both Voswinckel JAHA and Ghofrani disclose element 1[d].

> **2.    Dependent Claim 3**

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|----------------------------------------------------------------------------------------|

56

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

The limitation of claim 3 is disclosed by Voswinckel JAHA, which

specifically teaches use of the "pulsed OptiNeb® ultrasound nebulizer."  EX1008,

Methods.

### 3.    Dependent Claim 8

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

The limitation of claim 8 is disclosed by Voswinckel JAHA, which states that

a "preservative free solution of inhaled TRE" was used (EX1008, Methods), which

a POSA would understand to mean that the solution contained no metacresol,

because metacresol was known in 2006 to be a preservative.  EX1004, ¶¶94, 104;

*see also* EX1001, 15:40-41 (referring to a "metacresol preservative" in "treprostinil

solution").

## XIV.  GROUND 5: CLAIMS 1 AND 3 ARE ANTICIPATED BY VOSWINCKEL 2006

### A.    Independent Claim 1

#### 1.    Voswinckel 2006 discloses claim element 1[a]

| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
|---|---|

Element 1[a] is disclosed in Voswinckel 2006, which teaches the recited

method of treating pulmonary hypertension.  Voswinckel 2006 describes treating

57

"three patients with severe pulmonary hypertension" with "inhaled treprostinil." EX1009, 150. Voswinckel 2006 also describes "**a single** 15-µg **dose** of treprostinil, inhaled in 3 breaths" inducing "highly pulmonary selective and sustained vasodilatation" proving that "[t]he drug was clinically effective" at the dosage and number of breaths. *Id.*

### 2. Voswinckel 2006 discloses claim element 1[b]

| 1[b] | with an inhalation device, |
|------|----------------------------|

Element 1[b] is disclosed in Voswinckel 2006, which expressly discloses "inhaled treprostinil" administered "through a modified OptiNeb ultrasonic **inhalation device**." *Id.*

### 3. Voswinckel 2006 discloses claim element 1[c]

| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
|------|----------------------------|

Element 1[c] is disclosed in Voswinckel 2006, which teaches that "a single 15-µg dose of treprostinil" was inhaled by patients "through a modified OptiNeb ultrasonic inhalation device." *Id.*

### 4. Voswinckel 2006 discloses claim element 1[d]

| 1[d] | delivered in 1 to 3 breaths. |
|------|----------------------------|

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Element 1[d] is disclosed in Voswinckel 2006 which teaches that "15-µg dose

of treprostinil" was inhaled by patients "in **3 breaths** through a modified OptiNeb

ultrasonic inhalation device." *Id.*

### B.     Claim 3

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|---|

Voswinckel 2006 discloses use of a "modified OptiNeb ultrasonic inhalation

device" (EX1009 (Voswinckel 2006), 150), which was a known pulsed ultrasonic

nebulizer as of May 2006.   EX1004, ¶108; EX1002, ¶172; EX1001, 14:35-37

(describing use of a "pulsed ultrasonic nebulizer" OPTINEB® by Nebutec).

### XV.   GROUND 6: CLAIMS 2 AND 4-8 ARE OBVIOUS OVER VOSWINCKEL 2006 IN COMBINATION WITH THE '212 PATENT

As explained above, Claim 1 is anticipated by Voswinckel 2006.   The

additional limitations of claims 2 and 4-8 are obvious over Voswinckel 2006 in view

of the '212 Patent.

### A.     Motivation to Combine With a Reasonable Expectation of Success

Both the '212 Patent and Voswinckel 2006 are directed to the use of inhaled

treprostinil (also known as benzindene prostaglandin UT-15), for the treatment of

pulmonary hypertension.   *See, e.g.,* EX1006, Abstract (disclosing "[a] method of

delivering benzindene prostaglandins to a patient by inhalation" for the treatment of

"pulmonary hypertension"); *see also* EX1009 (Voswinckel 2006), 149 (titled

59

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

"Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension").

Indeed, Voswinckel 2006, like Voswinckel JESC and Voswinckel JAHA, puts into

clinical practice the express teachings of the '212 Patent, with success.    But

Voswinckel 2006 is limited to one form of inhalation delivery, and other forms were

well-known by 2006.    Each form had various advantages and disadvantages that

made it useful for different patients and scenarios.    *See, e.g.*, EX1031 ("Comparing

Clinical Features of the Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler").

As Dr. Gonda and Dr. Hill explain, a POSA would have been motivated to apply the

'212 Patent's teachings as to various forms of inhalers and dry powder formulations,

while maintaining the dosage and breath limitations of Voswinckel 2006, with a

reasonable expectation of success because Voswinckel 2006 had shown that

treprostinil was "clinically effective, safe, and well tolerated" at the dosage and

breath of "15 μg … inhaled in 3 breaths."    *See* EX1009, 150; EX1004, ¶110-113;

EX1002, ¶¶173-176.

### B.    Voswinckel 2006 in combination with the '212 Patent renders obvious claims 2 and 4-8

#### 1.    Dependent Claim 2

| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
|---|---|

As explained above at Sections X.B.2 and XV.A., a POSA would understand

the '212 Patent's teachings to apply to soft mist inhalers, and expect Voswinckel

2006's dosage and breath disclosures to be realizable via a soft mist inhaler.
EX1004, ¶115-116.  Thus, Voswinckel 2006 in combination with the '212 Patent
render obvious "wherein the inhalation device is a soft mist inhaler."

### 2.    Dependent Claim 4

| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
|---|---|

The '212 Patent discloses this element, as detailed above at Section X.B.4.
*See also* EX1002, ¶180; EX1004, ¶118.  A POSA would have readily understood
that "inhaled treprostinil" dosage and breath disclosure of Voswinckel 2006 could
be utilized as a powder delivered in a "dry powder inhaler" as disclosed and claimed
by the '212 Patent.  EX1004, ¶119.  A POSA would have been motivated to do so
because dry powder inhalers were well-known to be very portable and quick to use,
breath-actuated, could be designed as single-dose or multi-dose devices, provided
the "lowest cost dose," and were easier for patients (especially children) to use than
the pulsed ultrasonic nebulizer disclosed in Voswinckel 2006.  *Id.*; EX1030, 58, 61-
62, 63; EX1031, 1316-17; *see also* EX1039, 81 ("Advantages such as the potential
ability to generate high FPFs and a relatively high lung deposition, fast and easy
administration, the ability to prepare stable formulations (compared with solutions),
and the fact that DPIs are breath-actuated and easily portable, justify their
existence.").  A POSA would thus have had a reasonable expectation of success that

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

the "inhaled treprostinil" described in Voswinckel 2006 could be delivered using a

dry powder inhaler.  EX1004, ¶119.

### 3.    Dependent Claim 5

| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
|---|---|

The '793 Patent defines a pressurized metered dose inhaler (pMDI) as "a

device which produces the aerosol clouds for inhalation from solutions and/or

suspensions of respiratory drugs in chlorofluorocarbon (CFC) and/or

hydrofluoroalkane (HFA) solutions.  EX1001, 7:17-21.  The '212 Patent discloses

use of an "inhaler," (EX1006, 5:30-32) and pMDIs were well-known inhalers as of

2004.  *See* EX1004, ¶121; EX1002, ¶183.

A POSA would have been motivated to deliver the "inhaled treprostinil"

described in Voswinckel 2006 using pMDIs with a reasonable expectation of

success.  As Dr. Gonda explains, pMDIs were known to be "efficient" while being

"inherently portable and very convenient to use" (EX1020 at 379), which would

motivate a POSA to deliver the "inhaled treprostinil" using a pMDI, because patient

adherence was a known problem that could be eased by portability and convenience.

EX1004, ¶122. And a POSA would have had a reasonable expectation that the

"inhaled treprostinil" disclosed in Voswinckel 2006 could be delivered using a

pMDI, because they were readily available, well understood, and offered for

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

"[n]early all major respiratory drugs."  *Id.*

Thus, a POSA would have understood the combination of Voswinckel 2006

and the '212 Patent to render claim 5 obvious.  EX1002, ¶184.

### 4.    Dependent Claim 6

| 6 | The method of claim 1, wherein the formulation is a powder. |
|---|---|

Claim 6 would have been obvious over Voswinckel 2006 in combination with

the '212 Patent, which discloses and claims that powder formulations may be used

to treat pulmonary hypertension.    EX1006, 5:37-39 ("Alternatively, solid

formulations, usually in the form of a powder, may be inhaled in accordance with

the present invention."), claims 6 and 9.  A POSA would have been motivated to

convert Voswinckel 2006's treprostinil solution to a powder because powders were

known to be more stable formulations than solutions by May 2006, and the '212

Patent specifically claims such powder formulations for the same indication as

Voswinckel 2006.  *See* EX1004, ¶125; EX1039, 81; EX1006, claim 9.  A POSA

would have had a reasonable expectation of success in doing so because converting

a solution to dry powder was well known by 2006, and the '212 Patent discloses and

claims that treprostinil can be formulated as a powder for delivery by inhalation.

*See, e.g.*, EX1004, ¶125; EX1040, 51-53 ("Preparation of Powders" section).

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

### 5.    Dependent Claim 7

| 7 | The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter. |
|---|---|

Claim 7 would have been obvious over Voswinckel 2006 in combination with the '212 patent, which discloses that "the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter." EX1006, 5:39-41.

### 6.    Dependent Claim 8

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

Claim 8 is disclosed in Voswinckel 2006 and the '212 Patent.  Voswinckel 2006 does not disclose the presence of metacresol in the described formulation of "inhaled treprostinil," and the '212 Patent discloses formulations without metacresol.  *See generally* EX1009; EX1006, 5:25-29 (disclosing formulation of a "more preferred solution" that does not include metacresol), 8:39-44 (disclosing steps of formulating treprostinil inhalation solution that do not include metacresol).  Voswinckel 2006 in combination with the '212 Patent therefore discloses a formulation of treprostinil that contains no metacresol.  EX1004, ¶130-131.

## XVI.  NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS EXIST

No secondary considerations of non-obviousness were presented to the PTO.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

To the extent PO argues, similar to their arguments in IPR2017-01621 and IPR2017-01622 and in the '793 Patent, that the claims recite unexpected results, address a long-felt but unmet need, have been copied, and have been commercially successful, those considerations do not preserve validity, particularly because PO cannot establish a nexus between those considerations and the claims.

First, the fact that treprostinil by inhalation was safe and effective at the dosage range claimed by the '793 patent was not **an unexpected result** by 2006. This result was already disclosed by the prior art discussed in this Petition (*see, e.g.*, EXS1007-1010. Thus, the success of administering 15 to 90 micrograms of treprostinil in 1 to 3 breaths was entirely *expected* as of May 2006. EX1004, ¶133.

Second, no **long-felt, but unmet need** for a "treatment for pulmonary hypertension that can be administered using a compact inhalation device" (EX1001, 2:60-62) existed in 2006, such that it was allegedly addressed by PO's Tyvaso® (treprostinil) inhalation solution. By 2006, pulmonary hypertension treatment with a compact inhalation device, like a nebulizer, could be achieved in more breaths, lower concentrations, and by iloprost. *See supra*, Sections VIII.B-C. These treatments meet the articulated "long-felt need," regardless of whether they practice the '793 Patent claims—exemplifying why there is no nexus between the '793 Patent's treprostinil, dosage, or breath claim limitations and the purported need. In addition, treprostinil was already available for subcutaneous and intravenous

65

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

administration well before Tyvaso® (*see, e.g.*, EX1018), and there are disadvantages

to oral inhalation, such that even today, doctors prescribe subcutaneous or

intravenous dosing of treprostinil over inhaled treprostinil. *See* EX1002, ¶¶189-190;

EX1004, ¶135. So, more accurately, Tyvaso® was approved by the FDA as another

option, useful in certain circumstances, for an already met need.[15]  EX1004, ¶137.

To the extent there was any need for the other claimed, non-nebulizer inhalation

devices, PO actively gave up on those paths and instead pursued minor

advancements in its nebulizer and non-inhaled routes like oral delivery. *See*

EX1004, ¶136. PO simply claimed use of the other devices without producing a

product for the market, because they did not believe they met a long-felt need worth

pursuing and instead wanted to force out companies, like Petitioner, who developed

dry powder formulations and inhalers. *Id.*

Third, as for **copying**, PO cannot show evidence of copying simply because

---

[15] Further, as Dr. Gonda explains, a POSA would have known that pulmonary

hypertension treatment with compact inhalation devices, like a soft mist inhaler or a

dry powder inhaler, could be achieved in a smaller number of breaths using a higher

concentration of the drug, and the safety, tolerability, and efficacy of such

formulations was tested in patients. EX1004, ¶134.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

they have accused Petitioner of infringing the '793 Patent claims. As Dr. Gonda explains, a POSA would not consider Liquidia' s product "copying," because PO UTC never developed a dry powder formulation or inhaler. EX1004, ¶138. Further, considering the '793 Patent issued *after* Liquidia developed LIQ861 and submitted its NDA, a skilled artisan would not consider Liquidia's product a "copy" of the alleged claimed invention. *Compare* EX1001 (issued July 21, 2020), *with* EX1042 (announcing Liquidia's NDA submission in January 27, 2020 Press Release); EX1049 (announcing FDA acceptance of LIQ861 NDA on April 8, 2020.)

PO may argue, as they have in district court, that because inventor Roscigno is a former employee of the Petitioner, Petitioner must have copied the claimed invention. But any inference that Roscigno's involvement resulted in any alleged "copying" is unsupported speculation by the PO, and is belied by the fact that Roscigno had been working at Liquidia since 2015, years before the application for the '793 Patent was even filed in 2020.

Finally, PO has not produced evidence that Tyvaso®'s market share is tied to the '793 Patent claims. In fact, while the Tyvaso® label recommends an initial dosage of 3 breaths, it expressly instructs increasing the dosage by "an additional 3 breaths per session" every "1-2 week[s]" as tolerated. *See* EX1043, 1 (Dosage and Administration). All but the initial dosing usage of Tyvaso® would not practice the '793 Patent claims, which are limited to a single event dose of 1 to 3 breaths. In

67

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

addition, Tyvaso®, a solution of treprostinil, is approved for oral inhalation through

a pulsed ultrasonic delivery device, and therefore does not practice any claims

directed to a soft mist inhaler, dry powder, DPI or MDI. *Id.*, 2 (Section 2.1). In sum,

any evidence of Tyvaso®'s **commercial success** lacks the required nexus to the

claims.

Accordingly, the secondary considerations of non-obviousness do not warrant

a finding that the Petitioned Claims are patentable.

## XVII. CONCLUSION

Petitioner respectfully requests that the Board institute *inter partes* review of

claims 1–8 of the '793 Patent.

Respectfully submitted,

Dated: January 7, 2021

**COOLEY LLP**

COOLEY LLP
ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
Tel: (212) 479-6840
Fax: (212) 479-6275

By: */Ivor R. Elrifi/*
Ivor R. Elrifi
Reg. No. 39,529
*Counsel for Petitioner*

68

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

## **CERTIFICATE OF COMPLIANCE WITH WORD COUNT**

Pursuant to 37 C.F.R. § 42.24(d), I certify that this preliminary response complies with the type-volume limits of 37 C.F.R. § 42.24(c)(1) because it contains 13,689 words, according to the word-processing system used to prepare this petition, excluding the parts of this preliminary response that are exempted by 37 C.F.R. § 42.24(c) (including the table of contents, a table of authorities, an exhibits list, a listing of facts, a certificate of service or this certificate of word count, or appendix of exhibits).

Dated: January 7, 2021

Cooley LLP
ATTN: Patent Docketing
1299 Pennsylvania Ave. NW,
Suite 700
Washington, D.C. 20004
Tel:  (212) 479-6840
Fax: (212) 479-6275

By:  */Ivor R. Elrifi/*
Ivor R. Elrifi
Reg. No. 39,529

69

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify, pursuant to 37 C.F.R. §§ 42.6(e) and 42.105(b), that a complete and entire copy of this **PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 10,716,793** including all exhibits (**Nos. 1001-1079**) and related documents, were served via FEDERAL EXPRESS on the 7th day of January, 2021, the same day as the filing of the above-identified document in the United States Patent and Trademark Office/Patent Trial and Appeal Board, upon the Patent Owner by serving the correspondence address of record with the USPTO as follows:

> Foley & Lardner LLP
> 3000 K Street N.W.
> Suite 600
> Washington, DC 20007-5109

And, via FEDERAL EXPRESS upon counsel of record for Patent Owner in the litigation pending before the U.S. District Court for the District of Delaware entitled *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA as follows:

| | |
|---|---|
| Jack B. Blumenfeld | Douglas H. Carsten |
| Michael J. Flynn | Joshua Mack |
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP | Art Dykhuis |
| | WILSON SONSINI GOODRICH & ROSATI |
| 1201 North Market Street, 16th Floor | 12235 El Camino Real |
| P.O. Box 1347 | San Diego, CA 92130 |
| Wilmington, DE 19899 | |

Dated: January 7, 2021

Cooley LLP
ATTN: Patent Docketing
1299 Pennsylvania Ave. NW,
Suite 700
Washington, D.C. 20004
Tel: (212) 479-6840
Fax: (212) 479-6275

By: */Ivor R. Elrifi/*
Ivor R. Elrifi
Reg. No. 39,529

# EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED THERAPEUTICS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 20-755 (RGA) |
| LIQUIDIA TECHNOLOGIES, INC., | ) ) | |
| Defendant. | ) | |

**EXHIBIT 4: PLAINTIFF'S STATEMENT OF CONTESTED ISSUES OF LAW**

## TABLE OF CONTENTS

I.  INTRODUCTION.................................................................................................. 1
    A.  The Asserted Patents and Claims............................................................ 2
    B.  Defendant's Accused Infringing Product................................................. 2

II. INFRINGEMENT.............................................................................................. 2
    A.  Legal Standards....................................................................................... 2
        1.  Infringement in the Hatch-Waxman Context............................... 3
        2.  Infringement Under the Doctrine of Equivalents......................... 4
        3.  Induced Infringement................................................................... 4
        4.  Contributory Infringement........................................................... 7
        5.  A Promise Not to Infringe is Insufficient ................................... 7
        6.  Presumption of Infringement ....................................................... 8
        7.  Safe Harbor and Stockpiling ....................................................... 9
    B.  Infringement of the '066 Patent .......................................................... 10
    C.  Infringement of the '793 Patent .......................................................... 12

III. EXCEPTIONAL CASE .................................................................................. 13

IV. CLAIM CONSTRUCTION ............................................................................ 13

V.  VALIDITY....................................................................................................... 15
    A.  Legal Standards..................................................................................... 15
        1.  Presumption of Validity............................................................. 15
        2.  Level of Skill in the Art ............................................................ 15
        3.  What Constitutes Prior Art......................................................... 16
        4.  Public Availability ..................................................................... 18
        5.  Anticipation................................................................................ 19
        6.  Obviousness Under Pre-AIA 35 U.S.C. § 103........................... 20
        7.  Written Description..................................................................... 29
        8.  Enablement ................................................................................ 31
        9.  Definiteness................................................................................ 32
        10. Collateral Estoppel..................................................................... 34
        11. Assignor Estoppel ...................................................................... 35
        12. Product-by-Process..................................................................... 37
    B.  Validity of the '066 Patent ................................................................. 37
    C.  Validity of the '901 Patent ................................................................. 38
    D.  Validity of the '793 Patent ................................................................. 38

claims and product-by-process claims have materially distinct validity analyses. *See, e.g.,* *Torpharm, Inc. v. Ranbaxy Pharms.*, 336 F.3d 1322, 1329–30 (Fed. Cir. 2003) (holding invalid product claims could not collaterally estop process claims).

133.    To determine the validity of process claims, courts conduct a "fact-intensive comparison of the claimed process with the prior art." *In re Ochiai*, 71 F.3d 1565, 1571 (Fed. Cir. 1995). Each process limitation must be taught by the prior art. *Id.*

134.    The validity of product-by-process claims is analyzed based on the claimed product as impacted by the prior art. *See Amgen Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1367, 1370 (Fed. Cir. 2009). The trier of fact must determine—as a matter of fact—whether process limitations, which expressly define the product, impart structural or functional differences to the claimed product. *See id.* When limitations "impart[] structural and functional differences distinguishing the claimed product from the prior art, then those differences are relevant as evidence" to the obviousness inquiry. *Greenliant Sys., Inc. v. Xicor LLC*, 692 F.3d 1261, 1268 (Fed. Cir. 2012) (internal quotation marks omitted).

135.    Once the claims have been properly construed, to assess if collateral estoppel applies, the fact finder must determine

> whether the nonlitigated claims present new issues as to the art pertinent to the nonlitigated claims; as to the scope and content of that art; as to the differences between the prior art and the nonlitigated claims; and as to the level of ordinary skill in that art. If none of these inquiries raises any new triable issues, then the obviousness determination in the prior proceeding should be equally applicable to the nonlitigated claims.

*Westwood Chem., Inc. v. United States*, 525 F.2d 1367, 1375 (Ct. Cl. 1975).

### 11.    Assignor Estoppel

136.    "Assignor estoppel applies when an invalidity defense in an infringement suit conflicts with an explicit or implicit representation made in assigning patent rights." *Minerva*

*Surgical, Inc. v. Hologic, Inc.*, 141 S. Ct. 2298, 2311 (2021).

137.    "[A]ssignor estoppel is an equitable doctrine that prohibits an assignor of a patent
or patent application, or one in privity with him, from attacking the validity of that patent when he
is sued for infringement by the assignee." *Semiconductor Energy Lab'y Co. v. Nagata*, 706 F.3d
1365, 1369 (Fed. Cir. 2013).

138.    The doctrine of "[a]ssignor estoppel also prevents parties in privity with an
estopped assignor from challenging the validity of the patent. Whether two parties are in privity
depends on the nature of their relationship in light of the alleged infringement. The closer that
relationship, the more the equities will favor applying the doctrine of assignor estoppel. Assessing
a relationship for privity involves evaluation of all direct and indirect contacts." *Mentor Graphics
Corp. v. Quickturn Design Sys.*, 150 F.3d 1374, 1379 (Fed. Cir. 1998) (quoting *Shamrock Techs.,
Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990)) (internal quotation marks and
citations omitted).

139.    A non-exhaustive list of factors for evaluating whether privity exists for assignor
estoppel include:  (1) the assignor's leadership role at the new employer; (2) the assignor's
ownership stake in the defendant company; (3) whether the defendant company changed course
from manufacturing non-infringing goods to infringing activity after the inventor was hired; (4)
the assignor's role in the infringing activities; (5) whether the inventor was hired to start the
infringing operations; (6) whether the decision to manufacture the infringing product was made
partly by the inventor; (7) whether the defendant company began manufacturing the accused
product shortly after hiring the assignor; and (8) whether the inventor was in charge of the
infringing operation. *Mag Aerospace Indus., Inc. v. B/E Aerospace, Inc.*, 816 F.3d 1374, 1380
(Fed. Cir. 2016) (citation omitted); *see Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d

789, 794 (Fed. Cir. 1990) (finding privity between an employer and an inventor hired as Vice President with responsibilities for developing the accused product); *Juniper Networks, Inc. v. Palo Alto Networks, Inc.*, 15 F. Supp. 3d 499, 508 (D. Del. Feb. 6, 2014) (finding privity between an employer and an employee granted the title of "founder").

140.    Further, privity exists between an assigning inventor and a party infringing a patent when "the ultimate infringer availed itself of the inventor's 'knowledge and assistance' to conduct infringement." *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 839 (Fed. Cir. 1991) (quoting *Shamrock Techs.*, 903 F.2d at 794). Indeed, even consultants or contractors will be found to be in privity with the infringer when that consultant or contractor plays a "significant role" in the infringing product. *Leading Tech. Composites v. MV2, LLC*, No. CCB-19-1256, 2020 WL 790601, at *4 (D. Md. Feb. 18, 2020); *BASF Corp. v. Aristo Inc.*, 872 F. Supp. 2d 758, 776 (N.D. Ind. May 29, 2012).

### 12.    Product-by-Process

141.    The general rule of product-by-process validity is to focus on the product, and not the process by which the product is made. *Amgen Inc. v. F. Hoffman–La Roche Ltd.*, 580 F.3d 1340, 1369 (Fed.Cir.2009). However, there is an exception to this general rule, where the process imparts "structural and functional differences" into the product which distinguishes it from the prior art product. *Greenliant Sys.*, 692 F.3d at 1268–69 (citation omitted). This is especially true where "the manufacturing process steps would be expected to impart distinctive structural characteristics to the final product." *Id*. at 1268 (citation omitted).

### B.    Validity of the '066 Patent

142.    That Liquidia has failed to meet its burden of proving, by clear and convincing evidence, that any claim of the '066 patent is invalid pursuant to 35 U.S.C. §§ 102, 103, or 112.

### C.    Validity of the '901 Patent

143.    That Liquidia is estopped, pursuant to 35 U.S.C. §315(e)(2), from asserting or maintaining any ground of invalidity that it raised or could have raised in the IPR relating to the '901 patent.  *Novartis Pharms. Corp. v. Par Pharm. Inc.*, C.A. No. 15-0078-RGA, 2019 WL 9343055, at *2 (D. Del. Apr. 11, 2019); *see Brit. Telecomms. PLC v. IAC*, C.A. No. 18-366-WCB, 2019 WL 4740156, at *8 (D. Del. Sept. 27, 2019) ("any conclusion" will "limit[] the arguments"); *f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, C.A. No. 16-41-CFC, 2019 WL 1558486, at *1-2 (D. Del. Apr. 10, 2019) (the estoppel inquiry is broad, and merely "limited to whether the [] reference could reasonably have been discovered by a 'skilled searcher conducting a diligent search'" (citing *Parallel Networks Licensing, LLC v. IBM Corp.*, C.A. No. 13-2072 (KAJ), 2017 WL 1045912, at *11 (D. Del. Feb. 22, 2017)); *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, 330 F. Supp. 3d 574, 600 (D. Mass. 2018) ("the statute makes no distinction between successful and unsuccessful grounds"); *see also New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (recognizing judicial estoppel includes an inquiry into whether a prevailing party presents an "inconsistent position in a later proceeding").

144.    That Liquidia has failed to meet its burden of proving, by clear and convincing evidence, that any claim of the '901 patent is invalid pursuant to 35 U.S.C. §§ 102, 103, or 112.

### D.    Validity of the '793 Patent

145.    That Liquidia is estopped, pursuant to the doctrine of assignor estoppel, from asserting or maintaining grounds of invalidity against the '793 patent.

146.    That Liquidia is or will be estopped, pursuant to 35 U.S.C. §315(e)(2), from asserting or maintaining any ground of invalidity that it raised or could have raised in the pending IPR relating to the '793 patent.  *Novartis Pharms. Corp. v. Par Pharm. Inc.*, C.A. No. 15-0078-

RGA, 2019 WL 9343055, at *2 (D. Del. Apr. 11, 2019); *see Brit. Telecomms. PLC v. IAC*, C.A.
No. 18-366-WCB, 2019 WL 4740156, at *8 (D. Del. Sept. 27, 2019) ("any conclusion" will
"limit[] the arguments"); *f'real Foods, LLC v. Hamilton Beach Brands, Inc.*, C.A. No. 16-41-CFC,
2019 WL 1558486, at *1-2 (D. Del. Apr. 10, 2019) (the estoppel inquiry is broad, and merely
"limited to whether the [] reference could reasonably have been discovered by a 'skilled searcher
conducting a diligent search'" (citing *Parallel Networks Licensing, LLC v. IBM Corp.*, C.A. No.
13-2072 (KAJ), 2017 WL 1045912, at *11 (D. Del. Feb. 22, 2017)); *SiOnyx, LLC v. Hamamatsu
Photonics K.K.*, 330 F. Supp. 3d 574, 600 (D. Mass. 2018) ("the statute makes no distinction
between successful and unsuccessful grounds").

147.    That Liquidia has failed to meet its burden of proving, by clear and convincing
evidence, that any claim of the '793 patent is invalid pursuant to 35 U.S.C. §§ 102, 103, or 112.

# EXHIBIT 26

```
1
```

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4   UNITED THERAPEUTICS CORPORATION, )
                                     )
5             Plaintiff,             )
                                     ) C.A. No. 20-755-RGA
6   v.                               )
                                     )
7   LIQUIDIA TECHNOLOGIES, INC.,     )
                                     )
8             Defendant.             )

9
                              J. Caleb Boggs Courthouse
10                            844 North King Street
                              Wilmington, Delaware
11
                              Friday, March 4, 2022
12                            9:51 a.m.
                              Pretrial Conference
13

14  BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15  APPEARANCES:

16          MORRIS NICHOLS ARSHT & TUNNELL LLP
            BY:  MICHAEL J. FLYNN, ESQUIRE
17
                    -and-
18
            GOODWIN PROCTER LLP
19          BY:  WILLIAM JACKSON, ESQUIRE
            BY:  HUIYA WU, ESQUIRE
20
                    -and-
21
            McDERMOTT WILL & EMERY
22          BY:  DOUGLAS H. CARSTEN, ESQUIRE
            BY:  ADAM BURROWBRIDGE, ESQUIRE
23          BY:  ART P. DYKHUIS, ESQUIRE

24                            For the Plaintiff

25
```

```
2
```

```
1

2

3   APPEARANCES CONTINUED:

4       SHAW KELLER, LLP
        BY:  NATHAN R. HOESCHEN, ESQUIRE
5
               -and-
6
        COOLEY LLP
7       BY:  SANYA SUKDUANG, ESQUIRE
        BY:  JONATHAN R. DAVIES, ESQUIRE
8       BY:  DOUG CHEEK, ESQUIRE
        BY:  BRITTANY CAZAKOFF, ESQUIRE
9       BY:  ROBERT J. MINN, ESQUIRE

10                         For the Defendant

11  Also Present:

12      Mr. Rusty Schundler

09:46:23
09:46:23
09:46:23  13
09:51:09  14
                    *** PROCEEDINGS ***
09:51:09  15      DEPUTY CLERK:  All rise.  Court is now in
09:51:11  16  session.  The Honorable Richard G. Andrews presiding.
09:51:19  17      THE COURT:  All right.  Please be seated.
09:51:22  18      This is the pretrial conference in United
09:51:26  19  Therapeutics vs. Liquidia Technologies, Civil Action Number
09:51:29  20  20-755.
09:51:32  21      And so, for the Plaintiff, Mr. Flynn, good
09:51:40  22  morning.
09:51:40  23      MR. FLYNN:  Good morning, Your Honor.
09:51:42  24      THE COURT:  Who's sitting at the table with you?
09:51:43  25      MR. FLYNN:  Sure.  I have William Jackson and
```

```
3
```

```
09:51:47   1  Huiya Wu from Goodwin Procter.  Adam Burrowbridge, Art
09:51:51   2  Dykhuis and Doug Carsen from McDermott Will & Emery.
09:51:56   3      THE COURT:  Good morning.  Way faster than I
09:51:58   4  could possibly absorb that.
09:52:01   5      Who do you have over on this side here?
09:52:04   6      MR. HOESCHEN:  Good morning, again, Your Honor.
09:52:06   7  Nate Hoeschen from Shaw Keller on behalf of Defendant.  With
09:52:08   8  me at counsel table, I have Sanya Sukduang, and Jonathan
09:52:11   9  Davies from Cooley, as well as Rusty Schundler from
09:52:15  10  Liquidia.  And behind us here we have Brittany Cazakoff,
09:52:19  11  Doug Cheek and Robert Minn from Cooley.
09:52:21  12      THE COURT:  Okay.  All right.  Well, good
09:52:24  13  morning to you all.
09:52:24  14      So, I read the Pretrial Order.  I've read the
09:52:30  15  motions in limine.  I'm prepared to rule on them.  Prepared,
09:52:40  16  I think, to rule on basically the issues that were
09:52:44  17  highlighted in the Pretrial Order.
09:52:48  18      There was one thing that I had a question about
09:52:55  19  which was:  So, there's a motion filed by the Plaintiff for
09:53:00  20  what I would call the 295 presumption.  And even though
09:53:05  21  we're a few weeks away from trial, the parties stipulated to
09:53:15  22  delay that briefing, which I denied because it didn't make
09:53:24  23  much sense to me from what I could see.
09:53:26  24      But does somebody want to explain to me, is this
09:53:29  25  important to you all or why are we talking about delaying
```

```
4
```

```
09:53:32   1  the 295 briefing?
09:53:34   2      MR. DAVIES:  Your Honor, I can address the
09:53:37   3  request for extension.  The request for extension was made
09:53:40   4  because we thought it was untimely.  The parties were trying
09:53:43   5  to complete a Pretrial Order.
09:53:45   6      That being said, Your Honor, our response will
09:53:47   7  be ready on Tuesday, and we'll be prepared to file opposing
09:53:50   8  responses on Tuesday.
09:53:51   9      THE COURT:  Okay.  Thank you.
09:53:59  10      All right.  So, let's go through the Pretrial
09:54:01  11  Order.  And when I say go through, I'm going through the
09:54:05  12  things that I marked as being disputes.  If I miss a
09:54:09  13  dispute, you know, there will be -- let me know.
09:54:16  14      So, one was on Page 12, and it had to do with
09:54:27  15  using deposition designations of the parties' own officers
09:54:32  16  and employees.  And the Plaintiff said, Well, let's go by
09:54:37  17  the rules here.  And the Defendant said, No, let's change
09:54:42  18  the rules.
09:54:43  19      So, my question is:  Why shouldn't I go with
09:54:48  20  Plaintiff since they're saying, Let's follow the rules?
09:54:53  21      MR. SUKDUANG:  Your Honor, this is just simply a
09:54:54  22  matter of trial housekeeping.  We have three days.  I think
09:54:58  23  it pertains to really one witness from Liquidia.
09:55:02  24      THE COURT:  Who is that?
09:55:05  25      MR. SUKDUANG:  Mr. Kindig.  And it really just
```

5

| | |
|---|---|
| 09:55:07 | 1 pertains to what evidence Plaintiff presents at trial with |
| 09:55:13 | 2 respect to infringement. If it's really -- they took his |
| 09:55:18 | 3 deposition. It's probably a few minutes of deposition |
| 09:55:21 | 4 transcripts. If you need him live, then we'll bring him, |
| 09:55:24 | 5 but really it's a matter of trying to be -- |
| 09:55:27 | 6 THE COURT: All right. Well, if you need him |
| 09:55:29 | 7 live, you should bring him. So, I will go with the |
| 09:55:32 | 8 Plaintiff's proposal. |
| 09:55:32 | 9 All right. On Page 15 to 16, there's a dispute, |
| 09:55:49 | 10 which as I could see it, is contingent upon the outcome of |
| 09:55:54 | 11 the 295 briefing. So, what I thought, since I take it |
| 09:55:59 | 12 you're in agreement that if the 295 motion is not granted, I |
| 09:56:05 | 13 think your proposals are the same; right? |
| 09:56:15 | 14 MR. JACKSON: William Jackson on behalf of |
| 09:56:19 | 15 United Therapeutics. Yes, that's my understanding as well. |
| 09:56:21 | 16 THE COURT: Okay. Let's put it in the Pretrial |
| 09:56:27 | 17 Order what you both agree on, and you can put in a footnote |
| 09:56:32 | 18 saying if the 295 motion is granted, then the Order will be |
| 09:56:47 | 19 as Plaintiff proposes it in that alternative. |
| 09:56:53 | 20 Okay? |
| 09:56:54 | 21 MR. SUKDUANG: I have a question on that, if I |
| 09:56:56 | 22 may, Your Honor. In Plaintiff's alternative if the 295 is |
| 09:56:59 | 23 granted, they've requested presenting their case-in-chief on |
| 09:57:04 | 24 infringement on '793. We present our opposition, but then |
| 09:57:09 | 25 they get to rebut infringement on '793 and rebut |

6

| | |
|---|---|
| 09:57:14 | 1 infringement on '066. Our understanding is, and we had |
| 09:57:18 | 2 asked for rebuttal on invalidity and they said, no. So, it |
| 09:57:22 | 3 doesn't seem to be appropriate if they present their |
| 09:57:24 | 4 evidence on '793 that they don't get a rebuttal on '793. |
| 09:57:28 | 5 And if the presumption has shifted, they've already admitted |
| 09:57:32 | 6 that that's the best they can present. Why do they get a |
| 09:57:35 | 7 rebuttal on the '066? |
| 09:57:37 | 8 THE COURT: All right. Well, to the extent that |
| 09:57:41 | 9 what you're saying is -- |
| 09:57:47 | 10 MR. SUKDUANG: It's bullet point four. |
| 09:57:49 | 11 THE COURT: No, no. I'm sorry. I was just |
| 09:57:51 | 12 checking to make sure, because what you have on the thing |
| 09:57:55 | 13 you agree on is basically whoever has the burden of proof |
| 09:57:59 | 14 goes first. The other side goes second and we're done. |
| 09:58:02 | 15 MR. SUKDUANG: Right. First, correct, Your |
| 09:58:04 | 16 Honor, they're changing that in their proposal. |
| 09:58:07 | 17 THE COURT: Right. Well, that's the way it |
| 09:58:09 | 18 should be if the 295 motion is granted. |
| 09:58:14 | 19 MR. JACKSON: Agreed, Your Honor. |
| 09:58:15 | 20 THE COURT: So, you may need to change it |
| 09:58:17 | 21 because it does -- you know, I didn't pay a lot of attention |
| 09:58:19 | 22 to it because it wasn't objected to on the basis that has |
| 09:58:23 | 23 just been raised, but it does look like perhaps there was a |
| 09:58:29 | 24 point there. |
| 09:58:30 | 25 Okay? |

7

| | |
|---|---|
| 09:58:30 | 1 MR. JACKSON: Yes, Your Honor. |
| 09:58:31 | 2 THE COURT: All right. On Page 60 at the bottom |
| 09:58:38 | 3 going over to the next page, there's a dispute about closing |
| 09:58:42 | 4 argument. So, basically closing argument is not going to |
| 09:58:48 | 5 count against the ten-and-a-half hours of trial time. And |
| 09:58:54 | 6 if you want to have closing argument, we can have it on the |
| 09:59:00 | 7 Thursday morning following the three days of trial. And I |
| 09:59:06 | 8 think I had a time, but I lost track of what that is. |
| 09:59:10 | 9 I think I have something else. In any event, if |
| 09:59:16 | 10 I don't come up with it, let me ask: What do I have |
| 09:59:16 | 11 scheduled on that Thursday morning? |
| 09:59:21 | 12 (Discussion held off the record:) |
| 09:59:28 | 13 THE COURT: Okay. Well, we can have closing |
| 09:59:30 | 14 argument at 8:30 a.m. on the Thursday, and that will just |
| 09:59:34 | 15 be -- it will be limited to some amount of time in the |
| 09:59:40 | 16 neighborhood of 30 to 45 minutes per side, but we can |
| 09:59:49 | 17 discuss that more later. |
| 09:59:53 | 18 Oh, yeah. Okay. Right. 8:30 a.m. on Thursday. |
| 09:59:58 | 19 So, then there's somewhere in here. Oh, yeah, |
| 10:00:03 | 20 then we started to have the additional matters. So, as I |
| 10:00:13 | 21 understand it, Liquidia wants to try the invalidity or |
| 10:00:24 | 22 validity of the '901 patent. |
| 10:00:28 | 23 Besides for retrying the case that you did in |
| 10:00:31 | 24 front of the PTAB, do you have other invalidity and '901 |
| 10:00:37 | 25 patent cases that you want to try? |

8

| | |
|---|---|
| 10:00:39 | 1 MR. SUKDUANG: Yes, Your Honor. We actually |
| 10:00:41 | 2 made an offer to Defendant when we had our meet and confer |
| 10:00:44 | 3 for the pretrial submission, and we had offered to |
| 10:00:46 | 4 streamline the case, given that there's three days and |
| 10:00:53 | 5 ten-and-a-half hours that we would forego any invalidity on |
| 10:01:00 | 6 the '901 at trial here. If UTC appeals the Court's claim |
| 10:01:03 | 7 construction that led to non-infringement to the Federal |
| 10:01:06 | 8 Circuit and is remanded, we would bring those issues at that |
| 10:01:06 | 9 time. |
| 10:01:07 | 10 So, we're willing to get rid of the '901 now |
| 10:01:09 | 11 reserving our right to bring our invalidity if there's a |
| 10:01:12 | 12 remand. But to your question -- |
| 10:01:14 | 13 THE COURT: Well, wait. Hold on. Because I |
| 10:01:16 | 14 understood that was not your position when the Pretrial |
| 10:01:21 | 15 Order was written. |
| 10:01:23 | 16 Is that what the Plaintiff wants to do? |
| 10:01:27 | 17 MR SUKDUANG: We're not sure. They haven't |
| 10:01:28 | 18 responded to our offer. |
| 10:01:29 | 19 THE COURT: Yes, now they're about to. |
| 10:01:31 | 20 MR. JACKSON: So, Your Honor, the offer was |
| 10:01:34 | 21 actually conditioned on some other things as well. In our |
| 10:01:37 | 22 view, the '901, considering that, A, there's a stipulation |
| 10:01:42 | 23 of -- |
| 10:01:43 | 24 THE COURT: Well, I understand. |
| 10:01:44 | 25 MR. JACKSON: -- non-infringement, it should all |

9

10:01:46 1  be pushed to --

10:01:47 2        THE COURT:  Well, so let me tell you what I'm

10:01:49 3  going to do, which is this:  You can keep talking about it

10:01:54 4  between yourselves, but as we get to the motions in limine,

10:02:00 5  I'm not going to let the Defendant do anything that they

10:02:10 6  could have done in front of the PTAB.  That's, in my

10:02:16 7  opinion, statutorily estopped because of the final written

10:02:20 8  decision.  My view is, and this actually includes the things

10:02:27 9  that you won on, it certainly includes things that you lost

10:02:30 10  on because or that you -- where you say, well, the claim

10:02:37 11  construction was wrong.

10:02:40 12        So, if they have other '901 defenses that they

10:02:44 13  want to do, I think we ought to get them done.  But if

10:02:50 14  there's a dispute between you, but if -- but I'm also

10:02:55 15  agreeable if you want to stipulate or otherwise agree to

10:03:02 16  the -- that the rest of the '901 defenses are preserved for

10:03:09 17  in the event of a remand on the stipulated non-infringement.

10:03:14 18  I'm good with that, too.  But the default is that we'll try

10:03:19 19  everything that the Defendant wants to try at the trial.

10:03:26 20        MR. SUKDUANG:  Your Honor, and we do have some

10:03:28 21  112 defenses, but we'll speak to counsel and we're willing

10:03:31 22  to push those if there's --

10:03:32 23        THE COURT:  Yeah, so speak -- you don't need

10:03:33 24  to -- you should speak to each other.  Like I said, it's in

10:03:37 25  your ball park now.  Okay?

10

10:03:40 1        MR. JACKSON:  Yeah.

10:03:41 2        THE COURT:  Okay.  All right.

10:03:47 3        So, then there was a question about the

10:03:51 4  statutory estoppel on the '793 patent which is at Pages 19

10:04:00 5  and 20 of the Pretrial Order.  And so, as I understand it,

10:04:05 6  there's no final written description at the PTAB.  So, by

10:04:12 7  law, Defendant can present whatever it wants to in terms of

10:04:17 8  the '793 patent; right?

10:04:21 9        MR. SUKDUANG:  Yes, Your Honor.  If you're

10:04:22 10  following the '901, then the similar applies to '793.

10:04:25 11  There's no statutory estoppel.

10:04:27 12        THE COURT:  Well, there's no final written

10:04:30 13  decision, so it's the same thing; right?

10:04:32 14        MR. SUKDUANG:  Right.  The estoppel is based on

10:04:33 15  the final decision.  There's none in the '793, so we agree

10:04:36 16  with you.  That's our position.

10:04:37 17        THE COURT:  Sorry.  I didn't get what you --

10:04:39 18  what about you?

10:04:39 19        MR. JACKSON:  So, Your Honor, Axinn agreed

10:04:41 20  there's no final written decision, so estoppel would not

10:04:45 21  apply.  To the degree if this would extend beyond August

10:04:49 22  11th, I believe the date is, I recall the Court in another

10:04:53 23  case had the circumstance where the PTAB issued a final

10:04:55 24  written decision after trial, but before the decision.  And

10:04:58 25  we just wanted to identify that there's the possibility that

11

10:05:01 1  that might happen here, too.

10:05:02 2        THE COURT:  No, I appreciate that and, you know,

10:05:08 3  I'm certainly not -- I have zero interest in racing the PTAB

10:05:13 4  to a decision here.  And I don't -- you said the PTAB's

10:05:26 5  decision, that's due in mid-August?

10:05:29 6        MR. JACKSON:  I believe it's August 11th, if I'm

10:05:31 7  not mistaken.

10:05:33 8        MR. SUKDUANG:  That could get first pushed, Your

10:05:35 9  Honor, because Plaintiffs have continued to ask for

10:05:37 10  extensions in that even as of yesterday.  So, it's still up

10:05:40 11  in the air, but yes, it should be some time in August some

10:05:43 12  time.

10:05:43 13        THE COURT:  Well, put it like this, so you can

10:05:45 14  put the case on or, I mean, you can put your case on.

10:05:53 15  There's no guarantee that I will actually decide it.  But,

10:05:59 16  and to the extent you have, of course, non, you know, 112 or

10:06:05 17  defenses or something else, you can obviously put them on

10:06:08 18  because the PTAB won't decide because they're not barred and

10:06:12 19  PTAB won't rule on those.  So, okay.  So, in any event, the

10:06:24 20  Defendant can put that on.

10:06:27 21        All right.  So, the 295 presumption, I will

10:06:32 22  decide that after we finish the briefing.

10:06:37 23        There is an argument in here about the plain and

10:06:43 24  ordinary meaning of pulmonary hypertension.  And I read what

10:06:46 25  the parties submitted because it's in the Pretrial Order.

12

10:06:50 1  Other than reading it, I didn't do anything else.  It

10:06:54 2  certainly struck me, just based on reading it, that the

10:07:00 3  opinion of the Plaintiff's expert, pulmonary hypertension is

10:07:06 4  pulmonary arterial hypertension struck me as a losing

10:07:12 5  position.  But, you know, I don't usually decide these

10:07:18 6  things just based on, I don't know, kind of offhand remarks

10:07:23 7  in a Pretrial Order.

10:07:24 8        So, the question is:  What do you want to do

10:07:29 9  about this?  You know, we can do some expedited claim

10:07:35 10  construction before trial.  We can have people testify at

10:07:39 11  trial.  There's probably other things that creative lawyers

10:07:44 12  can think of that we can do.

10:07:45 13        And have you all talked to each other about

10:07:48 14  this?

10:07:50 15        MR. SUKDUANG:  No, but we've thought about it,

10:07:50 16  Your Honor.

10:07:50 17        THE COURT:  Okay.  Well, that's a start.

10:07:53 18        MR. SUKDUANG:  Yeah.  Well, again, we're trying

10:07:54 19  to expedite.  We're trying to not put additional papers

10:07:57 20  because you've got the 295 now.  If the testimony wants to

10:08:00 21  go in at trial, we're fine with that, but the witness,

10:08:06 22  Dr. Waxman, should not now submit a new report on his

10:08:11 23  intrinsic evidence or extrinsic evidence relying --

10:08:14 24  supporting his construction because his report simply says

10:08:17 25  in one paragraph, the '793 patent, which is the question

# EXHIBIT 27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED THERAPEUTICS
CORPORATION,

           Plaintiff,

      v.

LIQUIDIA TECHNOLOGIES, INC.,

         Defendant.

Civil Action No. 20-755-RGA

## ORDER ON MOTIONS IN LIMINE

Plaintiff's MIL #1 (D.I. 323).  The parties agree that the '393 patent is not prior art.

Thus, for purposes of deciding obviousness, it is irrelevant.  Whether the same product—

trepostinol—is the product of the claims of the '393, '901, and '066 patents is also irrelevant to

obviousness.  Thus, any obviousness arguments directed to the '901 and '066 patents based the

two patents "claiming the same product" as the '393 patent are not probative.  Plaintiff's motion

is **GRANTED** to the extent it seeks to exclude that argument.  Based on what counsel said at the

pretrial conference, it appears that the only theory Defendant wanted to offer this evidence for

was disputed factual issues relating to collateral estoppel.  I ruled that factual issues relating to

collateral estoppel would not be tried at the March 28th trial.

As to the '901 patent, non-infringement is stipulated.  Defendant, I believe, has a

counterclaim for invalidity.  Defendant can pursue its counterclaim.  What it cannot do, however,

is to pursue that counterclaim based on "any ground that [it] raised or reasonably could have

raised during [its instituted IPR that has resulted in a final written decision]."  There is no

exception for "successful" grounds.  Perhaps if there were a jury and if there were infringement

claims, I would have to consider any claimed issues of unfairness to Defendant in excluding its

"successful" grounds. But those issues are not present in the posture of this case. Statutory estoppel applies, and Plaintiff's motion is **GRANTED** on this issue too.

Plaintiff's MIL #2 (D.I. 325). Plaintiff's motion is **DENIED.** Ghofrani and Voswinckel on their face each have a different inventive entity than the '793 patent. In the absence of any other evidence, that is enough to make them art "by others." But it seems like there will be other evidence. Thus, whether Ghofrani and Voswinckel are in fact prior art is therefore an issue for trial to be decided after consideration of the relevant admissible evidence.

Defendant's MIL (D.I. 320). Dr. Fawzi may not opine that the PTAB got the invalidity decision as to the '393 patent wrong or that there are "clear errors in" "the '393 IPR panel's conclusions." It is not clear from the briefing how much more Defendant is trying to limit Dr. Fawzi. There was further elucidation during the pretrial conference, and the issues overlap with the issues in the pending motion for summary judgment (D.I. 281), which is referred to a magistrate judge. I may need to consider that motion's resolution before reaching any further conclusions.

The balance of the dispute, including whether Dr. Fawzi's opinions involving column chromatography are "non-sensical," appear to relate to invalidity challenges to the '066 and '901 patents and are best handled by cross-examination and/or opposing testimony from Defendant's experts.

Thus, Defendant's motion is **GRANTED** in part, **DENIED** in part, and **LEFT OPEN** in part.

IT IS SO ORDERED this 4th day of March 2022.

United States District Judge

# EXHIBIT 28

No. 2022-2217
_____

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————

**UNITED THERAPEUTICS CORPORATION,**

*Plaintiff-Appellee,*

**v.**

**LIQUIDIA TECHNOLOGIES INC.,**

*Defendant-Appellant,*

———————

On Appeal from a Judgment of the United States District Court
for the District of Delaware, No. 20-cv-755 (Andrews, J.)

———————

## UNITED THERAPEUTICS' OPPOSITION TO LIQUIDIA'S
## MOTION TO EXPEDITE BRIEFING AND ORAL ARGUMENT

———————

The Court should deny Liquidia's request to drastically shorten
United Therapeutics' (UT's) briefing deadlines and to expedite the oral
argument in this appeal (and two other appeals that have been
designated as companion cases). Liquidia has failed to establish any
reason—let alone good cause—for that extraordinary relief. The harm it
asserts is one that all losing Hatch-Waxman defendants face: an order
under 35 U.S.C. §271(e)(4)(A) setting the earliest date on which the FDA
may approve Liquidia's proposed product. This routine scenario does not

justify relief that is "not routinely granted."  Fed. Cir. R. 27, Practice Note.

Liquidia asserts that this case nevertheless warrants expedited consideration, but the central premises of its argument are flawed—if not misleading.  On Liquidia's telling, the PTAB has finally invalidated UT's '793 Patent, and the district court's decision finding that patent valid and infringed conflicts with both precedent and the PTAB's decision.  None of that is correct.

First, the PTAB's final written decision will not take effect—and the Patent Office will not cancel any claims of the '793 Patent—unless and until (1) the PTAB denies UT's pending request for rehearing and (2) any future appeal from that IPR decision "has terminated" in Liquidia's favor.  35 U.S.C. §318(b).  Second, the one decision that Liquidia cites for the proposition that a not-yet-final invalidity ruling in the PTAB compels a finding of noninfringement in district court says no such thing.  On the contrary, that case makes clear that validity and infringement are two entirely separate inquiries.  Third, there is no "conflict" between the district court and PTAB decisions because each considered entirely different invalidity arguments—a consequence of Liquidia's decision to

abandon its obviousness arguments midway through the district-court trial and pursue only enablement and written-description challenges there. In other words, the issue that Liquidia's motion focuses on, the obviousness of the '793 Patent, will not arise in the three appeals that are currently pending in this Court. Obviousness will come up, if at all, only in a potential future appeal from the PTAB's final written decision on the '793 Patent—which no party can even bring until the PTAB acts on UT's rehearing request.

Moreover, the prejudicial impact of Liquidia's requested schedule on UT is particularly inappropriate because Liquidia's request flows from its own strategic decision to pursue an IPR on the '793 Patent and abandon those arguments in the district-court litigation. Liquidia knew when it made that choice, well after the '793 Patent was asserted, that the IPR could not result in cancellation of the '793 Patent until after any appeals from the PTAB's decision. *See, e.g.*, D. Del. Dkt. No. 428, at 1-2; Liquidia Mot. Ex. 3 (Trial Op.) at 36. Liquidia also knew that, if the district court found the '793 Patent valid and infringed, it would have no choice but to order the effective date of final FDA approval of Liquidia's product to be a date "which is not earlier than the date of the expiration"

of that patent.  35 U.S.C. §271(e)(4)(A).  UT should not have to prepare its briefs in half-time simply because Liquidia made a strategic choice to pursue an IPR instead of presenting its anticipation and obviousness defenses in district court.

Liquidia is free to self-expedite its own briefs, and UT takes no position on when the Court should schedule oral argument—UT will appear at the Court's convenience.  But Liquidia has not come close to justifying the compression of UT's briefing schedule.

## BACKGROUND AND PROCEDURAL HISTORY

UT brought this patent-infringement suit because Liquidia plans to market an inhalation powder that will infringe three of UT's patents: the '066, '901, and '793 Patents.  Liquidia Mot. at 1; Trial Op. at 1.  When seeking FDA approval to market that product, Liquidia certified that UT's patents were invalid and not infringed, triggering this litigation in accordance with the Hatch-Waxman framework.  Liquidia Mot. at 1-2; Trial Op. at 2.  Liquidia advanced its invalidity and noninfringement arguments in the district court, *see, e.g.*, D. Del. Dkt. No. 365, Ex. 3, and also brought parallel IPRs challenging all three patents, *see* Nos. IPR2020-00769, IPR2020-00770, IPR2021-00406.  The PTAB instituted

reviews on the '901 and '793 Patents but declined to institute review of the '066 Patent.

The PTAB concluded that claims 1-5, 8, and 9 of the '901 Patent were obvious, while claims 6-7 were not. Liquidia Mot. Ex. 5 ('901 FWD) at 2. Both parties have appealed the PTAB's final written decision. In district court, following claim construction, UT stipulated to noninfringement of the asserted '901 Patent claims. Liquidia Mot. Ex. 6 (Stipulation). Thus, the '901 Patent does not currently have any effect on Liquidia's ability to market its product.

With respect to the '793 Patent, Liquidia's invalidity defenses in the district court originally included obviousness and anticipation arguments. *See* D. Del. Dkt. No. 365, Ex. 3, at 150-185 (advancing these arguments in final pretrial submissions). But then, on the second day of trial, Liquidia made a strategic choice: it dropped these arguments, leaving them to be litigated *solely* in the parallel IPR proceeding, and limited its district-court invalidity defenses on the '793 Patent to written-description and enablement issues only. *See* Trial Op. at 39-53.

Thereafter, in the '793 Patent IPR, the PTAB concluded that the claims of the '793 Patent are obvious. Liquidia Mot. Ex. 7 ('793 FWD) at

2, 46-47.  UT filed requests for rehearing and for review of that decision by the PTAB's Precedential Opinion Panel.  *See* No. IPR2021-00406, Papers 79-80.  Both requests are still pending.  If they are denied, UT intends to appeal the PTAB's decision to this Court.

Meanwhile, in district court, Judge Andrews found after a four-day bench trial that Liquidia will infringe claims 1, 4, 6, 7, and 8 of the '793 Patent, and that Liquidia had not shown that the patent was invalid for lack of enablement or adequate written description.  Trial Op. at 53. Because Liquidia had abandoned its obviousness challenges in the district-court litigation, the district court made no findings regarding obviousness.  The district court also found that Liquidia had proven that claims 1, 2, 3, 6, and 9 of the '066 patent are invalid; had not proven the invalidity of claim 8; and will not infringe claim 8.  *Id.*

The district court subsequently entered final judgment.  Consistent with 35 U.S.C. §271(e)(4)(A), the court "ordered that the effective date of any final approval by the FDA of Liquidia's [application for its inhaled powder product] shall be a date which is not earlier than the expiration date of the '793 patent."  Liquidia Mot. Ex. 4 (Final Judgment) ¶4. Liquidia appealed the district court's judgment as to the '793 Patent, and

6

UT cross-appealed the district court's judgment as to the '066 Patent.

## ARGUMENT

"[M]otions to expedite proceedings are not routinely granted," Fed. Cir. R. 27, Practice Note. Liquidia asserts that it will be harmed without expedited briefing.[1] But Liquidia has been harmed no more than any other Hatch-Waxman defendant that loses at trial. Liquidia took advantage of the Hatch-Waxman statutory framework to rely on UT's data and thereby secure abbreviated FDA review of its application and pre-approval district court litigation. It cannot turn around and argue that a routine element of that same framework—the §271(e)(4)(A) remedy—justifies extraordinary relief.

Nothing about this case justifies departing from the Court's standard practice or imposing shortened deadlines on UT. Liquidia suggests that, unless the Court indulges Liquidia's request for an expedited schedule, it will be wrongly foreclosed from marketing its

---

[1] Liquidia also suggests that patients will be harmed without expedited briefing, Liquidia Mot. at 3, but that conclusory assertion ignores the fact that patients already have access to treprostinil drugs, including UT's own dry powder inhalation formulation (Tyvaso DPI). Other drugs include injection products (Remodulin and Liquidia's own generic copy), a liquid formulation for inhalation (Tyvaso), and a tablet formulation (Orenitram).

product. But there is nothing wrong with following the statute that Congress enacted, and Liquidia misrepresents both the effect of the PTAB's '793 Patent final written decision and the differences between that pending case and the ones currently on appeal before the Court. Moreover, Liquidia's manufactured sense of urgency arises from its own actions and strategic choices. Liquidia remains free to self-expedite its own briefs, but the Court should deny Liquidia's motion.

## I.   The PTAB's final written decision regarding the '793 Patent is irrelevant to this appeal and its briefing schedule.

Liquidia's motion rests on three premises: that the PTAB has *already* invalidated the '793 Patent; that the Supreme Court's decision in *Commil USA, LLC v. Cisco Systems, Inc.*, 575 U.S. 632 (2015), somehow compels the district court to find noninfringement; and that the district court's decision in this case "conflict[s]" with the PTAB's final written decision on the '793 Patent. Liquidia Mot. at 4. Liquidia is wrong on all counts. There is no urgency on these facts.

First, it is false to suggest that the PTAB has *already* invalidated the '793 Patent. *See, e.g.*, Liquidia Mot. at 3 (suggesting that the patent "has been rendered unpatentable"); *id.* at 5 (suggesting that this Court should expedite the appeal "given the PTAB's decision rendering

unpatentable all asserted claims of the '793 patent"). Rehearing is still pending in the PTAB, and even if it were not, the PTAB's final written decision on the '793 Patent is not self-executing. Instead, 35 U.S.C. §318(b) provides that such a decision takes effect only if affirmed on appeal:

> If the Patent Trial and Appeal Board issues a final written decision under subsection (a) *and the time for appeal has expired or any appeal has terminated*, the Director shall issue and publish a certificate canceling any claim of the patent finally determined to be unpatentable, confirming any claim of the patent determined to be patentable, and incorporating in the patent by operation of the certificate any new or amended claim determined to be patentable.

(emphasis added). This plain language makes clear that the claims of the '793 Patent can be cancelled only if and when the Director issues the required certificate—which can happen only after any appeals are over and only if those appeals are resolved in Liquidia's favor. *Cf. Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 645 (Fed. Cir. 2011) (explaining, in applying §318's predecessor, that "a determination of patentability [can] occur only after all appeals have terminated"). Until then, the '793 Patent remains valid.

Second, Liquidia incorrectly argues (Mot. at 5) that the district court's "fail[ure] to properly take into account the PTAB's decision"

conflicts with the Supreme Court's decision in *Commil USA, LLC v. Cisco Systems, Inc.*, 575 U.S. 632 (2015). The very language that Liquidia quotes makes clear why that is wrong. The Supreme Court explained that "if [a] patent is indeed invalid, and shown to be so *under the proper procedures*, there is no liability." 575 U.S. at 644 (emphasis added). As discussed above, the "proper procedures" here include the issuance of an appropriate certificate by the PTO. Liquidia agreed that the PTAB's decision "does not compel [the district court] to enter a decision finding the '793 patent invalid," arguing instead that it makes it impossible to find infringement. D. Del. Dkt. No. 427, at 1. *Commil* itself contradicts Liquidia's argument: "infringement and invalidity are separate matters under patent law." 575 U.S. at 643 ("When infringement is the issue, the validity of the patent is not the question to be confronted."). In other words, as Judge Andrews correctly explained, "[t]he Supreme Court never stated . . . that a PTAB decision invalidating patent claims in an IPR will preclude liability before it becomes final and nonappealable." D. Del. Dkt. No. 433, at 36. Unless and until the PTO Director issues a certificate after all appeals have been exhausted, the patent is valid and remains in force—and an infringer is subject to liability.

10

Third, it is false to suggest that the district court's decision and the PTAB's decision are "conflicting decision[s] on [the] validity" of the '793 Patent. Liquidia Mot. at 4. The two decisions considered entirely different invalidity challenges. In the IPR proceedings, Liquidia argued that the '793 Patent was invalid as obvious or anticipated over several references. *See supra*, p. 5. In the district-court proceedings, Liquidia abandoned those arguments at trial for its own strategic reasons and ultimately pressed *only* written-description and enablement challenges at trial. *See id.* Thus, those written-description and enablement challenges are the *only* invalidity arguments it can make in this appeal.[2] There is simply no "conflict." Liquidia chose to pursue its anticipation and obviousness arguments in a separate forum on a separate timeline.

For all those reasons, the grounds that Liquidia has offered for expediting these appeals do not withstand scrutiny. In the end, Liquidia

---

[2] Even when Liquidia sought a partial stay of judgment in the district court permitting it to launch its infringing product immediately, it never argued that it is likely to prevail in appealing the district court's written-description, enablement, or infringement findings. Instead, it has always hinged its argument on the outcome of the PTAB proceedings, which, as noted above, are still pending. Thus, Liquidia has never even attempted to make a showing that the outcome of *this* appeal is likely to permit Liquidia to launch its infringing product.

simply seeks to expedite for the sake of expediting.

## II. Liquidia's self-inflicted sense of urgency does not justify expediting UT's briefing schedule.

Even if Liquidia could persuade the Court that there is some need for expedited briefing, the Court should not entertain Liquidia's request because the claimed need resulted from Liquidia's own conduct. As discussed, Liquidia chose to pursue an IPR knowing full well that the PTAB's final written decision would not bind the district court unless and until affirmed on appeal. *See supra*, p. 3. Liquidia chose not to move to stay the district court proceedings when IPR was instituted on the '793 Patent. And it chose to abandon its obviousness arguments as to the '793 Patent in the district court, even though it knew that if the court found the '793 Patent infringed and not invalid, UT would be entitled to an order barring final FDA approval of Liquidia's product under 35 U.S.C. §271(e)(4)(A). *See supra*, pp. 3-5.

This Court should not order expedited proceedings—a form of relief that is "not routinely granted," Fed. Cir. R. 27, Practice Note—solely to save Liquidia from the statutory consequences of its own strategic decisions to secure a more favorable burden of persuasion on its obviousness challenges to the '793 Patent. Liquidia is free to file its own

briefs early. But the fact that Liquidia is now unhappy with the consequences of its litigation strategy is no reason to burden UT by artificially compressing UT's briefing deadlines for three (soon-to-be-four) appeals,[3] two of which address a completely different patent.

## III. Liquidia's proposed schedule is prejudicial to UT.

At the very least, the Court certainly should not adopt the lopsided briefing deadlines that Liquidia has proposed. Liquidia has had the district court's decision in hand since August 31. Yet it proposes to have its own opening brief due 45 days later, on October 14, while giving UT only 20 days for its principal and response brief. And it would give UT only 12 days for its cross-appeal reply, of which the first four are Thanksgiving and the holiday weekend.

Liquidia also insists that this appeal must remain on the same schedule as the '901 IPR appeals—seeking to obscure the fact that it has absolutely no basis for expediting the '901 IPR appeals, which concern a patent that is not currently affecting Liquidia's ability to market its product. Even if the Court were to deem expedition appropriate in this

---

[3] UT noticed its cross-appeal from the district court's judgment after Liquidia filed its motion; that cross-appeal will presumably be consolidated with this appeal.

appeal, it certainly should not expedite the '901 IPR appeals just because the Court linked them as companion cases. The Court could simply decouple the appeals and keep the '901 IPR appeals on a normal schedule. It certainly should not force UT to file its opening brief in those appeals barely two weeks from now, and only about three weeks after Liquidia broached the subject of expedition.

## CONCLUSION

The Court should deny Liquidia's motion.

October 4, 2022

Respectfully submitted.

_/s/ Jaime A. Santos_

Shaun R. Snader
UNITED THERAPEUTICS
  CORPORATION
1735 Connecticut Ave., N.W.
Washington, DC 20009
(202) 304-1701

William Jackson
William M. Jay
Jaime A. Santos
GOODWIN PROCTER LLP
1900 N St., N.W.
Washington, D.C. 20036
(202) 346-4000

Douglas H. Carsten
Arthur P. Dkyhuis
MCDERMOTT WILL & EMERY LLP
18565 Jamboree Rd., Suite 250
Irvine, CA 92612
(949) 851-0633

Gerard J. Cedrone
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02128
(617) 570-1000

Adam Burrowbridge
MCDERMOTT WILL & EMERY LLP
500 N. Capitol St., N.W.
Washington, DC 20001
(202) 756-8000

_Counsel for Appellee_

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 22-2217 |
| **Short Case Caption** | United Therapeutics Corporation v. Liquidia Technologies, Inc. |
| **Filing Party/Entity** | United Therapeutics Corporation |

---

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/04/2022

Signature: /s/ Jaime A. Santos

Name: Jaime A. Santos

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| United Therapeutics Corp. | | BlackRock Inc. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

17

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| JACK B. BLUMENFELD<br>Morris, Nichols, Arsht & Tunnell LLP | JIAXIAO ZHANG<br>McDermott, Will & Emery LLP | SARAH ELIZABETH SIMONETTI<br>Morris, Nichols, Arsht & Tunnell LLP |
| TIMOTHY M. DUNKER<br>McDermott, Will & Emery LLP | JOSHUA MACK<br>Wilson, Sonsini, Goodrich & Rosati | |
| KATHERINE PAPPAS<br>McDermott, Will & Emery LLP | MICHAEL J. FLYNN<br>Morris, Nichols, Arsht & Tunnell LLP | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| CAFC Nos. 22-2133, -2174, United Therapeutics Corporation v. Liquidia Technologies, Inc. | PTAB No. IPR2021-00406, Liquidia Technologies, Inc. v. United Therapeutics Corporation | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## CERTIFICATE OF COMPLIANCE

This response complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 27(d), it contains 2,710 words.

This response complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word for Office 365 in 14-point Century Schoolbook, a proportionally spaced typeface.

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the Court's CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jaime A. Santos*
Jaime A. Santos

# EXHIBIT 29



Deposition of:
# Transcription 03/14/2019

*October 26, 2021*

In the Matter of:

# BTG International Limited Vs. Amneal Pharmaceuticals LLC

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

```
 1    1            IN THE UNITED STATES COURT OF APPEALS
                         FOR THE FEDERAL CIRCUIT
 2    2
          BTG INTERNATIONAL LIMITED,     )
 3    3    JANSSEN BIOTECH, INC.,         )
           JANSSEN ONCOLOGY, INC.,        )
 4    4    JANSSEN RESEARCH &             )
           DEVELOPMENT, LLC,              )
 5    5                                   )
                    Plaintiffs-Appellants, )
 6    6                                   )
          v.                              )
 7    7                                   )
          AMNEAL PHARMACEUTICALS LLC, ) March 14, 2019
 8    8    AMNEAL PHARMACEUTICALS OF  )
           NEW YORK, LLC, DR. REDDY'S )
 9    9    LABORATORIES, INC., DR.    )
           REDDY'S LABORATORIES, LTD.,
10   10                                   )
          WOCKHARDT BIO AG, WOCKHARDT
11   11                                   )
           USA LLC, WOCKHARDT LTD.,   )
12   12
                 MYLAN PHARMACEUTICALS INC.,
13   13                                   )
           MYLAN INC., WEST-WARD      )
14   14
           PHARMACEUTICALS CORP., NKA )
15   15    HIKMA PHARMACEUTICALS USA  )
16   13
           INC., HIKMA PHARMACEUTICALS
17   14                                   )
          LLC, TEVA PHARMACEUTICALS  )
           USA, INC,                      )
18   15                                   )
                    Defendants-Appellees,  )
19   16                                   )
          PAR PHARMACEUTICAL, INC., PAR )
20   17    PHARMACEUTICAL COMPANIES,    )
           INC., RISING PHARMACEUTICALS, )
21   18    INC.,                      )
                                           )
22   19          Defendants.         )
                          NO. 2019-1147
23   20
                    ON APPEAL FROM THE ORDER OF THE
24   21         UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW JERSEY
25   22    CASE NOS.:  2:15-cv-05909-KM-JBC; 2:17-cv-06435-KM-JBC
     23
26   24
     25
```

Page 2

```
 1   BTG INTERNATIONAL LIMITED,      )
      JANSSEN BIOTECH, INC.,          )
 2    JANSSEN ONCOLOGY, INC., AND     )
      JANSSEN RESEARCH &              )
 3    DEVELOPMENT, LLC,               )
                                      )
 4          Plaintiffs-Appellants,    )
                                      )
 5   v.                               )
                                      )
 6   AMERIGEN PHARMACEUTICALS,        )
      INC., AMERIGEN                  )
 7    PHARMACEUTICALS LIMITED,        )
                                      )
 8          Defendants-Appellees.    )
                        NO. 2019-1148
 9
10              ON APPEAL FROM THE ORDER OF THE
             UNITED STATES DISTRICT COURT FOR THE
11                   DISTRICT OF NEW JERSEY
               CASE NO. 2:16-CV-02449-KM-JBC
12
     JANSSEN ONCOLOGY, INC.,          )
13                                    )
             Appellant,               )
14                                    )
     v.                               )
15                                    )
     AMERIGEN PHARMACEUTICALS         )
16    LIMITED, ARGENTUM               )
      PHARMACEUTICALS LLC,            )
17                                    )
             Appellees.               )
18                        NO. 2019-1323
19
                ON APPEAL FROM THE ORDER OF THE
20           UNITED STATES PATENT AND TRADEMARK OFFICE
                 PATENT TRIAL AND APPEAL BOARD
21           NOS. IPR2016-00286 AND IPR2016-01317
22
23
24
25
```

```
 1   JANSSEN ONCOLOGY, INC.,          )
                                      )
 2          Appellant,                )
                                      )
 3   v.                               )
                                      )
 4   MYLAN PHARMACEUTICALS INC.,      )
      AMNEAL PHARMACEUTICALS LLC,     )
 5    AMNEAL PHARMACEUTICALS OF       )
      NEW YORK, LLC, DR. REDDY'S      )
 6    LABORATORIES, INC., DR.         )
      REDDY'S LABORATORIES, LTD.,     )
 7    TEVA PHARMACEUTICALS USA,       )
      INC., WEST-WARD                 )
 8    PHARMACEUTICAL CORPORATION,     )
      HIKMA PHARMACEUTICALS LLC,      )
 9                                    )
            Appellees.                )
10                         NO. 2019-1324
11
                  ON APPEAL FROM THE ORDER OF THE
12          UNITED STATES PATENT AND TRADEMARK OFFICE
                 PATENT TRIAL AND APPEAL BOARD
13          NOS. IPR2016-01332 AND IPR2017-00853
     JANSSEN ONCOLOGY, INC.,          )
14                                    )
            Appellant,                )
15                                    )
     v.                               )
16                                    )
     WOCKHARDT BIO AG,                )
17                                    )
            Appellee.                 )
18                         NO. 2019-1325
19                ON APPEAL FROM THE ORDER OF THE
            UNITED STATES PATENT AND TRADEMARK OFFICE
20               PATENT TRIAL AND APPEAL BOARD
                     NO. IPR2016-01582
21
22
23
24
25
```

Page 4

1

2

3

4                    BEFORE APPELLATE PANEL:
5            HON. KIMBERLY A. MOORE, Circuit Judge
                HON. EVAN J. WALLACH, Circuit Judge
6               HON. RAYMOND T. CHEN, Circuit Judge
7

8

9

10   APPEARANCES
     (see next page)
11

12

13

14

15

16

17

18

19

20

21

22

23          Veritext National Court Reporting Company
                        1801 Market Street
24                        Suite 1800
                      Philadelphia PA 19103
25                       (888)777-6690

1    I'd suggest.  But, Judge Chen, to your question -- and

2    I will say that I don't think that there's expert

3    testimony in the record on this.  But I will tell you

4    what I think "directly" and "indirectly" mean here.

5    "Directly", I think, means what's called a cytotoxic

6    effect.  It actually -- it's a poison for those cells

7    which is much like chemotherapy.  That's the way

8    chemotherapy works.

9              "Indirect", I think means in this

10   invention cutting off the supply of hormones that

11   those cells need to survive.  I think that would be an

12   indirect effect on the cancer cells or tissue.  The

13   direct effect would be you directly poison them with a

14   -- for example, a chemo type agent.  I think that's

15   the -- that's what that means in that context.

16             HON. MOORE:  Okay.  Thank you, Mr.

17   Trela.  Let's hear from the collection of people on

18   the other side.

19             Mr. Krause, are you going first?

20             MR. KRAUSE:  May it please the Court.

21   The USPTO is here at the Court's invitation to address

22   the questions related to the --

23             HON. CHEN:  I have a logistical

24   question first.  The Board issued all three IPRs in

25   the final written decision in January of 2018.  The

Page 33

1  patent (indiscernible) file (indiscernible) hearing

2  requests in February of 2018.  For some strange reason

3  that I don't understand, and there's no earthly

4  justification I can think of of good reason the Board

5  lollygagged and took 10 full months before it issued

6  its -- the hearing decisions in December of 2018.  Why

7  in the world did it take so long for the Board to

8  issue its re-hearing decision?

9            HON. MOORE:  In fact, it only seemed to

10  happen after our order which they have, my guess,

11  prompted those decisions.

12            MR. KRAUSE:  I honestly don't know the

13  answer to either of those questions.  The Board

14  aspires to answer re-hearing requests --

15            HON. CHEN:  I mean, don't you think

16  it's a little embarrassing?  I mean, the Board

17  certainly was well aware that there was a concurrent

18  litigation going on.  You know, it understands it

19  needs to be working with special dispatch.  I mean, it

20  took about as long as it takes for a regular

21  (indiscernible) review itself to be completed for it

22  to handle a re-hearing request.  It doesn't make any

23  sense.

24            MR. KRAUSE:  Well, I haven't looked at

25  the underlying merits of this case.  I understand it

1   is a complicated case.  There might have been

2   different views within the Board panel itself.  There

3   is no absolute deadline.  I'm sure the Board did its

4   best to get the decision issued in a timely manner.  I

5   can convey your concerns to Board management but I

6   don't have much standing here to say -- standing here

7   before you today to say to explain what happened.

8                   HON. MOORE:  So unlike IPRs where there

9   are certain timelines that the PTO is required to

10  comply with for completion, are you telling me there

11  is absolutely no timeline placed on the hearing

12  decisions?

13                  MR. KRAUSE:  There's no statutory

14  timeline.  There's an aspiration --

15                  HON. MOORE:  Or regulatory?

16                  MR. KRAUSE:  I believe the trial

17  practice --

18                  HON. MOORE:  No.  Is there a regulatory

19  timeline placement?

20                  MR. KRAUSE:  I don't believe there's a

21  regulatory timeline.  There's a --

22                  HON. MOORE:  Wouldn't that seem to

23  significantly undermine Congress' goal to have an

24  expeditious and fully resolved IPR proceeding within

25  the PTO to avoid unnecessary duplicative district

Page 35

1  court litigation?

2           MR. KRAUSE:  I think it potentially

3  can.

4           HON. MOORE:  And like in this case.

5           MR. KRAUSE:  In --

6           HON. MOORE:  Don't you think it did in

7  this case?

8           MR. KRAUSE:  This case is extremely

9  unusual for --

10           HON. MOORE:  No.  Do you think it did

11  in this case?

12           MR. KRAUSE:  In this case, it would

13  have been better if they had issued it sooner and we

14  could have gotten the invalidity arguments before this

15  Court --

16           HON. MOORE:  And it would have

17  avoided --

18           MR. KRAUSE:  -- sooner.

19           HON. MOORE:  -- a lot of unnecessary

20  litigation and briefing, right?

21           MR. KRAUSE:  I believe that's correct.

22           HON. MOORE:  And how long did it take

23  for the Board to resolve the entire underlying IPR in

24  this case?

25           MR. KRAUSE:  There were issues in this

1   case involving joinder of multiple parties as the

2   right complex case arising out of a Hatch-Waxman

3   dispute.  In the joinder situation, the deadlines also

4   are off.  So again, it took longer than usual.  That's

5   why this is a very unusual case for resolving or even

6   for evaluating the estoppel issue.

7                    HON. CHEN:  What made the re-hearing

8   request so unusual?

9                    MR. KRAUSE:  I --

10                   HON. MOORE:  The opinion certainly

11  doesn't give any indication that anybody was

12  struggling with anything.

13                   MR. KRAUSE:  I only know from the fact

14  that it took a long time that something must have been

15  going on.

16                   HON. MOORE:  Do you know how long it

17  normally takes for panels?  Are you aware within the

18  Agency how long it normally takes for panels to deal

19  with re-hearing requests?

20                   MR. KRAUSE:  I believe normally it

21  takes in the time frame of the aspirational two

22  months.  Re-hearing requests often are just a check on

23  the Board to make sure that they didn't overlook

24  something or misapprehend the law.  And they can

25  normally get them done in a timely manner.  I don't

1    know what happened in this case.

2                    HON. CHEN:  Is it your sense that 10

3    months is an outlier for the Board?

4                    MR. KRAUSE:  That would be my --

5                    HON. CHEN:  Or -- I'm trying to

6    understand how meaningful is this so-called

7    aspirational goal of yours to respond to a re-hearing

8    request in one month or two months.

9                    MR. KRAUSE:  I'm not aware of

10   statistics on the time to re-hearing so I'd rather not

11   speculate on that.  But my basic belief from seeing

12   re-hearing requests is that they're done reasonably

13   promptly.

14                   HON. MOORE:  I mean, I just -- I don't

15   -- I share Judge Chen's concern which when a panel is

16   aware of a concurrent district court ongoing

17   litigation, why they wouldn't promptly turn to that

18   particular re-hearing request.  Not all IPRs and

19   re-hearings have concurrent district court

20   litigations.  But here there was one that the panel

21   board were clearly aware of.  I'm baffled.

22                   MR. KRAUSE:  Your Honor, it seems like

23   a fair point and I will take it back to Board

24   management.

25                   HON. CHEN:  Board management, yes.