No. 2023-1805

United States Court of Appeals
for the Federal Circuit

UNITED THERAPEUTICS CORPORATION,

*Appellant*,

v.

LIQUIDIA TECHNOLOGIES, INC.,

*Appellee*,

*Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2021-00406*

## APPELLEE LIQUIDIA TECHNOLOGIES, INC.'S RESPONSE BRIEF

SANYA SUKDUANG
JONATHAN R. DAVIES
BRITTANY CAZAKOFF
COOLEY LLP
1299 Pennsylvania Ave NW
Washington, DC 20004
Telephone: (202) 842-7800

*Counsel for Appellee Liquidia
Technologies, Inc.*

## CLAIMS AT ISSUE

| U.S. Patent No. 10,716,793 | |
|---|---|
| 1 | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths. |
| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
| 6 | The method of claim 4, wherein the formulation is a powder. |
| 7 | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 | The method of claim 1, wherein the formulation contains no metacresol. |

# CERTIFICATE OF INTEREST

Counsel for Appellee certifies the following:

**1. The full name of every party represented by me is:**

Liquidia Technologies, Inc.

**2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

None.

**3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:**

Liquidia Corporation

**4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:**

Cooley LLP: Sanya Sukduang, Erik B. Milch, Ivor R. Elrifi, Jonathan Davies, Deepa Kannappan, Brittany Cazakoff

**5. The title and number of any case known to me to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal are:**

*United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Nos. 2022-2217, 2023-1021 (Fed. Cir.); originating from *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, 1-20-cv-755 (D. Del.)

**6. Any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):**

None.

Dated: September 6, 2023         /s/ *Sanya Sukduang*
                                      Sanya Sukduang

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................1

II.   STATEMENT OF ISSUES PRESENTED ...................................3

III.  STATEMENT OF THE CASE ...............................................5

    A.   The Relevant Prior Art ............................................5

    B.   The Board Found that JAHA and JESC Are §102(b) Prior Art. ..........8

    C.   The Board Found Claim 1 Unpatentable. ..........................16

    D.   The Board Found the Dry Powder Claims Obvious. ..................19

IV.   SUMMARY OF ARGUMENT ...............................................22

V.    ARGUMENT ..................................................................25

    A.   Standard of Review ................................................25

    B.   The Board Correctly Determined that JAHA and JESC Were
       Publicly Accessible Prior Art. .....................................25

       1.   Substantial evidence supports the Board's public
          accessibility findings. ......................................25

       2.   The Board did not legally or factually err in finding public
          accessibility. ..............................................29

          a.   The Board did not legally err in considering
             Liquidia's Petition arguments and Reply evidence
             submitted in response to UTC's briefing. .................. 29

          b.   The Board's finding that the references were made
             publicly accessible at conferences is supported by
             substantial evidence. ..................................... 37

    C.   The Board's Claim 1 Unpatentability Conclusion Is Supported
       by Substantial Evidence. ..........................................42

       1.   Substantial evidence, including unanimous physician
          testimony, supports the Board's dosage analysis. ............44

       2.   The Board considered and rejected UTC's unexpected
          results. ...................................................48

    D.   The Board Correctly Addressed the Dry Powder Arguments
       Properly Raised by UTC and Its Findings Should Be Affirmed. .......50

ii

## TABLE OF CONTENTS

**Page**

1.    UTC waived its appealed dry powder arguments....................50

2.    The    Board    considered    and    rejected    UTC's "inconsistency/credibility" arguments.....................................52

3.    The Board did not legally err in its dry powder analysis..........54

    a.    The Board addressed disclosure of full dry powder claims and UTC's properly briefed arguments................ 54

    b.    The '212 patent enables both solution and powder formulations, and the Board did not legally err in requiring nothing further................................................... 56

    c.    The Board did not legally err in relying on the '212 patent to convert liquid dosages to dry powder claims............................................................................. 58

4.    The Board's conclusion that the dry powder claims are obvious is supported by substantial evidence. ..........................60

VI.    CONCLUSION..............................................................................62

iii

# TABLE OF AUTHORITIES
## continued

**Page(s)**

**Cases**

*ABT Sys., LLC v. Emerson Elec. Co.*,
  797 F.3d 1350 (Fed. Cir. 2015) .........................................................60

*Arendi S.A.R.L. v. Apple Inc.*,
  832 F.3d 1355 (Fed. Cir. 2016) ....................................................59, 60

*Belden Inc. v. Berk-Tek LLC*,
  805 F.3d 1064 (Fed. Cir. 2015) .........................................................34

*Bristol-Myers Squibb v. Teva Pharms. USA, Inc.*,
  752 F.3d 967 (Fed. Cir. 2014) ...........................................................48

*Bruckelmyer v. Ground Heaters, Inc.*,
  445 F.3d 1374 (Fed. Cir. 2006) .........................................................32

*BTG Int'l Ltd. v. Amneal Pharms. LLC*,
  923 F.3d 1063 (Fed. Cir. 2019) .........................................................46

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)...........................................................................25

*Constant v. Advanced Micro-Devices, Inc.*,
  848 F.2d 1560 (Fed. Cir. 1988) ....................................................27, 38

*Dell Inc. v. Acceleron, LLC*,
  884 F.3d 1364 (Fed. Cir. 2018) .........................................................54

*Driessen v. Best Buy Co., Inc.*,
  No. 2022-1907, 2023 WL 2422441 (Fed. Cir. Mar. 9, 2023) ...........54

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
  227 F.3d 1361 (Fed. Cir. 2000) .........................................................31

*Elbit Sys. of Am. LLC v. Thales Visionix, Inc.*,
  881 F.3d 1354 (Fed. Cir. 2018) ...........................................25, 41, 54

*Enova Tech. Corp. v. Seagate Tech. (US) Holdings Inc.*,
  706 F. App'x 987 (Fed. Cir. 2017) .....................................................25

iv

**TABLE OF AUTHORITIES**
continued

Page(s)

*Ethicon Endo-Surgery, Inc. v. Covidien LP*,
812 F.3d 1023 (Fed. Cir. 2016) ........................................................47

*Fresenius USA, Inc. v. Baxter Int'l, Inc.*,
582 F.3d 1288 (Fed. Cir. 2009) ........................................................51

*Geo M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*,
618 F.3d 1294 (Fed. Cir. 2010) ........................................................61

*Henny Penny Corp. v. Frymaster LLC*,
938 F.3d 1324 (Fed. Cir. 2019) ..................................................25, 35

*Hulu LLC v. Sound View Innovations, LLC*,
No. IPR2018-01039, 2019 WL 7000067 (P.T.A.B. Dec. 20, 2019) .................34

*I/P Engine, Inc. v. AOL Inc.*,
576 F. App'x 982 (Fed. Cir. 2014) ....................................................61

*Incept LLC v. Palette Life Scis., Inc.*,
Nos. 2021-2063, -2065, 2023 WL 5248043 (Fed. Cir. Aug. 16,
2023) ........................................................................................42

*Infineum USA L.P. v. Chevron Oronite Co.*,
No. 2020-1333, 2022 WL 3147683 (Fed. Cir. Aug. 8, 2022) ............25, 47, 60

*Jazz Pharms., Inc. v. Amneal Pharms., LLC*,
895 F.3d 1347 (Fed. Cir. 2018) ......................................25, 26, 38, 44

*In re Klopfenstein*,
380 F.3d 1345 (Fed. Cir. 2004) .................................................*passim*

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
545 F.3d 1340 (Fed. Cir. 2008) ........................................................26

*In re Lister*,
583 F.3d 1307 (Fed. Cir. 2009) ..............................................27, 33, 38

*In re Magnum Oil Tools Int'l Ltd.*,
829 F.3d (Fed. Cir. 2016) ..............................................................59

## TABLE OF AUTHORITIES
### continued

Page(s)

*Mass. Inst. of Tech. v. AB Fortia*,
  774 F.2d 1104 (Fed. Cir. 1985) ................................................................32, 36

*MCM Portfolio LLC v. Hewlett-Packard Co.*,
  812 F.3d 1284 (Fed. Cir. 2015) ........................................................51

*Medtronic, Inc. v. Barry*,
  891 F.3d 1368 (Fed. Cir. 2018) ................................................25, 40

*Nobel Biocare Servs. AG v. Instradent USA, Inc.*,
  903 F.3d 1365 (Fed. Cir. 2018) ...............................................*passim*

*Norian Corp. v. Stryker Corp.*,
  363 F.3d 1321 (Fed. Cir. 2004) ........................................................41

*Novartis AG v. Torrent Pharm. Ltd.*,
  853 F.3d 1316 (Fed. Cir. 2017) ........................................................51

*Novosteel SA v. U.S.*,
  284 F.3d 1261 (Fed. Cir. 2002) ........................................................38

*In re NTP, Inc.*,
  654 F.3d 1279 (Fed. Cir. 2011) ........................................................26

*In re Nuvasive*,
  842 F.3d 1376 (Fed. Cir. 2016) ................................................52, 58

*Promos Techs., Inc. v. Samsung Elecs. Co.*,
  809 F. App'x 825 (Fed. Cir. 2020) ...................................................48

*Raytheon Tech. Corp. v. General Elec. Co.*,
  993 F.3d 1374 (Fed. Cir. 2021) ........................................................59

*Samsung Elecs. Co. v. Infobridge Pte. Ltd.*,
  929 F.3d 1363 (Fed. Cir. 2019) ................................26, 36, 38, 51

*Sirona Dental Sys. GmbH v. Institut Straumann AG*,
  892 F.3d 1349 (Fed. Cir .2018) ........................................................35

# TABLE OF AUTHORITIES
## continued

**Page(s)**

*Suffolk Techs., LLC v. AOL Inc.*,
   752 F.3d 1358 (Fed. Cir. 2014) ..................................................26

*Telefonaktiebolaget LM Ericsson v. TCL Corp.*,
   941 F.3d 1341 (Fed. Cir. 2019) ..................................................34

*UCB, Inc. v. Accord Healthcare, Inc.*,
   890 F.3d 1313 (Fed. Cir. 2018)) ...........................................20, 60

*Vanderlande Indus. Nederland BV v. I.T.C.*,
   366 F.3d 1311 (Fed. Cir. 2004) ..................................................47

*VidStream LLC v. Twitter, Inc.*,
   981 F.3d 1060 (Fed. Cir. 2020) .............................................10, 32

**Statutes**

35 U.S.C.
   § 102(b) ...................................................................................*passim*
   § 312(a)(3) ...................................................................................35

**Other Authorities**

37 C.F.R.
   § 42 ...............................................................................................54
   § 42.2 ............................................................................................34
   § 42.23 ..........................................................................................34

MPEP § 2128.01(IV) .......................................................................32

Office Patent Trial Practice Guide, 77 Fed. Reg. 48756, 48768
   (Aug. 14, 2012) ............................................................................54

## TABLE OF ABBREVIATIONS

| Abbreviation | Term |
|---|---|
| '793 patent | U.S. Patent No. 10,716,793 |
| '212 patent | U.S. Patent No. 6,521,212 |
| AHA | American Heart Association |
| BB | UTC's Opening Blue Brief |
| Board | Patent Trial and Appeal Board |
| Director | Director of the Patent and Trademark Office |
| EHJ | European Heart Journal |
| ESC | European Society of Cardiology |
| FWD | Final Written Decision |
| IPR | *Inter partes* review |
| JAHA | Robert Voswinckel, et al., *Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension*, in Abstracts from the 2004 Scientific Sessions of the American Heart Association, 110 CIRCULATION III-295 (Oct. 26, 2004), published by the "**J**ournal of the **A**merican **H**eart **A**ssociation" |
| JESC | Voswinckel, R., et al., *Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension*, 25 EUROPEAN HEART J. 22 (2004), published in the "**J**ournal of the **E**uropean **S**ociety of **C**ardiology" |
| Liquidia | Liquidia Technologies, Inc. |
| PAH | Pulmonary arterial hypertension |
| PH | Pulmonary hypertension |
| POR | Patent Owner Response |
| POP | Precedential Opinion Panel |
| POPR | Patent Owner Preliminary Response |
| POSA | Person of ordinary skill in the art |
| PTO | Patent and Trademark Office |
| UTC | United Therapeutics Corporation |

## STATEMENT OF RELATED CASES

The patent at issue in the IPR that is the subject of this appeal, U.S. Patent No. 10,716,793, was the subject of a related district court proceeding between the parties in the U.S. District Court for the District of Delaware, *United Therapeutics Corp. v. Liquidia Technologies, Inc.*, C.A. No. 1:20-cv-00755-RGA.  Liquidia appealed the district court decision in this Court (No. 22-2217), UTC filed a cross-appeal (No. 23-1021), and the two were consolidated.  In July 2023, this Court affirmed the district court's decision.  Liquidia filed a petition for panel rehearing and rehearing en banc, which remains pending as of the filing date of this Brief.

## I.    INTRODUCTION

This Court should affirm the Board's FWD finding claims 1-8 of UTC's '793 patent obvious over the combination of the '212 patent, JAHA and JESC. UTC only contests three issues: (1) whether the Board erred in finding that JAHA and JESC were publicly available prior art; (2) whether the Board erred in its dosing findings; and (3) whether the Board erred in finding claims 4, 6, and 7 unpatentable.

First, the Board's express findings contradict UTC's assertion that the public accessibility determination for JESC and JAHA is based on a "dissemination-by-abstract-book theory" not presented in Liquidia's Petition. *See, e.g.*, BB1-2. The Board's findings began with analysis of Liquidia's Petition and its arguments that both JESC and JAHA were included in journals corresponding to two conferences where those abstracts were presented. The Board correctly determined that Liquidia could provide additional evidence on public accessibility in response to UTC's arguments and that such evidence was not a change in theory from the Petition. Upon UTC's request for rehearing, the Board further found, based both on the journals and corroborating evidence from both parties' experts, that the abstracts were included in journals disseminated by 2004, more than a year before the '793 patent's priority date. Thus, substantial evidence supports the Board's findings on JESC and JAHA's public accessibility.

1

Second, UTC's dosing arguments rehash facts rejected by the Board. The Board's finding that a POSA would have expected *delivery* of at least 1mL of solution to the patients in JESC is supported by substantial evidence, including testimony from both parties' experts. Moreover, this finding is specific to *delivered* volume, not fill volume as UTC argues. The Board also correctly rejected UTC's "unexpected results," comparing a different drug (iloprost) to the '793 patent rather than the closest inhaled treprostinil prior art. The Board's claim 1 obviousness determination, supported by substantial evidence, should be affirmed.

Third, UTC's dry powder arguments on appeal were never presented to the Board and are thus waived. The Board did address UTC's "inconsistency/reliability" arguments, finding that Dr. Gonda's district court enablement opinion was not inconsistent with, and did not affect the credibility of, his unrebutted obviousness testimony before the Board. Relying on '212 patent's teachings regarding liquid and powder formulations of inhaled treprostinil, with the combination of JESC and JAHA, the Board's obviousness finding on claims 4, 6, and 7 is supported by substantial evidence. Further, this Court already affirmed the district court's rejection of Dr. Gonda's enablement opinion. The Board did not err, legally or factually, in rejecting UTC's arguments on the '793 dry powder claims, and its decision should be affirmed.

## II.    STATEMENT OF ISSUES PRESENTED

1) Whether the Board's determination that JESC and JAHA qualify as 35 U.S.C. §102(b) publicly accessible prior art is supported by substantial evidence and not erroneous where the Board:

- determined that Liquidia's Petition properly raised the public accessibility of JESC and JAHA as a basis for prior art under §102(b);

- determined that Liquidia's evidence supporting public accessibility, presented in Reply, was proper because it directly responded to arguments raised by UTC;

- found that JESC and JAHA were presented at large conferences attended by POSAs; and

- found, based on testimony from both parties' experts, that JESC and JAHA would have been disseminated to conference attendees before or at the conferences.

2) Whether the Board's determination that the '793 patent claims, including claim 1's 15 to 90 micrograms dosing limitation, are obvious over the combination of the '212 patent, JESC and JAHA is supported by substantial evidence where the Board:

- found JESC teaches inhalation of treprostinil concentrations of 16, 32, 48, and 64 µg/mL;

3

- found that "in May 2006 . . . nebulizers conventionally deliver[ed] between 1 and 5 mL" of solution;

- found that a POSA would have understood that "nebulizers . . . nebulize (i.e., aerosolize liquid) at least" 1 mL of solution;

- determined, based on consistent testimony from Liquidia's and UTC's experts that the *delivered* volume of JESC was at least 1mL;

- concluded that, at 1-5mL of JESC's 16, 32, 48, or 64 μg/mL of treprostinil, JESC teaches "the delivery of 16–80, 32–160, 48–240, or 64–320 micrograms of treprostinil"; and

- considered and rejected UTC's unexpected results because UTC did not compare the '793 patent claims with the closest prior art.

3) Whether the Board's determination that claims 4, 6 and 7, directed to dry powder formulations, are obvious over the combination of the '212 patent, JESC and JAHA is supported by substantial evidence and not erroneous when the Board:

- considered the entirety of the claims and found, based on the unrebutted testimony of Liquidia's expert, that the combination of the '212 patent, JESC, and JAHA render these claims obvious;

- rejected UTC's argument that the testimony of Liquidia's expert was inconsistent and not reliable; and

4

- found the '212 patent's teachings apply to solution and dry powder claims.

## III.    STATEMENT OF THE CASE

The '793 patent describes "Treprostinil Administration by Inhalation," with a priority date of May 15, 2006.  Appx1001.  Before 2006, intravenous, subcutaneous, and inhaled treprostinil were used to treat PH.  Appx1019, 5:42-58; Appx0004.  The '793 patent purportedly "improved" on the prior art by administering treprostinil in high concentrations over a short time.   Appx0004; Appx1024-1025, 16:61-63, 17:44-46.  Claim 1 recites administering a "therapeutically effective single event dose . . . compris[ing] from 15 micrograms to 90 micrograms of treprostinil . . . delivered in 1 to 3 breaths."  Appx1025, 18:23-31 (cl. 1).  Seven claims depend from claim 1.  *Id.*, 18:32-45 (cls. 2-8).  Relevant to this appeal, claims 4, 6, and 7 require claim 1's inhalation device to be a "dry powder inhaler" where the "formulation is a powder" that "comprises particles less than 5 micrometers in diameter."  *Id.*, 18:36-37 (cl. 4), 18:40-43 (cls. 6-7).  The Board found all eight claims unpatentable.  Appx0047; Appx0063-0065; Appx0114-0115.

### A.    The Relevant Prior Art

The Board found the claims unpatentable over the '212 patent, JESC, and JAHA.  Appx0006-0035.

The '212 patent is a ***UTC*** patent, published in 2003, teaching "[a] method of delivering [treprostinil] to a patient by inhalation[.]" Appx1207. As the Board found (Appx0006-0007), the '212 patent discloses that treprostinil (also known as UT-15) has "unexpectedly superior results when administered by inhalation compared to parenterally administered UT-15 in sheep with induced pulmonary hypertension." *Id.* The '212 patent discloses and claims that inhaled treprostinil may be delivered either as droplets formed "from a solution or liquid containing the active ingredient(s)" or as a solid-phase "powder" via an inhaler, to "treat[] pulmonary hypertension in a mammal[,]" including "medical use" in a "human." Appx1228-1229, 5:30-41, 7:4-5; Appx1232, 14:7-12 (cls. 5-6). The '212 patent states that "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention[;]" that treprostinil "is inhaled in powder form;" that dry powder "particles are preferably . . . less than 5 micrometers in diameter[;]" and it claims an inhaled powder formulation of treprostinil. Appx1228, 5:30-32, 5:37-41; Appx1232, 14:19-21 (cl. 9). The '212 patent teaches that "aerosolized UT-15 has a greater potency as compared to intravascularly administered UT-15," and, for inhalation, delivering "only a fraction (10–50%) of the dosage delivered intravascularly." Appx1229, 8:8-12. Even at "high doses[,]" the '212 patent teaches a lack of "significant non-lung effects, i.e., heart rate, cardiac output." Appx1230, 10:51-54.

JESC is an abstract published in the *European Heart Journal* ("EHJ") and disseminated at an international conference describing a UTC study of inhaled treprostinil in 29 patients. Appx1234-1240, Appx1240. As the Board noted (Appx0007-0008), eight patients received a placebo, groups of six patients each were administered 16, 32, and 48 µg/mL solutions of treprostinil, and three patients were administered 64 µg/mL solutions of treprostinil. *Id.* Each administration lasted six minutes using an "OptiNeb ultrasound nebulizer[.]" *Id.* For each patient, various measurements were taken before administration of treprostinil and at 0, 15, 30, 60, 90, 120, 150, and 180 minutes. *Id.* The abstract concluded that "[t]reprostinil inhalation results in a significant long-lasting pulmonary vasodilatation," and, "at a concentration of 16 µg/mL, near maximal pulmonary vasodilatation is achieved without adverse effects." *Id.* (quoting Appx1240, Conclusion). As detailed below, JESC was presented at a European conference with thousands of attendees and published in EHJ in 2004. That journal issue was date-stamped and indexed in libraries around the world in 2004 and cited by another publication in the field in 2005. Appx1250-1265, Appx1260; Appx2681-2692; Appx7559-7580; Appx0133-0134; Appx0473-0474; Appx1855-2048, Appx1892-1893, ¶68; Appx7702-7759, ¶65.

JAHA is an abstract from 2004, published in the Journal of the American Heart Association and presented at a U.S. conference. It describes a UTC study of

17 patients with "severe" PH who received inhaled treprostinil.  Appx1241-1243, Appx1243.  As the Board found (Appx0008), these inhalations each involved "3 single breaths" of a "600 µg/mL" treprostinil solution using a "pulsed OptiNeb® ultrasound nebulizer[,]" and "[t]wo patients with idiopathic PAH received compassionate treatment with 4 inhalations of TRE per day after the acute test" and were "treated for more than 3 months."  *Id.* (quoting Appx1243).  According to JAHA, such "inhalation resulted in a sustained, highly pulmonary selective vasodilatation over 120 minutes," showing "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing" with "[t]olerability [being] excellent even at high drug concentrations and short inhalation times (3 breaths)."  *Id.*  As detailed below, JAHA was presented at a 2004 U.S. conference with thousands of attendees and published in *Circulation* in 2004.  That journal issue was date-stamped and indexed in libraries around the world in 2004 and cited by another publication in the field in 2005.  Appx2877-2890, Appx2889 (ref. 51); Appx0135; Appx0474-0477; Appx1886-1887, ¶59; Appx7581-7620; Appx7715-7759, Appx7716, ¶33.

## B.    The Board Found that JAHA and JESC Are §102(b) Prior Art.

In its Petition, Liquidia asserted that JESC was "an abstract presented at the European Society of Cardiology . . . Congress from August 28 to September 1, 2004 in Munich, Germany[.]"  Appx0133.  Providing a copy, Liquidia also asserted that

the abstract was published in EHJ on October 15, 2004. Appx0133; Appx1234-1240. Because the dates were "more than a year before May 15, 2006[,]" Liquidia asserted that JESC was "prior art to the '793 [p]atent under at least 35 U.S.C § 102(b)." *Id.* For JAHA, Liquidia provided a copy and stated it was "an abstract published in the Journal of the American Heart Association on October 26, 2004[.]" Appx0135; Appx1241-1243. JAHA discloses it was presented on November 10, 2004. Appx1243; *see also* Appx1131-1196, Appx0135 (citing Appx1886-1892, ¶¶59-67 and Appx1166-1167, ¶58); Appx1166-1167, ¶58 (Dr. Gonda explaining that JAHA "was presented at the 'Scientific Sessions 2004' conference").) Because this publication and presentation date were more than one year before May 2006, Liquidia asserted that JAHA was §102(b) prior art. Appx0135.

UTC did not contest JESC and JAHA's prior art status in its POPR, despite contesting other Petition-cited art. Appx0237-0251. The Board instituted the '793 IPR, finding the Petition established "reasonable likelihood of prevailing on its assertion that claims 1–8 are unpatentable as obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA." Appx0321.

In its POR, UTC argued that JESC and JAHA were not publicly accessible, based on the declaration of Pilar Wyman, an unqualified expert whose opinion the Board did not rely on. Appx0372-0379; Appx0469-0477. UTC argued there was no evidence that either journal was "stamped" as received or indexed by libraries, or

9

that they could have been located with reasonable diligence. Appx0373-0378. UTC characterized JESC and JAHA as appearing in journal "supplements compiling conference abstracts[,]" arguing that such conference abstracts are often published years after the conference. Appx0374.

In Reply, Liquidia responded to UTC's POR public accessibility arguments. Liquidia submitted multiple library-stamped copies of both references and evidence regarding indexing, directly countering UTC's argument that these journals were published so long after the conference that libraries would not have timely received them. Appx0472-0477. Liquidia explained that the versions of JESC and JAHA filed with the Petition indicate on their face that both were published by established publishers, entitling them under this Court's precedent to a "presumption of public accessibility as of the publication date." Appx0470, Appx0474 (quoting *VidStream LLC v. Twitter, Inc.*, 981 F.3d 1060, 1065 (Fed. Cir. 2020)). Liquidia further explained that, again from the references submitted with its Petition, both were presented at conferences, and also submitted evidence of the thousands of conference attendees, including POSAs. *Id.* Liquidia also submitted deposition testimony of both parties' experts agreeing that a POSA would have received the abstract books prior to or at the conferences, and, contrary to UTC's POR argument (Appx0376-0377), a POSA would have been able to easily locate JESC and JAHA within those books. Appx0470-0471, Appx0475. Liquidia also argued that POSAs

10

clearly could find JAHA and JESC because two had cited them in 2005 articles (Ghofrani (Appx1250-1265) and Sulica (Appx2877-2890)), and those articles were research aids for other POSAs to locate the abstracts.  Appx0471-0472, Appx0475-0476.

In its Sur-Reply, UTC conceded that Liquidia's "***Petition***, citing the Gonda and Hall-Ellis declarations, asserted that [JAHA and JESC] are prior art because they were 'presented' at conferences in 2004," indicating this is not a "new" argument.  Appx0561 (emphasis added); Appx0133, Appx0135; Appx1164-1169, ¶¶55, 58); Appx1886-1897, ¶¶59-75.  UTC argued that only certain of Liquidia's Reply "*evidence*" was "new," and spent eight pages of its Sur-Reply arguing that the additional evidence "fail[ed] to establish the Abstracts are prior art."  Appx0562-0570.  UTC argued that the information regarding the journal copies and both parties' expert testimony was insufficient to establish public accessibility because an actual abstract book or testimony from a physical conference attendee was not in the record.  Appx0563-0564.  For Liquidia's library-stamped copies and established publisher arguments, UTC only asserted that a POSA still would not have been able to find the journals.  Appx0565-0568.  Finally, UTC addressed Liquidia's arguments regarding the 2005 Ghofrani and Sulica articles as research aids.  Appx0568-0570.  UTC did not argue that evidence establishing dissemination of the abstract books at the conferences was a "new" theory.  *Id.*

11

In its FWD, the Board found JESC is §102(b) prior art because it is an abstract presented at the ESC Congress, as Liquidia argued in its Petition. Appx0001-0049; Appx0009-0010; Appx0133. The Board also found that JESC was cited in documents dating from before the priority date of the '793 patent, whose public accessibility is not at issue, evidence the Board found Liquidia properly raised in its Reply in response to UTC's arguments. Appx0009-0010; Appx0471-0472.

In its FWD, the Board found JAHA is §102(b) prior art because it "was publicly presented at the 2004 Scientific Sessions of the American Heart Association." Appx0009 (citing Appx0133; Appx0471-0472, Appx0474-0476); Appx0135; *see also* Appx0135 (citing Appx1166-1167, ¶58; Appx1886-1892, ¶¶59-67); Appx0474-0476. The Board also found that JAHA was cited in documents dating from before the '793 patent priority date, whose public accessibility is not at issue. Appx0009. The Board found Liquidia was "not untimely" in identifying the evidence submitted in Reply. Appx0010. Therefore, in its FWD, for both JESC and JAHA, the Board found public accessibility based on arguments made in the Petition and the evidence in the record that the abstracts were presented publicly and referenced in publicly accessible research aids. Appx0009-0012.

UTC filed a request for rehearing by the PTO's POP. The POP denied UTC's request but directed the FWD panel, "in its consideration on rehearing, to clearly identify whether the Voswinckel JESC and Voswinckel JAHA references qualify as

prior art[,]" and specified that "[s]uch analysis shall clarify whether the relied upon research aids were available prior to the critical date and whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library." Appx0886.

The FWD panel denied UTC's request for rehearing and clarified the prior art status of JESC and JAHA, as the POP directed. In its decision, the panel concluded that there was insufficient evidence that Ghofrani and Sulica were published before May 15, 2005. Appx0055-0056. But the Board acted upon the POP instructions to consider whether the references "were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library[,]" and answered "in the affirmative" that Liquidia argued, in its Petition, that JESC and JAHA were §102(b) prior art. Appx0055-0057 (citing Appx0133, Appx0135).

The Board found "the evidence of record shows that Voswinckel JESC was distributed to more than twenty thousand people before or at the time of the ESC Congress 2004 in late August and early September of 2004." Appx0058-0059. The Board cited substantial supporting evidence:

(1) JESC was published in "Volume 25 Abstract Supplement August/September 2004" of EHJ with a subtitle indicating that the journal is the "Journal of the European Society of Cardiology" and that the supplement relates to "ESC

13

Congress 2004," held "28 August–1 September" in "Munich, Germany" (citing Appx1234; Appx2681);

(2) the Table of Contents organized the abstracts into categories with corresponding days of the conference, with JESC listed as presented on "Day 2—Sunday 29 August 2004" (citing Appx1235);

(3) the categories consistently identified specific pages corresponding to abstracts presented on those days;

(4) the conference where JESC was presented "is the largest medical congress in Europe and among the top three cardiology meetings in the world," is "an established forum for the exchange of science as much as education" with attendees including "basic scientists, nurses and allied professionals working in field of cardiovascular care of patients[,]" and that the 2004 conference in particular had "24,527 attendees," including "18,413 professionals, 4,715 exhibitors, 636 journalists and 763 accompanying persons" (citing Appx7665-7701); and

(5) both parties' experts testified that anyone who paid to attend the ESC Congress 2004 would have received a copy of the abstract book from which JESC is excerpted, either at or before the meeting (citing Appx2913-2914, ¶28; Appx3137-3140, 105:16–108:1).

Appx0058-0059. The Board found this evidence demonstrated that JESC was distributed to more than twenty thousand recipients at the ESC Congress 2004, including highly skilled professionals (e.g., scientists, nurses, and other clinicians), journalists, and those who accompanied the professionals and the journalists, suggesting "very strongly" that there was no expectation that JESC would be kept confidential. Appx0059-0060.

The Board found the same for JAHA, relying on substantial evidence:

(1) JAHA was published in a "Supplement to Circulation," subtitled "Journal of the American Heart Association" and "Abstracts from Scientific Sessions

2004," indicating that those sessions occurred "November 7–10" (citing Appx1241);

(2) the abstract appeared in a section titled "Pulmonary Arterial Hypertension: New Therapies," indicating that the session in which JAHA was presented occurred on "Wednesday" in "Hall I2" of the "Ernest N Morial Convention Center," with November 10, 2004 corresponding to a Wednesday amidst the published conference dates (citing Appx1243);

(3) Liquidia's expert, Dr. Hill's testimony that attendance at AHA's Scientific Sessions 2004 conference was large (citing Appx2907-2908, ¶22 ("a [POSA] would have attended the Scientific Sessions 2004 Conference, as it is one of the principal conferences on the circulatory system and diseases and conditions affecting circulation"));

(4) UTC's expert, Dr. Waxman's testimony that attendance at AHA's Scientific Sessions 2004 conference was large (citing Appx3148, 116:4–21 (testifying that attendance at Scientific Sessions 2004 was likely larger than the 18,000 professionals who attended ESC Congress 2004));

(5) Dr. Hill's testimony that the AHA's Scientific Sessions 2004 conference was "attended by physicians and researchers working on and studying the cardiovascular system, including pulmonary circulation." (citing Appx2907); and

(6) testimony from Drs. Hill and Waxman that a copy of the abstract book containing JAHA would have been provided to all attendees at the Scientific Sessions 2004 conference (citing Appx2908, ¶23; Appx3140, 108:3–20).

Appx0060-0061. The Board noted that UTC had not directed it to "any evidence of record indicating there was any expectation of confidentiality" for the abstract at the conference. Appx0061. Accordingly, the Board concluded that "[t]he distribution of thousands of copies of Voswinckel JAHA at the conference is strong evidence that Voswinckel JAHA was a printed publication as of the date of the conference. Because that conference occurred in November 2004, more than one year before the

May 15, 2006 application date of the '793 patent," the Board found that "JAHA was a printed publication" as of the conference date at which that distribution occurred and prior art under 35 U.S.C. §102(b). Appx0061.

Accordingly, the Board found JAHA and JESC were "distributed sufficiently at professional conferences to be publicly accessible at the time of those conferences" and therefore qualified as §102(b) prior art. *Id.*

### C.    The Board Found Claim 1 Unpatentable.

After finding public accessibility of JAHA and JESC, the Board found claim 1 unpatentable over the combination of the '212 patent, JESC, and JAHA. Appx0012-0030. On appeal, UTC contests only the Board's finding that the combination rendered obvious inhaled delivery of 15 to 90 micrograms of treprostinil in 1 to 3 breaths. JESC teaches inhalation of treprostinil concentrations of 16, 32, 48, and 64 μg/mL for 6 minutes via an inhalation device called a nebulizer. Appx0015 (citing Appx1240). While JESC does not expressly state "the amount of solution administered," i.e., delivered to the patient, the Board relied on expert testimony regarding what a POSA would have understood JESC's delivered amount to be, based on expert experience and well-known volume ranges for nebulizers at the time. *Id.* The Board's evidence included:

- Liquidia formulation expert Dr. Gonda's sworn declaration that "in May 2006 . . . nebulizers conventionally deliver[ed] between 1 and 5 mL" of solution. (Appx1166, ¶56 (citing Appx2403-2404, Appx2404 (Dosage

and Administration (3mL dose)); Appx1784-1798, Appx1792 (Dosage and Administration (2.5-5mL dose)); Appx2231-2232, Appx2231 (Dosage and Administration, How Supplied (2.5mL dose)));

- Liquidia physician expert Dr. Hill's sworn declaration that a POSA in 2006 would have understood that "nebulizers . . . nebulize (i.e. aerosolize liquid) at least" 1 mL of solution.  (Appx1054-1055, ¶65 (citing Dr. Gonda and his own 40+ years of experience)).

Appx0015.  Crediting this testimony, the Board found that, at 1-5mL, a POSA "would have interpreted Voswinckel JESC as teaching the delivery of 16–80, 32–160, 48–240, or 64–320 micrograms of treprostinil[,]" with each dosage range having "at least one endpoint that falls within the 15–90 microgram claimed range." Appx0016.

The Board also addressed UTC's arguments to the contrary.  UTC argued that the "fill volume," i.e., the amount of solution loaded into a nebulizer, varied such that "there is no guarantee that the entire fill volume would be completely nebulized in" the 6-minute time period of JESC.  Appx0016 (citing Appx0391-0392).  UTC also argued other factors might have caused less than all the solution to be delivered. *Id.* (citing Appx0392-0393).

The Board rejected both arguments, finding that "[t]o the extent that something less than the entire fill volume was delivered to the patient, either because it was not nebulized or because other factors resulted in the nebulized solution not reaching the mouthpiece," testimony from both parties' experts explained that the

17

*delivered* volume was at least 1mL. Appx0016-0017. The Board relied on Liquidia's expert Dr. Hill's declaration that nebulizers at the time were known to "*nebulize*" (i.e., deliver) "at least 1mL" of solution (not simply have that amount loaded as a fill volume). Appx0016-0017 (citing Appx1054, ¶65). The Board also relied on UTC's expert Dr. Waxman's admission that standard nebulizers had fill volumes of "3 to 5 [milliliters]" and that he had ***never administered a dose as low as one milliliter*** to a patient. *Id.* (citing Appx3185, 153:1–22; Appx3188, 156:12–16).

The Board, based on its factual findings, concluded that a POSA would have expected at least 1mL delivered to the patients in JESC and thus have understood 16, 32, 48, or 64 micrograms were delivered to the patients in JESC—all within the 15–90 microgram claimed range of '793 patent claim 1. *Id.*

The Board also addressed UTC's secondary considerations arguments. Appx0022-0030. Of that analysis, UTC only challenges the Board's findings on unexpected results. BB51-52. For unexpected results, UTC erroneously compared the '793 patent to other drugs, like iloprost and epoprostenol, or to intravenous (rather than inhaled) treprostinil. The Board correctly found none of those were the closest prior art. Appx0022-0023. As the Board found, the '212 patent, JESC, and JAHA each teach inhaled treprostinil and are the relevant closest prior art for an unexpected results analysis. Appx0023. Accordingly, the Board correctly found

18

"that the evidence of record does not establish that the challenged claims produced a result that was unexpected over the closest prior art." Appx0023; *see also* Appx0372-0379, Appx0416-0417; Appx0584-0585.

### D.    The Board Found the Dry Powder Claims Obvious.

After finding sole independent claim 1 unpatentable, the Board moved to the dependent claims. Of those, UTC only appeals the Board's findings on claims 4, 6, and 7. BB52-71. These claims require claim 1's inhalation device to be a "dry powder inhaler," where the "formulation is a powder" that "comprises particles less than 5 micrometers in diameter." Appx1025, 18:36-37, 18:40-43 (cls. 4, 6-7). The Board credited that the '212 patent discloses "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention," that treprostinil "is inhaled in powder form," that dry powder "particles are preferably . . . less than 5 micrometers in diameter[,]" and that it claims an inhaled powder formulation of treprostinil. Appx0034-0035; Appx1228, 5:30-32, 5:37-41; Appx1232, 14:9-21 (cls. 6, 9); Appx0154-0156. The Board also credited Drs. Hill's and Gonda's testimony that a POSA would have known that the "inhaler" used to deliver the "powder" of the '212 patent was a dry powder inhaler because such inhalers were well-known in the art by 2006. Appx0033, Appx0034 (citing Appx1073, ¶116).

19

UTC never disputed these facts. Appx0034 ("Petitioner argues that the '212 patent teaches or suggests each of these limitations, and Patent Owner does not dispute that argument."). Instead, UTC argued that it "primarily contends [claims 4, 6, and 7] are nonobvious because the prior art lacks disclosure of a single event dose of 15-90 μg delivered in 1-3 breaths, *regardless of the form of administration (liquid or powder)*[,]" thus specifically tying the fate of claims 4, 6, and 7 to its arguments for claim 1. Appx0401 (emphasis added).

UTC's *only* independent argument to the Board for these claims was based on supposedly "inconsistent" statements made by Liquidia's expert Dr. Gonda in his obviousness analysis before the Board and his enablement analysis in a parallel district court proceeding. Appx0399-0401. But as the Board found, the reasonable expectation of success inquiry for obviousness is a different inquiry than undue experimentation for enablement. Appx0032 (citing *UCB, Inc. v. Accord Healthcare, Inc.*, 890 F.3d 1313, 1327 (Fed. Cir. 2018)). Dr. Gonda's opinion that the '793 patent suffered from §112 issues does not render a POSA oblivious to the literal disclosure of the '212 patent, which specifically teaches "solid formulations . . . in the form of a powder" for inhalation "in accordance with the ['212] invention" and claims both solution and powder formulations of inhaled treprostinil. Appx0488-0489; Appx1228, 5:30-32, 5:37-39 Appx1232, 14:13-14, 14:19-21); Appx0154-0156. The

Board, as factfinder, credited Dr. Gonda's testimony in this IPR and found his testimony reliable. Appx0032-0033.

Having done so, the Board correctly found that the '212 patent's disclosures, supported by Dr. Gonda's testimony and cited prior art that dry powder inhalers were standard in the art, was unrebutted and sufficient to establish why a POSA "would have had a reasonable expectation of success that the 'powder' disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler." Appx0032-0033 (citing Appx1176, ¶80 (Dr. Gonda's testimony) and the prior art (Appx2082-2090 (article stating dry powder inhalers are widely accepted) and Appx1650-1671 (article stating that 14 dry powder inhalers were approved in the United States by 2006)).

Further undermining UTC's inconsistent/credibility argument, the Board found that UTC conceded at oral argument that the '212 patent enables its own claims. Appx0033; Appx0810-0811, 43:6-44:12; Appx0817-0820, 50:24-53:25. UTC had to admit as much since the '212 patent is UTC's own patent. Appx1207 (Assignee); Appx0779, 12:22-25. As the Board found, the '212 patent claims "[a] method for treating pulmonary hypertension in a mammal [including a human] comprising delivering to said mammal an effective amount of [treprostinil] or its pharmaceutically acceptable salt or ester by inhalation," wherein the treprostinil "is inhaled in powder form comprising particles less than 10 micrometers in diameter."

Appx0033; Appx1232, 14:7-12, 14:19-21.  The Board correctly found, to the extent that "there remains any connection at all between a reasonable expectation of success and enablement, the fact that a [POSA] was enabled to make and use this ['212] invention presumably would have rendered that person more likely to expect success in achieving the similar invention of claims 4, 6, and 7 of the '793 patent." Appx0033.

The Board's findings on claims 4, 6, and 7 are supported by substantial evidence.  UTC's contrary arguments were never presented to the Board below and are inconsistent with UTC's own arguments, the district court's findings, and this Court's affirmance in the parallel district court case on the same '793 patent.

## IV.    SUMMARY OF ARGUMENT

1)  The Board properly determined that JESC and JAHA are prior art, and that determination was legally correct and supported by substantial evidence.  In its Petition, Liquidia, unequivocally argued that JESC and JAHA are prior art under 35 U.S.C. §102(b) and presented evidence to support that argument.  Based on Liquidia's Petition, the Board concluded that JESC and JAHA were prior art under §102(b).  No new "theory" was presented by Liquidia nor relied upon by the Board. Further, the Board correctly determined that Liquidia's additional Reply evidence of public accessibility, including date-stamped copies of the journals and dissemination at large international conferences, was proper to consider because it was presented

in direct response to UTC's POR arguments.  The Board did not commit legal error in its prior art analysis and should be affirmed.

The Board's prior art analysis is also supported by substantial evidence, including date-stamped copies of the journals containing extensive Tables of Contents and other indices permitting a POSA to locate the abstracts within the journals; the conferences were attended by tens of thousands of individuals, each of whom, as confirmed by the testimony of both parties' experts, would have received the abstracts either before or during the conference; both abstracts were presented on specific days during the conference; and the corroborated testimony that there was no expectation of confidentiality.   Thus, substantial evidence supports the Board's findings that JESC and JAHA were publicly accessible.

2)  The Board's determination that the 15-90 microgram dosing requirement in claim 1 is obvious in view of JESC is supported by substantial evidence.  The Board correctly found, based on documentary and testimonial evidence, that as of the priority date of the '793 patent, nebulizers used for inhalation treatment "delivered" between 1mL and 5mL of solution and were known to deliver at least 1mL of solution.  The Board also credited UTC's expert Dr. Waxman's testimony that he had never administered a dose less than one milliliter to a patient.  Based on this evidence, the Board correctly concluded a POSA would understand that JESC

discloses "delivering" inhaled doses of treprostinil within the claimed 15-90 microgram range.

UTC incorrectly argues that the Board did not recognize nor address unexpected results. The Board's FWD contains numerous pages addressing each of UTC's alleged secondary considerations and correctly concluded that UTC did not, as required, compare its claims to the closest prior art. The Board's determination that claim 1 is obvious over the combination of the '212 patent, JESC, and JAHA should be affirmed.

3) The Board did not commit legal error in determining claims 4, 6 and 7 obvious. The Board considered claims 4, 6 and 7 as a whole and found these claims obvious over the combination of the '212 patent, JESC, and JAHA. UTC's attempt to discredit the Board's finding as failing to consider the "unique" combination of dosing and a dry powder, is belied by the fact that UTC never presented these arguments to the Board and thus waived them here. The Board also properly rejected the *only* argument UTC presented below concerning these claims—an allegation that the testimony of Dr. Gonda, Liquidia's expert, was inconsistent and unreliable. Based on this credible, unrebutted evidence, substantial evidence supports the Board's finding that claims 4, 6 and 7 are obvious, and this determination should be affirmed.

24

## V.    ARGUMENT

### A.    Standard of Review

This Court reviews the Board's legal determinations de novo but reviews the Board's factual findings underlying those determinations for substantial evidence. *Jazz Pharms., Inc. v. Amneal Pharms., LLC*, 895 F.3d 1347, 1355 (Fed. Cir. 2018); *see also Henny Penny*, 938 F.3d at 1330.  Substantial evidence supports a finding if a reasonable mind might accept the evidence as adequate support.  *Id.* (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  In assessing substantial evidence, "attorney argument is not evidence and cannot rebut other admitted evidence[.]" *Elbit Sys. of Am. LLC v. Thales Visionix, Inc.*, 881 F.3d 1354, 1359 (Fed. Cir. 2018) (cleaned up).  Further, this Court should "defer to the Board's findings concerning the credibility of expert witnesses." *Infineum USA L.P. v. Chevron Oronite Co.*, No. 2020-1333, 2022 WL 3147683, at *5 (Fed. Cir. Aug. 8, 2022) (citation omitted); *see also Enova Tech. Corp. v. Seagate Tech. (US) Holdings Inc.*, 706 F. App'x 987, 992 (Fed. Cir. 2017).

### B.    The Board Correctly Determined that JAHA and JESC Were Publicly Accessible Prior Art.

#### 1.    Substantial evidence supports the Board's public accessibility findings.

Whether a reference qualifies as a "printed publication" is a legal conclusion based on underlying factual determinations.  *Medtronic, Inc. v. Barry*, 891 F.3d

1368, 1380 (Fed. Cir. 2018); *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1364 (Fed. Cir. 2014)). The underlying factual findings include whether the reference was publicly accessible. *In re NTP, Inc.*, 654 F.3d 1279, 1296 (Fed. Cir. 2011). Determining whether a document is a "'printed publication' under 35 U.S.C. §102(b) involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004) (citation omitted). In an IPR, public accessibility must be proven by a preponderance of evidence. *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375 (Fed. Cir. 2018). "A reference is considered publicly accessible if it was 'disseminated or otherwise made available to the extent that [a POSA] exercising reasonable diligence, [sic] can locate it.'" *Id.* (quoting *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008)).

This Court has "consistently held that the standard for public accessibility is whether a [POSA] *could*, after exercising reasonable diligence, access a reference." *Samsung Elecs. Co. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1374 (Fed. Cir. 2019) (finding that the Board erred in requiring Petitioner to show *actual* receipt of a prior art reference via a listserv email, when the Board should have considered whether the evidence established that a POSA *could* have accessed the reference, after exercising reasonable diligence, based on the listserv email); *Jazz Pharms.*, 895 F.3d at 1355–56 ("A reference is considered publicly accessible upon a satisfactory

showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it.  If accessibility is proved, there is no requirement to show that particular members of the public actually received the information.") (cleaned up); *In re Lister*, 583 F.3d 1307, 1314 (Fed. Cir. 2009) (same); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed. Cir. 1988) (same).

As discussed above, the Board properly found in the FWD and Denial of Rehearing that JESC and JAHA were available as §102(b) prior art because they were presented and disseminated at conferences.  Appx0009-0012; Appx0056-0061; *supra* §III.B.  The Board detailed the evidence supporting its findings on public dissemination and presentation, including the abstract journals which are date stamped in 2004, the publication dates of the "abstract books," the conference dates, and Tables of Contents that would direct a POSA to each abstract.  Appx0058-0061. The Board also relied on the corroborating testimony of both parties' experts, Drs. Hill and Waxman, concerning the size and nature of each conference, the types of individuals who would attend, and the distribution of the abstract books either before or during the conference.  Appx0056-0061.  In reaching this conclusion, the Board properly considered this Court's precedent addressing the factors to consider when determining if distribution at a conference constitutes sufficient dissemination for

prior art purposes. Appx0058. Considering the evidence as a whole, as the Board did, substantial evidence supports the Board's determination that JESC and JAHA qualify as §102(b) prior art.

In response to UTC's argument in its Sur-Reply, the Board further found that Liquidia's evidence of public presentation was "not a change in theory from the Petition[.]" Appx0010. The Board found that Liquidia's additional evidence, submitted in Reply, was proper because it was limited to addressing the position UTC raised for the first time in its Response. *Id.* That the Board also relied on the "research aid" argument in its FWD, but then confirmed the prior art status of JESC and JAHA as disseminated in journals distributed before or at large international conferences, was not factually or legally improper. *Supra* §III.B.

UTC asked the Board, and now asks this Court, to ignore the consistent evidence in the record and to hold Liquidia to a higher standard than the preponderance of evidence required to establish public accessibility of §102(b) prior art. *Nobel Biocare*, 903 F.3d at 1375. The Court should reject UTC's request.

    **2.**      **The Board did not legally or factually err in finding public accessibility.**

          **a.**      **The Board did not legally err in considering Liquidia's Petition arguments and Reply evidence submitted in response to UTC's briefing.**

UTC argues that the Board legally erred in relying on prior art theories outside of Liquidia's Petition.[1]  BB32-39.  UTC is incorrect.  There is no dispute that Liquidia asserted in its Petition that both JAHA and JESC were publicly accessible prior art under §102(b).  Appx0133, Appx0135; *see also id.* (citing Appx1164-1167, ¶¶55, 58; Appx1886-1887, ¶59; Appx1892-1893, ¶68); Appx0009.  Indeed, the Petition established by a preponderance of the evidence that JAHA and JESC were publicly accessible because those abstracts were printed in journals and presented at conferences.  Appx0133, Appx0135.  While UTC ***did challenge*** the prior art status of different Petition references, UTC ***did not challenge*** the prior art status of JAHA and JESC in its POPR.  Appx0241-0251.  Based on this evidence, the Board instituted the IPR.  Appx0309-0310, Appx330.

---

[1] UTC is incorrect that the Board, on rehearing, "abandoned its prior conclusion that the Voswinckel abstracts as published . . . were publicly available prior-art printed publications," and substituted it with a new "abstract book" dissemination theory.  BB20.  The only prior art theory the Board reversed itself on was whether there was sufficient evidence as to whether the "research aids" were published prior to the '793 patent's priority date.  Appx0054-0056.

UTC only challenged the prior art status of JAHA and JESC after Institution. There, UTC argued that JESC and JAHA were not publicly accessible because there was no evidence that either journal containing the abstracts was "stamped" as received or indexed by libraries. Appx0373-0375, Appx0375-0378. UTC characterized the Petition exhibits as "supplements compiling conference abstracts[,]" agreeing that the abstracts were both "conference abstracts[,]" and used that fact to argue that such abstracts are often published years after the conference at which they were presented. Appx0374. Significantly, JAHA and JESC describe *UTC* studies done with the support of UTC's subsidiary, LungRx. UTC submitted several declarations by JAHA and JESC authors addressing the prior art status of other references with its POPR. Tellingly, none declared that JESC and JAHA were not publicly accessible in 2004—indicating no author of JESC or JAHA would swear under oath that the abstracts were not disseminated or presented as of the '793 priority date.[2] *See* Appx5304-5340; Appx5347-5353.

Contrary to UTC's assertion that Liquidia "never offered any of the facts this Court considers when determining the public accessibility of alleged conference publications[,]" (BB36), Liquidia rebutted UTC's POR prior art arguments by

---

[2] Instead, UTC relied on a declaration from its unqualified "expert" Pilar Wyman (*see* Appx0469), whose opinions the Board correctly did not rely on. *See generally* Appx0001-0049; Appx0050-0067.

referencing its Petition and additional responsive evidence of public accessibility as follows:

(1) As asserted in the Petition, and evidenced on the face of the references, the abstracts were published[3] in journals and presented at conferences.  Appx0133, Appx0135; Appx0009-0010; Appx0058-0061; Appx1234-1243; Appx1164-1167, ¶¶55, 58; Appx1886-1887, ¶59; Appx1892-1893, ¶68.

(2) Consistent testimony from both parties' declarants that (a) the two conferences were attended by thousands of POSAs with no evidence of any confidentiality expectations; and (b) these conferences would have had abstract books in which the references would have been printed, disseminated, and easily located in advance of or at the conference itself.  Appx0009-0010; Appx0056-0061; Appx0133, Appx0135; Appx0470-0477; Appx2892-2979, Appx2907-2908, ¶¶22-23; Appx2913-2915, ¶¶28-29; Appx3137-3140, 105:20-108:20; Appx3143, 111:11-19; Appx3149, 117:4-13; *Nobel Biocare*, 903 F.3d at 1376 (finding catalog date "is relevant evidence that supports the Board's finding of public accessibility at the March 2003 IDS Conference."); *In re Klopfenstein*, 380 F.3d at 1350-52; *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1369 (Fed. Cir. 2000); *Mass.*

---

[3] UTC admits that Liquidia's Petition asserted JESC and JAHA were published in 2004.  BB34.

*Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985); MPEP §2128.01(IV).

(3) Multiple 2004 date-stamped copies of the journals from various libraries in America and Europe. [4]  Appx0133-0136; Appx0472-0477; Appx1886-1897, ¶¶59-76; Appx2681-2692; Appx7559-7620; Appx7716, ¶33; Appx7740, ¶65).

(4) Evidence of publication by an established publisher.  Appx0470, Appx0474; *VidStream*, 981 F.3d at 1065; Appx2684, Appx7755, ¶88 (JESC published by Elsevier, an established publisher since 1880); Appx7603; Appx7610; Appx7737, ¶61) (JAHA published by Lippincott Williams & Wilkins, an established publisher since 1998).

(5) Evidence that POSAs knew of these abstracts and cited them approximately a year after their presentation (research aids).  Appx0471-0472, Appx0475-0476; Appx1260, Appx1263 (2005 Ghofrani Article); Appx2889 (2005 Sulica Article); Appx1879-1884, ¶¶47-55; Appx2910-2911, ¶26 and Appx2915-2916, ¶30; Appx3564-3565, 121:19-122:12, Appx3562, 119:11-18; Appx7737, ¶62, Appx7755, ¶89; *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1379 (Fed. Cir. 2006);

---

[4] UTC questions whether the abstract books containing JESC and JAHA "exist[.]" BB34.  The fact that there are copies of each journal, date stamped from well-respected libraries in 2004, proves the absurdity of this assertion.

(6) Evidence that the journals or the articles were indexed and searchable on multiple commercial databases. Appx0471-0476; Appx1868-1869, ¶31 and Appx1886-1897, ¶¶59-76; Appx7722-7727, Appx7736-7737, Appx7754-7757, ¶¶40-48, 60, 87, 90; Appx7580; Appx7796-7814; Appx7823-7830, Appx7823; Appx7847-7867. *In re Lister*, 583 F.3d at 1315-16 (finding a manuscript publicly available as of the date it was included in "databases that permitted keyword searching of titles").

UTC filed a Sur-Reply and argued that Liquidia's "presentation" of the abstracts at the conferences[5]; library "date-stamped" copies; and "research aid" arguments were "new," and not presented in the Petition. Appx0563-0569. Again, UTC did not submit a declaration from the JESC or JAHA authors challenging the public accessibility of the references.

In its FWD, the Board correctly found that Liquidia's additional evidence was not a change in theory from the Petition but instead merely additional evidence supporting the public accessibility argument originally presented in Liquidia's Petition. Appx009-0010. Germane here is the Board's finding that "both of the arguments that Patent Owner alleges are new—the argument that Voswinckel JESC

---

[5] In its Sur-Reply, UTC conceded Liquidia asserted in its "[p]etition, . . . that [JAHA and JESC] are prior art because they were 'presented' at conferences in 2004[.]" Appx0561.

and Voswinckel JAHA were presented publicly and the argument that these references were cited in other publicly available references—respond to Patent Owner's argument in the Patent Owner Response[,]" and were thus permissible. Appx0010. Even the Board recognized that UTC had not asserted "dissemination" was a new theory.

Moreover, as both this Court's and the Board's precedent allow, Liquidia properly raised additional bases for public accessibility in direct response to UTC's arguments. *See Hulu LLC v. Sound View Innovations, LLC*, No. IPR2018-01039, 2019 WL 7000067, at *6 (P.T.A.B. Dec. 20, 2019) (Precedential Opinion Panel) ("For example, if the patent owner challenges a reference's status as a printed publication, a petitioner may submit a supporting declaration with its reply to further support its argument that a reference qualifies as a printed publication.") (citing 37 C.F.R. §§ 42.2 (affidavit), 42.23); *Telefonaktiebolaget LM Ericsson v. TCL Corp.*, 941 F.3d 1341, 1345 (Fed. Cir. 2019) (concluding Board did not abuse its discretion in admitting librarian declaration as supplemental information); *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1078 (Fed. Cir. 2015) (finding the Board did not err in admitting a Reply declaration, which responded to arguments raised in the POR). Thus, the Board did not legally err in relying on evidence in the record, including evidence properly submitted in Liquidia's Reply, to evaluate and agree with Liquidia's Petition that JAHA and JESC's are prior art under §102(b).

34

UTC does not cite any case where this Court held that a petitioner is precluded from subsequently presenting additional evidence in support of a public accessibility argument first raised in the petition. UTC's cases address changes in the references presented in the petition supporting the grounds of unpatentability. BB33, 35-36; *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330-31 (Fed. Cir. 2019); *Sirona Dental Sys. GmbH v. Institut Straumann AG*, 892 F.3d 1349, 1358 (Fed. Cir .2018) ("Petitioners are, in essence, attempting to add references to the ground of unpatentability put forth in their petition."); PTAB Consol. Patent Trial Practice Guide, 73 (Nov. 2019) ("Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g.[,] to make out a prima facie case of unpatentability."). Here, neither the references (the '212 patent, JESC, and JAHA), nor the ground asserted for unpatentability (obviousness), is new or changed. Thus, the Board did not violate 35 U.S.C. §312(a)(3).

Relying on *Massachusetts Institute of Technology* and *In re Klopfenstein*, UTC also asserts that Liquidia "forfeited" any argument that JAHA and JESC were publicly presented. BB36. But the Board found Liquidia's publicly presented argument was made in Liquidia's Petition, and UTC points to nothing supporting its contentions this was legally erroneous. Appx0009-0010. *Massachusetts Institute of Technology* does not address waiver and nonetheless agreed with the ITC's conclusion that the cited reference was publicly disseminated and thus prior art. *See*

774 F.2d at 1109. And *In re Klopfenstein* determined that an oral presentation was not a "printed publication," an issue not presented here, but nonetheless determined that the reference in question was publicly accessible. 380 F.3d at 1349-50 n.4, 1351-1352.

The only case that UTC cites for "forfeiture" in the prior art status context, *Samsung*, is inapposite. BB38. Samsung never argued to the Board that the reference was publicly accessible because it was presented or disseminated at meetings and confirmed as much during oral argument. *See Samsung*, 929 F.3d at 1370 (A. We have never taken the position before the Board or here that there was a distribution of WD4 at the Torino meeting .... Q. But even as to the Geneva meeting .... you never relied on that alone? A. We are not relying on the Geneva meeting ...."). That is clearly not true here. Appx0133, Appx0135 (citing Appx1164-1167, ¶¶55, 58, Appx1886-1887, ¶59 and Appx1892-1893, ¶68 (declarations from experts Gonda and Hall-Ellis, who address conferences)). Liquidia submitted additional evidence in response to UTC's POR in its Reply; UTC responded to that evidence in its Sur-Reply, where it acknowledged Liquidia's Petition *and* Reply arguments on the issue (Appx0561 (citing Appx0133, Appx0135), Appx0563-0564 (citing Appx0470-0471, Appx0475)); and Liquidia continued to assert the argument at hearings before the Board. Appx0470-0471, Appx0474-0475; Appx0912, 16:3-14. Unlike *Samsung*, there was no waiver. *Cf.* 929 F.3d at 1370.

36

The Board also correctly denied UTC's request to submit additional evidence with its Sur-Reply.  Appx0536-0542.  The Board did not abuse its discretion in reasoning that, so long as the Board found Liquidia's Reply evidence properly submitted as "responsive to the [Patent Owner's] prior briefing[,]" it had no reason to allow UTC to submit additional evidence with its Sur-Reply.  Appx0538-0539.  When asked what evidence UTC would have wanted to include, UTC's counsel was vague, such that it was unclear what difference such evidence would have made.  Appx0539-0540 ("[W]e asked Patent Owner to describe the nature of the evidence it seeks to submit along with the Sur-Reply and how that evidence might help show a lack of public accessibility, but Patent Owner answered only by listing vague types of evidence that might be submitted.  Thus, we are unable to consider whether the specific evidence that Patent Owner seeks to submit would help resolve the public accessibility issue in its favor. . . . "); Appx0914, 23:3-18.

Accordingly, the Board did not legally err in relying on evidence presented in both Liquidia's Petition and Reply in finding JAHA and JESC publicly accessible.

> **b.    The Board's finding that the references were made publicly accessible at conferences is supported by substantial evidence.**

UTC also argues that the Board's factual finding of public accessibility is unsupported by substantial evidence.  BB39-44.  The crux of UTC's argument is that because the record does not contain a copy of the literal abstract book, "actual

dissemination," is speculative. BB39-43.[6]  UTC is wrong.  Liquidia submitted 2004

date-stamped journals from reputable libraries around the world.  Appx1234-1243,

Appx2681-2692, Appx7559-7620; Appx7760-7765; Appx7794-7795; Appx7821-

7822; *see also* Appx7715, ¶33, Appx7727-7735, ¶¶49-58, Appx7740-7741, ¶65,

Appx7748-7754, ¶¶79-86).  This is substantial evidence, pointed to by the Board

(Appx0058-0062), supporting the indicia of reliability and dissemination.

Moreover, this Court has previously held that actual receipt of a reference was not

required to provide public accessibility.  *See Samsung*, 929 F.3d at 1374; *Jazz*

*Pharms.*, 895 F.3d at 1355–56; *In re Lister*, 583 F.3d at 1314; *Constant*, 848 F.2d at

1569.

UTC also ignores the numerous other sources of evidence cited by the Board.

Appx0009-0010; Appx0056-0062; *supra* §III.B.  This Court has previously found

the same types of evidence that exist for JAHA and JESC support a Board's finding

of public accessibility:

Per *Nobel Biocare*, the publication's cover date is "relevant evidence that

supports the Board's finding of public accessibility."  *Nobel Biocare Servs. AG v.*

---

[6] UTC cites to one line from *Novosteel SA v. U.S.*, 284 F.3d 1261, 1276 (Fed. Cir. 2002) regarding speculation.  BB40, 42.  The case has nothing to do with patent law, much less what constitutes speculation in the context of public accessibility or distribution.  Additionally, the cited line is from the dissent, which is not precedent.

*Instradent USA, Inc.*, 903 F.3d 1365, 1376 (Fed. Cir. 2018), as amended (Sept. 20, 2018). The Board found that JESC was published in "'Volume 25 Abstract Supplement August/September 2004' of 'European Heart Journal,' with a subtitle indicating that the journal is the 'Journal of the European Society of Cardiology' and that the supplement relates to 'ESC Congress 2004,' held '28 August – 1 September' in 'Munich, Germany.'" Appx0058 (citing Appx1234, Appx2681). The Board also pointed to further corroborating evidence from the Table of Contents, which organized the abstracts into categories with corresponding days of the conference, listing JESC as presented on "Day 2—Sunday 29 August 2004." Appx0058-0059 (citing Appx1235, Appx2681-2692). Further, the categories in the JESC journal consistently identified specific pages corresponding to abstracts presented on those days. Appx0059 (citing Appx1240, Appx2681-2692).

The Board also relied on evidence that JAHA was published in a "Supplement to Circulation," subtitled "Journal of the American Heart Association" and "Abstracts from Scientific Sessions 2004," indicating that those sessions occurred "November 7–10." Appx0060 (citing Appx1241). The Board pointed to the abstract appearing in a section titled "Pulmonary Arterial Hypertension: New Therapies," indicating that the session occurred on "Wednesday" in "Hall I2" of the "Ernest N Morial Convention Center," with November 10, 2004 corresponding to a Wednesday amidst the published conference dates. *Id.* (citing Appx1243).

This Court has also held that "the size and nature of the meetings and whether they are open to people interested in the subject matter of the material disclosed are important considerations" in determining whether materials "distributed at meetings or conferences" were made publicly accessible. *Medtronic*, 891 F.3d at 1382. In that vein, the Board relied on evidence that JESC was presented during "the largest medical congress in Europe and among the top three cardiology meetings in the world," in "an established forum for the exchange of science as much as education" with attendees including "basic scientists, nurses and allied professionals working in the field of cardiovascular care of patients[,]" and that *the 2004 conference in particular* had "24,527 attendees," including "18,413 professionals, 4,715 exhibitors, 636 journalists and 763 accompanying persons." Appx0059 (citing Appx7683). The Board also relied on testimony from both parties' experts that anyone who paid to attend the ESC Congress 2004 would have received a copy of the abstract book containing JESC, either at or before the meeting. *Id.* (citing Appx2913-2914, ¶28 and Appx3137-3140, 105:16-108:1). For JAHA, the Board relied on evidence of Drs. Hill and Waxman agreeing that attendance by POSAs at the Scientific Sessions 2004 conference was large and that that a copy of the abstract book containing JAHA would have been provided to all attendees at Scientific Sessions 2004. Appx0060-0061 (citing Appx2907-2908, ¶¶22-23 and Appx3140-3148, 116:4–21, 108:3–20). UTC did not challenge any of this evidence. And

UTC's argument that this evidence is insufficient or unreasonably speculative (BB39-44) is attorney argument, contradicted by its own expert. *See Elbit*, 881 F.3d at 1359.

Contrary to UTC's hyperbole, affirming the Board's decision does not "amount[] to an unprecedented *per se* rule that an abstract associated with a scientific conference is presumed to have been printed and made publicly accessible through a conference 'abstract book.'" BB43-44. The Board found specific evidence that in this particular field, at these particular conferences in 2004, JESC and JAHA would be printed in the journal conference abstract books, disseminated to conference attendees, and publicly presented, without an expectation of confidentiality, on the dates identified in each journal. Appx0009-0010, Appx0058-0062. Appx2681-2692; Appx7559-7620; Appx7715, Appx7727-7736, Appx7740, Appx7748-7754, ¶¶33, 49-58, 65, 79-86); Appx0058 (citing Appx2681). This is not a *per se* rule, but instead a case-specific inquiry supported by substantial evidence, as required by this Court's precedent. *In re Klopfenstein*, 380 F.3d at 1350. UTC's reliance on *Norian* is inapplicable because the Patent Owner there presented evidence that the abstract was made available only upon individual request to the authors, negating "testimony that it was the general practice at IADR meetings for presenters to hand out abstracts to interested attendees." *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330 (Fed. Cir. 2004); BB40-41. UTC presented no such evidence.

UTC argues that the October 2004 date of the JAHA journal predated the November 2004 date of the AHA conference. BB40-41. But this is consistent with Drs. Hill's and Waxman's testimony, credited by the Board, that the abstract journals were disseminated to conference attendees prior to the conference. *See supra* §III.B.

Thus, extensive factual findings support the Board's conclusion that JESC and JAHA were publicly accessible via distribution at conferences, and the Board's decision should be affirmed.

## C.    The Board's Claim 1 Unpatentability Conclusion Is Supported by Substantial Evidence.

"Obviousness is a question of law based on underlying factual determinations." *Incept LLC v. Palette Life Scis., Inc.*, Nos. 2021-2063, -2065, 2023 WL 5248043, at *2 (Fed. Cir. Aug. 16, 2023). The underlying factual determinations are "(1) the scope and content of the prior art; (2) differences between the prior art and the claims at issue; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations" of non-obviousness. *Id.* Here, UTC merely repeats arguments it previously made regarding claim 1's dosing limitation—factual arguments that the Board considered and rejected. Appx0016-0021.

As explained above, JESC teaches inhalation of concentrations of 16, 32, 48, and 64 µg/mL of treprostinil for 6 minutes. Appx0015 (citing Appx1240). Liquidia presented evidence that a POSA would have understood the JESC dosing led to

"significant long-lasting pulmonary vasodilatation" without "significant adverse events" beyond "mild and transient" cough, or bronchoconstriction, or a 1-hour headache.     Appx1240;   Appx0134-0135,   Appx0148-0150;   Appx0477-0483, Appx0487-0488; Appx2955-2961, ¶¶74-75, 77, 79).   The Board relied on three different experts who explained what a POSA would have understood the *delivered* amount of treprostinil to be:

- Liquidia formulation expert Dr. Gonda's sworn declaration that "in May 2006 . . . nebulizers conventionally deliver[ed] between 1 and 5 mL" of solution.  Appx1166, ¶56;

- Liquidia physician expert Dr. Hill's sworn declaration that a person of ordinary skill in the art in 2006 would have understood that "nebulizers . . . nebulize (i.e. aerosolize liquid) at least" 1mL of solution.  Appx1054, ¶65-66 (citing Dr. Gonda **and** his own experience);

- UTC's expert Dr. Waxman's admission during his deposition that standard nebulizers had fill volumes of "3 to 5 [milliliters]" and that he had ***never administered a dose as low as one milliliter*** to a patient. Appx0016-0017 (citing Appx3185, 153:1–22 and Appx3188, 156:12–16).

Crediting this testimony, the Board found that the "preponderance of the evidence … supports the actual delivered solution volume being at least one milliliter." Appx0017.  At 1mL of JESC's 16, 32, 48, or 64 μg/mL of treprostinil, a POSA "would have interpreted Voswinckel JESC as teaching the delivery of" 16, 32, 48, or 64 micrograms of treprostinil, all within the 15–90 microgram claimed dosage range of claim 1.  Appx0015-0017.

> **1. Substantial evidence, including unanimous physician testimony, supports the Board's dosage analysis.**

On appeal, UTC repeats that "JESC does not disclose a dose," and "hindsight" cannot fill this gap. BB44-46; Appx0015; Appx0133-0134, Appx0149. The Board already rejected these arguments, findings that this Court reviews deferentially for substantial evidence. *Jazz Pharms.,* 895 F.3d at 1355.

As part of its analysis, the Board relied on testimony from Dr. Gonda that "nebulizers conventionally delivere[d] between 1 and 5 mL" of solution. Appx0015 (citing Appx1166, ¶56). UTC argues that Dr. Gonda's evidence refers to *fill* volumes, rather than delivered volumes (BB46-47), and that reliance on nebulizer fill volumes is erroneous because "no nebulizer is 100% efficient, and thus no nebulizer's fill volume equals the amount of solution 'delivered' to the patient." BB45. UTC presented no evidence that nebulizer efficiency was so low that even at 1mL of a 64 µg/mL solution, less than 15 µg would be delivered.

Nonetheless the Board addressed this argument. *See* Appx0016-0017. The Board acknowledged that "Patent Owner argues that there were other factors that might have caused less than all the solution nebulized by a nebulizer to be actually delivered to the patient, none of which Petitioner accounts for." Appx0016. The Board accounted for the possibility of fill and delivered volume being different by finding that "[t]o the extent that something less than the entire fill volume was

delivered to the patient, either because it was not nebulized or because other factors resulted in the nebulized solution not reaching the mouthpiece, ***the preponderance of the evidence still supports the actual delivered solution volume being at least one milliliter***." Appx0016-0017 (emphasis added).  Moreover, the Board's "at least one milliliter" finding is supported by both parties' experts.  As the Board cited, "Dr. Hill testifie[d] that the 'at least 1 mL' of solution he discusses is the volume that 'nebulizers at the time were known to nebulize,' not the amount of liquid loaded into the nebulizer" and "Patent Owner's declarant, Dr. Aaron Waxman, testifie[d] that standard nebulizers had fill volumes of '3 to 5 [milliliters]' and that he had never administered a dose as low as one milliliter to a patient."  Appx0017 (citing Appx1054, ¶65 and Appx3185-3188, 153:1–22; 156:12–16).

On appeal, UTC attempts to discredit Drs. Hill's and Waxman's testimony. Both doctors, however, have decades of experience treating PH and prescribing treprostinil.  Appx1026-1098, Appx1032-1033, Appx1038, ¶¶7, 10, 11, 18-19); Appx3908, ¶1.  UTC argues that "Dr. Hill did not provide any opinion about the actual delivered dose, nor did he cite any evidence establishing any particular delivered dose.  Instead, he simply said that 'nebulizers at the time were known to nebulize (i.e., aerosolize liquid) at least [1 mL] volume,' citing only Dr. Gonda's unsupported and uncredited declaration." BB47.  First, UTC cites the very language where Dr. Gonda refers to *nebulized* volume, not fill volume.  That is the same

language the Board cited. Appx0017 (referencing nebulized volume, not fill volume). Second, UTC misrepresents Dr. Hill's testimony as "citing only Dr. Gonda's unsupported and uncredited declaration." BB47. But Dr. Hill also declared that "[i]n [his] own practice, [he] prescribed volumes of at least 1 mL for inhalation therapy using nebulizers."[7] Appx1054, ¶65. Thus, Dr. Hill presented testimonial evidence, from his 40+ years of experience (Appx1032, ¶7), of nebulizer delivered volumes prescribed to patients in practice. He made clear that when he "prescribed" that volume, he was referring to *delivered*, not fill, volume: "[a]ssuming at least 1 mL of volume for *delivery*, a POSA as of 2006 would thus reasonably understand that Voswinckel JESC delivered at least **16, 32, 48, or 64 μg** (16, 32, 48, 64 μg/mL*1 mL) of inhaled treprostinil to patients." Appx1054, ¶65 (italics added). Thus, the Board did not rely on an "unsubstantiated assumption" from Dr. Hill. BB48-49.

UTC complains that Dr. Hill "fails to provide any supporting details such as the specific prescribed drug, the specific dosing, the specific nebulizer, the specific indication, etc." for his practice of prescribing at least 1mL using nebulizers. BB49-50. UTC cites no legal or factual requirement for Dr. Hill to have done so. Expert experience is frequently credited as reliable evidence, (*see, e.g.*, *BTG Int'l Ltd. v.*

---

[7] Dr. Hill also relied on the rate of solution delivery for the OptiNeb® inhaler. Appx1055, ¶67; Appx2947-2948, ¶63.

*Amneal Pharms. LLC*, 923 F.3d 1063, 1074 (Fed. Cir. 2019); *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1027 (Fed. Cir. 2016); *Vanderlande Indus. Nederland BV v. I.T.C.*, 366 F.3d 1311, 1321 (Fed. Cir. 2004)), and this Court "defer[s] to the Board's findings concerning the credibility of expert witnesses." *Infineum*, 2022 WL 3147683, at *5.

This is particularly true when UTC's own expert, Dr. Waxman, testified to that fact based on his 20 years of practice. Appx3908, ¶1. As the Board credited, Dr. Waxman testified that he had never administered a dose as low as one milliliter to a patient. Appx3185, 153:1–22. UTC now cites to Dr. Waxman's subsequent attempt to backtrack that testimony. BB50-51; Appx3185-3186, 153:8-154:17. The Board chose not to credit Dr. Waxman's testimony that a physician would have *no* expectation of the amount of drug delivered to his patient. As the factfinder, the Board determines what expert testimony it finds credible, and this Court defers to such findings. *Infineum*, 2022 WL 3147683, at *5.

In sum, on appeal, UTC disagrees with the Board's fact-finding and rejection of its fill versus delivered volume arguments. But that does not mean the Board's findings are unsupported by substantial evidence. The Board specifically addressed UTC's concerns by citing consistent expert testimony that neither had ever delivered less than 1mL to a patient. Applying that evidence to how a POSA would translate the JESC concentrations into delivered dosages is not hindsight—it is rational,

straightforward calculation.  This Court should reject UTC's attempts to relitigate this factual issue and instead find that substantial evidence supports the Board's dosing analysis.

### 2.     The Board considered and rejected UTC's unexpected results.

UTC next argues that the Board erred in overlooking its evidence of unexpected results.  BB51-52.  The Board specifically addressed UTC's unexpected results arguments and found UTC failed to allege that the results of the '793 claims are unexpected over the closest prior art, namely treprostinil inhalation references like the '212 patent, JESC, and JAHA.  Appx0022-0023.  The Board correctly noted, "unexpected results must establish . . . a difference between the results obtained and those of the closest prior art."  Appx0022 (quoting *Bristol-Myers Squibb v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 977 (Fed. Cir. 2014)).

UTC now asserts that it did compare the '793 patent claims against inhaled treprostinil.  BB51-52 (citing Appx0585).  This is incorrect.  UTC has a *single* sentence in its Sur-Reply: "the ability to administer treprostinil at high doses in only 1-3 breaths and with fewer side effects was unexpected."  Appx0585 (citing Appx3983-3984,  ¶25;  Appx4795-4797,  ¶¶101-104;  Appx5524,  ¶¶29-32).  Argument raised for the first time in a sur-reply is waived.  *See Promos Techs., Inc. v. Samsung Elecs. Co.*, 809 F. App'x 825, 835 (Fed. Cir. 2020).  Moreover, this cited

"evidence" compares treprostinil to iloprost, *a different drug*, therefore falling squarely within the Board's finding that UTC failed to compare inhaled treprostinil against the closest inhaled treprostinil prior art. *See* Appx3983-3984, ¶25 ("we discovered that treprostinil has a slower transpulmonary transit time . . . compared to ***iloprost***") (emphasis added); Appx4795-4796, ¶¶101-103 ("This was a more than 10-fold increase in the treprostinil dose as compared with ***iloprost***. . . . 'when we used treprostinil at a much higher dose in our second study with the Optineb ultrasonic nebulizer device, we discovered that treprostinil has a slower transpulmonary transit time … compared to ***iloprost***.'") (emphasis added; citations omitted); Appx5524, ¶¶29-32 ("aerosolized terprostinil [sic] administered according to the instant claims has a dose dependent and longer pharmacokinetic effect than would be expected based on ***iloprost***"; "treatment with treprostinil achieved this maximum effect much sooner and lasted for a longer duration compared to treatment with ***iloprost***"; "[t]hese data suggest that treprostinil is far more pulmonary [sic] selective than ***iloprost***") (emphasis added; underlining in original). The Board correctly rejected UTC's unexpected results evidence, and remand is not warranted.

### D.    The Board Correctly Addressed the Dry Powder Arguments Properly Raised by UTC and Its Findings Should Be Affirmed.

### 1.    UTC waived its appealed dry powder arguments.

Across its POPR, POR, and Sur-Reply, UTC submitted 145 pages of argument but spent less than 3 pages making *any* arguments specific to claims 4, 6, and 7.  Appx0399-0401.

UTC's *sole* argument was that "Petitioner cannot have it both ways" with Liquidia's expert Dr. Gonda arguing that the '212 patent renders obvious claims 4, 6, and 7 in the IPR while also arguing, in the district court, that the '793 patent did not enable a POSA to practice claims directed to dry powder formulations.  *See* Appx0399-0400.  UTC also suggested Dr. Gonda's district court report was more reliable than his IPR declaration because it was longer.  Appx0400-0401.  UTC concluded by arguing that Dr. Gonda's contradictions, alone, "failed to show Claims 4, 6, or 7 to be obvious by a preponderance of the evidence."  Appx0401.

In presenting this enablement (district court) versus obviousness (IPR) argument, UTC made clear to the Board that it was solely addressing Dr. Gonda's inconsistency/credibility with respect to claims 4, 6 and 7, stating: "Patent Owner primarily contends the claims are nonobvious because the prior art lacks disclosure of a single event dose of 15-90 μg delivered in 1-3 breaths, ***regardless of the form of administration (liquid or powder)***."  *Id.* (emphasis added).  No additional substantive arguments were made.

Based solely on Dr. Gonda's district court opinion, UTC now contends on appeal that the Board failed to consider "all of the limitations of the dry-powder dependent claims[,]" that "a dry powder is completely different than a solution[,]" and the lack of a "reasonable expectation of success." BB53-71.

None of these arguments on appeal were presented to the Board—UTC's Brief does not cite its POR or Sur-Reply evidencing that it previously made these arguments. *Id.* UTC has thus waived its "all limitations," "powder vs solution," and "reasonable expectation of success" arguments on appeal. *See Fresenius USA, Inc. v. Baxter Int'l, Inc.,* 582 F.3d 1288, 1296 (Fed. Cir. 2009) ("If a party fails to raise an argument before the trial court, or presents only a skeletal or undeveloped argument to the trial court, [this Court] may deem that argument waived on appeal."); *see also MCM Portfolio LLC v. Hewlett-Packard Co.*, 812 F.3d 1284, 1294 n.3 (Fed. Cir. 2015) (adopting *Fresenius* in the IPR context and deeming arguments not presented to the Board waived); *Novartis AG v. Torrent Pharm. Ltd.*, 853 F.3d 1316, 1330 (Fed. Cir. 2017) (same). This is particularly true here where UTC submitted Dr. Gonda's district court opinion only to support an inconsistency/credibility argument—not as affirmative evidence of non-obviousness—and never presented arguments specifically to claims 4, 6 and 7 in its Sur-Reply. Appx0399-0401; Appx0570-0582; *Samsung*, 929 F.3d at 1370 (finding waiver where party made concession in oral argument). Because UTC never

51

affirmatively relied on, nor made any substantive dry powder arguments, UTC cannot fault the Board for not addressing them. *In re Nuvasive*, 842 F.3d 1376, 1380 (Fed. Cir. 2016) ("[A] party waives an argument that it failed to present to the PTAB because it deprives the court of the benefit of the PTAB's informed judgment.") (cleaned up).

### 2. The Board considered and rejected UTC's "inconsistency/credibility" arguments.

The Board adequately addressed UTC's inconsistency/credibility arguments. Appx0031-0035. First, the Board correctly noted that UTC was asserting an inconsistency argument. Appx0032. The Board, in rejecting UTC's inconsistency and lack of reliability argument, concluded that "[r]easonable expectation of success is a separate inquiry from enablement," and further found that "the mere fact Dr. Gonda testifies to a lack of enablement in one forum and the presence of a reasonable expectation of success in a second forum does not render unreliable the testimony in either forum." *Id.* As such, the Board determined that Dr. Gonda's testimony was reliable and not inconsistent. *Id.*, Appx0032-0033.

Second, after finding Dr. Gonda's IPR testimony credible, the Board "credit[ed] the ***unrebutted testimony*** of Dr. Gonda that a [POSA] 'would have had a reasonable expectation of success that the 'powder' disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler." Appx0032-

0033 (citing Appx1176, ¶80.)  Further supporting Dr. Gonda's unrebutted testimony, and crediting its reliability, the Board relied on several exhibits demonstrating the wide availability and use of dry powder inhalers as of the '793 patent's priority date. *Id.* (citing Appx2082-2090; Appx1650-1671).

Finally, the Board found that if there was some connection between enablement and reasonable expectation of success, UTC conceded "that the '212 patent enables its own claims."[8]  Appx0033 (citing Appx0810-0811, 43:6-44:12).  As the Board found, the '212 patent claims treating PH by delivering an effective amount of treprostinil, via inhalation of a powder comprising particles less than 10 micrometers in diameter.  Appx0033; Appx1232, 14:9-12, 14:19-21.

Before the district court and this Court, UTC ultimately prevailed on the enablement issue, which found that the '793 patent, with disclosures almost identical to the '212 patent on dry powder, adequately enabled a POSA to practice claims 4, 6, and 7.  *See United Therapeutics*, 624 F. Supp. 3d at 470–73, *aff'd,* 74 F.4th 1360.  In UTC's own words, UTC "cannot have it both ways."  Appx0399.

---

[8] UTC argued during the oral hearing that the '212 patent disclosures were insufficient for dry powder obviousness in this IPR but argued that similar disclosures in the '793 patent were adequate for enablement in the parallel district court proceeding.  The Board observed UTC's own inconsistency.  *See* Appx0817-0820, 50:24-53:1 (the PTAB panel noting that by alleging inconsistency between obviousness and enablement by Liquidia, UTC was "only proving [that its] own party is also a hypocrite").

### 3.    The Board did not legally err in its dry powder analysis.

To the extent this Court considers UTC's newly made arguments, they should be rejected.

### a.    The Board addressed disclosure of full dry powder claims and UTC's properly briefed arguments.

UTC first argues that the Board "erred as a matter of law by failing to analyze each dependent dry powder claim as a complete and independent invention with all its limitations." BB53. But UTC never argued any unique obviousness position for the dry powder claims. *See Driessen v. Best Buy Co.*, No. 2022-1907, 2023 WL 2422441, at *3 n.2 (Fed. Cir. Mar. 9, 2023) (citing *Dell Inc. v. Acceleron, LLC*, 884 F.3d 1364, 1369 (Fed. Cir. 2018)) (finding untimely an argument raised for the first time at oral argument to the Board); Office Patent Trial Practice Guide, 77 Fed. Reg. 48756, 48768 (Aug. 14, 2012) (to be codified at 37 C.F.R. pt. 42) ("No new evidence or arguments may be presented at the oral argument."). In its five pages briefing this argument (BB53-58), there is not a single citation to UTC's IPR briefing. UTC's attorney argument should be rejected. *Elbit*, 881 F.3d at 1359 ("attorney argument is not evidence and cannot rebut other admitted evidence") (cleaned up).

Regardless, the Board did analyze the dry powder claims separately. *See* Appx0030-0035. Relying on Dr. Gonda's "unrebutted" testimony, the Board found that "a [POSA] would have had a reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA and would have had a reasonable

expectation of success in doing so in order to arrive at the invention of the challenge claims, including claims 4, 6, and 7." Appx0032-0034 (citing Appx1176, ¶80). UTC offered no counter evidence questioning the substantial evidence supporting the Board's determination. To the extent UTC argues, now, that there is no evidence supporting the use of a powder to deliver a dose comprising 15-90 micrograms of treprostinil (BB56), the Board had already determined, supported by substantial evidence, that the combination of the '212 patent with JESC and JAHA established the doses of '793 patent claim 1. Appx0014-0017. Thus, there was no issue that the Board needed to address beyond the obviousness of the specific powder formulation aspects of these claims, and UTC did not present any argument on the dry powder dosing.

UTC also criticizes the Board for relying on the '212 patent's claims but overlooks what the '212 patent claims disclose. BB56-57. The '212 patent claims disclose, for prior art purposes, treating PH by delivering an effective amount of treprostinil (UT-15) to a mammal, by inhalation of a dry powder comprising particles less than 10 micrometers in diameter. Appx1232, 14:9-12, 14:19-21. The Board relied on the '212 patent's disclosure and claims, in combination with JESC and JAHA, to render claims 4, 6 and 7 obvious. Appx0033-0034.

### b.    The '212 patent enables both solution and powder formulations, and the Board did not legally err in requiring nothing further.

The Board did not "err[] in its direct [] application of solution dosing/delivery and breath count references (JESC and JAHA) to the dry powder inventions without analyzing the 'differences between the prior art and the [dependent dry powder] claims at issue.'" BB59 (citation omitted). The '212 patent describes experiments involving inhaled treprostinil solution and still claims treating PH with inhaled treprostinil powder. *See* Appx1228, 5:22-36, Appx1229, 8:36-9:60, Appx1230, 10:35-37; Appx1232, 14:19-21 ("The method of claim 6, wherein said UT-15 [treprostinil] is inhaled in powder form comprising particles less than 10 micrometers in diameter."). To get from solution to powder, the '212 patent states that "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention," that treprostinil "is inhaled in powder form[,]" and that dry powder "particles are preferably . . . less than 5 micrometers in diameter." Appx0034-0035; Appx1228, 5:30-32, 5:37-41; Appx1232, 14:19-21; Appx0154-0156. UTC conceded at oral argument that it was not challenging whether the '212 patent sufficiently enabled its dry powder claims. Appx0810-0811, 43:26–44:12 (**Q**: "It looks like Claim 9 of the '212 Patent is directed to a method of treating pulmonary hypertension in a mammal comprising delivering to the mammal an effective amount of UT-15 . . . by inhalation. And then, Claim 9 further specifies,

'Wherein said UT-15 is inhaled in powder form comprising particles less than 10 micrometers in diameter.' Do you contend that that disclosure is not enabled?  **A**: No, Your Honor, . . . I don't contend that that disclosure is not -- is not enabled."); Appx0033 (Board citing the same colloquy).  Thus, UTC admitted the '212 patent's disclosures and claims bridge the gap from liquid to powder formulation for obviousness purposes.  Appx0131; Appx0145; Appx00154-0156.  *No party ever disputed this before the Board*.

The dosing of claim 1, and therefore claims 4, 6, and 7, has always come from JESC and JAHA.  No party argued that JESC and JAHA dosing were different enough between liquid and powder formulations such that the '212 patent's disclosures were insufficient for a POSA to have a reasonable expectation of success in combining the dosing of JAHA and JESC with the '212 patent's liquid *and* dry powder teachings.  The Board specifically found they were sufficient.  Appx0033. Indeed, the '793 patent itself only discloses examples of dosing *solutions* in a certain number of breaths but claims *dry powder* formulations of those same doses and breaths based solely on one disclosure: "The inhalation device can be also a dry powder inhaler.  In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter."  Appx1020, 7:23-26.  The '793 patent lacks any disclosure of successfully achieving the same dosing or breaths for

powder but was nonetheless found enabled. *See United Therapeutics*, 624 F. Supp. 3d at 470–73. The same should logically apply to the '212 patent. Thus, substantial evidence supports the Board's finding that the combination of the '212 patent, JESC, and JAHA render obvious claims 4, 6 and 7.

The only evidence UTC identifies for "unpredictability" between solutions and dry powders of treprostinil is Dr. Gonda's district court report. BB59-60 (citing Appx5948, Appx5951-5953, Appx5955, Appx5965). UTC never argued for this unpredictability before the Board, and thus, on appeal, UTC does not cite any page of its own IPR briefing. That alone should doom UTC's appeal of this issue. *See In re Nuvasive*, 842 F.3d at 1380. Regardless, those unpredictability arguments have been rejected, at UTC's urging, by the district court, a rejection this Court affirmed. *See United Therapeutics*, 624 F. Supp. 3d at 470–73. This Court should thus decline UTC's invitation to adopt Dr. Gonda's testimony of unpredictability here while rejecting this same testimony in a prior proceeding.

> **c.    The Board did not legally err in relying on the '212 patent to convert liquid dosages to dry powder claims.**

Finally, UTC argues that the Board committed legal error because "neither the Board nor petitioner explained why the asserted solution references would apply to the dry powder claims[.]" BB62. But the Board addressed every limitation, alone

and in combination, and the reasonable expectation of success in combining the three references' teachings in the context of the dependent claims.  Appx0031-0035.

UTC's cited cases, *Magnum*, *Raytheon*, and *Arendi*, do not compel a different conclusion.  BB62-63.  In *Magnum*, this Court determined, based on FWD statements faulting patent owner for not addressing a reference (Alpha) that was *not relied upon* in instituting the IPR, that the Board improperly shifted the burden to patent owner.  *In re Magnum Oil Tools Int'l Ltd.*, 829 F.3d, 1364, 1377–78 (Fed. Cir. 2016).  Here, no such burden shifting occurred—the Board only relied upon the '212 patent, JESC, and JAHA—the basis of institution.  Similarly in *Raytheon*, the Court concluded the Board improperly determined that the Knip reference enabled its disclosure, as opposed to whether Knip "enable[d] the claimed invention." *Raytheon Tech. Corp. v. General Elec. Co.*, 993 F.3d 1374, 1381-82 (Fed. Cir. 2021).  But in doing so, the Court noted the petitioner provided no other supporting evidence.  *Id.*  Not so here.  The Board did not rely on the '212 patent alone with respect to the dosing limitation but relied on evidence from the '212 patent, Dr. Gonda's declaration and supporting evidence, and JESC and JAHA—none of which UTC rebutted.  Appx0031-0034.  And finally, in *Arendi*, the Board's obviousness determination was based on "common sense," when it came to disclosure of a missing limitation.  *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361-63 (Fed. Cir. 2016).  The Board here did not rest its determination on "common sense," but on

59

actual evidence presented by Liquidia. Appx0031-0034. Accordingly, the Board made no legal errors.

### 4. The Board's conclusion that the dry powder claims are obvious is supported by substantial evidence.

UTC attempts to recast much of the "legal" arguments addressed above into factual issues. BB64-71. Again, UTC fails to cite any instance in its briefing before the Board where it raised these issues—it never did. *Id.* Substantial evidence supports the Board's conclusion that the dry powder claims are obvious, and this Court's inquiry should end with waiver.

UTC provides a list of Dr. Gonda's district court testimony, contending it was "erroneously disregarded" by the Board. B64-68. UTC disregards the Board's crediting of Dr. Gonda's IPR testimony over any perceived inconsistency in his district court testimony. Appx0032-0033. This Court gives deference to such a determination. *See Infineum*, 2022 WL 3147683, at *5. The Board correctly separated the two Gonda declarations, explaining that "[r]easonable expectation of success is a separate inquiry from enablement." Appx0032 (citing *UCB*, 890 F.3d at 1327 (finding no "authority for the proposition that the presumption of" enablement of prior art "precludes . . . finding that there was no reasonable expectation of success")). Other cases from this Court have also regarded obviousness and enablement as distinct inquiries. *See, e.g.*, *ABT Sys., LLC v.*

*Emerson Elec. Co.*, 797 F.3d 1350, 1360 n.2 (Fed. Cir. 2015); *I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 988-89 (Fed. Cir. 2014); *Geo M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1302 (Fed. Cir. 2010) ("Under an obviousness analysis, a reference need not work to qualify as prior art; it qualifies as prior art, regardless, for whatever is disclosed therein.") (cleaned up). The Board's credibility assessment complements its finding that UTC admitted the '212 patent was enabled for what it disclosed and claimed. Appx0810-0811, 43:26–44:12.

UTC also argues that the prior art is "silent" on "dosing of a treprostinil dry powder formulation delivered by a dry powder inhaler for the treatment of pulmonary hypertension in 1-3 breaths." BB64. But this requires the '212 patent to *anticipate*; the Board found obviousness based on a *combination* of references. Here, the '212 patent explicitly discloses and claims a method of treating PH by delivering an effective amount of treprostinil via a dry powder inhaler using a dry powder formulation of treprostinil. Appx1228 5:37-41; Appx1231, 14:9-21. It is this disclosure, combined with dosages and breaths of JESC and JAHA, that the Board determined met the preponderance of the evidence standard in rendering claims 4, 6 and 7 obvious.

UTC is further incorrect that "Dr. Gonda 'provides no express discussion of, nor any connection to' the unique treprostinil dry powder formulation-inhaler combination that could deliver 15-90 mgs in 1-3 breaths." BB69. Dr. Gonda pointed

to references discussing the use and availability of dry powder inhalers, evidence relied upon by the Board. Appx0033 (citing Appx1650-1671, Appx2082-2090). This is substantial evidence rendering claims 4, 6 and 7 obvious, particularly in view of the fact that not even the '793 patent discloses a "unique treprostinil dry powder formulation-inhaler combination that could deliver 15-90 mgs in 1-3 breaths."

Finally, the Board's finding is not based on any "single conclusory sentence" from Dr. Gonda. BB70. Rather, the Board relied upon multiple pieces of evidence, including Dr. Gonda's "unrebutted" testimony as well as JESC and JAHA to support its determination that claims 4, 6, and 7 are unpatentable. That the '212 patent does not disclose every limitation of claim 1 does not negate, as UTC argues (BB69-70), the substantial evidence supporting the Board's determination of obviousness based on the combination of the '212 patent, JESC and JAHA.

## VI.    CONCLUSION

For the foregoing reasons, Liquidia asks this Court to deny UTC's appeal and affirm the Board's decision.


Dated: September 6, 2023              Respectfully submitted,

                                      */s/ Sanya Sukduang*
                                      Sanya Sukduang
                                      Jonathan R. Davies
                                      Brittany Cazakoff
                                      Cooley LLP

1299 Pennsylvania Ave., NW
Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Facsimile: (202) 842-7899


*Counsel for Appellee*
*Liquidia Technologies, Inc.*

## **CERTIFICATE OF COMPLIANCE**

The foregoing filing complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d) and 32(a) and has been prepared using a proportionally-spaced typeface and includes 13,935 words.


Dated:  September 6, 2023                    */s/  Sanya Sukduang*
                                             Sanya Sukduang
                                             Cooley LLP

                                             *Counsel for Appellee*
                                             *Liquidia Technologies, Inc.*