**[Vol. I, Appx0001 – Appx1996]**

**No. 2023-1805**

_____

# United States Court of Appeals for the Federal Circuit

_____

UNITED THERAPEUTICS CORPORATION,

*Appellant,*

– v. –

LIQUIDIA TECHNOLOGIES, INC.,

*Appellee.*

_____

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
IPR2021-00406

_____

**NON-CONFIDENTIAL JOINT APPENDIX**

_____

**COOLEY LLP**
Sanya Sukduang
Jonathan R. Davies
Brittany Cazakoff
1299 Pennsylvania Ave NW,
Suite 700
Washington, DC 20004
Tele: (202) 842-7800

*Counsel for Appellee*
Liquidia Technologies, Inc.

**MCDERMOTT WILL & EMERY LLP**
Douglas H. Carsten
Arthur P. Dykhuis
18565 Jamboree Road, Suite 250
Irvine, CA 92612-2565
Tele: (949) 851-0633

Adam W. Burrowbridge
500 North Capitol Street, NW
Washington, DC 20001-1531
Tele: (202) 756-8797

*Counsel for Appellant*
United Therapeutics Corporation

**UNITED THERAPEUTICS CORPORATION**
Shaun R. Snader
1735 Connecticut Ave. NW,
2nd Floor, Washington, DC 20009
Tele: (202) 304-1701

**GOODWIN PROCTER LLP**
William Jackson
1900 N St. NW, Washington, DC 20036
Tele: (202) 346-4216

*Additional Counsel for Appellant*
United Therapeutics Corporation

| Vol. I, Appx0001 – Appx1996 | | | |
|---|---|---|---|
| **Date** | **No.** | **Description** | **Appx. No.** |
| 07/19/2022 | 78 | Final Written Decision | Appx0001-Appx0049 |
| 02/02/2023 | 82 | Decision on Request for Rehearing | Appx0050-Appx0067 |
| | | Docket Sheet/Certified List | Appx0068-Appx0070 |
| | | | |
| 01/07/2021 | 2 | Liquidia IPR Petition | Appx0101 Appx0112-Appx0179 |
| 05/17/2021 | 13 | Patent Owner Preliminary Response | Appx0202, Appx0236-Appx0252 |
| 08/11/2021 | 18 | Decision Granting Institution of IPR | Appx0288, Appx0308-Appx0311 Appx0320-Appx0322 Appx0329-Appx0330 |
| 08/25/2021 | 20 | Patent Owner Objections to Evidence | Appx0343 Appx0347-Appx0348 |
| 11/10/2021 | 29 | Patent Owner Response | Appx0352-Appx0424 |
| 02/10/2022 | 44 | Liquidia Reply in Support of 793 IPR Petition | Appx0456 Appx0469-Appx0490 Appx0492 |
| 03/03/2022 | 50 | Order re Sur-Reply Evidence | Appx0536-Appx0542 |
| 03/16/2022 | 55 | Patent Owner Sur-Reply | Appx0548 Appx0560-Appx0585 |
| 06/22/2022 | 77 | Record of Oral Hearing | Appx0768 Appx0778-Appx0780 Appx0809-Appx0821 |
| 08/18/2022 | 79 | Patent Owner Request for Rehearing | Appx0862-Appx0880 |
| 08/22/2022 | 80 | Notification of Receipt of POP Request | Appx0881-Appx0883 |
| 10/26/2022 | 81 | Order Denying POP Request | Appx0884-Appx0888 |
| 04/05/2023 | 83 | Notice of Appeal | Appx0889-Appx0893 |

| 02/28/2022 | | Email from PTAB to Counsel re Request for Authorization to Submit Rebuttal Evidence with PO Sur-Reply | Appx0894-Appx0895 |
| 03/01/2022 | | Telephonic Conference Transcript | Appx0908-Appx0917 |

| Ex. | Description | Appx. No. |
|---|---|---|
| 1001 | U.S. Patent No. 10,716,793 ("'793 patent") | Appx1001-Appx1025 |
| 1002 | Declaration of Dr. Nicholas Hill | Appx1026-Appx1098 |
| 1004 | Declaration of Dr. Igor Gonda | Appx1131-Appx1196 |
| 1006 | U.S. Patent No. 6,521,212 B1 ("'212 patent") | Appx1207-Appx1233 |
| 1007 | Voswinckel JESC | Appx1234-Appx1240 |
| 1008 | Voswinckel JAHA | Appx1241-Appx1243 |
| 1010 | Ghofrani | Appx1250-Appx1265 |
| 1019 | Stein | Appx1650-Appx1671 |
| 1029 | Ventavis® Label 2004 | Appx1784-Appx1798 |
| 1036 | Declaration of Sylvia Hall-Ellis, Ph.D. | Appx1855-Appx1996 |

| Vol. II, Appx1997 – Appx8034 | | |
|---|---|---|
| **Ex.** | **Description** | **Appx. No.** |
| 1036 | Declaration of Sylvia Hall-Ellis, Ph.D. | Appx1997-Appx2048 |
| 1038 | Atkins | Appx2082-Appx2090 |
| 1050 | Pulmozyme® Label | Appx2231-Appx2232 |
| 1066 | AccuNeb® Label | Appx2403-Appx2404 |
| 1089 | Voswinckel JESC, UWash | Appx2681-Appx2692 |
| 1104 | Sulica 2005 | Appx2877-Appx2890 |
| 1106 | Reply Declaration of Nicholas Hill, M.D. | Appx2892-Appx2979 |
| 1108 | Transcript from the January 8, 2022 Deposition of Aaron Waxman, M.D., Ph.D., IPR2021-00406 | Appx3033 Appx3136-Appx3150 Appx3184-Appx3189 |
| 1109 | Transcript from the January 11, 2022 Deposition of Jason McConville, Ph.D., IPR2021-00406 | Appx3205 Appx3271-Appx3272 |

| 1110 | Transcript from the December 29, 2021 Deposition of Lyndsey Pilar Wyman, IPR2021-00406 | Appx3444 Appx3561-Appx3566 |
|---|---|---|
| 2001 | Declaration of Dr. Aaron Waxman | Appx3907-Appx3909 Appx3923-Appx3925 |
| 2003 | Declaration of Dr. Werner Seeger | Appx3970 Appx3983-Appx3985 |
| 2041 | Declaration of Ms. Pilar Wyman | Appx4534 Appx4539 Appx4542-Appx4545 Appx4552 Appx4555-Appx4557 |
| 2052 | Second Declaration of Dr. Aaron Waxman, M.D., Ph.D. | Appx4744 Appx4760-Appx4768 Appx4778-Appx4781Appx4795-Appx4797 |
| 2053 | Declaration of Dr. Jason McConville | Appx4800 Appx4817-Appx4818 Appx4823-Appx4834 Appx4838-Appx4840 |
| 2055 | Transcript from the October 17, 2021 Deposition of Dr. Nicholas Hill, IPR2021-00406 | Appx4885 Appx5012-Appx5013 Appx5017 Appx5026-Appx5033 |
| 2056 | Transcript from the October 26, 2021 Deposition of Igor Gonda, Ph. D., IPR2021-00406 | Appx5075 Appx5142 Appx5155-Appx5157 Appx5159 Appx5167 Appx5186-Appx5193 Appx5198-Appx5199 |
| 2061 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, Declaration of Dr. Robert Roscigno (EX2048) | Appx5238-Appx5249 |
| 2065 | Declaration of Dr. Werner Seeger regarding Application No. 11/748,205 | Appx5304-Appx5305 |

| 2066 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Declaration of Dr. Werner Seeger (EX2020) | Appx5306-Appx5312 |
|---|---|---|
| 2067 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Hossein A. Ghofrani (EX2026) | Appx5313-Appx5317 |
| 2068 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Frank Reichenberger (EX2027) | Appx5318-Appx5322 |
| 2069 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Friedich Grimminger (EX2028) | Appx5323-Appx5327 |
| 2070 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Declaration of Dr. Werner Seeger (EX2097) | Appx5328-Appx5329 |
| 2071 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Second Declaration of Dr. Werner Seeger (EX2098) | Appx5330-Appx5340 |
| 2074 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Second Declaration of Dr. Hossein A. Ghofrani (EX2099) | Appx5347-Appx5353 |
| 2076 | Kendrick (1997) | Appx5362 |
| 2086 | [Part 1] Declaration of Dr. Roham T. Zamanian regarding Application No.12/591,200 | Appx5518 Appx5524 |
| 2091 | Expert Report of Dr. Igor Gonda, *United Therapeutics Corp. v. Liquidia Techs., Inc.*, Case No. 1:20-cv-00755-RGA (D. Del.) (excerpts) | Appx5940-Appx5966 |

| 2097 | **[SEALED]** Transcript from the January 7, 2022 Deposition of Igor Gonda, Ph.D., *United Therapeutics Corp. v. Liquidia Techs., Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.) | Appx6217<br>Appx6223<br>Appx6227Appx6242-<br>Appx6243<br>Appx6267-Appx6268 |
|------|------|------|
| 2104 | Transcript of Telephonic Hearing (March 1, 2022) | Appx6410<br>Appx6415-Appx6420 |
| 2109 | Patent Owner's Demonstrative Exhibit | Appx6616<br>Appx6673 |
| 1062 | Gessler, T., et al., "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension," Eur Respir J, 17:14-19 (2001) | Appx7362-Appx7367 |
| 1090 | Voswinckel JESC, UWisc | Appx7559-Appx7563 |
| 1091 | Voswinckel JESC, British Library | Appx7564-Appx7570 |
| 1092 | Voswinckel JESC, Additional Pages | Appx7571-Appx7580 |
| 1093 | Voswinckel JAHA, British Library | Appx7581-Appx7586 |
| 1094 | Voswinckel JAHA, Library of Congress | Appx7587-Appx7596 |
| 1095 | Voswinckel JAHA, Stanford | Appx7597-Appx7613 |
| 1096 | Voswinckel JAHA, UC Davis | Appx7614-Appx7620 |
| 1105 | European Society of Cardiology Annual Report 2005 | Appx7665-Appx7701 |
| 1112 | Reply Declaration of Sylvia Hall-Ellis, Ph.D. | Appx7702-Appx7759 |
| 1113 | Voswinckel JAHA Supplemental Author Index | Appx7760-Appx7765 |
| 1116 | Voswinckel JAHA British Library Declaration | Appx7794-Appx7795 |
| 1117 | Voswinckel JAHA Supplement PubMed Search Results | Appx7796-Appx7814 |
| 1119 | Voswinckel JESC British Library Declaration | Appx7821-Appx7822 |
| 1120 | Voswinckel JESC Web of Science Search Results | Appx7823-Appx7830 |
| 1123 | Circulation MARC record, British Library | Appx7847 |

| 1124 | Circulation MARC record, Library of Congress | Appx7848-Appx7854 |
|------|----------------------------------------------|-------------------|
| 1125 | Circulation MARC record, Stanford | Appx7855-Appx7856 |
| 1126 | Circulation MARC record, UC Davis | Appx7857 |
| 1127 | European Heart Journal bibliographic record, UWash | Appx7858-Appx7860 |
| 1128 | European Heart Journal MARC record, UWisc | Appx7861-Appx7865 |
| 1129 | European Heart Journal MARC record, British Library | Appx7866-Appx7867 |
| | Advanced Concepts in Spinal Deformity Surgery | Appx7881-Appx7913 |
| | Alpha Bio System Product Catalog March 2003 | Appx7914-Appx7971 |
| | Declaration of Yechiam Hantman dated June 30, 2016, IPR2015-01786 | Appx7972-Appx8034 |

Trials@uspto.gov                                                    Paper 78
Tel: 571-272-7822                                      Entered: July 19, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

———————————

IPR2021-00406
Patent 10,716,793 B2

———————————

Before ERICA A. FRANKLIN, CHRISTOPHER M. KAISER,
and DAVID COTTA, *Administrative Patent Judges.*

KAISER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

INTRODUCTION

*A. Background*

Liquidia Technologies, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1–8 of U.S. Patent No. 10,716,793 B2 (Ex. 1001, "the '793 patent"). United Therapeutics Corporation ("Patent Owner") filed a Preliminary Response. Paper 13 ("Prelim. Resp.").

On August 11, 2021, we instituted *inter partes* review of claims 1–8 of the '793 patent on all grounds set forth in the Petition. Paper 18 ("Inst. Dec."). After institution of trial, Patent Owner filed a Response (Paper 29, "PO Resp."), Petitioner filed a Reply (Paper 44), and Patent Owner filed a Sur-Reply (Paper 55). In addition, both parties filed Motions to Exclude Evidence (Papers 65 and 66), Oppositions to their respective opponents' Motions to Exclude (Papers 68 and 69), and Replies in support of their own Motions to Exclude (Papers 71 and 72). At the request of both parties, we held an oral hearing, the transcript of which has been entered into the record. Paper 77 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of the challenged claims of the '793 patent. For the reasons discussed below, we determine Petitioner has established by a preponderance of the evidence that each of claims 1–8 of the '793 patent is unpatentable.

*B. Related Matters*

The parties identify *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, 1:20-cv-00755-RGA (D. Del.) ("the District Court proceeding"), as a related matter. Pet. 1; Paper 3, 1.

2

IPR2021-00406
Patent 10,716,793 B2

*C. The Asserted Grounds of Unpatentability*

Petitioner contends that claims 1–8 of the '793 patent are unpatentable based on the following grounds (Pet. 30–68):[1]

| Claim(s) Challenged | 35 U.S.C. §[2] | Reference(s)/Basis |
|---|---|---|
| 1–8 | 103(a) | '212 patent,[3] Voswinckel JESC,[4] Voswinckel JAHA[5] |
| 1–8 | 103(a) | '212 patent, Voswinckel JESC |
| 1 | 102(a) | Ghofrani[6] |
| 1, 3, 8 | 103(a) | Voswinckel JAHA, Ghofrani |
| 1, 3 | 102(a) | Voswinckel 2006[7] |

---

[1] Petitioner also relies on declarations from Nicholas Hill, M.D., and Igor Gonda, Ph.D. Exs. 1002, 1004, 1106, 1107.

[2] The '793 patent claims a priority date of May 15, 2006, and Petitioner "assumes the relevant priority date . . . is May 15, 2006." Pet. 12; Ex. 1001, code (60). Accordingly, patentability is governed by the versions of 35 U.S.C. §§ 102 and 103 preceding the amendments in the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112–29, 125 Stat. 284 (2011).

[3] US 6,521,212 B1, issued Feb. 18, 2003 (Ex. 1006) (alleged to be prior art under 35 U.S.C. §§ 102(a), (b), (e)).

[4] Voswinckel, R., et al., *Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension*, 25 EUROPEAN HEART J. 22 (2004) (Ex. 1007) (alleged to be prior art under 35 U.S.C. § 102(b)).

[5] Robert Voswinckel, et al., *Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension*, in Abstracts from the 2004 Scientific Sessions of the American Heart Association, 110 CIRCULATION III-295 (Oct. 26, 2004) (Ex. 1008) (alleged to be prior art under 35 U.S.C. § 102(b)).

[6] Hossein Ardeschir Ghofrani, et al., *Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie*, 30 HERZ 296–302 (June 2005) (Ex. 1010) (alleged to be prior art under 35 U.S.C. § 102(a)). We rely on the English translation that follows the German original article as part of Ex. 1010.

[7] Robert Voswinckel, et al., *Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension*, 144 ANNALS OF INTERNAL MEDICINE

IPR2021-00406
Patent 10,716,793 B2

| Claim(s) Challenged | 35 U.S.C. §² | Reference(s)/Basis |
|---|---|---|
| 2, 4–8 | 103(a) | Voswinckel 2006, '212 patent |

### D. The '793 Patent

The '793 patent, titled "Treprostinil Administration by Inhalation," issued on July 21, 2020. Ex. 1001, codes (45), (54). The patent "relates to methods and kits for therapeutic treatment and, more particularly, to therapeutic methods involving administering treprostinil using a metered dose inhaler and related kits." *Id.* at 1:20–23.

Treprostinil "is a prostacyclin analogue" that may be used to treat pulmonary hypertension. *Id.* at 5:37–41. According to the '793 patent, it was previously known to administer treprostinil by intravenous, subcutaneous, or inhalation routes to treat any of several conditions, including pulmonary hypertension. *Id.* at 5:42–58.

The '793 patent relates to the administration of treprostinil in high concentrations over a short inhalation time. *Id.* at 16:61–63, 17:44–46. This method of administration is described as reducing pulmonary vascular resistance and pulmonary artery pressure, as well as increasing cardiac output. *Id.* at 16:32–42, Fig. 10.

### E. Illustrative Claim

Claims 1–8 of the '793 patent are challenged. Claim 1 is independent and illustrative; it recites:

> 1. A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a

---

149–50 (January 2006) (Ex. 1009) (alleged to be prior art under 35 U.S.C. § 102(a)).

**Appx0004**

IPR2021-00406
Patent 10,716,793 B2

> formulation comprising treprostinil or a
> pharmaceutically acceptable salt thereof with an
> inhalation device, wherein the therapeutically
> effective single event dose comprises from 15
> micrograms to 90 micrograms of treprostinil or a
> pharmaceutically acceptable salt thereof delivered
> in 1 to 3 breaths.

Ex. 1001, 18:23–31.

## ANALYSIS

### A. Claim Construction

In an *inter partes* review, we construe a claim in an unexpired patent "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b) (2020). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Neither party presents any terms for construction. Pet. 12–13 ("Petitioner does not believe construction of any claim term is required"); PO Resp. 7 (not proposing construction of any terms). Accordingly, we determine that no express construction of any claim term is necessary in order to decide whether to institute trial. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)

IPR2021-00406
Patent 10,716,793 B2

("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.")).

### B. Asserted Obviousness over '212 Patent, Voswinckel JESC, and Voswinckel JAHA

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA. Pet. 30–46. Patent Owner argues that Petitioner fails to show that Voswinckel JESC and Voswinckel JAHA are prior art to the '793 patent. PO Resp. 11–18. Patent Owner also argues that Petitioner fails to show that this combination of references teaches or suggest all the limitations of any of the challenged claims. PO Resp. 18–22, 38–40. In addition, Patent Owner also argues that Petitioner fails to show that a person of ordinary skill in the art would have had a reason to combine the teachings of these references. *Id.* at 23–38.

#### 1. '212 Patent

The '212 patent teaches "[a] method of delivering benzindene prostaglandins to a patient by inhalation." Ex. 1006, code (57). In particular, the '212 patent teaches the use of "[a] benzindene prostaglandin known as UT-15," which "has unexpectedly superior results when administered by inhalation compared to parenterally administered UT-15 in sheep with induced pulmonary hypertension." *Id.* There is evidence in the present record that "UT-15" was also known as "Remodulin" or "treprostinil sodium." Ex. 1035, 582. According to the '212 patent, the UT-15 may be delivered either as droplets formed "from a solution or liquid containing the active ingredient(s)" via a nebulizer, or as a solid-phase powder via an inhaler. Ex. 1006, 5:30–41.

6

According to the '212 patent, this method may be used to "treat[] pulmonary hypertension in a mammal." *Id.* at 14:9–12. Moreover, the '212 patent teaches "medical use" of its method in a "human." *Id.* at 7:4–5. The necessary dose to achieve "a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of the effect desired by the patient's doctor. Titration to effect may be used to determine proper dosage." *Id.* at 6:66–7:3. "[A]erosolized UT-15 has a greater potency as compared to intravascularly administered UT-15," so the '212 patent teaches delivering "only a fraction (10–50%) of the dosage delivered intravascularly" when using its inhalation delivery method. *Id.* at 8:8–12. Even at "high doses," however, the '212 patent teaches a lack of "significant non-lung effects, i.e., heart rate, cardiac output." *Id.* at 10:51–54.

> 2. *Voswinckel JESC*

Voswinckel JESC discusses a study to investigate "the acute hemodynamic response to inhaled treprostinil." Ex. 1007, 7. Of the 29 patients in the study, eight were administered a placebo, groups of six patients each were administered 16, 32, and 48 μg/mL solutions of treprostinil, and three patients were administered a solution containing 64 μg/mL of treprostinil. *Id.* Each administration used an "OptiNeb ultrasound nebulizer, [made by] Nebu-Tec, Germany" for six minutes. *Id.* For each patient, various measurements were taken before administration of the treprostinil and at 0, 15, 30, 60, 90, 120, 150, and 180 minutes after administration. *Id.* According to Voswinckel JESC, "[t]reprostinil inhalation results in a significant long-lasting pulmonary vasodilatation,"

7

and, "at a concentration of 16 μg/mL, near maximal pulmonary vasodilatation is achieved without adverse effects." *Id.*

### 3. Voswinckel JAHA

Voswinckel JAHA discusses a study of 17 patients with "severe pulmonary hypertension" who received treprostinil inhalations. Ex. 1008, 3. These inhalations each involved "3 single breaths" using a "pulsed OptiNeb® ultrasound nebulizer" and a "600 μg/mL" treprostinil solution. *Id.* In addition, "[t]wo patients with idiopathic PAH received compassionate treatment with 4 inhalations of TRE per day after the acute test" and were "treated for more than 3 months." *Id.* According to Voswinckel JAHA, "inhalation resulted in a sustained, highly pulmonary selective vasodilatation over 120 minutes," showing "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing," and "[t]olerability is excellent even at high drug concentrations and short inhalation times (3 breaths)." *Id.*

### 4. Prior-Art Status of Voswinckel JESC and Voswinckel JAHA

In arguing that claims 1–8 would have been obvious, Petitioner relies on Voswinckel JESC and Voswinckel JAHA, but Patent Owner argues that Petitioner fails to show sufficiently that either of these references qualifies as a "printed publication." PO Resp. 11–18.

Only "prior art consisting of patents or printed publications" may form "the basis of" an *inter partes* review. 35 U.S.C. § 311(b). Neither Voswinckel JESC nor Voswinckel JAHA is a patent, so Petitioner may not rely on these references unless they are "printed publications." *Id.* Public accessibility is the "touchstone in determining whether a reference constitutes a printed publication," and a reference is considered publicly

8

accessible only if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008) (quoting *SRI Int'l, Inc. v. Internet Sec. Sys. Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008); *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)).

Patent Owner argues that, because Petitioner relies on Voswinckel JESC and Voswinckel JAHA having been "stored in libraries, public accessibility requires that the reference be both available at the library and sufficiently indexed or catalogued by the priority date." PO Resp. 12 (citing *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016); *In re Klopfenstein*, 380 F.3d 1345, 1349 (Fed. Cir. 2004)). According to Patent Owner, Petitioner fails to show sufficiently either of these requirements. *Id.* at 12–18.

But Petitioner does not rely solely on availability in libraries to show the prior-art status of Voswinckel JESC and Voswinckel JAHA. Instead, Petitioner also argues that "Voswinckel JESC is an abstract presented at the European Society of Cardiology (JESC) Congress," that Voswinckel JAHA "was publicly presented at the 2004 Scientific Sessions of the American Heart Association," and that both references were cited in other documents dating from before the priority date of the '793 patent whose public accessibility is not at issue. Pet. 22; Reply 3–4, 6–8.

Patent Owner objects that Petitioner's public-presentation and citation-in-other-references arguments are untimely because they should have been, but were not, presented in the Petition. Sur-Reply 2–3. We disagree. First, the argument that Voswinckel JESC was presented publicly

9

appears in the Petition. Pet. 22. Second, although other of Petitioner's arguments appear for the first time in the Reply, they are not untimely. Reply 3–4, 6–8.

Petitioner is permitted a "limited opportunit[y]" to present new evidence in or with its Reply, as long as that new evidence is "responsive to the prior briefing" and does not constitute "changing theories after filing [the] petition." *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29, at 14–15 (PTAB Dec. 20, 2019) (precedential). Here, both of the arguments that Patent Owner alleges are new—the argument that Voswinckel JESC and Voswinckel JAHA were presented publicly and the argument that these references were cited in other publicly available references—respond to Patent Owner's argument in the Patent Owner Response that Voswinckel JESC and Voswinckel JAHA were not publicly accessible. PO Resp. 11–18. The argument that Voswinckel JESC was publicly presented is not a change in theory from the Petition, because Petitioner presented this argument in the Petition. Pet. 22. As to both Voswinckel JESC and Voswinckel JAHA, Petitioner's Reply evidence showing citation to the references in other publicly accessible documents is merely additional evidence supporting Petitioner's original theory that a person of ordinary skill in the art could have located the references. Accordingly, we find that the following arguments made by Petitioner are not untimely: (1) that Voswinckel JESC was presented publicly, (2) that Voswinckel JESC was referenced in a publicly accessible document, and (3) that Voswinckel JAHA was referenced in a publicly accessible document.

Given the evidence supporting Petitioner's timely arguments, we are persuaded that Petitioner has shown by a preponderance of the evidence that

IPR2021-00406
Patent 10,716,793 B2

Voswinckel JESC and Voswinckel JAHA were publicly accessible. "[T]he presence of a 'research aid' can . . . establish public accessibility" of a reference if that research aid "provide[s] a skilled artisan with a sufficiently definite roadmap leading to" the reference by "provid[ing] enough details [to] determine that an interested party is reasonably certain to arrive at the destination: the potentially invalidating reference." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1350 (Fed. Cir. 2016).

Here, Petitioner directs us to research aids for finding both Voswinckel JESC and Voswinckel JAHA: a "June 2005 Ghofrani article in the journal *Herz*" for the former, and "a March 2005 article authored by Roxana Sulica et al. in the *Expert Review of Cardiovascular Therapy*" for the latter. Reply 3, 7 (citing Ex. 1010, 298, 301; Ex. 1104, 359). The Ghofrani article cites Voswinckel JESC as providing a solution to patients experiencing "pain at the injection site" by replacing injected treprostinil for "pulmonary arterial hypertension" with "*inhaled* treprostinil." Ex. 1010, 298 (citing reference 6), 301 (defining reference 6 as Voswinckel JESC). The Ghofrani article also discusses the study reported in Voswinckel JESC, summarizing both the "major reduction in pulmonary selective pressure and resistance" and the lack of "adverse effects" described in Voswinckel JESC. *Id.* The Sulica article cites to Voswinckel JAHA, explaining that the reference reports that "inhaled treprostinil demonstrated substantial pulmonary vasodilatory efficacy in acute administration, as well as symptomatic and functional benefit in chronic use in a small number of PAH patients." Ex. 1104, 351, 359. Thus, both the Ghofrani article and the Sulica article provide roadmaps directing a person of ordinary skill in the art looking for successful studies discussing the use of inhaled treprostinil in

11

IPR2021-00406
Patent 10,716,793 B2

pulmonary arterial hypertension straight to Voswinckel JESC or Voswinckel
JAHA. Because these articles provide these roadmaps, they are "research
aid[s]" that "establish [the] public accessibility" of Voswinckel JESC and
Voswinckel JAHA. *Blue Calypso*, 815 F.3d at 1350.

   5.   *Analysis*

Petitioner argues that the combination of the '212 patent, Voswinckel
JESC, and Voswinckel JAHA teaches or suggests the subject matter of
claims 1–8 and that a person of ordinary skill in the art would have had a
reason to combine the teachings of these references with a reasonable
expectation of success. Pet. 30–46. Patent Owner argues that this
combination of references fails to teach or suggest delivering a dose of
treprostinil within the dose range of the challenged claims in a single dosing
event of one to three breaths. Prelim. Resp. 42–55.

   a.   Claim 1

> (1) *"A method of treating pulmonary hypertension
> comprising administering by inhalation to a
> human suffering from pulmonary hypertension
> a therapeutically effective single event dose of a
> formulation comprising treprostinil or a
> pharmaceutically acceptable salt thereof"*

Claim 1 recites "[a] method of treating pulmonary hypertension
comprising administering by inhalation to a human suffering from
pulmonary hypertension a therapeutically effective single event dose of a
formulation comprising treprostinil or a pharmaceutically acceptable salt
thereof." Ex. 1001, 18:23–27. Petitioner argues that the '212 patent,
Voswinckel JESC, and Voswinckel JAHA each teach or suggest this
limitation. Pet. 35–37. Patent Owner does not dispute this argument.
PO Resp. 10–40.

12

The '212 patent teaches treating pulmonary hypertension via inhalation of a benzindene prostaglandin called UT-15, which was also known as "treprostinil sodium." Ex. 1006, code (57) (identifying "benzindene prostaglandin" as "UT-15"), 2:66–3:5 ("This invention relates to . . . a method of treating pulmonary hypertension by administering an effective amount of a benzindene prostaglandin to a mammal in need thereof by inhalation."); Ex. 1035, 582 ("UT-15" also known as "treprostinil sodium"). Voswinckel JAHA teaches treating "patients with severe pulmonary hypertension" with "Inhaled Treprostinil Sodium (TRE)" with "3 single breaths" of "TRE solution 600 µg/ml," resulting in "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." Ex. 1008, 3. Voswinckel JESC describes "the acute hemodynamic response to inhaled treprostinil" following the administration to patients of nebulized treprostinil solution in concentrations of 16, 32, 48, and 64 µg/ml for six minutes, resulting in "significant long-lasting pulmonary vasodilatation" without "adverse effects." Ex. 1007, 7.

Accordingly, Petitioner has shown by a preponderance of the evidence that the '212 patent, Voswinckel JESC, and Voswinckel JAHA each teach or suggest this portion of claim 1.

*(2) "With an inhalation device"*

Next, claim 1 recites "with an inhalation device." Ex. 1001, 18:27–28. Petitioner argues that the '212 patent, Voswinckel JESC, and Voswinckel JAHA each teach or suggest this limitation. Pet. 37. Patent Owner does not dispute this argument. PO Resp. 10–40. The '212 patent teaches the use in its inhalation method of "a nebulizer, inhaler, atomizer or aerosolizer" to "form[] droplets from a solution or liquid containing the

13

IPR2021-00406
Patent 10,716,793 B2

active ingredient(s)." Ex. 1006, 5:30–32. Both Voswinckel JESC and

Voswinckel JAHA teach the use of a "nebulizer" in their inhalation

methods. Ex. 1007, 7 ("OptiNeb ultrasound nebulizer"); Ex. 1008, 3 ("the

pulsed OptiNeb® ultrasound nebulizer"). Dr. Hill testifies that a person of

ordinary skill in the art would have understood "that nebulizers and inhalers

are inhalation devices." Ex. 1002 ¶ 94. Accordingly, Petitioner has shown

by a preponderance of the evidence that the '212 patent, Voswinckel JESC,

and Voswinckel JAHA each teach or suggest this limitation of claim 1.

> (3) *"Wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof"*

Claim 1 recites "wherein the therapeutically effective single event

dose comprises from 15 micrograms to 90 micrograms of treprostinil or a

pharmaceutically acceptable salt thereof." Ex. 1001, 18:28–30. Petitioner

argues that the combination of the '212 patent and Voswinckel JESC teaches

or suggests this limitation. Pet. 37–40. Patent Owner disagrees. PO

Resp. 18–38.

Petitioner calculates the dose that the prior art teaches delivering by

inhalation in three separate ways: (1) relying on Voswinckel JESC's solution

concentrations and solution volumes taught by Ex. 1037, (2) relying on

Voswinckel JESC's solution concentrations and solution volumes normally

delivered according to the testimony of Petitioner's declarants, and

(3) relying on the '212 patent's conversion from an intravascular treprostinil

dose to an equivalent inhaled dose. Pet. 22–24, 38–39. According to

Petitioner, each of these three calculation methods results in a teaching of a

14

therapeutically effective single event dose comprising from 15 micrograms to 90 micrograms of treprostinil.  *Id.*

We agree with Patent Owner that Petitioner's first and third calculation methods do not demonstrate that the prior art taught or suggested a therapeutically effective single event dose comprising from 15 micrograms to 90 micrograms of treprostinil, and we do not discuss these calculations any further.  The preponderance of the evidence, however, supports Petitioner's argument that its second calculation demonstrates that the prior art taught or suggested a therapeutically effective single event dose comprising from 15 micrograms to 90 micrograms of treprostinil.

Voswinckel JESC teaches that "patients inhaled solvent solution (placebo) (n=8) or treprostinil for 6 min (OptiNeb ultrasound nebulizer, Nebu-tec, Germany) in concentrations of 16, 32, 48, and 64 µg/ml (n=6, 6, 6, and 3 patients)."  Ex. 1007, 7.  Although this teaching shows administration to patients of inhaled solutions with particular concentrations of treprostinil, it does not disclose the amount of solution administered, which is necessary in order to calculate the amount of treprostinil administered.  *Id.*  Petitioner directs us to the testimony of its declarants, Dr. Nicholas Hill and Dr. Igor Gonda, to understand how a person of ordinary skill in the art would have interpreted Voswinckel JESC's disclosure.  Pet. 23 (citing Ex. 1002 ¶ 65; Ex. 1004 ¶ 56).  Dr. Gonda testifies that "in May 2006 . . . nebulizers conventionally deliver[ed] between 1 and 5 mL" of solution.  Ex. 1004 ¶ 56.  Relying on Dr. Gonda's testimony as well as his own experience, Dr. Hill testifies that a person of ordinary skill in the art in 2006 would have understood that "nebulizers . . . nebulize (i.e. aerosolize liquid) at least" 1 mL of solution.  Ex. 1002 ¶ 65.

IPR2021-00406
Patent 10,716,793 B2

Multiplying Voswinckel JESC's 16, 32, 48, or 64 micrograms of treprostinil per milliliter of solution by the 1 to 5 milliliters of solution in the testimony of Drs. Hill and Gonda, a person of ordinary skill in the art would have interpreted Voswinckel JESC as teaching the delivery of 16–80, 32–160, 48–240, or 64–320 micrograms of treprostinil. Each of those four dose ranges has at least one endpoint that falls within the 15–90 microgram claimed range.

Patent Owner argues that this evidence is insufficient to show that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests a therapeutically effective single event dose comprising from 15 micrograms to 90 micrograms of treprostinil. Specifically, Patent Owner argues that the volume of solution that Drs. Hill and Gonda testify was typically used in nebulizers is "the fill volume," or the amount of solution loaded into a nebulizer to be nebulized, which cannot be used with the concentrations in Voswinckel JESC to arrive at the amount of treprostinil actually delivered to a patient. PO Resp. 30–31. This is because "there is no guarantee that the entire fill volume would be completely nebulized in" the time period over which Voswinckel JESC teaches delivering its dose of treprostinil. *Id.* at 30. In addition, Patent Owner argues that there were other factors that might have caused less than all the solution nebulized by a nebulizer to be actually delivered to the patient, none of which Petitioner accounts for. *Id.* at 31–32.

Petitioner "presented evidence that nebulizers at the time typically involved fill volumes of 1-5mL." Reply 10–11. To the extent that something less than the entire fill volume was delivered to the patient, either because it was not nebulized or because other factors resulted in the

16

**Appx0016**

IPR2021-00406
Patent 10,716,793 B2

nebulized solution not reaching the mouthpiece, the preponderance of the evidence still supports the actual delivered solution volume being at least one milliliter. Dr. Hill testifies that the "at least 1 mL" of solution he discusses is the volume that "nebulizers at the time were known to nebulize," not the amount of liquid loaded into the nebulizer. Ex. 1002 ¶ 65. Patent Owner's declarant, Dr. Aaron Waxman, testifies that standard nebulizers had fill volumes of "3 to 5 [milliliters]" and that he had never administered a dose as low as one milliliter to a patient. Ex. 1108, 153:1–22; 156:12–16.

Thus, Voswinckel JESC teaches delivering solution with a treprostinil concentration of 16, 32, 48, or 64 micrograms per milliliter, and the preponderance of the evidence supports a finding that a person of ordinary skill in the art would have understood the volume of solution delivered in Voswinckel JESC to be at least one milliliter. Accordingly, Petitioner has shown by a preponderance of the evidence that Voswinckel JESC teaches or suggests a therapeutically effective single event dose comprising from 15 micrograms to 90 micrograms of treprostinil.

### (4) "Delivered in 1 to 3 breaths"

Claim 1 recites "delivered in 1 to 3 breaths." Ex. 1001, 18:31. Petitioner argues that Voswinckel JAHA teaches or suggests this limitation. Pet. 40–41. Patent Owner does not dispute this teaching of Voswinckel JAHA. PO Resp. 10–40.

Voswinckel JAHA teaches delivering to patients "a TRE inhalation by use of the pulsed OptiNeb® ultrasound nebulizer (3 single breaths, TRE solution 600 μg/ml)." Ex. 1008, 3. It also reports that "[t]olerability is excellent even at high drug concentrations and short inhalation times (3

17

IPR2021-00406
Patent 10,716,793 B2

breaths)." *Id.*  Accordingly, Petitioner has shown by a preponderance of the evidence that Voswinckel JAHA teaches or suggests this limitation of claim 1.

> b. Reason to Combine with a Reasonable Expectation
> of Success

As discussed above, Petitioner has shown sufficiently on the present record that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests every limitation of claim 1.  This alone is not sufficient to show that the challenged claims would have been obvious; Petitioner also must show that a person of ordinary skill would have had a reason to combine the teachings of the references and would have had a reasonable expectation of success in doing so.

Petitioner argues that a person of ordinary skill in the art would have had a reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.  Pet. 30–34.  Patent Owner argues that a person of ordinary skill in the art would have had "serious concerns about side effects" that would have persuaded them not to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.  PO Resp. 37–38.

The '212 patent teaches the use of inhaled treprostinil sodium for the treatment of pulmonary hypertension at doses between 10 and 50 percent of the doses needed for intravascular delivery.  Ex. 1006, code (57), 6:1–2, 8:8–12.  According to the '212 patent, the inhaled treprostinil sodium is used in sheep, which are a model for pulmonary hypertension in humans.  *Id.* at 9:14–27.  Dr. Hill testifies that, based on these teachings, a person of ordinary skill in the art would have looked for further information regarding "experimentation [with] inhaled treprostinil in humans."  Ex. 1002 ¶ 78.  On

IPR2021-00406
Patent 10,716,793 B2

the present record, such information can be found in Voswinckel JESC, which reports on a study in which humans with pulmonary hypertension inhaled treprostinil and experienced "significant long-lasting pulmonary vasodilatation . . . without adverse effects." Ex. 1007, 7.

Dr. Hill testifies that, based on the teachings of these references a person of ordinary skill would reasonably have expected that treprostinil could safely and effectively treat pulmonary hypertension in humans. Ex. 1002 ¶ 79. Dr. Hill also testifies that a person of ordinary skill in the art "would have been motivated to further decrease the 6 minute administration time in Voswinckel JESC." Ex. 1002 ¶ 80. Specifically, Dr. Hill testifies that patients often did not adhere to "inhalation therapy for respiratory diseases," that "[p]oor adherence to medication was known to correlate with worse outcomes," and that "reducing administration time or the number of breaths required for therapy [was known to] improve adherence rates." *Id.* (citing Ex. 1002 ¶¶ 36–37; Ex. 1030, 63; Ex. 1032, 179–80; Ex. 1077, 4). Voswinckel JAHA teaches administering treprostinil in three breaths using a high concentration of treprostinil in the aerosolized solution. Ex. 1008, 3. Accordingly, Dr. Hill testifies that a person of ordinary skill in the art would have looked to Voswinckel JAHA to improve patient adherence to the treatment suggested by the combination of the '212 patent and Voswinckel JESC, providing a reason to combine its teachings with those of the other two references. Ex. 1002 ¶¶ 80–82.

Against this evidence, Patent Owner directs us to the report in Voswinckel JESC that "there were no significant adverse effects" at the lowest treprostinil concentration but that "mild and transient" "[h]eadache, cough or bronchoconstriction were observed" in some patients at higher

doses, and that one patient at Voswinckel JESC's highest treprostinil dose "complained of major headache for 1 hour." Ex. 1007, 7; *see* PO Resp. 37–38. As Patent Owner puts it, "Voswinckel JESC warns in its Conclusion that 'at a concentration of 16 µg/ml, near maximal pulmonary vasodilation is achieved without adverse effects' but '[a]t higher doses, local and systemic side effects may occur.'" PO Resp. 37–38 (quoting Ex. 1007, 7). Because Petitioner's proffered reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA requires an increase in treprostinil concentration in order to administer the full dose in three breaths, Patent Owner argues that Voswinckel JESC's warning about side effects at higher doses would have persuaded a person of ordinary skill in the art not to pursue such a course. *Id.*

The preponderance of the evidence supports Petitioner's position. Patent Owner is correct that Voswinckel JESC notes that side effects could occur more frequently at higher doses than at lower doses. Ex. 1007, 7. But there is considerable evidence of record that a person of ordinary skill in the art would not have avoided increasing Voswinckel JESC's dose due to the side effects reported in Voswinckel JESC. First, Dr. Hill testifies that "[p]otential side effects are always weighed against potential clinical benefit, and pulmonary arterial hypertension is a serious, life-threatening disease where physicians and patients are more willing to tolerate side effects . . . to obtain clinical benefit." Ex. 1106 ¶ 74. Second, Dr. Waxman testifies that "[u]sually the headache goes away" and "there are things that can be done to help ameliorate the cough so in general we are able to get over that issue." Ex. 1108, 101:19–102:10. Together with Voswinckel JESC's description of potential side effects as "mild and transient," this evidence supports a

20

IPR2021-00406
Patent 10,716,793 B2

finding that a person of ordinary skill in the art would not have been deterred from pursuing the course that is supported by the evidence to which Petitioner directs us.

With respect to reasonable expectation of success, Petitioner argues that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA because Voswinckel JAHA teaches that "[t]olerability is excellent" for its short-duration, high-concentration treprostinil inhalation therapy.  Pet. 33 (citing Ex. 1008, 3).  Other than the argument discussed above about side effects reported in Voswinckel JESC, Patent Owner does not raise any timely counter to this argument.[8]  PO Resp. 10–40.  The record supports Petitioner's argument.  Ex. 1008, 3.

Accordingly, Petitioner has shown by a preponderance of the evidence that a person of ordinary skill in the art would have had a reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA and that they reasonably would have expected to succeed in doing so.

---

[8] In the Sur-Reply, Patent Owner raises for the first time three arguments against a reasonable expectation of success.  Sur-Reply 21–22 (arguing that a person of ordinary skill in the art would not expect success in delivering Voswinckel JESC's dose over Voswinckel JAHA's three breaths because (1) it would require "increas[ing] the number [of] doses per day," (2) Voswinckel JAHA "lacked any placebo arm," and (3) Voswinckel JESC and Voswinckel JAHA used patients with differing pulmonary vascular resistances).  "A sur-reply may only respond to arguments raised in the corresponding reply."  37 C.F.R. § 42.23(b).  Petitioner's Reply did not raise any argument regarding a reasonable expectation of success.  Reply 1–27.  Therefore, we do not consider these newly raised arguments as they exceed the proper scope of the Sur-Reply.

IPR2021-00406
Patent 10,716,793 B2

c.  Objective Indicia of Nonobviousness

Patent Owner directs us to evidence of three objective indicia that Patent Owner argues show the nonobviousness of the challenged claims.  PO Resp. 55–62.  Petitioner argues that the claims would have been obvious despite the evidence to which Patent Owner directs us.  Reply 23–27.

*(1) Unexpected Results*

First, Patent Owner directs us to evidence that allegedly demonstrates that the challenged claims would have been nonobvious because they "unexpectedly achieved a therapeutically effective dose that was well tolerated" despite the fact that such "high doses of treprostinil were known in the art to produce dose-limiting side effects."  PO Resp. 55.  According to Patent Owner, the challenged claims "produce[d] a new and unexpected result which is different in kind and not merely in degree from the results of the prior art," which is evidence of those claims' nonobviousness.  *Id.* at 55–57 (quoting *In re Aller*, 220 F.2d 454, 456 (CCPA 1955)).  Specifically, Patent Owner argues that the inhaled treprostinil dose recited in the challenged claims represented an increase of "an order of magnitude" over "the maximal tolerated dose" of "intravenous epoprostenol" or "intravenous treprostinil."  *Id.* at 56.  Similarly, Patent Owner argues that the challenged claims cover doses of inhaled treprostinil higher than a dose of inhaled iloprost that many patients were unable to tolerate.  *Id.* at 56–57.

"[U]nexpected results must establish . . . a difference between the results obtained and those of the closest prior art."  *Bristol-Myers Squibb v. Teva Pharms. USA*, 752 F.3d 967, 977 (Fed. Cir. 2014).  Petitioner argues that the prior art over which Patent Owner argues the challenged claims showed unexpected results is not the closest prior art.  Reply 24.  We agree.

22

IPR2021-00406
Patent 10,716,793 B2

As noted above, Patent Owner argues that the challenged claims show unexpected results over inhaled iloprost, intravenous epoprostenol, and intravenous treprostinil.  PO Resp. 55–57.  But the challenged claims recite inhaled treprostinil, and, as discussed above, inhaled treprostinil is taught by each of the '212 patent, Voswinckel JESC, and Voswinckel JAHA. Ex. 1001, 18:22–44; Ex. 1006, code (57); Ex. 1007, 7; Ex. 1008, 3; Ex. 1035, 582.  Patent Owner does not even allege that the results of the challenged claims are unexpected over these references.[9]  Accordingly, we find that the evidence of record does not establish that the challenged claims produced a result that was unexpected over the closest prior art.

*(2) Copying*

Second, Patent Owner directs us to evidence that allegedly demonstrates that the challenged claims would have been nonobvious because Petitioner copied Patent Owner's product, Tyvaso, which is an embodiment of the challenged claims, when Petitioner developed its product, LIQ861.  PO Resp. 57–61.

"[F]or objective indicia of nonobviousness to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention." *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33, 32 (PTAB Jan. 24, 2020) (precedential) (citing *ClassCo, Inc. v. Apple, Inc.*, 838 F.3d 1214, 1220 (Fed. Cir. 2016)).  A patentee is entitled to a presumption of nexus "when the patentee shows that

---

[9] Patent Owner argues that Voswinckel JESC and Voswinckel JAHA are not prior art to the '793 patent.  PO Response 44–55; Sur-Reply 2–11, 25.  As discussed above, however, Petitioner has shown by a preponderance of the evidence that these references qualify as prior art.

IPR2021-00406
Patent 10,716,793 B2

the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) (quoting *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018) (quoting *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000))).

Here, Patent Owner does not allege, let alone "show[]" as required by *Fox Factory*, that Petitioner's LIQ861 product "is coextensive with" the features claimed in the '793 patent. 944 F.3d at 1373; *see* PO Resp. 57–61; Sur-Reply 26. Patent Owner does allege that the LIQ861 product embodies the challenged claims, PO Resp. 58–61, and we presume for purposes of our analysis that Patent Owner's allegation on this issue is correct. But *Fox Factory* requires both a showing that the product in question embodies the claims and a showing that the product in question is coextensive with the claims, and Patent Owner satisfies at most one of those two requirements. Accordingly, we find that a presumption of nexus is inappropriate.

"A finding that a presumption of nexus is inappropriate does not end the inquiry into secondary considerations." *Fox Factory*, 944 F.3d at 1373. "To the contrary, the patent owner is still afforded an opportunity to prove nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Id.* at 1373–74 (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)). "Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention," meaning that "there must be a nexus to

some aspect of the claim not already in the prior art." *In re Kao*, 639 F.3d 1057, 1068–69 (Fed. Cir. 2011) (emphasis in original).

On the other hand, there is no requirement that "objective evidence must be tied exclusively to claim elements that are not disclosed in a particular prior art reference in order for that evidence to carry substantial weight." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331 (Fed. Cir. 2016). A patent owner may show, for example, "that it is the claimed combination as a whole that serves as a nexus for the objective evidence; proof of nexus is not limited to only when objective evidence is tied to the supposedly 'new' feature(s)." *Id.* Ultimately, the fact finder must weigh the secondary considerations evidence presented in the context of whether the claimed invention as a whole would have been obvious to a skilled artisan. *Id.* at 1331–32.

Here, Patent Owner directs us to several pieces of evidence that it contends show the LIQ861 product has a nexus to the challenged claims. First, as noted above, Patent Owner argues that LIQ861 embodies those claims. PO Resp. 58–61. Second, Patent Owner notes that "[t]he pharmacokinetics and bioavailability of a 79.5 microgram capsule dose [of LIQ861] was directly compared [by Petitioner] with Patent Owner's commercial product," demonstrating that "Petitioner's commercial product had comparable treprostinil bioavailability with Tyvaso® when delivered in a similar dosage range." *Id.* at 57–58 (citing Ex. 2085). Third, Patent Owner directs us to the new drug application Petitioner filed with the FDA, "relying in part on FDA's previous findings of efficacy and safety of Tyvaso® for the treatment of PAH." *Id.* at 58 (citing Ex. 2089, 3).

Taking these pieces of evidence in reverse order, we note first that the new drug application for LIQ861 was filed "under the 505(b)(2) regulatory pathway." *Id.*; *see also* Reply 25; Ex. 2089, 3. As Petitioner notes, Reply 25, and as Patent Owner does not dispute, Sur-Reply 26, applications for drugs under this pathway do not necessarily copy all aspects of the original drug, but they may rely on the investigations that showed the safety and efficacy of the original drug that uses the same active ingredient. 21 U.S.C. § 355(b)(2). In this respect, they differ from applications under the § 505(j) regulatory pathway, under which the new drug must generally have the same "active ingredient," "route of administration," "dosage form," "strength," and "labeling" as the original drug. 21 U.S.C. § 355(j)(2). Because the challenged claims here recite limitations requiring administration by inhalation of a particular amount of treprostinil in a particular number of breaths (and in some cases using a particular type of device and with the drug in a particular form), evidence that Petitioner merely relied on previous studies of the safety and efficacy of the recited active ingredient is not particularly strong evidence of copying.

Next, we consider the evidence that Petitioner compared the pharmacokinetics and bioavailability of its LIQ861 product with those of Patent Owner's Tyvaso product. Ex. 2085. Patent Owner argues that this evidence shows that "Petitioner's commercial product had comparable treprostinil bioavailability with Tyvaso® when delivered in a similar dosage range." PO Resp. 57–58. Regardless of whether an objective indicium of nonobviousness has its nexus to a single "aspect of the claim not already in the prior art," *Kao*, 639 F.3d at 1068–69, or to "the claimed combination as a whole," *WBIP*, 829 F.3d at 1331, it still must have some nexus to the claim

IPR2021-00406
Patent 10,716,793 B2

in question.  The challenged claims, however, do not recite any limitations for treprostinil bioavailability or pharmacokinetics.  Ex. 1001, 18:22–44.  Accordingly, evidence that Petitioner formulated its product to have similar bioavailability and pharmacokinetics to Patent Owner's product is, at most, very weak evidence of copying as to the claims at issue here.

Finally, we consider the evidence that LIQ861 embodies the challenged claims.  PO Resp. 58–61.  "Not every competing product that arguably falls within the scope of a patent is evidence of copying; otherwise, 'every infringement suit would automatically confirm the nonobviousness of the patent.'"  *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (quoting *Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004)).  Proof of copying requires "actual evidence of copying efforts as opposed to mere allegations regarding similarities between the accused product and a patent."  *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1137–38 (Fed. Cir. 2019).  Thus, evidence that LIQ861 embodies the challenged claims is not evidence that could, without more, support a finding that Petitioner copied Patent Owner's patented method.  As discussed above, to the extent there is any evidence of what *Liqwd* refers to as "copying efforts" beyond mere similarity between LIQ861 and the challenged claims, that evidence shows that Petitioner copied only features that appear in the prior art, are not recited in the challenged claims, or both.  Accordingly, we do not find that Patent Owner has shown that Petitioner copied the method of the challenged claims.

### (3) Long-Felt and Unmet Need

Patent Owner directs us to evidence that allegedly demonstrates that the challenged claims would have been nonobvious because "[t]he claimed

invention of the '793 patent satisfies a long-felt unmet need in the treatment of pulmonary hypertension." PO Resp. 61–62; *see* Sur-Reply 26. Patent Owner relies on three separate theories to demonstrate this long-felt need. First, in the Response, Patent Owner argues that the approval of inhaled treprostinil as the first treatment for "pulmonary hypertension associated with interstitial lung disease" satisfied "a completely unmet medical need." PO Resp. 61–62 (quoting Ex. 2056, 105:6–8). Second, also in the Response, Patent Owner argues that Petitioner admitted that its LIQ861 product "fulfill[ed] a significant unmet need for PAH patients by maximizing the therapeutic benefits of treprostinil by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy-to-use inhaler." *Id.* at 62 (quoting Ex. 2085). Third, in the Sur-Reply, Patent Owner argues that its Tyvaso product satisfied a need for an "inhaled treatment for pulmonary hypertension" that avoided the "inconvenient dosing and side effects of Ventavis," the only previously approved treatment. Sur-Reply 26 (citing Ex. 1002 ¶ 42; Ex. 1108, 44:19–21, 49:17–50:10; Ex. 2055, 28:22–29:20). Each of these arguments fails for a different reason.

We begin with Patent Owner's third argument, that Tyvaso satisfied a need for an inhaled treatment that avoided the dosing problems and side effects of Ventavis. Patent Owner offers this argument for the first time in the Sur-Reply. *Id.* "A sur-reply may only respond to arguments raised in the corresponding reply." 37 C.F.R. § 42.23(b). "'Respond,' in the context of 37 C.F.R. § 42.23(b), does not mean proceed in a new direction with a new approach as compared to the positions taken in a prior filing." Patent Trial and Appeal Board Consolidated Trial Practice Guide 74 (Nov. 2019), available at https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf.

IPR2021-00406
Patent 10,716,793 B2

As discussed in more detail below, in its prior filings, Patent Owner's only positions with respect to long-felt need were (1) that the patented method satisfied a need for a treatment for pulmonary hypertension associated with interstitial lung disease and (2) that Petitioner admitted that its product satisfied a need. PO Resp. 61–62. Neither of those positions related to a need for a treatment that avoided the problems associated with Ventavis. *Id.* Accordingly, Patent Owner's argument in the Sur-Reply is a new argument that we do not consider further.

Next, we consider Patent Owner's argument that the method of the '793 patent provided the first treatment for pulmonary hypertension associated with interstitial lung disease. *Id.* Even if this is true, it is extremely weak evidence of the nonobviousness of the claims at issue because those claims do not cover treatment of pulmonary hypertension associated with interstitial lung disease. There are multiple groups of pulmonary hypertension conditions. Ex. 1088, 1. In addition to other groups not relevant here, these groups include "WHO Group 1," or "[p]ulmonary arterial hypertension," and "WHO Group 3," or "[p]ulmonary hypertension associated with interstitial lung disease." *Id.* Patent Owner's declarant, Dr. Waxman, testifies that all pulmonary hypertension groups other than Group 1 fall outside the scope of the claims of the '793 patent. Ex. 1132, 116:9–119:12. Dr. Hill agrees. Ex. 1106 ¶ 100. Thus, to the extent the challenged claims satisfied a long-felt and unmet need for a treatment for pulmonary hypertension associated with interstitial lung disease, Patent Owner has not shown that that need is tied to any limitation of the challenged claims or to any challenged claim as a whole.

IPR2021-00406
Patent 10,716,793 B2

Finally, we consider Patent Owner's argument that Petitioner admitted that its LIQ861 product "fulfill[ed] a significant unmet need for PAH patients by maximizing the therapeutic benefits of treprostinil by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy-to-use inhaler." PO Resp. 62 (quoting Ex. 2085). "Evidence of a long-felt but unresolved need can weigh in favor of the non-obviousness of an invention because it is reasonable to infer that the need would not have persisted had the solution been obvious." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1056 (Fed. Cir. 2016). Patent Owner directs us to two pieces of evidence. First, Patent Owner directs us to Exhibit 2085, which states that LIQ861 "fulfill[ed] a significant unmet need for PAH patients by maximizing the therapeutic benefits of treprostinil by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy-to-use inhaler." Ex. 2085, 1. This demonstrates that Petitioner believed its product satisfied a particular "significant unmet need," but it does not demonstrate how long that need persisted. *Id.* Second, Patent Owner directs us to page F-7 of Exhibit 2089, but this page does not address the filling of any need by LIQ861. Ex. 2089, F-7. Thus, Patent Owner does not show that any previously unmet need satisfied by LIQ861 was a need that had persisted, as required by *Apple v. Samsung*. Accordingly, we do not find that Patent Owner has shown that the patented method satisfied any previously unmet and long-felt need.

d. Dependent Claims

Claims 2–8 of the '793 patent depend directly or indirectly from claim 1. Ex. 1001, 18:32–45. Petitioner argues that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests

30

IPR2021-00406
Patent 10,716,793 B2

the additional limitations of these claims. Pet. 41–46. Patent Owner does not dispute these arguments, except with respect to claims 4, 6, and 7. PO Resp. 38–40.

We have reviewed the evidence cited by Petitioner with respect to dependent claims 2, 3, 5, and 8, and we are persuaded that Petitioner has shown by a preponderance of the evidence that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests the subject matter of these claims. For example, claim 2 depends from claim 1 and recites a further limitation that requires that "the inhalation device [be] a soft mist inhaler," and Petitioner directs us to evidence that soft mist inhalers were known in the prior art, as well as evidence that soft mist inhalers were known to be suitable for inhaled delivery of drugs in a small number of breaths. Ex. 1001, 7:33–39, 18:32–33; Ex. 1002 ¶¶ 106–110; Ex. 1004 ¶¶ 66–71; Ex. 1006, 5:30–32; Ex. 1034, 175.

The parties dispute the obviousness of claims 4, 6, and 7. Claim 4 depends from claim 1 and recites a limitation requiring that "the inhalation device [be] a dry powder inhaler." Ex. 1001, 18:36–37. Claim 6 depends from claim 4 and adds a limitation requiring that "the formulation [be] a powder." *Id.* at 18:40–41. Claim 7 depends from claim 6 and adds a limitation requiring that "the powder comprise[] particles less than 5 micrometers in diameter." *Id.* at 18:42–43. Petitioner argues that each of these limitations is taught or suggested by the '212 patent. Pet. 43–45 (citing Ex. 1006, 5:30–32, 5:37–41, 14:19–21; Ex. 1002 ¶¶ 116–117; Ex. 1004 ¶¶ 77–80; Ex. 1038, 311). Patent Owner argues that Petitioner's obviousness argument with respect to these claims is inconsistent with Petitioner's argument in the parallel District Court proceeding that these

31

IPR2021-00406
Patent 10,716,793 B2

claims are not enabled.  PO Resp. 38–40.  Specifically, Patent Owner argues that Dr. Gonda's testimony here that a person of ordinary skill in the art "would have had a reasonable expectation of success that the 'powder' disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler" contradicts Dr. Gonda's testimony in District Court that a person of ordinary skill in the art "would be unable to formulate a treprostinil powder suitable for administration via a dry powder inhaler for [pulmonary hypertension] patients without excessive experimentation." PO Resp. 38–39 (quoting Ex. 1004 ¶ 80; Ex. 2091, 40–61).  Because Dr. Gonda's District Court testimony is more "lengthy" than his testimony here, Patent Owner argues that the District Court testimony is more reliable and that, accordingly, we should not rely on Dr. Gonda's testimony here.  *Id.* at 40.

Dr. Gonda's testimony here provides support for Petitioner's argument that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA in order to arrive at the invention of claims 4, 6, and 7.  Ex. 1004 ¶ 80.  Reasonable expectation of success is a separate inquiry from enablement.  *UCB, Inc. v. Accord Healthcare, Inc.*, 890 F.3d 1313, 1327 (Fed. Cir. 2018) (finding no "authority for the proposition that the presumption of" enablement of prior art "precludes . . . finding that there was no reasonable expectation of success").  Accordingly, the mere fact that Dr. Gonda testifies to a lack of enablement in one forum and to the presence of a reasonable expectation of success in a second forum does not render unreliable the testimony in either forum.  Therefore, we credit the unrebutted testimony of Dr. Gonda that a

32

IPR2021-00406
Patent 10,716,793 B2

person of ordinary skill in the art "would have had a reasonable expectation of success that the 'powder' disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler." Ex. 1004 ¶ 80. In addition, Dr. Gonda's testimony in this proceeding is supported by a citation to Ex. 1038, an October 2005 article that states that dry powder inhalers "are a widely accepted inhaled delivery dosage form," as well as to Ex. 1019, an article stating that 14 separate dry powder inhalers were approved in the United States by 2006. Ex. 1019, 33; Ex. 1038, 1311. This evidence provides us with an additional reason to credit Dr. Gonda's testimony as to reasonable expectation of success.

Moreover, even if there were some connection between enablement and reasonable expectation of success, Patent Owner concedes that the '212 patent enables its own claims. Tr. 43:6–50:9. In other words, the '212 patent provides enough information for a person of ordinary skill in the art to have made and used the invention defined by the claims of the '212 patent. *See* 35 U.S.C. § 112. That invention includes "[a] method for treating pulmonary hypertension in a mammal comprising delivering to said mammal an effective amount of [treprostinil] or its pharmaceutically acceptable salt or ester by inhalation," wherein the treprostinil "is inhaled in powder form comprising particles less than 10 micrometers in diameter." Ex. 1006, 14:9–12, 14:19–21. To the extent that, despite *UCB*, 890 F.3d at 1327, there remains any connection at all between a reasonable expectation of success and enablement, the fact that a person of ordinary skill in the art was enabled to make and use this invention presumably would have rendered that person more likely to expect success in achieving the similar invention of claims 4, 6, and 7 of the '793 patent.

IPR2021-00406
Patent 10,716,793 B2

Further, as discussed above with respect to the reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA, Petitioner directs us to other evidence that a person of ordinary skill in the art would have had a reasonable expectation of success.

For all these reasons, we determine that Petitioner has shown by a preponderance of the evidence that a person of ordinary skill in the art would have had a reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA and would have had a reasonable expectation of success in doing so in order to arrive at the invention of the challenged claims, including claims 4, 6, and 7.

Thus, we move on to whether the prior art teaches or suggests the additional limitations of claims 4, 6, and 7. Petitioner argues that the '212 patent teaches or suggests each of these limitations, and Patent Owner does not dispute that argument. Pet. 43–45; PO Resp. 38–40. Claim 4 recites a limitation requiring that "the inhalation device [be] a dry powder inhaler." Ex. 1001, 18:36–37. The '212 patent teaches using an "inhaler" to deliver treprostinil, that "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention," and that treprostinil "is inhaled in powder form." Ex. 1006, 5:30–32, 5:37–39, 14:19–21. Dr. Hill testifies that a person of ordinary skill in the art would have known that the "inhaler" used to deliver the "powder" of the '212 patent was a dry powder inhaler. Ex. 1002 ¶ 116. Claim 6 depends from claim 4 and adds a limitation requiring that "the formulation [be] a powder." Ex. 1001, 18:40–41. The '212 patent teaches that "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention," as well as that treprostinil "is inhaled in powder form." Ex. 1006, 5:37–39, 14:19–

34

IPR2021-00406
Patent 10,716,793 B2

21.  Claim 7 depends from claim 6 and adds a limitation requiring that "the powder comprise[] particles less than 5 micrometers in diameter."  Ex. 1001, 18:42–43.  The '212 patent teaches that "the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter."  Ex. 1006, 5:39–41.  Accordingly, Petitioner has shown by a preponderance of the evidence that the '212 patent teaches or suggests the additional limitations of claims 4, 6, and 7 of the '793 patent.

e.  Conclusion

As discussed above, Petitioner has shown by a preponderance of the evidence that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests the subject matter of claims 1–8.  Petitioner also has shown by a preponderance of the evidence that a person of ordinary skill in the art would have had a reason to combine the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA and would have had a reasonable expectation of success in doing so to arrive at the invention of the challenged claims.  In addition, the preponderance of the evidence shows that there is at most very weak evidence of objective indicia of nonobviousness, including unexpected results, copying, and long-felt but unmet need.  Weighing together the evidence of the prior art teaching or suggesting the subject matter of the claims, of a reason to combine the teachings of the prior art with a reasonable expectation of success, and of objective indicia of nonobviousness, we conclude that Petitioner has demonstrated that claims 1–8 of the '793 patent would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA and, accordingly, that those claims are unpatentable.

IPR2021-00406
Patent 10,716,793 B2

*C. Asserted Obviousness over '212 Patent and Voswinckel JESC*

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent and Voswinckel JESC. Pet. 46–50. Because Petitioner has shown by a preponderance of the evidence that all of the challenged claims would have been obvious over the similar combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA, we need not reach this asserted ground.

*D. Grounds Relying on Ghofrani or Voswinckel 2006*

Petitioner argues that claim 1 was anticipated by Ghofrani; that claims 1, 3, and 8 would have been obvious over the combination of Voswinckel JAHA and Ghofrani; that claims 1 and 3 were anticipated by Voswinckel 2006; and that claims 2 and 4–8 would have been obvious over the combination of Voswinckel 2006 and the '212 patent. Pet. 50–64. Patent Owner argues that each of these grounds fails because Petitioner fails to show sufficiently that Ghofrani and Voswinckel 2006 qualify as prior art. PO Resp. 44–54. Petitioner disagrees, arguing that these references qualify as prior art under 35 U.S.C. § 102(a). Pet. 25–30.

In the institution decision, we determined that, on the preliminary record available at the time, Petitioner had not shown that either Ghofrani or Voswinckel 2006 qualified as prior art. Inst. Dec. 37–43. Since that decision, Petitioner has neither supplemented the record nor made any additional arguments on this issue. Reply 1–27. During the hearing, Petitioner did not agree that it had abandoned its argument on the grounds asserting Ghofrani or Voswinckel 2006. Tr. 35:13–36:10. Nevertheless, in the absence of any new evidence or argument, we have been directed to nothing that persuades us to reach any decision other than we reached

36

initially.  Accordingly, our analysis below mirrors the analysis we conducted in the institution decision.

### 1.    Prior-Art Status of *Ghofrani*

Ghofrani is an article published in the German journal Herz in June 2005, less than one year before the priority date of the '793 patent. Pet. 25; Ex. 1010, 9; Ex. 1036 ¶¶ 47–55.  Petitioner argues that Ghofrani is prior art to the '793 patent under 35 U.S.C. § 102(a).  Pet. 25–27.  Patent Owner disagrees, arguing that Petitioner has not shown sufficiently that Ghofrani is "by others" under § 102(a).  PO Resp. 44–51.

As both parties acknowledge, establishing prior-art status under § 102(a) requires showing that the reference is "by others," meaning that it was authored by an entity different from the entity that invented the challenged patent.  Pet. 26–27; PO Resp. 44–46; *see Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1346 (Fed. Cir. 2003) ("it is well-settled law that an inventor's own disclosure will not anticipate his later invention" unless published more than one year prior to the priority date (internal quotation marks omitted)).

The authors of Ghofrani are "Hossein Ardeschir Ghofrani, Robert Voswinckel, Frank Reichenberger, Friedrich Grimminger, [and] Werner Seeger."  Ex. 1010, 9.  The inventors of the '793 patent are Horst Olschewski, Robert Roscigno, Lewis J. Rubin, Thomas Schmehl, Werner Seeger, Carl Sterritt, and Robert Voswinckel.  Ex. 1001, code (72).  Thus, there are, as Petitioner argues, "inventors listed on the '793 Patent that are not listed as authors on Ghofrani, and vice versa."  Pet. 26.  Specifically, Ghofrani, Reichenberger, and Grimminger authored the Ghofrani reference but were not inventors of the '793 patent; and Olschewski, Roscigno, Rubin,

IPR2021-00406
Patent 10,716,793 B2

Schmehl, and Sterritt were inventors of the '793 patent but not authors of the Ghofrani reference.

Petitioner argues that these differences alone are sufficient to show that Ghofrani is "by others." *Id.* at 26–27. We agree that it is possible, depending on the state of the rest of the evidence of record, for any difference between the authors of an alleged prior-art reference and the inventors of a challenged patent to render the reference "by others" for purposes of § 102(a). *See, e.g.*, *In re Katz*, 687 F.2d 450, 455 (CCPA 1982) ("ambiguity [was] created by the printed publication" where authors included people not named as inventors); *cf. In re Land*, 368 F.2d 866, 877 (CCPA 1966) (for purposes of § 102(e), reference authored by one co-inventor was "by another").

That said, it is not always sufficient for Petitioner merely to show a difference between a list of authors and a list of inventors. Where the record contains evidence that the reference was derived entirely from the work of the inventors or at least one joint inventor, this evidence may be sufficient to show that the reference is not "by others" for purposes of § 102(a). *Katz*, 687 F.2d at 455–56 (finding inventor's declaration of sole inventorship sufficient to render reference authored by inventor and others not "by others"). Although the testimony of an inventor that the reference in question was derived from the inventors' work may be sufficient on its own, at least where it is not "a mere pro forma restatement of the oath in [the inventor's] application," affidavits from the other authors disclaiming the invention are particularly strong evidence that the reference is not "by others." *Id.* ("Submission of such affidavits or declarations would have ended the inquiry . . . ."). Here, for the reasons discussed below, the

38

IPR2021-00406
Patent 10,716,793 B2

preponderance of the evidence persuades us that, despite the differences between its list of authors and the list of the inventors of the '793 patent, Ghofrani is not "by others" for purposes of § 102(a).

Petitioner's first argument that Ghofrani is "by others" is that there are people who are authors of Ghofrani who are not inventors of the '793 patent. Pet. 26. But Dr. Seeger, one of the inventors of the '793 patent, as well as an author of Ghofrani, describes the roles of the other authors of Ghofrani, explaining that Dr. Ghofrani drafted the portion of the article "relating to phosphodiesterase inhibitors," that Drs. Reichenberger and Grimminger drafted the portion of the article relating to "the use of selective endothelin A receptor agonists for treating pulmonary hypertension," and that he and Dr. Voswinckel—another co-inventor—drafted the portion of the article relating to "the use of inhaled iloprost and inhaled treprostinil for treatment of pulmonary hypertension," the only portion on which Petitioner's unpatentability case rests. Ex. 2003 ¶¶ 4–8. Dr. Seeger's testimony is corroborated by the testimony of Drs. Ghofrani, Reichenberger, and Grimminger, each of whom testifies that they "did not make material contributions to" the portion of the Ghofrani reference relating to inhaled treprostinil. Ex. 2004 ¶¶ 4–5; Ex. 2005 ¶¶ 4–5; Ex. 2006 ¶¶ 4–5. This is precisely the type of testimony that the *Katz* court held should "end[] the inquiry" into whether Ghofrani was "by others." 687 F.2d at 455–56. Accordingly, this evidence overcomes Petitioner's argument that the difference between the Ghofrani authors and the inventors of the '793 patent is sufficient to show that Ghofrani is "by others."

Petitioner also argues that the failure to include some of the inventors of the '793 patent—Olschewski, Roscigno, Rubin, Schmehl, and Sterritt—as

39

authors of Ghofrani renders Ghofrani "by others." Pet. 26–27. But "the fact that a reference does not list any co-inventors as authors . . . is certainly not dispositive in itself." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 969 (Fed. Cir. 2014); *see* MEPEP § 2132.01(I) ("An inventor's or at least one joint inventor's disclosure of his or her own work within the year before the application filing date cannot be used against the application as prior art under pre-AIA 35 U.S.C. 102(a)."). Moreover, Dr. Seeger explains the roles of the other named inventors in designing trials and clinical studies leading to the patent application. Ex. 2003 ¶¶ 22–27. In particular, Dr. Seeger testifies that the Ghofrani reference did not report on the details of the studies and trials that were in part designed by these other authors, explaining why they did not contribute to writing Ghofrani, even though they were involved in the related work that gave rise to the '793 patent. *Id.* ¶¶ 11–12. Dr. Seegar further explains that, "any study that formed the basis of our discussion of inhaled trepostinil in [Ghofrani and two other references] was performed by me in conjunction with my ongoing collaboration with Drs. Voswinckel, Olschewski, Rubin, Schmehl, Sterrit, and Roscigno." *Id.* ¶ 12. Again, then, the preponderance of the evidence supports a determination that Ghofrani is not "by others" for purposes of § 102(a).

## 2.   *Prior-Art Status of Voswinckel 2006*

The issues and arguments regarding Voswinckel 2006 are quite similar to those discussed above regarding Ghofrani. Petitioner argues that Voswinckel 2006 qualifies as prior art under § 102(a) and that it is "by others" both because some of its authors—specifically, Ghofrani and Grimminger—are not inventors of the '793 patent and because some

IPR2021-00406
Patent 10,716,793 B2

inventors of the '793 patent—specifically, Olschewski, Roscigno, Rubin, Schmehl, and Sterritt—are not authors of Voswinckel 2006. Pet. 27–30. Patent Owner disagrees, pointing to the testimony of Drs. Seeger, Ghofrani, and Grimminger explaining the role that the other inventors of the '793 patent played, as well as making clear that neither Ghofrani nor Grimminger authored the portion of Voswinckel 2006 that is relevant as prior art. PO Resp. 44–46, 51–54; Ex. 2003 ¶¶ 20–21 (describing the roles of Drs. Ghofrani and Grimminger, explaining that they "did not participate in the design of any of the studies, did not select the dosing regimen, and did not conduct analysis of patient results discussed in . . . Voswinckel 2006"); 19 ("any study that formed the basis of our discussion of inhaled treprostinil in this reference was performed by me in connection with my ongoing collaboration with [the other inventors]").

For the same reasons discussed above with respect to Ghofrani, we determine that the preponderance of the evidence shows that Petitioner has not shown sufficiently that Voswinckel 2006 is "by others."

### 3. Conclusion

For the reasons discussed above, Petitioner has not shown that either Ghofrani or Voswinckel 2006 qualifies as prior art. Accordingly, Petitioner has not shown the unpatentability of any challenged claim on any ground that relies on either Ghofrani or Voswinckel 2006.

### E. Motions to Exclude Evidence

Each party filed a motion to exclude evidence. Paper 65; Paper 66. We consider each motion separately below.

41

IPR2021-00406
Patent 10,716,793 B2

### 1. Petitioner's Motion to Exclude

Petitioner moves to exclude Exhibits 2092, 2100, 2101, 2102, and 2103 as not authenticated and, for Ex. 2092, as incomplete. Paper 65, 1. Petitioner also moves to exclude the portions of Patent Owner's Sur-Reply that rely on these exhibits. *Id.*

We do not rely on any of the exhibits Petitioner challenges in reaching our decision in this case. Accordingly, we dismiss Petitioner's motion to exclude as moot.

### 2. Patent Owner's Motion to Exclude

Patent Owner moves to exclude Exhibits 1037, 1114, 1117, and 1120 as hearsay and, for Ex. 1037, as not authenticated, irrelevant, and lacking the original writing. Paper 66, 2. Patent Owner also moves to exclude Exhibits 1029, 1050, 1066, 1074, and 1078 as not authenticated. *Id.* Patent Owner moves to exclude Exhibit 1087 as lacking personal knowledge and as irrelevant. *Id.* Patent Owner also moves to exclude portions of Exhibit 1112 as not based on sufficient facts and analysis. *Id.* Further, Patent Owner moves to exclude the portions of Petitioner's Petition and Reply, as well as the portions of Exhibits 1002 and 1004, that cite these exhibits. *Id.* at 2–3.

We do not rely on any of the exhibits or portions of exhibits Patent Owner moves to exclude in reaching our decision in this case, with two exceptions: paragraphs 36 and 42 of Ex. 1002, which cite Ex. 1029, and paragraph 56 of Ex. 1004, which Patent Owner argues cites Ex. 1029, Ex. 1050, and Ex. 1066. We dismiss as moot Patent Owner's motion to exclude, except as to these paragraphs of Exhibits 1002 and 1004. We discuss the remaining portions of Patent Owner's motion to exclude below.

IPR2021-00406
Patent 10,716,793 B2

a. Paragraphs 36 and 42 of Exhibit 1002

Patent Owner moves to exclude paragraphs 36 and 42 of Exhibit 1002 because they rely on Exhibit 1029, which Patent Owner argues lacks authentication.  Paper 66, 2–3.

Certain items are self-authenticating under Federal Rule of Evidence ("FRE") 902, and, for items that are not self-authenticating, FRE 901 provides that "the proponent [of the evidence in question] must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  The evidence showing "that the items is what the proponent claims it is" may include "[t]estimony that an item is what it is claimed to be," or "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the  circumstances," among other things.  Fed. R. Evid. 901(b).

Here, Dr. Hill, Petitioner's declarant, testifies three times that Exhibit 1029 is the "Ventavis Label 2004."  Ex. 1002 ¶¶ 36, 41, 42.  Dr. Gonda, another declarant for Petitioner, testifies that Exhibit 1029 is the "Ventavis (iloprost) Label."  Ex. 1004 ¶ 56 n.4.  Dr. Waxman, Patent Owner's declarant, cites to Exhibit 1029 twice as support for the approved dose for, and side effects experienced by, patients taking Ventavis.  Ex. 2052 ¶ 100.  The "appearance, contents, substance, internal patterns, [and] other distinctive characteristics," Fed. R. Evid. 901(b), of Ex. 1029 confirm the testimony of Drs. Hill, Gonda, and Waxman.  The document contains sections titled "description," "clinical pharmacology," "indications and usage," "contraindications," "warnings," "precautions," "adverse reactions," "overdosage," "dosage and administration," "how supplied," "storage," and "patient information," with each section providing information related to

43

IPR2021-00406
Patent 10,716,793 B2

"Ventavis." Ex. 1029, 1–17. This information is consistent with a drug
label for Ventavis, which is what Dr. Hill and Dr. Gonda testify, what
Dr. Waxman assumes, and what Petitioner argues, Ex. 1029 is.
Accordingly, we find that Petitioner has "produce[d] evidence sufficient to
support a finding that [Ex. 1029] is what [Petitioner] claims it is." Fed. R.
Evid. 901(a). Because Ex. 1029 does not lack authentication, we deny
Patent Owner's motion to exclude paragraphs 36 and 42 of Ex. 1002, which
cite to Ex. 1029.

### b. Paragraph 56 of Exhibit 1004

Patent Owner moves to exclude paragraph 56 of Exhibit 1004 because
it relies on Exhibits 1029, 1050, and 1066, all of which Patent Owner argues
lack authentication. Paper 66, 2–3. We discuss Exhibit 1029 above, finding
that it is sufficiently authenticated. The situation with respect to
Exhibits 1050 and 1066 is similar. Dr. Gonda testifies that Ex. 1050 is the
"Pulmozyme® Label" and that Ex. 1066 is the "AccuNeb® Label."
Ex. 1004 ¶ 56 n.4. Moreover, Dr. Gonda's testimony about what
Exhibits 1050 and 1066 are is confirmed by the contents of those exhibits.
Exhibit 1050 contains sections titled "description," "clinical pharmacology,"
"indications and usage," "contraindications," "warnings," "precautions,"
"adverse reactions," "overdosage," "dosage and administration," and "how
supplied," with each section providing information related to "Pulmozyme."
Ex. 1050, 1–2. Exhibit 1066 contains sections titled "description," "clinical
pharmacology," "indications and usage," "contraindications," "warnings,"
"precautions," "adverse reactions," "overdosage," "dosage and
administration," "how supplied," "storage," and "patient's instructions for
use," with each section providing information related to "AccuNeb."

44

IPR2021-00406
Patent 10,716,793 B2

Ex. 1066, 1–2.  This information is consistent with drug labels for
Pulmozyme and AccuNeb, which is what Dr. Gonda testifies, and what
Petitioner argues, Exhibits 1050 and 1066 are.  Accordingly, we find that
Petitioner has "produce[d] evidence sufficient to support a finding that
[Ex. 1050 and Ex. 1066 are] what [Petitioner] claims [they are]."  Fed. R.
Evid. 901(a).  Because Exhibits 1050 and 1066 do not lack authentication,
we deny Patent Owner's motion to exclude paragraph 56 of Ex. 1004, which
cites to those exhibits.

IPR2021-00406
Patent 10,716,793 B2

CONCLUSION[10]

For the reasons discussed above, Petitioner has shown by a preponderance of the evidence that claims 1–8 of the '793 patent are unpatentable.

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–8 | 103(a) | '212 patent, Voswinckel JESC, Voswinckel JAHA | 1–8 | |
| 1–8 | 103(a) | '212 patent, Voswinckel JESC[11] | | |
| 1 | 102(a) | Ghofrani | | 1 |
| 1, 3, 8 | 103(a) | Voswinckel JAHA, Ghofrani | | 1, 3, 8 |
| 1, 3 | 102(a) | Voswinckel 2006 | | 1, 3 |
| 2, 4–8 | 103(a) | Voswinckel 2006, '212 patent | | 2, 4–8 |
| **Overall Outcome** | | | 1–8 | |

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

[11] This Final Written Decision does not reach these grounds because Petitioner has proven all challenged claims are unpatentable based on obviousness over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.

46

IPR2021-00406
Patent 10,716,793 B2

ORDER

It is hereby

ORDERED that, based on the preponderance of the evidence, claims 1–8 of the '793 patent have been shown to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is dismissed as moot;

FURTHER ORDERED that Patent Owner's Motion to Exclude is denied as to paragraphs 36 and 42 of Exhibit 1002 and as to paragraph 56 of Exhibit 1004;

FURTHER ORDERED that Patent Owner's Motion to Exclude is dismissed as moot in all other respects; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

47

IPR2021-00406
Patent 10,716,793 B2

For PETITIONER:

Ivor R. Elrifi
Erik B. Milch
Deepa Kannappan
Sanya Sukduang
Lauren Krickl
Douglas Cheek
Jonathan Davies
COOLEY LLP
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com
lkrickl@cooley.com
dcheek@cooley.com
jdavies@cooley.com

For PATENT OWNER:

Stephen B. Maebius
George Quillin
Jason N. Mock
Michael Houston
FOLEY & LARDNER LLP
smaebius@foley.com
gquillin@foley.com
jmock@foley.com
mhouston@foley.com

Shaun R. Snader
UNITED THERAPEUTICS CORP.
ssnader@unither.com

Douglas Carsten
April E. Weisbruch
Judy Mohr, Ph.D.
Jiaxiao Zhang
Mandy Kim

48

IPR2021-00406
Patent 10,716,793 B2

Arthur Dykhuis
Amy Mahan
MᶜDERMOTT WILL & EMERY LLP
dcarsten@mwe.com
aweisbruch@mwe.com
jmohr@mwe.com
jazhang@mwe.com
mhkim@mwe.com
adykhuis@mwe.com
amahan@mwe.com

49

Trials@uspto.gov                                    Paper 82
Tel: 571-272-7822                        Entered: February 2, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

IPR2021-00406
Patent 10,716,793 B2

Before ERICA A. FRANKLIN, CHRISTOPHER M. KAISER,
and DAVID COTTA, *Administrative Patent Judges.*

KAISER, *Administrative Patent Judge.*

DECISION
Denying Patent Owner's Request on Rehearing of Final Written Decision
*37 C.F.R. § 42.71(d)*

IPR2021-00406
Patent 10,716,793 B2

## INTRODUCTION

Liquidia Technologies, Inc. ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting an *inter partes* review of claims 1–8 of U.S. Patent No. 10,716,793 B2 (Ex. 1001, "the '793 patent"). United Therapeutics Corporation ("Patent Owner") filed a Preliminary Response. Paper 13 ("Prelim. Resp.").

On August 11, 2021, we instituted *inter partes* review of claims 1–8 of the '793 patent on all grounds set forth in the Petition. Paper 18 ("Inst. Dec."). After institution of trial, Patent Owner filed a Response (Paper 29, "PO Resp."), Petitioner filed a Reply (Paper 44), and Patent Owner filed a Sur-Reply (Paper 55). In addition, both parties filed Motions to Exclude Evidence (Papers 65 and 66), Oppositions to their respective opponents' Motions to Exclude (Papers 68 and 69), and Replies in support of their own Motions to Exclude (Papers 71 and 72). At the request of both parties, we held an oral hearing, the transcript of which was entered into the record. Paper 77 ("Tr.").

On July 19, 2022, we issued a Final Written Decision determining that Petitioner had proven by a preponderance of evidence that all the challenged claims were unpatentable. Paper 78 ("Final Dec."). On August 18, 2022, Patent Owner requested rehearing and filed a request that rehearing be conducted by the Precedential Opinion Panel. Paper 79 ("Req. Reh'g"); Paper 80. The request for rehearing by the Precedential Opinion Panel was denied, returning jurisdiction to us to consider the rehearing request itself. Paper 81.

For the reasons discussed below, we deny Patent Owner's Request for Rehearing. Where the present decision differs from the Final Written

2

IPR2021-00406
Patent 10,716,793 B2

Decision, the present decision controls. Otherwise, the Final Written Decision remains in force.

ANALYSIS

*A.  The Final Written Decision*

Petitioner asserted the unpatentability of the challenged claims on six separate grounds. Final Dec. 3–4. Four of those grounds relied on references referred to as Voswinckel 2006 and Ghofrani, both of which we determined did not qualify as prior art. *Id.* at 3–4, 36–41. The remaining two grounds both relied on a reference referred to as Voswinckel JESC, and one of the grounds also relied on a reference referred to as Voswinckel JAHA. *Id.* at 3.

Patent Owner argued during the trial that Petitioner had not proven that either Voswinckel JESC or Voswinckel JAHA had been made publicly accessible early enough to qualify as prior art in the way that Petitioner argued they did. PO Resp. 11–18; Sur-Reply 2–11. Petitioner countered these arguments with several arguments for the public accessibility of Voswinckel JESC and Voswinckel JAHA. Reply 2–9. In particular, Petitioner argued that each of these references was cited in a publicly available journal article that could have served as a research aid to help a person of ordinary skill in the art locate the references. *Id.* at 3–4 (arguing that Voswinckel JESC was cited in Ghofrani), 7–8 (arguing that Voswinckel JAHA was cited in Sulica).

In the Final Written Decision, we were persuaded by Petitioner's argument regarding these research aids. Final Dec. 10–12. Based in part on our determination that these research aids established the public accessibility of Voswinckel JESC and Voswinckel JAHA, we determined that Petitioner

IPR2021-00406
Patent 10,716,793 B2

had proven by a preponderance of the evidence that each of the challenged claims would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA. *Id.* at 12–35.

### B. The Rehearing Request

Patent Owner seeks rehearing of our Final Written Decision on the ground that we overlooked Patent Owner's argument that the Ghofrani and Sulica research aids had been "published *after* the critical §102(b) date of May 15, 2005." Req. Reh'g 1 (emphasis in original). Patent Owner notes that this argument appeared in the Sur-Reply. *Id.* at 5 (citing Sur-Reply 9). According to Patent Owner, had we not overlooked this argument, we would have determined that Petitioner had not shown that Voswinckel JESC and Voswinckel JAHA were publicly accessible in the way necessary to treat them as prior art to the '793 patent. *Id.* at 5–14.

When it requested rehearing, Patent Owner also requested that the rehearing be conducted by the Precedential Opinion Panel. Ex. 3003. The Precedential Opinion Panel denied that request and directed us to consider Patent Owner's rehearing request. Paper 81, 3. The Precedential Opinion Panel directed us, "in [our] consideration on rehearing, to clearly identify whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art" and specified that "[s]uch analysis shall clarify whether the relied upon research aids were available prior to the critical date and whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library." *Id.*

IPR2021-00406
Patent 10,716,793 B2

### C. Standard of Review

A request for rehearing of an institution decision is reviewed under the abuse of discretion standard. 37 C.F.R. § 42.71(c). "The burden of showing a decision should be modified lies with the party challenging the decision." 37 C.F.R. § 42.71(d). "The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, reply, or a sur-reply." *Id.* An abuse of discretion may be found where a decision "(1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) involves a record that contains no evidence on which the Board could rationally base its decision." *Redline Detection, LLC v. Star Envirotech, Inc.*, 811 F.3d 435, 442 (Fed. Cir. 2015) (quoting *Abrutyn v. Giovanniello*, 15 F.3d 1048, 1050–51 (Fed. Cir. 1994) (citation omitted)).

### D. We Overlooked Patent Owner's Argument

Patent Owner is correct that its argument that the Ghofrani and Sulica research aids were dated after May 15, 2005, appeared in the Sur-Reply. Sur-Reply 9–11. Patent Owner also is correct that we overlooked this argument in relying on these research aids as supporting that Petitioner had established that Voswinckel JESC and Voswinckel JAHA were prior art to the '793 patent. Final Dec. 11–12; Paper 81, 2 ("the Board's analysis did not consider whether the research aids themselves were available prior to the critical date").

5

IPR2021-00406
Patent 10,716,793 B2

### E. *Reconsideration of the Record Shows that the Research Aids Did Not Establish the Prior-Art Status of Voswinckel JESC and Voswinckel JAHA*

Petitioner argued that Voswinckel JESC and Voswinckel JAHA were "prior art to the '793 Patent under at least 35 U.S.C. § 102(b)." Pet. 22, 24. In the Final Written Decision, we determined that Petitioner had shown that these references were prior art based on the existence of research aids. Final Dec. 10–12. As noted above, that determination overlooked Patent Owner's argument that the research aids themselves were published too late for their mention of Voswinckel JESC and Voswinckel JAHA to render those references prior art under § 102(b). We now consider that argument.

To qualify as prior art under § 102(b), a reference must have been publicly accessible "more than one year prior to the date of application for patent in the United States." 35 U.S.C. § 102(b) (2006). Here, the parties agree that the application that ultimately led to the issuance of the '793 patent was filed May 15, 2006. Pet. 12; PO Resp. 5. Thus, to qualify as § 102(b) prior art, Voswinckel JESC and Voswinckel JAHA must have been publicly accessible before May 15, 2005.

Petitioner argues that Voswinckel JESC "was cited in the June 2005 Ghofrani article in the journal *Herz* . . . , an article that was publicly accessible." Reply 3 (citing Ex. 1010, 298, 301). Patent Owner argues that "Ghofrani bears a July 2005 date-stamp." Sur-Reply 9 (citing Ex. 1121, 1). Petitioner does not explain its characterization of Ghofrani as a "June 2005" article. The pages of Ghofrani cited by Petitioner do not indicate a June 2005 publication date. Ex. 1010, 298, 301. The same article appears, however, as Exhibit 1121, which bears a date of July 7, 2005. *Compare* Ex. 1010, *with* Ex. 1121. Accordingly, Patent Owner's characterization of

6

Ghofrani as having been published in July 2005 is better supported by the evidence of record than is Petitioner's characterization of Ghofrani as having been published in June 2005. Even if the evidence of record supported Petitioner's June 2005 publication date, that date is still later than May 15, 2005, so the citation of Voswinckel JESC in Ghofrani does not show that Voswinckel JESC was prior art under § 102(b).

Petitioner argues that Voswinckel JAHA "was cited by a March 2005 article authored by Roxana Sulica et al. in the *Expert Review of Cardiovascular Therapy*." Reply 7 (citing Ex. 1104, 359). Patent Owner argues that the Sulica article "shows only the year 2005." Sur-Reply 9 (citing Ex. 1104, 347). We agree with Patent Owner. The Sulica article bears a 2005 copyright date but otherwise does not indicate when it was published. Ex. 1104, 347. The 2005 copyright date does not support a finding that the Sulica article was published before May 15, 2005, so the citation of Voswinckel JAHA in the Sulica article does not show that Voswinckel JAHA was prior art under § 102(b).

### F. Reexamination of the Record Shows that Voswinckel JESC and Voswinckel JAHA Were Prior Art to the '793 Patent Due to Distribution at Conferences

The Precedential Opinion Panel directed us, "in [our] consideration on rehearing, to clearly identify whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art" and specified that "[s]uch analysis shall clarify . . . whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library." Paper 81, 3. Accordingly, we consider below whether the evidence of record establishes the prior-art status of Voswinckel JESC and Voswinckel

IPR2021-00406
Patent 10,716,793 B2

JAHA due to presentation and/or inclusion in distributed materials. We answer this question in the affirmative.

"Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touch-stone in determining whether a reference constitutes a 'printed publication.'" *Jazz Pharm., Inc. v. Amneal Pharm., LLC*, 895 F.3d 1347, 1356 (Fed. Cir. 2018) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). A reference is considered publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it." *Id.* at 1355–56 (citing *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981)). Under at least some circumstances, a reference may be a printed publication under § 102(b) if it was "displayed to the public," even if it "was not later indexed in any database, catalog, or library." *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). There are several factors relating to whether such a display is sufficient to constitute a printed publication, including "the length of time the display was exhibited, the expertise of the target audience, the existence (or lack thereof) of reasonable expectations that the material displayed would not be copied, and the simplicity or ease with which the material displayed could have been copied." *Id.* In addition, distribution of a reference at a professional conference may, under at least some circumstances, constitute sufficient dissemination to show public accessibility. *Nobel Biocare Services AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1375–80 (Fed. Cir. 2018); *Medtronic, Inc. v. Barry*, 891 F.3d 1368, 1380–83 (Fed. Cir. 2018).

8

IPR2021-00406
Patent 10,716,793 B2

> 1. *Voswinckel JESC Was Sufficiently Distributed at a Conference to be Publicly Accessible as of the Conference Date*

A reference may be "[a] printed publication ' . . . if it was sufficiently disseminated at the time of its publication.'" *Medtronic*, 891 F.3d at 1381 (quoting *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1365 (Fed. Cir. 2014)). Several factors are relevant to the determination of whether distribution of a reference at a conference constitutes such sufficient dissemination. *Id.* at 1381–82. These include "the size and nature of the meetings and whether they are open to people interested in the subject matter of the material disclosed," as well as "whether there is an expectation of confidentiality between the distributor and the recipients of the materials." *Id.* at 1382. "The expertise of the target audience can [also] be a factor in determining public accessibility." *Id.* To the extent that these factors are addressed via testimonial evidence, corroboration of that evidence may be necessary. *Nobel Biocare*, 903 F.3d at 1377–78. "Corroborating evidence may include documentary or testimonial evidence," and "[c]ircumstantial evidence can be sufficient corroboration." *Id.* (citing *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1301 (Fed. Cir. 2016)).

Voswinckel JESC is an abstract contained in "Volume 25 Abstract Supplement August/September 2004" of "European Heart Journal," with a subtitle indicating that the journal is the "Journal of the European Society of Cardiology" and that the supplement relates to "ESC Congress 2004," held "28 August – 1 September" in "Munich, Germany." Ex. 1007, 1; *see also* Ex. 1089, 1. The Table of Contents organizes abstracts into categories, including "Epidemiology and treatment of pulmonary arterial hypertension," with each category associated with an entry corresponding to a day of the

9

conference, such as "Day 2—Sunday 29 August 2004." *Id.* at 2. Each of these categories points to a page or pages in the supplement, with those pages containing abstracts that report the "Background," "Methods," "Results," and "Conclusion" of studies. *Id.* at 7.

The conference with which Voswinckel JESC is associated "is the largest medical congress in Europe and among the top three cardiology meetings in the world," and "it has become an established forum for the exchange of science as much as education." Ex. 1105, 19. Attendees of the conference include "basic scientists, nurses and allied professionals working in the field of cardiovascular care of patients." *Id.* At the 2004 conference, there were "24,527 attendees," including "18,413 professionals, 4,715 exhibitors, 636 journalists and 763 accompanying persons." *Id.* Both Petitioner's declarant, Dr. Nicholas Hill, and Patent Owner's declarant, Dr. Aaron Waxman, testify that anyone who paid to attend the ESC Congress 2004 would have received a copy of the abstract book from which Voswinckel JESC is excerpted, either at the meeting itself or as a distribution before the meeting. Ex. 1106 ¶ 28; Ex. 1108, 105:16–108:1.

Thus, the evidence of record shows that Voswinckel JESC was distributed to more than twenty thousand people before or at the time of the ESC Congress 2004 in late August and early September of 2004. Those twenty thousand recipients included both highly skilled professionals, including scientists, nurses, and other clinicians, as well as journalists and those who accompanied the professionals and the journalists. That the recipients included journalists and "accompanying persons" suggests very strongly that there was no expectation that the contents of Voswinckel JESC would be kept confidential. Moreover, Drs. Hill and Waxman corroborate

10

IPR2021-00406
Patent 10,716,793 B2

one another's testimony, and their testimony is further corroborated by the contents of both Voswinckel JESC itself and Exhibit 1105. The distribution of Voswinckel JESC to over twenty thousand recipients, including thousands of experts in the field of cardiology, with no expectation of confidentiality, establishes that Voswinckel JESC was a printed publication as of the date of the conference at which that distribution occurred. Because that conference occurred in August and September 2004, more than one year before the May 15, 2006 application date of the '793 patent, Voswinckel JESC was a printed publication early enough to qualify as prior art under 35 U.S.C. § 102(b).

> 2.    *Voswinckel JAHA Was Sufficiently Distributed at a Conference to be Publicly Accessible as of the Conference Date*

Like Voswinckel JESC, Voswinckel JAHA is associated with a professional conference. Ex. 1008. It is an abstract that has been extracted from a document headed "Supplement to Circulation," subtitled "Journal of the American Heart Association" and "Abstracts from Scientific Sessions 2004," indicating that those sessions occurred "November 7–10." *Id.* at 1. The abstract in question appears in a section titled "Pulmonary Arterial Hypertension: New Therapies," subtitled "Subspecialty: Integrative Biology" and indicating that the session occurred on "Wednesday" in "Hall I2" of the "Ernest N Morial Convention Center." *Id.* at 3. We take official notice that the range of dates from November 7, 2004, to November 10, 2004, includes Wednesday, November 10, 2004.

Both Dr. Hill and Dr. Waxman agree that attendance at the Scientific Sessions 2004 conference was large. Ex. 1106 ¶ 22 ("a [person of ordinary skill in the art] would have attended the Scientific Sessions 2004

11

IPR2021-00406
Patent 10,716,793 B2

Conference, as it is one of the principal conferences on the circulatory system and diseases and conditions affecting circulation"); Ex. 1108, 116:4–21 (testifying that attendance at Scientific Sessions 2004 was likely larger than the 18,000 professionals who attended ESC Congress 2004). Dr. Hill testifies that the conference was "attended by physicians and researchers working on and studying the cardiovascular system, including pulmonary circulation." *Id.* Both Dr. Hill and Dr. Waxman also agree that a copy of the abstract book from which Voswinckel JAHA is excerpted would have been provided to all attendees at Scientific Sessions 2004. Ex. 1106 ¶ 23; Ex. 1108, 108:3–20. We have not been directed to any evidence of record indicating there was any expectation of confidentiality. The distribution of thousands of copies of Voswinckel JAHA at the conference is strong evidence that Voswinckel JAHA was a printed publication as of the date of the conference. Because that conference occurred in November 2004, more than one year before the May 15, 2006 application date of the '793 patent, Voswinckel JAHA was a printed publication early enough to qualify as prior art under 35 U.S.C. § 102(b).

### 3.    Conclusion

As instructed by the Precedential Opinion Panel, we have considered "whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art" and in particular "whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference." Paper 81, 3. As discussed above, we find that both references were distributed sufficiently at professional conferences to be publicly accessible at the time of those conferences. By virtue of this public accessibility, both Voswinckel

IPR2021-00406
Patent 10,716,793 B2

JESC and Voswinckel JAHA were printed publications early enough to qualify as prior art under 35 U.S.C. § 102(b).

### G. Asserted Obviousness over '212 Patent, Voswinckel JESC, and Voswinckel JAHA

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA. Pet. 30–46. As discussed above, Petitioner has shown by a preponderance of the evidence that both Voswinckel JESC or Voswinckel JAHA qualify as prior art. Accordingly, we do not disturb the obviousness analysis in the Final Written Decision, which relies on the prior-art status of Voswinckel JESC and Voswinckel JAHA. Final Dec. 12–35.

### H. Remaining Grounds

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent and Voswinckel JESC. Pet. 46–50. We do not disturb the determination in the Final Written Decision that we need not reach this ground "[b]ecause Petitioner has shown by a preponderance of the evidence that all of the challenged claims would have been obvious over the similar combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA." Final Dec. 36.

Petitioner argues that claim 1 was anticipated by Ghofrani; that claims 1, 3, and 8 would have been obvious over the combination of Voswinckel JAHA and Ghofrani; that claims 1 and 3 were anticipated by Voswinckel 2006; and that claims 2 and 4–8 would have been obvious over the combination of Voswinckel 2006 and the '212 patent. Pet. 50–64. These grounds fail for the reasons discussed in the Final Written Decision. Final Dec. 36–41.

13

IPR2021-00406
Patent 10,716,793 B2

CONCLUSION[1]

For the reasons discussed above, Patent Owner has shown that we overlooked its argument regarding the date of availability of the research aids that Petitioner argued showed that Voswinckel JESC and Voswinckel JAHA qualified as prior art. A proper consideration of that argument shows that the research aids do not establish the prior-art status of Voswinckel JESC and Voswinckel JAHA, but there is no change to the outcome with respect to Petitioner's asserted grounds of unpatentability, because the distribution of Voswinckel JESC and Voswinckel JAHA at professional conferences proves the prior-art status of those references. Accordingly, we deny Patent Owner's request for rehearing.

When all arguments are properly considered, Petitioner has shown by a preponderance of the evidence that claims 1–8 of the '793 patent are unpatentable.

Outcome of Decision on Rehearing:

| Claims | 35 U.S.C § | Reference(s)/Basis | Denied | Granted |
|---|---|---|---|---|
| 1–8 | 103(a) | '212 patent, Voswinckel JESC, Voswinckel JAHA | 1–8 | |
| **Overall Outcome** | | | 1–8 | |

---

[1] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

14

IPR2021-00406
Patent 10,716,793 B2

Final Outcome of Final Written Decision after Rehearing:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–8 | 103(a) | '212 patent, Voswinckel JESC, Voswinckel JAHA | 1–8 | |
| 1–8 | 103(a) | '212 patent, Voswinckel JESC[2] | | |
| 1 | 102(a) | Ghofrani | | 1 |
| 1, 3, 8 | 103(a) | Voswinckel JAHA, Ghofrani | | 1, 3, 8 |
| 1, 3 | 102(a) | Voswinckel 2006 | | 1, 3 |
| 2, 4–8 | 103(a) | Voswinckel 2006, '212 patent | | 2, 4–8 |
| **Overall Outcome** | | | 1–8 | |

ORDER

It is hereby

ORDERED that Patent Owner's Request for Rehearing is denied;

FURTHER ORDERED that the determination in the Final Written Decision that the research aids relied on by Petitioner show the prior-art status of Voswinckel JESC and Voswinckel JAHA is overturned and replaced with the determination in the present decision that the distribution

---

[2] Neither the Final Written Decision nor this Rehearing Decision reaches this ground because Petitioner has proven all challenged claims are unpatentable based on obviousness over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.

15

IPR2021-00406
Patent 10,716,793 B2

of Voswinckel JESC and Voswinckel JAHA at professional conferences establishes the prior-art status of those references;

FURTHER ORDERED that, based on the preponderance of the evidence, claims 1–8 of the '793 patent have been shown to be unpatentable;

FURTHER ORDERED that all other rulings in the Final Written Decision remain undisturbed; and

FURTHER ORDERED that parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

16

IPR2021-00406
Patent 10,716,793 B2

For PETITIONER:

Ivor R. Elrifi
Erik B. Milch
Deepa Kannappan
Sanya Sukduang
Lauren Krickl
Douglas Cheek
Jonathan Davies
COOLEY LLP
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com
lkrickl@cooley.com
dcheek@cooley.com
jdavies@cooley.com

For PATENT OWNER:

Stephen B. Maebius
George Quillin
Jason N. Mock
Michael Houston
FOLEY & LARDNER LLP
smaebius@foley.com
gquillin@foley.com
jmock@foley.com
mhouston@foley.com

Shaun R. Snader
UNITED THERAPEUTICS CORP.
ssnader@unither.com

Douglas Carsten
April E. Weisbruch
Judy Mohr
Jiaxiao Zhang
Mandy Kim

17

IPR2021-00406
Patent 10,716,793 B2

Arthur Dykhuis
Amy Mahan
MCDERMOTT WILL & EMERY LLP
dcarsten@mwe.com
aweisbruch@mwe.com
jmohr@mwe.com
jazhang@mwe.com
mhkim@mwe.com
adykhuis@mwe.com
amahan@mwe.com

Prosecution History ~ IPR2021-00406

| Date | Document |
|------|----------|
| 1/7/2021 | Petition for Inter Partes Review |
| 1/7/2021 | Petitioner's Power of Attorney |
| 1/25/2021 | Patent Owner's Mandatory Notice |
| 2/3/2021 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 3/30/2021 | Patent Owner's Updated Mandatory Notices |
| 4/13/2021 | Order - Patent Owner's Request to Extend the Due Date for Preliminary Response |
| 4/15/2021 | Petitioner's Updated Power of Attorney |
| 4/15/2021 | Petitioner's Updated Mandatory Notice Regarding Additional Backup Counsel |
| 4/19/2021 | Petitioner's Updated Exhibit List |
| 4/19/2021 | Unopposed Motion for Pro Hac Vice Admission - Kannappan |
| 4/21/2021 | Order - Pro Hac Vice Admission - Kannappan |
| 5/3/2021 | Patent Owner's Updated Mandatory Notices |
| 5/17/2021 | Patent Owner's Preliminary Response |
| 6/3/2021 | Patent Owner's Updated Mandatory Notices |
| 6/9/2021 | Panel Change Order - Conduct of the Proceedings |
| 7/20/2021 | Patent Owner's Notice of Supplemental Authority and Stipulation |
| 7/23/2021 | Petitioner's Response to Patent Owner's Notice of Supplemental Authority and Stipulation |
| 8/11/2021 | Scheduling Order |
| 8/11/2021 | Decision - Institution of Inter Partes Review |
| 8/25/2021 | Patent Owner's Objections to Petitioner's Evidence Submitted with Petition |
| 9/29/2021 | Patent Owner's Updated Mandatory Notices |
| 10/7/2021 | Notice of Deposition - Hall-Ellis, Ph.D. |
| 10/15/2021 | Notice of Deposition - Hill, M.D. |
| 10/21/2021 | Notice of Deposition - Gonda, Ph.D. |
| 10/25/2021 | Joint Stipulation to Extend Due Dates |
| 10/26/2021 | Patent Owner's Updated Mandatory Notices |
| 11/10/2021 | Patent Owner's Response |
| 11/10/2021 | Patent Owner's Motion to File Under Seal |
| 11/10/2021 | Patent Owner's Second Motion to File Under Seal |
| 11/19/2021 | Order - Petitioner's Request for Authorization to File Motion to Submit Supplemental Information |
| 12/1/2021 | Petitioner's Updated Mandatory Notice |
| 12/1/2021 | Petitioner's Updated Power of Attorney |
| 12/10/2021 | Notice of Deposition - Wyman |
| 1/4/2022 | Petitioner's Updated Exhibit List |
| 1/4/2022 | Unopposed Motion for Pro Hac Vice Admission - Davies |
| 1/5/2022 | Petitioner's Updated Mandatory Notice re Additional Backup Counsel |
| 1/5/2022 | Petitioner's Updated Power of Attorney |
| 1/5/2022 | Unopposed Motion for Pro Hac Vice Admission - Kim |
| 1/6/2022 | Patent Owner's Updated Exhibit List |

**Prosecution History ~ IPR2021-00406**

| Date | Document |
|------|----------|
| 1/6/2022 | Patent Owner's Updated Mandatory Notices |
| 1/7/2022 | Order - Pro Hac Vice Admission - Davies |
| 1/7/2022 | Order - Pro Hac Vice Admission - Kim |
| 2/10/2022 | Petitioner's Updated Exhibit List |
| 2/10/2022 | Petitioner's Reply in Support of Petition |
| 2/10/2022 | Petitioner's Unopposed Motion to File Under Seal |
| 2/17/2022 | Patent Owner's Objections to Petitioner's Evidence Submitted with Petitioner's Reply |
| 2/22/2022 | Patent Owner's Identification of Non-Responsive Evidence and Arguments |
| 2/28/2022 | Petitioner's Identification of Portions of Patent Owner's Response to Which Identified Reply Evidence and Arguments are Responsive |
| 2/28/2022 | Joint Stipulation to Extend Due Date |
| 3/3/2022 | Order - Conduct of the Proceeding |
| 3/8/2022 | Notice of Deposition - Hall-Ellis, Ph.D. |
| 3/8/2022 | Notice of Deposition - Butler |
| 3/16/2022 | Patent Owner's Sur-Reply |
| 3/16/2022 | Patent Owner's Unopposed Third Motion to File Under Seal |
| 3/16/2022 | Order - Conduct of Proceeding |
| 3/23/2022 | Petitioner's Objections to Evidence |
| 3/30/2022 | Petitioner's Request for Oral Hearing |
| 3/30/2022 | Patent Owner's Request for Oral Argument |
| 4/6/2022 | Patent Owner's Updated Exhibit List |
| 4/7/2022 | Petitioner's Identification of Exhibits and Portions of Patent Owner's Sur-Reply that Exceed the Scope of Allowable Sur-Reply Evidence |
| 4/11/2022 | Notice of Deposition - Hill, M.D. |
| 4/14/2022 | Patent Owner's Identification of Portions of Petitioner's Reply to Which Identified Sur-Reply Evidence and Arguments are Responsive |
| 4/15/2022 | Patent Owner's Observations on April 13, 2022 Deposition of Hill, M.D. |
| 4/15/2022 | Petitioner's Observations on the Cross-Examination of Hill, M.D. |
| 4/20/2022 | Patent Owner's Motion to Exclude Evidence |
| 4/20/2022 | Petitioner's Motion to Exclude Exhibits |
| 4/22/2022 | Order - Setting Oral Argument |
| 4/27/2022 | Patent Owner's Updated Exhibit List |
| 4/27/2022 | Patent Owner's Opposition to Petitioner's Motion to Exclude |
| 4/27/2022 | Petitioner's Opposition to Patent Owner's Motion to Exclude |
| 5/4/2022 | Patent Owner's Reply in Support of Its Motion to Exclude |
| 5/4/2022 | Petitioner's Reply in Support of Its Motion to Exclude |
| 5/6/2022 | Joint Errata |
| 5/11/2022 | Patent Owner's Updated Exhibit List |
| 5/11/2022 | Petitioner's Updated Exhibit List |
| 5/17/2022 | Order - Conduct of the Proceeding |
| 6/22/2022 | Oral Hearing Transcript |
| 7/19/2022 | Final Written Decision |

**Prosecution History ~ IPR2021-00406**

| Date | Document |
|------|----------|
| 8/18/2022 | Patent Owner's Request for Rehearing |
| 8/22/2022 | Notice of Receipt of Precedential Opinion Panel (POP) Request |
| 10/26/2022 | Order - POP Request |
| 2/2/2023 | Decision on Rehearing |

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

LIQUIDIA TECHNOLOGIES, INC.,

Petitioner

v.

UNITED THERAPEUTICS CORPORATION,

Patent Owner

---

IPR2021-00406
U.S. Patent No. 10,716,793 B2
Issue Date: July 21, 2020

Title: Treprostinil Administration by Inhalation

---

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. Patent No. 10,716,793 B2**

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

This is a petition for *Inter Partes* Review of claims 1-8 of U.S. Patent No. 10,716,793 B2 (EX1001) (the "'793 Patent"). The '793 Patent is directed to a method of treatment of pulmonary hypertension via inhalation of 15 to 90 micrograms of treprostinil in 1 to 3 breaths, through various inhalation devices. Treprostinil products have been on the market for almost two decades, and the initial, actually innovative patents have expired. In contrast, the '793 Patent was issued in July 2020, over 14 years after the application to which it claims priority. The '793 Patent is Patent Owner ("PO") United Therapeutics Corporation's ("UTC") latest attempt to evergreen their way into blocking fair competition, and should be invalidated based on the numerous prior art references disclosing its claim limitations before 2006.

## I.     MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

### A.     Real Party-In-Interest Under 37 C.F.R. § 42.8(b)(1)

Petitioner Liquidia Technologies, Inc. ("Liquidia") is the real party-in-interest.

### B.     Related Matters Under 37 C.F.R. § 42.8(b)(2)

UTC has alleged infringement of the '793 Patent by Liquidia Technologies, Inc. in *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, 1:20-cv-00755-RGA, in the United States District Court for the District of Delaware.

1

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

### C.     Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3)

Petitioner provides the following designation of counsel.

| LEAD COUNSEL | BACK-UP COUNSEL |
|---|---|
| Ivor R. Elrifi (Reg. No. 39,529)<br>ielrifi@cooley.com<br>zLiquidiaIPR@cooley.com<br>zpatdocketing@cooley.com<br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Avenue NW, Suite 700<br>Washington, DC 20004<br>Tel:  (212) 479-6840<br>Fax: (212) 479-6275 | Erik B. Milch (Reg. No. 42887)<br>emilch@cooley.com<br>zLiquidiaIPR@cooley.com<br>zpatdocketing@cooley.com<br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Avenue NW, Suite 700<br>Washington, DC 20004<br>Tel:  (703) 456-8573<br>Fax: (703) 456-8100<br><br>Deepa Kannappan<br>(*pro hac vice* to be filed)<br>dkannappan@cooley.com<br>zLiquidiaIPR@cooley.com<br>zpatdocketing@cooley.com<br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Avenue NW, Suite 700<br>Washington, DC 20004<br>Tel:  (650) 843-5673<br>Fax: (650) 849-7400 |

### D.     Service Information

The Petition is being served by FEDERAL EXPRESS to the current

correspondence address for the '793 Patent, Foley & Lardner LLP, 3000 K Street

N.W., Suite 600, Washington, DC 20007-5109.  Petitioner may be served by e-mail

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

at the addresses provided above for lead and back-up counsel.

### E.    Power of Attorney

Filed concurrently with this petition per 37 C.F.R. § 42.10(b).

## II.    PAYMENT OF FEES - 37 C.F.R. § 42.103

This Petition requests review of claims 1-8 of the '793 Patent (8 claims) and

is accompanied by a payment of $41,500.  37 C.F.R. § 42.15.  This Petition meets

the fee requirements of 35 U.S.C. § 312(a)(1).  The undersigned further authorizes

the United States Patent and Trademark Office, including the Patent Trial and

Appeal Board, to charge any additional fee that might be due or required to Deposit

Account No. 50-1283.

## III.    REQUIREMENTS UNDER 37 C.F.R. §§ 42.104 AND 42.108 AND CONSIDERATIONS UNDER §§ 314(A) AND 325(D)

### A.    Grounds for Standing Under 37 C.F.R. § 42.104(a)

Petitioner certifies that the '793 Patent is eligible for *inter partes* review, and

Petitioner is not barred or estopped from requesting *inter partes* review.

### B.    Identification of Challenge Under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested

Petitioner requests the Board institute *inter partes* review of claims 1-8 of the

'793 Patent based on these grounds:

| Ground | '793 Claim(s) | Basis for Challenge |
|--------|---------------|---------------------|
| 1.     | 1-8           | Obvious over U.S. Patent No. 6,521,212 (EX1006), Voswinckel JAHA (EX1008), and |

3

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

| | | Voswinckel JESC (EX1007) |
|------|---------|---------------------------------------------|
| 2. | 1-8 | Obvious over '212 Patent and Voswinckel JESC |
| 3. | 1 | Anticipated by Ghofrani |
| 4. | 1, 3, 8 | Obvious over Voswinckel JAHA and Ghofrani (EX1010) |
| 5. | 1, 3 | Anticipated by Voswinckel 2006 (EX1009) |
| 6. | 2, 4-8 | Obvious over Voswinckel 2006 and '212 Patent |

Sections X to XV of this Petition detail why the challenged claims are invalid. This Petition is supported by accompanying Declarations of Dr. Nicholas Hill (EX1002) and Dr. Igor Gonda (EX1004), qualified experts in their fields. *See* EX1003; EX1005 (*Curriculum Vitae*).

### C.   Threshold Requirement for *Inter Partes* Review 37 C.F.R. § 42.108(c)

*Inter partes* review of claims 1-8 should be instituted because this Petition establishes a reasonable likelihood that Petitioner will prevail with respect to each of the challenged claims.  35 U.S.C. § 314(a).

### D.   Considerations under 35 U.S.C. § 314(a)

Petitioner diligently filed this Petition.  PO asserted the '793 Patent against Petitioner for the first time on July 22, 2020 (EX1011, 15-17), and identified claims 1, 4, and 6-8 as the asserted claims in infringement contentions served October 16, 2020.   This Petition is filed within three months of receiving infringement contentions and over six months before the one-year bar.

4

The Board should not discretionarily deny this Petition because UTC filed a motion in the district court litigation to prevent Petitioner from contesting the validity of the '793 Patent under the doctrine of assignor estoppel, based on one of the inventors, Robert Roscigno, being a former Liquidia employee.   EX1013. Although the district court denied UTC's original motion (EX1014), UTC indicated it intends to further pursue its assignor estoppel allegations in district court. *See, e.g.*, EX1012, 13. Should UTC ultimately prevail on the issue of assignor estoppel in district court, Petitioner would be foreclosed from raising invalidity of the '793 Patent in that forum.  Under this scenario, this Petition would be Petitioner's only available means for challenging validity of the claims, because "assignor estoppel has no place in IPR proceedings." *Arista Networks, Inc. v. Cisco Sys., Inc.*, 908 F.3d 792, 804 (Fed. Cir. 2018).  Accordingly, the pending district court litigation should not be a basis for discretionary denial.

Further, the *Fintiv* factors do not weigh in favor of discretionary denial.  First, this Petition includes claims not at issue in the district court litigation, namely claims 2, 3, and 5—just under half of the total claims challenged in this petition.  Second, the parties have just begun claim construction proceedings in the district court litigation, have not yet taken any depositions, and have conducted only the initial minimum required discovery.  Third, the merits of this Petition are strong, as exemplified by the Board's institution of petitions involving two of the references

5

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

here against similar claims in IPR2017-01621 and IPR2017-01622 (brought by a different petitioner),[1] as well as the fact that this Petition asserts five grounds to challenge independent claim 1 and at least three different grounds for each of the seven dependent claims.

Finally, previous IPRs filed on related patents 9,358,240 (IPR2017-01621) and 9,339,507 (IPR2017-01622) do not warrant discretionary denial. The prior IPRs were filed by Watson Laboratories, Inc., an unrelated party, prior to PO suing Petitioner. *Alphatec Holdings, Inc. v. Nuvasive, Inc.*, IPR2019-00361, Paper 19 at 10 (P.T.A.B. July 9, 2019). The prior IPRs were instituted, but terminated before final decision due to settlement between the parties. *Watson Labs., Inc. v. United Therapeutics, Corp.*, IPR2017-01621, Paper 64 (P.T.A.B. Aug. 27, 2018); IPR2017-01622, Paper 64 (P.T.A.B. Aug. 27, 2018).

### E.    Considerations under 35 U.S.C. § 325(d)

This Petition does not present a scenario in which "the same or substantially the same prior art or arguments previously were presented to the Office." 35 U.S.C. § 325(d).

---

[1] There is no evidence that the '793 Examiner substantively considered the institution decisions in the prior IPRs.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

The art presented in this petition was listed in PO's Information Disclosure Statement, but in the absence of additional evidence of "consideration" by the Examiner, discretionary denial under § 325(d) is not warranted. *See Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH,* IPR2019-01469, Paper 6 at 7-8 (P.T.A.B Feb. 13, 2020) (precedential) (art in IDS may be considered "[p]reviously presented"); *but see, e.g., Microsoft Corp. v. Parallel Networks Licensing, LLC*, IPR2015-00483, Paper 10 at 15 (P.T.A.B. July 15, 2015) ("[W]hile [a reference] was listed on a lengthy Information Disclosure Statement initialed by the Examiner, the reference was not applied against the claims and there is no evidence that the Examiner considered the particular disclosures cited . . . in the Petition."). There is no evidence in the '793 Prosecution History that the Examiner substantively considered the art or arguments presented in this Petition. The Examiner erred in not doing so, and an analysis under the *Becton* factors confirms why discretionary denial is not appropriate here.[2]

---

[2] The *Becton* factors are six, non-exclusive factors that are to be considered in the § 325(d) analysis: (1) the similarities and material differences between the asserted art and the prior art involved during examination; (2) the cumulative nature of the

7

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

The Patent Office only issued one substantive rejection during prosecution —

for obviousness-type double patenting over U.S. Patent Nos. 10,376,525; 9,358,240;

and 9,339,507.  EX1015, 24-28.  Because no prior art was substantively relied on

during examination, under *Becton* factor 3, the "record of the [Patent] Office's

previous consideration of the art is . . . silent," and the threshold for Petitioner to

show the Office erred is lower:   Petitioner must simply show the Office

"overlook[ed] something persuasive" under *Becton* factors 5 and 6.   *Advanced*

*Bionics*, IPR2019-01469, Paper 6 at 10.  As to *Becton* factor 5, Petitioner details

---

asserted art and the prior art evaluated during examination; (3) the extent to which

the asserted art was evaluated during examination; (4) the extent of the overlap

between the arguments made during examination and the manner in which a

petitioner relies on the prior art or a patent owner distinguishes the prior art; (5)

whether a petitioner has pointed out sufficiently how the Office erred in evaluating

the asserted prior art; and (6) the extent to which additional evidence and facts

presented in the petition warrant reconsideration of the prior art or arguments.  Trial

Practice Guide Update (July 2019), 29-30 (citing *Becton Dickinson & Co. v. B.*

*Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17–18 (P.T.A.B. Dec. 15, 2017)

(informative)).

8

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

below five persuasive grounds (four based on combinations) that the Examiner overlooked even though they disclose every element of the claims and are directed to the same disease (pulmonary hypertension), drug (treprostinil), and mode of administration (inhalation).  As to *Becton* factor 6, Petitioner provides two expert declarations, as well as background art not listed in the Information Disclosure Statement, demonstrating how much was already known in the art and how that art would be understood by a person of ordinary skill in the art, as additional evidence and facts that warrant reconsideration of the prior art—and consideration for the first time of arguments involving the particular grounds and combinations presented here.

Further, the prosecution histories of the patents to which the '793 Patent was terminally disclaimed (U.S. Patent Nos. 10,376,525; 9,358,240; and 9,339,507) are not applicable to this Petition, because they do not contain the arguments (i.e., the particular grounds) presented here, and any overlapping prior art was applied against different claims and combinations and/or considered by a different Examiner and cancelled.

- For the '525 patent, certain claims to a treprostinil solution and kit with a different breath disclosure were rejected over the '212 Patent under § 102(b) and Voswinckel JAHA in combination with Chaudry under § 103(a), but, tellingly, those claims were cancelled and did not issue. EX1016, 33-42.  Those claims were replaced by claims requiring a "opto-acoustical" trigger on a pulsed ultrasonic nebulizer, at different

9

**Appx0120**

concentrations and breaths than the '793 Patent claims. *Id.*

- For the '240 patent, a different Examiner (Townsley, rather than the '793 Patent's Examiner Schmitt) considered those claims and rejected them over art in combination with the '212 patent asserted here. EX1044, 7-23. However, that rejection was overcome by an affidavit that overcame the other art (i.e., the Sandifer reference) not asserted here, and the later rejections did not involve the art presented here. *Id.*

- For the '507 patent, a different Examiner (again, Townsley, rather than Schmitt) rejected the claims to nebulizer kits over Voswinckel 2006 in combination with Chaudry, and applicants submitted an affidavit by Dr. Werner Seeger that Voswinckel 2006 was not prior art because it was not "by others" under pre-AIA § 102(a). EX1017, 50, 35-36. Despite the affidavit, the Applicant cancelled the rejected claims after conducting a telephonic interview with the Examiner and applied for new, different claims, which the Examiner allowed without rejection or addressing whether Voswinckel 2006 was proper prior art. *Id.*, 28-31.

*See NRG Energy, Inc. v. Midwest Energy Emissions Corp.*, IPR2020-00926, Paper 19 at 20-21 (P.T.A.B. Dec. 2, 2020) (rejecting relevance of related patent's prosecution history where it did "not appear that the same or substantially the same arguments [i.e. combinations] predicated on [the prior art] were before the Office"); *Unified Patents v. B# On Demand, LLC*, IPR2020-00995, Paper 20 at 56 (P.T.A.B. Dec. 8, 2020) (finding that a related patent application's claims "shed[] little light on how the Examiner would have applied those references to the materially different" claims of the petitioned patent).

10

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

For these reasons, this Petition does not present a scenario in which discretionary denial is warranted under 35 U.S.C. § 325(d).

## IV. SUMMARY OF THE '793 PATENT

### A. Brief Description of the '793 Patent

The '793 Patent is entitled "Treprostinil Administration by Inhalation" and is directed to methods of treating pulmonary hypertension where a single event dose of 15 micrograms to 90 micrograms of a treprostinil formulation are delivered by inhalation in 1 to 3 breaths. EX1001, Abstract, claims 1-8. Claim 1 is the only independent claim.

Dependent claims 2, 3, and 5 claim various types of inhalers that the '793 Patent specification describes as already well-known and on the market. *See, e.g.*, *id.*, 7:15-21; 7:27-39 (listing multiple soft mist inhalers and citing to M. Hindle, The Drug Delivery Companies Report, Autumn/Winter 2004, pp. 31-34, for "a review of soft mist inhaler technology"); 12:58-59; 14:35-37 (describing use of a pulsed ultrasonic nebulizer OPTINEB® by Nebutec).

Dependent claims 4, 6, and 7 relate to the use of a dry powder (as opposed to liquid) formulation of treprostinil and a dry powder inhaler. The '793 Patent's sole description to support these claims is the following two sentences:

The inhalation device can be also a dry powder inhaler. In such case,
the respiratory drug is inhaled in solid formulation, usually in the form

11

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

of a powder with particle size less than 10 micrometers in diameter or

less than 5 micrometers in diameter.

*Id.*, 7:22-26.

Finally, dependent claim 8 requires the absence of the preservative metacresol

sometimes used in formulations. *Id.*, 15:38-41; 16:11-17; 17:36-37.

### B.    Summary of the Prosecution History of the '793 Patent

The '793 Patent issued July 21, 2020, ***just six months*** after application No.

16/778,662 was filed on January 31, 2020.  EX1001, 1.  Application No. 16/778,662

is a continuation and divisional of several patent applications, including applications

that resulted in U.S. Patent Nos. 10,376,525, 9,339,507, and 9,358,240.  *Id.*  The

patent's provisional application, No. 60/800,016, was filed on May 15, 2006.  *Id.*

For purposes of this Petition, Petitioner assumes the relevant priority date for the

'793 Patent is May 15, 2006.

After responding to missing parts, the applicants added **Thomas Schmehl** as

an inventor (*id.*, 64-65, 58), and the PTO issued one substantive rejection:

obviousness-type double patenting over U.S. Patent Nos. 10,376,525; 9,358,240;

and 9,339,507, which was overcome by terminal disclaimer.  *Id.*, 24-30, 50-51.

### V.    CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(b)(3)

For purposes of resolving this IPR, Petitioner does not believe construction of

any claim term is required.  All terms should be given their plain and ordinary

12

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

meaning in the art as of May 15, 2006. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-

1313 (Fed. Cir. 2005); 37 C.F.R. § 42.100(b).

## VI.    OVERVIEW OF THE GROUNDS

Given the state of the art and the knowledge of a person of ordinary skill in

the art as of May 15, 2006, all claims are unpatentable under 35 U.S.C. §§ 102(b)

and 103.  The grounds presented here rely on the '212 Patent, Voswinckel JESC,

Voswinckel JAHA, Ghofrani, and Voswinckel 2006 prior art references as follows:

1. **Ground 1, Claims 1-8**: Obvious over '212 Patent and Voswinckel JESC
   and Voswinckel JAHA;

2. **Ground 2, Claims 1-8**: Obvious over '212 Patent and Voswinckel JESC;

3. **Ground 3, Claim 1**: Anticipated by Ghofrani;

4. **Ground 4, Claims 1, 3, and 8**: Obvious over Voswinckel JAHA and
   Ghofrani;

5. **Ground 5, Claims 1 and 3**: Anticipated by Voswinckel 2006; and

6. **Ground 6, Claims 2, 4-8**: Obvious over Voswinckel 2006 and the '212
   Patent.

## VII.    PERSON OF ORDINARY SKILL IN THE ART

The challenged claims are directed to a method of treating pulmonary

hypertension by administering an inhaled formulation of treprostinil.  As such, the

challenged claims cover multiple disciplines.  With respect to the method of treating

pulmonary hypertension, a person of ordinary skill in the art ("skilled artisan" or

13

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

"POSA"), at the time of the alleged invention would have a medical degree with a

specialty in pulmonology or cardiology, plus at least two years of experience treating

patients with pulmonary hypertension as an attending, including with inhaled

therapies, or equivalent degree or experience. EX1002, ¶¶17-19. With respect to

inhaled formulations used in the method to treat pulmonary hypertension, a POSA

would be a Ph.D. in pharmaceutical science or a related discipline like chemistry or

medicinal chemistry, plus two years of experience in pharmaceutical formulations,

including inhaled products, or equivalent (*e.g.*, an M.S. in the same fields, plus 5

years of experience). EX1004, ¶¶9-11.

## VIII. TECHNICAL BACKGROUND

The petitioned claims are not directed, generally, to treating pulmonary

hypertension ("PH") with treprostinil, since the compound itself, and methods of

using the compound to treat PH were known, patented, and FDA approved for both

subcutaneous injection and intravenous administration by 2004. *See* EX1018;

EX1002, ¶¶29-30; EX1004, ¶19. Rather, the claims are directed to methods of

treating PH by the administration of *inhaled* treprostinil formulations, such that the

relevant technical background for this Petition is the state of inhalation therapy art

as of 2006.

14

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

### A.    History of Inhalation Therapy

Formulation POSA Dr. Gonda provides a history of inhalation therapy from ancient times to 2006, explaining that nebulizers, meter dosed inhalers ("MDI"), and dry powder inhalers ("DPI") were well-known by the mid-1990s and FDA-approved by 2006.  EX1004, ¶¶21-25.

### B.    Inhaled Treprostinil and Its Analogues

Dr. Gonda and clinician POSA Dr. Hill also explain that treprostinil is similar to iloprost, both chemical compounds are analogues of epoprostenol, and all three compounds were known to treat patients with pulmonary arterial hypertension ("PAH") by 2006.  EX1021, 392 ("Epoprostenol, a synthetic prostacyclin, and iloprost and treprostinil, synthetic prostacyclin analogues, are currently used to treat patients with PAH."); EX1004, ¶¶26-33; EX1002, ¶¶40-44.  Dr. Gonda and Hill also explain that numerous patents and patent publications on inhaled epoprostenol, iloprost, and treprostinil existed by 2006.  *Id.*; *see, e.g.*, EX1027, Figs. 1-5 (depicting effects of intravenous and aerosolized UT15/treprositinil and derivatives); EX1028, Abstract, [0010], [0012], [0017], [0026], [0097], Claim 44 (directed to "inhalable formulation[s] for the treatment of pulmonary hypertension" where the formulation comprises a "hypertension-reducing agent" including a "vasodilator," such as "the

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

prostacyclin analog **treprostinil sodium**").[3]   The '212 Patent, detailed in the

"Overview of the Prior Art" section below, discloses use of inhaled treprostinil for

treatment of pulmonary hypertension.  EX1006, Abstract, 3:1-5, 2:16-18, 2:66-3:5,

4:10-13, 4:41-54, 7:18-24.

As both Dr. Gonda and Dr. Hill explain, the benefits of inhalation over other

forms of administration, such as intravenous delivery, were also well-known by

2006.  EX1004, ¶¶32-33; EX1002, ¶¶31-33.  For example, Chaudry disclosed that

"[c]ontinuous intravenous prostacyclin is far from ideal as a treatment for pulmonary

hypertension, . . . because the agent is available only in limited supply, it is very

costly, and optimal management requires that the intravenous therapy with

prostacyclin be started in specialized centers familiar with the technique, equipment,

and dose ranging. . . .  Further, because the agent is delivered systemically with only

a small percentage of the agent actually absorbed by the pulmonary system, it must

be administered in high dosages."  EX1028, [0011].  Chaudry disclosed that

"therapeutically effective amount[s] of a hypertension-reducing agent" may include

various ranges, such as from "about 0.001 mg/ml to about 20 mg/ml" and provided

extensive disclosure regarding the use of nebulizing devices for inhalation.  *Id.*,

---

[3] All emphasis added unless otherwise noted.

16

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

[0037]-[0038], [0061]-[0066].  The '212 Patent similarly disclosed inhaled delivery

was known to be more "potent" than intravenous delivery.  EX1006, 8:9-17.

In fact, iloprost had already been approved for inhaled use to treat pulmonary

arterial hypertension in 2004, under the brand name Ventavis®.  "Ventavis is

breathed (inhaled) into your lungs" and "[o]ne treatment session will usually last

about 4 to 10 minutes."  EX1029, 4, 15; EX1002, ¶42; EX1004, ¶33.  Ventavis®

(iloprost) is indicated for treatment of pulmonary arterial hypertension (EX1029 at

8) and has a maximum daily dose of 45 micrograms (*id.*, 11).  *Id.*

### C.    Well Known Considerations for Inhalation Therapies

By 2006, it was well-known that inhalation drug particles needed to be a

certain size.  For example, from modern use of inhalation therapy for asthma in the

1990s, it was well known "to avoid inertial impaction in the oropharyngeal cavity

and reach the lung," aerosol particles needed to be 7 micrometers or less.  EX1020,

374; EX1002, ¶35; EX1004, ¶34.  If those particles needed to reach the peripheral

lung, they needed to be closer to 2-3 micrometers.  *Id.*  A 2006 Encyclopedia of

Respiratory Medicine confirms that it was generally known that "inhaler devices

should deliver particles smaller than approximately 5 µm in diameter in order to

enter the lungs."  EX1030, 58.  The '212 Patent also discloses particles "preferably,

less than 5 micrometers in diameter."  EX1006, 5:40-41.

17

**Appx0128**

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Similarly, by 2006, there was extensive literature on pros and cons of various inhalation devices, particularly around patient adherence concerns. *See, e.g.*, EX1031, 1313 ("Comparing clinical features of the Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler"); EX1002, ¶¶34, 36-39; EX1004, ¶36.

Patient adherence was a recognized problem with inhaled medications. EX1002, ¶¶36-39. A 1997 article discusses the challenges of patient adherence to inhaled medications, and found that patients "on average [only] take about 50% of prescribed medication," and that adherence (or nonadherence) was linked to treatment outcome. EX1032, Abstract, 179-80. Skilled artisans understood the burden of therapy, i.e., the effort a patient needs to make to take their medication, was one of the factors impacting adherence with the prescribed dosage regimen. *See, e.g.*, EX1033, Abstract (noting that a factor "related to patient adherence" was the "complexity of the inhalation regiment (dosing frequency, number of drugs)"); EX1004, ¶40; EX1002, ¶¶36-39.

By 2006, it was well-understood that patient adherence could be improved by reducing the number of breaths and overall duration of administration required for adequate dosing with inhalation devices. *See, e.g.* EX1033 at Abstract (noting that a factor "related to patient adherence" was the "complexity of the inhalation regimens (dosing frequency, number of drugs)"); EX1034, Abstract (emphasizing the efficiency benefit of reducing the duration of therapy from 10-20 minutes on a

18

nebulizer to just 3 breaths from a soft mist inhaler AERx); EX1002, ¶¶ 37-38; EX1004, ¶40.

Thus, reducing the duration of the inhaled dose administration of treprostinil was a common goal by 2006, and one that had met with success. Chaudry disclosed that inhalation of its treprostinil formulation "may take about . . . 3 minutes" (EX1028, [0067]), while Voswinckel JAHA and Voswinckel 2006, detailed below, disclosed reductions in treprostinil administration duration to 3 breaths. *See also* EX1004, ¶¶40-42; EX1002, ¶39.

## IX.    OVERVIEW OF THE PRIOR ART

### A.    '212 Patent

The '212 Patent issued on February 18, 2003, and therefore is prior art to the '793 Patent under at least 35 U.S.C. §§ 102(a), (b), and (e).

The '212 Patent discloses "a method of treating pulmonary hypertension by administering an effective amount of a benzindene[4] prostaglandin" (including treprostinil, referred to as "UT-15") "by inhalation." EX1006, Abstract, 3:1-5, 2:16-18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24. A POSA in May 2006 would have known

---

[4] Some references spell this compound as "benzindene" and others as "benzidine." For purposes of this Petition, both spellings refer to the same compound.

19

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

that "UT-15" is synonymous with treprostinil sodium.[5]  The '212 Patent discloses

that an "inhaler" may be used to deliver the UT-15.  *Id.*, 5:30; EX1004, ¶¶50-54;

EX1002, ¶¶53-61.

The '212 Patent discloses, in the same fashion as the '793 Patent, that powder

formulations may be used.  *Compare* EX1006, 5:30-32, 5:37-41 ("Alternatively,

solid formulations, usually in the form of a powder, may be inhaled in accordance

with the present invention.  In such case, the particles are preferably less than 10

micrometers in diameter, and more preferably, less than 5 micrometers in

diameter."), *with* EX1001, 7:22-26.  Further, claim 9 is directed to a method of

treating pulmonary hypertension in a mammal, which would include humans, by the

administration of an inhaled powder formulation of treprostinil.  EX1006, claim 9;

EX1002, ¶60.

---

[5] *See, e.g.,* EX1035 ("United Therapeutics Corp (UTC) is developing treprostinil
sodium (Remodulin, UT-15), a stable structural analog of prostacyclin
[prostaglandin I2 or $PGI_2$], for the potential treatment of primary pulmonary
(arterial) hypertension (PAH), peripheral vascular disease (PVD) and other
cardiovascular conditions. . ."); *see also* EX1046 ("U.S. Pat No[]. 6,521,212 . . .
describe[s] administration of treprostinil by inhalation for treatment of pulmonary
hypertension, peripheral vascular disease and other diseases and conditions.").

20

As for dosage, the '212 Patent states "[i]n the case of treating peripheral vascular disease by inhalation of a benzindene prostaglandin of the present invention, the dosage for inhalation . . . should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg; typically from 0.5 tg [sic] to 2.5 mg, preferably from 7 µg to 285 µg, per day per kilogram bodyweight." EX1006, 5:54-62; *see also id.*, Figs. 16, 18.

For treating pulmonary hypertension, the '212 Patent states that aerosolized (i.e., inhaled) UT-15 "has a greater potency as compared to intravascularly administered UT-15" and teaches the "actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.*, 8:9-17. The '212 Patent then discloses multiple examples of administering treprostinil to sheep. Sheep were "the animal model of choice" for many reasons, including, in relevant part, "sheep have been utilized for several years as an animal model of pulmonary arterial hypertension." *Id.*, 9:14-27.

The '212 Patent relies on its disclosed sheep experiments to claim treatment of mammals, including humans (*see id.*, 14:7-8, claims 5, 6, 9), and to support the overall aim of its invention—treprostinil "delivered by inhalation to a patient in need thereof in a 'therapeutically effective amount,'" where a "'therapeutically effective amount' . . . refers to that amount in which the effects from pulmonary hypertension, and particularly, pulmonary arterial pressure (PAP), are reduced towards a normal

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

level relative to hypertensive levels, or maintained at normal levels." *Id.*, 6:56-66.

The '212 Patent then explains that POSAs can readily determine the appropriate

single event dose "upon the specific circumstances of the patient being treated and

the magnitude of effect desired by the patient's doctor," and "[t]itration to effect . . .

to determine proper dosage." *Id.*, 6:66-7:3; EX1004, ¶35 (explaining that such

titration was well-known). Such UT-15 formulations can be "given in high doses

without significant non-lung effects" and are described "for human medical use."

*Id.*, 10:51-57, 7:4-5.

### B.    Voswinckel JESC

Voswinckel JESC is an abstract presented at the European Society of

Cardiology (JESC) Congress from August 28 to September 1, 2004 in Munich,

Germany and published in the European Heart Journal on October 15, 2004—more

than a year before May 15, 2006—and is therefore prior art to the '793 Patent under

at least 35 U.S.C. § 102(b). EX1036, ¶¶ 68-75; EX1004, ¶55.

Voswinckel JESC describes a study investigating "the acute hemodynamic

response to inhaled treprostinil." EX1007, Background. The study enrolled 29

patients: 8 received placebo and 21 were administered 16, 32, 48, and 64 µg/mL

treprostinil solutions for 6 minutes via the OptiNeb ultrasound nebulizer, then

produced by the company Nebu-tec in Germany. *Id.*, Methods. Of the 29 patients,

10 had "idiopathic PAH". *Id.*, Results. The results showed that "[t]reprostinil

22

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

inhalation results in a significant long-lasting pulmonary vasodilatation" and that, at 16 µg/mL, "near maximal pulmonary vasodilatation is achieved without adverse effects." *Id.*, Conclusion.

As Dr. Hill explains, a POSA would have expected at least 1 mL of the treprostinil solution was used over 6 minutes of inhalation, and thus would understand, therefore, at least **16, 32, 48, or 64 µg** of treprostinil were delivered to different dosing groups in this study. EX1002, ¶65. Such dosages would make sense to a POSA for patients being administered treprostinil for the first time. *Id.* This understanding is further confirmed by Dr. Gonda, who explains that the numerous nebulizers used at the time were known and expected to deliver more than 1mL of solution. EX1004, ¶56 (citing several inhalation therapies delivering 1-5mL of solution via nebulizers). In fact, a POSA would have expected the OptiNeb® device used at the time (before 2006) to nebulize (i.e., turned liquid to aerosol) at a rate of 0.6 mL of solution per minute. EX1002, ¶67 (citing EX1037, 28.) Assuming continuous administration over 6 minutes, the administered volume would have been as much as 0.6 x 6, or 3.6mL. *Id.* Thus, at 16 µg/mL, which is what Voswinckel JESC recommends as the concentration at which "near maximal pulmonary vasodilatation is achieved without adverse side effects" (EX1007, Conclusion), the administered single event dose could be as high as 0.6 mL/min x 16 µg/mL x 6 min = **57.6** µg. *Id.*

23

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

In sum, a skilled artisan would have understood at least 16, 32, 48, or 64 µg of treprostinil were delivered to patients with PAH in this study, and that understanding would have been confirmed by the volume of solution a POSA would have expected to be nebulized by the device used in the study, as well as the nebulizers known in the art.  EX1002, ¶¶65-67; EX1004, ¶56.

### C.     Voswinckel JAHA

Voswinckel JAHA is an abstract published in the Journal of the American Heart Association on October 26, 2004—more than a year before May 15, 2006—and is therefore prior art to the '793 Patent under at least 35 U.S.C. § 102(b). EX1036, ¶¶59-67; EX1004, ¶58.

Voswinckel JAHA describes a study in which 17 patients with "severe pulmonary hypertension" received a treprostinil inhalation by use of the "pulsed OptiNeb® ultrasound nebulizer" in "3 single breaths" of a "600 µg/ml" treprostinil solution.  EX1008, Methods.  The study found that treprostinil "inhalation resulted in a sustained, highly pulmonary selective vasodilatation over 120 minutes," showing "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." *Id.*, Methods, Conclusion.  Voswinckel JAHA also teaches that "[t]olerability [of treprostinil] is excellent even at high drug concentrations and short inhalation times (3 breaths)" with "very promising" long term treatment effects. *Id.*, Conclusion.  This description has been confirmed by the

24

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Board in its Institution Decisions in IPR2017-01621 and IPR2017-01622.  IPR2017-01621, Paper 10 at 23; IPR2017-01622, Paper 9 at 23.

### D.  Ghofrani

Ghofrani is a prior printed publication under 35 U.S.C. § 102(a) because it was published before May 15, 2006.  It was published in the June 2005 issue of *Herz* and a translation, with a declaration attesting the accuracy of the translation, is provided as EX1010.  *See also* EX1036, ¶¶47-55.

Ghofrani describes the use of inhaled treprostinil to treat pulmonary hypertension.  EX1010, 297-98.  Ghofrani states the following:

> Initial trials in Giessen have shown proof of efficacy of *inhaled* treprostinil for the effective reduction of the pulmonary vascular resistance (PVR) [6]. In this first study, 17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil (***15 mcg/inhalation***). This led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min. In direct comparison with inhaled iloprost, inhaled treprostinil showed a stronger pulmonary selectivity, so that ***it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring*** [6]. Due to these unique properties (pronounced pulmonary selectivity and long duration of action after an individual inhalation), it is possible to reduce the number inhalations necessary to up to four per day; the inhalation period can be reduced to < 1 min. by selecting a suitable device.

25

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Additionally, the initial data shows that ***it is technically feasible for there to be only one to two breaths in an application***.

*Id.*, 298.[6]

Ghofrani is prior art "by others" under judicial interpretations of pre-AIA § 102(a), because there are inventors listed on the '793 Patent that are not listed as authors on Ghofrani, and vice versa. *In re Katz*, 687 F.2d 450, 454 (C.C.P.A. 1982). The Ghofrani authors that are not '793 inventors are **Ghofrani, Reichenberger, and Grimminger**. *Compare* EX1010, 1, *with* EX1001, 1. PO encountered this issue in IPR2017-01621 and IPR2017-01622 and submitted an affidavit attesting that these authors did not contribute to the relevant portion of Ghofrani. *See* IPR2017-01621; Paper 10 at 12-14; IPR2017-01622, Paper 9 at 12-15.

But there are also individuals identified as inventors of the '793 Patent that are not included as authors of Ghofrani: **Olschewski, Roscigno, Rubin, Schmehl, and Sterritt**. EX1001, 1. In IPR2017-01621/IPR2017-01622, PO put forth a self-serving affidavit by one of the inventors, Dr. Seeger, as to how "any study that formed the basis of our discussion of inhaled treprostinil" was "performed by [him in] collaboration with Dr. Voswinckel, Olschewski, Rubin, Schmehl, Sterritt, and

---

[6] Quotations to Ghofrani are from the English-language translation of Ghofrani.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Roscigno." IPR2017-01621/01622, EX2098 at ¶ 8. But Dr. Seeger fails to explain

why Drs. Olschewski, Rubin, Schmehl, Sterritt, and Roscigno were not listed as

authors on the Ghofrani article, a concurrent fact that supports the inference that they

did not make any contribution to Ghofrani's disclosure. Dr. Seeger's affidavit also

does not explain if and how any inventor contributed to the use of the various

inhalation devices and formulations specifically claimed in the '793 Patent. Where

there are disputed facts, and Petitioner has not had a chance to depose declarant Dr.

Seeger, a preliminary determination that Ghofrani is by another is appropriate,[7] and

the issue should not impede institution. *Varian Med. Sys., Inc. v. William Beaumont

Hosp.*, IPR2016-00163, Paper 14 at 13-15 (P.T.A.B. May 6, 2016).

### E.    Voswinckel 2006

Voswinckel 2006 is prior art under at least 35 U.S.C. § 102(a), because it was

published in the Annals of Internal Medicine on January 17, 2006, before May 15,

2006. EX1036, ¶¶77-84.

---

[7] Petitioner is entitled to a presumption that "any factual dispute created by

testimonial evidence that is material to the institution decision will be resolved in

favor of the petitioner . . . for purposes of determining whether to institute." 81 FR

18755 (April 1, 2016).

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Voswinckel 2006 discloses a patient trial to "characterize the effects of inhaled treprostinil with special regard to safety, tolerability, and efficacy in patients with severe pulmonary arterial hypertension." EX1009 (Voswinckel 2006), 149-50. Three patients with "severe pulmonary hypertension" were given a "single 15-µg dose of treprostinil, inhaled in 3 breaths through a modified OptiNeb ultrasonic inhalation device." *Id.*, 150. One patient had a "favorable vasodilator response" and the other two patients were given "long-term inhaled treprostinil therapy . . . consisting of 4 daily 15-µg doses" over 3 months, resulting in "dramatic[]" functional improvement without side effect. *Id.* The authors concluded that treprostinil was "clinically effective, safe, and well tolerated when 15 µg was inhaled in 3 breaths 4 times daily." *Id.*

Voswinckel 2006 is "by others" under judicial interpretations of pre-AIA § 102(a). *In re Katz*, 687 F.2d at 454. Voswinckel 2006 authors **Ghofrani and Grimminger** are not listed as inventors on the '793 Patent. *Compare* EX1009, 150, *with* EX1001, 1. During prosecution of the related 9,339,507 patent, PO submitted an affidavit that these two authors "are properly listed as co-authors on the Voswinckel article because of their contributions to the Voswinckel article" but "did not contribute to conception of the presently claimed invention." EX1017, 35-36. But this affidavit fails to establish that Ghofrani and Grimminger did not contribute to the testing of the safety and efficacy of inhaled treprostinil (dosing and breaths)

28

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

used in the patient study of Voswinckel 2006 relied on in this Petition.[8]  In fact, PO would be hard pressed to identify different contributions for these authors because the entire Voswinckel 2006 publication is only 1 page, all of which this Petition relies on.

Further, **Olschewski, Roscigno, Rubin, Schmehl, and Sterritt** are identified as inventors of the '793 Patent, but are not authors of Voswinckel 2006.  *Compare* EX1009, 150, *with* EX1001, 1.  No evidence exists in the record of the proceedings, before the Board or before the PTO, to indicate these inventors contributed to Voswinckel 2006.  The fact that they are not authors on Voswinckel 2006 supports the inference they did not make any contribution to that disclosure.  *Accord EmeraChem Holdings*, 859 F.3d at 1345-48.  Further, PO specifically added Schmehl as inventor in February 2020, so, at the very least, PO cannot reasonably claim that Schmehl somehow contributed to the Voswinckel 2006 article published ***14 years prior***.  *See* EX1015, 64-65, 58.

---

[8] Also, despite the affidavit, PO cancelled the rejected claims and applied for new, different claims, which the Examiner allowed without addressing whether Voswinckel 2006 was prior art.  EX1017, 28-31.  Thus, the issue has not been resolved or evaluated by the Patent Office for either the '507 or '793 patents.

29

**Appx0140**

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Thus, the Voswinckel 2006 publishing entity is different than the '793 Patent

inventive entity. *In re Land*, 368 F.2d at 877. In these circumstances, a preliminary

determination that Voswinckel 2006 is by another is appropriate and the issue should

not impede institution. *Varian Med. Sys., Inc.*, IPR2016-00163, Paper 14 at 13-15.

## X. GROUND 1: CLAIMS 1-8 ARE RENDERED OBVIOUS UNDER 35 U.S.C. § 103(A) OVER THE '212 PATENT IN COMBINATION WITH VOSWINCKEL JESC AND VOSWINCKEL JAHA

### A. Motivation to Combine '212 Patent with Voswinckel JESC and Voswinckel JAHA With a Reasonable Expectation of Success

A POSA would have been motivated to combine the '212 Patent with

Voswinckel JESC and Voswinckel JAHA to arrive at the claims of the '793 Patent.

EX1002, ¶¶75-83. All three publications are directed to solving the same problem

(treatment of pulmonary hypertension) via the same means (inhaled treprostinil).

*See, e.g.,* EX1006, Abstract (disclosing "[a] method of delivering benzindene

prostaglandins to a patient by inhalation" for the treatment of "pulmonary

hypertension"); EX1007, Background, Results (investigating "inhaled treprostinil"

on patients with "idiopathic PAH"); EX1008 (titled "Inhaled Treprostinil Sodium

(TRE) For the Treatment of Pulmonary Hypertension").

A POSA starting with the '212 Patent would understand that it discloses use

of inhaled treprostinil sodium (UT-15, *see supra* n.5) for the treatment of pulmonary

hypertension, discloses a dosage range for intravascular administration of

treprostinil for the treatment of pulmonary vascular disease, and discloses that only 10-50% of the dosage delivered intravascularly would be needed via inhalation to have the same therapeutic effect. EX1006, Abstract, 6:1-2 (disclosing "[a] method of delivering benzindene prostaglandins" "including UT-15" "to a patient by inhalation" for the treatment of "pulmonary hypertension"); 5:54-62 ("daily infusion dose in the range of 25 µg to 250 mg; typically from 0.5 tg [sic] to 2.5 mg, preferably from 7 µg to 285 µg, per day per kilogram bodyweight"), 8:9-17 (the "actual amount of UT-15 delivered via aerosolization delivery" need only be "a fraction (10-50%) of the dosage delivered intravascularly").

A POSA would also understand the '212 Patent discloses experiments in sheep and explains sheep are a model of pulmonary arterial hypertension in humans. EX1006, 9:14-27; Examples I-V and accompanying Figs. A POSA would further understand these sheep experiments were relied upon to support claims directed to treating pulmonary hypertension in mammals, which include humans, via inhaled solutions and powder formulations of treprostinil. *Id.*, claims 6, 9; EX1002, ¶77. Given these teachings, a POSA would have been motivated to further investigate inhaled treprostinil as a treatment for PH in humans and would have looked to the results of Voswinckel JESC and Voswinckel JAHA, which report on this very issue. *Id.*, ¶¶78.

31

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Voswinckel JESC, published after issuance of the '212 Patent, confirms the results of the '212 Patent that inhaled treprostinil is a safe and effective means for treating PH in humans. EX1002, ¶79. Voswinckel JESC discloses the effective administration of inhaled treprostinil for human patients with PAH via a nebulizer for 6 minutes. EX1007, Methods. As detailed above at Section IX.B, a POSA would understand Voswinckel JESC to disclose delivery of at least 16 to 64 µg of inhaled treprostinil to achieve this effectiveness. A POSA would have a reasonable expectation of success in combining the '212 Patent's disclosure with the dosage of Voswinckel JESC, because Voswinckel JESC's results showed that "[t]reprostinil inhalation results in significant long-lasting pulmonary vasodilatation" and that "near maximal pulmonary vasodilatation is achieved without adverse effects." *Id.*, Conclusion; EX1002, ¶79.

Having established via the '212 Patent and Voswinckel JESC that inhaled treprostinil can be used to safely and effectively treat PH, a POSA would have been further motivated to reduce the duration of treatment to increase patient convenience and adherence—from the 6 minutes disclosed in Voswinckel JESC to 3 breaths, as disclosed in Voswinckel JAHA. EX1002, ¶80. As explained above, the problem of patient nonadherence to inhaled medications was well-understood, and a POSA in May 2006 would have readily appreciated reducing the number of breaths for drug delivery would increase patient adherence and, in turn, treatment outcome. *See*

32

*supra*, Section VIII.C.; EX1002, EX1002, ¶¶80-81.  A POSA would also have understood that reducing the duration of treatment would require increasing the concentration of the administered treprostinil solution, which is confirmed by Voswinckel JAHA's use of a 600 mcg/mL solution.  EX1002, ¶82 (citing EX1008, Methods).

A POSA would have a reasonable expectation of success with this combination, because Voswinckel JAHA teaches that "[t]olerability is excellent even at high drug concentrations[9] and short inhalation times (3 breaths)" with "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing."  EX1008, Conclusion; EX1002, ¶83.  Additionally, the relevant scientific literature taught safe and effective administration of high dosages of inhaled therapeutics in short durations.  *See, e.g.,* EX1010, 298 (disclosing administration of inhaled treprostinil at a dose of "15 mcg/inhalation" and that "it is possible to increase the dosage to up to 90 mcg" and that "it is technically feasible for there to be only one to two breaths in an application.");

---

[9] Voswinckel JAHA's results confirm the conclusions reached in the '212 Patent that "aerosolized UT-15 can be given in high doses without significant non-lung effects, i.e., heart rate, cardiac output."  EX1006, 10:51-57.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

EX1034, 177 (delivery 0.45mg of drug in 3 breaths).  In sum, a POSA would have expected to succeed in reducing the number of breaths when delivering 15-90μg of inhaled treprostinil, due to the general state of the art regarding the safety and efficacy of such dosages of inhaled therapeutics, the known problem of patient noncompliance, and Voswinckel JAHA's explicit disclosure that administration of treprostinil was successful.

A POSA would expect Voswinckel JESC's dosage and Voswinckel JAHA's breaths to be a therapeutically effective dosing regimen for PH, and would be motivated by the '212 Patent's disclosure that "solid formulations, usually in the form of a powder" could also "be inhaled in accordance with the ['212 Patent's] invention" to create a dry powder that provided the same single event dosage as Voswinckel JESC and breath limitations of Voswinckel JAHA with a reasonable expectation of success.  EX1006, 5:30-32, 5:37-41, claims 6, 9; EX1004, ¶¶78-80.

Therefore, a POSA would have been motived to and had a reasonable expectation of success in combining the teachings of the '212 Patent with the dosage of Voswinckel JESC and the breaths of Voswinckel JAHA, the combination of which renders all claims invalid, as explained below.

34

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

###    B.    The '212 Patent in combination with Voswinckel JESC and Voswinckel JAHA renders obvious claims 1-8

####        1.    Independent Claim 1

#####            a.    The '212 Patent discloses claim element 1[a]

| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
|------|---|

The '212 Patent describes methods of delivering a therapeutically effective amount of benzindene prostaglandin (also known as "UT-15") by inhalation to treat pulmonary hypertension in a single dose event.  EX1006, Abstract, 2:16-18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24.[10]   A POSA as of May 2006 would have readily

---

[10] Voswinckel JESC and Voswinckel JAHA additionally disclose this limitation. Voswinckel JAHA describes treating "patients with severe pulmonary hypertension" with "Inhaled Treprostinil Sodium (TRE)" with a single event dose of "3 single breaths" of "TRE solution 600 µg/ml," resulting in "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." EX1008, Title, Methods, Conclusion.  Voswinckel JESC describes a study investigating "the acute hemodynamic response to inhaled treprostinil," in which

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

understood that "UT-15" is synonymous with treprostinil sodium, and that

treprostinil is an analog of benzindene prostaglandin.[11]

Specifically, the '212 Patent discloses and claims "a method of treating

pulmonary hypertension by inhalation of a benzindene prostaglandin" (*id.*, 7:18-20)

or a "pharmaceutically acceptable salt" thereof (*id.*, 4:11-12). *Id.*, claims 6, 9. The

'212 Patent further states that the "benzindene prostaglandin is delivered by

inhalation to a patient in need thereof in a 'therapeutically effective amount.'" *Id.*,

6:56-58. "A 'therapeutically effective amount' refers to that amount that has

therapeutic effects on the condition intended to be treated or prevented." *Id.*, 6:58-

61. The '212 Patent explains that "[t]he precise amount that is considered effective

for a particular therapeutic purpose will, of course, depend upon the specific

circumstances of the patient being treated and the magnitude of effect desired by the

patient's doctor." *Id.*, 6:66-7:2. Dr. Hill confirms that a POSA would have the above

_____

patients with pulmonary hypertension were enrolled and administered nebulized

treprostinil solution for 6 minutes, resulting in "significant long-lasting pulmonary

vasodilatation" with "near maximal pulmonary vasodilatation is achieved without

adverse effects." EX1007, Background, Methods, Conclusion.

[11] *See infra* note 5.

36

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

understanding.  EX1002, ¶¶85-92.

### b.    The '212 Patent discloses claim element 1[b]

| 1[b] | with an inhalation device |
|------|---------------------------|

The '212 Patent discloses that an inhaler may be used to deliver the benzindene prostaglandin.  EX1006, 5:30-32 ("Preferably, a nebulizer, **inhaler**, atomizer or aerosolizer is used[,] which forms droplets from a solution or liquid containing the active ingredient(s).").  A POSA as of May 2006 would have readily understood that an inhaler is an inhalation device.[12]  EX1002, ¶¶93-94.

### c.    Voswinckel JESC renders obvious claim element 1[c]

| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
|------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------|

The '212 Patent discloses that "[i]t has been discovered that aerosolized UT-15 has both greater potency and efficacy" for "attenuating chemically induced pulmonary hypertension" as compared to intravascular delivery.  EX1006, 8:5-8. The '212 Patent quantifies this potency, teaching that "aerosolized UT-15 has a

---

[12] Voswinckel JESC and Voswinckel JAHA additionally disclose this limitation, as both use the pulsed OptiNeb® ultrasound nebulizer as the inhalation device. EX1007, Methods; EX1008, Methods.

greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.*, 8:8-12.

Given these teachings, the successful sheep data, and the claims of the '212 Patent, a POSA would have been motivated to look for data administering inhaled treprostinil in humans with PH and the doses used therein. EX1002, ¶¶96-98. A POSA would have been readily led to Voswinckel JESC, which discloses the effective administration of inhaled treprostinil for human patients with pulmonary arterial hypertension for 6 minutes on the OptiNeb® nebulizer of treprostinil solution at a concentrations of 16 to 64 μg/mL. EX1007, Methods.

As explained above at Section IX.B., a skilled artisan would have understood at least 16, 32, 48, or 64 μg of treprostinil were delivered to patients with PAH in this study, and that understanding would have been confirmed by the volume of solution a POSA would have expected to be nebulized by the OptiNeb® device used in the study, as well as the nebulizers known in the art. EX1002, ¶99; EX1004, ¶56.

This understanding is confirmed by the intravascular dosing of UT-15 to treat pulmonary hypertension approved by the FDA in 2004 for intravascular treatment of pulmonary hypertension at a dosage of 1.25 ng/kg/min. EX1018. The label provides calculations based on a 60kg and 65kg patient. *Id.*, 10. Accordingly, a POSA administering Remodulin would have known he was giving his patients a

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

daily treprostinil dose of 1.25ng x 60kg x (24x60)min to 1.25ng x 65kg x (24x60)min, which is to *108 to 117 micrograms*. EX1002, ¶100. A POSA would apply the '212 Patent's 10-50% adjustment between intravascular and inhaled dosing (EX1006, 8:5-12) and understand the '212 Patent to be teaching that an FDA-approvable effective dosage of aerosolized treprostinil for the treatment of pulmonary hypertension would be **10.8 to 58.5 micrograms**. *Id.* This range covers over half of the claimed 15 to 90 µg dosage.[13]

---

[13] In addition, the '212 Patent discloses that "[i]n the case of treating peripheral vascular disease . . . [,] the dosage for inhalation . . . should be sufficient to deliver an amount that is equivalent to a daily [intravascular] infusion dose in the range of 25µg to 250mg." EX1006, 5:54-62; *see also id.*, Figs. 16, 18. By teaching that only 10-50% is needed for inhalation (*id.*, 8:5-12), the '212 Patent discloses that the effective dosage of inhaled treprostinil for treating peripheral vascular disease would be 2.5µg (micrograms) to 125mg (milligrams). This encompasses the full 15 to 90 micrograms claimed by the '793 Patent. Accordingly, given the fact that the '212 Patent is directed to methods of treating both pulmonary hypertension and peripheral vascular disease (*see id.*, 13:26-14:29, claims 6 and 9), a POSA would understand

39

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Accordingly, a POSA would understand the '212 Patent in combination with Voswinckel JESC to disclose an inhaled dosage range of 15 to 90 µg of treprostinil as claimed.

### d.    Voswinckel JAHA discloses claim element 1[d]

| 1[d] | *delivered in 1 to 3 breaths.* |
|---|---|

As explained above in Sections X.A and VIII. C., a POSA would have known to increase patient compliance and convenience, it would be desirable to reduce the number of breaths required for delivery of treprostinil by inhalation. A POSA who understood the necessary amount of dosing for aerosolized delivery of treprostinil would then look to the art for the fewest number of breaths in which that delivery could occur. EX1002, ¶102.

Voswinckel JAHA discloses a low number of breaths for the aerosolized delivery of treprostinil *specifically for treatment of pulmonary hypertension*. Thus, a POSA would understand the '212 Patent and Voswinckel JESC's dosage teachings would be readily applicable to the breath disclosure of Voswinckel JAHA. *Id.*, ¶¶102, 104 (also explaining that a "subset of the Voswinckel JESC authors"

---

that an inhaled dosage of 15 to 90 micrograms of treprostinil for treatment of pulmonary hypertension would be equally possible. EX1002, ¶100n4.

40

**Appx0151**

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

published Voswinckel JAHA, additionally motivating a POSA to look at
Voswinckel JAHA in combination with the '212 Patent and Voswinckel JESC).

In particular, Voswinckel JAHA states "[p]atients received a TRE [inhaled
treprostinil sodium] by use of the pulsed OptiNeb® ultrasound nebulizer (**3 single
breaths**, TRE solution 600 µg/ml)" and further observes that "[t]olerability is
excellent even at high drug concentrations and short inhalation times (**3 breaths**)"
with "strong pulmonary selective vasodilatory efficacy with a long duration of affect
following single acute dosing." *See* EX1008, Methods, Conclusion. A POSA
therefore would have applied the 3-breath delivery disclosure of Voswinckel JAHA
to the teachings of the '212 Patent to improve patient adherence to treatment.
EX1002, ¶¶103, 104.

Accordingly, a POSA reading the '212 Patent and Voswinckel JESC and
applying Voswinckel JAHA's teachings to increase patient compliance and ease of
use would have thought it obvious to administer treprostinil via inhalation in 3
breaths, thereby rendering 1[d] obvious.

### 2.    Dependent Claim 2

| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
|---|---|

The '212 Patent discloses use of an "inhaler," (EX1006, 5:30-32), and soft
mist inhalers were known as of 2004. The '793 Patent itself acknowledges that

41

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

multiple soft mist inhalers were already known in the prior art and on the market, including "the Respimat® Inhaler (Boehringer Ingelheim GmbH), the AERx® Inhaler (Aradigm Corp.), the Mystic™ Inhaler (Ventaira Pharmaceuticals, Inc) and the Aira™ Inhaler (Chrysalis Technologies Incorporated)." EX1001, 7:33-39 (also citing to M. Hindle, The Drug Delivery Companies Report, Autumn/Winter 2004, pp. 31-34, for "a review of soft mist inhaler technology"); *see also* EX1034, Abstract (demonstrating successful use of the AERx soft mist inhaler for treatment of pulmonary exacerbations in cystic fibrosis).

A POSA would find it obvious that the treprostinil disclosed in the '212 Patent could be used in such soft mist inhalers and be motivated to do so. EX1002, ¶¶106-110; EX1004, ¶¶66-71. As Dr. Gonda explains, a POSA would have known that the aqueous solution described in the '212 Patent would be suitable for soft mist inhalation in 3 breaths, and would have been motivated to develop/found it obvious to try using a soft mist inhaler because "soft mist inhalers were known to offer numerous advantages," particularly "repeatable and consistent" drug delivery "regardless of ambient temperature (T = 15-30°C), pressure, or humidity" without the use of propellants. EX1004, ¶¶68-69 (citing EX1069, 932). A POSA would have a reasonable expectation of success in delivering 15 to 90 micrograms of treprostinil in 1 to 3 breaths with a soft mist inhaler, because Voswinckel JAHA successfully delivered treprostinil in 3 breaths and because soft mist inhalers

42

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

approved for market use were well characterized as suitable for inhaled delivery of drugs at similar dosages in one or a small number of breaths. *Id.*, ¶70.

Accordingly, to a POSA, the '212 Patent in combination with Voswinckel JESC and Voswinckel JAHA renders this claim obvious.

### 3. Dependent Claim 3

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|---|

The '212 Patent discloses use of an ultrasonic nebulizer, teaching that "[o]ne preferred nebulizer is the AM-601 MEDICATOR AEROSOL DELIVERY SYSTEM™ (a nebulizer manufactured by Healthline Medical in Baldwin Park, Calif.)." EX1006, 5:33-36. Voswinckel JESC discloses use of the "OptiNeb ultrasound nebulizer", and Voswinckel JAHA use of the "pulsed OptiNeb® ultrasound nebulizer." EX1007, Methods; EX1008, Methods. Also, pulsed ultrasonic nebulizers were well-known and already on the market by 2006. *See, e.g.*, EX1001, 12:58-59, 14:35-37 (describing use of a pulsed ultrasonic nebulizer OPTINEB® by Nebutec). Thus, to a POSA, the '212 Patent in combination with Voswinckel JESC and Voswinckel JAHA renders this claim obvious. EX1002, ¶¶112-114; EX104, ¶¶73-75.

### 4. Dependent Claim 4

| 4 | The method of claim 1, wherein the inhalation device is a dry powder |
|---|---|

43

| | inhaler. |
|---|---|

Claim 4 is disclosed in the '212 Patent, which discloses an "inhaler" may be used to deliver the benzindene prostaglandin. EX1006, 5:30-32. The '212 Patent further states "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention." *Id.*, 5:37-39. And finally, claim 9 of the '212 Patent is specifically directed to an inhaled powder formulation of treprostinil. Accordingly, a POSA would have readily understood the "inhaler" disclosed in the '212 Patent could be used as a "dry powder inhaler," as claimed, to deliver powder formulations. EX1004, ¶¶77-80; EX1002, ¶¶116-117. Such dry powder inhalers were well known and "widely accepted" as of 2006. *See id.*; EX1038, 1311 (October 2005 "Dry Powder Inhalers: An Overview").

### 5.    Dependent Claim 5

| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
|---|---|

The '793 Patent defines a pressurized metered dose inhaler as "a device which produces the aerosol clouds for inhalation from solutions and/or suspensions of respiratory drugs in chlorofluorocarbon (CFC) and/or hydrofluoroalkane (HFA) solutions." EX1001, 7:17-21. The '212 Patent discloses use of an "inhaler," (EX1006, 5:30-32), and pressurized metered dose inhalers were well-known as of 2004, offered the advantage of being "reasonably efficient" while being "inherently

44

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

portable and very convenient to use" and were readily available, well understood, and offered for "[n]early all major respiratory drugs. *See* EX1004, ¶¶82-85 (citing EX1020, 379; EX1019, 29, 32); EX1002, ¶119.

### 6. Dependent Claim 6

| 6 | The method of claim 4, wherein the formulation is a powder. |
|---|---|

Claim 6 is disclosed in the '212 Patent, which discloses and specifically claims that powder formulations may be used to treat pulmonary hypertension. EX1006, 5:37-39 ("Alternatively, solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention."), claim 9.

### 7. Dependent Claim 7

| 7 | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
|---|---|

Claim 7 is disclosed in the '212 Patent, which expressly discloses and claims that "the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter." EX1006, 5:39-41, claim 9.

### 8. Dependent Claim 8

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

Claim 8 is disclosed in the '212 Patent, which has no disclosure requiring the presence of metacresol in the described formulation. EX1006, 5:25-29 (disclosing formulation of a "more preferred solution" that does not include metacresol), 8:39-

45

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

44 (disclosing steps of formulating treprostinil inhalation solution that do not include

metacresol).   A POSA would thus understand the '212 Patent to disclose a

formulation of UT-15 (*i.e.*, treprostinil) that contains no metacresol.  EX1004, ¶¶92-

93 (explaining that "use of preservatives in inhalation products was strongly

discouraged by 2006").

Voswinckel JAHA also specifically states that a "preservative free solution of

inhaled TRE" was used (Voswinckel JAHA at Methods), which a POSA would

understand to mean that the solution contained no metacresol, because metacresol

was known in 2006 to be a preservative.  EX1004, ¶94; *see also* EX1001, 15:40-41

(referring to a "metacresol preservative" in "treprostinil solution").

Accordingly, a POSA would have understood the combination of the '212

Patent, Voswinckel JESC, and Voswinckel JAHA to render this claim obvious.

EX1002, ¶123.

## XI.   GROUND 2: CLAIMS 1-8 ARE RENDERED OBVIOUS UNDER 35 U.S.C. § 103(a) OVER THE '212 PATENT IN COMBINATION WITH VOSWINCKEL JESC

### A.   Motivation to Combine With a Reasonable Expectation of Success

A POSA would have been motivated to combine the '212 Patent with

Voswinckel JESC, because both disclose use of the same drug (treprostinil/UT-15)

for the same disease (pulmonary arterial hypertension) through the same route of

administration (inhalation of solution of treprostinil).  The first four paragraphs of

46

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Section X.A. explain why a POSA would have been motivated to combine these

references with a reasonable expectation of success.

**B.    The '212 Patent in combination with Voswinckel JESC renders obvious claims 1-8**

**1.    Independent Claim 1**

**a.    The '212 Patent in combination with Voswinckel JESC renders obvious claim elements 1[a], 1[b], and 1[c]**

| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
|------|------|
| 1[b] | with an inhalation device |
| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |

As explained above at Sections X.B.1.a to X.B.1.c, the '212 Patent discloses

elements 1[a] and 1[b], and the '212 Patent in combination with Voswinckel JESC

discloses element 1[c].

**b.    Claim element 1[d] is obvious via routine optimization**

| 1[d] | delivered in 1 to 3 breaths. |
|------|------|

Element 1[d] would have been obvious over the '212 Patent and Voswinckel

JESC in view of a POSA's general knowledge in the field and/or by applying routine

optimization.

47

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

A POSA reading the '212 Patent and Voswinckel JESC would have been motivated to minimize the number of breaths required for administration of treprostinil by inhalation, to increase patient compliance and convenience. *See* EX1002, ¶¶128, 130. In addition, by May 2006, the general state of the art had established the safety and efficacy of high dosages of inhaled therapeutics delivered over a small number of breaths. *See, e.g., id.*, ¶129; EX1034, 177 (delivery of 0.45mg of drug in 3 breaths); EX1010, 298 ("[I]t is technically feasible for there to be only one to two breaths in an application."); EX1008, Methods (administration of 600 μg/mL treprostinil in 3 breaths); EX1009, 150 (administration of 15μg treprostinil in 3 breaths). Further, claim 9 of the '212 Patent is specifically directed to an inhaled powder formulation of treprostinil, which is commonly delivered by dry powder inhalers. EX1006, claim 9. Dry powder inhalers are breath-actuated as opposed to delivering doses over a set period of time. EX1039, 81 ("Advantages such as the potential ability to generate high FPFs and a relatively high lung deposition, fast and easy administration, the ability to prepare stable formulations (compared with solutions), and the fact that DPIs are breath-actuated and easily portable, justify their existence."). Therefore, a POSA would have been encouraged to and found it obvious to modify the teachings of the '212 Patent and Voswinckel JESC to deliver inhaled treprostinil in 1 to 3 breaths. EX1002, ¶¶126-131.

Relying on the '212 Patent and Voswinckel JESC to deliver inhaled

48

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

treprostinil in 1 to 3 breaths would have amounted to mere routine optimization. *See, e.g., Genzyme Therapeutic Prods. L.P. v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1365, 1373 (Fed. Cir. 2016) (affirming decision finding dosing claims obvious when "the claimed dosing schedule would have been arrived at by routine optimization"); *see also Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326, 1329-31 (Fed. Cir. 2014) (affirming decision finding dosing claims obvious because "[a] relatively infrequent dosing schedule has long been viewed as a potential solution to the problem of patient compliance"); *see also Merck & Co., Inc. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364, 1373 (Fed. Cir. 2005) (reversing decision to find claims obvious that covered slightly different dosages from those of the prior art).  In fact, the '212 Patent itself contemplates dose optimization as a matter of routine.  EX1006, 6:56-7:3 ("Titration to effect may be used to determine proper dosage."), 7:25-33; *see also generally id.*, 1:10-2:64.  Such titration to effect was well known in similar aerosolized prostacyclin therapy.  EX1004, ¶35 (citing EX1047, EX1048); EX1002, ¶127, 130.  A POSA therefore would have understood the benzindene prostaglandin (*i.e.*, treprostinil) disclosed in the '212 Patent and Voswinckel JESC could be "delivered in 1 to 3 breaths."

### 2.    Dependent Claims 2-8

| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
|---|---|

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|---|
| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
| 6 | The method of claim 4, wherein the formulation is a powder. |
| 7 | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 | The method of claim 1, wherein the formulation contains no metacresol. |

The additional limitations of dependent claims 2-8 are disclosed in the '212

Patent, as explained above in Sections X.B.2 to X.B.8.  Further, for claim 3,

Voswinckel JESC specifically teaches use of the "OptiNeb® ultrasound nebulizer,"

which the '793 patent confirms is pulsed.  EX1007, Methods; EX1001, 14:35-37.

## XII.   GROUND 3: CLAIM 1 IS ANTICIPATED BY GHOFRANI

Ghofrani explicitly discloses every element of claim 1.

### A.    Ghofrani Discloses Claim Element 1[a]

| 1[a] | A method of treating pulmonary hypertension, comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
|---|---|

Element 1[a] is disclosed by Ghofrani, which teaches the recited method of

treating pulmonary hypertension.  Ghofrani, in relevant part, discloses the efficacy

50

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

of "inhaled treprostinil" for 17 patients with "pulmonary hypertension" at a dosage

of "15mcg/inhalation" for total dosage of "up to 90mcg . . . without adverse effects

occurring." EX1010, 298; EX1002, ¶¶136-138. Ghofrani further discloses that

"initial data shows that it is technically feasible for there to be only one to two

breaths in an application." EX1010, 298.

### B. Ghofrani Discloses Claim Element 1[b]

| 1[b] | with an inhalation device |
|------|---------------------------|

Element 1[b] is disclosed by Ghofrani, which states patients were

administered "inhaled treprostinil," which would require an inhalation device.

EX1010, 298. Ghofrani further discloses that "it is possible to reduce the number

[of] inhalations necessary to up to four per day; the inhalation period can be reduced

to <1min. by selecting **a suitable device**." *Id*. A POSA as of May 2006 would have

readily understood such a "suitable device" to be an inhalation device. EX1002,

¶139.

### C. Ghofrani Discloses Element 1[c]

| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
|------|---------------------------|

Ghofrani discloses a study in which patients "were administered [a single

51

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

event dose of] inhaled treprostinil (15 mcg[14]/inhalation)." EX1010 (Ghofrani), 298.

That dose "led to a major reduction in pulmonary selective pressure and resistance

with an overall duration of action of >180 min." *Id*. Ghofrani further discloses "it

is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per

inhalation exercise) without adverse effects occurring." *Id*. Ghofrani thus discloses

a per inhalation exercise (i.e., single event dose) that covers the claimed dosage

range.  EX1002, ¶140.

### D.    Ghofrani Discloses Claim Element 1[d]

| 1[d] | delivered in 1 to 3 breaths. |
|------|------------------------------|

Ghofrani discloses that "it is technically feasible for there to be only one to

two breaths in an application" of the claimed dosage, disclosing element 1[d] to a

POSA.  EX1010, 298; EX1002, ¶141-142.

## XIII.  GROUND 4: CLAIMS 1, 3, AND 8 ARE RENDERED OBVIOUS UNDER 35 U.S.C. § 103(A) OVER VOSWINCKEL JAHA IN COMBINATION WITH GHOFRANI

### A.    Motivation to Combine With A Reasonable Expectation of Success

The Board has found that "Voswinckel [2004] references a 17 patient study

that appears to be the same as the 17 patent study discussed in the relevant portions

of Ghofrani."  IPR2017-01621, Paper 10 at 14.  Dr. Hill agrees and explains why a

---

[14] A POSA would have understood that "mcg" and "μg" refer to micrograms.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

POSA would have expected the disclosures of Ghofrani to apply to Voswinckel

JAHA.  EX1002, ¶¶143-144.

Even if not the same study, every author of Ghofrani is also an author of

Voswinckel JAHA, motivating a POSA to look at Ghofrani for additional details

after reviewing the Voswinckel JAHA Abstract.  *Compare* EX1010, with EX1008;

EX1002, ¶145.  Since Voswinckel JAHA does not expressly provide the total dose

administered in its single event dose of 1 to 3 breaths, a POSA would have been

motivated to look to Ghofrani for the optimal dosing range in Voswinckel JAHA's

breath range.  Ghofrani discloses a study in which patients "were administered

inhaled treprostinil (15 mcg/inhalation)," teaches that "it is possible to increase the

dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without

adverse effects occurring," and discloses that "it is technically feasible for there to

be only one to two breaths in an application" with these dose ranges.  EX1010, 298.

Thus, a POSA would have been motivated to combine Voswinckel JAHA with the

15-90 mcg dosage disclosure of Ghofrani.  EX1002, ¶145.

A POSA would have had a reasonable expectation of success in combining

the two, because both references teach successful safety and efficacy of inhaled

treprostinil at their respective breath and dosage levels.  EX1002, ¶145.  Voswinckel

JAHA teaches that its "inhalation resulted in a sustained, highly pulmonary selective

vasodilatation over 120 minutes," showing "strong pulmonary selective vasodilatory

53

efficacy with a long duration of effect following single acute dosing" with "[n]o side effects." EX1008, Methods, Conclusion. Ghofrani teaches that its dosing "led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of >180 min . . . without adverse effects occurring." EX1010, 298.

### B.     Voswinckel JAHA in combination with Ghofrani renders obvious claims 1, 3, and 8

#### 1.     Independent Claim 1

##### a.     Voswinckel JAHA and Ghofrani disclose claim element 1[a]

| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
|---|---|

Element 1[a] is disclosed by Voswinckel JAHA, which teaches the recited method of treating pulmonary hypertension. Voswinckel JAHA describes treating "17 patients with severe pulmonary hypertension" with "Inhaled Treprostinil Sodium (TRE)." EX1008, Title, Methods. Voswinckel JAHA also describes a single event dose of "3 single breaths" of "TRE solution 600 µg/ml" having "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." *Id.*, Methods, Conclusion.

Ghofrani also discloses element 1[a]. *See supra* Section XII.A.

54

### b. Voswinckel JAHA and Ghofrani disclose claim element 1[b]

| 1[b] | with an inhalation device |
|------|---------------------------|

Element 1[b] is disclosed by Voswinckel JAHA, which expressly discloses "inhaled TRE" through the "use of the pulsed OptiNeb® ultrasound nebulizer." *Id.*, Methods. A POSA as of May 2006 would have readily understood that this nebulizer is an inhalation device. EX1002, ¶150.

Ghofrani also discloses element 1[b]. *See supra* Section XII.B.

### c. Voswinckel in combination with Ghofrani discloses element 1[c]

| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
|------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------|

Element 1[c] would have been obvious over Voswinckel JAHA in combination with Ghofrani. Because Voswinckel does not expressly provide the total dose administered in its single event dose, a POSA would have looked to Ghofrani to fill in the optimal single event dosing range, since "both references disclose that inhaled administration of treprostinil at these doses in 1-3 breaths was an effective treatment for pulmonary hypertension." EX1002, ¶155. In Ghofrani, patients "were administered inhaled treprostinil (15 mcg/inhalation)." EX1010, 298. Ghofrani further discloses that "it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring."

55

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

*Id.* Ghofrani further discloses that "it is technically feasible for there to be only one to two breaths in an application." *Id.* Thus, a POSA would have understood that Ghofrani was disclosing a 15 to 90 µg single event dose—the entire claimed range—in the same 1-3 breath range as Voswinckel JAHA. EX1002, ¶154. A POSA administering treprostinil in accordance with the teachings of Voswinckel JAHA would have been motivated to use the range of doses disclosed by Ghofrani because such doses "led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min . . . without adverse effects occurring," i.e. a POSA would understand that this dose was therapeutically effective and safe. EX1010, 298; EX1002, ¶¶153-154.

> **d.    Voswinckel JAHA and Ghofrani disclose claim element 1[d]**

| 1[d] | delivered in 1 to 3 breaths. |
|------|------------------------------|

Element 1[d] is disclosed by Voswinckel JAHA, which discloses treating patients with a single event dose of "3 single breaths." EX1008, Methods. Ghofrani further discloses that "it is technically feasible for there to be only one to two breaths in an application" of the claimed dosage. EX1010, 298. Thus, both Voswinckel JAHA and Ghofrani disclose element 1[d].

> **2.    Dependent Claim 3**

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|------------------------------------------------------------------------------------------|

56

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

The limitation of claim 3 is disclosed by Voswinckel JAHA, which

specifically teaches use of the "pulsed OptiNeb® ultrasound nebulizer." EX1008,

Methods.

### 3.    Dependent Claim 8

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

The limitation of claim 8 is disclosed by Voswinckel JAHA, which states that

a "preservative free solution of inhaled TRE" was used (EX1008, Methods), which

a POSA would understand to mean that the solution contained no metacresol,

because metacresol was known in 2006 to be a preservative. EX1004, ¶¶94, 104;

*see also* EX1001, 15:40-41 (referring to a "metacresol preservative" in "treprostinil

solution").

## XIV.  GROUND 5: CLAIMS 1 AND 3 ARE ANTICIPATED BY VOSWINCKEL 2006

### A.    Independent Claim 1

#### 1.    Voswinckel 2006 discloses claim element 1[a]

| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
|---|---|

Element 1[a] is disclosed in Voswinckel 2006, which teaches the recited

method of treating pulmonary hypertension. Voswinckel 2006 describes treating

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

"three patients with severe pulmonary hypertension" with "inhaled treprostinil."

EX1009, 150.  Voswinckel 2006 also describes "**a single** 15-µg **dose** of treprostinil,

inhaled in 3 breaths" inducing "highly pulmonary selective and sustained

vasodilatation" proving that "[t]he drug was clinically effective" at the dosage and

number of breaths.  *Id.*

### 2.     Voswinckel 2006 discloses claim element 1[b]

| 1[b] | with an inhalation device, |
|------|----------------------------|

Element 1[b] is disclosed in Voswinckel 2006, which expressly discloses

"inhaled treprostinil" administered "through a modified OptiNeb ultrasonic

**inhalation device**."  *Id.*

### 3.     Voswinckel 2006 discloses claim element 1[c]

| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
|------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------|

Element 1[c] is disclosed in Voswinckel 2006, which teaches that "a single

15-µg dose of treprostinil" was inhaled by patients "through a modified OptiNeb

ultrasonic inhalation device."  *Id.*

### 4.     Voswinckel 2006 discloses claim element 1[d]

| 1[d] | delivered in 1 to 3 breaths. |
|------|------------------------------|

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Element 1[d] is disclosed in Voswinckel 2006 which teaches that "15-µg dose

of treprostinil" was inhaled by patients "in **3 breaths** through a modified OptiNeb

ultrasonic inhalation device." *Id.*

### B.    Claim 3

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|---|

Voswinckel 2006 discloses use of a "modified OptiNeb ultrasonic inhalation

device" (EX1009 (Voswinckel 2006), 150), which was a known pulsed ultrasonic

nebulizer as of May 2006.   EX1004, ¶108; EX1002, ¶172; EX1001, 14:35-37

(describing use of a "pulsed ultrasonic nebulizer" OPTINEB® by Nebutec).

## XV.  GROUND 6: CLAIMS 2 AND 4-8 ARE OBVIOUS OVER VOSWINCKEL 2006 IN COMBINATION WITH THE '212 PATENT

As explained above, Claim 1 is anticipated by Voswinckel 2006.   The

additional limitations of claims 2 and 4-8 are obvious over Voswinckel 2006 in view

of the '212 Patent.

### A.    Motivation to Combine With a Reasonable Expectation of Success

Both the '212 Patent and Voswinckel 2006 are directed to the use of inhaled

treprostinil (also known as benzindene prostaglandin UT-15), for the treatment of

pulmonary hypertension.  *See, e.g.,* EX1006, Abstract (disclosing "[a] method of

delivering benzindene prostaglandins to a patient by inhalation" for the treatment of

"pulmonary hypertension"); *see also* EX1009 (Voswinckel 2006), 149 (titled

59

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

"Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension").

Indeed, Voswinckel 2006, like Voswinckel JESC and Voswinckel JAHA, puts into

clinical practice the express teachings of the '212 Patent, with success.    But

Voswinckel 2006 is limited to one form of inhalation delivery, and other forms were

well-known by 2006.    Each form had various advantages and disadvantages that

made it useful for different patients and scenarios.    *See, e.g.*, EX1031 ("Comparing

Clinical Features of the Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler").

As Dr. Gonda and Dr. Hill explain, a POSA would have been motivated to apply the

'212 Patent's teachings as to various forms of inhalers and dry powder formulations,

while maintaining the dosage and breath limitations of Voswinckel 2006, with a

reasonable expectation of success because Voswinckel 2006 had shown that

treprostinil was "clinically effective, safe, and well tolerated" at the dosage and

breath of "15 µg … inhaled in 3 breaths."    *See* EX1009, 150; EX1004, ¶110-113;

EX1002, ¶¶173-176.

**B.    Voswinckel 2006 in combination with the '212 Patent renders obvious claims 2 and 4-8**

**1.    Dependent Claim 2**

| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
|---|---|

As explained above at Sections X.B.2 and XV.A., a POSA would understand

the '212 Patent's teachings to apply to soft mist inhalers, and expect Voswinckel

60

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

2006's dosage and breath disclosures to be realizable via a soft mist inhaler.

EX1004, ¶¶115-116. Thus, Voswinckel 2006 in combination with the '212 Patent

render obvious "wherein the inhalation device is a soft mist inhaler."

### 2. Dependent Claim 4

| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
|---|---|

The '212 Patent discloses this element, as detailed above at Section X.B.4.

*See also* EX1002, ¶180; EX1004, ¶118. A POSA would have readily understood

that "inhaled treprostinil" dosage and breath disclosure of Voswinckel 2006 could

be utilized as a powder delivered in a "dry powder inhaler" as disclosed and claimed

by the '212 Patent. EX1004, ¶119. A POSA would have been motivated to do so

because dry powder inhalers were well-known to be very portable and quick to use,

breath-actuated, could be designed as single-dose or multi-dose devices, provided

the "lowest cost dose," and were easier for patients (especially children) to use than

the pulsed ultrasonic nebulizer disclosed in Voswinckel 2006. *Id.*; EX1030, 58, 61-

62, 63; EX1031, 1316-17; *see also* EX1039, 81 ("Advantages such as the potential

ability to generate high FPFs and a relatively high lung deposition, fast and easy

administration, the ability to prepare stable formulations (compared with solutions),

and the fact that DPIs are breath-actuated and easily portable, justify their

existence."). A POSA would thus have had a reasonable expectation of success that

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

the "inhaled treprostinil" described in Voswinckel 2006 could be delivered using a

dry powder inhaler.  EX1004, ¶119.

### 3.    Dependent Claim 5

| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
|---|---|

The '793 Patent defines a pressurized metered dose inhaler (pMDI) as "a

device which produces the aerosol clouds for inhalation from solutions and/or

suspensions of respiratory drugs in chlorofluorocarbon (CFC) and/or

hydrofluoroalkane (HFA) solutions.  EX1001, 7:17-21.  The '212 Patent discloses

use of an "inhaler," (EX1006, 5:30-32) and pMDIs were well-known inhalers as of

2004.  *See* EX1004, ¶121; EX1002, ¶183.

A POSA would have been motivated to deliver the "inhaled treprostinil"

described in Voswinckel 2006 using pMDIs with a reasonable expectation of

success.  As Dr. Gonda explains, pMDIs were known to be "efficient" while being

"inherently portable and very convenient to use" (EX1020 at 379), which would

motivate a POSA to deliver the "inhaled treprostinil" using a pMDI, because patient

adherence was a known problem that could be eased by portability and convenience.

EX1004, ¶122. And a POSA would have had a reasonable expectation that the

"inhaled treprostinil" disclosed in Voswinckel 2006 could be delivered using a

pMDI, because they were readily available, well understood, and offered for

"[n]early all major respiratory drugs."  *Id.*

Thus, a POSA would have understood the combination of Voswinckel 2006 and the '212 Patent to render claim 5 obvious.  EX1002, ¶184.

### 4.    Dependent Claim 6

| 6 | The method of claim 1, wherein the formulation is a powder. |
|---|---|

Claim 6 would have been obvious over Voswinckel 2006 in combination with the '212 Patent, which discloses and claims that powder formulations may be used to treat pulmonary hypertension.    EX1006, 5:37-39 ("Alternatively, solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention."), claims 6 and 9.  A POSA would have been motivated to convert Voswinckel 2006's treprostinil solution to a powder because powders were known to be more stable formulations than solutions by May 2006, and the '212 Patent specifically claims such powder formulations for the same indication as Voswinckel 2006.  *See* EX1004, ¶125; EX1039, 81; EX1006, claim 9.  A POSA would have had a reasonable expectation of success in doing so because converting a solution to dry powder was well known by 2006, and the '212 Patent discloses and claims that treprostinil can be formulated as a powder for delivery by inhalation. *See, e.g.*, EX1004, ¶125; EX1040, 51-53 ("Preparation of Powders" section).

63

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

### 5.  Dependent Claim 7

| 7 | The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter. |
|---|---|

Claim 7 would have been obvious over Voswinckel 2006 in combination with the '212 patent, which discloses that "the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter." EX1006, 5:39-41.

### 6.  Dependent Claim 8

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

Claim 8 is disclosed in Voswinckel 2006 and the '212 Patent.  Voswinckel 2006 does not disclose the presence of metacresol in the described formulation of "inhaled treprostinil," and the '212 Patent discloses formulations without metacresol.  *See generally* EX1009; EX1006, 5:25-29 (disclosing formulation of a "more preferred solution" that does not include metacresol), 8:39-44 (disclosing steps of formulating treprostinil inhalation solution that do not include metacresol).  Voswinckel 2006 in combination with the '212 Patent therefore discloses a formulation of treprostinil that contains no metacresol.  EX1004, ¶¶130-131.

## XVI.  No Secondary Considerations of Non-Obviousness Exist

No secondary considerations of non-obviousness were presented to the PTO.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

To the extent PO argues, similar to their arguments in IPR2017-01621 and IPR2017-01622 and in the '793 Patent, that the claims recite unexpected results, address a long-felt but unmet need, have been copied, and have been commercially successful, those considerations do not preserve validity, particularly because PO cannot establish a nexus between those considerations and the claims.

First, the fact that treprostinil by inhalation was safe and effective at the dosage range claimed by the '793 patent was not **an unexpected result** by 2006. This result was already disclosed by the prior art discussed in this Petition (*see, e.g.*, EXS1007-1010. Thus, the success of administering 15 to 90 micrograms of treprostinil in 1 to 3 breaths was entirely *expected* as of May 2006. EX1004, ¶133.

Second, no **long-felt, but unmet need** for a "treatment for pulmonary hypertension that can be administered using a compact inhalation device" (EX1001, 2:60-62) existed in 2006, such that it was allegedly addressed by PO's Tyvaso® (treprostinil) inhalation solution. By 2006, pulmonary hypertension treatment with a compact inhalation device, like a nebulizer, could be achieved in more breaths, lower concentrations, and by iloprost. *See supra*, Sections VIII.B-C. These treatments meet the articulated "long-felt need," regardless of whether they practice the '793 Patent claims—exemplifying why there is no nexus between the '793 Patent's treprostinil, dosage, or breath claim limitations and the purported need. In addition, treprostinil was already available for subcutaneous and intravenous

65

administration well before Tyvaso® (*see, e.g.*, EX1018), and there are disadvantages to oral inhalation, such that even today, doctors prescribe subcutaneous or intravenous dosing of treprostinil over inhaled treprostinil. *See* EX1002, ¶¶189-190; EX1004, ¶135. So, more accurately, Tyvaso® was approved by the FDA as another option, useful in certain circumstances, for an already met need.[15]  EX1004, ¶137. To the extent there was any need for the other claimed, non-nebulizer inhalation devices, PO actively gave up on those paths and instead pursued minor advancements in its nebulizer and non-inhaled routes like oral delivery. *See* EX1004, ¶136.  PO simply claimed use of the other devices without producing a product for the market, because they did not believe they met a long-felt need worth pursuing and instead wanted to force out companies, like Petitioner, who developed dry powder formulations and inhalers. *Id.*

Third, as for **copying**, PO cannot show evidence of copying simply because

---

[15] Further, as Dr. Gonda explains, a POSA would have known that pulmonary hypertension treatment with compact inhalation devices, like a soft mist inhaler or a dry powder inhaler, could be achieved in a smaller number of breaths using a higher concentration of the drug, and the safety, tolerability, and efficacy of such formulations was tested in patients.  EX1004, ¶134.

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

they have accused Petitioner of infringing the '793 Patent claims. As Dr. Gonda explains, a POSA would not consider Liquidia' s product "copying," because PO UTC never developed a dry powder formulation or inhaler. EX1004, ¶138. Further, considering the '793 Patent issued *after* Liquidia developed LIQ861 and submitted its NDA, a skilled artisan would not consider Liquidia's product a "copy" of the alleged claimed invention. *Compare* EX1001 (issued July 21, 2020), *with* EX1042 (announcing Liquidia's NDA submission in January 27, 2020 Press Release); EX1049 (announcing FDA acceptance of LIQ861 NDA on April 8, 2020.)

PO may argue, as they have in district court, that because inventor Roscigno is a former employee of the Petitioner, Petitioner must have copied the claimed invention. But any inference that Roscigno's involvement resulted in any alleged "copying" is unsupported speculation by the PO, and is belied by the fact that Roscigno had been working at Liquidia since 2015, years before the application for the '793 Patent was even filed in 2020.

Finally, PO has not produced evidence that Tyvaso®'s market share is tied to the '793 Patent claims. In fact, while the Tyvaso® label recommends an initial dosage of 3 breaths, it expressly instructs increasing the dosage by "an additional 3 breaths per session" every "1-2 week[s]" as tolerated. *See* EX1043, 1 (Dosage and Administration). All but the initial dosing usage of Tyvaso® would not practice the '793 Patent claims, which are limited to a single event dose of 1 to 3 breaths. In

67

Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

addition, Tyvaso®, a solution of treprostinil, is approved for oral inhalation through

a pulsed ultrasonic delivery device, and therefore does not practice any claims

directed to a soft mist inhaler, dry powder, DPI or MDI. *Id.*, 2 (Section 2.1). In sum,

any evidence of Tyvaso®'s **commercial success** lacks the required nexus to the

claims.

Accordingly, the secondary considerations of non-obviousness do not warrant

a finding that the Petitioned Claims are patentable.

## XVII. CONCLUSION

Petitioner respectfully requests that the Board institute *inter partes* review of

claims 1–8 of the '793 Patent.

Respectfully submitted,

Dated: January 7, 2021

COOLEY LLP

COOLEY LLP
ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC 20004
Tel: (212) 479-6840
Fax: (212) 479-6275

By: */Ivor R. Elrifi/*
Ivor R. Elrifi
Reg. No. 39,529
*Counsel for Petitioner*

68

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

LIQUIDIA TECHNOLOGIES, Inc.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

_____

IPR2021-00406
U.S. Patent No. 10,716,793

_____

**PATENT OWNER UNITED THERAPEUTIC CORPORATION'S
PRELIMINARY RESPONSE**

Liquidia has asserted six grounds for institution:

**Ground 1 (Claims 1-8)**: '212 Patent, Voswinckel JESC, and Voswinckel JAHA
**Ground 2 (Claims 1-8)**: '212 Patent, Voswinckel JESC
**Ground 3 (Claim 1)**: Ghofrani
**Ground 4 (Claims 1, 3, and 8)**: Voswinckel JAHA and Ghofrani
**Ground 5 (Claims 1 and 3)**: Voswinckel 2006
**Ground 6 (Claims 2 and 4-8)**: Voswinckel 2006 and the '212 Patent

Although nominally styled as the '212 patent in view of Voswinckel JESC, or in further view of Voswinckel JAHA, Grounds 1 and 2 rely expressly on the disclosure found in Exhibit 1037, an Operating Instruction manual for a single device referred to by Liquidia as "Optineb 2005." Pet., 23; EX1004, e.g., ¶¶74 and 108; EX1002, ¶47.[4] Yet, the Voswinckel references are discussing multiple different Optineb devices, and the pulsed Optineb device capable of providing per breath dosing is not described. EX2003, ¶26. Liquidia has provided no evidence by which a reasonable person could conclude that Exhibit 1037 was publicly available as of the critical date of the '793 patent. Further, Grounds 3 through 6 explicitly rely on Ghofrani and/or Voswinckel 2006. Liquidia has failed to establish a reasonable likelihood of prevailing during trial in showing that Ghofrani and Voswinckel 2006

---

[4] Both Dr. Gonda (EX1004 at ¶108) and Dr. Hill (EX1002 at ¶47) also cites to the specification of the '793 patent for disclosing that a "pulsed" type of Optineb device was known, but the modifications that gave rise to the pulsed Optineb device are not prior art. EX2003 at ¶26.

27

qualify as prior art under § 102(a), because as Drs. Seeger, Ghofrani, Reichenberger, and Grimminger explain, the information relied upon by Liquidia from these two references was solely the work of the inventors of the '793 patent. Thus, they are not prior art to the claimed invention.

Because Liquidia has failed to meet its burden of establishing that the references relied upon were publicly accessible and prior art, UTC respectfully suggests that institution should be denied.

### 1. Liquidia Has Failed to Establish That the Undated Optineb Manual Was Publicly Available at the Priority Date (Grounds 1-2)

At the institution stage, the petitioner must "identify, with particularity, evidence sufficient to establish a reasonable likelihood that the reference was publicly accessible before the critical date of the challenged patent" in order to rely upon that reference as a grounds for institution. *Hulu, LLC v. Sound View Innovations, LLC,* IPR2018-01039, Paper 29, 13 (PTAB Dec. 20, 2019) (precedential). Here, Liquidia relies on Exhibit 1037, an undated Optineb manual that Liquidia speculatively refers to as "Optineb 2005" as a basis for Grounds 1 and 2 of its Petition. Yet Liquidia provides no evidence of its public accessibility before the critical date of the '793 patent. Accordingly, Grounds 1 and 2 must be denied.

Exhibit 1037, the undated Optineb manual, appears to be a translation of an Operating Instruction manual for "Optineb®-ir", a microprocessor controlled,

mobile ultrasonic nebulizer (Model No. ON-100/2-2.4 MHz). This undated Optineb manual discloses certain technical features, including that the nebulizer output (what Liquidia's expert, Dr. Hill refers to as "nebulizing rate") is 0.6 mL/min. Liquidia relies on this technical detail to argue that Voswinckel JESC teaches "an effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil" (Petition at 23), even though the reference makes no mention of the nebulization rate it used.

Liquidia's expert, Dr. Hill, first notes that Voswinckel JESC teaches "[d]oses of treprostinil in solution . . . of 16, 32, 48, and 64 µg/mL using an OptiNeb® ultrasound nebulizer." EX1002, ¶64. Dr. Hill next argues that nebulizers at the time were known to nebulize at least 1 mL, citing only to Liquidia's other expert, Dr. Gonda, for that assertion. *Id.* at ¶65. Dr. Hill further argues that "[a] POSA would further confirm that 16-64 µg was the administered dosage in Voswinckel JESC by using his understanding of the rate of solution delivery for OptiNeb® device available before 2006." *Id.* at ¶67. Citing only the undated Optineb manual for the proposition that the nebulizing rate of Voswinckel JESC would be 0.6 mL/min, Dr. Hill argues that continuous delivery of inhaled treprostinil across 6 minutes as described in Voswinckel JESC would have resulted in a dosage of 57.6 µg (16 µg/mL * 0.6 mL/min * 6 min). *Id.* This calculation requiring the nebulization rate is

29

the sole manner in which Liquidia attempts to meet one of the claim limitations found in independent claim 1.

Dr. Hill's analysis of Voswinckel JESC in view of the undated Optineb Manual fails based on several unsupported assumptions. *First*, Dr. Hill is assuming without evidence that the "OptiNeb ultrasound nebulizer, Nebu-tec, Germany" mentioned in the reference is *the same Optineb device* described in the undated Optineb manual. But Voswinckel JESC does not specify a model number or give any other identifying information that would suggest that this was the actual model used. Thus, a person of ordinary skill in the art would not have been able to determine whether the flow rate of the Optineb device referenced in Voswinckel JESC was identical or even similar to that of the device stated in the undated Optineb manual.

*Second*, neither Liquidia nor Dr. Hill provide any evidence or basis for their assertion that the undated Optineb manual was publicly available before 2006. The undated Optineb manual does not provide any copyright information that would indicate when it was first published. Nor does Liquidia make any effort to fulfill its burden to demonstrate public availability before 2006. Neither of Liquidia's experts discuss the question and merely assume that the undated Optineb manual was available before 2006. Further, Liquidia retained a third expert to authenticate the publication date of other documents, but that declaration is completely silent on

IPR2021-00406
U.S. Patent No. 10,716,793 B2

EX1037. See EX1036. In sum, Liquidia has failed to make *any* evidentiary showing

that Exhibit 1037, the undated Optineb manual was publicly accessible as of the

critical date of the '793 patent.[5]  Nebulizing rates are necessary factual predicates

for Liquidia's statement that Voswinckel JESC teaches the claim element:

---

[5] Liquidia has also made a vague assertion that "numerous nebulizers used at the

time were known and expected to deliver more than 1 mL of solution" relying on a

statement by Dr. Gonda that "[a] POSA would have known in May 2006 that

nebulizers conventionally deliver between 1 and 5 mL." (Petition at 23, EX1004 at

¶56).  Such a statement lacks the particularity required to count as "evidence that

supports the grounds for the challenge to each claim." *See, e.g., Adaptics Ltd. v.

Perfect Company,* IPR2018-01596, Paper 20, 16 (PTAB Mar. 6, 2019) (holding

that the Petition's "catch-all ground" that the pending claims were obvious over

any combination of 10 prior art references suffered from a lack of particularity that

results in voluminous and excessive grounds). Here, Liquidia's catch-all and

conclusory statement regarding the nebulizing rate of various nebulizers in use at

the time, without more, also lacks the requisite particularity and should be

disregarded.

31

> wherein the therapeutically effective single event dose comprises
> from 15 micrograms to 90 micrograms of treprostinil or a
> pharmaceutically acceptable salt thereof.

Accordingly, grounds 1 and 2, which rely only upon Voswinckel JESC when read in view of the undated Optineb manual to supply this limitation, must fail.

### 2.    Liquidia Has Failed to Establish that Ghofrani and Voswinckel 2006 Are Prior Art "by others" under 102(a) (Grounds 3-6).

Liquidia does not dispute that Ghofrani and Voswinckel 2006 were both published less than one year prior to the effective filing date of the '793 patent. *See, e.g.,* Petition at 25 (admitting that Ghofrani was published in June of 2005, *i.e.*, less than one year prior to the filing date of the provisional application to which the '793 patent claims priority); *Id.* at 27 (admitting that Voswinckel 2006 was published on January 17, 2006, *i.e.*, less than one year prior to the date of application). Accordingly, Liquidia bears the burden of establishing that Ghofrani and Voswinckel 2006 are prior art "by others" under 35 U.S.C. § 102(a). *See, e.g., Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1346 (Fed. Cir. 2003) (establishing as "well-settled law that an inventor's own disclosure will not anticipate his later invention" unless published less than one year prior to the application date)(internal citations omitted).

At the institution stage of an *inter partes* review, the petitioner must "demonstrate a reasonable likelihood of prevailing during trial in showing that the

32

[] reference qualifies as prior art under § 102(a)." *Google LLC v. IPA Technologies,* IPR2019-00734, Paper 14, 9 (PTAB Oct. 17, 2019). For the reasons set forth below, Liquidia has failed to meet this burden.

In order for Ghofrani or Voswinckel 2006 to qualify as prior art under 35 U.S.C. § 102(a), these publications must be the work of another. *In re Katz,* 687 F.2d 450, 454 (CCPA 1982) ("[A] printed publication cannot stand as a reference under § 102(a) unless it is describing the work of another."). "[T]he fact that a reference does not list any co-inventors as authors, or that it lists other authors, is certainly not dispositive in itself." *See, e.g., Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 969 (Fed. Cir. 2014); *see also* MPEP § 2132.01 (II)("[a]n <u>inventor's or at least one joint inventor's disclosure</u> of his or her own work within the year before the application filing date cannot be used against the application as prior art under pre-AIA 35 U.S.C. 102(a)."). A common inventive entity may still exist even where a co-inventor is not listed as an author on the purported prior art reference. *See, e.g., Trans Ova Genetics, LC v. XY, LLC,* IPR2018-00250, Paper 35, at 7-8, n. 8 (PTAB Jun. 26, 2019). The relevant inquiry is whether the co-authors <u>that are not listed as inventors</u> on the '793 patent <u>invented the portions of the reference relied upon</u> as prior art. *See, e.g., Cellco Partnership v. Bridge and Post, Inc.*, IPR2018-00054, Paper 40, 20 (PTAB Apr. 15, 2019)(citing *In re Land,* 368 F.2d 866, 878 (CCPA 1996) and *In re DeBaun*, 687 F.2d 459, 462-63 (CCPA 1982)).

33

Under this analysis, a co-author does not become an inventor by simply implementing a design dictated by the inventor. *See, e.g.*, *Sewall v. Walters*, 21 F.3d 411, 416 (Fed. Cir. 1994)(finding that the Board did not err in "holding that Sewall's hardware design was dictated explicitly by Walters' specifications" and thus co-author Sewall was not a joint inventor). A publication is not the work of another where the work described was performed solely at the direction and supervision of the listed inventor(s). *See In re Katz,* 687 F.2d at 450, 455-456 (holding that a publication that identified an inventor and two students as authors was not the work of others, and thus not prior art, because the work performed by students in "testing features of the invention" was performed under the direction and supervision of the inventor); *see also CSL Behring LLC v. Bioverative Therapeutics Inc.,* IPR2018-01313, Paper 10, 11 (PTAB Jan. 9, 2019) (holding a publication is not the work of another where the patent owner can show that the non-inventor co-authors "carried out experiments under [the inventor's] direction and control," and that it was the inventor who "designed and lead the [] project, and experiments performed by the co-authors.")

a.   **Ghofrani**

Ghofrani is a review article, published in German, describing "New therapies in the treatment of pulmonary hypertension." In addition to describing recent developments relating to inhaled treprostinil, the review article also describes other

34

"new therapy approaches, which are partially still under development, and that can find their way into the therapy guidelines in the near future" including inhaled iloprost, selective endothelin A receptor antagonists (sitaxsentan and ambristentan), and PDE5-inhibors (e.g., sildenafil). *See, e.g.,* Ghofrani at Abstract.

This Ghofrani review article was co-authored by Dr. Werner Seeger and Dr. Robert Voswinckel (inventors of the '793 patent) as well as Dr. Hossein A. Ghofrani, Dr. Frank Reichenberger, and Dr. Friedrich Grimminger (non-inventors). Drs. Ghofrani, Reichenberger, and Grimminger have each submitted declarations stating that they did not contribute to the sections of the Ghofrani review article relating to the studies on inhaled treprostinil. EX2004, EX2005, EX2006. Further, Ghofrani, Reichenberger, and Grimminger have each declared that they did not design the inhaled treprostinil clinical trials and that the information on the clinical trials mentioned in the Ghofrani article were designed and conducted by Dr. Voswincekl and Seeger based on their work with Drs. Olschewski, Rubin, Schmehl, Sterritt, and Roscigno. *Id.*

Instead, Drs. Ghofrani, Reichenberger, and Grimminger contributed to other sections of Ghofrani not relevant to Liquidia's grounds for *inter partes* review.

Dr. Ghofrani has stated that his contribution was to the section on phosphodiesterase inhibitors. EX2004, ¶4. Dr. Ghofrani has experience in the use of phosphodiesterase inhibitors for treatment of pulmonary hypertension. *Id*. His

35

contribution to the Ghofrani publication was drafting the section of the article relating to phosphodiesterase inhibitors and jointly drafting the sections on vasoactive therapy, inhaled iloprost, combination therapies, and treatment of early forms of treatment of pulmonary hypertension, as well as the introduction. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Liquidia. *Id*. at ¶¶4-6.

Dr. Reichenberger has stated that his contribution was to the section on selective endothelin A receptor antagonists. EX2005, ¶4. Dr. Reichenberger has experience in the use of selective endothelin A receptor agonists for treating pulmonary hypertension. *Id*. His contribution to Ghofrani was jointly drafting the section on selective endothelin A receptor agonists with Dr. Grimminger. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Liquidia. *Id*. at ¶¶4-6.

Dr. Grimminger has stated that his contribution was also to the section on selective endothelin A receptor antagonists. EX2006, ¶4. Dr. Grimminger has experience in the use of selective endothelin A receptor agonists for treating pulmonary hypertension. *Id*. His contribution to Ghofrani consisted of jointly drafting the section on selective endothelin A receptor agonists with Dr. Richenberger. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Liquidia. *Id.* at ¶¶4-6.

As noted in *In re Katz*, "authorship of an article by itself does not raise a presumption of inventorship with respect to the subject matter disclosed in the article. Thus, co-authors may not be presumed to be coinventors merely from the fact of co-authorship." 687 F.2d at 455. The explanation provided by Seeger and *each of the non-inventor co-authors*—Seeger, Ghofrani, Richenberger, and Grimminger—is consistent not only with the content of the article, but also with the nature of the publication—a review article summarizing different advances in the treatment of pulmonary hypertension. *Id.* (accepting the Appellant's explanation "consistent not only with the content of the article but with the nature of the publication"). From such a fact pattern, joint inventorship with Drs. Ghofrani, Richenberger, and Grimminger cannot be inferred.

Further, Liquidia appears to accept UTC's explanation for why Drs. Ghofrani, Richenberger, and Grimminger are not inventors of the relevant subject matter of Ghofrani based on declarations submitted by these authors in IPR2017-01621. *See,* Pet. at 26 ("PO encountered this issue in IPR2017-01621 and IPR2017-01622 and submitted an affidavit attesting that these authors did not contribute to the relevant portion of Ghofrani. See IPR2017-01621; Paper 10 at 12-14; IPR2017-01622, Paper 9 at 12-15.")

37

Nonetheless, Liquidia contends that because "Olschewsi, Roscigno,[6] Rubin, Schmehl, and Sterritt are identified as inventors of the '793 Patent, but are not authors of Ghofrani" there is an "inference that they did not make any contribution to that disclosure." *Id.* at 27. This distinction between authorship and inventorship is legally irrelevant. The fact that a reference does not list certain coinventors as *authors* is not dispositive on the issue of whether a prior art reference is the work of another. *See, e.g., Allergan, Inc. v. Apotex Inc.*, 754 F.3d at 969. There is no requirement that every listed inventor on the '793 patent be listed as a co-author to disqualify a reference under § 102(a) as not by another. *See, e.g., Trans Ova Genetics, LC v. XY, LLC,* IPR2018-00250, Paper 35 at 7-8, n. 8. The relevant inquiry is whether the co-authors that are not listed as inventors on the '793 patent invented the portions of the reference relied upon as prior art. *See, e.g.*, *Cellco Partnership v. Bridge and Post, Inc.*, IPR2018-00054, Paper 40 at 20.

Here, the declaration of Dr. Seeger explains that these other co-inventors helped design the development program for the claimed invention of the '793 patent including designing the pilot and pivotal trials, which resulted in three clinical

---

[6] Robert Roscigno is a named inventor of the '793 patent, and he was later employed as an executive in Liquidia. Liquidia failed to present *any* evidence on these points.

4826-0990-5385.2

studies that became the basis of the patent application leading to the '793 patent. EX2003, ¶¶12, 22-27. Many of the specific parameters used and the particulars of these studies performed by the co-inventors were not fully reported in Ghofrani. *Id.* at ¶¶11-12. Accordingly, the absence of these co-inventors as authors on the Ghofrani review article is irrelevant to whether Ghofrani is "by another."

   b.    **Voswinckel 2006**

Voswinckel 2006 is a short "Clinical Observation" published in the Annals of Internal Medicine, titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," which describes clinical observations on three patients with severe pulmonary hypertension, who were treated with administration of a single 15 µg dose of treprostinil, inhaled in three breaths through a modified Optineb ultrasonic inhalation device.

This Voswinckel 2006 Clinical Observation Report was co-authored by Dr. Werner Seeger, Dr. Robert Voswinckel, and Dr. Olschewski (inventors of the '793 patent) as well as Dr. Hossein A. Ghofrani and Dr. Friedrich Grimminger (non-inventors). Drs. Ghofrani and Grimminger have each submitted declarations stating that they did not contribute to design or control of the clinical trial described in Voswinckel 2006, and that all of the work performed by Drs. Ghofrani and/or Grimminger was at the direction of or under the supervision and control of Drs. Seeger, Voswinckel, and Olschewski. EX2004, ¶¶7-12; EX2006, ¶¶7-12.

As set forth in the declarations, the dosage amounts of administered inhaled treprostinil to give to patients, the inhalation time and/or number of breaths employed, the particular equipment and administration devices and methods to use, the spacing between inhalation events, the analysis of the hemodynamic and pharmacokinetic effects over time in the study with inhaled treprostinil were all determined Drs. Seeger, Voswinckel, and/or Olschewski. Drs. Ghofrani and Grimminger did not participate in the design of any of the studies, did not select the dosing regimen, and did not conduct analysis of patient results discussed in Voswinckel 2006. EX2004, ¶¶11-12; EX2006, ¶¶11-12.

As explained in the declarations of Dr. Seeger, Ghofrani, and Grimminger, it was standard practice within the group to include *all* group members as authors on clinical observation reports such as Voswinckel 2006, even when that group is broader than the individuals actually involved in inventing the methods or devices and designing the trials disclosed in that publication. EX2003, ¶21; EX2004, ¶¶10-11; EX2006, ¶¶10-11. This explanation is consistent with industry practice for publishing clinical observation reports such as this one. Joint inventorship with Ghofrani and Grimminger cannot be inferred in these circumstances.

40

Liquidia contends that "Olschewsi, Roscigno,[7] Rubin, Schmehl, and Sterritt are identified as inventors of the '793 Patent, but are not authors of Voswinckel 2006." Pet. at 29. As a preliminary matter, UTC notes that Dr. Olschewsi is an author on Voswinckel 2006.

Liquidia is also incorrect to state that, because these other co-inventors "are not authors on Voswinckel 2006, [this] supports the inference that they did not make any contribution to that disclosure." Pet. at 29. As discussed above with respect to Ghofrani, this fact is legally irrelevant. The fact that a reference does not list certain co-inventors as authors is not dispositive on the issue of whether a prior art reference is the work of another.[8] *See, e.g., Allergan, Inc. v. Apotex Inc.*, 754 F.3d at 969. Rather, as is the case here, the non-author coinventors, contributed to aspects of one or more of the claimed inventions, not disclosed by the publication that Liquidia is relying on.

Here, Dr. Seeger explains that these coinventors helped design the development program for the claimed invention of the '793 patent including

---

[7] See footnote 4, above.

[8] Where the asserted prior art reference is a patent, then a different question may arise because the scope of claimed subject matter determines who is listed as a co-inventor on the patent.

41

designing the pilot and pivotal trials, which resulted in three clinical studies that became the basis of the patent application leading to the '793 patent. EX2003, ¶¶19-20, 22-27. Many of the specific parameters used and the particulars of these studies performed by the co-inventors were not fully reported in Voswinckel 2006 (for example, the particular details of the "*modified* OptiNeb® ultrasonic device"). *Id*. at ¶19. Accordingly, the absence of these co-inventors as authors on Voswinckel 2006 is not dispositive on the issue.

### D.    Grounds 1-4 and 6 Should Be Denied Because Liquidia Has Failed to Show That They Would Succeed on the Merits

It is the petitioner's burden from the onset "to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.,* 815 F.3d 1356, 1363 (Fed. Cir.)(citing 35 U.S.C. § 312(a)(3)). Under 35 U.S.C. § 314(a), an IPR can be instituted only if there is a reasonable likelihood that the petitioner would prevail with respect to at least one of the claims in the petition. *See also, SAS Institute Inc. v. Iancu*, 138 S.Ct. 1348 (2018).  Here, Liquidia has failed to establish a reasonable likelihood that claims 1-8 would have been obvious over any of the prior art combinations of Grounds 1-2, 4, and 6.

In addition to relying on publications and references that are not available as prior art to the '793 patent (discussed *supra* II.C), Liquidia relies on the '212 patent, Voswinckel JAHA, and Voswinckel JESC, each of which—when considered alone

or combined—fail to teach one or more limitations of claims 1-8 of the '793 patent. Specifically, none of the references cited by Liquidia teach "a therapeutically effective single event dose of 15 μg to 90 μg" that is "delivered in 1 to 3 breaths".

Rather than disclosing the single event dose, these three references *only* provide the initial concentration of the pre-aerosolized drug and the length of time that the drug is inhaled.  As explained in more detail below, the actual dose achieved for any given patient using an inhalation device depends upon the type of inhalation device used (e.g., continuous nebulizer), gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern and device interface.  EX2001 at ¶¶13, 23; EX2029-EX2031.  But for the '212 patent, Voswinckel JESC, and Voswinckel JAHA, many of these critical details are missing:

Trials@uspto.gov                                    Paper 18
Tel: 571-272-7822                        Entered: August 11, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

———————————

IPR2021-00406
Patent 10,716,793 B2

———————————

Before ERICA A. FRANKLIN, CHRISTOPHER M. KAISER,
and DAVID COTTA, *Administrative Patent Judges.*

KAISER, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

Pet. 30–46.  Patent Owner argues that this combination of references fails to teach or suggest all the limitations of any of the challenged claims.  Prelim. Resp. 42–55.  Patent Owner also argues that Petitioner relies on a reference, Exhibit 1037, that has not been proven to be prior art.  *Id.* at 28–32.

###### 1.    '212 Patent

The '212 patent teaches "[a] method of delivering benzindene prostaglandins to a patient by inhalation."  Ex. 1006, code (57).  In particular, the '212 patent teaches the use of "[a] benzindene prostaglandin known as UT-15," which "has unexpectedly superior results when administered by inhalation compared to parenterally administered UT-15 in sheep with induced pulmonary hypertension."  *Id.*  There is evidence in the present record that "UT-15" was also known as "Remodulin" or "treprostinil sodium."  Ex. 1035, 582.  According to the '212 patent, the UT-15 may be delivered either as droplets formed "from a solution or liquid containing the active ingredient(s)" via a nebulizer, or as a solid-phase powder via an inhaler.  Ex. 1006, 5:30–41.

According to the '212 patent, this method may be used to "treat[] pulmonary hypertension in a mammal."  *Id.* at 14:9–12.  Moreover, the '212 patent teaches "medical use" of its method in a "human."  *Id.* at 7:4–5.  The necessary dose to achieve "a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of the effect desired by the patient's doctor.  Titration to effect may be used to determine proper dosage."  *Id.* at 6:66–7:3.  "[A]erosolized UT-15 has a greater potency as compared to intravascularly administered UT-15," so the '212 patent teaches delivering "only a fraction (10–50%) of the dosage delivered intravascularly" when using its inhalation delivery

method.  *Id.* at 8:8–12.  Even at "high doses," however, the '212 patent

teaches a lack of "significant non-lung effects, i.e., heart rate, cardiac

output."  *Id.* at 10:51–54.

### 2.    *Voswinckel JESC*

Voswinckel JESC discusses a study to investigate "the acute

hemodynamic response to inhaled treprostinil."  Ex. 1007, 7.  Of the 29

patients in the study, eight were administered a placebo, groups of six

patients each were administered 16, 32, and 48 µg/mL solutions of

treprostinil, and three patients were administered a solution containing 64

µg/mL of treprostinil.  *Id.*  Each administration used an "OptiNeb ultrasound

nebulizer, [made by] Nebu-Tec, Germany" for six minutes.  *Id.*  For each

patient, various measurements were taken before administration of the

treprostinil and at 0, 15, 30, 60, 90, 120, 150, and 180 minutes after

administration.  *Id.*  According to Voswinckel JESC, "[t]reprostinil

inhalation results in a significant long-lasting pulmonary vasodilatation,"

and, "at a concentration of 16 µg/mL, near maximal pulmonary

vasodilatation is achieved without adverse effects."  *Id.*

### 3.    *Voswinckel JAHA*

Voswinckel JAHA discusses a study of 17 patients with "severe

pulmonary hypertension" who received treprostinil inhalations.  Ex. 1008, 3.

These inhalations each involved "3 single breaths" using a "pulsed

OptiNeb® ultrasound nebulizer" and a "600 µg/mL" treprostinil solution.

*Id.*  In addition, "[t]wo patients with idiopathic PAH received compassionate

treatment with 4 inhalations of TRE per day after the acute test" and were

"treated for more than 3 months."  *Id.*  According to Voswinckel JAHA,

"inhalation resulted in a sustained, highly pulmonary selective vasodilatation

over 120 minutes," showing "strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing," and "[t]olerability is excellent even at high drug concentrations and short inhalation times (3 breaths)." *Id.*

### 4. Reliance on Exhibit 1037

In arguing that claims 1–8 would have been obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA, Petitioner and its declarants cite Exhibit 1037, an English translation of the "Operating Instructions" for the "OPTINEB®-ir Microprocessor Controlled Ultrasonic Nebulizer." Pet. 23; Ex. 1002 ¶ 67; Ex. 1037, 1. Patent Owner argues that Exhibit 1037 is undated and therefore not proven to be prior art, so Petitioner's reliance on it should lead to a determination that Petitioner has not shown a reasonable likelihood of prevailing on this asserted ground. Prelim. Resp. 28–32.

We note first that Patent Owner is correct that Exhibit 1037 bears no date. Ex. 1037, 1–33. Accordingly, Petitioner cannot rely on this exhibit as prior art. But the way Petitioner and its declarants use Exhibit 1037 does not amount to a reliance on it as prior art.

As discussed more fully below, Petitioner and its declarants provide two separate calculations to attempt to establish that the prior art taught or suggested the range of treprostinil doses recited in the challenged claims. Pet. 23, 38–39; Ex. 1002 ¶¶ 65–67, 99–100; Ex. 1004 ¶¶ 56–57. One of these calculations begins with the intravascular dose on the FDA label for Remodulin and adjusts that for the '212 patent's teaching that inhalation requires 10–50% the dose that intravascular administration requires. Pet. 38–39. This calculation does not rely on Exhibit 1037 at all. *Id.*

The other calculation begins with Voswinckel JESC's teaching that patients were administered a nebulized solution over six minutes with a treprostinil concentration of 16, 32, 48, or 64 µg/mL, then multiplies that concentration by the volume of solution that would have been nebulized over a six-minute period.  Pet. 23.  The evidence supporting that volume of solution comes from Petitioner's declarants.  *Id.* (citing Ex. 1002 ¶¶ 65, 67; Ex. 1004 ¶ 56).  Dr. Hill testifies that "a [person of ordinary skill in the art] would understand [a six-minute nebulization event] to [deliver] at least 1 mL [of solution]" and that he personally "prescribed volumes of [at] least 1 mL for inhalation therapy using nebulizers."  Ex. 1002 ¶ 65.  In addition, Dr. Hill also testifies that Exhibit 1037 confirms his understanding of typical nebulization volumes because it teaches "a nebulizing rate of 0.6 mL/min." *Id.* ¶ 67 (citing Ex. 1037, 28).  Finally, Dr. Gonda testifies that a person of ordinary skill in the art "would have known in May 2006 that nebulizers conventionally deliver between 1 and 5 mL."  Ex. 1004 ¶ 56 (citing Ex. 1029, 11; Ex. 1050, 2; Ex. 1066, 1).  Thus, Dr. Hill's testimony regarding his own experience and his opinion of what a person of ordinary skill in the art would have believed about nebulization volumes does not rely on Exhibit 1037.  Similarly, Dr. Gonda's testimony regarding his opinion of what a person of ordinary skill in the art would have believed about nebulization volumes does not rely on Exhibit 1037.  Only Dr. Hill's separate testimony about confirmation of the knowledge of a person of ordinary skill in the art relies on this exhibit, and in doing so, it relies on Exhibit 1037 not as prior art but merely as evidence of the general knowledge in the art at around the time of the invention.  *See Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330, 1337–38 (Fed. Cir. 2020)

IPR2021-00406
Patent 10,716,793 B2

ordinary skill in the art would have looked for further information regarding "experimentation [with] inhaled treprostinil in humans." Ex. 1002 ¶ 78. On the present record, such information can be found in Voswinckel JESC, which reports on a study in which humans with pulmonary hypertension inhaled treprostinil and experienced "significant long-lasting pulmonary vasodilatation . . . without adverse effects." Ex. 1007, 7. Thus, the present record shows sufficiently that a person of ordinary skill in the art would have had reason to combine the teachings of the '212 patent with those of Voswinckel JESC.

Dr. Hill testifies that, based on the teachings of these references that treprostinil could safely and effectively treat pulmonary hypertension in humans, a person of ordinary skill in the art "would have motivated to further decrease the 6 minute administration time in Voswinckel JESC." Ex. 1002 ¶ 80. Specifically, Dr. Hill testifies that patients often did not adhere to "inhalation therapy for respiratory diseases," that "[p]oor adherence to medication was known to correlate with worse outcomes," and that "reducing administration time or the number of breaths required for therapy [was known to] improve adherence rates." *Id.* (citing Ex. 1002 ¶¶ 36–37; Ex. 1030, 63; Ex. 1032, 179–80; Ex. 1077, 4). Voswinckel JAHA teaches administering treprostinil in three breaths using a high concentration of treprostinil in the aerosolized solution. Ex. 1008, 3. Accordingly, Dr. Hill testifies that a person of ordinary skill in the art would have looked to Voswinckel JAHA to improve patient adherence to the treatment suggested by the combination of the '212 patent and Voswinckel JESC, providing a reason to combine its teachings with those of the other two references. Ex. 1002 ¶¶ 80–82.

33

Petitioner argues that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the teachings of these three references because Voswinckel JAHA teaches that "[t]olerability is excellent" for its short-duration, high-concentration treprostinil inhalation therapy. Pet. 33 (citing Ex. 1008, 3). The present record supports this argument. Ex. 1008, 3. In addition, Petitioner notes that other studies "taught safe and effective administration of high dosages of inhaled therapeutics in short durations." Pet. 33–34 (citing Ex. 1010, 298; Ex. 1034, 177). Patent Owner argues that these other studies should not be considered, Prelim. Resp. 54, but even without these studies, the present record shows sufficiently that a person of ordinary skill in the art reasonably would have expected to succeed in combining the teachings of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.

### d. Conclusion

On the present record, Petitioner has shown sufficiently that the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA teaches or suggests all limitations of claims 1–8 and that a person of ordinary skill in the art would have had a reason to combine the teachings of these references with a reasonable expectation of success. Accordingly, we determine that Petitioner has demonstrated a reasonable likelihood of prevailing on its assertion that claims 1–8 are unpatentable as obvious over the combination of the '212 patent, Voswinckel JESC, and Voswinckel JAHA.

### D. Asserted Obviousness over '212 Patent and Voswinckel JESC

Petitioner argues that claims 1–8 would have been obvious over the combination of the '212 patent and Voswinckel JESC. Pet. 46–50. Patent

Owner argues that this combination of references fails to teach or suggest all the limitations of any of the challenged claims. Prelim. Resp. 42–55. Patent Owner also argues that Petitioner relies on a reference, Exhibit 1037, that has not been proven to be prior art. *Id.* at 28–32. This ground and the arguments by both parties differ from the previously discussed ground only in that Petitioner does not rely here on Voswinckel JAHA to teach or suggest any limitation of the challenged claims. *Compare* Pet. 30–46, *with* Pet. 46–50. In particular, Petitioner relies here on routine optimization to reach the limitation of the challenged claims requiring that the single event dose of treprostinil be delivered in one to three breaths. Pet. 47–49.

For the same reasons discussed above, we determine that, on the present record, Petitioner has shown sufficiently that the combination of the '212 patent and Voswinckel JESC teaches or suggests all limitations of claims 1–8, except for the limitation requiring delivery in one to three breaths. Also for the same reasons discussed above, we determine that, on the present record, Petitioner has shown sufficiently that a person of ordinary skill in the art would have had a reason to combine the teachings of these references with a reasonable expectation of success.

Petitioner argues that the combination of the '212 patent and Voswinckel JESC teaches or suggests the final limitation of the challenged claims, delivering inhaled treprostinil treatment in one to three breaths. Pet. 47–49. Specifically, Petitioner argues that the method taught directly by the combination of these references, delivering a single event dose of treprostinil over a six-minute period, would have caused problems with "patient compliance and convenience." *Id.* at 48 (citing Ex. 1002 ¶¶ 128, 130). Petitioner argues further that a person of ordinary skill in the art would have

IPR2021-00406
Patent 10,716,793 B2

likelihood of prevailing with respect to at least one claim on at least one of its grounds, and instituting review on that ground requires institution as to all grounds. *SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348, 1355–56 (2018); *PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1360 (Fed. Cir. 2018); *AC Techs. S.A. v. Amazon.com, Inc.*, 912 F.3d 1358, 1364 (Fed. Cir. 2019). Accordingly, although we are not persuaded that Petitioner has shown a reasonable likelihood of prevailing as to the grounds that rely on Ghofrani, we institute review on those grounds. To the extent either party disagrees with our interpretation of the law governing whether a reference is "by others," we invite such argument during trial.

### 2.    Prior-Art Status of Voswinckel 2006

The issues and arguments regarding Voswinckel 2006 are quite similar to those discussed above regarding Ghofrani. Petitioner argues that Voswinckel 2006 qualifies as prior art under § 102(a) and that it is "by others" both because some of its authors—specifically, Ghofrani and Grimminger—are not inventors of the '793 patent and because some inventors of the '793 patent—specifically, Olschewski, Roscigno, Rubin, Schmehl, and Sterritt—are not authors of Voswinckel 2006. Pet. 27–30. Patent Owner disagrees, pointing to the testimony of Drs. Seeger, Ghofrani, and Grimminger explaining the role that the other inventors of the '793 patent played, as well as making clear that neither Ghofrani nor Grimminger authored the portion of Voswinckel 2006 that is relevant as prior art. Prelim. Resp. 32–34, 39–42.

For the same reasons discussed above with respect to Ghofrani, we are not persuaded that the current record, without more, establishes that Petitioner has shown sufficiently that Voswinckel 2006 is "by others," but

42

IPR2021-00406
Patent 10,716,793 B2

we institute on the grounds relying on Voswinckel 2006, as we are required to do under *SAS Institute*.  To the extent either party disagrees with our interpretation of the law governing whether a reference is "by others," we invite such argument during trial.

CONCLUSION

Upon consideration of the Petition, the Preliminary Response, and the evidence presented, we determine that Petitioner has shown a reasonable likelihood that it will prevail in showing that at least one of the challenged claims is unpatentable.  Accordingly, we institute an *inter partes* review of all challenged claims based on all grounds asserted in the Petition.

ORDER

It is hereby

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review is hereby instituted on all claims of the '793 patent and on all relevant grounds set forth in the Petition; and

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(a) and 37 C.F.R. § 42.4, notice is hereby given of the institution of trial, which shall commence on the entry date of this decision.

43

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

LIQUIDIA TECHNOLOGIES, INC.,

Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,

Patent Owner.


———————————

Case IPR2021-00406
Patent 10,716,793

———————————


**PATENT OWNER'S OBJECTIONS TO PETITIONER'S EVIDENCE
SUBMITTED WITH PETITION**

## EXHIBIT 1010

Exhibit 1010 is described as "Hossein Ardeschir Ghofrani, Robert

Voswinckel, et al., Neue Therapieoptionen in der Behandlung der

pulmonalarteriellen Hypertonie, 30(4) HERZ, 30(4):296–302 (June 2005)

('Ghofrani') (Foreign article and English translation attached)." Patent Owner

objects to Exhibit 1010 under FRE 802, including to the extent Petitioner has

asserted that the translation is a true and accurate representation of the original

document. Petitioner relies on this exhibit to prove the truth of the matter asserted

therein, but it fails to meet the requirements of any hearsay exception or exemption

under FRE 803-807. Patent Owner further objects to this exhibit under FRE 402

and 403 because an inadequate translation renders the exhibit irrelevant.

## EXHIBIT 1036

Exhibit 1036 is described as "Declaration of Sylvia Hall-Ellis, Ph.D."

Patent Owner objects to Exhibit 1036, under FRE 701, because the opinion

testimony contained in this exhibit reaches legal conclusions for which the

declarant has not established that she is capable of providing. Patent Owner also

objects to Exhibit 1036 under FRE 702, on the basis that the testimony is not based

on sufficient facts and is based on other informal and unpublished documents

including its attached exhibits that are hearsay under FRE 802, have not been

5

authenticated under FRE 901, are not self-authenticating under FRE 902, and are

not duplicates as defined by FRE 1001(e).  Patent Owner objects to Exhibit 1036 to

the extent it includes subject matter that is not permitted pursuant to FRE 602 or

701, including without limitation, to the extent that the declaration presents as

"facts" information that is outside the personal knowledge of the declarant, and/or

to the extent that the document offers improper lay opinion testimony.  Exhibit

1036 is also objected to as irrelevant under FRE 401 and 402 because it does not

make any facts at issue in the *inter partes* review more or less probable than it

would have been without the evidence.  Patent Owner objects to Exhibit 1036, and

the exhibits thereto, as unfairly prejudicial, confusing the issues, and a waste of

time under FRE 403.  Patent Owner objects to the portions of Exhibit 1036 that

cite or reproduce an exhibit objected to herein for the reasons stated herein.

## **EXHIBIT 1037**

Exhibit 1037 is described as "English translation of OptiNeb® User Manual

2005."  Patent Owner objects to Exhibit 1037 under FRE 802, including to the

extent Petitioner has asserted that the translation is a true and accurate

representation of the original German-language manual and to the extent Petitioner

has asserted that Exhibit 1037's statements regarding or relating to whether certain

practices or procedures were well-known, routine, or conventional, the level of

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

LIQUIDIA TECHNOLOGIES, Inc.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

———————————

IPR2021-00406
U.S. Patent No. 10,716,793

———————————

**PATENT OWNER RESPONSE**

IPR2021-00406
U.S. Patent No. 10,716,793 B2

# TABLE OF CONTENTS

I.    INTRODUCTION................................................................................1
II.   BACKGROUND.................................................................................2
    A.    Pulmonary Hypertension.........................................................2
    B.    The Inventors Developed a Novel Method of Treating
        PAH That Overcame Limitations of Existing Treatments...................4
III.  Claim Construction and Person of Ordinary Skill in the Art...................7
IV.   PETITIONER HAS NOT MET ITS BURDEN TO ESTABLISH THAT
    CLAIMS 1-8 OF THE '793 PATENT ARE ANTICIPATED OR
    OBVIOUS .................................................................................8
    A.    Ground 1: the '212 Patent, Voswinckel JESC, and
        Voswinckel JAHA Fail to Render Claims 1-8 Obvious ....................10
        1.    Petitioner Has Not Established That Voswinckel
            JAHA And Voswinckel JESC Were Publicly
            Accessible Prior Art Before The Priority Date........................11
        2.    None of the identified references teaches a single
            event dose of 15 micrograms to 90 micrograms in 1
            to 3 breaths ...................................................................18
        3.    A POSA would not have a reasonable expectation
            of success in combining the '212 patent,
            Voswinckel JESC and JAHA or have been
            motivated to combine them...............................................23
    B.    Ground 2: the '212 Patent and Voswinckel JESC Fail to
        Render Claims 1-8 Obvious ...............................................38
    C.    Grounds 3-6 Fail Because Each Ground Relies On
        Publications That Petitioner Has Failed to Establish Are
        Prior Art.......................................................................44
        1.    Ghofrani .................................................................46
        2.    Voswinckel 2006........................................................51
V.    OBJECTIVE INDICIA OF NONOBVIOUSNESS...............................55
    A.    Unexpected Results...........................................................55
    B.    Copying .........................................................................57
    C.    Long-Felt Unmet Need.......................................................61
VI.   CONCLUSION ...............................................................................63

i

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acceleration Bay, LLC v. Activision Blizzard Inc.*,
908 F.3d 765 (Fed. Cir. 2018) ..................................................12, 13, 14, 15, 18

*In re Aller*,
220 F.2d 240 (CCPA 1955) ................................................................................55

*Allergan, Inc. v. Apotex Inc.*,
754 F.3d 952 (Fed. Cir. 2014) ................................................................45, 50, 54

*Blue Calypso, LLC v. Groupon, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016) ........................................................11, 12, 18, 27

*Cellco Partnership v. Bridge and Post, Inc.*,
IPR2018-00054, paper 40, 20 (PTAB Apr. 15, 2019).................................45, 50

*In re Cronyn*,
890 F.2d 1158 (Fed. Cir. 1989) .........................................................................27

*CSL Behring LLC v. Bioverative Therapeutics Inc.*,
IPR2018-01313, paper 10, 11 (PTAB Jan. 9, 2019).........................................52

*E.I. DuPont de Nemours & Company v. Synvina C.V.*,
904 F.3d 996 (Fed. Cir. 2018) ...........................................................................55

*In re Geisler*,
116 F.3d 1465 (Fed. Cir. 1997) .........................................................................55

*In re Katz*,
687 F.2d 450 (CCPA 1982) ...........................................................45, 48, 49, 52

*In re Klopfenstein*,
380 F.3d 1345 (Fed. Cir. 2004) .........................................................................12

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
545 F.3d 1340 (Fed. Cir. 2008) .........................................................................12

*Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.*
322 F.3d 1335 (Fed. Cir. 2003) .........................................................................44

IPR2021-00406
U.S. Patent No. 10,716,793 B2

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
 941 F.3d 1133 (Fed. Cir. 2019) ...................................................................57, 58

*In re Lister*,
 583 F.3d 1307 (Fed. Cir. 2009) ..........................................................................15

*Ormco Corp. v. Align Technology, Inc*,
 463 F.3d 1299 (Fed. Cir. 2006) ..........................................................................55

*Proctor & Gamble Co. v. Teva Pharmaceuticals USA, Inc.*,
 566 F.3d 989 (Fed. Cir. 2009) ............................................................................61

*Trans Ova Genetics, LC v. XY, LLC*,
 IPR2018-00250, paper 35 (PTAB Jun. 26, 2019) .......................................45, 50

**Federal Statutes**

35 U.S.C. § 102(a) .............................................................................10, 44, 45, 50

35 U.S.C. § 316I...................................................................................................8

**Regulations**

37 C.F.R. § 42.108 ...............................................................................................8

**Other Authorities**

IPR2017-01621 and -01622....................................................................47, 48

IPR2017-01622, Paper 9 ........................................................................49, 50

MPEP § 2132.01 ...................................................................................45

PubMed, *available at* https://pubmed.ncbi.nlm.nih.gov/ (last visited Nov. 1,
 2021) ..................................................................................................16

iii

**Appx0355**

IPR2021-00406
U.S. Patent No. 10,716,793 B2

EXHIBIT LIST

| Exhibit | Description |
|---|---|
| EX2001 | Declaration of Dr. Aaron Waxman |
| EX2002 | Dr. Waxman's *curriculum vitae* |
| EX2003 | Declaration of Dr. Werner Seeger |
| EX2004 | Declaration of Dr. Hossein A. Ghofrani |
| EX2005 | Declaration of Dr. Frank Reichenberger |
| EX2006 | Declaration of Dr. Friedrich Grimminger |
| EX2007 | Tyvaso Orange Book listing |
| EX2008 | Hill, N., 2005, *Therapeutic Options for the Treatment of Pulmonary Hypertension,* Medscape Pulmonary Medicine 9(2). |
| EX2009 | Substantive Submission filed in 12/591,200 (Mar. 9, 2015) |
| EX2010 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-1 (public docket). |
| EX2011 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-11 (public docket). |
| EX2012 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-16 (public docket). |
| EX2013 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), unnumbered docket entry dated 7/30/2020 |
| EX2014 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-20 (public docket)(excerpted). |
| EX2015 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-29 (public docket). |
| EX2016 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-45 (public docket). |

iv

| Exhibit | Description |
|---------|-------------|
| EX2017 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-21 (public docket). |
| EX2018 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-41 (public docket). |
| EX2019 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-49 (public docket). |
| EX2020 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-68 (public docket). |
| EX2021 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-71 (public docket). |
| EX2022 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-40 (public docket). |
| EX2023 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-47 (public docket). |
| EX2024 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-75 (public docket). |
| EX2025 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-80 (public docket). |
| EX2026 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-81 (public docket). |
| EX2027 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-92 (public docket). |

| Exhibit | Description |
|---------|-------------|
| EX2028 | *United Therapeutics Corporation v. Liquidia Technologies, Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.), ECF-74 (public docket). |
| EX2029 | Hess *et al.,* 2007, A guide to aerosol delivery devices for respiratory therapists. American Association for Respiratory Care |
| EX2030 | Dennis JH, 2002, Standardization issues: in vitro assessment of nebulizer performance. Respir. Care. 47(12):1455-1458 |
| EX2031 | Hess *et al*., 1996, Medication nebulizer performance. Effects of diluent volume, nebulizer flow, and nebulizer brand. Chest, 110(2):498-505 |
| EX2032 | Rubin BK *et al.*, 2008 Treatment Delivery Systems (in Clinical Asthma), *available at* https://www.sciencedirect.com/topics/medicine-anddentistry/ nebulizer |
| EX2033 | Gardenhire, D.S. *et al.*, 2017, A Guide to Aerosol Delivery Devices for Respiratory Therapists (4th Ed.) American Association for Respiratory Care |
| EX2034 | Tyvaso® Label 2021 |
| EX2035 | Bourge *et al., Cardiovascular Therapeutics*, 31:38-44 (2013) |
| EX2036 | McLaughlin *et al.*, *Efficacy and safety of treprostinil: an epoprostenol analog for primary pulmonary hypertension*, J. Cardiovascular Pharmacology, 41:293-299 (2003) |
| EX2037 | Springer website (from fn 13 of Hall-Ellis Decl) |
| EX2038 | (Intentionally Left Blank) |
| EX2039 | Springer website (from fn 14 of Hall-Ellis Decl) |
| EX2040 | University of Wisconsin–Madison Library Catalog Search for holdings of *Circulation: the journal of the American Heart Association* |
| EX2041 | Declaration of Ms. Pilar Wyman |
| EX2042 | Ms. Pilar Wyman's *curriculum vitae* |
| EX2043 | Deposition Transcript of Sylvia Hall-Ellis, Ph. D. |
| EX2044 | American Heart Association Listing of *Circulation* Supplements |

| Exhibit | Description |
|---|---|
| EX2045 | Chemical Abstracts Plus Search Results Transcript |
| EX2046 | Ovid Search Results for "Voswinckel" |
| EX2047 | PubMed Search Results for "Voswinckel" |
| EX2048 | Compilation Showing Search Results for Descriptor Terms |
| EX2049 | Oxford Academic Listing of *European Heart Journal* Supplements |
| EX2050 | Simonneau *et al.*, *Updated Clinical Classification of Pulmonary Hypertension.*, J Am. College of Cardiol, 62(25)D34-D42 at D34-D35 (2013) |
| EX2051 | Sitbon and Noordegraaf, *Epoprostenol and pulmonary arterial hypertension:* 20 years of clinical experience, Eur. Respir Rev. 26:160055 (2017) |
| EX2052 | Second Declaration of Dr. Aaron Waxman |
| EX2053 | Declaration of Dr. Jason McConville |
| EX2054 | Dr. McConville's *curriculum vitae* |
| EX2055 | Deposition of Dr. Nicholas Hill |
| EX2056 | Deposition of Igor Gonda, Ph. D. |
| EX2057 | *Vital Signs (Body Temperature, Pulse Rate, Respiration Rate, Blood Pressure)*, Johns Hopkins Medicine, *available at* https://www.hopkinsmedicine.org/health/conditions-and-diseases/vital-signs-body-temperature-pulse-rate-respiration-rate-blood-pressure |
| EX2058 | Pharmacokinetics of Inhaled Drugs, *available at* https://media.lanecc.edu/users/ driscolln/RT127/Softchalk/Pharmcology_SFTCHLK_Lesson/ Pharmacology_lesson10.html |
| EX2059 | (Intentionally Left Blank) |
| EX2060 | Waxman *et al., Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease*, N. Eng. J. Med. 384:325-334 (2021) |
| EX2061 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, Declaration of Dr. Robert Roscigno (EX2048) |

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Exhibit | Description |
|---------|-------------|
| EX2062 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, (EX2049) |
| EX2063 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, (EX2050) |
| EX2064 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, (EX2051) |
| EX2065 | Declaration of Dr. Werner Seeger regarding Application No. 11/748,205 |
| EX2066 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Declaration of Dr. Werner Seeger (EX2020) |
| EX2067 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Hossein A. Ghofrani (EX2026) |
| EX2068 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Frank Reichenberger (EX2027) |
| EX2069 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Friedich Grimminger (EX2028) |
| EX2070 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Declaration of Dr. Werner Seeger (EX2097) |
| EX2071 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Second Declaration of Dr. Werner Seeger (EX2098) |
| EX2072 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 (EX2101) |
| EX2073 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 (EX2102) |
| EX2074 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Second Declaration of Dr. Hossein A. Ghofrani (EX2099) |
| EX2075 | Le Brun *et al.*, *A review of the technical aspects of drug nebulization*, Pharmacy World & Science, 22(3):75-81 (2000) |
| EX2076 | Kendrick, *et al.*, *Selecting and Using Nebuliser Equipment*, Thorax, 52(Suppl 2):S92-S101 (1997) |
| EX2077 | Rau *et al.*, *Performance Comparison of Nebulizer Designs: Constant-Output, Breath-Enhanced, and Dosimetric*, Respiratory Care, 49(2):174-179 (2004) |

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Exhibit | Description |
|---------|-------------|
| EX2078 | Rau, *The Inhalation of Drugs: Advantages and Problems*, Respiratory Care, 50(3):367-382 (2005) |
| EX2079 | Hess *et al.*, *Medication Nebulizer Performance*, Laboratory and Animal Investigations, 110(2):498-505 (1996) |
| EX2080 | FDA Guidance 2002 |
| EX2081 | Newman *et al.*, *Efficient Delivery to the Lungs of Flunisolide Aerosol from a New Portable Hand-Held Multidose Nebulizer*, 1996 85(9) J. Pharm Sciences 960 (1996) |
| EX2082 | Dubus *et al.*, *Aerosol Deposition in Neonatal Ventilation*, PEDIATRIC RESEARCH, 58(1):10-15 (2005) |
| EX2083 | Treprostinil, PubChem, *available at* https://pubchem.ncbi.nlm.nih.gov/compound/Treprostinil |
| EX2084 | Roscigno *et al.*, 2020 *Pharmacokinetics and tolerability of LIQ861, a novel dry-powder formulation of treprostinil.* Pulmonary Circulation, 10(4):1-9 (2020) |
| EX2085 | Roscigno *et al.*, *Comparative bioavailability of inhaled treprostinil administered as LIQ861 and Tyvaso® in healthy subjects,* Vascular Pharmacology 138:106840 (2021) |
| EX2086 | Declaration of Dr. Roham T. Zamanian regarding Application No. 12/591,200 |
| EX2087 | Sandifer *et al.*, *Potent Effects of aerosol compared with intravenous Treprostinil on the pulmonary circulation*, J. Appl. Physiol. 99:2363-2368 (2005) |
| EX2088 | U.S. Patent Publication No. 2012/0177693 (Cipolla *et al.*) |
| EX2089 | Liquidia SEC Form 10-K (2020) |
| EX2090 | Preston *et al.*, *Safety and efficacy of transition from inhaled treprostinil to parenteral treprostinil in selected patients with pulmonary arterial hypertension.* Pulm Cir. 4(3):456-461 (2014) |
| EX2091 | Expert Report of Dr. Igor Gonda (D. Del) (excerpts) |

ix

## I.  INTRODUCTION

Liquidia Technologies, Inc. ("Petitioner") has failed to meet its burden of proving claims 1-8 of U.S. Patent No. 10,716,793 ("the '793 patent") are unpatentable because it relies on references that are not, in fact, prior art and bases its arguments on impermissible hindsight rather than teachings in the prior art.

First, each of Petitioner's six unpatentabily grounds rely upon references that Petitioner has failed to establish constitute prior art.  Grounds 1, 2, and 4 expressly rely on Voswinckel JESC and/or Voswinckel JAHA, but Petitioner has not set forth sufficient evidence to show that either abstract was publicly accessible as of the priority date of the claimed inventions.  Grounds 3-6 expressly rely on Ghofrani and/or Voswinckel 2006, but Petitioner has not set forth sufficient evidence to show that either of these references are antedating or "by others."  This fundamental failure of proof is fatal to Petitioner's case-in-chief.

Second, Petitioner's unpatentability grounds based on the combination of the '212 patent, Voswinckel JESC, and/or Voswinckel JAHA cobble together bits of disclosure guided by impermissible hindsight and expert declarations that rely on unsupported assumptions and unreliable calculations.  None of these references disclose administration of a single event dose from 15-90 µg to a human, let alone delivery of that dose in 1-3 breaths.  The '212 patent discloses sheep data delivered over 30 or more minutes. Voswinckel JESC and JAHA disclose concentrations, but

1

not single event doses. Petitioner therefore cites an undated device manual that Petitioner has not proven was publicly available and relies on assumptions of its experts in an attempt to calculate a single event dose. The POSA, however, would not perform these calculations and the calculations are flawed. Without disclosure of the claimed single event dose, Petitioner's grounds fail.

Accordingly, Petitioner has not carried its burden to prove unpatentability and the claims are patentable over all of the cited grounds.

## II.    BACKGROUND

The '793 patent relates to the treatment of pulmonary hypertension and is listed in the Orange Book for Tyvaso® (treprostinil) Inhalation Solution, a drug-device combination for delivery of treprostinil by inhalation marketed by Patent Owner, United Therapeutics Corporation ("UTC"). EX1001, 18:22-23; EX2007.

### A.    Pulmonary Hypertension

Pulmonary hypertension is a disease associated with high blood pressure in the pulmonary vasculature. *See generally* EX2050. At the time of the invention, as is the case even today, pulmonary hypertension is a poorly understood, often fatal, disease with limited treatment options.

Epoprostenol is a prostacyclin and was the first and only FDA-approved drug for the treatment of pulmonary arterial hypertension ("PAH") from 1995 to 2001. EX2051. The use of epoprostenol had substantial shortcomings. The half-life of

2

epoprostenol is only a few minutes, meaning that it is cleared from the body very quickly has a short duration of action. EX2008, 7-10. Thus, epoprostenol required administration by continuous intravenous infusion to maintain adequate levels in the body. Unfortunately, the need for a permanent transcutaneous intravenous catheter posed risks of infection, occlusion, and sepsis. Moreover, even a short interruption in infusion could increase the risk of hemodynamic collapse and even death because the half-life of epoprostenol is so short. Epoprostenol also requires daily mixing and refrigeration, which meant the patient must carry a cold pack to avoid degradation at room temperature and an infusion pump to administer the drug, which adversely affect patient compliance.

In 2004, a synthetic prostacyclin analog, iloprost (Ventavis®), was approved as an inhaled treatment for PAH. *Id.* at 10. Although inhaled iloprost had a slightly longer duration of action than epoprostenol, doctors still preferred intravenous administration of a prostacyclin analog over inhaled delivery of iloprost for a number of reasons. *Id.* For instance, iloprost has a half-life between 20-25 minutes and needs to be used 6-9 times a day, as frequently as every 2 hours, which is considered challenging for patients. *Id.* at 21, 23-24. Moreover, the fact that iloprost has a short half-life results in periods of patients being under-medicated while asleep unless they wake at regular intervals to take another dose. *Id.*

3

Treprostinil, the compound described in the '793 patent, was approved to treat PAH as a subcutaneous formulation (Remodulin®) by 2002 and for intravenous use in 2004. *Id.* Treprostinil offered benefits over both epoprostenol and iloprost such as room temperature stability and a half-life of several hours versus several minutes. Patients no longer needed to carry ice packs to ensure the stability, safety, and efficacy of the drug. *Id.* However, there were still significant limitations to subcutaneous and intravenous delivery of treprostinil, such as severe site pain for some patients, and systemic side effects. EX1018, 1.

### B.   The Inventors Developed a Novel Method of Treating PAH That Overcame Limitations of Existing Treatments

At the time of the invention, the inventors recognized a need for improving existing pulmonary hypertension treatments. The '793 patent relates to a breakthrough method of treating pulmonary hypertension using high dose administration of inhaled treprostinil that addressed many of the substantial shortcomings of other existing treatments. The '793 patent claims methods of treating pulmonary hypertension using a single event dose of 15-90 micrograms of treprostinil, or a salt thereof, delivered by inhalation in only 1 to 3 breaths. By using the inhalation route of administration, the claimed methods overcame limitations to subcutaneous and intravenous administration, such as site pain injection, systemic side effects, and the need for patients to lug around bulky pumps. The inventors also improved the safety and efficacy of treatment with the surprising discovery that

4

treprostinil could be delivered at higher drug concentrations and shorter inhalation times (3 breaths) with fewer side effects.

The '793 patent issued from an application filed on January 31, 2020 and claims priority to a provisional application, 60/800,016, filed on May 15, 2006. Petitioner does not contest this priority date.

The '793 patent has 1 independent claim and 7 dependent claims. Independent claim 1 recites:

> A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

EX. 1001, claim 1.  Dependent claims 2 through 5 require specific types of inhalation devices, namely a soft mist inhaler (claim 2), a pulsed ultrasonic nebulizer (claim 3), a dry powder inhaler (claim 4) or a pressurized metered dose inhaler (claim 5).  Dependent claim 6 requires the formulation to be a dry powder, and dependent claim 7 requires the powder to comprise particles less than 5 micrometers in diameter.  Dependent claim 8 requires the formulation to contain no metacresol.

The '793 patent teaches that administration of treprostinil using the claimed methods resulted in a significant reduction in pulmonary vascular resistance (PVR) and pulmonary artery pressure (PAP) and an increase in cardiac output.  EX1001,

5

FIG. 10; 16:32-42. The specification describes the surprising result of clinical studies showing that the time of inhalation could be reduced by increasing the concentration of treprostinil aerosol. *Id.* at 16:61-63, 17:44-46. This single-breath drug administration induced pulmonary vasodilation for longer than 3 hours with minimal side effects. *Id.* at 18:1-6. Surprisingly, very high concentrations of treprostinil were well tolerated (*id.*), even though initial clinical trials showed that increasing concentration from 16 mcg/ml to 64 mcg/ml led to significant side effects without increasing pulmonary vasodilation. EX1007 (at 16 mcg/ml, "near maximal pulmonary vasodilation is achieved without adverse effects").

The commercial embodiment of the '793 patent, Tyvaso® (treprostinil) Inhalation Solution, has shown distinct advantages over the other available treatments for pulmonary hypertension. Tyvaso® has a much longer half-life than Ventavis®. Thus, there is less risk of undermedication when the patient is asleep or otherwise unable to take the medication. Additionally, Tyvaso® does not need to be administered as frequently as Ventavis® (only 4 times a day, down from 6-9 times/day). Less frequent dosing leads to higher patient compliance, time savings of 1.4 hours per day (EX2052, ¶43) and lower risk of rebound hypertension. Patients transferring from inhaled iloprost to inhaled treprostinil also had improved six-minute walk distances (a common metric to assess pulmonary hypertension), improved patient satisfaction, and improved quality of life. *Id.* at 8-9. Notably, once

6

Tyvaso® entered the market, it was clinically preferred to Ventavis®. As illustrated below, Tyvaso® rapidly increased its market share after launch at Ventavis®'s expense, indicating the clinical advantages that Tyvaso® has over Ventavis®:



EX2086, ¶18.

## III.   CLAIM CONSTRUCTION AND PERSON OF ORDINARY SKILL

The parties agree that all claim limitations of the '793 patent should be given their plain and ordinary meaning in the art by a person of ordinary skill in the art (POSA) as of May 15, 2006.

A POSA, with respect to the '793 patent, would have an M.D. or a graduate degree (Masters or Ph.D.) in a field relating to drug development and at least two years practical experience in either (i) the investigation or treatment of pulmonary

hypertension; or (ii) in the development of potential drug candidates, specifically in

the delivery of drugs by inhalation.  EX2052, ¶¶13-16; EX2053, ¶¶28-31.

## IV.  PETITIONER HAS NOT MET ITS BURDEN TO ESTABLISH THAT CLAIMS 1-8 OF THE '793 PATENT ARE ANTICIPATED OR OBVIOUS

Petitioner has "the burden of proving a proposition of unpatentability by a

preponderance of the evidence." 35 U.S.C. § 316I; *see also* 37 C.F.R. § 42.108.

Petitioner has failed to carry that burden for any of its six Grounds:

> **Ground 1 (Claims 1-8)**: Obvious over '212 Patent, Voswinckel JESC, and Voswinckel JAHA
> **Ground 2 (Claims 1-8)**: Obvious over '212 Patent and Voswinckel JESC
> **Ground 3 (Claim 1)**: Anticipated by Ghofrani
> **Ground 4 (Claims 1, 3, and 8)**: Obvious over Voswinckel JAHA and Ghofrani
> **Ground 5 (Claims 1 and 3)**: Anticipated by Voswinckel 2006
> **Ground 6 (Claims 2 and 4-8)**: Obvious over Voswinckel 2006 and the '212 Patent

Grounds 1 and 2 rely upon a combination of the '212 patent and Voswinckel

JESC (Ground 2) and in further view of Voswinckel JAHA (Ground 1).  Petitioner

has failed to show that Voswinckel JAHA and Voswinckel JESC were publicly

accessible prior art. Even setting aside this fatal flaw, none of the references

8

IPR2021-00406
U.S. Patent No. 10,716,793 B2

expressly teach a "single event dose"[1] of "15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths." In an effort to fill this gap, Petitioner relies on flawed calculations and assumptions and an undated Operating Instruction Manual (EX1037) for a device referred to by Petitioner as "Optineb 2005." Pet., 23; *see also, e.g.*, EX1004, ¶¶74, 108; EX1002, ¶47.[2] In addition to improperly relying on the undated OptiNeb Manual, the POSA would not be able to calculate a delivered dose based on the scant information in Voswinckel JAHA or JESC, let alone with any reasonable accuracy. Accordingly, Petitioner cannot meet its burden of establishing that the '212 patent, Voswinckel JESC and/or Voswinckel JAHA teaches or suggests the claimed dose or that a POSA would have been motivated to combine the teachings of these prior art references to achieve the claimed invention with a reasonable expectation of success.

--------

[1] A POSA would understand "single event dose" to mean the dose administered in one sitting, which could be one or multiple breaths. EX2053, ¶50 n.5; EX2052, ¶48 n.4.

[2] Both Drs. Gonda (EX1004, ¶108) and Hill (EX1002, ¶47) rely on the specification of the '793 patent as disclosing that a "pulsed" feature of the Optineb device was known, but the modifications that gave rise to this "pulsed" feature in the Optineb device are not prior art. EX2003, ¶26.

9

Further, Grounds 3 through 6 explicitly rely on Ghofrani and/or Voswinckel 2006. Ghofrani and Voswinckel 2006 do not qualify as prior art under § 102(a) because they are not "by another" as Drs. Seeger, Ghofrani, Reichenberger, and Grimminger explain, the information relied upon by Petitioner for these two references was solely the work of the inventors of the '793 patent. As discussed below, these references are also antedated because the claimed invention was invented prior to the publication date of Ghofrani and Voswinckel 2006 and are thus, not qualifying prior art.

### A.    Ground 1: the '212 Patent, Voswinckel JESC, and Voswinckel JAHA Fail to Render Claims 1-8 Obvious

The Petition fails to establish by a preponderance of the evidence that any of the challenged claims are invalid as obvious over the combination in Ground 1 for several reasons. First, Petitioner has not set forth sufficient evidence to show that Voswinckel JAHA and Voswinckel JESC were publicly accessible prior art. Specifically, Petitioner failed to establish that either of these abstracts were received by a library before the priority date. Furthermore, Petitioner failed to identify how a POSA could allegedly locate these abstracts through the exercise of reasonable diligence before the priority date. To the contrary, the evidence shows that the Voswinckel JAHA and Voswinckel JESC abstracts are not indexed and difficult to find even today.

10

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Second, none of the cited prior art references teaches or suggests a "single event dose" of "15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths." The '212 patent specified a broad range of delivered doses, but on a per kilogram and a per minute basis – not a total dose delivered. Voswinckel JESC and Voswinckel JAHA only provide the initial concentration of a pre-aerosolized drug solution and the length of time that the drug is inhaled. As explained in more detail below, the single event dose delivered for any given patient using an inhalation device depends upon numerous factors relating to the type of inhalation device used and use by the patient. The information provided by Voswinckel JESC and Voswinckel JAHA is insufficient for a POSA to determine what single event dosage was administered. Only impermissible hindsight fills this hole in the references.

Third, Petitioner has failed to show that a POSA would have had a reasonable expectation of success for treatment of a patient with pulmonary hypertension by modifying the dosage ranges of the '212 patent to achieve a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths.

### 1. Petitioner Has Not Established That Voswinckel JAHA And Voswinckel JESC Were Publicly Accessible Prior Art Before The Priority Date

The determination of whether a document is a "printed publication" that qualifies as prior art hinges on "public accessibility." *Blue Calypso, LLC v.*

11

*Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)).  Public accessibility is the "touchstone in determining whether a reference constitutes a printed publication," and a reference is considered publicly accessible only if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence[] can locate it." *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008) (internal citations omitted).

For references stored in libraries, public accessibility requires that the reference be both available at the library and sufficiently indexed or catalogued by the priority date. *Blue Calypso, LLC v. Groupon, Inc.,* 815 F.3d 1331, 1348 (Fed. Cir. 2016); *In re Klopfenstein,* 380 F.3d 1345, 1349 (Fed. Cir. 2004).  In many circumstances, whether a reference is publicly accessible will turn on whether it was "meaningfully indexed such that an interested artisan exercising reasonable diligence would have found it." *Acceleration Bay, LLC v. Activision Blizzard Inc.,* 908 F.3d 765, 774 (Fed. Cir. 2018).

### a)    No Evidence That A Library Received Voswinckel JAHA Or Voswinckel JESC Before The Priority Date

Petitioner has failed to show that either Voswinckel JAHA (EX1008) or Voswinckel JESC (EX1007) were received by a library before the priority date. Neither reference contains a "received by" or "accepted" stamp or notation and

12

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Petitioner's expert, Dr. Hall-Ellis, admitted the same. *See generally* EX1007;

EX1008; EX2043, 150:16-23; EX2041, ¶¶13, 18-19, 33.

Dr. Hall-Ellis' reliance on the publication frequency for the journal

*Circulation* and the *European Heart Journal* does not establish the public

availability of the relevant abstracts appearing in the *supplements* of those journals.

*See* EX2041, ¶¶10-14, 30-33. Voswinckel JAHA and Voswinckel JESC are

abstracts appearing in special supplements of the journal *Circulation*, published by

the American Heart Association (the "Circulation Supplement"), and the *European*

*Heart Journal*, published by the European Society of Cardiology ("EHJ

Supplement"), respectively. *Id.*, ¶¶6, 10, 28, 30; *see also* EX2043, 108:15-25, 219:1-

23. The *Circulation* and *EHJ* Supplements are not normal issues, and instead

constitute irregularly published supplements, each containing thousands of

disjointed abstracts. *Id.*

Importantly, supplements compiling conference abstracts can sometimes

publish years after the conference in question, putting the *Circulation* and *EHJ*

Supplements' availability (if any) past the priority date. EX2041, ¶¶10-11, 30-31.

Thus, the publication frequencies for normal issues of *Circulation* and *EHJ* do not

establish when a library might have received a print copy of the irregularly published

supplements. *Id.* at ¶¶9-14, 29-33. Accordingly, Petitioner has not provided any

evidence showing if or when *Circulation* and *EHJ* Supplements were actually

13

received by a library. *Id*. at ¶¶14, 27, 33; *see also* EX2043, 150:16-151:7, 157:6-11,

217:11-13, 222:1-10.

Library Machine-Readable Cataloging ("MARC") and Library of Congress

("LOC") records containing metadata fields cited by Dr. Hall-Ellis likewise fail to

establish when the *Circulation* or *EHJ* Supplements were publicly accessible.  All

of the records provided by Dr. Hall-Ellis relate only to the journal *Circulation* and

the *EHJ – i.e.*, the publications at large, comprising all published issues spanning

decades – not the *Circulation* and *EHJ* Supplements that actually contain the

Voswinckel JAHA and JESC abstracts.  *See* EX1036, ¶¶63, 69; *see also* EX2043,

157:1-5, 222:12–224:2; EX2041, ¶¶20-22, 34-35.  Because the metadata fields in

MARC and LOC records cited by Dr. Hall-Ellis also relate to the entire journals

Circulation and the EHJ, the records do not establish receipt of the *Circulation* or

*EHJ* Supplements before the priority date.  *Id.*

> **b)** **Insufficient Evidence that Voswinckel JAHA and JESC Could Have Been Located with Reasonable Diligence**

Even assuming Voswinckel JAHA and JESC were received by the University

of Wisconsin-Madison and University of Iowa libraries, respectively, before the

priority date, Petitioner has still failed to show that the abstracts were meaningfully

catalogued and indexed before the priority date such that a POSA could have located

14

them through reasonable diligence.[3]  *Acceleration Bay*, 908 F.3d at 774.  There are two major shortcomings with Petitioner's alleged evidence.

First, Petitioner has not offered any evidence that Voswinckel JAHA and Voswinckel JESC were meaningfully catalogued or indexed at a library or in a database before the priority date, or why and how a POSA would search for or find the *Circulation* and *EHJ* Supplements.  *See* EX2041, ¶¶16-17, 34-37.  Even if a POSA found the Supplements, Voswinckel JAHA shares the page with three-and-a-half other abstracts and is just one of many thousands of abstracts spanning 1,102 pages in the full version of the *Circulation* Supplement.  *Id*. at ¶10.  Petitioner has not submitted any evidence that the *Circulation* Supplement contained a table of contents or subject matter index through which the cited abstract (number 1,414) could be located.  *Id*. at ¶¶7-8, 25-26.  Similarly, Voswinckel JESC cited by Petitioner shares the page with three other abstracts and is just one of 3,850 abstracts spanning over 700 pages in the full version of the *EHJ* Supplement.  *Id*. at ¶28.  Although there is a list of "Contents" included within Voswinckel JESC, it is not

---

[3] The Federal Circuit has held that proof of indexing in a "meaningful way," together with evidence that the indexing occurred by the critical date, may be necessary before the burden shifts to Patent Owner to prove otherwise.  *In re Lister*, 583 F.3d 1307, 1312 (Fed. Cir. 2009).

15

organized alphabetically or otherwise ordered by subject. *Id.* at ¶35. As a result, Petitioner has not shown that the POSA could locate either Voswinckel JAHA or JESC using reasonable diligence.

To the contrary, it is undisputed that Voswinckel JAHA and Voswinckel JESC remain difficult to find even today. For example, Dr. Hall-Ellis admitted she either did not search for Voswinckel JESC using typical searches, such as through a common database like PubMed,[4] or was unable to locate Voswinckel JESC. *See* EX2043, 242:11–245:22. Ms. Wyman searched all of the databases cited by Dr. Hall-Ellis (*see id.* at 41:1-42:4; 242:11-243:18 (listing Ovid, PubMed, MEDLINE, Index Medicus, and Chemical Abstracts)), but neither abstract is listed in any of these databases today, and Petitioner has failed to show they were listed in 2006. EX2041, ¶¶5, 16-17, 37. Moreover, the *Circulation* Supplement cannot be found on the *Circulation* Journal's website, AHA online archives, or even in a list of supplements to the journal. *Id.* at ¶¶12, 15. Similarly, the *EHJ* Supplement cannot be found on *European Heart Journal's* website or online archives. *Id.* at ¶32.

---

[4] PubMed.gov searches "more than 33 million citations for biomedical literature from MEDLINE, life science journals, and online books." *See* PubMed, *available at* https://pubmed.ncbi.nlm.nih.gov/ (last visited Nov. 1, 2021).

Second, the MARC and LOC records cited by Dr. Hall-Ellis do not establish meaningful indexing either.  Dr. Hall-Ellis cites two subject headings or descriptor terms, "Cardiology $x Societies" and "Heart $x Diseases $v Periodicals," as alleged evidence of meaningful indexing.  EX1036, ¶64.  However, these terms only indicate the entire journals themselves were allegedly indexed with these terms and are not unique to the cited abstracts.  EX2041, ¶¶20-23, 34-35.  *Circulation* has been published for more than 50 years (*id*. at ¶24), and the *EHJ* has been published for about 40 years (*id*. at ¶35), so merely locating the journals would not help a POSA find the Supplements, let alone the specific Voswinckel abstracts buried among many thousands of other disparate abstracts.  *Id.* at ¶¶4, 20-24, 34-35.  Any searches using Dr. Hall-Ellis' descriptor search terms would be futile as they would return hundreds of thousands of hits, including hundreds of journals having decades of issues.[5]  *Id.* at ¶¶4, 23-25, 34-35; *see also* EX2043, 158:5-160:2.

---

[5] Dr. Hall-Ellis admitted that researchers typically only look at the first three pages of search results, (EX2043, 88:7-9), which confirms the difficulty the POSA would have in locating the Voswinckel abstracts when faced with so many journals, issues, and articles hitting on Dr. Hall-Ellis's search terms.

The law requires Petitioner to provide evidence establishing that Voswinckel JAHA and Voswinckel JESC were received at a library and meaningfully indexed before the priority date.[6]  Petitioner's evidence falls far short of that standard (EX2041, ¶¶3-4, 27, 38), and the Board should find that Petitioner has failed to prove that the Voswinckel JAHA and JESC abstracts were publicly accessible prior art.

### 2.  None of the identified references teaches a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths

None of the '212 patent, Voswinckel JAHA, or Voswinckel JESC references teach a single event dose of treprostinil of 15 micrograms to 90 micrograms, delivered in 1 to 3 breaths.  Petitioner concedes that the '212 patent and Voswinckel JESC do not explicitly disclose these limitations.  Pet., 37-39.

### a)  The '212 patent

U.S. Patent No. 6,521,212 ("the '212 patent") issued February 8, 2003 and is titled "Method for Treating Peripheral Vascular Disease by Administering Benzindene Prostaglandins by Inhalation."  The '212 patent teaches methods of delivering benzindene prostaglandins by inhalation generally.  EX1006, Abstract.  The '212 patent states, "aerosolized treprostinil] has a greater potency as compared to intravascularly administered [treprostinil]."  *Id.* at 8:9-10.  The '212 patent

---

[6] *Blue Calypso,* 815 F.3d at 1348; *Acceleration Bay,* 908 F.3d at 774.

18

provides examples, wherein intravenous or aerosolized treprostinil is administered to sheep at 30, 60 or 90 minutes at a concentration of 250, 500, or 1000 ng/kg/min. *See, e.g., Id.* at FIGS 3-18, Examples I-V.

The '212 patent does not teach a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths. Instead, the '212 patent describes a very broad range of dosages delivered over a period of minutes. The disclosed dosages either specify a "daily infusion dose" or "per kilogram bodyweight per minute" dose, which are not inhaled single event doses as claimed by the '793 patent but *rates* (*e.g.*, μg per unit of body mass per day) or *daily* doses:

> In the case of treating *peripheral vascular disease* by inhalation of a benzindene prostaglandin of the present invention, the dosage for inhalation, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, should be sufficient to deliver an amount that is equivalent to **a daily infusion dose** in the range of 25 μg to 250 mg; typically from 0.5 tg[sic] to 2.5 mg, preferably from 7 μg to 285 μg, **per day per kilogram bodyweight**. For example, an intravenous dose in the range 0.5 μg to 1.5 mg **per kilogram bodyweight per day** may conveniently be administered as an infusion of from 0.5 [μg] to 1.0 μg **per kilogram bodyweight per minute**. A preferred dosage is 10 **ng/kg/min**.

EX1006, 5:56-67 (emphasis added).

Further, the dosages described in the '212 patent are contemplated for use in a continuous nebulization device. For example, the '212 patent describes an "AM-601 MEDICATOR AEROSOL DELIVERY SYSTEM" as the preferred device, and it is the only specific device mentioned anywhere in the patent. EX1006, 5:34-36;

19

EX2052, ¶53. This device is a *continuous* nebulizer designed to deliver small amounts of medication in a dosing event *spread over several minutes using dozens or hundreds of breaths*. EX2087, 2364; EX2052, ¶50. This type of device lacks the precision to deliver a measured amount of drug in the range of 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in only 1 to 3 breaths. EX2052. ¶55.

Similarly, the working examples of the '212 patent use continuous delivery of a treprostinil solution over 30, 60, or 90-minute intervals. EX1006, 10:44, 11:11-13. Treprostinil is delivered at a concentration of 250, 500 or 1000 ng/kg/min. None of these modes of administration disclose or teach a single event dose of 15 micrograms to 90 micrograms. EX2041, ¶52. Nor could a POSA determine the amount delivered in 1 to 3 breaths from the experimental descriptions of Examples I-V. EX2053, ¶¶49-50.

### b) Voswinckel JESC

Voswinckel JESC is a quarter-page abstract dated August/September 2004 and titled "Inhaled treprostinil is a potent vasodilator in severe pulmonary hypertension." EX1007. Voswinckel JESC generally describes the delivery of treprostinil over a six-minute interval using an OptiNeb ultrasound nebulizer with a pre-aerosolized starting solution of 16, 32, 48 and 64 μg/mL. EX1007. The abstract observed that "[a]t higher doses, local and systemic side effects may occur." *Id.*

Indeed, all patients who received the 64 µg/mL complained of headache, cough or bronchoconstriction, including one patient who complained of a major headache. *Id.* The reference concludes that, at 16 mcg/ml, "near maximal pulmonary vasodilation is achieved without adverse effects." *Id.* Thus, Voswinckel JESC teaches away from titrating up to higher drug concentrations over an even shorter time interval.

Petitioner admits that Voswinckel JESC does not teach a single event dose of 15 micrograms to 90 micrograms, but instead describe solution concentrations and a nebulization time of 6 minutes[7] that their experts admit lack many details that bear on the actual delivered dose. Pet., 38. As explained in more detail below, the actual dose delivered for any given patient using an inhalation device depends upon a number of factors including the type of inhalation device used, pre-aerosolized drug concentration, gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions. Without accounting for any of these factors, Petitioner relies on unsupported calculations (discussed in section IV.A.3 below), that Petitioner alleges would lead a POSA to the claimed dosage range.

---

[7] A POSA would understand that the plain and ordinary meaning of the claimed dose of 15-90 µg is the dose delivered to the patient (as opposed to a quantity placed into a nebulizer or starting solution). EX2053, ¶55; EX2052, ¶65 n. 8.

### c)      Voswinckel JAHA

Voswinckel JAHA is a quarter-page abstract dated October 26, 2004 and titled "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension." EX1008. Voswinckel JAHA generally describes the delivery of inhaled treprostinil sodium to 17 patients with severe pulmonary hypertension using a "pulsed" Optineb® ultrasound nebulizer in three breaths, with a pre-aerosolized treprostinil solution of 600 μg/ml. *Id.*

Petitioner does not contend that Voswinckel JAHA teaches a dosage of 15 micrograms to 90 micrograms. Instead, Petitioner relies on Voswinckel JAHA for teaching "a low number of breaths for the aerosolized delivery of treprostinil specifically for the treatment of pulmonary hypertension." *Id.* at 40. A POSA, reading Voswinckel JAHA, would not be able to determine the delivered dose in 1 to 3 breaths based on the disclosure of JAHA. EX2053, ¶52. The dosage delivered using an unknown pulsed nebulizer would depend on a number of factors including the amount of aerosol delivered per pulse, the number of pulses generated per breath, the shape of the mouthpiece or mask, and the breathing pattern of the patient. *Id.*

Accordingly, because none of the identified references in Ground 1 teach a single event dosage of 15 micrograms to 90 micrograms or provide any motivation for administering this amount, this ground must fail even if all of the references are prior art (which they are not).

22

### 3.    The POSA Would Not Be Motivated To Combine The '212 Patent, Voswinckel JESC, and Voswinckel JAHA With A Reasonable Expectation of Success

Petitioner concedes that neither the '212 patent nor Voswinckel JESC teach a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths. Instead, Petitioner incorrectly argues that these two references render this limitation obvious based on three erroneous calculations. The first erroneous calculation relies on an undated Optineb manual, which Petitioner suggests provides a nebulization rate for an OptiNeb® ultrasound nebulizer. Yet there is no evidence that this manual is prior art or refers to a device that was available, much less used, in the reported studies. Petitioner incorrectly relies on this assumption to argue that the patients described in Voswinckel JESC may have received more than 1 ml of solution and leaps to conclude that these subjects received dosages of treprostinil within the claimed ranges.

The second erroneous calculation relies on unsupported assumptions provided by the testimony of Drs. Hill and Gonda that nebulizers are usually prescribed to deliver more than 1 ml of solution. Moreover, Dr. Hill relies on his experience as an investigator in the Tyvaso® clinical trials and approved drug label – the drug embodying disclosure of the '793 patent. EX2055, 96:3-101:12. Petitioner incorrectly relies on these unsupported assumptions to argue that the patients

23

IPR2021-00406
U.S. Patent No. 10,716,793 B2

described in Voswinckel JESC received more than 1 ml of solution and further received dosages of treprostinil within the claimed ranges.

The third erroneous calculation relies on the teaching in the '212 patent that "the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." EX1006, 8:8-12, *see* Pet., 38-39. Petitioner and Dr. Hill provide calculations of an inhaled dose based on this 10-50% fraction and the dosing calculations approved by the FDA for intravascular treatment with treprostinil. But as Dr. Hill acknowledged, it is misleading to compare blood levels during infusion as compared to after inhalation and not an accurate measure of the relative potency of treprostinil in aerosolization versus intravascular administration. EX2055, 102:13-104:15.

As discussed in detail below, each of these erroneous calculations is unsupported by the record.

> ### a) Petitioner Fails to Establish That the Undated Optineb Manual or Optineb Device Was Publicly Available at the Priority Date

As a preliminary matter, while agreeing that Petitioner has not established that the undated Optineb manual is prior art (Institution Decision at 23), the Institution Decision relied on the undated Optineb manual "as evidence of the general knowledge in the art at around the time of the invention." *Id.* at 24 (citing *Koninklijke Philips N.V. v. Google LLC,* 948 F.3d 1330, 1337-1338 (Fed. Cir.

24

2020)). But even on this basis, Petitioner fails to show that the information disclosed in the undated Optineb manual was general knowledge as of the priority date.

The undated Optineb manual appears to be a translation of an Operating Instruction manual for "Optineb®-ir", a microprocessor-controlled, mobile ultrasonic nebulizer (Model No. ON-100/2-2.4 MHz). EX1037. This undated Optineb manual discloses certain technical features, including that the nebulizer output (what Petitioner's expert, Dr. Hill refers to as "nebulizing rate") is provided as 0.6 mL/min. *Id.* at 28. Petitioner relies on this technical detail to argue that Voswinckel JESC teaches "an effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil."

Dr. Hill first notes that Voswinckel JESC teaches "[d]oses of treprostinil in solution . . . of 16, 32, 48, and 64 μg/mL using an OptiNeb® ultrasound nebulizer." EX1002, ¶64. Dr. Hill next argues, without evidence, that nebulizers at the time were known to nebulize at least 1 mL by citing his personal experience and Petitioner's other expert, Dr. Gonda.[8] *Id.* at ¶65. As an initial matter, Dr. Hill

---

[8] But Dr. Hill admitted that he did not recall reviewing Dr. Gonda's declaration prior to signing his own declaration that cites to Dr. Gonda's declaration; rather he relied on his attorneys' "verbal" explanations "relay[ing] the content to [him]." EX2055, 132:20-134:5.

testified that his personal experience was based drugs for other indications, not prostcyclins for the treatment of pulmonary hypertension.  EX2055, 146:16-23.  Dr. Gonda cites three drug labels, but only one involved a pulmonary hypertension treatment and none of the cited drugs used an OptiNeb device.  Dr. Hill further argues that "[a] POSA would further confirm that 16-64 μg was the administered dosage in Voswinckel JESC by using his understanding of the rate of solution delivery for OptiNeb® device available before 2006."  *Id.* at ¶67.  Citing only the undated Optineb manual for the proposition that the nebulizing rate of Voswinckel JESC would be 0.6 mL/min, Dr. Hill argues that continuous delivery of inhaled treprostinil across 6 minutes as described in Voswinckel JESC would have resulted in a dosage of 57.6 μg (16 μg/mL * 0.6 mL/min * 6 min).  *Id.*

Dr. Hill's analysis of Voswinckel JESC in view of the undated Optineb manual fails based on several unsupported assumptions.

*First*, neither Petitioner nor Dr. Hill provide any evidence for their assertion that the undated Optineb manual was publicly available before 2006.  The undated Optineb manual does not provide any copyright information that would indicate when it was first published.  Nor does Petitioner make any effort to fulfill its burden to demonstrate public accessibility before 2006.  Indeed, Petitioner provides no indication that the Optineb manual was disseminated or publicly available and indexed in a manner substantiating public accessibility since there is no evidence

that it could be located before the critical date using key words. *Blue Calypso*, 815

F.3d at 1349; *see also In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989)." Dr. Hill

merely assumed that the undated Optineb manual was available before 2006 and

testified that the only basis for his conclusion that this document was available in

2005 was "from the attorneys." He did not "know where the derivation was beyond

that." EX2055, 63:3-64:2, 83:8-22. Further, Petitioner retained an expert to

authenticate the publication date of other documents, but that declaration is

completely silent on EX1037. *See* EX1036. Regardless, the inventors of the '793

patent, who contributed to development of Optineb, have confirmed it was not

available before the 2006. EX2003, ¶26; EX2071 (IPR2017-01621, EX2098)

(Seeger Decl.), ¶14 (citing EX2101-EX2102). In sum, Petitioner has failed to make

*any* evidentiary showing that Exhibit 1037, the undated Optineb manual was

publicly accessible as of the critical date of the '793 patent.

*Second*, there is no evidence that the Optineb manual reflects "general

knowledge in the art at around the time of the invention." Institution Decision at 24.

The Optineb manual is not being used for general knowledge, such as the existence

of nebulizers capable of delivering drug within the recited parameters. Dr. Hill

specifically used the Optineb manual to determine "the rate of solution delivery for

the OptiNeb® device available before 2006," *i.e.*, the deliver rate of a prior art

device. EX1002, ¶67. Dr. Hill confirmed that in addition to relying on EX1037 in

forming his opinion, he had no personal basis for his conclusion that this document was available in 2005, stating only that he "got it from the attorneys."  EX2055, 63:3-64:2.  He further testified that as of 2006 he had never used an OptiNeb device and that he had not tried to verify whether EX1037 came from the 2005.  *Id.* Nonetheless, Dr. Hill relies on the Optineb manual for a specific fact integral to his calculations: an alleged nebulizing rate of 0.6 mL/min.  There is no evidence that 0.6 mL/min or even a similar nebulization rate was general knowledge at the time of invention, suggesting reliance on hindsight.

*Third*, Dr. Hill assumes without evidence that the "OptiNeb ultrasound nebulizer, Nebu-tec, Germany" is *the same Optineb device* described in the undated Optineb manual.  However, Dr. Hill conceded that he did not know what the "IR" refers to or whether the various Optineb models are the same or different devices. EX2055, 61:10-62:25.  In fact, Dr. Hill did not know whether the Optineb device of EX1037 was the same device used in Voswinckel JESC because the reference does not identify which model was used.  *Id.* at 81:12-22; 83:3-7.

Further, while the undated Optineb manual states the nebulizer output is 0.6 ml/min (EX1037, 28), that number is far too unsubstantiated and unclear to support any conclusions about actual nebulizer output in any specific instance.  EX2053, ¶81.  For example, the manual states that this particular nebulizer model has six different programs or modes (EX1037 at 18-20).  In certain modes (P1, P2, and P3),

28

the device generates aerosol at intermittent intervals, while in other modes, it generates aerosol continuously. *Id.* Moreover, EX1037 fails to explain whether the 0.6 number is a maximum, minimum, or average; whether the number is a theoretical output based on the electrical components in the nebulizer or the ultrasonic horn driving nebulization of the aerosol; or, if the 0.6 ml/min was derived empirically, whether the measurements were of nebulization of pure water, or a solvent, or a mix of both, or if there was a drug or placebo in the solution. EX2053, ¶¶81-83. All of these variables could affect the amount of drug in the nebulizer output. *Id.*

As a result, even if the Optineb device disclosed in Voswinckel JESC were the same nebulizer described in the undated Optineb manual, there are too many unknowns such that a POSA could not calculate a single event dose. For example, Voswinckel JESC does not describe which program, face mask or mouthpiece, type of tubing, operation frequency, or which baffle plate was used, and all of these variations can effect the device's output. EX2053, ¶¶75-83. Thus, a POSA would not have been able to determine the dosage delivered in Voswinckel JESC with any reasonable certainty.

Because all of the factors addressed above affect the amount of aerosolized treprostinil delivered to the patient and are thus necessary factual predicates for Petitioner's statement that Voswinckel JESC teaches the claim element "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90

micrograms of treprostinil or a pharmaceutically acceptable salt thereof," Grounds 1 and 2, which rely only upon Voswinckel JESC when read in view of the undated Optineb manual to supply this limitation, must fail.

### b)    Petitioner Fails to Establish That Fill Volume is Sufficient to Determine the Single Event Dose

With respect to Voswinckel JESC, Petitioner's argument that "a POSA would have expected at least 1 mL of the treprostinil solution was used over 6 minutes of inhalation, and thus would understand, therefore, at least 16, 32, 48, or 64 µg of treprostinil were delivered to different dosing groups in this study" (*see* Petition at 23, EX1002, ¶99; EX1004, ¶56) is flawed on several grounds.

*First*, the single event dose of treprostinil delivered to a patient using a continuous nebulizer cannot be meaningfully determined using only the fill volume (*i.e.* the amount of pre-aerosolized solution loaded into the nebulizer). In practice, patients may be administered an inhaled therapeutic through a continuous nebulizer until the solution in the reservoir has been completely nebulized. *See* EX2052, ¶83. For example, each of the FDA approved labels, which Dr. Gonda cites to in his declaration, involve administering the solution until the contents of the reservoir of the nebulizer are emptied. EX.1004, 56, n. 4. But Voswinckel JESC does not describe nebulization until the reservoir is emptied. It mentions a six-minute time period, and there is no guarantee that the entire fill volume would be completely nebulized in six minutes. EX2052, ¶83; EX2053, ¶45.

30

The labels Dr. Gonda relies on indicate wide variability in the time required to nebulizer all of the solution.  For example, the AccuNeb® Label referred to by Dr. Gonda teaches that it may take anywhere from 5 to 15 minutes for the 3 mL solution to be nebulized.[9]  EX.1004, 56, n. 4; EX1066.  Voswinckel JESC does not provide either the starting volume of treprostinil solution or identify whether the entire volume had been nebulized at 6 minutes.  The AccuNeb® label also explicitly recognizes that *delivery* of a dose to the patient – as opposed to what is converted to an aerosol by nebulization – depends not only the nebulizer itself, but also on patient factors.  EX2053, ¶61.

*Second*, even if Voswinckel JESC taught a starting volume of solution with a specified concentration of treprostinil, and further taught that the solution was completely nebulized – which Voswinckel JESC does not – a POSA still would not be able determine the single event dosage over that six-minute interval without additional information about the nebulization device.  Fill volume is just one of many variables that may affect drug dosage.  EX2001, ¶41; EX2053, ¶¶55-56.  Additional factors that may affect the dose of drug received by a patient through a continuous

---

[9] Dr. Hill admitted that AccuNeb® is not used to treat pulmonary hypertension and there may be different considerations in determining whether a particular medication is suitable via a particular mode of administration.  EX2055, 136:8-141:18.

nebulizer include gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern, and device interface. *See, e.g.,* EX2033, 11-12; EX2001, ¶13; EX2053, ¶55-56. These factors are not uniform between nebulization devices or patients; EX2053, ¶61. Thus, without additional information regarding the numerous factors mentioned above, the single event dose delivered to patients in Voswinckel JESC cannot be determined. EX2053, ¶¶55-60, 68.

*Third*, it is not true that all continuous nebulizers deliver a dosage of between 1 and 5 mL of aerosolized solution. *See, e.g.,* EX2082, 13; EX2053, ¶¶69-73. Certain commercially available nebulizers –available as of the priority date – were suitable for use with at least 0.5 mLs. *See, e.g.,* EX2082; EX2053, ¶71. Other nebulizers were known to deliver more than 5 mL of aerosolized solution. *See, e.g.,* EX2053, ¶71. A POSA would not know one way or the other whether the ultrasonic Optineb device of Voswinckel JESC was filled with more than 1 mL or less than 5 mL of solution. EX2053, ¶72.

*Finally*, as discussed in Section IV.A.2.a), it is impossible to extrapolate what an appropriate single event dose should be from the data included in Voswinckel JESC because the delivery efficiencies and pharmacokinetics of a continuous nebulizer to do not predictably translate to devices capable of delivering consistent

32

dosages in just 1 to 3 breaths.  *See, e.g.*, EX2061, ¶¶11, 14-15 (citing IPR2017-01622, EX2049, EX2050, EX2051).

> **c)     Petitioner's Calculation of Dose Based on the Teachings of the '212 Patent are Flawed For Several Reasons.**

Alternatively, Petitioner starts from the premise that the '212 patent "discloses a dosage range for intravascular administration of treprostinil for the treatment of pulmonary vascular disease, and discloses that only 10-50% of the dosage delivered intravascularly would be needed via inhalation *to have the same therapeutic effect*." *See, e.g.,* Petition at 30-31, 38-39.  Petitioner's incorrect calculation starts with the fact that intravascular treprostinil is approved to treat pulmonary hypertension at a dosage of 1.25 ng/kg/min.  Petitioner then calculates that a patient weighing between 60 and 65 kg would receive a dosage of 108 to 117 micrograms per day.  Petitioner argues that a POSA would then "apply the '212 Patent's 10-50% adjustment between intravascular and inhaled dosing to achieve a dosage of 10.8 to 58.5 micrograms." This analysis is flawed, because (i) the '212 patent does not provide a mathematical calculation for converting an intravascular dosage to an inhaled dosage; and (ii) Petitioner's flawed calculation establishes a *daily* dose not a *single event* dose.

What the '212 patent actually teaches is that "aerosolized [treprostinil] has a *greater potency* as compared to intravascularly administered [treprostinil]." EX1006, 8:8-10 (emphasis added).  The '212 patent further explains, "the actual

amount of [treprostinil] delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.* at 8:10-13. However, the '212 patent notes that "the mechanism(s) that accounts for the greater potency and efficacy for aerosolized UT-15 is unknown." *Id.* at 8:13-15.

Petitioner improperly reads into this disclosure a mathematical formula for converting a therapeutically effective dose of intravascularly administered treprostinil into a therapeutically effective dose of inhaled treprostinil. But the '212 patent provides no such formula. The '212 patent simply notes that inhaled solutions are more potent despite the fact that the delivered dose may only be 10-50% of the aerosolized solution. Nor do the examples support such a calculation. The examples described in the '212 patent simply demonstrate that at the *same dosage* (250, 500 and 1000 ng/kg/min) and *same duration* (30 and 60 minutes), UT-15 is more potent in aerosolized form than intravenous form. *See* EX1006, 11:7-13. There is nothing in this data to suggest a formula for calculating the therapeutic dosage of inhaled treprostinil from an approved intravascular treprostinil treatment.

Further, Petitioner's oversimplified calculation fails to take into account the difference in pharmacokinetic effects of a large dose of treprostinil delivered in 1-3 breaths. Large doses of treprostinil were known to produce "dose-limiting side effects" such as nausea, vomiting, headache, dizziness, and anxiety. *See, e.g.,* EX2037. For subcutaneous administration, the maximal tolerated dose is just 10

34

ng/kg/min, which is 2 orders of magnitude lower than the claimed dosage of the '793 patent. *Id.* As discussed above, intravascular treprostinil is approved at a much lower dosage of 1.25 ng/kg/min. EX1018.

Dr. Hill admits that it "is misleading to rely on blood levels, circulating levels" and "rough measures of relative potency between intravascular and aerosolized delivery." EX2055, 103:21-104:6; *see also* EX2090, 460. And Dr. Hill, outside of this IPR proceeding, would never rely upon the calculation he puts forward here. In his own publications, including one 8 years after the priority date, when not being paid by Liquidia to say the opposite, Dr. Hill told his colleagues that "how the pharmacokinetics and the effectiveness of inhaled forms compare to parental forms [i.e. intravenous and subcutaneous] of prostanoids at the currently approved doses . . . has not been adequately studied." EX2090, 460; *see also* EX2061, ¶11 (noting risk of spillover effect when inhaled amount of treprostinil is increased). Instead, "clinicians need to rely on clinical assessment as proof of response to therapy." *Id.*

Iloprost, the only other inhaled prostacyclin analogue as of the priority date, approved for dosages of 5 micrograms or less in a single event dose, demonstrated adverse systemic effects at doses as low as 7.5 micrograms per single event dosage. EX1001, 17:15-22. Given these dose limiting side effects, a POSA would not have been motivated to achieve a dose of 15 to 90 micrograms in just 1 to 3 breaths with any reasonable expectation of success.

35

Finally, even if the Board were to accept Petitioner's calculation, it does not result in a single event dose between 15 micrograms and 90 micrograms. Remodulin® intravenous infusion is dosed *continuously*, and 108 to 117 micrograms would be the dosage over *24 hours*. *Id.*, EX1018. The '212 patent teaches, therefore, that 10.8 to 58.5 micrograms would be the expected *daily* inhaled dose, and not a single event dosage. *Id.* As Dr. Hill admits, this calculation is comparing "apples and oranges." EX2055, 100:15-25.

The continuous nature of the drug delivery in the prior art confirms that one single event dose is insufficient to control PAH for an entire day. *Id.* For example, Voswinckel JAHA, which has itself not been established to be prior art, confirms that 4 individual dosing events were required throughout the day to treat pulmonary hypertension. *Id*; EX1008. Even at the high end, the simple math demonstrates that a 58.5 microgram daily dose would amount to less than 15 micrograms of treprostinil sodium per single event dose when spread over four individual dosing events. *Id.*

Surprisingly, during Dr. Hill's deposition, Petitioner asked about "dose adjustments" of Remodulin as described on the label on redirect. Dr. Hill testified that the dose of Remodulin may be adjusted "no more than 2.5 nanograms per kilogram per minute per week". *Id.* at 174:15-21. Dr. Hill then testified that these dose adjustments would "end up in that 15 to 90 microgram range taking into account dividing the dose in paragraph 100 by four." *Id.* at 176:5-10. Patent Owner

objects to this testimony because it is outside the scope of a proper redirect examination and presents new theories of invalidity that were not presented in the Petition. Further, following the dosage instructions from the Remodulin label would ultimately result in dosages significantly above a single event dose of 15 to 90 micrograms even if Petitioner's calculation methodology had any scientific merit, which it does not. *See, e.g.,* EX2052, ¶60.

For at least these reasons, a POSA would not be motivated to combine the disclosure of the '212 patent with the teachings of Voswinckel JESC and JAHA in a way that would result in a single event dose of 15 to 90 micrograms in 1 to 3 breaths with a reasonable expectation of success. There is simply no motivation offered by Petitioner that would override a POSA's serious concerns about side effects to support modifying the Voswinckel references and '212 patent in order to achieve a single event dose of 15 to 90 micrograms in 1 to 3 breaths. In fact, Voswinckel JESC warns in its Conclusion that "at a concentration of 16 µg/ml, near maximal pulmonary vasodilation is achieved without adverse effects" but "[a]t higher doses, local and systemic side effects may occur." EX1007. Nowhere does the Petition address why a POSA would increase the dose or have a reasonable expectation of success if the dose is increased by shortening the single event dose of Voswinckel JESC to 1 to 3 breaths using a much higher dose per breath. In fact, Petitioner's expert Dr. Gonda remarks in his own inhaled treprostinil patent

37

application that it would be preferable to *reduce* the treprostinil dosage taught by Voswinckel 2006 in order to reduce systemic levels and adverse side effects. EX2091, ¶¶25, 26, 29-32. If anything, a POSA would be motivated to lower the dose based on Voswinckel 2006 (if it were prior art at all).

### 4. Claims 4, 6, and 7: Petitioner's Arguments Regarding Obviousness Are Contradicted And Undermined By Its Arguments Regarding Enablement

Here, Petitioner asserts that claims 4, 6, and 7 are obvious. But in co-pending litigation between Petitioner and Patent Owner, Petitioner says the claims are not enabled. Petitioner cannot have it both ways.

Petitioner uses half of a page to assert that claim 4 would be obvious. Pet. 44. Petitioner cites the '212 patent, which describes an "inhaler" and references powder formulations in the specification and a claim, and an article stating that "dry powder inhalers were well known and 'widely accepted' as of 2006." *Id.* (citing EX1038, 1311). Petitioner cites the '212 patent again for claims 6-7, using four and three lines, respectively. Pet. 45. Dr. Gonda's declaration asserts that "because dry powder inhalers were well-known and 'widely accepted' by May 2006, … a POSA would have had a reasonable expectation of success that the "powder" disclosed and claimed in the '212 Patent could be 'inhaled' by a patient using a dry powder inhaler." EX1004, ¶80 (citing EX1019, 33).

Dr. Gonda asserts the opposite in his district court expert report. Spanning twenty pages, Dr. Gonda identifies a litany of alleged challenges that he contends demonstrate a lack of enablement.[10] EX2091, 40-61. According to Dr. Gonda, "a POSA would have to engage in excessive (undue) experimentation to develop a treprostinil powder formulation and corresponding dry powder inhaler that achieve [sic] effective administration as required by claims 1, 4, 6, and 7 of the '793 patent." *Id.* at 42. "[T]he level of unpredictability in the art was high." *Id.* at 44. "Without guidance from the '793 Patent, *a POSA would be unable* to formulate a treprostinil powder suitable for administration via a dry powder inhaler for PH patients without excessive experimentation." *Id.* at 47 (emphasis added); *see also, e.g.*, *id.* at 49 (treprostinil would be more challenging that other drugs used with DPIs); 51 (powders present unique challenges).

Dr. Gonda's opinions in the district court completely contradict his assertions before the Board. *Compare* EX2091, 40-61 *with* Pet. 44 *and* EX1004, ¶¶76-80. This is particularly true where Petitioner and Dr. Gonda contend that "the '212 patent's disclosure that one can use a powder formulation of treprostinil is nearly identical to that of the '793 patent's disclosure of treprostinil powder formulations." EX1004,

---

[10] Patent Owner disputes Petitioner's claims of invalidity for lack of written description and enablement and obviousness.

¶78 n.8. "[N]early identical" disclosures cannot support both a reasonable expectation of success (*without* the '793 patent's guidance on dosing) and a conclusion of undue experimentation (*with* the '793 patent's guidance).

Dr. Gonda purports to condition his opinions on enablement, stating that the claims are not enabled "[t]o the extent [Petitioner] contends that he asserted claims are not obvious," but this does not resolve his inconsistency. *See, e.g.*, EX2091, 40. Patent Owner primarily contends the claims are nonobvious because the prior art lacks disclosure of a single event dose of 15-90 µg delivered in 1-3 breaths, regardless of the form of administration (liquid or powder). Whether the Board or Court agrees does not affect how difficult it allegedly was in 2006 to prepare a powder formulation for use with a DPI. Petitioner's conclusory evidence of obviousness is contradicted by its lengthy district court assertions and it has therefore failed to show Claims 4, 6, or 7 to be obvious by a preponderance of the evidence.

## B.     Ground 2: the '212 Patent and Voswinckel JESC Fail to Render Claims 1-8 Obvious

Petitioner's rationale under Ground 2 is identical to Ground 1, except with respect to the claim limitation "delivered in 1 to 3 breaths." Rather than relying on Voswinckel JAHA for this limitation, Petitioner argues that this limitation "would have been obvious over the '212 Patent and Voswinckel JESC in view of a POSA's general knowledge in the field and/or by applying routine optimization." To the

extent that Ground 2 relies on arguments set forth under Ground 1, Patent Owner incorporates the arguments from Section IV.A.

Petitioner is incorrect that a "POSA's general knowledge in the field" would motivate a POSA to "minimize the number of breaths required for administration of treprostinil." As discussed above, there were known dose limiting side effects associated with treprostinil and prostacyclin molecules generally that would have prevented a POSA from expecting that such a high dosage in just 1 to 3 breaths would be well tolerated. *See* Section IV.A.3.c). The "general knowledge" relied upon by Petitioner does not support the notion that the "the general state of the art had established safety and efficacy of high dosages of inhaled therapeutics delivered over a small number of breaths."

As a preliminary matter, Petitioner relies on publications that are not "prior art" as discussed in Section IV.C below (*i.e.*, Voswinckel 2006 (EX1009) and Ghofrani (EX1010)).

Second, even the actual prior art relied upon relate to different types of molecules with different indications and mechanisms of action. Geller 2003, for example, which Petitioner also relies upon, teaches inhalation of recombinant human deoxyribonuclease (rhDNase) for the treatment of cystic fibrosis. EX1034, Abstract. A POSA would understand that the ability of an inhaled therapeutic to be well tolerated at high concentrations in just 1 to 3 breaths is highly dependent on the

41

nature of the compound inhaled.  EX2052, ¶89.  The pharmacokinetic profile and potential side effects of inhaled rhDNase are completely unrelated to treprostinil or other prostacyclin analogues.  *Id*.  And Frijlink 2004 (EX1039) simply teaches that dry powder inhalers may be used to deliver high fine particle fractions to the lung resulting in relatively high lung deposition.  It does not teach that high concentrations of treprostinil in just 1 to 3 breaths would be well tolerated in the case of a totally different patient population, namely pulmonary hypertension patients.  Indeed, Dr. Hill acknowledged that there are different considerations in determining whether a particular medication is suitable via a particular mode of administration when treating different diseases.  EX2055, 136:8-141:18.  Finally, Petitioner relies upon Voswinckel JAHA, but as explained in Section IV.A.2.c) above, this abstract does not teach dosages of treprostinil of 15 micrograms to 90 micrograms.

Petitioner has likewise failed to explain *why* it would have been "routine optimization" to arrive at the claimed dosage in just 1 to 3 breaths in view of the general disclosures of the '212 patent and Voswinckel JESC.  As discussed in Sections IV.A.2.a) and IV.A.2.b) above, neither the '212 patent nor Voswinckel JESC teach a single event dose of 15 micrograms to 90 micrograms or teach administration of treprostinil in just 1 to 3 breaths.  In fact, Voswinckel JESC teaches away from using higher concentrations due to side effects as described above.

42

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Petitioner incorrectly assumes that a POSA could readily titrate dosage up from the teachings of the '212 patent and Voswinckel JESC to achieve a single event dose of 15 micrograms to 90 micrograms in 1 to 3 breaths. However, both the '212 patent and Voswinckel JESC utilize continuous nebulization to deliver a dosage of treprostinil over a longer duration. It would not be possible to administer a single event dose in 1 to 3 breaths of the claimed invention using these devices. Further, as discussed *supra*, with continuous nebulization, a patient breathes in a very small fraction of the nebulized output of the device over a substantial time period without knowing the precise dosage that is ultimately administered. *Id.* ("only 10% of the total dose loaded in a [continuous] nebulizer is in reality deposited in the lungs"). The patient wears a mask and breathes in unmeasured portions of the entire nebulized output delivered through the mask:



EX2033, EX2052, ¶37.

43

Various factors that would affect the dose of drug received by a patient through a continuous nebulizer include gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern and device interface. *Id.* at ¶38. Petitioner overlooks the fundamental difference between operating principles of continuous nebulization devices and other types of inhalation devices and erroneously combines elements from incompatible references throughout its Petition.

Petitioner's assertions of obviousness of claims 4, 6, and 7 fail for the same reasons as cited above with respect to Ground 1.

### C.    Grounds 3-6 Fail Because Each Ground Relies On Publications That Petitioner Has Failed to Establish Are Prior Art

Petitioner does not dispute that Ghofrani and Voswinckel 2006 were both published less than one year prior to the date of the application that resulted in the '793 patent. *See, e.g.,* Petition at 25 (admitting that Ghofrani was published in June of 2005, *i.e.*, less than one year prior to the date of application); *Id.* at 27 (admitting that Voswinckel 2006 was published on January 17, 2006, *i.e.*, less than one year prior to the date of application). Accordingly, Petitioner bears the burden of establishing that Ghofrani and Voswinckel 2006 are prior art "by others" under 35 U.S.C. § 102(a). *See, e.g., Lacks Industries, Inc. v. McKechnie Vehicle Components USA, Inc.* 322 F.3d 1335, 1346 (Fed. Cir. 2003) (an inventor's own disclosure 'will

44

not anticipate his later invention" unless published more than one year prior to the application date).

Ghofrani and Voswinckel 2006 are not prior art unless they are the work of another. *In re Katz,* 687 F.2d 450, 454 (CCPA 1982). "[T]he fact that a reference does not list any co-inventors as authors, or that it lists other authors, is certainly not dispositive in itself." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 969 (Fed. Cir. 2014); MPEP § 2132.01 (II) ("[a]n inventor's or at least one joint inventor's disclosure of his or her own work within the year before the application filing date cannot be used against the application as prior art under pre-AIA 35 U.S.C. 102(a)."). A common inventive entity may still exist even where a co-inventor is not listed as an author on the purported prior art reference. *See, e.g., Trans Ova Genetics, LC v. XY, LLC,* IPR2018-00250, paper 35, at 7-8, n. 8 (PTAB Jun. 26, 2019). The relevant inquiry is whether the co-authors that are not listed as inventors on the '793 patent invented the portions of the reference relied upon as prior art. *Cellco Partnership v. Bridge and Post, Inc.*, IPR2018-00054, paper 40, 20 (PTAB Apr. 15, 2019) (citing *In re Land,* 368 F.2d 866, 878 (CCPA 1996) and *In re DeBaun*, 687 F.2d 459, 462-63 (CCPA 1982)).

The declarations of inventors Drs. Seeger and Roscigno, together with the deposition testimony of Dr. Rubin and the corroboration provided by non-inventor Dr. Ghofrani, establish that the relevant portion of the Ghofrani reference was

45

reduced to practice by the present inventors prior to the publication date of the Ghofrani reference. EX2071, ¶5; EX2074, ¶8.  In addition, Dr. Roscigno confirms and identifies corroborating regulatory documents demonstrating that the inventors had conceived of and reduced to practice all limitations of the independent claims by 2003, and certainly no later than January 2005.  EX2061, ¶¶16-17 (citing EX2062-EX2064). Certainly, the inventors had reduced to practice at least the limitations alleged in Ghofrani by the end of 2003 and no later than January 2005. *Id.* at ¶14-15.  The same is true in relation to Voswinckel 2006.  Accordingly, Ghofrani and Voswinckel 2006 are not qualifying prior art.

### 1.    Ghofrani

Ghofrani is a review article, published in German, describing "New therapies in the treatment of pulmonary hypertension."  In addition to describing recent developments relating to inhaled treprostinil, the review article also describes other "new therapy approaches, which are partially still under development, and that can find their way into the therapy guidelines in the near future" including inhaled iloprost, selective endothelin A receptor antagonists (sitaxsentan and ambrisentan), and PDE5-inhibors (e.g., sildenafil).  EX1010, 297.

The Ghofrani review article was co-authored by Drs. Seeger and Voswinckel (inventors of the '793 patent) as well as Drs. Ghofrani, Reichenberger, and Grimminger (non-inventors).  Drs. Seeger and Voswinckel testified that they

46

contributed to portions of the Ghofrani review article relating to inhaled iloprost and inhaled treprostinnil. *See* EX2066, 3 (IPR2017-01621, EX2020) (Seeger Decl.). Drs. Ghofrani, Reichenberger, and Grimminger have each submitted declarations stating that they did not contribute to the sections of the Ghofrani review article relating to the studies on inhaled treprostinil. EX2004, ¶ 5; EX2005, ¶ 5; EX2006, ¶ 5; *see also* EX2067-EX2069 (IPR2017-01621 and -01622) (Ghofrani, Grimminger, Reichenberg Decls.) (EX2026, EX2099, EX2028, EX2027). Further, Drs. Ghofrani, Reichenberger, and Grimminger have each declared that they did not design the inhaled treprostinil clinical trials and that the information on the clinical trials mentioned in the Ghofrani article were designed and conducted by Drs. Voswinckel and Seeger based on their work with Drs. Olschewski, Rubin, Schmehl, Sterritt, and Roscigno. *Id.*

Instead, Drs. Ghofrani, Reichenberger, and Grimminger contributed to other sections of Ghofrani not relevant to the Petitioner's grounds for *inter partes* review. Dr. Ghofrani stated that his contribution was to the section on phosphodiesterase inhibitors. EX2004, ¶4. Dr. Ghofrani has experience in the use of phosphodiesterase inhibitors for treatment of pulmonary hypertension. *Id.* His contribution to the Ghofrani publication was drafting the section of the article relating to phosphodiesterase inhibitors and jointly drafting the sections on vasoactive therapy, inhaled iloprost, combination therapies, and treatment of early forms of treatment of

47

pulmonary hypertension, as well as the introduction. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Liquidia. *Id.* at ¶¶4-6.

Dr. Reichenberger stated that his contribution was to the section on selective endothelin A receptor antagonists. EX2005, ¶4. Dr. Reichenberger has experience in the use of selective endothelin A receptor agonists for treating pulmonary hypertension. *Id.* His contribution to Ghofrani was jointly drafting the section on selective endothelin A receptor agonists with Dr. Grimminger. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Liquidia. *Id.* at ¶¶4-6.

Dr. Grimminger stated that his contribution was also to the section on selective endothelin A receptor antagonists. EX2006, ¶4. Dr. Grimminger has experience in the use of selective endothelin A receptor agonists for treating pulmonary hypertension. *Id.* His contribution to Ghofrani consisted of jointly drafting the section on selective endothelin A receptor agonists with Dr. Reichenberger. *Id.* His work was limited to these sections, and he did not contribute to the portion of Ghofrani relied upon by Petitioner. *Id.* at ¶¶4-6.

As noted in *In re Katz*, "authorship of an article by itself does not raise a presumption of inventorship with respect to the subject matter disclosed in the article. Thus, co-authors may not be presumed to be co-inventors merely from the

48

IPR2021-00406
U.S. Patent No. 10,716,793 B2

fact of co-authorship." 687 F.2d at 455. The explanations provided by Seeger and *each of the non-inventor co-authors* – Drs. Seeger, Ghofrani, Reichenberger, and Grimminger – is consistent not only with the content of the article, but also with the nature of the publication, *i.e.*, a review article summarizing different advances in the treatment of pulmonary hypertension. *Id.* (accepting the Appellant's explanation "consistent not only with the content of the article but with the nature of the publication"). From such a fact pattern, joint inventorship with Drs. Ghofrani, Reichenberger, and Grimminger cannot be inferred.

Further, Petitioner appears to accept UTC's explanation for why Drs. Ghofrani, Reichenberger, and Grimminger are not inventors of the relevant subject matter of Ghofrani based on declarations submitted by these authors in IPR2017-01621. *See,* Pet. at 26 ("PO encountered this issue in IPR2017-01621 and IPR2017-01622 and submitted an affidavit attesting that these authors did not contribute to the relevant portion of Ghofrani. *See* IPR2017-01621; Paper 10 at 12-14; IPR2017-01622, Paper 9 at 12-15.")

Nonetheless, Petitioner contends that because "Olschewski, Rubin, Schmehl, Sterritt, and Roscigno were not listed as authors on the Ghofrani article"[11] there is an "inference that they did not make any contribution to Ghofrani's disclosure." *Id.* at 27. This distinction between authorship and inventorship is legally irrelevant. The fact that a reference does not list certain co-inventors as authors is not dispositive on the issue of whether a prior art reference is the work of another. *See, e.g., Allergan, Inc. v. Apotex Inc.*, 754 F.3d at 969. There is no requirement that every listed inventor on the '793 patent be listed as a co-author to disqualify a reference under § 102(a) as not by another. *See, e.g., Trans Ova Genetics, LC v. XY, LLC,* IPR2018-00250, Paper 35 at 7-8, n. 8. The relevant inquiry is whether the co-authors that are not listed as inventors on the '793 patent invented the portions of the reference relied upon as prior art. *See, e.g., Cellco Partnership v. Bridge and Post, Inc.*, IPR2018-00054, Paper 40 at 20.

Here, the declaration of Dr. Seeger explains that these other co-inventors helped design the development program for the claimed invention of the '793 patent including designing the pilot and pivotal trials, which resulted in three clinical

---

[11] Robert Roscigno is a named inventor of the '793 patent, and was later employed as an executive of, and is currently a consultant for, Liquidia. Petitioner failed to present *any* evidence on these points.

studies that became the basis of the patent application leading to the '793 patent. EX2003, ¶¶12, 22-27. Many of the specific parameters used in these studies performed by the co-inventors were not fully reported in Ghofrani. *Id.* at ¶¶11-12. In addition, Dr. Roscigno further confirms and corroborates that the clinical trials underlying the relevant portions of Ghofrani were conceived by the named inventors and not by the non-inventor co-authors of these references. EX2061, ¶¶12-17. Accordingly, the absence of these co-inventors as authors on the Ghofrani review article is irrelevant to whether Ghofrani is "by another."

### 2. Voswinckel 2006

Voswinckel 2006 is a short "Clinical Observation" published in the Annals of Internal Medicine, titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," which describes clinical observations on three patients with severe pulmonary hypertension, who were treated with administration of a single 15 μg dose of treprostinil, inhaled in three breaths through a modified Optineb ultrasonic inhalation device.

Voswinckel 2006 was co-authored by Drs. Seeger, Voswinckel, and Dr. Olschewski (inventors of the '793 patent) as well as Drs. Ghofrani and Grimminger (non-inventors). Drs. Ghofrani and Grimminger have each submitted declarations stating that they did not contribute to design or control of the clinical trial described in Voswinckel 2006, and that all of the work performed by Drs. Ghofrani and/or

51

Grimminger was at the direction of or under the supervision and control of Drs. Seeger, Voswinckel, and Olschewski.  EX2004, ¶¶7-12; EX2006, ¶¶7-12; *see also* EX2070, ¶6; EX2065.  A publication is not the work of another where the work described was performed solely at the direction and supervision of the listed inventor(s).  *See In re Katz,* 687 F.2d at 450, 455-456 (holding that a publication that identified an inventor and two students as authors was not the work of others, and thus not prior art, because the work performed by students in "testing features of the invention" was performed under the direction and supervision of the inventor); *see also CSL Behring LLC v. Bioverative Therapeutics Inc.,* IPR2018-01313, paper 10, 11 (PTAB Jan. 9, 2019) (holding a publication is not the work of another where the patent owner can show that the non-inventor co-authors "carried out experiments under [the inventor's] direction and control," and that it was the inventor who "designed and lead the … project, and experiments performed by the co-authors.").

As set forth in the declarations, the dosage amounts of administered inhaled treprostinil to give to patients, the inhalation time and/or number of breaths employed, the particular equipment and administration devices and methods to use, the spacing between inhalation events, the analysis of the hemodynamic and pharmacokinetic effects over time in the study with inhaled treprostinil were all determined Drs. Seeger, Voswinckel, and/or Olschewski.  Drs. Ghofrani and Grimminger did not participate in the design of any of the studies, did not select the

52

dosing regimen, and did not conduct analysis of patient results discussed in Voswinckel 2006.  EX2004, ¶¶11-12; EX2006, ¶¶11-12.

As explained in the declarations of Drs. Seeger, Ghofrani, and Grimminger, it was standard practice within the group to include *all* group members as authors on clinical observation reports such as Voswinckel 2006, even when that group is broader than the individuals actually involved in inventing the methods or devices and designing the trials disclosed in that publication.  EX2003, ¶21; EX2004, ¶¶10-11; EX2006, ¶¶10-11.  This explanation is consistent with industry practice for publishing clinical observation reports such as this one.  Joint inventorship with Ghofrani and Grimminger cannot be inferred in these circumstances.

Petitioner contends that "Olschewski, Roscigno,[12] Rubin, Schmehl, and Sterritt are identified as inventors of the '793 patent, but are not authors of Voswinckel 2006."  Pet., 29.  As a preliminary matter, UTC notes that Dr. Olschewski is an author on Voswinckel 2006.

Petitioner is also incorrect to state that, because these other co-inventors "are not authors on Voswinckel 2006, [this] supports the inference that they did not make any contribution to that disclosure."  Pet. at 29.  As discussed above with respect to Ghofrani, this fact is legally irrelevant.  The fact that a reference does not list certain

---

[12] *See* footnote 4, above.

co-inventors as authors is not dispositive on the issue of whether a prior art reference is the work of another. *See, e.g., Allergan, Inc. v. Apotex Inc.*, 754 F.3d at 969. Rather, as is the case here, the non-author co-inventors, contributed to aspects of one or more of the claimed inventions, not disclosed by the publication that Petitioner is relying on.

Here, Dr. Seeger explains that these co-inventors helped design the development program for the claimed invention of the '793 patent including designing the pilot and pivotal trials, which resulted in three clinical studies that became the basis of the patent application leading to the '793 patent. EX2003, ¶¶19-20, 22-27. Many of the specific parameters used and the particulars of these studies performed by the co-inventors were not fully reported in Voswinckel 2006 (for example, the particular details of the "*modified* OptiNeb® ultrasonic device"). *Id.* at ¶19. In addition, Dr. Roscigno further confirms and corroborates that the clinical trials underlying the relevant portions of Voswinckel 2006 were conceived by the named inventors and not by the non-inventor co-authors of these references. EX2061, ¶¶12-17. Accordingly, the absence of these co-inventors as authors on Voswinckel 2006 is not dispositive on the issue.

## V.    OBJECTIVE INDICIA OF NONOBVIOUSNESS

There are a number of secondary considerations that establish that the claims of the '793 patent are not obvious as of the priority date, including unexpected results, copying and unmet need.

### A.    Unexpected Results

For the reasons discussed above, Petitioner has failed to establish a prima facie case of obviousness under any one of Grounds 1-6.  Moreover, the specification teaches the claimed single event dose of "15 micrograms to 90 micrograms of treprostinil" "delivered in 1 to 3 breaths" unexpectedly achieved a therapeutically effective dose that was well tolerated which further supports non-obviousness of the claimed inventions.  A claimed dosage regimen as claimed in the '793 patent is non-obvious where it "produce[s] a new and unexpected result which is different in kind and not merely in degree from the results of the prior art."  *In re Aller*, 220 F.2d 240, 456 (CCPA 1955); *E.I. DuPont de Nemours & Company v. Synvina C.V.,* 904 F.3d 996, 1007 (Fed. Cir. 2018); *In re Geisler,* 116 F.3d 1465, 1471 (Fed. Cir. 1997). Further, said critical range may be non-obvious, where the prior art taught away from the claimed range.  *Ormco Corp. v. Align Technology, Inc*, 463 F.3d 1299, 1311 (Fed. Cir. 2006).  Here, high doses of treprostinil were known in the art to produce dose-limiting side effects.  As a result, a POSA would not have expected such dosage ranges delivered in just a few breaths to be well tolerated.  EX2061, ¶¶11, 14-16

55

(citing IPR2017-01622, EX2049, EX2050, EX2051) (inventors "discovered unexpectedly that [they] could deliver more treprostinil in a shorter period of time with fewer side effects (increasing the treprotinil [sic] dose more than 10-fold compared with iloprost…was not obvious to anyone")).

Prostacyclin analogues were known to produce dose limiting adverse side effects.   EX2036.   For example, intravenous epoprostenol and intravenous treprostinil can induce headache, nausea, chest pain, jaw pain, backache and restlessness at certain concentrations.   *Id*.   EX2037 teaches that the maximum tolerated dose for intravenous treprostinil is 24.6 ± 4.0 ng/kg/min.   Based on Dr. Hill's assumptions for a person's weight between 60 and 65 kg, the average maximal tolerated dose would have been between 1.47 micrograms/min and 1.59 micrograms/min.   Even if a person were to take an entire minute to inhale the one to three breaths, the dosage of 15 micrograms to 90 micrograms, would be an order of magnitude larger than what was considered the maximal tolerated dose.   *See also* EX2055, 113:23-114:10 (testifying that if he applied the calculation described in paragraph 100 of his report to the maximal tolerated dose of intravenous treprostinil the maximal tolerated dose of inhaled treprostinil should be 53.125 micrograms).

As of the priority date, only one approved inhalation therapy for the treatment of pulmonary hypertension – Ventavis® (iloprost) – was available.   EX1029. Ventavis® was approved for a single event dose of 2.5 micrograms or 5 micrograms

to be taken 6 to 9 times per day.  Even at these doses, at least 39% of patients experienced at least one adverse event.  *Id.* at 8.  The Ventavis® label further teaches – in a study where health volunteers were given inhaled doses of iloprost solution every 2 hours increasing from 5 mcg to up to 20 mcg – 32% of subjects failed to reach the highest scheduled dose.  Both iloprost and treprostinil are prostacyclin analogs.  A POSA reading the iloprost label, would not have thought that dosages as high as 15 micrograms to 90 micrograms delivered in 1 to 3 breaths would have been well tolerated.

###    B.    Copying

Petitioner's deliberate copying of Tyvaso®, Patent Owner's commercial product embodying the claimed invention, is further evidence of nonobviousness of the claimed inventions.  *Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1136 (Fed. Cir. 2019) (copying by a competitor is evidence of nonobviousness) (citing *Iron Grip Barbell Co. v. USA Sports, Inc.,* 392 F.3d 1317, 1325 (Fed. Cir. 2004)).  Petitioner's commercial product is referred to in its press releases, corporate filings, patents and publications as LIQ861.  LIQ861 is an inhaled, dry-powder formulation of treprostinil.  It comes in four "capsule strengths" ranging from approximately 25 to 100 micrograms.  EX2084.  In clinical trials, LIQ861 has been administered using the Plastiape RS00 Model 8 dry powder inhaler in 2 breaths per capsule.  *Id.* at 2.  The pharmacokinetics and bioavailability of a 79.5 microgram capsule dose (which

57

delivers a single event dose of approximately 58.1 micrograms) was directly compared with Patent Owner's commercial product. EX2085. This study demonstrated that Petitioner's commercial product had comparable treprostinil bioavailability with Tyvaso® when delivered in a similar dosage range. *Id.* at Abstract, 5; *see also* EX2036.

Evidence of copying is further supported by Petitioner's patent filings, which disclose that LIQ861 can deliver a single event dosage of treprostinil between 15 micrograms to 90 micrograms in 1 to 3 breaths. EX2088. Finally, Petitioner has chosen to submit an NDA to the FDA for LIQ861 under the 505(b)(2) regulatory pathway with Tyvaso® as the reference listed drug – relying in part on FDA's previous findings of efficacy and safety of Tyvaso® for the treatment of PAH. EX2089, 3.

**Comparison of Claims of '793 Patent to LIQ861**

| Claim 1 | LIQ861 |
|---------|--------|
| 1. A method of treating pulmonary hypertension comprising | "***LIQ861 is*** an investigational, inhaled, dry-powder formulation of treprostinil…***for the treatment of PAH***" EX2084, 2<br><br>"Based on these results, a phase 3 study (INSPIRE; Clinicaltrials.gov Identifier NCT03399604) evaluating the long-term safety and tolerability of ***LIQ861 in patients with pulmonary arterial hypertension*** was initiated." EX2084, Abstract |

58

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| | |
|---|---|
| administering by inhalation to a human suffering from pulmonary hypertension | "***LIQ861*** is an investigational, ***inhaled***, dry-powder formulation of treprostinil…"<br>    EX2084, 2 |
| a therapeutically effective single event dose of a formulation | "***LIQ861*** has the potential to overcome the limitations of current inhaled therapies and to maximize the therapeutic benefits of treprostinil for the treatment of PAH by safely delivering high doses into the lungs in ***one to two breaths***."<br>    EX2084, 2<br><br>"***LIQ861***…safely delivering doses to the lungs ***in 1 to 2 breaths***."<br>    EX2085, Abstract |
| comprising treprostinil or a pharmaceutically acceptable salt thereof | "***LIQ861 is*** an investigational, inhaled, dry-***powder formulation of treprostinil***…"<br>    EX2084, 2 |
| with an inhalation device, | "LIQ861 is an investigational, inhaled, dry-powder formulation of treprostinil designed using Liquidia's PRINTVR technology (Particle Replication in Nonwetting Templates), aiming to enhance deep-lung ***delivery using a convenient, palm-sized dry-powder inhaler (DPI)***, the Plastiape RS00 Model 8 Device, for the treatment of PAH."<br>    EX2084, 2 |
| wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of | "…treprostinil exposure from LIQ861 (79.5 µg capsule [approximate delivered dose of 58.1 µg treprostinil])…"<br>    EX2085, Abstract |

59

| | |
|---|---|
| treprostinil or a pharmaceutically acceptable salt thereof | |
| delivered in 1 to 3 breaths. | "***LIQ861*** has the potential to overcome the limitations of current inhaled therapies and to maximize the therapeutic benefits of treprostinil for the treatment of PAH by safely delivering high doses into the lungs in ***one to two breaths***."    EX2084, 2<br><br>"***LIQ861***…safely delivering doses to the lungs ***in 1 to 2 breaths***."    EX2085, Abstract |
| **Claim 4** | **LIQ861** |
| 4. The method of claim 1, | *See* above |
| wherein the inhalation device is a dry powder inhaler. | "LIQ861 is an investigational, inhaled, dry-powder formulation of treprostinil designed using Liquidia's PRINTVR technology (Particle Replication in Nonwetting Templates), aiming to enhance deep-lung ***delivery using a convenient, palm-sized dry-powder inhaler (DPI)***, the Plastiape RS00 Model 8 Device, for the treatment of PAH."    EX2084, 2 |
| **Claim 6** | **LIQ861** |
| 6. The method of claim 4, | *See* above |
| wherein the formulation is a powder. | "***LIQ861*** is an investigational, inhaled, ***dry-powder formulation*** of treprostinil…"    EX2084, 2 |
| **Claim 7** | **LIQ861** |
| 7. The method of claim 6, | *See* above |

60

| wherein the powder comprises particles less than 5 micrometers in diameter. | "LIQ861 particles are a precise, uniform size (1µm) and trefoil pollen-like shape." Roscigno, Poster presentation at the Pulmonary Vascular Research Institute (PVRI) 12th Annual World Congress, Jan. 2018. Available online here. |
| --- | --- |

### C.    Long-Felt Unmet Need

The claimed invention of the '793 patent satisfies a long-felt unmet need in the treatment of pulmonary hypertension.  *See, e.g., Proctor & Gamble Co. v. Teva Pharmaceuticals USA, Inc.,* 566 F.3d 989, 998 (Fed. Cir. 2009) ("Secondary considerations of non-obviousness include . . . [the claimed invention's] satisfaction of a long-felt need.").  *First*, inhaled treprostinil is indicated for a broader range of pulmonary hypertension patients than the therapeutics available at the time.  *Second,* even for the treatment of pulmonary arterial hypertension, many patients found the existing therapies either intolerable or ineffective.

Inhaled treprostinil is currently approved for pulmonary arterial hypertension and pulmonary hypertension associated with interstitial lung disease.  *Compare* EX2034 (2021 Tyvaso® label) *with* EX1018.  The '793 patent further suggests that inhaled treprostinil in doses of 15 to 90 micrograms may also be effective for other types of pulmonary hypertension.  *See, e.g.,* EX1001, 9:44-50 (explaining that the study described in example 1 included patients with idiopathic PAH, PAH other,

61

chronic thromboembolic pulmonary hypertension (CTEPH) and pulmonary fibrosis).

As of May 2006 – in fact, even as of January 28, 2021 – no therapies were approved for the treatment of pulmonary hypertension in patients with interstitial lung disease.  EX2060, 325.  As Petitioner's own expert acknowledged, there is "a completely unmet medical need" where "[t]here [is] nothing that these patients were getting as a therapy for their problems."  EX2056, 105:6-8 (discussing the unmet need provided by Pulmozyme).

Even where other therapies had been approved, for example, for the treatment of pulmonary arterial hypertension, there still existed a need for the inhaled dosing regimen described in the claims of the '793 patent.  By Petitioner's own admission, the claimed invention of the '793 patent satisfies a long-felt unmet need.  EX2089, F-7.  In promoting its own product, LIQ861 – which infringes and is an embodiment of the claimed invention, Petitioner touts that the claimed invention as embodied by LIQ861 satisfies a long-felt unmet need.  EX2085. ("Given the comparable treprostinil bioavailability and similar safety profiles of LIQ861 and Tyvaso®, LIQ861 fulfills a significant unmet need for PAH patients by maximizing the therapeutic benefits of treprostinil by safely delivering doses to the lungs in 1 to 2 breaths using a discreet, convenient, easy-to-use inhaler").

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## VI.  CONCLUSION

For the foregoing reasons, the claims are patentable over the cited grounds,

and Petitioner has not carried its burden to prove unpatentability.

Respectfully submitted,

Date November 10, 2021                By /Stephen B. Maebius/
FOLEY & LARDNER LLP                   Stephen B. Maebius
3000 K St., NW                        Registration No. 35,264
Washington Harbour
Washington, DC 20007
Telephone: (202) 672-5569
Facsimile: (202) 672-5399

63

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

LIQUIDIA TECHNOLOGIES, INC.,

Petitioner

v.

UNITED THERAPEUTICS CORPORATION,

Patent Owner

———————————

IPR2021-00406
U.S. Patent No. 10,716,793 B2
Issue Date: July 21, 2020

Title: Treprostinil Administration by Inhalation

———————————

**REPLY IN SUPPORT OF PETITION FOR *INTER PARTES* REVIEW
OF U.S. Patent No. 10,716,793 B2**

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

Voswinckel JESC ("JESC") and Voswinckel JAHA ("JAHA") were publicly
accessible before 2006, and grounds 1 and 2 render obvious the '793 Patent's
claimed dosage.  Petitioner thus requests the Board find claims 1-8 unpatentable.

## I.    GROUND 1: CLAIMS 1-8 ARE OBVIOUS OVER THE '212 PATENT, JESC, AND JAHA

### A.    JESC and JAHA Were Publicly Accessible Before 2006

"A reference will be considered publicly accessible if it was 'disseminated or
otherwise made available to the extent that persons interested and ordinarily skilled
in the subject matter or art exercising reasonable diligence, can locate it.'" *Blue
Calypso v. Groupon*, 815 F.3d 1331, 1348 (Fed. Cir. 2016).

PO's evidence that the JESC and JAHA references were not publicly
accessible comes from a single unqualified "expert" Pilar Wyman.  (EX2041,
EX2042.)  Wyman lacks relevant library or research-related degrees, is not a "trained
librarian," has never assessed the public accessibility of a document outside of this
IPR and an IPR on a related patent, never worked in a research library or library that
generated MARC records, or done any indexing relevant to public availability.  (*See*
EX1112, ¶¶28-32; EX1110, 49:13-19, 27:15-20, 50:22-53:11.)   Her lack of
qualifications is apparent from her mistakes and disregard of contradictory evidence
known to her, detailed below.  Accordingly, her opinions should be accorded "little
weight." *Elbit Sys. of Am. v. Thales Visionix*, 881 F.3d 1354, 1358 (Fed. Cir. 2018).

1

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

## 1. JESC was publicly accessible before 2006

JESC was published by Elsevier, an established publisher since 1880.[1]
(EX1089, 4; 1112, ¶88.) "When there is an established publisher there is a
presumption of public accessibility as of the publication date." *VidStream v. Twitter*,
981 F.3d 1060, 1065 (Fed. Cir. 2020).

Additionally, a reference can qualify as a "printed publication" if publicly
presented, independent of whether that presentation was further distributed, or
meaningfully indexed. *See, e.g.*, *In re Klopfenstein*, 380 F.3d 1345, 1350-52 (Fed.
Cir. 2004); *Ecolochem v. S. Cal. Edison*, 227 F.3d 1361, 1369 (Fed. Cir. 2000);
*Mass. Inst. of Tech. v. AB Fortia*, 774 F.2d 1104, 1109 (Fed. Cir. 1985); MPEP
§2128.01(IV). As the supplement cover shows, the JESC abstract was presented at
the European Society of Cardiology (ESC) Congress. (Pet.22; EX1007, 1-2.) The
page where the abstract appears states it was presented on August 29, 2004 as an
abstract on "Epidemiology and treatment of pulmonary arterial hypertension."
(EX1007, 2.) It is undisputed the conference was widely attended by POSAs.
(EX1105, 19 (conference had 24,527 attendees, including 18,413 professionals);
EX1106, ¶28; EX1108, 117:4-13.) Both parties' experts agree that a POSA would

---

[1] *See* https://www.elsevier.com/about.

2

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

have received a copy of the abstract book prior to or at the meeting. (*See* EX1106, ¶28; EX1108, 105:20-108:1.) Both experts agree that a POSA would have been interested in treatments for pulmonary hypertension, including pulmonary arterial hypertension ("PAH"), and would have been interested in the session in which JESC was presented. (*See* EX1106, ¶29; EX1108, 104:10-20.)

Contrary to PO's argument (POR15-16), PO's expert testified that a POSA would have been able to find the JESC abstract within the supplement in which it appears. (EX1108, 104:22-105:15.) This is at least because the supplement (1) had a short table of contents, in which JESC could be found as one of just five abstracts under the subject "Epidemiology and treatment of pulmonary arterial hypertension" (EX1007, 2, 7; Pet.22 (citing EX1036, ¶67)), and (2) was indexed by topic, with JESC appearing as one of two lines of abstracts listed under the subject "Therapy (Pulmonary circulation)" (EX1092, 10). The table of contents was only five pages, with the relevant topic on the first page (EX1007, 2), and the topic index only nine pages. (EX1092, 2-10.) A POSA would have been interested in these topics (*see, e.g.*, EX1110, 156:3-6), and looked for and easily found the abstract within the supplement. (EX1106, ¶¶29, 32; EX1112, ¶¶87, 90.) Accordingly, JESC was made publicly available based on the conference. (EX1112, ¶92.)

Additionally, JESC was cited in the June 2005 Ghofrani article in the journal *Herz* (EX1010, 298, 301), an article that was publicly accessible (a point PO does

not dispute).  (EX1036, ¶¶47-55; EX1112, ¶89.)  An interested POSA would have

relied on Ghofrani's disclosures to seek other references on the treatment of PAH

(EX1106, ¶30) and would have been able to access the JESC abstract—by exercising

no more than reasonable diligence—before May 15, 2006.  *See Bruckelmyer v.

Ground Heaters*, 445 F.3d 1374, 1379 (Fed. Cir. 2006); *Blue Calypso*, 815 at 1350

(citation to article can establish public accessibility).

At the time of the '793 Patent, "the number of physicians and researchers

working [in the PAH space] was small," and a POSA would have "known the names

of the other physicians and researchers" working in the space and sought their

publications and presentations.  (EX1106, ¶¶27, 29, 33-34.)  A POSA would have

known of JESC authors—members of a research group in Germany working on

inhaled therapies for treating PAH, including the only FDA-approved therapy at the

time (iloprost)—and would have sought further work by these authors, including

JESC.  (*Id.*; EX1065; EX1108, 79:5-12, 124:18-125:5.)

Petitioner has shown the abstract was publicly accessible by indexing and

cataloguing by public libraries.  Dr. Hall-Ellis, a seasoned expert in library sciences

(EX1036, ¶¶7-10) provided MARC record analysis demonstrating issues of the

*European Heart Journal*, in which JESC was published, were regularly received and

kept at least at the University of Iowa libraries.  (EX1036, ¶¶69-75.)  PO's argument

that journal supplements were irregular and not received by libraries (POR12-14) is

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

belied by Hall-Ellis's original declaration, which identified a copy of the abstract
from University of Wisconsin-Madison's library with a receipt date of October 15,
2004. (EX1036, 37 n.22.) PO's assertion that the journal's MARC record is
irrelevant to supplements (POR14) is also incorrect—the journal's MARC record
has fields showing the journal had supplements, and as such, libraries subscribing to
the journal would be expected to hold every supplement as part of their routine
business practice*,* including the 2004 JESC Supplement, since February 1980.
(EX1112, ¶¶70-78.)[2]

PO's attempt to suggest the abstract, by virtue of being contained in a "special
supplement[]" rather than a "normal issue[]," may have been "publish[ed] *years
after the conference* in question" (POR13) is rebutted by (1) Wyman's testimony
that she would expect "urgency" in publishing abstracts from a medical conference
(EX1110, 130:14-131:3, 125:13-126:18), and (2) additional copies of the same
abstract, received by three different libraries, all date-stamped as received in 2004.

---

[2] Additionally, PO's assertion that the JESC Supplement does not appear in the
*European Heart Journal* online archive is false. PO's "expert" acknowledged the
supplement is listed on the journal's online archive as "Volume 25, Issue suppl_1,
September 2004." (*See* EX1110, 139:21-141:2; EX2049, 3; EX1112, ¶¶68-69.)

5

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

(EX1089; EX1090; EX1091; EX1112, ¶¶65, 78-86; EX1106, ¶31; EX1110, 58:13-17 (Wyman testifying that date stamps signify when a periodical is received by a library).)[3]  Record evidence conclusively demonstrates that JESC was publicly accessible through multiple libraries by 2004.

### 2.     JAHA was publicly accessible before 2006

The record evidence similarly establishes that JAHA was publicly accessible before May 15, 2006.  In fact, the Patent Office used JAHA to reject claims of U.S. Patent No. 10,376,525, to which the '793 Patent is terminally disclaimed.  (Pet.9; EX1016, 40.)  Moreover, JAHA was published by Lippincott Williams & Wilkins, an established publisher of the Wolters Kluwer conglomerate since 1998.[4]  (EX1095, 7, 14; EX1112, ¶61.)  *VidStream*, 981 F.3d at 1065.

Additionally, the journal supplement cover in which JAHA appears shows the abstract was publicly presented at the 2004 Scientific Sessions of the American Heart Association, another conference widely attended by POSAs.  (EX1008, 1;

---

[3] All EX1007 citations herein are supported by the identical text in these copies.

[4] *See* https://www.wolterskluwer.com/en/solutions/lippincott-journals; https://www.bioprocessonline.com/doc/lippincott-williams-wilkins-a-wolters-kluwer-0001.

6

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

EX1106, ¶¶21-23; EX1108, 116:4-21; EX1112, ¶¶36, 63.)  Both parties' experts

agree the conference's programs and supplements would have been provided for

POSAs to identify abstracts on subject matter of interest, and POSAs in possession

of the supplement would have been able to identify the abstract within the

supplement. (EX1106, ¶¶21-23, 27; EX1108, 108:3-20, 111:11-19.) A POSA could

do so because the supplement was indexed alphabetically by author, and JAHA

(Abstract 1414) was indexed under both "Voswinckel, Robert" and "Seeger,

Werner." (EX1095, 16; EX1113, 5.) These authors were well-known in the small

field, and an interested POSA would have sought their work. (EX1106, ¶27;

EX1065; EX1108, 79:5-12, 124:18-125:5.)  Thus, JAHA was publicly available

based on the conference alone. *See, e.g.*, *Klopfenstein*, 380 F.3d at 1350-52;

*Ecolochem*, 227 F.3d at 1369; *Mass. Inst.*, 774 F.2d at 1109; MPEP §2128.01(IV).

JAHA was cited in other articles before 2005, evidencing public availability

of the abstract and a POSA's ability to use those articles as research aids to locate

the abstract through reasonable diligence. JAHA was cited by a March 2005 article

authored by Roxana Sulica et al. in the *Expert Review of Cardiovascular Therapy*.

(EX1104 ("Sulica"), 359.)  Sulica was itself indexed and easy-to-find. (EX1112,

¶62.)  The Sulica authors were able to access JAHA in 2005 and directed their

readers to it. An interested POSA would have relied on Sulica's disclosures to seek

other references on the treatment of PAH (EX1106, ¶¶25-26), and would have been

7

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

able to access JAHA with Sulica as a research aid (EX1112, ¶62; EX1110, 122:9-

12, 119:11-18 (PO's expert agreeing)) before 2006.  *See Bruckelmyer*, 445 F.3d at

1379.

PO's argument that supplements to the journal were irregular and not received

by libraries is belied by Hall-Ellis's original declaration, which identified a copy of

the abstract from the British Library with a receipt date of November 22, 2004.

(EX1036, 31 n.21; EX1110, 83:16-19, 85:10-21 (PO's "expert" admitting having

seen this date-stamped copy); EX1112, ¶37.)  PO's assertion that the journal's

MARC record is irrelevant to supplements (POR14) is also incorrect—the journal's

MARC record has fields showing the journal had irregular supplements, and libraries

subscribing to the journal held every supplement, including the 2004 supplement,

since 1950.  (EX1112, ¶¶40-48.) [5]

PO's further attempt to suggest the abstract, by virtue of being contained in a

"special supplement[]" rather than a "normal issue[]," may have been "publish[ed]

*years after the conference* in question" (POR13) is rebutted by (1) the "urgency" in

publishing abstracts from a medical conference (EX1110, 130:14-131:3, 125:13-

---

[5] Additionally, PO's assertion that this supplement does not appear in the *Circulation*

online archive is false.  (*See* EX1112, ¶39.)

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

126:18), and (2) additional copies of the same abstract, received by four different

libraries around the world, all date-stamped as received in 2004.  (EX1093-EX1096;

EX1112, ¶¶33, 48-58; EX1106, ¶24.)[6]  Record evidence conclusively demonstrates

JAHA was publicly accessible through multiple libraries by 2004.

### B.    Claim 1's "Single Event Dose" of 15-90μg "delivered in 1 to 3 breaths" is Obvious Over Combination of the '212 Patent, JAHA, and JESC

PO "cannot show non-obviousness by attacking references individually"

(POR18-22) where, as here, Petitioner's grounds "are based on combinations of

references."  *See In re Keller*, 642 F.2d 413, 426 (C.C.P.A. 1981).[7]  There is no

dispute JAHA and JESC disclose therapeutically effective inhaled single event doses

of treprostinil (ID26; EX1108, 79:18-22, 82:10-16, 84:10-86:7, 93:14-94:21), or that

JAHA discloses the 1 to 3 breath limitation.  (EX1108, 84:22-86:7; *cf.* POR22.)  The

only substantive point of dispute is the 15-90μg dosage range, which, as detailed

below, is rendered obvious by the '212 patent and JESC.

---

[6] All EX1008 citations herein are supported by the identical text in these copies.

[7] Nonetheless, Hill addresses these reference-specific attacks in detail.  (EX1106,
¶¶37, 49-70.)

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

### 1.    JESC Renders Obvious 15-90µg Delivered Dosage

#### a.    Primary Calculation Is Based on POSA's Understanding of Volumes Delivered by Nebulizers in 2006

A POSA would understand that at least 1mL of treprostinil solution was delivered and inhaled over the 6 minute period disclosed in JESC, which at concentrations of 16, 32, 48, and 64 µg/mL, puts the delivered and inhaled dosage between 15 and 90µg. (EX1007, 7; Pet.22-24, 37-39; EX1106, ¶¶38, 42-43; EX1107, ¶¶18-21, 47-50.) Indeed, Dr. Waxman has never administered or overseen the administration of less than 1mL in a nebulizer for any inhaled drug, including for the treatment of pulmonary hypertension. (EX1108, 153:1-14, 156:12-16; *see also* EX1002, ¶65; EX1106, ¶42 (Dr. Hill's concurring experience).) Waxman also acknowledged that standard nebulizers used 3-5mL volumes as of 2006. (EX1108, 153:7-22.) Applying this volume, JESC's dosages would still be within 15-90µg. (EX1106, ¶42; EX1107, ¶¶19, 47.) Thus, based simply on the experience of both parties' clinicians, a POSA reviewing JESC would have understood JESC disclosed the claimed dose range.

PO argues that fill volume is not necessarily delivery volume, because liquid is lost between the fill chamber and what is delivered to JESC's nebulizer mouthpiece for inhalation. Gonda presented evidence that nebulizers at the time typically involved fill volumes of 1-5mL, a fact supported by PO's own reference

10

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

and Waxman's testimony. (EX1004, ¶56; EX2076, S94 ("Whilst the residual and maximum fill volumes are accurate, the percentage of solution nebulised at 5 and 10 minutes is the best figure obtainable. This has been obtained for a fill volume of 2-2.5 ml and is generally taken from data obtained with its retail compressor."), S96 (showing 9/10 nebulizers with 2-2.5mL fill volumes); EX1108, 153:7-22.) PO argues that JESC does not teach exhausting the fill volume of the nebulizer used in the study, so there is no guarantee that 1-5mL were actually delivered in 6 minutes. (POR30.) PO's argument is based entirely on improper use of the disclosed nebulizer, artificially attempting to create uncertainty where none exists. A POSA reading the abstract would assume the well-known authors used the nebulizer properly, including having enough fill volume to support 6 minutes of administration and instructing patients on proper use. (EX2055, 154:6-156:14, 162:4-163:1; EX1106, ¶¶43-45, 60; EX1108, 155:12-22.)

A POSA would understand that fill volume to be sufficient to deliver at least 1mL of solution for multiple reasons. First, per PO's expert, a POSA would know the fill volume of standard nebulizers was 3-5mL. (EX1108, 153:7-22; *see also* EX1107, ¶20 (citing EX2076, S94, S96 (9/10 nebulizers with 2-2.5 mL)).) At these

11

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

volumes, even assuming as high as 50% loss,[8] a POSA would still expect at least

1mL of treprostinil to be delivered to and inhaled by the patients in JESC. (EX1106,

¶41; EX1107, ¶20.)   In fact, then FDA-approved dosing included teachings of

*delivering* at least 1mL of solution. (*See, e.g.*, EX1050, 2 (Pulmozyme label teaches

dosing of a "single-use ampule inhaled once daily" where each ampule "*delivers*

2.5mL of ... solution") (emphasis added).)   Second, neither parties' practicing

clinician experts has *ever* prescribed delivery of less than 1mL of a nebulized

solution to their patients. (EX2055, 146:24-147:2; EX1108, 156:12-16.)  Third, a

POSA would have knowledge of the typical ultrasonic nebulizer output rates, all of

which support delivery of at least 1mL of solution over 6 minutes. (*See* EX1107,

¶25 (citing EX1097, 87 (0.33 mL/min delivery rate); EX1098, 71-73 (0.22-0.68

mL/min); EX1099, 280 (0.67-1.14 mL/min); EX1037, 28 (0.6mL/min)); *see also*

EX1107, ¶¶18-21, 47-50.)

PO additionally argues that "patient factors," gas flow and pressure, fill and

---

[8] This is a conservative loss estimate for an ultrasonic nebulizer.  PO, through its

expert McConville, relies on inapposite jet nebulizer art to assert a 9-90% loss range.

(EX1107, ¶¶22-23.)   McConville's only cited ultrasonic nebulizer art had an

efficiency of 86%. (*Id.*; EX1062, 3.)

12

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

dead volumes, gas density, humidity and temperature conditions, breathing pattern,

and device interface" are all factors that affect dosage delivery and are not discussed

by JESC. (POR21, 32, 44.)  As discussed above, the JESC authors were well-known

and experienced in delivering prostacyclins via inhalation—they were intimately

involved in developing iloprost and were sponsored by PO's subsidiary LungRx,

legitimizing to a POSA the reliability and propriety of the procedures used.

(EX1106, ¶44; EX1107, ¶27; EX1108, 79:5-17, 88:9-16, 92:16-19, 120:3-122:17.)

Thus, a POSA would expect (1) the JESC authors used the disclosed OptiNeb device

properly, and (2) the device accounts for these factors and produces consistent

delivery dosage either in line with, or more efficient than, the rates and volumes

typically delivered by nebulizers known at the time.  (EX1107, ¶¶22-27; EX2055,

154:6-155:10; *see also infra* n.10.)

Finally, a POSA would be motivated to look for ways to administer JESC's

dosing but in a fewer number of breaths, e.g., via the pulsed nebulizer disclosed in

JAHA, to increase patient compliance.  (Pet.32-34, 40.)  Any "delivery efficienc[y]

and pharmacokinetic[]" differences between continuous and pulsed nebulizers are

13

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

irrelevant, as both were capable of delivering the same dosage.  (*Cf.* POR32-33.)[9]

> **b.    POSA's Understanding of Volumes Delivered by Nebulizers in 2006 is Confirmed by OptiNeb Manual**

The above reasoning is independent of whether the OptiNeb manual is prior art or not.  Indeed, Hill relied on the manual only to confirm what he already knows from his years of practice: that multiple milliliters of solution would have been delivered to and inhaled by the patient over 6 minutes in JESC.  (EX1002, ¶¶67, 99 & n.3; EX1106, ¶63.)  This confirms the testimony of both parties' experts: standard nebulizers in 2006 delivered multiple milliliters (EX1002, ¶65; EX1004, ¶56; EX1106, ¶¶63-65; EX1107, ¶¶18-21, 47-48; EX1108, 153:8-22), and neither clinician expert has ever delivered less than 1mL to a patient in their decades of practice (EX2055, 146:24-147:2; EX1108, 156:12-16).  Nonetheless, Petitioner provided supplemental evidence with an affidavit from the Internet Archive establishing the manual was publicly available on the Internet as of July 18, 2004. (EX1087; EX1112, ¶¶10-14 (librarians rely on Internet Archive).)

The manual need not be the exact device used by the inventors or a device that Petitioner's experts used themselves—the inquiry is what a POSA would have

---

[9] In fact, Petitioner pointed out that a POSA would expect use of higher solution concentrations to achieve the same dosage in 1 to 3 breaths.  (Pet.33, 66 n.15.)

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

understood the reference to disclose.  (*Cf.* POR27.)  JESC describes an "OptiNeb ultrasound nebulizer" from the company Nebu-tec in Germany, and the publicly available OptiNeb manual matches this description.  (EX1037, 1, 2 (calling the product "OPTINEB" and describing it as an "Ultrasonic Nebuliser" "Made in Germany" by "NEBU-TEC").)  Thus, a POSA would reasonably have understood the authors to be referring to use of the particular device disclosed in the manual. (*See* EX1107, ¶¶24-25, 33, 42, 49; EX1106, ¶¶61-62.) [10]

## 2.    '212 Patent Renders Obvious 15-90µg Inhaled Dosing

The '212 patent, PO's own patent, teaches that "aerosolized [treprostinil] has a greater potency as compared to intravascularly administered [treprostinil]" since just 10-50% of the dose is actually delivered.  (EX1006, 8:8-12.)  A POSA reading this disclosure would understand that one need only deliver, by inhalation, 10-50%

---

[10] A POSA would not expect face mask or tubing use with the OptiNeb device in JESC, because such equipment was generally for children and patients on ventilators.  (EX1107, ¶¶17, 37, 54.)  A POSA would expect device design choices like baffle plates or operation frequency to not make a meaningful difference in delivery amount and to be accounted for in the manual's reported 0.6mL/min delivery rate.  (*Id.*, ¶53; EX1037, 28; *cf.* POR28-30.)

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

of the dosage to achieve the same effects.  (EX1002, ¶¶96, 100; EX1106, ¶¶47, 52-55.)

PO contends JAHA teaches 4 daily dosing events, so the '212 patent's daily dosage must be divided by 4.  (POR36.)  A POSA would understand the '212 patent's 10-50% adjustment to apply to all FDA-approved dosages of Remodulin® at the time.  As Hill explains, this would include following the label's instruction to up-titrate dosing over time: "infusion rate should be adjusted in increments of no more than 1.25ng/kg/min per week for the first four weeks and then no more than 2.5ng/kg/min per week for the remaining duration of the infusion, depending on clinical response." (EX1018, 9; EX2055, 174:2-21; EX1106, ¶53.) Therefore, even if Hill's originally calculated single event dose started at less than 15μg when divided by four (POR36-37), by the second week, the single event dose would undoubtedly reach the claimed 15-90μg range—i.e., the 58.5μg daily dose would double to 117μg, which divided by 4 is 29.25μg.[11]  (EX1106, ¶53.)  Hill's analysis is not a "new" theory of invalidity—it is the same calculation applied to dosing in

---

[11] PO's concern that up-titrating would eventually go past 90μg is irrelevant. (POR37.)  A POSA would first have to dose within the 15-90μg range before exceeding it.

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

the same Remodulin label relied on in the Petition, responsive to the Board's

Institution Decision, which PO had notice of and addressed in its POR. (Pet.38-39;

POR36-67.)[12]    That a POSA would understand the obviousness of this range is

confirmed by PO's 2003 reference (EX1106, ¶55 (explaining EX2036)), and the

'212 patent's disclosure of a 2.5 µg to 125mg daily range to treat peripheral vascular

disease, encompassing the full 15-90µg even when divided by 4.    (Pet.39 n.13;

EX1002, ¶100 n.4; EX1106, ¶¶50, 56 (explaining why a POSA would understand

dosing for peripheral vascular disease and pulmonary hypertension to be similar).)

The '212 patent's 10-50% disclosure is an overarching conclusion, untied to

any particular example.  PO cites to one example (POR34 (citing EX1006, 11:7-13))

where the same intravenous and aerosolized dosage was given to sheep, but that

example found the aerosolized dosage more effective with fewer side effects—

consistent with the '212 patent's teaching of less inhaled product (10-50%) being

necessary for the same effect.  (EX1006, 11:16-22, 11:45-49 (aerosolized dosage

_____

[12] These calculations are based on a 60-65kg weight from the Remodulin label

(EX1002, ¶100 (citing EX1018, 10-11)), but the same label discloses 70kg and 75kg

weights as well (EX1018, 4, 11), and those patients would start in the 15-90µg dose

range even without titration.  (EX1106, ¶54.)

17

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

caused "a significant decrease" in pulmonary vascular resistance with "no effect on

heart rate" while intravenous dosage had no effect on PVR but caused heart rate to

"significantly increase[]"); *see also id.* at 12:64-67 ("pulmonary vascular resistance

... was more affected by aerosolized UT-15"), 8:21-31 (explaining why decrease in

PVR is desirable, while increase in heart rate is not).) The '212 patent discusses the

very pharmacokinetics PO argues makes the routes different (POR34-35)—of

course the routes are different, but Hill's opinion is that the '212 patent actually

compares the two routes side-by-side and provides POSAs with a rough 10-50%

adjustment as a starting point to calculate dose for future experimentation. (EX1106,

¶49.) That future experimentation is done in JESC and JAHA, which administer the

dosages the '212 patent suggests.

As for PO's concerns with the side effects of delivery large doses of

treprostinil (POR34), the '212 patent actually discloses aerosolized treprostinil

triggered fewer of those side effects (e.g., no increase in heart rate described above),

compared to subcutaneous and intravenous administration. (*Compare* EX1006,

11:16-22; EX1007, 7 ("mild and transient" side effects); EX1008, 3 ("[n]o side

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

effects"), *with* EX2036, 296.)[13]

### 3. A POSA Would Have Been Motivated to Combine the Dosage Disclosures in the Three References

PO argues a POSA would not have been motivated to concentrate the dosages disclosed by JESC and the '212 patent into a much higher dose per breath due to concerns about higher doses inducing side effects. (POR21, 37-38.) JESC squarely addresses these concerns, stating that "side effects *may* occur" at higher dosages but were "mild and transient," with the exception of one headache that resolved after one hour. (EX1007, 7 (emphasis added).) As Hill explains, in his experience, side effects are common and expected with dose increases, and would not have deterred a POSA, who would weigh potential side effects against potential clinical benefit. (EX1106, ¶¶74-77.) In fact, PO's expert Waxman testified that he would not consider such side effects "serious," that "[u]sually the headache goes away," and that "there are things that can be done to help ameliorate cough so in general we are able to get over that issue." (EX1108, 97:13-16, 101:16-102:10.) Here, a POSA would not be deterred by (at worst) an hour-long headache, when the trade-off is

---

[13] It appears PO meant to cite EX2036, not EX2037, which says nothing about large doses inducing side effects.

19

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

"significant long-lasting pulmonary vasodilation" to treat a serious, life-threatening

disease. (*Id.*; EX1106, ¶¶74-77; EX1007, 7.)[14]

### C.    Claims 4, 6, and 7 are Obvious Over the Same Combination

Tellingly, PO does not dispute that the dry powder inhaler of claims 4, 6, and

7 is directly disclosed by the '212 patent.  Instead, PO tries to bring in a district court

dispute to the Board.  In district court, Petitioner is allowed to raise §112 defenses,

and thus, PO is in an untenable position of arguing the same disclosure is enabling

in the '793 Patent, but not obviating in the prior art '212 patent.  The '793 Patent has

§112 issues, but that does not render a POSA oblivious to the literal disclosure of

the '212 patent, which states "solid formulations, usually in the form of a powder,

may be inhaled in accordance with the present invention," and claims an inhaled

powder formulation of treprostinil.  (Pet.43-45 (citing EX1006, 5:30-32, 5:37-39).)

That Gonda questions whether the '793 Patent's disclosure is sufficient to

demonstrate possession and enablement to a POSA of a dry powder formulation does

───────────────

[14] PO also miscites and mischaracterizes Gonda's patent application (POR38

(erroneously citing EX2091, instead of EX2088)), which agrees with and extends

Voswinckel 2006's teaching that treprostinil can be delivered in high dosages

because of its slower absorption rate.  (EX1107, ¶¶61-62.)

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

not change the fact that the '212 patent literally discloses inhalation of a dry powder via an inhaler.

## II.     GROUND 2: CLAIMS 1-8 ARE OBVIOUS OVER THE '212 PATENT AND JESC

For Ground 2, PO conspicuously does not address Petitioner's main argument that a POSA would have been motivated to optimize the dosing regimen disclosed in JESC to improve patient compliance and reduce the number of breaths.  (Pet.48; EX1106, ¶80.)

Instead, PO repeats its "large dosing has side effects" argument, which is incorrect for the reasons detailed in Section I.B.3 above.  PO then attempts to discredit certain references as examples establishing the safety and efficacy of high inhaled therapeutics dosages delivered over a small number of breaths (POR41-42), but is wrong.  A POSA would have known the teachings of Ghofrani and Voswinckel 2006 by May 2005, regardless of whether those references were "by another" for §102(a) purposes, and as such, the references are relevant to the knowledge a POSA would have of the state of the art.  (*Cf.* POR41.)  JESC discloses doses from 16-64µg/mL, observing efficacy with only "mild and transient" side effects.  (EX1106, ¶¶79, 85; EX1007, 7.)   Geller noted the efficiency benefit from reducing administration of a cystic fibrosis drug to three inhalations, and the differences PO's expert points to (i.e., size of the molecule and disease indication) are irrelevant where Geller's rhDNase—like treprostinil—is a liquid formulation administered by

21

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

nebulizer, for which a POSA would understand the basic principles of nebulization to be the same. (EX1034, 176; EX1106, ¶¶72, 80; EX2055, 137:20-25, 139:1-2, 140:13-15; *see also* EX1108, 146:2-14 (PO's expert relying on the teachings of inhalers for other diseases, expecting benefits, like ease of use, to translate).)

Additionally, these references were exemplary. Other references cited in the Petition disclose similar standard use of increasing doses (*see, e.g.*, EX1028, [0063]; EX1048, 962; EX1047, 1867-68; EX1106, ¶¶52-56)), as does the actual day-to-day experience of Hill. (EX1002, ¶¶128, 130; EX1106, ¶¶72, 74-77, 94.) Further, increasing the dose was common practice in the pulmonary field generally, because patients can handle/could need higher doses over time. (EX1106, ¶¶52-56; EX1004, ¶35 (citing EX1047; EX1048); EX1006, 1:10-2:63, 6:56-7:3.) PO's own pre-2006 FDA-approved treprostinil formulation Remodulin® directs a physician to increase doses every 1-2 weeks "depending on clinical response" (EX1018, 9), and another FDA-approved inhaled drug Ventavis® directs dosage doubling if the initial dose is "well tolerated." (EX1029, 11.)

Finally, PO argues that continuous nebulization inhalation devices disclosed in the '212 patent and JESC are incompatible with delivering high doses in 1 to 3 breaths. (POR42-44.) But a POSA would have been aware of other devices capable of doing so, including all the devices used in the above cited references, and the dry powder inhalers disclosed by the '212 patent, which were known to be breath-

Reply in Support of Petition for *Inter Partes Review* of
U.S. Patent No. 10,716,793 B2

102:10.)

### B.   PO Fails to Provide Any Evidence of Nexus Between Secondary Considerations and the Claimed Invention

#### 1.   No Unexpected Results Due to Well-Tolerated Dosage

A POSA reading the *closest* prior art would have expected the claimed dosage ranges delivered in a few breaths would have been well-tolerated. (EX1106, ¶¶103-104; *cf.* POR55-56.) "[U]nexpected results must establish ... a difference between the results obtained and those of the ***closest*** prior art[.]" *Bristol-Myers Squibb v. Teva Pharms. USA*, 752 F.3d 967, 977 (Fed. Cir. 2014) (emphasis added). A POSA would have considered art disclosing inhaled delivery of treprostinil (e.g., EX1007-EX1010)—not the references cited by PO disclosing intravenous prostacyclins (EX2036, EX2037) and inhaled iloprost (EX1029)—as the closest prior art. (EX1106, ¶103.) This treprostinil art discloses either no side effects, mild and transient side effects, or that the drug was "safe, and well tolerated" in the claimed dose range. (*Id.*, ¶104.) Even if Exhibits 2036 and 2037 were the closest prior art, a POSA would have expected inhaled treprostinil, as a form of localized delivery, to avoid the systemic side effects of the intravenous prior art. (*Id.*) In fact, 20mcg doses of inhaled iloprost were FDA-approved and used by May 15, 2006 for 68% of patients. (EX1106, ¶105.)

24

Trials@uspto.gov                                  Paper No. 50
571.272.7822                                      Entered: March 3, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

———————

IPR2021-00406
Patent 10,716,793 B2

———————

Before ERICA A. FRANKLIN, CHRISTOPHER M. KAISER,
and DAVID COTTA, *Administrative Patent Judges*.

KAISER, *Administrative Patent Judge*.

ORDER
Conduct of the Proceeding
*37 C.F.R. § 42.5*

IPR2021-00406
Patent 10,716,793 B2

On March 1, 2022, Judges Franklin, Cotta, and Kaiser held a conference call with counsel for both parties to discuss Patent Owner's email request for authorization to submit rebuttal evidence with its Sur-Reply. A transcript of the conference call was made by a court reporter, and that transcript will be entered in the record of this proceeding in due course. For the reasons discussed below, we deny Patent Owner's request.

BACKGROUND

Petitioner challenges claims 1–8 of U.S. Patent No. 10,716,793 on grounds that rely on, *inter alia*, Exhibits 1007 and 1008, which Petitioner asserts are prior art to the '793 patent. Paper 2 (Petition), 30–68. In its Response to the Petition, Patent Owner argues that Petitioner has not proven that Exhibits 1007 and 1008 are prior art because Petitioner has not shown that they were publicly accessible at an early enough date. Paper 29 (Patent Owner Response), 11–18. In particular, Patent Owner argues that Petitioner has not shown that Exhibits 1007 and 1008 were received, catalogued, and indexed sufficiently by a library to show that a person of ordinary skill in the art could have located them. *Id.* In connection with its Reply to Patent Owner's Response, Petitioner submitted evidence in addition to that submitted with the Petition. Exs. 1087–1132. Petitioner argues that this evidence, considered together with the evidence submitted with the Petition, supports the public accessibility of Exhibits 1007 and 1008. Paper 44, 1–9.

Patent Owner has the right to file a Sur-Reply to Petitioner's Reply, but, under 37 C.F.R. § 42.23(b), the Sur-Reply "may only respond to arguments raised in the corresponding reply and may not be accompanied by new evidence other than deposition transcripts of the cross-examination of

IPR2021-00406
Patent 10,716,793 B2

any reply witness." Here, Patent Owner seeks relief beyond what Rule 42.23(b) permits, by requesting authorization to submit additional evidence with its Sur-Reply that rebuts the evidence Petitioner submitted with its Reply.

ANALYSIS

As noted above, Rule 42.23(b) does not, in general, permit Patent Owner to submit evidence along with its Sur-Reply, except for "deposition transcripts of the cross-examination of any reply witness." Although Patent Owner could not identify during the conference call the specific evidence it would seek to submit along with its Sur-Reply, it represented that the evidence in question would not be limited to deposition transcripts authorized by Rule 42.23(b). Thus, to grant Patent Owner the relief it seeks, we would need to waive the provisions of Rule 42.23(b).

We are permitted to "waive or suspend a requirement of [our rules]." 37 C.F.R. § 42.5(b). In deciding whether to do so, we construe our rules "to secure the just, speedy, and inexpensive resolution of every proceeding." *Id.* § 42.1(b). In particular, we note the requirement that "the final determination in an inter partes review be issued not later than 1 year after the date on which the Director notices the institution of a review." 35 U.S.C. § 316(a)(11). In accordance with these requirements, our rules provide for the closure of the evidentiary record with the Petitioner's Reply, with the only subsequent additions being any cross-examination Patent Owner conducts of Petitioner's Reply witnesses. Neither the requirement to resolve disputes within twelve months nor the requirement to resolve proceedings in a speedy and inexpensive manner would be served by waiving the requirements of Rule 42.23(b) here for Patent Owner to submit

3

IPR2021-00406
Patent 10,716,793 B2

its rebuttal evidence, followed by Petitioner filing the equivalent of a Sur-Reply commenting upon the new evidence submitted by Patent Owner.

In addition, there is no clear need for additional evidence on the issue of the public accessibility of Exhibits 1007 and 1008. Petitioner is permitted some "limited opportunities . . . to present new evidence [after the Petition], including . . . in a reply to the patent owner response," as long as that new evidence is "responsive to the prior briefing." *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29, at 14 (PTAB Dec. 20, 2019) (precedential). "The opportunity to submit additional evidence does not allow a petitioner to completely reopen the record, by, for example, changing theories after filing a petition." *Id.* at 15. Here, Petitioner has submitted new evidence with the Reply, and the parties dispute whether the evidence represents a change from the Petition's theory of public accessibility. Papers 47, 49. Ultimately, we will consider only properly submitted evidence that satisfies *Hulu*'s requirements and from that evidence determine whether Petitioner shows sufficiently that the exhibits in question were publicly accessible. It is unclear how any additional evidence submitted by Patent Owner—as opposed to Patent Owner's arguments for ignoring Petitioner's evidence, giving Petitioner's evidence little weight, or finding a lack of public accessibility in light of Petitioner's evidence, all of which Patent Owner is already permitted to assert in its Sur-reply—would assist in resolving the issue of public accessibility. This lack of clarity also weighs against granting Patent Owner's request for relief from Rule 42.23(b).

Moreover, during the conference call, we asked Patent Owner to describe the nature of the evidence it seeks to submit along with the Sur-Reply and how that evidence might help show a lack of public accessibility,

IPR2021-00406
Patent 10,716,793 B2

but Patent Owner answered only by listing vague types of evidence that might be submitted.  Thus, we are unable to consider whether the specific evidence that Patent Owner seeks to submit would help resolve the public accessibility issue in its favor.  This also weighs against granting Patent Owner's request.

Thus, to summarize, there is no right to submit additional evidence with Patent Owner's Sur-Reply; Rule 42.23(b) provides precisely the opposite.  To the extent that we are permitted to waive Rule 42.23(b), we may do so only in the interest of resolving this proceeding in a just, speedy, and inexpensive manner.  Waiving the rule would work at cross-purposes to two of those three factors, and might threaten our ability to resolve this *inter partes* review within one year of institution.  As to the remaining factor, in the absence of a clear explanation of what the evidence in question is, what that evidence might show, how that evidence might support Patent Owner's position, or why Patent Owner's already-existing opportunity to provide arguments rather than evidence is insufficient, we cannot say that providing Patent Owner the opportunity it seeks to present additional evidence is necessary in order to promote the just resolution of this proceeding.  Accordingly, we are not persuaded that we should waive the limits imposed on the Sur-Reply by Rule 42.23(b).

It is

ORDERED that Patent Owner's request for authorization to submit evidence with its Sur-Reply beyond the limits placed on that evidence by 37 C.F.R. § 42.23(b) is *denied*.

IPR2021-00406
Patent 10,716,793 B2

For PETITIONER:

Ivor R. Elrifi
Erik B. Milch
Deepa Kannappan
Sanya Sukduang
Jonathan R. Davies
COOLEY LLP
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com
jdavies@cooley.com
zLiquidiaIPR@cooley.com
zpatdocketing@cooley.com


For PATENT OWNER:

Stephen B. Maebius
Michael R. Houston
Jason N. Mock
FOLEY & LARDNER LLP
smaebius@foley.com
mhouston@foley.com
jmock@foley.com

Shaun R. Snader
UNITED THERAPEUTICS CORP.
ssnader@unither.com

Douglas H. Carsten
April E. Weisbruch
Judy Mohr, Ph.D.
Arthur P. Dykhuis
Jiaxiao Zhang
Amy L. Mahan
Mandy H. Kim
MCDERMOTT WILL & EMERY LLP
dcarsten@mwe.com

6

IPR2021-00406
Patent 10,716,793 B2

aweisbruch@mwe.com
jmohr@mwe.com
adykhuis@mwe.com
jiazhang@mwe.com
amahan@mwe.com
mhkim@mwe.com

IPR2021-00406
U.S. Patent No. 10,716,793 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

LIQUIDIA TECHNOLOGIES, Inc.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

———————————

IPR2021-00406
U.S. Patent No. 10,716,793

———————————

**PATENT OWNER SUR-REPLY**

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## I.    SUMMARY OF ARGUMENT

Liquidia Technologies, Inc. ("Petitioner") has failed to meet its burden of proving claims 1-8 of U.S. Patent No. 10,716,793 ("the '793 patent") are unpatentable for two primary reasons.

First, each of Petitioner's six unpatentability grounds rely upon references that Petitioner has failed to establish constitute prior art. Grounds 1, 2, and 4 rely on the JESC and JAHA abstracts, but Petitioner has not set forth sufficient evidence to show that either abstract was publicly accessible as of the priority date of the claimed inventions. Petitioner improperly adds new exhibits in its Reply attempting to cure this failure of proof, but the belated exhibits (even if admissible) fail to establish a date of indexing required for public accessibility. Petitioner's untimely evidence likewise fails to show that either abstract was in widespread circulation, cited by others who did not have a connection to the inventors, or presented to anyone at the meetings. Grounds 3-6 rely on Ghofrani and/or Voswinckel 2006, but Petitioner has not set forth sufficient evidence to show that either is antedating or "by others." These fundamental failures are fatal to Petitioner's case.

Second, Petitioner's unpatentability grounds based on the combination of the '212 patent, JESC, and/or JAHA are constructed with impermissible hindsight. None of these references, alone or in combination, discloses the administration of the claimed single event dose from 15 to 90 micrograms to a human, let alone

1

delivery of that dose in 1-3 breaths. Petitioner relies on unsupported assumptions and unreliable calculations, while ignoring uncontroverted evidence of unpredictability, in order to argue that the prior art teaches the claimed dose. The POSA, however, would not perform these calculations and, even if performed, the calculations are unreliable and yield speculative doses that fall outside the claimed range.

## II.    PETITIONER'S REPLY DOES NOT CURE THE PETITION'S FAILURE TO ESTABLISH THE JESC AND JAHA ABSTRACTS AS PRIOR ART

The Petition fails to establish that Voswinckel JESC (EX1007) ("JESC") and Voswinckel JAHA (EX1008) ("JAHA") (collectively, the "Abstracts") are prior art under Section 102(b) because they were not publicly accessible to a person of ordinary skill in the art more than one year before the priority date. The Petition, citing the Gonda and Hall-Ellis declarations, asserted that the Abstracts are prior art because they were "presented" at conferences in 2004. Pet., 22, 24 (citing EX1004 (Gonda), ¶¶55, 58; EX1036 (Hall-Ellis), ¶¶59-75). Dr. Gonda, however, merely parrots the Petition's claim that the Abstracts "correspond" to presentations at the conferences and provided no evidence that he attended or of what was actually presented at either conference. Dr. Hall-Ellis relied on MARC records for *Circulation* and *European Heart Journal* in arguing that the special supplements containing the Abstracts were received by libraries in late 2004. Yet Dr. Hall-Ellis

2

provided no evidence that the supplements—not searchable or indexed in any meaningful way—were, in fact, publicly accessible. The Petition thus failed to prove that the Abstracts qualify as prior art. *See* POR, 11-18.

Realizing the Petition's shortcomings, the Reply barely discusses the Petition evidence, focusing instead on new arguments and evidence. Petitioner earlier sought unsuccessfully to file supplemental information. The Board found that Petitioner failed to show that it could not have presented such evidence earlier. Paper 30. Undeterred, Petitioner instead filed new evidence and arguments with its Reply, to which Patent Owner timely objected. Reply, 1-9; Paper 47. Petitioner's late arguments and evidence should not be considered for at least the same reasons that submitting supplemental information was not permitted. *Intelligent Bio-Systems v. Illumina Cambridge*, 821 F.3d 1359, 1369 (Fed. Cir. 2016); Trial Practice Guide, 74. Permitting Petitioner to introduce new evidence and argument at this late stage prejudices Patent Owner, who is barred from presenting any rebuttal evidence with its sur-reply beyond that associated with the cross-examination of Petitioner's declarants (*see* Paper 50). Even if considered, however, Petitioner's new evidence still fails to establish the Abstracts are prior art.

### A. Petitioner Has Not Shown that a POSA Exercising Reasonable Diligence Could Have Located the Abstracts

Petitioner has failed to meet its burden—to be satisfied in the Petition—of proving that the Abstracts are prior art. Petitioner provides no evidence establishing

3

whether or how the Abstracts were "presented" at their respective conferences. The supplements containing the Abstracts lack meaningful indexing and do not remedy this fatal deficiency. Ms. Wyman—an expert in indexing—testified that a POSA in the 2004-2005 timeframe seeking these abstracts would have been searching for a needle in a haystack—without even knowing that a needle was present. EX2041, ¶¶6-38.

### 1. There Is No Evidence that the Abstracts Were Publicly Accessible at the Respective Conferences

Petitioner's argument that the "presentation" of the abstracts at their respective conferences make them prior art (Reply, 2-3, 6-7) fails because Petitioner has not proved that the Abstracts were, in fact, presented in any meaningful way. *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004). Petitioner cannot satisfy its burden by simply claiming that a POSA would have attended the conferences. Reply, 2-3, 7.[1] Nor is Petitioner's burden satisfied by vague assertions that

---

[1] For example, Petitioner's expert admits that the presentations may have occurred in any number of formats but has no idea what was actually said or presented or to whom. EX2094, 37:5–39:3, 42:21–44:17. Petitioner also failed to adduce any evidence from the '793 patent inventors, JESC/JAHA authors, or conference

conference programs or abstract books were allegedly available or given to attendees (*id.*), given the lack of actual evidence of those hypothetical programs and books, their content, or testimony from conference organizers or attendees regarding whether and how the Abstracts were presented. This lack of evidence is astounding given Petitioner's claims that the ESC conference had more than 25,000 attendees (Reply, 2) and the AHA conference was even larger (*see* EX1106, ¶22 n.3).

This lack of evidence also moots Petitioner's argument (Reply, 3, 7) that POSAs at the conference would have sought out these presentations by searching for the authors or subject matter, since no record evidence establishes how a POSA knew the presentations would occur. The lack of evidence also distinguishes the three cases cited by Petitioner where conference proceedings established public accessibility because those cases relied on evidence establishing what was presented at the conference and confirming the number and type of attendees. Reply, 2. Here, there is no such evidence.

---

attendees to establish what information in the abstracts was actually presented at either conference.

### 2. Petitioner's Belatedly Submitted "Date-Stamped" Copies of the Journal Supplements Do Not Prove Public Accessibility, Even If From an "Established Publisher"

Petitioner's Reply argues for the first time that the Board should presume public accessibility because the supplements are from an "established publisher." Reply, 2, 6. As support, Petitioner submits date-stamped copies of the Supplements from the *European Heart Journal* (for JESC) and *Circulation* (for JAHA) (*see* EX1089-EX1096) along with an unsworn statement from a librarian alleging that the *Circulation* Supplement was "available for public use" (EX1116). Even if this belated argument/evidence is considered, it still does not establish that the Abstracts were publicly accessible during the relevant timeframe because none of it shows that a POSA exercising reasonable diligence could have located the Abstracts.

Two critical facts separate this case from the typical analysis regarding run-of-the-mill journal articles. First, before the 2006 priority date, neither of these Abstracts were indexed in any online database or index outside of the printed supplement issues themselves. POR, 6. Petitioner's expert identified the online databases that a POSA would have used for such a search (*see* EX2043, 41:1-42:4; 242:11-243:18), and the abstracts do not appear in any of them (*see* EX2041, ¶¶5, 16-17, 37). While Dr. Hall-Ellis belatedly asserts that the *Circulation* Supplement can be found in PubMed (EX1112, ¶60), she fails to present any evidence that PubMed includes the abstracts themselves (or the indexes), as opposed to just a

6

IPR2021-00406
U.S. Patent No. 10,716,793 B2

citation to the supplement.  EX2094, 12:9–14:8; 50:11–56:22.  Dr. Hall-Ellis also

now claims that JESC can be found on the "Web of Science" (*id.*, ¶87), but fails to

assert (let alone prove) that this listing was available in 2004-2005.[2]

Compounding the difficulty a POSA would encounter if trying to locate the

Abstracts, Petitioner's newly-submitted evidence confirms that the indexes for the

JAHA Abstract supplement appear only within that issue:

**Supplements to *Circulation* Published in 2004**

*Supplements to* Circulation *are published occasionally and for archival purposes may be bound with the regular issue. Supplement page numbers are preceded by a Roman numeral and a hyphen. Supplements are indexed with the regular issue with the exception of the Abstracts issue, which is indexed within that issue.*

EX1095, 12 (highlighting added).

Second, a POSA could not access the only available indexes within the

supplements to find the Abstracts—even if received by a library as Petitioner

claims—because the supplemental issues of *Circulation* and *EHJ* were not made

available to patrons in their entirety.  Therefore, because the only indexes identifying

the Abstracts are within the supplement issues themselves, a POSA could not access

---

[2] Patent Owner was not allowed to present rebuttal evidence on these points, but Dr.

Hall-Ellis admitted that she did not use the Internet Archive to try to show that either

of these results existed in 2006.  EX2094, 25:4-26:6.

7

those indexes to even attempt to find Abstracts without the entire issue.[3]  While Dr. Hall-Ellis relies on an unsworn, conclusory statement from a librarian at the British Library that the JAHA Supplement was "available for public use" (EX1112, ¶50 (citing EX1116)), another librarian at the British Library explained that the supplements could not be requested or checked out in their entirety.  *See* EX2094, 63-65.  Instead, they were only available to the extent a patron provided a specific citation for the desired abstract(s) and asked to have them copied.  *Id*., 64 (¶2).  Thus, even if the supplements were from an "established publisher" and various libraries had them, the Abstracts themselves were not available unless patrons somehow had the specific citations.

These two crucial facts taken together show why Petitioner's new evidence (even if admitted and considered) fails to establish public accessibility.  A POSA could not have reasonably located the citations for either Abstract because they were not indexed anywhere other than within the printed supplemental volumes themselves.  Those printed indices were not available to patrons because the libraries

---

[3] Patent Owner does not concede that the Table of Contents (JESC), subject matter index (JESC), or author index (JAHA) were sufficient for a POSA to locate the Abstracts using reasonable diligence, but was not permitted to submit rebuttal evidence from its indexing expert on these newly raised points by Petitioner.

did not make the whole supplements available (EX2094, 64). The fact that Dr. Hall-Ellis was able to retrieve copies of the Abstracts by providing exact citations (EX2094, 6:6–9:3, 39:5 41:16) does not establish a POSA interested in pulmonary hypertension treatments—who would not have known the citations to ask for, whether the Abstracts existed, where they were located, or how to obtain/review the indexes within the supplemental issues—could find the Abstracts through the exercise of reasonable diligence.

### B.     Petitioner's "Research Aid" Evidence Likewise Does Not Establish Public Accessibility

Another of Petitioner's new arguments—that the Abstracts are prior art by virtue of being cited in two later publications—is also unavailing. Petitioner contends that Ghofrani (EX1121) and Sulica (EX1104) are "research aids" that would have allowed a POSA to find the Abstracts. Reply, 3-4, 7-8. This belated argument establishes, at best, that a POSA may have been able to find the Abstract as of the date the alleged "research aids" became available. Ghofrani bears a July 2005 date-stamp (EX1121, 1), while Sulica shows only the year 2005 (EX1104, 1).[4]

---

[4] Petitioner references a "March 2005" publication date (Reply, 7 (citing EX1104)), but Sulica only identifies 2005, not any month of publication. Patent Owner also

However, if the Abstracts only became publicly accessible (via these alleged "research aids") after May 15, 2005, they do not qualify as prior art under 35 U.S.C. § 102(b). And if the Abstracts are not Section 102(b) prior art, they are not prior art at all because they are not "by another" under Section 102(a), given Patent Owner's prior showing that the subject matter of both Abstracts is the inventors' own work. *See* EX2071, ¶¶6-8 (referencing the Abstracts as Watson Exhibits 1003 (JAHA) and 1046 (JESC)); EX2003, ¶27; EX2061, ¶¶12-13.

Finally, although Petitioner's expert argued that the citations in Ghofrani and Sulica showed a POSA could find the Abstracts (EX1112, ¶¶62, 89), she admitted that she did not consider the close affiliations among the authors and how that might explain how the Abstracts came to be cited in Ghofrani and Sulica (*see* EX2094, 30:19–36:16). Ghofrani's authors include both Voswinckel and Seeger, who of-course knew about their own JESC Abstract and would not have needed to search for it like a POSA. Similarly, Sulica was a principal investigator in the TRIUMPH study group that participated in the clinical trial reported in the Voswinckel publications. *See, e.g.*, EX2094, 75-76 (listing both Sulica and Seeger as principal investigators in the TRIUMPH study group); EX2061, ¶¶5-8; EX2066, ¶¶5-12

---

objected to Exhibit 1104 on hearsay grounds (Paper 46, 4-5), but Petitioner did not serve any supplemental evidence for this exhibit.

(confirming TRIUMPH study relates to Ghofrani, JESC, and JAHA). Therefore, neither Ghofrani nor Sulica constitute evidence that a POSA found the Abstracts using reasonable diligence.

## III. GROUND 1: PETITIONER'S CALCULATIONS CANNOT SUPPLY THE MISSING 15-90 MICROGRAM DOSE

### A.    Flawed Assumptions Cannot Supply the Missing Dose

Petitioner cannot dispute that JESC, JAHA, and the '212 patent lack any express disclosure of the claimed dose. The Reply continues attempting to fill this gap in new (and belated) ways by relying on flawed assumptions driven by hindsight.

#### 1.    A POSA Could Not Infer the Fill Volume In JESC

Petitioner's first attempt at calculating the claimed dosage simply assumes a fill volume while ignoring contrary evidence. A POSA could not reliably determine the fill volume used, or the volume actually delivered, to JESC's patients because:

- Drs. Waxman and Hill's experience with 1 mL "or more" fill volumes only serve to confirm the broad range of potential fill volumes. Even if 1 mL was used in JESC, the dead volume in a nebulizer (*e.g.*, EX1037[5], 22) or

---

[5] EX1037 is an undated English translation of "a German optineb manual," but the original document is not attached to EX1037. Petitioner improperly cites EX1087 (only as supplemental evidence), but EX1087 is a 2004 German Optineb manual

11

IPR2021-00406
U.S. Patent No. 10,716,793 B2

the duration of administration may result in less than 1 mL being delivered to the patient.

- Dr. Waxman's testimony regarding 3-5 mL volumes does not confine the range of "conventional" fill volumes, as his testimony related to "old style" nebulizers for asthma and COPD, not pulmonary hypertension. EX1108, 153:7-154:17.

- Petitioner's fill volume calculations assume without support that fill volume corresponds to one single event dose. However, fill volume may refer to a daily fill volume for more than one single event dose. EX1028, ¶¶[0066]-[0067]; EX1043, 2, 4. Additionally, knowing fill but not residual volume following a single event dose is unhelpful, because residual/dead volume varies so widely. EX1028, ¶[0064]; EX1037, 22; EX1026, S-2.

- Dr. Gonda cites Kendrick (EX2076), which shows a broad range of potential fill volumes, with Table 2 showing maximum fill volumes ranging from 3 to 38 mL. He also admitted that the cited text under Table 2 (Reply, 11 (citing EX2076, S94) does not identify 2-2.5 mL as a typical fill volume. EX2097, 108:1-9. Table 6 proves nothing about typical fill

---

without translation. Mr. Butler's deposition confirmed that Ex. E of his Declaration was from 2004, while Ex. D of his Declaration was from 2005. EX2095, 28.

volumes, instead merely showing that common ampule sizes might be around 2.0-4.0 mL. EX2076, S96.  JESC does not state that its nebulizer was loaded using ampules, let alone how many were used.

- The Pulmozyme label does not describe delivered doses, only the dose provided "to the nebulizer bowl."  EX1050, "DESCRIPTION."

- Dr. Gonda did not undertake a comprehensive analysis of ultrasonic nebulizers available in 2006 (EX2097, 160:12-17), so there is no basis to conclude his examples are representative.

In sum, the evidence shows an enormous range of fill volumes, and there is no motivation for a POSA to land at the specific volume Petitioner selected.  Without an accurate volume delivered to the patient, which is not equivalent to a fill volume, the POSA could not reliably calculate the dose in JESC.

## 2.   A POSA Could Not Infer the Output Rate in JESC

Petitioner's calculations also attempt to rely on alleged "typical" nebulization rates (Reply, 12).  Again, Petitioner's analysis misapplies and misrepresents the evidence:

- Dr. Gonda asserts an "average" nebulizer output of 0.6 mL/min, but this average is based on limited, single-manufacturer data from 1991 or earlier. EX2097, 179:3-8, 159:7-12; EX1097-1099.  This "average" hides the true

13

variation in nebulizer output, with Dr. Gonda's three references spanning output rates from 0.22-1.14 mL/min.

- Discrepancies between tested nebulizer output rates and nominal rates identified in nebulizer manuals underscore the need to perform testing to determine a nebulization rate instead of inferring rates from different devices and drug formulations. *Compare* EX2197, 181:3-182:6; EX2102, 27 (DeVilbiss manual: output rates of 3.0 and 2.5 mL/min) *with* EX1107, ¶33; EX1099 (DeVilbiss testing: 0.67-1.14 mL/min); *compare* EX2197, 164:5-14, 174:17-20; EX2100, 28; EX2101, 28 (Multisonic manual: rates of 0.6 and 0.5 mL/min) *with* EX1062 (Multisonic testing: 0.140 mL/min delivered dose rate).

- EX1037 shows multiple operating programs, such as P2 where "aerosol is intermittently generated (no continuous aerosol production)," which would reduce nebulized volume by some unspecified and uncertain amount. EX1037, 18.

These issues support Dr. McConville's opinion that a POSA would not know the nebulization rate used in JESC without more information. EX2053, ¶60. They also establish that a POSA would not rely on the 0.6 mL/min rate in EX1037 (OptiNeb) because there is nothing in JESC establishing which OptiNeb model was used (EX1087 at 9 shows 11 Optineb-ir instruction guides and EX2071, ¶14) or

14

whether an intermittent aerosol mode was used, much less its accuracy. Indeed, Dr.

Gonda agreed that before relying on rates in the Multisonic manuals, he would have

asked the manufacturer how the rates were calculated, which he did not do for

EX1037. EX2197, 173:19-174:9; *cf.* EX2053, ¶81.

The evidence also disproves Dr. Gonda's unsupported assertion that a

manual's output rate "takes into account the losses all the way from the volume of

the solution placed in the nebulizer to the point where the aerosol is exiting the

mouthpiece" (EX1107, ¶30; Reply, 13).

### 3.     A POSA Could Not Infer the Nebulizer Efficiency In JESC

Petitioner and Dr. Gonda attempt to rely on assumed nebulizer efficiencies in

their calculations. Reply, 12 n.8 (asserts nebulizer losses could "conservative[ly]"

be as high as 50%). The Reply criticizes reliance on jet nebulizers[6] and states that

Dr. McConville's only cited ultrasonic nebulizer reference had an efficiency of 86%.

*Id.* (citing EX1062). There is wide variation among nebulizer efficiencies such that

a POSA could not assume any one rate and apply it to JESC:

---

[6] Two of the three references Dr. Gonda relies on to support alleged "conventional"

fill volumes were also jet nebulizers. EX1004, ¶56 n.4 (citing EX1066, EX1050).

- Dr. Gonda admitted that not all ultrasonic nebulizers in 2006 would have an efficiency of 86%, and some would be lower.  EX2197, 158:6-8, 158:24-159:3.

- The 86% efficiency in Gessler (EX1062, Fig.2b, Table 1) reflects the rate of delivery to the patient (0.140 mL/min) divided by the measured rate of aerosol generation.  But if the delivery output rate is compared to the alleged rate from the manual, the efficiency would be 0.140/0.5, or only 28%.  EX2100, 28; EX1062, 17 (Table 1).

- Lieberman 2006 (EX2103; EX2197, 198:15-199:6) tested a MyNeb ultrasonic nebulizer using 2.5 mg albuterol sulfate, 20 mg cromolyn sodium, and 0.5 mg ipratropium bromide that yielded 1.73 mg, 10.3 mg, and 0.3 mg of the three drugs.  EX2103, 3.  Dividing the "Amount of Drug Exiting Nebulizer" by the inputs shows efficiencies of 69%, 52%, and 60%, respectively.

- The AccuNeb label cited by Dr. Gonda describes efficiencies of 39-43% depending on the nebulizer used.  EX1066 (right hand column).

Given this variation, assumed nebulizer efficiencies cannot be used to reliably calculate a dose from JESC.

16

IPR2021-00406
U.S. Patent No. 10,716,793 B2

### 4. Petitioner Relies on Impermissible Hindsight

Dr. Gonda admits that his calculations, and Dr. Hill's, do not yield precise doses. EX2197, 101:3-15 (explaining his calculations provide a range that is "bigger than plus/minus 15 percent"). Dr. Gonda argues that the "extremely broad" 15-90 μg range in claim 1 serves as the basis for the imprecision and unreliability of his calculations. *Id.*, 104:14-21. His reference to the breadth of the claimed range, however, betrays impermissible hindsight. Dr. Gonda used the claimed range to drive his calculations: "Q.: So as you perform the calculations looking at Voswinckel JESC, you're also looking at the extremely broad range of 15 to 90 in the 793 patent, is that correct? A. Yes." EX2197, 104:14-105:1.

### B. The POSA Could Not Reliably Calculate A Dose from the '212 Patent

Petitioner's Reply presents several new theories regarding its calculations based on the '212 patent, including asserting that the alleged "10-50% adjustment" would (1) apply to all FDA-approved dosages of Remodulin, not just the initial dosing addressed in the Petition; (2) apply to additional patient weights, not just those addressed in the Petition, and (3) involve, for the first time, a "divide by four" conversion from daily dosing to individual single event doses. All of these arguments could have been, but were not, raised in the Petition.

To the extent these untimely arguments are considered, Petitioner's calculations still does not reasonably disclose the claimed dose. That a POSA would

17

simply take a *total daily dose given by continuous intravenous infusion* from Remodulin®, multiply by 10-50%, and divide by four based on JAHA (Reply, 15-17) is flawed and premised on impermissible hindsight. As an initial matter, the 10-50% "adjustment" is (1) so broad as to imply imprecision and (2) reliant on sheep, not human data, making it unreliable for the POSA to use with any expectation of accuracy or achieving a therapeutically effective dose. Moreover, a POSA would not apply a dose from healthy sheep with induced pulmonary hypertension to human patients having "severe" PH as in JAHA. EX2052, ¶62; EX2087, 2367 ("[t]o achieve an effect in sheep, it was necessary to administer doses of treprostinil that were much higher than those used in treating patients"; "it is difficult to compare these [human] results with our acute model of pulmonary hypertension with one-time dosing of therapy in otherwise normal sheep with acute pulmonary vasoconstriction").

Further, a POSA would not divide the total continuous daily Remodulin® dose resulting from the '212 patent by four to arrive at a single event dose for use in human PH patients. Even though two—only two—"compassionate use" patients with idiopathic PAH received four "inhalations" per day "after the acute test," the abstract reports for the full 17-patient study that "TRE inhalation resulted in a sustained, highly pulmonary selective vasodilation over 120 minutes" and that PVR returned to 89.2 ± 4.2% of baseline after 120 minutes. Based on these results, a

18

POSA could conclude that the ranges disclosed in the '212 patent should be divided by twelve or another number sufficient to maintain vasodilation throughout the day (e.g., a dosing event every two hours).  However, because JAHA does not disclose a dose, the POSA could not compare a converted '212 patent dose to assess whether four, or some other number, of doses would be required. JAHA does not teach a hard rule of "dividing by 4" and a POSA could not calculate a dosage with a reasonable expectation of success based on such limited information.

There is likewise no merit to Petitioner's assertion that the '212 patent's disclosure of *daily* doses of 2.5 µg to 125 mg for the treatment of *peripheral* vascular disease—a different disease—satisfies the claim's requirement to treat *pulmonary* hypertension.  The dose is so broad—the maximum 50,000 times larger than the minimum—that it could not render the 15-90 µg range obvious to the POSA when the '793 patent describes surprising efficacy without systemic effects.  EX1001, 17:23-25.  Petitioner's calculations based on application of JAHA to the '212 patent also fail.

## C.     The References Alone or in Combination Fail To Render the Claims Obvious

The Reply asserts that Patent Owner and/or its experts failed to analyze the combination of Petitioner's alleged prior art.  That is incorrect, but also inapposite. None of the references teach the claimed single event dose administered in 1-3

19

breaths and combining them does not magically make disclosure of the dose appear. The combinations also fail for the reasons below.

### 1. Petitioner's Calculations Fail Because They Do Not Address Non-Linearity

The pharmacokinetics, side effects, and efficacy of increasing amount per breath and reducing number of breaths are not linearly related due to spillover of drug administered to the lung into systemic blood circulation. EX2058; EX2052, ¶51; EX2001, ¶39; EX2003, ¶25. Indeed, JESC shows that the efficacy and side effects are not linear because the "*maximal* pulmonary vasodilation" was experienced at the lowest concentration, without side effects. EX1007, 7. JESC reports that its six-minute dosing using the lower pre-aerosolized concentration led to "maximum treprostinil effect" after about 50 minutes and still provided 50% of maximal ("half-maximal") effect at 110 minutes (*id.*), whereas JAHA reports that its 3 breath dosing using a higher pre-aerosolized concentration led to a "maximum PVR decrease" after 30 minutes and about 11% after 120 minutes (PVR returned to "89.2 ± 4.2 % of baseline" after 120 minutes). EX1008, 3. Petitioner's proposed combination incorrectly assumes that doses administered slowly over 30+ minutes to sheep ('212 patent), 6 minutes (JESC), or in 3 breaths (JAHA) can be held constant, without affecting efficacy or increasing side effects. There is no basis for this flawed assumption, which is undermined by JESC. *Endo Pharms. Sols., Inc. v. Custopharm Inc.*, 894 F.3d 1374 (Fed. Cir. 2018) (claimed dosing unobvious

20

where "it was unclear from the [prior art reference] if there is a linear relationship between the dose amount and the amount of [claimed drug] in the patient's body").

### 2.     No Motivation to Combine with A Reasonable Expectation of Success

There must be a reasonable expectation of success for the specific dosing recited in the '793 patent claims. *Teva Pharmaceuticals USA, Inc. v. Corcept Therapeutics, Inc.*, (Fed. Cir. 2021) (claim requiring specific dose not obvious in the absence of a reasonable expectation of success for that claimed "specific [drug] dosage"). Although Petitioner asserts the POSA would modify the method implied in JESC to adopt the 3-breath approach of JAHA, this overlooks the nonlinearity described above, the duration of efficacy of the single event dose, and the number of dosing events per day that are required to treat PH patients, which is important for patient adherence. EX1033, 5. The POSA would not want to increase side effects or increase the number doses per day. More dosing events are not preferable to fewer events, even if those fewer events take a little longer.

Instead, a POSA would rely upon and select dosing that was proven to work in a placebo-controlled clinical study like JESC, rather than trying to select dosing based on an uncontrolled study that lacked any placebo arm, like JAHA. *See* EX1079, 6 (criticizing use of drug with "no data from adequately controlled studies").

21

Finally, a POSA would not have been motivated to modify JESC's method based on JAHA's results with a reasonable expectation of success because JAHA only reports results in patients with "severe pulmonary hypertension" who had a pulmonary vascular resistance (PVR) of $948 \pm 112$ dyn*s*cm$^{-5}$, whereas JESC used pulmonary hypertension patients with a PVR of $885 \pm 72$ dyn*s*cm$^{-5}$. Petitioner has not shown that success in this subgroup provides a reasonable expectation of success in treating JESC's patients with a lower PVR.

### 3.    The Prior Art Does Not Disclose a "Therapeutically Effective" Single Event Dose According to Dr. Hill

In its Reply, Petitioner's assert that "[t]here is no dispute JAHA and JESC disclose *therapeutically effective* inhaled single event doses of treprostinil." Reply, 9 (emphasis added). The '793 patent discloses that "therapeutically effective" may include effects on hemodynamics (*e.g.*, EX1001, Fig. 7, 16:31-32). However Petitioner's expert, Dr. Hill, contradicts Petitioner's assertion and disregards the clear disclosures in the '793 patent in opining that the "therapeutically effective" limitation in claim 1 (Reply, 9) requires disclosure of an improvement in what the FDA describes as how a patient "feels, functions, or survives" over time (EX2096, 82:21-83:5, 96:22-97:4). On this faulty basis, Dr. Hill testified that *JESC does not contain* evidence of therapeutic effectiveness. EX2096, 135:3-9. Under Dr. Hill's reasoning, *the '212 patent does not disclose* therapeutic effectiveness either because he agrees that the '212 patent describes the effects of inhaled treprostinil *on*

22

*hemodynamics* in sheep. EX1002, ¶57; EX1002, ¶59 (citing EX1006, 6:56-61) (the '212 patent defines "therapeutically effective" as an "amount that has therapeutic effects on the condition intended to be treated or prevented."); EX2096, 102:18-105:2). Likewise, JAHA would not disclose therapeutic effectiveness because Dr. Hill asserts that JAHA's study on 17 patients reports treprostinil's "sustained … vasodilation" (measured by hemodynamics). EX1002, ¶92. Thus, Ground 1 (and 2) fails based upon Dr. Hill's own positions.

## IV.  GROUND 2: PETITIONER'S REPLY DOES NOT CURE THE DEFECTS IN ITS PETITION

The Reply fails to establish that routine optimization would lead to administration of the claimed dose in 1-3 breaths.

First, side effects would discourage the POSA from "optimizing" Petitioner's calculated doses to reduce the number of breaths. The Reply (Section I.B.3) does not adequately address the POSA's concern with side effects. The unknown dose used in JESC was delivered over 6 minutes. The Reply fails to explain why allegedly minor side effects at an unknown dose delivered *over 6 minutes* would cause the POSA to believe that delivering that same unknown dose in a tiny fraction of the time – *in 1-3 breaths* – would not cause side effects.

Second, Petitioner cannot circumvent the requirements of Section 102(a) by relying on non-prior art references, Ghofrani and Voswinckel 2006, to supply

missing teachings under the guise of labeling them as mere "state of the art" references.  Reply 21.

Third, the ability to administer a protein like rhDNase to treat cystic fibrosis in three breaths does not establish that treprostinil, a smaller and potent molecule that treats a different indication, could also be administered in three breaths.  Reply 21-22; EX2053, ¶62.

Fourth, the Reply claims that certain references were "exemplary."  Petitioner was required to cite any additional references it intended to rely on in the Petition. Regardless, Petitioner has failed to establish that merely because patients may handle increasing doses of a drug over time, they necessarily could handle a reduction in the time of administration and corresponding increased concentration.

Fifth, the suggestion that a POSA would "optimize" to get the exact dosing of the '793 claims based on JESC combined with the '212 patent (Reply, 21-23) is contradicted by the non-linear pharmacokinetics shown in JESC itself.  A POSA would not have known whether a lower concentration with more breaths or a higher concentration with fewer breaths would be more effective and yet tolerable.  In fact, the Abstracts suggest that the lowest concentration administered in more breaths (16mcg/mL for 6 minutes) provided "maximal pulmonary vasodilation" with the least side effects and the fewest number of single event doses per day.  *Compare* EX1007, 7 *with* EX1008.  *Endo Pharms. Sols., Inc. v. Custopharm Inc.*,

24

894 F.3d 1374 (Fed. Cir. 2018) (finding claimed dosing unobvious where "it was unclear from the [prior art] if there is a linear relationship between the dose amount and the amount of [drug] in the patient's body").

## V. GROUNDS 3-6: PETITIONER'S REPLY FAILS TO ADDRESS GHOFRANI OR VOSWINCKEL 2006

The Reply fails to address the prior art status of Ghofrani or Voswinckel 2006, conceding they are not prior art. *See* POR, 44-54; *accord* Institution Decision, 41-42 (viewing current record as failing to establish the references as "by others"). Grounds 3-6 therefore fail.

## VI. SECONDARY CONSIDERATIONS REBUT PETITIONER'S GROUNDS

Disputing nexus of Tyvaso® to the claims, Petitioner incorrectly asserts that "PO's Tyvaso® product does not 'embod[y] the claimed features,' nor is it 'coextensive with the patented invention.'" Reply, 23-24. But it cannot be disputed that the starting dose of Tyvaso® includes 18 mcg of treprostinil administered in 3 breaths, as claimed. EX2034, 1, 2. Tyvaso® is also administered through claim 3's ultrasonic, pulsed-delivery device (EX2034, 2) and lacks metacresol (claim 8) (EX2034, 8).

Petitioner also incorrectly asserts that Patent Owner has not properly considered the alleged "*closest* prior art," EX1007-EX1010. But EX1007-EX1010 are not prior art. Section II, *supra*; POR 44-55. Even if EX1007-EX1008 were prior

25

art, the ability to administer treprostinil at high doses in only 1-3 breaths and with fewer side effects was unexpected.  EX2003, ¶25; EX2052, ¶¶101-104; EX2086, ¶¶29-32.

Tyvaso also satisfies a long-felt and unmet need, which Petitioner does not dispute, resulting from the inconvenient dosing and side effects of Ventavis, then the only inhaled treatment for pulmonary hypertension.  EX1002, ¶42.  In fact, Dr. Hill agrees that Tyvaso® meets the needs of an underserved patient population (EX1108, 44:19-21, 49:17-50:10; EX2055, 28:22-29:20), which can support an inference of long-felt but unmet need.  *See, e.g.*, *In re Cyclobenzaprine Hydrochloride*, 676 F.3d 1063, 1083 (Fed. Cir. 2012).

Regarding copying, Petitioner's adoption of the claimed API, route of administration, treprostinil dosage, and number of breaths extends to using the FDA's previous findings of Tyvaso®'s efficacy and safety in applying for approval of its proposed product, LIQ861. EX2089, 3.  Petitioner's reliance on '793 patent named inventor Dr. Roscigno, VP of Product Development at Liquidia (EX2061, ¶2) and lead author on EX2084, discussing development of LIQ861, further rebuts the Reply's incorrect assertions regarding copying.

## VII.  CONCLUSION

For the foregoing reasons, the claims are patentable over the cited grounds, and Petitioner has not carried its burden to prove unpatentability.

26

Trials@uspto.gov                                                          Paper 77
571-272-7822                                              Entered: June 22, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

———————

IPR2021-00406
Patent 10,716,793 B2

———————

Record of Oral Hearing
Held: May 13, 2022

———————

Before ERICA A. FRANKLIN, CHRISTOPHER M. KAISER, and
DAVID COTTA, *Administrative Patent Judges*.

IPR2021-00406
Patent 10,716,793 B2

1    you've suggested that you'd like to submit some -- some

2    papers as well.  I think perhaps just as things that

3    respond to what Patent Owner is looking to submit, and you

4    know, perhaps just for completeness, and you know, that's

5    understandable, I think.  If we weren't to admit the

6    evidence that Patent Owner seeks to submit at this point,

7    would you want to submit that information?

8         MR. SUKDUANG:  Sure, so I'll address that

9    question first.

10        If -- if you were not to admit Patent Owner's

11   request, then we would similarly withdraw our request,

12   because it does address directly the issue Mr. Carsten has

13   raised.  And Mr. Carsten actually highlighted the problem

14   with the argument.  He said, expressly, that with respect

15   to enablement, there is a reasonable expectation of

16   success.  That is, of course, wrong.  Enablement is

17   whether there is undue experimentation.  Obviousness is

18   reasonable expectation of success.

19        So what we're dealing with here in the District

20   Court is an argument based on what does the '793 Patent

21   teach for a person of ordinary skill in the art.  And that

22   is enablement with respect to undue experimentation.

23        The question before the Panel, before the Board,

24   is obviousness.  What does the prior art teach to a person

25   of ordinary skill in the art.  Those two inquiries are

26   vastly different.  And in fact, there is no dispute, as

11

IPR2021-00406
Patent 10,716,793 B2

1  Mr. Carsten says with respect to the dependent claims.

2  Mr. Carsten says, incorrectly, that our argument with

3  respect to dependent claims rest solely -- and that was

4  his word -- solely on solutions.  That is entirely

5  incorrect.  When you look at our petition, the '212 Patent

6  expressly, expressly teaches dry powder formulations from

7  treprostinil, dry powders and inhalers, and also the

8  different nebulizers in the dependent claims, as well as

9  the size of the particle.  That was not, as doc -- as Mr.

10  Carsten said, disputed in their response.  It was not

11  disputed in their preliminary response.  Dr. Waxman and

12  Dr. McConville do not have testimony responding to that.

13       So with respect to the issue of dispute -- and

14  we'll cover this in the primary argument, but with respect

15  to the issue of dispute, this is -- this is a new argument

16  backfilling by Petitioner, because when you look at the

17  prior art, the '212, ,it expressly teaches that.

18       With respect to the issues of Mr. Gond -- Dr.

19  Gonda in the District Court versus here, he was talking

20  about whether based on the '793 Patent, whether there

21  would be undue experimentation to make a powder

22  formulation.  Here, he's talking about with respect to

23  obviousness what is literally disclosed by UTC's own

24  patent, the '212 Patent.  It's their own patent.  They

25  can't dispute that.  Those are literal terms.  And our

26  argument here is obviousness, but those dependent claim

12

1   limitations are anticipated by the '212 Patent.  Right?

2   We can argue obviousness because all of those dependent

3   claim -- excuse me, anticipation, because all of those

4   dependent claims are from one, but those are literally

5   disclosed.  Mr. Carsten cannot dispute that.  None of

6   their experts can dispute that.  202847

7         With respect to our evidence that we seek to

8   admit, UTC's experts at the District Court, Dr. Clarke and

9   Dr. Smith (phonetic), took the '793 Patent, and just

10  discloses it with no dispute, the word, powder.  That's

11  all it has.  A powder and a dry powder inhaler.  And they

12  said, "Looking at those two words alone, it would be easy

13  within three weeks with the knowledge of person already

14  skilled in the art to make a dry powder formulation."

15        Well, that evidence - if they want to bring in

16  their evidence - that evidence supports the obviousness of

17  the claims, because the '212 Patent has the same

18  disclosure as '793. And if Dr. Clarke and Dr. Smithe says,

19  "All I need to do is see the word, treprostinil powder, and

20  that's enough to make a dry powder formulation", then the

21  '212 Patent and our arguments here support the obviousness

22  of the dependent claims.

23        So again , it's Dr. Clarke and Dr. Smithe

24  testified on the issue of enablement.  Patent Owner wants

25  to submit Dr. -- our brief on the issue of enablement, and

26  so if you permit that, then a complete record on the issue

13

IPR2021-00406
Patent 10,716,793 B2

1   the four corner of the prior art.  And we do have expert

2   testimony that suggests that perhaps they might take more

3   than what's there.

4        MR. CARSTEN:  Absolutely, Your Honor, I agree

5   with that.  And the filter is you know, of where there's a

6   motivation to combine those references with a reasonable

7   expectation of success.  And this is exactly the issue

8   that we talked about earlier with respect to -- with

9   respect to our attempt to have a motion to allow some of

10  the information that Dr. Gonda mentioned.

11       You know, there was a significant amount of

12  discussion earlier when Mr. Sukduang was speaking about

13  the question of enablement and its relationship here.  You

14  know, the '212 Patent does have the words, and we've

15  acknowledged that it has the words, dry powder.  We've

16  never taken a contrary position on that.  And we've always

17  said that the '793 Patent is enabling.  Mr. Sukduang said

18  that -- that the '212 Patent and the '793 Patent have

19  exactly the same disclosure.  That's not correct.  The

20  '793 Patent gives you the missing pieces.  It gives you

21  the pieces pertaining to dose.  It gives you the pieces

22  pertaining to the 1 to 3 breaths, which isn't found in the

23  '212 or the -- or the -- or Voswinckel -- Voswinckel JESC.

24  And in connection with Voswinckel JAHA, it does say 1 to 3

25  breaths.  But it ignores the argument that Dr. Waxman sets

26  forth in the papers pertaining to the differences that a

42

IPR2021-00406
Patent 10,716,793 B2

1    person of skill in the art would understand between

2    continuous and bolus administration of treprostinil.

3          JUDGE COTTA:  Counsel, can I interrupt for just a

4    second.

5          MR. CARSTEN:  Certainly.

6          JUDGE COTTA:  Petitioner said that Patent Owner

7    does not dispute that the '212 Patent is enabled.  Do you

8    agree with that statement?

9          MR. CARSTEN:  The '212 Patent enablement was

10    never raised in connection with this case at all.  And

11    just because one says that the '793 Patent is enabled,

12    which has a priority date of 2006, doesn't mean that the

13    '212 Patent necessarily was enabled.  It has --

14          JUDGE COTTA:  So does the Patent Owner --

15          MR. CARSTEN:  -- the -- I'm sorry.

16          JUDGE COTTA:  Does Patent Owner contend that the

17    '212 Patent is not enabled?

18          MR. CARSTEN:  No, I believe the patent -- the

19    '212 Patent is enabled for its claims.  It would not,

20    however, allow a person of skill in the art to know to

21    develop a dry powder formulation of 15 to 90 micrograms to

22    be delivered in 1 to 3 breaths, which is the requirements

23    of the claim.  You know, but there is no record evidence

24    pertaining to the enablement of the '212 Patent, which has

25    a priority date of 1999.

26          JUDGE COTTA: Counsel, if I could interrupt again.

Appx0810

1    It looks like Claim 9 of the '212 Patent is directed to a

2    method of treating pulmonary hypertension in a mammal

3    comprising delivering to the mammal an effective amount of

4    UT-15, or it's pharmacet -- pharmaceutically acceptable

5    salt or ester by inhalation.  And then, Claim 9 further

6    specifies, "Wherein said UT-15 is inhaled in powder form

7    comprising particles less than 10 micrometers in diameter."

8          Do you contend that that disclosure is not

9    enabled?

10         MR. CARSTEN:  No, Your Honor, I don't disclose --

11   I don't contend that that disclosure is not -- is not

12   enabled.  Certainly, it's not enabled -- well, that is a

13   different claim, however, than the claims that are -- that

14   are the subject of the '793 Patent.  So the question of

15   whether or not one could go ahead and prepare a dry powder

16   formulation, I think that the evidence is clear on that

17   pertaining to the '793.  And the '21 -- the '212 Patent

18   doesn't claim 1 to 3 breaths.  It doesn't claim 15 to 19

19   micrograms.  It simple claims a therapeutically effective

20   amount.  And that 15 to 90 micrograms is really the heart

21   of -- 1 to 3 breaths is really the heart of the '793

22   invention.  It's what gives rise to the surprising and

23   unaccepted results here.  That is the key.  And when you

24   look at the Vos -- when a person of skill in the art looks

25   at Voswinckel JESC, they see that certain rate, certain

26   concentrations could said be administered over six

44

IPR2021-00406
Patent 10,716,793 B2

1    minutes.  God only knows how much of that treprostinil is

2    actually administered during those six minutes.  That is

3    Liquidia's burden to establish that for obviousness

4    purposes.  They haven't.  They failed.  It's based solely

5    on supposition and -- supposition and assumption.  The

6    JAHA reference talks about a post-nebulized approach in

7    three breaths of 600 microgram per milliliter

8    concentration.

9        When you look at the data that's presented there,

10   the six-minute continuous administration reaches a maximum

11   at 50 minutes, and after 110 minutes, nearly two hours, it

12   remains 50 percent of maximum in terms of those

13   hemodynamic properties.  When you look at JAHA, JAHA says

14   a maximum at 30 minutes, and then, 120 minutes, it's down

15   to 11 percent of maximum.  The entire amount or effects of

16   the treprostinil has been shifted, has been shifted

17   because of the bolus administration.  And at 120 minutes,

18   that's suggestive of more times per day.  You can't say

19   that one is better than the other.  Unlike, you know, the

20   assumption, and an actually specified and supported

21   assumption that Mr. Sukduang is saying here.

22       Moreover, Your Honor, the fact is that Dr. Gonda

23   and Liquidia has said that even as of 2006, the '793

24   Patent itself for those dry powders is not enabled.  We've

25   been consistent all along.  Liquidia, however, is having

26   -- is having its cake and eating it here too.  It is

45

IPR2021-00406
Patent 10,716,793 B2

1   saying  -- I'm sorry, I see your finger up.  I want to

2   make sure I --

3       JUDGE COTTA:  Yeah, I'm just a little confused.

4       MR. CARSTEN:  Sure.

5       JUDGE COTTA: If -- if Patent Owner does not

6   contend that the '212 Patent is not enabled, what would

7   you have us do with this alleged inconsistent testimony?

8       MR. CARSTEN:  Well --

9       JUDGE COTTA: What is the -- what are you offering

10  it for?  What -- what are you trying to establish here?

11  Are you just impeaching the credibility of Petitioner's

12  witness?

13      MR. CARSTEN:  First, it goes to the credibility

14  of Petitioner's witnesses.  Second, it goes to the very

15  heart of the reasonable expectation of success that a

16  person of skill in the art reading the '212 Patent in

17  combination with JAHA and JESC would not have a reasonable

18  expectation of successfully being able to take the

19  disclosures in solution form and say this applies directly

20  -- this dose and dosing strategy applies directly to the

21  dry powder formulation that's suggested or taught in the

22  '212 Patent.  So it really comes down to that issue, Your

23  Honor.  It's fundamentally a different -- they're taking a

24  fundamentally opposite position in these two matters.  And

25  I think what -- what we're losing sight of is the

26  requirement that Liquidia has to meet its burden over the

46

IPR2021-00406
Patent 10,716,793 B2

1   scope of the claims.  Each claim in the '793 Patent is a

2   separately claimed invention.  And so when you look at dry

3   powder, it's not enough -- I heard Mr. Sukduang say for

4   the first time that the '212 Patent anticipates Claims 4,

5   6 and 7.  That's nonsense, 1.  And 2, it's a brand new

6   argument, like so many things that Mr. Sukduang said this

7   morning.  The question of Claim 4 is a dry powder in with

8   -- with the requirements of Claim 1, which include the

9   single event dose, and include the -- the dosage range,

10   and the 1 to 3 breaths.  And there is absolutely nothing

11   in the '212 Patent, or the '212 Patent in JAHA and JESC,

12   all taken as a bundle, suggesting or directing the person

13   of skill in the art that they would be able to succeed.

14       And that's the cherry on top of that sundae, Your

15   Honor, is the very fact that even as of 2006, the '793

16   Patent which discloses dry powder, which discloses the

17   dosage range, which discloses the 1 to 3 breaths, they

18   still say it's not enabled.  They still say that a person

19   of skill in the art would not understand the solution

20   disclosures in the art to apply to dry powders.  That's

21   the argument that they made in the -- in their post-trial

22   brief for the very first time nine days ago.  And that

23   absolutely undermines Liquidia's ability to stand here and

24   tell you in the -- looking you in the eye, that those

25   claims are obvious with a reasonable expectation of

26   success.  The only substantive information that they rely

47

IPR2021-00406
Patent 10,716,793 B2

1    upon -- I'm going to double down on this.  Mr. Sukduang

2    said I was -- I was incorrect on this, but it's not I'm

3    not incorrect.  The only information pertaining to

4    actually an administration that they rely upon with

5    respect to establishing a desirability of 15 to 90

6    micrograms and 1 to 3 breaths are all solutions.  It's the

7    sheep data from the '212.  Solution.  It's the -- it's the

8    administration, and it's over six minutes in JESC.

9    Solution.  It's the JAHA 600 microgram, three breaths.

10   Solution.  Nothing having to do with dry powder.  The dry

11   powder assessment in the Petition runs about a half a

12   page.  And it just says, The words are there.  That's the

13   entirety of their assessment, and they're trying to meet

14   their burden even under the reasonable expectation of

15   success standing.

16          And we called them on it.  In our Patent Owner

17   response page 38 to 40, we said, It's not enough, they've

18   failed to meet their burden, and they ran away from the

19   burden.  Why strategically they can't take that position

20   and maintain the position in the District Court.

21          So that's -- that's the reason, Your Honor, and

22   that's what we really get down to.  I don't think that

23   they have established and met their burden for any one of

24   these claims.  Certainly not based upon their -- their

25   grounds.  The dose is just not there.  This is not a

26   simple math problem.  That's what Dr. -- Drs. Waxman and

48

IPR2021-00406
Patent 10,716,793 B2

1    Dr. McConville demonstrate.  And when they say it is a
2    simple math problem, and they say, Okay, well, I'm just
3    going to use one here, and I'm going to use 1.25 nanograms
4    per kilograms per minute, and I'm going to use 35
5    kilograms.  When we called them out and say that doesn't
6    work, on their reply, they come back with brand new
7    calculations with even further deviations.  This is not a
8    situation of a 300-page book.  And you can say, Yeah, give
9    or minus, plus or minus, it's 75,000 words.  This is a
10   question of maybe it's a kids' book, maybe it's, you know,
11   the number of words.  At each one of their -- each one of
12   their steps on their calculations are just missing or so
13   overwhelmingly broad that any person can pick a number.
14   When you have a two or three factor test or equation, and
15   you know what the right answer is, you're given your spot
16   at one or two inputs, you can pick the third input that
17   you know is going to get you within the range.
18         And as for the use of the Ghofrani and Voswinckel
19   2006, they had the opportunity to actually depose Dr.
20   Seeger, and confirm that it is by another, they ran away
21   from it.  And now, they're trying to backdoor by saying,
22   Oh, well, Voswinckel 2006 and Ghofrani say a dose.
23         That's a telling point, Your Honor.  Voswinckel
24   and Ghofrani, in their articles, knew how to say a dose.
25   You know what they didn't put in these abstracts?  The
26   dose.  If they -- if these -- if these well-qualified and

49

IPR2021-00406
Patent 10,716,793 B2

1  smart authors believed that it was just a trivial math

2  problem in order to derive the dose, why on earth would

3  they go to lengths to conceal the dose by not including

4  it.  They knew how to say what the dose was.  They

5  specifically chose not to.  And that absolutely undermines

6  and supports the nuance and careful assessment by Dr.

7  Waxman and Dr. McConville here.  It's not a simple math

8  problem as much as Mr. Sukduang or Liquidia would have you

9  believe that to be the case.

10       I'm not sure where I am on time -- oh, I still

11  have a fair bit of time.

12       So I think --

13       JUDGE KAISER:  Just a question --

14       MR. CARSTEN:  -- that -- I hope that responds to

15  your questions, both -- both Judge Kaiser and Judge Cotta.

16       If you have further questions, absolutely

17  interrupt me.  I mean, this -- this is designed to help

18  you render a decision, and Judge Franklin as well.  If

19  there's anything that you guys need, just please free to

20  ask me.  I want to make this as helpful of a 45 minutes or

21  an hour session for you.

22       JUDGE KAISER:  Can I --

23       MR. CARSTEN:  Turning --

24       JUDGE KAISER: Can I interrupt you, I'm sorry,

25  before you turn away from this topic.  There's a -- so you

26  see this all the time in -- in sort of unhelpful political

50

1  discussions, right, where someone says, "The people in my

2  party are right on issue X and issue Y," but the people in

3  the other party who take the opposite position on both of

4  those issues are hypocrites because they take those

5  positions. And I'm pointing out that to you, of course,

6  only proving that your own party is also a hypocrite. And

7  so it doesn't tend to move ball very far forward in terms

8  of proving that you're right on either issue X or issue Y.

9  And it feels a little bit like there's something similar

10 going on here with respect to this enablement issue,

11 right, where there's -- there's an argument in the

12 District Court over well, the -- the challenged patent is

13 not enabled, or it is enabled. And that argument by -- by

14 the defendant in the District Court means perforce that

15 the defendant is saying that the prior art isn't enough to

16 enable these claims either. And then, they come here and

17 they argue as Petitioner that the claims are obvious over

18 this combination of prior art, which has to include an

19 enablement portion, right. I mean, it isn't something

20 that people usually talk about in obviousness grounds

21 because usually the prior art is presumed enabling. You

22 know, unless there is some evidence in the record to

23 suggest that it's not. And both parties are kind of

24 dancing around the issue because there's some sensitivity

25 to understandably just saying something that is going to

26 result -- in other words, you can't come in in this

51

IPR2021-00406
Patent 10,716,793 B2

1   proceeding and say, "Look, the prior art is not enabling,"

2   or at least you have to be very careful about saying that,

3   because if you're not very careful about how you say it,

4   then, you may end up with your own claims being found not

5   enabled in the District Court.  And Petitioner can't come

6   in and say, Well, the prior art is enabling, because then,

7   they're going to lose on non-enablement in the District

8   Court proceeding.  And so both parties are being very

9   careful not to say anything that's not all that helpful

10   upon the issue of whether Petitioner has proven enough on

11   the enablement portion of its obviousness ground.

12        And I don't know that I have a very helpful

13   question to ask beyond sort of what do we do with this?

14   You know, we see this from time to time on things like

15   claim construction where, you know, Petitioner will come

16   to us and say, "We think you should construe the claims

17   this way for purposes of this proceeding," but we don't --

18   we don't actually think that's the right claim

19   construction and we're just using it because that's what's

20   going on in the District Court or something.

21        And we've often struggled with that, and I'm not

22   sure what to do with arguments that a party makes that it

23   doesn't believe.  I don't think they're wrong because the

24   party doesn't believe in them, but it's also really

25   difficult to figure out how to treat them.  And I don't

26   know if you have any advice on that, and particularly any

52

IPR2021-00406
Patent 10,716,793 B2

1    authority to back up what your advice is on that.

2        MR. CARSTEN:  Well, I always have advice.  I

3    often don't have authority to back up my advice.  But you

4    know, I think that the enablement of the '212 Patent is --

5    is a distraction, frankly, and I think it doesn't

6    necessarily matter whether the '212 Patent or the '212

7    Patent claims, as I mentioned earlier, is enabled.  The

8    question isn't whether the '212 Patent is enabled to

9    prepare a dose -- to prepare a dry powder form.  The

10   question is has Liquidia established that a person of

11   skill in the art reading the '212 Patent coupled with JESC

12   and JAHA would be -- would have a reasonable expectation

13   of succeeding in preparing and administering a dose -- a

14   dry powder form for Claim 4 containing 15 to 90 micrograms

15   of -- administering 15 to 90 micrograms of treprostinil to

16   treat pulmonary hypertension in 1 to 3 breaths.

17       And I -- my -- my view on that, Your Honor, is it

18   doesn't matter whether the '212 Patent with its claims is

19   enabled or not to address whether or not Liquidia has met

20   its burden to establish all of that.  What instead they're

21   trying to do, it seems to me, is to sort of pick and

22   choose from various pieces, and just rely upon, in

23   violation of Arendi (phonetic), this sort of general

24   knowledge to say, "Oh, yeah, you would do it and it would

25   be fine."

26       And I think that's the failure of proof that I

53

1   see for specifically for Claims 4, 6 and 7.  They didn't

2   go ahead separately and identify a reasonable expectation

3   of success.  All they did was point out and say, It says

4   it, and so, therefore, it's in the art, and therefore,

5   it's obvious.  And that's just missing the boat in terms

6   of what they need to show in order to establish or show

7   for obviousness of this specific claim, which is a

8   separate invention.

9       So I apologize to the extent that you get the

10  sense that this is an unhelpful political debate.  And in

11  fairness, Mr. Sukduang and I have spent a large number of

12  quality hours together over the last couple of months, and

13  I think we're in a situation where absence might make the

14  heart grow fonder.  But having said that, I don't want

15  that to color your view on what I think is a fairly

16  straightforward argument about a failure of proof.  You

17  know, were there -- were there reasonable expectation of

18  success?  Were they to have actually assessed this

19  properly?  There -- it just wasn't done, and that's the

20  gap that -- that enables us, or allows us -- I don't want

21  to use the word, enable -- that allows us to make the

22  argument that you know, they just really missed the boat

23  on these specific claims.  We think they missed the boat

24  on all of the claims, but for these in particular, 4, 6

25  and 7, which are constrained and circumscribed by the

26  limitations that there's a reasonable expectation of

IPR2021-00406
U.S. Patent No. 10,716,793 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

———————————

Inter Partes Review No. IPR2021-00406
U.S. Patent No. 10,716,793 B2

———————————

**PATENT OWNER'S REQUEST FOR REHEARING**

## TABLE OF CONTENTS

I.    Introduction and Background ........................................................... 1

II.   Legal Standard ................................................................................ 3

III.  Argument ........................................................................................ 3

      A.    Liquidia failed to demonstrate that the Voswinckel abstracts are
            prior art ................................................................................ 4

      B.    The Board's conclusion that Voswinckel JESC and Voswinckel
            JAHA are prior art conflicts with settled legal principles .................... 7

      C.    But for the Board's legal error, the challenged claims would
            have been upheld ................................................................ 12

IV.   Conclusion ................................................................................ 14

i

# TABLE OF AUTHORITIES

**Cases:**

*Argentum Pharm. LLC v. Research Corp. Tech., Inc.*,
　IPR2016-00204, Paper 19 (P.T.A.B. May 23, 2016) .........................................11

*Blue Calypso, LLC v. Groupon, Inc.*,
　815 F.3d 1331 (Fed. Cir. 2016) .......................................................................7, 8

*Caterpillar Inc. v. Wirtgen Am., Inc.*,
　IPR2017-02185, Paper 48 (P.T.A.B. July 11, 2019) ...........................................3

*Constant v. Advanced Micro-Devices, Inc.*,
　848 F.2d 1560 (Fed. Cir. 1988) .............................................................................7

*Handi Quilter, Inc. v. Bernina International AG*,
　IPR2013-00364, Paper 39 (P.T.A.B. Sept. 25, 2014).........................................12

*Kyocera Wireless Corp. v. ITC*,
　545 F.3d 1340 (Fed. Cir. 2008) .............................................................................8

*In re Lister*,
　583 F.3d 1307 (Fed. Cir. 2009) .........................................................................2, 8

*Minnesota Min. & Mfg. Co. v. Chemque, Inc.*,
　303 F.3d 1294 (Fed. Cir. 2002) .............................................................................1

*Samsung Elecs. Co. v. Infobridge Pte. Ltd.*,
　929 F.3d 1363 (Fed. Cir. 2019) ...........................................................................10

*Teoxane S.A. v. Allergan*,
　IPR2017-01906, Paper 15 (P.T.A.B. Mar. 9, 2018) ...................................2, 7, 10

**Statutes:**

35 U.S.C. §102(a) .....................................................................................6, 7, 12, 13

35 U.S.C. §102(b) ............................................................... 1, 2, 6, 8, 9, 10, 11, 12

**Regulations:**

37 C.F.R. §42.71 ....................................................................................................3

4855-7660-5999.1

37 C.F.R. §42.104(b)(2) .............................................................................12

**Other Authorities:**

M.P.E.P. §2127 ..........................................................................................8

iii

Patent Owner United Therapeutics Corporation (UT) respectfully requests that the Board reconsider its Final Written Decision (Paper 78) (FWD) finding claims 1–8 of U.S. Patent No. 10,716,793 unpatentable.

## I.     Introduction and Background

The Board ruled that all eight claims of the '793 patent are obvious, relying in part on two references: Voswinckel JESC (Ex. 1007) and Voswinckel JAHA (Ex. 1008). The Final Written Decision concluded that these references qualify as prior art under pre-AIA 35 U.S.C. §102(b) because research aids made them publicly accessible. FWD at 8–12. But that prior-art determination rests on a substantial legal error, because the supposed research aids were published *after* the critical §102(b) date of May 15, 2005.

Public accessibility prior to the critical date is the defining feature of a §102(b) "printed publication." *See, e.g.*, *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002). The Board did not find that Liquidia proved that either Voswinckel abstract was *itself* publicly accessible, such as if they had been indexed and catalogued in public libraries more than a year before the priority date. Instead, the Board reasoned that two references the Board described as "research aids"—Ghofrani (Ex. 1010) and Sulica (Ex. 1104)—provided a skilled artisan with a roadmap to the Voswinckel abstracts. FWD at 10–12.

That ruling contravenes settled legal principles. Where a research aid is relied

upon as a "roadmap" to establish public accessibility to a skilled artisan under §102(b), the date of public accessibility is *the date of the research aid*, not *the date of the underlying reference.* *See In re Lister*, 583 F.3d 1307, 1312 (Fed. Cir. 2009) (holding that the date of accessibility through a searchable index was the effective date of an asserted reference). That is because "[t]he touchstone of public accessibility is whether an ordinary artisan exercising reasonable diligence would have been able to locate the document prior to the critical date." *Teoxane S.A. v. Allergan*, IPR2017-01906, Paper 15, at 11 (P.T.A.B. Mar. 9, 2018) (quotation marks omitted). Ghofrani was clearly published within a year of the priority date (*see* Ex. 1121, at 1; Paper 55, at 9), and Liquidia provided no evidence that Sulica was published outside that one-year window (*see* Ex. 1104, at 1; Paper 55, at 9). Thus, even assuming Ghofrani and Sulica provide a skilled artisan with the requisite "roadmap" to find the Voswinckel abstracts (*see* FWD at 11), neither could have led the skilled artisan to the relevant abstract more than one year before the priority date. The Final Written Decision erred in failing to address this critical distinction and allowing Liquidia to use research aids published within a year of the applicable date to establish the Voswinckel abstracts as publicly accessible more than a year before the applicable date.

With this error corrected, the obviousness conclusion falls apart. Aside from Voswinckel JESC and Voswinckel JAHA, the Board found *no* evidence that either

the claimed drug quantity (15 to 90 micrograms) or the claimed delivery duration (one to three breaths) was disclosed in the prior art. None of Liquidia's other asserted obviousness grounds are viable, either. Each of the other grounds relies on Voswinckel JESC, Voswinckel JAHA, or another reference that the Board concluded does not constitute prior art. *See* FWD at 3–4.

For these reasons, the Board should grant rehearing, vacate the Final Written Decision, and issue a new decision upholding the challenged claims.

## II.    Legal Standard

A party dissatisfied with a final written decision of the Board may file one rehearing request, without prior authorization, within 30 days of the Board's decision. 37 C.F.R. §42.71. The requesting party "must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, an opposition, a reply, or a sur-reply." *Id.* The Board reviews its decision for abuse of discretion, which occurs when "the decision is based on an erroneous interpretation of law, if a factual finding is not supported by substantial evidence, or if an unreasonable judgment is made in weighing relevant factors." *Caterpillar Inc. v. Wirtgen Am., Inc.*, IPR2017-02185, Paper 48, at 2 (P.T.A.B. July 11, 2019).

## III.    Argument

A long-established legal principle governs the Voswinckel abstracts' status as

prior art:  if a skilled artisan must rely on a research aid to provide a roadmap to access an underlying reference, then the *underlying reference* cannot have been publicly accessible until the *research aid* was.  The Final Written Decision contravenes this principle by allowing Liquidia to use two later-published research aids (Ghofrani and Sulica) to smuggle those earlier, otherwise-inaccessible abstracts into the record as prior art.  But for this legal error, the Board would have been required to uphold the asserted claims.

## A.      Liquidia failed to demonstrate that the Voswinckel abstracts are prior art

Liquidia's Petition contained only the most conclusory evidence that Voswinckel JESC and Voswinckel JAHA were prior art.  The Petition asserted that the abstracts were published in 2004 (*see* Paper 2, at 22, 24), and an accompanying expert declaration speculated that the abstracts likely would have been received, catalogued, and indexed by libraries by late 2004—without providing any evidence that they actually were.  *See* Ex. 1036 ¶¶59–75.

As UT explained in the Patent Owner Response, this cursory showing did not come close to satisfying Liquidia's burden of proof.  Liquidia's Petition failed to demonstrate that any library actually received either abstract, let alone more than a year before the priority date.  *See* Paper 29, at 12–14.  And the Petition further failed to show that any library had indexed or catalogued the abstracts or even the supplements in which they appeared before that date.  *See id.* at 14–18.

4

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Evidently recognizing the threadbare nature of its prior submissions, Liquidia shifted stances and sought to rely on new evidence and arguments in its Reply. As relevant here, Liquidia argued for the first time that Voswinckel JESC "was cited in the June 2005 Ghofrani article in the journal *Herz*," and that a skilled artisan "would have relied on Ghofrani's disclosures to … access the JESC abstract." Paper 44, at 3–4. Liquidia advanced effectively the same argument for Voswinckel JAHA, contending that a skilled artisan "would have been able to access JAHA with Sulica as a research aid." *Id.* at 7–8. Finally, Liquidia suggested that Sulica's citation to Voswinckel JAHA itself demonstrated public accessibility of that reference, because it showed that "[t]he Sulica authors were able to access" it. *Id.* at 7.

UT explained in its Surreply that Liquidia failed to show that either Voswinckel abstract was prior art. Instead, Liquidia's "belated argument establishe[d], at best, that a POSA may have been able to find the Abstract as of the date the alleged 'research aids' became available." Paper 55, at 9. Crucially, "Ghofrani bears a July 2005 date-stamp, while Sulica shows only the year 2005" without any actual evidence demonstrating the March 2005 date that Liquidia asserted. *Id.* (citations omitted); *see id.* at 9 n.4.

UT further explained that the mere fact that Sulica and Ghofrani contain citations to the Voswinckel abstracts cannot establish that the abstracts were publicly accessible to persons of ordinary skill in the art more than a year before the priority

5

date. The Sulica and Ghofrani authors are not persons of ordinary skill with respect to the Voswinckel abstracts because the Voswinckel abstracts' authors had a close affiliation with the supposed research aids' authors: Voswinckel JESC and the relevant portions of Ghofrani shared coauthors (Dr. Voswinckel and Dr. Seeger), Paper 29, at 46–47 (citing Ex. 2066 at 3, ¶7); Paper 55, at 10, and Dr. Sulica was a principal investigator in the TRIUMPH study group (there, too, along with Dr. Seeger) who participated in the clinical trials reported in the Voswinckel publications, Paper 55, at 10. Thus, the fact that the authors of Sulica and Ghofrani had access to and could cite the Voswinckel abstracts, given their affiliation with those abstracts, is irrelevant to whether a person of ordinary skill could have publicly accessed them, much less accessed them more than a year before the priority date. *See* Paper 55, at 10.

As UT explained, "if the Abstracts only became publicly accessible (via these alleged 'research aids') after May 15, 2005, they do not qualify as prior art under 35 U.S.C. §102(b)." *Id.* at 10. "And if the Abstracts are not Section 102(b) prior art, they are not prior art at all because they are not 'by another' under Section 102(a), given Patent Owner's showing that the subject matter of both Abstracts is the

inventors' own work." *Id.*[1]

## B. The Board's conclusion that Voswinckel JESC and Voswinckel JAHA are prior art conflicts with settled legal principles

The Board erroneously concluded that Voswinckel JESC and Voswinckel JAHA were prior art. According to the Final Written Decision, because "both the Ghofrani article and the Sulica article" cite the Voswinckel abstracts, they are research aids that serve as "roadmaps" to establish public accessibility of those abstracts. FWD at 11–12 (citing *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1350 (Fed. Cir. 2016)). That conclusion conflicts with settled legal principles.

As the Board has previously explained, "[t]he touchstone of public accessibility is whether an ordinary artisan exercising reasonable diligence would have been able to locate the document prior to the critical date." *Teoxane*, IPR2017-01906, Paper 15, at 11 (quotation marks omitted). Indeed, the decisions of both the

---

[1] This showing was uncontested. Liquidia did not object to or move to exclude any of Exhibits 2003, 2061, and 2071, which were first filed with the Patent Owner Response (Paper 29) and later cited in the Surreply (Paper 55, at 10) to show that the abstracts were not §102(a) prior art. Furthermore, Liquidia declined the opportunity to depose Dr. Seeger in the IPR in relation to Exhibits 2003 and 2071 following their submission with the Patent Owner Response, and it made no request to submit any rebuttal evidence on this issue following the Surreply.

7

Federal Circuit and this Board have repeatedly underscored the point: what matters is public accessibility as of the critical date. *See, e.g.*, *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1568 (Fed. Cir. 1988) ("The statutory phrase 'printed publication' has been interpreted to mean that before the critical date the reference must have been sufficiently accessible to the public interested in the art[.]"); *In re Lister*, 583 F.3d 1307, 1312 (Fed. Cir. 2009) (analyzing whether a reference was "publicly accessible as of the critical date"); *Kyocera Wireless Corp. v. ITC*, 545 F.3d 1340, 1350 (Fed. Cir. 2008) (similar).

These principles apply with equal force regardless of whether a reference is publicly accessible on its own or instead becomes publicly accessible only by way of a "research aid." As the Federal Circuit has explained, "the presence of a 'research aid' can … establish public accessibility" by "provid[ing] a skilled artisan with a sufficiently definite roadmap leading to … the potentially invalidating reference." *Blue Calypso*, 815 F.3d at 1350. By simple logic, that roadmap can "lead[] to … the potentially invalidating reference" only if and when it becomes publicly accessible—before then, there is nothing to guide the skilled artisan to the underlying reference. *See Lister*, 583 F.3d at 1312 (for a reference that becomes publicly accessible through a searchable index, the relevant date is the date of indexing); *cf.* M.P.E.P. §2127 ("An abandoned patent application may become evidence of prior art only when it has been appropriately disclosed, as, for example,

when the abandoned patent application is referenced in the disclosure of another patent, in a publication, or by voluntary disclosure[.]" (brackets omitted)).  The key issue in this case is therefore when *the research aid* providing the roadmap became publicly accessible, and whether that was before the §102(b) critical date.

The Final Written Decision did not address that question and overlooked UT's arguments doing so.  Even assuming that "the Ghofrani article and the Sulica article provide roadmaps directing a person of ordinary skill in the art … straight to Voswinckel JESC or Voswinckel JAHA" (FWD at 11–12), the question is when those roadmaps became available to an ordinary artisan in this field.  The answer: not before the critical May 15, 2005, §102(b) date.  Ghofrani is an article from the June 2005 issue of *Herz*; the exhibit in the record bears a July 2005 date-stamp.  *See* Ex. 1121, at 1.  And Sulica bears a "2005" date with no indication of when in 2005 it was published—much less when it became publicly accessible.[2]  *See* Ex. 1104, at 2.

---

[2] Liquidia asserted that Sulica is a "March 2005 article" (Paper 44, at 7), and the Final Written Decision quoted that statement (FWD at 11).  But there is no evidence that it appeared in any publication in March 2005.  The document itself, Exhibit 1104, only references the year "2005" and offers no other date information.  Paper 55, at 9.  And there was no other evidence supporting Liquidia's March 2005 date.

9

In short, neither of the alleged research aids were shown to have been publicly accessible before the critical §102(b) date. And Liquidia essentially conceded this point—it argued, for example, that Ghofrani would have provided a roadmap to an ordinary skilled artisan to locate Voswinckel JESC "*before May 15, 2006*." Paper 44, at 4 (emphasis added); *accord id.* at 7–8 (arguing that Sulica would have allowed an ordinary skilled artisan exercising reasonable diligence to access Voswinckel JAHA "*before 2006*" (emphasis added)). In nevertheless concluding that Sulica and Ghofrani establish the Voswinckel abstracts as prior art under §102(b), the Board effectively blessed an end-run around the principle that a reference must be publicly accessible before the critical date. That legal error infected the Board's decision, and warrants rehearing.

Furthermore, to the extent the Board concluded that Ghofrani and Sulica's mere citations to the Voswinckel abstracts demonstrated that those references were publicly accessible because it demonstrated that the authors of Ghofrani and Sulica were able to access the abstracts—as Liquidia argued in its Reply (Paper 44, at 7)— that conclusion is equally erroneous. Section 102(b) requires prior-art references to be "publicly accessible" to an "ordinary" skilled artisan. *Teoxane*, IPR2017-01906, Paper 15, at 11; *Samsung Elecs. Co. v. Infobridge Pte. Ltd.*, 929 F.3d 1363, 1369 (Fed. Cir. 2019) (whether "persons of ordinary skill in the art" were able to locate the abstracts through the exercise of "reasonable diligence"). The authors of

Ghofrani and Sulica were not ordinary skilled artisans with respect to the Voswinckel abstracts. Rather, they were coauthors of one Voswinckel abstract (citing their own prior work) and a principal investigator of the team conducting the clinical work described in the other abstract; they therefore would naturally have known about (and had access to) those documents irrespective of their public accessibility. Paper 55, at 10.

In other words, if a petitioner is relying on a research aid to establish public accessibility of a reference by a hypothetical person of ordinary skill, it is not enough for a petitioner to point to the mere existence of a citation in a research aid authored by someone affiliated with the cited reference. Doing so simply demonstrates that the research aid's author was aware of the work he or she contributed to—not that the public (or an ordinary skilled artisan) had access to it. *Argentum Pharm. LLC v. Research Corp. Tech., Inc.*, IPR2016-00204, Paper 19 at 11 (P.T.A.B. May 23, 2016) (concluding that references citing a disputed prior-art thesis, authored either by the student who wrote the thesis or by the student's thesis advisor, only indicated that the authors "had personal knowledge regarding the cited thesis").[3] Nor, of

---

[3] Although the Board mentioned Liquidia's argument that Voswinckel JESC was publicly presented, *see* FWD at 10, the Board did not adopt that argument, and Liquidia offered no evidence of what was presented or to whom. Nor did Liquidia

11

course, does it demonstrate that an affiliated author who published *after* the critical §102(b) date had access to the reference *before* that date.

### C.     But for the Board's legal error, the challenged claims would have been upheld

For the foregoing reasons, the Board erred in concluding that Voswinckel JESC and Voswinckel JAHA are prior art under §102(b).  And without that erroneous conclusion, the Board's decision cannot stand.

Nor would there have been any basis for concluding that the two Voswinckel abstracts are prior art under §102(a).  First, it would be improper for the Board to entertain the Voswinckel abstracts as §102(a) prior art because the Petition alleges them only to be §102(b) art. *Compare* Paper 2, at 22, 24 (addressing the abstracts and identifying §102(b)), *with id.* at 25, 27 (addressing Ghofrani and Voswinckel 2006 as prior art under §102(a)).  The Board has held that belated conversion from §102(a) to §102(b) is not permitted.  *See Handi Quilter*, Paper 39, at 6; *see also SAS Inst. v. Iancu*, 138 S. Ct. 1348, 1356 (2018) (holding that an *inter partes* review must

---

anywhere argue or explain how any public presentation could have served as a "research aid" that establishes any specific date of public accessibility sufficient to render JESC a §102(b) reference, especially given that the only reference of record which actually cites JESC (Ghofrani) was published less than a year before the priority date.

12

proceed "in accordance with or in conformance to the petition"); 37 C.F.R. §42.104(b)(2) (providing that a petition must state "[t]he specific statutory grounds under 35 U.S.C. 102 or 103 on which the challenge to the claim is based and the patents or printed publications relied upon for each ground."). Second, even if Liquidia had raised a §102(a) argument, the argument would have failed on the merits. Section 102(a) applies only to printed publications by "others"—*i.e.*, individuals other than the inventors. As already explained, Voswinckel JESC and Voswinckel JAHA are not by "others": they reflect the inventors' own work. *See* Paper 55, at 10; Ex. 2003 ¶27; Ex. 2061 ¶¶12–13; Ex. 2071¶¶6–8; *supra*, pp. 5–6, 10.

There is also no basis for adopting any of the other obviousness grounds in the Petition. Ground 2 also relies on Voswinckel JESC. FWD at 3. Ground 3 relies on Ghofrani, which the Board correctly found not to constitute prior art because it was not by "others." *See id.* at 37–40. Ground 4 relies on Voswinckel JESC and Ghofrani. *Id.* at 3. And Grounds 5 and 6 rely on Voswinckel 2006, *see id.* at 3–4, which the Board correctly found not to constitute prior art because it was not by others, *see id.* at 40–41.

In short, the Board's erroneous conclusion that Ghofrani and Sulica could establish public accessibility—without any proof that those sources provided a roadmap to the Voswinckel abstracts before the critical date—was an outcome-

13

determinative error.

## IV.     Conclusion

The Board should grant rehearing, vacate its prior final written decision, and enter a revised final written decision confirming that Liquidia has not shown that claims 1–8 of the '793 patent are unpatentable.

August 18, 2022                     Respectfully submitted.

<u>/Stephen B. Maebius/</u>
Stephen B. Maebius (Reg. No. 35,264)
FOLEY & LARDNER LLP
3000 K Street, NW
Washington, DC 20007
Telephone: (202) 672-5569
Facsimile: (202) 672-5399

*Counsel for Patent Owner*
  *United Therapeutics Corporation*

14

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that a copy of the foregoing "Patent Owner's Request for Rehearing" was served on August 18, 2022, via e-mail on the following counsel of record for the Petitioner:

zLiquidiaIPR@cooley.com
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com

August 18, 2022

/Stephen B. Maebius/
Stephen B. Maebius (Reg. No. 35,264)
FOLEY & LARDNER LLP
3000 K Street, NW
Washington, DC 20007
Telephone: (202) 672-5569
Facsimile: (202) 672-5399

*Counsel for Patent Owner*
  *United Therapeutics Corporation*

Trials@uspto.gov                                                                Paper No. 80
571.272.7822                                                        Filed: August 22, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

_____

IPR2021-00406
Patent 10,716,793

_____

Before Jamilah Sultan, *Trial Paralegal*

NOTIFICATION OF RECEIPT OF POP REQUEST

The Office has received a request for Precedential Opinion Panel (POP) review of an issue raised in this case.  *See* Ex. 3003.  The request is under review. The Office will provide another notification after a decision on the request has been made.

IPR2021-00406
Patent 10,716,793

For PETITIONER:

Ivor R. Elrifi
Erik B. Milch
Deepa Kannappan
Sanya Sukduang
Lauren Krickl
Douglas Cheek
Jonathan Davies
COOLEY LLP
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com
lkrickl@cooley.com
dcheek@cooley.com
jdavies@cooley.com

For PATENT OWNER:

Stephen B. Maebius
George Quillin
Jason N. Mock
Michael Houston
FOLEY & LARDNER LLP
smaebius@foley.com
gquillin@foley.com
jmock@foley.com
mhouston@foley.com

Shaun R. Snader
UNITED THERAPEUTICS CORP.
ssnader@unither.com

Douglas Carsten
April E. Weisbruch
Judy Mohr, Ph.D.
Jiaxiao Zhang
Mandy Kim
Arthur Dykhuis
Amy Mahan

2

IPR2021-00406
Patent 10,716,793

MCDERMOTT WILL & EMERY LLP
dcarsten@mwe.com
aweisbruch@mwe.com
jmohr@mwe.com
jazhang@mwe.com
mhkim@mwe.com
adykhuis@mwe.com
amahan@mwe.com

Trials@uspto.gov
571-272-7822

Paper 81
Date October 26, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

_____

IPR2021-00406
Patent 10,716,793 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office*, SCOTT R. BOALICK, *Chief Administrative Patent Judge*, and JACQUELINE WRIGHT BONILLA, *Deputy Chief Administrative Patent Judge.*

PER CURIAM.

ORDER

IPR2021-00406
Patent 10,716,793 B2

The Office received a request for Precedential Opinion Panel (POP) review of issues raised in the Board's Final Written Decision. Ex. 3003; *see* Paper 78. In the request, Patent Owner argues that the Board improperly determined that the Voswinckel JESC (Ex. 1007) and Voswinckel JAHA (Ex. 1008) references were publicly accessible and therefore qualify as prior art under pre-AIA 35 U.S.C. § 102(b) because a person of ordinary skill in the art would have been able to find them with the benefit of certain research aids. Paper 79, 1–3; *see* Paper 78, 8–12. The request was referred to the POP panel referenced above.

We have reviewed the request, the Board's Final Written Decision, the Papers, and the Exhibits in the above-listed proceeding. We determine that the Board's Final Written Decision did not address adequately whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art. *See* Paper 78, 8–12. Specifically, the Board's analysis did not consider whether the research aids themselves were available prior to the critical date, such that a person of ordinary skill in the art would have used them to find Voswinckel JESC and Voswinckel JAHA. *Id.* at 12. Further, the Board's analysis did not address whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library. Paper 78, 8–12; *see In re Klopfenstein*, 380 F.3d 1345, 1350–52 (Fed. Cir. 2004) ("The determination of whether a reference is a 'printed publication' under 35 U.S.C. § 102(b) involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public.").

2

IPR2021-00406
Patent 10,716,793 B2

However, because the record has been fully developed on these issues, the Board panel is best suited to make the appropriate factual findings for this analysis in its decision on rehearing.  Accordingly, we deny Patent Owner's request for POP review of the Final Written Decision.  With this denial of POP review, authority over all issues in this case — including consideration of Patent Owner's pending rehearing request — is returned to the original panel.  We direct the Board, in its consideration on rehearing, to clearly identify whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art.  Such analysis shall clarify whether the relied upon research aids were available prior to the critical date and whether the Voswinckel JESC and Voswinckel JAHA references were publicly accessible by way of their presentation and/or inclusion in distributed materials, such as at a conference or library.

Accordingly, based on the foregoing, it is:

ORDERED that the request for POP review is denied;

FURTHER ORDERED that the original panel maintains authority over all matters, including considering the submitted rehearing request in view of the complete record; and

FURTHER ORDERED that the Board, on rehearing, shall clearly identify whether the Voswinckel JESC and Voswinckel JAHA references qualify as prior art.

3

IPR2021-00406
Patent 10,716,793 B2

For PETITIONER:

Ivor R. Elrifi
Erik B. Milch
Deepa Kannappan
Sanya Sukduang
Lauren Krickl
Douglas Cheek
Jonathan Davies
COOLEY LLP
ielrifi@cooley.com
emilch@cooley.com
dkannappan@cooley.com
ssukduang@cooley.com
lkrickl@cooley.com
 dcheek@cooley.com
jdavies@cooley.com


For PATENT OWNER:

Stephen B. Maebius
George Quillin
Jason N. Mock
Michael Houston
FOLEY & LARDNER LLP
smaebius@foley.com
gquillin@foley.com
jmock@foley.com
mhouston@foley.com


Shaun R. Snader
UNITED THERAPEUTICS CORP.
ssnader@unither.com


Douglas Carsten
April E. Weisbruch
Judy Mohr, Ph.D.
Jiaxiao Zhang

4

IPR2021-00406
Patent 10,716,793 B2

Mandy Kim
Arthur Dykhuis
Amy Mahan
MCDERMOTT WILL & EMERY LLP
dcarsten@mwe.com
aweisbruch@mwe.com
jmohr@mwe.com
jazhang@mwe.com
mhkim@mwe.com
adykhuis@mwe.com
amahan@mwe.com

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

# LIQUIDIA TECHNOLOGIES, INC.,

*Petitioner,*

v.

# UNITED THERAPEUTICS CORPORATION,

*Patent Owner.*

_____

Case No.  IPR2021-00406
Patent No.  10,716,793 B2

_____

# PATENT OWNER'S NOTICE OF APPEAL

## <u>NOTICE OF APPEAL TO THE FEDERAL CIRCUIT</u>

Notice is hereby given, pursuant to 35 U.S.C. §§ 141, 142, and 319 and 37 C.F.R. §§ 90.2 and 90.3(a)(1) that United Therapeutics Corporation ("Patent Owner") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision entered on July 19, 2022 (Paper 78), the Decision on Request for Rehearing entered on February 2, 2023 (Paper 82), and from all underlying orders, decisions, rulings, and opinions, regarding the *inter partes* review of U.S. Patent No. 10,716,783 ("the '793 Patent") in Case No. IPR2021-00406. This appeal is timely under 35 U.S.C. § 142 and 37 C.F.R. § 90.3.

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner further states that the issues on appeal are anticipated to include, but are not limited to:

(1)    Whether the Board erred in concluding that two references, Voswinckel JESC (Ex. 1007)[1] and Voswinckel JAHA (Ex. 1008)[2], qualify as prior art under 35 U.S.C. § 102(b);

---

[1] Voswinckel, R., et al., Abstract 218: "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal 25:22 (2004).

[2] Robert Voswinckel, Beate Enke, Andre Kreckel, Frank Reichenberger, Stefanie Krick, Henning Gall, Tobias Gessier, Thomas Schmehl, Markus G. Kohstall, Friedrich Grimminger, Hossein A. Ghofrani, Werner Seeger, and Horst Olschewski, Abstract 1414: "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension," Abstracts from the 2004 Scientific Sessions of the American Heart Association, Circulation, 110(17 Suppl.):III-295 (October 26, 2004).

1

(2)     Whether the Board erred in analyzing whether a skilled artisan would have been motivated to combine the asserted references in the manner recited in the challenged claims, and whether a skilled artisan would have had a reasonable expectation of success in doing so;

(3)     Whether the Board erred in rejecting objective indicia of nonobviousness;

(4)     Whether the Board erred in concluding that claims 1-8 are unpatentable as obvious over Voswinckel JESC, Voswinckel JAHA, and U.S. Patent No. 6,521,212 B1 (Ex. 1006);

(5)     Whether, in arriving at its decisions, the Board acted in a manner that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, was in excess of statutory limitations and without observance of procedure required by law, or was based on findings unsupported by substantial evidence;

(6)     Whether the Board erred in any finding or determination supporting or related to those issues, as well as all other issues decided adversely to Patent Owner in any orders, decisions, rulings, and opinions;

(7)     Whether the Board violated the Administrative Procedure Act in rendering its Final Written Decision.

Concurrently with this submission, in accordance with 37 C.F.R. § 90.2(a) and Federal Circuit Rule 15(a)(1), a copy of this Notice of Appeal is being filed with

2

the Patent Trial and Appeal Board, and a copy is being filed electronically with the

United States Court of Appeals for the Federal Circuit along with the required

docketing fee.


Dated:  April 5, 2023                    Respectfully submitted,


                                         By: /Stephen B. Maebius/
                                         Stephen B. Maebius
                                         Registration No. 35,264

                                         *Counsel for Patent Owner*


3

## CERTIFICATE OF SERVICE AND FILING

The undersigned hereby certifies that a true and correct copy of the

foregoing **PATENT OWNER'S NOTICE OF APPEAL** was served on April 5,

2023, via email, to attorneys for Petitioner at the following addresses:

ssukduang@cooley.com          dkannappan@cooley.com
zLiquidiaIPR@cooley.com       lkrickl@cooley.com
ielrifi@cooley.com            dcheek@cooley.com
emilch@cooley.com             jdavies@cooley.com

The undersigned certifies that, in addition to being filed electronically

through the Patent Trial and Appeal Board Case Tracking System (P-TACTS)

system on April 5, 2023, a true and correct copy of the foregoing **PATENT**

**OWNER'S NOTICE OF APPEAL** was filed on April 5, 2023, with the Director

of the United States Patent and Trademark Office at the following address:

Director of the United States Patent and Trademark Office
c/o Office of the General Counsel
Madison Building East, 10B20
600 Dulany Street
Alexandria, VA 22314-5793

The undersigned also certifies that a true and correct copy of the foregoing

**PATENT OWNER'S NOTICE OF APPEAL** was filed electronically on April 5,

2023, with the United States Court of Appeals for the Federal Circuit.

/Stephen B. Maebius/
Stephen B. Maebius
Registration No. 35,264
Counsel for Patent Owner

4854-5254-7932.1

Appx0893

**From:** Johnson, Carrie <Carrie.Johnson@USPTO.GOV>
**Sent:** Monday, February 28, 2022 10:14 AM
**To:** Maebius, Steve <SMaebius@foley.com>; zLiquidiaIPR@cooley.com; UT-793 <UT-793@foley.com>; Houston, Michael R. <MHouston@foley.com>; Shaun Snader <ssnader@unither.com>; Doug Carsten <dcarsten@mwe.com>
**Cc:** Trials <Trials@USPTO.GOV>
**Subject:** RE: IPR2021-00406 - Request for Authorization to Submit Rebuttal Evidence with PO Sur-Reply

**\*\* EXTERNAL EMAIL MESSAGE \*\***
Counsel,

A conference call has been scheduled for **tomorrow, March 1, 2022, at 11:00 am ET**.

Call-in number: 866-564-5759
Passcode: 7629501

Please email trials@uspto.gov with any questions or concerns.

```
Fduulh#P 1#Mrkqvrq#
S duddhjdd#Vshfldolvw#
Sdwhqw#Wuldd#dqg#D sshdd#Erdug#
X 1V1#Sdwhqw#dqg#Wudghp dun#R iilfh#
Skrqh##8:4,#5:5049<#
Hp dlo##fduulh1mrkqvrqQxvswr1jry#
```

**From:** Maebius, Steve <SMaebius@foley.com>
**Sent:** Tuesday, February 22, 2022 2:50 PM
**To:** Trials <Trials@USPTO.GOV>
**Cc:** zLiquidiaIPR <zLiquidiaIPR@cooley.com>; UT-793 <UT-793@foley.com>; Houston, Michael R. <MHouston@foley.com>; Shaun Snader <ssnader@unither.com>; Doug Carsten <dcarsten@mwe.com>
**Subject:** RE: IPR2021-00406 - Request for Authorization to Submit Rebuttal Evidence with PO Sur-Reply
**Importance:** High

CAUTION: This email has originated from a source outside of USPTO. **PLEASE CONSIDER THE SOURCE** before responding, clicking on links, or opening attachments.

Dear Board,

We write on behalf of Patent Owner United Therapeutics Corp.

Patent Owner respectfully requests a telephone conference with the Board in order to request authorization to submit rebuttal evidence with its PO Sur-Reply in IPR2021-00406 in order to address the 29 new exhibits and 5 new declarations submitted by Petitioner in its Reply on the issue of public accessibility.

1

**Appx0894**

Petitioner has indicated that it opposes Patent Owner's request.

Counsel for both parties are available for a telephone conference Thurs. Feb. 24th after 2 pm EST.

Respectfully submitted,
Steve Maebius

Counsel for Patent Owner
Reg. No. 35,264

#

The information contained in this message, including but not limited to any attachments, may be confidential or protected by the attorney-client or work-product privileges. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message and any attachments or copies. Any disclosure, copying, distribution or reliance on the contents of this message or its attachments is strictly prohibited, and may be unlawful. Unintended transmission does not constitute waiver of the attorney-client privilege or any other privilege. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

The information contained in this message, including but not limited to any attachments, may be confidential or protected by the attorney-client or work-product privileges. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message and any attachments or copies. Any disclosure, copying, distribution or reliance on the contents of this message or its attachments is strictly prohibited, and may be unlawful. Unintended transmission does not constitute waiver of the attorney-client privilege or any other privilege. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

The information contained in this message, including but not limited to any attachments, may be confidential or protected by the attorney-client or work-product privileges. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message and any attachments or copies. Any disclosure, copying, distribution or reliance on the contents of this message or its attachments is strictly prohibited, and may be unlawful. Unintended transmission does not constitute waiver of the attorney-client privilege or any other privilege. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

Page 1

```
 1        UNITED STATES PATENT AND TRADEMARK OFFICE
 2         BEFORE THE PATENT TRIAL AND APPEAL BOARD
 3
    LIQUIDIA TECHNOLOGIES, INC.,        )
 4                                      )
                        Petitioner,     )
 5                                      )
            vs.                         )
 6                                      )
    UNITED THERAPEUTICS CORPORATION,    )
 7                                      )
                        Patent Owner.   )
 8
 9              TELEPHONE CONFERENCE
           MARCH 1, 2022, 10:00 A.M. CST
10              CASE IPR2021-00406
           U.S. PATENT NO. 10,716,793 B2
11            ISSUE DATE:  July 21, 2020
12  BOARD:
           Mr. Christopher Kaiser
13         Ms. Erica Franklin
           Mr. David Cotta
14
    PETITIONER:
15         Cooley, LLP
           Ms. Deepa Kannappan
16         Mr. Jonathan Davies
           3175 Hanover Street
17         Palo Alto, California 94394-1130
           650-843-5673
18         Dkannappan@cooley.com
           Jdavies@cooley.com
19
    PATENT OWNER:
20         Foley & Lardner, LLP
           Mr. Michael R. Houston
21         Mr. Stephen B. Maebius
           321 North Clark Street, Suite 3000
22         Chicago, Illinois 60654
           312-832-4378
23         Mhouston@foley.com
           Smaebius@foley.com
24
```

Page 2

1          (Whereupon the conference call
2          commenced at 10:01 a.m. cst.)
3      JUDGE KAISER:  This is a call in
4  IPR2021-00406.  I'm Judge Kaiser.  With me on the
5  line are Judges Franklin and Cotta as well.
6          Before we get started can we do a
7  rollcall to see who all is here.  Let's start
8  with anyone here on behalf of Petitioner.
9      MS. KANNAPPAN:  Good morning, your Honor.
10  This is Deepa Kannappan from Cooley, LLP, on
11  behalf of the Petitioner and with me is Jonathan
12  Davies also from Cooley, LLP.  I just wanted to
13  alert your Honor that there is a court reporter
14  on the line that is transcribing and taking down
15  our appearances.
16      JUDGE KAISER:  Okay.  Thank you.  Before I
17  go to Patent Owner, let me just state for the
18  record that whoever provided the court reporter
19  if you would please file the transcript of the
20  call as an exhibit whenever you get the
21  transcript back we would appreciate that.
22      MS. KANNAPPAN:  Yes, your Honor.  Petitioner
23  has the court reporter so we will do that.
24      JUDGE KAISER:  Okay.  Thank you.  And then

Page 3

1  Patent Owner.
2      MR. HOUSTON:  Good morning, your Honor.
3  This is Michael Houston on behalf of Patent
4  Owner, United Therapeutics, and I believe my
5  colleague, Steve Maebius, should have dialed in
6  as well.  Steve, are you there?
7      MR. MAEBIUS:  Yes.  Hi, this is Steve
8  Maebius.
9      JUDGE KAISER:  Okay.  Thank you.  Is there
10  anyone else on the line who I didn't call on?
11  Okay.  Thank you.
12          All right.  So as I recall this call
13  was requested by Patent Owner to request
14  authorization to submit evidence, new evidence,
15  along with its sur-reply.  Assuming I have that
16  right, I guess I will open the floor up to Patent
17  Owner first.
18      MR. HOUSTON:  Yes, thank you, your Honor.
19  And that is correct.  We did make this request.
20  The reason being, your Honor, that as part of
21  Petitioner's reply filed in this case a few weeks
22  ago, they submitted a significant amount of new
23  evidence, some 5 declarations and 44 exhibits.
24          And while our initial position is that

Page 4

1  much of that new evidence is improper reply
2  evidence and was the subject of our message to
3  the Board in our subsequent filing identifying
4  what we believe to be the new and improper reply
5  evidence, we are under the impression that that
6  issue is not likely to be decided, the propriety
7  of that evidence is not likely to be decided or
8  ruled upon until the final written decision stage
9  of the case.  And, therefore, to protect the
10  prejudice against us in case some or all of that
11  evidence is not struck, we feel the need to be
12  able to submit our own evidence in response to
13  Petitioner's submissions.
14          The evidence topic wise, your Honor,
15  mostly focuses on this issue of public
16  accessibility of two abstracts that are at issue
17  in the proceeding.  And your Honor may recall
18  that we also -- the parties had a call to discuss
19  this in the context of Petitioner's request to
20  file supplemental information.  So it has to do
21  with that same topic.  We feel like a lot of
22  these arguments, new arguments and new evidence,
23  should have been part of the petition and so
24  that's why we objected to it, but nonetheless

Page 5

1  this is the first time that we have seen a lot of
2  this -- these arguments and this evidence.  And
3  so if it's not going to be struck, then we feel
4  like we should have a chance to respond to it
5  more fully than simply being able to depose their
6  witnesses and submit those deposition
7  transcripts.
8      JUDGE KAISER:  Okay.  I have a couple of
9  questions there.  One is just a clarification.
10  So is it the volume of the reply evidence that is
11  sparking this request or is it something in the
12  nature of the evidence itself that makes it
13  different from sort of typical reply evidence?
14      MR. HOUSTON:  So, your Honor, it's very much
15  the latter.  So, you know, you have heard us
16  mention the volume just to kind of alert the
17  Board to that.  So, no, the request was not based
18  on the volume.  It's based on the content which
19  is, simply put, they have raised new theories of
20  public accessibility for these two abstracts, new
21  legal theories, beyond what was in their petition
22  and I have them summarized here.  I'm happy to go
23  through those just to highlight for your Honor if
24  you want to hear what those are; but unless you

2 (Pages 2 - 5)

Page 6

1 ask me I won't go into that level of detail, but
2 they have new theories and new evidence
3 supporting those theories which we have just
4 simply not had a chance to respond to up until
5 now.
6     JUDGE KAISER: Sure. I mean, I guess public
7 accessibility seems to me like without going off
8 and doing a lot of legal research because
9 sometimes these are more complicated than they
10 seem at first glance. It seems to me like an
11 issue of fact, right. I mean, I'm confused and
12 maybe you could just tell me at a very high level
13 what was the initial legal theory for public
14 accessibility and what's the new one that they've
15 changed to.
16     MR. HOUSTON: Sure, your Honor. And also
17 just to be clear, I don't think they have
18 abandoned sort of the what they initially put in
19 the petition. And so I just want to make clear
20 not that I think they have changed. You used the
21 word change there and I just want to clarify. So
22 they are keeping that theory, but adding a bunch
23 of new ones.
24     The new ones that they have added is

Page 7

1 now they have said that there should be a
2 presumption of public accessibility based on the
3 identity of the publishers. That was not in the
4 petition. They said that these abstracts should
5 be considered publicly available based on what
6 was presented and/or handed out physically at the
7 conference. That was not in the petition. They
8 said that now they have put in some evidence of
9 topic indexes and author indexes. None of that
10 evidence was in the petition. It wasn't -- in
11 other words, there was not an argument made in
12 the petition nor was the evidence in the
13 petition.
14     And then two more. Now they are
15 saying that there should be public accessibility
16 found based on the theory of there being two,
17 quote, research aids. So they have now cited two
18 new articles that cite the abstracts and have
19 argued that those should count as research aids
20 to establish public accessibility.
21     And then they have put in a bunch of
22 new date-stamp copies of the abstracts from
23 libraries that was the -- that was what we
24 pointed out in our Patent Owner response was not

Page 8

1 part of the petition and that's why we felt like
2 their argument failed in the petition and that
3 was the subject of the their motion to submit
4 supplemental information which the Board did not
5 allow, but now they have put that evidence in as
6 reply.
7     So there is roughly five -- I broke it
8 down into roughly five sort of categories of new
9 arguments and evidence that they have submitted,
10 your Honor.
11     JUDGE KAISER: Okay. All right. Thank you.
12 That helps front the issue a little bit. I have
13 to confess, you know, the reply isn't something
14 that I've dug into very much at this point and so
15 I appreciate you giving me your side of the
16 rundown there.
17     I guess my other question then is the
18 new evidence that you would like to submit with
19 the sur-reply, what's the nature of that evidence
20 and what is it that it shows in the way of sort
21 of rebutting these new arguments if I can use
22 that phrase.
23     MR. HOUSTON: Sure. Well, your Honor, I
24 guess I have a couple responses to that. First

Page 9

1 is we are still scrambling. We're still trying
2 to reach out to people who can provide relevant
3 information whether that's about the details of
4 this conference, whether that's about these
5 research aids that they have now cited to,
6 whether it's about the author and topic indexes.
7 You know, we are still very much actively trying
8 to figure out how to respond to this and it's
9 very challenging because of the short timeframe
10 we have.
11     Number two, I'm not sure quite how to
12 -- obviously I want this to be with very much all
13 due to respect to the Board, but I also feel a
14 little hesitant to go into a lot of detail of
15 what we're thinking. I feel like that opens the
16 door to some of our work product which we, you
17 know, we're still formulating our ideas here.
18     But at a high level, at a high level,
19 your Honor, what I think I can say is we're -- we
20 think we should be able to respond to this in
21 full. We don't think there should be limits on
22 how we are able to respond, but I'll tell you at
23 a high level the types of things we are thinking
24 of.

3 (Pages 6 - 9)

Page 10

1    There could be just new documentary
2  evidence whether that's new documents or just,
3  you know, could just be all types.  There could
4  be some documents or testimony from the prior
5  proceeding that involve this issue.  And
6  certainly we think that would be fair because
7  Liquidia is well aware of that information.  They
8  cited some of the information from that prior
9  proceeding in their own papers.  So we think we
10  should be able to put in some of the
11  counter-argument and evidence from that
12  proceeding as appropriate.
13    Also, your Honor, there was some
14  depositions taken of the witnesses that are
15  already involved in this case.  They were taken
16  in the context of the litigation that the parties
17  are currently undergoing.  So there's a parallel
18  litigation there with a trial coming up in late
19  March.  So there were some depositions by
20  Liquidia of some of these witnesses where the
21  subject matter was not identical to what was
22  covered in the corresponding IPR depositions.  So
23  we think there may be instances where we would
24  like to be able to cite that deposition testimony

Page 11

1  or submit it and cite to it which again should
2  not be prejudicial to Liquidia since they were
3  the ones doing the deposing in the first place.
4    And then, your Honor, I think it
5  really should be up to and including fresh new
6  declarations from witnesses on our end.  Whether
7  it's to talk about what happened at the
8  conference.  Whether it's to talk about these
9  research aids.  The, you know, what the affect or
10  import is of all these new date-stamped copies of
11  the articles that they submitted.
12    You know, so I think, your Honor, our
13  request is to have sort of unfortunately just as
14  if this were the Patent Owner response.  I think
15  we should be able to submit whatever we might
16  have submitted in the Patent Owner response had
17  all this evidence been in the petition the way we
18  think it should have been.  So I think that
19  that's our request, your Honor.  Was that
20  responsive to your question?
21    JUDGE KAISER:  Yes, I think I understand
22  what you're getting at.  And I would like, you
23  know, an opportunity to kind of discuss those
24  things with the rest of the panel, but let me

Page 12

1  hear from Petitioner first.  I presume that, Miss
2  Kannappan, you oppose this request?
3    MS. KANNAPPAN:  Correct, your Honor.  And
4  this is the first time we're receiving the full
5  basis and what Patent Owner is actually looking
6  to include with their sur-reply.  So some of this
7  I'm trying to respond to on the spot and I
8  apologize if it's not the most coherent.
9    But, for example, the points that they
10  point to from our reply are not new legal
11  theories of public accessibility, and in fact are
12  just factual support for the original positions
13  and are actually positions taken directly in
14  response to certain arguments raised in the
15  Patent Owner response.  And as Patent Owner just
16  alluded to, there is a whole other set of papers
17  that the parties have filed for the Board to
18  consider on exactly what arguments in the Patent
19  Owner response the replies were responding to.
20    So, for example, the Patent Owner
21  response specifically argued that because these
22  abstracts showed up in supplements, they would
23  not be published within a year of the conference
24  taking place.  And that was just not true based

Page 13

1  on the numerous date-stamped copies that
2  Petitioner submitted with its reply.  And, in
3  fact, Patent Owner has known about those exhibits
4  since at least the motion for supplemental
5  information and has known about all of these
6  arguments from the parallel district court
7  proceedings for months now and they chose to just
8  ask about this last week.
9    So we think that the cries for
10  prejudice are not real quite frankly.  And, in
11  fact, we tried to ask their witnesses, Miss
12  Weiman, Dr. Waxman and Dr. Merconval (phonetic)
13  about some of these issues in their IPR
14  depositions and Patent Owner actively would not
15  allow us to with the date-stamped copies.
16    And then for the other issue that we
17  did ask about, for example, we asked Dr. Waxman
18  about the conferences that these abstracts were
19  presented at and if they were well-attended and
20  he agreed that they were.  So it's unclear to us
21  what new documentary evidence or testimony would
22  establish the opposite.  And as your Honor asked
23  them to identify what that evidence would be,
24  Patent Owner has still not really identified what

4 (Pages 10 - 13)

Page 14

1 that evidence is going to show that they couldn't
2 just make an argument in a sur-reply as would
3 normally be allowed.
4        So in summary, your Honor, nothing in
5 the reply evidence makes this case different.
6 It's in addition to the petition and responsive
7 to the POR is something that the petition or the
8 Patent Owner has been on notice for months now.
9        But we do ask if the Board was
10 inclined to grant Patent Owner's request, that we
11 as Petitioners be authorized to depose any
12 declarants as to those transcripts and if
13 possible to file a supplemental reply or
14 cross-examination remarks addressing arguments
15 related to new exhibits that are not normally
16 authorized by sur-reply.
17    JUDGE KAISER: Okay. I think I get that. I
18 guess one question I have for you, Miss
19 Kannappan, is the precedential decision in Julio
20 seems to at least contemplate if not outright
21 authorize, you know, Petitioner to do something
22 along the lines of what you've done here, right,
23 which is to in response to some argument that's
24 raised in the Patent Owner response to submit

Page 15

1 additional evidence with the reply sort of
2 expanding on their original theories.
3        But I guess my question is how far
4 does that go? What's your understanding of kind
5 of what are the limits on that? There's, you
6 know, certainly a sort of -- I can picture a set
7 of facts that's clearly acceptable, right, where
8 Petitioner brings in new things that just sort of
9 help bolster its original theories that everyone
10 was aware of and that just for whatever reason
11 weren't in the record to begin with.
12        And I can picture I think a set of
13 facts that is beyond the pale where Petitioner
14 really changes horses in midstream. But what's
15 the lines between those two extremes and how do
16 we know that what you're doing -- what you've
17 done so far is on the side of the line that
18 shouldn't give rise to some opportunity for
19 Patent Owner to respond?
20    MS. KANNAPPAN: Sure, your Honor. I think
21 what's helpful is to look at what the Board has
22 even put in the manual itself which is changing,
23 for example, like combinations of ground. That
24 falls on the side of change to theory that was

Page 16

1 essential to the petition being granted and that
2 would be beyond the pale.
3        But, for example, what's happening
4 here is that we have always said that these
5 abstracts were publicly accessible and in the
6 petition we pointed to the fact that they were
7 both presented at conferences. Based on the face
8 of the abstract it says that. And then also the
9 dates on the -- or the actual physical documents
10 that we already submitted with the petition. And
11 then Patent Owner raised specific reasons why
12 they thought these weren't enough and we
13 submitted evidence in response to those
14 arguments.
15        And so I guess a second category I
16 would add, your Honor, is if it's responsive to
17 Patent Owner's arguments, then it would also fall
18 on the side of -- allow evidence so long as it's
19 not a completely new theory that would vitiate
20 the petitioned grounds. Does that make sense?
21    JUDGE KAISER: Yes, I think I understand
22 that argument. Let me -- because I think I
23 sprang that question on you without posing it to
24 Mr. Houston. Mr. Houston, let me give you an

Page 17

1 opportunity to respond at least to that question
2 which is what is the dividing line, the right
3 dividing line, in your opinion between, you know,
4 Petitioner doing something that is an acceptable
5 expansion which clearly does exist in our rules
6 and an impermissible change that ought to give
7 rise to the sort of response that you're
8 suggesting here?
9    MR. HOUSTON: Sure, your Honor. So, first
10 of all, just acknowledge that this is a somewhat
11 nebulous issue with the Board. We see it arise
12 in many, many cases and many, many more
13 decisions. And so, you know, a lot of times
14 there is not a black and white answer.
15        But here I do think it's more clear in
16 that our Patent Owner response essentially took
17 the position what the petition's evidence of
18 public accessibility for these two documents. I
19 mean, keep in mind there is many, many priorate
20 references at issue in this proceeding; but as to
21 these two documents, we took the position that
22 the petition simply failed to show public
23 accessibility. And in those circumstances that's
24 where the Board and the Federal Circuit quite

5 (Pages 14 - 17)

1 frankly has been more reluctant to let a party
2 come in and reply and fix that deficiency.
3        In other words, we should be allowed
4 to just say your petition didn't meet the burden.
5 And that doesn't -- that doesn't then give rise
6 to the ability for a redo.  And we certainly have
7 seen that sort of I would say decisionmaking
8 process especially in the context of citing the
9 contents of prior art where maybe the petition
10 focuses on a given embodiment in a reference when
11 it says the patent at issue is invalid over that
12 prior art.  And when somebody points out a
13 problem with that embodiment, why it doesn't
14 invalidate the claims at issue.  Then the
15 Petitioner points to a new embodiment in the same
16 reference and says, oh, look, this is part of our
17 same theory.  It's the same art.  We're still
18 saying the patents are invalid over it, but now
19 it's just another embodiment.
20        I think that is a pretty good analogy
21 for what's happening here, your Honor.  And I
22 think where the Board can have some guidance in
23 terms of where to come out on this issue is we
24 have said that their initial sufficient evidence

1 wasn't sufficient and now they have put in a lot
2 of new stuff, a lot of new arguments and new
3 evidence, and that's basically just fixing a hole
4 in the petition.
5        And, you know, while in some ways you
6 think, okay, it is responsive to our Patent Owner
7 response, but I think where we just say your
8 evidence is inadequate, that shouldn't be viewed
9 and typically hasn't been viewed as an invitation
10 to now go fix the problem as opposed to an
11 argument that would be more allowable which is to
12 argue why the original evidence was sufficient.
13 If they limited themselves to that, that would be
14 fair game for a reply.  But the new argument, new
15 evidence, is where we think it's out of bounds.
16        The only other thing I would add, your
17 Honor, is that they did try to submit a lot of
18 this evidence as supplemental information and
19 they couldn't convince the Board that the
20 information couldn't have been presented as part
21 of the petition and so that request was denied.
22 And we think that that same language really
23 applies to the reply and we're taking that
24 position out of what the Trial Practice Guide

1 indicates.
2        I think we mentioned it in one of our
3 e-mails, but I'll just mention it here for
4 completeness.  On page 74 of the Trial Practice
5 Guide it talks about, you know, reply or
6 sur-reply that raise a new issue or belatedly
7 presents evidence, you know, is not -- is not to
8 be considered.  Won't be considered.  And so we
9 think that that's exactly what's happening here
10 just for the same reasons that the supplemental
11 information request was denied because it was
12 just belated evidence and I think that's exactly
13 what is happening here, your Honor.
14        So we do think the Trial Practice
15 Guide helps speak to this point to help the
16 Board's, you know, analysis of the issue.
17        JUDGE KAISER:  Okay.  I think I understand
18 the parties' positions here on both sides.  So
19 what we're going to do is I'm going to ask the
20 parties and everyone on the call to hold the line
21 and the panel and I are going to go off and
22 discuss and we'll be back in a few minutes with
23 how we're going to go forward here.
24        (Whereupon a recess was taken.)

1        JUDGE KAISER:  All right.  Everybody we are
2 back from our deliberations.  Let me just make
3 sure there are still people here representing
4 Petitioner.
5        MS. KANNAPPAN:  Yes, your Honor.  We're
6 still here.
7        JUDGE KAISER:  Okay.  And still someone here
8 from Patent Owner.
9        MR. HOUSTON:  Yes, your Honor.
10        JUDGE KAISER:  Okay.  Thank you.  So the way
11 that these proceedings are set up unfortunately
12 unlike in district court proceedings doesn't
13 allow us to keep the record open for as long as
14 it takes to get the job done.  It requires us to
15 make a decision in a particular time which
16 requires us to have a hearing at a particular
17 time which requires us to close the record at
18 some point.
19        And the way that all the various
20 things that go into balancing the decision about
21 when to close the record have been resolved in
22 the main is what is set forward in the Trial
23 Practice Guide which is to -- in the mine-run of
24 cases place the end of things going into the

1 record along with the Petitioner's reply and then
2 just permit Patent Owner an opportunity to
3 comment on Petitioner's reply evidence and to
4 make legal arguments regarding the state of the
5 record as it exists at that point without
6 submitting or generating new evidence to go along
7 with those arguments.
8        And given that it seems to us that the
9 way to resolve this is to look at the arguments
10 that the parties have already submitted about
11 whether the new evidence and arguments in the
12 reply -- or let me rephrase that.  The allegedly
13 new arguments and evidence in the reply are
14 actually new or not and notwithstanding Patent
15 Owner's point that that won't happen until we sit
16 down to review the entire record at the time of
17 the hearing and thereafter, it seems like we've
18 got a way forward to resolve this which is to,
19 you know, if we agree with Patent Owner that this
20 stuff is new, then we're going to ignore it
21 because it's beyond the scope of things that
22 ought to be in the record and we'll say in the
23 final written decision that that's what we're
24 doing.  And in this case there is no need for

1 additional evidence to rebut what came in with
2 the reply.
3        And if we agree with Petitioner that
4 it's not new and it is an appropriate expansion
5 of the record on the original theories, then the
6 Trial Practice Guide would apply and there would
7 be no -- no right to submit additional rebuttal
8 evidence in that case.  And those two scenarios
9 seem to cover the waterfront pretty well and so
10 we don't see a need to keep expanding the record
11 at this point beyond what's allowed in the Trial
12 Practice Guide which is to say, you know,
13 deposition testimony of any reply witnesses can
14 obviously be put in as well as any legal
15 arguments that are appropriate for the sur-reply.
16 But there is no -- no need for or no call for
17 additional evidence beyond what is called out
18 there.
19        So I think that makes things clear,
20 but -- and we will follow up with an order along
21 those lines.  But to the extent that that sparks
22 any need for clarification, let me ask the
23 parties -- I'll start with Patent Owner.  Is
24 there any need for me to clarify that any

1 further?
2        MR. HOUSTON:  I think I understand your
3 Honor's position.  I guess there was one question
4 I would ask as a part of that.  If we are
5 deposing their witnesses and we are covering
6 subject matter that's in the relevant declaration
7 that we are deposing them on and we feel like we
8 have some documents that are relevant to that
9 testimony and we want to put those documents in
10 front of the witness as we ask the witness
11 questions, I presume those documents by virtue of
12 being exhibits to the deposition, those would at
13 least get submitted as part of submitting the
14 deposition transcript?  Is that your Honor's
15 understanding that that -- in other words --
16        JUDGE KAISER:  In that situation -- I have
17 seen that situation come up before and I remember
18 having a fight over it and I honestly don't
19 remember how we ended up coming out.
20        Let me ask Petitioner, you know,
21 assuming we are talking about, you know,
22 documents that were actually, you know, presented
23 to a witness and the witness testified about, I
24 mean, it does seem like it would be hard to

1 understand the testimony without any ability to
2 look at the document generally speaking.  Would
3 you have any objection to those sorts of exhibits
4 going in?
5        MS. KANNAPPAN:  Well, your Honor, just a
6 first question that that actually seems like a
7 bit of a runaround of what your Honor just
8 articulated.  Because essentially the Patent
9 Owner could just put in whatever exhibits they
10 would have put with their sur-reply in front of
11 the witness and then be able to add it to their
12 record in that manner.  And so if that's what's
13 happening, we would object both in the deposition
14 and to the general practice.
15        So I guess that is my initial
16 response.  We don't want it to just be a
17 workaround of what your Honor's order just
18 specifically said they shouldn't do.  If it's
19 exhibits that the -- oh, I'm sorry.  Go ahead,
20 please.
21        JUDGE KAISER:  That does -- you're right.  I
22 mean, there is definitely some opportunity for
23 gamesmanship there.  I think --
24        MR. HOUSTON:  Your Honor, if I may, I'll

7 (Pages 22 - 25)

1 just -- could I say -- make one comment on behalf
2 of Patent Owner is just that we understand what
3 Petitioner's concern is. There is not an
4 intention to use the depositions as a workaround.
5 Any evidence that we submit in that manner will
6 be relevant to the witness's testimony.
7 So, in other words, we're not just
8 going to put some random document in front of the
9 witness, ask them if they have seen it before and
10 regardless of what they say, we submit it as
11 evidence and start relying on it for all sorts of
12 reasons. That wasn't the nature of my question.
13 So if that helps, your Honor, that's not our
14 intention.
15 JUDGE KAISER: Sure. I mean, so I think
16 we'll reserve ruling on that. Why don't we wait
17 and see if it comes up. You know, if there are
18 things that, you know, that are -- that are
19 averted to in the deposition that are put before
20 the witness where we really need it in order to
21 understand what the witness's testimony is, I
22 think we will find a way to get those into the
23 record. But it's sort of difficult to say in the
24 abstract, you know, as a general principle we're

1 going to allow everything in or we're not going
2 to allow anything in.
3 Why don't we just reserve ruling on
4 that until and unless it comes up and if the
5 parties can agree that there are documents that
6 are used in depositions, particular documents
7 that are used in depositions, that should be
8 introduced into the record, just go ahead and
9 introduce them. And if you -- if the parties
10 can't agree, then let us know and we'll make a
11 ruling on the documents either document by
12 document or as a package.
13 That said, I don't want to be having
14 an hour's long call about hundreds of documents
15 either. I presume that if it comes to that, we
16 will be ruling on it in a relatively limited
17 universe of things. Does that work for Patent
18 Owner?
19 MR. HOUSTON: Yes, your Honor. I understand
20 what you're saying and I agree. It will not be a
21 universe of 100 documents. At most it would
22 probably be 1 or 2. So thank you, your Honor.
23 MS. KANNAPPAN: Your Honor, can you
24 clarify --

1 JUDGE KAISER: Uh-huh.
2 MS. KANNAPPAN: Sorry. I was just asking
3 one clarifying question. If an exhibit comes up
4 during the deposition and we as Petitioners think
5 it's on the side of new evidence that they would
6 have submitted with their sur-reply otherwise, do
7 we just lodge an objection on the record and then
8 raise it with the Board later? Would you like us
9 to call you in the middle of the deposition? How
10 would you foresee handling that with you?
11 JUDGE KAISER: What's the sort of thing that
12 might come up? I apologize. I don't think I
13 heard you.
14 MS. KANNAPPAN: Oh, the gamesmanship that I
15 had raised previously where it's not something
16 that the witness has raised themselves or it's
17 appropriate for the witness to be asked about,
18 but instead seems to be evidence that the Patent
19 Owner is trying to get in through the deposition.
20 JUDGE KAISER: I think the general rule is
21 to the extent that you think you've got an
22 appropriate objection to a line of questioning,
23 lodge that objection during the deposition to
24 preserve it and then file a motion to exclude

1 later on. The grounds on which, you know, a
2 witness can be instructed not to answer during a
3 deposition are very limited by design and so
4 there's I think probably rarely a lot of point in
5 approaching us; but obviously if you get to an
6 impasse and you need a ruling right away, that's
7 what we're here for.
8 So I don't know -- again, it's sort of
9 hard in the abstract to know, but I -- it seems
10 to me like in general if as an attorney I want to
11 take my sort of limited time with the witness and
12 go over a line of questioning, I'm generally
13 permitted to do that barring some privilege
14 issue.
15 MS. KANNAPPAN: Okay. Thank you, your
16 Honor. I just wanted to note that the Patent
17 Owner actually did that in their -- in our
18 depositions of their witnesses. They instructed
19 their witness not to answer for similar reason,
20 but we will -- we are talking in the abstract
21 here. So we will raise any issues if they come
22 up and thank you for your time.
23 JUDGE KAISER: Sure. Okay. So I think that
24 covers everything that we intended to cover

Page 30

1 during this call. Let me just before we adjourn
2 make sure there isn't anything else that needs to
3 be discussed.
4      Patent Owner, anything else that we
5 need to talk about before we adjourn?
6      MR. HOUSTON: I don't think so, your Honor.
7 I guess and I wasn't thinking through what I
8 understand to be the oral order from the Board
9 and I guess I just wanted to clarify. I think I
10 understand, but let me just ask one more time to
11 be sure.
12      So it sounds like the Board's position
13 is they don't want to see any new evidence beyond
14 what's contemplated by the rules which would be a
15 deposition transcript accompanying the sur-reply.
16      So, for example, the fact that
17 Liquidia deposed some of these witnesses as part
18 of the litigation and presumably that type of
19 evidence it's already been a deposition, Liquidia
20 already did it, it wouldn't require sort of this
21 continued reopening of the record. But even that
22 evidence it sounds like the ruling from the Board
23 is that that is not allowed for us to submit at
24 this time?

Page 31

1      JUDGE KAISER: I'm tempted to say, yes, that
2 understanding is correct. On the other hand I
3 guess I don't know -- without seeing the
4 transcripts in question it's hard to say whether
5 they qualify under whatever the precise wording
6 of the rule is, you know, that permits -- and I'm
7 paraphrasing the rule because I don't have it in
8 front of me at the moment. The deposition
9 testimony of reply declarant witnesses.
10      So it's hard to say without seeing
11 either the evidence or some argument with respect
12 to the language of the rule one way or the other.
13 I think you have the rules and, yes, the
14 intention is to follow the language of the rules.
15 And to the extent there is some dispute over
16 that, you know, if you step over the line, then
17 Petitioner will probably let us know that they
18 think that you have. And then it will be up to
19 us at some point to rule on a potential motion to
20 exclude or something along those lines.
21      So I think that would be the way to
22 resolve it. But, you know, I'll leave it up to
23 your professional judgment what's the appropriate
24 way to proceed with respect to that evidence.

Page 32

1      MR. HOUSTON: Yes, sure, your Honor. And I
2 think I have an understanding of what the rules
3 say as written and which is pretty limiting. I
4 guess I was just thinking and I just want to make
5 it clear for the record that to not allow us to
6 respond at all, we do feel like is very
7 prejudicial to Patent Owner.
8      And we see -- we see at least some
9 evidence, for example, the deposition transcripts
10 that were taken in the litigation, the evidence
11 from the prior proceedings which Liquidia is well
12 aware of, we see some evidence that it just
13 strikes us as being very easy to allow into this
14 proceeding with very little prejudice to Liquidia
15 that avoids a lot of the prejudice to Patent
16 Owner. So I guess I just wanted to clarify that
17 it is indeed the Board's position that we can't
18 introduce it at this time.
19      JUDGE KAISER: I mean, I don't know that I
20 would necessarily go as far as saying that you
21 can't. If there's an argument for it being
22 within the scope of the rule, then you can to the
23 extent that you think that argument will be
24 successful should it be necessary to make it.

Page 33

1      You know, the way these proceedings
2 are intended to go is that parties introduce the
3 evidence that they feel is within the scope of
4 the rules and it's up to the other side to
5 challenge that. And those challenges take the
6 form of motions to exclude that then get ruled
7 on.
8      And, you know, I think that's all I
9 can really say without getting into the realm of
10 giving either side advice about how to practice
11 law which is not something that it would be
12 appropriate for the Board to do nor something
13 that in all honesty you really want my advice on.
14 You all have practiced law much more recently
15 than I have.
16      MR. HOUSTON: Okay. I think I understand,
17 your Honor. Thank you.
18      JUDGE KAISER: Okay. So I think there has
19 been nothing else to discuss from Patent Owner.
20 Anything else we need to discuss, any other
21 issues from Petitioner?
22      MS. KANNAPPAN: No, your Honor.
23      JUDGE KAISER: Okay. Well, thank you very
24 much. We appreciate the parties' willingness to

9 (Pages 30 - 33)

Page 34

1 get together on this call.  We look forward to
2 seeing the rest of the briefing in the case and
3 to the hearing thereafter if one is requested.
4         And as far as this call is concerned,
5 you'll be getting an order from us, but for the
6 moment we're adjourned.
7             (Whereupon the call ended at
8             10:53 a.m. cst.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 35

1 STATE OF ILLINOIS )
2                 ) SS.
3 COUNTY OF L A K E )
4
5       JULIE WALSH, being first duly sworn
6 on oath says that she is a court reporter doing
7 business in the City of Chicago; that she
8 reported in shorthand the proceedings given at
9 the taking of said conference call and that the
10 foregoing is a true and correct transcript of her
11 shorthand notes so taken as aforesaid and
12 contains all the proceedings given at said
13 conferen
14
15
16
        Julie Walsh, CSR
17         Illinois CSR No. 084-004032
18
19
20 My Commission Expires
   August 5, 2024
21
22
23
24

(12) **United States Patent**     (10) Patent No.:     **US 10,716,793 B2**
Olschewski et al.     (45) Date of Patent:     *Jul. 21, 2020

(54) **TREPROSTINIL ADMINISTRATION BY INHALATION**

(71) Applicant: **United Therapeutics Corporation**, Silver Spring, MD (US)

(72) Inventors: **Horst Olschewski**, Graz (AT); **Robert Roscigno**, Chapel Hill, NC (US); **Lewis J. Rubin**, LaJolla, CA (US); **Thomas Schmehl**, Giessen (DE); **Werner Seeger**, Giessen (DE); **Carl Sterritt**, Weybridge (GB); **Robert Voswinckel**, Giessen (DE)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/778,662**

(22) Filed: **Jan. 31, 2020**

(65) **Prior Publication Data**

US 2020/0171044 A1     Jun. 4, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/536,954, filed on Aug. 9, 2019, which is a continuation of application No. 15/011,999, filed on Feb. 1, 2016, now Pat. No. 10,376,525, which is a division of application No. 13/469,854, filed on May 11, 2012, now Pat. No. 9,339,507, which is a division of application No. 12/591,200, filed on Nov. 12, 2009, now Pat. No. 9,358,240, which is a continuation of application No. 11/748,205, filed on May 14, 2007, now abandoned.

(60) Provisional application No. 60/800,016, filed on May 15, 2006.

(51) **Int. Cl.**
*A61K 31/557*     (2006.01)
*A61K 9/00*     (2006.01)
*A61K 31/192*     (2006.01)

(52) **U.S. Cl.**
CPC ............. *A61K 31/557* (2013.01); *A61K 9/008* (2013.01); *A61K 9/0078* (2013.01); *A61K 31/192* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,664,337 A | 5/1972 | Lindsey et al. |
| 4,001,650 A | 1/1977 | Romain |
| 4,007,238 A | 2/1977 | Glenn |
| 4,281,113 A | 7/1981 | Axen et al. |
| 4,306,075 A | 12/1981 | Aristoff |
| 4,306,076 A | 12/1981 | Nelson |
| 4,349,689 A | 9/1982 | Aristoff |
| 4,473,296 A | 9/1984 | Shofner et al. |
| 4,486,598 A | 12/1984 | Aristoff |
| 4,495,944 A | 1/1985 | Brisson et al. |
| 4,635,647 A | 1/1987 | Choksi |
| 4,668,814 A | 5/1987 | Aristoff |
| 4,677,975 A | 7/1987 | Edgar et al. |
| 4,683,330 A | 7/1987 | Aristoff |
| 4,692,464 A | 9/1987 | Skuballa et al. |
| 4,708,963 A | 11/1987 | Skuballa et al. |
| 4,976,259 A | 12/1990 | Higson et al. |
| 4,984,158 A | 1/1991 | Hillsman |
| 5,063,922 A | 11/1991 | Hakkinen |
| 5,080,093 A | 1/1992 | Raabe et al. |
| 5,153,222 A | 10/1992 | Tadepalli et al. |
| 5,234,953 A | 8/1993 | Crow et al. |
| 5,322,057 A | 6/1994 | Raabe et al. |
| 5,361,989 A | 11/1994 | Merchat et al. |
| 5,363,842 A | 11/1994 | Mishelevich et al. |
| 5,497,763 A | 3/1996 | Lloyd et al. |
| 5,551,416 A | 9/1996 | Stimpson et al. |
| 5,727,542 A | 3/1998 | King |
| 5,865,171 A | 2/1999 | Cinquin |
| 5,881,715 A | 3/1999 | Shibasaki |
| 5,908,158 A | 6/1999 | Cheiman |
| 6,054,486 A | 4/2000 | Crow et al. |
| 6,123,068 A | 9/2000 | Lloyd et al. |
| 6,357,671 B1 | 3/2002 | Cewers |
| 6,521,212 B1 | 2/2003 | Gilles et al. |
| 6,626,843 B2 | 9/2003 | Hillsman |
| 6,756,033 B2 | 6/2004 | Cloutier et al. |
| 6,765,117 B2 | 7/2004 | Moriarty et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 1999959533 B2 | 2/2000 |
| DE | 19838711 C1 | 6/2000 |

(Continued)

OTHER PUBLICATIONS

Abe et al., "Effects of inhaled prostacyclin analogue on chronic hypoxic pulmonary hypertension," J. Cardiovascular Pharmacology, 2001, 37, 239 251.

Agnew JE, Bateman RM, Pavia D, Clarke SW. (1984) Radionuclide demonstration of ventilatory abnormalities in mild asthma. Clinical Science; 66: 525-531.

(Continued)

*Primary Examiner* — Jeffrey S Lundgren
*Assistant Examiner* — Michael J Schmitt
(74) *Attorney, Agent, or Firm* — Foley & Lardner LLP

(57)     **ABSTRACT**

Treprostinil can be administered using a metered dose inhaler. Such administration provides a greater degree of autonomy to patients. Also disclosed are kits that include a metered dose inhaler containing a pharmaceutical formulation containing treprostinil.

**8 Claims, 12 Drawing Sheets**

**US 10,716,793 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,803,386 | B2 | 10/2004 | Shorr et al. |
| 6,809,223 | B2 | 10/2004 | Moriarty et al. |
| 7,172,557 | B1 | 2/2007 | Parker |
| 7,199,157 | B2 | 4/2007 | Wade et al. |
| 7,261,102 | B2 | 8/2007 | Barney et al. |
| 7,384,978 | B2 | 6/2008 | Phares et al. |
| 7,417,070 | B2 | 8/2008 | Phares et al. |
| 7,544,713 | B2 | 6/2009 | Phares et al. |
| 7,726,303 | B2 | 7/2010 | Tyvoll et al. |
| 9,339,507 | B2 * | 5/2016 | Olschewski ............... A61P 9/12 |
| 9,358,240 | B2 * | 6/2016 | Olschewski ........... A61P 43/00 |
| 10,376,525 | B2 * | 8/2019 | Olschewski ........... A61P 11/00 |
| 2003/0192532 | A1 | 10/2003 | Hopkins |
| 2004/0063912 | A1 | 4/2004 | Blumberg et al. |
| 2004/0105819 | A1 | 6/2004 | Hale et al. |
| 2004/0149282 | A1 | 8/2004 | Hickle |
| 2004/0265238 | A1 | 12/2004 | Chaudry |
| 2005/0165111 | A1 | 7/2005 | Wade et al. |
| 2005/0166913 | A1 | 8/2005 | Sexton et al. |
| 2005/0183719 | A1 | 8/2005 | Wuttke et al. |
| 2005/0282901 | A1 | 12/2005 | Phares et al. |
| 2006/0147520 | A1 | 7/2006 | Ruegg |
| 2006/0201500 | A1 | 9/2006 | Von Hollen et al. |
| 2008/0200449 | A1 | 8/2008 | Olschewski et al. |
| 2008/0280986 | A1 | 11/2008 | Wade et al. |
| 2009/0036465 | A1 | 2/2009 | Roscigno et al. |
| 2010/0076083 | A1 | 3/2010 | Olschewski et al. |
| 2010/0236545 | A1 | 9/2010 | Kern |
| 2010/0282622 | A1 | 11/2010 | Phares |
| 2012/0177693 | A1 | 7/2012 | Cipolla et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19934582 A1 | 1/2001 |
| FR | 2783431 A1 | 3/2000 |
| JP | 2003-522003 A | 7/2003 |
| JP | 2004-512101 A | 4/2004 |
| JP | 2005-034341 A | 2/2005 |
| WO | WO 93/00951 A1 | 1/1993 |
| WO | WO 01/58514 A1 | 8/2001 |
| WO | WO 01/85241 A1 | 11/2001 |
| WO | WO 02/34318 A2 | 5/2002 |

OTHER PUBLICATIONS

Annals of the International Commission on Radiological Protection (ICRP) vol. 28, No. 3, 1998, Publication 80, Radiation Dose to Patients from Radiopharmaceuticals.

Aradigm Corporation news release Oct. 24, 2005, "Aradigm and United Therapeutics Sign Development and Commercialization Agreement Targeting Pulmonary Hypertension," Red Orbit News, http://www.redorbit.com/modules/news/tools.php?tool=print&id=281787, 2 pages.

Aristoff et al., "Synthesis of benzopyran prostaglandins, potent stable prostacyclin analogs, via an intermolecular mitsunobu reaction," Tetrahedron Letters, 1984, 25(36):3955-3958.

Badesch et al., "Prostanoid Therapy for Pulmonary Arterial Hypertension," Journal of the American College of Cardiology, 2004, 43(12:Suppl.S):56S-61S.

Bein et al., "Cardiovascular and pulmonary effects of aerosolized prostacyclin administration in severe respiratory failure using a ventilator nebulization system," J. Cardiovascular Pharmacology, 1996, 27, 583-586.

Benedict et al., "Evidence-based pharmacologic management of pulmonary arterial hypertension," Clinical Therapeutics, 2007, 29, 2134-2153.

Bindl et al., "Aerosolised prostacyclin for pulmonary hypertension in neonates," Archives of disease in childhood, Fetal and neonatal edition, 1994, 71(3), F214-6.

Blanchard, J.D., Cipolla, D., Liu, K., Morishige, R., Mudumba, S., Thipphawong, J., Taylor, G., Warren, S., Radhakrishnan, R., Van Vlasselaer, R., Visor , G. and Starko, K. (2003) Lung Deposition of

Interferon Gamma-1b following Inhalation via AERx® System vs. Respiragard II™ Nebulizer Proc. ATS Annual Meeting (Abstract A373), Seattle.

Booke et al., "Prostaglandins in Patients with Pulmonary Hypertension: The Route of Administration," Anesth. Analg., 1998, 86:917, Letter to the Editor.

Boyd, B., Noymer, P., Liu, K., Okikawa, J., Hasegawa, D., Warren, S., Taylor, G., Ferguson, E., Schuster, J., Farr, S., and Gonda, I. (2004) Effect of Gender and Device Mouthpiece Shape on Bolus Insulin Aerosol Delivery Using the AERx Pulmonary Delivery System. Pharmaceutical Research. 21 (10) 1776-1782.

Byron, Peter R., "Drug Delivery Devices, Issues in Drug Development," Proc. Am. Thorac. Soc., 2004, 1:321-328.

Channick et al., "Safety and efficacy of inhaled treprostinil as add-on therapy to bosentan in pulmonary arterial hypertension," J. American College of Cardiology, 2006, 48, 1433-1437.

Colthorpe P, Taylor G, Farr SJ. (1997) A comparison of two non-invasive methods for quantifying aerosol deposition in the lungs of rabbits. J. Aerosol Med.; 10:255.

Defendant Watson Laboratories, Inc.'s Invalidity Contentions for U.S. Pat. No. 9,339,507 and 9,358,240, in The United States District Court for the District of New Jersey, Civil Action No. 3.15:cv-05723-PGS-LHG, Aug. 5, 2016, 56 pages.

Doyle et al., "Inhaled prostacyclin as a selective pulmonary vasodilator," Anaesthesia and Intensive Care, Aug. 1996, 24(4):514-515.

Dumas et al., "Hypoxic pulmonary vasoconstriction," General Pharmacology, 1999, 33, 289-297.

Dworetz et al., "Survival of infants with persistent pulmonary hypertension without extracorporeal membrane oxygenation," Pediatrics, 1989, 84, 1-6.

EPA Integrated Risk Information System (IRIS): data sheet for 3-methylphenol (m-cresol). Accessed at http://www.epa.gov/iris/subst/0301/htm on Mar. 9, 2014.

EU Community Register, Annexes to Commission Decision C(2005)3436, Sep. 5, 2005, http://ec.europa.eu/health/documents/communityregister/2005/2005090510259/anx_10259_en.pdf (Annex III—Ventavis® Labelling and Package Leaflet), 30 pages.

Ewert et al., "Aerosolized iloprost for primary pulmonary hypertension," New England Journal of Medicine, 2000, 343, 1421-1422.

Ewert et al., "Iloprost als inhalative bzw. Intravenose langzeitbehandlung von patienten mit primarer pulmonaler hypertonie," Z. Kardiol., 2000, 89, 987-999.

Farr et al., "Comparison of in vitro and in vivo efficiencies of a novel unit-dose liquid aerosol generator and a pressurized metered dose inhaler," International Journal of Pharmaceutics, 2000, 198:63-70.

Final Office Action dated Oct. 10, 2014 in U.S. Appl. No. 12/591,200.
Final Office Action dated Oct. 17, 2012 in U.S. Appl. No. 12/591,200.
Final Office Action dated Nov. 4, 2013 in U.S. Appl. No. 12/303,877.
Final Office Action dated Dec. 22, 2011 in U.S. Appl. No. 12/591,200.
Final Office Action dated Jul. 2, 2013 in U.S. Appl. No. 13/120,015.
Final Office Action dated Jul. 20, 2015 in U.S. Appl. No. 13/120,015.
Final Office Action dated Aug. 1, 2012 in U.S. Appl. No. 12/303,877.

Findlay et al., "Radioimmunoassay for the Chemical Stable Prostacyclin Analog, 15AU81: a Preliminary Pharmacokinetics Study in the Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):167-174.

Fink et al., "Use of Prostacyclin and its Analogues in the Treatment of Cardiovascular Disease," Heart Disease, 1999, 1:29-40.

Gessler et al., "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension," Eur. Respir. J., 2001, 17, 14-19.

Ghofrani et al., "Hypoxia- and non-hypoxia-related pulmonary hypertension—Established and new therapies," Cardiovascular Research, 2006, 72:30-40.

Ghofrani et al., "New therapies in the treatment of pulmonary hypertension," Herz (Heart), 2005, 4:296-302, with English translation.

Hallioglu et al., "Comparison of Acute Hemodynamic Effects of Aerosolized and Intravenous Iloprost in Secondary Pulmonary Hypertension in Children With Congenital Heart Disease," Am. J. Cardiol., 2003, 92:1007-1009.

Liquidia's Exhibit 1001
Page 2

US 10,716,793 B2

Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

Haraldsson et al., "Comparison of inhaled nitric oxide and inhaled aerosolized prostacyclin in the evaluation of heart transplant candidates with elevated pulmonary vascular resistance," Chest, 1998, 114, 780-786.

Hoeper et al., "A comparison of the acute hemodynamic effects of inhaled nitric oxide and aerosolized iloprost in primary pulmonary hypertension," J. American College of Cardiology, 2000, 35, 176-182.

Hoeper et al., "Effects of inhaled nitric oxide and aerosolized iloprost in pulmonary veno-occlusive disease," Respiratory Medicine, 1999, 93, 62-70.

Hoeper et al., "Long term treatment of primary pulmonary hypertension with aerosolized iloprost, a prostacyclin analogue," New England Journal of Medicine, 2000, 342, 1866-1870.

Horn et al., "Treprostinil therapy for pulmonary artery hypertension," Expert Opinion on Investigational Drugs, 2002, 11(11):1615-1622.

Howarth, P.H., "Why particle size should affect clinical response to inhaled therapy," Journal of Aerosol Medicine, 2001, 14 Supp. 1, S-27-S-34.

Ichida et al., "Additive effects of beraprost on pulmonary vasodilation by inhaled nitric oxide in children with pulmonary hypertension," American Journal of Cardiology, 1997, 80, 662-664.

Konorza et al., "Klinisch-pharmakologische Austestung bei pulmonaler Hypertonie zur Therapiefuehrung," Herz, 2005, 30:286-295, English abstract on first page.

Krause et al., "Pharmacokinetics and pharmacodynamics of the prostacyclin analogue iloprost in man," Eur. J. Clin. Pharmacol., 1986, 30, 61-68.

Labiris et al., "Pulmonary drug delivery. Part II: The role of inhalant delivery devices and drug formulations in therapeutic effectiveness of aerosolized medications," Br. J. Clin. Pharmacol., 2003, 56(6):600-612.

Lee et al., "Current strategies for pulmonary arterial hypertension," J. Internal Medicine, 2005, 258, 199-215.

Martin, John C., "Inhaled Form of Remodulin in the Pipeline," http://www.phneighborhood.com/content/in_the_news/archive_2320,aspx, ph Neighborhood, Oct. 28, 2005, 2 pages.

Max et al., "Inhaled prostacyclin in the treatment of pulmonary hypertension," Eur. J. Pediatr., 1999, 158 Suppl 1, S23-S26.

McNulty et al., "The Pharmacokinetics and Pharmacodynamics of the Prostacyclin Analog 15AU81 in the Anesthetized Beagle Dog," Prostaglandins Leukot. Essent. Fatty Acids, Feb. 1993, 48(2):159-166.

Miller et al., "Standardisation of spirometry. Series ATS/ERS Task Force: Standardisation of Lung Function Testing" Eur Respir J 2005; 26: 319-338.

Mueller et al., "Inhaled iloprost in the management of pulmonary hypertension in infants undergoing congenital heart surgery," European Journal of Anaesthesiology, Jun. 2004, 21(Suppl.33):3, Abstract No. 084.

National Radiological Protection Board. Doses to Patients from Medical Radiological Examinations in Great Britain. (1986) Radiological Protection Bulletin No. 77.

Nebu-Tec med. Produkte Eike Kern GmbH, VENTA-NEB®-ir A-I-C-I® Operating Instrutions, Sep. 2005.

Non-Final Office Action dated Jan. 29, 2015 in U.S. Appl. No. 13/120,015.

Non-Final Office Action dated Oct. 11, 2011 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Oct. 31, 2012 in U.S. Appl. No. 13/120,015.

Non-Final Office Action dated Dec. 30, 2014 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Mar. 15, 2013 in U.S. Appl. No. 12/303,877.

Non-Final Office Action dated Mar. 9, 2014 in U.S. Appl. No. 12/591,200.

Notes for Guidance on the Clinical Administration of Radiopharmaceuticals and Use of Sealed Radioactive Sources.

Administration of Radioactive Substances Advisory Committee (ARSAC) (Mar. 2006). ARSAC Secretariat, Chilton, Didcot, Oxon. OX11 0RQ.

Notice of Allowance dated Jun. 11, 2015 in U.S. Appl. No. 12/303,877.

Olschewski et al. For the German PPH Study Group, "Inhaled iloprost to treat severe pulmonary hypertension—An uncontrolled trial," Annals of Internal Medicine, 2000, 132, 435-443.

Olschewski et al., Aerosolized prostacyclin and iloprost in severe pulmonary hypertension,: Annals of Internal Medicine, 1996, 124, 820 824.

Olschewski et al., "Inhaled Iloprost for Severe Pulmonary Hypertension," N. Eng. J. Med., Aug. 1, 2002, 347(5):322-329.

Olschewski et al., "Inhaled prostacyclin and iloprost in severe pulmonary hypertension secondary to lung fibrosis," Am. Respir. Crit. Care Med., 1999, 160, 600-607.

Olschewski et al., "Pharmacodynamics and pharmacokinetics of inhaled iloprost, aerosolized by three different devices, in severe pulmonary hypertension," Chest, 2003, 124, 1294-1304.

Olschewski et al., "Prostacyclin and its analogues in the treatment of pulmonary hypertension," Pharmacology and Therapeutics, 2004, 102, 139-153.

Olschewski et al., "Recovery from circulatory shock in severe primary pulmonary hypertension (PPH) with aerosolization of iloprost," Intensive Care Med., 1998, 24, 631-634.

Olschewski, Horst, "Therapie der pulmonalen Hypertonie," Pneumologe, 2004, 1:95-101.

OPTINEB®-ir Operating Instructions, Unit Type ON-100/2-2.4 MHz, 2005, 33 pages, verified English translation.

Pappert et al., "Aerosolized Prostacyclin Versus Inhaled Nitric Oxide in Children with Severe Acute Respiratory Distress Syndrome," Anesthesiology, Jun. 1995, 82(6):1507-1511.

Publications of the International Commission on Radiological Protection (ICRP) (1977) Recommendations of the International Commission on Radiological Protection 26.

Pulmonary Delivery, ONdrugDelivery, 2006, 5 pages.

Rigby, Jonathan, Aradigm Corporation, "Technological advances for success: Product pipeline in targeted pulmonary delivery," Pulmonary Delivery Innovative Technologies Breathing New Life into Inhalable Therapeutics, ONdrugDelivery, http://www.ondrugdelivery.com/publications/Pulmonary.pdf, 2006, 17-19.

Rubin et al., "Pulmonary Arterial Hypertension: A Look to the Future," Journal of the American College of Cardiology, Jun. 18, 2004, 43(12,Suppl.S):89S-90S.

Saini et al., "Effect of Electrostatic Charge and Size Distributions on Respirable Aerosol Deposition in Lung Model," Industry Applications Conference, 2004, 39th IAS Annual Meeting, Conference Record of the 2004 IEEE Seattle, WA, Oct. 3-7, 2004, 2:948-952.

Sandifer et al., "Effects of Aerosol vs IV UT-15 on Prostaglandin H2 Analog-Induced Pulmonary Hypertension in Sheep," Chest, 2005, 128:6165.

Sandifer et al., "Potent effects of aerosol compared with intravenous treprostinil on the pulmonary circulation," J. Appl. Physiol., 2005, 99:2363-2368.

Santak et al., "Prostacyclin aerosol in an infant with pulmonary hypertension," Eur. J. Pediatr., 1995, 154, 233-235.

Scientific discussion for the approval of Ventavis, European Medicines Agency (EMEA), Oct. 20, 2004, 30 pages.

Soditt et al., "Improvement of oxygenation induced by aerosolized prostacyclin in a preterm infant with persistent pulmonary hypertension of the newborn," Intensive Care Med., 1997, 23, 1275-1278.

Steffen et al., "The Effects of 15AU81, a Chemically Stable Prostacyclin Analog, on the Cardiovascular and Renin-Angiotensin Systems of Anesthetized Dogs," Prostaglandins, Leukotrienes and Essential Fatty Acids, 1991, 43:277-286.

Stricker et al., "Sustained improvement of performance and haemodynamics with long-term aerosolized prostacyclin therapy in severe pulmonary hypertension," Schweiz Med. Wochenschr., 1999, 129, 923-927.

Van Heerden et al., "Inhaled aerosolized prostacyclin as a selective pulmonary vasodilator for the treatment of severe hypertension," Anaesthesia and Intensive Care, 1996, 24, 87-90.

Liquidia's Exhibit 1001
Page 3

(56)          **References Cited**

OTHER PUBLICATIONS

Van Heerden et al., "Re: Delivery of inhaled aerosolized prostacyclin (IAP)," Anaesthesia and Intensive Care, 1996, 24, 624-625.

Voswinckel et al., "Acute effects of the combination of sildenafil and inhaled treprostinil on haemodynamics and gas exchange in pulmonary hypertension," Pulmonary Pharmacology & Therapeutics, 2008, 21, 824-832.

Voswinckel et al., "Favorable Effects of Inhaled Treprostinil in Severe Pulmonary Hypertension," Journal of the American College of Cardiology, 2006, 48(8):1672-1681.

Voswinckel et al., "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," Annals of Internal Medicine, Jan. 17, 2006, 144(2):149-150.

Voswinckel et al., "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," European Heart Journal, Journal of the European Society of Cardiology, ESC Congress, Aug. 28-Sep. 1, 2004, Munich, Germany, p. 22, abstract 218.

Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 2004, Abstract 1414, 110, 17 Supplement.

Voswinckel et al., "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," Circulation, Oct. 26, 2004, Supplement, 110(17):295, abstract 1414.

Walmrath et al., "Effects of inhaled versus intravenous vasodilators in experimental pulmonary hypertension," Eur. Respir. J., 1997, 10, 1084-1092.

Wasserman et al., "Bronchodilator effects of prostacyclin (PGI2) in dogs and guinea pigs," European Journal of Pharmacology, 1980, 66, 53-63.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01621, U.S. Pat. No. 9,358,240, Jan. 11, 2018.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Decision Granting Institute of Inter Partes Review 37 C.F.R. 42.108, IRP2017-01622, U.S. Pat. No. 9,339,507, Jan. 11, 2018.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Petition for Inter Partes Review, IRP2017-01622, U.S. Pat. No. 9,339,507, with all Exhibits on exhibit list.

Watson Laboratories, Inc. (Petitioner) v. United Therapeutics Corp. (Patent Owner), Petition for Inter Partes Review, IRP2017-01621, U.S. Pat. No. 9,358,240, with only Exhibits 1002, 1059, 1161 and 1164 and not including exhibits already provide with C2.

Webb et al., "The use of inhaled aerosolized prostacyclin (IAP) in the treatment of pulmonary hypertension secondary to pulmonary embolism," Intensive Care Med., 1996, 22, 353-355.

Wensel et al., "Effects of iloprost inhalation on exercise capacity and ventilator efficiency in patients with primary pulmonary hypertension," Circulation, 2000, 101, 2388-2392.

Wetzel, R.C., "Aerosolized prostacyclin: in search of the ideal pulmonary vasodilator," Anesthesiology, 1995, 82, 1315-1317.

Wittwer et al., "Inhalative Pre-Treatment of Donor Lungs Using the Aerosolized Prostacyclin Analog Iliprost Ameliorates Reperfusion Injury," J. Heart Lung Transplant, 2005, 24:1673-1679.

Zanen et al., "Optimal particle size for beta 2 agonist and anticholinergic aerosols in patients with severe airflow obstruction," Thorax, 1996, 51, 977-980.

Zanen et al., "The optimal particle size for β-adrenergic aerosols in mild asthmatics," International Journal of Pharmaceutics, 1994, 107, 211-217.

* cited by examiner

Liquidia's Exhibit 1001

Page 4

U.S. Patent

Jul. 21, 2020

Sheet 1 of 12

US 10,716,793 B2

# FIGURE 1



Liquidia's Exhibit 1001
Page 5

U.S. Patent

Jul. 21, 2020

Sheet 2 of 12

US 10,716,793 B2

## FIGURE 2



Liquidia's Exhibit 1001
Page 6

FIGURE 3



U.S. Patent

Jul. 21, 2020

Sheet 3 of 12

US 10,716,793 B2

Liquidia's Exhibit 1001
Page 7

FIGURE 4



Liquidia's Exhibit 1001
Page 8

U.S. Patent    Jul. 21, 2020    Sheet 5 of 12    US 10,716,793 B2

# FIGURE 5





Liquidia's Exhibit 1001
Page 9

FIGURE 6



# FIGURE 7



Liquidia's Exhibit 1001
Page 11

FIGURE 8



Liquidia's Exhibit 1001
Page 12

FIGURE 9



Liquidia's Exhibit 1001
Page 13

FIGURE 10



Liquidia's Exhibit 1001
Page 14

FIGURE 11



FIGURE 12



Liquidia's Exhibit 1001
Page 16

US 10,716,793 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## TREPROSTINIL ADMINISTRATION BY INHALATION

### CROSS REFERENCE TO RELATED APPLICATIONS

The present application is a Continuation of U.S. application Ser. No. 16/536,954, filed Aug. 9, 2019, which is a Continuation of U.S. application Ser. No. 15/011,999, filed Feb. 1, 2016, which is a Divisional of U.S. application Ser. No. 13/469,854, filed May 11, 2012, Divisional of U.S. application Ser. No. 12/591,200, filed Nov. 12, 2009, which is a Continuation of U.S. application Ser. No. 11/748,205, filed May 14, 2007, which claims priority to U.S. provisional application No. 60/800,016 filed May 15, 2006, which are incorporated herein by reference in their entirety.

### FIELD OF THE INVENTION

The present application relates to methods and kits for therapeutic treatment and, more particularly, to therapeutic methods involving administering treprostinil using a metered dose inhaler and related kits.

### BACKGROUND OF THE INVENTION

All blood is driven through the lungs via the pulmonary circulation in order, among other things, to replenish the oxygen which it dispenses in its passage around the rest of the body via the systemic circulation. The flow through both circulations is in normal circumstances equal, but the resistance offered to it in the pulmonary circulation is generally much less than that of the systemic circulation. When the resistance to pulmonary blood flow increases, the pressure in the circulation is greater for any particular flow. The above described condition is referred to as pulmonary hypertension (PH). Generally, pulmonary hypertension is defined through observations of pressures above the normal range pertaining in the majority of people residing at the same altitude and engaged in similar activities.

Pulmonary hypertension may occur due to various reasons and the different entities of pulmonary hypertension were classified based on clinical and pathological grounds in 5 categories according to the latest WHO convention, see e.g. Simonneau G., et al. J. Am. Coll. Cardiol. 2004; 43(12 Suppl S):5S-12S. Pulmonary hypertension can be a manifestation of an obvious or explicable increase in resistance, such as obstruction to blood flow by pulmonary emboli, malfunction of the heart's valves or muscle in handling blood after its passage through the lungs, diminution in pulmonary vessel caliber as a reflex response to alveolar hypoxia due to lung diseases or high altitude, or a mismatch of vascular capacity and essential blood flow, such as shunting of blood in congenital abnormalities or surgical removal of lung tissue. In addition, certain infectious diseases, such as HIV and liver diseases with portal hypertension may cause pulmonary hypertension. Autoimmune disorders, such as collagen vascular diseases, also often lead to pulmonary vascular narrowing and contribute to a significant number of pulmonary hypertension patients. The cases of pulmonary hypertension remain where the cause of the increased resistance is as yet inexplicable are defined as idiopathic (primary) pulmonary hypertension (iPAH) and are diagnosed by and after exclusion of the causes of secondary pulmonary hypertension and are in the majority of cases related to a genetic mutation in the bone morphogenetic protein receptor-2 gene. The cases of idiopathic

pulmonary arterial hypertension tend to comprise a recognizable entity of about 40% of patients cared for in large specialized pulmonary hypertension centers. Approximately 65% of the most commonly afflicted are female and young adults, though it has occurred in children and patients over 50. Life expectancy from the time of diagnosis is short without specific treatment, about 3 to 5 years, though occasional reports of spontaneous remission and longer survival are to be expected given the nature of the diagnostic process. Generally, however, disease progress is inexorable via syncope and right heart failure and death is quite often sudden.

Pulmonary hypertension refers to a condition associated with an elevation of pulmonary arterial pressure (PAP) over normal levels. In humans, a typical mean PAP is approximately 12-15 mm Hg. Pulmonary hypertension, on the other hand, can be defined as mean PAP above 25 mmHg, assessed by right heart catheter measurement. Pulmonary arterial pressure may reach systemic pressure levels or even exceed these in severe forms of pulmonary hypertension. When the PAP markedly increases due to pulmonary venous congestion, i.e. in left heart failure or valve dysfunction, plasma can escape from the capillaries into the lung interstitium and alveoli. Fluid buildup in the lung (pulmonary edema) can result, with an associated decrease in lung function that can in some cases be fatal. Pulmonary edema, however, is not a feature of even severe pulmonary hypertension due to pulmonary vascular changes in all other entities of this disease.

Pulmonary hypertension may either be acute or chronic. Acute pulmonary hypertension is often a potentially reversible phenomenon generally attributable to constriction of the smooth muscle of the pulmonary blood vessels, which may be triggered by such conditions as hypoxia (as in high-altitude sickness), acidosis, inflammation, or pulmonary embolism. Chronic pulmonary hypertension is characterized by major structural changes in the pulmonary vasculature, which result in a decreased cross-sectional area of the pulmonary blood vessels. This may be caused by, for example, chronic hypoxia, thromboembolism, collagen vascular diseases, pulmonary hypercirculation due to left-to-right shunt, HIV infection, portal hypertension or a combination of genetic mutation and unknown causes as in idiopathic pulmonary arterial hypertension.

Pulmonary hypertension has been implicated in several life-threatening clinical conditions, such as adult respiratory distress syndrome ("ARDS") and persistent pulmonary hypertension of the newborn ("PPHN"). Zapol et al., Acute Respiratory Failure, p. 241-273, Marcel Dekker, New York (1985); Peckham, J. Ped. 93:1005 (1978). PPHN, a disorder that primarily affects full-term infants, is characterized by elevated pulmonary vascular resistance, pulmonary arterial hypertension, and right-to-left shunting of blood through the patent ductus arteriosus and foramen ovale of the newborn's heart. Mortality rates range from 12-50%. Fox, Pediatrics 59:205 (1977); Dworetz, Pediatrics 84:1 (1989). Pulmonary hypertension may also ultimately result in a potentially fatal heart condition known as "cor pulmonale," or pulmonary heart disease. Fishman, "Pulmonary Diseases and Disorders" 2nd Ed., McGraw-Hill, New York (1988).

Currently, there is no treatment for pulmonary hypertension that can be administered using a compact inhalation device, such as a metered dose inhaler.

### SUMMARY OF THE INVENTION

One embodiment is a method of delivering to a subject in need thereof a therapeutically effective amount of trepros-

Liquidia's Exhibit 1001
Page 17

US 10,716,793 B2

3

tinil, or treprostinil derivative or a pharmaceutically acceptable salt thereof comprising administering to the subject a therapeutically effective amount of the treprostinil or treprostinil derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Another embodiment is a method for treating pulmonary hypertension comprising administering to a subject in need thereof treprostinil or its derivative, or a pharmaceutically acceptable salt thereof using a metered dose inhaler.

Yet another embodiment is a kit comprising a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or treprostinil derivative, or a pharmaceutically acceptable salt thereof.

And yet another embodiment is a kit for treating pulmonary hypertension in a subject, comprising (i) an effective amount of treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; (ii) a metered dose inhaler; (iii) instructions for use in treating pulmonary hypertension.

Administration of treprostinil using a metered dose inhaler can provide patients, such as pulmonary hypertension patients, with a high degree of autonomy.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 pulmonary and systemic changes in hemodynamics following the inhalation of placebo (open circles), 30 μg treprostinil (triangles), 45 μg treprostinil (squares) or 60 μg TREprostinil (black circles) applied by a Metered Dose Inhaler (MDI-TRE). A single short inhalation of treprostinil induced sustained reduction of PAP and PVR that outlasted the observation period of 120 minutes at doses of 45 and 60 μg MDI-TRE. Systemic arterial pressure and resistance were not significantly affected. PAP=mean pulmonary artery pressure; PVR=pulmonary vascular resistance; SAP=mean systemic arterial pressure; SVR=systemic vascular resistance. Data are given as mean value±standard error of the mean (SEM).

FIG. 2 presents hemodynamic changes induced by the inhalation of placebo (open circles), 30 μg treprostinil (triangles), 45 μg treprostinil (squares) or 60 μg treprostinil (black circles) applied by a metered dose inhaler. Treprostinil induced sustained elevation of cardiac output. Heart rate was rather unchanged as a sign for low spillover of MDI-TRE to the systemic circulation. Gas exchange was not negatively affected. CO=cardiac output; HR=heart rate; SaO2=arterial oxygen saturation; SvO2=central venous oxygen saturation. Data are given as mean value±SEM.

FIG. 3 shows areas under the curve for changes in pulmonary vascular resistance (PVR) calculated for an observation period of 120 minutes after inhalation treprostinil using a metered dose inhaler. PVR was markedly lowered by treprostinil inhalation. The increased pulmonary vasodilation over time with the two highest doses mainly relies on the more sustained effect over time. Data are shown as mean value±95% confidence intervals.

FIG. 4 demonstrates Ventilation-perfusion matching measured with the multiple inert gas elimination technique. Five patients (30 μg TRE, n=2; 45 μg TRE, n=1; 60 μg TRE, n=2) with pre-existing gas exchange problems were investigated for changes in ventilation-perfusion ratios. All patients had significant shunt flow at baseline. Shunt-flow and low V/Q areas were not significantly changed by nitric oxide (NO) inhalation or treprostinil inhalation using a metered dose inhaler (MDI-TRE). MDI-TRE applied at high treprostinil concentrations did not negatively affect ventilation-perfusion matching and gas-exchange. Data are given as mean value±95% confidence intervals.

4

FIG. 5 presents response of pulmonary vascular resistance (PVR) to inhaled treprostinil vs. iloprost—period effects. a) First inhalation with treprostinil (n=22) vs. first inhalation with iloprost (n=22); b) second inhalation with treprostinil (n=22) vs. second inhalation with iloprost (n=22). The PVR decrease with treprostinil was delayed and prolonged, compared to iloprost. Due to carryover effects from the first period, in the second period, the effects of both drugs appeared shortened. Data are shown as percent of baseline values (mean value±95% confidence interval).

FIG. 6 presents response of PVR and systemic arterial pressure (SAP) to inhalation of treprostinil vs. iloprost—dose effects. a) Inhalation of 7.5 μg iloprost (in 6 min) vs. 7.5 μg treprostinil (6 min) (n=14, in a randomized order). b) Inhalation of 7.5 μg iloprost (6 min) vs. 15 μg treprostinil (6 min) (n=14, in randomized order). c) Inhalation of 7.5 μg iloprost (6 min) vs. 15 μg treprostinil (3 min) (n=16, in randomized order). Data are shown as percent of baseline values (mean±95% confidence interval). Iloprost, filled circles; Treprostinil, open triangles.

FIG. 7 presents hemodynamic response to inhalation of treprostinil vs. iloprost. Data from n=44 patients, who inhaled both drugs in randomized order, shown as percent of baseline values (mean value±95% confidence interval). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. 8 presents pharmacodynamics after treprostinil inhalation vs. placebo. Placebo or treprostinil in doses of 30 μg, 60 μg or 90 μg were inhaled (means±95% confidence intervals). Maximal decrease of PVR was comparable for all doses. The duration of pulmonary vasodilation (PVR-decrease) appeared to be dose dependent. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output; SaO2, arterial oxygen saturation; SvO2, mixed venous oxygen saturation.

FIG. 9 presents Areas Between the placebo and the treprostinil Curves (ABC). ABCs were calculated for a 3-hour period after inhalation of TRE or placebo from the relative changes of hemodynamic parameters (means±95% confidence intervals). PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; SVR, systemic vascular resistance.

FIG. 10 presents hemodynamic responses to the inhalation of 15 μg treprostinil. The inhalation time by increasing treprostinil concentration. A pulse of aerosol was generated every 6 seconds. TRE aerosol was inhaled in concentrations of 100 μg/ml (18 pulses; n=6), 200 μg/ml (9 pulses; n=6), 600 μg/ml (3 pulses; n=21), 1000 μg/ml (2 pulses; n=7) and 2000 μg/ml (1 pulse; n=8). Placebo data correspond to FIG. 8. Data are shown as means±95% confidence intervals. PVR, pulmonary vascular resistance; PAP, mean pulmonary arterial pressure; SAP, mean systemic arterial pressure; CO, cardiac output.

FIG. 11 presents areas between the placebo curve and the responses to 15 μg treprostinil applied at increasing concentrations to minimize inhalation time. Mean±SEM of relative changes of hemodynamic parameters (observation time 120 min). PAP, pulmonary arterial pressure, SAP, systemic arterial pressure, PVR, pulmonary vascular resistance, CO, cardiac output, SaO2, systemic arterial oxygen saturation, SvO2, pulmonary arterial oxygen saturation.

FIG. 12 presents pharmacokinetics of treprostinil after a single inhalation. Treprostinil plasma levels after inhalation of 30 μg, 60 μg, 90 μg or 120 μg treprostinil (6 min

5

inhalation period; experiments correspond to those shown in FIGS. **8** and **9**). Data with error bars represent mean values±SEM.

### DETAILED DESCRIPTION OF THE INVENTION

Unless otherwise specified, the term "a" or "an" used herein shall mean "one or more."

The present application incorporates herein by reference in its entirety Voswinckel R, et al. J. Am. Coll. Cardiol. 2006; 48:1672-1681.

The inventors discovered that a therapeutically effective dose of treprostinil can be administered in a few single inhalations using a compact inhalation device, such as a metered dose inhaler. Furthermore, the inventors discovered that such administering does not cause significant side effects, especially no significant side effects related to systemic blood pressure and circulation as well as no gas exchange deteriorations or disruptions.

Accordingly, one embodiment of the invention is a method of delivering to a subject in need thereof, such as a human being, a therapeutically effective amount of treprostinil comprising administering to the subject a formulation comprising a therapeutically effective amount of treprostinil, its derivative or a pharmaceutically acceptable salt thereof using a metered dose inhaler. Treprostinil can be administered via a metered dose inhaler to a subject affected with a condition or disease, which can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

Another embodiment of the invention is a method for treating pulmonary hypertension, comprising administering to a subject in need thereof, such as a human being, treprostinil or its derivative, or a pharmaceutically acceptable salt using a metered dose inhaler.

Treprostinil, or 9-deoxy-2',9-alpha-methano-3-oxa-4,5,6-trinor-3,7-(1'3'-interphenylene)-13,14-dihydro-prostaglandin F1, is a prostacyclin analogue, first described in U.S. Pat. No. 4,306,075. U.S. Pat. No. 5,153,222 describes use of treprostinil for treatment of pulmonary hypertension. Treprostinil is approved for the intravenous as well as subcutaneous route, the latter avoiding septic events associated with continuous intravenous catheters. U.S. Pat. Nos. 6,521,212 and 6,756,033 describe administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions. U.S. Pat. No. 6,803,386 discloses administration of treprostinil for treating cancer such as lung, liver, brain, pancreatic, kidney, prostate, breast, colon and head-neck cancer. US patent application publication No. 2005/0165111 discloses treprostinil treatment of ischemic lesions. U.S. Pat. No. 7,199,157 discloses that treprostinil treatment improves kidney functions. US patent application publication No. 2005/0282903 discloses treprostinil treatment of neuropathic foot ulcers. U.S. provisional application No. 60/900,320 filed Feb. 9, 2007, discloses treprostinil treatment of pulmonary fibrosis.

The term "acid derivative" is used herein to describe C1-4 alkyl esters and amides, including amides wherein the nitrogen is optionally substituted by one or two C1-4 alkyl groups.

The present invention also encompasses methods of using Treprostinil or its derivatives, or pharmaceutically acceptable salts thereof. In one embodiment, a method uses Treprostinil sodium, currently marketed under the trade name of REMODULIN®. The FDA has approved Treprostinil sodium for the treatment of pulmonary arterial hypertension by injection of dose concentrations of 1.0 mg/mL, 2.5 mg/mL, 5.0 mg/mL and 10.0 mg/mL. The chemical structure formula for Treprostinil sodium is:



Treprostinil sodium is sometimes designated by the chemical names: (a) [(1R,2R,3aS,9aS)-2,3,3a,4,9,9a-hexahydro-2-hydroxy-1-[(3S)-3-hydroxyoctyl]-1H-benz[f]inden-5-yl]oxy]acetic acid; or (b) 9-deoxy-2',9-α-methano-3-oxa-4,5,6-trinor-3,7-(1',3'-interphenylene)-13,14-dihydro-prostaglandin F$_1$. Treprostinil sodium is also known as: UT-15; LRX-15; 15AU81; UNIPROST™; BW A15AU; and U-62,840. The molecular weight of Treprostinil sodium is 390.52, and its empirical formula is C$_{23}$H$_{34}$O$_5$.

In certain embodiments, treprostinil can be administered in combination with one or more additional active agents. In some embodiments, such one or more additional active agents can be also administered together with treprostinil using a metered dose inhaler. Yet in some embodiments, such one or more additional active agents can be administered separately from treprostinil. Particular additional active agents that can be administered in combination with treprostinil may depend on a particular disease or condition for treatment or prevention of which treprostinil is administered. In some cases, the additional active agent can be a cardiovascular agent such as a calcium channel blocker, a phosphodiesterase inhibitor, an endothelial antagonist, or an antiplatelet agent.

The present invention extends to methods of using physiologically acceptable salts of Treprostinil, as well as non-physiologically acceptable salts of Treprostinil that may be used in the preparation of the pharmacologically active compounds of the invention.

The term "pharmaceutically acceptable salt" refers to a salt of Treprostinil with an inorganic base, organic base, inorganic acid, organic acid, or basic or acidic amino acid. Salts of inorganic bases can be, for example, salts of alkali metals such as sodium or potassium; alkaline earth metals such as calcium and magnesium or aluminum; and ammonia. Salts of organic bases can be, for example, salts trimethylamine, triethylamine, pyridine, picoline, ethanolamine, diethanolamine, and triethanolamine. Salts of inorganic acids can be, for example, salts of hydrochloric acid, hydrobroric acid, nitric acid, sulfuric acid, and phosphoric acid. Salts of organic acids can be, for example, salts of formic acid, acetic acid, trifluoroacetic acid, fumaric acid, oxalic acid, lactic acid, tartaric acid, maleic acid, citric acid, succinic acid, malic acid, methanesulfonic acid, benzenesulfonic acid, and p-toluenesulfonic acid. Salts of basic amino acids can be, for example, salts of arginine, lysine and ornithine. Salts of acidic amino acids can include, for example, salts of aspartic acid and glutamic acid. Quaternary ammonium salts can be formed, for example, by reaction with lower alkyl halides, such as methyl, ethyl, propyl, and butyl chlorides, bromides, and iodides, with dialkyl sul-

Liquidia's Exhibit 1001
Page 19

US 10,716,793 B2

7                                                                                    8

phates, with long chain halides, such as decyl, lauryl, myristyl, and stearyl chlorides, bromides, and iodides, and with aralkyl halides, such as benzyl and phenethyl bromides.

Preferred pharmaceutically acceptable salts are disclosed, for example, in US patent application publication No. 20050085540.

Treprostinil can be administered by inhalation, which in the present context refers to the delivery of the active ingredient or a combination of active ingredients through a respiratory passage, wherein the subject in need of the active ingredient(s) through the subject's airways, such as the subject's nose or mouth.

A metered dose inhaler in the present context means a device capable of delivering a metered or bolus dose of respiratory drug, such as treprostinil, to the lungs. One example of the inhalation device can be a pressurized metered dose inhaler, a device which produces the aerosol clouds for inhalation from solutions and/or suspensions of respiratory drugs in chlorofluorocarbon (CFC) and/or hydro-fluoroalkane (HFA) solutions.

The inhalation device can be also a dry powder inhaler. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter.

The metered dose inhaler can be a soft mist inhaler (SMI), in which the aerosol cloud containing a respiratory drug can be generated by passing a solution containing the respiratory drug through a nozzle or series of nozzles. The aerosol generation can be achieved in SMI, for example, by mechanical, electromechanical or thermomechanical process. Examples of soft mist inhalers include the Respimat® Inhaler (Boeringer Ingelheim GmbH), the AERx® Inhaler (Aradigm Corp.), the Mystic™ Inhaler (Ventaira Pharmaceuticals, Inc) and the Aira™ Inhaler (Chrysalis Technologies Incorporated). For a review of soft mist inhaler technology, see e.g. M. Hindle, The Drug Delivery Companies Report, Autumn/Winter 2004, pp. 31-34. The aerosol for SMI can be generated from a solution of the respiratory drug further containing pharmaceutically acceptable excipients. In the present case, the respiratory drug is treprostinil, its derivative or a pharmaceutically acceptable salt thereof, which can be formulated in SMI as a solution. The solution can be, for example, a solution of treprostinil in water, ethanol or a mixture thereof. Preferably, the diameter of the treprostinil-containing aerosol particles is less than about 10 microns, or less than about 5 microns, or less than about 4 microns.

Treprostinil concentration in an aerosolable formulation, such as a solution, used in a metered dose inhaler can range from about 500 µg/ml to about 2500 µg/ml, or from about 800 µg/ml to about 2200 µg/ml, or from about 1000 µg/ml to about 2000 µg/ml.

The dose of treprostinil that can be administered using a metered dose inhaler in a single event can be from about 15 µg to about 100 µg or from about 15 µg to about 90 µg or from about 30 µg to about 90 µg or from about 30 µg to about 60 µg.

Administering of treprostinil in a single event can be carried out in a limited number of breaths by a patient. For example, treprostinil can be administered in 20 breaths or less, or in 10 breaths or less, or than 5 breaths or less. Preferably, treprostinil is administered in 3, 2 or 1 breaths.

The total time of a single administering event can be less than 5 minutes, or less than 1 minute, or less than 30 seconds.

Treprostinil can be administered a single time per day or several times per day.

In some embodiments, the method of treatment of pulmonary hypertension can further comprise administering at least one supplementary agent selected from the group consisting of sildenafil, tadalafil, calcium channel blockers (diltiazem, amlodipine, nifedipine), bosentan, sitaxsentan, ambrisentan, and pharmaceutically acceptable salts thereof. In some embodiments, the supplementary agents can be included in the treprostinil formulation and, thus, can be administered simultaneously with treprostinil using a metered dose inhaler. In some embodiments, the supplementary agents can be administered separately from treprostinil. In some embodiments, the application of intravenous prostacyclin (flolan), intravenous iloprost or intravenous or subcutaneous treprostinil can be administered in addition to treprostinil administered via inhalation using a metered dose inhaler.

The present invention also provides a kit that includes a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof. Such a kit can further include instructions on how to use the metered dose inhaler for inhaling treprostinil. Such instructions can include, for example, information on how to coordinate patient's breathing, and actuation of the inhaler. The kit can be used by a subject, such as human being, affected with a disease or condition that can be treated by treprostinil, such as asthma, pulmonary hypertension, peripheral vascular disease or pulmonary fibrosis.

In some cases, the kit is a kit for treating pulmonary hypertension, that includes (i) a metered dose inhaler containing a pharmaceutical formulation comprising treprostinil or its derivative, or a pharmaceutically acceptable salt thereof; and (ii) instructions for use of the metered dose inhaler containing treprostinil in treating pulmonary hypertension.

As used herein, the phrase "instructions for use" shall mean any FDA-mandated labeling, instructions, or package inserts that relate to the administration of Treprostinil or its derivatives, or pharmaceutically acceptable salts thereof, for treatment of pulmonary hypertension by inhalation. For example, instructions for use may include, but are not limited to, indications for pulmonary hypertension, identification of specific symptoms associated with pulmonary hypertension, that can be ameliorated by Treprostinil, recommended dosage amounts for subjects suffering from pulmonary hypertension and instructions on coordination of individual's breathing and actuation of the metered dose inhaler.

The present invention can be illustrated in more detail by the following example, however, it should be understood that the present invention is not limited thereto.

Example 1

Open Label Study Upon Acute Safety, Tolerability and Hemodynamic Effects of Inhaled Treprostinil Delivered in Seconds

A study was conducted of acute vasodilator challenge during right heart catheter investigation to determine the safety, tolerability and pulmonary vasodilatory potency of inhaled treprostinil applied in seconds by a soft mist inhaler (SMI-TRE). The study produced evidence for a long lasting

Liquidia's Exhibit 1001
Page 20

US 10,716,793 B2

9 | 10

favourable effect of SMI-TRE on pulmonary hemodynamics in absence of systemic side effects and gas exchange disruptions.

Summary:

Inhaled nitric oxide (20 ppm; n=45) and inhaled treprostinil sodium (TRE; n=41) or placebo (n=4) were applied once during right heart catheter investigation. TRE was delivered in 2 breaths (1000 µg/ml aerosol concentration; 30 µg dose; n=12), 3 breaths (1000 µg/ml; 45 µg; n=9) or 2 breaths (2000 µg/ml; 60 µg; n=20) from a Respimat® SMI. Pulmonary hemodynamics and blood gases were measured at defined time points, observation time following TRE application was 120 minutes. TRE doses of 30 µg, 45 µg and 60 µg reduced pulmonary vascular resistance (PVR) to $84.4\pm8.7\%$, $71.4\pm17.5\%$ and $77.5\pm7.2\%$ of baseline values, respectively (mean±95% confidence interval). The 120 minute area under the curve for PVR by 30 µg, 45 µg and 60 µg TRE was $1230\pm1310$, $-870\pm940$, $-2450\pm2070$ and $-2000\pm900$ min %, respectively. Reduction of PVR by a single inhalation of the two higher doses outlasted the observation period of 120 minutes. Reduction of systemic vascular resistance and pressure was negligible, showing a high pulmonary selectivity for SMI-TRE. Intrapulmonary selectivity was also provided by SMI-TRE as ventilation/perfusion matching, assessed by the multiple inert gas elimination technique in 5 patients with gas exchange problems, was not significantly different after SMI-TRE compared to inhaled nitric oxide or no treatment. No significant side effects were observed.

Conclusions: The acute application of inhaled treprostinil with a metered dose inhaler in 2-3 breaths was safe, well tolerated and induced a strong and sustained pulmonary selective vasodilation.

Methods and Patients

A total number of 45 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics were: female to male ratio (f/m)=29/16, age 59±2.3 years, pulmonary artery pressure (PAP) 45±1.8 mmHg, pulmonary vascular resistance (PVR) 743±52 dynes·s·cm$^{-5}$, pulmonary artery wedge pressure (PAWP) 8.6±0.5 mmHg, central venous pressure (CVP) 6.4±0.7 mmHg, cardiac output (CO) 4.5±0.2 l/min, central venous oxygen saturation (SvO2) 62.3±1.2 mmHg (mean±Standard Error of the Mean). Disease etiologies were idiopathic PAH (iPAH) (n=13), PAH other (n=11), chronic thromboembolic pulmonary hypertension (CTEPH) (n=17) and pulmonary fibrosis (n=4). Table 1 presents the patient characteristics of the different groups.

TABLE 1

Patient characteristics of the different treatment groups.
Data are given as mean ± Standard Error of the Mean (SEM).

|  | Placebo (n = 4) | 30 µg TRE (n = 12) | 45 µg TRE (n = 9) | 60 µg TRE (n = 20) |
|---|---|---|---|---|
| Age [years] | 61 ± 8 | 53.9 ± 3.9 | 54.2 ± 5.7 | 65.5 ± 3.1 |
| PAP [mmHg] | 49.5 ± 10.1 | 45 ± 3.1 | 54.3 ± 2.8 | 39.7 ± 2.0 |
| PVR [Dynes] | 896 ± 163 | 597 ± 53.9 | 1049 ± 107 | 663 ± 81 |
| CO [l/min] | 4.46 ± 0.9 | 5.2 ± 0.4 | 3.9 ± 0.4 | 4.4 ± 0.3 |
| SAP [mmHg] | 98 ± 8.1 | 90.1 ± 3.2 | 82.8 ± 3.9 | 86.1 ± 2.0 |
| SaO2 [%] | 85.3 ± 4.5 | 90.0 ± 1.1 | 89.6 ± 1.1 | 90.6 ± 0.5 |
| SvO2 [%] | 57.5 ± 3.9 | 66.0 ± 1.6 | 59.1 ± 3.4 | 62.5 ± 1.6 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

Baseline values were determined 20-30 minutes after placement of the catheter. Heart rate, pulmonary and systemic blood pressure and cardiac output were measured and blood gases were taken during each pharmacological intervention at defined time points. Pharmacological interventions included the inhalation of 20 ppm nitric oxide (NO) after evaluation of baseline parameters (n=45) and the consecutive inhalation of placebo (n=4), 30 µg SMI-TRE (n=12), 45 µg SMI-TRE (n=9) or 60 µg (n=20) SMI-TRE. Placebo and treprostinil was applied with the Respimat® SMI. For filling of this device with treprostinil solution, the placebo solution was withdrawn from the device with a syringe and treprostinil solution was injected into the device under sterile conditions. Aerosol quality was controlled before and after refilling of the SMI devices by laser diffractometry, see e.g. Gessler T., Schmehl T., Hoeper M. M., Rose F., Ghofrani H. A., Olschewski H. et al. Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension. Eur. Respir. J. 2001; 17:14-19 incorporated herein in its entirety. The aerosol sizes before (placebo) and after filling (treprostinil) were unchanged. The aerosol particles mass median aerodynamic diameter of treprostinil-aerosol was 4-5 µm, which can be at the upper limit for alveolar deposition. The aerosol volume delivered by one cycle from the SMI was 15 µl. The solution used for aerosol generation was prepared from treprostinil sodium salt using a standard protocol. The SMI was either filled with a concentration of 1000 µg/ml treprostinil sodium (one aerosol puff=15 µg TRE) or with 2000 µg/ml (one puff=30 µg TRE). The different doses were applied as 2 puffs 1000 µg/ml (30 µg), 3 puffs 1000 µg/ml (45 µg) and 2 puffs 2000 µg/ml (60 µg). The placebo was inhaled as 2 puffs from a placebo-SMI. Hemodynamics and gas-exchange parameters were recorded for 120 minutes after TRE inhalation. This study used the Respimat® device, because the implemented "soft mist" technology was well suited for the deposition of such highly active drugs like prostanoids.

The impact of SMI-TRE on ventilation-perfusion matching was assessed in five patients (30 µg TRE, n=2; 45 µg TRE, n=1; 60 µg TRE, n=2) with pre-existing gas exchange problems by use of the multiple inert gas elimination technique (MIGET), see e.g. Wagner P D, Saltzman H A, West J B. Measurement of continuous distributions of ventilation-perfusion ratios: theory. J Appl Physiol. 1974; 36:588-99; Ghofrani H A, Wiedemann R, Rose F, Schermuly R T, Olschewski H, Weissmann N et al. Sildenafil for treatment of lung fibrosis and pulmonary hypertension: a randomised controlled trial. Lancet. 2002; 360:895-900, both incorporated herein in their entirety.

Statistics:

Mean values, standard deviation, standard error of the mean and 95% confidence intervals were calculated. Statistical analysis was done by use of a paired t-test.

Results:

The inhalation of treprostinil sodium from the metered dose inhaler (SMI-TRE) was well tolerated, only mild and transient cough for a maximum of one minute was reported. No systemic side effects like headache, flush, nausea or dizziness were observed.

Two to three breaths of SMI-TRE induced a strong pulmonary vasodilation that outlasted the observation time of 120 minutes (45 and 60 µg). The lower dose of 30 µg TRE induced a somewhat shorter effect on pulmonary vascular resistance; however, the maximal pulmonary vasodilation was comparable. In contrast, placebo inhalation did not induce pulmonary vasodilation. In fact a slight increase in PVR over the time of the right heart catheter investigation could be recorded following placebo inhalation (FIG. 1). The effect of SMI-TRE on systemic vascular resistance and

Liquidia's Exhibit 1001
Page 21

US 10,716,793 B2

| 11 | 12 |

pressure was very small and not clinically significant. Cardiac output was significantly increased over the whole observation period, whereas heart rate was rather unchanged. Gas exchange was not influenced by SMI-TRE (FIG. **2**). The maximal changes in hemodynamic and gas-exchange parameters compared to baseline values are depicted in Table 2.

TABLE 2

Extremes of the relative changes of hemodynamic and gas
exchange parameters compared to baseline after inhalation
of Placebo (n = 4), 30 μg treprostinil (n =
12), 45 μg treprostinil (n = 9) and 60 μg treprostinil
(n = 20). Highest (max) and lowest (min) values during
the observation period are shown. Data are given as percent
of baseline values (mean ± SEM).

|  | Placebo | 30 μg TRE | 45 μg TRE | 60 μg TRE |
|---|---|---|---|---|
| PAP (min) | 99.4 ± 3.0 | 83.4 ± 3.2 | 77.6 ± 6.8 | 79.5 ± 2.4 |
| PVR (min) | 101.4 ± 1.9 | 84.4 ± 4.4 | 71.4 ± 8.9 | 77.5 ± 3.7 |
| CO (max) | 99.7 ± 1.1 | 108.8 ± 3.8 | 108.6 ± 5.6 | 103.8 ± 2.0 |
| SVR (min) | 104.3 ± 4.3 | 97.7 ± 4.2 | 92 ± 3.9 | 91.3 ± 2.1 |
| SAP (min) | 102.7 ± 1.7 | 97.3 ± 1.9 | 96.1 ± 1.5 | 93.6 ± 2.9 |
| HR (max) | 105 ± 2.1 | 106.1 ± 2.9 | 99.1 ± 2.4 | 101.1 ± 0.9 |
| SaO2 (min) | 98.2 ± 0.4 | 101 ± 0.3 | 94.4 ± 1.8 | 95.8 ± 0.9 |
| SvO2 (max) | 104.5 ± 1.4 | 102.4 ± 1.3 | 104.5 ± 4.4 | 102 ± 1.0 |

PAP = pulmonary artery pressure; PVR = pulmonary vascular resistance; SVR = systemic vascular resistance; CO = cardiac output; SAP = systemic arterial pressure; HR = heart rate; SaO2 = arterial oxygen saturation; SvO2 = central venous oxygen saturation.

The areas under the curve for PVR were calculated for placebo and the different SMI-TRE doses over the 120 minute observation period (FIG. **3**). A dose effect of SMI-TRE with a trend to a more sustained effect with the two highest doses could be observed.

The inhalation of a highly concentrated aerosol can be in theory prone to disturbances of gas exchange because the deposition of even small amounts of aerosol may deliver high doses locally and thereby antagonize the hypoxic pulmonary vasoconstriction in poorly ventilated areas. This would then lead to increased shunt flow or increase of low ventilation/perfusion (V/Q) areas. This question was addressed in five patients with the multiple inert gas elimination technique (MIGET), the gold-standard for intrapulmonary V/Q ratio determination. The MIGET patients were selected for pre-existing gas exchange limitations. Characteristics of these patients were: PAP 54.6±3.2 mmHg, PVR 892±88 dynes, SaO2 91.7±0.5%, SvO2 65.2±1.8%. Etiologies were iPAH (n=1), CTEPH (n=3), pulmonary fibrosis (n=1). The maximal relative reduction of SaO2 after inhalation of SMI-TRE in these patients was −3.8±1.5% compared to baseline values. Shunt flow at baseline, NO-inhalation and 60 minutes after SMI-TRE was 6.4±4.3%, 5.4±3.0% and 8.3±3.4%, respectively (mean±95% confidence interval; FIG. **4**).

No significant increase in low V/Q areas or shunt fraction after inhalation of SMI-TRE was observed, in fact the distribution of perfusion was not different to that at baseline and during nitric oxide inhalation. This proves an excellent intrapulmonary selectivity of SMI-TRE, which is also reflected by unchanged arterial oxygen saturation.
Conclusion:

Treprostinil is tolerated at high doses with no systemic side effects. The application of an effective amount of treprostinil in only few or even one single breath was achieved with a highly concentrated treprostinil sodium solution. Treprostinil can be applied by a metered dose inhaler, such as Respimat® soft mist inhaler.

Example 2

Investigation of the Effects of Inhaled Treprostinil
on Pulmonary Hemodynamics and Gas Exchange
in Severe Pulmonary Hypertension

This study investigated the effects of inhaled treprostinil on pulmonary vascular resistance in severe pulmonary hypertension and addressed systemic effects and gas exchange as well as tolerability and efficacy of high doses of treprostinil given in short time. A total of 123 patients with a mean pulmonary artery pressure of about 50 mmHg were investigated in three separate randomized studies. Inhaled treprostinil exerted potent sustained pulmonary vasodilation with excellent tolerability and could be safely applied in a few breaths or even one breath.

Summary:

Three different studies were conducted on a total of 123 patients by means of right heart catheterization: i) a randomized crossover-design study (44 patients), ii) a dose escalation study (31 patients) and iii) a study of reduction of inhalation time while keeping the dose fixed (48 patients). The primary endpoint was the change in pulmonary vascular resistance (PVR).

The mean pulmonary artery pressure of the enrolled patients was about 50 mmHg. Hemodynamics and patient characteristics were similar in all studies. In study i) TRE and Iloprost (ILO), at an inhaled dose of 7.5 μg, displayed comparable PVR decrease, with a significantly different time course (p<0.001), TRE exhibiting a more sustained effect on PVR (p<0.0001) and less systemic side effects. In study ii) placebo, 30 μg, 60 μg, 90 μg or 120 μg TRE were applied with drug effects being observed for 3 hours after inhalation. A near-maximal acute PVR decrease was observed at 30 μg TRE. In study iii) TRE was inhaled with a pulsed ultrasonic nebulizer, mimicking a metered dose inhaler. 15 μg TRE was inhaled with 18 pulses (TRE concentration 100 μg/ml), 9 pulses (200 μg/ml), 3 pulses (600 μg/ml), 2 pulses (1000 μg/ml) or 1 pulse (2000 μg/ml), each mode achieving comparable, sustained pulmonary vasodilation.

Inhaled treprostinil exerts sustained pulmonary vasodilation with excellent tolerability at doses, which may be inhaled in a few or even one breath. Inhaled treprostinil is advantageous to inhaled iloprost in terms of duration of effect and systemic side effects. Inhaled treprostinil is well tolerated in concentrations up to 2000 mg/ml (bringing down inhalation time to a single breath) and in high doses (up to 90 μg).
Methods:

All inhalations were performed with the OPTINEB® ultrasonic nebulizer (Nebutec, Elsenfeld, Germany).

Study i) was a randomized, open-label, single-blind crossover study. The primary objective was to compare the acute hemodynamic effects and the systemic side effects of inhaled treprostinil with inhaled iloprost at comparable doses. A total number of 44 patients with moderate to severe precapillary pulmonary hypertension were enrolled. Patient characteristics and hemodynamic as well as gas exchange parameters are outlined in Table 3.

Liquidia's Exhibit 1001
Page 22

TABLE 3

Patient characteristics, hemodynamic parameters and gas exchange values at baseline, before challenge with inhalative prostanoids.

| | N | Age | Gender f/m | Etiology i/o/t/f | PAP [mmHg] | PVR [dyn * s * cm⁻⁵] | SAP [mmHg] | CVP [mmHg] | PAWP [mmHg] | CO [l/min] | SaO2 [%] | SvO2 [%] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1a | 14 | 55.1 ± 4.8 | 11/3 | 4/4/2/4 | 53.8 ± 3.1 | 911 ± 102 | 95.4 ± 3.6 | 7.4 ± 1 | 8.0 ± 0.8 | 4.3 ± 0.4 | 93.8 ± 2 | 63.9 ± 2.4 |
| 1b | 14 | 54.1 ± 3.3 | 10/4 | 1/6/5/2 | 47.4 ± 3.8 | 716 ± 80 | 90.6 ± 3.3 | 5.9 ± 1.4 | 6.4 ± 0.7 | 4.7 ± 0.4 | 92 ± 1 | 64.8 ± 2.3 |
| 1c | 16 | 56 ± 2.9 | 7/9 | 6/3/6/1 | 47.5 ± 4.5 | 777 ± 102 | 92 ± 4.5 | 8.3 ± 1.4 | 8.6 ± 1.4 | 4.4 ± 0.5 | 91.4 ± 0.9 | 59.8 ± 2.6 |
| 2a | 8 | 60.8 ± 4 | 4/4 | 2/2/3/1 | 51.9 ± 4.9 | 849 ± 152 | 95.9 ± 4.8 | 7.6 ± 1.4 | 11.1 ± 1.7 | 4.4 ± 0.6 | 89.6 ± 2.8 | 60.1 ± 2.8 |
| 2b | 8 | 52.8 ± 6.6 | 6/2 | 1/3/3/1 | 49 ± 4 | 902 ± 189 | 92.4 ± 2.4 | 4.8 ± 1.1 | 7.2 ± 1.3 | 4.0 ± 0.4 | 92.4 ± 2.4 | 62.5 ± 1.7 |
| 2c | 6 | 56.8 ± 5.9 | 4/2 | 0/2/2/2 | 44.2 ± 3.5 | 856 ± 123 | 96.3 ± 3.9 | 5 ± 1.1 | 6 ± 1 | 3.8 ± 0.3 | 92.8 ± 1.5 | 63.6 ± 1.8 |
| 2d | 6 | 51.2 ± 3.8 | 4/2 | 2/2/2/0 | 55.5 ± 4.9 | 940 ± 110 | 91.2 ± 8.1 | 11.2 ± 1.2 | 10 ± 0.7 | 3.9 ± 0.4 | 92 ± 1.9 | 62 ± 5.8 |
| 2e | 3 | 57.3 ± 9.1 | 1/2 | 0/1/0/2 | 45.3 ± 5.2 | 769 ± 267 | 99 ± 3.2 | 5 ± 2.1 | 9 ± 0.6 | 4.5 ± 0.6 | 94.2 ± 1.3 | 66.3 ± 1.5 |
| 3a | 6 | 52.7 ± 6.6 | 4/2 | 2/4/0/0 | 53.8 ± 6.7 | 928 ± 145 | 92.7 ± 7.9 | 8.7 ± 2.7 | 8.8 ± 1.3 | 4.2 ± 0.6 | 90.4 ± 2.8 | 64.8 ± 4.3 |
| 3b | 6 | 58.3 ± 3.5 | 4/2 | 3/1/1/1 | 54.2 ± 6.1 | 808 ± 156 | 94.3 ± 2.8 | 7 ± 1.4 | 10 ± 1.3 | 5 ± 0.7 | 91.9 ± 0.7 | 63.5 ± 2.9 |
| 3c | 21 | 57.4 ± 5.6 | 8/3 | 7/7/6/1 | 46.1 ± 2.5 | 900 ± 99 | 88 ± 2.8 | 9 ± 1.4 | 9.2 ± 0.5 | 3.7 ± 0.3 | 91.7 ± 0.5 | 59.7 ± 2 |
| 3d | 7 | 55.6 ± 5.8 | 3/4 | 0/4/3/0 | 53.1 ± 7.1 | 732 ± 123 | 91.4 ± 5.6 | 7.9 ± 3.1 | 8.6 ± 1.3 | 5 ± 0.4 | 90.7 ± 1.4 | 61.3 ± 3.7 |
| 3e | 8 | 59 ± 5.2 | 7/1 | 0/4/4/0 | 45.1 ± 3.9 | 733 ± 114 | 92.8 ± 6.8 | 4.6 ± 0.8 | 8.1 ± 1.1 | 4.3 ± 0.2 | 90.7 ± 0.8 | 66.3 ± 2.8 |

Group 1 corresponds to study i); randomized crossover study comparing inhaled iloprost (ILO) and inhaled treprostinil (TRE).
a = 7.5 g ILO vs. 7.5 ug TRE,
b = 7.5 g ILO vs. 15 ug TRE (6 min inhalation time),
c = 7.5 g ILO vs. 15 ug TRE (3 min inhalation time).
Group 2 corresponds to study ii); evaluation of maximal tolerated dose of TRE.
a = placebo inhalation,
b = 30 ug TRE,
c = 60 ug TRE,
d = 90 ug TRE,
e = 120 ug TRE.
Group 3 corresponds to study iii); reduction of inhalation time by increase of TRE concentration, aiming at a total inhaled dose of 15 ug.
a = 18 pulses of 100 ug/ml TRE,
b = 9 pulses of 200 ug/ml TRE,
c = 3 pulses of 600 ug/ml TRE,
d = 2 pulses of 1000 ug/ml TRE,
e = 1 pulse 2000 ug/ml TRE.
Etiology of pulmonary hypertension was classified as idiopathic PAH (i), PAH of other causes (o), chronic thromboembolic PH (t), and pulmonary fibrosis (f).

Each patient inhaled both iloprost and treprostinil on the same day during right heart catheter investigation; the drugs were administered consecutively with a one hour interval between the drug applications. One half of the study patients initially inhaled treprostinil and then inhaled iloprost (n=22), while the other half initially inhaled iloprost and then inhaled treprostinil (n=22). Patients were randomized to one of the two groups and blinded as to the study drugs. Drug effects were monitored for 60 minutes after each inhalation. Iloprost was inhaled at 4 μg/ml (6 min inhalation time; n=44) and treprostinil was inhaled at a concentration of 4 μg/ml (6 min inhalation; n=14), 8 μg/ml (6 min inhalation; n=14) or 16 μg/ml (3 min inhalation; n=16). Based on previous biophysical characterization of the ultrasonic device with iloprost- and treprostinil-solution, this corresponds to a total inhaled dose of 7.5 μg iloprost and treprostinil (4 μg/ml) and 15 μg treprostinil (8 μg/ml and 16 μg/ml), respectively.

Study ii) was a randomized, open-label, single blind, placebo controlled study. The primary objectives were to describe the pharmacodynamic and pharmacokinetic effects of inhaled treprostinil at a well tolerated dose (30 μg) and to explore the highest tolerated single dose. A total number of 31 patients inhaled either placebo or treprostinil; each patient received one inhalation. The first 16 patients were randomized to 30 μg TRE (16 μg/ml, n=8) or placebo (stock solution in a concentration corresponding to TRE 16 μg/ml). Subsequent patients received 60 μg TRE (32 μg/ml; n=6), 90 μg TRE (48 μg/ml; n=6) and 120 μg TRE (64 μg/ml; n=3). Inhalation time was 6 minutes in all groups. Hemodynamics and gas-exchange as well as arterial treprostinil concentrations were recorded for 180 minutes.

Study iii) was a randomized, open-label, single blind study. The primary objective was to explore the shortest possible inhalation time for a 15 μg dose of inhaled treprostinil. A total of 48 patients inhaled one dose of TRE during right heart catheter investigation. The drug was applied in 18, 9, 3, 2 or 1 breaths. The aerosol was generated by a pulsed ultrasonic nebulizer (OPTINEB®, Nebutec, Elsenfeld, Germany) in cycles consisting of 2 seconds aerosol production (pulse) and 4 seconds pause. The device included an opto-acoustical trigger for the patient to synchronize the inspiration to the end of the aerosol pulse, thereby providing exact dosage. The TRE dose of 15 μg was either generated during 18 cycles (OPTINEB® filled with 100 μg/ml TRE, n=6), 9 cycles (200 μg/ml TRE, n=6), 3 cycles (600 μg/ml TRE, n=21), 2 cycles (1000 μg/ml TRE, n=7) or 1 cycle (2000 μg/ml TRE, n=8). Hemodynamics and gas exchange were recorded for 120-180 minutes.

Treprostinil plasma concentrations were assessed in study ii) at 10, 15, 30, 60 and 120 minutes after inhalation. Treprostinil quantification was done by Alta Analytical Laboratory (El Dorado Hills, Calif., USA) with a validated liquid chromatography atmospheric-pressure ionization tandem mass spectrometry as previously described Wade M., et al. J. Clin. Pharmacol. 2004; 44:503-9. Mixed venous blood was drawn at the depicted time points (FIG. **11**) after inhalation, centrifuged and the plasma frozen at −80° C. until temperature controlled shipping on dry ice. Statistics:

For statistical analysis of study i) the repeated PVR measurements after inhaled iloprost and treprostinil were subjected to a three-factorial analysis of variance (ANOVA; factors: time (A), drug (B), treprostinil concentration (C)) to avoid multiple testing. The maximum PVR decrease after inhalation of iloprost versus treprostinil was compared by paired t-test. Area under the curve (AUC) was calculated from start of inhalation until 60 min after inhalation. Means, standard error of the mean (SEM) and 95% confidence

intervals were calculated. For study ii) and iii) areas between curves (ABC) were calculated between placebo inhalation (study ii) and the respective treprostinil inhalation until 180 min (study ii)) and 120 min (study iii)) after end of inhalation.

Results:

The inhalation of iloprost as well as treprostinil in study i) resulted in a rapid decrease in PVR and PAP (FIG. **5-7**). No significant differences were observed for the areas under the curve (AUC) of PVR decrease after inhalation of 7.5 µg TRE in 6 minutes (AUC −12.6±7.0%), 15 µg TRE in 6 minutes (AUC −13.3±3.2%) and 15 µg TRE in 3 minutes (AUC −13.6±4.3%). The AUC for PVR after the inhalation of 7.5 µg iloprost in 6 minutes was −7.7±3.7% (mean±95% confidence interval). An overview of the pooled data of 3 treprostinil inhalation as compared to iloprost inhalation is given in FIG. **7**. The maximum effect of iloprost and treprostinil on PVR was comparable but this effect was reached significantly later after treprostinil inhalation (18±2 min) compared to iloprost (8±1 min; mean±SEM, p<0.0001) and lasted considerably longer (after 60 min, PVR values in the treprostinil group had not yet returned to baseline). The increase in cardiac output was less acute but prolonged after treprostinil inhalation. Systemic arterial pressure (SAP) was unaffected by treprostinil inhalation, whereas a transient decrease was observed after iloprost inhalation. Iloprost and treprostinil did not affect gas exchange. Three-factorial ANOVA for PVR demonstrated a significant difference between repeated measurements after inhalation ($p_{(A)}$<0.0001), no significant difference between drugs ($p_B$=0.1), no difference between treprostinil concentrations ($p_{(C)}$=0.74) and a significant drug×time interaction ($p_{(A×B)}$<0.0001). This translates into a significant effect of both drugs on PVR with comparable drug potency but a prolonged drug effect of treprostinil compared to iloprost.

In this study the occasionally observed mild side effects of iloprost inhalation at the given dose (transient flush, headache) were not observed with inhaled treprostinil. Bad taste was reported by most of the patients after inhalation of TRE. This was later found to be attributable to the metacresol preservative contained in the treprostinil solution.

In study ii) pharmacodynamics of inhaled placebo or treprostinil were observed for 180 minutes. Placebo inhalation was followed by a gradual increase in PVR over the entire observation time. Due to reduced patient numbers in the 120 µg TRE group (because of side effects, see below), the hemodynamic data for this group were not included in the graphs of this study (FIG. **8-9**). All TRE doses lead to comparable maximal decreases of PVR to 76.5±4.7% (30 µg), 73.7±5.8% (60 µg), 73.3±4.3% (90 µg) and 65.4±4.1% (120 µg) of baseline values. An extended duration of pulmonary vasodilation was noted, surpassing the 3 hour observation period for the 60 µg and 90 µg (and 120 µg) TRE doses, whereas in the 30 µg dose group the hemodynamic changes had just returned to baseline within this period. Even at the highest doses, TRE had only minor effects on systemic arterial pressure (FIG. **8**). Cardiac output was increased to a maximum of 106.8±3.2% (30 µg), 122.9±4.3% (60 µg), 114.3±4.8% (90 µg) and 111.3±3.9% (120 µg TRE). The areas between the response curves after placebo versus TRE inhalation were calculated for PVR, PAP, SVR and SAP (FIG. **9**). Areas between the curves for PVR were not significantly different for 30 µg, 60 µg and 90 µg TRE, a nearly maximal effect on PVR was already observed with 30 µg TRE. Effects on PAP and SAP were small and did not show a dose-response relationship. Gas exchange was not affected at doses up to 90 µg TRE, but

arterial oxygen saturation was significantly decreased at a dose of 120 µg TRE in all 3 patients. Further dose increments were omitted due to this side effect and severe headache in one patient.

Again, bad taste of the TRE aerosol was reported by most patients. Other side effects were flushing (n=1; 30 µg TRE), mild transient cough (n=3; 60 µg TRE), mild transient bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 30 µg TRE), moderate bronchoconstriction that resolved after one inhalation of fenoterol (n=1; 120 µg TRE), and severe headache (n=1; 120 µg TRE). The bad taste, the bronchoconstriction and the drop in SaO2 was attributed to metacresol in the original TRE solution. With the use of a metacresol-free solution of TRE (University Hospital Giessen, Germany; produced according to the manufacturer's protocol) in the following study, these side effects did no longer occur.

Study iii) was performed with metacresol-free TRE solution, having no specific taste and smell. A total of 48 patients were enrolled. This study aimed at the reduction of inhalation time and aerosol volume needed for pulmonary drug delivery. A modified OPTINEB® inhalation device was programmed to produce a constant amount of aerosol during repeatable pulses of aerosol generation. With this device, treprostinil could be safely utilized up to a concentration of 2000 µg/ml without considerable side effects. No relationship of number or type of side effects to TRE concentration was observed. Reported side effects were mild transient cough (n=6), mild headache (n=2) and mild jaw pain (n=1).

The reduction of PVR and PAP was comparable between all groups (FIG. **10**). TRE inhalation reduced PVR to 76.3±5.6% (18 pulses, 100 µg/ml), 72.9±4.9% (9 pulses, 200 µg/ml), 71.2±6.0% (3 pulses, 600 µg/ml), 77.4±4.5% (2 pulses, 1000 µg/ml) and 80.3±5.2% (1 pulse, 2000 µg/ml). PAP was reduced to 84.2±4.5% (18 pulses, 100 µg/ml), 84.2±4.1% (9 pulses, 200 µg/ml), 81.1±4.1% (3 pulses, 600 µg/ml), 86±4% (2 pulses, 1000 µg/ml) and 88±5.4% (1 pulse, 2000 µg/ml). Cardiac output was moderately increased in all groups, whereas systemic arterial pressure was not significantly affected.

The areas between the curves (ABC) for changes in hemodynamic and gas-exchange parameters after inhalation of 15 µg TRE versus placebo were calculated for an observation time of 120 minutes (FIG. **11**). The ABC for both PVR and PAP was comparable between all groups.

Pharmacokinetic results from study ii): Peak plasma concentrations of treprostinil were found 10-15 minutes after inhalation. Maximal treprostinil plasma concentrations ($C_{max}$) for the 30 µg, 60 µg, 90 µg and 120 µg doses were 0.65±0.28 ng/ml (n=4), 1.59±0.17 ng/ml (n=4), 1.74 ng/ml (n=1) and 3.51±1.04 ng/ml (n=2), respectively (mean±SEM; FIG. **12**).

Discussion:

These studies investigated whether i) the acute effects of inhaled treprostinil would be comparable to or possibly advantageous over inhaled iloprost in pulmonary hypertensive patients, ii) the inhaled prostanoid dose might be increased without substantial local or systemic side effects, and iii) if the time of inhalation, which is 6-12 minutes for iloprost, could be reduced significantly by increasing the concentration of treprostinil aerosol.

The patient population in these studies included different forms of precapillary pulmonary hypertension. All these patients had a need for therapy of pulmonary hypertension and reflected the typical population of a pulmonary hyper-

Liquidia's Exhibit 1001
Page 24

US 10,716,793 B2

17

tension center. No major differences in patient characteristics or hemodynamic baseline values existed between the different groups (table 3).

In study i) it was shown that the inhalation of treprostinil and iloprost in similar doses resulted in a comparable maximum pulmonary vasodilatory effect. However, marked differences in the response profile were noted. The onset of the pulmonary vasodilatory effect of inhaled treprostinil was delayed compared to iloprost, but lasted considerably longer, with the PVR decrease continuing beyond the one-hour observation period. Although the average dose of treprostinil was higher than the iloprost dose, no systemic effects were noted after treprostinil inhalation, whereas flush and transient SAP decrease, accompanied by more prominent cardiac output increase, occurred after iloprost inhalation. Such side effects were more prominent than in previous studies with inhaled iloprost. This may have been caused by the fact that the iloprost dose used in this study was 50% higher than the recommended single inhalation dose (5 μg) and that the preceding treprostinil inhalation may have added to the systemic side effects caused by the iloprost inhalation. Surprisingly, with TRE there was no such systemic side effect, although the average effect on PVR was as potent as with iloprost.

This study used a cross-over design in order to minimize the effects of inter-individual differences in response to prostanoids. The short observation period of 1 hour was used to avoid an uncomfortably long catheter investigation. As a study limitation, the short observation interval may have caused carryover effects of the first to the second period as suggested by FIG. 5. However, this still allowed for the interpretation of the study, that both drugs are potent pulmonary vasodilators and that treprostinil effects are significantly sustained compared to the iloprost effects.

The longer duration of action and the virtual absence of side effects (except the bitter taste of treprostinil aerosol, later attributed to metacresol) encouraged increasing the applied treprostinil dose in study ii). Observation time was extended to 3 hours to obtain precise pharmacodynamic data. Inhaled treprostinil resulted in a strong pulmonary vasodilation that outlasted the observation time of 3 hours when compared to placebo inhalation. Surprisingly, inhaled treprostinil was tolerated in doses up to 90 μg.

Study iii) successfully demonstrated that the inhalation time could be reduced to literally one single breath of 2000 μg/ml treprostinil solution, thereby applying a dose of 15 μg.

18

This drug administration with a single breath induced pulmonary vasodilation for longer than 3 hours compared to placebo inhalation. Side effects were minor, of low frequency and not related to drug concentration. It was a surprising finding that such high concentrations of treprostinil were so well tolerated.

Conclusion:

Inhaled treprostinil can be applied in high doses (up to 90 μg) with a minimal inhalation time. Inhaled treprostinil exerts high pulmonary selectivity and leads to a long-lasting pulmonary vasodilation.

Although the foregoing refers to particular preferred embodiments, it will be understood that the present invention is not so limited. It will occur to those of ordinary skill in the art that various modifications may be made to the disclosed embodiments and that such modifications are intended to be within the scope of the present invention.

All of the publications, patent applications and patents cited in this specification are incorporated herein by reference in their entirety.

What is claimed is:

**1**. A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths.

**2**. The method of claim **1**, wherein the inhalation device is a soft mist inhaler.

**3**. The method of claim **1**, wherein the inhalation device is a pulsed ultrasonic nebulizer.

**4**. The method of claim **1**, wherein the inhalation device is a dry powder inhaler.

**5**. The method of claim **1**, wherein the inhalation device is a pressurized metered dose inhaler.

**6**. The method of claim **4**, wherein the formulation is a powder.

**7**. The method of claim **6**, wherein the powder comprises particles less than 5 micrometers in diameter.

**8**. The method of claim **1**, wherein the formulation contains no metacresol.

\* \* \* \* \*

Liquidia's Exhibit 1001
Page 25

Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————————

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner

—————————————

U.S. Patent No. 10,716,793 B2

**DECLARATION OF NICHOLAS HILL, M.D.**

Liquidia's Exhibit 1002
Page 1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................1

II.   QUALIFICATIONS ......................................................................2

    A.    Qualifications and Experience .............................................2

    B.    Materials Considered...........................................................4

III.  PERSON OF ORDINARY SKILL IN THE ART .........................7

IV.   STATEMENT OF LEGAL PRINCIPLES....................................8

V.    RELEVANT TECHNICAL BACKGROUND ...........................11

    A.    Overview of Pulmonary Hypertension................................11

    B.    Well Known Advantages of Inhalation Therapy and Inhalers...........12

    C.    Considerations for Inhalation Therapy................................13

    D.    Treprostinil .........................................................................15

VI.   THE '793 PATENT ......................................................................17

VII.  APPLICATION OF THE PRIOR ART TO THE CLAIMS ........19

    A.    Brief Summary of Prior Art ................................................20

        1.    '212 Patent [Ex. 1006] ..............................................20

        2.    Voswinckel JESC [Ex. 1007] ...................................23

        3.    Voswinckel JAHA [Ex. 1008] ..................................26

        4.    Ghofrani [Ex. 1010] ..................................................26

        5.    Voswinckel 2006 [Ex. 1009] ....................................27

    B.    Ground 1: Claims 1–8 are Obvious over '212 Patent in View of Voswinckel JAHA and Voswinckel JESC........................28

        1.    Motivation to Combine the '212 Patent with Voswinckel JAHA and Voswinckel JESC with a Reasonable Expectation of Success ............................28

        2.    Independent Claim 1 .................................................32

- i -

Liquidia's Exhibit 1002
Page 2

(a)    "A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[a]) ............................................................... 33

(b)    "with an inhalation device," (Claim 1[b]) ..................... 35

(c)    "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[c]) ............................ 36

(d)    "delivered in 1 to 3 breaths." (Claim 1[d]) ................... 39

3.    Dependent Claim 2 ................................................ 41

4.    Dependent Claim 3 ................................................ 42

5.    Dependent Claim 4 ................................................ 43

6.    Dependent Claim 5 ................................................ 44

7.    Dependent Claims 6, 7, and 8 ................................ 44

C.    Ground 2: Claims 1–8 are Obvious over '212 Patent in View of Voswinckel JESC ............................................................ 46

1.    Motivation to Combine the '212 Patent with Voswinckel JESC With a Reasonable Expectation of Success .................. 46

2.    Independent Claim 1 ................................................ 47

(a)    "A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[a][b][c]) ......................................................... 47

(b)    "delivered in 1 to 3 breaths." (Claim 1[d]) ................... 47

Liquidia's Exhibit 1002
Page 3

3.   Dependent Claims 2-8 ....................................................49

D.   Ground 3: Claim 1 is anticipated by Ghofrani ...................50

   1.   Independent Claim 1 ...............................................50

        (a)   "A method of treating pulmonary hypertension
              comprising administering by inhalation to a human
              suffering from pulmonary hypertension a
              therapeutically effective single event dose of a
              formulation comprising treprostinil or a
              pharmaceutically acceptable salt thereof" (Claim
              1[a]) ...............................................................50

        (b)   "with an inhalation device," (Claim 1[b]) ....................51

        (c)   "wherein the therapeutically effective single event
              dose comprises from 15 micrograms to 90
              micrograms of treprostinil or a pharmaceutically
              acceptable salt thereof" (Claim 1[c]) ...........................52

        (d)   "delivered in 1 to 3 breaths." (Claim 1[d]) ...................52

E.   Ground 4: Claims 1, 3, and 8 are Obvious over Voswinckel
     JAHA and Ghofrani ........................................................53

   1.   Motivation to Combine Voswinckel JAHA and Ghofrani
        With a Reasonable Expectation of Success ............................53

   2.   Independent Claim 1 ...............................................55

        (a)   "A method of treating pulmonary hypertension
              comprising administering by inhalation to a human
              suffering from pulmonary hypertension a
              therapeutically effective single event dose of a
              formulation comprising treprostinil or a
              pharmaceutically acceptable salt thereof" (Claim
              1[a]) ...............................................................55

        (b)   "with an inhalation device," (Claim 1[b]) ....................56

        (c)   "wherein the therapeutically effective single event
              dose comprises from 15 micrograms to 90
              micrograms of treprostinil or a pharmaceutically
              acceptable salt thereof" (Claim 1[c]) ...........................57

        (d)   "delivered in 1 to 3 breaths." (Claim 1[d]) ...................58

   3.   Dependent Claim 3 .................................................58

- iii -

           4.      Dependent Claim 8 ...................................................58

    F.     Ground 5: Claims 1 and 3 are Anticipated by Voswinckel 2006 ......59

           1.      Independent Claim 1 ...............................................59

                (b)    "A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[a])....................................................................59

                (c)    "with an inhalation device," (Claim 1[b]) ....................60

                (d)    "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[c])............................60

                (e)    "delivered in 1 to 3 breaths." (Claim 1[d])...................60

           2.      Dependent Claim 3 ................................................61

    G.    Ground 6: Claims 2 and 4–8 are Obvious over Voswinckel 2006 and the '212 Patent .......................................................61

           1.      Motivation to Combine Voswinckel 2006 and the '212 Patent with a Reasonable Expectation of Success ..................61

           2.      Dependent Claim 2 ................................................63

            3.      Dependent Claim 4 ................................................63

            4.      Dependent Claim 5 ................................................64

            5.      Dependent Claim 6, 7, and 8...................................64

VIII.  NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS ......66

IX.    CONCLUSION..........................................................67

Liquidia's Exhibit 1002

I, Nicholas Hill, M.D., declare as follows:

## I.    INTRODUCTION

1.    I am over the age of eighteen and otherwise competent to make this declaration.

2.    Counsel for Liquidia Technologies, Inc. ("the Petitioner") retained me to offer technical opinions with respect to U.S. Patent No. 10,716,793 ("the '793 Patent") and the prior art references cited in the *inter partes* review (IPR) proceedings for the '793 Patent, **Ex. 1001**.

3.    I am being compensated for my time in connection with this IPR at my standard consulting rate of $550 per hour.  My compensation does not depend on the outcome of, or the content of my testimony in, the current IPR.

4.    I have assessed the '793 Patent.  In doing so, I have considered the teachings of the scientific literature before May 15, 2006, in light of general knowledge in the art before that date.

5.    In this declaration, I set forth my opinion that the claims of the '793 Patent would have been obvious to a person of ordinary skill in the art before May 15, 2006.

1

Liquidia's Exhibit 1002

Page 6

## II.    QUALIFICATIONS

### A.    Qualifications and Experience

6.    Below, I summarize my background, qualifications, and experience relevant to the issues raised in the present IPR.  A copy of my curriculum vitae, which includes a full description of my background and qualifications is attached to this declaration as **Exhibit 1003**.

7.    I am a Doctor of Medicine with more than 41 years of experience treating pulmonary diseases.  I practiced at Tufts Medical Center from 1982 through 1987, spent 15 years in Pulmonary and Critical Care Medicine at Rhode Island Hospital, Brown University, and returned to Tufts in 2002 to occupy my current position as Chief of the Division of Pulmonary, Critical Care, and Sleep.  As a physician, I specialize in pulmonary hypertension, mechanical ventilation, noninvasive ventilation, and general pulmonology.  I am also a Professor of Medicine at Tufts University School of Medicine where I research pulmonary vascular biology, disease, and treatment.

8.    In 1975, I earned my medical degree from Dartmouth Medical School.  I then trained as a resident at the New England Medical Center, Tufts University School of Medicine, from 1975-1977, and at the Boston Veterans Admin. Medical Center from 1977-1978.  From 1978 to 1979, I served as a fellow in cardiovascular medicine at University of Massachusetts Medical Center.  From 1979-1982, I completed a fellowship in pulmonary medicine at Boston University School of Medicine.

2

9.      I am licensed to practice in Massachusetts and Rhode Island and hold certifications in Internal Medicine, Pulmonary Diseases, and Critical Care Medicine from the American Board of Internal Medicine.  In addition to my position at Tufts Medical Center, I have held several clinical positions at pulmonary clinics in New England.  From 2002-2012, I held a clinical position at the Rhode Island Hospital Pulmonary Hypertension Clinic.  Since 2017, I have held a clinical position at the University of Massachusetts Medical Center Pulmonary Hypertension Clinic.

10.      I have treated many hundreds of patients with pulmonary hypertension, and have prescribed inhaled prostacyclin, including treprostinil and iloprost, to many dozens of these patients.  I regularly prescribe the use of inhalers to my patients including soft mist inhalers, dry powder inhalers, pressurized metered dose inhalers, and nebulizers.

11.      As a supervising physician, I have conducted or helped conduct over fifteen clinical trials evaluating treatments for pulmonary hypertension, including treatments with inhaled therapies.  Of particular relevance, in 2006, I participated in a multi-center trial on the effects on pulmonary hypertension of the addition of inhaled treprostinil to sildenafil or bosentan.  **Ex. 1003**, at 10.  In 2007, I participated in the extension of the multicenter study to examine the long-term effects of inhaled treprostinil on patients.  *Id.*

3

Liquidia's Exhibit 1002
Page 8

12.     Since 1974, I have published over 176 original articles in peer-reviewed journals, including at least 70 on pulmonary hypertension.  Several of these articles concern treatments for pulmonary hypertension, including treatments using inhaled therapies.  For example, in 2015, I published a review article titled "Inhaled Therapies for Pulmonary Hypertension" in the journal Respiratory Care.  Ex. 1079 (Hill 2015). The article reviews FDA-approved inhaled therapies for pulmonary hypertension over the last 20 years, including inhaled treprostinil, and describes the advantages and disadvantages of inhaled therapies.  *Id.*

13.     During my time as a Professor of Medicine, I have supervised over fifty students and postdoctoral fellows who completed original research on pulmonary hypertension and treatments for pulmonary diseases.

14.     Accordingly, I consider myself an expert in the field of pulmonary medicine, and I have been an expert in this field since before May 15, 2006.

**B.     Materials Considered**

15.     The analysis that I provide in this Declaration is based on my education, research, and experience, as well as my investigation and study of relevant materials, including the '793 Patent.  I have further reviewed the declaration in support of Petitioner from Dr. Igor Gonda.  Ex. 1004.  In addition to these materials, I may consider additional documents and information in forming any supplemental opinions.  To the extent I am provided additional documents or information, I may offer further opinions.

4

Liquidia's Exhibit 1002
Page 9

16.    I have reviewed and cited to the following documents in my analysis

below:

| Exhibit No. | Description of Document |
|---|---|
| 1001 | U.S. Patent No. 10,716,793 B2 to Olschewski, et al. ("'793 patent") |
| 1003 | *Curriculum Vitae* of Dr. Nicholas Hill |
| 1004 | Declaration of Dr. Igor Gonda ("Gonda Decl.") |
| 1006 | U.S. Patent No. 6,521,212 B1 to Cloutier, et al. ("'212 patent") |
| 1007 | Voswinckel, R., et al., Abstract 218: "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," *European Heart Journal* 25:22 (2004) ("Voswinckel JESC") |
| 1008 | Robert Voswinckel, Beate Enke, Andre Kreckel, Frank Reichenberger, Stefanie Krick, Henning Gall, Tobias Gessier, Thomas Schmehl, Markus G. Kohstall, Friedrich Grimminger, Hossein A. Ghofrani, Werner Seeger, and Horst Olschewski, Abstract 1414: "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension," Abstracts from the 2004 Scientific Sessions of the American Heart Association, *Circulation,* 110(17 Suppl.):III-295 (October 26, 2004)  ("Voswinckel JAHA") |
| 1009 | Robert Voswinckel, Hossein A. Ghofrani, Friedrich Grimminger, and Werner Seeger, "Clinical Observations" on "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," "Letters" Section of the *Annals of Internal Medicine*, 144(2):149-50 (January 2006) ("Voswinckel 2006") |
| 1010 | Hossein Ardeschir Ghofrani, Robert Voswinckel, et al., Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie, 30(4) HERZ,  30(4):296–302 (June 2005) ("Ghofrani") (Foreign article and English translation attached) |
| 1018 | Remodulin® 2004 Label |
| 1019 | Stein, S.W., et al., "The History of Therapeutic Aerosols: A Chronological Review," *Journal of Aerosol Medicine and Pulmonary Drug Delivery*, 30(1):20-41 (2017) ("Stein") |

5

Liquidia's Exhibit 1002
Page 10

| 1020 | Clark, A.R., "Medical Aerosol Inhalers: Past, Present, and Future," *Aerosol Science and Technology*, 22:374-91 (1995) ("Clark") |
| 1022 | Walmrath, D., et al., "Direct Comparison of Inhaled Nitric Oxide and Aerosolized Prostacyclin in Acute Respiratory Distress Syndrome," *American Journal of Respiratory Critical Care Medicine*, 153:991-96 (1996) ("Walmrath 1996") |
| 1023 | Olschewski, H., et al., "Inhaled Prostacyclin and Iloprost in Severe Pulmonary Hypertension Secondary to Lung Fibrosis," *American Journal of Respiratory Critical Care Medicine*, 160:600-07 (1999) ("Olschewski 1999") |
| 1025 | De Wet, C.J., et al., "Inhaled prostacyclin is safe, effective, and affordable in patients with pulmonary hypertension, right heart dysfunction, and refractory hypoxemia after cardiothoracic surgery," *Journal of Thoracic and Cardiovascular Surgery*, 127:1058-67 (2004) ("De Wet") |
| 1028 | U.S. Patent Application Publication No. US 2004/0265238 A1 to Chaudry ("Chaudry") |
| 1029 | Ventavis® Label 2004 |
| 1030 | Newman, S.P., "Aerosols", Chapter from *Encyclopedia of Respiratory Medicine* pp. 58-64 (2006) ("Newman") |
| 1031 | Geller, D.E., "Comparing Clinical Features of the Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler," *Respiratory Care*, 50(10):1313-21 (2005) ("Geller 2005") |
| 1032 | Bender, B., et al., "Nonadherence in asthmatic patients: is there a solution to the problem?" *Annals of Allergy, Asthma & Immunology*, 79:177-86 (1997) ("Bender 1997") |
| 1034 | Geller, D., et al., "Bolus Inhalation of rhDNase with the AERx System in Subjects with Cystic Fibrosis," *Journal of Aerosol Medicine*, 16(2):175-82 (2003) ("Geller 2003") |
| 1035 | Chattaraj, S.C., "Treprostinil sodium Pharmacia," *Current Opinion in Investigational Drugs*, 3(4):582-86 (Apr. 2002), *available at* https://pubmed.ncbi.nlm.nih.gov/12090728/ ("Chattaraj") |
| 1037 | English translation of OptiNeb® User Manual 2005 |
| 1046 | U.S. Patent No. 9,358,240 to Olschewski, et al. ("'240 Patent") |

6

Liquidia's Exhibit 1002
Page 11

| 1047 | Hoeper, M.M., et al., "Long-Term Treatment of Primary Pulmonary Hypertension with Aerosolized Iloprost, a Prostacyclin Analogue," *N Engl J Med*, 342:1866-70 (2000) ("Hoeper") |
|------|------|
| 1048 | Walmrath, D., et al., "Aerosolised prostacyclin in adult respiratory distress syndrome," *Lancet*, 342:961-62 (1993) ("Walmrath 1993") |
| 1059 | Nauser, T.D., "Pulmonary Hypertension: New Perspectives," *CHF*, 9:155-62 (2003) ("Nauser 2003") |
| 1065 | Olschewski, H., et al., "Inhaled Iloprost for Several Pulmonary Hypertension," *N Engl J Med*, 347(5):322-29 (2002) ("Olschewski 2002") |
| 1068 | Vachiéry, J.-L., et al., "Transitioning From IV Epoprostenol to Subcutaneous Treprostinil in Pulmonary Arterial Hypertension," *CHEST*, 121:1561-65 (2002) ("Vachiéry 2002") |
| 1077 | Boyle, M.P., "So Many Drugs, So Little Time. The Future Challenge of Cystic Fibrosis Care," *CHEST*, 123(1):3-5 (2003) ("Boyle 2003") |
| 1078 | Azmacort® Label 2003 |
| 1079 | Hill, N.S., et al., "Inhaled Therapies for Pulmonary Hypertension," *Respiratory Care*, 60(6):794-805 (2015) ("Hill 2015") |

## III.    PERSON OF ORDINARY SKILL IN THE ART

17.    I understand that an assessment of the claims of the '793 Patent should be undertaken from the perspective of a person of ordinary skill in the art ("POSA" or "skilled artisan") as of the earliest claimed priority date, which I have been informed is May 15, 2006.  I have been advised by counsel for Liquidia that to determine the appropriate level of a person having ordinary skill in the art, the following factors may be considered: (1) the types of problems encountered by those working in the field and prior art solutions thereto; (2) the sophistication of the technology in question, and the rapidity with which innovations occur in the field; (3)

7

the educational level of active workers in the field; and (4) the educational level of the inventor.

18.    I have assessed the level of ordinary skill in the art based upon my review of the prior art, the patent, and my over 41 years of working in the field of pulmonary medicine.

19.    A POSA for a method of treating pulmonary hypertension as of May 15, 2006 would have a medical degree with a specialty in pulmonology or cardiology, plus at least two years of experience treating patients with pulmonary hypertension as an attending, including with inhaled therapies, or equivalent degree or experience. Accordingly, I qualify as a POSA:  I am Chief of the Division of Pulmonary, Critical Care, and Sleep at Tufts Medical Center.  Ex. 1003.  By 2006, I had treated patients with pulmonary hypertension for more than several decades including prescribing inhaled prostacyclin receptor agonists.  *See id*.

## IV.    STATEMENT OF LEGAL PRINCIPLES

### A.    Claim Construction

20.    I have been informed by counsel that claim terms are generally given their ordinary and customary meaning, which is the meaning that the term would have to a POSA in question at the time of the invention, i.e., as of the effective filing date of the patent application.  I further understand that a POSA is deemed to read the claim term not only in the context of the particular claim in which a claim term appears, but in the context of the entire patent, including the specification and prosecution history.

8

Liquidia's Exhibit 1002
Page 13

21.    I have reviewed the claims of the '793 Patent and believe a POSA would understand each of the claim terms to have their plain and ordinary meaning.

**B.    Anticipation**

22.    I understand from counsel that the law recognizes a concept called "anticipation."  I understand that a patent is invalid when the invention claimed is anticipated (i.e. not novel) over a prior art reference.  I have been advised by counsel that a patent claim is anticipated only if the prior art reference teaches every element of the claim.

**C.    Obviousness**

23.    Counsel has advised me that a patent claim may be found invalid as obvious if, at the time when the invention was made, the subject matter of the claim, considered as a whole, would have been obvious to a person having ordinary skill in the field of the technology (the "art") to which the claimed subject matter belongs.

24.    I understand that the following factors should be considered in analyzing obviousness: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims; and (3) the level of ordinary skill in the pertinent art.

25.    I also understand that certain other factors known as "secondary considerations" such as commercial success, unexpected results, long felt but unmet need, industry acclaim, simultaneous invention, copying by others, skepticism by experts in the field, and failure of others may be utilized as indicia of nonobviousness.

9

Liquidia's Exhibit 1002
Page 14

I understand, however, that secondary considerations should be connected, or have a "nexus," with the invention claimed in the patent at issue.

26.    I understand that a POSA is assumed to have knowledge of all prior art. I understand that a POSA can combine various prior art references based on the teachings of those references, the general knowledge present in the art, or common sense. I understand that a motivation to combine references may be implicit in the prior art, and there is no requirement that there be an actual or explicit teaching to combine two references. Thus, one may take into account the inferences and creative steps that a person of ordinary skill in the art would employ to combine the known elements in the prior art in the manner claimed by the patent at issue. I understand that one should avoid "hindsight bias" and *ex post* reasoning in performing an obviousness analysis, but that this does not mean that a POSA does not have recourse to common sense for purposes of the obviousness inquiry.

27.    I have been advised by counsel that obviousness may be shown by demonstrating that it would have been obvious to modify what is taught in a single piece of prior art to create the patented invention. Obviousness may also be shown by demonstrating that it would have been obvious to combine the teachings of more than one item of prior art.

28.    I have been advised by counsel that a claimed invention may be obvious if some teaching, suggestion, or motivation exists that would have led a person of

10

ordinary skill in the art to combine the invalidating references and to do so with a reasonable expectation of success. Counsel has also advised me that this suggestion or motivation may come from the knowledge of a person having ordinary skill in the art, or from sources such as explicit statements in the prior art. Alternatively, any need or problem known in the field at the time and addressed by the patent may provide a reason for combining elements of the prior art. I have been further advised by counsel that if a patent claims a combination of familiar elements according to known methods, the combination is likely to be obvious when a POSA has a reasonable expectation of success in combining the elements. Absolute certainty of success is not required.

## V.    RELEVANT TECHNICAL BACKGROUND

### A.    Overview of Pulmonary Hypertension

29.    Pulmonary hypertension is a chronic disease characterized by abnormally elevated pressure in the pulmonary arteries, the arteries that carry blood from the right heart to the lungs. Patients with pulmonary hypertension suffer from persistent and progressive exertional shortness of breath, fatigue, and dizziness. In my experience, advanced stages of the disease are fatal, and without therapy, patients may die on average in two to three years. Ex. 1059 (Nauser 2003) at 158.

30.    Therapies for respiratory diseases, including pulmonary hypertension, were used extensively by 2006. Exs. 1034 (Geller 2003); 1065 (Olschewski 2002); 1023 (Olschewski 1999); 1022 (Walmrath 1996). These therapies could be

11

administered to a patient through a variety of routes, including intravenous, subcutaneous, and inhalation delivery. *Id.* Because the '793 Patent concerns delivery of therapies via inhalation, I focus here on the state of inhalation therapy in 2006.

**B.    Well Known Advantages of Inhalation Therapy and Inhalers**

31.    Several advantages of inhalation therapy were well-known by 2006. Compared to intravenous or subcutaneous therapies, inhalation was relatively non-invasive. A patient needed to only breathe in the drug. Such ease of administration meant that, unlike continuous intravenous therapy, patients did not need to receive treatment at "specialized centers familiar with the [intravenous] technique, equipment, and dose ranging." Ex. 1028 (Chaudry 2004) at [0011].

32.    Inhalation therapies were also known to provide pulmonary selectivity because they were delivered to the organ of interest—the lung. Direct delivery to the lung could eliminate or reduce the side effects associated with intravenous delivery. As Chaudry 2004 explains, with intravenous therapies, larger doses were often required as only a small fraction of the dose delivered actually reached the lungs. *Id.* Inhalation therapy was also known to reduce systemic toxicity (i.e. toxicity at multiple sites or throughout the body) and intravenous catheter infection. Ex. 1065 (Olschewski 2002) at 322.

33.    By 2006, inhalation therapies could easily be administered with inhalers. As early as the 1950s, clinicians and patients recognized inhalers were convenient and portable. Ex. 1019 (Stein) at 27. In 1956, for example, the metered dose inhaler for

12

Liquidia's Exhibit 1002
Page 17

treating asthma was introduced. As the first "truly convenient and portable" inhalation device, it quickly became the dominant system for delivering asthma medication. *Id.*; *see also* Ex. 1020 (Clark) at 375.

34. Several other inhalers and inhalation devices were also well-known and used by me, along with many other clinicians, for treatment of pulmonary disease before 2006. By 2006, I was regularly prescribing these devices to patients with airways diseases. Older forms of medical nebulizers had been used since at least the 1950s, Ex. 1020 (Clark) at 375, and by the early 2000s, clinicians and researchers used pulsed ultrasonic and jet nebulizers, including the OptiNeb® Ex. 1037 (OptiNeb® 2005 manual) and HaloLite. Exs. 1065 (Olschewski 2002) at 323; 1067 (Anderson 2005) at 1144. Dry powder inhalers were invented in 1852, and like the nebulizer and metered dose inhaler, were widely available by the 1990s. *See generally* Ex. 1020 (Clark). Compared to the nebulizer, dry powder inhalers were easier and quicker to use. Ex. 1031 (Geller 2005) at 1315. And unlike nebulizers or most metered dose inhalers, dry powder inhalers provided breath actuation. Exs. 1030 (Newman) at 62; 1031 (Geller 2005) at 1316.

### C.    Considerations for Inhalation Therapy

35. Inhalation therapy was not without its technical difficulties. By the early 1990s, it was well known that large drug particles were ineffective when used in inhalation therapy. Clark reported that "to avoid inertial impaction in the oropharyngeal cavity and reach the lung" aerosol particles needed to be 7 micrometers

13

Liquidia's Exhibit 1002
Page 18

or less.  Ex. 1020 (Clark) at 374.  To reach the peripheral lung, furthermore, the particles needed to be 2 to 3 micrometers.  *Id.*

36.    Many inhalation therapies required administration times of tens of minutes or longer.  For example, iloprost, which has been on the market since the early 2000s, was prescribed at four to ten minutes per dose.  Ex. 1029 (Ventavis Label 2004) at 17.  Long inhalation times meant patients did not reliably adhere to a treatment regime.

37.    By the early 2000s, numerous groups had worked and were working to improve upon inhalation therapy.  Notably, while inhalation therapy provided advantages over intravenous therapy, adherence rates were still not 100 percent.  Ex. 1032 (Bender 1997) at Abstract, 179-80.  My own experience in the early 2000s echoes this finding.  I regularly treated patients with asthma chronic obstructive pulmonary disease (COPD), and pulmonary vascular disease using inhaled therapies, including iloprost.  Patients receiving iloprost required six doses per day at ten minutes per dose.  Due to the time required to administer the therapies and frequency of dosing, a sizable percentage of patients did not adhere to their treatment regimen.

38.    Clinicians and researchers recognized adherence rates might improve if drug delivery time and number of breaths required for inhalation therapy were reduced.  Geller, et. al. noted "more efficient delivery methods are required to reduce the time burden of taking multiple inhaled drugs" for patients with cystic fibrosis.  Ex.

14

1034 (Geller 2003) at 176.  Olschewski, et al. explained that while their study delivered iloprost to patients over a ten minute inhalation period, other techniques could be used to considerably shorten the duration.  Ex. 1065 (Olcheswki 2002) at 328.  A patent from Chaudry et al. in 2004 describing an inhalable formulation for pulmonary hypertension explained "[r]educing the amount of time to complete the treatment means individuals will be more likely to comply with the prescribed dosing regimen and achieve optimal benefit from the medication prescribed."  Ex. 1028 (Chaudry 2004) at [0063].

39.    Several of these groups were successful in demonstrating that inhalation therapies remained effective at lower doses.  The Geller 2003 study, for example, reported just three breaths in a single sitting using an AERx inhaler improved the forced expiratory volume (a volume that is reduced in patients with cystic fibrosis).  Ex. 1034 (Geller 2003) at Abstract.  The three breath administration was significantly reduced in time compared to the ten to twenty minute administration of most nebulizers.  And, as further explained below, Exs. 1008 (Voswinckel JAHA), 1010 (Ghofrani), and 1009 (Voswinckel 2006) demonstrated that as few as three breaths of treprostinil were required to treat patients with pulmonary hypertension.

**D.    Treprostinil**

40.    From the perspective of a POSA in 2006, I understand (and a POSA would have known) that treprostinil is a pulmonary vasodilator, meaning it acts to widen the arteries of the lungs and reduce pulmonary artery pressure.

15

Liquidia's Exhibit 1002
Page 20

41.    Treprostinil is part of the class of drugs known as prostacyclin receptor agonists.  This class includes other drugs used for inhalation therapy including epoprostenol and iloprost (iloprost is sold under the brand name Ventavis).  Ex. 1065 (Olschewski 2002) at 322; Ex. 1023 (Olschewski 1999) at 602; Ex. 1029 (Ventavis Label 2004).  Treprostinil and iloprost are both analogues of epoprostenol.

42.    By 2006, inhaled prostacyclin agonists were known to be effective in treating pulmonary diseases, including pulmonary hypertension.  For example, in 1999, Olschewski, et al. reported "in pulmonary hypertension secondary to lung fibrosis, aerosolization of $PGI_2$ or iloprost causes marked pulmonary vasodilatation with maintenance of gas exchange and systemic arterial pressure."  Ex. 1023 (Olschewski, 1999) at Abstract.  The same group reported in 2002 that inhaled iloprost could improve hemodynamic variables in pulmonary hypertension.  Ex. 1065 (Olschewski 2002) at 328.  De Wet, et al. also examined inhaled prostacyclin in patients with pulmonary hypertension, right heart dysfunction, or refractory hyposemia; and reported inhaled prostacyclin was safe, effective and affordable.  Ex. 1025 (De Wet 2004) at 1058.  By 2004, inhaled iloprost was approved for treatment of pulmonary hypertension under the brand name Ventavis®.  Ex. 1029 (Ventavis Label 2004).  Ventavis was administered at a dose of 45 micrograms in one treatment session that typically lasted between four to ten minutes.  *Id.*

16

Liquidia's Exhibit 1002
Page 21

43.    Treprostinil and salts of treprostinil were also well-known treatments for pulmonary hypertension.    In 2004, Remodulin®, a treprostinil salt delivered intravenously, was approved by the FDA for treating pulmonary hypertension.    Ex. 1018 (Remodulin® 2004 Label).    Vachiéry et al, a study of which I was a part, reported successful use of subcutaneous treprostinil in patients with pulmonary hypertension who had previously presented with life-threatening complications in response to other drugs like epoprostenol.    Ex. 1068 (Vachiéry 2002) at 1561.

44.    In turn, by 2006, numerous patents and publications had combined the teachings from inhaled prostacyclins studies and treprostinil studies, including for treatment of pulmonary hypertension.    These studies are further described in Section VII below.

## VI.    THE '793 PATENT

45.    I understand the '793 Patent, titled "Treprostinil Administration by Inhalation," includes one independent claim (claim 1) and seven dependent claims.

46.    The '793 Patent describes administering treprostinil to a subject using an inhaler.    Ex. 1001 ('793 Patent) at Abstract, 2:66-3:9, claims 1-8.    Claim 1 is specifically drawn to administering treprostinil to a human suffering from pulmonary hypertension using a single event dose of 15-90 µg in 1 to 3 breaths.    The dependent claims are drawn to different inhalers and formulations of treprostinil.    *Id.* at claims 2-8.

17

Liquidia's Exhibit 1002
Page 22

47.    For administering treprostinil by inhalation, the '793 Patent describes several types of inhalers.  In one example, the '793 Patent describes a pressurized metered dose inhaler which "produces the aerosol clouds for inhalation from solutions and/or suspensions of respiratory drugs in chlorofluorocarbon (CFC) and/or hydrofluoroalkane (HFA) solutions." *Id.* at 7:16-21.  In another example, the inhaler is a dry powder inhaler where the respiratory drug is inhaled in solid, powder form. *Id*. at 7:22-24.  The '793 Patent further describes a soft mist inhaler where respiratory drug, in solution, is aerosolized by passing it through a nozzle or series of nozzles. *Id*. at 7:27-30.    Finally, the '793 Patent discloses a pulsed ultrasonic nebulizer, specifically the OPTINEB® nebulizer. *Id.* at 12:58-59; 14:35-37.

48.    This Declaration addresses the limitations of claims 1–8 of the '793 Patent as follows:

| | Claim Limitation |
|---|---|
| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
| 1[b] | with an inhalation device, |
| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
| 1[d] | delivered in 1 to 3 breaths. |
| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
| 3 | The method of claim 1, wherein the inhalation device is a pulsed |

Liquidia's Exhibit 1002
Page 23

| | |
|---|---|
| | ultrasonic nebulizer. |
| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
| 6 | The method of claim 4, wherein the formulation is a powder. |
| 7 | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 | The method of claim 1, wherein the formulation contains no metacresol. |

49.    It is my opinion that all of these claims were either directly disclosed/anticipated in the prior art or would have been obvious to a skilled artisan by May 15, 2006.

## VII.  APPLICATION OF THE PRIOR ART TO THE CLAIMS

50.    In my opinion, the limitations of claims are disclosed by the following combination of prior art references.

| Ground | References | Claim(s) |
|---|---|---|
| 1 | Obvious over the combination of the '212 Patent, Voswinckel JAHA , and Voswinckel JESC | 1-8 |
| 2 | Obvious over the combination of the '212 Patent and Voswinckel JESC | 1-8 |
| 3 | Anticipated by Ghofrani | 1 |
| 4 | Obvious over the combination of Voswinckel JAHA and Ghofrani | 1, 3, 8 |
| 5 | Anticipated by Voswinckel 2006 | 1, 3 |
| 6 | Obvious over the combination of Voswinckel 2006 and the '212 Patent | 2, 4-8 |

51.    I am informed by counsel that each of the references cited in the grounds above qualifies as prior art to the challenged claims because each reference was filed

19

and/or published before May 15, 2006, the earliest effective filing date for the '793 Patent. As I am not an expert in patent law, I offer no opinion on the issue of whether the cited references qualify as prior art.

### A. Brief Summary of Prior Art

52. As an initial general matter, a POSA would understand that microgram, mcg, and µg are synonymous.

#### 1. '212 Patent [Ex. 1006]

53. **The '212 Patent**, titled "Method for Treating Peripheral Vascular Disease by Administering Benzindene Prostaglandins by Inhalation," was granted on February 18, 2003. Ex. 1006 ('212 Patent) at 1.

54. The '212 Patent describes a method of delivering benzindene[1] prostaglandins to a patient by inhalation, and particularly using inhaled benzindene prostaglandin to treat pulmonary hypertension. *Id*. at Abstract, 2:16-18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24. The patent explains that UT-15 is a preferred benzindene prostaglandin. Ex. 1006 ('212 Patent) at 4:38. I know, and a POSA in 2006 would have known, that UT-15 is treprostinil sodium. By 2006, UT-15 had been identified in the literature as treprostinil sodium. Chattaraj, for example, notes "United Therapeutics Corp (UTC) is developing treprostinil sodium (Remodulin, UT-15), a

---

[1] While some references spell this compound as "benzindene," others use "benzidine." For purpose of this Declaration, both spellings refer to the same compound.

Liquidia's Exhibit 1002
Page 25

stable structural analog of prostacyclin [prostaglandin I2 or PGI$_2$], for the potential treatment of primary pulmonary (arterial) hypertension (PAH), peripheral vascular disease (PVD) and other cardiovascular conditions . . . ." Ex. 1035 (Chattaraj); *see also* Ex. 1046 (U.S. Patent No. 9,358,240) at 5:41-47 ("U.S. Pat. No[]. 6,521,212 . . . describe[s] administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions.").

55. For inhalation of benzindene prostaglandin, the '212 Patent describes using a nebulizer, inhaler, atomizer, or aerosolizer. Ex. 1006 ('212 Patent) at 5:30. One preferred embodiment describes the nebulizer AM-601 MEDICATOR AEROSOL DELIVERY SYSTEM™. *Id.* at 5:33-36.

56. The '212 Patent further describes a range of benzindene prostaglandin doses that may be used for treating pulmonary disease. For example, for treating peripheral vascular disease, the '212 Patent describes "the dosage for inhalation . . . should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg; typically from 0.5 tg [sic] to 2.5 mg, preferably from 7 µg to 285 µg, per day per kilogram bodyweight." *Id.* at 5:54-62. In another example, the '212 Patent describes delivering benzindene prostaglandin in a "therapeutically effective amount" to treat pulmonary hypertension, and "titrating" to determine the proper dosage for the patient being treated. *Id.* at 6:56-7:3. In the context of pulmonary hypertension, the '212 Patent further discloses that "aerosolized UT-15

21

has a greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.* at 8:9-12.

57.    In several examples using sheep as an animal model for pulmonary hypertension, the '212 Patent describes the effect of treatment with aerosolized UT-15 on baseline hemodynamics.  Ex. 1006 ('212 Patent) at 10:41-57; 10:60-11:60; 11:63-13:10.  The '212 Patent explains sheep were chosen because they are large, docile, and can tolerate instrumentation with little discomfort. *Id.* at 9:14-24.  As the '212 Patent explains, and as comports with my own experience, sheep were used as an animal model of pulmonary hypertension in the early 2000s and before. *Id.* at 9:24-27.

58.    UT-15 was delivered to sheep in dosages of 262.5 micrograms, *id.* at 9:4-12, and in dosages of 250, 500, and 1000 micrograms per kg per min for 30-60 minutes. *Id.* at 11:7-13.

59.    Relying on the experiments in sheep, the '212 Patent claims an invention for delivering inhalable treprostinil (in the form of UT-15) to treat pulmonary hypertension in humans.  The '212 Patent discloses delivering UT-15 to "a patient in need thereof" in a "therapeutically effective amount," where a therapeutically effective amount is an "amount that has therapeutic effects on the condition intended to be treated or prevented." Ex. 1006 ('212 Patent) at 6:56-61.  The '212 Patent further

Liquidia's Exhibit 1002
Page 27

describes "[f]or example, an 'antihypertensive effective amount' refers to that amount in which the effects from pulmonary hypertension, and particularly, pulmonary arterial pressure (PAP), are reduced towards a normal level relative to hypertensive levels, or maintained at normal levels." *Id.* at 6:61-66.

60.    Claim 5 of the '212 Patent specifically claims treating peripheral vascular disease in a human while claim 6 further claims a method for treating pulmonary hypertension. *Id.* at claims 1, 6.

61.    The '212 Patent explains the invention may include solid formulations of benzindene prostaglandins where the solid formulation is "usually in the form of a powder" and the particles are "preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter." Ex. 1006 ('212 Patent) at 5:37-41.  As such, claim 9 of the '212 Patent claims treating pulmonary hypertension where UT-15 is delivered in "powder form comprising particles less than 10 micrometers in diameter." *Id.* at claim 9.

### 2.    Voswinckel JESC [Ex. 1007]

62.    **Voswinckel JESC** is an abstract describing a poster presented by Voswinckel et. al., at the 2004 Congress of the European Society of Cardiology.  Ex. 1007 (Voswinckel JESC).  It is titled "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension." *Id.* at 22.

63.    Voswinckel JESC describes a clinical study to examine the response of 29 patients, 10 with idiopathic pulmonary hypertension, to inhaled treprostinil. *Id.* at

Background, Methods, Results. Pulmonary arterial hypertension is also known as idiopathic hypertension.

64.    As Voswinckel JESC explains, 21 patients inhaled a single dose of treprostinil solution over the course of 6 minutes. *Id.* at Methods. Doses of treprostinil in solution were administered in concentrations of 16, 32, 48, and 64 µg/mL using an OptiNeb® ultrasound nebulizer. *Id.*

65.    A POSA in 2006 reading Voswinckel JESC would assume that the study used a sufficient volume of treprostinil solution for 6 minutes of delivery which a POSA would understand to be at least 1 mL because nebulizers at the time were known to nebulize (i.e. aerosolize liquid) at least that volume. Ex. 1004 (Gonda Decl.) at paragraph 56. In my own practice, I prescribed volumes of a least 1 mL for inhalation therapy using nebulizers. Assuming at least 1 mL of volume for delivery, a POSA as of 2006 would thus reasonably understand that Voswinkel JESC delivered at least **16, 32, 48, or 64 µg** (16, 32, 48, 64 µg/mL*1 mL) of inhaled treprostinil to patients.

66.    From my own experience, greater volumes at the same dose and time, resulting in a higher total dose of drug delivered, could produce painful side effects for patients receiving inhalation therapy for the first time, although higher doses might be used for experienced patients who developed tolerance. Indeed, Voswinckel JESC which is an early disclosure of inhalable treprostinil in humans, indicates that at the

24

higher concentrations (e.g. 32, 48, and 64 µg/mL), patients experienced "[h]eadaches, cough or bronchoconstriction." Ex. 1007 (Voswinckel JESC) at Results. Thus, in my opinion, a POSA as of May 2006 would understand Voswinckel JESC to disclose the administration of at least 16, 32, 48, or 64 µg.

67. A POSA would further confirm that 16-64 µg was the administered dosage in Voswinckel JESC by using his understanding of the rate of solution delivery for the OptiNeb® device available before 2006. Ex. 1037 (OptiNeb® 2005 Manual) at 28 (disclosing a nebulizing rate of 0.6 mL/min). Voswinckel JESC explains the 16 µg/mL dose is the dose at which patients showed "near maximal pulmonary vasodilatation" without adverse side effects. Ex. 1007 (Voswinckel JESC) at Conclusion. A POSA as of May 2006, assuming continuous delivery of inhaled treprostinil across 6 minutes, would understand that patients in Voswinckel JESC would have received **57.6** µg (16 µg/mL * 0.6 mL/min * 6 min) in a single event dose at 16 µg/mL. Voswinckel JESC describes that these dosages of inhaled treprostinil were used effectively in patients with pulmonary hypertension: compared to placebo controls, patients who inhaled treprostinil showed "significant long-lasting pulmonary vasodilatation" including at the lower dose of 16 µg/mL. *Id.* A POSA would have thus understood inhaled treprostinil doses of 16, 32, 48, or 64 µg/mL delivered in volumes known in the art or typical for the OptiNeb® inhaler could be used to treat patients with pulmonary hypertension.

25

### 3.    Voswinckel JAHA [Ex. 1008]

68.    **Voswinckel JAHA** is an abstract from Scientific Sessions 2004 hosted by the American Heart Association from November 7-10, 2004 in New Orleans.  The abstract, titled "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonary Hypertension," was published in the Supplement to the journal *Circulation* on October 26, 2004.

69.    Voswinckel JAHA describes using inhaled treprostinil sodium (a treprostinil salt) to treat seventeen patients with severe pulmonary hypertension.  Ex. 1008 (Voswinckel JAHA) at Objective, Methods.  The patients used an OptiNeb® ultrasound nebulizer to inhale, in three single breaths, a treprostinil sodium solution at a concentration of 600 µg/mL.  *Id.* at Methods.  The single dose of inhaled treprostinil sodium produced sustained pulmonary vasodilatation over 120 minutes.  *Id.* at Results.  Pulmonary vascular resistance, a measure related to arterial pressure, decreased in patients who inhaled treprostinil sodium.  *Id.*

### 4.    Ghofrani [Ex. 1010]

70.    **Ghofrani**, titled in English as "New therapies in the treatment of pulmonary hypertension," is a scientific article published in 2005 in Herz [Heart].  I was provided an English translation of the article.  Ex. 1010 (Ghofrani).

71.    Ghofrani reviews therapies used to treat pulmonary hypertension, including inhaled treprostinil.  Ex. 1010 (Ghofrani) at 297-98.  In particular, Ghofrani describes initial clinical trials in Giessen, Germany, where inhaled treprostinil is used

26

in patients with severe pulmonary hypertension. *Id.* Seventeen patients each received a 15 µg dose of inhaled treprostinil, after which they displayed decreased pulmonary pressure and resistance for more than 180 minutes. *Id.* at 298. Ghofrani explains dosages could be increased "up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring." *Id.*

72.    Ghofrani describes that the inhaled treprostinil used in the clinical trial showed strong pulmonary selectivity and long duration of action. Ex. 1010 (Ghofrani) at 298. Because of these properties, Ghofrani notes:

> it is possible to reduce the number [of] inhalations necessary to up to four per day; the inhalation period can be reduced to < 1 min. by selecting a suitable device. Additionally the initial data shows that it is technically feasible for there to be only one to two breaths in an application.

*Id.*

### 5.    Voswinckel 2006 [Ex. 1009]

73.    **Voswinckel 2006** was published on January 17, 2006 in the Annals of Internal Medicine and is titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension." Ex. 1009 (Voswinckel 2006) at 149.

74.    Voswinckel 2006 describes a patient study aimed at characterizing the safety, tolerability, and efficacy of inhaled treprostinil in patients with pulmonary hypertension. *Id.* at 150. In the study, conducted by researchers from University of Giessen Lung Center, three patients with pulmonary hypertension received a single 15 µg dose of treprostinil in three breaths using an OptiNeb® ultrasonic inhalation

27

Liquidia's Exhibit 1002
Page 32

device.  *Id.*  Voswinckel describes treatment with inhaled treprostinil reduced pulmonary vascular resistance by -45.2 ± 17.5 percent for more than 180 min.  Two of the patients were further provided "long-term inhaled treprostinil therapy . . . consisting of 4 daily 15-µg doses."  *Id.*  The authors report inhaled treprostinil was found to be "clinically effective, safe, and well tolerated" at a dosage of "15 µg . . . inhaled in 3 breaths 4 times daily."  *Id.*

**B.    Ground 1: Claims 1–8 are Obvious over '212 Patent in View of Voswinckel JAHA and Voswinckel JESC**

**1.    Motivation to Combine the '212 Patent with Voswinckel JAHA and Voswinckel JESC with a Reasonable Expectation of Success**

75.    A POSA as of May 2006 would have had reason to combine, and a reasonable expectation of success in combining, the '212 Patent with Voswinckel JESC and Voswinckel JAHA.  As I explain in detail below, all three publications concern treatment of pulmonary hypertension with inhaled treprostinil.

76.    The '212 Patent describes methods of delivering benzindene prostaglandin (particularly a treprostinil salt in the form of UT-15) by inhalation to treat pulmonary hypertension.  Ex. 1006 ('212 Patent) at Abstract, 4:38-51; Section VII.A.1.

77.    As discussed in paragraphs 57 and 58 above, the '212 Patent demonstrates, in sheep, that inhaled treprostinil can attenuate pulmonary hypertension.  Ex. 1006 ('212 Patent) at Examples I-IV; Figs. 2, 7, 9, 13, 14, 15, 16.

28

The '212 Patent notes, and as was commonly understood by POSAs at the time, that sheep were used as models for pulmonary hypertension in humans, and that positive results in sheep provided useful information for moving to human trials. The '212 Patent further describes, in sheep, that inhaled treprostinil can reduce pulmonary vascular resistance. *Id.* at 10:47-50; 11:45-49; Fig. 9. A POSA would understand that these sheep experiments were relied upon to support claims directed to treating pulmonary hypertension in mammals via inhaled solutions and powder formulations of treprostinil. *Id.* at claims 6 and 9.

78.    Based on the above disclosures in the '212 Patent, a POSA would seek out further experimentation of inhaled treprostinil in humans. In doing so, a POSA would be led to Voswinckel JESC and Voswinckel JAHA, which put into practice the teachings of the '212 Patent.

79.    Voswinckel JESC discloses human clinical trials using inhaled treprostinil in dosages that fall within the 15 to 90 µg range of claim element 1[c] of the '793 patent. Ex. 1007 (Voswinckel JESC). As I described in paragraphs 64-66 above, Voswinckel JESC discloses doses of 16, 32, 48, and 64 µg/mL delivered for 6 minutes, Ex. 1007 (Voswinckel JESC) at Methods, and a POSA would reasonably assume that at least 1 mL of treprostinil solution was administered. The treatment at the lowest dose of 16 µg is effective as it produces "significant long-lasting pulmonary vasodilatation." *Id.* at Conclusion. Accordingly, a POSA would have had a

29

reasonable expectation of successfully treating pulmonary hypertension in humans with inhaled treprostinil based on the combination of the '212 Patent and Voswinckel JESC.

80.    Based on known issues with patient nonadherence to inhalation therapy, a POSA would have been motivated to further decrease the 6 minute administration time in Voswinckel JESC.  As I explained above, in the early 2000s, adherence with inhalation therapy for respiratory diseases was not optimal.  *See* paragraphs 36-37. Poor adherence to medication was known to correlate with worse outcomes.  *See, e.g.*, Ex. 1032 (Bender) at Abstract, 179-80.  But several studies indicated that reducing administration time or the number of breaths required for therapy could improve adherence rates.  For example, Boyle  explains "[a] decrease in the time required to deliver [drug] also would likely result in increased adherence to the TSI regimen, as adherence to therapy in CF [cystic fibrosis] patients has been shown to correspond to the simplicity of the treatment." Ex. 1077 (Boyle 2003) at 4.  Newman similarly noted that novel nebulizers have a short nebulization time, which should improve patient adherence.  Ex. 1030 (Newman) at 63.

81.    The state of the art in 2006 further demonstrated breaths and/or administration time could be reduced without sacrificing therapeutic efficacy.  For example, Chaudry 2004 describes a nebulization treatment of 3 minutes or less may be therapeutically effective in treating hypertension.  Ex. 1028 (Chaudry 2004) at

30

Liquidia's Exhibit 1002
Page 35

[0063], [0067].  Geller 2003, furthermore, demonstrated cystic fibrosis can be treated with rhDNase (a drug that breaks down mucus build up) delivered in three inhalations, and noted the efficiency benefit from reducing administration to this three breath time. Ex. 1034 (Geller 2003) at Abstract.  *See also* Ex. 1010 (Ghofrani 2005) at 298 (further described in Section VII.A.4) (teaching inhaled treprostinil can be effective when delivered at 15 mcg/inhalation and up to 90 mcg/inhalation and can be feasibly administered in one to two breaths).

82.    A POSA in 2006 would understand that therapeutic efficacy could be maintained with lower administration time by increasing the concentration of inhaled treprostinil used.  In my own practice, I routinely increased the concentration of drug used when delivery drug over a shorter time period or in fewer breaths.  Voswinckel JAHA confirms this teaching as it describes inhaled treprostinil administered in three breaths at a concentration of 600 µg/mL.  Ex. 1008 (Voswinckel JAHA) at Methods.

83.    Given the motivation to reduce administration time, the fact that all of the authors on Voswinckel JESC are also authors on Voswinckel JAHA (in addition to others), and the fact that the '212 Patent, Voswinckel JESC, and Voswinckel JAHA all disclose the use of inhaled treprostinil for pulmonary hypertension, a POSA in 2006 would find and rely on Voswinckel JAHA.  As I noted above, Voswinckel JAHA discloses an inhalable treprostinil regimen delivered to patients with pulmonary hypertension in just 3 single breaths.  Ex. 1008 (Voswinckel JAHA) at Methods.  As

31

Voswinckel JAHA explains, the dosage received in such a small number of breaths is still effective in reducing pulmonary vascular resistance: patients displayed "sustained, highly pulmonary selective vasodilatation over 120 minutes." *Id.* at Results.  A POSA would thus have a reasonable expectation of successfully treating pulmonary hypertension in humans using inhaled treprostinil in doses of 15-90 µg in 1 to 3 breaths, as taught by the '212 Patent and Voswinckel JESC in combination with Voswinckel JAHA.

### 2.    Independent Claim 1

84.    I have reproduced independent claim 1 below, and divided up the limitations using bracketed notations (*e.g.*, "[a]," "[b]," etc.) to facilitate easier identification of the limitations in my analysis of all the grounds below.

| | |
|---|---|
| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
| 1[b] | with an inhalation device, |
| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
| 1[d] | delivered in 1 to 3 breaths. |

('793, Claim 1 (bracketed notations added).)  In the sections below, I explain why each limitation of claim 1 is disclosed and rendered obvious by the combination of the '212 Patent, Voswinckel JESC, and Voswinckel JAHA.

32

(a) **"A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[a])**

85.    The '212 Patent discloses claim element 1[a] of the '793 patent.

86.    As explained above, the '212 Patent describes an invention for administering a therapeutically effective amount of benzindene prostaglandin or a pharmaceutically acceptable salt thereof, and delivering benzindene prostaglandin to treat pulmonary hypertension.  Ex. 1006 ('212 Patent) at 2:16-18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24.

87.    The '212 Patent specifically discloses administering by inhalation. According to the '212 Patent "benzindene prostaglandin is delivered by **inhalation** to a patient in need thereof in a 'therapeutically effective amount.'"  *Id.* at 6:56-58.

88.    The '212 Patent explains UT-15 as the most preferred benzindene prostaglandin.  *Id.* at 4:38. A POSA would understand that UT-15 is treprostinil sodium.  *See* paragraph 54 above.

89.    The '212 Patent further discloses that a therapeutically effective amount is "an amount that has therapeutic effects on the condition intended to be treated or prevented," Ex. 1006 ('212 Patent) at 6:58-61, and notes that "[t]he precise amount that is considered effective for a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of

33

Liquidia's Exhibit 1002
Page 38

effect desired by the patient's doctor." *Id.* at 6:66-7:3. Finally, the '212 Patent specifically claims treating pulmonary hypertension with an effective amount of inhaled treprostinil. *Id.* at claim 6.

90.    Voswinckel JESC also discloses claim element 1[a] of the '793 patent. The abstract describes a clinical study where 10 patients with idiopathic pulmonary hypertension were treated with treprostinil administered by inhalation. Ex. 1007 (Voswinckel JAHA) at Methods, Results.  Using an OptiNeb® ultrasound nebulizer, patients received a dose of treprostinil for 6 minutes at a concentration of 16, 32, 48, or 64 µg/ml. *Id.* at Methods.

91.    Voswinckel JESC further discloses that at the lowest concentration, "near maximal pulmonary vasodilatation is achieved without adverse effects." *Id.* at Conclusion.  As such, Voswinckel JESC confirms, in humans, the teachings of the '212 Patent.

92.    Voswinckel JAHA discloses treating patients with pulmonary hypertension by administering treprostinil sodium through inhalation.  Ex. 1008 (Voswinckel JAHA) at Objective, Methods.  The Voswinckel JAHA study examines the safety, tolerability, and clinical efficacy of inhaled treprostinil sodium on 17 patients with pulmonary hypertension and reports treprostinil sodium produces "sustained, highly pulmonary selective vasodilatation."  *Id.* at Methods, Results.

34

Liquidia's Exhibit 1002
Page 39

Thus, like Voswinckel JESC, Voswinckel JAHA confirms the teachings of the '212 Patent.

### (b)    "with an inhalation device," (Claim 1[b])

93.    The '212 describes nebulizers and inhalers, which are inhalation devices. Specifically, the '212 Patent explains that "'[i]nhalation' delivery . . . refers to the delivery of the active ingredient or combination of active ingredients through a respiratory passage . . . ." Ex. 1006 ('212 Patent) at 4:41-43. The '212 Patent further explains "[p]referably, a nebulizer, inhaler, atomizer, or aerosolizer is used which forms droplets from a solution or liquid containing the active ingredient(s)."[2] *Id.* at 5:30-33. And the '212 Patent claims, in claim 6, treating pulmonary hypertension with inhaled treprostinil, which would require an inhalation device.

94.    As I explained in paragraphs 33-34 above, nebulizers and inhalers were frequently used before 2006 to deliver therapeutics to patients via an inhalation route. Accordingly, a POSA in 2006 would have easily appreciated that nebulizers and inhalers are inhalation devices.

---

[2] Both Voswinckel JESC and Voswinckel JAHA also disclose the use of an inhalation device, specifically the OptiNeb® ultrasound nebulizer. Exs. 1007, 1008 (Voswinckel JESC) at Methods; (Voswinckel JAHA) at Methods.

Liquidia's Exhibit 1002
Page 40

      **(c)**    **"wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[c])**

95.    The '212 Patent in combination with Voswinckel JESC renders obvious claim element 1[c] of the '793 Patent.

96.    The '212 Patent discloses and claims administering a therapeutically effective amount of UT-15 to treat pulmonary hypertension. Ex. 1006 ('212 Patent) at 2:66-3:5, 4:38, claims 6, 9. In some examples, the '212 Patent compares aerosolized and intravenous delivery of UT-15 on pulmonary hypertension in a sheep model. *Id.* at Example IV-V. Compared to intravenous delivery, the '212 Patent discloses aerosolized UT-15 "has a greater potency . . . since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly." *Id.* at 8:8-12. A POSA reading this disclosure would infer that a lower dose of inhaled UT-15 may be used to treat pulmonary hypertension in a manner similar to that produced with intravenous delivery.

97.    A POSA as of May 2006 would be motivated by the above disclosure to determine a more precise dose of inhaled treprostinil for humans. As I explained in paragraphs 76-78 above, a POSA would be motivated to look for examples of administration of inhaled treprostinil to human, since the '212 Patent discloses examples of successful administration in sheep and claims administering, via inhalation, an effective amount of treprostinil, either in solution or powder form.

36

Liquidia's Exhibit 1002
Page 41

98.    Because Voswinckel JESC describes such a study in humans, a POSA would readily find Voswinckel JESC.  Voswinckel JESC describes, in humans, a clinical study in which 10 patients with pulmonary hypertension were treated with a single dose of inhaled treprostinil.  Ex. 1007 (Voswinckel JESC) at Methods, Results.  The single dose produced "significant long-lasting pulmonary vasodilatation."  *Id.* at Conclusion.

99.    Patients in the Voswinkel JESC study inhaled single doses of 16, 32, 48, or 64 µg/mL of treprostinil solution delivered using the OptiNeb® ultrasound nebulizer.  *Id.* at Methods.  The solution was delivered for 6 minutes.  *Id.*  Voswinckel JESC further discloses "near maximal pulmonary vasodilatation" was achieved with the 16 µg/mL dose.  *Id.* at Conclusion.  As I explained above in paragraphs 65-66, a POSA would expect that the patients in the Voswinckel JESC study received between at least 16, 32, 48, or 64 µg (based on the baseline, common sense expectation of a POSA that at least 1 mL of solution would be nebulized over 6 minutes, regardless of nebulizer, and concentrations of 16, 32, 48, or 64 µg/mL were administered).[3]  These

---

[3] As I previously explained in paragraph 67, even if more than 1 mL of solution was used, the calculated dose would still fall within the 15-90 µg range.  For example, the OptiNeb® device used before 2006 delivered solution at 0.6 ml/min.  Ex. 1037 (OptiNeb® 2005 manual) at 28. Voswinckel JESC describes administering inhaled treprostinil in concentrations of 16, 32, 48, and 64 µg/mL, and further explains the 16 µg/mL dose produced "near maximal pulmonary vasodilatation . . . without adverse side effects."  Ex. 1007 (Voswinckel JESC) at Methods, Conclusion.  At 0.6 mL/min and continuous administration of solution across 6 minutes then, a patient may receive

37

Liquidia's Exhibit 1002
Page 42

doses are within the 15-90 µg range disclosed by the '793 Patent. Based on the dosage disclosed and the fact that patients showed significant pulmonary vasodilatation after treatment, a POSA reading the '212 Patent in combination with Voswinckel JESC would have a reasonable expectation of successfully treating pulmonary hypertension in humans by administering, via inhalation, 15-90 µg of treprostinil.

100.  A POSA could also calculate a therapeutically effective dose of inhaled treprostinil based on the '212 Patent's disclosure that the inhalation dose is only a fraction (10-50%) of the intravenous dose. Intravenous dosages for treprostinil were well-known at the time of the '793 Patent. For example, in 2004, the FDA approved intravenously delivered treprostinil under the brand name Remodulin® for treatment of pulmonary hypertension. Ex. 1018 (Remodulin® 2004 Label). The Remodulin® label prescribes a daily dose of 1.25 ng/kg/min for a patient between 60-65 kg. *Id.* at 10-11. Based on the below calculation, the Remodulin® label prescribes a dosage of 108 to 117 µg of treprostinil:

- 1.25 ng/kg/min*60kg*(24*60)min*0.001 ug/ng = 108 µg
- 1.25 ng/kg/min*65kg*(24*60)min*0.001 ug/ng = 117 µg

A POSA would have multiplied the 108 to 117 µg range by the 10-50% fraction disclosed by the '212 Patent as follows.

- For the lowest end: 108 µg * 10% = 10.8 µg

---

approximately 3.6 ml of solution (0.6 mL/min * 6 min). At the 16 µg/ml dose in Voswinckel JESC, the patient would accordingly receive 57.6 µg (16 µg/mL * 0.6 mL/min * 6 min).

38

**Appx1068**

- For the highest end:  117 µg * 50% = 58.5 µg

Thus, a POSA in 2006 would understand that the effective inhalation single dose of treprostinil for treatment of pulmonary hypertension would be **10.8 – 58.5 µg**.  This dosage range covers more than half of the 15-90 µg range disclosed by the '793 Patent, and based on the teachings of the '212 Patent, a POSA would have had a reasonable expectation that this dosage range would successfully treat pulmonary hypertension.[4]

### (d)     "delivered in 1 to 3 breaths." (Claim 1[d])

101.    The '212 Patent in combination with Voswinckel JAHA renders obvious claim element 1[d] of the '793 Patent.

102.    Given known issues with patient nonadherence to inhalation therapies that I described above in paragraphs 36-38, a POSA would seek out disclosures that

---

[4] This is consistent with the dosages disclosed in the '212 Patent.  The '212 Patent describes an inhalation dosage for treating peripheral vascular disease that "should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 µg to 250 mg; typically from 0.5 µg to 2.5 mg, preferably from 7 µg to 285 µg, per day per kilogram bodyweight."  Ex. 1006 ('212 Patent) at 5:54-62.  The '212 Patent further describes "aerosolized UT-15 has a greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly."  *Id.* at 8:9-12.  Reading these disclosures, a POSA would have been motivated to deliver an effective daily dose of 2.5. µg to 125 mg of inhaled treprostinil (based on a calculation of 10-50% of the 25 µg to 250 mg daily infusion dose).  This range encompasses the entire range claimed in the '793 Patent.  Because the '212 Patent is directed to treating peripheral vascular disease and pulmonary hypertension (*id.* at 13:26-14:29, claims 6 and 9), a POSA would have had a reasonable expectation that the 2.5 µg to 125 mg dosage range disclosed in the '212 Patent would be effective in treating pulmonary hypertension.

39

Liquidia's Exhibit 1002
Page 44

reduced the overall number of breaths or administration time for inhalable treprostinil, but that were still efficacious. In other words, a POSA would search for art that discloses the fewest number of breaths in which delivery could occur. The state of the field at the time indicates reducing to as few as three breaths was possible and could still be effective. *See, e.g.*, Ex. 1034 (Geller 2003) at Abstract (describing treatment of cystic fibrosis with drug administered in three inhalations in a single setting). A subset of the Voswinckel JESC authors had in fact published the results of another study that did exactly this (Voswinckel JAHA), and thus, a POSA would have been motivated to look at that study in combination with the '212 Patent and Voswinckel JESC.

103.    Voswinckel JAHA describes a study where patients received treprostinil salt inhalation "by use of the pulsed OptiNeb® ultrasound nebulizer" in "(3 single breaths, TRE solution 600 µg/ml)." Ex. 1008 (Voswinckel JAHA) at Methods. Voswinckel reports this 3-breath dose was effective as "TRE inhalation resulted in a sustained, highly pulmonary selective vasodilatation over 120 minutes." *Id.* at Results. In order to maintain dosage but in a shorter duration time, it is, and would have been in 2006, common practice to increase the concentration of drug delivered in a particular time window. Voswinckel JAHA confirms this as it discloses a 600 µg/ml concentration. *Id.* at Methods. Patients showed excellent tolerability at the high concentration and short inhalation time. *Id.* at Conclusion.

40

104.    A POSA would have applied the teachings of Voswinckel JAHA to the disclosures in the '212 Patent and Voswinckel JESC with a reasonable expectation of success. The '212 Patent teaches delivering a benzindene prostaglandin to a patient in need thereof in a "therapeutically effective amount." The '212 Patent further discloses the "precise amount that is considered effective for a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor[,]" and "[t]itration to effect may be used to determine proper dosage." Ex. 1006 ('212 Patent) at 6:56-7:3. And the '212 Patent explicitly claims administering an "effective amount" of treprostinil via inhalation for the treatment of pulmonary hypertension. *Id.* at claim 6. By 2006, the state of the art recognized that titration to effect was important in patients with pulmonary disease. *See* Ex. 1004 (Gonda Decl.) at paragraph 35 (describing studies where dose was optimized for patient tolerance and efficacy). A POSA would understand the specific circumstances of the patient include maintaining adherence to a treatment regimen and accordingly reduce the number of inhaled breaths to 3, as disclosed in Voswinckel JAHA.

### 3.    Dependent Claim 2

105.    I have reproduced dependent claim 2 below:

| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
|---|---|

41

106.    The '212 Patent describes an inhaler which a POSA would understand to include a soft mist inhaler.

107.    The '793 Patent describes a soft mist inhaler is a metered dose inhaler "in which the aerosol cloud containing a respiratory drug can be generated by passing a solution containing the respiratory drug through a nozzle or series of nozzles."  Ex. 1001 ('793 Patent) at 7:27:30.  The '793 Patent further describes several example soft mist inhalers including the Respimat® Inhaler, the AERx® Inhaler, the Mystic™ Inhaler and the Aira™ Inhaler.  *Id.* at 7:33-39.

108.    By 2006, soft mist inhalers were well known in the art.  Respimat was readily available since it had been approved for use in Germany in 2004 and in the United States shortly after.  Ex. 1019 (Stein) at 35.  The AERx Inhaler was developed in the 1990s.  *Id.*  I also used soft mist inhalers in my own practice in the early 2000s.

109.    I have also read the declaration of Dr. Gonda.  I agree with and further adopt his analysis that the '212 Patent discloses a soft mist inhaler.

110.    Thus, the additional limitation of claim 2 would be obvious over the '212 Patent's disclosure of "inhalers," as informed by a POSA's knowledge as of 2006.

### 4.    Dependent Claim 3

111.    I have reproduced dependent claim 3 below:

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|---|

42

112.    The '212 Patent describes an inhaler, and in one preferred example, discloses the AM-601 MEDICATOR AEROSOL DELIVERY SYSTEM™, which it described as "a nebulizer manufactured by Healthline Medical . . . ." Ex. 1006 ('212 Patent) at 5:33-36.

113.    Voswinckel JESC and Voswinckel JAHA also use the OptiNeb®, describing it as a pulsed ultrasonic nebulizer.    Exs. 1007 (Voswinckel JESC) at Methods; 1008 (Voswinckel JAHA) at Methods.

114.    A POSA would thus understand that the '212 Patent, Voswinckel JESC, and Voswinckel JAHA disclose the use of a pulsed ultrasonic nebulizer.

### 5.    Dependent Claim 4

115.    I have reproduced dependent claim 4 below:

| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
|---|---|

116.    The '212 Patent specifically claims using treprostinil in inhaled powder form to treat pulmonary hypertension.  Ex. 1006 ('212 Patent) at claims 6, 9.  The '212 Patent further discloses an "inhaler," *id.* at 5:30-32, and "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention." *Id.* at 5:37-39.  A POSA in 2006 would understand by common sense reasoning that a powder formulation is used with a dry powder inhaler.  As such, a POSA as of May 2006 would understand the '212 Patent's disclosure of "inhalers" to include dry powder inhalers.

43

117.   Additionally, by 2006, I and other clinicians specializing in cardiology or pulmonology regularly used dry powder inhalers.  For example, I used these inhalers the treatment of asthma and COPD, while Geller 2005 similarly describes effective use of DPIs for the same diseases. Ex. 1031 (Geller 2005) at 1316. Accordingly, a POSA would have understood that a dry powder inhaler is an inhalation device, and that the combination of the '212 Patent, Voswinckel JESC, and Voswinckel JAHA renders obvious claim 4.

### 6.    Dependent Claim 5

118.   I have reproduced dependent claim 5 below:

| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
|---|---|

119.   As I noted above, the '212 Patent describes an inhaler.  Pressurized metered dose inhalers were introduced in the 1950s and were well in use by the 1990s. Exs. 1020 (Clark) at Abstract, 378; 1004 (Gonda Decl.) at paragraphs 24, 37; *see above* paragraphs 33-34.  I also used pressurized metered dose inhalers in my own practice in the early 2000s.  For example, I prescribed the Azmacort inhaler, a pressurized metered dose inhaler for administering corticosteroid to patients with asthma that was available by 2006. Ex. 1078 (Azmacort Label 2003).  Accordingly, a POSA would understand inhaler to include a pressurized metered dose inhaler.

### 7.    Dependent Claims 6, 7, and 8

120.   I have reproduced dependent claims 6, 7, and 8 below:

44

| 6 | The method of claim 4, wherein the formulation is a powder. |
| 7 | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 | The method of claim 1, wherein the formulation contains no metacresol. |

121.   Claim 9 of the '212 Patent claims "[t]he method of claim 6, wherein said UT-15 is inhaled in powder form comprising particles less than 10 micrometers in diameter." Ex. 1006 ('212 Patent) at claim 9; *see also id.* at claim 6. The '212 Patent further discloses that "solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention." Ex. 1006 ('212 Patent) at 5:37-39. Thus, a POSA would understand from the '212 Patent alone that the reference discloses the use of a powder inhalation formulation of treprostinil to treat pulmonary hypertension.

122.   Further, the '212 Patent specifically claims particle size less than 10 micrometers, *id.* at claim 9, and discloses "more preferably, less than 5 micrometers in diameter." *Id.* 5:39-41. This size accords with my own experience, and a POSA would know to use a powder with particle size less than 5 micrometers. I generally did not prescribe therapies with particles larger than 10 micrometers for inhalation therapies as they impacted on the upper airways and were thus ineffective. Conversely, to reach areas of gas exchange, it was known that particles needed to be 2 to 3 micrometers. *See* paragraph 35 above.

45

123.    I have reviewed the declaration of Dr. Gonda and understand he has provided an opinion on the disclosure of a dry powder formulation in the '212 Patent, wherein the formulation contains no metacresol.  Ex. 1004 (Gonda Decl.) at Section VII.A.8.  I adopt his analysis and knowledge for purposes of this claim, and therefore conclude a POSA would have understood the combination of the '212 Patent, Voswinckel JESC, and Voswinckel JAHA to render claims 6, 7, and 8 obvious.

**C.    Ground 2: Claims 1–8 are Obvious over '212 Patent in View of Voswinckel JESC**

**1.    Motivation to Combine the '212 Patent with Voswinckel JESC With a Reasonable Expectation of Success**

124.    In paragraphs 77-79 above, I describe the motivation to combine the '212 Patent with Voswinckel JESC with a reasonable expectation of success.  Those same reasons are applicable here.

46

Liquidia's Exhibit 1002
Page 51

**2.    Independent Claim 1**

> **(a)    "A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[a][b][c])**

125.    Above, I have explained that the '212 Patent discloses claim elements 1[a] and 1[b].  I have further explained that the '212 Patent in combination with Voswinckel JESC discloses element 1[c].  *See* Sections VII.B.2(a)-(c).

**(b)    "delivered in 1 to 3 breaths." (Claim 1[d])**

126.    In view of the general state of knowledge in 2006, a POSA would have understood that the '212 Patent and Voswinckel JESC render obvious claim element 1[d] of the '793 patent.

127.    The '212 Patent describes "[t]he precise amount [of prostaglandin benzindene] that is considered effective for a particular therapeutic purpose will, of course, depend upon the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor."  Ex. 1006 ('212 Patent) at 6:66-7:2.  It further discloses titrating to determine proper dosage of inhaled UT-15.  *Id.* at 7:3.

47

128.    Voswinckel JESC describes administering treprostinil by inhalation over a period of 6 minutes in concentrations of 16, 32, 48, and 64 µg/ml.  Ex. 1007 (Voswinckel JESC) at Methods.  Due to known problems with patient adherence by 2006 (*see* paragraphs 36-38 above), a POSA in 2006 reading the '212 Patent and Voswinckel JESC would be motivated to minimize the number of breaths required for administration of treprostinil by inhalation.

129.    The general state of knowledge in the field as of May 2006 teaches that delivery by inhalation could still be safe and effective when delivered in a few breaths. For example, Geller 2003 describes treating cystic fibrosis with a dose of rhDNase delivered in "three inhalations in a single setting."  Ex. 1034 (Geller 2003) at Abstract. And both Voswinckel JAHA and Voswinckel 2006 taught doing so for treprostinil. Exs. 1008 (Voswinckel, JAHA) at Methods; 1009 (Voswinckel 2006) at 150.  Based on the state of the field, a POSA in 2006 reading the '212 Patent and Voswinckel JESC then would have a reasonable expectation of success in reducing the number of breaths required for administration of inhalable treprostinil.

130.    A POSA would accordingly be motivated to titrate to effect, as taught in the '212 Patent, down to a few breaths.  Optimization of dosing time, frequency, and concentration is routine practice in pulmonary medicine and was routine in 2006. *See* Exs. 1047 (Hoeper 2000) at 1867 (explaining that, in a pulmonary hypertension study using inhaled iloprost, some patients received an increased dose when their symptoms

48

Liquidia's Exhibit 1002
Page 53

did not improve after three months of treatment on the initial dose); 1048 (Walmrath 1993) at 962 (explaining that aerosolized prostacyclin therapy in patients with adult respiratory distress syndrome may need to be titrated for individual patients "to produce selective vasodilation in well-ventilated lung areas"). *See also* Gonda Decl. at paragraph 35 for further explanation. I commonly altered administration time to deliver treatment that would be safe and effective in light of a patient's age, stage of disease, reaction to other medication, and previous level of compliance. I would begin with a short administration time (to increase adherence and minimize side effects) and high concentration (to maintain effectiveness), and then would further optimize the time and dose based on the patient's response. Accordingly, a POSA relying on the teachings of the '212 Patent and Voswinckel JESC as well as routine practice would have delivered inhaled treprostinil in 1 to 3 breaths.

131. Finally, as noted above in paragraphs 116 and 117, a POSA reading the disclosure of the '212 Patent specification and claim 9, would understand the '212 Patent's disclosure of a dry powder inhaler. Dry powder inhalers are breath actuated, and thus, a POSA understanding the known problems with patient adherence by 2006 (*see* paragraphs 36-38 above), would be motivated to reduce the number of breaths to administer inhaled treprostinil to 1-3.

### 3. Dependent Claims 2-8

132. As described above in Section VII.B.3-7, the '212 Patent discloses the dependent claims of the '793 Patent.

49

Liquidia's Exhibit 1002
Page 54

133.    Regarding claim 3 of the '793 Patent, Voswinckel JESC describes using an OptiNeb® ultrasound nebulizer.  Ex. 1007 (Voswinckel JESC) at Methods.

### D.    Ground 3: Claim 1 is anticipated by Ghofrani

134.    In the sections below, I explain why each limitation of claim 1 is disclosed and therefore anticipated by Ghofrani.

#### 1.    Independent Claim 1

(a)    **"A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[a])**

135.    Ghofrani discloses claim element 1[a] of the '793 Patent.

136.    Ghofrani describes a clinical trial in which "17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprositnil (15 mcg/inhalation)."  Ex. 1010 (Ghofrani) at 298.

137.    Ghofrani further discloses the administered treprostinil was used in treating a human and in a therapeutically effective manner.  Ghofrani explains, "[i]nitial trials [showed] proof of efficacy of inhaled treprostinil for the effective reduction of the pulmonary vascular resistance . . . ."  *Id.*  It further explains that inhaled treprostinil led to a major reduction in pulmonary selective pressure and resistance.  *Id.*  A POSA would understand that "effective reduction" and decreases

50

in pressure and resistance indicate that the administered treatment is therapeutically effective.

138.    A single event dose is also disclosed in Ghofrani.    Patients were administered inhaled treprostinil in "15 mcg/inhalation." Ex. 1010 (Ghofrani) at 298. Ghofrani also suggests "it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring." *Id.* A POSA would understand the per inhalation and inhalation exercise language discloses a single event dose. Thus, the 15 mcg to 90 mcg dosing range described in Ghofrani directly discloses the dose claimed in element 1[a] of the '793 Patent.

### (b)    "with an inhalation device," (Claim 1[b])

139.    Ghofrani discloses an inhalation device. Ghofrani states that patients "were administered **inhaled** treprostinil (15 mcg/inhalation)." Ex. 1010 (Ghofrani) at 298.[5] Ghofrani further notes "the inhalation period can be reduced to < 1 min. by selecting a **suitable device**." *Id.* A POSA would understand by common sense logic that inhaled treprostinil requires an inhalation device, because, without a device, inhaled treprostinil could not be delivered. A POSA would further understand a suitable device for administration by inhalation is an inhalation device. To deliver drugs by inhalation, clinicians in 2006 regularly used inhalation devices, including

---

[5] All emphasis is added unless otherwise noted.

51

Liquidia's Exhibit 1002
Page 56

nebulizers and inhalers. *See* paragraphs 33-34 above. Thus, a POSA would understand Ghofrani to disclose use of an inhalation device.

> **(c)** **"wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[c])**

140. Ghofrani discloses inhaled treprostinil delivered in a 15 mcg/inhalation dosage. Ex. 1010 (Ghofrani) at 298. Ghofrani also suggests "it is possible to increase the dosage up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring." *Id.* The 15 mcg to 90 mcg dosing range disclosed in Ghofrani corresponds to the entire 15 to 90 microgram dosage claimed in element 1[c] of the '793 Patent.

> **(d)** **"delivered in 1 to 3 breaths." (Claim 1[d])**

141. Ghofani discloses claim element 1[d] by stating that "the initial data shows that it is technically feasible for there to be only **one to two breaths** in an application." Ex. 1010 (Ghofrani) at 298.

142. Accordingly, a POSA would understand Ghofrani to directly disclose every element of claim 1, and therefore anticipate claim 1.

52

**E.    Ground 4: Claims 1, 3, and 8 are Obvious over Voswinckel JAHA and Ghofrani**

**1.    Motivation to Combine Voswinckel JAHA and Ghofrani With a Reasonable Expectation of Success**

143.    A POSA would reasonably understand Voswinckel JAHA and Ghofrani disclose the same clinical study and, accordingly, combine them.  Voswinckel JAHA and Ghofrani disclose parallel details concerning a clinical trial in which treprostinil was administered by inhalation to patients.  The authors of Voswinckel JAHA work at the Department of Internal Medicine in Giessen, Germany, Ex. 1008 (Voswinckel JAHA) Author Details, while Ghofrani discloses "[i]nitial trials in Giessen . . . ."  Ex. 1010 (Ghofrani) at 298.  Each author on Voswinckel JAHA, furthermore, is an author on Ghofrani.  Both references disclose administering treprostinil to 17 patients with pulmonary hypertension.  *Compare* Ex. 1008 (Voswinckel JAHA) at Methods (describing "inhaled TRE [treprostinil sodium] was applied to 17 patients with severe pulmonary hypertension during Swan-Ganz catheter investigation") with Ex. 1010 (Ghofrani) at 298 (explaining "17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil").  And both Voswinckel JAHA and Ghofrani report sustained reduction in pulmonary vascular resistance following treatment with inhaled treprostinil.  Exs. 1008 (Voswinckel JAHA), at Results; 1010 (Ghofrani) at 298.  Voswinckel JAHA explains "TRE inhalation resulted in a sustained, highly pulmonary selective vasodilatation over 120 minutes" while Ghofrani notes inhaled treprostinil "led to a major reduction in pulmonary selective

53

pressure and resistance with an overall duration of action of > 180 min." *Id.* Given these similarities in authorship, place of clinical trial, number of patients, and reported results, a POSA would reasonably assume Voswinckel JAHA and Ghofrani describe the same clinical trial.

144. Based on general practice for disclosing scientific results, a POSA would reasonably assume Ghofrani summarizes the study disclosed in Voswinckel JAHA. Ghofrani is a review article of therapies for treatment of pulmonary hypertension. In my experience, in review articles, researchers commonly summarize their own results and reports from clinical trials and ongoing research. Nothing prevents the same authors from disclosing the same results in abstracts for a scientific meeting.

145. In my opinion, a POSA would reasonably conclude that Ghofrani and Voswinckel JAHA describe the same study. If, however, the references describe two different studies, a POSA would still be motivated to combine them. Based on the Voswinckel JAHA disclosure that treprostinil delivered in 1 to 3 breaths is effective in producing "sustained, highly pulmonary selective vasodilatation," Ex. 1008 (Voswinckel JAHA) at Results, a POSA would be motivated to further identify suitable doses for these number of breaths. A POSA would desire to deliver treprostinil in fewer breaths but would want to ensure (through proper dosing) that the treprostinil delivered was effective. Based on general practice in 2006, a POSA seeking to find an appropriate dosage would easily find Ghofrani. Much like a reader

54

who seeks out books by her favorite author, a clinician or researcher who finds a useful article will seek to determine whether other articles by the same author(s) are of further use. As noted above, Voswinckel JAHA and Ghofrani share authors, are directed to treating the same disease (pulmonary hypertension), using the same drug (treprostinil), via the same route of administration (inhalation). A POSA reading Voswinckel JAHA would accordingly find Ghofrani and expect Ghofrani's disclosure of 15 mcg and up to 90 mcg dosage of inhaled treprostinil to be readily and obviously combinable with the teachings of Voswinckel JAHA. And a POSA as of May 2006 would have a reasonable expectation of successfully using the doses disclosed in Ghofrani with Voswinckel JAHA based on the disclosure of both references that such treatment was effective.

### 2. Independent Claim 1

146. In the sections below, I explain why each limitation of claim 1 is disclosed and rendered obvious by the combination of Voswinckel JAHA and Ghofrani.

> **(a)** **"A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[a])**

147. Voswinckel JAHA discloses claim element 1[a] of the '793 Patent. The abstract discloses evaluating "the effects of inhaled TRE [treprostinil salt] on

55

Liquidia's Exhibit 1002
Page 60

pulmonary hemodynamics and gas exchange in severe pulmonary hypertension . . . ." Ex. 1008 (Voswinckel JAHA) at Objective.  A POSA would understand a patient with severe pulmonary hypertension is suffering from pulmonary hypertension. Voswinckel JAHA further describes "[p]atients received a TRE inhalation by use of the pulsed OptiNeb® ultrasound nebulizer (3 single breaths, TRE solution 600 µg/ml)."  *Id.* at Methods.   Voswinckel JAHA indicates the 3 single breath administration was therapeutically effective because TRE inhalation resulted in a "sustained, highly pulmonary selective vasodilatation over 120 minutes."  *Id.* at Results.

148.   As I explained in Ground 3 above, Ghofrani also discloses claim 1[a].

### (b)     "with an inhalation device," (Claim 1[b])

149.   Voswinckel JAHA and Ghofrani each disclose claim element 1[b] of the '793 Patent.

150.   Voswinckel JAHA describes administering inhaled treprostinil using the pulsed OptiNeb® ultrasound nebulizer.  Ex. 1008 (Voswinckel JAHA) at Methods. As I previously explained, a POSA would readily understand an OptiNeb® ultrasound nebulizer is an inhalation device.

151.   As I explained in Ground 3 above, Ghofrani also discloses Claim 1[b].

56

Liquidia's Exhibit 1002
Page 61

**(c)** **"wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[c])**

152.    Voswinckel JAHA in combination with Ghofrani discloses claim element 1[c] of the '793 Patent.

153.    Voswinckel JAHA discloses that "[p]atients received a TRE inhalation by use of the pulsed OptiNeb® ultrasound nebulizer . . . ." Ex. 1008 (Voswinckel JAHA) at Methods.  It explains TRE inhalation can be delivered in "3 single breaths, TRE solution 600 µg/ml." *Id.*

154.    Ghofrani specifically discloses the full 15-90 µg range of claim element 1[c].  Ghofrani describes "17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil (15 mcg/inhalation)." Ex. 1010 (Ghofrani) at 298.  Ghofrani also explains "it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring." *Id.*

155.    A POSA in May 2006 would thus be motivated to combine Voswinckel JAHA with the dosage disclosed in Ghofrani and have a reasonable expectation that such dosages would be effective in treating pulmonary hypertension, as both references disclose that inhaled administration of treprostinil at these doses in 1-3 breaths was an effective treatment for pulmonary hypertension.

57

Liquidia's Exhibit 1002
Page 62

(d)    **"delivered in 1 to 3 breaths." (Claim 1[d])**

156.    Voswinckel JAHA and Ghofrani disclose claim element 1[d] of the '793 Patent.

157.    As explained in Voswinckel JAHA, "[p]atients received a TRE inhalation by use of the pulsed OptiNeb® ultrasound nebulizer (**3 single breaths**, TRE solution 600 μg/ml)."  Ex. 1008 (Voswinckel JAHA) at Methods.

158.    As I explained in Ground 3 above, Ghofrani discloses one to two breaths, and therefore, also discloses claim element 1[d] of the '793 Patent.

### 3.    Dependent Claim 3

159.    I have reproduced dependent claim 3 below:

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|---|

160.    Voswinckel JAHA discloses a pulsed ultrasonic nebulizer.

161.    As I described for Ground 2 above, Voswinckel JAHA discloses an OptiNeb® ultrasound nebulizer.  Ex. 1008 (Voswinckel JAHA) at Methods.  A POSA would understand that an OptiNeb® ultrasound nebulizer is a pulsed ultrasonic nebulizer.  Ex. 1037 (OptiNeb® 2005 Manual).

### 4.    Dependent Claim 8

162.    I have reproduced dependent claim 8 below:

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

58

163.   I have reviewed the expert declaration of Dr. Gonda, and in particular paragraphs 103-104, and understand that he has provided an opinion on the disclosure of treprostinil formulation in Voswinckel JAHA, including whether the formulation contains no metacresol.  I adopt his analysis and knowledge for purposes of this claim, and therefore conclude a POSA would have understood the combination of Voswinckel JAHA and Ghofrani to render obvious claim 8.

**F.     Ground 5: Claims 1 and 3 are Anticipated by Voswinckel 2006**

**1.     Independent Claim 1**

164.   In the sections below, I will explain why each limitation of claim 1 is disclosed in and therefore anticipated by Voswinckel 2006.

> **(b)     "A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[a])**

165.   Voswinckel 2006 discloses administering inhaled treprostinil to three patients with severe pulmonary hypertension.  Ex. 1009 (Voswinckel 2006) at 150.

166.   Voswinckel 2006 further describes a single event dose.   The three patients in the study were administered "a **single 15-µg dose** of treprostinil, inhaled in 3 breaths through a modified OptiNeb ultrasonic inhalation device . . . ." *Id.*

167.   The single event dose used in Voswinckel 2006 is therapeutically effective.  As Voswinckel 2006 explains, "single applications of inhaled treprostinil

59

induced highly pulmonary selective and sustained vasodilatation. The drug was clinically effective, safe, and well tolerated when 15 µg [of treprostinil] was inhaled in 3 breaths 4 times daily." *Id.* Accordingly, Voswinckel 2006 discloses claim element 1[a].

### (c)    "with an inhalation device," (Claim 1[b])

168. Voswinckel 2006 describes "administration of a single 15-µg dose of treprostinil, inhaled in 3 breaths through a modified OptiNeb ultrasonic **inhalation device** . . . ." Ex. 1009 (Voswinckel 2006) at 150. Voswinckel 2006 thus discloses claim element 1[b].

### (d)    "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof" (Claim 1[c])

169. Voswinckel 2006 describes "administration of a single 15-µg of treprostinil," Ex. 1009 (Voswinckel 2006) at 150, a dose that matches the 15-µg dose claimed in element 1[c] of the '793 Patent. Voswinckel 2006 thus discloses claim element 1[c].

### (e)    "delivered in 1 to 3 breaths." (Claim 1[d])

170. Voswinckel 2006 further anticipates claim element 1[d] of the '793 patent. Patients in the Voswinckel 2006 were administered treprostinil, "inhaled **in 3 breaths** . . . ." Ex. 1009 (Voswinckel 2006) at 150. Accordingly, Voswinckel 2006 discloses claim element 1[d].

60

### 2. Dependent Claim 3

171.   I have reproduced dependent claim 3 below:

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|---|

172.   Voswinckel 2006 anticipates claim 3 of the '793 Patent.  The study discloses administration of treprostinil "through a modified OptiNeb ultrasonic inhalation device . . . ."  Ex. 1009 (Voswinckel 2006) at 150.  By May 2006, the OptiNeb ultrasonic inhalation device was a known pulsed ultrasonic nebulizer.  Ex. 1037 (OptiNeb® 2005 Manual); Ex. 1001 ('793 Patent) at 14:35-37 (describing use of a "pulsed ultrasonic nebulizer (OPTINEB®, Nebutec, Elsenfeld, Germany)").

### G.   Ground 6: Claims 2 and 4–8 are Obvious over Voswinckel 2006 and the '212 Patent

#### 1.   Motivation to Combine Voswinckel 2006 and the '212 Patent with a Reasonable Expectation of Success

173.   The '212 Patent discloses treating pulmonary hypertension with inhaled treprostinil in the form of UT-15. Ex. 1006 ('212 Patent) at Abstract.  The '212 Patent further describes administering the treprostinil using an inhaler.  *Id.* at 5:30-32.  As I explained in detail for Grounds 1 and 2 above, a POSA would understand that the '212 patent's disclosure of "inhaler" includes soft mist inhalers, metered dose inhalers, and dry powder inhalers.

174.   Voswinckel 2006 describes a clinical study demonstrating successful treatment of pulmonary hypertension with treprostinil.  Ex. 1009 (Voswinckel 2006)

Liquidia's Exhibit 1002
Page 66

at 150.  The study reports treprostinil was "clinically effective, safe, and well tolerated when 15 µg [of treprostnil] was inhaled in 3 breaths 4 times daily." *Id.*  Voswinckel 2006, however, discloses only one type of inhalation device—the OptiNeb ultrasonic inhalation device, a nebulizer.

175.  By 2006, several inhalation devices besides the OptiNeb ultrasonic inhalation device were in circulation.  And as I described in the Relevant Technical Background section above, different inhalers had unique advantages depending on the patient and effect desired.  *See* paragraphs 33-34 above.  These advantages were known by 2006.  Dry powder inhalers, for example, were known to be easier to use compared to nebulizers.  They also provided the advantage of breath actuation.  Ex. 1031 (Geller 2005) at 1316.  Metered dose inhalers were known to be small, portable, quick to use, and in many cases less expensive.  *Id.* at 1315.

176.  A POSA who is a clinician as described in paragraph 19 above, would reasonably seek to apply the teachings of Voswinckel 2006 to different inhalers.  As I noted above, Voswinckel 2006 teaches treprostinil, at a dosage of 15 µg, is still safe and effective when delivered in 3 breaths 4 times daily.  Ex. 1009 (Voswinckel 2006) at 150.  To provide similarly safe and effective treatment but in a manner that capitalizes on the advantages of other inhalers, a POSA would combine the specific dosage and number of breaths disclosed in Voswinckel 2006 with the inhalers

62

Liquidia's Exhibit 1002
Page 67

described in the '212 Patent, and would have reasonable expectation of success in doing so.

### 2.    Dependent Claim 2

177.   I have reproduced dependent claim 2 below:

| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
|---|---|

178.   A POSA would understand that the '212 Patent's description of an inhaler, Ex. 1006 ('212 Patent) at 5:30-32, included a soft mist inhaler, as I detailed in Ground 1 above.

### 3.    Dependent Claim 4

179.   I have reproduced dependent claim 4 below:

| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
|---|---|

180.   As I described above in paragraphs 61 and 116, claim 9 of the '212 Patent specifically claims administering a powder formulation of treprostinil for the treatment of pulmonary hypertension.  A POSA, as of May 2006, would understand that the powder claimed in claim 9 would be administered by a dry powder inhaler. As such, a POSA would understand the '212 Patent's disclosure of inhalers to include dry powder inhalers.

181.   Additionally, I understand from the declaration of Dr. Gonda that a POSA would understand that the '212 Patent discloses a dry powder inhaler.  Ex. 1004

63

Liquidia's Exhibit 1002
Page 68

(Gonda Decl.) at paragraphs 117-119. I adopt his analysis and knowledge for purposes of this claim, and therefore conclude a POSA would have understood the combination of the Voswinckel 2006 and '212 Patent to render claim 4 obvious.

### 4. Dependent Claim 5

182. I have reproduced dependent claim 5 below:

| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
|---|---|

183. The '212 patent discloses an inhaler. Pressurized metered dose inhalers were introduced in the 1950s and were well in use by the 1990s. Exs. 1020 (Clark) at Abstract, 378; 1004 (Gonda Decl.) at paragraphs 24, 37; paragraphs 33-34 above. Accordingly, a POSA would understand the '212 Patent's disclosure to include a pressurized metered dose inhaler.

184. I understand that Dr. Gonda has opined how a formulation expert POSA would expect the formulation disclosed in Voswinckel 2006 to work in a pressurized metered dose inhaler and would be motivated to make use of the formulation in such an inhaler. Ex. 1004 (Gonda Decl.) at paragraph 122. I adopt his analysis and knowledge for purposes of this claim, and therefore conclude a POSA would have understood the combination of Voswinckel 2006 and the '212 Patent to render claim 5 obvious.

### 5. Dependent Claim 6, 7, and 8

185. I have reproduced dependent claims 6, 7, and 8 below:

64

| 6 | The method of claim 4, wherein the formulation is a powder. |
| 7 | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 | The method of claim 1, wherein the formulation contains no metacresol. |

186.   As I noted above, the '212 Patent specifically claims treprostinil in powder form with particles less than ten micrometers. Ex. 1006 ('212 Patent) at claim 9.  It further describes particles less than five micrometers. Ex. 1006 ('212 Patent) at 5:39-41.  By 2006, further, it was well known that powders of particle sizes less than 3 micrometers were best for reaching gas exchange areas. *See* paragraphs 35, 122 above.  Accordingly, a POSA would know to use a powder with particle size less than 5 micrometers.

187.   I have also reviewed the declaration of Dr. Gonda and understand he has provided an opinion on the disclosure of a dry powder formulation in the '212 Patent, where the powder comprises particles less than 5 micrometers in diameter and wherein the formulation contains no metacresol. Ex. 1004 (Gonda Decl) at Sections VII.E.5-7.  I adopt his analysis and knowledge for purposes of this claim, and therefore conclude a POSA would have understood the combination of Voswinckel 2006 and the '212 Patent to render claims 6, 7, and 8 obvious.

65

## VIII.  NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

188.   I was asked by counsel to consider the secondary consideration of non-obviousness concerning whether the invention addresses a long-felt but unmet need. The prior art and general practice in the field in 2006 demonstrates it did not.

189.   The Patent Owner markets inhaled treprostinil as Tyvaso®.  Before Tyvaso® came on the market, treprostinil was readily available for delivery by subcutaneous and intravenous routes.   For example, Remodulin® (intravenous treprostinil) was FDA approved and available by 2004.   Ex. 1018 (Remodulin® Label).  In the early 2000s, I both prescribed subcutaneous and intravenous treprostinil and conducted clinical studies on their safety and efficacy.  *See, e.g.*, Ex. 1068 (Vachiéry).

190.   Even when inhalable therapies became available, I and other clinician POSAs continued to prescribe subcutaneous and intravenous therapies.  For many patients, intravenous delivery was more efficacious than inhalation therapy while other patients, due to compromised airway integrity or side effects, could not tolerate administration by inhalation.   And at later stages of the pulmonary hypertensive disease, intravenous therapy was often the only effective treatment.  For these reasons, even today when Tyvaso® is readily available, clinicians prescribe treprostinil by subcutaneous and intravenous routes.

191.   With respect to the considerations discussed above, I also refer to and incorporate my opinions stated throughout this Declaration, including my analysis

66

showing that the '793 Patent is directed to techniques known in the prior art and does not provide any inventive technology.

192.    To the extent Patent Owner, at a later date, cites or provides any other evidence regarding secondary considerations, including any expert opinions, I reserve the right to supplement my analysis and opinions to comment on it.

## IX.    CONCLUSION

193.    My opinions are summarized as follows:

- The '212 Patent in combination with Voswinckel JESC and Voswinckel JAHA renders claims 1-8 of the '793 Patent obvious.

- The '212 Patent in combination with Voswinckel JESC renders claims 1-8 of the '793 Patent obvious.

- Ghofrani anticipates claim 1 of the '793 Patent.

- Voswinckel JAHA in combination with Ghofrani renders claims 1, 3, and 8 of the '793 Patent obvious.

- Voswinckel 2006 anticipates claims 1 and 3 of the '793 Patent.

- Voswinckel 2006 in combination with the '212 Patent renders obvious claims 2 and 4-8 of the '793 Patent.

194.    In signing this Declaration, I recognize that the Declaration will be filed as evidence in a contested case before the Patent Trial and Appeal Board of the U.S. Patent and Trademark Office.  I also recognize that I may be subject to cross-examination in this proceeding.  If required, I will appear for cross-examination at the appropriate time.  I reserve the right to offer opinions relevant to the invalidity of the '793 Patent claims at issue and/or offer testimony in support of this Declaration.

Liquidia's Exhibit 1002
Page 72

195.   I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001.


Dated: January 7, 2021                    Respectfully submitted,

                                          *ns Hill*

                                          Dr. Nicholas Hill, M.D.

68

Liquidia's Exhibit 1002
Page 73

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner

————————————

U.S. Patent No. 10,716,793 B2

**DECLARATION OF IGOR GONDA, Ph.D.**

Liquidia's Exhibit 1004
Page 1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND QUALIFICATIONS ................................................1

    A.    Qualifications and Experience .................................................1

    B.    Materials Considered..............................................................4

II.    PERSON OF ORDINARY SKILL IN THE ART .....................................11

III.    STATEMENT OF LEGAL PRINCIPLES..............................................12

IV.    RELEVANT TECHNICAL BACKGROUND ...........................................14

    A.    History of Inhalation Therapy ................................................15

    B.    Inhaled Treprostinil and Its Analogues .................................17

    C.    Well Known Considerations for Inhalation Therapies ...................21

V.    THE '793 PATENT.....................................................................26

    A.    The Specification....................................................................26

    B.    The Claims of the '793 Patent ...............................................28

VI.    SUMMARY OF PRIOR ART.........................................................29

    A.    '212 Patent [Ex. 1006] ..........................................................29

    B.    Voswinckel JESC [Ex. 1007].................................................31

    C.    Voswinckel JAHA [Ex. 1008] ...............................................33

    D.    Voswinckel 2006 [Ex. 1009].................................................36

VII.    APPLICATION OF THE PRIOR ART TO THE CLAIMS........................37

    A.    Ground 1: Claims 1–8 are Obvious over '212 Patent in Combination with Voswinckel JESC Voswinckel JAHA .................38

        1.    Independent Claim 1 .................................................38

        2.    Dependent Claim 2 ...................................................38

        3.    Dependent Claim 3 ...................................................40

        4.    Dependent Claim 4 ...................................................41

        5.    Dependent Claim 5 ...................................................43

        6.    Dependent Claim 6 ...................................................44

        7.    Dependent Claim 7 ...................................................45

        8.    Dependent Claim 8 ...................................................45

- i -

Liquidia's Exhibit 1004
Page 2

# TABLE OF CONTENTS
## (continued)

Page

B.    Ground 2: Claims 1–8 are Obvious over '212 Patent in Combination with Voswinckel JESC ................................................47

    1.    Independent Claim 1 ...............................................47

    2.    Dependent Claims 2-8..............................................48

C.    Ground 4: Claims 1, 3, and 8 are Rendered Obvious by Voswinckel JAHA in Combination with Ghofrani ...........................49

    1.    Independent Claim 1 ...............................................49

    2.    Dependent Claim 3 .................................................49

    3.    Dependent Claim 8 .................................................49

D.    Ground 5: Claims 1 and 3 Are Anticipated by Voswinckel 2006 .....50

    1.    Independent Claim 1 ...............................................50

    2.    Dependent Claim 3 .................................................50

E.    Ground 6: Claims 2 and 4-8 are Obvious Over Voswinckel 2006 in Combination with the '212 Patent ........................................51

    1.    Motivation to Combine With a Reasonable Expectation of Success...................................................51

    2.    Dependent Claim 2 .................................................53

    3.    Dependent Claim 4 .................................................54

    4.    Dependent Claim 5 .................................................55

    5.    Dependent Claim 6 .................................................56

    6.    Dependent Claim 7 .................................................57

    7.    Dependent Claim 8 .................................................58

VIII.  NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS ......60

IX.    CONCLUSION................................................................63

- ii -

Liquidia's Exhibit 1004
Page 3

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

I, Igor Gonda, Ph.D. declare as follows:

## I.    INTRODUCTION AND QUALIFICATIONS

### A.    Qualifications and Experience

1.    I am currently the founder and CEO of Respidex LLC, which has offered consulting services to pharmaceutical and medical device companies since 2018.    Before founding Respidex LLC, I held leadership positions at several pharmaceutical companies, including Aradigm Corporation, a company that focused on developing inhalation therapies for the prevention and treatment of serious respiratory and systemic diseases.

2.    In 1971, I received my Bachelor of Science in Chemistry from the University of Leeds.    In 1974, I received my Ph.D. in Physical Chemistry from the University of Leeds.    After working as a Project Chemist for Nicholas Research Laboratories, I served as a Lecturer at the University of Aston's Pharmacy Department, located in Birmingham, U.K., from 1975 to 1982.    My research was primarily on inhalation therapies, including dry powder inhaler and liquid formulations.    I taught undergraduate and graduate courses in Physical Pharmacy and Pharmaceutical Sciences, which included lectures on inhalation products.    Then, from 1983 to 1992, I served as a Lecturer and later Senior Lecturer at the University of Sydney's Department of Pharmacy.    While at the University of Sydney, my

1

Liquidia's Exhibit 1004
Page 4

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

research on inhalation expanded into human studies and investigations of liquid

aerosolized products.  During my time at the University of Aston and University of

Sydney, I also consulted for pharmaceutical companies, compendial bodies, and

pharmaceutical regulatory authorities.

3.      After leaving the University of Sydney in 1992, I served as a Senior

Scientist and Group Leader in Genentech, Inc.'s Aerosol Drug Delivery Group and

later Pharmaceutics department where I prepared and executed the development plan

for pulmonary delivery of the first human recombinant protein administered by

inhalation (Pulmozyme®), which is an aqueous formulation delivered via a

nebulizer.  *See* Ex. 1050 (Pulmozyme® Label).  During that time, I also led the

selection of potential technologies for inhalation delivery of Genentech's

development candidates, which included nebulizers, soft mist inhalers, and dry

powder inhalers.  In particular, the group that I led put a significant effort into the

development of a "metered dose" dry powder inhaler for recombinant human

rhDNase.

4.      Later, in 1995, I joined Aradigm Corporation as Vice President of

Research and Development.  Five years later, I was promoted to Chief Scientific

Officer of Aradigm where I led the New Product Research Department, which

focused on preclinical and clinical exploration of new therapeutic and technological

2

Liquidia's Exhibit 1004
Page 5

opportunities, including new inhalation therapies, such as a proprietary soft mist inhaler AERx. From 2001 to 2006, I served as CEO and Managing Director of Acrux Limited, an emerging company in Australia's life science sector that developed a unit dose metered spray technology for dermal and transdermal administration. Then, in 2006, I rejoined Aradigm as Chief Executive Officer and President between the years 2006 and 2018. There, I oversaw the research and development of inhaled therapies using nebulizers and metered dose soft mist inhalers, which included laboratory investigations, preclinical studies, clinical studies, and extensive interactions with manufacturers, regulatory authorities, and pharmaceutical companies.

5.    I have authored or co-authored well over 100 publications, including research articles, reviews, and book chapters in the areas of treatment of respiratory diseases, pulmonary drug delivery, and other aspects of clinical and pharmaceutical sciences. I am a named inventor of over 120 patents and patent applications in the United States and many patents and patent applications in other countries. Additionally, I have been invited to speak and serve as a session chairperson at many national and international scientific conferences and have served on the editorial boards of several journals in the areas of pharmaceutical sciences and drug delivery.

6.    My Curriculum Vitae is submitted herewith as **Exhibit 1005**.

Liquidia's Exhibit 1004
Page 6

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

7.      I have been retained by counsel for Petitioner Liquidia Technologies, Inc. ("Petitioner") to provide my expert opinion in connection with the above-captioned proceeding.  More particularly I have been asked to provide my opinion about the formulations and delivery devices for inhaled therapies described in U.S. Patent No. 10,716,793 (the "'793 Patent") **(Ex. 1001)** as well as the state of the art of formulations for inhaled therapies and the devices used for those therapies. I am being compensated by Petitioner for my time spent preparing this declaration, preparing to give and giving any testimony that may be required, and performing other related work, at my consulting rate of $850 per hour, plus reasonable expenses. My compensation is not contingent on any opinions or outcomes from this case.  The following is my written declaration on these topics.

**B.    Materials Considered**

8.      The analysis that I provide in this Declaration is based on my education, research, and experience, as well as my investigation and study of relevant materials, including the '793 Patent.  I have further reviewed the declaration of Dr. Nicholas Hill in support of the Petitioner.  Ex. 1002.  I have cited to the following documents in my analysis below:

| Exhibit No. | Description of Document |
|---|---|
| **1001** | U.S. Patent No. 10,716,793 B2 to Olschewski, et al. ("'793 Patent") |

4

Liquidia's Exhibit 1004
Page 7

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

| Exhibit No. | Description of Document |
|---|---|
| 1002 | Declaration of Dr. Nicholas Hill ("Hill Decl.") |
| 1003 | *Curriculum Vitae* of Dr. Nicholas Hill |
| 1005 | *Curriculum Vitae* of Dr. Igor Gonda |
| 1006 | U.S. Patent No. 6,521,212 B1 to Cloutier, et al. ("'212 Patent") |
| 1007 | Voswinckel, R., et al., Abstract 218: "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," *European Heart Journal* 25:22 (2004) ("Voswinckel JESC") |
| 1008 | Robert Voswinckel, Beate Enke, Andre Kreckel, Frank Reichenberger, Stefanie Krick, Henning Gall, Tobias Gessier, Thomas Schmehl, Markus G. Kohstall, Friedrich Grimminger, Hossein A. Ghofrani, Werner Seeger, and Horst Olschewski, Abstract 1414: "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension," Abstracts from the 2004 Scientific Sessions of the American Heart Association, *Circulation,* 110(17 Suppl.):III-295 (October 26, 2004) ("Voswinckel JAHA") |
| 1009 | Robert Voswinckel, Hossein A. Ghofrani, Friedrich Grimminger, and Werner Seeger, "Clinical Observations" on "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," "Letters" Section of the *Annals of Internal Medicine*, 144(2):149-50 (January 2006) ("Voswinckel 2006") |
| 1010 | Hossein Ardeschir Ghofrani, Robert Voswinckel, et al., Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie, 30(4) HERZ, 30(4):296–302 (June 2005) ("Ghofrani") (Foreign article and English translation attached) |
| 1018 | Remodulin® 2004 Label |
| 1019 | Stein, S.W., et al., "The History of Therapeutic Aerosols: A Chronological Review," *Journal of Aerosol Medicine and Pulmonary Drug Delivery*, 30(1):20-41 (2017) ("Stein") |

5

Liquidia's Exhibit 1004
Page 8

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

| Exhibit No. | Description of Document |
|---|---|
| 1020 | Clark, A.R., "Medical Aerosol Inhalers: Past, Present, and Future," *Aerosol Science and Technology*, 22:374-91 (1995) ("Clark") |
| 1021 | Ruan, C.-H., et al., "Prostacyclin Therapy for Pulmonary Arterial Hypertension," *Texas Heart Institute Journal*, 37(4):391-99 (2010) ("Ruan") |
| 1022 | Walmrath, D., et al., "Direct Comparison of Inhaled Nitric Oxide and Aerosolized Prostacyclin in Acute Respiratory Distress Syndrome," *American Journal of Respiratory Critical Care Medicine*, 153:991-96 (1996) ("Walmrath 1996") |
| 1023 | Olschewski, H., et al., "Inhaled Prostacyclin and Iloprost in Severe Pulmonary Hypertension Secondary to Lung Fibrosis," *American Journal of Respiratory Critical Care Medicine*, 160:600-07 (1999) ("Olschewski 1999") |
| 1024 | Haché, M., et al., "Inhaled epoprostenol (prostacyclin) and pulmonary hypertension before cardiac surgery," *Journal of Thoracic and Cardiovascular Surgery*, 125:642-49 (2003) ("Hache") |
| 1025 | De Wet, C.J., et al., "Inhaled prostacyclin is safe, effective, and affordable in patients with pulmonary hypertension, right heart dysfunction, and refractory hypoxemia after cardiothoracic surgery," *Journal of Thoracic and Cardiovascular Surgery*, 127:1058-67 (2004) ("De Wet") |
| 1026 | Denver, J. and Dyche, T., "The Adaptive Aerosol Delivery (AAD) Technology: Past, Present, and Future," *Journal of Aerosol Medicine and Pulmonary Drug Delivery*, 23(1 suppl):S-1-S10 (2010) ("Denver and Dyche") |
| 1027 | U.S. Patent No. 6,242,482 B1 to Shorr, et al. ("Shorr") |
| 1028 | U.S. Patent Application Publication No. US 2004/0265238 A1 to Chaudry ("Chaudry") |
| 1029 | Ventavis® Label 2004 |

6

Liquidia's Exhibit 1004
Page 9

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

| Exhibit No. | Description of Document |
|---|---|
| 1030 | Newman, S.P., "Aerosols", Chapter from *Encyclopedia of Respiratory Medicine* pp. 58-64 (2006) ("Newman") |
| 1031 | Geller, D.E., "Comparing Clinical Features of the Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler," *Respiratory Care*, 50(10):1313-21 (2005) ("Geller 2005") |
| 1032 | Bender, B., et al., "Nonadherence in asthmatic patients: is there a solution to the problem?" *Annals of Allergy, Asthma & Immunology*, 79:177-86 (1997) ("Bender 1997") |
| 1033 | Rau, J.L., "Determinants of Patient Adherence to an Aerosol Regimen," Respiratory Care 50(10):1346-56 (2005) ("Rau 2005") |
| 1034 | Geller, D., et al., "Bolus Inhalation of rhDNase with the AERx System in Subjects with Cystic Fibrosis," *Journal of Aerosol Medicine*, 16(2):175-82 (2003) ("Geller 2003") |
| 1035 | Chattaraj, S.C., "Treprostinil sodium Pharmacia," *Current Opinion in Investigational Drugs*, 3(4):582-86 (Apr. 2002), *available at* https://pubmed.ncbi.nlm.nih.gov/12090728/ ("Chattaraj") |
| 1037 | English translation of OptiNeb® User Manual 2005 |
| 1038 | Atkins, P.J., "Dry Powder Inhalers: An Overview," *Respiratory Care*, 50(10):1304-12 (2005) ("Atkins") |
| 1039 | Frijlink, H.W. and De Boer, A.H., "Dry powder inhalers for pulmonary drug delivery," Expert Opinion on Drug Delivery, 1(1):67-86 (2004) ("Frijlink and De Boer") |
| 1040 | Chew N. and Chan H.-K., "Pharmaceutical Dry Powder Aerosol Delivery," KONA, No. 19, pp. 46-56 (2001) ("Chew and Chan") |
| 1042 | January 27, 2020 Press Release, "Liquidia Submits New Drug Application for LIQ861 (Treprostinil) Inhalation Powder to U.S. Food And Drug Administration for the Treatment of Pulmonary Arterial Hypertension (PAH)," *available at* https://investors.liquidia.com/news-releases/news-release- |

7

Liquidia's Exhibit 1004
Page 10

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

| Exhibit No. | Description of Document |
|---|---|
| | details/liquidia-submits-new-drug-application-liq861-treprostinil |
| 1043 | 2009 Tyvaso® Label, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/022387s015lbl.pdf |
| 1046 | U.S. Patent No. 9,358,240 to Olschewski, et al. ("'240 Patent") |
| 1047 | Hoeper, M.M., et al., "Long-Term Treatment of Primary Pulmonary Hypertension with Aerosolized Iloprost, a Prostacyclin Analogue," *N Engl J Med*, 342:1866-70 (2000) ("Hoeper") |
| 1048 | Walmrath, D., et al., "Aerosolised prostacyclin in adult respiratory distress syndrome," *Lancet*, 342:961-62 (1993) ("Walmrath 1993") |
| 1049 | April 8, 2020 Press Release, "Liquidia Announces FDA Acceptance of New Drug Application for LIQ861 (Treprostinil) Inhalation Powder for the Treatment of Pulmonary Arterial Hypertension," *available at* https://investors.liquidia.com/news-releases/news-release-details/liquidia-announces-fda-acceptance-new-drug-application-liq861 |
| 1050 | Pulmozyme® Label |
| 1051 | Farber, H.W. and Loscalzo, J., "Pulmonary Arterial Hypertension," *N Engl J Med*, 351:1655-65 (2004) ("Farber and Loscalzo") |
| 1052 | Rubin, L.J. and Badesch, D.B., "Evaluation and Management of the Patient with Pulmonary Arterial Hypertension," *Ann Intern Med.*, 143:282-92 (2005) ("Rubin and Badesch") |
| 1053 | Flolan® Label |
| 1054 | Gonda, I., "A semi-empirical model of aerosol deposition in the human respiratory tract for mouth inhalation," *J. Pharm. Pharmacol.*, 33:692-96 (1981) ("Gonda 1981") |

8

Liquidia's Exhibit 1004
Page 11

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

| Exhibit No. | Description of Document |
|---|---|
| 1055 | Gonda, I., "Study of the effects of polydispersity of aerosols on regional deposition in the respiratory tract," *J. Pharm. Pharmacol.*, 33 (Suppl.) 52P (1981) ("Gonda 1981b") |
| 1056 | Telko, M.J. and Hickey, A.J., "Dry Powder Inhaler Formulation," *Respiratory Care*, 50(9):1209-27 (2005) ("Telko and Hickey") |
| 1057 | October 24, 2005 Press Release, "Aradigm Corporation And United Therapeutics Corporation Sign Development and Commercialization Agreement Targeting Pulmonary Hypertension," *available at* https://www.biospace.com/article/releases/aradigm-corporation-and-united-therapeutics-corporation-sign-development-and-commercialization-agreement-targeting-pulmonary-hypertension-/ |
| 1058 | Ziegler, J. and Wachtel, H., "Comparison of Cascade Impaction and Laser Diffraction for Particle Size Distribution Measurements," *Journal of Aerosol Medicine*, 18(3):311-24 (2005) ("Ziegler and Wachtel") |
| 1060 | Pitcairn, G., et al., "Deposition of Corticosteroid Aerosol in the Human Lung by Respimat® Soft Mist™ Inhaler Compared to Deposition by Metered Dose Inhaler or by Turbuhaler® Dry Powder Inhaler," *Journal of Aerosol Medicine*, 18(3):264-72 (2005) ("Pitcairn") |
| 1061 | Dalby, R., et al., "A review of the development of Respimat® Soft Mist™ Inhaler," *International Journal of Pharmaceutics*, 283:1-9 (2004) ("Dalby") |
| 1062 | Gessler, T., et al., "Ultrasonic *versus* jet nebulization of iloprost in severe pulmonary hypertension," *Eur Respir J*, 17:14-19 (2001) ("Gessler") |
| 1064 | Dolovich, M.B., et al., "Device Selection and Outcomes of Aerosol Therapy: Evidence-Based Guidelines," *CHEST*, 127:335-71 (2005) ("Dolovich") |

**Appx1142**

Liquidia's Exhibit 1004
Page 12

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

| Exhibit No. | Description of Document |
|---|---|
| 1065 | Olschewski, H., et al., "Inhaled Iloprost for Several Pulmonary Hypertension," *N Engl J Med*, 347(5):322-29 (2002) ("Olschewski 2002") |
| 1066 | AccuNeb® Label |
| 1069 | Zierenberg, B. and Eicher, J., Chapter 78 "The Respimat, a New Soft Mist Inahler for Delivering Drugs to The Lungs," Modified-Release Drug Delivery Technology (2002) pp.925-933 ("Zierenberg") |
| 1070 | Beasley, R., et al., "Preservatives in Nebulizer Solutions: Risks without Benefit," *Pharmacotherapy*, 18(1):130-39 (1998) ("Beasley") |
| 1071 | Prober, C.G., et al., "Technical Report: Precautions Regarding the Use of Aerosolized Antibiotics," *Pediatrics*, 106(6):1-6 (2000) ("Prober") |
| 1073 | Aradigm Corporation Form 10-Q for the quarterly period ended June 30, 2009, *available at* https://www.sec.gov/Archives/edgar/data/1013238/000095012 309031361/f53244e10vq.htm |
| 1074 | Orenitram® Label, *available at* https://www.orenitram.com/pdf/Orenitram-Prescribing-Information.pdf |
| 1075 | November 17, 2008 Press Release, "Eli Lilly and Company Licenses U.S. Rights for Tadalafil PAH Indication to United Therapeutics Corporation," *available at* https://www.fiercebiotech.com/biotech/eli-lilly-and-company-licenses-u-s-rights-for-tadalafil-pah-indication-to-united |
| 1076 | October 23, 2017 Press Release, "United Therapeutics Announces FDA Approval Of Third Generation Nebulizer For The Tyvaso® Inhalation System," *available at* https://www.prnewswire.com/news-releases/united-therapeutics-announces-fda-approval-of-third-generation-nebulizer-for-the-tyvaso-inhalation-system-300540953.html |

Liquidia's Exhibit 1004
Page 13

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

## II.     PERSON OF ORDINARY SKILL IN THE ART

9.     I understand that an assessment of the claims of the '793 Patent should be undertaken from the perspective of a person of ordinary skill in the art as of the earliest claimed priority date, which I have been advised by counsel to be May 15, 2006.  I have been advised that to determine the appropriate level of a person having ordinary skill in the art, the following factors may be considered: (1) the types of problems encountered by those working in the field and prior art solutions thereto; (2) the sophistication of the technology in question, and the rapidity with which innovations occur in the field; (3) the educational level of active workers in the field; and (4) the educational level of the inventor.

10.     In my opinion, a person of ordinary skill in the art ("POSA" or "skilled artisan") as of May 2006 with respect to inhaled formulations used in a method of treating pulmonary hypertension would be a Ph.D. in pharmaceutical science or a related discipline like chemistry or medicinal chemistry, plus two years of experience in pharmaceutical formulations, including inhaled products, or equivalent (*e.g.*, an M.S. in the same fields, plus 5 years of experience).

11.     My opinions regarding the level of ordinary skill in the art are based on, among other things, my review of the '793 Patent, the prior art, and my over 45 years working in the inhalation research field.

11

Liquidia's Exhibit 1004
Page 14

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

12.    As reflected in my qualifications set forth above and in my curriculum

vitae (Ex. 1005), I qualified as a POSA with respect to inhaled formulations at the

time of the alleged invention (before May 2006).

## III.    STATEMENT OF LEGAL PRINCIPLES

### A.    Claim Construction

13.    I understand that the claim terms are given their ordinary and customary

meaning, which is the meaning that the term would have to a POSA as of the

effective filing date, unless the patent applicant supplied a different meaning.  I have

reviewed the specification and claims of the '793 Patent and applied the ordinary

and customary meaning that the claim terms would have to a POSA as of May 15,

2006.

### B.    Obviousness

14.    Counsel[1] has advised me that under pre-AIA 35 U.S.C. § 103, effective

before March 16, 2013, a patent claim may be found invalid as obvious if, at the time

when the invention was made, the subject matter of the claim, considered as a whole,

would have been obvious to a person having ordinary skill in the field of the

technology (the "art") to which the claimed subject matter belongs.

---

[1] All references to "counsel" are to Liquidia's counsel.

12

Liquidia's Exhibit 1004
Page 15

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

15.    I understand that a person of ordinary skill in the art is assumed to have knowledge of all prior art in evaluating the prior art.  I have been advised by counsel that obviousness may be shown by demonstrating that it would have been obvious to modify what is taught in a single piece of prior art to create the patented invention. Obviousness may also be shown by demonstrating that it would have been obvious to combine the teachings of more than one item of prior art.  I have been advised by counsel that a claimed invention is obvious if a POSA would have been motivated to combine the teachings in the prior art and would have had a reasonable expectation of success in doing so.

16.    I understand that one skilled in the art can combine various prior art references based on the teachings of those prior art references, the general knowledge present in the art, or common sense.  I understand that a motivation to combine references may be implicit in the prior art, and there is no requirement that there be an actual or explicit teaching to combine two references. Thus, one may take into account the inferences and creative steps that a person of ordinary skill in the art would employ to combine the known elements in the prior art in the manner claimed by the patent at issue.  I understand that one should avoid "hindsight bias" and *ex post* reasoning in performing an obviousness analysis.  But this does not mean

13

Liquidia's Exhibit 1004
Page 16

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

that a POSA for purposes of the obviousness inquiry does not have recourse to

common sense.

17.    I also have been informed by counsel that the following factors should

be considered in analyzing obviousness: (1) the scope and content of the prior art;

(2) the differences between the prior art and the claims; and (3) the level of ordinary

skill in the pertinent art.  I also understand that certain other factors known as

"secondary considerations" such as commercial success, unexpected results, long

felt but unmet need, industry acclaim, simultaneous invention, copying by others,

skepticism by experts in the field, and failure of others may be utilized as indicia of

nonobviousness.  I understand, however, that secondary considerations should be

connected, or have a "nexus," with the invention claimed in the patent at issue.

### C.    Anticipation

18.    Counsel has advised me that a prior art reference can also be

"anticipatory," meaning that the reference alone discloses every element of the

claim.

### IV.    RELEVANT TECHNICAL BACKGROUND

19.    Based on my review of the '793 Patent, it appears to be directed to

methods of treating pulmonary hypertension where treprostinil is delivered by

inhalation. Ex. 1001 ('793 Patent) at Abstract, claims 1-8.  The claims of the '793

14

Liquidia's Exhibit 1004
Page 17

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Patent are specific to inhaled treprostinil, because treating pulmonary hypertension

("PH") with treprostinil via other routes of administration was already discovered,

patented, and approved by the FDA before 2006. *See* Ex. 1018 (Remodulin® 2004

Label) (approving use of treprostinil for both subcutaneous injection and intravenous

administration by 2004).

20.    In this section, I provide a brief discussion of the state of the field of

inhaled therapies and treprostinil as of May 2006, based both on my personal

involvement and experience in the field then and based on the publications and

patents that were publicly available and known to a POSA by then.

**A.    History of Inhalation Therapy**

21.    Inhalation therapy has been used since ancient times, and the inhalation

of therapeutic aerosols for the treatment of asthma is described as early as 600 BC.

Ex. 1019 (Stein) at 20-21. Mass production of standardized inhalation devices

arrived with the industrial revolution in the late 18th century to 19th century. *Id.* at

23-25.

22.    Devices that reduced a medicated liquid to fine droplets for inhalation,

such as atomizers and nebulizers, were developed in the late 1800s. *Id.* at 25. And

dry powder inhalers ("DPI") were first developed in 1852, as a powdered medicine

Liquidia's Exhibit 1004
Page 18

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

in a glass inhaler.  *Id.* at 26.  Other DPIs for various uses were developed before
1900.  *Id.* at 26-27.

23.    After the passage of the Food and Drug Act of 1906, multiple clinical
studies were conducted to evaluate the effectiveness of various therapeutic aerosols.
*Id.* at 27.  By the mid-1950s, the "aerosol delivery of beta agonists, corticosteroids,
and anticholinergic . . . drugs had all been demonstrated to be effective for the
treatment of respiratory diseases," and "[c]onvenient delivery by a DPI or squeeze
bulb glass nebulizers had been demonstrated."  *Id.*  DPIs and nebulizer technologies
advanced from 1956 to 1986.  *See id.* at 29.

24.    The first propellant meter dosed inhaler ("MDI" or, more specifically,
"pMDI" to distinguish from other inhalers that use metered doses) was introduced
in 1956 as the "first inhaler device that achieved effective lung delivery in a truly
convenient and portable device and rapidly became the dominant delivery system
for treatment of asthma."  *Id.* at 27.  These inhalers passed FDA approval and were
marketed as the Medihaler Epi and Medihaler Iso in 1956.  *Id.* at 28.  But these
inhalers had an issue:  the patient had to synchronize the release of the drug dose
with their inhalation.  The first-breath actuated MDI, the Autohaler, addressed this
concern and was launched in 1970.  *Id.*

16

**Appx1149**

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

25.     The period from 1987 to the 21st century was "a period of unprecedented innovation and growth in the delivery of therapeutic aerosols." *Id.* at 30.     The "signing of the Montreal Protocol in September of 1987 dramatically changed the pharmaceutical aerosol industry and led to a surge of development and innovation of inhaler products that eventually resulted in hydrofluoroalkane (HFA) MDIs and a large increase in the number and types of DPIs available, as well as the development of advanced nebulizer systems and other inhalation devices." *Id.*; *see also id.* at 30-32.     By 1995, "three major types of medical aerosol inhalers" – the nebulizer, the pressurized metered dose inhaler, and the dry powder inhaler were on the market.     Ex. 1020 (Clark) at Abstract.     By 2006, multiple DPIs and nebulizers had been approved by the FDA and were available, as well as the soft mist inhaler Respimat.     Ex. 1019 (Stein) at Table 3, Table 4, 33-36, Figure 15.     Dozens of MDI inhalers were also approved by the FDA by 2006.     *See, e.g., id.* at Tables 1-3.

**B.     Inhaled Treprostinil and Its Analogues**

26.     Treprostinil is a prostacyclin receptor agonist, meaning that it stimulates the prostacyclin receptor on cells.     Such stimulators have long been used to treat pulmonary vascular disease by countering vasoconstriction, i.e. the narrowing of blood vessels.     As such, the therapeutic utility of injected and inhaled prostacyclins for pulmonary arterial hypertension was well-known and widely

17

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

publicized in prominent journals before 2006. *See* Ex. 1051 (Farber and Loscalzo);

Ex. 1052 (Rubin and Badesch).

27.    Other prostacyclin receptor agonists known by 2006 include iloprost

and epoprostenol (the name for the naturally occurring prostacyclin, but which could

also be produced synthetically).    Ex. 1053 (Flolan® Label) at 1, Description

("Epoprostenol ($PGI_2$, PGX, prostacyclin), a metabolite of arachidonic acid, is a

naturally occurring prostaglandin with potent vasodilatory activity and inhibitory

activity of platelet aggregation.").

28.    Treprostinil and iloprost are analogues of epoprostenol.    Ex. 1021

(Ruan) at 392 ("Epoprostenol, a synthetic prostacyclin, and iloprost and treprostinil,

synthetic prostacyclin analogues, are currently used to treat patients with PAH.").

29.    Between the 1990s and 2006, there was already extensive literature on

inhaled prostacyclins.  For example, a 1996 article reported the use of prostacyclin

aerosol compared to the standard of therapy with nitric oxide (NO) for patients with

Adult Respiratory Distress Syndrome (ARDS).    Ex. 1022 (Walmrath); Ex. 1002

(Hill Decl.) at ¶ 30.

30.    Even more specifically, prostacyclins and iloprost have been proven to

treat pulmonary arterial hypertension.  A 1999 article published in the American

Journal of Respiratory Critical Care Medicine studied inhaled prostacyclin and

Liquidia's Exhibit 1004
Page 21

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

inhaled iloprost in pulmonary arterial hypertension patients.  Ex. 1023 (Olschewski

1999).  Olschewski 1999 concluded that "in pulmonary hypertension secondary to

lung fibrosis, aerosolization of $PGI_2$ or iloprost causes marked pulmonary

vasodilatation with maintenance of gas exchange and systemic arterial pressure."

Ex. 1023 (Olschewski 1999) at Abstract.  Other researchers described the benefits

of inhaled prostacyclin in surgical patients with pulmonary hypertension and

compared this approach over the use of nitrous oxide.  Ex. 1024 (Hache 2003) at 642

("Inhaled epoprostenol (prostacyclin) and pulmonary hypertension before cardiac

surgery"); Ex. 1025 (De Wet 2004) at 1058 ("Inhaled prostacyclin is safe, effective,

and affordable in patients with pulmonary hypertension, right heart dysfunction, and

refractory hypoxemia after cardiothoracic surgery.").

31.     Numerous patents and patent publications on inhaled epoprostenol,

iloprost, and treprostinil, existed by 2006.  U.S. Patent No. 6,242,482 to Shorr et al.

disclosed the administration of treprostinil and prostaglandin derivatives via

intravenous injection and inhalation.  Ex. 1027 (Shorr) at 1:54-56, 4:37-61, Figure

1-5, and claims 1, 35, and 49.  U.S. Patent Publication No. 2004/0265238 to Chaudry

was directed to "inhalable formulation[s] for the treatment of pulmonary

hypertension" where the formulation comprises a "hypertension-reducing agent"

including a "vasodilator," such as "the prostacyclin analog **treprostinil sodium**."

19

Liquidia's Exhibit 1004
Page 22

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

*See* Ex. 1028 (Chaudry) at Abstract, [0010], [0012], [0017], [0026], [0097], Claim 44. The '212 Patent, detailed in the "Overview of the Prior Art" section below, similarly discloses use of inhaled treprostinil for the treatment of pulmonary hypertension. Ex. 1006 ('212 Patent) at Abstract, 3:1-5, 2:16-18, 2:66-3:5, 4:10-13, 4:41-54, 7:18-24.

32.     The benefits of inhalation over other forms of administration, such as intravenous delivery, were also well-known by 2006.   For example, Chaudry disclosed that "[c]ontinuous intravenous prostacyclin is far from ideal as a treatment for pulmonary hypertension, . . . because the agent is available only in limited supply, it is very costly, and optimal management requires that the intravenous therapy with prostacyclin be started in specialized centers familiar with the technique, equipment, and dose ranging. . . .  Further, because the agent is delivered systemically with only a small percentage of the agent actually absorbed by the pulmonary system, it must be administered in high dosages." Ex. 1028 (Chaudry) at [0011].  Chaudry 2004 disclosed that "therapeutically effective amount[s] of a hypertension-reducing agent" may include various ranges, such as from "about 0.001 mg/ml to about 20 mg/ml" and provided extensive disclosure regarding the use of nebulizing devices for inhalation. *Id.* at [0037]-[0038], [0061]-[0066]. The '212 Patent, detailed below,

20

Liquidia's Exhibit 1004
Page 23

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

similarly disclosed that inhaled delivery was known to be more "potent" than

intravenous delivery.  Ex. 1006 ('212 Patent) at 8:9-17.

33.    In fact, iloprost had already been approved for inhaled use to treat

pulmonary arterial hypertension in 2004, under the brand name Ventavis®.

"Ventavis is breathed (inhaled) into your lungs" and "[o]ne treatment session will

usually last about 4 to 10 minutes."  Ex. 1029 (Ventavis® Label 2004) at 4, 15-16.

Ventavis® was approved for treatment of pulmonary arterial hypertension (*id.* at 8)

with a maximum daily dose of 45 micrograms (*id.* at 11).

## C.    Well Known Considerations for Inhalation Therapies

34.    As early as 1981, the deposition of pharmaceutical aerosols in the

human respiratory tract as a function of their size distribution was well understood.

Ex. 1054 (Gonda 1981); Ex. 1055 (Gonda 1981b).  By 2006, it was certainly well-

known that inhalation drug particles needed to be a certain size.  For example, from

modern use of inhalation therapy for asthma in the 1990s, it was well known that "to

avoid inertial impaction in the oropharyngeal cavity and reach the lung," aerosol

particles needed to be 7 micrometers or less.  Ex. 1020 (Clark) at 374.  If those

particles needed to reach the peripheral lung, the particles needed to be closer to 2

to 3 micrometers.  *Id.*  A 2006 chapter on "Aerosols" in the Encyclopedia of

Respiratory Medicine by S.P. Newman ("Newman") confirms that it was generally

21

Liquidia's Exhibit 1004
Page 24

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

known that "inhaler devices should deliver particles smaller than approximately 5

μm in diameter in order to enter the lungs." Ex. 1030 (Newman) at 58. The '212

Patent, discussed more below, also discloses particles "preferably, less than 5

micrometers in diameter." Ex. 1006 ('212 Patent) at 5:40-41.

35.    Further, it was well known by May 2006 that titrating doses of inhaled

prostacyclins achieved optimal levels of efficacy and safety for individual patients.

*See, e.g.*, Ex. 1048 (Walmrath 1993) at 962 ("Titration of aerosolized [prostacyclin]

in individual patients might be necessary to produce selective vasodilation in well-

ventilated lung areas."). In 1997, Hoeper et al. delivered iloprost by inhalation to 24

patients suffering from pulmonary hypertension and increased the doses of iloprost

for patients whose symptoms did not improve after three months of treatment. Ex.

1047 (Hoeper) at 1867. The study revealed that "[c]oughing during inhalation was

common during the first days of treatment but invariably disappeared spontaneously

within the first four weeks." *Id*. at 1868. Accordingly, well before May 2006, it was

known that titration of inhaled prostacyclins achieved therapeutic efficacy and that

patients gained a tolerance to initial side effects (e.g., coughing).

36.    Similarly, by 2006, various inhalation devices were commonly used,

and there was extensive literature on the pros and cons of those devices. *See, e.g.*,

Ex. 1031 (Geller 2005) at 1313 (titled "Comparing clinical features of the Nebulizer,

Liquidia's Exhibit 1004
Page 25

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Metered-Dose Inhaler, and Dry Powder Inhaler).  Specifically, nebulizers can be

used by patients of any age, do not use propellants, and can deliver high drug doses;

however, nebulizers were known to be more time-consuming, less portable, and less

predictable with respect to the amount of drug available for lung deposition.  *Id*. at

1315.  To contrast, Geller explains that pressurized metered dose inhalers are

portable, less expensive, and offer very high lung deposition; however, pressurized

metered dose inhalers were known to be the most difficult device to use, causing

them to be often used incorrectly.  *Id*. at 1315-16.  Lastly, Geller explains that dry

powder inhalers are breath-actuated (and, therefore, easier to use), portable, and

quick to use; however, dry powder inhalers require higher inspiratory flow and lung

volume, making them unsuitable for some patients (e.g., young children).  *Id*. at

1316.

37.    Dozens of pressurized MDIs were FDA approved by 1997.  *See e.g.*,

Ex. 1019 (Stein) at Table 1 (listing over 20 pressurized metered dose inhalers

(pMDIs) approved in US by 1997).   In particular, at least 6 pMDIs using

hydrofluoralkanes as propellants were approved.  *Id.* at Table 2.

38.    Dry powder inhalers (DPIs) were also well-known as of 2006.  *See* Ex.

1038 (Atkins) at 1305-06 (describing the choice of single and multiple dose DPIs,

including the means of "metering" doses).  At least 10 dry powder inhalers had been

Liquidia's Exhibit 1004
Page 26

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

approved by the FDA by 2006, including the blockbuster product Advair, used for

asthma and chronic obstructive pulmonary disease (COPD) treatment.  Ex. 1019

(Stein) at 33, Table 3.  Methods of creating dry powder formulations to use in DPIs

were also known, such as by grinding (or "milling" or "micronization") of powders,

spray drying, and using supercritical fluid preparations of powders for inhalation.

*See* Ex. 1056 (Telko and Hickey) at 1212-23 (summarizing the variety of

formulation composition and manufacturing methods for preparation of dry powders

for inhalations).

39.     The first soft mist inhaler approved was Respimat (first in Germany in

2004, then in U.S.), while several other soft mist inhalers were in development at the

time, including Aradigm's AERx which was the inhaler used in the treprostinil

collaboration with UTC announced in 2005.  *See* Ex. 1057 (Aradigm's 2005 press

release).  Respimat capabilities were well characterized—using a range of drug

concentrations from 0.049-0.833%, the majority of the drug mass was in droplets of

< 5 microns (as evidenced by the mass median diameter < 5 microns) and the dose

delivered per puff was about 5 micrograms.  Ex. 1058 (Ziegler and Wachtel) at 313;

Ex. 1060 (Pitcairn) at Abstract (describing *in vitro* and *in vivo* studies delivering an

asthma drug in a single breath using 200 micrograms in 15 microliters of solution,

delivered via Respimat and showing successful delivery to the lung); *see generally*

24

Liquidia's Exhibit 1004
Page 27

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Ex. 1061 (Dalby) (describing Respimat's operation in great detail, including results

*in vitro* and in humans with multiple drugs and a variety of drug concentrations and

doses). Based on these understood characteristics of Respimat, an inhaled

formulation POSA would understand that the Respimat would be suitable for inhaled

delivery of treprostinil from such a small convenient device at similar dosages in one

or a small number of breaths.

40.    For all of these inhaled therapies, there were widespread patient

adherence concerns. *See* Ex. 1032 (Bender 1997) at Abstract, 179-80 (patients on

inhaled therapies "on average [only] take about 50% of prescribed medication");

Ex. 1033 (Rau 2005) at Abstract (noting that a factor "related to patient adherence"

was the "complexity of the inhalation regimens (dosing frequency, number of

drugs)"); Ex. 1002 (Hill Decl.) at ¶¶ 37-38.

41.    By May 2006, it was well-known that inhalation therapies could

achieve therapeutic efficacy in three or fewer breaths. *See, e.g.*, Ex. 1034 (Geller

2003) at 181 (concluding that "inhalation . . . in only three breaths is feasible").

42.    Thus, reducing the duration of the inhaled dose administration of

treprostinil was a common goal by 2006, and one that had been met with success.

Chaudry disclosed that inhalation of its treprostinil formulation "may take about . . .

3 minutes" (Ex. 1028 (Chaudry) at [0067]), while Voswinckel JAHA and

Liquidia's Exhibit 1004
Page 28

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Voswinckel 2006, detailed below, disclosed reductions in treprostinil administration

duration to 3 breaths.  The desire to reduce the administration duration of aerosolized

prostacyclins goes back well before 2006 (*see* Ex. 1062 (Gessler 2001) at 19; Ex.

1065 (Olschewski 2002) at 328), which is consistent with the general sentiments that

nebulizers are "cumbersome and time-consuming to use."  Ex. 1064 (Dolovich) at

337.

## V.    THE '793 PATENT

### A.    The Specification

43.    The '793 Patent, entitled "Treprostinil Administration by Inhalation,"

is directed towards "methods and kits for therapeutic treatment and, more

particularly, to therapeutic methods involving administering treprostinil using a

metered dose inhaler and related kits."  Ex. 1001 ('793 Patent) at 1:20-23.

44.    Claim 1 is the only independent claim of the '793 Patent and claims a

method of treating pulmonary hypertension by delivering 15-90 µg of treprostinil to

a patient in 1-3 breaths using an "inhalation device."  *Id.* at claim 1.  Dependent

claims 2-5 are directed to specific types of inhalation devices, including soft mist

inhalers, pulsed ultrasonic nebulizers, dry powder inhalers, and pressurized metered

dose inhalers.  And dependent claims 6-8 are directed to formulation characteristics,

including powder formulations, particle size, and the exclusion of the preservative

26

Liquidia's Exhibit 1004
Page 29

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

metacresol. *See also id*. at 15:40-41 (mentioning a "metacresol preservative" in a "treprostinil solution").

45.    The '793 Patent explains that using a soft mist inhaler, "the aerosol cloud containing a respiratory drug can be generated by passing a solution containing the respiratory drug through a nozzle or series of nozzles." *Id*. at 7:27-30.  The patent provides examples of commercially available soft mist inhalers, including "the Respimat® Inhaler (Boeringer Ingelheim GmbH), the AERx® Inhaler (Aradigm Corp.), the Mystic™ Inhaler (Ventaira Pharmaceuticals, Inc) and the Aira™ Inhaler (Chrysalis Technologies Incorporated)." *Id*. at 7:33-37; *see also id*. at 7:37-39 ("For a review of soft mist inhaler technology, see e.g. M. Hindle, The Drug Delivery Companies report, Autumn/Winter 2004, pp. 31-34.").  The patent explains that the solution of treprostinil used with the soft mist inhaler should be in "water, ethanol or a mixture thereof" and have particles with a diameter less that about 10 μm, less than about 5 μm, and less than about 4 μm. *Id*. at 7:42-49.

46.    Second, the patent describes a clinical study in which patients received inhaled doses of treprostinil using a "pulsed ultrasonic nebulizer (OPTINEB®, Nebutec, Elsenfeld, Germany)." *Id*. at 14:35-37.  Third, the patent explains that "the inhalation device can be also a dry powder inhaler" and that "[i]n such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with

27

Liquidia's Exhibit 1004
Page 30

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

particle size less than 10 micrometers in diameter or less than 5 micrometers." *Id*.

at 7:22-26.  Lastly, the patent explains that a pressurized metered dose inhaler

"produces the aerosol clouds for inhalation from solutions and/or suspensions of

respiratory drugs in chlorofluorocarbon (CFC) and/or hydrofluoroalkane (HFA)

solutions." *Id*. at 7:16-21.[2]

## B.    The Claims of the '793 Patent

47.    I address claims 1 – 8 of the '793 Patent, reproduced below:

| | **Claim Limitation** |
|---|---|
| 1 | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof with an inhalation device, wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof delivered in 1 to 3 breaths. |
| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |

---

[2] The '793 Patent provides no guidance on formulating a solution or powder for inhalation via a pulsed ultrasonic nebulizer, dry powder inhaler, or pressurized metered dose inhaler.  *See generally* Ex. 1001 ('793 Patent).

28

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

| 6 | The method of claim 4, wherein the formulation is a powder. |
|---|---|
| 7 | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 | The method of claim 1, wherein the formulation contains no metacresol. |

48.    I will address why these claims would have been disclosed or rendered obvious to a skilled artisan in 2006 in my detailed analysis below.

## VI.    SUMMARY OF PRIOR ART

49.    Below I summarize the key prior art that I believe would have disclosed or rendered obvious claims 1 to 8 of the '793 Patent to a POSA.

### A.    '212 Patent [Ex. 1006]

50.    The **'212 Patent** is directed to "methods of treating pulmonary hypertension by administering an effective amount of a benzindene prostaglandin." Ex. 1006 ('212 Patent) at 3:2-4.    The patent explains that the "most preferred" benzindene prostaglandin is UT-15 (*see id.* at 4:38-40), which a POSA would understand to be treprostinil sodium.    *See* Ex. 1035 (Chattaraj) at 582 (referring to treprostinil sodium as UT-15); Ex. 1046 ('240 Patent) at 5:41-44 ("U.S. Pat. No[]. 6,521,212 . . . describe[s] administration of treprostinil by inhalation for treatment of pulmonary hypertension, peripheral vascular disease and other diseases and conditions.").

29

Liquidia's Exhibit 1004
Page 32

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

51.    The '212 Patent discloses that the treprostinil sodium is "[p]referably" delivered using a "nebulizer" or "inhaler." Ex. 1006 ('212 Patent) at 5:30-32. The patent explains that "[o]ne preferred nebulizer is the AM-601 MEDICATOR AEROSOL DELIVERY SYSTEM™ (a nebulizer manufactured by Healthline Medical in Baldwin Park, Calif.)."

52.    The '212 Patent further states that one possible "solution for administration by inhalation with a nebulizer includes a sterile solution of UT-15 comprising UT-15, sodium citrate, citric acid, sodium hydroxide, sodium chloride, and meta-cresol." *Id.* at 5:22-25. However, the '212 Patent explains that "[a] more preferred solution is prepared by mixing 0.125 grams UT-15, 1.25 grams hydrous sodium citrate, 0.125 grams of anhydrous citric acid, 0.05 grams of sodium hydroxide, and approximately 250 ml of water for injection." *Id.* at 5:25-29. A POSA would understand that the "more preferred" solution of treprostinil disclosed by the '212 Patent does not contain metacresol, because the preservative is expressly included in the less preferred solution but is excluded from the more preferred solution.

53.    Additionally, the '212 Patent describes an animal model in which the inhalation solution was "prepared by combining 1.25 grams of Sodium Citrate (Hydrous), 0.125 Citric Acid (Anhydrous), 0.05 grams of Sodium Hydroxide

Liquidia's Exhibit 1004
Page 33

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

(NF/BP), 0.125 grams of UT-15, and approximately 250 ml of Water for Injection."

*Id*. at 8:40-44.  Thus, the '212 Patent provides an example formulation delivered via

inhalation to animals that did not contain metacresol.

54.    The '212 Patent further discloses that "solid formulations, usually in

the form of a powder, may be inhaled in accordance with the present invention."  *Id*.

at 5:37-39.  The patent explains that "[i]n such case, the particles are preferably less

than 10 micrometers in diameter, and more preferably, less than 5 micrometers in

diameter."  *Id*. at 5:39-41.[3]  Additionally, the '212 Patent claims a method of treating

pulmonary hypertension in mammals, wherein treprostinil "is inhaled in powder

form."  *Id*. at claims 6, 9.

**B.    Voswinckel JESC [Ex. 1007]**

55.    **Voswinckel JESC** is an abstract titled "Inhaled treprostinil is a potent

pulmonary vasodilator in severe pulmonary hypertension" that was published in the

European Heart Journal: Journal of European Society of Cardiology on October 15,

2004.  The abstract corresponds to a presentation made at a conference before the

European Society of Cardiology Congress from August 28 to September 1, 2004 in

---

[3] The '793 Patent provides a nearly identical disclosure related to inhalation of
powder formulations.  *See* Ex. 1001 ('793 Patent) at 7:22-26 ("The inhalation device
can be also a dry powder inhaler. In such case, the respiratory drug is inhaled in solid
formulation, usually in the form of a powder with particle size less than 10
micrometers in diameter or less than 5 micrometers in diameter.").

31

Liquidia's Exhibit 1004
Page 34

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Munich, Germany.  In my opinion, a POSA would have either attended the conference or read the abstracts published after the conference, looking specifically at the abstracts relating to pulmonary hypertension.  From my recollection, well-known journals like the *European Heart Journal* were available at university libraries and published in online databases like PubMed in 2004.  I have been informed by counsel that a librarian is separately providing authentication for that availability.  It is my opinion that a POSA looking at a hard copy of the "Abstract Supplement" issue of the *European Heart Journal* would notice the topic "Epidemiology and treatment of pulmonary arterial hypertension" listed in the table of contents and would read the abstracts listed there.  Ex. 1007 at 2 (listing Abstracts 215-220 under the topic).  Voswinckel JESC is one of these six abstracts (it is Abstract 218).  *Id.* at 7.  I personally pulled and kept copies of many similar abstracts that I was interested in from the time.  In sum, a POSA interested in pulmonary hypertension, exercising reasonable diligence in following updates on new pulmonary hypertension research, would have either been present when Voswinckel JESC was presented in the conference or would have been interested in and able to locate Voswinckel JESC in the *European Heart Journal* publication shortly after the conference.

32

Liquidia's Exhibit 1004
Page 35

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

56.     The abstract describes an open-label, single blind placebo-controlled

clinical study intended to "investigate[] the acute hemodynamic response to inhaled

treprostinil." Ex. 1007 (Voswinckel JESC) at Background, Methods.  Voswinckel

JESC explains that patients received either inhaled treprostinil (in concentrations of

16, 32, 48 or 64 µg/ml) or an inhaled placebo solution via an "OptiNeb ultrasound

nebulizer, Nebu-tech, Germany" (*id.* at Methods).  A POSA would have known in

May 2006 that nebulizers conventionally deliver between 1 and 5 mL.[4]

57.     Based on the clinical study results, Voswinckel JESC concludes that

"[t]reprostinil    inhalation    results    in    a    significant    long-lasting    pulmonary

vasodilation" and that "[w]ith the applied technology, at a concentration of 16µg/ml,

near maximal pulmonary vasodilatation is achieved without adverse effects."  Ex.

1007 (Voswinckel JESC) at Conclusion.

## C.     Voswinckel JAHA [Ex. 1008]

58.     **Voswinckel JAHA** is an abstract titled "Inhaled Treprostinil Sodium

(TRE) For the Treatment of Pulmonary Hypertension" that was presented at the

---

[4] Inhalation therapies approved by the FDA before May 2006, including iloprost, were delivered using a nebulizer in 1 to 5 mL volumes. *See, e.g.*, Ex. 1066 (AccuNeb® Label) at 1, Dosage and Administration (3 mL dose); Ex. 1029 (Ventavis® (iloprost) Label) at 11, Dosage and Administration (2.5-5 mL dose); Ex. 1050 (Pulmozyme® Label) at 2, Dosage and Administration, How Supplied (2.5 mL dose).

Liquidia's Exhibit 1004
Page 36

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

"Scientific Sessions 2004" conference run by the American Heart Association and

published in the *Circulation* Journal of the American Heart Association on October

26, 2004. In my opinion, a POSA would have either attended the conference or read

the abstracts published after the conference, looking specifically at the abstracts

relating to pulmonary hypertension. From my recollection, well-known journals

like *Circulation* were available at university libraries and published in online

databases like PubMed in 2004. I have been informed by counsel that a librarian is

separately providing authentication for that availability. It is my opinion that a

POSA looking at a hard copy of the "Abstracts from Scientific Sessions 2004" issue

of the *Circulation* would notice and the read the abstracts listed under the topic

"Pulmonary Arterial Hypertension: New Therapies." Ex. 1008 at 3 (listing Abstracts

1414-1418 under the topic). Voswinckel JAHA is one of these five abstracts listed

there (it is Abstract 1414). *Id.* I personally pulled and kept copies of many similar

abstracts that I was interested in from the time. In sum, a POSA interested in

pulmonary hypertension, exercising reasonable diligence in following updates on

new pulmonary hypertension research, would have either been present when

Voswinckel JAHA was presented in the American Heart Association conference or

would have been interested in and able to locate Voswinckel JAHA in the

*Circulation* publication shortly after the conference.

34

Liquidia's Exhibit 1004
Page 37

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

59.    The abstract describes an open-label study intended "[t]o evaluate the effects of inhaled [treprostinil] on pulmonary hemodynamics and gas exchange in severe pulmonary hypertension (PH) and to assess safety, tolerability and clinical efficacy in patients with severe PH."  Ex. 1008 (Voswinckel JAHA) at Objective, Methods.    The abstract explains that during the study, patients with severe pulmonary hypertension inhaled a 600 µg/mL **treprostinil** solution using a "pulsed OptiNeb® ultrasound nebulizer" (*see id.* at Methods), which a POSA would understand to be a pulsed[5] ultrasonic nebulizer. *See, e.g.*, Ex. 1001 ('793 Patent) at 14:35-37.  The abstract mentions that the treprostinil solution was "preservative free" (Ex. 1008 (Voswinckel JAHA) at Methods), which a POSA would understand to mean that the solution did not contain metacresol. *See, e.g.* Ex. 1001 ('793 Patent) at 15:40-41.  After receiving the inhaled treprostinil in "3 single breaths," patients exhibited "a sustained, highly pulmonary selective vasodilation over 120 minutes." Ex. 1008 (Voswinckel JAHA) at Results.    Based on this effect, the abstract concludes that inhaled treprostinil "shows strong pulmonary selective vasodilatory efficacy with a long duration of effect following single acute dosing." *Id.* at

---

[5] The "pulsed" feature would also have been known to a POSA, because the first approved prostacyclin for inhalation, iloprost (Ventavis), was delivered using a pulsed nebulizer. *See* Ex. 1029 (Ventavis (iloprost) Label); Ex. 1026 (Denver and Dyche).

35

Liquidia's Exhibit 1004
Page 38

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Conclusion. The abstract further notes that "[t]olerability is excellent even at high drug concentrations and short inhalation times (3 breaths)" and that inhaled treprostinil shows "very promising" long-term treatment effects. *Id.*

### D.     Voswinckel 2006 [Ex. 1009]

60.     **Voswinckel 2006** is a publication titled "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension" that was published in the Annals of Internal Medicine on January 17, 2006. Voswinckel 2006 describes a clinical study intended to "characterize the effects of inhaled treprostinil with special regard to safety, tolerability, and efficacy in patients with severe pulmonary arterial hypertension." Ex. 1009 (Voswinckel 2006) at Objective.

61.     During the study described in Voswinckel 2006, three patients with severe pulmonary hypertension received single 15-µg doses of treprostinil in 3 breaths "through a modified OptiNeb ultrasonic inhalation device (Nebu-Tec), Elsenfeld, Germany)" (*id.* at Methods and Findings), which a POSA would understand to be a pulsed[6] ultrasonic nebulizer. *See, e.g.*, Ex. 1001 ('793 Patent) at 14:35-37. The study found that inhaled treprostinil "substantially reduced

---

[6] The "pulsed" feature would also have been known to a POSA, because the first approved prostacyclin for inhalation, iloprost (Ventavis), was delivered using a pulsed nebulizer. *See* Ex. 1029 (Ventavis (iloprost) Label); Ex. 1026 (Denver and Dyche).

36

Liquidia's Exhibit 1004
Page 39

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

pulmonary vascular resistance" for a "sustained period (duration of effect, > 180

min)." Ex. 1009 (Voswinckel 2006) at Methods and Findings. Two patients

received long-term inhaled treprostinil therapy consisting of 4 daily 15-µg doses. *Id*.

Based on those findings, Voswinckel 2006 concludes that inhaled treprostinil "was

clinically effective, safe, and well tolerated when 15 µg was inhaled in 3 breaths 4

times daily." *Id*. at Conclusion.

**VII.   APPLICATION OF THE PRIOR ART TO THE CLAIMS**

62.   I have reviewed and analyzed the prior art references and materials

listed in Section I.B above. In my opinion, the limitations of claims are disclosed

by the following combination of prior art references.

| Ground[7] | References | Claim(s) |
|---|---|---|
| 1 | Obvious over '212 Patent (Ex. 1006) in combination with Voswinckel JESC (Ex. 1007) and Voswinckel JAHA (Ex. 1008) | 1-8 |
| 2 | Obvious over '212 Patent (Ex. 1006) in combination with Voswinckel JESC (Ex. 1007) | 1-8 |
| 4 | Obvious over Voswinckel JAHA (Ex. 1008) in combination with Ghofrani (Ex. 1010) | 1, 3, 8 |
| 5 | Anticipated by Voswinckel 2006 (Ex. 1009) | 1, 3 |
| 6 | Obvious over Voswinckel 2006 (Ex. 1009) and the '212 Patent (Ex. 1006) | 2, 4-8 |

[7] I understand that Liquidia is asserting a Ground 3 in its Petition, but I offer no opinion on that ground.

Liquidia's Exhibit 1004
Page 40

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

63.    I am informed by counsel that each of the references cited in the

grounds above qualifies as prior art to the challenged claims because each reference

was filed and/or published before the earliest effective filing date for the '793 Patent,

i.e., May 15, 2006.

**A.    Ground 1: Claims 1–8 are Obvious over '212 Patent in Combination with Voswinckel JESC Voswinckel JAHA**

**1.    Independent Claim 1**

64.    I understand that Dr. Hill opines that the '212 Patent in combination

with Voswinckel JESC and Voswinckel JAHA renders obvious the claim elements

of independent claim 1 as of May 2006.

**2.    Dependent Claim 2**

65.    I have reproduced dependent claim 2 below:

| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
|---|---|

66.    It is my opinion that the '212 Patent in combination with Voswinckel

JESC and Voswinckel JAHA also discloses the additional element of claim 2.

67.    The '212 Patent discloses use of an "inhaler" to administer treprostinil.

Ex. 1006 ('212 Patent) at 5:30-32.  A POSA would understand the term to include

"soft mist inhalers" because those were known in the art by 2006.  *See* ¶¶ 25, 39, 45

above.  Further, as the '793 Patent acknowledges, numerous soft mist inhalers were

on the market or known to be in development as of May 2006, such as the

38

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

"Respimat® Inhaler (Boehringer Ingelheim GmbH), the AERx® Inhaler (Aradigm

Corp.), the Mystic™ Inhaler (Ventaira Pharmaceuticals, Inc) and the Aira™ Inhaler

(Chrysalis Technologies Incorporated)." Ex. 1001 ('793 Patent) at 7:33-37; *see also*

*id.* at 7:37-39 ("For a review of soft mist inhaler technology, see e.g. M. Hindle, The

Drug Delivery Companies Report, Autumn/Winter 2004, pp. 31-34.").

68.    A POSA would have been motivated to use a soft mist inhaler to deliver

the "solution" disclosed in the '212 Patent, because soft mist inhalers were known

to offer numerous advantages.  Specifically, soft mist inhalers delivered a soft mist

without the use of propellants in a "repeatable and consistent manner regardless of

ambient temperature (T = 15-30°C), pressure, or humidity." Ex. 1069 (Zierenberg)

at 932.

69.    A POSA would also have known that the aqueous solution described in

the '212 Patent would be suitable for soft mist inhalation.  Both water and ethanolic

solutions were known to be suitable for use with soft mist inhalers.  Ex. 1069

(Zierenberg) at 930 ("Water, ethanol, or a mixture of both can be used as a solvent

for formulating the drug solution.").  Moreover, the quality of the particles produced

by soft mist inhalers was known to be independent of the patient's inspiratory flow

and ambient conditions.  *Id.*  Additionally, the first approved soft mist inhaler,

Respimat, was  well-characterized  by  May  2006,  as  evidenced  by  numerous

39

Liquidia's Exhibit 1004
Page 42

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

publications describing it.  *See* Ex. 1058 (Ziegler and Wachtel); Ex. 1060 (Pitcairn);

Ex. 1061 (Dalby).  Because soft mist inhalers were known to be compatible with

aqueous solutions and a wide variety of environmental conditions, a POSA would

understand that the aqueous solution described in the '212 Patent could be

administered using a soft mist inhaler.  Sterile solutions were known to be

deliverable by soft mist inhalers such as AERx Inhaler.

70.    A POSA would have a reasonable expectation of success in delivering

15 to 90 micrograms of treprostinil in 1 to 3 breaths with a soft mist inhaler, because,

as I explained above at Paragraph 39, Voswinckel JAHA successfully delivered

treprostinil in 3 breaths.  Further, Respimat® had been approved for market use and

was well characterized as suitable for inhaled delivery of drugs at similar dosages in

one or a small number of breaths.  *See* Ex. 1061 (Dalby) at 5.

71.    It is my opinion that a POSA would understand the '212 Patent in

combination with Voswinckel JESC and Voswinckel JAHA to render obvious claim

2 of the '793 Patent.

### 3.    Dependent Claim 3

72.    I have reproduced dependent claim 3 below:

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|---|

40

Liquidia's Exhibit 1004
Page 43

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

73.     It is my opinion that the '212 Patent in combination with Voswinckel

JESC and Voswinckel JAHA also discloses the additional element of claim 3.

74.     Both the '212 Patent and Voswinckel JAHA disclose use of a pulsed

ultrasonic nebulizer to administer inhaled treprostinil.  The '212 Patent states that

"[o]ne preferred nebulizer is the AM-601 MEDICATOR AEROSOL DELIVERY

SYSTEM™."  Ex. 1006 ('212 Patent) at 5:33-35.  Additionally, Voswinckel JAHA

states that patients received inhaled treprostinil via a "pulsed OptiNeb® ultrasound

nebulizer."  Ex. 1008 (Voswinckel JAHA) at Methods; *see also* Ex. 1001 ('793

Patent) at 14:35-37 (referring to the Optineb® ultrasonic nebulizer as a "pulsed

ultrasonic nebulizer").  A POSA in May 2006 would understand that the references

disclose pulsed ultrasonic nebulizers.

75.     A POSA would have a reasonable expectation of success in delivering

15 to 90 micrograms of treprostinil in 1 to 3 breaths with a pulsed ultrasonic

nebulizer, because Voswinckel JAHA successfully delivered treprostinil in 3 breaths

using a pulsed ultrasonic nebulizer.

### 4.    Dependent Claim 4

76.     I have reproduced dependent claim 4 below:

| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
|---|---|

41

Liquidia's Exhibit 1004
Page 44

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

77.    It is my opinion that the '212 Patent in combination with Voswinckel

JESC and Voswinckel JAHA also discloses the additional element of claim 4.

78.    The '212 Patent discloses that an "inhaler" may be used to deliver the

treprostinil salt and specifies that "solid formulations, usually in the form of a

powder, may be inhaled in accordance with the present invention." Ex. 1006 ('212

Patent) at 5:30-39.    The '212 Patent also claims administering a dry powder

formulation for the treatment of pulmonary hypertension and, accordingly, a POSA

would understand that a dry powder inhaler would be used. *See id*. at claim 9.  As

such, a POSA would understand the '212 Patent to disclose the use of a dry powder

inhaler to deliver the "powder" treprostinil formulation.[8]

79.    A POSA would have been motivated to use a dry powder inhaler to

deliver the treprostinil "powder" disclosed in the '212 Patent, because dry powder

inhalers offer numerous advantages.  Specifically, dry powder inhalers are breath-

actuated, require less coordination than conventional MDIs, do not contain harmful

chlorofluorocarbon propellants, and can be designed as either single-dose or multi-

dose inhalation devices.  Ex. 1038 (Atkins) at 1305; Ex. 1040 (Chew and Chan) at

---

[8] As I note in Paragraph 54 n.3, the '212 Patent's disclosure that one can use a
powder formulation of treprostinil is nearly identical to that of the '793 Patent's
disclosure of treprostinil powder formulations. *Compare* Ex. 1006 ('212 Patent) at
5:37-41, *with* Ex. 1001 ('793 Patent) at 7:22-26.

42

Liquidia's Exhibit 1004
Page 45

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

49; Ex. 1030 (Newman) at 58, 61-63; Ex. 1031 (Geller 2005) at 1316-17; Ex. 1039

(Frijlink and De Boer) at 81.

80.    And because dry powder inhalers were well-known and "widely

accepted" by May 2006 (*see* Ex. 1038 (Atkins) at 1311), a POSA would have had a

reasonable expectation of success that the "powder" disclosed and claimed in the

'212 Patent could be "inhaled" by a patient using a dry powder inhaler.  *See* Ex.

1019 (Stein) at 33 (Table 3 listing over 10 dry powder inhalers approved in U.S.

before 2006).

### 5.    Dependent Claim 5

81.    I have reproduced dependent claim 5 below:

| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
|---|---|

82.    It is my opinion that the '212 Patent in combination with Voswinckel

JESC and Voswinckel JAHA also discloses the additional element of claim 5.

83.    The '212 Patent discloses that the treprostinil solution can be

administered using an "inhaler."  Ex. 1006 ('212 Patent) at 5:30-32.  A POSA would

have understood that pressurized metered dose inhalers were one example of such

inhalers, because they were widely used by 2006.  *See above*, Paragraphs 25 and 36-

37 (from Relevant Technical Background).

43

Liquidia's Exhibit 1004
Page 46

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

84.    A POSA would have been motivated to use a pressurized metered dose inhaler as the "inhaler" disclosed in the '212 Patent, because they offer several advantages, including being "efficient" while being "inherently portable and very convenient to use." Ex. 1020 (Clark) at 379.  Since patient adherence was a known problem that could be eased by portability and convenience (*see above*, Paragraphs 24 and 40-42 (from Relevant Technical Background)), a POSA would have been motivated to develop such an inhaler.

85.    And a POSA would have had a reasonable expectation that the doses of treprostinil disclosed in the '212 Patent and Voswinckel JESC could be delivered in 1-3 breaths using a pressurized metered dose inhaler because they were readily available, well understood, and offered for "[n]early all major respiratory drugs." Ex. 1020 (Clark) at 379; *see also* Ex. 1019 (Stein) at 29 (Table 1 listing over 20 CFC-pressurized metered dose inhalers approved in the U.S. by 1997), 32 (Table 2 listing 6 HFA-pressurized metered dose inhalers before 2006).

### 6.    Dependent Claim 6

86.    I have reproduced dependent claim 6 below:

| 6 | The method of claim 4, wherein the formulation is a powder. |
|---|---|

87.    It is my opinion that the '212 Patent in combination with Voswinckel JESC and Voswinckel JAHA also discloses the additional element of claim 6.

Liquidia's Exhibit 1004
Page 47

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

88.    The '212 Patent discloses and claims inhalation of a "powder" treprostinil formulation.  Ex. 1006 ('212 Patent) at 5:37-39 ("Alternatively, solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention."), claim 9 ("The method of claim 6, wherein said [treprostinil] is inhaled in powder form . . . .").  For the reasons stated above (*see* ¶ 79, above), a POSA would have been motivated to deliver the "powder" formulation disclosed in the '212 Patent with a reasonable expectation of success.

### 7.    Dependent Claim 7

89.    I have reproduced dependent claim 7 below:

| 7 | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
|---|---|

90.    As mentioned above, the '212 Patent discloses a "powder" formulation of treprostinil that is "inhaled" and contains particles that are "more preferably, less than 5 micrometers in diameter."  Ex. 1006 ('212 Patent) at 5:39-41; *see also* above at Paragraph 34 (from Relevant Technical Background).

### 8.    Dependent Claim 8

91.    I have reproduced dependent claim 8 below:

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

45

Liquidia's Exhibit 1004
Page 48

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

92.    The '212 Patent discloses administration of treprostinil containing no

metacresol because it contains no disclosure requiring the presence of metacresol in

the described formulation. *See generally* Ex. 1006 ('212 Patent). Indeed, the use of

preservatives in inhalation products was strongly discouraged by 2006. Ex. 1070

(Beasley) at 137-38 ("On the basis of current knowledge, it can be recommended

that nebulizer solutions be formulated preservative free and made available in sterile

unit-dose vials . . . ."). Additionally, the FDA-approval of preservative-free

tobramycin (Tobi®) for inhalation in 1998 was well publicized and replaced the off-

label inhalation of preservative-containing tobramycin intended for injection. *See*

*generally* Ex. 1071 (Prober) at 1, 3. And significantly, the label of then-approved

iloprost (Ventavis®), an inhaled prostacyclin, specifically stated that the product

contained "no preservatives." Ex. 1029 (Ventavis® Label) at Description.

93.    Moreover, the '212 Patent describes a "more preferred" formulation

that contains no metacresol. *See* Ex. 1006 ('212 Patent) at 5:25-29. Specifically,

the patent states, "[a] more preferred solution is prepared by mixing 0.125 grams of

UT-15, 1.25 grams hydrous sodium citrate, 0.125 grams of anhydrous citric acid,

0.05 grams of sodium hydroxide, and approximately 250 ml of water for injection."

*Id*. Additionally, the '212 Patent discloses steps of preparing a treprostinil inhalation

solution that does not include metacresol. *Id*. at 8:39-44 ("Inhalation solutions were

Liquidia's Exhibit 1004
Page 49

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

prepared by combining 1.25 grams of Sodium Citrate (Hydrous), 0.125 Citric Acid

(Anhydrous), 0.05 grams of Sodium Hydroxide (NF/BP), 0.125 grams of UT-15,

and approximately 250 ml of Water for Injection according to the following steps.").

Accordingly, a POSA would know from the '212 Patent that treprostinil

formulations containing no metacresol could be administered by inhalation, and

were actually "more preferred," in May 2006.

94.    Additionally, Voswinckel JAHA discloses administration of a

treprostinil solution containing no metacresol.   Specifically, Voswinckel JAHA

states that the subjects received a "preservative free solution of inhaled TRE."   Ex.

1008 (Voswinckel JAHA) at Methods.   Because metacresol was a known

preservative in May 2006 (*see* Ex. 1001 ('793 Patent) at 15:40-41), a POSA would

understand that the treprostinil solution described in Voswinckel JAHA contained

no metacresol.

> **B.     Ground 2: Claims 1–8 are Obvious over '212 Patent in Combination with Voswinckel JESC**
>
> **1.     Independent Claim 1**

95.    I understand that Dr. Hill opines that the '212 Patent in combination

with Voswinckel JESC renders obvious the claim elements of independent claim 1

as of May 2006.

Liquidia's Exhibit 1004
Page 50

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

### 2.    Dependent Claims 2-8

96.    I have reproduced dependent claims 2-8 below:

| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
|---|---|
| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
| 6 | The method of claim 4, wherein the formulation is a powder. |
| 7 | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 | The method of claim 1, wherein the formulation contains no metacresol. |

97.    For the reasons I described in Paragraphs 64-74 and 76-93 for Ground

1 above, the additional limitations of claims 2-8 are disclosed in the '212 Patent and

Voswinckel JESC.[9]

---

[9] To the extent Paragraphs 64-74 and 76-93 of Ground 1 also rely on Voswinckel JAHA, I am not relying on the Voswinckel JAHA reference in support of my opinions regarding Ground 2 and claims 2-8. Paragraphs 64-74 and 76-93 of Ground 1 set forth my opinions as to why the '212 Patent and Voswinckel JESC, either alone or in combination, render claims 2-8 obvious.

48

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

### C.     Ground 4: Claims 1, 3, and 8 are Rendered Obvious by Voswinckel JAHA in Combination with Ghofrani

#### 1.     Independent Claim 1

98.     I understand that Dr. Hill opines that Voswinckel JAHA in combination with Ghofrani renders obvious the claim elements of independent claim 1.

#### 2.     Dependent Claim 3

99.     I have reproduced dependent claim 3 below:

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|---|

100.    It is my opinion that Voswinckel JAHA in combination with Ghofrani also discloses the additional element of claim 3.

101.    As mentioned above (*see* ¶¶   above), Voswinckel JAHA specifically discloses inhalation of a treprostinil solution using a "pulsed OptiNeb® ultrasonic nebulizer," which a POSA would understand to be a pulsed ultrasonic nebulizer in May 2006.  Ex. 1008 (Voswinckel JAHA) at Methods (disclosing use of a "pulsed OptiNeb® ultrasonic nebulizer").  Further, a POSA would have had a reasonable expectation of success in delivering 15-90 µg of treprostinil in 1-3 breaths with a pulsed ultrasonic nebulizer because Voswinckel JAHA successfully delivered treprostinil in 3 breaths.  *Id.*

#### 3.     Dependent Claim 8

102.    I have reproduced dependent claim 8 below:

Liquidia's Exhibit 1004
Page 52

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

103.   It is my opinion that Voswinckel JAHA in combination with Ghofrani also discloses the additional element of claim 8.

104.   As mentioned above (*see* Paragraphs 59 and 94 above), Voswinckel JAHA discloses inhalation of a treprostinil solution containing no metacresol.  Ex. 1008 (Voswinckel JAHA) at Methods (disclosing inhalation of a "preservative free solution of inhaled TRE"); *see also* Ex. 1001 ('793 Patent) at 15:40-41.  Thus, in my opinion, claim 8 would have been obvious to a POSA in light of Voswinckel JAHA in combination with Ghofrani.  Further, the already approved inhaled prostacyclin, iloprost (Ventavis®), was known to also use a preservative-free solution.  Ex. 1029 (Ventavis® Label) at Description.

**D.    Ground 5: Claims 1 and 3 Are Anticipated by Voswinckel 2006**

**1.    Independent Claim 1**

105.   I understand that Dr. Hill opines that Voswinckel 2006 anticipates all claim elements of independent claim 1.

**2.    Dependent Claim 3**

106.   I have reproduced dependent claim 3 below:

| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
|---|---|

Liquidia's Exhibit 1004
Page 53

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

107.    It is my opinion that Voswinckel 2006 also discloses the additional element of claim 3.

108.    Voswinckel 2006 discloses inhalation of treprostinil using a "modified OptiNeb ultrasonic inhalation device." Ex. 1009 (Voswinckel 2006) at Methods and Findings. A POSA would understand the Optineb® inhalation device disclosed in Voswinckel 2006 to be a pulsed ultrasonic nebulizer. Ex. 1001 ('793 Patent) at 14:35-37. The "pulsed" feature would also have been known to a POSA, because the first approved prostacyclin for inhalation, iloprost (Ventavis), was delivered using a pulsed nebulizer. *See* Ex. 1029 (Ventavis (iloprost) Label); Ex. 1026 (Denver and Dyche).

**E.    Ground 6: Claims 2 and 4-8 are Obvious Over Voswinckel 2006 in Combination with the '212 Patent**

109.    It is my opinion that claims 2 and 4 to 8 are rendered obvious as well by Voswinckel 2006 in combination with the '212 Patent.

**1.    Motivation to Combine With a Reasonable Expectation of Success**

110.    As I explained above in the "Summary of the Prior Art" section, both the '212 Patent and Voswinckel 2006 are directed to the use of inhaled treprostinil for the treatment of pulmonary hypertension. *See, e.g.,* Ex. 1006 ('212 Patent) at Abstract (disclosing "[a] method of delivering benzindene prostaglandins to a patient

51

Liquidia's Exhibit 1004
Page 54

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

by inhalation" for the treatment of "pulmonary hypertension"); *see also* Ex. 1009

(Voswinckel 2006) at 149 (titled "Inhaled Treprostinil for Treatment of Chronic

Pulmonary Arterial Hypertension").

111.    Voswinckel 2006 demonstrates the success of the '212 Patent's inhaled

treprostinil dosage and administration teachings on humans but is limited to one

form of inhalation delivery: via a nebulizer.

112.    Other forms of inhalation delivery were well-known by 2006, and each

form had various advantages that made it useful for different patients and scenarios.

*See, e.g.*, Ex. 1031 (Geller 2005) (titled, "Comparing Clinical Features of the

Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler").  A POSA would thus

have been motivated to apply the '212 Patent's teachings as to various forms of

inhalers and dry powders formulations, and could have done so (as explained above

in Paragraphs 64-93 and below in Paragraphs 115-30) while maintaining the 15

microgram in 3 breath dosage successfully used to treat PH in Voswinckel 2006.

Ex. 1009 (Voswinckel 2006) at Methods and Findings.

113.  Further, a POSA would have had a reasonable expectation of

successfully administering treprostinil with different inhalation devices as the '212

Patent specifically states treprostinil formulations according to the '212 Patent are

"[p]referably" delivered using a "nebulizer" or "inhaler" and that "solid

Liquidia's Exhibit 1004
Page 55

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

formulations, usually in the form of a powder, may be inhaled in accordance with

the present invention."  Ex. 1006 ('212 Patent) at 5:30-32, 37-39.

### 2.    Dependent Claim 2

114.    It is my opinion that Voswinckel 2006 in combination with the '212

Patent discloses the additional element of claim 2.  I have reproduced dependent

claim 2 below:

| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
|---|---|

115.    As I explained above in my Ground 1 opinion, a POSA would

understand and find it obvious to use a soft mist inhaler to deliver the treprostinil

"solution" disclosed in the '212 Patent by inhalation.  *See* ¶¶ 66-71, above.

116.    Further, a POSA would have found it obvious to deliver the "inhaled

treprostinil" described in Voswinckel 2006 with a soft mist inhaler like the "inhaler"

disclosed in the '212 Patent.  As explained in Paragraphs 39 and 68, soft mist inhalers

were known to offer numerous advantages, including the production of a soft mist

without the use of propellant in a "repeatable and consistent manner regardless of

ambient temperature (T = 15-30°C), pressure, or humidity."  Ex. 1069 (Zierenberg)

at 932.  Additionally, as explained above in Paragraphs 39 and 69-70, a POSA would

have had a reasonable expectation that the "inhaled treprostinil" could be delivered

using a soft mist inhaler because soft mist inhalers were known to be compatible

Liquidia's Exhibit 1004
Page 56

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

with aqueous and ethanol solutions and in a variety of ambient conditions. *See id*.

at 930; *see also* Ex. 1058 (Ziegler and Wachtel); Ex. 1060 (Pitcairn); Ex. 1061

(Dalby).

### 3.    Dependent Claim 4

117.    It is my opinion that Voswinckel 2006 in combination with the '212

Patent discloses the additional element of claim 4.  I have reproduced dependent

claim 4 below:

| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
|---|---|

118.    As I explained above in my Ground 1 opinion, a POSA would have

readily understood that the "inhaler" used to administer the "powder" disclosed in

the '212 Patent could be a dry powder inhaler.  *See* ¶¶ 78-80, above.

119.    Further, a POSA would have been motivated to deliver the "inhaled

treprostinil" described in Voswinckel 2006 using a dry powder inhaler because dry

powder inhalers offered numerous advantages.  As mentioned above in Paragraphs

36 and 79, dry powder inhalers are breath-actuated, require less coordination than

conventional MDIs, do not contain harmful chlorofluorocarbon propellants, and can

be designed as either single-dose or multi-dose inhalation devices.  Ex. 1038

(Atkins) at 1305; Ex. 1040 (Chew and Chan) at 49; Ex. 1030 (Newman) at 58, 61-

63; Ex. 1031 (Geller 2005) at 1316-17; Ex. 1039 (Frijlink and De Boer) at 81.  And

Liquidia's Exhibit 1004
Page 57

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

because dry powder inhalers were well-known and "widely accepted" by May 2006

(*see* Ex. 1038 (Atkins)), a POSA would have had a reasonable expectation of success

that the "inhaled treprostinil" described in Voswinckel 2006 could be delivered

using a dry powder inhaler. *See* Ex. 1019 (Stein) at 33 (Table 3 listing over 10 dry

powder inhalers approved in U.S. before 2006).

### 4.    Dependent Claim 5

120.    It is my opinion that the Voswinckel 2006 in combination with the '212

Patent discloses the additional element of claim 5.  I have reproduced dependent

claim 5 below:

| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
|---|---|

121.    As I explained above in my Ground 1 opinion, a POSA would have

found it obvious to use a pressurized metered dose inhaler as the "inhaler" disclosed

in the '212 Patent.  *See* ¶¶ 83-85, above.

122.    Further, a POSA would have been motivated to deliver the "inhaled

treprostinil" described in Voswinckel 2006 using a pressurized metered dose inhaler.

As mentioned above in Paragraphs 25, 36-37, and 83-85, pressurized metered dose

inhalers were known to be "efficient" while being "inherently portable and very

convenient to use" (Ex. 1020 (Clark) at 379), which would motivate a POSA to

deliver the "inhaled treprostinil" using a pressurized metered dose inhaler because

Liquidia's Exhibit 1004
Page 58

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

patient adherence was a known problem that could be eased by portability and

convenience (*see above*, Paragraphs 24 and 40-42 (from Relevant Technical

Background)).  And a POSA would have had a reasonable expectation that the

"inhaled treprostinil" disclosed in Voswinckel 2006 could be delivered using a

pressurized metered dose inhaler because they were readily available, well

understood, and offered for "[n]early all major respiratory drugs."  Ex. 1020 (Clark)

at 379; *see also* Ex. 1019 (Stein) at 29 (Table 1 listing over 20 CFC-pressurized

metered dose inhalers approved in the U.S. by 1997), 32 (Table 2 listing 6 HFA-

pressurized metered dose inhalers before 2006).

### 5.    Dependent Claim 6

123.    It is my opinion that Voswinckel 2006 in combination with the '212

Patent discloses the additional element of claim 6.  I have reproduced dependent

claim 6 below:

| 6 | The method of claim 1, wherein the formulation is a powder. |
|---|---|

124.    As I explained above in my Ground 1 opinion, using a powder

formulation would have been obvious to a POSA in May 2006 because the '212

Patent discloses and claims the inhalation of a "powder" treprostinil formulation.

*See* ¶ 54, above; Ex. 1006 ('212 Patent) at 5:37-39 ("Alternatively, solid

formulations, usually in the form of a powder, may be inhaled in accordance with

Liquidia's Exhibit 1004
Page 59

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

the present invention."), claim 9 ("The method of claim 6, wherein said [treprostinil]

is inhaled in powder form . . . .").

125.    Further, because powder formulations were known to be more

chemically stable and easily inhaled (using a dry powder inhaler), a POSA would

have been motivated to use a powder treprostinil formulation instead of the

treprostinil solution disclosed in Voswinckel 2006.  *See* Ex. 1039 (Frijlink and De

Boer) at 81.  Considering the '212 Patent discloses use of a powder formulation and

that formulation of powders was well-understood in May 2006, a POSA would have

had a reasonable expectation of success in converting treprostinil for the treatment

of pulmonary arterial hypertension disclosed in Voswinckel 2006 into a powder

formulation of treprostinil (or its salt) suitable for inhalation.  *See* Ex. 1040 (Chew

and Chan) at 51-53.

### 6.    Dependent Claim 7

126.    It is my opinion that Voswinckel 2006 in combination with the '212

Patent discloses the additional element of claim 7.  I have reproduced dependent

claim 7 below:

| 7 | The method of claim 1, wherein the powder comprises particles less than 5 micrometers in diameter. |
|---|---|

127.    As I explained above in my Ground 1 opinion, formulating a powder

comprising particles less than 5 μm in diameter would have been obvious to a POSA

Liquidia's Exhibit 1004
Page 60

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

in May 2006 because, as the '212 Patent discloses, particles are "more preferably, less than 5 micrometers in diameter." *See* ¶ 54, above; Ex. 1006 ('212 Patent) at 5:39-41.

128.    Further, a POSA would have been motivated to formulate a powder comprising particles less than 5 micrometers from the "inhaled treprostinil" described in Voswinckel 2006 because it was generally known that "inhaler devices should deliver particles smaller than approximately 5 μm in diameter in order to enter the lungs." Ex. 1030 (Newman) at 58. And a POSA would have had a reasonable expectation of success that the "inhaled treprostinil" could be formulated as a powder comprising particles less than 5 micrometers in light of the '212 Patent's disclosure of a "powder" treprostinil formulation comprising particles less than 5 micrometers. *See* Ex. 1006 ('212 Patent) at 5:39-41.

### 7.    Dependent Claim 8

129.    It is my opinion that Voswinckel 2006 in combination with the '212 Patent discloses the additional element of claim 8. I have reproduced dependent claim 8 below:

| 8 | The method of claim 1, wherein the formulation contains no metacresol. |
|---|---|

130.    As I explained above in my Ground 1 opinion, using a formulation that contains no metacresol would have been obvious in May 2006 because the '212

Liquidia's Exhibit 1004
Page 61

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Patent discloses a "more preferred solution" that contains no metacresol. *See* ¶¶ 52-53, above; Ex. 1006 ('212 Patent) at 5:22-29 (disclosing a solution that contains metacresol and a "more preferred solution" that does not); 8:39-44 (disclosing steps of formulating treprostinil inhalation solution that do not include metacresol).

131. Further, a POSA would have been motivated to deliver the "inhaled treprostinil" without the preservative metacresol because Voswinckel 2006 does not disclose the presence of a preservative in the inhaled formulation, and preservatives were recommended to be excluded from inhaled formulations at that time. *See, e.g.*, Ex. 1070 (Beasley) at 137-38 ("On the basis of current knowledge, it can be recommended that nebulizer solutions be formulated preservative free and made available in sterile unit-dose vials . . . ."). Further, a POSA would have had a reasonable expectation of success in delivering a preservative-free "inhaled treprostinil," as disclosed in Voswinckel 2006, because inhaled and preservative-free therapies were known to be safe and effective as of May 2006. *See generally* Ex. 1071 (Prober) at 1, 3. For example, the then-approved inhaled prostacyclin, iloprost (Ventavis®), was known to use a preservative-free solution. Ex. 1029 (Ventavis® Label) at Description.

Liquidia's Exhibit 1004

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

## VIII. NO SECONDARY CONSIDERATIONS OF NON-OBVIOUSNESS

132.    In addition to the above grounds, I was asked by counsel to consider a

POSA's perspective on the following secondary considerations of non-obviousness:

whether the '793 Patent claims unexpected results, addresses a long-felt but unmet

need, or has been copied.

133.    First, that inhaled treprostinil was safe and effective at the 15-90

microgram dosage range claimed by the '793 Patent was not an unexpected result

by 2006.  The fact was disclosed multiple times over by the prior art I discussed

above.  *See, e.g.*, Exs. 1007 to 1010 (Voswinckel JESC, Voswinckel JAHA 2004,

Voswinckel 2006, and Ghofrani).  Thus, a POSA would have entirely expected

success in administering 15 to 90 micrograms of treprostinil in 1 to 3 breaths as of

May 2006.

134.    Second, a POSA would not have understood that the '793 Patent claims

met a long-felt need for a "treatment for pulmonary hypertension that can be

administered using a compact inhalation device."  Ex. 1001 ('793 Patent) at 2:60-

62.  As I explained in discussing dependent claims 2 to 7 of the '793 Patent above,

a POSA would have known that pulmonary hypertension treatment with compact

inhalation devices, like a soft mist inhaler or a dry powder inhaler, could be achieved

in a smaller number of breaths using a higher concentration of the drug.  The safety,

Liquidia's Exhibit 1004
Page 63

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

tolerability, and efficacy of such formulations was tested in patients (see Exs. 1006

to 1010 ('212 Patent, Voswinckel JESC, Voswinckel JAHA, Voswinckel 2006,

Ghofrani)) and the means to deliver the medication in these more convenient formats

was known.  *See* Paragraphs 21-42 and 67-94 above for discussion in Relevant

Technical Background, and Ground 1, Dependent Claims 2 to 7.

135.   Patent Owner UTC developed one practicing method of administering

inhaled treprostinil: via a nebulizer.  Ex. 1043 (Tyvaso® Label).  But as Dr. Hill

explains, many doctors still prefer and prescribe treprostinil for the previously

approved forms of delivery: intravenous and subcutaneous administration.  Ex. 1002

(Hill Decl.) at ¶¶ 189-90.  So, it's not clear that there was "long-felt" need for a

"compact inhalation device."

136.   Further, as to the other forms of claimed devices that also meet this

allegedly "long-felt need," Patent Owner UTC simply patented them without

producing a product for the market.  Indeed, Patent Owner UTC collaborated with

Aradigm Corporation (for which I was a Board member and Chair of the Scientific

Advisory Board), on the delivery of inhaled treprostinil with a soft mist inhaler—a

program and technology that was publicly disclosed in 2005.  Ex. 1057 (Aradigm

2005 Press Release).  However, Patent Owner gave up on this path and terminated

the agreement (*see* Ex. 1073 (Aradigm August 2009 10-Q) at 12), pursuing non-

61

Liquidia's Exhibit 1004
Page 64

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

inhaled routes like oral delivery and minor advancements in its nebulizer instead.

*See, e.g.*, Ex. 1074 (Orenitram[®] Label); Ex. 1075 (UT-Eli Lilly Tadalafil Licensing

Agreement Press Release); Ex. 1076 (Tyvaso[®] FDA Approval Press Release).

137.    In sum, it is not clear that there was a long-felt need for "compact

inhalation device" for treprostinil delivery; to the extent any such need existed: there

was public knowledge about how to meet the need for more convenient inhalation

delivery of treprostinil prior to May 15, 2006; Tyvaso[®] was approved by the FDA

as one, useful in certain circumstances, for that need; and Liquidia (not UTC) was

the company that took the steps to meet this need with dry powder formulations and

inhalers.

138.    Third, a POSA would not consider Petitioner's product "copying,"

because Patent Owner UTC never developed a dry powder formulation or inhaler.

Further, considering the '793 Patent issued *after* Petitioner developed LIQ861 and

submitted its NDA, a skilled artisan would not consider Petitioner's product a

"copy" of the '793 Patent's alleged invention. *Compare* Ex. 1001 ('793 Patent) at 1

(issue date July 21, 2020), *with* Exs. 1042 (announcing LIQ861 NDA Submission

on January 27, 2020) and 1049 (announcing FDA acceptance of LIQ861 NDA on

April 8, 2020).

Liquidia's Exhibit 1004
Page 65

Declaration of Igor Gonda in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

## IX.  CONCLUSION

139.   In signing this Declaration, I recognize that the Declaration will be filed as evidence in a contested case before the Patent Trial and Appeal Board of the U.S. Patent and Trademark Office.  I also recognize that I may be subject to cross-examination in this proceeding.  If required, I will appear for cross-examination at the appropriate time.  I reserve the right to offer opinions relevant to the invalidity of the '793 Patent claims at issue and/or offer testimony in support of this Declaration.

140.   I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001.

Dated: January 7, 2021                              Respectfully submitted,

                                                    *Igor Gonda*

                                                    Igor Gonda, Ph.D.

63

Liquidia's Exhibit 1004
Page 66



US006521212B1

(12) **United States Patent**        (10) **Patent No.:**        **US 6,521,212 B1**

Cloutier et al.        (45) **Date of Patent:**        *Feb. 18, 2003

(54) **METHOD FOR TREATING PERIPHERAL VASCULAR DISEASE BY ADMINISTERING BENZINDENE PROSTAGLANDINS BY INHALATION**

(75) Inventors: **Gilles Cloutier; James Crow; Michael Wade**, all of Chapel Hill, NC (US); **Richard E. Parker**, Spring Hill; **James E. Loyd**, Nashville, both of TN (US)

(73) Assignee: **United Therapeutics Corporation**, Silver Spring, MD (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/525,471**

(22) Filed: **Mar. 15, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/124,999, filed on Mar. 18, 1999, and provisional application No. 60/124,999, filed on Mar. 18, 1999.

(51) **Int. Cl.**[7] ........................... **A61K 9/12**; A61K 31/19

(52) **U.S. Cl.** ........................... **424/45**; 424/46; 424/489; 514/573; 514/571

(58) **Field of Search** ........................... 424/45, 46, 489; 514/573, 571

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,306,075 A    12/1981 Aristoff

5,153,222 A    10/1992 Tadepalli et al.
6,054,486 A  *  4/2000 Crow et al.

FOREIGN PATENT DOCUMENTS

EP        0 159 784 A    10/1985

OTHER PUBLICATIONS

W. M. Zapol et al., Pulmonary Circulation During ARDS, "Pulmonary Circulation During Adult Respiratory Distress Syndrome," pp. 241–273 (1985).

W. W. Fox et al., Pediatrics, "Pulmonary Hypertension in the Perinatal Aspiration Syndromes," vol. 59, No. 2, pp. 205–211 (1977).

A. R. Dworetz et al. Pediatrics, "Survival of Infants With Persistent Pulmonary Hypertension Without Extracorporeal Membrane Oxygenation," vol. 84, No. 1, pp. 1–6 (1989).

G. J. Peckham et al., The Journal of Pediatrics, "Physiologic factors affecting pulmonary artery pressure in infants with persistent pulmonary hypertension," vol. 93, No. 6, pp. 1005–1010 (1978).

R. C. Wetzel, Anesthesiology, "Aerosolized Prostacyclin," vol. 82, No. 6 (1995).

* cited by examiner

*Primary Examiner*—Jose' G. Dees
*Assistant Examiner*—M. Haghighatrai
(74) *Attorney, Agent, or Firm*—Foley & Lardner

(57) **ABSTRACT**

A method of delivering benzindene prostaglandins to a patient by inhalation is discussed. A benzindene prostaglandin known as UT-15 has unexpectedly superior results when administered by inhalation compared to parenterally administered UT-15 in sheep with induced pulmonary hypertension.

**12 Claims, 18 Drawing Sheets**



U.S. Patent

Feb. 18, 2003

Sheet 1 of 18

US 6,521,212 B1



FIG. 1

Liquidia's Exhibit 1006
Page 2

U.S. Patent

Feb. 18, 2003

Sheet 2 of 18

US 6,521,212 B1



**FIG. 2**

Liquidia's Exhibit 1006
Page 3

U.S. Patent

Feb. 18, 2003

Sheet 3 of 18

US 6,521,212 B1



Liquidia's Exhibit 1006
Page 4



FIG. 4

U.S. Patent

Feb. 18, 2003

Sheet 4 of 18

US 6,521,212 B1

Liquidia's Exhibit 1006
Page 5

U.S. Patent

Feb. 18, 2003    Sheet 5 of 18    US 6,521,212 B1

# FIG. 5



Liquidia's Exhibit 1006
Page 6

U.S. Patent    Feb. 18, 2003    Sheet 6 of 18    US 6,521,212 B1



**FIG. 6**

Liquidia's Exhibit 1006
Page 7

U.S. Patent

Feb. 18, 2003

Sheet 7 of 18

US 6,521,212 B1

Liquidia's Exhibit 1006
Page 8



FIG. 7

U.S. Patent

Feb. 18, 2003

Sheet 8 of 18

US 6,521,212 B1



FIG. 8

● AEROSOL UT 15
○ INTRAVENOUS UT 15

CARDIAC OUTPUT (liters/min)

BASELINE    UT 15 250 (ng/kg/min)    UT 15 500 (ng/kg/min)    UT 15 1000 (ng/kg/min)

Liquidia's Exhibit 1006
Page 9

U.S. Patent

Feb. 18, 2003

Sheet 9 of 18

US 6,521,212 B1



FIG. 9

● AEROSOL UT 15
○ INTRAVENOUS UT 15

PULMONARY VASCULAR RESISTANCE ($cmH_2O*min*liters^{-1}$)

BASELINE    UT 15 250 (ng/kg/min)    UT 15 500 (ng/kg/min)    UT 15 1000 (ng/kg/min)

Liquidia's Exhibit 1006
Page 10

U.S. Patent

Feb. 18, 2003

Sheet 10 of 18

US 6,521,212 B1



FIG. 10

Liquidia's Exhibit 1006
Page 11

U.S. Patent

Feb. 18, 2003

Sheet 11 of 18

US 6,521,212 B1

Liquidia's Exhibit 1006
Page 12



**FIG. 11**

● AEROSOL UT 15
○ INTRAVENOUS UT 15

CENTRAL VENOUS PRESSURE (cm H$_2$O)

BASELINE    U44069    UT 15 250 (ng/kg/min)    UT 15 500 (ng/kg/min)    UT 15 1000 (ng/kg/min)

U.S. Patent

Feb. 18, 2003

Sheet 12 of 18

US 6,521,212 B1

Liquidia's Exhibit 1006
Page 13



FIG. 12

U.S. Patent    Feb. 18, 2003    Sheet 13 of 18    US 6,521,212 B1

# FIG. 13



Liquidia's Exhibit 1006
Page 14

U.S. Patent    Feb. 18, 2003    Sheet 14 of 18    US 6,521,212 B1



**FIG. 14**

Liquidia's Exhibit 1006
Page 15

U.S. Patent    Feb. 18, 2003    Sheet 15 of 18    US 6,521,212 B1

# FIG. 15



Liquidia's Exhibit 1006
Page 16

U.S. Patent    Feb. 18, 2003    Sheet 16 of 18    US 6,521,212 B1



**FIG. 16**

Liquidia's Exhibit 1006
Page 17

U.S. Patent

Feb. 18, 2003

Sheet 17 of 18

US 6,521,212 B1



FIG. 17

Liquidia's Exhibit 1006
Page 18

U.S. Patent

Feb. 18, 2003

Sheet 18 of 18

US 6,521,212 B1



FIG. 18

Liquidia's Exhibit 1006
Page 19

US 6,521,212 B1

1

# METHOD FOR TREATING PERIPHERAL VASCULAR DISEASE BY ADMINISTERING BENZINDENE PROSTAGLANDINS BY INHALATION

This application claims the benefit of provisional application Serial No. 60/124,999, filed Mar. 18, 1999.

## BACKGROUND OF THE INVENTION

Benzindene prostaglandins are now known to be useful to treat a variety of conditions. U.S. Pat. No. 5,153,222 describes the use of a preferred class of benzindene prostaglandins in the treatment of pulmonary hypertension, including both primary and secondary pulmonary hypertension. In particular, this patent discusses the use of the compound 9-deoxy-2′,9-alpha-methano-3-oxa-4,5,6-trinor-3,7-(1′,3′-interphenylene)-13,14-dihydro-prostaglandin F1 (also known as UT-15).

However, this patent does not specifically suggest the administration of such benzindene prostaglandins by inhalation or the surprising benefits that result from their delivery by inhalation.

U.S. Pat. No. 4,306,075 describes a large group of carbacyclin analogs, including, benzindene prostaglandins which produce various pharmacological responses, such as inhibition of platelet aggregation, reduction of gastric secretion, and bronchodilation. It is indicated that the compounds have useful application as anti-thrombotic agents, anti-ulcer agents, and anti-asthma agents. The patent does mention administration by inhalation. The patent specifically discloses the compound UT-15 in Example 33. However., this patent provides only limited biological data relating to the use of such compounds. At column 59, example 31, the patent discloses a compound that is structurally similar to that of example 33 (UT-15), but it is not the same compound. Example 31 discloses (column 59, lines 41–45) that "[t]he compounds [sic] 9-deoxy-2′, 9-methano-3-oxa4,5,6-trinor-3,7-(1′,3′-interphenylene)- PGF1, methyl ester, given to a rat orally at a dose of 1 mg/kg lowered blood pressure 44 mmHg. After 52 min the blood pressure was still lower 14 mm."

All blood is driven through the lungs via the pulmonary circulation in order, among other things, to replenish the oxygen which it dispenses in its passage around the rest of the body via the systemic circulation. The flow through both circulations is in normal circumstances equal, but the resistance offered to it in the pulmonary circulation is generally much less than that of the systemic circulation. When the resistance to pulmonary blood flow increases, the pressure in the circulation is greater for any particular flow. This is referred to as pulmonary hypertension. Generally, pulmonary hypertension is defined through observations of pressures above the normal range pertaining in the majority of people residing at the same altitude and engaged in similar activities.

Most often pulmonary hypertension is a manifestation of an obvious or explicable increase in resistance, such as obstruction to blood flow by pulmonary emboli, malfunction of the heart's valves or muscle in handling blood after its passage through the lungs, diminution in pulmonary vessel caliber as a reflex response to hypoventilation and low oxygenation, or a mismatch of vascular capacity and essential blood flow, such as shunting of blood in congenital abnormalities or surgical removal of lung tissue. Such pulmonary hypertension is referred to as secondary hypertension.

2

There remain some cases of pulmonary hypertension where the cause of the increased resistance is as yet inexplicable. They are described as primary pulmonary hypertension (PPH) and are diagnosed by and after exclusion of the causes of secondary pulmonary hypertension. Despite the possibility of a varied etiology, cases of primary pulmonary hypertension tend to comprise a recognizable entity. Approximately 65% are female and young adults are most commonly afflicted, though it has occurred in children and patients over 50. Life expectancy from the time of diagnosis is short, about 3 to 5 years, though occasional reports of spontaneous remission and longer survival are to be expected given the nature of the diagnostic process. Generally, however, progress is inexorable via syncope and right heart failure and death is quite often sudden.

Pulmonary hypertension refers to a condition associated with an elevation of pulmonary arterial pressure (PAP) over normal levels. In humans, a typical mean PAP is approximately 12–15 mm Hg. Pulmonary hypertension, on the other hand, is sometimes marked by PAP increases by at least 5 to 10 mm Hg over normal levels. PAP readings as high as 50 to 100 mm Hg over normal levels have been reported. When the PAP markedly increases, plasma can escape from the capillaries into the lung interstitium and alveoli. Fluid buildup in the lung (pulmonary edema) can result, with an associated decrease in lung function that can in some cases be fatal.

Pulmonary hypertension may either be acute or chronic. Acute pulmonary hypertension is often a potentially reversible phenomenon generally attributable to constriction of the smooth muscle of the pulmonary blood vessels, which may be triggered by such conditions as hypoxia (as in high-altitude sickness), acidosis, inflammation, or pulmonary embolism. Chronic pulmonary hypertension is characterized by major structural changes in the pulmonary vasculature, which result in a decreased cross-sectional area of the pulmonary blood vessels. This may be caused by, for example, chronic hypoxia, thromboembolism, or unknown causes (idiopathic or primary pulmonary hypertension).

Pulmonary hypertension has been implicated in several life-threatening clinical conditions, such as adult respiratory distress syndrome ("ARDS") and persistent pulmonary hypertension of the newborn ("PPHN"). Zapol et al., Acute Respiratory Failure, p. 241–273, Marcel Dekker, New York (1985); Peckham, J. Ped. 93:1005 (1978). PPHN, a disorder that primarily affects full-term infants, is characterized by elevated pulmonary vascular resistance, pulmonary arterial hypertension, and right-to-left shunting of blood through the patent ductus arteriosus and foramen ovale of the newborn's heart. Mortality rates range from 12–50%. Fox, Pediatrics 59:205 (1977); Dworetz, Pediatrics 84:1 (1989). Pulmonary hypertension may also result in a potentially fatal heart condition known as "cor pulmonale", or pulmonary heart disease. Fishman, "Pulmonary Diseases and Disorders" 2nd Ed., McGraw-Hill, New York (1988).

The treatment of pulmonary hypertension by the parenteral administration of certain prostaglandin endoperoxides, such as prostacyclin (also known as flolan), is also known and is the subject of U.S. Pat. No. 4,883,812. Prostacyclin has been administered by inhalation and is used to treat pulmonary hypertension by inhalation. Anesthesiology, vol. 82, no. 6, pp. 1315–1317.

## SUMMARY OF THE INVENTION

This invention relates to the administration of a therapeutically effective amount of a benzindene prostaglandin to a

Liquidia's Exhibit 1006
Page 20

3

mammal in need thereof by inhalation. More particularly, the invention relates to a method of treating pulmonary hypertension by administering an effective amount of a benzindene prostaglandin to a mammal in need thereof by inhalation.

Inhalation of benzindene prostaglandins provides unexpectedly superior results compared to parenteral administration of benzindene prostaglandins.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a graph of pulmonary vascular resistance (cmH$_2$O*min/liter) intravenously induced by U44069 over time (min).

FIG. 2 describes the effects of a high dose of UT15, given as an aerosol, on the hemodynamic variables of the sheep. Specifically, FIG. 2 depicts the effects of the aerosolized UT15 administered to the sheep intravenously induced with U44069 on systemic arterial pressure (PSA or PSYS); on pulmonary arterial pressure (PPA); and pulmonary vascular resistance (PVR), respectively.

FIG. 3 is the dose-response effect of intravenously infused UT15 and aerosolized UT15 on the heart rate during baseline conditions.

FIG. 4 is the dose-response effect of intravenously infused UT15 and aerosolized UT15 on the systemic arterial pressure during baseline conditions.

FIG. 5 is the dose-response effect of intravenously infused UT15 and aerosolized UT15 on the central venous pressure during baseline conditions.

FIG. 6 is the dose-response effect of intravenously infused UT15 and aerosolized UT15 on the pulmonary arterial pressure during baseline conditions.

FIG. 7 is the dose-response effect of intravenously infused UT15 and aerosolized UT15 on the left atrial pressure during baseline conditions.

FIG. 8 is the dose-response effect of intravenously infused UT15 and aerosolized UT15 on cardiac output during baseline conditions.

FIG. 9 is the dose-response effect of intravenously infused UT15 and aerosolized UT15 on pulmonary vascular resistance during baseline conditions.

FIG. 10 is the dose-response effect on the heart rate of intravenously infused UT15 and aerosolized UT15 during intravenously infused U44069.

FIG. 11 is the dose-response effect of intravenously infused and aerosolized UT15 on central venous pressure during intravenously infused U44069.

FIG. 12 is the dose-response effect of intravenously infused and aerosolized UT15 on systemic arterial pressure during intravenously infused U44069.

FIG. 13 is the dose-response effect of intravenously infused and aerosolized UT15 on pulmonary arterial pressure during intravenously infused U44069.

FIG. 14 is the dose-response effect of intravenously infused and aerosolized UT15 on left atrial pressure during intravenously infused U44069.

FIG. 15 is the dose-response effect of intravenously infused and aerosolized UT15 on cardiac output during intravenously infused U44069.

FIG. 16 is the dose-response effect of intravenously infused and aerosolized Ut15 on pulmonary vascular resistance during intravenously infused U44069.

FIG. 17 is the dose-response effect of intravenously infused and aerosolized UT15 on pulmonary vascular driving pressure (PPA minus PLA) during baseline-conditions.

4

FIG. 18 is the dose-response effect of intravenously infused and aerosolized UT15 on pulmonary vascular driving pressure (PPA-PLA) during intravenously infused U44069.

## DETAILED DESCRIPTION OF THE INVENTION

Unless otherwise specified, all references to "a" or "an" mean at least one.

One embodiment of the present invention is a method of delivering a benzindene prostaglandin or a pharmaceutically acceptable salt or ester thereof to a mammal in need thereof by inhalation.

A preferred group of benzindene prostaglandins for delivery by inhalation according to the present invention is as follows:



(I)

wherein a is an integer of from 1 to 3; X and Y, which may be the same or different, are selected from —O— and —CH$_2$—; R is —(CH$_2$)$_8$—R$^1$ wherein R$^1$ is hydrogen or methyl, or R is cyclohexyl, or R is —CH(CH$_3$)CH$_2$C≡CCH$_3$; and the dotted line represents an optional double bond; or a physiologically acceptable salt or acid derivative thereof.

The most preferred benzindene prostaglandin is UT-15, which is 9-deoxy-2', 9-alpha-methano-3-oxa-4,5,6-trinor-3, 7-(1',3'-interphenylene)-13,14-dihydro-prostaglandin F1.

"Inhalation" delivery in the context of this invention refers to the delivery of the active ingredient or combination of active ingredients through a respiratory passage, wherein the mammal in need of the active ingredient(s) inhales the active ingredient(s) through the mammal's airways, such as the nose or mouth.

Active ingredients, which are aerosolized, atomized, and/or nebulized for delivery by inhalation according to the present invention include liquid formulations comprising a benzindene prostaglandin, such as UT-15, alone or in combination with other active ingredients described below. UT-15 may be used as a free acid or in the form of a pharmaceutically acceptable salt or ester or other acid derivative. In addition, sustained release formulations comprising UT-15 may be used, including PEGylated forms and/or protein-conjugated forms of UT-15.

The term "acid derivative" is used herein to describe C$_1$–C$_4$ alkyl esters and amides, including amides wherein the nitrogen is optionally substituted by one or two C$_1$–C$_4$ alkyl groups.

The invention also includes bioprecursors or "pro-drugs" of UT-15, that is, compounds which are converted in vivo to UT-15 or its pharmaceutically active derivatives thereof.

Further aspects of the present invention are concerned with the use of UT-15, or a pharmaceutically acceptable salt or acid derivative thereof, in the manufacture of a medicament for the treatment of peripheral vascular disease

Liquidia's Exhibit 1006
Page 21

US 6,521,212 B1

5

The present invention extends to non-physiologically acceptable salts of UT-15 which may be used in the preparation of the pharmacologically active compounds of the invention. The physiologically acceptable salts of UT-15 include salts derived from bases.

Base salts include ammonium salts, alkali metal salts such as those of sodium and potassium, alkaline earth metal salts such as those of calcium and magnesium, salts with organic bases such as dicyclohexylamine and N-methyl-D-glucamine, and salts with amino acids such as arginine and lysine.

Quaternary ammonium salts can be formed, for example, by reaction with lower alkyl halides, such as methyl, ethyl, propyl, and butyl chlorides, bromides, and iodides, with dialkyl sulphates, with long chain halides, such as decyl, lauryl, myristyl, and stearyl chlorides, bromides, and iodides, and with aralkyl halides, such as benzyl and phenethyl bromides.

Optionally, one or more pharmaceutically acceptable carriers or excipients may be included in the formulation to be aerosolized, atomized, or nebulized according to the invention.

A preferred solution for administration by inhalation with a nebulizer includes a sterile solution of UT-15 comprising UT-15, sodium citrate, citric acid, sodium hydroxide, sodium chloride, and meta-cresol. A more preferred solution is prepared by mixing 0.125 grams UT-15, 1.25 grams hydrous sodium citrate, 0.125 grams of anhydrous citric acid, 0.05 grams of sodium hydroxide, and approximately 250 ml of water for injection.

Preferably, a nebulizer, inhaler, atomizer or aerosolizer is used which forms droplets from a solution or liquid containing the active ingredient(s). The droplets are preferably less than 10 micrometers in diameter. One preferred nebulizer is the AM-601 MEDICATOR AEROSOL DELIVERY SYSTEM™ (a nebulizer manufactured by Healthline Medical in Baldwin Park, Calif.).

Alternatively, solid formulations, usually in the form of a powder, may be inhaled in accordance with the present invention. In such case, the particles are preferably less than 10 micrometers in diameter, and more preferably, less than 5 micrometers in diameter.

This invention further relates to delivering a benzindene prostaglandin and/or its salts or esters by inhalation for applications where inhalation delivery is appropriate for the treatment of that particular condition. Benzindene prostaglandins, including UT-15 and its salts or esters, have been shown to be useful for multiple applications. For example, UT-15 has been shown to exhibit a potent anti-aggregatory action on blood platelets, and therefore has a particular utility in mammals as an anti-thrombotic agent. Further known uses of UT-15 include treatment of peripheral vascular disease (covered in co-pending application Serial No. 09/190,450, now U.S. Pat. No. 6,054,486, the entire contents of which are incorporated by reference herein). In the case of treating peripheral vascular disease by inhalation of a benzindene prostaglandin of the present invention, the dosage for inhalation, taking into account that some of the active ingredient is breathed out and not taken into the bloodstream, should be sufficient to deliver an amount that is equivalent to a daily infusion dose in the range of 25 $\mu$g to 250 mg; typically from 0.5 tg to 2.5 mg, preferably from 7 $\mu$g to 285 $\mu$g, per day per kilogram bodyweight. For example, an intravenous dose in the range 0.5 $\mu$g to 1.5 mg per kilogram bodyweight per day may conveniently be administered as an infusion of from 0.5 ng to 1.0 $\mu$g per kilogram bodyweight per minute. A preferred dosage is 10 ng/kg/min.

6

Benzindene prostaglandins, including UT-15 and its salts or esters, may also be administered according to the present invention by inhalation to reduce and control excessive gastric secretion, thereby reducing or avoiding gastrointestinal ulcer formation, and accelerating the healing of ulcers and lesions already present in the gastrointestinal tract. In addition, benzidene prostaglandins may also be administered according to the present invention by inhalation to treat congestive heart failure, to reduce inflammation and/or pulmonary hypertension associated with lung transplants[,].

Benzindene prostaglandins, including UT-15 and its salts or esters, further exhibit vasodilatory action on blood vessels and therefore have a particular utility as anti-hypertensives for the treatment of high blood pressure in mammals, including man. Use as an anti-hypertensive (or hypotensive agent) may be accomplished by administering a pharmaceutical composition containing a benzindene prostaglandin, including UT-15.

Benzindene prostaglandins, including UT-15, may be used according to the present invention by inhalation to treat any condition where it is desired to reduce blood pressure, inhibit platelet aggregation, to reduce the adhesive character of platelets, and/or to treat or prevent the formation of thrombi in mammals, including man. For example, they may be used in the treatment and prevention of myocardial infarcts and in the treatment of peripheral vascular disease, to treat and prevent post-operative thrombosis, to promote patency of vascular grafts following surgery, and to treat complications of arteriosclerosis and conditions such as atherosclerosis, blood clotting defects due to lipemia, and other clinical conditions in which the underlying etiology is associated with lipid imbalance or hyperlipidemia. Moreover, benzidene prostaglandins, including UT-15 and its salts or esters, have a further utility in the promotion of wound healing in mammals, including man.

Benzindene prostaglandins, including UT-15 and its salts or esters, may also be used as additives to blood, blood products, blood substitutes, and other fluids, which are used in artificial extra-corporeal circulation and perfusion of isolated body portions, e.g., limbs and organs, whether attached to the original body, detached and being preserved or prepared for transplant, or attached to a new body. During these circulations and perfusions, aggregated platelets tend to block the blood vessels and portions of the circulation apparatus. This blocking is avoided by the presence of UT-15. For this purpose, UT-15 or its salts or esters may be introduced by inhalation until it reaches a level in the circulating blood, the blood of the donor animal, or the blood of the perfused body portion, or to two or all of those equivalent to a steady state dose of 0.001 micrograms to 10 micrograms, per liter of circulating fluid. Another embodiment is to use UT-15 in laboratory animals, e.g., cats, dogs, rabbits, monkeys and rats, for these purposes in order to develop new methods and techniques for organ and limb transplants.

In accordance with the present invention, a benzindene prostaglandin is delivered by inhalation to a patient in need thereof in a "therapeutically effective amount". A "therapeutically effective amount" refers to that amount that has therapeutic effects on the condition intended to be treated or prevented. For example, an "antihypertensive effective amount" refers to that amount in which the effects from pulmonary hypertension, and particularly, pulmonary arterial pressure (PAP), are reduced towards a normal level relative to hypertensive levels, or maintained at normal levels. The precise amount that is considered effective for a particular therapeutic purpose will, of course, depend upon

Liquidia's Exhibit 1006
Page 22

US 6,521,212 B1

7

the specific circumstances of the patient being treated and the magnitude of effect desired by the patient's doctor. Titration to effect may be used to determine proper dosage.

Such formulations, both for veterinary and for human medical use, of the present invention comprise the active ingredient, a benzindene prostaglandin or salt or ester thereof, together with one or more pharmacologically acceptable carriers therefore and optionally other therapeutic ingredients. The carrier(s) must be "acceptable" in the sense of being compatible with the other ingredients of the formulation and not deleterious to the recipient thereof.

Furthermore, the formulations may conveniently be presented in unit dosage form and may be prepared by any of the methods well known in the art of pharmacy. All methods include the step of bringing into association the active ingredient with the carrier which constitutes one or more pharmacologically acceptable accessory ingredients.

The invention further relates to a method of treating pulmonary hypertension by inhalation of a benzindene prostaglandin. "Pulmonary hypertension" refers to both acute and chronic hypertension, including primary pulmonary hypertension and secondary pulmonary hypertension, and is associated with an elevated pulmonary arterial pressure over normal levels.

The efficacy of benzindene prostaglandins, such as UT-15, for treating pulmonary hypertension can be assessed by determining the hemodynamics associated with pulmonary hypertension. In particular, measurements of pulmonary arterial pressure (PPA), left atrial pressure (PLA), central venous pressure (PCV), systemic arterial pressure (PSYS), heart rate (HR), and cardiac output (CO) are useful in determining the effects of benzindene prostaglandins delivered by inhalation or parenterally.

Although pulmonary arterial pressure can be directly measured and is often used to quantify pulmonary arterial hypertension, PPA can be affected by 3 other variables: Co, PLA and PVR, as indicated by Equation 1:

$$PPA = (CO*PVR) + PLA \qquad (1)$$

As can be seen from Equation 1, PPA can be elevated by increases in PLA (e.g., left heart failure, mitral valve stenosis, mitral valve regurgitation), increases in CO (e.g., low hematocrit, peripheral vasodilation, left to right shunt, etc.), and by increases in PVR (decreased pulmonary vascular surface area, decreased pulmonary vascular radii, pulmonary vascular obstructions, etc.).

On the other hand, PVR can not be directly measured and must be calculated by the following Equation 2:

$$PVR = (PPA - PLA)/CO \qquad (2)$$

PVR is a better index of pulmonary arterial hypertension (PAH), since interventions used to treat PAH are best if they only affect PVR and have no or little effect on CO and PLA.

Heart rate was determined by measuring the time (seconds) required for 25 heart beats to occur ($t_{25}$) as indicated by the pulsations on the blood flow meter; the beats per minute (BPM) were calculated by the following equation:

$$BPM = (25 \text{ beats}/t_{25})*60 \text{ seconds}$$

All pressure may be monitored by commercially available transducers, such as Model 1290A HEWLETT PACKARD™ transducer (Andover, Me.), which is attached to VALIDYNE CD19A Carrier Dmod. Amplifiers (Northridge, Calif.). Cardiac output may be measured by a Transonic Systems T101 Ultrasonic Bloodflow. Meter (Ithaca, N.Y.).

8

The pressure and blood flow signals may be recorded on ASTROMED MT-9500 Stripchart Recorder (West Warwick, R.I.) and digitally recorded with a personal-computer using Easy Data Acquisition Software (Nashville, Tenn.).

It has been discovered that aerosolized UT-15 has both greater potency and efficacy relative to attenuating chemically induced pulmonary hypertension as shown by an increase in pulmonary vascular resistance. Furthermore, aerosolized UT-15 has a greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10–50%) of the dosage delivered intravascularly. While the mechanism(s) that accounts for the greater potency and efficacy for aerosolized UT-15 is unknown, it can be hypothesized that a low "first-pass" uptake via intravenous infusion of UT-15 could be at least partially responsible. A low first-pass uptake would thus allow the majority of the drug to be made available to the peripheral circulation (including the coronary circulation), which would increase the heart rate and cardiac output.

Aerosolized UT-15 has no apparent peripheral effects, such as on the heart rate or cardiac output, as compared to intravascular UT-15 during pulmonary vascular hypertension by chemical inducement. This is particularly beneficial for those patients that are near right heart failure and where peripheral vasodilation would exacerbate the challenge to the right heart. On the other hand, if cardiac output is compromised due to right heart failure, then aerosolized prostaglandin would decrease PVR and could allow cardiac output to increase while allowing lowering the load upon the right heart.

The following examples are provided by way of an illustration of the present invention and should in no way be construed as constituting a limitation thereof.

EXAMPLES

Example I

Animal Model

Inhalation solutions were prepared by combining 1.25 grams of Sodium Citrate (Hydrous), 0.125 Citric Acid (Anhydrous), 0.05 grams of Sodium Hydroxide (NF/BP), 0.125 grams of UT-15, and approximately 250 ml of Water for Injection according to the following steps.

1. Measured approximately 210 ml of water into a sterile siliconized glass beaker with a magnetic stir bar
2. Added sodium citrate. Mixed until dissolved.
3. Added citric acid to Step 2 solution. Mixed until dissolved.
4. Measured 12.5 ml of water into sterile plastic tube. Added sodium hydroxide. Mixed until dissolved.
5. Added UT15 to Step 4 solution. Mixed by hand until dissolved.
6. Added the Step 5 solution to Step 3 solution and mixed.
7. pH was adjusted using hydrochloric acid and/or sodium hydroxide solutions to a value of 7.3
8. Final solution was filtered using sterile microfilter into another sterile beaker, then 5 ml of solution was aliquoted to sterile stoppered blood test tubes.
9. Solutions were double boxed and put in −4 degrees Celsius freezer.
10. Placebo solution made up as described above except UT-15 not added and quantities adjusted to make only 50 ml. Working solution was made by adding sterile saline to dilute the UT15 stock solution or placebo to the desired amount (depending on dose desired, weight

Liquidia's Exhibit 1006
Page 23

| 9 | 10 |

of sheep, and duration of aerosolizing). This solution was then added to the nebulizer in volumes not exceeding 5 ml until entire amount was used.

For a 35 kg sheep at a UT-15 dose of 250 ng per kg per minute for 30 minutes, the calculations used were, Calculations: $250 \times 35 \times 30 = 262,500$ ng of UT-15 or 262.5 micrograms of UT-15. The nebulization rate was 0.28 ml per minute, thus 8.4 ml of solution was needed containing 262.5 micrograms of UT-15. However, an amount of solution is needed for the "void" volume (volume always left in the nebulizer). Thus a volume of 9 ml containing a total of 281.25 micrograms of UT-15 (or 0.5625 ml of the stock solution) was made up.

0.5625 ml of UT-15 was measured and added to 8.4375 ml of sterile saline. This was nebulized over exactly 30 minutes.

Sheep were used as the animal model of choice for these experiments for a number of reasons. First is the docile nature of sheep. They will stand quietly in metabolic cages without having to utilize tranquilizing drugs, which have the potential to complicate experimental results. Second, sheep are large enough to allow direct measurement of CO, PPA, PLA, PCV, and PSYS. Sheep are also large enough to allow direct aerosolization of substances into the lung via tracheoestomy thereby preventing swallowing of drugs and thus eliminating a possible secondary route of administration of UT-15. Third, sheep can tolerate a great amount of instrumentation with little or no discomfort. Fourth, sheep have been utilized for several years as an animal model of pulmonary arterial hypertension and thus, there is a great amount of historical data with which to compare the results.

The agent chosen to induce pulmonary arterial hypertension was a PGH2 analog, U44069 (9,11-dideoxy,9α,11α-epoxymethanoprostaglandin $F_{2\alpha}$). The reasons for using U44069 are that it is a very potent pulmonary vasoconstrictor, its characteristics are very similar to endogenously formed thromboxane A2, and it can be titrated to induce the desired degree of pulmonary vasoconstriction. U44069 was mixed with sterile normal saline immediately prior to being used and was protected from light by wrapping the solution with aluminum foil. The concentration of U44069 was adjusted such that a minimal flow rate of 0.8 ml per min was being infused into the sheep. This was done because more concentrated U44069 would have to be infused at very low rates and often causes "pulses" of U44069 due to the infusion characteristics of roller pumps. The U44069 pulses cause vasoconstriction "spikes" and thus would create induce a non-steady-state.

Surgical Procedures

Six yearling sheep (3 males, 3 females; 21–37 kg) were fasted 18–24 hours and initially anesthetized with a short acting barbiturate (thiopental) to allow intubation of the sheep. Halothane gas anesthesia (1.5–2.5%) was then used for the surgical procedures. Via a left thoracotomy, a Transonic blood flow probe was placed around the main pulmonary artery, silastic catheters placed in the main pulmonary artery and left atrium. After approximately 7 days the sheep were reanesthetized and the left carotid artery cannulated, a Cordis Introducer Sheath inserted in the left jugular vein, and a tracheotomy made. The sheep were allowed to recover for another 3–5 days prior to experimentation. These sheep were used to allow measurement of pulmonary arterial pressure (PPA), left atrial pressure (PLA), central venous pressure (PCV), systemic arterial pressure (PSYS), heart rate (HR), and cardiac output (CO) after baseline measurements were made for a minimum of 30 minutes.

Example II

EFFECTS OF PROLONGED U44069 INTRAVENOUS INFUSION ON PULMONARY VASCULAR RESISTANCE

In four sheep, the ability of U44069 to maintain a steady-state increase in PVR was determined. After a 30 minute baseline, U44069 was infused at a rate of 1 microgram per kg of body weight per minute for 180 minutes. As can be seen by FIG. 1, the increase in PVR induced by intravenously induced U44069 is very stable over 3 hours. (In the figures, all data are given as mean ±SEM. "*" indicates significantly different from corresponding intravenously infusion UT-15 delivery rate. "#" indicates significantly different from corresponding baseline value. "&" indicates significantly different from corresponding U44069 value.) Statistical analysis was also tested using multiple paired t-tests, which are not as rigorous as One-way ANOVA/Dunnett's test. In particular, FIG. 1 illustrates that intravenously infused U44069 causes PVR to reach a steady-state increase by 30 minutes and that the steady-state increase lasts for a minimum of 180 minutes. U44069 caused significant alterations in other variables (data not shown) over the 180 minute infusion period relative to their baseline values: PPA increased, HR decreased, CO decreased. PSYS increased above baseline values, however, the differences were not statistically different except at 120, 150 and 180 minutes during U44069 infusion. PCV also increased during U44069 infusion, however, the increases were only significant at 30 and 60 minutes. PLA did not significantly change at any of the time points investigated.

Since all of the U44069 time values were different from baseline yet none were different from each other as determined by the paired t-tests, this would argue strongly that there were no differences at any of the time points during U44069 infusion. These data would indicate that any alterations in PVR by UT-15 is due to the effects of UT-15 and not complicated by waning of the vasoconstrictor response.

Example III

EFFECTS OF AEROSOLIZED UT-15 GIVEN AT HIGH DOSES ON BASELINE HEMODYNAMICS

Baseline measurements consisted of 30 minutes of monitoring during vehicle/saline aerosolization (0.28 ml/min). After baseline measurements, the vehicle/saline solution in the aerosol delivery system was replaced with the stock UT-15 solution (500 ng/ml) and was aerosolized at 0.28 ml/min for 90 minutes.

FIG. 2 depicts the only statistically altered variables observed after 90 minutes of high dose aerosolized UT-15 (3800–5700 ng per kg per min). PSYS decreased by 7.5%, PPA decreased by approximately 18%, and PVR decreased by approximately 19% relative to their respective baseline values.

These data are important in that this would indicate that, unlike intravenously infused UT-15, aerosolized UT-15 can be given in high doses without significant non-lung effects, i.e., heart rate, cardiac output. The aerosol delivery of UT-15 for these experiments is approximately 15–27 times that of the effective minimal tested dose of 250 ng per kg per min shown in FIG. 16.

Example IV

CONTROL INTRAVENOUS UT-15 AND CONTROL AEROSOLIZED UT-15 DOSE RESPONSE EFFECTS ON BASELINE HEMODYNAMICS

Two separate experiments were conducted to determine the dose response effects of intravenously infused UT-15 on baseline hemodynamics and aerosolized UT-15 on baseline

Liquidia's Exhibit 1006
Page 24

US 6,521,212 B1

11

hemodynamics. For the infusion experimental protocol, after a 30 minute baseline was established, UT-15 was infused intravenously at 3 rates (250, 500 and 1000 ng per kg per min). In three sheep, the infusion rates lasted for 30 minutes each, and for the other three sheep, the infusions were for 60 minutes each.

The aerosolized UT-15 protocol involved establishing a 30 minute baseline, then administering aerosolized UT-15 via a tracheostromy at rates of 250, 500 and 1000 microgram per kg of body weight per min and at an aerosolization rate of 0.28 ml/min. Again, three sheep were aerosolized for 30 minutes and the other three sheep were aerosolized for 60 minutes.

No differences were found between 30 minute and 60 minute UT-15 delivery at each of the 3 rates of administration. FIG. **3** shows the dose-response of intravenously infused and aerosolized UT-15 on heart rate. Heart rate significantly increased during intravenous administration of UT-15 at 250, 500 and 1000 ng per kg per min. Aerosolized UT15 had no effect on heart rate. There was a significant difference between aerosolized and intravenously infused UT-15 at each of the 3 rates of administration.

FIG. **4** shows that both aerosolized and intravenous UT-15 had no significant effect on PSYS at any of the administration rates used.

The effects of UT-15 on PCV are depicted by FIG. **5**. There were no statistical difference at any dose relative to its baseline value nor between intravenous and aerosol administered UT-15 at any respective dose. The same effects were also observed for PPA as indicated by FIG. **6**, although there was a general trend for PPA to decrease when UT-15 was aerosolized.

Interestingly, while neither intravenous nor aerosolized UT-15 caused PLA to significantly change from their respective baselines (although the mean values increased during aerosol delivery and decreased for intravenous delivery), there were significant differences between aerosolized and intravenous administered UT-15 at each of the delivery rates. See FIG. **7**.

FIG. **8** depicts the effects on CO: no significant changes were observed for any delivery rate relative to the respective baseline values nor were any significant changes observed between the two modes of drug delivery.

FIG. **9** represents the overall effect of aerosolized and intravenously infused UT-15 on the pulmonary circulation, PVR. Intravenous UT-15 had no significant effect on PVR whereas aerosolized UT-15 did cause a significant decrease at all 3 delivery rates.

The decrease in PVR for aerosolized UT-15 at 250, 500, and 100 ng per kg per min is attributable to the small increase in PLA and small decrease in PPA. While neither of these variables were significantly different from the baseline values, the combinations (i.e., PPA minus PLA, used in Equation 2) were significant, as depicted in FIG. **17**. Intravascularly infused UT-15 had no effect on PVR yet did have significant effects on heart rates. The statistical analysis of these data were done using rigorous two-way ANOVA and Student-Newman-Keuls tests, thus any statistical differences can be accepted with confidence.

## Example V

### CONSTRICTED INTRAVENOUS AND AEROSOLIZED UT-15 DOSE RESPONSE

Two separate experiments were conducted to determine the dose response effects of intravenously infused UT-15 and

12

aerosolized UT-15 during U44069 induced pulmonary hypertension. After a 30 minute baseline was established, U44069 was infused intravenously at a rate of 1 ng per kg per min. For the intravenous administration of UT-15 and after allowing the sheep to achieve a steady-state for 30–60 minutes, a dose-response to intravenous UT-15 was similar to that set forth in Example IV. For the aerosolized administration of UT-15 and after allowing the sheep to achieve a steady-state for 30–60 minutes, a dose-response to intravenous UT-15 was similar to that set forth in Example IV. In each experimental protocol, UT-15 was administered to three sheep for 30 minutes and to the other three sheep for 60 minutes.

No differences were found between 30 minute and 60 minute UT-15 delivery at each of the three rates of administration. The effects of U44069 and the subsequent dose-response effects of UT-15 during U44069 infusion on heart rate are shown in FIG. **10**. Intravenous UT-15 caused heart rate to increase above the values during U44069 conditions, whereas aerosolized UT-15 had no effect on heart rate. In particular, for intravenous UT-15, the heart rate was significantly different relative to the baseline only at a delivery rate of 1000 ng per kg per min, whereas both 500 and 1000 ng per kg per min intravenous delivery of UT-15 were statistically different from the U44069 values. Both 500 and 1000 ng per kg per min aerosol delivery rates were different from their corresponding intravenous infusion delivery rates.

Data for central venous pressure are shown by FIG. **11**. Some differences were noted for central venous pressure for intravenous UT-15, in that, at 500 and 1000 ng per kg per min delivery rates the values were different from the U44069 values. Only the 500 ng per kg per min aerosol value was different from the corresponding intravenous UT-15 infusion value.

There were no statistical differences for the systemic arterial pressure for these series of experiments (FIG. 12). Pulmonary arterial pressure responses are illustrated by FIG. **13**. U44069 significantly increased PPA relative baseline and all 3 delivery rates for significantly greater for aerosolized UT-15 for all 3 rates of drug delivery relative to intravenous delivery. In fact, for aerosolized UT 15 at 500 and 1000 ng per kg per min PPA was back to normal values.

U44069 did not alter left atrial pressure significantly. However, intravenously infused UT-15 caused a significant decrease from the U44069 value at all three delivery rates and were different from the baseline values at 500 and 1000 ng per kg per min. All three aerosol delivery rates were increased above baseline, while 250 and 500 ng per kg per min were increased above the U44069 values. As can be seen from FIG. **14**, all three aerosol delivery rate effects were different from the intravenously infused delivery rates.

The most dramatic effects for UT-15 by either mode of administration were on cardiac output and the "lung variables." U44069 caused cardiac output to decrease from the baseline as depicted in FIG. **15**. Aerosol UT-15 had no effect on cardiac output. Intravenous UT-15 caused a dose-response increase in cardiac output, which was significant at 500 and 100 ng per kg per min. At 1000 ng per kg per min, aerosolized UT-15 delivery was significantly different from the intravenously infused UT-15.

FIG. **16** graphically demonstrates the overall effects of intravenous and aerosol delivery of UT-15 on pulmonary vascular resistance during U44069. It shows that pulmonary vascular resistance, while being significantly attenuated by both intravascularly infused and aerosolized UT-15, was more affected by aerosolized UT-15. In particular, U44069

Liquidia's Exhibit 1006
Page 25

US 6,521,212 B1

13

caused a dramatic increase in PVR, which was significantly attenuated at 500 and 1000 ng per kg per min for intravenously infused UT-15. Aerosolized UT-15 caused PVR to decrease such that there was no significant difference for any of the three delivery rates relative to the baseline PVR. Interestingly, the time at which intravenous and aerosol UT-15 began to attenuate the increase in PVR were very similarly (4–5 minutes), whereas the off response for aerosolized UT-15 was much longer than intravenous UT-15 (43 vs. 12 minutes).

FIG. **18** shows that although intravascular UT-15 caused PPA to decrease significantly from the UT44069 value, this decrease matched by a decrease in PLA. Therefore, the pulmonary vascular driving pressure (PPA-PLA) was unchanged.

While the invention has been described in detail and with reference to specific embodiments thereof, it will be apparent to one skilled in the art that various changes and modifications can be made therein without departing from the spirit and scope of the invention.

All references cited herein are incorporated by reference to the same extent as if each was incorporated by reference individually.

What is claimed is:

**1**. A method of treating peripheral vascular disease comprising administering to a mammal in need thereof by inhalation a formulation comprising a therapeutically effective amount of a benzindene prostaglandin.

**2**. The method of claim **1**, wherein said benzindene prostaglandin is inhaled in an aerosolized form.

14

**3**. The method of claim **2**, wherein said benzindene prostaglandin is UT-15.

**4**. The method of claim **3**, wherein said aerosolized form comprises droplets less than 10 micrometers in diameter, said droplets comprising said UT-15 in a suitable pharmacologically-acceptable liquid carrier.

**5**. The method of claim **1**, wherein the mammal is a human.

**6**. A method for treating pulmonary hypertension in a mammal comprising delivering to said mammal an effective amount of UT-15 or its pharmaceutically acceptable salt or ester by inhalation.

**7**. The method of claim **6**, wherein said UT-15 is inhaled in an aerosolized form.

**8**. The method of claim **7**, wherein said aerosolized form comprises droplets less than 10 micrometers in diameter, said droplets comprising said compound in a suitable pharmacologically-acceptable liquid carrier.

**9**. The method of claim **6**, wherein said UT-15 is inhaled in powder form comprising particles less than 10 micrometers in diameter.

**10**. The method of claim **1**, wherein the formulation comprises a sustained release form of a benzindene prostalandn.

**11**. The method of claim **6**, wherein said UT-15 is a sustained release form.

**12**. The method of claim **1**, wherein said aerosolized administration of benzindene prostaglandin has no effect on heart rate.

* * * * *

Liquidia's Exhibit 1006
Page 26

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 6,521,212 B1                                    Page 1 of 1
APPLICATION NO. : 09/525471
DATED               : February 18, 2003
INVENTOR(S)       : Gilles Cloutier et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 14, claim 8, line 17, "said compound" should be --said UT-15--.

Signed and Sealed this

Twelfth Day of January, 2010

David J. Kappos
*Director of the United States Patent and Trademark Office*



Volume 25   Abstract Supplement   August/September 2004   ISSN 0195-668X

UNIVERSITY OF IOWA
3 1858 050 525 850

**EUROPEAN SOCIETY OF CARDIOLOGY**

# European Heart Journal

Journal of the European Society of Cardiology

ESC Congress 2004
28 August – 1 September
Munich, Germany

Editor-in-Chief: Frans Van de Werf

Deputy Editors: Stefan Janssens
Frank Rademakers

ELSEVIER

Liquidia's Exhibit 1007
Page 1

*European Heart Journal* (2004) **25** *(Abstract Supplement), xi–xvi*

# Contents

*Programme number (P = poster)*      *Page*

**Abstract Selection** .................................................................................................. iii

**Abstract Review Committee** ....................................................................................... vii

**Abstracts** ............................................................................................................ 1

**Day 2 — Sunday 29 August 2004**

| | | |
|---|---|---|
| 117–122 | Trends and risk factors in cardiovascular disease | 3 |
| 123–128 | Risk factors management in prevention | 4 |
| 129–134 | Predictive factors in dilated cardiomyopathy | 6 |
| 135–140 | New applications of strain and strain rate imaging | 7 |
| 149–154 | From mice to men: lessons in myocardial protection and hypertrophy | 9 |
| 155–160 | Impact of non surgical treatment and physiological stress on the GUCH-heart | 10 |
| 161–166 | Vascular growth and collateral vessels: opportunities and drawbacks | 12 |
| 176–181 | Drug eluting stent in complex lesion subsets | 13 |
| 182–187 | Gene variants in hypertension, coronary artery disease and dilated cardiomyopathy | 15 |
| 188–193 | Markers of severity in hypertrophic cardiomyopathy | 16 |
| 199–204 | How to perfect coronary artery bypass grafting? | 18 |
| 209–214 | Intravascular ultrasound and plaque characterisation | 19 |
| 215–220 | Epidemiology and treatment of pulmonary arterial hypertension | 21 |
| 221–226 | Revisiting the electrocardiogram and electrophysiologic markers of arrhythmic events | 22 |
| 229–234 | Nursing aspects of acute cardiac care | 24 |
| 244–249 | Follow-up in the pacemaker and implantable cardioverter-defibrillator Era: old and new issues | 25 |
| 250–255 | Threatening complications with sophisticated devices | 27 |
| 256–261 | New risk markers of sudden death after acute myocardial infarction | 28 |
| 275–280 | Inotropic intervention: new mechanisms | 30 |
| 281–286 | Muscle wasting and cachexia in heart failure: ready for intervention | 31 |
| 304–309 | Percutaneous coronary intervention and beyond for ST-elevation acute myocardial infarction | 33 |
| 310–315 | IIb or not to be in acute myocardial infarction? | 34 |
| P356–P361 | Moderated e-Posters I: Cardiac dysfunction: new insights | 36 |
| P362–P377 | Atherosclerosis I – Basic Science | 37 |
| P378–P384 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 41 |
| P385–P386 | Computers in cardiology | 43 |
| P387–P401 | Echocardiography/Doppler | 44 |
| P402–P417 | Atherosclerosis I – Basic Science | 48 |
| P418–P424 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology. | 52 |
| P425 | Computers in cardiology | 53 |
| P426–P441 | Echocardiography/Doppler | 54 |
| P442–P449 | Moderated Poster session I: Arterial hypertension | 58 |
| P450–P466 | Atrial fibrillation | 60 |
| P467–P498 | Mechanisms of arrhythmias | 64 |
| P499–P540 | Heart failure: clinical aspects | 71 |
| P541–P558 | Pulmonary circulation | 81 |
| P559–P606 | Thrombosis | 86 |
| P607–P623 | Coronary plaque imaging | 98 |
| P624–P652 | Endothelial function | 102 |
| P653–P682 | Myocardial disease | 109 |
| 683–686 | Computed tomography: Imaging of coronary arteries | 116 |
| 688–691 | Young Investigators' Award Session – Basic Science | 117 |
| 693–696 | Young Investigators' Award Session – Thrombosis | 118 |
| 698–701 | Young Investigators' Award Session – Population Sciences | 119 |
| 703–706 | Young Investigators' Award Session – Clinical Science | 120 |
| 729–734 | New prevention strategies | 121 |
| 735–740 | Women, men and cardiovascular disease | 123 |
| 741–746 | Multiple uses of myocardial deformation assessment by echocardiography | 124 |

Liquidia's Exhibit 1007
Page 2

| 747–752 | Communication in vascular smooth muscle cells | 126 |
| 767–772 | Oxidative stress and the endothelium | 127 |
| 794–799 | Improving risk stratification by nuclear cardiology | 129 |
| 817–822 | Pathophysiological aspects of resynchronisation therapy | 130 |
| 823–828 | Determinants and prevention of post myocardial infarction left ventricular remodelling | 132 |
| 831–836 | Ablation of atrial fibrillation: from source to success | 133 |
| 846–851 | Heart failure with preserved systolic function: whats new? | 135 |
| 852–857 | Diagnosis and evaluation of heart failure – still a challenge in the everyday clinical practice | 136 |
| 876–880 | Novel therapeutic strategies in chronic stable angina | 138 |
| 913–918 | Dilated cardiomyopathy or viral myocarditis? | 139 |
| P955–P960 | Moderated e-Posters II: Brugada syndrome | 141 |
| P961–P976 | Atherosclerosis II – Basic Science | 142 |
| P977–P983 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 146 |
| P984–P985 | Computers in cardiology | 147 |
| P986–P1000 | Echocardiography/Doppler | 148 |
| P1001–P1016 | Atherosclerosis II – Basic Science | 152 |
| P1017–P1023 | Nuclear cardiology/magnetic resonance imaging and cardiac radiology | 156 |
| P1024–P1025 | Computers in cardiology | 157 |
| P1026–P1039 | Echocardiography/Doppler | 158 |
| P1040–P1047 | Moderated Poster session II: Exercise testing | 161 |
| P1048–P1076 | Implantable cardioverter-defibrillator therapy | 163 |
| P1077–P1096 | Ventricular tachycardia | 170 |
| P1097–P1148 | Heart failure: experimental aspects and risk of inflammation | 175 |
| P1149–P1196 | Ischaemia basic aspects | 188 |
| P1197–P1225 | Non-coronary interventions | 199 |
| P1226–P1254 | Hypertension | 206 |
| P1255–P1276 | Valve surgery | 213 |
| 1277–1280 | Aortic interventions | 218 |

**Day 3 — Monday 30 August 2004**

| 1300–1305 | Endothelial function, oxidative stress and nitric oxide | 223 |
| 1306–1310 | Gene expression, contractile function and hypertrophy | 224 |
| 1312–1317 | Physical fitness: correlations and determinants | 225 |
| 1318–1323 | Percutaneous interventions in congenital heart disease | 227 |
| 1337–1342 | Myocardial perfusion during acute ischaemia: the added value of myocardial contrast echocardiography (MCE) | 228 |
| 1343–1348 | New aspects of endothelial function related to atherosclerosis | 230 |
| 1353–1358 | Markers and identification of the vulnerable plaque | 231 |
| 1369–1374 | Protection against ischaemia and ischaemia-reperfusion injury | 233 |
| 1375–1380 | Frequent unwanted companions: hypertension and hyperlipidaemia | 234 |
| 1381–1386 | New horizons in risk stratification of unstable coronary syndromes | 236 |
| 1399–1403 | Resistance to antiplatelet agents | 237 |
| 1405–1410 | Intensive treatment for diabetes: key to improved prognosis | 238 |
| 1411–1416 | Oral treatment in prevention of in-stent restenosis | 240 |
| 1425–1430 | Atrial fibrillation – clinical presentation risk factors and prognosis | 242 |
| 1458–1463 | Risk stratification tools in the prediction of coronary events | 243 |
| 1469–1474 | Statins in heart failure: friend or foe? | 244 |
| 1475–1480 | Betablockade: new aspects in chronic heart failure | 246 |
| 1496–1501 | Primary percutaneous coronary intervention – special issues | 248 |
| 1502–1507 | Evolving concepts in the management of aortic stenosis | 249 |
| 1512–1517 | Registries and guidelines in acute coronary syndromes | 251 |
| P1544–P1559 | Angiogenic and stem cell therapy – Basic Science | 252 |
| P1560–P1566 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 256 |
| P1567–P1568 | Computers in cardiology | 258 |
| P1569–P1583 | Echocardiography/Doppler | 258 |
| P1584–P1598 | Angiogenic and stem cell therapy – Basic Science | 262 |
| P1599–P1606 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 266 |
| P1607–P1608 | Computers in cardiology | 268 |
| P1609–P1623 | Echocardiography/Doppler | 268 |
| P1624–P1631 | Moderated Poster session III: Catheter ablation | 272 |
| P1632–P1665 | Catheter ablation | 274 |

Liquidia's Exhibit 1007
Page 3

| P1666–P1709 | Peptides and heart failure | 282 |
| P1710–P1766 | Acute coronary syndromes | 292 |
| P1767–P1811 | Percutaneous coronary intervention | 306 |
| P1812–P1826 | Nursing | 317 |
| P1827–P1844 | Exercise testing and rehabilitation | 321 |
| P1845–P1871 | Hypertension therapeutic aspects | 325 |
| 1872–1875 | Advanced cardiac imaging | 332 |
| 1929–1934 | Bio-markers of cardiovascular disease | 333 |
| 1935–1940 | Novel magnetic resonance techniques to assess coronary artery disease | 334 |
| 1941–1945 | Mechanisms underlying plaque instability | 336 |
| 1947–1952 | Hormones and cardiac function | 337 |
| 1961–1966 | Clinical and genetic aspects of arrhythmias | 339 |
| 1967–1972 | Recent advances in three-dimensional echocardiography | 340 |
| 1973–1978 | Ischaemia-reperfusion, slow flow and no reflow | 342 |
| 1989–1994 | Computer-based advances in cardiology | 343 |
| 1995–2000 | Vascular and myocardial damage and remodelling | 345 |
| 2001–2006 | Subclinical peripheral artery disease: a marker for severity of coronary artery disease | 346 |
| 2007–2012 | Stem cells in heart failure | 348 |
| 2026–2031 | Percutaneous interventions in unstable coronary syndromes | 349 |
| 2032–2037 | Neurally mediated syncope: a recurrent syndrome revisited | 351 |
| 2042–2047 | Novel pharmacological approaches for the treatment of atrial fibrillation | 352 |
| 2052–2057 | New developments in thrombolysis: fibrinolysis | 354 |
| 2087–2091 | A new era in the prognostic assessment of heart failure patients | 355 |
| 2097–2102 | New evidence for the beneficial effects of exercise training | 357 |
| 2107–2112 | Primary percutaneous coronary intervention in acute myocardial infarction | 358 |
| 2113–2117 | Many things to remember in CABG | 360 |
| 2119–2123 | Exercise testing in mitral valve disease | 361 |
| 2129–2134 | Drug eluting stents in diabetic patients | 362 |
| 2140–2145 | Bad and good habits | 364 |
| P2166–P2178 | Stress-induced myocardial damage and protective mechanisms – Basic Science | 365 |
| P2179–P2185 | Nuclear cardiology/MRI and cardiac radiology | 368 |
| P2186 | Computers in cardiology | 370 |
| P2187–P2201 | Echocardiography/Doppler | 370 |
| P2202–P2213 | Stress-induced myocardial damage and protective mechanisms | 374 |
| P2214–P2220 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 377 |
| P2221–P2222 | Computers in cardiology | 379 |
| P2223–P2237 | Echocardiography/Doppler | 379 |
| P2238–P2245 | Moderated Poster session IV: Inflammation and coronary artery disease | 383 |
| P2246–P2265 | Pacing | 385 |
| P2266–P2286 | Mechanisms of arrhythmias | 390 |
| P2287–P2341 | Resynchronisation therapy | 395 |
| P2342–P2409 | Acute myocardial infarction and reperfusion therapy | 408 |
| P2410–P2438 | Coronary circulation: functional evaluation | 425 |
| P2439–P2484 | Epidemiology | 432 |
| 2485–2488 | Databases and guidelines | 443 |

**Day 4 — Tuesday 31 August 2004**

| 2605–2609 | Congenital heart disease: secondary challenges after early "repair" | 447 |
| 2611–2616 | Experimental cell transplantation: preclinical and clinical developments | 448 |
| 2617–2622 | More fuel to inflammation | 449 |
| 2636–2641 | Chronic heart failure: new treatment options | 451 |
| 2642–2647 | Oral anticoagulation for atrial fibrillation – still unresolved | 452 |
| 2648–2653 | The diabetic vessel | 454 |
| 2667–2672 | Heart failure news from off the beaten track | 455 |
| 2673–2677 | Catheter ablation of ventricular tachycardia | 457 |
| 2709–2714 | Diabetes and the heart | 458 |
| 2725–2730 | Treatment and outcome of acute pulmonary embolism | 459 |
| 2768–2773 | Coronary artery disease and renal failure: prognostic aspects and prevention | 461 |
| 2774–2779 | Clopidogrel loading – 600 mg may be better | 462 |
| 2799–2804 | Mitral regurgitation: from prognosis to treatment | 464 |
| P2830–P2835 | Moderated e-Posters III: Drug therapy in cardiovascular disease | 465 |

| | | |
|---|---|---|
| P2836–P2851 | Endothelial function, vascular care and remodelling | 467 |
| P2852–P2858 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 471 |
| P2859 | Computers in cardiology | 472 |
| P2860–P2874 | Echocardiography/Doppler | 473 |
| P2875–P2887 | Ion channels and arrhythmias | 476 |
| P2888–P2894 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 479 |
| P2895–P2896 | Computers in cardiology | 481 |
| P2897–P2911 | Echocardiography/Doppler | 482 |
| P2912–P2919 | Moderated Poster session V: Trials in heart failure | 485 |
| P2920–P2950 | Atrial fibrillation | 488 |
| P2951–P2995 | Heart failure: clinical aspects | 495 |
| P2996–P3046 | Coronary artery disease in high-risk patients | 506 |
| P3047–P3079 | Restenosis and drug-eluting stents | 519 |
| P3080–P3123 | Risk factor | 527 |
| P3124–P3144 | Myocardial disease | 537 |
| 3145–3148 | Simulation and modelling | 543 |
| P3265–P3270 | Moderated e-Posters IV: Nurse-led interventions in patients with heart failure | 544 |
| P3271–P3284 | Cardiac hypertrophy and remodelling contractile function – Basic Science | 545 |
| P3285–P3291 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 548 |
| P3292–P3293 | Computers in cardiology | 550 |
| P3294–P3308 | Echocardiography/Doppler | 551 |
| P3309–P3323 | Cardiac hypertrophy and remodelling contractile function – Basic Science | 554 |
| P3324–P3330 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 558 |
| P3331–P3332 | Computers in cardiology | 560 |
| P3333–P3347 | Echocardiography/Doppler | 560 |
| P3348–P3354 | Moderated Poster session VI: In stent restenosis | 564 |
| P3355–P3374 | Electrocardiography | 566 |
| P3375–P3394 | Syncope | 571 |
| P3395–P3418 | Heart transplantation | 575 |
| P3419–P3444 | Heart failure – medical therapy | 581 |
| P3445–P3485 | Valvular disease | 588 |
| P3486–P3512 | Coronary artery disease: risk stratification and medical therapy | 597 |
| P3513–P3531 | Stroke | 604 |
| P3532–P3544 | Exercise testing and rehabilitation | 608 |
| P3545–P3577 | Grown-up and congenital heart disease | 611 |
| P3578–P3588 | Coronary artery bypass grafting | 620 |
| 3589–3592 | Databases | 622 |

**Day 5 — Wednesday 1 September 2004**

| | | |
|---|---|---|
| 3617–3622 | Pericarditis | 627 |
| 3627–3632 | Structure and function of cardiac ion channels | 628 |
| 3637–3642 | Lipid modulation in atherogenesis – beyond cholesterol | 630 |
| 3643–3648 | Pulse pressure, distensibility and cardiovascular risk | 631 |
| 3649–3654 | Fat, lean or active: all relevant for cardiovascular risk? | 633 |
| 3655–3660 | Conduction of the electrical impulse | 634 |
| 3661–3666 | Novel players in receptor-mediated signalling in cardiac myocytes | 636 |
| 3671–3676 | Nuclear cardiology – beyond the future | 637 |
| 3681–3686 | Challenges in aortic interventions | 638 |
| 3687–3692 | Stenting of supra-aortic extracranial arteries | 640 |
| 3693–3698 | New navigation and mapping techniques for targeting the arrhythmogenic substrate | 641 |
| 3703–3708 | Reducing thrombotic risk – old concepts, new therapies | 643 |
| 3713–3718 | Acute myocardial intervention and diabetes | 644 |
| 3723–3728 | Pacing mode and lead position: does it matter? | 646 |
| 3729–3734 | How important is abnormal respiration in heart failure? | 647 |
| 3735–3740 | New insights into native or repaired mitral valve dynamics | 649 |
| 3745–3750 | Renal dysfunction and anaemia – overlooked parts of the heart failure syndrome | 650 |
| 3751–3756 | Ablation of atrial fibrillation: new techniques | 652 |
| 3757–3762 | Management of acute heart failure | 653 |
| 3763–3768 | Multiple applications of cardiac computed tomography | 654 |
| 3778–3783 | Challenging issues after valve replacement | 656 |
| 3784–3789 | Clinical assessment of resynchronisation therapy | 658 |

3790–3795   Hypertension and heart failure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   660
3801–3806   Blood pressure reduction and cardiovascular risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   661
3811–3816   Heart economics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   663
3821–3826   Physical training and secondary prevention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   664
3827–3831   Percutaneous coronary interventions in diabetic patients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   666
3833–3838   Prognostic value of stress echocardiography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   667
3839–3843   Restenosis following bare stents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   669
3845–3850   Drug eluting stent to treat in-stent restenosis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   670

**Author Index** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   673

**Index of Topics** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   717

Liquidia's Exhibit 1007
Page 6