**[Vol. II, Appx1997 – Appx8034]**

**No. 2023-1805**

_____

# United States Court of Appeals for the Federal Circuit

_____

UNITED THERAPEUTICS CORPORATION,

*Appellant,*

– v. –

LIQUIDIA TECHNOLOGIES, INC.,

*Appellee.*

_____

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
IPR2021-00406

_____

**NON-CONFIDENTIAL JOINT APPENDIX**

_____

**COOLEY LLP**
Sanya Sukduang
Jonathan R. Davies
Brittany Cazakoff
1299 Pennsylvania Ave NW,
Suite 700
Washington, DC 20004
Tele: (202) 842-7800

*Counsel for Appellee*
Liquidia Technologies, Inc.

**MCDERMOTT WILL &  EMERY LLP**
Douglas H. Carsten
Arthur P. Dykhuis
18565 Jamboree Road, Suite 250
Irvine, CA 92612-2565
Tele: (949) 851-0633

Adam W. Burrowbridge
500 North Capitol Street, NW
Washington, DC 20001-1531
Tele:  (202) 756-8797

*Counsel for Appellant*
United Therapeutics Corporation

**UNITED THERAPEUTICS CORPORATION**
Shaun R. Snader
1735 Connecticut Ave. NW,
2nd Floor, Washington, DC 20009
Tele: (202) 304-1701

**GOODWIN PROCTER LLP**
William Jackson
1900 N St. NW, Washington, DC 20036
Tele: (202) 346-4216

*Additional Counsel for Appellant*
United Therapeutics Corporation

| Vol. I, Appx0001 – Appx1996 | | | |
|---|---|---|---|
| **Date** | **No.** | **Description** | **Appx. No.** |
| 07/19/2022 | 78 | Final Written Decision | Appx0001-Appx0049 |
| 02/02/2023 | 82 | Decision on Request for Rehearing | Appx0050-Appx0067 |
| | | Docket Sheet/Certified List | Appx0068-Appx0070 |
| | | | |
| 01/07/2021 | 2 | Liquidia IPR Petition | Appx0101 Appx0112-Appx0179 |
| 05/17/2021 | 13 | Patent Owner Preliminary Response | Appx0202, Appx0236-Appx0252 |
| 08/11/2021 | 18 | Decision Granting Institution of IPR | Appx0288, Appx0308-Appx0311 Appx0320-Appx0322 Appx0329-Appx0330 |
| 08/25/2021 | 20 | Patent Owner Objections to Evidence | Appx0343 Appx0347-Appx0348 |
| 11/10/2021 | 29 | Patent Owner Response | Appx0352-Appx0424 |
| 02/10/2022 | 44 | Liquidia Reply in Support of 793 IPR Petition | Appx0456 Appx0469-Appx0490 Appx0492 |
| 03/03/2022 | 50 | Order re Sur-Reply Evidence | Appx0536-Appx0542 |
| 03/16/2022 | 55 | Patent Owner Sur-Reply | Appx0548 Appx0560-Appx0585 |
| 06/22/2022 | 77 | Record of Oral Hearing | Appx0768 Appx0778-Appx0780 Appx0809-Appx0821 |
| 08/18/2022 | 79 | Patent Owner Request for Rehearing | Appx0862-Appx0880 |
| 08/22/2022 | 80 | Notification of Receipt of POP Request | Appx0881-Appx0883 |
| 10/26/2022 | 81 | Order Denying POP Request | Appx0884-Appx0888 |
| 04/05/2023 | 83 | Notice of Appeal | Appx0889-Appx0893 |

| 02/28/2022 | | Email from PTAB to Counsel re Request for Authorization to Submit Rebuttal Evidence with PO Sur-Reply | Appx0894-Appx0895 |
| 03/01/2022 | | Telephonic Conference Transcript | Appx0908-Appx0917 |

| Ex. | Description | Appx. No. |
| --- | --- | --- |
| 1001 | U.S. Patent No. 10,716,793 ("793 patent") | Appx1001-Appx1025 |
| 1002 | Declaration of Dr. Nicholas Hill | Appx1026-Appx1098 |
| 1004 | Declaration of Dr. Igor Gonda | Appx1131-Appx1196 |
| 1006 | U.S. Patent No. 6,521,212 B1 ("212 patent") | Appx1207-Appx1233 |
| 1007 | Voswinckel JESC | Appx1234-Appx1240 |
| 1008 | Voswinckel JAHA | Appx1241-Appx1243 |
| 1010 | Ghofrani | Appx1250-Appx1265 |
| 1019 | Stein | Appx1650-Appx1671 |
| 1029 | Ventavis® Label 2004 | Appx1784-Appx1798 |
| 1036 | Declaration of Sylvia Hall-Ellis, Ph.D. | Appx1855-Appx1996 |

**Vol. II, Appx1997 – Appx8034**

| Ex. | Description | Appx. No. |
| --- | --- | --- |
| 1036 | Declaration of Sylvia Hall-Ellis, Ph.D. | Appx1997-Appx2048 |
| 1038 | Atkins | Appx2082-Appx2090 |
| 1050 | Pulmozyme® Label | Appx2231-Appx2232 |
| 1066 | AccuNeb® Label | Appx2403-Appx2404 |
| 1089 | Voswinckel JESC, UWash | Appx2681-Appx2692 |
| 1104 | Sulica 2005 | Appx2877-Appx2890 |
| 1106 | Reply Declaration of Nicholas Hill, M.D. | Appx2892-Appx2979 |
| 1108 | Transcript from the January 8, 2022 Deposition of Aaron Waxman, M.D., Ph.D., IPR2021-00406 | Appx3033 Appx3136-Appx3150 Appx3184-Appx3189 |
| 1109 | Transcript from the January 11, 2022 Deposition of Jason McConville, Ph.D., IPR2021-00406 | Appx3205 Appx3271-Appx3272 |

| 1110 | Transcript from the December 29, 2021 Deposition of Lyndsey Pilar Wyman, IPR2021-00406 | Appx3444<br>Appx3561-Appx3566 |
|---|---|---|
| 2001 | Declaration of Dr. Aaron Waxman | Appx3907-Appx3909<br>Appx3923-Appx3925 |
| 2003 | Declaration of Dr. Werner Seeger | Appx3970<br>Appx3983-Appx3985 |
| 2041 | Declaration of Ms. Pilar Wyman | Appx4534<br>Appx4539<br>Appx4542-Appx4545<br>Appx4552<br>Appx4555-Appx4557 |
| 2052 | Second Declaration of Dr. Aaron Waxman, M.D., Ph.D. | Appx4744<br>Appx4760-Appx4768<br>Appx4778-Appx4781Appx4795-Appx4797 |
| 2053 | Declaration of Dr. Jason McConville | Appx4800<br>Appx4817-Appx4818<br>Appx4823-Appx4834<br>Appx4838-Appx4840 |
| 2055 | Transcript from the October 17, 2021 Deposition of Dr. Nicholas Hill, IPR2021-00406 | Appx4885<br>Appx5012-Appx5013<br>Appx5017<br>Appx5026-Appx5033 |
| 2056 | Transcript from the October 26, 2021 Deposition of Igor Gonda, Ph. D., IPR2021-00406 | Appx5075<br>Appx5142<br>Appx5155-Appx5157<br>Appx5159<br>Appx5167<br>Appx5186-Appx5193<br>Appx5198-Appx5199 |
| 2061 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, Declaration of Dr. Robert Roscigno (EX2048) | Appx5238-Appx5249 |
| 2065 | Declaration of Dr. Werner Seeger regarding Application No. 11/748,205 | Appx5304-Appx5305 |

| 2066 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Declaration of Dr. Werner Seeger (EX2020) | Appx5306-Appx5312 |
|---|---|---|
| 2067 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Hossein A. Ghofrani (EX2026) | Appx5313-Appx5317 |
| 2068 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Frank Reichenberger (EX2027) | Appx5318-Appx5322 |
| 2069 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Declaration of Dr. Friedich Grimminger (EX2028) | Appx5323-Appx5327 |
| 2070 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Declaration of Dr. Werner Seeger (EX2097) | Appx5328-Appx5329 |
| 2071 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621 Second Declaration of Dr. Werner Seeger (EX2098) | Appx5330-Appx5340 |
| 2074 | *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621/-01622 Second Declaration of Dr. Hossein A. Ghofrani (EX2099) | Appx5347-Appx5353 |
| 2076 | Kendrick (1997) | Appx5362 |
| 2086 | [Part 1] Declaration of Dr. Roham T. Zamanian regarding Application No.12/591,200 | Appx5518 Appx5524 |
| 2091 | Expert Report of Dr. Igor Gonda, *United Therapeutics Corp. v. Liquidia Techs., Inc.*, Case No. 1:20-cv-00755-RGA (D. Del.) (excerpts) | Appx5940-Appx5966 |

| | | |
|---|---|---|
| 2097 | **[SEALED]** Transcript from the January 7, 2022 Deposition of Igor Gonda, Ph.D., *United Therapeutics Corp. v. Liquidia Techs., Inc.*, Case No. 1:20-cv-00755-RGA-JLH (D. Del.) | Appx6217 Appx6223 Appx6227Appx6242-Appx6243 Appx6267-Appx6268 |
| 2104 | Transcript of Telephonic Hearing (March 1, 2022) | Appx6410 Appx6415-Appx6420 |
| 2109 | Patent Owner's Demonstrative Exhibit | Appx6616 Appx6673 |
| 1062 | Gessler, T., et al., "Ultrasonic versus jet nebulization of iloprost in severe pulmonary hypertension," Eur Respir J, 17:14-19 (2001) | Appx7362-Appx7367 |
| 1090 | Voswinckel JESC, UWisc | Appx7559-Appx7563 |
| 1091 | Voswinckel JESC, British Library | Appx7564-Appx7570 |
| 1092 | Voswinckel JESC, Additional Pages | Appx7571-Appx7580 |
| 1093 | Voswinckel JAHA, British Library | Appx7581-Appx7586 |
| 1094 | Voswinckel JAHA, Library of Congress | Appx7587-Appx7596 |
| 1095 | Voswinckel JAHA, Stanford | Appx7597-Appx7613 |
| 1096 | Voswinckel JAHA, UC Davis | Appx7614-Appx7620 |
| 1105 | European Society of Cardiology Annual Report 2005 | Appx7665-Appx7701 |
| 1112 | Reply Declaration of Sylvia Hall-Ellis, Ph.D. | Appx7702-Appx7759 |
| 1113 | Voswinckel JAHA Supplemental Author Index | Appx7760-Appx7765 |
| 1116 | Voswinckel JAHA British Library Declaration | Appx7794-Appx7795 |
| 1117 | Voswinckel JAHA Supplement PubMed Search Results | Appx7796-Appx7814 |
| 1119 | Voswinckel JESC British Library Declaration | Appx7821-Appx7822 |
| 1120 | Voswinckel JESC Web of Science Search Results | Appx7823-Appx7830 |
| 1123 | Circulation MARC record, British Library | Appx7847 |

| | | |
|---|---|---|
| 1124 | Circulation MARC record, Library of Congress | Appx7848-Appx7854 |
| 1125 | Circulation MARC record, Stanford | Appx7855-Appx7856 |
| 1126 | Circulation MARC record, UC Davis | Appx7857 |
| 1127 | European Heart Journal bibliographic record, UWash | Appx7858-Appx7860 |
| 1128 | European Heart Journal MARC record, UWisc | Appx7861-Appx7865 |
| 1129 | European Heart Journal MARC record, British Library | Appx7866-Appx7867 |
| | Advanced Concepts in Spinal Deformity Surgery | Appx7881-Appx7913 |
| | Alpha Bio System Product Catalog March 2003 | Appx7914-Appx7971 |
| | Declaration of Yechiam Hantman dated June 30, 2016, IPR2015-01786 | Appx7972-Appx8034 |

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages Appx6217, Appx6223, Appx6227, Appx6242-Appx6243, and Appx6267-Appx6268 was designated confidential by the parties under the terms of the Protective Order entered by the district court as relating to the parties' trade secrets, highly confidential technical information, and/or other non-public information the disclosure of which could result in harm.

# Attachment B2

Liquidia's Exhibit 1036
Page 143



# Cardiovascular Diseases MeSH Descriptor Data 2021

Details    Qualifiers    MeSH Tree Structures    Concepts

**MeSH Heading**
Cardiovascular Diseases
**Tree Number(s)**
C14
**Unique ID**
D002318
**RDF Unique Identifier**
http://id.nlm.nih.gov/mesh/D002318
**Annotation**
general, prefer specifics
**Scope Note**
Pathological conditions involving the CARDIOVASCULAR SYSTEM including the HEART; the BLOOD VESSELS; or the PERICARDIUM.
**Entry Version**
CARDIOVASC DIS
**Entry Combination**
rehabilitation:Cardiac Rehabilitation
**Date Established**
1966/01/01
**Date of Entry**
1999/01/01
**Revision Date**
2016/05/31

page delivered in 0.079s

Copyright , Privacy , Accessibility , Site Map , Viewers and Players

U.S. National Library of Medicine, 8600 Rockville Pike, Bethesda, MD 20894

National Institutes of Health, Health & Human Services, Freedom of Information Act



# Attachment B3

Liquidia's Exhibit 1036
Page 145

| OCLC | 3955104 | **No holdings in XXX - 82 other holdings** | | | | | | |
|---|---|---|---|---|---|---|---|---|

| | | | | | | | **Rec Stat** | **Entered** 197 806 07 | **Replace d** 2018112 0195615 .4 |

Continuing Resources ▼

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Type** | a | **ELvl** | | **Srce** | o | **GPub** | | **Ctrl** | | **Lang** | ger |
| **BLvl** | s | **Form** | | **Conf** | 0 | **Freq** | b | **MRec** | | **Ctry** | gw |
| **S/L** | 0 | **Orig** | | **EntW** | | **Regl** | x | **Alph** | b | | |
| **Desc** | | **SrTp** | p | **Cont** | | **DtSt** | c | **Dates** | 1976 | , | 9999 |

```
010    sn 78002166
040    NLM $b eng $c NLM $d NSD $d OCL $d RCS $d AIP $d NST $d OCL $d SYS $d CUS $d OCLCQ $d
MUQ $d CLU $d OCLCQ $d CLU $d OCLCF $d OCLCO $d OCLCQ $d OCLCO $d UKMGB
012    $b 3 $e n $i 8509
016 7  7801231 $2 DNLM
016 7  H11740000 $z H11720000 $2 DNLM
016 7  009202292 $2 Uk
019    1063343614
022 0  0340-9937 $l 0340-9937 $2 6
030    HERZDW
041 0  ger $b eng
042    nsdp
050 14 RC666
060 00 W1 $b HE986U
090    $b
210 0  Herz $b (Münch., Print)
222  0 Herz $b (Münch., Print)
245 00 Herz.
260    Lagenfeld, $b Springer
300    volumes $b illustrations
310    Eight issues a year, $b 2007-
321    Quarterly
321    Bimonthly, $b <1980-
336    text $b txt $2 rdacontent
337    unmediated $b n $2 rdamedia
338    volume $b nc $2 rdacarrier
362 0  1.- Jahrg.; Juli 1976-
500    Imprint varies: München, Urban & Schwarzenberg, 1976-
525    Some vols. have supplements.
530    Also issued via the World Wide Web to subscribers.
550    Issued by Deutsches Herzzentrum München.
550    Organ des Bundesverbandes Niedergelassener Kardiologen, <2010-
650 0 Cardiovascular system $x Diseases $v Periodicals.
650 2 Cardiovascular Diseases.
650 6 Appareil cardiovasculaire $x Maladies $v Périodiques.
650 7 Cardiovascular system $x Diseases. $2 fast $0 (OCoLC)fst00847181
655 2 Periodicals.
```

Liquidia's Exhibit 1036
Page 146

655  7 Periodicals. $2 fast $0 (OCoLC)fst01411641
710 2  Deutsches Herzzentrum München.
710 2  Bundesverband Niedergelassener Kardiologen.
776 08 $i Online version: $t Herz (Online) $x 1615-6692 $w (DLC)  2007233923 $w (OCoLC)47205307
850    CSt-L $a CU-SM $a ICU $a NjR $a PPC $a TNJ-M
856 41 $u http://link.springer-ny.com/link/service/journals/000059/index.htm

Liquidia's Exhibit 1036
Page 147

# Attachment B4

Liquidia's Exhibit 1036
Page 148

1/3/2021                                    MARC Display (Library of Congress Authorities)

[The Library of Congress](#)                                    >> [Go to Library of Congress Online Catalog](#)



**LIBRARY OF CONGRESS AUTHORITIES**



Library buildings are closed to the public until further notice, but LC Authorities is available. **More**.

| Help | New Search | Search History | Headings List | Start Over |
|------|-----------|----------------|---------------|------------|

◄ **Previous**    **Next** ►

**MARC Display**    **Labelled Display**

**LC control no.:** sh2009118412

**LCCN Permalink:** https://lccn.loc.gov/sh2009118412

**HEADING:** Cardiovascular system Diseases Periodicals

**000** 00493cz a2200169n 450

**001** 7933075

**005** 20110729162230.0

**008** 090624|| anannbabn |n ana

**010** __ |a sh2009118412

**035** __ |a (DLC)430289

**035** __ |a (DLC)sh2009118412

**040** __ |a DLC |b eng |c DLC

**150** __ |a Cardiovascular system |x Diseases |v Periodicals

**667** __ |a Record generated for validation purposes.

**670** __ |a Work cat.: Revista brasileira de cirurgia cardiovascular,

**906** __ |t 8888 |u tc00 |v 0

**953** __ |a tc00

◄ **Previous**    **Next** ►



| **Save, Print or Email Records (View Help)** |
|---|
| Select Download Format: Text (Labelled Display) ▾   Press to SAVE or PRINT |
| Email Text (Labelled Display) to: |
| [                    ]   Press to SEND EMAIL |

Help - Search - Search History - Headings List - Start Over



**Library of Congress**
URL: https://www.loc.gov/

*Mailing Address:*
101 Independence Ave, S.E.
Washington, DC 20540

**Library of Congress Authorities**
*URL:* http://authorities.loc.gov/
**Library of Congress Online Catalog**
*URL:* https://catalog.loc.gov/

**Questions, comments, error reports:** Contact Us

Liquidia's Exhibit 1036
Page 149

# Attachment D1

Liquidia's Exhibit 1036
Page 150

## MARC Bibliographic Record

| LEADER | | 01560cas a22004811a 4500 |
|---|---|---|
| 001 | | 991532243602122 |
| 005 | | 20150313115236.0 |
| 008 | | 750817c19509999nyumx1p 0uu1a0eng d |
| 010 | | $a 51008753 |
| 022 | 0_ | $a0009-7322$y009-7322 |
| 030 | | $aCIRCAZ |
| 035 | | $a(OCoLC)01554748 |
| 035 | | $9AAR9120UW |
| 035 | | $a153224 |
| 035 | | $a(WU)153224-uwmadisondb |
| 035 | | $a(EXLNZ-01UWI_NETWORK)999482509302121 |
| 040 | | $aMUL$beng$cMUL$dOCL$dUCU$dMUL$dNSD$dDLC$dNSD$dm.c.$dNSD$dSER$dRCS$dCRL |
| 042 | | $ansdp$alc |
| 050 | 0_ | $aRC681.A1$bC5 |
| 060 | 0_ | $aW1 CI743 |
| 069 | 1_ | $aC22640000 |
| 082 | 0_ | $a616.105 |
| 090 | | $aRC681.A1$bC6 |
| 210 | 0_ | $aCirculation |
| 222 | _0 | $aCirculation |

Liquidia's Exhibit 1036
Page 151

Appx2005

| 245 | 00 | $aCirculation :$bthe journal of the American Heart Association. |
|-----|-----|---|
| 260 |  | $aNew York :$bGrune & Stratton,$c1950- |
| 300 |  | $avolumes :$billustrations ;$c28 cm |
| 310 |  | $a14 no. a year$b<Nov. 1979-> |
| 321 |  | $aMonthly |
| 336 |  | $atext$btxt$2rdacontent |
| 337 |  | $aunmediated$bn$2rdamedia |
| 338 |  | $avolume$bnc$2rdacarrier |
| 362 | 0_ | $aVol. 1, no. 1 (Jan. 1950)- |
| 500 |  | $aThe journal of the American Heart Association. |
| 555 |  | $aVols. 1-52, 1950-75. 1 v. |
| 530 |  | $aAlso available on the Internet. |
| 525 |  | $aIncludes supplements; [1993]- supplements for each vol. are consecutively numbered. |
| 650 | _0 | $aCardiology$xSocieties. |
| 650 | _0 | $aHeart$xDiseases$vPeriodicals. |
| 650 | _2 | $aBlood Circulation$vperiodicals. |
| 650 | _2 | $aCardiovascular System$vperiodicals. |
| 710 | 2_ | $aAmerican Heart Association. |
| 997 |  | $aMARCIVE |
| LEADER |  | 02043nas--2200613-a-4500 |
| 001 |  | 991021966103602122 |

Liquidia's Exhibit 1036
Page 152

Appx2006

```
005        20201217190618.0

006        m-----o--d--------

007        cr-unu||||||||

008        980212c19509999mduuu-pso-----0---a0eng-c

010            $asn 99003671

015            $aGBB564276$2bnb

016    7_      $a100886989$2DNLM

016    7_      $a015996889$2Uk

022            $a1524-4539

035            $a(DE-599)ZDB1466401 X

035            $a(OCoLC)38425031

035            $a(CKB)954925390275

035            $a(CONSER)sn-99003671-

035            $a(EXLCZ)99954925390275

042            $ansdp$apcc

050    14      $aQM178

060    10      $aW1

082    10      $a616$213

130    0_      $aCirculation (Online)

210    0_      $aCirculation$b(Online)

222    _0      $aCirculation$b(Online)

245    10      $aCirculation
```

Liquidia's Exhibit 1036
Page 153

Appx2007

246    33    **$a**Journal of the American Heart Association

260          **$a**[Baltimore, Md.] :**$b**Lippincott Williams & Wilkins ;**$a**[Stanford, Calif.] :**$b**Highwire Press

336          **$a**text**$b**txt**$2**rdacontent

337          **$a**computer**$b**c**$2**rdamedia

338          **$a**online resource**$b**cr**$2**rdacarrier

362    1_    **$a**Print began in 1950.

500          **$a**Refereed/Peer-reviewed

506          **$a**Limited access, restrictions may apply.

538          **$a**Mode of access: World Wide Web.

588          **$a**Description based on: Vol. 91, no. 1 (Jan. 1995); title from home page.

650    _0    **$a**Blood**$x**Circulation**$v**Periodicals.

650    _0    **$a**Cardiovascular system**$v**Periodicals.

650    _0    **$a**Cardiology**$v**Periodicals.

650    _0    **$a**Heart**$x**Diseases**$v**Periodicals.

650    12    **$a**Blood Circulation.

650    22    **$a**Cardiovascular System.

650    22    **$a**Vascular Diseases.

650    _7    **$a**Blood**$x**Circulation.**$2**fast**$0**(OCoLC)fst00834555

650    _7    **$a**Cardiology.**$2**fast**$0**(OCoLC)fst00847121

650    _7    **$a**Cardiovascular system.**$2**fast**$0**(OCoLC)fst00847172

650    _7    **$a**Heart**$x**Diseases.**$2**fast**$0**(OCoLC)fst00953527

Liquidia's Exhibit 1036
Page 154

Appx2008

**655**    _0    **$a**Electronic journals.

**655**    _7    **$a**Periodicals.**$2**fast**$0**(OCoLC)fst01411641

**776**    0_    **$x**0009-7322

**770**    0_    **$t**Hypertension**$w**(CKB)2320000000000463

**710**    2_    **$a**American Heart Association.

**906**        **$a**JOURNAL

## MMS IDs

**Document ID:**
999482509302121
**Network Electronic IDs:**
9911025187102121
**Network Physical IDs:**
999482509302121
**mms_lc_ids:**
992181773402125, 991016441821602125
**mms_mad_ids:**
991532243602122, 991021966103602122
**mms_ml_ids:**
99540973402124, 991012379446902124
**mms_pl_ids:**
99901302699702127
**mms_rf_ids:**
991013779215202129

Liquidia's Exhibit 1036
Page 155

# Attachment D2

Liquidia's Exhibit 1036
Page 156

1/3/2021                                        MARC Display (Library of Congress Authorities)

The Library of Congress                                    >> Go to Library of Congress Online
                                                                                    Catalog

  

**Library buildings are closed to the public until further notice, but LC Authorities is available.** **More**.

| Help ⓘ | New Search | Search History | Headings List | Start Over |

◄ Previous        Next ►

| MARC Display | Labelled Display |

**LC control no.:** sh 85020214
**LCCN Permalink:** https://lccn.loc.gov/sh85020214
**HEADING:** Cardiology

**000** 00389cz a2200169n 450
**001** 4672779
**005** 20120322080350.0
**008** 860211i| anannbabn |b ana
**010** __ |a sh 85020214
**035** __ |a (DLC)sh 85020214
**035** __ |a (DLC)19464
**040** __ |a DLC |c DLC
**150** __ |a Cardiology
**550** __ |a Heart |x Diseases
**550** __ |w g |a Internal medicine
**906** __ |t 00-- |u ---- |v 0
**953** __ |a xx00

◄ Previous        Next ►

| **Save, Print or Email Records (View Help)** |
| Select Download Format: [Text (Labelled Display) ▾]   [Press to SAVE or PRINT] |
| Email Text (Labelled Display) to: |
| [                    ] [Press to SEND EMAIL] |

Help - Search - Search History - Headings List - Start Over



**Library of Congress**
URL: https://www.loc.gov/

*Mailing Address:*
101 Independence Ave, S.E.
Washington, DC 20540

**Library of Congress Authorities**
*URL:* http://authorities.loc.gov/
**Library of Congress Online Catalog**
*URL:* https://catalog.loc.gov/

**Questions, comments, error reports:** Contact Us

https://authorities.loc.gov/cgi-bin/Pwebrecon.cgi?AuthRecID=4672779&v1=1&HC=10&SEQ=20210103194422&PID=mxxSwvauLaFvd-g8tLJ-K4oN7VnO    1/1

Liquidia's Exhibit 1036
Page 157

# Attachment D3

Liquidia's Exhibit 1036
Page 158

1/3/2021                                 MARC Display (Library of Congress Authorities)

The Library of Congress                                                    >> Go to Library of Congress Online Catalog



**Library buildings are closed to the public until further notice, but LC Authorities is available. More.**



◄ Previous          Next ►

**LC control no.:** sh 85124175
**LCCN Permalink:** https://lccn.loc.gov/sh85124175
**HEADING:** Societies

**000** 00962cz a2200253n 450
**001** 4773191
**005** 20120328080336.0
**008** 860211i| anannbabn |b ana
**010** __ |a sh 85124175
**035** __ |a (DLC)sh 85124175
**035** __ |a (DLC)119876
**035** __ |a (DLC)5901606
**035** __ |a (DLC)sp 85124175
**035** __ |a (DLC)298296
**040** __ |a DLC |c DLC |d DLC
**053** _0 |a AS |c Academies and learned societies
**053** _0 |a HS |c Associations, secret societies, clubs
**150** __ |a Societies
**360** __ |i subdivision |a Societies, etc. |i under names of individual persons, families, and corporate bodies, and under classes of persons, ethnic groups, uniform titles of sacred works, and topical headings; also subdivision |a Societies and clubs |i under age and sex groups; and names of individual societies
**450** __ |a Academies (Learned societies)
**550** __ |w g |a Associations, institutions, etc.
**550** __ |a Clubs
**906** __ |t 0316 |u te04 |v 0
**953** __ |a xx00 |b ta27

◄ Previous          Next ►

| Save, Print or Email Records (View Help) |
|---|
| Select Download Format: [Text (Labelled Display) ▾]   [Press to SAVE or PRINT] |
| Email Text (Labelled Display) to: |
| [                    ]   [Press to SEND EMAIL] |

Liquidia's Exhibit 1036
Page 159

Appx2013

1/3/2021                                    MARC Display (Library of Congress Authorities)

Help – Search – Search History – Headings List – Start Over



**Library of Congress**
URL: https://www.loc.gov/

*Mailing Address:*
101 Independence Ave, S.E.
Washington, DC 20540

**Library of Congress Authorities**
*URL:* http://authorities.loc.gov/
**Library of Congress Online Catalog**
*URL:* https://catalog.loc.gov/

**Questions, comments, error reports:** Contact Us

Liquidia's Exhibit 1036
Page 160

**Appx2014**

# Attachment D4

Liquidia's Exhibit 1036
Page 161

1/3/2021                                    MARC Display (Library of Congress Authorities)

 [The Library of Congress](#)                                    >> [Go to Library of Congress Online Catalog](#)

 **LIBRARY OF CONGRESS AUTHORITIES** 

**Library buildings are closed to the public until further notice, but LC Authorities is available.** [More](#).

| Help | New Search | Search History | Headings List | Start Over |

◄ Previous        Next ►

**MARC Display** | Labelled Display

**LC control no.:** sh2009126258
**LCCN Permalink:** https://lccn.loc.gov/sh2009126258
**HEADING:** Heart Diseases Periodicals

**000** 00476cz a2200169n 450
**001** 8068195
**005** 20110729162727.0
**008** 091027|| anannbabn |n ana
**010** __ |a sh2009126258
**035** __ |a (DLC)442828
**035** __ |a (DLC)sh2009126258
**040** __ |a DLC |b eng |c DLC
**150** __ |a Heart |x Diseases |v Periodicals
**667** __ |a Record generated for validation purposes.
**670** __ |a Work cat.: Revista costarricense de cardiología, 1999-
**906** __ |t 8888 |u tc00 |v 0
**953** __ |a tc00

◄ Previous        Next ►

| **Save, Print or Email Records (View [Help](#))** |
| Select Download Format: [Text (Labelled Display)] [Press to SAVE or PRINT] |
| Email Text (Labelled Display) to: [_____] [Press to SEND EMAIL] |

[Help](#) - [Search](#) - [Search History](#) - [Headings List](#) - [Start Over](#)

 **Library of Congress**
URL: https://www.loc.gov/

*Mailing Address:*
101 Independence Ave, S.E.
Washington, DC 20540

**Library of Congress Authorities**
*URL:* http://authorities.loc.gov/
**Library of Congress Online Catalog**
*URL:* https://catalog.loc.gov/

**Questions, comments, error reports:** [Contact Us](#)

https://authorities.loc.gov/cgi-bin/Pwebrecon.cgi?AuthRecID=8068195&v1=1&HC=1&SEQ=20210103195016&PID=_HsQEM3xAg8BXeqz9qzH63-q6r1    1/1

# Attachment D5

Liquidia's Exhibit 1036
Page 163

| OCLC | 1554748 | **No holdings in XXX - 1168 other holdings** | | | | | |

| | | | | Rec Stat | Entered | 197 508 17 | Replaced | 2020073 1221429 .5 |

Continuing Resources ▼

| Type | a | ELvl | 1 | Srce | c | GPub | | Ctrl | | Lang | eng |
|------|---|------|---|------|---|------|---|------|---|------|-----|
| BLvl | s | Form | | Conf | 0 | Freq | w | MRec | | Ctry | txu |
| S/L | 0 | Orig | | EntW | | Regl | n | Alph | a | | |
| Desc | | SrTp | p | Cont | | DtSt | c | Dates | 1950 , | 9999 | |

010     51008753
040     MUL $b eng $c MUL $d OCL $d UCU $d MUL $d NSD $d DLC $d NSD $d SER $d RCS $d AIP $d NSD $d AIP $d NSD $d AIP $d NSD $d OCL $d NSD $d NYG $d NSD $d HUL $d DLC $d NST $d OCL $d NST $d DLC $d CUS $d IUL $d DLC $d NSD $d OCLCQ $d DLC $d OCL $d NLGGC $d LVB $d CUS $d EEM $d WUOHS $d OCLCQ $d AU@ $d BLBSF $d UKMGB $d OCLCQ $d WHF $d OCLCO $d P4I $d KLH $d WIC $d EUW $d OCLCO $d OCLCQ $d OCLCO $d OCLCF $d OCLCO $d PRB $d MTG $d ZAS $d OCLCQ $d ATVSV $d IBO $d CSA $d CSJ $d TFH $d UIU $d NJR $d OCLCQ $d CSAIL $d OKS $d CAHUS $d BUF $d ZAP $d GILDS $d CNO $d CCH $d GZM $d MRM $d PAU $d DXU $d TORON $d OCLCO $d DCHUA $d CUI $d OCLCO $d OCLCA $d LGG $d W2U $d NZHMA $d U3G $d YOU $d L2U
012     3 $b 3 $e n $i 8702 $j 4 $k 1 $l 1 $m 1
016 7  C22640000 $2 DNLM
016 7  009549936 $2 Uk
019     11292471 $a 219861143 $a 818653317 $a 926189493 $a 976548462 $a 1003612187 $a 1062027881 $a 1078053466 $a 1153416976 $a 1167041665
022 0  0009-7322 $l 0009-7322 $y 009--7322 $y 0065-8499 $z 0069-4193 $z 0069-0406 $z 0065-8502 $2 1
030     CIRCAZ
032     113720 $b USPS
042     nsdp $a pcc
050 00 RC681.A1 $b C5
060 00 W1 CI743
082 04 616.105
090     $b
210 0  Circulation $b (N.Y.N.Y.)
222  0 Circulation $b (New York, N.Y.)
245 00 Circulation.
260     [Dallas, Tex., etc.], $b [American Heart Association, etc.]
300     volumes $b illustrations $c 28 cm
310     Weekly (except the first two weeks in Jan. and the last two weeks in Dec.), $b <Apr. 8, 2003-
321     Monthly, $b 1950-
336     text $b txt $2 rdacontent
337     unmediated $b n $2 rdamedia
338     volume $b nc $2 rdacarrier
362 0  v. 1- Jan. 1950-
510 2  Chemical abstracts $x 0009-2258
525     Has annual supplements with titles: Cardiovascular surgery, 1962-, and: Abstracts, 1964- ; also has occasional additional supplements.

525   Supplements for 1962-63 and <1982 lack "supplement" in title.

525   Supplements for 1987- also called: Circulation monograph, no. 1-

555   Vols. 1-52, 1950-75. 1 v.

580   Some supplements also issued as: American Heart Association monograph, 1962-85; and, Monograph (American Heart Association), 1986.

580   Includes: Hypertension, v. 12 (published as Aug. 1964 supplement), which is also available separately.

588   Latest issue consulted: Vol. 107, no. 14 (Apr. 15, 2003).

650  0 Cardiology $v Periodicals.

650  0 Cardiovascular system $v Periodicals.

650  0 Hypertension $v Periodicals.

650  2 Blood Circulation $x periodicals.

650  2 Cardiovascular System $x periodicals.

650  6 Cardiologie $v Périodiques.

650  6 Sang $x Circulation $v Périodiques.

650  6 Appareil cardiovasculaire $v Périodiques.

650  7 44.85 cardiology. $0 (NL-LeOCL)077596765 $2 bcl

650  7 Cardiology. $2 fast $0 (OCoLC)fst00847121

650  7 Cardiovascular system. $2 fast $0 (OCoLC)fst00847172

650  7 Hypertension. $2 fast $0 (OCoLC)fst00965831

650 17 Bloedvaten. $2 gtt

655  0 Electronic journals.

655  4 Electronic Journals.

655  7 Periodicals. $2 fast $0 (OCoLC)fst01411641

655  7 Periodicals. $2 rbgenr

710  2 American Heart Association.

710  2 American Heart Association. $t Abstracts.

730  0 Cardiovascular surgery.

730  0 Circulation monograph.

770  0 $t Cardiovascular surgery $w (DLC)   66009486 $w (OCoLC)1586259

776 08 $i Online version: $t Circulation (Online) $x 1524-4539 $w (DLC)sn 99003671 $w (OCoLC)38425031

787  1 $t Hypertension $x 0073-425X $w (DLC)sn 79005036 $w (OCoLC)1643474

787  1 $t American Heart Association monographs $x 0065-8499 $w (DLC)sf 81001017 $w (OCoLC)1695120

787  1 $t Monograph (American Heart Association) $x 0891-320X $w (DLC)sn 86003055 $w (OCoLC)13757741

850   CPT $a DLC $a InU $a MBCo $a MSobPR $a N $a NjR $a OU

856 41 $u http://www.circulationaha.org/

Liquidia's Exhibit 1036

# Attachment D6

Liquidia's Exhibit 1036
Page 166

 The Library of Congress                                    >> Go to Library of Congress Online Catalog

 **LIBRARY OF CONGRESS AUTHORITIES** 

**Library buildings are closed to the public until further notice, but LC Authorities is available. More.**

| Help | New Search | Search History | Headings List | Start Over |

◄ Previous          Next ►

**MARC Display** | Labelled Display

**LC control no.:** sh2008117649
**LCCN Permalink:** https://lccn.loc.gov/sh2008117649
**HEADING:** Cardiology Periodicals
**000** 00453cz a2200169n 450
**001** 7518214
**005** 20110729161154.0
**008** 080423|| anannbabn |n ana
**010** __ |a sh2008117649
**035** __ |a (DLC)396177
**035** __ |a (DLC)sh2008117649
**040** __ |a DLC |b eng |c DLC
**150** __ |a Cardiology |v Periodicals
**667** __ |a Record generated for validation purposes.
**670** __ |a Work cat.: Circulation journal, [2002-
**906** __ |t 8888 |u te00 |v 0
**953** __ |a te00

◄ Previous          Next ►

| **Save, Print or Email Records (View Help)** |
| Select Download Format: [Text (Labelled Display) ▾]  [Press to SAVE or PRINT] |
| Email Text (Labelled Display) to: |
| [ ]  [Press to SEND EMAIL] |

Help - Search - Search History - Headings List - Start Over

 **Library of Congress**
URL: https://www.loc.gov/

*Mailing Address:*
101 Independence Ave, S.E.
Washington, DC 20540

**Library of Congress Authorities**
*URL:* http://authorities.loc.gov/
**Library of Congress Online Catalog**
*URL:* https://catalog.loc.gov/

**Questions, comments, error reports:** Contact Us

Liquidia's Exhibit 1036
Page 167

# Attachment D7

Liquidia's Exhibit 1036
Page 168

1/3/2021                                MARC Display (Library of Congress Authorities)

The Library of Congress                                >> Go to Library of Congress Online
                                                                    Catalog



**Library buildings are closed to the public until further notice, but LC Authorities is available. More.**



| | |
|---|---|
| Help | New Search | Search History | Headings List | Start Over |

◀ Previous    Next ▶

**MARC Display**    **Labelled Display**

**LC control no.:** sh 85020226
**LCCN Permalink:** https://lccn.loc.gov/sh85020226
**HEADING:** Cardiovascular system

**000** 00668cz a2200217n 450
**001** 4672791
**005** 20120322080351.0
**008** 860211|| anannbabn |b ana
**010** __ |a sh 85020226
**035** __ |a (DLC)sh 85020226
**035** __ |a (DLC)19476
**040** __ |a DLC |c DLC |d DLC
**053** _0 |a QL835 |b QL841 |c Comparative anatomy
**053** _0 |a QM178 |b QM197 |c Human anatomy
**150** __ |a Cardiovascular system
**360** __ |i subdivision |a Cardiovascular system |i under individual animals and groups of animals, e.g. |a Fishes--Cardiovascular system
**450** __ |a Circulatory system
**450** __ |a Vascular system
**550** __ |a Blood |x Circulation
**906** __ |t 8751 |u fk03 |v 0
**953** __ |a ff02

◀ Previous    Next ▶

| **Save, Print or Email Records (View Help)** |
|---|
| Select Download Format: [ Text (Labelled Display) ▾ ]    [ Press to SAVE or PRINT ] |
| Email Text (Labelled Display) to: |
| [                    ]    [ Press to SEND EMAIL ] |

Help – Search – Search History – Headings List – Start Over

---

**Library of Congress**
URL: https://www.loc.gov/

**Library of Congress Authorities**
*URL:* http://authorities.loc.gov/

https://authorities.loc.gov/cgi-bin/Pwebrecon.cgi?AuthRecID=4672791&v1=1&HC=7&SEQ=20210103201837&PID=WIInR0qj-HdJhBQ1uRW0Vl53o-Ox    1/2

Liquidia's Exhibit 1036
Page 169

1/3/2021

MARC Display (Library of Congress Authorities)



*Mailing Address:*
101 Independence Ave, S.E.
Washington, DC 20540

**Library of Congress Online Catalog**
*URL:* https://catalog.loc.gov/

**Questions, comments, error reports:** Contact Us

**Appx2024**

Liquidia's Exhibit 1036
Page 170

# Attachment D8

Liquidia's Exhibit 1036
Page 171

1/3/2021                                    MARC Display (Library of Congress Authorities)

The Library of Congress                                            >> Go to Library of Congress Online
Catalog

 **LIBRARY OF CONGRESS AUTHORITIES** 

**Library buildings are closed to the public until further notice, but LC Authorities is available. More.**



| | |
|---|---|
| **LC control no.:** | sh 85099890 |
| **LCCN Permalink:** | https://lccn.loc.gov/sh85099890 |
| **HEADING:** | Periodicals |

**000** 01324cz a2200337n 450
**001** 4749694
**005** 20120717060125.0
**008** 860211 | anannbabn |b ana
**010** __ |a sh 85099890
**035** __ |a (DLC)sh 85099890
**035** __ |a (DLC)6226910
**035** __ |a (DLC)sp 85099890
**035** __ |a (DLC)314952
**040** __ |a DLC |c DLC |d DLC
**053** _0 |a AP |c General periodicals
**053** _0 |a PN4700 |b PN5650 |c History
**150** __ |a Periodicals
**360** __ |i subdivision |a Periodicals |i under specific subjects, e.g. |a Engineering--Periodicals; United States--History--Periodicals
**450** __ |a Journals (Periodicals)
**450** __ |a Magazines
**550** __ |w g |a Library materials
**550** __ |w g |a Mass media
**550** __ |w g |a Serial publications
**550** __ |a Newspapers
**550** __ |a Press
**670** __ |a UMI business vocab. |b (Journals)
**680** __ |i Here are entered works on the periodicals of the world and, with appropriate subdivisions, works on special aspects or sections of periodicals. Works on periodicals in a specific language, or in a specific country or larger area, are entered under the adjectival form of the language or area, e.g. |a Arabic periodicals; Canadian periodicals.
**906** __ |t 0420 |u te03 |v 0
**910** __ |a Proposal saved by tc03 on 05/14/2012 at 17:15:30
**953** __ |a xx00 |b td14
**906** __ |t 1206 |v 0

https://authorities.loc.gov/cgi-bin/Pwebrecon.cgi?AuthRecID=4749694&v1=1&HC=237&SEQ=20210103201935&PID=NzhteCol9JW0EbXeSKxmuj-3…     1/2





| Save, Print or Email Records (View **Help**) | |
|---|---|
| Select Download Format: Text (Labelled Display) ▾ | Press to SAVE or PRINT |
| Email Text (Labelled Display) to: | |
| [                    ] | Press to SEND EMAIL |

Help - Search - Search History - Headings List - Start Over



**Library of Congress**
URL: https://www.loc.gov/

*Mailing Address:*
101 Independence Ave, S.E.
Washington, DC 20540

**Library of Congress Authorities**
*URL:* http://authorities.loc.gov/
**Library of Congress Online Catalog**
*URL:* https://catalog.loc.gov/

**Questions, comments, error reports:** Contact Us

Liquidia's Exhibit 1036
Page 173

# Attachment D9

Liquidia's Exhibit 1036
Page 174

The Library of Congress                                      >> Go to Library of Congress Online Catalog

 **LIBRARY OF CONGRESS AUTHORITIES** 

**Library buildings are closed to the public until further notice, but LC Authorities is available. More.**



◄ **Previous**        **Next** ►

**MARC Display**    Labelled Display

| | |
|---|---|
| **LC control no.:** | sh 85063723 |
| **LCCN Permalink:** | https://lccn.loc.gov/sh85063723 |
| **HEADING:** | Hypertension |

**000** 00516cz a2200205n 450
**001** 4714924
**005** 20120326100035.0
**008** 860211i| anannbabn |a ana
**010** __ |a sh 85063723
**035** __ |a (DLC)sh 85063723
**035** __ |a (DLC)61609
**040** __ |a DLC |c DLC |d DLC
**053** _0 |a RC685.H8
**150** __ |a Hypertension
**450** __ |a Blood pressure, High
**450** __ |a High blood pressure
**450** __ |a Vascular hypertension
**550** __ |w g |a Blood circulation disorders
**906** __ |t 9106 |u fk07 |v 1
**953** __ |a xx00 |b ff04

 ◄ **Previous**    **Next** ► 

| **Save, Print or Email Records (View Help)** |
|---|
| Select Download Format: [ Text (Labelled Display) ▾ ]   [ Press to SAVE or PRINT ] |
| Email Text (Labelled Display) to: |
| [                    ]   [ Press to SEND EMAIL ] |

Help - Search - Search History - Headings List - Start Over

---

**Library of Congress**
URL: https://www.loc.gov/

*Mailing Address:*
101 Independence Ave, S.E.

**Library of Congress Authorities**
*URL:* http://authorities.loc.gov/
**Library of Congress Online Catalog**
*URL:* https://catalog.loc.gov/

Liquidia's Exhibit 1036
Page 175

1/3/2021

 Washington, DC 20540

MARC Display (Library of Congress Authorities)

**Questions, comments, error reports:** Contact Us

Liquidia's Exhibit 1036
Page 176

Appx2030

# Attachment E1

Liquidia's Exhibit 1036
Page 177

```
001     990001409620202771
005     20170713153742.0
008     810109c19809999enkmr p       0   a0eng d
010     ##$asn 79009215
022     0#$a0195-668X
030     ##$aEHJODF
032     ##$a575330$bUSPS
035     ##$a(IaU)000140962IOW01
035     ##$a(CStRLIN)IAUG0928S
035     ##$a(OCoLC)05585193
035     9#$aAAQ3194
037     ##$bAcademic Press Inc., 111 Fifth Ave., New York, NY, 10003
040
##$aNSDP$cNSDP$dDNLM$dNSDP$dNST$dOCoLC$dOCoLC$dOCoLC$dNST$dAIP$dNST
$dAIP$dNST$dOCoLC$dNST$dTxU$dNSDP$dIaU$dUtOrBLW
060     00$aW1 EU636
210     0#$aEur. heart j.
222     #0$aEuropean heart journal
245     00$aEuropean heart journal.
264     #1$aLondon ;$aNew York :$bAcademic Press
300     ##$avolumes :$billustrations ;$c25-28 cm
310     ##$aMonthly
321     ##$aBimonthly
336
##$atext$btxt$2rdacontent$0http://rdaregistry.info/termList/RDACont
entType/1020
337
##$aunmediated$bn$2rdamedia$0http://rdaregistry.info/termList/RDAMe
diaType/1007
338
##$avolume$bnc$2rdacarrier$0http://rdaregistry.info/termList/RDACar
rierType/1049
362     0#$av. 1-   Feb. 1980-
500     ##$aVolumes for 1980-1998 include irregularly issued
supplements, which became independent publication, 1999-.
530     ##$aAvailable also online to subscribers.
550     ##$aOfficial journal of the European Society of Cardiology.
650
#0$aCardiology$vPeriodicals.$0http://id.loc.gov/authorities/subject
s/sh2008117649$2LCSH$041-LIBRARY_OF_CONGRESS-sh2008117649$9Y
650
#0$aHeart$xDiseases$vPeriodicals.$0http://id.loc.gov/authorities/su
bjects/sh2009126258$2LCSH$041-LIBRARY_OF_CONGRESS-sh2009126258$9Y
650     #2$aCardiology$xperiodicals.$2MESH$041-NLM-D002309$9Y
650     #2$wnnna$aAngiology$2MESH$041-NLM-D002309$9N
650     #2$wnnna$aCardiovascular Disease Specialty$2MESH$041-NLM-
D002309$9N
650     #2$wnnna$aVascular Medicine$2MESH$041-NLM-D002309$9N
```

Liquidia's Exhibit 1036
Page 178

```
650    #2$wnnna$aDisease Specialty, Cardiovascular$2MESH$041-NLM-
D002309$9N
650    #2$wnnna$aMedicine, Vascular$2MESH$041-NLM-D002309$9N
650    #2$wnnna$aSpecialty, Cardiovascular Disease$2MESH$041-NLM-
D002309$9N
710    2#$aEuropean Society of
Cardiology.$0http://id.loc.gov/authorities/names/n79040197$2LCNAMES
$041-LIBRARY_OF_CONGRESS-n 79040197$9Y
710    2#$aESC (European Society of Cardiology)$2LCNAMES$041-
LIBRARY_OF_CONGRESS-n 79040197$9N
710    2#$aEuropäische Gesellschaft für Kardiologie$2LCNAMES$041-
LIBRARY_OF_CONGRESS-n 79040197$9N
710    2#$aEuropean Cardiac Society$2LCNAMES$041-
LIBRARY_OF_CONGRESS-n 79040197$9N
710    2#$aSociedad Europea de Cardiología$2LCNAMES$041-
LIBRARY_OF_CONGRESS-n 79040197$9N
710    2#$aSocietà europea di cardiologia$2LCNAMES$041-
LIBRARY_OF_CONGRESS-n 79040197$9N
710    2#$aSociété européenne de cardiologie$2LCNAMES$041-
LIBRARY_OF_CONGRESS-n 79040197$9N
770    1#$tEuropean hear journal supplements$x1520-
765X$w(IaU)AJL7494
776    0#$tEuropean heart journal (Online)$x1522-9645
900    1#$aMAIN
945    ##$bCataloged$d19880607$cJEC/DS
999    ##$aRDA ENRICHED
999    ##$aMARS
AVA
##$0990001409620202771$822564703260002771$a01IOWA_INST$bSTOR$c(Heal
th Sciences Materials) (HASTU)$dShelved
Alphabetically$eavailable$f111$g0$iUILIB$jHASTU$k5$p1$qUI Libraries
Annex$tv.1-21(1980-2000); v.22:no.1-17,19-24(2001); v.23-26(2002-
2005)$tv.1:suppl.A-B(1980) v.2:suppl.A(1981) v.3:suppl.A-D(1982)
v.4:suppl.A-I(1983) v.5:suppl.A-F & abstract suppl.(1984)
v.6:suppl.A-D & abstract suppl.(1985) v.7:suppl.A-C & abstract
suppl.1(1986) v.8:suppl.A-M & abstract suppl.1-2(1987) v.9:suppl.A-
N & abstract suppl.(1988) v.10:suppl.A-H & abstract
suppl.(1989)$tv.11:suppl.A-I & abstract suppl.(1990) v.12:suppl.A-G
& abstract suppl.(1991) v.13:suppl.A-H & abstract suppl.(1992)
v.14:suppl.A-K & abstract suppl.(1993) v.16:suppl.A-0 & abstract
suppl.(1995) v.17:suppl.A-F & abstract suppl.(1996) v.18:suppl.A,C-
F & abstract suppl.(1997) v.19:suppl.A-P (1998) & abstract
suppl.(1998) v.20-25:abstract suppl.(1999-2004)
INST    ##$a01IOWA_INST
INT     ##$aP
PLK     ##$aAdditional Form.$b9982734772102771$mEuropean heart
journal.
PLK     ##$aSupplement.$b990019627290202771$mEuropean heart journal
supplements :$ejournal of the European Society of Cardiology.
```

Liquidia's Exhibit 1036
Page 179

# Attachment E2

Liquidia's Exhibit 1036
Page 180

OCLC 5585193    **No holdings in XXX - 282 other holdings**

| | | Rec Stat | En tere d | 197 910 25 | Re place d | 2020021 8043825 .6 |
|---|---|---|---|---|---|---|

Continuing Resources

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Type** | a | **ELvl** | | **Srce** | c | **GPub** | | **Ctrl** |
| **BLvl** | s | **Form** | | **Conf** | 0 | **Freq** | s | **MRec** |
| **S/L** | 0 | **Orig** | | **EntW** | | **Regl** | r | **Alph** |
| **Desc** | | **SrTp** | p | **Cont** | | **DtSt** | c | **Dates** |

Type a — ELvl — Srce c — GPub — Ctrl — Lang eng
BLvl s — Form — Conf 0 — Freq s — MRec — Ctry ne
S/L 0 — Orig — EntW — Regl r — Alph a
Desc — SrTp p — Cont — DtSt c — Dates 1980 , 9999

010    sn 79009215
040    NSD $b eng $c NSD $d NLM $d NSD $d NST $d SER $d OCL $d RCS $d NST $d AIP $d NST $d AIP $d NST $d OCL $d NST $d NSD $d NST $d IXA $d NSD $d WAU $d OCL $d SYS $d OCLCQ $d MUQ $d OCLCQ $d CLU $d NLM $d NLGGC $d CUS $d NSD $d OCLCQ $d OCLCF $d OCLCO $d OCLCQ $d OCLCO $d NLM $d I8M $d OCLCO $d OCLCQ $d OCLCA $d GILDS $d OCLCO $d OCLCA $d L2U
012    $b 3 $j 0 $k 1 $l 1 $m 1
016 7  8006263 $2 DNLM
016 7  E15845000 $2 DNLM
019    6878940
022 0  0195-668X $l 0195-668X $2 z
030    EHJODF
032    575330 $b USPS
042    nsdp $a pcc
050  4 RC681.A1 $b E94
060 00 W1 $b EU636
090    $b
210 0  Eur. heart j.
222  0 European heart journal
245 00 European heart journal.
260    Amsterdam, $b Elsevier.
300    volumes $b illustrations $c 28 cm
310    Semimonthly, $b <2004-
321    Bimonthly, $b <-1982
321    Monthly, $b <1983-
336    text $b txt $2 rdacontent
337    unmediated $b n $2 rdamedia
338    volume $b nc $2 rdacarrier
362 0  v. 1- Feb. 1980-
500    Published: Oxford ; New York : Pergamon Press, 1988- ; Oxford : Oxford University Press, 2005-
510 2  Chemical abstracts $x 0009-2258
525    Vols. for 19<80-1998 include irregularly issued supplements.
550    Official journal of the European Society of Cardiology.
580    Companion publication to: European heart journal. Cardiovascular pharmacotherapy.
580    Companion journal to: European heart journal. Quality of care & clinical outcomes.
650 0  Cardiology $v Periodicals.
650 2  Cardiology. $0 (DNLM)D002309
650 6  Cardiologie $v Périodiques.

Liquidia's Exhibit 1036
Page 181

650  7 44.85 cardiology. $0 (NL-LeOCL)077596765 $2 bcl
650  7 Cardiology. $2 fast $0 (OCoLC)fst00847121
650 17 Hartziekten. $2 gtt
655  2 Periodical. $0 (DNLM)D020492
655  7 Periodicals. $2 fast $0 (OCoLC)fst01411641
655  7 Periodicals. $2 lcgft
710 2  European Society of Cardiology.
770 0  $t European heart journal supplements $g 1999- $x 1520-765X $w (DLC)sn 98004643 $w (OCoLC)39530623
776 08 $i Online version: $t European heart journal (Online) $x 1522-9645 $w (DLC)sn 98005097 $w (OCoLC)40309576
787 08 $i Complemented by (work): $t European heart journal. Cardiovascular pharmacotherapy $x 2055-6837 $w (DLC) 2016243250 $w (OCoLC)908412356
787 08 $i Complemented by (work): $t European heart journal. Quality of care & clinical outcomes $x 2058-1742 $w (DLC) 2016243383 $w (OCoLC)945375563
850   CSt-L $a CU-AM $a CU-SM $a CaAEU $a CaOWtU $a CaSSUM $a IU-M $a IaU $a InU-M $a MBCo $a MBU-M $a MiU $a NbU-M $a NhD $a NjR $a OU $a TNJ-M $a TU-M $a TxHMC $a TxU $a ViBlbV $a ViRCU-H $a ViU-H $a WaU
856 4  $z Link no longer valid as of February 15, 2017 $u http://www.sciencedirect.com/science/journal/0195668X
856 4  $z Link no longer valid as of March 21, 2005 $u http://fai.idealibrary.com:80/cgi-bin/fai.idealibrary.com8011/iplogin/toc/hj
856 4  $u http://firstsearch.oclc.org $z Address for accessing the journal using authorization number and password through OCLC FirstSearch Electronic Collections Online. Subscription to online journal required for access to abstracts and full text
856 4  $u http://firstsearch.oclc.org/journal=0195-668x;screen=info;ECOIP $z Address for accessing the journal from an authorized IP address through OCLC FirstSearch Electronic Collections Online. Subscription to online journal required for access to abstracts and full text
856 4  $z Link no longer valid as of February 15, 2017 $u http://www.eurheartj.oupjournals.org/

# Attachment F1

Liquidia's Exhibit 1036
Page 183

## MARC Bibliographic Record

| | | |
|---|---|---|
| **LEADER** | | 01605cas a2200457 a 4500 |
| **001** | | 991469593602122 |
| **005** | | 20150313115221.0 |
| **008** | | 750727c19279999paumr1p 0bd1a0eng d |
| **010** | | **$a** 43032966 //r61 |
| **022** | | **$a**0003-4819 |
| **030** | | **$a**AIMEAS |
| **035** | | **$a**(OCoLC)01481385 |
| **035** | | **$a**(OCoLC)08576061 |
| **035** | | **$9**AAR2733UW |
| **035** | | **$a**146959 |
| **035** | | **$a**(WU)146959-uwmadisondb |
| **035** | | **$a**(EXLNZ-01UWI_NETWORK)999482007502121 |
| **040** | | **$a**MUL**$b**eng**$c**MUL**$d**NSD**$d**DLC**$d**NSD**$d**m.c.**$d**GZH |
| **042** | | **$a**nsdp**$a**lc |
| **050** | 0_ | **$a**R11**$b**.A84 |
| **210** | 0_ | **$a**Ann. intern. med. |
| **222** | _0 | **$a**Annals of internal medicine |
| **245** | 00 | **$a**Annals of internal medicine. |

Liquidia's Exhibit 1036
Page 184

260        **$a**Ann Arbor, Mich. :**$b**American College of Physicians.

300        **$a**volumes :**$b**illustrations ;**$c**25-28 cm

310        **$a**Monthly

336        **$a**text**$b**txt**$2**rdacontent

337        **$a**unmediated**$b**n**$2**rdamedia

338        **$a**volume**$b**nc**$2**rdacarrier

362    0_    **$a**[Vol. 1, no. 1 (July 1927)]-

530        **$a**Issued also in electronic format.

555        **$a**Vols. 1-40, July 1927-June 1954, 1 v., vols. 41-50, June 1954-June 1959, 1 v.

515        **$a**Vol. 2-71 called also old ser. v. 7-74

550        **$a**Official publication of: American College of Physicians.

580        **$a**Has supplement: 1991- ACP journal club.

650    _0    **$a**Medicine**$v**Periodicals.

650    _2    **$a**Internal Medicine**$v**periodicals.

710    2_    **$a**American College of Physicians.

770    1_    **$t**Annals of internal medicine. Supplement**$x**0570-183X

770    1_    **$t**ACP journal club**$g**1991-**$x**1056-8751**$w**(DLC) 93642454**$w**(OCoLC)23085040

780    00    **$t**Annals of clinical medicine**$x**0095-9944

997        **$a**MARCIVE

Liquidia's Exhibit 1036
Page 185

Appx2039

**LEADER**        -----nas--2200589-a-4500

001        991021969597502122

005        20200605082535.6

006        m-----o--d--------

007        cr-cnu||||||||

008        970725c19279999pausr-pso-----0---a0eng-c

010              **$a** 2002214103

022              **$a**1539-3704

035              **$a**(OCoLC)37354934

035              **$a**(CKB)954925380979

035              **$a**(CONSER)--2002214103

035              **$a**(EXLCZ)99954925380979

042              **$a**nsdp**$a**pcc

050      14      **$a**R11

060      _4      **$a**INTERNET

082      10      **$a**616**$2**13

130      0_      **$a**Annals of internal medicine (Online)

210              **$a**ANN INTERN MED

210              **$a**ANN INT MED

210              **$a**ANN. INTERN. MED

Liquidia's Exhibit 1036
Page 186

Appx2040

Staff details - Annals of internal medicine - UW-Madison Libraries

| 210 | 0_ | $aAnn. intern. medicin.$b(Online) |
| 222 | _0 | $aAnnals of internal medicine$b(Online) |
| 245 | 10 | $aAnnals of internal medicine. |
| 246 | 3_ | $aAnnals.org |
| 260 | | $a[Philadelphia, Pa.] :$bAmerican College of Physicians |
| 310 | | $aSemimonthly |
| 336 | | $atext$btxt$2rdacontent |
| 337 | | $acomputer$bc$2rdamedia |
| 338 | | $aonline resource$bcr$2rdacarrier |
| 362 | 1_ | $aPrint began with vol. 1 (July 1927). |
| 500 | | $aRefereed/Peer-reviewed |
| 515 | | $aVol. 2-[50] called also old ser. v.7-[55]. |
| 515 | | $aIssues for [1991-] consist of 2 vols. per year with 12 nos. each. |
| 580 | | $aHas supplement: ACP journal club, 1991-94; which became an independent publication in 1995. |
| 588 | 0_ | $a15 July 1997. |
| 588 | 1_ | $aVol. 172, issue 7 (Apr. 7, 2020) (annals.org, viewed Apr. 19, 2020). |
| 650 | _0 | $aMedicine$vPeriodicals. |
| 650 | _2 | $aInternal Medicine. |
| 650 | _2 | $aMedicine. |

Liquidia's Exhibit 1036
Page 187

Appx2041

| 650 | _7 | $aInternal Medicine.$2ebps |
|---|---|---|
| 650 | _7 | $aMedicine.$2fast$0(OCoLC)fst01014893 |
| 655 | _0 | $aElectronic journals. |
| 655 | _2 | $aPeriodical. |
| 655 | _4 | $aElectronic journals. |
| 655 | _7 | $aPeriodicals.$2fast$0(OCoLC)fst01411641 |
| 655 | _7 | $aPeriodicals.$2lcgft |
| 776 | | $x0003-4819 |
| 770 | 0_ | $tAnnals of internal medicine. Supplement$w(CKB)991042744489202 |
| 770 | 0_ | $tACP journal club$w(CKB)954927720473$w(DLC)93642454$x1539-8560 |
| 710 | 2_ | $aAmerican College of Physicians. |
| 906 | | $aJOURNAL |

## MMS IDs

**Document ID:**
999482007502121
**Network Electronic IDs:**
9911025226002121
**Network Physical IDs:**
999482007502121
**mms_mad_ids:**
991469593602122, 991021969597502122
**mms_ml_ids:**
99519973402124
**mms_osh_ids:**

992934083502126, 99100456734590212

Liquidia's Exhibit 1036
Page 188

Appx2042

**mms_lc_ids:**
991016438785302125
**mms_pl_ids:**
99901301535802127
**mms_ww_ids:**
991015488696102133

Liquidia's Exhibit 1036
Page 189

Appx2043

# Attachment F2

Liquidia's Exhibit 1036
Page 190

1/3/2021                                    MARC Display (Library of Congress Authorities)



The Library of Congress                                    >> Go to Library of Congress Online Catalog





**Library buildings are closed to the public until further notice, but LC Authorities is available.** More.

| Help | New Search | Search History | Headings List | Start Over |

◄ Previous        Next ►

**MARC Display**    Labelled Display

**LC control no.:** sh2008107665
**LCCN Permalink:** https://lccn.loc.gov/sh2008107665
**HEADING:** Medicine Periodicals

**000** 00451cz a2200169n 450
**001** 7458312
**005** 20110729160524.0
**008** 080304|| anannbabn |n ana
**010** __ |a sh2008107665
**035** __ |a (DLC)383840
**035** __ |a (DLC)sh2008107665
**040** __ |a DLC |b eng |c DLC
**150** __ |a Medicine |v Periodicals
**667** __ |a Record generated for validation purposes.
**670** __ |a Work cat.: Fa lü yu yi xue za zhi =,
**906** __ |t 8888 |u te00 |v 0
**953** __ |a te00

◄ Previous        Next ►

| **Save, Print or Email Records** (View Help) |
| Select Download Format: Text (Labelled Display) ▾   Press to SAVE or PRINT |
| Email Text (Labelled Display) to: |
| [                    ]   Press to SEND EMAIL |

Help - Search - Search History - Headings List - Start Over



**Library of Congress**
URL: https://www.loc.gov/

*Mailing Address:*
101 Independence Ave, S.E.
Washington, DC 20540

**Library of Congress Authorities**
*URL:* http://authorities.loc.gov/
**Library of Congress Online Catalog**
*URL:* https://catalog.loc.gov/

**Questions, comments, error reports:** Contact Us

Liquidia's Exhibit 1036
Page 191

Appx2045

# Attachment F3

Liquidia's Exhibit 1036
Page 192

| OCLC 1481385 | No holdings in XXX - 1475 other holdings | | | |
|---|---|---|---|---|

| | | Rec | Entered 197507 27 | Replace 2020123 0163924 .3 |
|---|---|---|---|---|
| | | Stat d | | |

Continuing Resources

| Type | a | ELvl | | Srce | c | GPub | | Ctrl | | Lang | eng |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BLvl | s | Form | | Conf | 0 | Freq | s | MRec | | Ctry | pau |
| S/L | 0 | Orig | | EntW | | Regl | r | Alph | a | | |
| Desc | | SrTp | p | Cont | | DtSt | c | Dates | 1927 | , | 9999 |

010   43032966
040   MUL $b eng $c MUL $d NSD $d DLC $d NSD $d SER $d AIP $d DLC $d AIP $d IUL $d AIP $d NST $d HUL $d NST $d EBZ $d OCL $d NSD $d OCL $d NST $d DLC $d GUA $d NSD $d OCLCQ $d MUQ $d NLGGC $d NYG $d GUA $d PFM $d CUS $d WUOHS $d OCLCQ $d HEBIS $d GEBAY $d GBVCP $d WAU $d UKMGB $d TULIB $d OCLCQ $d OCLCF $d OCLCA $d KLH $d OCLCO $d WIC $d DEBBG $d OCLCO $d EUW $d OCLCO $d CUS $d OCLCO $d OCLCQ $d VOD $d OCLCO $d PRB $d FC@ $d VPI $d OCLCO $d ZAS $d OCLCO $d OCLCA $d CNUTO $d HLO $d UAB $d UZO $d VGM $d ATVSV $d IBO $d CSJ $d TFH $d VZR $d OCLCQ $d CSAIL $d OKS $d OCLCO $d CAHUS $d OCLCO $d NJR $d OCLCO $d BUF $d OCLCO $d GILDS $d ISN $d OCLCO $d CAI $d OCLCO $d CNO $d OCLCO $d CCH $d OCLCO $d GZH $d OCLCO $d PAU $d MRM $d ZAP $d CPO $d OCLCO $d CASUM $d OCLCO $d JDP $d MYPUT $d DXU $d TORON $d OCLCO $d UWO $d OCLCO $d LGG $d LEAUB $d OCLCO $d UK5EZ $d OCLCO $d OCLCA $d GWDNB $d VDB
012   3 $e n $i 8509 $j 0 $k 1 $m 1
016 7  $2 DE-101 $a 010002790
016 7  $2 DE-600 $a 336-0
016 7  0372351 $2 DNLM
016 7  A34995000 $2 DNLM
016 7  AA00532617 $2 JP-ToKJK
016 7  009556072 $2 Uk
019   436881782 $a 643568115 $a 975218040 $a 978906225 $a 980595091 $a 981103536 $a 989192461 $a 990132554 $a 990477648 $a 995593477 $a 1003619337 $a 1052628693 $a 1055467957 $a 1063424647 $a 1089798020 $a 1162987651 $a 1167082757 $a 1191348459 $a 1197641883 $a 1201536830 $a 1201567460 $a 1202976202 $a 1203515023 $a 1227823314 $a 1228126777
022 0  0003-4819 $l 0003-4819 $2 1
030   AIMEAS
032   026120 $b USPS
037   $b American College of Physicians, Independence Mall W., Sixth St. at Race, Philadelphia, PA 19106-1572 $c $$103.00
042   nsdp $a pcc
050 00 R11 $b .A84
060 00 W1 AN605
082 04 616
090   $b
210 0  Ann. intern. med.
222  0 Annals of internal medicine
245 00 Annals of internal medicine.
260   [Philadelphia, etc.], $b [American College of Physicians]
300   volumes $b illustrations, diagrams $c 26 cm

310   Semimonthly, $b <1991-

321   Monthly, $b 1927-

336   text $b txt $2 rdacontent

337   unmediated $b n $2 rdamedia

338   volume $b nc $2 rdacarrier

362 0  v. 1- July 1927-

510 2  Chemical abstracts $x 0009-2258

515   Vol. 2-<50 called also old ser. v. 7-<55

515   Issues for <1991- consist of 2 vols. per year with 12 nos. each.

555   Vols. 1-40, July 1927-June 1954. 1 v.; Vols. 41-50, June 1954-June 1959. 1 v.

580   Has supplement: ACP journal club, 1991-1994; which became an independent publication in 1995.

580   Absorbed ACP journal club as a section and continues its own volume numbering with v. 148, no. 3 (20 May 2008).

650  0 Medicine $v Periodicals.

650 12 Internal Medicine. $0 (DNLM)D007388

650  6 Médecine interne $v Périodiques.

650  7 Medicine. $2 fast $0 (OCoLC)fst01014893

650  7 Innere Medizin $2 gnd $0 (DE-588)4027074-9

650 17 Interne geneeskunde. $2 gtt

655  4 Fulltext.

655  4 Periodicals.

655  4 Internet Resources.

655  7 Periodicals. $2 fast $0 (OCoLC)fst01411641

655  7 Zeitschrift. $0 (DE-588)4067488-5. $2 gnd

655  7 $0 (DE-588)4067488-5 $0 https://d-nb.info/gnd/4067488-5 $0 (DE-101)040674886 $a Zeitschrift $2 gnd-content

655  7 Periodicals. $2 rbgenr

710 2  American College of Physicians.

740 02 ACP journal club.

770 0  $t Annals of internal medicine. Supplement $x 0570-183X $w (DLC)sn 83002266 $w (OCoLC)1778587

770 0  $t ACP journal club $g 1991-1994 $x 1056-8751 $w (DLC)  93642454 $w (OCoLC)23085040

776 08 $i Online version: $t Annals of internal medicine (Online) $x 1539-3704 $w (DLC)  2002214103 $w (OCoLC)37354934

780 02 $t Annals of clinical medicine $x 0095-9944 $w (DLC)sn 83002264 $w (OCoLC)1481377

780 15 $t ACP journal club $g May 2008 $x 1056-8751 $w (DLC)  93642454 $w (OCoLC)23085040

850   GU $a IaAS $a InU $a MBCo $a MSobPR $a MnSU $a NBC $a NjP $a OU $a PU

856 41 $u http://www.acponline.org/journals/annals/annaltoc.htm

856 41 $u http://www.annals.org

# Conference Proceedings

# Dry Powder Inhalers: An Overview

Paul J Atkins PhD

Introduction
Powder Inhalers Today
   Unit-Dose Devices
   Multi-Dose Devices
Factors That Impact Performance and Patient Acceptance
DPI Development
Future DPI Developments
Summary

**Dry powder inhalers (DPIs) are a widely accepted inhaled delivery dosage form, particularly in Europe, where they currently are used by a large number of patients for the delivery of medications to treat asthma and chronic obstructive pulmonary disease. The acceptance of DPIs in the United States after the slow uptake following the introduction of the Serevent Diskus in the late 1990s has been driven in large part by the enormous success in recent years of the Advair Diskus. This combination of 2 well-accepted drugs in a convenient and simple-to-use device has created an accepted standard in pulmonary delivery and disease treatment that only a few years ago could not have been anticipated. The DPI offers good patient convenience, particularly for combination therapies, and also better compliance. The design and development of any powder drug-delivery system is a highly complex task. Optimization of the choice of formulation when matched with device geometry is key. The use of particle engineering to create a formulation matched to a simple device is being explored, as is the development of active powder devices in which the device inputs the energy, making it simpler for patients to receive the correct dose. Patient interface issues are also critically important. However, one of the most important factors in pulmonary delivery from a DPI is the requirement for a good-quality aerosol, in terms of the aerosol's aerodynamic particle size, and its potential to consistently achieve the desired lung deposition in vivo.** *Key words: dry powder inhaler, DPI, lactose, aerosol, asthma, bronchodilator, chronic obstructive pulmonary disease, COPD, corticosteroids, drug delivery.* [Respir Care 2005;50(10):1304–1312. © 2005 Daedalus Enterprises]

## Introduction

The most frequent use of inhalation therapy is for the treatment of obstructive airway diseases, including asthma and chronic obstructive pulmonary disease, using drugs such as short-acting and long-acting $\beta$ agonists, corticosteroids, and anti-cholinergic agents. Traditionally, these agents have been delivered via pressurized metered-dose inhaler (MDI). However, in recent years, dry powder inhalers (DPIs) have gained wider use, particularly in the United States, partly because of the introduction of the

Paul J Atkins PhD is affiliated with Oriel Therapeutics, Research Triangle Park, North Carolina.

Paul J Atkins PhD presented a version of this article at the 36th RESPIRATORY CARE Journal Conference, Metered-Dose Inhalers and Dry Powder Inhalers in Aerosol Therapy, held April 29 through May 1, 2005, in Los Cabos, Mexico.

Correspondence: Paul J Atkins PhD, Oriel Therapeutics, PO Box 14087, 630 Davis Drive, Research Triangle Park NC 27709. E-mail: patkins@orieltherapeutics.com.

Liquidia's Exhibit 1038
Page 1

first combination of a long-acting $\beta$ agonist (salmeterol) and a corticosteroid (fluticasone propionate) in a convenient multi-dose DPI (Advair Diskus, GlaxoSmithKline, Research Triangle Park, North Carolina).[1]

Key to all inhalation dosage forms (either MDI or DPI) is the need to generate the optimum "respirable dose" (particles $< 5.0 \ \mu m$) of a therapeutic agent that will reach the site of action (ie, the lung). This is a critical performance feature in the rational design and selection of a pulmonary delivery system. Historically, MDIs have achieved lung deposition of 5–15% of the delivered dose. Current DPIs have similar efficiency, but they have a number of advantages over MDIs, including the fact that they are breath-actuated and therefore require less coordination than a conventional press-and-breathe MDI. Furthermore, they do not contain chlorofluorocarbon propellants, which have been implicated in atmospheric ozone depletion[2] and are being phased out. In addition, the more recently developed multi-dose DPIs have either a dose counter or indicator that tells the patient how much medication remains in the inhaler, which is another feature that differentiates DPIs from currently available MDIs.

DPIs do, however, suffer from some inherent disadvantages, including the fact that they require moderate inspiratory effort to draw the formulation from the device; some patients are not capable of such effort. Furthermore, there is only a limited number of drugs available in a multi-dose format, with some drugs being available only in unit-dose formats. These unit-dose devices are perceived as complex and confusing for patients.[3] In a recent review, Frijlink and De Boer claimed that "well designed DPIs are highly efficient systems for pulmonary drug delivery. However, they are also complicated systems, the performance of which relies on many aspects, including design. . . , powder formulation, and airflow generated by the patient."[4] This paper will review the currently available DPIs, focusing primarily on the United States market, evaluate the key performance variables of these DPIs, including patient preferences, and provide some insights into potential future developments of DPIs for the delivery of agents to treat respiratory diseases and systemic diseases.

## Powder Inhalers Today

Today there are essentially 2 types of DPI: those in which the drug is packaged into discrete individual doses (in a gelatin capsule or a foil-foil blister) and those that contain a reservoir of drug from which doses are metered out.[5] Both are now widely available around the world and are gaining broad acceptance as suitable alternatives to MDIs. There is clearly considerable interest in these devices, because they do not require chlorofluorocarbon propellant to disperse the drug and are therefore ozone-friendly. Furthermore, DPIs obviate coordination of actuation and

inspiration (a limitation of MDIs) because DPIs are essentially breath-actuated. However, this breath-actuation is also one of their disadvantages. Some DPIs require inspiratory flow of $\geq 60$ L/min to effectively de-aggregate the powder,[6,7] which cannot always be achieved by all asthmatic patients, particularly infants. All the currently available DPIs suffer from this potential drawback and can be characterized as "passive" inhalers (ie, the patient provides the energy to suck the drug from the device). This has prompted several companies to evaluate ways of providing energy in the inhaler, which is leading to the development of several "active" DPIs, although none of these are currently available commercially.

## Unit-Dose Devices

With a single-dose DPI, a powder-containing capsule is placed in a holder inside the DPI, the capsule is opened within the device, and then the powder is inhaled. The spent capsule must be discarded after use and a new capsule inserted for the next dose. The concept of the first capsule-based device (the Spinhaler) was first described in the early 1970s, by Bell and colleagues,[8] who had developed this device for the administration of powdered sodium cromoglycate. Briefly, the drug mixture, which often includes a bulk carrier to aid powder flow, is pre-filled into a hard gelatin capsule and loaded into the device. After activation of the device, which pierces the capsule, the patient inhales the dose, which is dispensed from the vibrating capsule by means of inspired air. This product is no longer available in the United States.

A similar DPI (Rotahaler, GlaxoSmithKline), which has also been available for many years, delivers albuterol. With the Rotahaler, the drug mixture is also in a hard capsule. The capsule is inserted into the device, broken open inside the device, and the powder is inhaled through a screened tube (Fig. 1).[9,10] Again, this product is no longer available in the United States.

Although these single-dose devices have performed well in clinical use for many years, the main criticism of them is the cumbersome nature of loading the capsule, which might not be easily accomplished by a patient who is undergoing an asthma attack and requires immediate delivery of the drug. This is clearly very relevant for devices that deliver short-acting bronchodilators. In addition, elderly patients may not have the manual dexterity to accomplish all the necessary maneuvers to take the capsule from the package, load it, and pierce the capsule in the device. However, despite the perception that unit-dose devices are not patient-friendly and are not easy to use, several introductions of single-dose DPIs have occurred over the last few years using similar designs (eg, Foradil Aerolizer, made by Novartis/Schering-Plough, and Spiriva HandiHaler, made by Boehringer Ingelheim/Pfizer).[11,12]

Liquidia's Exhibit 1038
Page 2

**Appx2083**



Fig. 1. Examples of unit-dose dry powder inhalers (DPIs). A: Rotahaler and Rotacap (contains albuterol). B: Diagram of Rotahaler. C: Spiriva Handihaler. (Diagram from Reference 10, with permission. Photograph C courtesy of Boehringer Ingelheim/Pfizer.)

The Foradil device has been poorly accepted since its introduction. This may be related to the need to store the capsules refrigerated. With the recently introduced Spiriva Handihaler it is too early to evaluate the degree of patient acceptance of this device, although it is complex and requires at least 7 distinct steps to deliver the dose. For some patients, 2 inhalations are required to completely empty the capsule and achieve the therapeutic dose, which adds to the degree of complexity for the patient when using this device. Furthermore, there have been recent reports[3] of patients ingesting the capsules instead of placing the capsule in the device and inhaling the contents. This is clearly not desirable.

**Multi-Dose Devices**

Given the inherent limitations of single-dose devices, in the past decade or so there has been considerable focus on developing multi-dose DPIs. The development of multi-dose DPIs was pioneered by the AB Draco company (now a division of AstraZeneca), with their Turbuhaler.[13] This device was truly the first metered-dose powder delivery system. The drug formulation is contained within a storage reservoir and can be dispensed into the dosing chamber by a simple back-and-forth twisting action on the base of the device. The device is capable of working at a moderate flow rate and also delivers carrier-free particles as well as lactose-based formulations.[14] Although the Turbuhaler is widely available in Europe and Canada, and has been used

to deliver both $\beta$ agonists (formoterol, terbutaline) and combinations (formoterol and budesonide), in the United States this device is only available to deliver the inhaled corticosteroid budesonide (Pulmicort Turbuhaler).[15]

One of the drawbacks for the Turbuhaler, which may have contributed to its limited acceptance in the United States, is its variable delivery at different flow rates.[5,16] This has also been the major criticism of several recently developed reservoir-type DPIs[17] and may limit their introduction into the United States. It is, however, important to note that Schering-Plough recently announced approval of their reservoir DPI for the delivery of the inhaled corticosteroid mometasone (Asmanex Twisthaler).[18]

To address issues associated with multiple dosing and consistent dose-to-dose delivery, in the late 1980s Glaxo developed the Diskhaler,[19] which was used to deliver a range of drugs, including albuterol, beclomethasone, salmeterol, fluticasone, and the anti-viral agent zanamivir. This device uses a circular disk that contains either 4 or 8 powder doses, which typically would be sufficient drug for 1–2 days of treatment; the empty disk is then discarded and a new disk is inserted in the device. The doses are maintained in separate aluminum blister reservoirs until just before inspiration. On priming the device, the aluminum blister is pierced and its contents drop into the dosing chamber. This device had limited commercial success, primarily because it held only a few doses per disk and was perceived as very cumbersome to load (Fig. 2).[20] It was used in the United States for the delivery of fluticasone propionate to pediatric patients, although the product has now been withdrawn. It was also used (in a modified form) to deliver the anti-influenza agent zanamivir, although, again, the use was not widespread.

Further improvements in patient convenience and ease of use were incorporated into the next generation of multi-dose DPI, called the Diskus. This product was introduced in the late 1990s. Initially it delivered salmeterol or fluticasone, but in 2001 a version was released that contains a combination salmeterol-plus-fluticasone formulation (Advair Diskus). This is a true multi-dose device; it contains 60 doses (one month's therapy) in a foil-foil aluminum strip that is indexed, and the dose blister is only opened just prior to patient inspiration (Fig. 3).[20,21] Consistent performance,[5] broad patient acceptance,[22,23] and the growing use of combination therapy (long-acting $\beta$ agonist plus inhaled corticosteroid) for asthma have allowed the Diskus to become the accepted standard multi-dose powder delivery device (Fig. 4).

**Factors That Impact Performance and Patient Acceptance**

Currently available DPIs are all passive systems, meaning that the patient must provide the energy to disperse the

Liquidia's Exhibit 1038
Page 3





Fig. 2. Relenza Diskhaler. (Photograph courtesy of GlaxoSmith-Kline. Diagram from Reference 20, with permission.)

Table 1.   Resistance of 5 Dry Powder Inhalers

| Inhaler | Manufacturer | Resistance ($H_2O/L/s$) |
|---|---|---|
| Rotahaler | GlaxoSmithKline | 0.015 |
| Spinhaler | Sanofi-Aventis | 0.016 |
| Diskhaler/Diskus | GlaxoSmithKline | 0.032 |
| HandiHaler | Boehringer Ingelheim | 0.042 |
| Turbuhaler | AstraZeneca | 0.044 |

(Adapted from Reference 4.)

Table 1 shows that there are important differences in resistance among the DPIs, and this difference in resistance causes differences in drug delivery efficiency between these devices.

The patient labeling for DPIs reveals some interesting statistics. For example, with the Spiriva Handihaler,[12] the powder is delivered at a flow as low as 20 L/min. However, when tested under standardized in vitro conditions, the HandiHaler delivers a mean of only 10.4 $\mu$g (or 58% of the nominal dose) when tested at a flow of 39 L/min for 3.1 s (for a total of 2 L of inspired volume). For patients with chronic obstructive pulmonary disease (mean forced expiratory volume in the first second 1.02 L, 37.6% of predicted), their median peak inspiratory flow through the HandiHaler was only 30.0 L/min (range 20.4–45.6 L/min). That relatively low flow impacts the amount of drug the patient receives, and the patient instructions include a provision for a second inhalation if all the powder has not been evacuated from the capsule.

Under standard in vitro test conditions, Advair Diskus[1] delivers 93 $\mu$g, 233 $\mu$g, and 465 $\mu$g of fluticasone propionate and 45 $\mu$g of salmeterol base per blister from the 100/50 $\mu$g, 250/50 $\mu$g, and 500/50 $\mu$g products, respectively, when tested at a flow of 60 L/min for 2 seconds. In contrast to the HandiHaler, adult patients with obstructive lung disease and severely compromised lung function (mean forced expiratory volume in the first second 20–30% of predicted) achieved mean peak inspiratory flow of 82.4 L/min (range 46.1–115.3 L/min) through the Diskus. Furthermore, adolescents ($n = 13$, age 12–17 years) and adults ($n = 17$, age 18–50 years) with asthma inhaling maximally through the Diskus had a mean peak inspiratory flow of 122.2 L/min (range 81.6–152.1 L/min). Among pediatric patients with asthma inhaling maximally through the Diskus, mean peak inspiratory flow was 75.5 L/min (range 9.0–104.8 L/min) among the 4-year-old patient set ($n = 20$) and 107.3 L/min (range 82.8–125.6 L/min) among the 8-year-old patient set ($n = 20$).[1]

Thus, it is important that physicians recognize that these devices will deliver different amounts of drug to different patients, and the lung delivery depends on patient factors,

powder from the device. The performance of these devices depends on both the formulation and the geometry of the air path in the device. Thus, frequently these delivery systems tend to be compound-specific and, without substantial re-formulation efforts, are not used to deliver other compounds. Typical formulations in DPIs are either drug alone (eg, budesonide in the Turbuhaler) or drug blended with a carrier, typically lactose (eg, formoterol in the Foradil Aerolizer). The requirement for specific DPI formulations is addressed in Hickey's contribution to this Journal Conference,[24] but I will make some general observations regarding current DPI products.

The particle size distribution, both in vitro and, more importantly, in vivo, depends on the patient's ability to pull a certain airflow through the device to create the shear force that disperses the particles. In general, a higher shear leads to a higher percentage of smaller particles, which may be beneficial, depending on the drug being delivered.

Liquidia's Exhibit 1038
Page 4

DRY POWDER INHALERS: AN OVERVIEW



Fig. 3. Schematic of the Diskus powder inhaler. (From Reference 20, with permission.)



Fig. 4. Serevent Diskus (left) and Advair Diskus (right) powder inhalers. (Courtesy of GlaxoSmithKline.)

such as inspiratory flow, patient inhalation technique, and device resistance.

One of the key factors with DPIs is that the various DPIs require different techniques to achieve an appropriate therapeutic dose, unlike MDIs, with which, in general, the inhalation technique is the same. Thus, ease of use and clear, concise instructions are required. In a recent publication by Melani and colleagues,[25] some interesting observations were made linking patient-training with ease of use. In many device-handling studies the simple conclusions are that patients find device A better than device B, although often the criteria evaluated have been extremely subjective. In a recent study[26] conducted in Germany and Holland, it was shown that in elderly patients (mean age 60 years), approximately two thirds ($n = 254$) were able to use the Diskus successfully, without any problems, compared with less than 30% of the patients using HandiHaler. This is at-

Liquidia's Exhibit 1038
Page 5

Appx2086

tributable to the complex nature of the unit-dose system versus the simpler multi-dose system. In contrast, the study by Melani et al[25] showed that adherence to instructions was poorer with the Diskus and Turbuhaler than with another unit-dose device (the Aerolizer). Indeed, in that study, which examined over 1,400 patients in Italy, the authors concluded that adherence to correct inhaler use was similar across DPIs and, indeed, between the DPIs studied (Aerolizer, Turbuhaler, and Diskus) and an MDI. This was attributed in part to appropriate training prior to product use. Thus, one of the critical factors in ensuring that patients receive the appropriate medication from the currently available passive DPIs is the provision of appropriate training and device education by the health-care provider.

## DPI Development

Historically, drug particles for inhalation have been produced by a milling (micronization) process that creates particles of $1.0–3.0$ $\mu m$ (this is absolutely necessary for inhalation). Of critical importance in the development of DPI products is the evaluation, optimization, and control of flow and dispersion (de-aggregation) characteristics of the formulation. These typically consist of micronized drug blended with a carrier (eg, lactose). The properties of these blends are a function of the principal adhesive forces that exist between particles, including van der Waals forces, electrostatic forces, and the surface tension of adsorbed liquid layers.[27] Particle size distribution of the drug and the excipient (lactose) are optimized during early formulation development studies to ensure consistent aerosol cloud formation during subsequent clinical evaluation.

The efficiency of dispersion of DPI aerosols, relative to the various geometric diameters of the particles, may also be an important factor. Specifically, dispersion requires the powder to overcome interparticulate forces that bind particles in bulk powder and to become entrained as single particles in the inhalatory air stream. Interparticulate forces are dominated by the van der Waals force for particles in the respiratory size range. All other factors being equal, the van der Waals force will decrease as the geometric particle size increases. Thus, in general terms, the probability of deposition in the deep lung is at odds with efficiency of dispersion for DPIs.

Environmental factors, especially temperature and humidity, are key factors that can impact DPI formulation stability and performance. The impact of these are studied in early development studies, and often the humidity effects negatively impact the formulation (particularly for lactose blends), making it more cohesive and therefore more difficult to disperse. This will be to some extent dependent on the device/formulation combination, and typically reservoir devices have a poorer ability to protect the

formulation from moisture effects. Hence, many of the DPIs now available have secondary packing (a foil overwrap) to protect them from moisture effects until just prior to use.

Some years ago Brown[28] alluded to the complexities involved in the design and development of a DPI. In much the same way as for an MDI, the combination of formulation (drug and carrier), the way that it is presented to the device, and the design of the dosing device itself all contribute to the overall performance of the dosage form. The requirement to use micronized drug with small particles, to achieve good aerodynamic properties of the dispersed powder, is confounded by the need to develop formulations that fill easily and accurately.[29] It is also important that changes in the physical nature of the formulation on transportation and storage are studied and do not adversely affect the product performance.

The development of DPIs has traditionally linked a specific formulation to a particular device geometry that then creates a pneumatic dispersion of the powder to overcome the interparticulate forces and create the aerosol.[30] However, in the past decade, the notion of producing particles of a specific size, density, and morphology has evolved, and has the potential to lead to important advances in pulmonary drug delivery. This advance was recently reviewed by Peart and Clarke[31] and by Koushik and Kompella.[32] The underlying principle is that enhanced performance can be controlled by formulation changes (eg, generating highly porous particles with large geometric diameters but small aerodynamic diameters), an approach characterized as "particle engineering." These complex formulations are then coupled with a simple delivery device. This is clearly a subject of interest for formulation scientists as they strive to develop more efficient powder delivery systems.

The goal of delivering micronized powders is a challenging one. Because of their very nature, these types of powders are highly cohesive. Their high inter-particulate forces make them difficult to de-aggregate: hence, the need for high inspiratory flow and turbulent airflow within DPIs. Inclusion of a carrier can aid in the de-aggregation process, but it can also lead to problems with absorption of atmospheric moisture. The alternative approach to achieving efficient dispersion of these highly cohesive powders is to provide an energy source for dispersion within the device itself, and a number of companies are pursuing this approach. An outline review of some of these approaches is provided below as part of a prediction of future DPI developments.

## Future DPI Developments

The delivery of powdered medication for the treatment of lung ailments has been known for centuries, is well

Liquidia's Exhibit 1038
Page 6

Table 2.    Aerosol-Dispersion Mechanisms of Dry Powder Inhalers

| Mechanism | Inhaler | Manufacturer |
|---|---|---|
| Venturi effect | Easyhaler | Orion |
| Impact bodies | Clickhaler | Innovata Biomed (IB) |
| | CertiHaler | SkyePharma |
| Discharge channels | Turbuhaler | AstraZeneca |
| | Twisthaler | Schering Plough |
| Cyclone chambers | Pulvinal | Chiesi |
| | Airmax | Ivax |
| | Novolizer | Viatris |
| | Taifun | LAB International (formerly Focus Inhalation) |
| Pressurized air* | Inhance | Nektar |
| | Aspirair | Vectura |
| Battery powered* | (Inhaler names not yet released) | Microdose Technologies |
| | | Oriel Therapeutics |

*Active powder inhaler (Adapted from Reference 4.)



Fig. 5. Prototype of the Nektar PDS ("pulmonary delivery system") for Exubera. The device slides open and closed like a telescope, for compact carrying and portability. The patient opens the device, inserts the foil blister (which contains the powdered medicine), and pumps the handle, which compresses a small amount of air inside the device. When the patient pushes the button, the compressed air is released at high velocity, which aerosolizes the powder and sends the aerosol into the chamber, where it is a stationary cloud. The patient then inhales the aerosol from the chamber. The patient receives the medicine first, followed by a volume of air, which helps push the drug deep into the lung. (Courtesy of Nektar Therapeutics.)

documented,[33] and is addressed by Anderson in her contribution to this conference.[34] Despite this extensive history, and in part fuelled by a need for alternative pulmonary delivery methods, as the MDI is undergoing environmental challenge, innovative ways to deliver drugs to the lungs continue to be pursued today. As can be seen from the previous discussion, the goal of de-aggregating highly cohesive powder for delivery to the lung in a powdered form is a challenging one.[30] The small dose size required for many of these potent drugs is a confounding factor in developing optimal DPIs. Nevertheless, today it is estimated that annually approximately 100 million multidose DPIs are used, on a global basis. This compares with approximately 400 million MDIs. Most of the DPIs contain lactose-based formulations. There has been some concern raised about the use of lactose carriers in asthma patients who have lactose intolerance,[35] although the incidence of this is believed to be small.

As has been discussed by others,[4,30] there are only a limited number of mechanisms for dispersing powdered drugs (Table 2). Many of these devices are now available commercially, although only the Turbuhaler is currently available in the United States.

Much interest has been focused recently on developing delivery systems that de-aggregate the powder,[30–32] as this effectively minimizes formulation-development work. Some of these systems are extremely complex in operation and may prove difficult to achieve in everyday operations. In addition, some designs that have already been achieved (eg, Inhance device for the delivery of 1 mg or 3 mg of inhaled insulin, Nektar Therapeutics, San Carlos, Califor-

nia) are probably too bulky to be fully portable. Others are pursuing smaller and more compact options. A review of the full range of these delivery systems is beyond the scope of this paper, but there are a couple of subjects worth exploring.

A multi-dose reservoir device is now under review with the United States Food and Drug Administration for the delivery of formoterol (Foradil Certihaler, Skye-Pharma, San Diego, California; Novartis, East Hanover, New Jersey).[36] This would be a major advance, as it would provide a second long-acting $\beta$ agonist in a multidose powder form. In addition, the first use of an active DPI is currently being sought for the delivery of pulmonary insulin (Exubera, Pfizer/Sanofi-Aventis, licensed from Nektar Therapeutics, Fig. 5). The device uses an air pump system that disperses the insulin powder into a spacer chamber, from which the patient can

Liquidia's Exhibit 1038
Page 7

then inhale. Approval of such a device will pave the way for future developments in this area, and many companies are seeking to follow the path that Nektar Therapeutics has pioneered. In our laboratories[37] we are working to use vibration to disperse powder efficiently and achieve consistent aerosol delivery. Others are using various different techniques. Details of these early development efforts have been extensively described.[4,31,32]

## Summary

DPIs are a widely accepted inhaled delivery dosage form, particularly in Europe where they are currently used by an estimated 40% of patients to treat asthma and chronic obstructive pulmonary disease. Their use will continue to grow. The acceptance of DPIs in the United States, after the slow uptake following the introduction of Serevent Diskus in the late 1990s, has been driven in large part by the enormous success in recent years of Advair Diskus. This combination of 2 well-accepted drugs in a convenient and simple-to-use device has created an accepted standard in pulmonary delivery and disease treatment that only a few years ago could not have been anticipated. The DPI offers good patient convenience, particularly for combination therapies, and also better compliance. Adherence may be better, but only if there is sufficient effort put in place to clearly teach the correct use of the device.

The design and development of any powder drug delivery system is a highly complex task. Optimization of the choice of formulation when matched with device geometry is key. The use of particle engineering to create a formulation matched to a simple device is being explored, as well as the development of active powder devices that supply the energy, making it simpler for patients to receive the correct dose. Both of these avenues are being pursued by a number of companies and will result in further advances in DPI technology. Patient interface issues are also critically important. However, common to the development of all systems is an appreciation that one of the most important factors in pulmonary delivery from a DPI is the requirement for a good-quality aerosol (in terms of the aerodynamic particle size of the cloud generated) and its potential to consistently achieve the desired regional deposition in vivo. This has been the goal of many scientists over many years and we are still short of that goal. Today there is still no ideal DPI, unlike the MDI, which has been used ubiquitously. More work is required to ensure that DPIs are made available that are simple, easy to use, and independent of patient effort. Today, if we can make drugs on a chip, we should be able to make better DPIs!

## REFERENCES

1. GlaxoSmithKline. Advair Diskus 100/50 (fluticasone 100mcg and salmeterol 50mcg inhalation powder). http://www.advair.com. Accessed August 4, 2005.
2. Molina M, Rowland F. Stratospheric sink for chlorofluoro-methanes: chlorine atom catalysed destruction of ozone. Nature 1974;249:810–812.
3. Tezky T, Holquist C. Misadministration of capsules for inhalation. Drug Topics 2005;4:48.
4. Frijlink HW, De Boer AH. Dry powder inhalers for pulmonary drug delivery. Expert Opin Drug Deliv 2004;1(1):67–86.
5. Sumby B, Slater A, Atkins PJ, Prime D. Review of dry powder inhalers. Adv Drug Deliv Rev 1997;26(1):51–58.
6. Meakin BJ, Ganderton D, Panza I, Ventura P. The effect of flow rate on drug delivery from the Pulvinal, a high resistance dry powder inhaler. J Aerosol Med 1998;11(3):143–152.
7. De Boer AH, Winter HMI, Lerk CF. Inhalation characteristics and their effect on in-vitro drug delivery from dry powder inhalers. Int J Pharm 1996;130:231–244.
8. Bell JH, Hartley PS, Cox JS. Dry powder aerosols. I. A new powder inhalation device J Pharm Sci 1971;60(10):1559–1564.
9. Newman SP. Therapeutic aerosols. In: Clarke SW, Pavia D, editors. Aerosols and the lung: clinical and experimental aspects. London: Butterworths; 1984:87.
10. Clark T, Rees J. Practical management of asthma. London: Martin Dunitz; 1985:134.
11. Schering-Plough. Foradil Aerolizer (formoterol fumarate inhalation powder) 12mcg. http://www.foradil.com. Accessed April 2005.
12. Boehringer Ingelheim/Pfizer. Spiriva Handihaler (tiotropium bromide inhalation powder). http://www.spiriva.com. Accessed April 2005.
13. Wetterlin K. Turbuhaler: a new powder inhaler for administration of drugs to the airways. Pharm Res 1988;5(8):506–508.
14. Newman SP, Moren F, Crompton GK, editors. A new concept in inhalation therapy. London: Medicom; 1987.
15. AstraZeneca. Pulmicort Turbuhaler (budesonide inhalation powder) 200mcg. http://www.twistclickinhale.com. Accessed April 2005.
16. Everard ML, Devadason SG, Le Souef PN. Flow early in the inspiratory manoeuvre affects the aerosol particle size distribution from a Turbuhaler. Respir Med 1997;91(10):624–628.
17. Smith IJ, Parry-Billings M. The inhalers of the future? A review of dry powder devices on the market today. Pulm Pharmacol Ther 2003;16(2):79–95.
18. Schering-Plough, 31st March 2005, approval of Asmanex Twisthaler 220 mcg (mometasone furoate inhalation powder). http://www.schering-plough.com. Accessed August 4, 2005.
19. Pover GM, Langdon CG, Jones SR, Fidler C. Evaluation of a breath operated powder inhaler. J Int Med Res 1988;16(3):201–203.
20. Crompton GK. Delivery systems. In: Kay AB, editor. Allergy and allergic diseases. London: Blackwell Science; 1997:1440–1450.
21. Brindley A, Sumby BS, Smith IJ, Prime D, Haywood PA, Grant AC. Design manufacture and dose consistency of the Serevent Diskus inhaler. Pharm Tech Eur 1995;7:14–22.
22. Schlaeppi M, Edwards K, Fuller RW, Sharma R. Patient perception of the Diskus inhaler: a comparison with the Turbuhaler inhaler. Br J Clin Prac 1996;50(1):14–19.
23. Molimard M, Raherison C, Lignot S, Depont F, Abouelfath A, Moore N. Assessment of handling of inhaler devices in real life: an observational study in 3811 patients in primary care. J Aerosol Med 2003;16(3):249–254.
24. Telko MJ, Hickey AJ. Dry powder inhaler formulation. Respir Care 2005;50(9):1209–1227.
25. Melani AS, Zanchetta D, Barbato N, Sestini P, Cinti C, Canessa PA, et al; Associazione Italiana Pneumologi Ospedalieri Educational

Group. Inhalation technique and variables associated with misuse of conventional metered-dose inhalers and newer dry powder inhalers in experienced adults. Ann Allergy Asthma Immunol 2004;93(5): 439–446.

26. Moore AC, Stone S. Meeting the needs of patients with COPD: patients' preference for the Diskus inhaler compared with the Handihaler. Int J Clin Pract 2004;58(5):444–450.

27. Concessio NM, Hickey AJ. Descriptors of irregular particle morphology and powder properties. Adv Drug Deliv Rev 1997;26(1):29–40.

28. Brown K. The formulation and evaluation of powders for inhalation. In: Ganderton D, Jones TM, editors. Drug delivery to the respiratory tract 1987. Chichester, England: Ellis Horwood.1987:119–123.

29. Crowder TM, Rosati JA, Schroeter JD, Hickey AJ, Martonen TB. Fundamental effects of particle morphology on lung delivery: predictions of Stokes' law and the particular relevance to dry powder inhaler formulation and development. Pharm Res 2002;19(3):239–245.

30. Crowder TM, Louey MD, Sethuraman VV, Smyth HD, Hickey AJ. An odyssey in inhaler formulations and design. Pharm Technol 2001; 25(7):99–113.

31. Peart J, Clarke MJ. New developments in dry powder inhaler technology. Am Pharm Rev 2001;4(3):37–45.

32. Koushik K, Kompella UB. Inhalation engineering. Drug Deliv Technol 2004;4(2):40–50.

33. Sanders M. Inhalatorium. http://inhalatorium.com. Accessed April 30, 2005.

34. Anderson PJ. History of aerosol therapy: liquid nebulization to MDIs to DPIs. Respir Care 2005;50(9):1139–1149.

35. Nowak-Wegrzyn A, Shapiro GG, Beyer K, Bardina L, Sampson HA. Contamination of dry powder inhalers for asthma with milk proteins containing lactose (letter). J Allergy Clin Immunol 2004;113(3): 558–560.

36. Chuchalin AG, Manjra AI, Rozinova NN, Skopkova O, Cioppa GD, Till D, et al. Formoterol delivered via a new multi-dose dry powder inhaler (Certihaler) is as effective and well tolerated as the formoterol dry powder inhaler (Aerolizer) in children with persistent asthma. J Aerosol Med 2005;18(1):63–73.

37. Crowder TM. Vibration technology for active dry-powder inhalers. Pharm Technol 2004:2–6.

## Discussion

**Amato:*** Do you think if Advair was introduced as an MDI, it would be as popular as the DPI is? Is its popularity related more to the device or to the drug?

**Atkins:** As to whether the device or the drug drives physician choice, I think it is usually the drug. I can tell you that, in France, with fluticasone at the same price per dose, patients preferred Diskus over HFA MDI, 65% to 35%. Another aspect is that some small percentage of the population,

---

\* Michael T Amato, American Respiratory Care Foundation, Irving, Texas; Monaghan Medical/ Trudell Medical International, Syracuse, New York.

probably about 10% or less, will not be able to use Diskus or other DPIs. That doesn't answer your question directly, but I think there is probably a preference in some places for Diskus or other DPIs over MDI, but the MDI is going to be around for a while.

**Smaldone:** I think a lot of it has to do with the market. In the United States there was no heavy competition for the combination product. My answer to Mike's question would be that an MDI version of Advair probably would have been as popular. If you compare the Diskus against the MDI, the Diskus might win, but if the Diskus wasn't there, I don't think the company would have been any less successful with an MDI version.

**MacIntyre:** I was struck by Tony's [Hickey] comment during his presentation that there will probably not be generic DPIs. But you showed 2 devices that are being used as generic DPIs. Help me reconcile those 2 statements. Can you build a "generic" DPI and then find a product to disperse with it?

**Hickey:** It's a question of how you consider generic products to perform. If you do it based on performance, which is how the Europeans are looking at it, then it's possible. If you do it based on componentry equivalence, which is the way we look at it in the United States, it's absolutely impossible, because all these devices are different.

Liquidia's Exhibit 1038
Page 9



Pulmozyme® (dornase alfa) Inhalation Solution

**Figure 1** Mean Percent Change from Baseline FEV₁ in Patients with FVC ≥40% of Predicted



Treatment:  × — ×  Placebo   △······△  rhDNase 2.5 mg QD  •——•  rhDNase 2.5 mg BID

## DESCRIPTION

Pulmozyme is a sterile, clear, colorless, highly purified solution of recombinant human deoxyribonuclease I (rhDNase), an enzyme which selectively cleaves DNA. The protein is produced by genetically engineered Chinese Hamster Ovary (CHO) cells containing DNA encoding for the native human protein, deoxyribonuclease I (DNase). Fermentation is carried out in a nutrient medium containing the antibiotic gentamicin, 100-200 mg/L. However, the presence of the antibiotic is not detectable in the final product. The product is purified by tangential flow filtration and column chromatography. The purified glycoprotein contains 260 amino acids with an approximate molecular weight of 37,000 daltons (1). The primary amino acid sequence is identical to that of the native human enzyme.

Pulmozyme is administered by inhalation of an aerosol mist produced by a compressed air driven nebulizer system (see Clinical Experience, DOSAGE and ADMINISTRATION). Each Pulmozyme single-use ampule will deliver 2.5 mL of the solution to the nebulizer bowl. The aqueous solution contains 1.0 mg/mL dornase alfa, 0.15 mg/mL calcium chloride dihydrate and 8.77 mg/mL sodium chloride. The solution contains no preservative. The nominal pH of the solution is 6.3.

## CLINICAL PHARMACOLOGY

### General

In cystic fibrosis (CF) patients, retention of viscous purulent secretions in the airways contributes both to reduced pulmonary function and to exacerbations of infection (2,3).

Purulent pulmonary secretions contain very high concentrations of extracellular DNA released by degenerating leukocytes that accumulate in response to infection (4). *In vitro*, Pulmozyme hydrolyzes the DNA in sputum of CF patients and reduces sputum viscoelasticity (1).

### Pharmacokinetics

When 2.5 mg Pulmozyme was administered by inhalation to eighteen CF patients, mean sputum concentrations of 3 µg/mL DNase were measurable within 15 minutes. Mean sputum concentrations declined to an average of 0.6 µg/mL two hours following inhalation. Inhalation of up to 10 mg TID of Pulmozyme by 4 CF patients for six consecutive days, did not result in a significant elevation of serum concentrations of DNase above normal endogenous levels (5,6). After administration of up to 2.5 mg of Pulmozyme twice daily for six months to 321 CF patients, no accumulation of serum DNase was noted.

Pulmozyme, 2.5 mg by inhalation, was administered daily to 98 patients aged 3 months to ≤10 years, and bronchoalveolar lavage (BAL) fluid was obtained within 90 minutes of the first dose. BAL DNase concentrations were detectable in all patients but showed a broad range, from 0.007 to 1.8 µg/mL. Over an average of 14 days of exposure, serum DNase concentrations (mean ± s.d.) increased by 1.3 ± 1.3 ng/mL for the 3 months to <5 year age group and by 0.8 ± 1.2 ng/mL for the 5 to ≤10 year age group. The relationship between BAL or serum DNase concentration and adverse experiences and clinical outcomes is unknown.

### Clinical Experience

Pulmozyme has been evaluated in a randomized, placebo-controlled trial of clinically stable cystic fibrosis patients, 5 years of age and older, with baseline forced vital capacity (FVC) greater than or equal to 40% of predicted and receiving standard therapies for cystic fibrosis (7). Patients were treated with placebo (325 patients), 2.5 mg of Pulmozyme once a day (322 patients), or 2.5 mg of Pulmozyme twice a day (321 patients) for six months administered via a Hudson T Up-draft II® nebulizer with a Pulmo-Aide® compressor.

Both doses of Pulmozyme resulted in significant reductions when compared with the placebo group in the number of patients experiencing respiratory tract infections requiring use of parenteral antibiotics. Administration of Pulmozyme reduced the relative risk of developing a respiratory tract infection by 27% and 29% for the 2.5 mg daily dose and the 2.5 mg twice daily dose, respectively (see Table 1). The data suggest that the effects of Pulmozyme on respiratory tract infections in older patients (>21 years) may be smaller than in younger patients, and that twice daily dosing may be required in the older patients. Patients with baseline FVC >85% may also benefit from twice a day dosing (see Table 1). The reduced risk of respiratory infection observed in Pulmozyme treated patients did not directly correlate with improvement in FEV₁ during the initial two weeks of therapy.

Within 8 days of the start of treatment with Pulmozyme, mean FEV₁ increased 7.9% in those treated once a day and 9.0% in those treated twice a day compared to the baseline values. The overall mean FEV₁ during long-term therapy increased 5.8% from baseline at the 2.5 mg daily dose level and 5.6% from baseline at the 2.5 mg twice daily dose level. Placebo recipients did not show significant mean changes in pulmonary function testing (see Figure 1).

For patients 5 years of age or older, with baseline FVC greater than or equal to 40%, administration of Pulmozyme decreased the incidence of occurrence of first respiratory tract infection requiring parenteral antibiotics, and improved mean FEV₁, regardless of age or baseline FVC.

**Table 1**
Incidence of First Respiratory Tract Infection
Requiring Parenteral Antibiotics in Patients with FVC ≥40% of Predicted

|  | Placebo N=325 | 2.5 mg QD N=322 | 2.5 mg BID N=321 |
|---|---|---|---|
| Percent of Patients Infected | 43% | 34% | 33% |
| Relative Risk (vs placebo) |  | 0.73 | 0.71 |
| p-value (vs placebo) |  | 0.015 | 0.007 |
| Subgroup by Age and Baseline FVC | Placebo (N) | 2.5 mg QD (N) | 2.5 mg BID (N) |
| Age |  |  |  |
| 5-20 years | 42% (201) | 25% (199) | 28% (184) |
| 21 years and older | 44% (124) | 48% (123) | 39% (137) |
| Baseline FVC |  |  |  |
| 40-85% Predicted | 54% (194) | 41% (201) | 44% (203) |
| >85% Predicted | 27% (131) | 21% (121) | 14% (118) |

Pulmozyme has also been evaluated in a second randomized, placebo-controlled study in clinically stable patients with baseline FVC <40% of predicted (8). Patients were enrolled and treated with placebo (162 patients) or Pulmozyme 2.5 mg QD (158 patients) for twelve weeks. In patients who received Pulmozyme, there was an increase in mean change (as percent of baseline) compared to placebo in FEV₁ (9.4% vs. 2.1%, p <0.001) and in FVC (12.4% vs. 7.3%, p <0.01). Pulmozyme did not significantly reduce the risk of developing a respiratory tract infection requiring parenteral antibiotics (54% of Pulmozyme patients vs. 55% of placebo patients had experienced a respiratory tract infection by 12 weeks, relative risk = .93, p=0.62).

### Other Studies

Clinical trials have indicated that Pulmozyme therapy can be continued or initiated during an acute respiratory exacerbation.

Short-term dose ranging studies demonstrated that doses in excess of 2.5 mg BID did not provide further improvement in FEV₁. Patients who have received drug on a cyclical regimen (i.e., administration of Pulmozyme 10 mg BID for 14 days, followed by a 14 day wash out period) showed rapid improvement in FEV₁ with the initiation of each cycle and a return to baseline with each Pulmozyme withdrawal.

## INDICATIONS AND USAGE

Daily administration of Pulmozyme® (dornase alfa) Inhalation Solution in conjunction with standard therapies is indicated in the management of cystic fibrosis patients to improve pulmonary function. In patients with an FVC ≥40% of predicted, daily administration of Pulmozyme has also been shown to reduce the risk of respiratory tract infections requiring parenteral antibiotics.

Safety and efficacy of daily administration have not been demonstrated in patients for longer than twelve months.

## CONTRAINDICATIONS

Pulmozyme is contraindicated in patients with known hypersensitivity to dornase alfa, Chinese Hamster Ovary cell products, or any component of the product.

## WARNINGS

None.

## PRECAUTIONS

### General

Pulmozyme should be used in conjunction with standard therapies for CF.

### Information for Patients

Pulmozyme must be stored in the refrigerator at 2-8°C (36-46°F) and protected from strong light. It should be kept refrigerated during transport and should not be exposed to room temperatures for a total time of 24 hours. The solution should be discarded if it is cloudy or discolored. Pulmozyme contains no preservative and, once opened, the entire contents of the ampule must be used or discarded. Patients should be instructed in the proper use and maintenance of the nebulizer and compressor system used in its delivery.

Pulmozyme should not be diluted or mixed with other drugs in the nebulizer. Mixing of Pulmozyme with other drugs could lead to adverse physicochemical and/or functional changes in Pulmozyme or the admixed compound.

### Drug Interactions

Clinical trials have indicated that Pulmozyme can be effectively and safely used in conjunction with standard cystic fibrosis therapies including oral, inhaled and/or parenteral antibiotics, bronchodilators, enzyme supplements, vitamins, oral or inhaled corticosteroids, and analgesics. No formal drug interaction studies have been performed.

### Carcinogenesis, Mutagenesis, Impairment of Fertility

Carcinogenesis: Lifetime studies in Sprague Dawley rats showed no carcinogenic effect when Pulmozyme was administered at doses up to 246 µg/kg body weight per day. Pulmozyme was administered to rats as an aerosol for up to 30 minutes per day, daily for two years, with resulting lower respiratory tract doses of up to 246 µg/kg per day, which represents up to a 28.8-fold multiple of the clinical dose. There was no increase in the development of benign or malignant neoplasms and no occurrence of unusual tumor types in rats after lifetime exposure.

Mutagenesis: Ames tests using six different tester strains of bacteria (4 of S. typhimurium and 2 of E. coli) at concentrations up to 5000 µg/plate, a cytogenetic assay using human peripheral blood lymphocytes at concentrations up to 20000 µg/plate, and a mouse lymphoma assay at concentrations up to 1000 µg/plate, with and without metabolic activation, revealed no evidence of mutagenesis potential. Pulmozyme was tested in a micronucleus (in vivo) assay for its potential to produce chromosome damage in bone marrow cells of mice following a bolus intravenous dose of 10 mg/kg on two consecutive days. No evidence of chromosomal damage was noted.

Impairment of Fertility: In studies with rats receiving up to 10 mg/kg/day, a dose representing systemic exposures greater than 600 times that expected following the recommended human dose, fertility and reproductive performance of both males and females was not affected.

### Pregnancy (Category B)

Reproduction studies have been performed in rats and rabbits with intravenous doses up to 10 mg/kg/day, representing systemic exposures greater than 600 times that expected following the recommended human dose. These studies have revealed no evidence of impaired fertility, harm to the fetus, or effects on development due to Pulmozyme. There are, however, no adequate and well-controlled studies in pregnant women. Because animal

Liquidia's Exhibit 1050
Page 1

**Pulmozyme® (dornase alfa) Inhalation Solution**

reproductive studies are not always predictive of the human response, this drug should be used during pregnancy only if clearly needed.

**Nursing Mothers**

It is not known whether Pulmozyme is excreted in human milk. Small amounts of dornase alfa were detected in maternal milk of cynomolgus monkeys when administered a bolus dose (100 µg/kg) of dornase alfa followed by a six hour intravenous infusion (80 µg/kg/hr). Little or no measurable dornase alfa would be expected in human milk after chronic aerosol administration of recommended doses. Because many drugs are excreted in human milk, caution should still be exercised when Pulmozyme is administered to a nursing woman.

**Pediatric Use**

Because of the limited experience with the administration of Pulmozyme to patients younger than 5 years of age, its use should be considered only for those patients in whom there is a potential for benefit in pulmonary function or in risk of respiratory tract infection.

**Geriatric Use**

Cystic fibrosis is primarily a disease of pediatrics and young adults. Clinical studies of Pulmozyme did not include sufficient numbers of subjects aged 65 or older to determine whether they respond differently from younger patients.

**ADVERSE REACTIONS**

Patients have been exposed to Pulmozyme for up to 12 months in clinical trials.

In a randomized, placebo-controlled clinical trial in patients with FVC ≥40% of predicted, over 600 patients received Pulmozyme once or twice daily for six months; most adverse events were not more common on Pulmozyme than on placebo and probably reflected the sequelae of the underlying lung disease. In most cases events that were increased were mild, transient in nature, and did not require alterations in dosing. Few patients experienced adverse events resulting in permanent discontinuation from Pulmozyme, and the discontinuation rate was similar for placebo (2%) and Pulmozyme (3%). Events that were more frequent (greater than 3%) in Pulmozyme treated patients than in placebo-treated patients are listed in Table 2.

In a randomized, placebo-controlled trial of patients with advanced disease (FVC <40% of predicted) the safety profile for most adverse events was similar to that reported for the trial in mild to moderate disease. For this study, adverse events that were reported with a higher frequency (greater than 3%) in the Pulmozyme patients, are also listed in Table 2.

**Table 2**
Adverse Events Increased 3% or More in Pulmozyme Treated Patients Over Placebo in CF Clinical Trials

| Adverse Event (of any severity or seriousness) | Trial in Mild to Moderate CF Patients (FVC ≥40% of predicted) treated for 24 weeks | | | Trial in Advanced CF Patients (FVC < 40% of predicted) treated for 12 weeks | |
|---|---|---|---|---|---|
| | Placebo n=325 | Pulmozyme QD n=322 | Pulmozyme BID n=321 | Placebo n=159 | Pulmozyme QD n=161 |
| Voice alteration | 7% | 12% | 16% | 6% | 18% |
| Pharyngitis | 33% | 36% | 40% | 28% | 32% |
| Rash | 7% | 10% | 12% | 1% | 3% |
| Laryngitis | 1% | 3% | 4% | 1% | 3% |
| Chest Pain | 16% | 18% | 21% | 23% | 25% |
| Conjunctivitis | 2% | 4% | 5% | 0% | 1% |
| Rhinitis | | | | 24% | 30% |
| FVC decrease of ≥10% of predicted* | Differences were less than 3% for these adverse events in the Trial in mild to moderate CF patients | | | 17% | 22% |
| Fever | | | | 28% | 32% |
| Dyspepsia | | | | 0% | 3% |
| Dyspnea (when reported as serious) | Differences were less than 3% for this adverse events in the Trial in mild to moderate CF patients | | | 12%† | 17%† |

*Single measurement only, does not reflect overall FVC changes.
†Total reports of dyspnea (regardless of severity or seriousness) had a frequence of less than 3% for the Trial in advanced CF patients.

**Events Observed at Similar Rates in Pulmozyme® (dornase alfa) Inhalation Solution and Placebo Treated Patients with FVC ≥ 40% of Predicted**

| | |
|---|---|
| **Body as a Whole** | Abdominal pain, Asthenia, Fever, Flu syndrome, Malaise, Sepsis |
| **Digestive System** | Intestinal Obstruction, Gall Bladder disease, Liver disease, Pancreatic disease |
| **Metabolic Nutritional System** | Diabetes Mellitus, Hypoxia, Weight Loss |
| **Respiratory System** | Apnea, Bronchiectasis, Bronchitis, Change in Sputum, Cough Increase, Dyspnea, Hemoptysis, Lung Function Decrease, Nasal Polyps, Pneumonia, Pneumothorax, Rhinitis, Sinusitis, Sputum Increase, Wheeze |

Mortality rates observed in controlled trials were similar for the placebo and Pulmozyme treated patients. Causes of death were consistent with the progression of cystic fibrosis and included apnea, cardiac arrest, cardiopulmonary arrest, cor pulmonale, heart failure, massive hemoptysis, pneumonia, pneumothorax, and respiratory failure.

The safety of Pulmozyme, 2.5 mg by inhalation, was studied with 2 weeks of daily administration in 98 patients with cystic fibrosis (65 aged 3 months to <5 years, 33 aged 5 to ≤10 years). The PARI BABY™ reusable nebulizer (which uses a facemask instead of a mouthpiece) was utilized in patients unable to demonstrate the ability to inhale or exhale orally throughout the entire treatment period (54/65, 83% of the younger and 2/33, 6% of the older patients). The number of patients reporting cough was higher in the younger age group as compared to the older age group (29/65, 45% compared to 10/33, 30%) as was the number reporting moderate to severe cough (24/65, 37% as compared to 6/33, 18%). Other events tended to be of mild to moderate severity. The number of patients reporting rhinitis was higher in the younger age group as compared to the older age group (23/65, 35% compared to 9/33, 27%) as was the number reporting rash (4/65, 6% as compared to 0/33). The nature of adverse events was similar to that seen in the larger trials of Pulmozyme.

---

**Pulmozyme® (dornase alfa) Inhalation Solution**

**Allergic Reactions**

There have been no reports of anaphylaxis attributed to the administration of Pulmozyme to date. Urticaria, mild to moderate, and mild skin rash have been transient. Within all of the studies, a small percentage (average of 2-4%) of patients treated with Pulmozyme developed serum antibodies to Pulmozyme. None of these patients developed anaphylaxis, and the clinical significance of serum antibodies to Pulmozyme is unknown.

**OVERDOSAGE**

Single-dose inhalation studies in rats and monkeys at doses up to 180-times higher than doses routinely used in clinical studies are well tolerated. Single dose oral administration of Pulmozyme in doses up to 200 mg/kg are also well tolerated by rats.

Cystic fibrosis patients have received up to 20 mg BID for up to 6 days and 10 mg BID intermittently (2 weeks on/2 weeks off drug) for 168 days. These doses were well tolerated.

**DOSAGE AND ADMINISTRATION**

The recommended dose for use in most cystic fibrosis patients is one 2.5 mg single-dose ampule inhaled once daily using a recommended nebulizer. Some patients may benefit from twice daily administration (see Clinical Experience, Table 1). Clinical trial results and laboratory information are only available to support use of the following nebulizer/compressor systems (see Table 3).

**Table 3**
Recommended Nebulizer/Compressor System

| Jet Nebulizer | Compressor |
|---|---|
| Hudson T Up-draft II® with | Pulmo-Aide® |
| Marquest Acorn II® with | Pulmo-Aide® |
| PARI LC Jet+ with | PARI PRONEB® |
| *PARI BABY™ with | PARI PRONEB® |
| Durable Sidestream® with | MOBILAIRE™ |
| Durable Sidestream® with | Porta-Neb® |

*Patients who are unable to inhale or exhale orally throughout the entire nebulization period may use the PARI BABY™ nebulizer.

Patients who use the Sidestream® Nebulizer with the MOBILAIRE™ compressor should turn the compressor control knob fully to the right and then turn on the compressor. At this setting, the needle on the pressure gauge should vibrate between 35 and 45 pounds per square inch (highest pressure output).

No data are currently available that support the administration of Pulmozyme with other nebulizer systems. The patient should follow the manufacturer's instructions on the use and maintenance of the equipment.

Pulmozyme should not be diluted or mixed with other drugs in the nebulizer. Mixing of Pulmozyme with other drugs could lead to adverse physicochemical and/or functional changes in Pulmozyme or the admixed compound. Patients should be advised to squeeze each ampule prior to use in order to check for leaks.

**HOW SUPPLIED**

Pulmozyme is supplied in single-use ampules. Each ampule delivers 2.5 mL of a sterile, clear, colorless, aqueous solution containing 1.0 mg/mL dornase alfa, 0.15 mg/mL calcium chloride dihydrate and 8.77 mg/mL sodium chloride with no preservative. The nominal pH of the solution is 6.3.

Pulmozyme is supplied in:
• 30 unit cartons containing 5 foil pouches of 6 single-use ampules: NDC 50242-100-40.

**Storage**

Pulmozyme should be stored under refrigeration (2-8°C/36-46°F). Ampules should be protected from strong light. Do not use beyond the expiration date stamped on the ampule. Unused ampules should be stored in their protective foil pouch under refrigeration.

**REFERENCES**

1. Shak S, Capon DJ, Hellmiss R, Marsters SA, Baker CL. Recombinant human DNase I reduces the viscosity of cystic fibrosis sputum. *Proc Natl Acad Sci USA.* 1990;87:9188-92.

2. Boat TF. Cystic Fibrosis. In: Murray JF, Nadel JA, editors. *Textbook of respiratory medicine.* Philadelphia: Saunders WB, 1988;1:1126-52.

3. Collins FS. Cystic Fibrosis: molecular biology and therapeutic implications. *Science.* 1992;256:774-9.

4. Potter JL, Spector S, Matthews LW, Lemm J. Studies of pulmonary secretions. *Am Rev Respir Dis.* 1969;99:909-15.

5. Hubbard RC, McElvaney NG, Birrer P, Shak S, Robinson WW, Jolley C, et al. A preliminary study of aerosolized recombinant human deoxyribonuclease I in the treatment of cystic fibrosis. *N Engl J Med.* 1992;326:812-5.

6. Aitken ML, Burke W, McDonald G, Shak S, Montgomery AB, Smith A. Recombinant human DNase inhalation in normal subjects and patients with cystic fibrosis. *JAMA.* 1992;267(14):1947-51.

7. Fuchs HJ, Borowitz DS, Christiansen DH, Morris EM, Nash ML, Ramsey BW, et al. Effect of aerosolized recombinant human DNase on exacerbations of respiratory symptoms and on pulmonary function in patients with cystic fibrosis. *N Engl J Med.* 1994;331:637-42.

8. McCoy K, Hamilton S, Johnson C. Effects of 12-week administration of dornase alfa in patients with advanced cystic fibrosis lung disease. *Chest.* 1996;110:889-95.

Pulmozyme®
(dornase alfa)
Inhalation Solution

LE0339
7061805
(4824301)

Manufactured by
GENENTECH, Inc.
1 DNA Way
South San Francisco, CA 94080-4990

Code Revision Date: April 2005
FDA Approval Date: January 2001
©2005 Genentech, Inc.

Liquidia's Exhibit 1050
Page 2

# AccuNeb®
### (albuterol sulfate)
## Inhalation Solution
**1.25 mg*/3 mL and 0.63 mg*/3 mL**
**(*Potency expressed as albuterol, equivalent to 1.5 mg and 0.75 mg albuterol sulfate)**

## PATIENT'S INSTRUCTIONS FOR USE
**Read this patient information completely every time your prescription is filled as information may have changed. Keep these instructions with your medication, as you may want to read them again.**

**AccuNeb should only be used under the direction of a physician. Your physician and pharmacist have more information about AccuNeb and the condition for which it has been prescribed. Contact them if you have additional questions.**

**Storing your Medicine**
Store AccuNeb between 2° and 25° C (36° and 77° F). Vials should be protected from light before use, therefore, keep unused vials in the foil pouch. Do not use after the expiration (EXP) date printed on the vial.

**Dose**
AccuNeb is supplied as a single-dose, ready-to-use vial containing 3 mL of solution. No mixing or dilution is needed. Use one new vial with each nebulizer treatment.

Instructions for Use
1. Remove one vial from the foil pouch. Place remaining vials back into foil pouch for storage.

2. Twist the cap completely off the vial and squeeze the contents into the nebulizer reservoir (Figure 1).



**Figure 1**

3. Connect the nebulizer to the mouthpiece or face mask (Figure 2).



**Figure 2**

4. Connect the nebulizer to the compressor.

5. Sit in a comfortable, upright position; place the mouthpiece in your mouth (Figure 3) or put on the face mask (Figure 4); and turn on the compressor.

 

**Figure 3**          **Figure 4**

6. Breathe as calmly, deeply and evenly as possible through your mouth until no more mist is formed in the nebulizer chamber (about 5-15 minutes). At this point, the treatment is finished.

7. Clean the nebulizer (see manufacturer's instructions).



DEY®, Napa, CA 94558

03-492-23A                                        June 2005
                                        U.S. Pat. No. 6,702,997

---

**DOSAGE AND ADMINISTRATION**
The usual starting dosage for patients 2 to 12 years of age is 1.25 mg or 0.63 mg of AccuNeb administered 3 or 4 times daily, as needed, by nebulization. More frequent administration is not recommended.

To administer 1.25 mg or 0.63 mg of albuterol, use the entire contents of one unit-dose vial (3 mL of 1.25 mg or 0.63 mg inhalation solution) by nebulization. Adjust nebulizer flow rate to deliver AccuNeb over 5 to 15 minutes.

The use of AccuNeb can be continued as medically indicated to control recurring bouts of bronchospasm. During this time most patients gain optimum benefit from regular use of the inhalation solution.

Patients 6 to 12 years of age with more severe asthma (baseline FEV₁ less than 60% predicted), weight >40 kg, or patients 11 to 12 years of age may achieve a better initial response with the 1.25 mg dose.

AccuNeb has not been studied in the setting of acute attacks of bronchospasm. A 2.5 mg dose of albuterol provided by a higher concentration product (2.5 mg albuterol per 3 mL) may be more appropriate for treating acute exacerbations, particularly in children 6 years old and above.

If a previously effective dosage regimen fails to provide the usual relief, medical advice should be sought immediately, as this is often a sign of seriously worsening asthma which would require reassessment of therapy.

The drug compatibility (physical and chemical), clinical efficacy and safety of AccuNeb solution, when mixed with other drugs in a nebulizer have not been established.

The safety and efficacy of AccuNeb have been established in clinical trials when administered using the Pari LC Plus™ nebulizer and Pari PRONEB™ compressor. The safety and efficacy of AccuNeb when administered with other nebulizer systems have not been established.

AccuNeb should be administered via jet nebulizer connected to an air compressor with adequate air flow, equipped with a mouthpiece or suitable face mask.

**HOW SUPPLIED**
AccuNeb (albuterol sulfate) Inhalation Solution is supplied as a 3 mL, clear, colorless, sterile, preservative-free, aqueous solution in two different strengths, 0.63 mg and 1.25 mg, of albuterol (equivalent to 0.75 mg of albuterol sulfate or 1.5 mg of albuterol sulfate per 3 mL) in unit-dose low-density polyethylene (LDPE) vials. Each unit-dose LDPE vial is protected in a foil pouch, and each foil pouch contains 5 unit-dose LDPE vials. Each strength of AccuNeb (albuterol sulfate) Inhalation Solution is available in a shelf carton containing multiple foil pouches.

**AccuNeb® (albuterol sulfate) Inhalation Solution, 0.63 mg** (potency expressed as albuterol) contains 0.75 mg albuterol sulfate per 3 mL in unit-dose vials and is available in the following package configuration.

NDC 49502-692-03          5 foil pouches, each containing 5 vials, total 25 vials per carton

**AccuNeb® (albuterol sulfate) Inhalation Solution, 1.25 mg** (potency expressed as albuterol) contains 1.50 mg albuterol sulfate per 3 mL in unit-dose vials and is available in the following package configuration.

NDC 49502-693-03          5 foil pouches, each containing 5 vials, total 25 vials per carton

Rx Only.

**STORAGE**
Store between 2°C and 25°C (36°F - 77°F). Protect from light and excessive heat.

Store unit-dose vials in protective foil pouch at all times. Once removed from the foil pouch, use vial(s) within one week. Discard the vial if the solution is not colorless.

Keep out of the reach of children.



DEY®, Napa, CA 94558

03-492-23A                                        June 2005
                                        U.S. Pat. No. 6,702,997

---



0349223-A

# DEY
## AccuNeb®
### (albuterol sulfate)
## Inhalation Solution
**1.25 mg*/3 mL and 0.63 mg*/3 mL**
**(*Potency expressed as albuterol, equivalent to 1.5 mg and 0.75 mg albuterol sulfate)**

**PRESCRIBING INFORMATION**

**DESCRIPTION**
AccuNeb® (albuterol sulfate) inhalation solution is a sterile, clear, colorless solution of the sulfate salt of racemic albuterol, albuterol sulfate. Albuterol sulfate is a relatively selective beta₂-adrenergic bronchodilator (see CLINICAL PHARMACOLOGY). The chemical name for albuterol sulfate is α₁-[(tert-butylamino) methyl]-4-hydroxy-m-xylene-α, α'-diol sulfate (2:1) (salt), and its established chemical structure is as follows:



The molecular weight of albuterol sulfate is 576.7 and the empirical formula is $(C_{13}H_{21}NO_3)_2 \cdot H_2SO_4$. Albuterol sulfate is a white crystalline powder, soluble in water and slightly soluble in ethanol. The World Health Organization recommended name for albuterol is salbutamol.

AccuNeb (albuterol sulfate) Inhalation Solution is supplied in two strengths in unit dose vials. Each unit dose vial contains either 0.75 mg of albuterol sulfate (equivalent to 0.63 mg of albuterol) or 1.50 mg of albuterol sulfate (equivalent to 1.25 mg of albuterol) with sodium chloride and sulfuric acid in a 3-mL isotonic, sterile, aqueous solution. Sodium chloride is added to adjust isotonicity of the solution and sulfuric acid is added to adjust pH of the solution to 3.5 (see HOW SUPPLIED).

AccuNeb (albuterol sulfate) Inhalation Solution does not require dilution prior to administration by nebulization. For AccuNeb, like all other nebulized treatments, the amount delivered to the lungs will depend on patient factors, the jet nebulizer utilized, and compressor performance. Using the Pari LC Plus™ nebulizer (with face mask or mouthpiece) connected to a Pari PRONEB™ compressor, under in vitro conditions, the mean delivered dose from the mouth piece (% nominal dose) was approximately 43% of albuterol (1.25 mg strength) and 39% of albuterol (0.63 mg strength) at a mean flow rate of 3.6 L/min. The mean nebulization time was 15 minutes or less. AccuNeb should be administered from a jet nebulizer at an adequate flow rate, via a mouthpiece or face mask (see DOSAGE AND ADMINISTRATION).

**CLINICAL PHARMACOLOGY**
The prime action of beta-adrenergic drugs is to stimulate adenyl cyclase, the enzyme which catalyzes the formation of cyclic-3´,5´-adenosine monophosphate (cyclic AMP) from adenosine triphosphate (ATP). The cyclic AMP thus formed mediates the cellular responses. In vitro studies and in vivo pharmacologic studies have demonstrated that albuterol has a preferential effect on beta₂-adrenergic receptors compared with isoproterenol. While it is recognized that beta₂-adrenergic receptors are the predominant receptors in bronchial smooth muscle, recent data indicate that 10% to 50% of the beta-receptors in the human heart may be beta₂-receptors. The precise function of these receptors, however, is not yet established. Controlled clinical studies and other clinical experience have shown that inhaled albuterol, like other beta-adrenergic agonist drugs, can produce a significant cardiovascular effect in some patients, as measured by pulse rate, blood pressure, symptoms, and/or electrocardiographic changes. Albuterol is longer acting than isoproterenol in most patients by any route of administration because it is not a substrate for the cellular uptake processes for catecholamines nor for catechol-O-methyl transferase.

**Pharmacokinetics:** Studies in asthmatic patients have shown that less than 20% of a single albuterol dose was absorbed following either intermittent positive-pressure breathing (IPPB) or nebulizer administration; the remaining amount was recovered from the nebulizer and apparatus, and expired air. Most of the absorbed dose was recovered in urine collected during the 24 hours after drug administration. Following oral administration of 4 mg albuterol, the elimination half-life was five to six hours. Following a 3 mg dose of nebulized albuterol in adults, the mean maximum albuterol plasma level at 0.5 hours was 2.1 ng/mL (range, 1.4 to 3.2 ng/mL). The pharmacokinetics of albuterol following administration of 0.63 mg or 1.25 mg albuterol sulfate inhalation solution by nebulization have not been determined in children 2 to 12 years old.

**Animal Pharmacology/Toxicology:** Intravenous studies in rats with albuterol sulfate have demonstrated that albuterol crosses the blood-brain barrier and reaches brain concentrations amounting to approximately 5% of plasma concentrations. In structures outside the blood-brain barrier (pineal and pituitary glands), albuterol concentrations were found to be 100 times those found in whole brain.

Studies in laboratory animals (minipigs, rodents, and dogs) have demonstrated the occurrence of cardiac arrhythmias and sudden death (with histologic evidence of myocardial necrosis) when beta-agonists and methylxanthines are administered concurrently. The clinical significance of these findings is unknown.

**Clinical Trials:** The safety and efficacy of AccuNeb was evaluated in a 4-week, multi-center, randomized, double-blind, placebo-controlled, parallel group study in 349 children 6 to 12 years of age with mild-to-moderate asthma (mean baseline FEV₁ 60% to 70% of predicted). Approximately half of the patients were also receiving inhaled corticosteroids. Patients were randomized to receive AccuNeb 0.63 mg, AccuNeb 1.25 mg, or placebo three times a day administered via a Pari LC Plus™ nebulizer and a Pari PRONEB™ compressor. Racemic albuterol, delivered by a chlorofluorocarbon (CFC) metered dose inhaler (MDI) or nebulized, was used on an as-needed basis as the rescue medication.

Efficacy, as measured by the mean percent change from baseline in the area under the 6-hour curve for FEV₁, was demonstrated for both active treatment regimens (n=112 [1.25 mg group] and n=110 [0.63 mg group]) compared with placebo (n=110) on day 1 and day 28. Figures 1 and 2 illustrate the mean percentage change from pre-dose FEV₁ on day 1 and day 28, respectively. The mean baseline FEV₁ for all patients was 1.49 L.

**Figure 1**

% Change from Pre-Dose FEV₁
Intent-to-Treat Population
Day 1



Hours from Pre-Dose

Treatment: ◆ albuterol 1.25 mg ▲ albuterol 0.63 mg ● placebo

Liquidia's Exhibit 1066
Page 1



**Figure 2**
**% Change from Pre-Dose FEV₁**
**Intent-to-Treat Population**
**Day 28**

Treatment: albuterol 1.25 mg — albuterol 0.63 mg — placebo

The onset of a 15% increase in FEV₁ over baseline for both doses of AccuNeb was seen at 30 minutes (the first post-dose assessment). The mean time to peak effect was approximately 30 to 60 minutes for both doses on day 1 and after 4 weeks of treatment. The mean duration of effect, as measured by a >15% increase from baseline in FEV₁, was approximately 2.5 hours for both doses on day 1 and approximately 2 hours for both doses after 4 weeks of treatment. In some patients, the duration of effect was as long as 6 hours.

## INDICATIONS AND USAGE

AccuNeb is indicated for the relief of bronchospasm in patients 2 to 12 years of age with asthma (reversible obstructive airway disease).

## CONTRAINDICATIONS

AccuNeb is contraindicated in patients with a history of hypersensitivity to any of its components.

## WARNINGS

**Paradoxical Bronchospasm:** As with other inhaled beta-adrenergic agonists, AccuNeb can produce paradoxical bronchospasm, which may be life threatening. If paradoxical bronchospasm occurs, AccuNeb should be discontinued immediately and alternative therapy instituted. It should be noted that paradoxical bronchospasm, when associated with inhaled formulations, frequently occurs with the first use of a new canister or vial.

**Use of Anti-Inflammatory Agents:** The use of beta-adrenergic bronchodilators alone may not be adequate to control asthma in many patients. Early consideration should be given to adding anti-inflammatory agents (e.g., corticosteroids).

**Deterioration of Asthma:** Asthma may deteriorate acutely over a period of hours or chronically over several days or longer. If the patient needs more doses of AccuNeb than usual, this may be a marker of destabilization of asthma and requires reevaluation of the patient and the treatment regimen, giving special consideration of the possible need for anti-inflammatory treatment (e.g., corticosteroids).

Fatalities have been reported in association with excessive use of inhaled sympathomimetic drugs and with the home use of nebulizers. It is, therefore, essential that the physician instruct the patient in the need for further evaluation, if his/her asthma becomes worse.

**Cardiovascular Effects:** AccuNeb, like other beta-adrenergic agonists, can produce a clinically significant cardiovascular effect in some patients as measured by pulse rate, blood pressure, and/or symptoms. Although such effects are uncommon for AccuNeb at recommended doses, if they occur, the drug may need to be discontinued. In addition, beta-agonists have been reported to produce ECG changes, such as flattening of the T-wave, prolongation of the QTc interval, and ST segment depression. The clinical significance of these findings is unknown. Therefore, AccuNeb like all other sympathomimetic amines, should be used with caution in patients with cardiovascular disorders, especially coronary insufficiency, cardiac arrhythmias, and hypertension.

**Immediate Hypersensitivity Reactions:** Immediate hypersensitivity reactions may occur after administration of albuterol as demonstrated by rare cases of urticaria, angioedema, rash, bronchospasm, and oropharyngeal edema.

## PRECAUTIONS

**General:** Large doses of intravenous albuterol have been reported to aggravate pre-existing diabetes mellitus and ketoacidosis. As with other beta-agonists, inhaled and intravenous albuterol may produce a significant hypokalemia in some patients, possibly through intracellular shunting, which has the potential to produce adverse cardiovascular effects. The decrease is usually transient, not requiring potassium supplementation.

**Information for Patients:** The action of AccuNeb may last up to six hours, and therefore it should not be used more frequently than recommended. Do not increase the dose or frequency of medication without consulting your physician. If you find that treatment with AccuNeb becomes less effective for symptomatic relief, your symptoms become worse, and/or you need to use the product more frequently than usual, you should seek medical attention immediately. All asthma medication should only be used under the supervision and direction of a physician. Common effects with medications such as AccuNeb include palpitations, chest pain, rapid heart rate, tremor, or nervousness.

If you are pregnant or nursing, contact your physician about the use of AccuNeb. Effective and safe use of AccuNeb includes an understanding of the way it should be administered.

If the solution in the vial changes color or becomes cloudy, you should not use it.

The drug compatibility (physical and chemical), clinical efficacy, and safety of AccuNeb solution, when mixed with other drugs in a nebulizer, has not been established.

See illustrated Patient's Instructions for Use.

**Drug Interactions:** Other short-acting sympathomimetic aerosol bronchodilators or epinephrine should not be used concomitantly with AccuNeb.

AccuNeb should be administered with extreme caution to patients being treated with monoamine oxidase inhibitors or tricyclic antidepressants or within 2 weeks of discontinuation of such agents, since the action of albuterol on the vascular system may be potentiated.

Beta-receptor blocking agents not only block the pulmonary effect of beta-agonists, such as AccuNeb, but may produce severe bronchospasm in asthmatic patients. Therefore, patients with asthma should not normally be treated with beta-blockers. However, under certain circumstances (e.g., prophylaxis after myocardial infarction), there may be no acceptable alternatives to the use of beta-adrenergic blocking agents in patients with asthma. In this setting, cardioselective beta-blockers should be considered, although they should be administered with caution.

The ECG changes and/or hypokalemia that may result from the administration of non-potassium sparing diuretics (such as loop or thiazide diuretics) can be acutely worsened by beta-agonists, especially when the dose of the beta-agonist is exceeded. Although the clinical significance of these effects is unknown, caution is advised in the co-administration of beta-agonists with non-potassium sparing diuretics.

Mean decreases of 16% to 22% in serum digoxin levels were demonstrated after single dose intravenous and oral administration of albuterol, respectively, to normal volunteers who had received digoxin for 10 days. The clinical significance of these findings for patients with obstructive airway disease who are receiving albuterol and digoxin on a chronic basis is unclear. Nevertheless, it would be prudent to carefully evaluate the serum digoxin levels in patients who are currently receiving digoxin and albuterol.

**Carcinogenesis, Mutagenesis, and Impairment of Fertility:** In a 2-year study in Sprague-Dawley rats, albuterol sulfate caused a significant dose-related increase in the incidence of benign leiomyomas of the mesovarium and above dietary doses of 2 mg/kg (approx-

imately equivalent to the maximum recommended daily inhalation dose for AccuNeb on a mg/m² basis). In another study, this effect was blocked by the co-administration of propranolol, a non-selective beta-adrenergic antagonist.

In an 18-month study in CD-1 mice, albuterol sulfate showed no evidence of tumorigenicity at dietary doses up to 500 mg/kg (approximately 140 times the maximum recommended daily inhalation dose of AccuNeb on a mg/m² basis). In a 22-month study in Golden hamsters, albuterol sulfate showed no evidence of tumorigenicity at dietary doses up to 50 mg/kg (approximately 20 times the maximum recommended daily inhalation dose of AccuNeb on a mg/m² basis).

Albuterol sulfate was not mutagenic in the Ames test or a mutation test in yeast. Albuterol sulfate was not clastogenic in a human peripheral lymphocyte assay or in an AH₁ strain mouse micronucleus assay.

Reproduction studies in rats demonstrated no evidence of impaired fertility at oral doses of albuterol sulfate up to 50 mg/kg (approximately 30 times the maximum recommended daily inhalation dose of AccuNeb on a mg/m² basis).

**Pregnancy:** Teratogenic Effects: Pregnancy Category C: Albuterol has been shown to be teratogenic in mice. A study in CD-1 mice given albuterol subcutaneously showed cleft palate formation in 5 of 111 (4.5%) fetuses at 0.25 mg/kg (less than the maximum recommended daily inhalation dose of AccuNeb on a mg/m² basis) and cleft palate formation in 10 of 108 (9.3%) fetuses at 2.5 mg/kg (approximately equal to the maximum recommended daily inhalation dose of AccuNeb on a mg/m² basis). The drug did not induce cleft palate formation when administered subcutaneously at a dose of 0.025 mg/kg (less than the maximum recommended daily inhalation dose of AccuNeb on a mg/m² basis). Cleft palate formation also occurred in 23 of 72 (30.5%) fetuses from females treated subcutaneously with 2.5 mg/kg isoproterenol (positive control). A reproduction study in Stride rabbits revealed cranioschisis in 7 of 19 (37%) fetuses when albuterol sulfate was administered orally at 50 mg/kg (approximately 60 times the maximum recommended daily inhalation dose of AccuNeb on a mg/m² basis).

A study in which pregnant rats were dosed with radiolabelled albuterol sulfate demonstrated that drug-related material was transferred from the maternal circulation to the fetus.

There are no adequate and well-controlled studies of the use of albuterol sulfate in pregnant women. Albuterol should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus.

During worldwide marketing experience, various congenital anomalies, including cleft palate and limb defects, have been reported in the offspring of patients being treated with albuterol. Some of the mothers were taking multiple medications during their pregnancies. Because no consistent pattern of defects can be discerned, a relationship between albuterol use and congenital anomalies has not been established.

**Labor and Delivery:** Oral albuterol has been shown to delay pre-term labor in some reports. There are presently no well-controlled studies that demonstrate that it will stop pre-term labor or prevent labor at term. Because of the potential for beta agonist interference with uterine contractility, use of AccuNeb for relief of bronchospasm during labor should be restricted to those patients in whom the benefits clearly outweigh the risk.

Albuterol has not been approved for the management of pre-term labor. The benefit:risk ratio when albuterol is administered for tocolysis has not been established. Serious adverse reactions, including pulmonary edema, have been reported following administration of albuterol to women in labor.

**Nursing Mothers:** It is not known whether this drug is excreted in human milk. Because of the potential for tumorigenicity shown for albuterol in some animal studies, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

**Pediatric Use:** Safety and effectiveness of AccuNeb 1.25 mg and 0.63 mg have been established in pediatric patients between the ages of 2 and 12 years. The use of AccuNeb in these age groups is supported by evidence from adequate and well-controlled studies of AccuNeb in children age 6 to 12 years and published reports of albuterol sulfate trials in pediatric patients 3 years of age and older. The safety and effectiveness of AccuNeb in children below 2 years of age have not been established.

## ADVERSE REACTIONS

Adverse events reported in >1% of patients receiving AccuNeb and more frequently than in patients receiving placebo in a four-week double-blind study are listed in the following table.

**Table 1: Adverse Events with an Incidence of >1% of Patients Receiving AccuNeb and Greater than Placebo (expressed as % of treatment group)**

|  | 1.25 mg AccuNeb (N=115) | 0.63 mg AccuNeb (N=117) | Placebo (N=117) |
|---|---|---|---|
| Asthma Exacerbation | 13 | 11.1 | 8.5 |
| Otitis Media | 4.3 | 0.9 | 0 |
| Allergic Reaction | 0.9 | 3.4 | 1.7 |
| Gastroenteritis | 0.9 | 3.4 | 0.9 |
| Cold Symptoms | 0 | 3.4 | 1.7 |
| Flu Syndrome | 2.6 | 2.6 | 1.7 |
| Lymphadenopathy | 2.6 | 0.9 | 1.7 |
| Skin/Appendage Infection | 1.7 | 0 | 0 |
| Urticaria | 1.7 | 0.9 | 0 |
| Migraine | 0.9 | 1.7 | 0 |
| Chest Pain | 0.9 | 1.7 | 0 |
| Bronchitis | 0.9 | 1.7 | 0.9 |
| Nausea | 1.7 | 0.9 | 0.9 |

**There was one case of ST segment depression in the 1.25 mg AccuNeb treatment group.**

**No clinically relevant laboratory abnormalities related to AccuNeb administration were seen in this study.**

## OVERDOSAGE

The expected symptoms with overdosage are those of excessive beta-adrenergic stimulation and/or occurrence or exaggeration of symptoms such as seizures, angina, hypertension or hypotension, tachycardia with rates up to 200 beats per minute, arrhythmias, nervousness, headache, tremor, dry mouth, palpitation, nausea, dizziness, fatigue, malaise, insomnia, and exaggeration of the pharmacological effects listed in ADVERSE REACTIONS. Hypokalemia may also occur. As with all sympathomimetic aerosol medications, cardiac arrest and even death may be associated with abuse of AccuNeb. Treatment consists of discontinuation of AccuNeb together with appropriate symptomatic therapy. The judicious use of a cardioselective beta-receptor blocker may be considered, bearing in mind that such medication can produce bronchospasm. There is insufficient evidence to determine if dialysis is beneficial for overdosage of AccuNeb.

The oral median lethal dose of albuterol sulfate in mice is greater than 2000 mg/kg (approximately 580 times the maximum recommended daily inhalation dose of AccuNeb on a mg/m² basis). The subcutaneous median lethal dose of albuterol sulfate in mature rats and small young rats is approximately 450 mg/kg and 2000 mg/kg, respectively (approximately 260 and 1200 times the maximum recommended daily inhalation dose of AccuNeb on a mg/m² basis). The inhalation median lethal dose has not been determined in animals.

Liquidia's Exhibit 1066
Page 2



EUROPEAN
SOCIETY OF
CARDIOLOGY

Volume 25   Abstract Supplement   August/September 2004   ISSN 0195-668X

November 16, 2004

HEALTH SCIENCES
LIBRARIES

# European
# Heart Journal

Journal of the European Society of Cardiology

## ESC Congress 2004
## 28 August – 1 September
## Munich, Germany

Editor-in-Chief: **Frans Van de Werf**

Deputy Editors: **Stefan Janssens**
**Frank Rademakers**



Liquidia's Exhibit 1089
Page 1

# ESC Congress 2004, Munich

*28 August – 1 September 2004*

Liquidia's Exhibit 1089
Page 2



# EUROPEAN HEART JOURNAL

EUROPEAN
SOCIETY OF
CARDIOLOGY

**Editor in Chief**
Frans Van de Werf

**Deputy Editors**
Stefan Janssens
Frank Rademakers

**Consulting Editor**
Kim Fox

**Supplements Editor**
Roberto Ferrari

**Managing Editors**
Inge Hödl
Anita Meuris

**Manuscript Editor**
Neil Goodman

**Statisticians**
Ann Belmans
Emmanuel Lesaffre

## Associate Editors

André Aubert
Bart Bijnens
Werner Budts
Peter Carmeliet
Désiré Collen
Walter Desmet
Hugo Ector
Robert Fagard
Willem Flameng
Marc Gewillig
Hein Heidbüchel
Paul Herijgers
Luc Mortelmans
Erik Muls
André Nevelsteen

Paul Sergeant
Karin Sipido
Jan Staessen
Johan Vanhaecke
Raymond Verhaeghe

Liaising Editors:

North America: Bernard J. Gersh
Asia: Yean Leng Lim
Australia and New Zealand: Peter Thompson
South America: Ramon Corbalan
Africa: Anthony Dalby

## International Editorial Board

Cassiano Abreu e Lima
Joseph Alpert
Elliot M. Antman
Eliosa Arbustini
Diego Ardissino
Paul W. Armstrong
Philip Aylward
Lina Badimon-Maestro
Jean-Luc Balligand
Jean-Pierre Bassand
Eric R. Bates
Alexander Battler
Lawrie Beilin
Youry Belenkov
Guy Berkenboom
Michel E. Bertrand
Christoph Bode
Robert O. Bonow
Eugene Braunwald
Gunter Breithardt
Pedro Brugada
Robert M. Califf
François Cambien
Paolo Camici
Christopher P. Cannon
Andrew J. Coats
Dennis V. Cokkinos
Antonio Colombo
Richard Conti
Francisco Cosio
Harry Crijns
Raffaele De Caterina
Peter de Jaegere
Genevieve Derumeaux
Rafael Diaz
Pieter A.F.M. Doevendans
Helmut Drexler
Victor Dzau
István Édes
Eric Eekhout
Erling Falk
David P. Faxon
Francisco Fernandez-Aviles
Rafael Ferreira
Desmond J. Fitzgerald

Moshe Y. Flugelman
Valentin Fuster
Nazzareno Galiè
Michael A. Gatzoulis
Raymond Gibbons
Lino Gonçalves
Christopher B. Granger
Christian W. Hamm
Peter Hanrath
Gerd Hasenfuss
Liv Hatle
David R. Holmes, Jr
Kurt Huber
Steen Husted
Lukas Kappenberger
Karl R. Karsch
Hugo A. Katus
Neal S. Kleiman
Chu Pak Lau
Peter Libby
Gregory Y.H. Lip
Federico Lombardi
José-Luis Lopez Sendon
Joseph Loscalzo
Thomas Lüscher
Aldo Maggioni
Koon-Hou Mak
Klas Malmberg
Michael Marber
John Martin
Gerald Maurer
William J. McKenna
John McMurray
Bernard Meier
Gilles Montalescot
Elizabeth G. Nabel
Ryozo Nagai
Markku Nieminen
Magnus E. Ohman
Ali Oto
Mehmet Ozkan
Otmar Pachinger
Terje R. Pedersen
Dudley Pennell
Joep Perk

Marc E. Pfeffer
Mike Picard
Leopoldo Piegas
Philip Poole-Wilson
Silvia Giuliana Priori
Eric N. Prystowsky
Paul M. Ridker
Witold Ruzyllo
Lars Rydén
Marcus Schwaiger
Ketty Schwartz
Peter J. Schwartz
Udo Sechtem
Jungdon Seo
Patrick Serruys
Ajah J. Shah
Norman Sharpe
Maarten L. Simoons
Otto Smiseth
Jordi Soler-Soler
Christodoulos Stefanadis
Gabriel Steg
George R. Sutherland
Karl Swedberg
Michal Tendera
Erik Thaulow
Gianni Tognoni
Eric Topol
Adam Torbicki
Philip Urban
Alec Vahanian
Wiek H. Van Gilst
Panagiotis E. Vardas
Zvi Vered
Freek W.A. Verheugt
Renu Virmani
Cees A. Visser
Lars Wallentin
Harvey White
Petr Widimský
William Wijns
Kam Sang Woo
Seppo Ylä-Herttuala
Salim Yusuf
Andreas M. Zeiher

**Legend**

Every abstract is identified as either "BENCH" or "BEDSIDE".

 BENCH (Animal studies or in vitro experiments at the molecular, cellular or tissue level (including human
tissue). The core data are generated in the lab.)

 BEDSIDE (Patients studies. The core data are generated during clinical studies or interventions.)

This abstract book has been produced electronically by Elsevier B.V.

Every effort has been made to faithfully reproduce the abstracts as submitted. However, no responsibility is assumed by the organisers for any injury and/or damage to persons or property as a matter of products liability, negligence or otherwise, or from any use or operation of any methods, products, instructions or ideas contained in the material herein. Because of the rapid advances in the medical sciences, we recommend that independent verification of diagnoses and drug dosages should be made.

Liquidia's Exhibit 1089
Page 4

*European Heart Journal* (2004) **25** (Abstract Supplement), xi–xvi

# Contents

| Programme number (P = poster) | | Page |
|---|---|---|
| **Abstract Selection** | | iii |
| **Abstract Review Committee** | | vii |
| **Abstracts** | | 1 |

**Day 2 — Sunday 29 August 2004**

| | | |
|---|---|---|
| 117–122 | Trends and risk factors in cardiovascular disease | 3 |
| 123–128 | Risk factors management in prevention | 4 |
| 129–134 | Predictive factors in dilated cardiomyopathy | 6 |
| 135–140 | New applications of strain and strain rate imaging | 7 |
| 149–154 | From mice to men: lessons in myocardial protection and hypertrophy | 9 |
| 155–160 | Impact of non surgical treatment and physiological stress on the GUCH-heart | 10 |
| 161–166 | Vascular growth and collateral vessels: opportunities and drawbacks | 12 |
| 176–181 | Drug eluting stent in complex lesion subsets | 13 |
| 182–187 | Gene variants in hypertension, coronary artery disease and dilated cardiomyopathy | 15 |
| 188–193 | Markers of severity in hypertrophic cardiomyopathy | 16 |
| 199–204 | How to perfect coronary artery bypass grafting? | 18 |
| 209–214 | Intravascular ultrasound and plaque characterisation | 19 |
| 215–220 | Epidemiology and treatment of pulmonary arterial hypertension | 21 |
| 221–226 | Revisiting the electrocardiogram and electrophysiologic markers of arrhythmic events | 22 |
| 229–234 | Nursing aspects of acute cardiac care | 24 |
| 244–249 | Follow-up in the pacemaker and implantable cardioverter-defibrillator Era: old and new issues | 25 |
| 250–255 | Threatening complications with sophisticated devices | 27 |
| 256–261 | New risk markers of sudden death after acute myocardial infarction | 28 |
| 275–280 | Inotropic intervention: new mechanisms | 30 |
| 281–286 | Muscle wasting and cachexia in heart failure: ready for intervention | 31 |
| 304–309 | Percutaneous coronary intervention and beyond for ST-elevation acute myocardial infarction | 33 |
| 310–315 | IIb or not to be in acute myocardial infarction? | 34 |
| P356–P361 | Moderated e-Posters I: Cardiac dysfunction: new insights | 36 |
| P362–P377 | Atherosclerosis I – Basic Science | 37 |
| P378–P384 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 41 |
| P385–P386 | Computers in cardiology | 43 |
| P387–P401 | Echocardiography/Doppler | 44 |
| P402–P417 | Atherosclerosis I – Basic Science | 48 |
| P418–P424 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology. | 52 |
| P425 | Computers in cardiology | 53 |
| P426–P441 | Echocardiography/Doppler | 54 |
| P442–P449 | Moderated Poster session I: Arterial hypertension | 58 |
| P450–P466 | Atrial fibrillation | 60 |
| P467–P498 | Mechanisms of arrhythmias | 64 |
| P499–P540 | Heart failure: clinical aspects | 71 |
| P541–P558 | Pulmonary circulation | 81 |
| P559–P606 | Thrombosis | 86 |
| P607–P623 | Coronary plaque imaging | 98 |
| P624–P652 | Endothelial function | 102 |
| P653–P682 | Myocardial disease | 109 |
| 683–686 | Computed tomography: Imaging of coronary arteries | 116 |
| 688–691 | Young Investigators' Award Session – Basic Science | 117 |
| 693–696 | Young Investigators' Award Session – Thrombosis | 118 |
| 698–701 | Young Investigators' Award Session – Population Sciences | 119 |
| 703–706 | Young Investigators' Award Session – Clinical Science | 120 |
| 729–734 | New prevention strategies | 121 |
| 735–740 | Women, men and cardiovascular disease | 123 |
| 741–746 | Multiple uses of myocardial deformation assessment by echocardiography | 124 |

Liquidia's Exhibit 1089
Page 5

| | | |
|---|---|---|
| 747–752 | Communication in vascular smooth muscle cells | 126 |
| 767–772 | Oxidative stress and the endothelium | 127 |
| 794–799 | Improving risk stratification by nuclear cardiology | 129 |
| 817–822 | Pathophysiological aspects of resynchronisation therapy | 130 |
| 823–828 | Determinants and prevention of post myocardial infarction left ventricular remodelling | 132 |
| 831–836 | Ablation of atrial fibrillation: from source to success | 133 |
| 846–851 | Heart failure with preserved systolic function: whats new? | 135 |
| 852–857 | Diagnosis and evaluation of heart failure – still a challenge in the everyday clinical practice | 136 |
| 876–880 | Novel therapeutic strategies in chronic stable angina | 138 |
| 913–918 | Dilated cardiomyopathy or viral myocarditis? | 139 |
| P955–P960 | Moderated e-Posters II: Brugada syndrome | 141 |
| P961–P976 | Atherosclerosis II – Basic Science | 142 |
| P977–P983 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 146 |
| P984–P985 | Computers in cardiology | 147 |
| P986–P1000 | Echocardiography/Doppler | 148 |
| P1001–P1016 | Atherosclerosis II – Basic Science | 152 |
| P1017–P1023 | Nuclear cardiology/magnetic resonance imaging and cardiac radiology | 156 |
| P1024–P1025 | Computers in cardiology | 157 |
| P1026–P1039 | Echocardiography/Doppler | 158 |
| P1040–P1047 | Moderated Poster session II: Exercise testing | 161 |
| P1048–P1076 | Implantable cardioverter-defibrillator therapy | 163 |
| P1077–P1096 | Ventricular tachycardia | 170 |
| P1097–P1148 | Heart failure: experimental aspects and risk of inflammation | 175 |
| P1149–P1196 | Ischaemia basic aspects | 188 |
| P1197–P1225 | Non-coronary interventions | 199 |
| P1226–P1254 | Hypertension | 206 |
| P1255–P1276 | Valve surgery | 213 |
| 1277–1280 | Aortic interventions | 218 |

**Day 3 — Monday 30 August 2004**

| | | |
|---|---|---|
| 1300–1305 | Endothelial function, oxidative stress and nitric oxide | 223 |
| 1306–1310 | Gene expression, contractile function and hypertrophy | 224 |
| 1312–1317 | Physical fitness: correlations and determinants | 225 |
| 1318–1323 | Percutaneous interventions in congenital heart disease | 227 |
| 1337–1342 | Myocardial perfusion during acute ischaemia: the added value of myocardial contrast echocardiography (MCE) | 228 |
| 1343–1348 | New aspects of endothelial function related to atherosclerosis | 230 |
| 1353–1358 | Markers and identification of the vulnerable plaque | 231 |
| 1369–1374 | Protection against ischaemia and ischaemia-reperfusion injury | 233 |
| 1375–1380 | Frequent unwanted companions: hypertension and hyperlipidaemia | 234 |
| 1381–1386 | New horizons in risk stratification of unstable coronary syndromes | 236 |
| 1399–1403 | Resistance to antiplatelet agents | 237 |
| 1405–1410 | Intensive treatment for diabetes: key to improved prognosis | 238 |
| 1411–1416 | Oral treatment in prevention of in-stent restenosis | 240 |
| 1425–1430 | Atrial fibrillation – clinical presentation risk factors and prognosis | 242 |
| 1458–1463 | Risk stratification tools in the prediction of coronary events | 243 |
| 1469–1474 | Statins in heart failure: friend or foe? | 244 |
| 1475–1480 | Betablockade: new aspects in chronic heart failure | 246 |
| 1496–1501 | Primary percutaneous coronary intervention – special issues | 248 |
| 1502–1507 | Evolving concepts in the management of aortic stenosis | 249 |
| 1512–1517 | Registries and guidelines in acute coronary syndromes | 251 |
| P1544–P1559 | Angiogenic and stem cell therapy – Basic Science | 252 |
| P1560–P1566 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 256 |
| P1567–P1568 | Computers in cardiology | 258 |
| P1569–P1583 | Echocardiography/Doppler | 258 |
| P1584–P1598 | Angiogenic and stem cell therapy – Basic Science | 262 |
| P1599–P1606 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 266 |
| P1607–P1608 | Computers in cardiology | 268 |
| P1609–P1623 | Echocardiography/Doppler | 268 |
| P1624–P1631 | Moderated Poster session III: Catheter ablation | 272 |
| P1632–P1665 | Catheter ablation | 274 |

Liquidia's Exhibit 1089
Page 6

| | | |
|---|---|---|
| P1666–P1709 | Peptides and heart failure | 282 |
| P1710–P1766 | Acute coronary syndromes | 292 |
| P1767–P1811 | Percutaneous coronary intervention | 306 |
| P1812–P1826 | Nursing | 317 |
| P1827–P1844 | Exercise testing and rehabilitation | 321 |
| P1845–P1871 | Hypertension therapeutic aspects | 325 |
| 1872–1875 | Advanced cardiac imaging | 332 |
| 1929–1934 | Bio-markers of cardiovascular disease | 333 |
| 1935–1940 | Novel magnetic resonance techniques to assess coronary artery disease | 334 |
| 1941–1945 | Mechanisms underlying plaque instability | 336 |
| 1947–1952 | Hormones and cardiac function | 337 |
| 1961–1966 | Clinical and genetic aspects of arrhythmias | 339 |
| 1967–1972 | Recent advances in three-dimensional echocardiography | 340 |
| 1973–1978 | Ischaemia-reperfusion, slow flow and no reflow | 342 |
| 1989–1994 | Computer-based advances in cardiology | 343 |
| 1995–2000 | Vascular and myocardial damage and remodelling | 345 |
| 2001–2006 | Subclinical peripheral artery disease: a marker for severity of coronary artery disease | 346 |
| 2007–2012 | Stem cells in heart failure | 348 |
| 2026–2031 | Percutaneous interventions in unstable coronary syndromes | 349 |
| 2032–2037 | Neurally mediated syncope: a recurrent syndrome revisited | 351 |
| 2042–2047 | Novel pharmacological approaches for the treatment of atrial fibrillation | 352 |
| 2052–2057 | New developments in thrombolysis: fibrinolysis | 354 |
| 2087–2091 | A new era in the prognostic assessment of heart failure patients | 355 |
| 2097–2102 | New evidence for the beneficial effects of exercise training | 357 |
| 2107–2112 | Primary percutaneous coronary intervention in acute myocardial infarction | 358 |
| 2113–2117 | Many things to remember in CABG | 360 |
| 2119–2123 | Exercise testing in mitral valve disease | 361 |
| 2129–2134 | Drug eluting stents in diabetic patients | 362 |
| 2140–2145 | Bad and good habits | 364 |
| P2166–P2178 | Stress-induced myocardial damage and protective mechanisms – Basic Science | 365 |
| P2179–P2185 | Nuclear cardiology/MRI and cardiac radiology | 368 |
| P2186 | Computers in cardiology | 370 |
| P2187–P2201 | Echocardiography/Doppler | 370 |
| P2202–P2213 | Stress-induced myocardial damage and protective mechanisms | 374 |
| P2214–P2220 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 377 |
| P2221–P2222 | Computers in cardiology | 379 |
| P2223–P2237 | Echocardiography/Doppler | 379 |
| P2238–P2245 | Moderated Poster session IV: Inflammation and coronary artery disease | 383 |
| P2246–P2265 | Pacing | 385 |
| P2266–P2286 | Mechanisms of arrhythmias | 390 |
| P2287–P2341 | Resynchronisation therapy | 395 |
| P2342–P2409 | Acute myocardial infarction and reperfusion therapy | 408 |
| P2410–P2438 | Coronary circulation: functional evaluation | 425 |
| P2439–P2484 | Epidemiology | 432 |
| 2485–2488 | Databases and guidelines | 443 |

**Day 4 — Tuesday 31 August 2004**
| | | |
|---|---|---|
| 2605–2609 | Congenital heart disease: secondary challenges after early "repair" | 447 |
| 2611–2616 | Experimental cell transplantation: preclinical and clinical developments | 448 |
| 2617–2622 | More fuel to inflammation | 449 |
| 2636–2641 | Chronic heart failure: new treatment options | 451 |
| 2642–2647 | Oral anticoagulation for atrial fibrillation – still unresolved | 452 |
| 2648–2653 | The diabetic vessel | 454 |
| 2667–2672 | Heart failure news from off the beaten track | 455 |
| 2673–2677 | Catheter ablation of ventricular tachycardia | 457 |
| 2709–2714 | Diabetes and the heart | 458 |
| 2725–2730 | Treatment and outcome of acute pulmonary embolism | 459 |
| 2768–2773 | Coronary artery disease and renal failure: prognostic aspects and prevention | 461 |
| 2774–2779 | Clopidogrel loading – 600 mg may be better | 462 |
| 2799–2804 | Mitral regurgitation: from prognosis to treatment | 464 |
| P2830–P2835 | Moderated e-Posters III: Drug therapy in cardiovascular disease | 465 |

Liquidia's Exhibit 1089
Page 7

P2836–P2851  Endothelial function, vascular care and remodelling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  467
P2852–P2858  Nuclear cardiology/Magnetic resonance imaging and cardiac radiology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  471
P2859        Computers in cardiology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  472
P2860–P2874  Echocardiography/Doppler . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  473
P2875–P2887  Ion channels and arrhythmias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  476
P2888–P2894  Nuclear cardiology/Magnetic resonance imaging and cardiac radiology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  479
P2895–P2896  Computers in cardiology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  481
P2897–P2911  Echocardiography/Doppler . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  482
P2912–P2919  Moderated Poster session V: Trials in heart failure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  485
P2920–P2950  Atrial fibrillation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  488
P2951–P2995  Heart failure: clinical aspects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  495
P2996–P3046  Coronary artery disease in high-risk patients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  506
P3047–P3079  Restenosis and drug-eluting stents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  519
P3080–P3123  Risk factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  527
P3124–P3144  Myocardial disease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  537
3145–3148    Simulation and modelling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  543
P3265–P3270  Moderated e-Posters IV: Nurse-led interventions in patients with heart failure . . . . . . . . . . . . . . . . . . . . . . . . . . .  544
P3271–P3284  Cardiac hypertrophy and remodelling contractile function – Basic Science . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  545
P3285–P3291  Nuclear cardiology/Magnetic resonance imaging and cardiac radiology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  548
P3292–P3293  Computers in cardiology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  550
P3294–P3308  Echocardiography/Doppler . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  551
P3309–P3323  Cardiac hypertrophy and remodelling contractile function – Basic Science . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  554
P3324–P3330  Nuclear cardiology/Magnetic resonance imaging and cardiac radiology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  558
P3331–P3332  Computers in cardiology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  560
P3333–P3347  Echocardiography/Doppler . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  560
P3348–P3354  Moderated Poster session VI: In stent restenosis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  564
P3355–P3374  Electrocardiography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  566
P3375–P3394  Syncope . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  571
P3395–P3418  Heart transplantation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  575
P3419–P3444  Heart failure – medical therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  581
P3445–P3485  Valvular disease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  588
P3486–P3512  Coronary artery disease: risk stratification and medical therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  597
P3513–P3531  Stroke . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  604
P3532–P3544  Exercise testing and rehabilitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  608
P3545–P3577  Grown-up and congenital heart disease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  611
P3578–P3588  Coronary artery bypass grafting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  620
3589–3592    Databases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  622

**Day 5 — Wednesday 1 September 2004**

3617–3622    Pericarditis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  627
3627–3632    Structure and function of cardiac ion channels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  628
3637–3642    Lipid modulation in atherogenesis – beyond cholesterol . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  630
3643–3648    Pulse pressure, distensibility and cardiovascular risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  631
3649–3654    Fat, lean or active: all relevant for cardiovascular risk? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  633
3655–3660    Conduction of the electrical impulse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  634
3661–3666    Novel players in receptor-mediated signalling in cardiac myocytes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  636
3671–3676    Nuclear cardiology – beyond the future . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  637
3681–3686    Challenges in aortic interventions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  638
3687–3692    Stenting of supra-aortic extracranial arteries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  640
3693–3698    New navigation and mapping techniques for targeting the arrhythmogenic substrate . . . . . . . . . . . . . . . . . . . . . . .  641
3703–3708    Reducing thrombotic risk – old concepts, new therapies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  643
3713–3718    Acute myocardial intervention and diabetes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  644
3723–3728    Pacing mode and lead position: does it matter? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  646
3729–3734    How important is abnormal respiration in heart failure? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  647
3735–3740    New insights into native or repaired mitral valve dynamics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  649
3745–3750    Renal dysfunction and anaemia – overlooked parts of the heart failure syndrome . . . . . . . . . . . . . . . . . . . . . . . . . .  650
3751–3756    Ablation of atrial fibrillation: new techniques . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  652
3757–3762    Management of acute heart failure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  653
3763–3768    Multiple applications of cardiac computed tomography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  654
3778–3783    Challenging issues after valve replacement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  656
3784–3789    Clinical assessment of resynchronisation therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  658

Liquidia's Exhibit 1089
Page 8

3790–3795    Hypertension and heart failure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    660
3801–3806    Blood pressure reduction and cardiovascular risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    661
3811–3816    Heart economics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    663
3821–3826    Physical training and secondary prevention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    664
3827–3831    Percutaneous coronary interventions in diabetic patients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    666
3833–3838    Prognostic value of stress echocardiography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    667
3839–3843    Restenosis following bare stents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    669
3845–3850    Drug eluting stent to treat in-stent restenosis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    670

**Author Index** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    673

**Index of Topics** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    717

**Legend**

Every abstract is identified as either "BENCH" or "BEDSIDE".

 BENCH (Animal studies or in vitro experiments at the molecular, cellular or tissue level (including human
tissue). The core data are generated in the lab.)

 BEDSIDE (Patients studies. The core data are generated during clinical studies or interventions.)

This abstract book has been produced electronically by Elsevier B.V.

Every effort has been made to faithfully reproduce the abstracts as submitted. However, no responsibility is assumed by the organisers for any injury and/or damage to persons or property as a matter of products liability, negligence or otherwise, or from any use or operation of any methods, products, instructions or ideas contained in the material herein. Because of the rapid advances in the medical sciences, we recommend that independent verification of diagnoses and drug dosages should be made.

Liquidia's Exhibit 1089
Page 10



### 218 Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension

R. Voswinckel, M.G. Kohstall, B. Enke, T. Gessler, F. Reichenberger, H.A. Ghofrani, W. Seeger, H. Olschewski. *Medical Clinic 2, Department of Internal Medicine, Giessen, Germany*

**Background:** Treprostinil has been approved for therapy of PAH (US and Canada) as continuous subcutaneous infusion. However, local pain at the infusion site is a major drawback. Inhaled therapy with another stable prostacyclin analogue (iloprost) has been approved for PPH (EMEA). In this study we investigated the acute hemodynamic response to inhaled treprostinil.
**Methods:** Open-label, single blind placebo-controlled clinical study. After placement of a Swan-Ganz catheter and a femoral artery line, patients inhaled solvent solution (placebo) (n=8) or treprostinil for 6 min (OptiNeb ultrasound nebulizer, Nebu-tec, Germany) in concentrations of 16, 32, 48, and 64 μg/ml (n=6, 6, 6, and 3 patients). Measurement was performed before and after 0, 15, 30, 60, 90, 120, 150 and 180 min. The mean area between the placebo and the treprostinil curves (ABC186) was calculated (baseline=100%).
**Results:** We investigated idiopathic PAH (n=10), collagen vascular disease (n=5), chronic thromboembolic disease (n=9), and pulmonary fibrosis (n=5), f/m = 19/10, age 56 ± 3 years, PAP, PAWP, and CVP 51.3 ± 2.2, 9.2 ± 0.8, and 6.6 ± 0.6 mmHg, CO 4.4 ± 0.3 l/min, SvO2 62.3 ± 1.2%, PVR 885 ± 72 dyn s cm⁻⁵. At 16μg/ml there were no significant adverse events. Headache, cough or bronchoconstriction were observed in 2, 1, and 2 patients at 32, 48, and 64 μg/ml. These were mild and transient in all patients but one (64 μg/ml) who complained of major headache for 1 hour. Placebo inhalation was followed by slowly increasing PVR. Compared to this, the maximum treprostinil effect was reached after about 50 min and half-maximal effects at about 110 min. The ABC186 for PVR was −24.7 ± 4.4, -28.7 ± 4.9, and −29.0 ± 4.7%; PAP −14.4 ± 3.3, -13.5 ± 5.2, -13.1 ± 2.6%; SAP −5.1 ± 3.0, -6.0 ± 3.1, -3.8 ± 2.1% at 16, 32 and 48 μg/ml.
**Conclusion:** Treprostinil inhalation results in a significant long-lasting pulmonary vasodilatation. With the applied technology, at a concentration of 16μg/ml, near maximal pulmonary vasodilatation is achieved without adverse effects. At higher doses, local and systemic side effects may occur, whereas pulmonary selectivity is preserved.
This study was supported by Lung Rx.



### 219 The endothelin-receptor antagonist bosentan for the treatment of pulmonary arterial hypertension associated with congenital heart defects

O. Sitbon[1], M. Beghetti[2], J. Petit[3], L. Iserin[4], M. Humbert[1], V. Gressin[5], G. Simonneau[1]. *[1]Hôpital Antoine Béclère, Clamart, France; [2]HUG, Pediatric Cardiology Unit, Geneva, Switzerland; [3]CMC Marie-Lannelongue, Le Plessis-Robinson, France; [4]Hôpital Necker, Paris, France; [5]Actelion Pharmaceuticals France, Paris, France*

**Background:** Treatment with the oral dual endothelin-receptor antagonist bosentan has been shown to be an effective alternative option to intravenous epoprostenol in functional class (FC) III idiopathic pulmonary arterial hypertension (PAH) patients. In patients with PAH associated with congenital heart defects (CHD), an improvement of exercise capacity and hemodynamics has been demonstrated with epoprostenol in one uncontrolled study (Rosenzweig et al. Circulation 1999; 99: 1858-65).
The aim of this retrospective study was to evaluate the efficacy and safety of bosentan in FC III-IV CHD-PAH patients.
Study population consisted in 24 patients (22 females, mean age 35 ± 15 years [8-68]) with CHD-PAH: atrial septal defect (ASD: 13), ventricular septal defect (VSD: 4), partial abnormal pulmonary venous return (3, associated with ASD in 2 and repaired common atrium in 1), patent ductus arteriosus (PDA: 2), VSD associated with PDA (1), aortopulmonary window (1). Four patients had undergone previous cardiac surgery.
Patients had deteriorated despite conventional therapy (including oral anticoagulants, oxygen, diuretics) and were treated with chronic oral bosentan.
**Results:** Before starting bosentan, 22 patients were in FC III and 2 in FC IV, with a resting O2 saturation (SaO2) of 89 ± 9%. Mean 6-min walk distance (6MWD) was 288 ± 94 m and mean Borg index 3.0 ± 1.9. At last evaluation performed after 10 ± 9 months of bosentan treatment, 1 patient was in FC I, 8 were in FC II, 13 remained in FC III and 2 in FC IV. The mean 6MWD improved by 49 m (349 ± 85 m, p = 0.008) with no change in Borg index (3.0 ± 1.8) and resting SaO2 (89 ± 6%). There were no differences between pre and post-tricuspid shunt subgroups in terms of baseline characteristics and response to bosentan therapy. After 13 ± 9 months of follow-up, all patients are alive on bosentan, but 3 (1 ASD, 1 VSD, 1 aortopulmonary window) required combination therapy with intravenous epoprostenol after 5, 7 and 9 months on bosentan.
**Conclusion:** Chronic oral bosentan treatment improves exercise capacity in patients with PAH associated with CHD who deteriorated despite conventional therapy. Bosentan had no adverse effect on arterial oxygen saturation. As previously demonstrated in patients with idiopathic PAH, long term bosentan may be an important therapeutic option for patients with PAH associated with CHD.



### 220 Sildenafil in the treatment of primary pulmonary hypertension

A. Dharmadhikari[1], M. Kulkarni[2], V. Tzifos[3], F. Airoldi[4], I. Sheiban[5]. *[1]Nashik, India; [2]Rajebahadur Heart Foundation, Cardiology, Nashik, India; [3]Hospital Hunry Dununt, Interventional Cardiology, Athens, Greece; [4]Hospital San Raffaele, Interventional Cardiology, Milano, Italy; [5]University Hospital, Torino, Interventional Cardiology, Torino, Italy*

**Background:** The role of sildenafil as a pulmonary vasodilator is being extensively evaluated in the treatment of pulmonary hypertension.
**Aim:** This was a prospective study to assess the benefit of adding sildenafil in patients with high pulmonary artery pressures secondary to atrial septal defect (ASD), already receiving the conventional therapy.
**Methods:** Thirty consecutive patients with moderate to severe primary pulmonary hypertension were included in this study. All the patients were diagnosed previously and were receiving the conventional therapy with digoxin, diuretic and a calcium channel blocker. Sildenafil was added in the dose of 50 mg twice a day without changing the previous regimens. Changes in the New York Heart Association (NYHA) symptom class, distance covered during the six minute walk test and modified Borg dyspnea score were evaluated monthly. Acceptance of the new drug was assessed every week in the first month and then at the monthly follow up. Echocardiography and Doppler study was undertaken at baseline and every month for a period of six months. The parameters studied were the pulmonary artery systolic pressure (PASP) by tricuspid regurgitation (TR) jet and pulmonary artery diastolic pressure (PADP) by pulmonary regurgitation (PR) jet.
**Results:** Mean age of the subjects was 42.6±9.3 years. Twenty seven (90%) were females and 3 (10%) were males. Sildenafil was well tolerated and there was no dropout because of undesireable effects of the drug. Changes in the heart rate and systemic blood pressure were not significant enough to warrant withdrawal of the drug. Two patients died during the follow-up period. At the beginning of the therapy, 22 (73.3%) patients were in NYHA Class III or IV while at the end of six months, only 8 patients remained in either of these classes (p<0.05). By the 6 min walk test, functional capacity improved from 181.5±122.4 meters to 302.7±150.3 meters p(<0.05). Modified Borg dyspnea score improved from 5.6±1.2 to 3.3±1.1 (p<0.05). PASP by TR jet (mmHg) was down from 81.3±14.7 to 51.4±11.7 (p<0.05). PADP by PR jet (mmHg) reduced from 56.2±11.7 to 33.4±9.1 (p<0.05).
**Conclusion:** Sildenafil is well tolerated, improves symptoms, and reduces the systolic and diastolic pulmonary artery pressures in patients with moderate to severe primary pulmonary arterial hypertension.

## REVISITING THE ELECTROCARDIOGRAM AND ELECTROPHYSIOLOGIC MARKERS OF ARRHYTHMIC EVENTS




### 221 Prevalence of brugada-type ecg in an apparently healthy european population

G. Forleo[1], F. Di Liberato[2], L. De Luca[2], G. Magliano[2], V. Morgia[2], F. Clementi[2], M.M. Gallagher[2], F. Romeo[2]. *[1]University of Rome, Department of Cardiology, Roma, Italy; [2]University of Tor Vergata, Department of Cardiology, Roma, Italy*

**Background:** The Brugada Syndrome ECG is characterized by ST-segment elevation in right precordial leads and elevated risk of lethal arrhythmias in absence of identifiable structural heart disease. Few data are available on the Brugada type ECG, especially in Europeans. No epidemiological study has applied the diagnostic criteria recently proposed by the Study Group of the Molecular Basis of Arrhythmias of the ESC.
**Methods:** We analysed the ECG and clinical data of apparently healthy European adults undergoing routine medical examinations for occupational reasons. At each examination subjects underwent a medical interview, physical examination, blood pressure measurement and 12-lead ECG. Enrolment was confined to persons without a history of heart disease at the time of first attendance in whom at least one 12-lead ECG of good quality was recorded. The ECG records of 7483 subjects (89.6% male, age 29,5±10,8 years at first attendance) were reviewed by three cardiologists. We reviewed 1,97±2,1 ECGs for each subject. We considered a patient having a Brugada ECG pattern if 2 or more of the cardiologists judged that at least one of that persons ECGs fulfilled the criteria of the ESC Study Group.
**Results:** The Brugada pattern was present in 26 patients (0.35%), all male (table). In 17 cases (65.4%), information was available about the progress of the subject subsequent to the ECG on which the Brugada pattern was first recorded. No sudden death or cardiac arrhythmia was recorded among these patients in a follow-up of 5.2±4.6 years (total follow-up 87.8 patient-years).

| | Total | Pattern 1 | Pattern 2 | Pattern 3 | Tot. Brugada |
|---|---|---|---|---|---|
| Pts (n) | 7383 | 2 | 21 | 3 | 26 |
| Male | 6618 | 2 | 21 | 3 | 26 |
| Female | 765 | 0 | 0 | 0 | 0 |
| Male prevalence (*10000) | – | 3,02 | 31,73 | 4,53 | 39,29 |
| Total Prevalence (*10000) | – | 2,71 | 28,44 | 4,06 | 35,22 |

Liquidia's Exhibit 1089
Page 11

**218** Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension



R. Voswinckel, M.G. Kohstall, B. Enke, T. Gessler, F. Reichenberger, H.A. Ghofrani, W. Seeger, H. Olschewski. *Medical Clinic 2, Department of Internal Medicine, Giessen, Germany*

**Background:** Treprostinil has been approved for therapy of PAH (US and Canada) as continuous subcutaneous infusion. However, local pain at the infusion site is a major drawback. Inhaled therapy with another stable prostacyclin analogue (iloprost) has been approved for PPH (EMEA). In this study we investigated the acute hemodynamic response to inhaled treprostinil.

**Methods:** Open-label, single blind placebo-controlled clinical study. After placement of a Swan-Ganz catheter and a femoral artery line, patients inhaled solvent solution (placebo) (n=8) or treprostinil for 6 min (OptiNeb ultrasound nebulizer, Nebu-tec, Germany) in concentrations of 16, 32, 48, and 64 $\mu$g/ml (n=6, 6, 6, and 3 patients). Measurement was performed before and after 0, 15, 30, 60, 90, 120, 150 and 180 min. The mean area between the placebo and the treprostinil curves (ABC186) was calculated (baseline=100%).

**Results:** We investigated idiopathic PAH (n=10), collagen vascular disease (n=5), chronic thromboembolic disease (n=9), and pulmonary fibrosis (n=5), f/m = 19/10, age 56 ± 3 years, PAP, PAWP, and CVP 51.3 ± 2.2, 9.2 ± 0.8, and 6.6 ± 0.6 mmHg, CO 4.4 ± 0.3 l/min, SvO2 62.3 ± 1.2%, PVR 885 ± 72 dyn s cm$^{-5}$. At 16$\mu$g/ml there were no significant adverse events. Headache, cough or bronchoconstriction were observed in 2, 1, and 2 patients at 32, 48, and 64 $\mu$g/ml. These were mild and transient in all patients but one (64 $\mu$g/ml) who complained of major headache for 1 hour. Placebo inhalation was followed by slowly increasing PVR. Compared to this, the maximum treprostinil effect was reached after about 50 min and half-maximal effects at about 110 min. The ABC186 for PVR was –24.7 ± 4.4, -28.7 ± 4.9, and –29.0 ± 4.7%; PAP –14.4 ± 3.3, -13.5 ± 5.2, -13.1 ± 2.6%; SAP –5.1 ± 3.0, -6.0 ± 3.1, -3.8 ± 2.1% at 16, 32 and 48 $\mu$g/ml.

**Conclusion:** Treprostinil inhalation results in a significant long-lasting pulmonary vasodilatation. With the applied technology, at a concentration of 16$\mu$g/ml, near maximal pulmonary vasodilatation is achieved without adverse effects. At higher doses, local and systemic side effects may occur, whereas pulmonary selectivity is preserved.

This study was supported by Lung Rx.

Liquidia's Exhibit 1089
Page 12

Review

For reprint orders, please contact reprints@future-drugs.com



# Medical therapeutics for pulmonary arterial hypertension: from basic science and clinical trial design to evidence-based medicine

*Roxana Sulica and Michael Poon*[†]

Pulmonary arterial hypertension is a severe disease with poor prognosis, caused by obliteration of the pulmonary vasculature as a result of pulmonary-vascular remodeling, active vasoconstriction and *in situ* thrombosis. Left untreated, pulmonary arterial hypertension results in right-ventricular failure and death. There has been dramatic progress in the treatment of pulmonary arterial hypertension during recent years. A remarkable number of randomized-controlled trials with agents known to target specific abnormalities present in pulmonary arterial hypertension have been completed. Most commonly, therapeutic efficacy was judged by the ability of the drug under study to improve exercise capacity and to decrease the rate of severe complications. Completed clinical trials have mainly evaluated patients with relatively advanced disease. Despite these advances, responses to therapy in pulmonary arterial hypertension are not uniformly favorable and frequently incomplete. In addition, the methods of delivery and the adverse effect profile of the currently available pulmonary arterial hypertension-specific drugs create further management difficulties. Based on newly identified pathobiologic abnormalities in the pulmonary vasculature, future studies are likely to focus on the discovery of new therapeutic targets. Clinical trial design will continue to evolve in an attempt to enable inclusion of patients with less advanced disease and evaluation of treatment combinations or comparisons of the currently approved drugs.

*Expert Rev. Cardiovasc. Ther.* 3(2), 347–360 (2005)

CONTENTS

Definition & classification

Conventional treatment

Specific pulmonary arterial
hypertension treatment

Expert opinion

Five-year view

Key issues

References

Affiliations

[†]*Author for correspondence
Mount Sinai School of Medicine,
Director of Cardiology, Cabrini
Medical Center, New York,
NY 10003, USA
Tel.: +1 212 995 6865
Fax: +1 212 979 3474
mpoon@cabrininy.org*

KEYWORDS:
ambrisentan, bosentan,
epoprostenol, exercise capacity,
hemodynamics, iloprost,
pulmonary arterial hypertension,
sildenafil, sitaxsentan, treprostinil

## Definition & classification

Pulmonary arterial hypertension (PAH) encompasses a heterogeneous group of disorders characterized by increased pulmonary artery pressure (PAP) and pulmonary vascular resistance (PVR). PAH classification includes idiopathic PAH (IPAH; formerly primary pulmonary hypertension), familial PAH, PAH associated with collagen vascular disease, congenital systemic-to-pulmonary shunts, portal hypertension, HIV infection, drug and toxins, and other conditions (thyroid disorders, glycogen storage disease, Gaucher disease, hereditary hemorrhagic telangiectasia, hemoglobinopathies, myeloproliferative disorders and splenectomy), PAH associated with significant venous or capillary involvement and persistent pulmonary hypertension of the newborn [1].

Without intervention, PAH has a progressive course and poor prognosis. Estimated median survival of untreated IPAH patients is 2.8 years [2]. Survival is primarily determined by the level of the right-ventricular dysfunction and the most common cause of death is right-ventricular failure. Appropriate therapy may alter the natural course of the disease, but does not offer a definitive cure. To a certain degree, all forms of PAH share pathologic characteristics, clinical presentation, diagnostic modalities and therapeutic options. In PAH, the small pulmonary arteries are occluded by a combination of active vasoconstriction, *in situ* thrombosis and, most importantly, vascular proliferation and remodeling. PAH treatment is directed at all of these processes (FIGURE 1).

10.1586/14779072.3.2.347
© 2005 Future Drugs Ltd
ISSN 1477-9072
**347**

Liquidia's Exhibit 1104
Page 1

Sulica & Poon



Figure 1. Treatment of pulmonary arterial hypertension.

output. This response is present in less than 10% of PAH patients, mainly IPAH and PAH associated with anorexigen use [5]. Initiation of oral calcium channel-blocker therapy is restricted to patients who manifest acute vasoreactivity and requires frequent monitoring to document long-term clinical efficacy. Indiscriminate use of oral calcium channel blockers in patients with PAH is strongly discouraged to avoid precipitation of hypotension and heart failure with potentially fatal consequences.

*Oral anticoagulation*

Although no randomized, double-blind, placebo-controlled trials of anti-coagulation were performed in patients with PAH, two retrospective studies and one prospective report in patients with IPAH and PAH associated with anorexigen drug use have suggested improved outcome in patients receiving long-term warfarin therapy [3,6,7]. In the absence of contraindications, IPAH patients should receive long-term anticoagulant therapy, with a goal of keeping the international normalized ratio between 1.8 and 2.5. Some experts extend this recommendation to other forms of PAH, although this is controversial, particularly in cases with an increased risk of bleeding, such as PAH patients with scleroderma (erosive esophagitis), portopulmonary hypertension (gastrointestinal bleed) or congenital heart disease (hemoptysis).

Specific pulmonary arterial hypertension treatment

*Basic pathogenesis of pulmonary arterial hypertension*

Vascular wall remodeling and proliferation are the hallmarks of pulmonary arterial obstruction in PAH [8]. Central to the pathogenesis of vascular remodeling is the dysfunction of the pulmonary vascular endothelium with an imbalance between endothelial mediators with opposing actions on the pulmonary vasculature [9–13]. There is an over-expression and/or activation of vasoconstricting, mitogenic and prothrombotic factors (endothelin [ET]-1, thromboxane and serotonin), while prostacyclin, NO and heparin-like substances, which promote vasodilatation and have antiproliferative and antithrombotic properties, are decreased. Specific PAH treatment entails either replacing deficient vasodilator factors or inhibiting mediators that induce vasoconstriction and vascular proliferation (FIGURE 1).

Conventional treatment

*Oral calcium channel blockers*

Active vasoconstriction is detectable at right-heart catheterization during acute vasoreactivity testing. Patients who manifest acute vasoreactivity may have a good long-term response to oral calcium channel-blocker therapy [3]. Therefore, testing for acute vasoreactivity is recommended during initial evaluation in all patients with PAH [4]. During right heart catheterization, patients are administered short acting vasodilators such as inhaled nitric oxide (NO), intravenous epoprostenol or intravenous adenosine. Acute vasoreactivity is present if, after vasodilator challenge, the mean PAP decreases by at least 10 mmHg and to less than 40 mmHg, with preserved or increased cardiac

*Expert Rev. Cardiovasc. Ther.* 3(2), (2005)

Appx2878

Liquidia's Exhibit 1104
Page 2

*Specific pulmonary arterial hypertension therapeutic agents*

Recent developments in the management of PAH focus on the introduction of new drugs with different intracellular mechanisms of action and the use of alternative routes of administration. In the USA, the agents approved by the US Food and Drug Administration (FDA) for the specific treatment of PAH are continuous intravenous epoprostenol (prostacyclin and prostaglandin I$_2$), continuous subcutaneous treprostinil (prostacyclin analog) and oral bosentan (ET receptor antagonist). Agents approved by the European Agency for the Evaluation of Medicinal Products are continuous epoprostenol, oral bosentan and inhaled iloprost (prostacyclin analog). Other oral drugs recently investigated or currently studied in clinical trials include beraprost, sildenafil, sitaxsentan and ambrisentan.

**Expert opinion**

*Evidence-based management*

During the past 5 years, more than 2500 patients with PAH have been studied in a randomized, controlled fashion in more than ten completed major clinical trials. At least nine more randomized, controlled trials are planned or ongoing. TABLES 1–4 summarize the findings of the major clinical trials in PAH [14–36]. Sildenafil, a phosphodiesterase-5 inhibitor with pulmonary vasodilatory action, has also been evaluated in a 3-month double blind, placebo-controlled, multicenter, randomized trial in patients with PAH (63% IPAH, 30% PAH associated with connective tissue disease and 6% PAH associated with surgically corrected congenital heart disease) [37]. This trial included 278 patients with PAH in World Health Organization (WHO) functional Classes II to IV (39% Class II, 58% Class III and 3% Class IV) and evaluated three sildenafil doses (20, 40 and 80 mg three-times daily). The primary end point was the change from baseline in the 6-min walk test (6MWT) distance. There was a significant improvement in the exercise capacity as measured by the 6MWT, in hemodynamics and in WHO class for all three doses studied [37].

Multiple new findings in PAH pathobiology, genetics, diagnosis and therapy were assessed during the Third World Symposium on Pulmonary Arterial Hypertension (Venice, 2003) and proceedings of this meeting were published in a supplement to the Journal of the American College of Cardiology [38]. In addition, the American College of Chest Physicians has recently published evidence-based guidelines for PAH diagnosis and management [39]. Therapeutic choices in PAH depend on the etiopathogenic particularities of the disease and the severity of the functional impairment (FIGURE 2). A new treatment algorithm has been devised based on data from published randomized, controlled trials (FIGURE 3). This algorithm is mainly restricted to patients in WHO functional Classes III and IV and patients with IPAH and PAH due to the scleroderma spectrum of disease, who represented the majority of studied patients. Extrapolation of current recommendations to other PAH patient populations requires caution.

In the face of substantial achievements in the therapeutic armamentarium, PAH remains a disease with particularly poor prognosis, even among treated patients. Untreated IPAH patients from the National Institutes of Health registry had 1-, 3- and 5-year survival rates of 68, 48 and 34%, respectively [2]. Intravenous epoprostenol is the only PAH-specific therapy that has been shown to improve survival in a 3-month, randomized, controlled trial in IPAH [15], while newer drugs have been shown to reduce clinical deterioration during the same time interval [29–31]. IPAH is more responsive to treatment compared with other forms of PAH [21,31,34] and intravenous epoprostenol is still considered the most efficacious therapy available. Retrospective studies of IPAH patients treated with intravenous epoprostenol, demonstrated improved long-term outcome with 1-, 3- and 5-year survival rates of 85, 63 and 55%, respectively [19,20]. Response to available therapy is not universally favorable and there is no cure for PAH. Therefore, there is a continual need for discovery of novel therapeutic strategies.

**Table 1. Major randomized controlled clinical trials with intravenous epoprostenol in patients with PAH.**

| Trial | n | PAH | WHO class (%) | | | Route | Duration (months) | Dose of active drug achieved (ng/kg/min) | Control* | Primary end point | Treatment effect | | | | | | Ref. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | II | III | IV | | | | | | 6MWT (m) | H/dyn | WHO class | Symptoms | QOL | Survival | |
| Rubin (1990) | 24 | IPAH | 9 | 65 | 26 | Iv. | 2 | N/A | Conv. therapy | H/dyn | +45 (mean) | Better | N/A | Better | N/A | No change | [14] |
| Barst (1996) | 81 | IPAH | | 75 | 25 | Iv. | 3 | 9.2 | Conv. therapy | H/dyn | +47 (mean) | Better | Better | Better | Better | Better | [15] |
| Badesch (2000) | 111 | SPAH | 5 | 78 | 17 | Iv. | 3 | 11.2 | Conv. therapy | 6MWT | +94 (median) | Better | Better | Better | N/A | No Change | [16] |

*None of these studies were placebo-controlled for ethical reasons: patients in the active group received intravenous epoprostenol in addition to conventional therapy, while the control group was represented by patients receiving conventional therapy alone.
6MWT: 6-min walk test: Conv.: Conventional: H/dyn: Hemodynamics: IPAH: Idiopathic pulmonary arterial hypertension: Iv: Intravenous: N/A: Not applicable: PAH: Pulmonary arterial hypertension: QOL: Quality of life: SPAH: Scleroderma pulmonary arterial hypertension: WHO: World Health Organization.

Liquidia's Exhibit 1104
Page 3

Sulica & Poon

---

**Table 2. Other clinical trials with intravenous epoprostenol in patients with PAH.**

| Trial | Findings | Comments | Ref. |
|---|---|---|---|
| Barst 1994<br>Shapiro 1997 | Effect on survival | Improved long-term survival in IPAH patients treated with epoprostenol compared with historic controls | [17,18] |
| Retrospective reviews:<br>McLaughlin (2002)<br>Sitbon (2002)<br>Kuhn (2003) | Long-term outcome (3–5-year follow-up) and predictors of response to therapy | Baseline hemodynamics and right-ventricular function predict response to therapy. Patients who improve at 3–12-month follow-up have better long-term prognosis. Patients with scleroderma PAH have worse long-term prognosis, even if treated with intravenous epoprostenol. Treated patients had better survival compared with historic controls or to expected survival derived from the NIH equation | [19–21] |
| McLaughlin (1998) | Insights into mechanism of action | With epoprostenol, long-term decrease in PVR is more pronounced compared with the acute response, suggesting an effect on pulmonary vascular remodeling | [22] |
| Rich 1999 | Dose adjustment | Intravenous epoprostenol rate should be adjusted to avoid deleterious hyperdynamic cardiovascular effects | [23] |
| Case series:<br>McLaughlin 1999<br>Robbins 2000<br>Horn 2000<br>Krowka 1999<br>Rosenzweig 1999 | Use of intravenous epoprostenol in other forms of PAH | Hemodynamic and symptomatic improvement with intravenous epoprostenol in patients with other forms of PAH | [24–28] |

IPAH: Idiopathic pulmonary hypertension; NIH: National Institutes of Health; PAH: Pulmonary arterial hypertension; PVR: Pulmonary vascular resistance.

---

### Alternative approaches to therapy with currently available drugs

Several therapeutic strategies aimed at improving the control of the disease or the risk–benefit ratio of the treatment were employed in small clinical trials and retrospective series.

#### Combination therapy

Since multiple and complex pathogenetic mechanisms are implicated in the development and progression of pulmonary hypertension, various combinations of drugs with already proven benefit may represent alternative therapeutic strategies in PAH. Prostacyclins, ET receptor antagonists and drugs acting through a NO-dependent pathway (such as sildenafil, a phosphodiesterase inhibitor) have different intracellular signal transduction pathways with potential synergistic effect. A small multicenter clinical trial on the combined use of epoprostenol and bosentan, initiated simultaneously, suggested that bosentan may provide a small additional hemodynamic benefit to severe PAH patients who require epoprostenol treatment [40]. In retrospective studies of patients on chronic epoprostenol or treprostinil, the addition of bosentan was safe and increased vasodilatory efficacy, which allowed for prostacyclin dose reduction or even discontinuation [41–43]. Small series have demonstrated acute and chronic benefit from combined use of various prostacyclins (intravenous epoprostenol, subcutaneous treprostinil and inhaled iloprost) and oral sildenafil [44–47]. A multicenter trial investigating the effect of combined oral sildenafil and intravenous epoprostenol is currently ongoing. The possibility of unexpected interactions between these drugs and the absence of efficacy and safety data in large clinical trials preclude recommendation of routine use of combination PAH therapy.

#### Transition from intravenous epoprostenol to oral bosentan or subcutaneous treprostinil

Continuous intravenous epoprostenol administration, although known to improve exercise capacity, symptoms, hemodynamics and right-ventricular function in severe PAH and to offer survival benefit in IPAH patients, requires a complicated delivery system. It may be associated with potentially life-threatening side effects, such as line-related sepsis and thrombosis or rebound pulmonary hypertension and acute right heart failure from inadvertent discontinuation. Newer PAH drugs have also been shown to have beneficial effects on exercise capacity, symptoms, hemodynamics and clinical events in patients with severe PAH. Small published series from centers with extensive experience in PAH management have demonstrated the feasibility and safety of transitioning selected patients from intravenous epoprostenol to other therapeutic alternatives, such as subcutaneous treprostinil and oral bosentan [43,48,49]. In addition, a current multicenter trial is evaluating the safety of transitioning PAH patients from intravenous epoprostenol to subcutaneous treprostinil. At the present time, however, the authors caution against indiscriminate discontinuation and substitution of intravenous epoprostenol with other available drugs. There is no guarantee that, in the case of clinical deterioration, reinstitution of previous therapy will reverse disease progression, which may have fatal consequences. Larger clinical investigations are warranted to establish enrollment criteria and transitioning methods to assure both the efficacy and safety of such an approach.

#### Use of alternative methods of delivery

The main difficulty with subcutaneous treprostinil therapy is the development of pain and reactions at the infusion site [29]. To avoid this side effect of treprostinil, intravenous

Liquidia's Exhibit 1104<br>Page 4

Appx2880

and inhalatory routes of administration were recently investigated. Treprostinil has a longer half-life compared with epoprostenol, which decreases the risk of rebound pulmonary hypertension and right heart failure in the case of abrupt discontinuation. In comparison to intravenous epoprostenol, intravenous treprostinil administration alleviates the need for a large infusion pump, drug reconstitution and the use of ice packs. Continuous intravenous treprostinil administration has been evaluated for safety and efficacy in a multicenter trial, both as transition from intravenous epoprostenol and as *de novo* therapy [50]. Intravenous treprostinil was associated with an improvement in exercise performance and hemodynamics, with added advantages of safety and convenience [50]. It has recently received FDA approval for this route of administration.

In a recent report from Germany, inhaled treprostinil demonstrated substantial pulmonary vasodilatory efficacy in acute administration, as well as symptomatic and functional benefit in chronic use in a small number of PAH patients [51].

### Head-to-head comparisons between currently available drugs

With the advent of multiple therapeutic options for PAH patients, questions of relative efficacy, safety and therapy of choice are likely to arise. Head-to-head comparison trials are the most meaningful and accurate method of detecting efficacy and safety differences among various PAH treatments with already proven benefit. Experimental data from tissue culture and animal studies are not necessarily predictive of human response, and data from individual clinical trials cannot be directly compared. An example is represented by ET receptor antagonists. There are two types of ET receptors: $ET_A$ receptors, located in the vascular smooth muscle cells, and $ET_B$ receptors, found on both endothelial ($ET_{B1}$ subtype) and smooth muscle cells ($ET_{B2}$ subtype) [52]. ET binding to receptors located on the vascular smooth muscle cell ($ET_A$ and $ET_{B2}$) induces vasoconstriction and smooth muscle-cell proliferation [53,54]. The relative contribution of $ET_A$ and $ET_{B2}$ receptors to the ET-mediated vasoconstriction depends on the species, experimental conditions and vascular bed studied. $ET_{B1}$ receptors mediate vasodilatation and are responsible for ET clearance from the circulation [55]. Three ET receptor antagonists were recently evaluated in PAH trials: bosentan, a mixed $ET_A/ET_B$ receptor antagonist already



Figure 2. PAH management. Investigations used to characterize the disease process.
*Strongly consider early referral to specialized centers.
‡Right heart catheterization is required to confirm the diagnosis of PAH. Vasoreactivity testing by inexperienced operators may place patients at unduly increased risk.
§Type and extent of work-up varies on individual basis, but all patients with suspected PAH diagnosis should undergo a battery of essential tests, which include echocardiography, chest radiography, ventilation-perfusion scan, HIV testing and screening for connective tissue disease, and pulmonary function test with oximetry.
¶Prior to institution of therapy, it is essential to evaluate functional parameters with prognostic significance, such as exercise capacity and right-ventricular function.
MRI: Magnetic resonance imaging; PAH: Pulmonary arterial hypertension; WHO: World Health Organization.

approved for clinical use, and the selective $ET_A$ receptor antagonists, sitaxsentan and ambrisentan. Theoretically, selective blockade of the $ET_A$ receptors may be more advantageous compared with nonselective $ET_A/ET_B$ antagonism, by preserving $ET_{B1}$-mediated vasodilatation and ET clearance. However, in isolated pulmonary arteries and in animal models, combined $ET_A/ET_B$ receptor blockade was superior to selective $ET_A$ antagonism in reducing vasoconstriction and in improving right-ventricular hypertrophy and animal survival, respectively [56,57]. In randomized clinical trials in patients with PAH, all three ET receptor antagonists improved exercise capacity, hemodynamics, symptoms and WHO functional class [33–36]. It is impossible to accurately compare their relative efficacy on the basis of the available trials, because the PAH patient populations and trial designs were different. However, conducting large-scale head-to-head comparison studies would require more refined methodology and increased

Sulica & Poon

**Table 3. Major clinical trials with newer prostanoids.**

| Trial | Drug/route | n | PAH (%) active/placebo | WHO class (%) active/placebo | | | Duration (months) | Control | Primary end point | Dose |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | II | III | IV | | | | |
| Simmoneau (2002) | SQ treprostinil | 470 | IPAH: 58/58 CTDz: 17/21 CHDz: 25/22 | 11/12 | 82/81 | 8/7 | 3 | Placebo | 6MWT | 9.3 ng/kg/min (mean) |
| Olschewski (2002) AIR | Inhaled iloprost | 203 | IPAH: 50.5/50 CTDz: 12.9/21.6 Anorex.: 4/4.9 CTEPH: 32.7/23.5 | | 59.4/57.8 | 40.6/42.2 | 3 | Placebo | Combined clinical end point[¶] | 30 μg/day (median) 6–9 inhal./day |
| Galie (2002) ALPHABET | Oral beraprost | 130 | IPAH: 53.9/43.1 CTDz: 7.7/12.3 CHDz: 13.8/23/1 Portal HTN: 18.5/13.8 HIV: 6.2/7.7 | 47.7/50.8 | 52.3/49.2 | | 3 | Placebo | 6MWT | 80 μg four-times daily |
| Barst (2003) | Oral beraprost | 116 | IPAH: 78/70 CTDz: 10/11 CHDz: 12/20 | 55/50 | 45/50 | | 12 | Placebo | Disease progression[¶] | 120 μg four-times daily |

[¶]Combined clinical end point was met if there was an improvement in the WHO class by at least one unit and in the 6MWT distance by at least 10% compared with baseline in the absence of clinical deterioration or death.
[‡]Disease progression was represented by death, transplantation, epoprostenol rescue or more than 25% decrease in the peak $V_{O_2}$. Beraprost-treated patients exhibited less disease progression at 6 months, but no such effect was evident at shorter or longer duration of follow-up. The 6MWT distance improved at 3- and 6-month follow-up, but there were no further treatment effects noted at 9- and 12-month intervals.
[§]Treatment effect on the 6MWT distance is the difference between active and placebo groups.
[¶]Clinical worsening, variously defined in studies, includes clinical events consistent with PAH progression, such as death, (need for) transplantation, hospital admission for right heart failure, or need for additional PAH therapy.
6MWT: 6-min walk test; AIR: Aerosolized Iloprost Randomized study; ALPHABET: Arterial Pulmonary Hypertension And BeraprosT; CHDz: Congenital heart disease; CTDz: Connective tissue disease; CTEPH: Chronic thromboembolic pulmonary hypertension; H/dyn: Hemodynamics; HTN: Hypertension; QOL: Quality of life; WHO: World Health Organization.

cost. Such a study is expected to involve a longer duration, larger number of patients and more elaborate and sensitive end points to detect significant differences between groups. With the exception of an ongoing trial on the use of sitaxsentan in PAH (i.e., Sitaxsentan To Relieve ImpaireD Exercise [STRIDE] II), which has a bosentan comparison arm, the authors are not aware of any other direct comparison trials being conducted.

*Particularities associated with clinical trial design in pulmonary arterial hypertension*
Current design of therapeutic trials in PAH is challenged by ethical and logistic dilemmas, particularly with respect to the study design and the choice of appropriate end points. The scientific community and regulatory agencies require performance in randomized, controlled trials of investigational PAH drugs as definitive proof of efficacy and safety. Ethical difficulties may arise from enrolling patients in double-blind, placebo-controlled, randomized studies in the face of available therapeutic options known to improve outcome. Most of the recently completed randomized trials were blinded and placebo-controlled for 3 to 4 months, followed by open-label or blinded, dose-ranging, active treatment extensions for long-term data collection. Specific mechanisms to protect patients in case of clinical worsening were incorporated, such as switching to open-label active treatment or using rescue therapy with already approved drugs. The relatively short duration of the placebo-controlled period, however, may not detect possible attenuation of the clinical effect [32], and it may be inadequate for trials enrolling patients with less advanced disease or evaluating combination therapies.

The most commonly used primary end point in recent PAH clinical trials was the 6MWT distance as a measure of the exercise capacity. Peak oxygen consumption during formal cardiopulmonary exercise test (CPET), WHO/New York Heart Association (NYHA) functional class or measures of disease progression were also used as primary end points. Resting hemodynamics, symptoms (Borg score), general clinical status (e.g., dyspnea-fatigue rating), WHO/NYHA class, the time to clinical worsening (a composite of death, transplant, hospital admission for right heart failure or need for rescue therapy with intravenous epoprostenol) and quality of life measures were employed as secondary end points. The 6MWT is reliable, easy to administer and clinically meaningful, since it correlates with prognosis and CPET parameters in IPAH [58,59]. The 6MWT is validated for studies in PAH patients with moderate and severe disease. However, it may be insensitive in patients with less advanced disease and to date it is not validated in patients with certain forms of PAH, such as portopulmonary hypertension.

Liquidia's Exhibit 1104
Page 6

Table 3. Major clinical trials with newer prostanoids (cont.).

| 6MWT (m) | Peak $V_{O2}$ | H/dyn | Clinical worsening | Survival | Symptoms | WHO class | QOL | Comments | Ref. |
|---|---|---|---|---|---|---|---|---|---|
| +16 (median) | N/A | Better | No effect | No effect | Better | N/A | Better | Treatment effect was dependent on the baseline 6MWT distance and the dose achieved | [29] |
| +36.4 (median) | N/A | Better | Better | No effect | Better | Better | Better | Absolute change in the mean 6MWT distance was larger in the IPAH group | [30] |
| +25.1 (mean) | N/A | No effect | No effect | No effect | Better | No change | N/A | Subgroup analysis showed greater 6MWT improvement in IPAH | [31] |
| +31 (median)* | Trend to increase | No effect | Better | No effect | No effect | No effect | No effect | The study was prematurely terminated to accelerate data review. Less disease progression in the treated group at 6 months only | [32] |

The header spans: Treatment effect | | | | | | | | Comments | Ref.

*Combined clinical end point was met if there was an improvement in the WHO class by at least one unit and in the 6MWT distance by at least 10% compared with baseline in the absence of clinical deterioration or death.

‡Disease progression was represented by death, transplantation, epoprostenol rescue or more than 25% decrease in the peak $V_{O2}$. Beraprost-treated patients exhibited less disease progression at 6 months, but no such effect was evident at shorter or longer duration of follow-up. The 6MWT distance improved at 3- and 6-month follow-up, but there were no further treatment effects noted at 9- and 12-month intervals.

§Treatment effect on the 6MWT distance is the difference between active and placebo groups.

¶Clinical worsening, variously defined in studies, includes clinical events consistent with PAH progression, such as death, (need for) transplantation, hospital admission for right heart failure, or need for additional PAH therapy.

6MWT: 6-min walk test: AIR: Aerosolized Iloprost Randomized study: ALPHABET: Arterial Pulmonary Hypertension And BeraprosT: CHDz: Congenital heart disease: CTDz: Connective tissue disease: CTEPH: Chronic thromboembolic pulmonary hypertension: H/dyn: Hemodynamics: HTN: Hypertension: QOL: Quality of life: WHO: World Health Organization.

Compared with the 6MWT, CPET parameters may provide more objective and detailed evaluation of the functional capacity and the state of the pulmonary circulation in PAH [60–62]. In one trial with beraprost and another with sitaxsentan, the 6MWT distance and peak oxygen consumption were used in parallel as study end points [32,35]. Although a treatment effect was detected by improvement in the 6MWT distance, there were no consistent significant changes in peak oxygen consumption. Such a difference in findings is most likely due to variable interpretation of the CPET results at different centers, unpredictable degree of technical skill and failure to weight-adjust the 6MWT distance [63]. Use of follow-up right heart catheterization to document the treatment effect, although objective and accurate, may impact on the safety of study participants and increase the cost of investigation. Time to clinical worsening as a measure of severe complications has been a useful clinical end point in trials evaluating patients in WHO/NYHA Classes III and IV. It may be less sensitive in combination and direct comparison trials and even unethical in patients with less advanced disease. WHO/NYHA classification correlates well with disease severity and prognosis in IPAH, but it is a self-reported measure, subjected to interpersonal variability and observer bias. The impact of therapy on quality of life measures is an important end point from the perspective of both patients and regulatory agencies. To date, most PAH studies analyzed measures of general health status, such as Short-form Health Survey 36 and Nottingham Health Profile, rather than quality of life.

Five-year view

Based on a more advanced and ever improving understanding of the pathogenesis of PAH, the next 5 years are likely to bring dramatic changes in the management of PAH. New classes of drugs are likely to be developed as a result of recent advances in the molecular and cellular pathobiology of PAH. Larger proportions of patients with less advanced disease will be enrolled in clinical trials. Trial design will continue to evolve in an effort to gain further insights into the clinical management of PAH.

Inclusion of patients with WHO Class II in large-scale clinical trials

Treatment of less advanced disease may halt and even reverse the pathologic process early in its development, which may translate into improved outcome. Intravenous epoprostenol, oral bosentan and inhaled iloprost trials did not include patients with less severe, WHO/NYHA Class II disease. A few recent trials, investigating newer agents such as subcutaneous

Sulica & Poon

Table 4. Major trials with endothelin receptor antagonists.

| Trial | Drug/ route | Dose | Control | Duration (months) | Patients | | Patient PAH (%) active/placebo | | | Patients WHO class (%) active/placebo | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | n | Randomization | IPAH | CTDz | CHDz | II | III | IV |
| Channick (2001) | Oral bosentan | 125 mg b.i.d. | Placebo | 3 | 32 | 1:1 | 81/91 | 19/9 | | | 100/100 | |
| Rubin (2002) BREATHE-1 | Oral bosentan | 125 mg b.i.d. 250 mg b.i.d. | Placebo | 4 | 213 | 1:1:1 | 71/70 | 29/30 | | | 90/94 | 10/6 |
| Barst (2003) STRIDE-1 | Oral sitaxsentan | 100 mg q.d. 300 mg q.d. | Placebo | 3 | 178 | 1:1:1 | 53/62 | 24/15 | 24/23 | 33/37 | 66/60 | 1/3 |
| Rubin (2004) | Oral ambrisentan | 1 mg po q.d. 2.5 mg po q.d. 5 mg po q.d. 10 mg po q.d. | | 3 (blinded) | 64 | 1:1:1:1 | 61 (all active) | Non-IPAH 39 | | 36 (all patients) | 64 (all patients) | |

6MWT: 6-min walk test; b.i.d.: Twice daily; BREATHE: Bosentan: Randomized Trial of Endothelin Receptor Antagonist THErapy for Pulmonary Hypertension; CHDz: Congenital heart disease; CPET: Cardiopulmonary exercise test; CTDz: Connective tissue disease; H/dyn: Hemodynamics; IPAH: Idiopathic pulmonary arterial hypertension; PAH: Pulmonary arterial hypertension; q.d.: Every day; QOL: Quality of life; STRIDE: Sitaxsentan To Relieve ImpaireD Exercise; WHO: World Health Organization.

treprostinil, oral beraprost and oral sitaxsentan, enrolled WHO/NYHA Class II PAH patients in various proportions. Findings from these trials and subgroup analyses have suggested that for a 3 to 4-month placebo-controlled period, 6MWT and resting hemodynamics may be insensitive in detecting a meaningful treatment effect, while time to clinical worsening, as development of severe complications, may be ethically unsound. Duration and type of study end points would have to be modified accordingly, as demonstrated by a recently initiated bosentan trial in patients in WHO/NYHA functional Class II.

*Evolving clinical trial design in pulmonary arterial hypertension*
Design of clinical trials in PAH is likely to evolve in the next few years, particularly with respect to the study end points employed. Clinical end points will include predefined deterioration in the 6MWT distance or CPET parameters or subtle signs of clinical worsening. CPET findings would have to be analyzed in a standardized manner among centers, since it has been shown that by strict adherence to specific guidelines, CPET measurements are reliable and reproducible in patients with PAH [64]. Exercise hemodynamics are likely to be used on a larger scale in therapeutic trials of PAH. Standardized protocols of the exercise method, hemodynamic recording and vasodilators used to test vasoreactivity need to be developed. Quality of life questionnaires will include direct measures of the impact of disease and its treatment on the patient. Echocardiography is commonly used to assess right-ventricular function. In echocardiographic substudies of intravenous epoprostenol and oral bosentan, favorable treatment effects on right- and left-ventricular function could be ascertained [65,66]. Particular attention is given to the impact of PAH and its treatment on

the elevated right-atrial pressure, right-ventricular contractility and left-ventricular diastolic filling. Magnetic resonance imaging (MRI) is superior to echocardiography in the assessment of overall cardiac function due to its improved spatial resolution and signal-to-noise ratio, and its lack of dependency on the operator and the body habitus of the patients [67]. Using cardiac MRI, the authors and others have shown that decreased left-ventricular preload, as measured by increased eccentricity index and decreased left-ventricular end-diastolic volume, correlates well with the severity of the hemodynamic impairment in PAH [68,69]. In a small number of PAH patients with right heart failure, the authors have demonstrated improved right-ventricular filling as assessed by a decrease in the right-atrial dimension upon short-term administration of intravenous nesiritide [70]. Several biologic markers have been shown to correlate with prognosis in patients with PAH. It is likely that, in the near future, the effects of therapy on these biologic markers, such as brain natriuretic peptide, adrenomedullin, uric acid or cardiac troponins will be included in data analysis [71–74].

*Development of new pulmonary arterial hypertension therapeutic agents*
Recent advances in our understanding of the cellular and molecular pathobiology of PAH suggest the potential development of novel therapeutic targets. Cell-based therapy may develop in the future, based on the observation that endothelial progenitor cells may have a role in pulmonary vascular wall remodeling, while endothelial cell transplantation may reduce progression of experimental pulmonary hypertension [75,76]. Various defects in growth suppression genes in IPAH plexiform lesions allow for clonal expansion of pulmonary vascular

Appx2884
Liquidia's Exhibit 1104
Page 8

Table 4. Major trials with endothelin receptor antagonists (cont.).

| Primary end point | Treatment effect | | | | | | | | Comments | Ref. |
|---|---|---|---|---|---|---|---|---|---|---|
| | 6MWT (m) | Peak $V_{O_2}$ | H/dyn | Clinical events | Survival | Symptoms | WHO class | QOL | | |
| 6MWT | +76 (mean) | N/A | Better | Better | No effect | Better | Better | N/A | | |
| 6MWT | +44 (mean) | N/A | N/A | Better | No effect | Better | Better | N/A | Bosentan improved absolute distance walked in IPAH and prevented deterioration in the scleroderma subgroup | [33] |
| Peak $V_{O_2}$ | +35/33 (mean) | +3.1% (mean) | Better | No effect | No effect | N/A | Better | N/A | Peak $V_{O_2}$ improved significantly in the 300-mg group only. There is a dichotomy between 6MWT and CPET results | [34] |
| 6MWT | +33.9–38.1 (mean) | N/A | Better | N/A | N/A | Better | Better | N/A | Phase II trial, dose-ranging and safety evaluation. 6MWT distance analyzed before and after therapy | [35] |

6MWT: 6-min walk test; b.i.d.: Twice daily; BREATHE: Bosentan Randomized Trial of Endothelin Receptor Antagonist THErapy for Pulmonary Hypertension; CHDz: Congenital heart disease; CPET: Cardiopulmonary exercise test; CTDz: Connective tissue disease; H/dyn: Hemodynamics; IPAH: Idiopathic pulmonary arterial hypertension; PAH: Pulmonary arterial hypertension; q.d.: Every day; QOL: Quality of life; STRIDE: Sitaxsentan To Relieve ImpaireD Exercise; WHO: World Health Organization.

endothelial cells suggesting that, to a certain degree, PAH is a disease of dysregulated apoptosis [77]. Other mechanisms underlying selection of an apoptosis-resistant endothelial cell phenotype may involve the vascular endothelial growth factor (VEGF) and its receptors [78]. Cell-based VEGF gene transfer prevented the development and progression of monocrotaline-induced pulmonary hypertension in animal models [79]. Genetic abnormalities seem to play a role in the initiation and progression of the pathologic process in PAH. Intact bone morphogenetic protein (BMP) signaling is important in the maintenance of the normal pulmonary vasculature, while defective BMP-mediated signaling may participate in the pulmonary vascular remodeling process. Germline mutations in the gene encoding the BMP Type II receptor (BMPR-2) have been identified in 60% of familial PAH cases and 10 to 30% of sporadic IPAH [80,81]. BMPR-2 mutations have also been found in 9% of patients with fenfluramine-associated PAH and in 6% of a mixed cohort of adults and children with PAH due to congenital heart defects [82,83]. BMP signaling may be dysregulated at different levels in all forms of human PAH, as has been suggested by studies investigating interactions between angiopoietin-1 and its associated Tie2 receptor, and Type I receptor, a transmembrane protein required for BMPR-2 signaling [84,85]. Functional polymorphisms located on the serotonin transporter (5-HTT) with homozygosity of the L-allele, which induces a high level of gene transcription, is more prevalent in patients with pulmonary hypertension compared with controls, and promote pulmonary vascular proliferation [86–88]. Future studies will focus on identification and manipulation of genetic abnormalities and genetic modifiers that confer an increased risk for PAH. The imbalance between

vasoconstrictor-mitogenic and vasodilator-antiproliferative mediators at the level of the pulmonary vasculature in PAH seems to be further offset by other factors besides prostacyclin, NO and ET. Vasoactive intestinal peptide (VIP) is a neuropeptide with cyclic adenosine monophosphate- and cyclic guanosine monophosphate-mediated pulmonary vasodilatory activity. Increased serum VIP concentration and pulmonary arterial VIP immunoreactivity, as well as VIP receptor deficiency have been described in patients with IPAH. Inhaled VIP had both acute and chronic pulmonary vasodilator properties in a small series of patients with IPAH [89]. Adrenomedullin is a potent, nonselective vasodilator peptide and an inhibitor of vascular smooth muscle cell proliferation with abundant binding sites in the lung. Plasma adrenomedullin levels increase with the severity of pulmonary hypertension and short-term adrenomedullin intravenous infusions decreased the PVR in patients with IPAH [72,90]. Aerosolized administration of adrenomedullin decreased pulmonary arterial pressure in both animal models with pulmonary hypertension and humans with IPAH without any effect on systemic circulation [91–92]. Several abnormalities in the serotonin pathway have been described in clinical and experimental pulmonary hypertension [86–88,93–96]. In PAH, there are elevated plasma serotonin levels, increased expression of pulmonary vascular serotonin receptors and decreased serotonin platelet stores. Activation of serotonin receptors induces vasoconstriction in large and small muscular pulmonary arteries. Derivatives of the anorexigens aminorex and fenfluramine increase the circulating level of serotonin. In animal models and human pulmonary hypertension, serotonin pathway abnormalities potentiate hypoxic pulmonary vasoconstriction and remodeling. In

Sulica & Poon



**Figure 3. Pulmonary arterial hypertension treatment algorithm.** Evidenced-based recommendations with US Food and Drug Administration (FDA)-approved drugs are presented in bold letters. All other agents are either approved only in certain geographic areas or are still in the development stage. Combination therapy and transition from intravenous epoprostenol to oral bosentan or subcutaneous treprostinil are investigational.

*To date, optimal therapy for nonvasoreactive patients in WHO Class II is not well established. Few WHO II patients were included in randomized, controlled trials.
‡Oral sildenafil, inhaled iloprost and oral sitaxsentan are currently evaluated for FDA-approval. Inhaled iloprost is already approved in Europe for pulmonary arterial hypertension class III. Intravenous treprostinil has recently received FDA-approval.
§Oral ambrisentan therapy is still under investigation.
¶Inhaled treprostinil administration is during early stages of development.
#Intravenous iloprost in approved in New Zealand and has been widely used in Europe.
**Oral beraprost is approved in Japan.

experimental pulmonary hypertension, serotonin receptor antagonists and serotonin transporter inhibitors modulate the processes of pulmonary arterial vasoconstriction and proliferation [97,98]. In particular, fluoxetine and citalopram, available as antidepressant medication, protected against vascular remodeling, but potentiated the pulmonary vascular response to hypoxia [98]. In PAH, there are various abnormalities in the pulmonary vascular smooth muscle voltage-gated potassium ($K_v$) channels, such as downregulation of the $K_v$ 1.5 channels and of the $K_v$ genes [99,100]. Decreased activity of the potassium channels leads to pulmonary artery smooth muscle depolarization, increased activity of voltage-gated calcium channels and elevated cytosolic calcium, which results in both vasoconstriction and vascular smooth muscle proliferation. Increased proteolysis of the extracellular matrix in the

pulmonary vasculature may have a role in the development of pulmonary arteriopathy and elastase and metalloproteinase inhibitors have been shown to reduce and even to reverse the vascular remodeling process in experimental pulmonary hypertension [101,102]. Simvastatin, a hydroxymethylglutaryl coenzyme A reductase inhibitor, attenuates monocrotaline-induced pulmonary arteriopathy in rats [103,104]. Arginine, the nitrogen donor for endogenous NO synthesis, has been evaluated in animal models and humans with various forms of pulmonary hypertension. A small series of PAH patients treated with oral arginine demonstrated moderate acute and short-term hemodynamic responses and improved exercise capacity [105]. Prior studies of intravenous arginine administration in human pulmonary hypertension, however, raised suspicion about the magnitude of the pulmonary vasodilator response in PAH and the safety of administration in these patients [106,107]. Since thromboxane A2 is a vasoconstrictor, platelet aggregant and smooth muscle mitogen with pathogenic implications in PAH, a multicenter, randomized, placebo-controlled trial with terbogrel, a thromboxane synthetase inhibitor and receptor antagonist, was initiated a few years ago. The study was discontinued prior to the completion of enrollment due to the unforeseen side effect of leg pain [108]. Possible PAH therapeutic strategies in the near future may include administration of vasodilators such as VIP, arginine and adrenomedullin. Potassium channel openers or metalloproteinase inhibitors may be further investigated in PAH, provided that methods restricting their application to the pulmonary vasculature become available. Clinical trials in PAH with serotonin antagonists and hydroxymethylglutaryl coenzyme A reductase inhibitors may follow in the next few years. At the present time, however, one cannot recommend the use of any of these experimental agents in clinical PAH due to expected or potential troublesome side effects and a lack of documented efficacy.

*Conclusion*

Despite significant advances in our understanding of the pathogenesis of PAH, it remains a severe disease with poor prognosis and incomplete therapeutic response. In the future, improved knowledge of the genetic and molecular mechanism of PAH and well-designed clinical trials are likely to offer improved outcomes and perhaps even a cure for this disease.

*Expert Rev. Cardiovasc. Ther.* 3(2), (2005)

Appx2886

Liquidia's Exhibit 1104
Page 10

---

## Key issues

- Pulmonary arterial hypertension (PAH) remains a disease with a poor prognosis and an incomplete response to treatment despite a dramatic expansion of the current therapeutic armamentarium.
- There is a consensus among experts that intravenous epoprostenol is the most effective therapy for PAH patients with severe right-ventricular failure.
- Recently approved drugs improve exercise capacity, symptoms and reduce clinical deterioration in patients with relatively advanced disease, but their effect on survival is currently undetermined.
- Specifically approved drugs for PAH target a relatively small proportion of the pathobiologic abnormalities in PAH; novel therapeutic strategies are likely to address recently described genetic and molecular disturbances.
- Specifically designed clinical trials will include patients with less advanced disease with the goal of evaluating the therapeutic effect on early disease progression.
- Future clinical trials may focus on combinations and comparisons of the currently approved drugs.
- Design of clinical trials in PAH will evolve, particularly in reference to the clinical end points used to document the treatment effect. Newly proposed end points include more sensitive markers of the disease process, such as exercise hemodynamics, cardiopulmonary exercise stress test, biologic markers and imaging modalities. In addition, study measures to reflect early or subtle clinical deterioration and changes in quality of life are likely to be incorporated.
- The use of experimental PAH therapeutic modalities outside clinical protocols is strongly discouraged.
- Extensive knowledge of the pathobiologic mechanisms of PAH and well-designed clinical trials may provide improved outcomes and even a cure for this devastating disease.

## References

Papers of special note have been highlighted as:
- of interest
- of considerable interest

1 Simonneau G, Galie N, Rubin LJ *et al.* Clinical classification of pulmonary hypertension. *J. Am. Coll. Cardiol.* 43, S5–S 12 (2004).

2 D'Alonzo GE, Barst RJ, Ayres SM *et al.* Survival in patients with primary pulmonary hypertension. Results from a national prospective registry. *Ann. Intern. Med.* 115, 343–349 (1991).
- **Survival is dramatically decreased in untreated idiopathic pulmonary arterial hypertension (PAH).**

3 Rich S, Kaufmann E, Levy PS. The effect of high doses of calcium channel blockers on survival in primary pulmonary hypertension. *N. Engl. J. Med.* 327, 76–81 (1992).
- **Survival is improved by oral calcium channel-blocker treatment in vasoreactive idiopathic PAH patients.**

4 Barst RJ, McGoon M, Torbicki A *et al.* Diagnosis and differential assessment of pulmonary arterial hypertension. *J. Am. Coll. Cardiol.* 43, S40–S47 (2004).

5 Sitbon O, Humbert M, Ioos V *et al.* Who benefits from long-term calcium channel-blocker therapy in primary pulmonary arterial hypertension? *Am. J. Respir. Crit. Care Med.* 167 (2003) (Abstract 440).

6 Fuster V, Steele PM, Edwards WD *et al.* Primary pulmonary hypertension: natural history and the importance of thrombosis. *Circulation* 70, 580–587 (1984).

- **Retrospectively, idiopathic PAH patients receiving anticoagulation had better survival compared with untreated patients.**

7 Frank H, Mlczoch J, Huber K *et al.* The effect of anticoagulant therapy in primary and anorectic-induced pulmonary hypertension. *Chest* 112, 714–721 (1997).

8 Jeffrey TK, Morrell NW. Molecular and cellular basis of pulmonary vascular remodeling in pulmonary hypertension. *Prog. Cardiovasc. Dis.* 45, 173–202 (2002).

9 Christman BW, McPherson CD, Newman JH *et al.* An imbalance between the excretion of thromboxane and prostacyclin metabolites in pulmonary hypertension. *N. Engl. J. Med.* 327, 70–75 (1992).

10 Giaid A, Saleh D. Reduced expression of endothelial nitric oxide synthase in the lungs of patients with pulmonary hypertension. *N. Engl. J. Med.* 333, 214–221 (1995).

11 Giaid A, Yanagisawa M, Langleben D *et al.* Expression of endothelin-1 in the lungs of patients with pulmonary hypertension. *N. Engl. J. Med.* 328, 1732–1739 (1993).

12 Giaid A. Nitric oxide and endothelin-1 in pulmonary hypertension. *Chest* 114(Suppl. 3), S208–S212 (1998).

13 Tuder RM, Cool CD, Geraci MW *et al.* Prostacyclin synthase expression is decreased in lungs from patients with severe pulmonary hypertension. *Am. J. Respir. Crit. Care Med.* 159, 1925–1932 (1999).

14 Rubin LJ, Mendoza J, Hood M *et al.* Treatment of primary pulmonary hypertension with continuous intravenous prostacyclin (epoprostenol). Results of a randomized trial. *Ann. Intern. Med.* 112, 485–491 (1990).

15 Barst RJ, Rubin LJ, Long WA *et al.* A comparison of continuous intravenous epoprostenol (prostacyclin) with conventional therapy for primary pulmonary hypertension. The Primary Pulmonary Hypertension Study Group. *N. Engl. J. Med.* 334, 296–302 (1996).
- **Landmark intravenous epoprostenol trial in idiopathic PAH; treated patients had better 3-month survival than patients receiving conventional therapy.**

16 Badesch DB, Tapson VF, McGoon MD *et al.* Continuous intravenous epoprostenol for pulmonary hypertension due to the scleroderma spectrum of disease. A randomized, controlled trial. *Ann. Intern. Med.* 132, 425–434 (2000).

17 Barst RJ, Rubin LJ, McGoon MD *et al.* Survival in primary pulmonary hypertension with long-term continuous intravenous prostacyclin. *Ann. Intern. Med.* 121, 409–415 (1994).

18 Shapiro SM, Oudiz RJ, Cao T *et al.* Primary pulmonary hypertension: improved long-term effects and survival with continuous intravenous epoprostenol infusion. *J. Am. Coll. Cardiol.* 30, 343–349 (1997).

19 McLaughlin VV, Shillington A, Rich S. Survival in primary pulmonary hypertension: the impact of epoprostenol therapy. *Circulation* 106, 1477–1482 (2002).
- **Long-term outcome of idiopathic PAH patients treated with epoprostenol.**

Appx2887

Sulica & Poon

20  Sitbon O, Humbert M, Nunes H *et al.* Long-term intravenous epoprostenol infusion in primary pulmonary hypertension: prognostic factors and survival. *J. Am. Coll. Cardiol.* 40, 780–788 (2002).

•  **Long-term outcome of idiopathic IPAH patients treated with epoprostenol.**

21  Kuhn KP, Byrne DW, Arbogast PG *et al.* Outcome in 91 consecutive patients with pulmonary arterial hypertension receiving epoprostenol. *Am. J. Respir. Crit. Care Med.* 167, 580–586 (2003).

•  **Long-term outcome in patients with various PAH forms treated with epoprostenol.**

22  McLaughlin VV, Genthner DE, Panella MM, Rich S. Reduction in pulmonary vascular resistance with long-term epoprostenol (prostacyclin) therapy in primary pulmonary hypertension. *N. Engl. J. Med.* 338, 273–277 (1998).

23  Rich S, McLaughlin VV. The effects of chronic prostacyclin therapy on cardiac output and symptoms in primary pulmonary hypertension. *J. Am. Coll. Cardiol.* 34, 1184–1187 (1999).

24  McLaughlin VV, Genthner DE, Panella MM *et al.* Compassionate use of continuous prostacyclin in the management of secondary pulmonary hypertension: a case series. *Ann. Intern. Med.* 130, 740–743 (1999).

25  Robbins IM, Gaine SP, Schilz R *et al.* Epoprostenol for treatment of pulmonary hypertension in patients with systemic lupus erythematosus. *Chest* 117, 14–18 (2000).

26  Horn EM, Barst RJ, Poon M. Epoprostenol for treatment of pulmonary hypertension in patients with systemic lupus erythematosus. *Chest* 118, 1229–1230 (2000).

27  Krowka MJ, Frantz RP, McGoon MD *et al.* Improvement in pulmonary hemodynamics during intravenous epoprostenol (prostacyclin): a study of 15 patients with moderate-to-severe portopulmonary hypertension. *Hepatology* 30, 641–648 (1999).

28  Rosenzweig EB, Kerstein D, Barst RJ. Long-term prostacyclin for pulmonary hypertension with associated congenital heart defects. *Circulation* 99, 1858–1865 (1999).

29  Simonneau G, Barst RJ, Galie N *et al.* Continuous subcutaneous infusion of treprostinil, a prostacyclin analogue, in patients with pulmonary arterial hypertension: a double-blind, randomized, placebo-controlled trial. *Am. J. Respir. Crit. Care Med.* 165, 800–804 (2002).

••  **Landmark subcutaneous treprostinil trial in idiopathic IPAH; largest PAH study performed to date. Included patients with early disease.**

30  Olschewski H, Simonneau G, Galie N *et al.* Inhaled iloprost for severe pulmonary hypertension. *N. Engl. J. Med.* 347, 322–329 (2002).

••  **Landmark inhaled iloprost trial. Introduces the concept of combined primary end points and demonstrates that patients with inoperable chronic thromboembolic pulmonary hypertension have clinical similarities with PAH patients.**

31  Galie N, Humbert M, Vachiery JL *et al.* Effects of beraprost sodium, an oral prostacyclin analogue, in patients with pulmonary arterial hypertension: a randomized, double-blind, placebo-controlled trial. *J. Am. Coll. Cardiol.* 39, 1496–1502 (2002).

•  **First study to randomize in large proportion of patients with World Health Organization Class II disease.**

32  Barst RJ, McGoon M, McLaughlin VV *et al.* Beraprost therapy for pulmonary arterial hypertension. *J. Am. Coll. Cardiol.* 41, 2119–2125 (2003).

••  **Landmark trial with oral beraprost in PAH. Included patients with early disease; first study to evaluate disease progression as an end point. Longest clinical trial in PAH, which gave insights into duration of the clinical effect.**

33  Channick RN, Simonneau G, Sitbon O *et al.* Effects of the dual endothelin-receptor antagonist bosentan in patients with pulmonary hypertension: a randomized placebo-controlled study. *Lancet* 358, 1119–1123 (2001).

•  **Pilot study introducing a new class of drugs in PAH.**

34  Rubin LJ, Badesch DB, Barst RJ *et al.* Bosentan therapy for pulmonary arterial hypertension. *N. Engl. J. Med.* 346, 896–903 (2002).

••  **Landmark clinical study with bosentan in PAH. Introduces time to clinical worsening as an end point.**

35  Barst RJ, Langleben D, Frost A *et al.* Sitaxsentan therapy for pulmonary arterial hypertension. *Am. J. Respir. Crit. Care Med.* 169, 441–447 (2004).

••  **Landmark clinical study with endothelin A.**

36  Rubin LJ, Galie N, Badesch D *et al.* Ambrisentan improves exercise capacity and clinical measures in pulmonary arterial hypertension. *Am. J. Respir. Crit. Care Med.* 169(7) (2004) (Abstract 210).

37  Ghofrani HA. Sildenafil use in pulmonary arterial hypertension (SUPER-1 trial). *Presented at the 70th Annual Meeting of the American College of Chest Physicians.* Seattle, WA, USA 23–28 October 2004.

••  **Pivotal trial of phosphodiesterase inhibitor use in chronic treatment of PAH.**

38  Galie N, Rubin LJ. Pulmonary arterial hypertension. Epidemiology, pathobiology, assessment, and therapy. *J. Am. Coll. Cardiol.* 43(12 Suppl S), S89–S90 (2004).

39  Diagnosis and management of pulmonary arterial hypertension: ACCP evidence-based clinical practice guidelines. *Chest* 126(Suppl.) (2004).

40  Humbert M, Barst RJ, Robbins IM *et al.* Combination of bosentan with epoprostenol in pulmonary arterial hypertension: BREATHE-2. *Eur. Respir. J.* 24, 353–359 (2004).

41  Channick RN, Kim N, Lombardi S *et al.* Addition of bosentan to patients with pulmonary arterial hypertension receiving chronic epoprostenol or treprostinil is well tolerated and allows for weaning or discontinuation of prostacyclin in some patients. *Am. J. Respir. Crit. Care Med.* 167(7), A441 (2003).

42  Rayburn BK, Benza RL, Tallaj JA *et al.* The use of bosentan and a prostacyclin analog in the treatment of primary pulmonary hypertension. *International Society for Heart and Lung Transplantation Meeting.* Vienna, Austria, 8–12 April 2003 (Abstract 241).

43  Suleman N, Frost AE. Transition from epoprostenol and treprostinil to the oral endothelin receptor antagonist bosentan in patients with pulmonary hypertension. *Chest* 126, 808–815 (2004).

44  Ghofrani HA, Wiedemann R, Rose F *et al.* Combination therapy with oral sildenafil and inhaled iloprost for severe pulmonary hypertension. *Ann. Intern. Med.* 136(7), 515–522 (2002).

45  Stiebellehner L, Petkov V, Vonbank K *et al.* Long-term treatment with oral sildenafil in addition to continuous iv. epoprostenol in patients with pulmonary arterial hypertension. *Chest* 123, 1293–1295 (2003).

46  Wilkens H, Guth A, Konig J *et al.* Effect of inhaled iloprost plus oral sildenafil in patients with primary pulmonary hypertension. *Circulation* 104, 1218–1222 (2001).

47  Gomberg-Maitland M, Gulati M, Rich S. Combination therapy of subcutaneous treprostinil and oral sildenafil: a proof of concept of pilot trial. *Am. J. Respir. Crit. Care Med.* 169(Suppl. 7), A211 (2004).

48  Vachiery JL, Hill N, Zwicke D *et al.* Transitioning from iv. epoprostenol to subcutaneous treprostinil in pulmonary arterial hypertension. *Chest* 121, 1561–1565 (2002).

Liquidia's Exhibit 1104
Page 12

49  Kim NK, Channick RN, Rubin LJ. Successful withdrawal of long-term epoprostenol therapy for pulmonary arterial hypertension. *Chest* 124, 1612–1615 (2003).

50  Tapson V, Barst R, Horn E *et al.* Safety and efficacy of chronic intravenous treprostinil in patients with pulmonary arterial hypertension. *Am. J. Respir. Crit. Care Med.* 169(Suppl. 7), A172 (2004).

51  Voswinckel R, Enke B, Kreckel A *et al.* Inhaled treprostinil sodium for the treatment of pulmonary hypertension. *Circulation* 110(Suppl. 17), 1414 (2004).

52  Arai H, Hori S, Aramori I *et al.* Cloning and expression of a cDNA encoding an endothelin receptor. *Nature* 348, 730–732 (1990).

53  Seo B, Oemar BS, Siebenmann R *et al.* Both $ET_A$ and $ET_B$ receptors mediate contraction to endothelin-1 in human blood vessels. *Circulation* 89, 1203–1208 (1994).

54  Davie N, Haleen SJ, Upton PD *et al.* ET(A) and ET(B) receptors modulate the proliferation of human pulmonary artery smooth muscle cells. *Am. J. Respir. Crit. Care Med.* 165, 398–405 (2002).

55  de Nucci G, Thomas R, D'Orleans-Juste P *et al.* Pressor effects of circulating endothelin are limited by its removal in the pulmonary circulation and by the release of prostacyclin and endothelium-derived relaxing factor. *Proc. Natl Acad. Sci. USA* 85, 9797–9800 (1988).

56  MacLean MR, Docherty CC, McCulloch KM *et al.* Effect of novel mixed $ET_A/ET_B$ antagonists on responses to ET-1 in human small muscular pulmonary arteries. *Pulm. Pharmacol. Ther.* 11, 147–149 (1998).

57  Jasmin JF, Lucas M, Cernacek P *et al.* Effectiveness of a nonselective ET(A/B) and a selective ET(A) antagonist in rats with monocrotaline-induced pulmonary hypertension. *Circulation* 103, 314–318 (2001).

58  Miyamoto S, Nagaya N, Satoh T *et al.* Clinical correlates and prognostic significance of six-minute walk test in patients with primary pulmonary hypertension. Comparison with cardiopulmonary exercise testing. *Am. J. Respir. Crit. Care Med.* 161(2 Pt 1), 487–492 (2000).

59  Paciocco G, Martinez FJ, Bossone E *et al.* Oxygen desaturation on the 6-minute walk test and mortality in untreated primary pulmonary hypertension. *Eur. Respir. J.* 17, 647–652 (2001).

60  Sun XG, Hansen JE, Oudiz RJ *et al.* Exercise pathophysiology in patients with primary pulmonary hypertension. *Circulation* 104, 429–435 (2001).

61  Wax D, Garifano R, Barst RJ. Effects of long-term infusion of prostacyclin on exercise performance in patients with primary pulmonary hypertension. *Chest* 116, 914–920 (1999).

62  Wensel R, Opitz C, Anker SD *et al.* Assessment of survival in patients with primary pulmonary hypertension: importance of cardiopulmonary exercise testing. *Circulation* 106, 319–324 (2002).

63  Oudiz R, Barst R, Hansen JE *et al.* Cause of correlation failure between cardiopulmonary exercise testing and 6-minute walk distance in patients with pulmonary arterial hypertension. *Circulation* 110(17 Suppl.), 2496 (2004).

64  Hansen JE, Sun X, Yasunobu Y *et al.* Reproducibility of cardiopulmonary exercise measurements in patients with pulmonary arterial hypertension. *Chest* 126, 816–824 (2004).

65  Hinderliter AL, Willis PW IV, Barst RJ *et al.* Effects of long-term infusion of prostacyclin (epoprostenol) on echocardiographic measures of right-ventricular structure and function in primary pulmonary hypertension. Primary Pulmonary Hypertension Study Group. *Circulation* 95, 1479–1486 (1997).

66  Galie N, Hinderliter AL, Torbicki A *et al.* Effects of the oral endothelin-receptor antagonist bosentan on echocardiographic and Doppler measures in patients with pulmonary arterial hypertension. *J. Am. Coll. Cardiol.* 41, 1380–1386 (2003).

67  Bellenger NG, Grothues F, Smith GC, Pennell DJ. Quantification of right and left-ventricular function by cardiovascular magnetic resonance. *Herz* 25, 392–399 (2000).

68  Marcus JT, Vonk-Noordegraaf A, Roeleveld RJ *et al.* Impaired left-ventricular filling due to right-ventricular pressure overload in primary pulmonary hypertension: noninvasive monitoring using MRI. *Chest* 119, 1761–1765 (2001).

69  Sulica R, Rosenbluth A, Goldman J *et al.* A novel noninvasive marker of pulmonary hypertension using magnetic resonance imaging. *Am. J. Respir. Crit. Care Med.* 165(Suppl. 8), A336 (2002).

70  Sulica R, Sanz J, Fearon-Clarke J *et al.* Intravenous nesiritide improves hemodynamics in a randomized, double-blind, placebo-controlled trial in patients with pulmonary hypertension and right-ventricular failure. Right atrial dimension

by cardiac MRI is a reliable, novel treatment end point in pulmonary hypertension. *Circulation* 110(Suppl. 17), 2414 (2004).

71  Nagaya N, Nishikimi T, Uematsu M *et al.* Plasma brain natriuretic peptide as a prognostic indicator in patients with primary pulmonary hypertension. *Circulation* 102, 865–870 (2000).

72  Kakishita M, Nishikimi T, Okano Y *et al.* Increased plasma levels of adrenomedullin in patients with pulmonary hypertension. *Clin. Sci. (Lond)* 96, 33–39 (1999).

73  Nagaya N, Uematsu M, Satoh T *et al.* Serum uric acid levels correlate with severity and mortality of primary pulmonary hypertension. *Am. J. Respir. Crit. Care Med.* 160, 487–492 (1999).

74  Torbicki A, Kurzyna M, Kuca P *et al.* Detectable serum cardiac troponin T as a marker of poor prognosis among patients with chronic precapillary pulmonary hypertension. *Circulation* 108, 844–848 (2003).

75  Davie NJ, Crossno JT Jr, Frid MG *et al.* Hypoxia-induced pulmonary artery adventitial remodeling and neovascularization: contribution of progenitor cells. *Am. J. Physiol. Lung Cell. Mol. Physiol.* 286, L668–L678 (2004).

76  Takahashi M, Nakamura T, Toba T *et al.* Transplantation of endothelial progenitor cells into the lung to alleviate pulmonary hypertension in dogs. *Tissue Eng.* 10, 771–779 (2004).

77  Yeager ME, Halley GR, Golpon HA *et al.* Microsatellite instability of endothelial cell growth and apoptosis genes within plexiform lesions in primary pulmonary hypertension. *Circ Res.* 88, E2–E11 (2001).

78  Taraseviciene-Stewart L, Kasahara Y, Alger L *et al.* Inhibition of the VEGF receptor 2 combined with chronic hypoxia causes cell death-dependent pulmonary endothelial cell proliferation and severe pulmonary hypertension. *FASEB J.* 15, 427–438 (2001).

79  Campbell AI, Zhao Y, Sandhu R *et al.* Cell-based gene transfer of vascular endothelial growth factor attenuates monocrotaline-induced pulmonary hypertension. *Circulation* 104, 2242–2248 (2001).

80  Deng Z, Morse JH, Slager SL *et al.* Familial primary pulmonary hypertension is caused by mutations in the bone morphogenetic protein receptor-II gene. *Am. J. Hum. Genet.* 67, 737–744 (2000).

81  Thomson JR, Machado RD, Pauciulo MW *et al.* Sporadic primary pulmonary hypertension is associated with germline

Appx2889

Sulica & Poon

mutations of the gene encoding BMPR-II, a receptor of the TGF-β family. *J. Med. Genet* 37, 741–745 (2000).

82  Humbert M, Deng Z, Simonneau G *et al.* BMPR2 germline mutations in pulmonary hypertension associated with fenfluramine derivatives. *Eur. Respir. J.* 20, 518–523 (2002).

83  Roberts KE, McElroy JJ, Wong WPK *et al.* BMPR2 mutations in pulmonary arterial hypertension with congenital heart disease. *Eur. Respir. J.* 24, 371–374 (2004).

84  Du L, Sullivan CC, Chu D *et al.* Signaling molecules in nonfamilial pulmonary hypertension. *N. Engl. J. Med.* 348, 500–509 (2003).

85  Zhao YD, Campbell AI, Robb M *et al.* Protective role of angiopoietin-1 in experimental pulmonary hypertension. *Circ. Res.* 92, 984–991 (2003).

86  Eddahibi S, Humbert M, Fadel E *et al.* Serotonin transporter overexpression is responsible for pulmonary artery smooth muscle hyperplasia in primary pulmonary hypertension. *J. Clin. Invest.* 108, 1141–1150 (2001).

87  Eddahibi S, Chaouat A, Morrell N *et al.* Polymorphism of the serotonin transporter gene and pulmonary hypertension in chronic obstructive pulmonary disease. *Circulation* 108, 1839–1844 (2003).

88  Marcos E, Fadel E, Sanchez O *et al.* Serotonin-induced smooth muscle hyperplasia in various forms of human pulmonary hypertension. *Circ. Res.* 94, 1263–1270 (2004).

89  Petkov V, Mosgoeller W, Ziesche R *et al.* Vasoactive intestinal peptide as a new drug for treatment of primary pulmonary hypertension. *J. Clin. Invest.* 111, 1339–1346 (2003).

90  Nagaya N, Nishikimi T, Uematsu M *et al.* Hemodynamic and hormonal effects of adrenomedullin in patients with pulmonary hypertension. *Heart* 84, 653–658 (2000).

91  Nagaya N, Kyotani S, Uematsu M *et al.* Effects of adrenomedullin inhalation on hemodynamics and exercise capacity in patients with idiopathic pulmonary arterial hypertension. *Circulation* 109, 351–356 (2004).

92  Nagaya N, Okumura H, Uematsu M *et al.* Repeated inhalation of adrenomedullin ameliorates pulmonary hypertension and survival in monocrotaline rats. *Am. J. Physiol. Heart Circ. Physiol.* 285, H2125–H2131 (2003).

93  Herve P, Launay JM, Scrobohaci LM *et al.* Increased plasma serotonin in primary pulmonary hypertension. *Am. J. Med.* 99, 249–254 (1995).

94  Morecroft I, Heeley RP, Prentice HM *et al.* 5-hydroxytryptamine receptors mediating contraction in human small muscular pulmonary arteries: importance of the 5-HT1B receptor. *Br. J. Pharmacol.* 128, 730–734 (1999).

95  Welsh DJ, Harnett M, MacLean M *et al.* Proliferation and signaling in fibroblasts: role of 5-hydroxytryptamine-2A receptor and transporter. *Am. J. Respir. Crit. Care Med.* 170, 252–259 (2004).

96  Keegan A, Morecroft I, Smillie D *et al.* Contribution of the 5-HT (1B) receptor to hypoxia-induced pulmonary hypertension: converging evidence using 5-HT (1B)-receptor knockout mice and the 5-HT (1B/1D)-receptor antagonist GR 127935. *Circ. Res.* 89, 1231–1239 (2001).

97  Hironaka E, Hongo M, Sakai A *et al.* Serotonin receptor antagonist inhibits monocrotaline-induced pulmonary hypertension and prolongs survival in rats. *Cardiovasc. Res.* 60, 692–699 (2003).

98  Marcos E, Adnot S, Pham MH *et al.* Serotonin transporter inhibitors protect against hypoxic pulmonary hypertension. *Am. J. Respir. Crit. Care Med.* 168, 487–493 (2003).

99  Yuan JX, Wang J, Juhaszova M *et al.* Attenuated K-channel gene transcription in primary pulmonary hypertension. *Lancet* 351, 726–727 (1998).

100  Geraci MW, Moore M, Gessell T *et al.* Gene expression pattern in the lungs of patients with primary pulmonary hypertension: a gene microarray analysis. *Circ. Res.* 88, 555–562 (2001).

101  Cowan KN, Jones PL, Rabinovitch M. Elastase and matrix metalloproteinase inhibitors induce regression, and tenascin-C antisense prevents progression, of vascular disease. *J. Clin. Invest.* 105(1), 21–34 (2000).

102  Cowan KN, Heilbut A, Humpl T *et al.* Complete reversal of fatal pulmonary hypertension in rats by serine elastase inhibitor. *Nature Med.* 6, 698–702 (2000).

103  Nishimura T, Faul JL, Berry GJ *et al.* Simvastatin attenuates smooth muscle neointimal proliferation and pulmonary hypertension in rats. *Am. J. Respir. Crit. Care Med.* 166, 1403–1408 (2002).

104  Nishimura T, Vaszar LT, Faul JL *et al.* Simvastatin rescues rats from fatal pulmonary hypertension by inducing apoptosis of neointimal smooth muscle cells. *Circulation* 108, 1640–1645 (2003).

105  Nagaya N, Uematsu M, Oya H *et al.* Short-term oral administration of L-arginine improves hemodynamics and exercise capacity in patients with precapillary pulmonary hypertension. *Am. J. Respir. Crit. Care Med.* 163, 887–891 (2001).

106  Surdacki A, Zmudka K, Bieron K *et al.* Lack of beneficial effects of L-arginine infusion in primary pulmonary hypertension. *Wien Klin Wochenschr.* 106, 521–526 (1994).

107  Boger RH, Mugge A, Bode-Boger SM *et al.* Differential systemic and pulmonary hemodynamic effects of L-arginine in patients with coronary artery disease or primary pulmonary hypertension. *Int. J. Clin. Pharmacol. Ther.* 34, 323–328 (1996).

108  Langleben D, Christman BW, Barst RJ *et al.* Effects of the thromboxane synthetase inhibitor and receptor antagonist terbogrel in patients with primary pulmonary hypertension. *Am. Heart J.* 143, E4 (2002).

### Affiliations

•   Roxana Sulica, MD
    Assistant Professor of Medicine, Mount Sinai School of Medicine, 1 Gustave L Levy Place Box 1030, New York, NY 10029, USA
    Tel.: +1 212 241 3913
    Fax: +1 212 241 8872
    roxana.sulica@mssm.edu
•   Michael Poon, MD
    Associate Professor of Medicine, Mount Sinai School of Medicine, Director of Cardiology, Cabrini Medical Center, New York, NY 10003, USA
    Tel.: +1 212 995 6865
    Fax: +1 212 979 3474
    mpoon@cabrininy.org

Appx2890

Liquidia's Exhibit 1104
Page 14

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

LIQUIDIA TECHNOLOGIES, INC.,
Petitioner

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner

————————————

IPR2021-00406
U.S. Patent No. 10,716,793 B2

**REPLY DECLARATION OF NICHOLAS HILL, M.D.**

Liquidia's Exhibit 1106

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................1

II.    QUALIFICATIONS ............................................................2

    A.    Qualifications and Experience .............................................2

    B.    Materials Considered.......................................................3

III.    PERSON OF ORDINARY SKILL IN THE ART ...........................8

IV.    STATEMENT OF LEGAL PRINCIPLES.....................................8

V.    THE '793 PATENT ............................................................9

VI.    APPLICATION OF THE PRIOR ART TO THE CLAIMS ........................11

    A.    Public Availability of Prior Art:  A POSA in May 2006 Would Have Found and Relied upon Voswinckel JAHA and Voswinckel JESC ....................................................12

        1.    Voswinckel JAHA ..................................................12

        2.    Voswinckel JESC..................................................19

    B.    Ground 1:  Claims 1-8 Are Obvious Over the '212 Patent in View of Voswinckel JAHA and Voswinckel JESC.........................26

        1.    Dr. Waxman's Isolated Critique of the '212 Patent Fails to Rebut My Obviousness Opinions .........................39

        2.    Dr. Waxman's Isolated Critique of Voswinckel JESC Fails to Rebut My Obviousness Opinions ...............51

        3.    Dr. Waxman's Isolated Critique of Voswinckel JAHA Fails to Rebut My Obviousness Opinions ...............56

        4.    Dr. Waxman Never Considers the Combination of the Prior Art Disclosures.................................................58

    C.    Ground 2:  Claims 1-8 Are Obvious Over the '212 Patent and Voswinckel JESC ....................................................66

    D.    Grounds 3-6:  Dr. Waxman Provides No Opinions Regarding Invalidity Based on Ghofrani and/or Voswinckel 2006....................68

    E.    Dr. McConville Like Dr. Waxman Fails to Rebut My Obviousness Opinions.......................................................69

Liquidia's Exhibit 1106
Page i

VII.   SECONDARY CONSIDERATIONS DO NOT SUPPORT THE
       NON-OBVIOUSNESS OF CLAIMS 1-8 ....................................................76

VIII.  CONCLUSION..............................................................................................85

Liquidia's Exhibit 1106

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

I, Nicholas Hill, M.D., declare as follows:

## I.     INTRODUCTION

1.     I am over the age of eighteen and otherwise competent to make this declaration.

2.     Counsel for Liquidia Technologies, Inc. ("Liquidia" or "Petitioner") retained me to offer technical opinions with respect to U.S. Patent No. 10,716,793 ("the '793 Patent") and the prior art references cited in the inter partes review (IPR) proceedings for the '793 Patent, Ex. 1001.

3.     I am being compensated for my time in connection with this IPR at my standard consulting rate of $550 per hour for review of materials and report preparation, and $650 per hour for any time I might spend testifying.  For any weekend review and report preparation, I will be paid $600 per hour, and I will be paid $750 per hour for any time spent testifying on a weekend.  My compensation does not depend on the outcome of, or the content of my testimony in, the current IPR.[1]

4.     I incorporate by reference the opinions set forth in my First Declaration

---

[1] Any allegation by UTC that I am being "paid by Liquidia to say the opposite" of what I believe or to provide testimony is baseless.  *See* Patent Owner Response at 35.  As Dr. Waxman explained, I am "well regarded" within the field of pulmonary hypertension.  Ex. 1108 at 141:3-5.  Additionally, I am currently working on clinical trials sponsored by UTC.  UTC's arguments regarding the non-obviousness of the '793 Patent claims, however, lack merit, so UTC instead stoops to denigration.

Liquidia's Exhibit 1106
Page 1

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

submitted as Ex. 1002 on January 7, 2021 ("Hill First Decl."), as well as the exhibits

cited therein.

5.     I have assessed the '793 Patent.  In doing so, I have considered the

teachings of the scientific literature before May 15, 2006, in light of general

knowledge in the art before that date.

6.     Counsel informs me that the Patent Trial and Appeal Board ("the Board")

has instituted *inter partes* review of the '793 Patent based on the petition submitted

by Liquidia.  Since IPR institution, I understand that United Therapeutics Corporation

("UTC") has filed a Patent Owner Response as well as declarations from Dr. Aaron

Waxman, Dr. Jason McConville, and Ms. Pilar Wyman in support thereof.

7.     This declaration presents my additional expert opinions considering

UTC's Patent Owner Response and Supporting Declarations of Dr. Waxman, Dr.

McConville, and Ms. Wyman, that Claims 1-8 of the '793 Patent would have been

obvious to a person of ordinary skill in the art ("POSA") before May 15, 2006.

## II.   QUALIFICATIONS

### A.   Qualifications and Experience

8.     I summarized my background, qualifications, and experience relevant to

the issues raised in the present IPR in Exhibit 1002, which I incorporate by reference.

As part of my first declaration, I also provided a copy of my curriculum vitae, which

includes a full description of my background and qualifications as Exhibit 1003.  The

2

Liquidia's Exhibit 1106
Page 2

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

CV I provided as Exhibit 1003 complied with Tufts guidelines and followed the Tufts

template for CVs.  *See* Ex. 2055 (Hill Depo. Tr.) at 17:14-18:7.

### B.    Materials Considered

9.    The analysis that I provide in this Declaration is based on my education,

research, and experience, as well as my investigation and study of relevant materials,

including the '793 Patent.  I have reviewed Patent Owner Response, the supporting

Declarations of Dr. Waxman in support of the POPR and POR (Exs. 2001, 2052), Dr.

McConville (Ex. 2053), and Ms. Wyman (Ex. 2041), and the deposition testimony of

Dr. Waxman (Ex. 1108), Dr. McConville (Ex. 1109), and Ms. Wyman (Ex. 1110).  In

addition to these materials, I have reviewed and considered additional documents that

are cited in this declaration and listed in the table below.  To the extent I am provided

additional documents or information, I may offer further opinions.

| Exhibit No. | Description of Document |
|---|---|
| 1001 | U.S. Patent No. 10,716,793 B2 to Olschewski, et al. ("'793 patent") |
| 1002 | Declaration of Dr. Nicholas Hill, M.D., dated January 7, 2021 ("First Declaration") |
| 1003 | *Curriculum Vitae* of Dr. Nicholas Hill |
| 1004 | Declaration of Dr. Igor Gonda ("Gonda Decl.") |
| 1006 | U.S. Patent No. 6,521,212 B1 to Cloutier, et al. ("'212 patent") |
| 1007 | Voswinckel, R., et al., Abstract 218: "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," *European Heart Journal* 25:22 (2004) ("Voswinckel JESC") |

Liquidia's Exhibit 1106
Page 3

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

| 1008 | Robert Voswinckel, Beate Enke, Andre Kreckel, Frank Reichenberger, Stefanie Krick, Henning Gall, Tobias Gessier, Thomas Schmehl, Markus G. Kohstall, Friedrich Grimminger, Hossein A. Ghofrani, Werner Seeger, and Horst Olschewski, Abstract 1414: "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension," Abstracts from the 2004 Scientific Sessions of the American Heart Association, *Circulation,* 110(17 Suppl.):III-295 (October 26, 2004) ("Voswinckel JAHA") |
|------|------------------------------------------------------------------------------|
| 1009 | Robert Voswinckel, Hossein A. Ghofrani, Friedrich Grimminger, and Werner Seeger, "Clinical Observations" on "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," "Letters" Section of the *Annals of Internal Medicine*, 144(2):149-50 (January 2006) ("Voswinckel 2006") |
| 1010 | Hossein Ardeschir Ghofrani, Robert Voswinckel, et al., Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie, 30(4) HERZ, 30(4):296–302 (June 2005) ("Ghofrani") (Foreign article and English translation attached) |
| 1018 | Remodulin® 2004 Label |
| 1019 | Stein, S.W., et al., "The History of Therapeutic Aerosols: A Chronological Review," *Journal of Aerosol Medicine and Pulmonary Drug Delivery*, 30(1):20-41 (2017) ("Stein") |
| 1020 | Clark, A.R., "Medical Aerosol Inhalers: Past, Present, and Future," *Aerosol Science and Technology*, 22:374-91 (1995) ("Clark") |
| 1022 | Walmrath, D., et al., "Direct Comparison of Inhaled Nitric Oxide and Aerosolized Prostacyclin in Acute Respiratory Distress Syndrome," *American Journal of Respiratory Critical Care Medicine*, 153:991-96 (1996) ("Walmrath 1996") |
| 1023 | Olschewski, H., et al., "Inhaled Prostacyclin and Iloprost in Severe Pulmonary Hypertension Secondary to Lung Fibrosis," *American Journal of Respiratory Critical Care Medicine*, 160:600-07 (1999) ("Olschewski 1999") |
| 1025 | De Wet, C.J., et al., "Inhaled prostacyclin is safe, effective, and affordable in patients with pulmonary hypertension, right heart dysfunction, and refractory hypoxemia after cardiothoracic surgery," *Journal of Thoracic and Cardiovascular Surgery*, 127:1058-67 (2004) ("De Wet") |

4

Liquidia's Exhibit 1106
Page 4

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

| 1028 | U.S. Patent Application Publication No. US 2004/0265238 A1 to Chaudry ("Chaudry") |
|------|---|
| 1029 | Ventavis® Label 2004 |
| 1030 | Newman, S.P., "Aerosols", Chapter from *Encyclopedia of Respiratory Medicine* pp. 58-64 (2006) ("Newman") |
| 1031 | Geller, D.E., "Comparing Clinical Features of the Nebulizer, Metered-Dose Inhaler, and Dry Powder Inhaler," *Respiratory Care*, 50(10):1313-21 (2005) ("Geller 2005") |
| 1032 | Bender, B., et al., "Nonadherence in asthmatic patients: is there a solution to the problem?" *Annals of Allergy, Asthma & Immunology*, 79:177-86 (1997) ("Bender 1997") |
| 1034 | Geller, D., et al., "Bolus Inhalation of rhDNase with the AERx System in Subjects with Cystic Fibrosis," *Journal of Aerosol Medicine*, 16(2):175-82 (2003) ("Geller 2003") |
| 1035 | Chattaraj, S.C., "Treprostinil sodium Pharmacia," *Current Opinion in Investigational Drugs*, 3(4):582-86 (Apr. 2002), *available at* https://pubmed.ncbi.nlm.nih.gov/12090728/ ("Chattaraj") |
| 1037 | English translation of OptiNeb® User Manual 2005 |
| 1043 | 2009 Tyvaso® Label, *available at* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/022387s015lbl.pdf |
| 1046 | U.S. Patent No. 9,358,240 to Olschewski, et al. ("'240 Patent") |
| 1047 | Hoeper, M.M., et al., "Long-Term Treatment of Primary Pulmonary Hypertension with Aerosolized Iloprost, a Prostacyclin Analogue," *N Engl J Med*, 342:1866-70 (2000) ("Hoeper") |
| 1048 | Walmrath, D., et al., "Aerosolised prostacyclin in adult respiratory distress syndrome," *Lancet*, 342:961-62 (1993) ("Walmrath 1993") |
| 1059 | Nauser, T.D., "Pulmonary Hypertension: New Perspectives," *CHF*, 9:155-62 (2003) ("Nauser 2003") |
| 1065 | Olschewski, H., et al., "Inhaled Iloprost for Several Pulmonary Hypertension," *N Engl J Med*, 347(5):322-29 (2002) ("Olschewski 2002") |

Liquidia's Exhibit 1106
Page 5

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

| 1068 | Vachiéry, J.-L., et al., "Transitioning From IV Epoprostenol to Subcutaneous Treprostinil in Pulmonary Arterial Hypertension," *CHEST*, 121:1561-65 (2002) ("Vachiéry 2002") |
|------|---|
| 1077 | Boyle, M.P., "So Many Drugs, So Little Time. The Future Challenge of Cystic Fibrosis Care," *CHEST*, 123(1):3-5 (2003) ("Boyle 2003") |
| 1078 | Azmacort® Label 2003 |
| 1079 | Hill, N.S., et al., "Inhaled Therapies for Pulmonary Hypertension," *Respiratory Care*, 60(6):794-805 (2015) ("Hill 2015") |
| 1087 | Butler Affidavit |
| 1088 | Tyvaso® 2021 Label |
| 1089 | Voswinckel JESC, UWash |
| 1090 | Voswinckel JESC, UWisc |
| 1091 | Voswinckel JESC, British Library |
| 1092 | Voswinckel JESC, Additional Pages |
| 1093 | Voswinckel JAHA, British Library |
| 1094 | Voswinckel JAHA, Library of Congress |
| 1095 | Voswinckel JAHA, Stanford |
| 1096 | Voswinckel JAHA, UC Davis |
| 1104 | Roxana Sulica and Michael Poon, "Medical Therapeutics for Pulmonary Arterial Hypertension: From Basic Science and Clinical Trial Design to Evidence Based Medicine, EXPERT REV. CARDIOVASCULAR THERAPY 3(2):347-360, at 359 (2005) ("Sulica 2005") |
| 1105 | European Society of Cardiology® Annual Report 2005 |
| 1108 | Transcript from the January 8, 2022 Deposition of Aaron Waxman, M.D., Ph.D., *Liquida Technologies, Inc. v. United Therapeutics Corp.*, IPR2021-00406 ("Waxman Depo. Tr.") |
| 1109 | Transcript from the January 11, 2022 Deposition of Jason McConville, *Liquida Technologies, Inc. v. United Therapeutics Corp.*, IPR2021-00406 ("McConville Depo. Tr.") |

Liquidia's Exhibit 1106
Page 6

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

| 1110 | Transcript from the December 29, 2021 Deposition of Lyndsey Pilar Wyman, *Liquida Technologies, Inc. v. United Therapeutics Corp.*, IPR2021-00406 ("Wyman Depo. Tr.") |
|---|---|
| 1113 | Voswinckel JAHA Supplemental Author Index |
| 1132 | Transcript from the January 15, 2022 deposition of Aaron B. Waxman, M.D., Ph.D., United Therapeutics Corp. v. Liquidia Technologies, Inc., Case No. 1:20-cv-00755 (D. Del.) ("Waxman District Court Depo. Tr.") |
| 2001 | Declaration of Dr. Aaron Waxman dated May 17, 2021 ("Waxman POPR Decl.") |
| 2029 | Hess *et al.*, 2007, A guide to aerosol delivery devices for respiratory therapists. American Association for Respiratory Care |
| 2030 | Dennis JH, 2002, Standardization issues: in vitro assessment of nebulizer performance. Respir. Care. 47(12):1455-1458 |
| 2031 | Hess *et al*., 1996, Medication nebulizer performance. Effects of diluent volume, nebulizer flow, and nebulizer brand. Chest, 110(2):498-505 |
| 2035 | Bourge *et al., Cardiovascular Therapeutics*, 31:38-44 (2013) |
| 2036 | McLaughlin *et al., Efficacy and safety of treprostinil: an epoprostenol analog for primary pulmonary hypertension*, J. Cardiovascular Pharmacology, 41:293-299 (2003) |
| 2041 | Declaration of Ms. Pilar Wyman ("Wyman Decl.") |
| 2052 | Second Declaration of Dr. Aaron Waxman ("Waxman Decl.") |
| 2053 | Declaration of Dr. Jason McConville ("McConville Decl.") |
| 2055 | Deposition of Dr. Nicholas Hill ("Hill Depo. Tr.") |
| 2060 | Waxman *et al., Inhaled Treprostinil in Pulmonary Hypertension Due to Interstitial Lung Disease*, N. Eng. J. Med. 384:325-334 (2021) |
| 2085 | Roscigno et al., *Comparative bioavailability of inhaled treprostinil administered as LIQ861 and Tyvaso® in healthy subjects,* Vascular Pharmacology 138:106840 (2021) ("Roscigno 2021") |

Liquidia's Exhibit 1106
Page 7

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

## III.  PERSON OF ORDINARY SKILL IN THE ART

10.    My First Declaration detailed my definition of a person of ordinary skill in the art ("POSA").  I incorporate that definition as if fully set forth herein.

11.    I understand that Dr. Waxman states that, with respect to the '793 Patent, a POSA "would have an M.D. or a graduate degree (Masters or Ph.D.) in a field relating to drug development and at least two years of practical experience in either (i) the investigation or treatment of pulmonary hypertension or (ii) the development of potential drug candidates, specifically in the delivery of drugs by inhalation."  Ex. 2052 (Waxman Decl.) at ¶ 15; *see also* Ex. 2053 (McConville Decl.) at ¶ 30.  I note that I would have qualified as a POSA by May 15, 2006 under the definition provided by Dr. Waxman.  I further note that Dr. McConville states that "[t]he standards proposed by Drs. Hill and Gonda and Dr. Waxman are not radically different."  Ex. 2053, ¶ 31.  For purposes of this declaration, I continue to apply my definition of a POSA, but my opinions would not change if I were to apply the definition provided by Dr. Waxman.

## IV.  STATEMENT OF LEGAL PRINCIPLES

12.    I am not an attorney and do not provide any opinions regarding the law. However, I have been informed of certain legal principles relating to the issues I discuss.  I specifically incorporate by reference the legal principles, including for anticipation and obviousness, set forth in my First Declaration. Ex. 1002, §§ IV.B-C.

Liquidia's Exhibit 1106
Page 8

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

13.    Due to apparent errors in Dr. Waxman's application of the obviousness

legal standard (*see* ¶ 37 below; *see also* §§ VI.B.2-3 below), I reiterate my

understanding that "a POSA can combine various prior art references based on the

teachings of those references, the general knowledge present in the art, or common

sense." Ex. 1002 (Hill First Decl.) at ¶ 26.  Further, "one may take into account the

inferences and creative steps that a person of ordinary skill in the art would employ to

combine the known elements in the prior art in the manner claimed by the patent at

issue." *Id.*

14.    My First Declaration further set forth the legal standard for secondary

considerations of non-obviousness.  Ex. 1002, ¶ 25.  There, I noted my understanding

that secondary considerations should be connected, or have a "nexus," with the

invention claimed in the patent at issue.  *Id.*  For example, I understand that a nexus

must exist between the specific evidence of long-felt but unmet need and the invention

as claimed.  Likewise, evidence of unexpected results must establish that there is a

difference between the claimed results and the closest prior art, and that the difference

would not have been expected by a POSA at the time of the invention.

## V.    THE '793 PATENT

15.    My First Declaration submitted in this IPR proceeding summarizes the

'793 Patent.  *See* Ex. 1002, § IV.  I incorporate that section of Exhibit 1002 as if fully

set forth herein.

Liquidia's Exhibit 1106
Page 9

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

16.    It is still my opinion that the following claims of the '793 Patent were either directly disclosed/anticipated in the prior art or would have been obvious to a skilled artisan by May 15, 2006:

| | Claim Limitation |
|---|---|
| 1[a] | A method of treating pulmonary hypertension comprising administering by inhalation to a human suffering from pulmonary hypertension a therapeutically effective single event dose of a formulation comprising treprostinil or a pharmaceutically acceptable salt thereof |
| 1[b] | with an inhalation device, |
| 1[c] | wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof |
| 1[d] | delivered in 1 to 3 breaths. |
| 2 | The method of claim 1, wherein the inhalation device is a soft mist inhaler. |
| 3 | The method of claim 1, wherein the inhalation device is a pulsed ultrasonic nebulizer. |
| 4 | The method of claim 1, wherein the inhalation device is a dry powder inhaler. |
| 5 | The method of claim 1, wherein the inhalation device is a pressurized metered dose inhaler. |
| 6 | The method of claim 4, wherein the formulation is a powder. |
| 7 | The method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter. |
| 8 | The method of claim 1, wherein the formulation contains no metacresol. |

10

Liquidia's Exhibit 1106
Page 10

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

## VI.    APPLICATION OF THE PRIOR ART TO THE CLAIMS

17.    In my opinion, the limitations of claims are disclosed by the following

combination of prior art references:

| Ground | References | Claim(s) |
|--------|------------|----------|
| 1 | Obvious over the combination of the '212 Patent, Voswinckel JAHA, and Voswinckel JESC | 1-8 |
| 2 | Obvious over the combination of the '212 Patent and Voswinckel JESC | 1-8 |
| 3 | Anticipated by Ghofrani | 1 |
| 4 | Obvious over the combination of Voswinckel JAHA and Ghofrani | 1, 3, 8 |
| 5 | Anticipated by Voswinckel 2006 | 1, 3 |
| 6 | Obvious over the combination of Voswinckel 2006 and the '212 Patent | 2, 4-8 |

18.    My First Declaration provided detailed opinions, which I incorporate by

reference, regarding the invalidity of Claims 1-8 of the '793 Patent in light of the prior

art.  *See* Ex. 1002, § V.

19.    Here, I reply to the specific arguments set forth in the Declarations of Dr.

Waxman, Dr. McConville, and Ms. Wyman.  As explained below, their arguments

fail to rebut my opinions demonstrating Claims 1-8 are obvious and/or anticipated by

the prior art.

Liquidia's Exhibit 1106
Page 11

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

A.    **Public Availability of Prior Art:  A POSA in May 2006 Would Have
      Found and Relied upon Voswinckel JAHA and Voswinckel JESC**

   1.    **Voswinckel JAHA**

20.    As an initial matter, I understand that Ms. Wyman opines and UTC

argues that neither Voswinckel JAHA nor Voswinckel JESC were "disseminated in

any predictable way such as to be accessible more than one year before the May 15,

2006 priority date . . . ."  Ex. 2041 (Wyman Decl.) at ¶¶ 9, 29; *see also* Ex. 2052

(Waxman Decl.) at ¶ 75 n.9 (explaining "I understand that Patent Owner has asserted

that Petitioner has not set forth sufficient evidence to show that Voswinckel JESC and

Voswinckel JAHA were publicly accessible prior art").  For the reasons set forth

below, I disagree.

21.    Voswinckel JAHA is an abstract published in 2004 in the Supplement to

volume 110, issue 17 of the journal Circulation.[2]  Ex. 1008 (Voswinckel JAHA).  As

indicated by the Supplement in which Voswinckel JAHA appears and Ms. Wyman's

Declaration, "the title of the Supplement, *Abstracts from Scientific Sessions 2004*,

suggests the Supplement was released in relation to the Scientific Sessions 2004

Conference in November 2004."  Ex. 2041 (Wyman Decl.) at ¶ 11; Ex. 1008

---

[2] In my experience, a supplement is published in addition to the articles included in
the main issue of a journal and may contain, for example, a copy of the meeting
program or abstracts from a conference.  The supplement to volume 110, issue 17 of
Circulation ("JAHA Supplement"), for example, contains abstracts from the 2004
conference Scientific Sessions, a conference of the American Heart Association.

Liquidia's Exhibit 1106
Page 12

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

(Voswinckel JAHA) at 1. Scientific Sessions is a regular conference of the American

Heart Association (AHA) attended by physicians and researchers working on and

studying the cardiovascular system, including pulmonary circulation.

22.    In my experience, a POSA in 2004 would have attended the Scientific

Sessions 2004 Conference, as it is one of the principal conferences on the circulatory

system and diseases and conditions affecting circulation, including pulmonary

hypertension.[3]  As well, in my experience, abstracts from the meeting are published

in meeting programs or abstract books in advance of the meeting, and are at least

available on the first day of the meeting, if not before.  A person attending the meeting

can thus use the meeting program to determine which researchers and clinicians are

presenting at the meeting as well as the subject matter on which the clinicians or

researchers are presenting.  These meeting programs, or at least the abstracts from the

meeting programs, are also published as journal supplements.  A POSA attending the

Scientific Sessions 2004 Conference would have been interested in presentations on

treatments for pulmonary hypertension, including pulmonary arterial hypertension,

and contrary to Ms. Wyman's opinions, would have been able to identify the abstracts

---

[3] Dr. Waxman agrees that attendance at the conference would have been large. *See*
Ex. 1108 (Waxman Depo. Tr.) at 116:4-21 (explaining he expects attendance at the
AHA Scientific Sessions conference would have been bigger than the ESC conference
which had over 18,000 professionals in attendance).

13

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

disclosing such treatments, including Voswinckel JAHA.  *See* Ex. 2041 (Wyman

Decl.) at ¶ 25 (stating without evidence that "a POSA conducting diligent research

would not sift through such voluminous results").  The meeting programs and

supplements are provided for just this purpose, and I myself use such meeting

programs and supplements to identify abstracts on subject matter of interest.

23.    Dr. Waxman agrees with me.  He, too, expects that the abstract books for

the Scientific Sessions 2004 Conference would have been provided to conference

registrants and people who subscribe to Circulation prior to the conference, and

further that a copy of the abstract book would have at least been made available at the

time of the meeting.  *See* Ex. 1108 (Waxman Depo. Tr.) at 108:3-20 (answering "yes"

when asked if the Scientific Sessions 2004 abstract book would have been provided

to registrants and Circulation subscribers as well as provided at the meeting to late

registrants).  Dr. Waxman further agrees with me that a conference attendee, which in

my opinion would include POSA physicians and researchers, would have been able

to find Voswinckel JAHA within the Circulation supplement.  *Id.* at 111:11-19

(explaining "[h]ad they been in possession of the supplement, yes" a conference

attendee would have been able to identify Abstract 1414 within the supplement).  His

testimony thus contradicts Ms. Wyman's opinion "that a POSA exercising reasonable

diligence could [not] have located the Voswinckel JAHA abstract before May 15,

2006."  Ex. 2041 (Wyman Decl.) at ¶ 27.

14

Liquidia's Exhibit 1106
Page 14

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

24.    Ms. Wyman further opines that neither Voswinckel JAHA nor the

Supplement in which it appeared "was disseminated in any predictable way such as

to be accessible more than one year before the May 15, 2006 priority date . . . ." Ex.

2041 (Wyman Decl.) at ¶ 9. She further criticizes Ex. 1007 for lacking a "received"

or "accepted" stamp (Ex. 2041, ¶ 18) and opines Voswinckel JAHA could have been

published "years after" the Scientific Sessions 2004 Conference. Ex. 2041, ¶ 14.

Directly contradicting her opinions, I have been provided with stamped copies of

Voswinckel JAHA. *See, e.g.*, Ex. 1093 (Voswinckel JAHA stamped on 11/19/2004

by the British Library).[4] I have been informed that the stamps on these copies of

Voswinckel JAHA indicate that Voswinckel JAHA was disseminated and accessible

---

[4] I was provided with date-stamped copies of Voswinckel JAHA from the British
Library (stamped on 11/19/2004) (Ex. 1093), the Library of Congress (stamped on
10/2004) (Ex. 1094), the Lane Medical Library at Stanford University (stamped on
11/11/2004) (Ex. 1095), and the University of California Davis Medical Library
(stamped on 11/26/2004) (Ex. 1096). I was also provided with date-stamped copies
of Voswinckel JESC from the British Library (stamped on 9/27/2004) (Ex. 1091), the
University of Washington Health Sciences Libraries (stamped on 11/16/2004) (Ex.
1089), and the Ebling Library at the University of Wisconsin (stamped on 10/15/2004)
(Ex. 1090). Except as otherwise noted, any reference to Voswinckel JAHA in this
declaration refers to all the date-stamped copies as well as the copy I cited in my First
Declaration (Ex. 1008). Similarly, any reference to Voswinckel JESC in this
declaration refers to any of these date-stamped copies of Voswinckel JESC as well as
the copy originally provided with my First Declaration (Ex. 1007). However, purely
for simplicity, my subsequent citations to Voswinckel JESC will be to Ex. 1007 and
Ex. 1091, and my citations to Voswinckel JAHA will be to Ex. 1008 and Ex. 1093,
unless noted otherwise.

Liquidia's Exhibit 1106
Page 15

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

by the stamp date.  One of the stamped copies of Voswinckel JAHA was even stamped

with a "10/2004" date (Ex. 1094), indicating it was available before the date of the

Scientific Sessions 2004 conference, which took place from November 7-10, 2004.

Ex. 1094 at 2-3.  The stamp further indicates the abstract was available well before

May 15, 2006.  Thus, Ms. Wyman's opinions regarding the dissemination and

accessibility of Voswinckel JAHA is incorrect.

25.  I further disagree with Ms. Wyman's assertion that a POSA exercising

reasonable diligence could not have located Voswinckel JAHA.  In fact, publications

available at the time of the '793 Patent would have directed a POSA to the work of

the authors disclosed in the abstract.  I am informed by counsel that these publications

can act as "research aids" which would have directed a POSA to Voswinckel JAHA.

26.  As one example, a 2005 article by Sulica and Poon, cites to Voswinckel

JAHA.  *See* Ex. 1104 ("Sulica 2005") at 359.  Sulica 2005 cites to Voswinckel JAHA

in explaining "[i]n a recent report from Germany, inhaled treprostinil demonstrated

substantial pulmonary vasodilatory efficacy in acute administration, as well as

symptomatic and functional benefits in chronic use in a small number of PAH

patients." *Id.* at 351.  A POSA would have been interested in understanding the report

described in Sulica 2005 and would have sought out Voswinckel JAHA,  as disclosed

16

**Appx2910**

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

by Sulica 2005, to learn more.[5]  Indeed, as Ms. Wyman agrees, the fact that Sulica

2005 cites Voswinckel JAHA only further establishes the public availability of this

reference and that a POSA would readily find it.  *See* Ex. 1110 (Wyman Depo. Tr.) at

122:9-12 (explaining Sulica 2005 is "giving them the information so that they could -

- they would know to go to that issue of Circulation"); *see also id.* at 119:11-18 ("Q.

And considering the authors of [Sulica 2005] provided a citation to the abstract, they

were able to find Voswinckel JAHA, is that correct? . . . [A.] Right.  It looks like they

knew about it.").  While Ms. Wyman further opined during her deposition that she

does not know how the authors of Sulica 2005 knew about Voswinckel JAHA and

that "references can often include personal . . . communication," in my experience,

researchers indicate that a citation is a personal communication when they cite such a

communication.  *See id.* at 121:7-17.  I note that Sulica 2005 does not indicate

Voswinckel JAHA is a personal communication; rather it provides a citation to

Voswinckel JAHA as disclosed in the Supplement of Circulation.  Ex. 1104 at 359.

For this additional reason, Ms. Wyman's opinion regarding the dissemination and

accessibility of Voswinckel JAHA is incorrect.

---

[5] For example, in my experience, a POSA in May 2006 could have contacted the
authors of the abstract to receive a copy of Voswinckel JAHA.

Liquidia's Exhibit 1106
Page 17

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

27.    In my opinion, Ms. Wyman is also wrong that "there is no way to find [Voswinckel JAHA] except by going through the Supplement page by page." Ex. 2041 (Wyman Decl.) at ¶ 26. Contrary to Ms. Wyman's opinion, the Supplement is at least indexed by author last name ("Author Index") (*see, e.g.*, Ex. 1095 (Voswinckel JAHA) at III-888; *see also* Ex. 1113 (Voswinckel JAHA Supplemental Author Index) at III-880). In my opinion, a POSA could easily find Voswinckel JAHA using this Author Index. For example, page III-888 of the Author Index lists Robert Voswinckel as an author on abstracts 258 and 1414, where abstract 1414 is Voswinckel JAHA. *See* Ex. 1095 at III-888. And page III-880 of the Voswinckel JAHA Supplemental Author Index lists Werner Seeger. *See* Ex. 1113 at III-880. I note that at the time, and still today, the number of physicians and researchers working on treatments for pulmonary arterial hypertension was small. A POSA would have thus known the names of the other physicians and researchers in the field and would have sought out research, including abstracts and presentations, by these physicians and researchers. Such research includes the research of the authors on Voswinckel JAHA, who were members of a research group in Giessen, Germany. *See* Exs. 1008 and 1093 (Voswinckel JAHA) at authors (listing "Univ Hosp Giessen, Giessen, Germany"). Dr. Waxman agrees with me that based on previously published work by the Giessen Group using inhaled prostacyclins in treating pulmonary hypertension (*see, e.g.,* Ex. 1065 (Olschewski 2002)), a POSA would have known about the Giessen Group

18

Liquidia's Exhibit 1106
Page 18

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

authors.  *See* Ex. 1108 (Waxman Depo. Tr.) at 124:18-125:5 ("Q.  So based on the

abstract and publications we have looked at you would agree that as of 2006 a POSA

would have been aware of the [work] being done by the Giessen group on

prostacyclins for treatment of pulmonary hypertension, correct? . . . [A.]  Probably

yes"); *id.* at 79:5-12 (answering "yes" when asked if he was aware of the work of the

Giessen group on iloprost prior to May 2006 and if a POSA would have similarly

been aware).  Accordingly, and in direct contradiction to Ms. Wyman's opinion, a

POSA would have found Robert Voswinckel's or Werner Seeger's name in the

Author Index and would have further found Voswinckel JAHA.

### 2.    Voswinckel JESC

28.    A POSA would have similarly found Voswinckel JESC.  According to

Ms. Wyman, "Voswinckel JESC [is] an abstract within a supplement to the European

Heart Journal in 2004 – specifically vol. 25 (the 'EHJ Supplement')."  Ex. 2041

(Wyman Decl.) at ¶ 28; Exs. 1007 and 1091 (Voswinckel JESC).  I agree with Ms.

Wyman that the EHJ Supplement "appears to be associated with the European Society

of Cardiology ('ESC') Conference."  *Id.*  Like the AHA Scientific Sessions

Conference, the ESC Conference is a leading meeting on the cardiovascular system

and diseases and conditions of the circulatory system, which a POSA in 2004 would

have attended.  *See* Ex. 1105 (European Society of Cardiology Annual Report 2005)

at 19 (explaining a total of 24,527 attendees including 18,413 professionals attended

19

Liquidia's Exhibit 1106
Page 19

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

the 2004 ESC Congress); Ex. 1108 (Waxman Depo. Tr.) at 117:4-13 (explaining the

majority of the 18,413 professionals in attendance at the ESC conference would have

been clinicians).[6]  And Dr. Waxman and I agree that a POSA would have received a

copy of the abstract book prior to attending the meeting, or at least at the meeting.

*See* Ex. 1108 (Waxman Depo. Tr.) at 105:20-108:1 (agreeing that he would expect

people attending the European Society of Cardiology Congress 2003 would have

received the abstract book prior to or at the meeting).

29.    In turn, a POSA would have read the meeting program for the ESC

Conference and further sought out relevant abstracts associated with the Conference.

In doing so, a POSA would have found the EHJ Supplement, which has a table of

contents that includes the session "Epidemiology and treatment of pulmonary arterial

hypertension."   *See* Exs. 1007 and 1091 (Voswinckel JESC) at Contents, xi.

Voswinckel JESC is one of the abstracts listed as part of this session.  *See id.* (listing

Abstracts 215-220 as part of the Epidemiology and treatment of pulmonary arterial

hypertension session); *id.* at 22 (denoting the Voswinckel JESC abstract as abstract

218).  In my experience, a POSA would have been highly interested in treatments for

pulmonary hypertension, including pulmonary arterial hypertension, and thus would

---

[6] Compared to the ESC Conference, Dr. Waxman testified that he expects attendance
at the American Heart Association conference (like Scientific Sessions in which
Voswinckel JAHA was presented) would be bigger.  Ex. 1108 at 116:15-21.

Liquidia's Exhibit 1106
Page 20

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

have been interested in abstracts and presentations included in this session.  *See also*

Ex. 1108 (Waxman Depo. Tr.) at 104:10-20 (explaining he thinks "that a POSA would

certainly be interested" when asked if a POSA would have been interested in reading

abstracts described as "Epidemiology and treatment of pulmonary arterial

hypertension").  Moreover, Voswinckel JESC was published by authors from the

Giessen Group.  *See* Exs. 1007 and 1091 at Abstract 218 (listing location of authors

as "Medical Clinic 2, Department of Internal Medicine, Giessen, Germany").  For the

same reasons I noted for Voswinckel JAHA in paragraph 27 above, a POSA would

have sought out the work of the authors from the Giessen Group and found

Voswinckel JESC.  Accordingly, a POSA would have been interested in the abstracts

listed and identified Voswinckel JESC within the EHJ Supplement and abstract book.

30.    Additionally, and similar to Voswinckel JAHA, other publications

available before May 2006 would have acted as "research aids" to direct a POSA to

Voswinckel JESC.  For example, Ghofrani (Ex. 1010) cites to Voswinckel JESC in

explaining "[i]nitial trials in Giessen have shown proof of efficacy of inhaled

treprostinil for the effective reduction of the pulmonary vascular resistance (PVR)."

Ex. 1010 at 298; *id.* at 301 (listing Voswinckel JESC abstract in the "Literature"

section).  A POSA reading Ghofrani would have been interested in understanding the

initial Giessen trials showing proof of inhaled treprostinil efficacy, and relying on the

Liquidia's Exhibit 1106
Page 21

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

reference cited in Ghofrani, would have sought out Voswinckel JESC.[7]  I have further

been informed by counsel that Ghofrani, which was published in 2005 in the journal

*Herz*, is prior art to the '793 Patent.  While I offer no opinion on the prior art status of

Ghofrani, I note that its prior art status is irrelevant to my opinion concerning whether

a POSA would have found Voswinckel JESC.  Ghofrani was still publicly available

in 2005, and a POSA would have relied on the disclosures in Ghofrani, including the

cited Voswinckel JESC abstract, to seek out studies and references disclosing the

treatment of pulmonary arterial hypertension.  Thus, Ms. Wyman's opinion regarding

the dissemination and accessibility of Voswinckel JESC is incorrect.

  31. Like Voswinckel JAHA, Ms. Wyman also opined that Voswinckel JESC

was not disseminated in any predictable way as to be accessible as of May 15, 2006.

*See* Ex. 2041 (Wyman Decl.) at ¶ 29.  As I noted above, I was provided with stamped

copies of Voswinckel JESC which indicate that Voswinckel JESC was available in

2004.  *See* ¶ 24 & n.4 above; *cf.* Ex. 2041 (Wyman Decl.) at ¶¶ 29, 31, 33.  The

stamped copies demonstrate Voswinckel JESC was available soon after the ESC

Conference (*e.g.*, Ex. 1091, available by 09/27/2004) and more than a year before

---

[7] Again, given the disclosure in Ghofrani, a POSA could have contacted the authors
of Voswinckel JESC for a copy of the abstract.

Liquidia's Exhibit 1106
Page 22

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

May 15, 2006,[8] contradicting Ms. Wyman's opinion that Voswinckel JESC may have

been published "well after the conference date . . . ." Ex. 2041 (Wyman Decl.) at ¶

31. Again contradicting Ms. Wyman's opinion, I have been informed that the stamped

copies indicate that copies of Voswinckel JESC were received by a library before May

15, 2006. *Id.* at ¶ 33. For this additional reason, Ms. Wyman is wrong regarding the

dissemination and accessibility of Voswinckel JAHA.

32.     Ms. Wyman is further incorrect that neither the EHJ Supplement nor the

abstracts within were indexed in a meaningful way as of the critical date. *See* Ex.

2041 (Wyman Decl.) at Document 2:B. As I noted above, Voswinckel JESC is listed

in the table of contents under "Epidemiology and treatment of pulmonary arterial

hypertension," a subject in which a POSA would have been highly interested. *See* ¶

29 above. Voswinckel JESC is just one of five abstracts within this subject, and the

table of contents is only five pages. Exs. 1007 and 1091 at Contents, xi. A POSA

certainly would have been able to find Voswinckel JESC in this short table of

contents. Furthermore, in addition to the stamped copies of Voswinckel JESC, I was

also provided with an Index of Topics for the EHJ Supplement. Ex. 1092 (EHJ Index

---

[8] As I noted in paragraph 28, furthermore, in my experience, meeting programs are
made available to attendees of the meeting before the conference or at least on the
first day. Further, when made available in supplements, the meeting program or
abstracts from the meeting are typically true and correct copies of the meeting
program or abstracts provided to attendees at the meeting.

Liquidia's Exhibit 1106
Page 23

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

of Topics).  The EHJ Index of Topics shows the EHJ Supplement includes a nine page

Subject Index, which in my opinion a POSA would use as a "meaningful topic index"

through which to find Voswinckel JAHA.  The Subject Index includes the subject

"Therapy (Pulmonary Circulation)."  *Id.* at 725.  A POSA would have been highly

interested in this subject as well as the abstracts included under the subject, and would

have been able to find this subject over the mere nine pages without any special

ordering.  The Voswinckel JESC abstract is listed under Therapy (Pulmonary

Circulation) (*see id.* (listing abstract 218)), and thus, a POSA would have found

Voswinckel JESC through this method.

33.    Dr. Waxman opines that "a POSA would not likely rely on abstracts such

as Voswinckel JESC and Voswinckel JAHA because conference abstracts are not

peer-reviewed to the same rigor as published journal articles, and further often report

preliminary data which may or may not translate into actual results."  Ex. 2052

(Waxman Decl.) at ¶ 65 n.7.  I am informed by counsel that undergoing the peer-

review process is not a prerequisite for a reference to qualify as prior art.  Further, in

my opinion, a POSA would have relied on these abstracts.  Voswinckel JESC and

Voswinckel JAHA were hand-picked by industry experts for publication in journals

associated with two of the top conferences in the PAH community—the AHA

Scientific Sessions Conference and the ESC Conference, respectively, and the authors

were recognized as established authorities in the field.  *See* Ex. 1108 (Waxman Depo.

24

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Tr.) at 79:13-15 ("Q.  Is it fair to say [the Giessen Group] were a well respected group

within the field?  A.  They are, yes").  They were also cited and relied on in other

articles (*i.e.*, research aids), as noted in paragraph 24 above, directly contradicting Dr.

Waxman's opinion.  Therefore, in my opinion, a POSA would have believed and

relied on the information provided in these abstracts, even if the data was

"preliminary."

34.     In any event, there is no indication that the results reported in Voswinckel

JESC and Voswinckel JAHA were "preliminary data" that would "not translate into

actual results."  Ex. 2052 (Waxman Decl.) at ¶ 65 n.7.  To the contrary, Voswinckel

JAHA stated that "[l]ong-term treatment effects are very promising," and Voswinckel

JESC stated that "[t]reprostinil inhalation results in significant long-lasting pulmonary

vasodilation."  Exs. 1008 and 1093 at Conclusion; Exs. 1007 and 1091 at Conclusion.

Indeed, Ghofrani—which points to Voswinckel JESC—reaches the same conclusion

as I do when it states:

> "17 patients with severe pre-capillary pulmonary hypertension were
> administered inhaled treprostinil (15 mcg/inhalation). . . . Due to these
> unique properties (pronounced pulmonary selectivity and long duration
> of action after an individual inhalation), it is possible to reduce the
> number [of] inhalations necessary to up to four per day; the inhalation
> period can be reduced to < 1 min. by selecting a suitable device.
> Additionally, the initial data shows that it is technically feasible for
> there to be only one to two breaths in an application."

Liquidia's Exhibit 1106
Page 25

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Ex. 1010 at 298. Accordingly, it is my opinion that a POSA in May 2006 would have

found and relied on Voswinckel JAHA and Voswinckel JESC.

### B.    Ground 1:  Claims 1-8 Are Obvious Over the '212 Patent in View of Voswinckel JAHA and Voswinckel JESC

35.    Based on his Declaration and deposition testimony, I understand Dr.

Waxman believes the '212 Patent, Voswinckel JAHA, and Voswinckel JESC disclose

all of the limitations of Claims 1-8 of the '793 Patent at issue in this IPR except the

"dose." *See* Ex. 1108 (Waxman Depo. Tr.) at 69:4-72:6 (agreeing that the '212 patent

discloses a formulation comprising treprostinil, inhaled treprostinil, a powder of

treprostinil, administration to a patient suffering with pulmonary hypertension;

delivery by inhalation to a patient in need thereof a therapeutically effective amount

of treprostinil); *id.* at 79:18-86:14 (outside of a powder of treprostinil which was not

discussed and the dose, agreeing the same for Voswinckel JAHA and further agreeing

Voswinckel JAHA discloses inhaled treprostinil was delivered in three single

breaths); *id.* at 93:14-94:21 (outside of dose, agreeing Voswinckel JESC discloses that

inhaled treprostinil is delivered to a patient with pulmonary hypertension and the

inhaled treprostinil was therapeutically effective).  For the reasons set forth in the rest

of this Declaration, I disagree with Dr. Waxman's criticisms that the prior art fails to

disclose dose.

Liquidia's Exhibit 1106
Page 26

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

36.    Dr. Waxman argues that the '212 Patent, Voswinckel JAHA, and

Voswinckel JESC do not teach the claimed "therapeutically effective single event

dose of 15 micrograms to 90 micrograms . . . delivered in 1 to 3 breaths" because

these three references (1) "only provide the initial concentration of the pre-aerosolized

drug and the length of time that the drug is inhaled" and (2) do not account for

"numerous variables" needed to determine the actual delivered dose, such as "the type

of inhalation device used, gas (air) flow, pressure, and density, fill and dead volumes

(how much is put into the device, and how much is left over when the administration

is complete), humidity, temperature, the patients breathing patterns, and the inhalation

device interface."   Ex. 2052 (Waxman Decl.) at ¶¶ 47-48; *see also id.* at ¶ 80

(repeating argument that the three references do not disclose "an actual dose delivered

to a patient in 1 to 3 breaths").  These arguments attempt to inject artificial uncertainty

around the dosing of inhaled therapies, ignoring the clear teachings of the prior art

that doses within the claimed 15-90 micrograms of inhaled treprostinil delivered in 1-

3 breaths were safe and resulted in long-lasting pulmonary vasodilation.  *See* Exs.

1007 and Ex. 1091 (Voswinckel JESC) at Conclusion ("Treprostinil inhalation results

in a significant long-lasting pulmonary vasodilation.  With the applied technology, at

a concentration of 16 μg/ml, near maximal pulmonary vasodilatation is achieved

without adverse effects."); *see also* Exs. 1008 and 1093 (Voswinckel JAHA) at

Conclusion ("Inhaled TRE shows strong pulmonary selective vasodilatory efficacy

27

Liquidia's Exhibit 1106
Page 27

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

with a long duration of effect following single acute dosing.  Tolerability is excellent

even at high drug concentrations and short inhalation time (3 breaths)."); *see also* Ex.

1006 ('212 Patent) at 8:9-10 ("[A]erosolized UT-15 has a greater potency as

compared to intravascularly administered UT-15 . . . .").  A POSA in 2006 would not

have started from square one, as Dr. Waxman suggests, with no guidance regarding

the dosage amount and number of breaths that would be needed to treat pulmonary

arterial hypertension.  Instead, a POSA would have been guided by the plain teachings

of the '212 Patent, Voswinckel JAHA, and Voswinckel JESC to arrive at the claimed

dosing regimen.

37.    Dr. Waxman also fails to consider the combined disclosures of these

references.  He makes the mistake of only considering whether each prior art reference

***individually*** discloses each and every claim limitation, rather than evaluating whether

a POSA in May 2006, applying his/her general knowledge and common sense, would

have found the claims obvious over the identified combinations of prior art references.

I understand that considering the references in combination is required to determine

whether a claim would have been obvious (*see* Ex. 1002 (Hill First Decl.) at § IV.C);

Dr. Waxman therefore misapplies the legal standard for obviousness.  In fact, Dr.

Waxman concludes that "[b]ecause none of the reference [sic] individually disclose a

dose from 15 to 90 µg, the combination of the three references do not, either."  Ex.

2052 (Waxman Decl.) at ¶ 79.  This conclusion is unwarranted because it ignores the

Liquidia's Exhibit 1106
Page 28

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

general background knowledge that a POSA in May 2006 would have had, and how a POSA would have combined the teachings of the three references to arrive at the claimed "therapeutically effective single event dose [of] 15 micrograms to 90 micrograms . . . delivered in 1 to 3 breaths." *See* Ex. 1002 (Hill First Decl.) at §§ VII.B.2.c,VII.B.2.d.

38.     Dr. Waxman appears to argue that there is a meaningful difference between the "initial concentration of the pre-aerosolized drug," and the amount delivered to the mouth and/or the "actual dose delivered" to the lungs.  Ex. 2052, ¶ 48; *see also id.* at ¶ 65 n.8 ("A POSA would understand that a claimed single event dose of 15 micrograms to 90 micrograms means the dose delivered to the patient – not the amount of the starting solution."); *see also id.* at ¶ 37 (distinguishing between the total dose "loaded in a [] nebulizer" and the dose "deposited in the lungs").  While it is true that not all of the dose loaded into an inhaler or nebulizer may ultimately be emitted at the mouthpiece of the device, a POSA reviewing the prior art would not have needed to account for this because Voswinckel JESC expressly discloses that "patients inhaled . . . treprostinil . . . in concentrations of 16, 32, 48, and 64 µg/ml . . . ."  Ex. 1007 and 1091 (Voswinckel JESC) at Methods.  A POSA therefore would have understood that Voswinckel JESC discloses the concentrations of treprostinil actually inhaled at the mouthpiece, removing any need to account for variation that may occur between the "initial concentration of the pre-aerosolized drug" and the

Liquidia's Exhibit 1106
Page 29

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

amount delivered to the mouth. Further, a POSA would have assumed that the inhaled

concentrations in Voswinckel JESC already were average values that accounted for

variables such as "type of inhalation device used, gas (air) flow, pressure, and density,

fill and dead volumes (how much is put into the device, and how much is left over

when administration is complete), humidity, temperature, the patients [sic] breathing

patterns, and the inhalation device interface." Ex. 2052 (Waxman Decl.) at ¶ 48.

39.    To the extent Dr. Waxman asserts that the claimed "single event dose"

refers to the amount of drug deposited in the lungs, this position is contrary to the

teachings of the '793 Patent as well as standard clinical practice in 2006 and today.

When clinicians talk about the dose of an inhaled therapy, they do not refer to the

amount deposited in the lungs. In the clinic, physicians do not measure the amount

delivered to the lungs of the patient, and indeed, on a patient-by-patient level, the

variations that occur as a drug moves from the mouth to the lungs are difficult to

control. Dosing for inhaled therapies is therefore not customized on a patient-by-

patient basis. Instead, today and also in 2006, effective inhalation therapy relied on

average assumptions regarding the patient population characteristics, to best provide

effective doses across the broadest patient population possible. Many of Dr.

Waxman's and Dr. McConville's criticisms ignore this reality. Further, clinicians

relied on the dose provided by the manufacturer or the dose that can be calculated

according to known specifications of the inhalation device (such as volume emitted)

Appx2924

Liquidia's Exhibit 1106
Page 30

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

and the concentration of the drug loaded into the inhalation device, which inherently

allows for variation among patients in, *e.g.*, respiration rate, respiration volume, etc.,

to ensure that a therapeutically effective amount of the drug reaches the patients.  To

determine whether the drug is actually reaching clinically relevant regions of the

lungs, clinicians determine whether the drug is therapeutically effective through

assessment of symptoms or measures such as the 6 minute-walk-test.  If a patient

shows improvements on these assessments, a clinician can infer that a therapeutically

effective amount of the drug was delivered to the lungs, but the clinician does not

directly measure the dose that was delivered to the lungs.  In the context of the '793

Patent, the claimed "single event dose" of 15 to 90 µg refers to the dose emitted at the

mouthpiece.  The '793 Patent never discloses the amount of treprostinil that is

deposited in the patients' lungs; it discusses the amount of drug administered at the

mouthpiece of the inhalation device (*i.e.*, prior to inhalation).  *See, e.g.*, Ex. 1001 ('793

Patent) at 10:22-30 ("The aerosol volume delivered by one cycle from the SMI [soft

mist inhaler] was 15 µl. . . . The SMI was either filled with a concentration of 1000

µg/ml treprostinil sodium (one aerosol puff=15 µg TRE) or with 2000 µg/ml (one

puff=30 µg TRE).  The different doses were applied as 2 puffs 1000 µg/ml (30 µg), 3

puffs 1000 µg/ml (45 µg) and 2 puffs 2000 µg/ml (60 µg).").[9]  Additionally, the claims

---

[9] *See also id.* at 9:7-10 ("TRE **was delivered in 2 breaths** (1000 µg/ml aerosol

31

Liquidia's Exhibit 1106
Page 31

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

recite that this dose is "delivered in 1 to 3 breaths," further supporting that the dose

refers to the amount of drug administered at the mouthpiece of the inhalation device

and inhaled by the patient. *Id.* at claim 1.

40.     The '212 Patent and Voswinckel JESC also make no reference to the

amount of drug deposited in the lungs. Rather, a POSA reading the '212 Patent would

have understood it to be referring to doses supplied at the mouthpiece and inhaled.

For example, the '212 Patent states that "the dosage for inhalation, taking into account

that some of the active ingredient is breathed out and not taken into the bloodstream,

should be sufficient to deliver an amount that is equivalent to a daily infusion dose in

the range of 25 µg to 250 mg; typically from 0.5 tg [sic] to 2.5 mg, preferably from 7

µg to 285 µg, per day per kilogram bodyweight." Ex. 1006 ('212 Patent) at 5:54-62;

*see also id.* at 9:7-14 ("The nebulization rate was 0.28 ml per minute, thus 8.4 ml of

solution was needed containing 262.5 micrograms of UT-15. However, an amount of

solution is needed for the 'void' volume (volume always left in the nebulizer). Thus

a volume of 9 ml containing a total of 281.25 micrograms of UT-15 (or 0.5625 ml of

the stock solution) was made up. . . . This was nebulized over exactly 30 minutes.").

In my opinion, a POSA reading Voswinckel JESC would have understood that the

_____

concentration; 30 µg dose; n=12), . . .") (emphasis added); *see also id.* at 12:42-45
("15 µg TRE *was inhaled* with 18 pulses . . . .") (emphasis added).

Liquidia's Exhibit 1106
Page 32

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

dose information provided as concentrations refers to the dose delivered by the device

and inhaled by the patient. Exs. 1007 and 1091 at Methods ("[P]atients inhaled

solvent solution (placebo) (n=8) or treprostinil for 6 min (OptiNeb ultrasound [sic]

nebulizer, Nebu-tec, Germany) in concentrations of 16, 32, 48, and 64 µg/ml (n=6, 6,

6, and 3 patients).").

41.    Contrary to Dr. Waxman, Dr. McConville agrees with me that the

concentrations in Voswinckel JESC are the concentrations that are ultimately inhaled

by a patient. *See* Ex. 1109 (McConville Depo. Tr.) at 224:8-21; *id.* at 225:12-18.

Even if the concentrations disclosed in Voswinckel JESC refer to the

"concentration[s] of the drug in the pre-aerosolized solution" loaded into the

inhalation device, as Dr. Waxman argues (Ex. 2052, ¶ 65), the claimed range of 15-

90 µg still would have been obvious. Dr. Waxman never identifies a specific amount

of drug that he alleges is lost between the loaded dose and the mouthpiece, but even

assuming that a high percentage, such as 50%, of the drug is lost in this process,

Voswinckel JESC still renders obvious the claimed range. For example, in my First

Declaration, I assumed inhalation of at least 1 mL of the provided concentrations of

drug. Ex. 1002, ¶¶ 65, 99. Even assuming for the sake of argument that the 16, 32,

48, and 64 µg/ml concentrations provided in Voswinckel JESC refer to 1 mL

concentrations loaded into the nebulizer, and 50% of the loaded dose was lost between

the device reservoir and the mouthpiece, this still results in inhaled doses of 8, 16, 24,

Liquidia's Exhibit 1106
Page 33

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

and 32 μg, respectively, which includes doses in the claimed 15-90 μg range. Indeed, even a loss of 75% would still result in a dose within the claimed range (64 μg/mL * 1 mL * 0.25 = 16 μg dose).

42.    Moreover, during his deposition, Dr. Waxman explained that he never delivered below 1 mL (Ex. 1108 at 156:12-16) while standard nebulizers available in 2006 would have held between 3-5 mL. *Id.* at 153:8-22. He also explained that the only approved prostacyclin therapy available in 2006—Ventavis®—was delivered in volumes of 1 to 2 mL, which is consistent with my opinion and how a POSA would consider the doses administered in Voswinckel JESC. *Id.* at 163:7-18. Dr. Waxman's understanding of nebulizers available in 2006 accords with my own experience of prescribing volumes of at least 1 mL. Ex. 1002, ¶ 65. Using Dr. Waxman's understanding of Ventavis and standard nebulizers, and again assuming a loss of 50%-75%, Voswinckel JESC still renders the claims of the '793 Patent obvious. With a 2 mL volume and 75% loss, Voswinckel JESC discloses doses of 8, 16, 24, and 32 μg ((16 , 32, 48, 64 μg/mL) * 2 mL * 0.25), where 3 of the doses fall within the claimed 15-90 μg range. With a 5 mL volume and 75% loss, the results would be similar whereby Voswinckel JESC again discloses doses within the claimed range ((16 , 32, 48, 64 μg/mL) * 5 mL * 0.25 = 20, 40, 60, 80 μg dose). Even with no loss at 5 mL, the dose would fall in the claimed range (16 μg/mL * 5 mL = 80 μg). Thus, based on

34

Liquidia's Exhibit 1106
Page 34

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

my experience and Dr. Waxman's own understanding, Voswinckel JESC in light of a

POSA's understanding of nebulizers in 2006 discloses the claimed dose.

43.    Dr. Waxman's point about the "numerous variables" allegedly needed to

calculate the single event dose is misguided, and attempts to artificially create

uncertainty where none exists.  *See* Ex. 2052, ¶ 48; *see also id.* at ¶ 80 (repeating

argument that "the actual delivered dosage would depend on variables associated with

a particular nebulizer's features"); *see also id.* at ¶ 83 (repeating argument that a

POSA would need "additional information about the nebulization device" to calculate

the single event dose).  Voswinckel JESC expressly discloses that "patients inhaled .

. . treprostinil . . . in concentrations of 16, 32, 48, and 64 μg/ml . . . ."  Exs. 1007 and

1091 at Methods.  A POSA thus would have understood that Voswinckel JESC

discloses the concentrations of treprostinil actually inhaled at the mouthpiece,

removing any need to account for variation that may occur as the treprostinil travels

through the inhaler to the mouthpiece.

44.    Moreover, physicians in 2006 (and still today) did not account for these

variables in clinical practice, because each variable was inherent in the management

of the medication and had already been accounted for to ensure uniform dosing among

patients.  As I discussed above, Dr. Waxman's arguments rely on a misunderstanding

of the dose described in the '793 Patent, which is in fact directed to the amount of the

drug administered to the mouthpiece of the inhalation device.  Applying this correct

Liquidia's Exhibit 1106
Page 35

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

definition, none of the variables identified by Dr. Waxman impact this dose in a manner that would remove the dose from the broad claimed range of 15-90 µg. Moreover, a POSA would have recognized that the authors of the prior art were experts in the field and, accordingly, that they would have accounted for variables impacting dosing and effectiveness.    The authors of Voswinckel JAHA and Voswinckel JESC are part of the highly-regarded Giessen group in Germany, and the studies described in the abstracts were supported by LungRx, a subsidiary of UTC. *See* Exs. 1007 and 1091; Exs. 1008 and 1093; *see also* Ex. 1108 (Waxman Depo. Tr.) at 79:13-15 ("Q.  Is it fair to say [the Giessen Group] were a well respected group within the field?  A.  They are, yes"); *id.* at 88:9-16 (answering "yes" when asked if the research in Voswinckel JAHA was supported by Lung RX and if Lung Rx was known to be involved in the development of treatments for pulmonary hypertension as of May 2006); *id.* at 92:16-19 ("Q.  Looking at the bottom you see it indicates [Voswinckel JESC] was similarly supported by Lung RX; is that correct?  A.  Yes"). The '212 Patent is assigned to UTC, the first company to market a treprostinil therapy for PAH, Remodulin® in 2002.  Ex. 1006 ('212 Patent) at Cover; *see also* Ex. 2055 (Hill Depo. Tr.) at 165:2-11.   As I explained during my deposition, and as Dr. Waxman agrees, a POSA would have expected that these sophisticated investigators and parties accounted for the variables identified by Dr. Waxman when conducting their studies.  *See* Ex. 2055 (Hill Depo. Tr.) at 154:6-24, 162:4-163:1; *see also* Ex.

36

Liquidia's Exhibit 1106
Page 36

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

1108 (Waxman Depo. Tr.) at 155:12-22 (explaining he "ha[s] no reason to think [the

Giessen Group] used [the nebulizer] incorrectly").  For example, a POSA would have

assumed that the studies described in the prior art were conducted in controlled

environments at standard temperatures and humidity levels.  Thus, contrary to Dr.

Waxman's assertion, a POSA would "reasonably assume" that the prior art references

accounted for any variables relating to the particular nebulization device.  *See* Ex.

2052 (Waxman Decl.) at ¶ 83.  I further note that, once the FDA approved a product

for treatment in patients, POSAs (including myself) in 2006 and still today did not

perform mathematics in the clinic to calculate the required dose—we relied on the

approved dosing regimen in the label.

45.    Further, the additional references cited by Dr. Waxman—Exs. 2029-

2031—do not stand for the proposition that the listed "numerous variables" are

necessary or "critical" to determining "the actual dose delivered," as Dr. Waxman

suggests.  *See* Ex. 2052, ¶ 48.  Rather, these references just describe how variables

such as gas (air) flow and fill volume can affect drug delivery generally, without

specifying how these variables affect the actual delivered dose of inhaled treprostinil

in particular.  *See* Ex. 2029 (providing no details regarding treprostinil); Ex. 2030

(same); Ex. 2031 (same).

46.    Further, Dr. Waxman appears to argue that the prior art references do not

provide enough detail to enable a POSA to practice Claims 1-8.  However, the

Liquidia's Exhibit 1106
Page 37

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

"numerous variables" listed by Dr. Waxman are also absent from the specification of the '793 Patent. *See generally* Ex. 1001 (failing to provide any information regarding "gas (air) flow, pressure, and density, fill and dead volumes (how much is put into the device, and how much is left over when the administration is complete), humidity, temperature, the patients breathing patterns, and the inhalation device interface"). Thus, in my opinion, Dr. Waxman cannot fairly criticize the '212 Patent, Voswinckel JAHA, and Voswinckel JESC for allegedly not including information that is also absent from the '793 Patent.

47.    Dr. Waxman provides a chart listing the "[d]evice," "[p]re-aerosolized conc[entration]," "[n]ebulization rate," and "[d]uration" disclosed in each of the '212 Patent, Voswinckel JAHA, and Voswinckel JESC, and concludes without explanation that the "[s]ingle event dose" would have been "[u]nknown" for each reference based on these disclosures. Ex. 2052 (Waxman Decl.) at ¶ 48. I disagree. As explained at length in my First Declaration, a POSA would have been motivated to determine the claimed "single event dose" amount based on the combination of these references and their disclosures. Ex. 1002 (Hill First Decl.) at § VII.B.2.c. For example, "a POSA would expect that the patients in the Voswinckel JESC study received between at least 16, 32, 48, or 64 µg (based on the baseline, common sense expectation of a POSA that at least 1 mL of solution would be nebulized over 6 minutes, regardless of nebulizer, and concentrations of 16, 32, 48, or 64 µg/mL were administered)." *Id.* at ¶ 99.

38

Liquidia's Exhibit 1106
Page 38

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Alternatively, "[a] POSA could also calculate a therapeutically effective dose of inhaled treprostinil based on the '212 Patent's disclosure that the inhalation dose is only a fraction (10-50%) of the intravenous dose." *Id.* at ¶ 100; *see also id.* at ¶ 100 n.4. The fact that these references provide overlapping doses within the claimed 15 to 90 microgram range would have further directed the POSA to dose within the claimed range.

48.    Dr. Waxman provides an "overview" of each prior art reference—the '212 Patent, Voswinckel JESC, and Voswinckel JAHA—on an individual basis. *See* Ex. 2052 (Waxman Decl.) at § V.A.1-3. This is followed by a conclusory analysis that purports to address the three references in combination, but in fact largely mirrors Dr. Waxman's opinions regarding the individual references and fails to consider the references as a collective whole and in the context of a POSA's general knowledge. *See id.*, §§ V.B-V.C. I address these arguments below.

> **1.    Dr. Waxman's Isolated Critique of the '212 Patent Fails to Rebut My Obviousness Opinions**

49.    Dr. Waxman first states that the '212 Patent does not teach the claimed "therapeutically effective single event dose of 15 µg to 90 µg . . . delivered in 1 to 3 breaths" because the '212 Patent is "directed to providing continuous nebulization and describes a broad range of dosages delivered over a period of time." Ex. 2052, ¶ 52; *see also id.* at ¶¶ 50-51; *see also id.* at ¶ 78 (repeating opinion that the '212 Patent

Liquidia's Exhibit 1106
Page 39

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

does not teach a single event dose of 15 to 90 micrograms delivered in 1 to 3 breaths).
This misses my point.  I never opine that the '212 Patent expressly discloses the
claimed 1 to 3 breaths; instead, the '212 Patent provides guidance that would have led
a POSA to doses within the claimed dose ranges.  Specifically, I rely on the
combination of the '212 Patent with Voswinckel JESC and Voswinckel JAHA to
reach the 15-90 µg dose and 1 to 3 breaths limitation.  *See* Ex. 1002 (Hill First Decl.)
at §§ VII.B.2.c-d.  That the '212 Patent allegedly describes administering treprostinil
over "30-90 minutes at a low rate," (Ex. 2052, ¶ 51) does not impact that a POSA
would have used the '212 Patent as a starting point to "infer that a lower dose of
inhaled UT-15 may be used to treat pulmonary hypertension in a manner similar to
that produced with intravenous delivery."  *See* Ex. 1002, ¶ 96.  From there, a POSA
would have turned to Voswinckel JESC "to determine a more precise dose of inhaled
treprostinil for humans," and Voswinckel JAHA to reduce the number of breaths to
three.  *Id.* at ¶¶ 97-99, 102-104.  Further, Dr. Waxman's argument regarding the
differences in pharmacokinetics and spillover between continuous and bolus
administration ignores the effect of the dosage amount.  If a large amount of drug is
administered, spillover is more likely regardless of whether the dose is administered
over a long or short period of time; if a small amount of drug is administered, spillover
is less likely.  This is precisely why clinicians often start patients on a smaller dose of
a drug, and gradually increase the dose as the patient becomes more tolerant.

40

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Therefore, I disagree that any potential differences in pharmacokinetic effects and spillover would have dissuaded a POSA from relying on the '212 Patent as a starting point to reach the claimed dosing regimen. *Id.* at ¶¶ 96-99; *cf.* Ex. 2052 (Waxman Decl.) at ¶¶ 50-51.

50.    Dr. Waxman further complains that the '212 Patent teaches only "rates" or "daily doses," rather than "single event doses." Ex. 2052, ¶ 52. Again, this is inapposite, as I do not rely on the '212 Patent alone to arrive at the "delivered in 1 to 3 breaths" claim requirement. Instead, it is the combination of the '212 Patent with Voswinckel JESC and Voswinckel JAHA that teaches this claim limitation. *See* Ex. 1002 (Hill First Decl.) at §§ VII.B.2.c-d. Further, my First Declaration identifies three separate ways a POSA could have arrived at a dose within the claimed dosing regimen. First, I explain that Voswinckel JESC teaches the administration of 16, 32, 48, or 64 μg of inhaled treprostinil, which each fall within the claimed 15-90 μg range. Ex. 1002, ¶¶ 65-66, 99. I understand from counsel that the PTAB accepted this calculation in instituting this IPR. Second, I explain how the '212 Patent (applied to the Remodulin® label) teaches the administration of 10.8-58.5 μg of inhaled treprostinil, which covers more than half of the claimed 15-90 μg range. Ex. 1002, ¶ 100. Third, I explain how the '212 Patent teaches the administration of 2.5 μg to 125 mg of inhaled treprostinil, which encompasses the entire claimed 15-90 μg range.

41

Liquidia's Exhibit 1106
Page 41

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

*Id.* at ¶ 100 n.4.  The fact that a POSA could have reached a dose within the claimed range in three different ways reinforces the obviousness of Claims 1-8.

51.    Dr. Waxman's arguments at ¶¶ 52-54 are likewise misplaced because I never opined that a POSA would have used a continuous nebulizer to deliver the claimed dose; yet again, a POSA would have relied on the combination of the three prior art references to arrive at the claimed dose.  *See* Ex. 1002 (Hill First Decl.) at §§ VII.B.2.c-d; *cf.* Ex. 2052 (Waxman Decl.) at ¶¶ 52-54.

52.    Dr. Waxman next criticizes my "two calculations" based on the '212 Patent's disclosure that "aerosolized UT-15 has a greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly."  Ex. 2052, ¶ 56; *see also id.* at ¶¶ 57-63; *see also id.* at ¶¶ 79, 82 (repeating criticism of calculations).  Here, Dr. Waxman ignores that I also rely on Voswinckel JESC to show that a POSA could have arrived at the claimed dosing range.  Ex. 1002, ¶¶ 65-66, 99.  Regarding my "first calculation," Dr. Waxman says that a POSA would not have used the 10-50% number provided because it is "based upon sheep data" and "the range is broad."  Ex. 2052, ¶ 58.  However, the '212 Patent is not limited strictly to sheep; the claims expressly recite methods of treating a "mammal," which includes a human.  Ex. 2055 (Hill Depo. Tr.) at 168:22-169:11; Ex. 1006 ('212 Patent) at claim 1; *see also id.* at claim 5 (reciting "wherein the mammal

42

Liquidia's Exhibit 1106
Page 42

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

is a human"). And importantly, Dr. Waxman also ignores the fact that the '212 Patent is a UTC patent. Thus UTC, relying on sheep data, included claims on inhaled treprostinil therapies for mammals, which obviously includes humans. Also, the 10-50% range provides at least a starting point to calculate the inhaled dose based on the intravenous dose. I stated as much in my deposition testimony, which Dr. Waxman misconstrues in his Declaration. Ex. 2055 (Hill Depo. Tr.) at 102:4-103:20 (testifying that the 10-50% number "is what we were provided with" and "it's what we have to go on"); *cf.* Ex. 2052 (Waxman Decl.) at ¶ 58. Dr. Waxman repeats his point that the '212 Patent describes continuous nebulization over 30-90 minutes rather than delivery in 1 to 3 breaths as claimed. Ex. 2052, ¶¶ 59-60. But again, I do not rely on the '212 Patent for the "1 to 3 breaths" limitation; I simply point out that the "10-50%" disclosure provides one of several ways to calculate an inhaled dose of treprostinil. *See* Ex. 1002 (Hill First Decl.) at ¶ 100.

53.    Further, Dr. Waxman's argument that the daily calculated dose must be divided by four (Ex. 2052, ¶¶ 60-61) is disingenuous because Tyvaso® is also administered in "4 separate treatment sessions each day" (Ex. 1043 (2009 Tyvaso Label) at 1) and Dr. Waxman nonetheless contends that Tyvaso® is "the commercial embodiment of the '793 patent." Ex. 2052, ¶ 42. He cannot assert on one hand that Tyvaso® (administered 4 times a day) satisfies the claimed "therapeutically effective single event dose" and, on the other hand, that the prior art does not satisfy Claims 1-

43

Liquidia's Exhibit 1106
Page 43

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

8 because it requires "4 individual dosing events." *Id.* at ¶ 60 (also citing Voswinckel

JAHA). Relatedly, Dr. Waxman improperly truncates my deposition testimony

regarding "apples to oranges" (*see* Ex. 2052, ¶ 60)—I go on to clarify that the 1.25

ng/kg/min dose disclosed in the Remodulin® label is a "starter dose" that would "go

up gradually" such that "you're certainly going to cross the [claimed] range that you

would use with the inhaled dose," as shown below:

> Q. And so those are apples and oranges, aren't they?
>
> A. Yes, I think so. If I might add, the 1.25 is a starter dose,
> and it's a dose that no one would be kept on for any length
> of time. When we start this drug, we anticipate that we're
> going to go up gradually on the dose. Sometimes to
> manifold what this initial dose is. So as you go up, you're
> certainly going to cross the range that you would use with
> the inhaled dose.

Ex. 2055 at 100:15-25. In other words, a POSA would have known to up-titrate the

dose, thereby falling within the broad claimed dosing range of 15-90 micrograms. As

I further explained during my deposition, the Remodulin® label contemplates

"dos[age] adjustments" where "[i]nfusion rate should be adjusted in increments of no

more than 1.25 [ng/kg/min] per week for the first four weeks, and then no more than

2.5 [ng/kg/min] per week for the remaining duration of the infusion, depending on

clinical response." Ex. 2055 at 174:2-21. Specifically, the Remodulin® 2004 Label

discloses the following:

Liquidia's Exhibit 1106
Page 44

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

### Dosage Adjustments

> The goal of chronic dosage adjustments is to establish a
> dose at which PAH symptoms are improved, while
> minimizing excessive pharmacologic effects of Remodulin
> (headache, nausea, emesis, restlessness, anxiety and
> infusion site pain or reaction).

> The infusion rate should be increased in increments of no
> more than 1.25 ng/kg/min per week for the first four weeks
> and then no more than 2.5 ng/kg/min per week for the
> remaining duration of infusion, depending on clinical
> response. There is little experience with doses >40
> ng/kg/min. Abrupt cessation of infusion should be avoided
> (see PRECAUTIONS).

Ex. 1018 (Remodulin Label 2004) at 9. I follow this general approach in my clinical

practice, where I increase a PAH patient's dosing to the highest dose he or she can

tolerate, to maximize therapeutic benefit. Indeed, Dr. Waxman agrees that a POSA

would up-titrate the dose of Remodulin®, and in his own practice as of 2006, he up-

titrated faster than the instructions on the label:

> Q.  And how did you handle dose adjustments [of
> Remodulin] for patients with PH in 2006?

> A.  We would increase by one to two nanogram per
> kilogram per minute every six to eight hours to a goal dose.

> Q. What was the goal dose in 2006?

> A.  It varied from patient to patient.

> Q.  But the goal with Remodulin treatment of PH patients
> prior to May 2006 would have been to increase the dose
> depending on their clinical response, correct?

Liquidia's Exhibit 1106
Page 45

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

    A.  Correct.

Ex. 1108 (Waxman Depo. Tr.) at 140:5-16.  Therefore, even if the single event dose

started at less than 15 micrograms (*see* Ex. 2052, ¶ 60 (dividing 58.5 micrograms by

four)), over time the single event dose would undoubtedly reach the claimed 15-90

microgram range.[10]  As I testified during deposition:

> Q.  If a doctor following the dosage and administration
> section of Remodulin and applied the calculations
> performed in paragraph 100 of your declaration, would that
> patient end up at some point at an inhaled dose of between
> 15 and 90 micrograms?
>
> . . .
>
> THE WITNESS:  No doubt.

Ex. 2055 at 174:23-176:16.[11]  Indeed, a 65 kg person would receive a single event

dose in the claimed 15-90 microgram range after just one week of up-titration.  The

calculation of the single event dose upon up-titration is as follows:

---

[10] The same is true even if the single event dose started at 2.7 micrograms, based on dividing the low-end 10.8 microgram dose by four.  *See* Ex. 2055 (Hill Depo. Tr.) at 99:7-13.

[11] Further, Dr. Waxman disagrees that the Remodulin® label could be used to "extrapolate" an actual dose delivered to a patient in 1 to 3 breaths, but I never rely on the Remodulin® label in isolation.  *See* Ex. 2052 (Waxman Decl.) at ¶ 84.  Instead, I rely on a POSA's background knowledge of intravenous treprostinil (Remodulin®) in view of the '212 Patent's express teaching that "the actual amount of [treprostinil] delivered via aerosolization delivery [i.e., inhalation] is only a fraction (10-50%) of the dosage delivered intravascularly."  Ex. 1002 (Hill First Decl.) at ¶ 100 n.4; Ex. 1006 ('212 Patent) at 8:8-12.

Liquidia's Exhibit 1106
Page 46

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

$$x\ dose = \frac{S + \left( R * 1.25\ \frac{ng}{kg\ min} * W * \left( 24h * 60\ \frac{min}{h} \right) * 0.001\ \frac{\mu g}{ng} * C \right)}{4\ doses/day}$$

where "S" is the starting dose in µg,[12] "R" is the percentage of the dose used based on

the 10-50% range taught by the '212 Patent, "W" is the weight of the person in kg,

and C is the number of cycles of up-titration in weeks.  After one week, a 65 kg person

at a starting dose of 58.5 µg over 24 hours (*i.e.* 50% of the 1.25 ng/kg/min starting

dose of Remodulin®), will reach a single event dose of 29.25 µg (or a 117 µg daily

dose divided by 4).[13]  29.25 µg is within the claimed 15-90 µg dose of the '793

Patent.[14]

54.     I further note that while I based the calculation in my First declaration

on patients weighing 60 and 65 kg, the Remodulin® label also discloses 70 kg and 75

kg weights (Ex. 1018 at 4, 11), and I have regularly treated patients who weigh more

---

[12] In my First Declaration, I calculated these starting doses as 10.8 and 58.5 µg based
on the 10-50% range taught by the '212 Patent and a 60-65 kg person. *See* Ex. 1002,
at ¶ 100.  These starting doses were not divided by 4.  While I disagree with Dr.
Waxman's argument that Voswinckel JAHA teaches the daily dose should be divided
by 4, I have nonetheless accounted for the division by 4 in my calculations here.

[13] Said in another way, after 1 week, the dose will have been up-titrated to 2.5
ng/kg/min.  Thus a 65 kg person will receive a daily dose of 117 µg (2.5 ng/kg/min *
65 kg * 24h * 60 min *0.001*50%), which divided by 4, is 29.25 µg.

[14] Additionally, if a 60 kg person starts at 10% of the 1.25 ng/kg/min dose and up-
titrates at 10% of 1.25 ng/kg/min per week, the 60 kg person will reach a dose of 15
µg within ~4.6 weeks.

Liquidia's Exhibit 1106
Page 47

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

than 60-65 kg. Even dividing by four, patients weighing 70 kg and 75 kg would start

at a single event dose in the claimed range with no need for up-titration:

- $(1.25 \text{ ng/kg/min} \ast 70\text{kg} \ast (24\ast60)\text{min} \ast 0.001\mu\text{g/ng})/4 = 31.5 \ \mu\text{g}$
- $(1.25 \text{ ng/kg/min} \ast 75\text{kg} \ast (24\ast60)\text{min} \ast 0.001\mu\text{g/ng})/4 = 33.75 \ \mu\text{g}$

At the low end of the 10-50% fraction disclosed by the '212 Patent, a POSA would

have calculated a single event dose of 3.15 µg (10%*31.5 µg) while at the high end a

POSA would have calculated a single event dose of 16.875 µg (50%*33.75 µg), which

falls within the claimed single event dose range. Indeed, basic math in addition to the

50% fractional dose of the '212 Patent and 4 doses per day teaches a person weighing

~67 (66.$\dot{6}$) kg, for example, would start at a single event dose of 15 µg even without

titration:

$$W = \frac{(15 \ \mu g \ast 4)}{50\% \ast 1.25 \ \frac{ng}{kg \ min} \ast 24h \ast 60 \frac{min}{h} \ast 0.001 \frac{\mu g}{ng}} = \sim 67 \ kg$$

55.   I note that the McLaughlin 2003 reference relied upon by Dr. Waxman

for long-felt but unmet need (*see* Ex. 2052 (Waxman Decl.) at ¶¶ 97, 99) further

supports my opinion that the administration of 15-90 µg of treprostinil would have

been obvious by May 2006. McLaughlin 2003 discloses that the maximum tolerated

dose of intravenous treprostinil was 24.6 ± 4.0 ng/kg/min. Ex. 2036 at 295. During

my deposition, we converted that dose to micrograms, applied the 10-50% number

from the '212 Patent, and divided the result by four to reach a maximum tolerated

Liquidia's Exhibit 1106
Page 48

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

single event dose of 53.125 µg for inhaled treprostinil. *See* Ex. 2055 at 111:18-114:10.

This 53.125 µg dose falls squarely within the claimed 15-90 µg dose range, and thus

further demonstrates that a POSA in 2006 would have expected an inhaled dose within

the claimed range to be safe and produce the desired physiological response.[15]

56.    Regarding my "second calculation," Dr. Waxman opines that a POSA

would not rely on the '212 Patent's disclosures regarding "peripheral vascular

disease" to "infer or calculate delivered doses for the treatment of pulmonary

hypertension . . . ." Ex. 2052, ¶ 61.  However, as noted in my First Declaration, the

fact that the '212 Patent describes treating both peripheral vascular disease (PVD) and

pulmonary hypertension (PH) would have given a POSA a "reasonable expectation"

that the PVD dose would be used to treat PH. *See* Ex. 1002, ¶ 100 n.4.  Dr. Waxman

cites no support for his statement that "dosing is quite different" for PVD and PH (Ex.

2052, ¶ 61), and this is contrary to my clinical experience—a POSA actually would

have recognized that the dosing for PVD and PAH is quite similar.  For example, by

2006, clinicians treated Reynaud's disease (a form of PVD) with prostacyclin in a

---

[15] As I explained during my deposition, the 53.125 µg dose is not inconsistent with
my calculated dose of 57.6 µg based on Voswinckel JESC. *See* Ex. 1002 (Hill First
Decl.) at ¶ 99 n.3; Ex. 2055 (Hill Depo. Tr.) at 114:11-122:4 (testifying that the 53.125
µg calculated dose from McLaughlin 2003 and the 57.6 µg calculated dose from
Voswinckel JESC are "in the same range with regard to the effect on
[hemodynamics]").

Liquidia's Exhibit 1106
Page 49

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

similar manner with similar dosing as it was used to treat patients with PAH—by

starting with a lower dose and gradually increasing the dose to build up a tolerance

and maximize therapeutic benefit.  In my clinical practice, the dosing regimens for

these two disease states do not vary significantly.  Further, here, Dr. Waxman ignores

my opinions relying on the '212 Patent in combination with Voswinckel JESC to

arrive at the claimed dosage range.  *See* Ex. 1002, ¶¶ 96-99.

57.    Dr. Waxman further contends that a POSA would not infer or calculate

a therapeutically effective single event dose from a "daily infusion dose used with

tracheotomized sheep where there is no data that provides dosage administered to

humans."  Ex. 2052 (Waxman Decl.) at ¶ 62.  But a POSA would have known that

the sheep model is well-accepted for study of the pulmonary circulation, that the'212

Patent describes methods of treating mammals including humans, and that UTC itself

made this same inference in the '212 Patent by including claims to mammals, despite

the '212 Patent describing sheep data.  Ex. 1006 ('212 Patent) at claims 1, 5.  Dr.

Waxman again misconstrues my deposition testimony, where I merely pointed out

that the '212 Patent provides a starting point to calculate the inhaled single event dose.

*See* Ex. 2052, ¶ 62; *cf.* Ex. 2055 at 102:4-103:20.  For these reasons, I maintain my

opinion that a POSA would have had a reasonable expectation of success that the PVD

dose would be effective in treating pulmonary hypertension.  *Cf.* Ex. 2052, ¶ 63.

**Appx2944**

Liquidia's Exhibit 1106
Page 50

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

58. For the foregoing reasons, Dr. Waxman's critique of the '212 Patent in isolation fails to rebut my opinions demonstrating the obviousness of Claims 1-8.

### 2. Dr. Waxman's Isolated Critique of Voswinckel JESC Fails to Rebut My Obviousness Opinions

59. Dr. Waxman next opines that Voswinckel JESC, like the '212 Patent, "provides the concentration of the drug in the pre-aerosolized solution, but does not specify the dose delivered to the patient." Ex. 2052 (Waxman Decl.) at ¶ 65; *see also id.* at ¶ 79 (repeating this argument). As I explained above, this argument is flawed because the '793 Patent makes no distinction between the dose based on the concentration in the pre-aerosolized solution and the actual dose delivered to the patient (much less the dose deposited in the lungs), and Voswinckel JESC expressly discloses the concentrations of treprostinil delivered to and inhaled by the patients. *See* ¶¶ 38, 41, 42 above. Dr. Waxman also criticizes my First Declaration for "improperly imput[ing] a dosage to the teaching of Voswinckel JESC," based on four reasons that each fail for the reasons explained below. Ex. 2052, ¶ 65.

60. First, Dr. Waxman asserts that "disclosure of a nebulization rate, concentration and time is insufficient for a POSA to determine the actual dose delivered by a continuous nebulizer." *Id.* at ¶ 66. However, this dose calculation method was standard in the art in May 2006, and even the '793 Patent appears to use a similar method. *E.g.*, Ex. 1001 at 9:5-23 (listing administration rates and lengths of

51

Liquidia's Exhibit 1106
Page 51

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

time).  Dr. Waxman again contends that a POSA would need to account for numerous

variables such as gas flow and pressure (Ex. 2052, ¶ 66), but as I explained above,

this argument is flawed because POSAs in 2006 would not have accounted for these

variables in clinical practice, and in any event would have understood that the prior

art references already accounted for such variables.  *See* ¶ 44 above.

61.    Second, Dr. Waxman opines that "the relevant parameters for

determining a single event dose can vary significantly not only between

manufacturers, but also between nebulizers from the same manufacturer."  Ex. 2052

(Waxman Decl.) at ¶ 67.  He criticizes Voswinckel JESC for not providing "a

catalogue number, or any identifying information that would allow a person of

ordinary skill in the art to determine the particular OptiNeb ultrasound [sic] nebulizer

that was used by the authors."  *Id.*; *see also id.* at ¶ 68.  I disagree that determining

"the particular OptiNeb ultrasound [sic] nebulizer" would have been necessary to

determine the single event dose administered in Voswinckel JESC.  In my clinical

experience, the average nebulization rate for continuous nebulizers in the 2006

timeframe was 0.5 to 0.6 mL/min.  *E.g.*, Ex. 1037 at 28 (disclosing a nebulizing rate

of 0.6 mL/min).  A POSA would not have needed to determine a precise dosage

amount to deliver to a specific patient, and instead would have targeted the dosage

range known to achieve therapeutic effect in the average patient, based on a

nebulization rate of 0.5 to 0.6 mL/min.  Voswinckel JESC's disclosure of an

Liquidia's Exhibit 1106
Page 52

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

"OptiNeb, ultrasound [sic] nebulizer Nebu-tec, Germany)" is therefore more than

sufficient to determine the single event dose, as explained in my First Declaration.

Exs. 1007 and 1091 at Methods; Ex. 1002 (Hill First Decl.) at ¶¶ 67, 99.  In fact, the

'793 Patent contains a nearly identical disclosure regarding the nebulizer used—

"OPTINEB® ultrasonic nebulizer (Nebutec, Elsenfeld, Germany)"—without

specifying any particular model number.  Ex. 1001 at 12:57-58, 14:35-37, 16:23.

Thus, applying Dr. Waxman's logic, the '793 Patent does not provide sufficient

information to determine the dosage amount of a single event dose.  The same is true

for the Bourge 2013 reference relied upon by Dr. Waxman, which merely discloses

an "OPTINEB® device (Nebu-Tec, Elsenfeld, Germany)."  Ex. 2035 (Bourge) at 39;

*see* Ex. 2052 (Waxman Decl.) at ¶ 43.

62.    Further, Dr. Waxman is wrong to characterize the OptiNeb® User

Manual 2005 as "undated" (Ex. 2052, ¶¶ 67-68).  Counsel informs me that Liquidia

submitted an Affidavit from Christopher Butler attesting to the date of the OptiNeb®

User Manual, thereby establishing its date.  Ex. 1087.  And in any event, a POSA

reading Voswinckel JESC would have consulted the OptiNeb® User Manual 2005

and found that the relevant model in that time frame was OPTINEB®-ir, ON-100/2-

2.4 MHz.  *See* Ex. 1037 at 2; *see* Ex. 1002, ¶ 67.

63.    It does not matter that the OptiNeb® User Manual 2005 "lacks any

discussion of suitable doses for drug delivery" (Ex. 2052, ¶ 68) because I only rely on

Liquidia's Exhibit 1106
Page 53

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

it to confirm my opinion that the "baseline, common sense expectation of a POSA

that at least 1 mL of solution would be nebulized over 6 minutes . . . ." Ex. 1002, ¶

99. In fact, it appears almost certain that the nebulized volume in Voswinckel JESC

was 3.6 mL over the 6 minutes of administration since the Manual cites 0.6 ml/min as

the nebulization rate. *See* Ex. 1002, ¶¶ 67, 99 & n.3; *see also* Ex. 1037 at 28

(disclosing a nebulizing rate of 0.6 mL/min); *see also* Ex. 1108 (Waxman Depo. Tr.)

at 153:8-14 (explaining standard nebulizers in 2006 hold between 3-5 mL of volume);

*id.* at 153:15-22 (stating "[t]he standard nebulizer being what was used for treatment

of asthma and COPD generally, yes, would take 3 to 5 [mL]s of solution").

64.     Third, Dr. Waxman criticizes my statement that I have "prescribed

volumes of a[t] least 1 mL for inhalation therapy using nebulizers" (Ex. 1002, ¶ 65)

for not "tak[ing] into account the particular drug to be administered or the

concentration of that drug solution." Ex. 2052, ¶ 69. Again, Dr. Waxman's criticism

ignores common sense conclusions that a POSA would have drawn based on the prior

art and his or her general background knowledge. *E.g.,* Ex. 1037 at 28 (disclosing a

nebulizing rate of 0.6 mL/min); *cf.* Exs. 1007 and 1091 at Methods (disclosing that

patients inhaled treprostinil for 6 minutes using the OptiNeb® device). The fact that

inhaled solutions can be administered in at least 1 mL volumes is the critical issue

because a nebulizer can function appropriately with that volume.

Liquidia's Exhibit 1106
Page 54

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

65.    Additionally, administering a drug volume of at least 1 mL was standard

practice for nebulizers generally in May 2006 and remains standard today.  While Dr.

Waxman testified he does not think he has delivered only 1 mL, he confirmed as of

2006 that does not think he ever used less than 1 mL.  Ex. 1108 (Waxman Depo. Tr.)

at 156:12-16.  He also confirmed standard nebulizers used volumes of at least over 1

mL:

> "[I]f you are talking about a standard nebulizer, generally,
> they hold 3 to 5 [ml] in the old style nebulizer, and the
> Aerogen nebulizer, I think, holds about 3 to 5 [ml] as well.
> . . .
> The standard nebulizer being what was used for treatment
> of asthma and COPD generally [as of 2006], yes, would take
> 3 to 5 [mL] of solution."

Ex. 1108 at 153:1-22.  Dr. Waxman further confirmed that Ventavis®, which at the

time of the '793 Patent was the only approved inhaled prostacyclin—was delivered

using 1 and 2 mL volumes in a nebulizer.  *Id.* at 163:7-18.  Thus, even at the high end

(5 mL) of Dr. Waxman's understanding of the volumes delivered by standard

nebulizers, Voswinckel JESC discloses doses in the claimed range (16 µg/mL * 5 mL

= 80 µg dose).

66.    Fourth, Dr. Waxman yet again points to the different pharmacokinetic

effects of continuous dosing compared to acute dosing, asserting that the number of

breaths used in Voswinckel JESC would exceed the claimed "1 to 3 breaths."  Ex.

2052, ¶¶ 70-71.  This point is moot because I do not rely on Voswinckel JESC for the

Liquidia's Exhibit 1106
Page 55

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

claim limitation reciting "delivered in 1 to 3 breaths." *See* Ex. 1002 (Hill First Decl.)

at ¶¶ 101-104 (relying on Voswinckel JAHA's teachings regarding administration in

"3 single breaths"); *see also* ¶ 49 above.  Dr. Waxman again mischaracterizes my

deposition testimony regarding "apples to oranges," leaving out my clarification that

a POSA would have known to up-titrate the dose to reach the claimed range. *See* Ex.

2055 at 100:15-25; *see also id.* at 174:2-176:16.

67.    For the foregoing reasons, Dr. Waxman's critique of Voswinckel JESC

in isolation fails to rebut my opinions demonstrating the obviousness of Claims 1-8.

### 3.    Dr. Waxman's Isolated Critique of Voswinckel JAHA Fails to Rebut My Obviousness Opinions

68.    For his individualized assessment of Voswinckel JAHA, Dr. Waxman

repeats several of the same arguments he made for the '212 Patent and Voswinckel

JESC.  First, he complains again that Voswinckel JAHA discloses a "pre-aerosolized

concentration" of treprostinil rather than '793 Patent, the prior art, and the standards

for clinical practice in 2006 and today a "therapeutically effective single event dose

of 15 micrograms to 90 micrograms." Ex. 2052 (Waxman Decl.) at ¶ 72; *see also id.*

at ¶ 79 (repeating this argument).  As I repeatedly explained, this argument is

unfounded because it contradicts the teachings of the '793 Patent, the prior art, and

the standards for clinical practice in 2006 and today.  *See* ¶¶ 38-41 above.  Second,

Dr. Waxman again asserts that Voswinckel JAHA does not provide the "critical

Liquidia's Exhibit 1106
Page 56

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

details" allegedly needed to determine the single event dose. Ex. 2052, ¶ 73. But

these "critical details" are also missing from the '793 Patent, and a POSA in fact

would not have accounted for these details in clinical practice. *See* ¶¶ 44, 46 above.

69.    Dr. Waxman further asserts that Voswinckel JAHA does not adequately

describe how to coordinate breaths with the pulses of the nebulizer. Ex. 2052

(Waxman Decl.) at ¶ 74. However, the '793 Patent used the same nebulizer as

Voswinckel JAHA—the OptiNeb® ultrasonic nebulizer—and also does not disclose

anything about how a patient should coordinate his/her breaths with the pulses. *See*

Ex. 1001 ('793 Patent) at 12:57-58 ("All inhalations were performed with the

OPTINEB® ultrasonic nebulizer (Nebutec, Elsenfeld, Germany)."); *see also id.* at

12:30-42 ("TRE was inhaled with a pulsed ultrasonic nebulizer, mimicking a metered

dose inhaler"); *see also id.* at 14:35-36 ("The aerosol was generated by a pulsed

ultrasonic nebulizer (OPTINEB®, Nebutec, Elsenfeld, Germany)"); *see also id.* at

claim 3 (reciting a "pulsed ultrasonic nebulizer"); Exs. 1008 and Ex. 1093 at Methods

("Patients received a TRE inhalation by use of the pulsed OptiNeb® ultrasound [sic]

nebulizer . . . ."). Indeed, the '793 Patent states that the disclosed invention provides

a kit that can include "instructions on how to use the metered dose inhaler," including

"information on how to coordinate patient's breathing, and actuation of the inhaler,"

but the specification itself fails to disclose these instructions. Ex. 1001 at 8:20-27.

Nonetheless, as I discussed above in ¶¶ 43-44, a POSA would reasonably conclude

Liquidia's Exhibit 1106
Page 57

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

that the authors of Voswinckel JAHA properly instructed patients on administration

of the inhaled treprostinil therapy, including how to coordinate breaths with the pulses

of the nebulizer.  Therefore, Dr. Waxman cannot legitimately opine that Voswinckel

JAHA is required to disclose more information than the'793 Patent.  Further, it is my

opinion that a POSA in 2006 would have known how to instruct patients to coordinate

their breaths with the pulses in accordance with Voswinckel JAHA.  The OptiNeb®

device has a feature indicating when patients should inhale, and in my experience,

patients learn how to use the device quickly.

70.    For the foregoing reasons, Dr. Waxman's critique of Voswinckel JAHA

in isolation fails to rebut my opinions demonstrating the obviousness of Claims 1-8.

**4.    Dr. Waxman Never Considers the Combination of the Prior
Art Disclosures**

71.    Following the 17 pages providing an overview of the prior art references

individually, Dr. Waxman spends less than 8 pages purporting to address the

combination of the '212 Patent, Voswinckel JESC, and Voswinckel JAHA.  Ex. 2052

(Waxman Decl.) at § V.B; *cf. id.*, § V.A.  He states that he considers the three

references "individually or together," but then proceeds to address each reference

individually.  *See id.* at ¶¶ 76-78, 86; *see also generally* ¶¶ 75-86.  He even states:

"Because none of the references individually disclose a dose from 15 to 90 μg, the

combination of the three references do not, either."  *Id.* at ¶ 79.  Dr. Waxman never

Liquidia's Exhibit 1106
Page 58

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

evaluates the three references as a combination, in the context of a POSA's

background knowledge and common sense.   Much of Dr. Waxman's purported

analysis of the prior art "combination" is repetitive of the points he made with respect

to the individual references, which I address above.   He presents a few additional

arguments that I address below.

72.    Dr. Waxman criticizes the Geller 2003 (Ex. 1034) reference, which I rely

on to support my opinion that a POSA would have had a reasonable expectation of

success in reducing the number of breaths when delivering 15-90 micrograms of

treprostinil.   Ex. 2052 (Waxman Decl.) at ¶ 81; Ex. 1002 (Hill First Decl.) at ¶ 102.

As noted in my First Declaration, Geller 2003 specifically noted the efficiency benefit

from reducing administration of a cystic fibrosis drug to three inhalations.   Ex. 1002,

¶¶ 81, 102; Ex. 1034 (Geller 2003) at Abstract (reporting that bolus inhalation of

rhDNase in three breaths provided a "more efficient delivery system" and was

"feasible, reasonably well-tolerated, and associated with improvement in pulmonary

function").   Dr. Waxman dismisses Geller 2003 as "irrelevant" simply because the

rhDNase molecule is "much larger" than treprostinil and "designed to treat a different

disorder . . . ."  Ex. 2052, ¶ 81.   I disagree that the size of the molecule and disease

indication make the teachings of Geller 2003 wholly irrelevant here, particularly

because rhDNase—like treprostinil—is a liquid formulation administered by

nebulizer.  *See* Ex. 1034 (Geller 2003) at 176.   During his deposition, Dr. Waxman

Liquidia's Exhibit 1106
Page 59

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

also relied on the teachings of inhalers for other diseases, explaining he expected that

the benefits, including ease of use, afforded by powder inhalers for diseases such as

asthma and COPD would translate to treatments for pulmonary hypertension.  *See* Ex.

1108 at 146:2-14.  Moreover, Dr. Waxman is wrong to state that I rely on only two

additional references to support my expectation of success arguments—I also cite

Chaudry 2004 (Ex. 1028);[16] Ex. 2052, ¶ 81 (referring to "two additional references");

Ex. 1002, ¶ 81 (also citing Chaudry 2004 to demonstrate that "breaths and/or

administration time could be reduced without sacrificing therapeutic efficacy").[17]

73.    Dr. Waxman further asserts that a single event dose "should be found

using laboratory testing."  Ex. 2052, ¶ 82.  However, the claims here are method of

treatment claims—not formulation claims.  *See* Ex. 1001 at claims 1-8.  Therefore, in

my opinion, the claimed single event dose can be determined by a clinician, not in the

laboratory.    And  in  clinical  practice,  calculating  dosage  amount  using  drug

---

[16] Dr. Waxman does mention Ghofrani in passing, but does not offer any opinion regarding it.  Ex. 2052 (Waxman Decl.) at ¶ 81.  He fails to mention Chaudry 2004 at all.  *See id.*

[17] Dr. Waxman states that "Petitioner erroneously asserts that EX1034 [Geller 2003] teaches 'delivery of 0.45 mg of drug in 3 breaths.'"  Ex. 2052 (Waxman Decl.) at ¶ 81 n.10.  It is unclear what Dr. Waxman is referring to, as this assertion appears nowhere in my First Declaration.  Nonetheless, I do not rely on Geller 2003 for teaching the claimed single dose event; I cite it to support my opinion that a POSA would have expected success in reducing the number of breaths.  Ex. 1002, ¶¶ 81, 102.

Liquidia's Exhibit 1106
Page 60

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

concentration, nebulization time, and known volumes delivered by nebulizers is standard.

74.    Dr. Waxman asserts that "a POSA's knowledge of and concern about side effects weighs against any alleged motivation to combine" the three prior art references. Ex. 2052, ¶ 85. He argues that Voswinckel JESC "teaches away from using higher concentrations because the authors warn that at higher doses than 16 µg/ml, 'local and systemic side effects may occur.'" *Id.* However, the claims do not require "higher doses than 16 µg"[18]—they only require doses between 15 and 90 µg. Ex. 1001 at claims 1-8. Voswinckel JESC therefore does not "teach away" from the claimed dosage range; rather, it confirms that the claimed dose of 16 µg had no adverse effects, and merely notes that side effects may occur for higher doses. *See* Exs. 1007 and 1091 at Conclusion ("[A]t a concentration of 16 µg/ml, near maximal pulmonary vasodilatation is achieved without adverse effects. At higher doses, local and systemic side effects may occur . . . ."). Further, Voswinckel JESC stated that the side effects above 16 µg/ml were "mild and transient," with just one exception of a major headache that resolved after one hour. Exs. 1007 and 1091 at Results (stating

---

[18] As previously noted, a POSA would have known that the 16 µg/ml concentration disclosed in Voswinckel JESC corresponds to a dose of 16 µg, due to the common sense expectation that at least 1 mL of solution would be nebulized over 6 minutes. Ex. 1002, ¶ 99.

Liquidia's Exhibit 1106
Page 61

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

that one patient "complained of major headache for 1 hour"). In my experience, side

effects are common and expected with dose increases, and would not have deterred a

POSA from relying on Voswinckel JESC's teachings regarding treprostinil dosage

amounts. Potential side effects are always weighed against potential clinical benefit,

and pulmonary arterial hypertension is a serious, life-threatening disease where

physicians and patients are more willing to tolerate side effects (particularly "mild

and transient" side effects) to obtain clinical benefit. The single case of a 1-hour major

headache would not have deterred a POSA in 2006 from relying on Voswinckel JESC

because the risk of this side effect would have been far outweighed by the potential

clinical benefit of the dosing regimen disclosed in Voswinckel JESC. *See* Exs. 1007

and 1091 at Conclusion ("Treprostinil inhalation results in a significant long-lasting

pulmonary vasodilatation.").[19]

75.     Despite his Declaration, Dr. Waxman appears to agree with me that a

POSA would not be discouraged by the mild and transient side effects disclosed in

---

[19] I note that Dr. Waxman relies on McLaughlin 2003 in his Declaration as disclosing systemic side effects for intravenous epoprostenol and intravenous treprostinil. Ex. 2052 (Waxman Decl.) at ¶ 99; *see also* Ex. 2036 (McLaughlin 2003) at 295 (describing side effects such as headache, nausea, chest pain, jaw pain, backache, and restlessness). As I explained in paragraph 55 above, that reference discloses a dose within the claimed dosage range of the '793 Patent. And despite describing side effects, the McLaughlin 2003 reference still used this dose further evidencing that side effects would not deter a POSA from relying on teachings about doses.

Liquidia's Exhibit 1106
Page 62

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Voswinckel JESC.  *See* Ex. 1108 (Waxman Depo. Tr.) at 97:13-16 ("Q  Would you

consider a mild and transient adverse event to be significant?  A.  I would not consider

it serious.  I would just consider it an adverse event"); *see also* Ex. 1109 (McConville

Depo. Tr.) at 204:8-13 (Dr. McConville explaining that Voswinckel JESC describes

"[t]he drug has an effect and the authors don't think the . . . adverse effects are too

bad.  So you know, I can see that it could be used by inhalation from this abstract.").

Indeed, Dr. Waxman testified that the adverse events disclosed in Voswinckel JESC

were "[t]he same" as those observed with Tyvaso® with "two of the adverse events

[listed in Voswinckel JESC] also listed in the [Tyvaso®] label." Ex. 1108 at 99:7-14.

He further confirmed that in his own practice in using Tyvaso®, he has observed

similar side-effects to those disclosed by Voswinckel JESC (*i.e.*, headache and

cough).  Ex. 1108 at 101:19-102:10; Exs. 1007 and 1091 at Results.  At least some of

Dr. Waxman's patients who experienced headaches and cough side effects continued

on Tyvaso® treatment because, according to Dr. Waxman, "[u]sually the headache

goes away" and "there are things that can be done to help ameliorate the cough so in

general we are able to get over that issue." Ex. 1108 at 101:19-102:10.  Thus, even

Dr. Waxman's own practice indicates the side-effects disclosed in Voswinckel JESC

would not discourage a POSA from applying the teachings of Voswinckel JESC.

76.    Even the '793 Patent discloses side effects resulting from treprostinil

treatment similar to those described in the prior art.  Ex. 1001 ('793 Patent) at 16:6-

Liquidia's Exhibit 1106
Page 63

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

11 ("Other side effects were flushing (n=1; 30 μg TRE), mild transient cough (n=3;

60 μg TRE), mild transient bronchoconstriction that resolved after one inhalation of

fenoterol (n=1; 30 μg TRE), moderate bronchoconstriction that resolved after one

inhalation of fenoterol) (n=1, 120 μg TRE), and severe headache (n=1; 120 μg

TRE)."). The same is true for Tyvaso®, Remodulin®, and Ventavis®—the labels for

these drugs disclose side effects similar to, or more severe than, those in Voswinckel

JESC. Ex. 1043 (Tyvaso® 2009 Label) at 1 ("Most common adverse reactions (≥

10%) are cough, headache, nausea[,] dizziness, flushing, throat irritation,

pharyngolaryngeal pain and diarrhea."); *see id.* at 4 (noting an "increased risk of

bleeding" with Tyvaso®); *see also id.* at 5 (describing adverse reactions in clinical

trial patients, including cough in 54% of patients and headache in 41% of patients);

Ex. 1018 (Remodulin® 2004 Label) at 6-7 (listing precautions); *see also id.* at 7

(reporting severe adverse reactions in 38% of Remodulin® patients); *see also id.* at 8

(reporting adverse reaction of headache in 27% of Remodulin® patients); Ex. 1029

(Ventavis® 2005 Label) at 8-10 (listing precautions); *see also id.* at 10 (reporting

adverse reaction of increased cough and headache in roughly 39% and 30% of

Ventavis® patients, respectively[20]); *see also id.* at 11 (stating that 32% of Ventavis®

---

[20] I further note that the ***placebo*** group in the Ventavis® clinical trial experienced
increased cough and headache in roughly 26% and 20% of patients, respectively. Ex.
1029 (Ventavis 2004 Label) at 10. The reported 39% and 30% incidences of increased

Liquidia's Exhibit 1106
Page 64

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

patients failed to reach the highest scheduled dose).  In particular, coughing and

headaches are well-known, tolerable side effects that are not causes of death—unlike

untreated pulmonary arterial hypertension.  Therefore, a POSA would not have been

discouraged by the mild and transient side effects disclosed in the prior art, and instead

would have been motivated to administer the claimed dosing regimen to achieve the

reported clinical benefits.

      77.    Similarly, a POSA would not have been discouraged by the "significant

side effects" associated with iloprost (*see* Ex. 2052, ¶ 85), because Voswinckel JESC

taught that treprostinil had only "mild and transient" side effects at doses above 16 μg

(with a single exception), and no side effects at doses below 16 μg.  Exs. 1007 and

1091 at Methods, Results.  Nor would a POSA have been discouraged by the "small

data set" reporting no long-term side effects in Voswinckel JAHA; if anything, this

finding would have encouraged a POSA to administer a single event dose of

treprostinil at 15-90 micrograms in 1 to 3 breaths.

      78.    For these reasons, Dr. Waxman's purported obviousness analysis falls

short of rebutting the opinions set forth in my First Declaration.

---

cough and headache, respectively, in patients receiving Ventavis®, therefore, includes
adverse events unrelated to Ventavis®.

Liquidia's Exhibit 1106
Page 65

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

### C.    Ground 2:  Claims 1-8 Are Obvious Over the '212 Patent and Voswinckel JESC

79.    Dr. Waxman's opinions regarding obviousness over the '212 Patent and Voswinckel JESC are likewise unconvincing.  Ex. 2052 (Waxman Decl.) at ¶¶ 87-91. As explained in my First Declaration, a POSA would have relied on the '212 Patent, Voswinckel JESC, and routine optimization to deliver 15-90 micrograms of treprostinil in 1 to 3 breaths.  Ex. 1002, ¶¶ 126-131.  Dr. Waxman disagrees because he states that "a POSA was well aware of the local and systemic side effects associated with high dosages of [T]reprostinil . . . ."  Ex. 2052, ¶ 88; *see also id.* at ¶ 90 (repeating argument regarding side effects).  However, as I explained above, the prior art only taught that "mild and transient" side effects "may occur" at doses "higher" than 16 µg.  Exs. 1007 and 1091 at Results, Conclusion; *see* ¶¶ 74-76 above.  Claims 1-8 do not require doses above 16 µg, and at minimum, a POSA would have understood that doses in the claimed 15-16 µg range would have minimal risk of insignificant side effects.  *See* ¶¶ 74-76 above; Ex. 1001 at claims 1-8.  Further, the reports of "mild and transient" side effects at doses above 16 µg would not have dissuaded a POSA from following the teachings of Voswinckel JESC to administer the claimed 15-90 µg of treprostinil, given the expected nature of such side effects in clinical practice.  *See* ¶¶ 74-76 above; *see also* Ex. 1001 ('793 Patent) at 16:6-11 (disclosing similar side effects); Ex. 1108 (Waxman Depo. Tr.) at 97:13-16 ("Q.  Would you consider a mild

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

and transient adverse event to be significant?  A. I would not consider it serious.  I would just consider it an adverse event."); *id.* at 101:16-102:10 (Dr. Waxman explaining he has treated patients who experienced headache and cough while using Tyvaso, but "[u]sually the headache goes away" and "there are things that can be done to help ameliorate cough so in general we are able to get over that issue").

80.    Dr. Waxman does not address my opinion that a POSA in 2006 would have been motivated to reduce the number of breaths "[d]ue to known problems with patient adherence . . . ."  Ex. 1002 (Hill First Decl.) at ¶¶ 128, 130; Ex. 1047 (Hoeper 2000) at 1867; Ex. 1048 (Walmrath 1993) at 962; Ex. 1032 (Bender 1997) at 179-80; Ex. 1065 (Olschewski 2002) at 328; Ex. 1028 (Chaudry 2004) at [0063].  Instead, Dr. Waxman repeats his criticism of Geller 2003, which fails for the reasons I stated above.  Ex. 2052, ¶ 89; *see* ¶ 72 above.  Further, my deposition testimony cited by Dr. Waxman actually supports that a POSA would have relied upon Geller 2003 to reduce the number of breaths when administering treprostinil.  Ex. 2055 at 137:20-25 ("[T]he fundamental principles of using nebulizers is pretty much the same."); *id.* at 139:1-2 ("[T]he basic principles of nebulization . . . would be the same."); *id.* at 140:13-15 ("[T]hese principles related to nebulization have been understood for a while.").  Additionally, even assuming there are "different considerations in determining whether a particular medication is suitable through a particular mode of administration when treating different diseases" (Ex. 2052, ¶ 89), this would not have discouraged a

67

Liquidia's Exhibit 1106
Page 67

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

POSA from applying routine optimization to administer 15-90 µg in 1 to 3 breaths

based on the teachings of the '212 Patent in combination with Voswinckel JESC.  *See*

Ex. 1002 (Hill First Decl.) at ¶¶ 126-131.

81.    For these reasons, Dr. Waxman's analysis fails to rebut my opinions

regarding the obviousness of Claims 1-8 over the '212 Patent and Voswinckel JESC.

**D.    Grounds 3-6:   Dr. Waxman Provides No Opinions Regarding
Invalidity Based on Ghofrani and/or Voswinckel 2006**

82.    Dr. Waxman does not address the over 10 pages of my First Declaration

regarding invalidity based on Ghofrani and/or Voswinckel 2006.  *See* Ex. 1002,

§§ VII.D-G (addressing anticipation by Ghofrani, obviousness over Voswinckel

JAHA in view of Ghofrani, anticipation by Voswinckel 2006, and obviousness over

Voswinckel 2006 in view of the '212 Patent).  Instead, Dr. Waxman simply states: "I

have been advised that Voswinckel 2006 and Ghofrani are not qualifying prior art,

which causes Grounds 3-6 to fail."  Ex. 2052 (Waxman Decl.) at ¶ 46.

83.    Thus, I understand that, as long as Ghofrani and Voswinckel 2006 are

found to be prior art, Dr. Waxman has conceded that my opinions regarding these two

references establish the invalidity of the claims on Grounds 3-6 with respect to these

two references.  I reserve the right to supplement my opinions to the extent Dr.

Waxman offers opinions regarding validity based on Ghofrani and Voswinckel 2006.

Liquidia's Exhibit 1106
Page 68

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

### E.     Dr. McConville Like Dr. Waxman Fails to Rebut My Obviousness Opinions

84.     I have also reviewed the Declaration of Dr. Jason McConville (Ex. 2053).  His Declaration responds primarily to the opinions of Dr. Gonda, but also to certain opinions presented in my First Declaration.  Dr. McConville's responses to my opinions are largely repetitive of Dr. Waxman's opinions.  Like Dr. Waxman, Dr. McConville addresses the prior art references in isolation, and appears to never consider their teachings in combination and in light of a POSA's general background knowledge.  I address Dr. McConville's opinions as appropriate below.

85.     Dr. McConville first points to the fact that one-third of the patients overall in Voswinckel JESC had side effects. Ex. 2053 (McConville Decl.) at ¶¶ 45-46.  But, as Dr. McConville expressly acknowledges, Voswinckel JESC reported "no significant adverse events" for concentrations at 16 µg/ml (i.e., doses of 16 µg), and this dose falls within the claimed 15-90 µg dosing range.  *See id.*; *see also* ¶¶ 74-76 above.  Dr. McConville also ignores the fact that Voswinckel JESC stated that the side effects for doses above 16 µg were only "mild and transient," with one exception for a patient who complained of a major headache for one hour.  *See* Exs. 1007 and 1091 at Methods; *see also* ¶¶ 74-76 above.  In my opinion, these side effects are typical and would not have deterred a clinician from administering inhaled treprostinil according to the teachings of Voswinckel JESC, especially given the life-threatening

69

Liquidia's Exhibit 1106
Page 69

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

nature of pulmonary arterial hypertension and the clinical benefits reported by Voswinckel JESC. *See* ¶¶ 74-76 above; *see also* Exs. 1007 and 1091 at Conclusion ("Treprostinil inhalation results in a significant long-lasting pulmonary vasodilatation"); Ex. 1108 (Waxman Depo. Tr.) at 97:13-16 ("Q. Would you consider a mild and transient adverse event to be significant? A. I would not consider it serious. I would just consider it an adverse event."); *id.* at 101:16-102:10 (Dr. Waxman explaining he has treated patients who experienced headache and cough while using Tyvaso, but "[u]sually the headache goes away" and "there are things that can be done to help ameliorate the cough so in general we are able to get over that issue"). With the applied technology, at a concentration of 16 µg/ml, near maximal pulmonary vasodilatation is achieved without adverse effects.").

86.    As I understand, furthermore, Dr. McConville is not a physician, has never seen a patient use a nebulizer (Ex. 1109 (McConville Depo. Tr.) at 218:13-16) and when asked about the Voswinckel JESC adverse events, he explained he could not "come to a clinical conclusion . . . ." *Id.* at 202:13-19. Contradicting his declaration opinion on side effects, Dr. McConville further admitted that Voswinckel JESC describes "[t]he drug has an effect and the authors don't think the . . . adverse effects are too bad. So, you know, I can see that it could be used by inhalation from this abstract." *Id.* at 204:8-13.

70

Liquidia's Exhibit 1106
Page 70

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

87.    Dr. McConville next criticizes Voswinckel JAHA, asserting that I "have not shown that the POSA would interpret the 'pulsed' feature [of Voswinckel JAHA] in any particular way, let alone what that interpretation would be." Ex. 2053 (McConville Decl.) at ¶ 47; *see also id.* at ¶ 82. As I explained above, a POSA in 2006 would have known how to instruct patients to use the "pulsed feature" of Voswinckel JAHA, including, for example, how to coordinate their breaths with the pulses. *See* ¶ 69 above. And as discussed above, a POSA would have reasonably assumed that the authors of Voswinckel JAHA conducting the study with support from LungRx would have instructed patients properly on the use of the "pulse" feature. *See id.* Further, the '793 Patent does not explain how to use the "pulsed feature" of the OPTINEB® ultrasonic nebulizer described in the Examples. Dr. McConville's reasoning thus demands more of Voswinckel JAHA than the '793 Patent discloses. *See* Ex. 1001 ('793 Patent) at 12:57-58, 12:30-42, 14:35-36, claim 3; *see also id.* at 8:20-27; *see* ¶ 69 above.

88.    Dr. McConville further states that "Voswinckel JAHA describes a lack of side effects for the compassionate use patients over 3 months, of which there were only 2 patients." Ex. 2053, ¶ 48. However, a POSA in 2006 would have found this to be strong evidence that the claimed 15-90 µg of inhaled treprostinil delivered in 1-3 breaths would be safe and effective, as the 2 compassionate use patients received multiple inhalations at the high concentration of 600 µg/ml. Exs. 1008 and 1093 at

Liquidia's Exhibit 1106
Page 71

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Methods.  A POSA would not have dismissed this finding merely due to the "small

number" of patients; rather, a POSA would have concluded based on this finding that

nebulized pulsed delivery of high concentrations of treprostinil was a promising

therapeutic approach warranting further investigation.  *See id.* at Conclusion ("Long-

term treatment effects are very promising.").  Dr. McConville is also incorrect to state

that "Voswinckel JAHA does not describe, one way or the other, whether the

remaining 15 of 17 patients experienced any adverse effects."  Ex. 2053, ¶ 48.  Instead,

Voswinckel JAHA states clearly that, for all patients:

> Inhaled TRE shows strong pulmonary selective
> vasodilatory efficacy with a long duration of effect
> following single acute dosing.  Tolerability is excellent even
> at high drug concentrations and short inhalation times (3
> breaths).  Long-term treatment effects are very promising.

Exs. 1008 and 1093 at Conclusion.  A POSA would have understood this to mean that

treatment regimen was a safe and effective pulmonary vasodilator in the 15 remaining

patients.  And again, Voswinckel JAHA does discuss side effects, noting that "[n]o

side effects have been observed by the patients during long-term treatment."  *Id.* at

Results.  As such, if there were other side effects, a POSA would have presumed they

would be mentioned in the reference.

   89.    Like Dr. Waxman, Dr. McConville criticizes my single event dose

calculation based on the '212 Patent's disclosure regarding "peripheral vascular

disease."  Ex. 2053 (McConville Decl.) at ¶ 49.  As I explained above, a POSA reading

72

Liquidia's Exhibit 1106
Page 72

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

the '212 Patent still would have had a reasonable expectation that the PVD dose would

be similar to that used to treat pulmonary hypertension, because the dosing regimens

for these two disease states does not vary significantly in clinical practice. *See* ¶ 56

above.

      90.    Dr. McConville also complains that I did not "cite[] any examples or data

in the '212 [P]atent describing a specific device that was used to administer

treprostinil by inhalation to humans." Ex. 2053, ¶ 50. But, as I explained above, the

average nebulization rate for continuous nebulizers was known to be 0.5 to 0.6

mL/min in 2006, and a POSA would have relied on that knowledge to target a dosage

range that would be therapeutically effective for the average patient. *See* ¶¶ 61, 63

above. His point regarding the '212 Patent's use of tracheotomized sheep also fails

because the '212 Patent (which is a UTC patent) in fact covers methods of treating

humans. *See* Ex. 2053, ¶ 50; *see also* ¶ 52 above. Even the '793 Patent does not

specify which particular model of the OptiNeb® nebulizer was used. Dr. McConville

cannot demand more of the prior art than the '793 Patent discloses, and thus the "AM-

601 Medicator Aerosol Delivery System, by Healthline Medical in Baldwin Park,

California" would have been sufficiently specific to guide a clinician in 2006. *See* ¶¶

61, 63 above. In fact, the '793 Patent fails to identify any specific dry powder

inhaler—it merely states that "[t]he inhalation device can be also a dry powder

inhaler." Ex. 1001 at 7:22; *see also id.* at claim 4 (reciting a "dry powder inhaler").

Liquidia's Exhibit 1106
Page 73

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Dr. McConville's related argument regarding the "daily infusion dose" of the '212
Patent ignores the fact that I identify three separate ways a POSA could have arrived
at a dose within the claimed dosing regimen, including with up-titration of dosing and
patients who weigh more than 65 kg.  *See* Ex. 2053, ¶¶ 50, 52-53; *see also* ¶¶ 50-55
above.

91.    For Voswinckel JAHA, Dr. McConville expressly adopts Dr. Waxman's
opinion that a POSA would not have been able to determine the single event dose
without knowing various "critical details" regarding the pulsed Optineb device.  Ex.
2053, ¶¶ 51-52.  This argument fails for the reasons I articulated above at ¶¶ 43-47.

92.    Dr. McConville next criticizes Voswinckel JESC for "not provid[ing]
enough information" to teach delivering a single event dose of 15-90 µg of treprostinil.
Ex. 2053, ¶ 54; *see also id.* at ¶¶ 53-56.  Yet again, I disagree because POSAs in 2006
would have understood that the prior art references already accounted for the
identified "details."  *See* ¶¶ 43-44 above.  Further, even the '793 Patent fails to provide
the various details identified by Dr. McConville.  Ex. 2053, ¶ 55; *see also* ¶ 46 above.
I also disagree with Dr. McConville's contention that "[t]esting is required or
appropriate" to account for the various factors, because the claims recite methods of
treatment, not formulations.  Ex. 2053, ¶ 58; *see* ¶ 73 above.

93.    Dr. McConville is wrong to characterize the OptiNeb® User Manual
2005 as "undated" (*see* Ex. 2053, ¶¶ 74-75).  Counsel informs me that Liquidia

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

submitted an Affidavit from Christopher Butler (Ex. 1087). This Affidavit establishes

that the manual was publicly available in 2005. *See* ¶ 62 above.

94.     Dr. McConville argues that the Walmrath 1993 (Ex. 1048) and Hoeper

2000 (Ex. 1047) references do not support my opinion that a POSA "would have a

[sic] both increased drug concentrations and reduced breaths as a matter of routine

'titration.'" Ex. 2053, ¶ 90; *see also id.* at ¶¶ 84-90. He faults Walmrath 1993 and

Hoeper 2000 for "not say[ing] anything about titrating a number of breaths

downward." Ex. 2053, ¶ 85 (regarding Walmrath 1993); *see also id.* at ¶ 86 (regarding

Hoeper 2000). But this makes the mistake of treating Walmrath 1993 and Hoeper

2000 as anticipation references, whereas I only cite them to support my opinion that

a POSA in 2006 would have had general background knowledge regarding

"[o]ptimization of dosing time, frequency, and concentration . . . ." Ex. 1002 (Hill

First Decl.) at ¶ 130.[21]  Contrary to Dr. McConville's suggestion, I never cite to the

'212 Patent as "disclosing titration to effect" (Ex. 2053, ¶ 88)—I instead rely on a

POSA's background knowledge, supported by Walmrath 1993, Hoeper 2000, and a

number of other references, for this general concept. Ex. 1002, ¶¶ 36-39, 128, 130.

---

[21] Additionally, I only rely on Walmrath 1993 and Hoeper 2000 for my obviousness
opinion regarding the combination of the '212 Patent and Voswinckel JESC, but Dr.
McConville addresses these references in connection with my opinion regarding the
three-reference combination of the '212 Patent, Voswinckel JESC, and Voswinckel
JAHA. *See* Ex. 2053 (McConville Decl.) at § VI.A; *cf.* Ex. 1002, § VII.C.

Liquidia's Exhibit 1106
Page 75

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Dr. McConville also misses my point regarding how I altered administration time based on patient response (*see* Ex. 2053, ¶ 89); I never stated that I increase administration time to increase dose—I merely explain that dose optimization is a routine aspect of my clinical practice. *See* Ex. 1002, ¶ 130. Lastly, I disagree with Dr. McConville that a POSA "would be motivated to decrease the dose delivered to the patient in the face of side effects" (Ex. 2053, ¶ 90), because the prior art only taught that doses above 16 µg may result in "mild and transient" side effects (with one exception that would not have deterred a POSA), and such side effects were expected in clinical practice. *See* ¶¶ 74-76 above.

95.    Like Dr. Waxman, Dr. McConville fails to address my opinion that a POSA would have been motivated to reduce the number of breaths "[d]ue to known problems with patient adherence . . . ." Ex. 1002 (Hill First Decl.) at ¶¶ 128, 130; Ex. 1047 at 1867; Ex. 1048 at 962; Ex. 1032 at 179-80; Ex. 1065 at 328; Ex. 1028 at [0063].

96.    In sum, Dr. McConville's opinions add nothing of substance beyond those of Dr. Waxman, and thus also fail to rebut my obviousness opinions.

## VII.    SECONDARY CONSIDERATIONS DO NOT SUPPORT THE NON-OBVIOUSNESS OF CLAIMS 1-8

97.    I disagree with Dr. Waxman's opinions that secondary considerations, also known as objective indicia, establish the non-obviousness of Claims 1-8. Dr.

Liquidia's Exhibit 1106
Page 76

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Waxman only identifies two secondary considerations—long-felt but unmet need and

unexpected results.

98.     Regarding long-felt but unmet need, Dr. Waxman's opinions fail because

he never clearly identifies a long-felt but unmet need. Tyvaso® was never a first-line

therapy.[22] Rather, Tyvaso® is considered a "bridge medication," "add-on therapy,"

and/or "niche drug" that is used for a limited period of time in patients with mild to

moderate (but not severe) symptoms. *See* Ex. 2055 (Hill Depo. Tr.) at 30:6-9

(explaining "I use [Tyvaso] as a second- or a third-line agent in people who have not

achieved sufficient improvement to our satisfaction). PAH is a progressive disease

with severity increasing over time. Patients with mild symptoms start treatment with

dual therapy including an endothelin receptor antagonist (*e.g.*, ambrisentan) and a

PDE-5 inhibitor (*e.g.*, sildenafil). A subset of these patients may also receive

Tyvaso®. As the disease progresses, Tyvaso® is discontinued and patients move to

infusion therapies, such as Remodulin®. I personally manage approximately 120

pulmonary hypertension patients. Our clinical center manages approximately 4 times

that number. Of these patients, only about 5-10% receive Tyvaso® at any given time.

---

[22] A first-line therapy is a therapy that is accepted as the best or one of the best
treatments for a particular disease; by contrast, a second-line therapy is given when
the first-line therapy does not work sufficiently, stops working, or is not tolerated by
the patient.

Liquidia's Exhibit 1106
Page 77

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

Accordingly, I would expect that a stable rate of Tyvaso® prescriptions at the

population level would be due to patients coming on and off the drug at specific points

in time of their disease progression, such that a "homeostasis" is achieved.

99.     Also, Dr. Waxman's opinions rely exclusively on Tyvaso®, which he

asserts is a "commercial embodiment" of the '793 Patent but, in fact, does not have

the required nexus to the claims. *See* Ex. 2052, ¶¶ 92-97; *see also* ¶ 14 above. First,

Tyvaso® is not administered as a "therapeutically effective single event dose,"[23] as

required by Claims 1-8. Instead, Tyvaso® is administered chronically in "4 separate,

equally spaced treatment sessions per day," each "approximately 4 hours apart." Ex.

1088 (Tyvaso® Label 2021) at 2. The clinical studies supporting the approval of

Tyvaso® did not examine therapeutic effectiveness after a single dose session; they

only examined therapeutic effectiveness after multiple weeks of regular repeated

administration of Tyvaso®. *Id.* at 10 (stating that the primary efficacy endpoint of

the TRIUMPH I trial was "the change in 6-Minute Walk Distance (6MWD) relative

---

[23] While neither the phrase "therapeutically effective single event dose" or "single event dose" appear in the '793 Patent specification, the phrase "single event" appears twice. Ex. 1001 ('793 Patent) at 7:55-59, 7:60-67. Claim 1 of the '793 Patent expressly recites that a single event dose is administered in "1 to 3 breaths." Based on these disclosures, a POSA would have understood that a "single event dose" refers to a dose of inhaled treprostinil delivered in a single dose session. While I do not agree with Dr. Waxman's opinion that the '212 Patent teaches a daily inhaled dose (Ex. 2052, ¶ 60), his opinion confirms that a "single event dose" is a single dose session.

Liquidia's Exhibit 1106
Page 78

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

to baseline at 12 weeks."); *see also id.* at 12 (stating that the primary efficacy endpoint of the INCREASE study was "the change in 6MWD measured at peak exposure (between 10 and 60 minutes after dosing) from baseline to Week 16."). Thus, there is no "therapeutically effective single event dose" of Tyvaso®. Second, even if a single event dose of Tyvaso® was therapeutically effective (it is not), Tyvaso® is not "delivered in 1 to 3 breaths," which is also required by Claims 1-8. Rather, the target maintenance dose for Tyvaso® is "9 to 12 breaths per treatment session, 4 times daily," with a minimum maintenance dose of 54 μg per "treatment session." Ex. 1088 at 1; *see also id.* at 8. The "9 to 12 breaths" for Tyvaso® plainly exceeds the claimed "1 to 3 breaths." Ex. 1001 ('793 Patent) at claims 1-8. Accordingly, Tyvaso® does not have the required nexus to the claims, and Dr. Waxman's argument regarding long-felt but unmet need based on Tyvaso® does not support non-obviousness. For these reasons, Dr. Waxman's argument that Tyvaso® was a significant advance over other available treatments for pulmonary hypertension because it did not and does not need to be administered as frequently is irrelevant because it is not administered in 1-3 breaths. Ex. 2052, ¶ 94.

100.    Dr. Waxman further argues that "[i]nhaled treprostinil is also approved to treat a broader range of pulmonary hypertension patients than the therapeutics available at the time of the invention." *See id.* at ¶ 95; *see also id.* at ¶ 96. But Tyvaso® was only approved for treating interstitial lung disease in 2021—not by May

79

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

2006, and Dr. Waxman has not shown that the '793 Patent describes treatment of patients with PH-ILD. Indeed, during his deposition in the parallel district court proceeding, Dr. Waxman explained that the claims of the '793 Patent are restricted to pulmonary arterial hypertension and exclude other groups of pulmonary hypertension, including Group 3 in which PH-ILD falls. *See* Ex. 1132 (Waxman District Court Depo. Tr.) at 116:9-119:12. Thus, no nexus between the '793 Patent claims and interstitial lung disease exists. *See* Ex. 1088 at 1; *see also* Ex. 2060.

101. In paragraph 97, Dr. Waxman alleges that a publication by McLaughlin et al. acknowledges a long-felt but unmet need for the alleged invention of the '793 Patent. I disagree. Dr. Waxman misquotes McLaughlin 2003—the cited quote is actually from Roscigno 2021. *See* Ex. 2052, ¶ 97; *see generally* Ex. 2036; *cf.* Ex. 2085 ("Roscigno 2021") at Abstract. In any event, Roscigno 2021 does not support the non-obviousness of Claims 1-8 because it describes LIQ861, which, like Tyvaso®, does not have the required nexus to Claims 1-8. LIQ861 is not administered as a "therapeutically effective single event dose," and thus does not satisfy the claims. Indeed, Roscigno 2021 only discusses therapeutic effectiveness in the context of the INSPIRE study for LIQ861, which assessed exercise capacity, risk, scoring, and quality of life after two months—not after a single event dose. *See* Ex. Ex. 2085 at 5. Therefore, the quoted statement regarding LIQ861 cannot demonstrate long-felt but unmet need for the Claims 1-8.

**Appx2974**

Liquidia's Exhibit 1106
Page 80

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

102.   Furthermore, the fact that the '793 Patent issued in July 2020, over 10 years after Tyvaso® was approved in July 2009, undermines Dr. Waxman's argument that Tyvaso®, much less the invention claimed in the '793 Patent, satisfied a long-felt but unmet need in July 2009.  *See* Ex. 1043 (Tyvaso® Label 2009); *see generally* Ex. 1001.

103.   Regarding unexpected results, Dr. Waxman's arguments fail for a number of reasons.  First, he relies on McLaughlin 2003 (Ex. 2036) as evidence that "prostacyclins produced systemic side effects even with inhalation therapies" (Ex. 2052, ¶ 99)—but McLaughlin 2003 is directed to intravenous prostacyclins and is silent regarding inhaled prostacyclins.  *See generally* Ex. 2036.  McLaughlin 2003 is thus not the prior art that is most comparable or closest to the '793 Patent invention. A POSA would consider prior art on inhaled treprostinil to be the closest art.  As detailed in section VI above and my First Declaration (Ex. 1002), Voswinckel JESC, Voswinckel JAHA, Ghofrani, and Voswinckel 2006 are all prior art references that disclose inhaled treprostinil.

104.   Based on the information disclosed in Voswinckel JESC, Voswinckel JAHA, Ghofrani, and Voswinckel 2006, a POSA would not have found the invention claimed in the '793 patent to be unexpected or surprising.  Voswinckel JESC discloses "near maximal pulmonary vasodilatation is achieved without adverse effects" and that

81

Liquidia's Exhibit 1106
Page 81

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

the side effects at higher doses were mild and transient in nature.[24]  Exs. 1007 and

1091 at Results, Conclusion.  Ghofrani explains "it is possible to increase the dosage

to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects

occurring." Ex. 1010 at 298.  Both Voswinckel JAHA and Voswinckel 2006 discloses

no side effects were observed in patients treated long-term with inhaled treprostinil.

Exs. 1008 and 1093 at Results; Ex. 1009 at 150.  Voswinckel 2006 further states that

"[t]he drug was clinically effective, safe, and well-tolerated when 15 µg was inhaled

in 3 breaths 4 times daily." Ex. 1009 at 150.  A POSA in 2006 therefore would not

have jumped to the conclusion that inhaled treprostinil produced systemic side effects

simply based on McLaughlin 2003.  To the contrary, a POSA would have expected

local delivery of a drug by inhalation to be less toxic, and produce fewer side effects,

compared to systemic delivery by intravenous infusion.  Ex. 2055 (Hill Depo. Tr.) at

121:14-18 (explaining "the systemic effects of the inhaled route are, in general, less

than with the intravenous route").

105.  Second, a POSA would not have been discouraged from administering

the claimed dosing regimen due to side effects associated with iloprost (Ventavis®),

because as noted in the preceding paragraph, the prior art specific to inhaled

---

[24] As I noted above and as Dr. Waxman agrees, the side effects disclosed in
Voswinckel JESC are similar to disclosed by the '793 Patent and Tyvaso Label.  *See*
¶¶ 75-76 above.

Liquidia's Exhibit 1106
Page 82

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

treprostinil reported no side effects at the claimed doses, only potential "mild and transient" side effects at higher doses (with one exception), or that doses in the claimed range were safe and well-tolerated.  *See* Exs. 1007 and 1091 (Voswinckel JESC) at Results; Ex. 1009 (Voswinckel 2006) at 150; Ex. 1010 (Ghofrani) at 298; *see also* Exs. 1008 and 1093 (Voswinckel JAHA) at Results ("No side effects have been observed by the patients during long-term treatment."); *cf.* Ex. 2052, ¶¶ 100-101. Further, while patients administered Ventavis® experienced adverse events in the clinical trial, I note the drug was nonetheless approved to treat pulmonary arterial hypertension.  Dr. Waxman additionally suggests that 32% of patients (13 subjects) in a study of healthy volunteers failed to reach the highest scheduled dose (20 mcg). Ex. 2052, ¶ 100; Ex. 1029 at 11.  But Dr. Waxman omits that 8 of those patients discontinued "for other reasons" while only 5 of the patients were unable to increase the dose due to side effects.  Ex. 1029 at 11.  Thus, the vast majority of patients (68%) did reach the highest 20mcg dose, within the dosage range claimed by the '793 patent. A POSA would not be discouraged from using higher doses when few of the patients actually experienced side effects.

106.   Third, for his argument regarding unexpected results "[i]n view of the potential for side effects," Dr. Waxman cites several declarations submitted in *inter partes* reviews proceedings involving U.S. Patent Nos. 9,358,240 ("the '240 Patent")

83

Liquidia's Exhibit 1106
Page 83

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

and 9,339,507 ("the '507 Patent").[25]  Ex. 2052, ¶¶ 102-104.  As an initial matter, these declarations did not address the claims of the '793 Patent at issue here, and therefore do not establish the required nexus between unexpected results and the '793 claims. Further, the fact remains that Voswinckel JESC describes side effects very similar to those disclosed in the '793 Patent as well as Tyvaso®.  *See* ¶ 76 above; Ex. 1001 ('793 Patent) at 16:6-11; Exs. 1007 and 1091 (Voswinckel JESC) at Results.  Therefore, a POSA reading Voswinckel JESC would have expected that the claimed doses at 16 μg would produce no adverse effects, and doses above 16 μg only "may" produce "mild and transient" side effects.  *See id.*; *see also* Ex. 1108 (Waxman Depo. Tr.) at 97:13-16 (Dr. Waxman explaining he would not consider a mild and transient adverse event to be serious).  As such, in my opinion, the results associated with the claimed dosing regimen actually would not have been surprising.

107.  For these reasons, Dr. Waxman does not establish the existence of secondary considerations sufficient to overcome my showing of obviousness of Claims 1-8.

---

[25] I am informed that neither of these proceedings reached a Final Written Decision where the Board considered these declarations.

Reply Declaration of Nicholas Hill in Support of
Petition for *Inter Partes* Review
of U.S. Patent No. 10,716,793 B2

## VIII. CONCLUSION

108.    Neither Dr. Waxman nor Dr. Clark rebut my opinions that Claims 1-8 would have been anticipated by and/or rendered obvious by the prior art.

109.    In signing this Declaration, I recognize that the Declaration will be filed as evidence in a contested case before the Patent Trial and Appeal Board of the U.S. Patent and Trademark Office.   I also recognize that I may be subject to cross-examination in this proceeding.  If required, I will appear for cross-examination at the appropriate time.  I reserve the right to offer opinions relevant to the invalidity of the '793 Patent claims at issue and/or offer testimony in support of this Declaration.

110.    I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001.

Dated: February 10, 2022                     Respectfully submitted,

                                             Dr. Nicholas Hill, M.D.

Liquidia's Exhibit 1106
Page 85

Page 1

1

UNITED STATES PATENT AND TRADEMARK OFFICE

2          BEFORE THE PATENT TRIAL AND APPEAL BOARD

3     _____

4     LIQUIDIA TECHNOLOGIES, INC.,

5          Petitioner

6     vs.

7     UNITED THERAPEUTICS CORPORATION,

8          Patent Owner

      _____

9

10               IPR2021-00406

11           U.S. Patent No. 10,716,793

12

13

14          Remote Videotaped Deposition of

15          AARON B. WAXMAN, M.D., Ph.D.

16               January 8, 2022

17                 10:34 a.m.

18

19

20

21     Reported by:  Bonnie L. Russo

22     Job No. 5008601

| | | |
|---|---|---|
| 1 | that were presented on Day 2, Sunday 29 August | 12:58:43 |
| 2 | 2004? | 12:58:48 |
| 3 | A.    Yes. | 12:58:48 |
| 4 | Q.    Do you see the entry that says 2015 | 12:58:50 |
| 5 | to 2020? | 12:58:53 |
| 6 | A.    Yes. | 12:58:55 |
| 7 | Q.    It says:  "Epidemiology and | 12:58:56 |
| 8 | treatment of pulmonary arterial hypertension"? | 12:58:58 |
| 9 | A.    Yes. | 12:59:02 |
| 10 | Q.    And you would agree that a POSA as | 12:59:03 |
| 11 | of 2006 would have been interested in reading | 12:59:05 |
| 12 | the articles -- the abstract described as | 12:59:10 |
| 13 | "Epidemiology and treatment of pulmonary | 12:59:16 |
| 14 | arterial hypertension"? | 12:59:18 |
| 15 | MS. KIM:  Objection.  Calls for | 12:59:18 |
| 16 | speculation. | 12:59:18 |
| 17 | THE WITNESS:  Well, I think that a | 12:59:21 |
| 18 | POSA would certainly be interested, but I think | 12:59:25 |
| 19 | it is also striking how small that little | 12:59:29 |
| 20 | section is, but sure. | 12:59:31 |
| 21 | BY MR. DAVIES: | 12:59:35 |
| 22 | Q.    You would agree that a POSA with | 12:59:35 |

Page 105

| | | |
|---|---|---|
| 1 | this abstract book would have readily been able | 12:59:39 |
| 2 | to identify abstracts number 215 to 220 within | 12:59:43 |
| 3 | the abstract book? | 12:59:47 |
| 4 | MS. KIM:  Objection.  Vague.  Calls | 12:59:49 |
| 5 | for speculation. | 12:59:49 |
| 6 | THE WITNESS:  If they were in | 12:59:52 |
| 7 | possession of the abstract book they would have | 12:59:53 |
| 8 | been able to find them. | 12:59:55 |
| 9 | BY MR. DAVIES: | 12:59:59 |
| 10 | Q.    And they would have been able to | 13:00:00 |
| 11 | find abstract 20 -- strike that. | 13:00:02 |
| 12 | And they would have been able to | 13:00:06 |
| 13 | find Abstract 218? | 13:00:07 |
| 14 | A.    If they were in possession of the | 13:00:10 |
| 15 | book, yes. | 13:00:12 |
| 16 | Q.    When you attend meetings at which | 13:00:23 |
| 17 | abstracts are presented do you typically | 13:00:29 |
| 18 | receive a copy of the abstracts book prior to | 13:00:32 |
| 19 | the meeting? | 13:00:35 |
| 20 | A.    So typically with any society you | 13:00:38 |
| 21 | need to either pay as a member of the society | 13:00:42 |
| 22 | or pay for the meeting itself before you will | 13:00:44 |

Page 106

1    get the abstract book and generally you          13:00:50

2    register for that meeting usually two months     13:00:52

3    before -- well, maybe three months before the    13:00:57

4    meeting.  And then at some point between the      13:01:01

5    time you register, assuming you registered        13:01:05

6    early, and the meeting, you usually are given     13:01:08

7    or sent the abstract book.  Then it was in        13:01:12

8    print; now you may get it as an electronic        13:01:17

9    version some time before the meeting, but not     13:01:23

10   everybody going to the meeting may necessarily    13:01:25

11   have it beforehand if they register at the time   13:01:28

12   of the meeting but you have to pay for it.        13:01:31

13       Q.    Right.  But for those people who        13:01:33

14   have registered and paid to attend the meeting    13:01:35

15   or that are otherwise members they would, and     13:01:37

16   your expectation would be, that they would        13:01:39

17   receive the abstract book prior to the meeting,   13:01:41

18   correct?                                          13:01:41

19       A.    Yes.                                    13:01:44

20           MS. KIM:  Objection.  Calls for           13:01:45

21   speculation.                                      13:01:45

22           BY MR. DAVIES:  And that would have       13:01:47

Page 107

| | | |
|---|---|---|
| 1 | been true as of 2006 as well, correct? | 13:01:47 |
| 2 | MS. KIM:  Same objection. | 13:01:51 |
| 3 | THE WITNESS:  Yes. | 13:01:52 |
| 4 | BY MR. DAVIES: | 13:01:52 |
| 5 | Q.    And for those people that may not | 13:02:00 |
| 6 | have received a copy of the abstract book prior | 13:02:01 |
| 7 | to the meeting because of late registration, | 13:02:05 |
| 8 | for example, is it your experience even back | 13:02:10 |
| 9 | before 2006 that the abstract books would have | 13:02:11 |
| 10 | been available at the meeting for attendees to | 13:02:14 |
| 11 | pick up? | 13:02:16 |
| 12 | MS. KIM:  Objection.  Calls for | 13:02:18 |
| 13 | speculation. | 13:02:18 |
| 14 | THE WITNESS:  Yes. | 13:02:21 |
| 15 | BY MR. DAVIES: | 13:02:21 |
| 16 | Q.    And you don't have any reason to | 13:02:32 |
| 17 | believe that wasn't the case with respect to | 13:02:34 |
| 18 | the European Society of Cardiology Congress | 13:02:35 |
| 19 | 2004, correct? | 13:02:39 |
| 20 | MS. KIM:  Objection.  Calls for | 13:02:41 |
| 21 | speculation. | 13:02:41 |
| 22 | THE WITNESS:  I would expect it's | 13:02:44 |

Page 108

| | | |
|---|---|---|
| 1 | the same. | 13:02:45 |
| 2 | BY MR. DAVIES: | 13:02:48 |
| 3 | Q.   You would similarly expect that the | 13:02:48 |
| 4 | abstract book would have been provided to | 13:02:51 |
| 5 | registrants and Circulation subscribers for the | 13:02:53 |
| 6 | Scientific Session 2004 of the American Heart | 13:03:03 |
| 7 | Association? | 13:03:08 |
| 8 | MS. KIM:  Objection.  Calls for | 13:03:08 |
| 9 | speculation. | 13:03:08 |
| 10 | THE WITNESS:  Yes. | 13:03:13 |
| 11 | BY MR. DAVIES: | 13:03:13 |
| 12 | Q.   And similarly for the Scientific | 13:03:23 |
| 13 | Session 2004 of the American Heart Association | 13:03:25 |
| 14 | you would have expected that for those late | 13:03:28 |
| 15 | registrants who hadn't received the abstract | 13:03:30 |
| 16 | book ahead of time that there would have been | 13:03:33 |
| 17 | copies for it available at the meeting? | 13:03:38 |
| 18 | MS. KIM:  Objection.  Calls for | 13:03:38 |
| 19 | speculation. | 13:03:38 |
| 20 | THE WITNESS:  Yes. | 13:03:41 |
| 21 | MR. DAVIES:  I think -- I honestly | 13:03:51 |
| 22 | don't know how long we have been going but if | 13:03:52 |

Page 109

| | | |
|---|---|---|
| 1 | we could take a break, Doctor. | 13:03:54 |
| 2 | THE WITNESS:  If you need one. | 13:03:57 |
| 3 | MR. DAVIES:  I need a short one | 13:03:59 |
| 4 | again if that's okay. | 13:04:00 |
| 5 | THE WITNESS:  Sure. | 13:04:02 |
| 6 | MR. DAVIES:  Thank you. | 13:04:03 |
| 7 | THE VIDEOGRAPHER:  The time is 1:04 | 13:04:04 |
| 8 | p.m.  We are off the record. | 13:04:11 |
| 9 | (A short recess was taken.) | 13:04:12 |
| 10 | THE VIDEOGRAPHER:  The time is 1:22 | 13:22:47 |
| 11 | p.m.  This begins Unit 3.  We are on the | 13:22:51 |
| 12 | record. | 13:22:54 |
| 13 | BY MR. DAVIES: | 13:22:55 |
| 14 | Q.    Welcome back, Dr. Waxman.  Can we go | 13:22:55 |
| 15 | back to Voswinckel JESC, which is Exhibit 1007? | 13:22:57 |
| 16 | A.    Okay. | 13:23:06 |
| 17 | Q.    And I believe you testified that you | 13:23:07 |
| 18 | hadn't attended the 2004 Congress; is that | 13:23:11 |
| 19 | correct? | 13:23:11 |
| 20 | A.    That's correct. | 13:23:15 |
| 21 | Q.    Have you attended other congresses | 13:23:16 |
| 22 | other than the 2004 -- | 13:23:20 |

Page 110

```
 1              MS. KIM:  Objection.  Vague.          13:23:22
 2         Q.    -- for the European Society of       13:23:23
 3    Cardiology?                                     13:23:27
 4         A.    I'm sorry.  Were you asking me if I  13:23:27
 5    have attended other conferences or specifically 13:23:30
 6    the European Society of Cardiology?             13:23:32
 7         Q.    I apologize.  Let me re-ask the      13:23:34
 8    question.                                       13:23:37
 9              Have you attended the European        13:23:37
10    Society of Cardiology Congress at any time?     13:23:41
11         A.    At any time?                         13:23:43
12         Q.    Yes.                                 13:23:45
13         A.    Actually, I think I was supposed to  13:23:46
14    go just as the pandemic took off, but I don't   13:23:52
15    recall that we even did a virtual, so no.       13:23:57
16         Q.    Have you -- turning to Voswinckel    13:24:00
17    JAHA, have you attended the scientific sessions 13:24:11
18    meeting -- strike that.                         13:24:14
19              Did you attend the 2004 scientific    13:24:20
20    session meeting that is identified at           13:24:22
21    Voswinckel JAHA?                                13:24:26
22         A.    No.                                  13:24:27
```

Page 111

```
 1        Q.    Have you at any time attended the      13:24:27

 2   scientific session meeting of the American        13:24:31

 3   Heart Association?                                13:24:36

 4        A.    Yes.                                   13:24:36

 5        Q.    When was the last time you attended    13:24:38

 6   it?                                               13:24:40

 7        A.    When it was in Chicago.  It was a      13:24:40

 8   few years ago.  I don't remember exactly.         13:24:49

 9        Q.    Did you attend before 2006?            13:24:51

10        A.    No.                                    13:24:54

11        Q.    Going back to Voswinckel JAHA,         13:24:55

12   Exhibit 1008, you would agree that a conference   13:25:17

13   attendee in possession of this abstract           13:25:26

14   supplement would have been able to identify       13:25:29

15   Abstract 1414 within the supplement?              13:25:33

16             MS. KIM:  Objection.  Calls for         13:25:39

17   speculation.                                      13:25:39

18             THE WITNESS:  Had they been in          13:25:41

19   possession of the supplement, yes.                13:25:42

20             MR. DAVIES:  Can we enter -- this       13:26:27

21   will be IPR Deposition Exhibit 2.  This is at     13:26:29

22   Tab 15, Brittany.                                 13:26:33
```

Page 112

```
 1              (Deposition Exhibit 2 was marked for    13:26:35
 2      identification.)                                13:26:36
 3              THE WITNESS:  Which exhibit?            13:26:36
 4              BY MR. DAVIES:                          13:26:55
 5         Q.   I'm sorry.  It will come up.  There    13:26:56
 6      is not an IPR exhibit number for this.  This is 13:26:58
 7      not a document that was previously in the IPR,  13:27:01
 8      so this will be IPR Deposition Exhibit 2, and   13:27:04
 9      it should show up hopefully soon.               13:27:07
10         A.   Okay.  It is Exhibit 2-015?            13:27:15
11         Q.   Oh, that might be the tab number.      13:27:20
12      So it should be Exhibit 2 in the IPR.  It       13:27:23
13      should say "Annual Report 2005, European        13:27:26
14      Society of Cardiology"?                         13:27:31
15         A.   Yes.  I have it up.                     13:27:31
16         Q.   And do you recognize the European      13:27:33
17      Society of Cardiology that is referred to on    13:27:42
18      the face of IPR Exhibit 2 to be the same        13:27:45
19      European Society of Cardiology referred to on   13:27:48
20      Voswinckel JESC?                                13:27:53
21         A.   As far as the societies being one in   13:27:54
22      the same, yes.                                  13:28:01
```

Page 113

| | | |
|---|---|---|
| 1 | Q.    And if you turn to Page 3 at the | 13:28:04 |
| 2 | bottom there is a heading entitled | 13:28:10 |
| 3 | "Congresses"? | 13:28:14 |
| 4 | A.    Yes. | 13:28:15 |
| 5 | Q.    Do you see it states:  "Last year's | 13:28:16 |
| 6 | Congress in Munich was extremely successful | 13:28:18 |
| 7 | both in terms of the number of participants and | 13:28:22 |
| 8 | the scientific level of the event"? | 13:28:24 |
| 9 | A.    Yes. | 13:28:25 |
| 10 | Q.    And then if you turn to Page 4 there | 13:28:26 |
| 11 | is a heading "Journals"? | 13:28:29 |
| 12 | A.    Yes. | 13:28:32 |
| 13 | Q.    And do you see there is reference on | 13:28:35 |
| 14 | Page 4 to the European Heart Journal? | 13:28:38 |
| 15 | A.    Yes. | 13:28:43 |
| 16 | Q.    And you understand that to be the | 13:28:45 |
| 17 | same journal as Voswinckel JESC that we looked | 13:28:45 |
| 18 | at? | 13:28:49 |
| 19 | A.    Well, again, the Voswinckel is in a | 13:28:49 |
| 20 | supplement to the journal specifically for the | 13:28:53 |
| 21 | meeting.  It would not be the -- what is | 13:28:56 |
| 22 | expected of the European Heart Journal. | 13:29:00 |

Page 114

| | | |
|---|---|---|
| 1 | Q.   Understood. | 13:29:03 |
| 2 | A.   From the impact factors standpoint. | 13:29:04 |
| 3 | Q.   You see there is an impact factor | 13:29:07 |
| 4 | for the European Heart Journal below that? | 13:29:10 |
| 5 | A.   Yes. | 13:29:13 |
| 6 | Q.   And it's indicated as 6.247? | 13:29:14 |
| 7 | A.   Yes. | 13:29:18 |
| 8 | Q.   Would you consider that to be a good | 13:29:18 |
| 9 | impact factor as of 2004 for a journal in this | 13:29:20 |
| 10 | space? | 13:29:28 |
| 11 | MS. KIM:  Objection.  Calls for | 13:29:28 |
| 12 | speculation.  Lacks foundation. | 13:29:29 |
| 13 | THE WITNESS:  I mean it's okay. | 13:29:32 |
| 14 | BY MR. DAVIES: | 13:29:36 |
| 15 | Q.   It's at least a journal that POSAs | 13:29:36 |
| 16 | would have been aware of as of May 2006? | 13:29:39 |
| 17 | MS. KIM:  Same objection.  Calls for | 13:29:43 |
| 18 | speculation.  Lacks foundation. | 13:29:44 |
| 19 | THE WITNESS:  I guess when you say | 13:29:48 |
| 20 | "aware of," I mean simply aware of, yes.  If | 13:29:49 |
| 21 | you are speaking aware of as far as a specific | 13:29:53 |
| 22 | topic, that depends. | 13:29:56 |

Page 115

| | | |
|---|---|---|
| 1 | BY MR. DAVIES: | 13:30:00 |
| 2 | Q.    Can you go to Page 19. | 13:30:00 |
| 3 | A.    Of this same document? | 13:30:05 |
| 4 | Q.    Correct.  Yes.  Just let me know | 13:30:08 |
| 5 | once you are there. | 13:30:23 |
| 6 | A.    I'm there. | 13:30:23 |
| 7 | Q.    Do you see it states at the top of | 13:30:24 |
| 8 | the page:  "The ESC Congress is the largest | 13:30:24 |
| 9 | medical congress in Europe and among the top | 13:30:27 |
| 10 | three cardiology meetings in the world." | 13:30:31 |
| 11 | Do you see that? | 13:30:33 |
| 12 | A.    Yes. | 13:30:33 |
| 13 | Q.    Do you have any reason to disagree | 13:30:34 |
| 14 | with that? | 13:30:36 |
| 15 | MS. KIM:  Objection.  Calls for | 13:30:37 |
| 16 | speculation.  Lacks foundation. | 13:30:38 |
| 17 | THE WITNESS:  I have to say I | 13:30:40 |
| 18 | haven't seen a society, whether it be ESC or | 13:30:42 |
| 19 | AHA or ATS.  They all say the same thing, so it | 13:30:48 |
| 20 | doesn't surprise me that they say that. | 13:30:53 |
| 21 | BY MR. DAVIES: | 13:30:56 |
| 22 | Q.    If you go down below the -- there is | 13:30:56 |

Page 116

| | | |
|---|---|---|
| 1 | a table in the middle of the various annual | 13:30:59 |
| 2 | meetings, do you see that? | 13:31:03 |
| 3 | A.    Yes. | 13:31:05 |
| 4 | Q.    It says:  "The ESC Congress 2004," | 13:31:06 |
| 5 | and do you understand that to be the ESC | 13:31:10 |
| 6 | Congress of 2004 identified in Voswinckel JESC? | 13:31:13 |
| 7 | MS. KIM:  Objection.  Calls for | 13:31:20 |
| 8 | speculation.  Lacks foundation. | 13:31:21 |
| 9 | THE WITNESS:  Yes. | 13:31:26 |
| 10 | BY MR. DAVIES: | 13:31:26 |
| 11 | Q.    Do you see that it states that it | 13:31:26 |
| 12 | attracted professional attendance of over | 13:31:27 |
| 13 | 18,000? | 13:31:31 |
| 14 | A.    Yes. | 13:31:32 |
| 15 | Q.    How does that attendance compare to | 13:31:32 |
| 16 | the American Heart Association conference | 13:31:34 |
| 17 | that's described in Voswinckel JAHA? | 13:31:41 |
| 18 | A.    In 2004? | 13:31:45 |
| 19 | Q.    Yeah. | 13:31:48 |
| 20 | A.    I would expect -- I think the AHA is | 13:31:49 |
| 21 | bigger than that but I don't know. | 13:31:54 |
| 22 | Q.    Okay.  Then it goes on to say there | 13:31:56 |

Page 117

1    was a total of 24,527 attendees.                    13:32:01

2              Do you see that?                           13:32:05

3         A.    Yes.                                      13:32:06

4         Q.    And of those 18,413 of them were         13:32:07

5    professionals?                                       13:32:11

6         A.    Yes.                                      13:32:12

7         Q.    You understand that to be clinicians      13:32:14

8    or other working in the field?                       13:32:15

9              MS. KIM:   Objection.   Calls for          13:32:18

10   speculation.   Lacks foundation.                     13:32:20

11             THE WITNESS:   I mean certainly the        13:32:22

12   majority are clinicians but I would say it           13:32:23

13   includes nonclinicians as well.                      13:32:27

14             BY MR. DAVIES:                              13:32:29

15        Q.    We can put that to the side.              13:32:29

16             Have you ever presented at the             13:33:35

17   American Heart Association conference?               13:33:37

18        A.    I have.                                   13:33:38

19        Q.    About how many times?                     13:33:39

20        A.    Maybe one or two.                         13:33:40

21        Q.    Did you present on pulmonary              13:33:46

22   hypertension?                                        13:33:52

Liquidia's Exhibit 1108

Appx3149

Page 118

| | | |
|---|---|---|
| 1 | A.    Yes. | 13:33:53 |
| 2 | Q.    In both cases? | 13:33:55 |
| 3 | A.    Yes. | 13:33:56 |
| 4 | Q.    Do you recall about when you made | 13:33:57 |
| 5 | those presentations? | 13:34:00 |
| 6 | A.    I think it was somewhere between | 13:34:01 |
| 7 | 2012 and 2014, but I don't remember for sure. | 13:34:09 |
| 8 | Q.    Going back to Voswinckel JESC, which | 13:34:12 |
| 9 | is Exhibit 1007, once you are there go to Page | 13:34:29 |
| 10 | 7 again, back to the abstract. | 13:34:41 |
| 11 | A.    Okay. | 13:34:49 |
| 12 | Q.    And again, we have talked about the | 13:34:49 |
| 13 | Giessen group that are the authors on this | 13:34:55 |
| 14 | abstract prior in your deposition.  Do you | 13:34:59 |
| 15 | remember that? | 13:35:00 |
| 16 | A.    Yes, sir. | 13:35:00 |
| 17 | Q.    And these individuals were involved | 13:35:01 |
| 18 | in the development of iloprost prior to 2006 as | 13:35:02 |
| 19 | we talked about? | 13:35:07 |
| 20 | A.    Yes. | 13:35:08 |
| 21 | Q.    And a POSA would have been aware of | 13:35:09 |
| 22 | that development by this group prior to 2006? | 13:35:11 |

Page 152

1          Q.    You would agree, though, that in          14:20:08

2    your experience, including with patients taking    14:20:10

3    Tyvaso, that some patients may experience          14:20:13

4    improvements in hemodynamics and not see a         14:20:17

5    corresponding change in other nonhemodynamic       14:20:23

6    measures as you've described that you apply in     14:20:26

7    the clinic, correct?                               14:20:29

8          A.    No.                                     14:20:31

9          MS. KIM:  Objection.  Vague.                  14:20:31

10         THE WITNESS:  Sorry.  No.                     14:20:33

11         MS. KIM:  That's okay.                        14:20:36

12         BY MR. DAVIES:                                14:20:38

13         Q.    You have patients, Dr. Waxman, on       14:21:27

14   pulmonary hypertension treatments that utilize     14:21:37

15   nebulizers for delivery of the drug, correct?      14:21:40

16         A.    I -- well, yes.                         14:21:50

17         Q.    What are the products for treatment     14:21:54

18   of PH that utilize nebulizers for delivery?        14:22:00

19         A.    There are only two that I use and       14:22:03

20   that would include inhaled treprostinil or         14:22:09

21   Tyvaso and epoprostenol which generally we         14:22:14

22   would only use that in the hospital.               14:22:21

Page 153

```
1          Q.    Have you administered or overseen      14:22:30

2     the administration of one mil of drug solution    14:22:32

3     using a nebulizer to a PH patient?                14:22:37

4          A.    You mean a single ML?                  14:22:40

5          Q.    Correct.                               14:22:44

6          A.    I can't say that I have, no.           14:22:45

7          Q.    Okay.  What about 2 mils?              14:22:48

8          A.    Well, again, if you are talking        14:22:54

9     about a standard nebulizer, generally, they       14:22:57

10    hold 3 to 5 MLs in the old style nebulizer, and   14:22:59

11    the Aerogen nebulizer, I think, holds about 3     14:23:04

12    to 5 MLs as well.  I'm not -- I mean, even        14:23:09

13    using a weight-based approach to mixing a drug    14:23:15

14    I don't think we have ever just given 1 ML.       14:23:20

15         Q.    Okay.  As of 2006 was it true that     14:23:23

16    the standard nebulizer delivered 3 to 5 mils of   14:23:31

17    drug solution?                                    14:23:39

18              MS. KIM:  Objection.  Vague.            14:23:41

19              THE WITNESS:  The standard nebulizer    14:23:42

20    being what was used for treatment of asthma and   14:23:43

21    COPD generally, yes, would take 3 to 5 MLs of     14:23:45

22    solution.                                         14:23:51
```

Page 154

| | | |
|---|---|---|
| 1 | BY MR. DAVIES: | 14:23:53 |
| 2 | Q.   So if the nebulizers in general | 14:23:53 |
| 3 | could take up to 3 to 5 mils of solution how | 14:24:05 |
| 4 | much of that was actually delivered to the | 14:24:10 |
| 5 | patients? | 14:24:13 |
| 6 | MS. KIM:  Objection.  Vague. | 14:24:14 |
| 7 | THE WITNESS:  I don't know that we | 14:24:18 |
| 8 | could really say for certain how much was | 14:24:19 |
| 9 | delivered because some of it adheres to the | 14:24:22 |
| 10 | vehicle, some of it adheres to the tubbing, | 14:24:26 |
| 11 | some of it adheres to top of the mouth, some of | 14:24:29 |
| 12 | it gets swallowed, so as far as what is | 14:24:32 |
| 13 | actually inhaled some percentage of the total | 14:24:35 |
| 14 | volume is probably inhaled, but also with a | 14:24:38 |
| 15 | standard nebulizer there is inhalation and | 14:24:41 |
| 16 | exhalation, and you see that mist coming out | 14:24:43 |
| 17 | when they breathe out so you really don't know. | 14:24:48 |
| 18 | BY MR. DAVIES: | 14:24:50 |
| 19 | Q.   Do you -- when you are starting a | 14:24:50 |
| 20 | new patient on inhalation therapy do you | 14:24:53 |
| 21 | instruct them on the use, the proper use of the | 14:24:56 |
| 22 | nebulizer? | 14:24:59 |

Page 155

| | | |
|---|---|---|
| 1 | A.    I guess -- | 14:25:00 |
| 2 | MS. KIM:  Objection.  Vague. | 14:25:02 |
| 3 | THE WITNESS:  What nebulizer are we | 14:25:04 |
| 4 | talking about? | 14:25:05 |
| 5 | BY MR. DAVIES: | 14:25:07 |
| 6 | Q.    Any nebulizer? | 14:25:07 |
| 7 | A.    If we are talking about Tyvaso they | 14:25:12 |
| 8 | get a lot of instruction on how to use it and | 14:25:14 |
| 9 | that is a breath actuated device.  That is | 14:25:17 |
| 10 | different though from the typical in-hospital | 14:25:20 |
| 11 | nebulizers that we might use. | 14:25:22 |
| 12 | Q.    Do you have any reason -- do you | 14:25:27 |
| 13 | have any reason to believe that the individuals | 14:25:41 |
| 14 | at the Giessen group improperly used the | 14:25:45 |
| 15 | nebulizers described in the publications, | 14:25:49 |
| 16 | including JAHA and JESC that we have looked at | 14:25:52 |
| 17 | today? | 14:25:55 |
| 18 | MS. KIM:  Objection.  Vague.  Calls | 14:25:56 |
| 19 | for speculation. | 14:25:56 |
| 20 | THE WITNESS:  I mean, I don't know | 14:25:59 |
| 21 | exactly what nebulizer they used so I have no | 14:26:00 |
| 22 | reason to think they used it incorrectly. | 14:26:04 |

Page 156

```
 1              BY MR. DAVIES:                    14:26:08

 2       Q.   By 2006 that group certainly had     14:26:08

 3   experience delivering drug products using    14:26:19

 4   nebulizers, correct?                         14:26:24

 5              MS. KIM:  Same objection.  Vague.  14:26:25

 6   Calls for speculation.                       14:26:25

 7              THE WITNESS:  I think like any     14:26:27

 8   pulmonologist we all have experience in using  14:26:29

 9   nebulizers, but there are a number of different  14:26:32

10   kinds of devices out there.                  14:26:35

11              BY MR. DAVIES:                    14:27:10

12       Q.    In 2006 did you ever administer or  14:27:10

13   oversee the administration of any treatments  14:27:18

14   for pulmonary hypertension with a nebulizer  14:27:21

15   that utilized less than 1 mil of drug solution?  14:27:24

16       A.    I don't think so.                  14:27:29

17              MR. DAVIES:  Can we enter Exhibit  14:28:24

18   2036.                                        14:28:31

19              (Deposition Exhibit 2036 was marked  14:28:32

20   for identification.)                         14:28:33

21              BY MR. DAVIES:                    14:28:33

22       Q.    Let me know once you have that,    14:29:07
```

Page 157

1    Doctor.                                            14:29:10

2         A.    Okay.                                    14:29:27

3         Q.    Actually before we do that -- prior      14:29:28

4    to 2006 did you administer -- or prior to May       14:29:33

5    2006 did you administer -- I'm sorry.  Do you        14:29:40

6    need a second?                                       14:29:43

7         A.    No.  It's just one of my dogs.           14:29:44

8         Q.    That's fine.  No worries.  So let me     14:29:46

9    start over.                                          14:29:50

10         Prior to May 2006 did you administer          14:29:50

11   or oversee the administration of any inhaled         14:29:55

12   drug product from a nebulizer of less than 1         14:29:58

13   mil?                                                 14:30:04

14         MS. KIM:  Objection.  Asked and               14:30:06

15   answered.                                            14:30:07

16         THE WITNESS:  Yeah, I do not recall           14:30:08

17   ever doing less than an ML.                          14:30:10

18         BY MR. DAVIES:                                 14:30:14

19         Q.    Okay.                                    14:30:14

20         MS. KIM:  And Counsel, we have been           14:30:17

21   going for a little over an hour.  When it's a        14:30:19

22   good time to take a break, let's take one.          14:30:21

Page 1

```
 1
 2          UNITED STATES PATENT AND TRADEMARK OFFICE
 3          BEFORE THE PATENT TRIAL AND APPEAL BOARD
 4     _____
 5   LIQUIDIA TECHNOLOGIES, INC.,
 6        Petitioner
 7   vs.
 8   UNITED THERAPEUTICS CORPORATION,
 9        Patent Owner
       _____
10
11
                  IPR2021-00406
12
            U.S. Patent No. 10,716,793
13
14
          Remote Videotaped Deposition of
15
            JASON McCONVILLE, Ph.D.
16
              January 11, 2022
17
                 9:03 a.m.
18
19
20
21
22        Reported by:  Bonnie L. Russo
          Job No. 5008632
```

Liquidia's Exhibit 1109
Page 1

1          BY MR. DAVIES:

2          Q.    And I -- I understand that you are

3    drawing a distinction between, I believe, the

4    nominal dose and the emitted dose is what you

5    just described, correct?

6          A.    Yes, that's right.

7          Q.    Okay.  All right.  So my question is

8    different.

9          My question is:  Sitting here today,

10   do you know whether the nominal dose or metered

11   dose that you describe in Paragraph 39 of your

12   expert declaration would fall within the scope

13   of the term single event dose as that is used

14   in the '793 patent?

15          MR. DYKHUIS:  Objection.  Form.

16   Legal conclusion.

17          THE WITNESS:  So I mean, it's -- I

18   think I -- thought I have been pretty clear

19   here.

20          So the nominal -- nominal dose as I

21   describe it is what's loaded into the device.

22          BY MR. DAVIES:

Page 68

1          Q.    I understand that.  Yes.

2          A.    And -- and that cannot be the same

3    as what comes out of the device, and what comes

4    out of the device is what's delivered.  Okay.

5    And so the single event dose has to be

6    delivered.  So those two things differ.

7          Q.    Okay.  So what I think what you are

8    saying is the nominal dose or metered dose that

9    you described in Paragraph 39 could not be a

10   single event dose as described in the '793

11   patent; is that correct?

12               MR. DYKHUIS:  Objection.  Form.

13   Legal conclusion.

14               THE WITNESS:  I think you -- I think

15   we are on the same page.  I think that, you

16   know, you agree that the loaded dose into the

17   device is different from what comes out of a

18   device, and what comes out of the device is

19   only what a patient can inhale as a single

20   event dose, you know, as defined in the patent.

21               BY MR. DAVIES:

22         Q.    Okay.  So single event dose as used

Liquidia's Exhibit 1109
Page 68

Page 1

1

        UNITED STATES PATENT AND TRADEMARK OFFICE

2

        BEFORE THE PATENT TRIAL AND APPEAL BOARD

3

        _____

4                                        )

    LIQUIDIA TECHNOLOGIES, INC.   )

5                                        )

         Petitioner                      )

6                                        )

    vs.                                  )

7                                        )

    UNITED THERAPEUTICS              )

8    CORPORATION                        )

                                         )

9         Patent Owner                   )

         _____

10

11            Trial No. IPR 2021-00406

12            Patent No. 10,716,793 B2

13

14

15        Remote Videotaped Deposition of

16             LYNDSEY PILAR WYMAN

17            December 29, 2021

18                9:00 a.m.

19

20

21    Reported by:  Bonnie L. Russo

22    Job No. 5008760

Liquidia's Exhibit 1110
Page 1

```
 1            MR. HOUSTON:  Objection.  Beyond the    11:49:07

 2    scope.  Form.                                    11:49:08

 3            THE WITNESS:  That is the copyright      11:49:11

 4    date.  I am not clear on the publication date    11:49:13

 5    because I don't -- I don't -- I'm not familiar   11:49:18

 6    with this journal and I'm not -- I don't know    11:49:22

 7    what the 3(2) means.                             11:49:26

 8            BY MR. CHEEK:                             11:49:28

 9       Q.   If that's the copyright date, this       11:49:28

10    publication must have been written by, at the    11:49:30

11    latest, 2005; is that correct?                   11:49:33

12            MR. HOUSTON:  Objection.  Beyond the    11:49:36

13    scope.  Form.                                    11:49:38

14            THE WITNESS:  For the copyright          11:49:48

15    date?  Oh, in or -- in order for them to say     11:49:49

16    that it was copywritten in 2005 you're asking    11:49:52

17    me if that means that it has to have been        11:49:54

18    written in 2005?                                 11:49:56

19            BY MR. CHEEK:                             11:49:56

20       Q.   Yes.                                     11:49:58

21            MR. HOUSTON:  Same objections.           11:49:59

22            THE WITNESS:  I -- I am not an            11:50:00
```

```
 1    expert on copyright.                         11:50:01

 2             BY MR. CHEEK:                        11:50:04

 3        Q.   It -- it was written before 2006,   11:50:04

 4    would you agree?                             11:50:06

 5             MR. HOUSTON:  Same objections.       11:50:07

 6             THE WITNESS:  I guess.  I guess.     11:50:14

 7    I'm not an expert on that stuff, though.  I   11:50:16

 8    mean, with a copyright date of 2005 that's what 11:50:19

 9    it looks like.                               11:50:24

10             BY MR. CHEEK:                        11:50:26

11        Q.   And considering the authors of       11:50:26

12    Exhibit 9 provided a citation to the abstract, 11:50:30

13    they were able to find Voswinckel JAHA; is that 11:50:35

14    correct?                                     11:50:40

15             MR. HOUSTON:  Objection form.        11:50:40

16    Beyond the scope.                            11:50:42

17             THE WITNESS:  Right.  It looks like   11:50:45

18    they knew about it.                          11:50:46

19             BY MR. CHEEK:                        11:50:49

20        Q.   So the authors of Exhibit 9, who are 11:50:49

21    not the authors of Voswinckel JAHA, found    11:50:51

22    Voswinckel JAHA before 2006?                 11:50:55
```

Page 120

| | | |
|---|---|---|
| 1 | MR. HOUSTON:  Objection.  Form. | 11:50:58 |
| 2 | Beyond the scope. | 11:51:02 |
| 3 | THE WITNESS:  I don't know that they | 11:51:02 |
| 4 | found it, but they knew about it.  Maybe that's | 11:51:02 |
| 5 | just semantics there, but... | 11:51:05 |
| 6 | BY MR. CHEEK: | 11:51:11 |
| 7 | Q.    Considering they knew about it | 11:51:11 |
| 8 | before 2006, Voswinckel JAHA must have been | 11:51:14 |
| 9 | publicly available before 2006, would you | 11:51:18 |
| 10 | agree? | 11:51:21 |
| 11 | A.    No. | 11:51:23 |
| 12 | MR. HOUSTON:  Objection.  Form. | 11:51:23 |
| 13 | THE WITNESS:  I -- I -- no. | 11:51:23 |
| 14 | MR. HOUSTON:  Beyond the scope. | 11:51:24 |
| 15 | THE WITNESS:  I -- I do not agree | 11:51:24 |
| 16 | because I don't know how they knew about it. | 11:51:26 |
| 17 | BY MR. CHEEK: | 11:51:30 |
| 18 | Q.    Is it your opinion that they -- | 11:51:30 |
| 19 | sorry.  Strike that. | 11:51:34 |
| 20 | Whether they found it or knew about | 11:51:39 |
| 21 | it, they specifically cited it, would you | 11:51:41 |
| 22 | agree? | 11:51:44 |

Page 121

| | | |
|---|---|---|
| 1 | A.    They have cited it here | 11:51:44 |
| 2 | specifically, yes. | 11:51:47 |
| 3 | Q.    In a publication dated 2005? | 11:51:49 |
| 4 | MR. HOUSTON:  Objection.  Form. | 11:51:53 |
| 5 | Beyond the scope. | 11:51:55 |
| 6 | BY MR. CHEEK: | 11:52:17 |
| 7 | Q.    So is it your opinion that they | 11:52:17 |
| 8 | cited an article that was not publicly | 11:52:20 |
| 9 | available? | 11:52:24 |
| 10 | MR. HOUSTON:  Objection.  Form. | 11:52:26 |
| 11 | Beyond the scope. | 11:52:28 |
| 12 | THE WITNESS:  I -- I don't know how | 11:52:28 |
| 13 | they knew about the article or how they knew | 11:52:29 |
| 14 | about JAHA.  I mean, references can often | 11:52:31 |
| 15 | include personal, you know, communication. | 11:52:37 |
| 16 | They can include all sorts of things.  I don't | 11:52:40 |
| 17 | know how they knew about it. | 11:52:41 |
| 18 | BY MR. CHEEK: | 11:52:45 |
| 19 | Q.    Wouldn't you agree that a POSA using | 11:52:45 |
| 20 | the citation provided in Exhibit 9 could find | 11:52:48 |
| 21 | Voswinckel JAHA that provides the entire | 11:52:54 |
| 22 | citation? | 11:52:59 |

Page 122

| | | |
|---|---|---|
| 1 | MR. HOUSTON:  Objection.  Form. | 11:53:02 |
| 2 | THE WITNESS:  It does provide -- it | 11:53:02 |
| 3 | does tell them where to go to find it.  It | 11:53:03 |
| 4 | tells them -- | 11:53:03 |
| 5 | BY MR. CHEEK: | 11:53:06 |
| 6 | Q.   You knew they -- you knew they could | 11:53:06 |
| 7 | find it, is that -- | 11:53:08 |
| 8 | MR. HOUSTON:  Objection.  Form. | 11:53:10 |
| 9 | THE WITNESS:  Theoretically, yes. | 11:53:14 |
| 10 | It's giving them the information so that they | 11:53:14 |
| 11 | could -- they would know to go to that issue of | 11:53:14 |
| 12 | Circulation. | 11:53:14 |
| 13 | BY MR. CHEEK: | 11:53:17 |
| 14 | Q.   And you said it could be a personal | 11:53:17 |
| 15 | communication.  Wouldn't the index note that it | 11:53:19 |
| 16 | was a personal communication? | 11:53:23 |
| 17 | A.   Oh, yeah.  Yeah.  No, that was just | 11:53:26 |
| 18 | my -- | 11:53:27 |
| 19 | MR. HOUSTON:  Beyond the scope. | 11:53:27 |
| 20 | THE WITNESS:  I was giving an | 11:53:29 |
| 21 | example of references.  I mean, references | 11:53:30 |
| 22 | include a variety of materials and they are | 11:53:31 |

Page 123

1       cited accordingly.  But a list of references          11:53:34

2       like this doesn't mean that everything is             11:53:38

3       publicly available.  This is just their               11:53:44

4       references.  That's all I meant to be saying.         11:53:46

5                   BY MR. CHEEK:                              11:53:51

6           Q.    But you have no explanation for how          11:53:51

7       they were able to find it in 20005 --                 11:53:53

8           A.    I have no ex- -- I have no                   11:53:57

9       explanation how they knew about it.                   11:53:58

10                  MR. HOUSTON:  Ms. Wyman -- Ms.            11:54:00

11      Wyman, please let me get my objections on the         11:54:01

12      record --                                             11:54:01

13                  THE WITNESS:  Sorry.                      11:54:01

14                  MR. HOUSTON:  -- before you begin         11:54:02

15      answering the question.                               11:54:03

16                  Objection.  Form.  Beyond the scope.     11:54:04

17                  Now you may answer, if you can.          11:54:07

18                  THE WITNESS:  I have no idea how         11:54:11

19      they knew about it.                                   11:54:12

20                  BY MR. CHEEK:                              11:54:12

21          Q.    Okay.  I'd like to move back to the         11:54:25

22      declaration, Exhibit 1.                               11:54:27

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

LIQUIDIA TECHNOLOGIES, Inc.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

———————————

IPR2021-00406
U.S. Patent No. 10,716,793

———————————

**DECLARATION OF DR. AARON WAXMAN**

**IPR2021-00406
United Therapeutics EX2001**

I, Aaron Waxman, Ph.D., M.D., declare as follows:

1.    I am a pulmonary critical physician in Boston, Massachusetts.  I am Executive Director of the Center for Pulmonary and Heart Disease in the Heart and Vascular and Lung Centers, and Director of the Pulmonary Vascular Disease Program at Brigham and Women's Hospital in Boston, Massachusetts.  I am board certified in Internal Medicine, Pulmonary Disease and Critical Care Medicine.  I have been practicing as a pulmonary and critical care doctor for over 20 years.  I am a member of the American College of Chest Physicians, The American Thoracic Society, the Pulmonary Hypertension Association, and the Pulmonary Vascular Research Institute.

2.    I am an Associate Professor of Medicine at Harvard Medical School and have dual appointments in the Pulmonary Critical Care and Cardiovascular Medicine divisions at Brigham and Women's Hospital.  I have previously served as an assistant professor in Medicine at the Yale University School of Medicine and Tufts University School of Medicine.  I have authored or co-authored more than 150 peer-reviewed journal articles, book chapters and reviews.

3.    I received my Bachelor's degree from George Washington University. I received a Ph.D. in Anatomy and Neuroscience at the Albany Medical College, and an M.D. from Yale University School of Medicine.  I completed my internship and residency in Internal Medicine at Yale New Haven Hospital.  I also completed

1

a Fellowship in Pulmonary and Critical Care at the Yale School of Medicine. My *curriculum vitae* is provided as Exhibit 2002.

4.    I am a paid consultant for United Therapeutics Corporation, the assignee of U.S. Patent No. 10,716,793 ("the '793 patent"), in connection with IPR2021-00406. My compensation does not depend on the content of my opinions or the disposition of this proceeding. I have been retained by United Therapeutics Corporation to provide technical expertise and my expert opinion on the '793 patent.

5.    While I am neither a patent lawyer nor an expert in patent law, I have been informed of the applicable legal standards for obviousness of patent claims. I understand that the Petition brought forward by Liquidia Technologies, Inc. ("Petitioner" or "Liquidia") challenges claims 1-8 of the '793 patent.

6.    For reference, below is a list of the Exhibits that are cited herein:

| Exhibit No. | Description |
|---|---|
| EX1001 | U.S. Patent No. 10,716,793 ("'793 Patent") |
| EX1002 | Declaration of Dr. Nicholas Hill ("Hill Decl.") |
| EX1004 | Declaration of Dr. Igor Gonda ("Gonda Decl.") |
| EX1006 | U.S. Patent No. 6,521,212 B1 to Cloutier, et al. ("'212 patent") |
| EX1007 | Voswinckel, R., *et al.*, Abstract 218: "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension, Journal of the European Society of Cardiology, Volume 25, Abstract Supplement (August/September 2004) |
| EX1008 | Voswinckel, R. *et al.*, Abstract 1414: "Inhaled Treprostinil Sodium (TRE) For the Treatment of Pulmonary Hypertension," Abstracts from the 2004 Scientific Sessions of the American Heart Association, *Circulation,* 110(17 Suppl.):III-295 (October 26, 2004) ("Voswinckel JAHA") |

PAH for an entire day.  For example, Voswinckel JAHA confirms that 4 individual dosing events were required throughout the day to treat pulmonary hypertension. EX1008. Even at the high end, the simple math demonstrates that a 58.5 microgram daily dose would amount to less than 15 micrograms of treprostinil sodium per single event dose when spread over four individual dosing events.

34.    For these reasons, the '212 patent does not direct anyone to a single event dose that would fall within the 15 microgram to 90 microgram requirement delivered in 1 to 3 breaths of claim 1, and dissuades one from the idea of discrete, metered dose inhalation altogether.

**B.    Voswinckel JESC**

35.    Like the '212 patent, Voswinckel JESC also teaches <u>continuous</u> nebulization, albeit at a shorter time interval, over 6 minutes, at very low concentrations (16, 32, 48, and 64 μg/mL).  EX1007.  Voswinckel JESC specifies the concentration of the drug in the pre-aerosolized solution, but does not specify the dose.  Liquidia (through its experts—Drs. Hill and Ghonda) has attempted to impute a dosage to the teaching of Voswinckel JESC by applying multiplying a "nebulization rate" (in mL/min) by the stated concentrations (in μg/mL) by the deliver time (6 minutes).  *See, e.g.,* EX1002, ¶65.  This analysis is flawed for the following reasons:

16

36.    *First*, the actual dose delivered by a continuous nebulizer depends on more than just the nebulization rate, concentration and time.  It also depends on gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern and device interface.  EX2029-EX2031.  None of these parameters were disclosed in Voswinckel JESC.  Thus, a person of ordinary skill in the art would be unable to determine from the disclosure in Voswinckel JESC what the single event dose administered in the described study was.

37.    *Second*, the relevant parameters for determining dosage vary significantly not only between manufacturers, but also between nebulizers from the same manufacturer.  *Id.* Voswinckel JESC simply states that an "OptiNeb, ultrasound nebulizer (Nebu-tec, Germany)" was used, but does not provide a catalogue number, or any identifying information that would allow a person of ordinary skill in the art to determine precisely which OptiNeb ultrasound nebulizer was used.

38.    *Third,* even if a person of ordinary skill could determine the dosage based on the simplified formula used by Dr. Hill in his declaration, Dr. Gonda's assertion that "[a] POSA would have known that nebulizers conventionally deliver between 1 and 5 mL dose" (para 56 and n. 4) and Dr. Hill's assertion that he had in his own practice "prescribed volumes of at[sic] least 1 mL for inhalation therapy using nebulizers" (paragraph 65) is flatly irrelevant, because neither declarants'

17

statement takes into account the particular drug to be administered or the concentration of that drug solution.  The fact that Ventavis®--a drug with a different potency and a different half-life—is prescribed at a total volume of 2.5-5 mLs is completely irrelevant to understanding amount of treprostinil delivered in the dosing regimen of Voswinckel 2006.

39.    *Finally,* the pharmacokinetic effects of inhaling a low concentration of a medication over a long period of time (several minutes) is different than the pharmacokinetic effects of receiving that same dose over a shorter period of time (such as 1-3 breaths).   For example, during a 6-minute dosing event, the expected number of breaths would be in the range of 72 to 96 (a patient breathes approximately 12-16 times per minute, which equates to 72 to 96 breaths during a continuous nebulization session of 6 minutes).  This is orders of magnitude beyond the upper limit of 3 breaths in claim 1 and results in completely different pharmacokinetic effects (e.g., the amount of spillover treprostinil that enters systemic circulation is far lower with continuous nebulization).

### C.    Voswinckel JAHA

40.    Voswinckel JAHA also does not teach a therapeutically effective single event dose of 15 micrograms to 90 micrograms. Voswinckle JAHA is an abstract published in "Circulation-the Journal of the American Heart Association, which discloses "TRE inhalation by use of the pulsed OptiNeb® ultrasound nebulizer (3

18

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

## LIQUIDIA TECHNOLOGIES, INC.
Petitioner

v.

## UNITED THERAPEUTICS CORPORATION
Patent Owner

Patent No. 10,716,793 B2
Issue Date: July 21, 2020
Title: TREPROSTINIL ADMINISTRATION BY INHALATION

_____

_Inter Partes_ Review No. IPR2021-00406

_____

## DECLARATION OF DR. WERNER SEEGER

4847-7760-0219.1

occurred over this time period, without pulsing of aerosol generation and without

an opto-acoustical trigger (see '016 application, par. [0066], [0070], and [0071]).

25.    Unexpectedly, when we used treprostinil at a much higher dose in our

second study with the OptiNeb® ultrasonic nebulizer device, we discovered that

treprostinil has a slower transpulmonary transit time (time of drug "spillover" into

the blood to reach peak plasma concentration) of 10 to 15 minutes when

administered to pulmonary hypertension patients (id. at Fig. 12), compared to

iloprost. *See* Olschewski, *et al.*, *Pharmacodynamics and Pharmacokinetics of*

*Inhaled Iloprost, Aerosolized by Three Different Devices, in Severe Pulmonary*

*Hypertension*, Chest J., 124(4), 1294-1304, 1294 (Oct. 2003) ("rapid entry of

iloprost into the systemic circulation was noted, peaking immediately after

termination of the inhalation maneuver"). This particular pharmacokinetic data is

disclosed in our patent application (see '016 application at Fig. 12), but is not

reported in either of the Voswinckel abstracts (Exs. 1007 and 1008), Voswinckel

2006 (E. 1009), or the Ghofrani publication (Ex. 1010). This slower time to reach

peak plasma concentration is important. It obviously allows: a) to avoid major

systemic side effects even when high total inhalation doses are used (nevertheless

the high local concentrations in the lung already provide the desired therapeutic

effect); b) to reduce the inhalation time to even a few breaths (made possible by

switching to a pulsed ultrasonic nebulizer in the further course of the studies); and

13

c) to increase the overall inhaled treprostinil dose more than one order of

magnitude over the overall inhaled tolerable iloprost dose.

26.    In a subsequent trial, we modified the OptiNeb® device to include both

pulsing and an opto-acoustical trigger, while using a high enough concentration of

pre-aerosolized treprostinil solution to permit high dosing in a small number of

breaths coordinated with each of the aerosol pulses (Ex. 2100, par. [0072], [0079]-

[0081] and [0088]), which dramatically shortened the overall time of each

treatment session. Drs. Voswinckel, Olschewski, Schmehl and I were involved in

guiding the design of these changes to the OptiNeb® device and working to

implement them into the treatment regimen. The co-inventors and I, therefore, had

to work directly with Nebu-tec®, the manufacturer of the OptiNeb® device, to guide

modifying the device to achieve all of the necessary features. Because we moved

to such a high concentration of treprostinil in the aerosol, the opto-acoustical

trigger to guide the patient's breathing and synchronize it to each pulse of aerosol

was especially important. To my knowledge, the OptiNeb® device we created was

not one that was publicly available or otherwise publicly disclosed prior to our

patent application. Although the Voswinckel JESC publication references a

"pulsed" OptiNeb® nebulizer (Ex. 1008, p. 3), it does not disclose any of the

modifications we made, including the opto-acoustical trigger for coordinating each

patient's breath with each pulse of aerosol at these high treprostinil concentrations.

14

Declaration of Dr. Werner Seeger

27.    In sum, while my collaboration with Drs. Rubin, Voswinckel, Olschewski, Schmehl, Roscigno, and Sterritt was the basis of our patent application leading to the '793 patent, the collaboration did not necessarily result in their inclusion on a review article, abstracts having incomplete information or clinical observation letters.

28.    I hereby declare that all statements made herein of my knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both under Section 1001 of Title 18 of the United States Code.

Date: _____, 2021

_____

Dr. Werner Seeger

15

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

## LIQUIDIA TECHNOLOGIES, INC.,
Petitioner

v.

## UNITED THERAPEUTICS CORPORATION.
Patent Owner

_____

Trial No. IPR2021-00406
Patent No. 10,716,793 B2

_____

## DECLARATION OF Ms. PILAR WYMAN

IPR2021-00406
United Therapeutics EX2041

10.    As previously stated, Voswinckel JAHA is one of thousands of abstracts contained in a 1,102-page supplement to the journal *Circulation*. For example, page 3 of Exhibit 1008 alone contains four abstracts and part of a fifth abstract, suggesting that the Supplement likely contains many thousands of abstracts. Unlike regular publications, supplements contain additional information not found in the regular journal issues, and they are released irregularly as compared to normal issues of a given journal. Publishers typically have the option of when to release supplements, if at all. Because it is unpredictable when additional information will become available and publishers have discretion when to release supplements, supplements are often not released on a routine basis or predictable schedule.

11.    This is particularly true for the Supplement containing Voswinckel JAHA. First, the title of the Supplement, *Abstracts from Scientific Sessions 2004*, suggests the Supplement was released in relation to the Scientific Sessions 2004 Conference in November 2004. However, in my experience, it is not uncommon for supplements associated with conferences to be released well after the conference date because of the length of time associated with the peer-review process, printing, delivery, etc., all of which makes their publication date

not regularly published, if at all, each year. Ex. 2044. Finally, even if there was some predictable publication frequency for the supplements, Dr. Hall-Ellis admittedly has not provided any evidence showing that the Supplement was actually received by a library during that time. Ex. 2043, 157:6-158:1. As noted previously, I am personally aware of conference proceeding publications being delayed for years after the underlying event (*supra*, footnote 1), and a similar delay could easily have occurred here – certainly Dr. Hall-Ellis hasn't shown otherwise.

15.    Moreover, even today, this Supplement is difficult to locate and access, whereas other supplements from the same period have since been digitized or uploaded. In fact, I personally have searched for this Supplement online, and have not been able to locate it. The Supplement is also not listed in the American Heart Association online archives.

**B. Neither the Supplement of *Circulation* Nor Individual Abstracts Therein Were Meaningfully Indexed as of the Critical Date, and Dr. Hall-Ellis Has Not Provided any Evidence of Such**

16.    It is my opinion that Voswinckel JAHA was not publicly accessible before May 15, 2006 because neither the Supplement nor the abstracts within it were meaningfully indexed. For example, Dr. Hall-Ellis testified that the "510 field" from the MARC record for a given journal indicates where articles from that journal are indexed. *See* Ex. 1036, ¶50. Dr. Hall-Ellis attached a MARC record

corresponding to the journal *Circulation* to her Declaration (*id.*, Attachment D-5); the 510 field in this MARC record suggests that *Circulation* articles are indexed in Chemical Abstracts. However, I personally searched Chemical Abstracts Plus ("CAPlus") and confirmed that the Voswinckel JAHA abstract is **not** indexed therein. *See* Ex. 2045.[4] To the contrary, a search in CAPlus using the search terms "Voswinckel" and "treprostinil" shows that the oldest entry is from 2006, as shown by "2006:1023703" (*id.*, 11), and none of the search results are materials from the Supplement. In addition, the search results that are returned consist exclusively of full-scale journal articles, rather than abstracts. This confirms that CAPlus (like other research databases, in my experience) does not include the abstracts that were published in the Supplement.

17.    Importantly, the same is true for all of the common databases Dr. Hall-Ellis identified as ones that a POSA would typically turn to. *See* Ex. 2043, 41:1-42:4 (listing Ovid, PubMed, Index Medicus, and Chemical Abstracts as the relevant databases that a POSA would have used to search for art in the field as of

---

[4] The search results are returned as a "transcript," and in this case there were 8 hits returned, none of which corresponded to Voswinckel JAHA.

2006). I personally searched Ovid, PubMed (which incorporates Index Medicus[5]), and CAPlus (which incorporates Chemical Abstracts), and **the Voswinckel JAHA abstract cannot be found in any of them**. Ex. 2046; Ex. 2047; Ex. 2045. This is strong evidence that the Voswinckel JAHA abstract was not meaningfully indexed such that it could have been located by an interested POSA through reasonable diligence, especially as of the 2006 critical date when many more modern databases did not exist or were in their infancy and contained fewer indexed holdings.

18.    Dr. Hall-Ellis asserts Voswinckel JAHA was meaningfully indexed in the UWML by May 15, 2006. Ex. 1036, ¶59. For support, Dr. Hall-Ellis points to Exhibit D to conclude that UWML indexed a physical copy of the Supplement containing Voswinckel JAHA. *Id.* Exhibit D appears to be a scanned image of a physical copy of the Supplement cover, introductory pages, and the abstract. *Id.*, Exhibit D. Notably, while a white sticker appears to be affixed to the cover, the cover page lacks any indication it was ever received by or located at the UWML.

---

[5] Index Medicus is no longer published. "It ran in print form until 2004. The National Library of Medicine's PubMed database now covers the publications that Index Medicus once covered, as well as many other publications." https://onlinebooks.library.upenn.edu/webbin/serial?id=indexmedicus.

There is also no "received" or "accepted" stamp anywhere on the cover, and there is no evidence of any "received" or "accepted" date.



19.    Dr. Hall-Ellis states that her opinion is based, in part, on finding a digital copy in the UWML, not the physical copy reproduced in the above image. *See id.*, ¶¶59-61. However, Exhibit 2040 introduced during the Hall-Ellis Deposition indicates the UWML does not have physical copies of this Supplement. *See* Ex. 2040, 2 (showing physical holdings only of supplement volumes 114 and

**A. Unlike Normal Journal Issues, Supplements of the *European Heart Journal* Are Not Routinely or Predictably Released, and Dr. Hall-Ellis Has Not Provided any Evidence of Receipt by a Library as of the Critical Date**

29.     Like the Voswinckel JAHA abstract, it is my opinion that Dr. Hall-Ellis has failed to show that either the *EHJ* Supplement or the Voswinckel JESC abstract was disseminated in any predictable way such as to be accessible more than one year before the May 15, 2006 priority date—as evidenced by the fact that the *EHJ* Supplement and Voswinckel JESC abstract continue to be difficult to access even today.

30.     As previously stated, Voswinckel JESC is one of 3,850 abstracts spanning more than 700 pages in the *EHJ* Supplement to the *European Heart Journal*.  Unlike regular publications, supplements contain additional information not found in the regular journal issues and they are released irregularly as compared to normal issues of a given journal.  Publishers typically have the option of when to release supplements, if at all.  Because it is unpredictable when additional information will become available and publishers have discretion when to release supplements, supplements may not be released on a routine basis or predictable schedule.

31.     This is particularly true for the *EHJ* Supplement containing Voswinckel JESC.  First, the cover of the *EHJ* Supplement suggests the *EHJ*

19

**B. Neither the *EHJ* Supplement Nor Individual Abstracts Therein Were Meaningfully Indexed as of the Critical Date, and Dr. Hall-Ellis Has Not Provided any Evidence of Such**

34.     Like the Voswinckel JAHA abstract, Dr. Hall-Ellis relies on a digital copy from the University of Iowa Library rather than locating a physical copy to allegedly show the *EHJ* Supplement was available at the University of Iowa Library system by the priority date.  Further, Dr. Hall-Ellis similarly, and incorrectly, relies on the MARC and Library of Congress records to show the Voswinckel JESC abstract was available at the University of Iowa Library system by the priority date.  However, the same issues with the Voswinckel JAHA abstract are present with the Voswinckel JESC abstract.

35.     For example, Dr. Hall-Ellis identified the MARC catalog records corresponding to the entire *European Heart Journal* as alleged evidence that the *EHJ* Supplement (and the Voswinckel JESC abstract) were located at the University of Iowa Library by the priority date, but the cited evidence does not support her conclusions for the same reasons I have already discussed.  *See supra*, ¶¶16-17, 19-25.  Additionally, Dr. Hall-Ellis identifies general descriptor terms for the entire *European Heart Journal* rather than the *EHJ* Supplement or the Voswinckel JESC abstract, which would produce from thousands up to hundreds of thousands of search results that would include every issue of the *European*

22

*Heart Journal* since it started publication about 40 years ago,[13] and would not necessarily show the *EHJ* Supplement, just as I described previously. *See supra*, ¶24.

36.     Dr. Hall-Ellis contends that the *EHJ* Supplement contains a table of contents, indexed by topic.  Ex. 1036, ¶76.  However, even with the *EHJ* Supplement table of contents, a POSA exercising reasonable diligence still would not have been able to easily find the Voswinckel JESC abstract because this "table of contents" in the *EHJ* Supplement lacks a *meaningful* topic index.  Like the Supplement containing the Voswinckel JAHA abstract, a POSA would have to obtain an entire copy of the *EHJ* Supplement and then flip through it page by page in order to find the Voswinckel JESC abstract.

37.     However, like the Supplement containing the Voswinckel JAHA abstract, the *EHJ* Supplement and the Voswinckel JESC abstract are similarly difficult to locate.  The *EHJ* Supplement is not indexed in Ovid, PubMed, or CAPlus, all of which are common databases for clinical research and POSAs.  In

---

[13] Vol. 1, Issue 1 of the *European Heart Journal* is dated February 1980. https://academic.oup.com/eurheartj/issue/1/1.

fact, Dr. Hall-Ellis admitted she, too, had not located the Voswinckel JESC

abstract in these databases.  *See* Ex. 2043, 243:12-18.

38.    In sum, Dr. Hall-Ellis has provided little more than general

information about the *European Heart Journal* as a whole.  Dr. Hall-Ellis provides

no evidence that the *EHJ* Supplement containing Voswinckel JESC was ever

received by a library as of the priority date.  And even if it were, there is also no

evidence that any meaningful indexing of the *EHJ* Supplement or the Voswinckel

JESC abstract ever occurred or, if it has been done, when it occurred.  My own

research suggests that the *EHJ* Supplement and the Voswinckel JESC abstract have

not been meaningfully indexed, as evidenced by their lack of appearance in the

databases that Dr. Hall-Ellis admits a POSA would turn to.  *See supra*, ¶17; Ex.

2043, 41:1-42:4.  Based on the above, it is my opinion that the Voswinckel JESC

abstract was neither disseminated nor available such that a POSA exercising

reasonable diligence could have located the Voswinckel JESC abstract before May

15, 2006.

39.    I hereby declare that all statements made herein of my knowledge are

true and that all statements made on information and belief are believed to be true;

and further that these statements were made with the knowledge that willful false

IPR2021-00406
U.S. Patent No. 10,716,793 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

LIQUIDIA TECHNOLOGIES, Inc.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

————————————

IPR2021-00406
U.S. Patent No. 10,716,793

————————————

**DECLARATION OF AARON WAXMAN, M.D., PH.D**

**IPR2021-00406
United Therapeutics EX2052**

35.    By the 2006 priority date of the '793 patent, clinicians had begun to explore inhalation therapies for the treatment of pulmonary hypertension.  *See, e.g.,* EX1007.  At that time, the only FDA-approved prostacyclin-type drug that could be given in an inhalable form was iloprost, marketed as Ventavis®.  The results of an Aerosolized Iloprost Randomized (AIR) Study documenting the effects of inhaled iloprost had been public about three and a half years, and Ventavis®, which was approved in 2004, had been on the market for about one and a half years.  EX2009, 21.

36.    Clinicians were still largely of the opinion, however, that intravenous administration of a prostacyclin analog was preferable to inhaled delivery of iloprost for a number of reasons.  *Id.*  For instance, iloprost has a half-life between 20-25 minutes.  *Id.* at 21, 23-24.  As a result, iloprost needs to be administered 6-9 times a day, as frequently as every 2 hours, which was considered challenging for patients to implement.  *Id.*  Moreover, the fact that iloprost has a short half-life results in periods where patients may be off-medication or under-medicated while asleep unless they wake up to take a dose of the drug.  *Id.*

### C.    General Overview of Inhalation Therapies

37.    As of 2006, there were several known methods for delivering a drug using inhalation.  One class of inhalation devices were "continuous nebulizers." Continuous nebulizers deliver small amounts of drug by converting drug solutions

or suspensions into aerosols, which the patient inhales over a specified period of time (frequently between 5 and 30 minutes). EX2032 ("only 10% of the total dose loaded in a [continuous] nebulizer is in reality deposited in the lungs"). The patient wears a mask (or uses a mouthpiece) and breathes in unmeasured portions of the entire nebulized output delivered through the device and the components leading to the patient's mouth:



EX2033.

38.     Continuous nebulizers are designed to be used with a broad range of liquid formulations, but they have several drawbacks. They require delivery over a longer period of time, and the dosage is difficult to control. Various types of continuous nebulizers were available at the priority date of the '793 patent, and several studies indicated that performance varies between manufacturers and also between nebulizers from the same manufacturer. EX2029-EX2031. Various factors that can affect the dose of drug received by a patient through a continuous nebulizer

include gas flow and pressure, fill and dead volumes, gas density, humidity and temperature conditions, breathing patterns, nebulizer settings and programming, and the nebulization device interface (*e.g.*, whether it prompts or guides the patient during use in any way, or adapts to ongoing use). *Id.*

39.    Other types of inhalation devices are capable of delivering a more precise amount of a medication in a <u>specific number of breaths</u> over a single inhalation event. They can provide a fixed dose of medication per breath. Examples of these types of inhalers that I have used in my practice include pressurized metered-dose inhalers, soft-mist inhalers, pulsed ultrasonic nebulizers, breath-actualized nebulizers, and dry powder inhalers. Pressurized metered dose inhalers generally contain a propellant that, when the device is activated, provides a force for administering a dose of medication. An example soft mist inhaler is the Respimat device disclosed in the '793 patent. EX1001, 7:33. It works by using the force of a spring to propel drug solution through small nozzles and create an inhalable mist. EX1061 at 4. Ultrasonic nebulizers use ultrasonic frequency to create an aerosol. Continuous nebulizers run, as the term implies, continuously. "Pulsed nebulizers" operate with some type of pulse, which could turn the nebulizer on or off at fixed times, or there can be additional features that attempt to coordinate the patient's breaths with nebulization by the device. *See generally* EX1026 at 1; EX1029 at 1. For example, with the pulsed ultrasonic nebulizer described in the '793 patent and

employed with Tyvaso®, the patient completely inhales the nebulized output in one "pulse" of the device by enclosing the device's mouthpiece within their mouth and inhaling at the time indicated after the fixed amount of aerosol per breath is generated:



EX2034.

### D.    Overview of the Claimed Invention

40.    In my opinion, the inventors of the '793 patent overcame many of the limitations of the existing methods of pulmonary hypertension treatments by developing a method that utilizes a high administration of inhaled treprostinil in 1 to 3 breaths.

41.    While I am familiar with earlier treprostinil treatments that employed continuous nebulization methods, the method of treatment described in the '793 patent surprisingly demonstrated that a therapeutically effective dose of 15

micrograms[3] to 90 micrograms could be safely delivered to a patient in just a few breaths. EX1001 at 16:61-63; *see also id.* at 17:44-46 (study "successfully demonstrated that the inhalation time could be reduced to literally one single breath of 2000 μg/ml treprostinil solution, thereby applying a dose of 15 μg"). Surprisingly, high concentrations of treprostinil were shown to be well tolerated by patients with even a single breath administration of the drug, which induced pulmonary vasodilation for longer than 3 hours with minimal side effects. *Id.* at 18:1-6. This result was surprising because treprostinil was known to be a potent drug and another prostacyclin analog, iloprost, was approved in delivered doses of only 2.5 to 5.0 μg because of side effects. EX1083 at 9.

42. I have regularly prescribed Tyvaso® (inhaled treprostinil), which I understand to be the commercial embodiment of the '793 patent, because Tyvaso® has shown distinct advantages over Ventavis®, the only other available inhalation treatment for pulmonary hypertension. For example, Tyvaso® (inhaled treprostinil) does not need to be administered as frequently as Ventavis®, leading to higher patient compliance and less risk of rebound pulmonary hypertension. Tyvaso® (inhaled treprostinil) has a much longer half-life than Ventavis® when inhaled by

---

[3] A microgram is a unit of mass equal to one millionth of a gram. A microgram is commonly abbreviated as mcg or μg. As such, I may use microgram, mcg and/or μg interchangeably throughout my declaration.

human subjects suffering from pulmonary hypertension. This allows Tyvaso® to be administered markedly less frequently – about 4 times a day. I have observed that patients are more likely to comply with a regimen that requires less frequent administrations. Furthermore, because Tyvaso® has a longer half-life than Ventavis®, there is less risk when the patient is asleep or otherwise unable to take the medication.

43.     A study reported that "the transition from inhaled iloprost to inhaled treprostinil resulted in a time saving of approximately 1.4 h per day." EX2035, 5. Patients transferring from inhaled iloprost to inhaled treprostinil also had improved six-minute walk distances (a common metric to assess pulmonary hypertension), improved patient satisfaction, and improved quality of life. *Id.* at 5-6.

## V.     VALIDITY OF THE '793 PATENT

### A.     Overview of the Challenged Grounds and Cited References

44.     I have been informed that Petitioner has asserted six grounds of invalidity as set forth below:

| Ground | '793 Patent Claims | Alleged Basis |
|---|---|---|
| 1 | 1-8 | Obviousness: '212 patent, Voswinckel JAHA, Voswinckel JESC |
| 2 | 1-8 | Obviousness: '212 patent and Voswinckel JESC |
| 3 | 1 | Anticipation: Ghofrani |
| 4 | 1, 3, 8 | Obviousness: Voswinckel JAHA and Ghofrani |
| 5 | 1, 3 | Anticipation: Voswinckel 2006 |
| 6 | 2, 4-8 | Obviousness: Voswinckel 2006 and '212 patent |

45.    I understand that Petitioner is relying on the following references or combinations thereof as alleged prior art:

- United States Patent no. 6,521,212 (the "'212 patent") (EX1006)

- Voswinckel, R., et al., Abstract 218: "Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension," *European Heart Journal* 25:22 (2004) ("Voswinckel JESC") (EX1007)

- Voswinckel, R., et al., Abstract 1414: "Inhaled Treprostinil Sodium (TRE) for the Treatment of Pulmonayr Hypertension," Abstracts from the 2004 Scientific Sessions of the American Heart Association, *Circulation,* 110(17 Suppl.):III-295 (October 26, 2004) ("Voswinckel JAHA") (EX1008)

- Voswinckel, R., et al., "Clinical Observations" on "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension," "Letters" Section of the *Annals of Internal Medicine*, 144(2)149-50 (January 2006) ("Voswinckel 2006") (EX1009)

- Ghofrani, H.A., et al., Neue Therapieoptionen in der Behandlung der pulmonarlarteriellen Hypertonie, 30(4):296-302 (Junen 2005) ("Ghofrani") (translated) (EX1010)

46.    I have been advised that Voswinckel 2006 and Ghofrani are not qualifying prior art, which causes Grounds 3-6 to fail.  Thus, I have been asked to

provide opinions regarding Grounds 1-2, and the '212 patent, Voswinckel JESC and Voswinckel JAHA references cited therein, only.

47.     In my opinion, these references do not teach or suggest each and every limitation of the claims of the '793 patent.  Among other reasons, for example, none of these three references, alone or in combination, teach a "therapeutically effective single event dose of 15 micrograms to 90 micrograms … delivered in 1 to 3 breaths."

48.     Rather than disclosing the required single event dose,[4] these three references *only* provide the initial concentration of the pre-aerosolized drug and the length of time that the drug is inhaled.  As explained in more detail below, the actual dose delivered to the patient using an inhalation device depends upon numerous variables, including for example, the type of inhalation device used, gas (air) flow, pressure, and density, fill and dead volumes (how much is put into the device, and how much is left over when the administration is complete), humidity, temperature, the patients breathing patterns, and the inhalation device interface.   EX2029-EX2031.  I note however, that many of these critical details and information are not disclosed in the '212 patent, Voswinckel JESC, or Voswinckel JAHA, as further summarized below:

---

[4] A POSA would understand "single event dose" to mean the amount of treprostinil inhaled in a single treatment session. *See, e.g.*, EX1001, 7:60-67 (stating that the single event can be carried out in a limited number of breaths), claim 1 (referring to the single event dose delivered in 1 to 3 breaths).

IPR2021-00406
U.S. Patent No. 10,716,793 B2

| Reference | Disclosure |
|---|---|
| '212 Patent (EX1006) | Device: "AM-601 Medicator Aerosol Delivery System™" (Healthline Medical) (5:30-36)<br>Pre-aerosolized conc.: 31.25 mcg/mL (9:3-8)<br>Nebulization Rate: 0.28 mL/min (9:7-8; 10: 43-44; 11:9-10)<br>Duration: 30, 60 or 90 min (9:14; 10:43-44; 11:11-13)<br><br>Single Event Dose: Unknown |
| Voswinckel JESC (EX1007) | Device: "OptiNeb ultrasound nebulizer, Nebu-tec, German"<br>Pre-aerosolized conc.: 6, 32, 48, and 64 mcg/mL<br>Duration: 6 min<br>Single Event Dose: Unknown |
| Voswinckel JAHA (EX1008) | Device: "pulsed OptiNeb® ultrasound nebulizer"<br>Pre-aerosolized conc.: 600 mcg/mL<br>Duration: Three breaths<br>Single Event Dose: Unknown |

49.    In my opinion, a POSA would not read any of these references, alone or in combination, to teach or suggest "a therapeutically effective single event dose of 15 μg to 90 μg" "delivered in 1 to 3 breaths" for at least the reasons discussed below.

## 1.    The '212 Patent (EX1006)

50.    The '212 patent teaches methods of delivering benzindene prostaglandins by inhalation generally and describes studies involving continuous nebulization over an extended period of time. The '212 patent provides examples wherein intravenous or aerosolized treprostinil is administered to tracheotomized

22

nebulizer. *See* EX1001, claim 1 (requiring the single event dose be "delivered in 1 to 3 breaths"); *id.* at 13:46-62 (describing – based on biophysical characterization – the delivered doses that corresponded to certain concentrations for the formulation and device used, and identifying doses of, for example, 15, 30, 60, and 90 μg.) Based on my knowledge and experience, a POSA would also need to account for the gas flow and pressure, fill and dead volumes, gas density, and humidity and temperature conditions, breathing pattern and device interface, among other things. EX2029-EX2031. None of these parameters are disclosed in Voswinckel JESC and, in my opinion, a POSA would be unable to determine the actual single event dose administered in the described study described in Voswinckel JESC. Even if a POSA were to attempt a rough estimate of an administered dose, the range would be very broad and unreliable.

67.    *Second*, based on my knowledge and experience, the relevant parameters for determining a single event dose can vary significantly not only between manufacturers, but also between nebulizers from the same manufacturer. *Id.* Voswinckel JESC generally states that an "OptiNeb, ultrasound nebulizer (Nebu-tec, Germany)" was used in connection with the study, but does not provide a catalogue number, or any identifying information that would allow a person of ordinary skill in the art to determine the particular OptiNeb ultrasound nebulizer that was used by the authors. In fact, Dr. Hill agreed, testifying that he did not know

32

IPR2021-00406
U.S. Patent No. 10,716,793 B2

whether the Optineb device of the undated Optineb manual was the same device used in Voswinckel JESC because Voswinckel JESC does not specify a model number or give any other identifying information that would suggest what actual model used in connection with the study. EX2055 (Hill Dep. Tr.) at 81:12-22 (Dr. Hill didn't know whether it was an Optineb-IR, Optineb-Pro or Optineb ON-100-2); 83:3-7.

68.    Indeed, I note that Dr. Hill agreed that it was unclear whether the Optineb device of the undated Optineb manual upon which he relies on for the proposition that the nebulizing rate of Voswinckel JESC would be 0.6 mL/min was the same device used in Voswinckel JESC because Voswinckel JESC does not specify a model number or give any other identifying information that would suggest what actual model used in connection with the study. EX2055 (Hill Dep. Tr.) at 61:5-62:25; 81:12-22; 83:3-7. Similarly, Dr. Gonda admitted that it was unclear whether the Optineb device of the undated Optineb manual was a 1.6 or 2.4 megahertz model. EX2056 (Gonda Dep. Tr.) at 83:2-24. I agree and further note that the undated Optineb manual lacks any discussion of suitable doses for drug delivery. Thus, in my opinion, the undated Optineb manual was not "general knowledge of the art around the time of the invention."

69.    *Third,* even if a POSA could determine the dosage based on the simplified formula used by Dr. Hill in his declaration, Dr. Gonda's assertion that

33

"[a] POSA would have known that nebulizers conventionally deliver between 1 and 5 mL dose" (para 56 and n. 4) and Dr. Hill's assertion that he had in his own practice "prescribed volumes of at[sic] least 1 mL for inhalation therapy using nebulizers" (paragraph 65) is irrelevant, because neither experts' statements take into account the particular drug to be administered or the concentration of that drug solution.  For example, Dr. Hill stated that his experience delivering 1 mL or more of solution was based upon different indications and drugs. EX2055 (Hill Dep. Tr.), 146:16-23 (identifying bronchodilators for asthma/COPD, inhaled corticosteroids, and anticholinergics as "the main things I would have nebulized"). Dr. Hill did not mention experience nebulizing 1 mL or more of treprostinil.  In my opinion, the fact that Ventavis® – a drug with a different potency and a different half-life – is prescribed such that a total volume of 2.5-5 mLs is placed into the nebulizer does not suggest to a POSA how much treprostinil was added to the nebulizer in Voswinckel JESC.

70.     *Finally,* the pharmacokinetic effects of inhaling a low concentration of a medication over a long period of time (several minutes) are different than the pharmacokinetic effects of receiving that same dose over a shorter period of time (such as 1-3 breaths).  For example, during a 6-minute dosing event, the expected number of breaths would be in the range of 72 to 96 breaths per minute.  EX2057, *Vital Signs (Body Temperature, Pulse Rate, Respiration Rate, Blood Pressure),*

34

Johns Hopkins Medicine (stating the average respiration rate for an adult is 12-16 breaths per minute). I note Dr. Hill also agreed that the "pharmacokinetics of inhaled doses are very different than continuous" because "it's different routes of administration, different pharmacokinetics, apples and oranges." EX2055 (Hill Dep. Tr.) at 110:17-111:17.

71.     In my clinical experience, it is not uncommon to see higher breathing rates in patients with pulmonary hypertension, closer to 18-22 breaths per minute. The number of breaths per minute may depend on the individual patient and severity of illness. Regardless, this is orders of magnitude beyond the upper limit of 3 breaths in claim 1 of the '793 patent and a POSA would have been concerned with the completely different pharmacokinetic effects of administering treprostinil very quickly instead of over several minutes (*e.g.*, the amount of spillover treprostinil that enters systemic circulation is far lower with continuous nebulization).

### 3.     Voswinckel JAHA (EX1008)

72.     Voswinckle JAHA is a brief abstract spanning approximately a quarter of a single page in the Circulation Journal of the American Heart Association. It generally describes preliminary data of an open-label study of "TRE inhalation by use of the pulsed OptiNeb® ultrasound nebulizer (3 single breaths, TRE solution 600 μg/ml." EX1008. This abstract discloses a pre-aerosolized concentration for the treprostinil solution of 600 μg/mL for inhalation over a specific number of

35

to be taken 6 to 9 times per day. EX1029. Even at these doses, at least 39% of patients experienced at least one adverse event. *Id.* at 8. The Ventavis® label further teaches – in a study where health volunteers were given inhaled doses of iloprost solution every 2 hours increasing from 5 mcg to up to 20 mcg – 32% of subjects failed to reach the highest scheduled dose.

101.    The higher doses in Voswinckel JESC were also found to include more side effects than the 16 μg/mL dose.

102.    In view of the potential for side effects, the inventors of the '793 patent made the surprising discovery that therapeutically effective, high doses of treprostinil could be delivered to a patient in a shorter period of time with fewer side effects by developing a method that combined higher dosing in fewer breaths using a modified inhalation device (*e.g.*, modified Optineb pulsed ultrasonic nebulizer). *Watson Laboratories v. United Therapeutics*, IPR2017-01622, EX2048, Roscigno Declaration, ¶11 (inventors "discovered unexpectedly that [they] could deliver more treprostinil in a shorter period of time with fewer side effects (increasing the treprotinil [sic] dose more than 10-fold compared with iloprost…was not obvious to anyone"). This was a more than 10-fold increase in the treprostinil dose as compared with iloprost, the only other inhaled treprostinil therapy available as of 2006. *Id.*

103.    The claimed invention relies on the unexpected interplay of treprostinil's pharmacodynamic properties following inhalation, including a slower

time to reach peak plasma concentration.  As one of the inventors of the '793 patent

explained:

> Unexpectedly, when we used treprostinil at a much higher dose in our second study with the Optineb ultrasonic nebulizer device, we discovered that treprostinil has a slower transpulmonary transit time (time of drug 'spillover' into the blood to reach peak plasma concentration) of 10 to 15 minutes when administered to pulmonary hypertension patients … compared to iloprost … This slower time to reach peak plasma concentration is important.  It obviously allows: a) to avoid major systemic side effects even when high total inhalation doses are used (nevertheless the high local concentrations in the lung already provide the desired therapeutic effect); b) to reduce the inhalation time to even a few breaths (made possible by switching to a pulsed ultrasonic nebulized in the further course of the studies); and c) to increase the overall inhaled treprostinil dose more than one order of magnitude over the overall inhaled tolerable iloprost dose.  In a subsequent trial, we modified the Optineb device to include both pulsing and an opto-acoustical trigger, while using a high enough concentration of pre-aerosolized treprostinil solution to permit high dosing in a small number of breaths coordinated with each of the aerosol pulses … which dramatically shortened the overall time of each treatment session.

EX2071, *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01621, Second

Declaration of Dr. Werner Seeger (EX2098, ¶¶13-14) (internal citations omitted).

These properties are the result of the claimed invention achieving the right balance

of local delivery of treprostinil to the diseased pulmonary vasculature and circulatory

spillover.  EX2061, Declaration of Dr. Robert Roscigno, EX2048, ¶ 11 (noting risk

of spillover effect when inhaled amount of treprostinil is increased); *see also*

EX1048 Walmrath 1993 at 962 (describing that "an increase in the dose of

**CONFIDENTIAL MATERIAL OMITTED**

IPR2021-00406

U.S. Patent No. 10,716,793 B2

aerosolised prostacyclin might cause 'spillover' of the prostanoid into the systemic circulation.").

104.    Further, Petitioner and Dr. Hill has argued that it would be obvious to a POSA to titrate up the dose and decrease the time of inhalation.  Early studies in which PAH patients were administered varying doses of treprostinil by inhalation over different time periods however, demonstrated that doubling the concentration and shortening the administration time by half did not lead to better results:



EX2061, *Watson Labs., Inc. v. United Therapeutics Inc.*, IPR2017-01622, EX2049; *see also* Declaration of Dr. Robert Roscigno, EX2048, ¶¶ 11, 14-15 (citing EX2049, EX2050, EX2051).  As such, Dr. Roscigno, one of the inventors of the 793 patent explained it was unexpected that going to an even shorter interval than 1 minute to the claimed "1 to 3 breaths" would lead to better results, and that it was not obvious to try higher concentrations at 1 to 3 breaths.

51

IPR2021-00406
U.S. Patent No. 10,716,793 B2

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

LIQUIDIA TECHNOLOGIES, Inc.,
Petitioner,

v.

UNITED THERAPEUTICS CORPORATION,
Patent Owner.

————————————

IPR2021-00406
U.S. Patent No. 10,716,793

————————————

**DECLARATION OF DR. JASON MCCONVILLE**

IPR2021-00406
United Therapeutics EX2053

IPR2021-00406
U.S. Patent No. 10,716,793 B2

**B.    Prosecution History of the '793 Patent**

38.    The application leading to the '793 patent was filed January 31, 2020. I understand that during prosecution, there was a rejection based on double patenting in view of claims of U.S. Patent Nos. 9,339,507, 9,358,240, and 10,376,525. EX1015 ('793 Patent Prosecution History) at 27-28.  With the rejection, the examiner stated that the rejection could be overcome by a "terminal disclaimer."  I understand that the patent applicant filed a terminal disclaimer that resolved the double patenting rejection.  *Id.* at 47-57.  The patent examiner issued a Notice of Allowance on June 12, 2020. *Id.* at 6.  The '793 patent issued on July 21, 2020. *Id.* at 1.

**C.    Inhalation Devices and Dosing**

39.    By May 15, 2006, and earlier, it was known that there are different concepts relating to drug dosing by inhalation.  Regardless of the type of inhalation device used, there will always be some type of dose that is supplied to the device or included within it.  One could call this the "nominal dose" or "metered dose."  In the case of a dry powder inhaler ("DPI"), this would be the drug dose in the capsule that is loaded into the DPI.  For a single-use metered dose inhaler ("MDI"), the nominal dose or metered dose would be the dose loaded in the device.  For a multiple use device, it would be the dose intended to be metered out during use (e.g., in the case of a pressurized metered dose inhaler ("pMDI") it is the drug dose which can be charged into the device's metering chamber prior to activation).  In a nebulizer, the

17

nominal dose would be the dose placed into the nebulizer. The nominal or metered dose is easiest to prescribe or determine because it can be weighed or otherwise measured (possibly by mass or volume) before placing into the relevant device.

40.    Next, there is the concept of an "emitted dose." The emitted dose refers to the dose that is emitted from the device. The emitted dose is less than the nominal dose because there can be drug lost along the way. For example, in a DPI, not all of the powder may leave the capsule or device. In an MDI, there is typically some type of metering chamber that the medication is dispensed from prior to being administered to the patient. And in a nebulizer, there are also places in the nebulizer where the aerosol will be retained on its way out of the device, including the solution reservoir, device components adjacent to the reservoir, tubing, and any mouthpiece/mask that is present prior to reaching the patient. Thus, the emitted dose (or "delivered dose") will be less than the nominal or metered dose, as drug can be lost along the way.

41.    There are other dose concepts as well. In respirable drugs, it was understood that a dose intended for lung delivery should have a particle size (whether liquid aerosol or dry powder) of around 5 microns or less. To approximate the dose actually deposited within the lung of a patient, the POSA could consider the "fine particle dose," which would be the dose of particles with a particle size of some threshold (e.g., 5 microns, or another cutoff selected under the circumstances) or

18

IPR2021-00406
U.S. Patent No. 10,716,793 B2

## VI.    NONOBVIOUSNESS OF THE '793 PATENT

### A.    Ground 1: the '212 Patent, Voswinckel JESC, and Voswinckel JAHA

#### 1.    "wherein the therapeutically effective single event dose comprises from 15 micrograms to 90 micrograms of treprostinil or a pharmaceutically acceptable salt thereof"

##### a)    The '212 Patent Does Not Disclose Or Teach A Single Event Dose Of 15 To 90 Micrograms

49.    The Petition cites the '212 patent and asserts in a footnote that the '212 patent would teach the POSA a dose of 2.5 µg to 125 mg because it states, "[i]n the case of treating *peripheral vascular disease* . . . [,] the dosage for inhalation . . . should be sufficient to deliver an amount that is equivalent to a daily [intravascular] infusion dose in the range of 25µg to 250mg" and "aerosolized UT-15 has a greater potency as compared to intravascularly administered UT-15, since the actual amount of UT-15 delivered via aerosolization delivery is only a fraction (10-50%) of the dosage delivered intravascularly."  Petition at 39 n.13 (citing EX1006, 5:54-62) (emphasis added here); *see also* '212 patent, 8:5-12.  Notably, this portion of the '212 patent describes a treatment for peripheral vascular disease, not pulmonary hypertension.  Citing Dr. Hill, Petitioner states that the "POSA would understand that an inhaled dosage of 15 to 90 micrograms of treprostinil for treatment of pulmonary hypertension would be equally possible."  Petition at 39-40 n.13 (citing Hill Decl. at ¶100 n.4).

23

50.    Neither the Petition nor Dr. Hill cites any examples or data in the '212 patent describing a specific device that was used to administer treprostinil by inhalation to humans.  The specification mentions the AM-601 Medicator Aerosol Delivery System, by Healthline Medical in Baldwin Park, California, as "one preferred nebulizer."  '212 patent, 5:33-36.  But Examples I-V in the '212 patent relate to sheep and do not explicitly state whether the AM-601 device was used. Based on my experience as a formulator, the POSA would not interpret the *daily infusion* dose range of 15 µg to 250 mg to disclose any particular *single event dose*[5] *by inhalation* for humans.  Nor would the POSA be able to infer or calculate a dose of treprostinil for humans based upon the inhaled solution concentrations used for tracheotomized sheep for 30 minutes to calculate a single event dose for inhalation by humans.

### b)    Voswinckel JAHA Does Not Dislose Or Teach A Single Event Dose Of 15 To 90 Micrograms

51.    In an earlier declaration, I understand that Dr. Waxman stated:

---

[5] The '793 patent claims delivering a dose in 1-3 breaths and the specification describes that "[a]dministering of treprostinil in a single event can be carried out in a limited number of breaths by a patient." EX1001, 7:60-61. It also says that treprostinil can be administered a single time, or multiple times, per day. *Id.* at 8:1-2. This establishes the "single event dose" can be multiple breaths and is a discrete event that occurs one or more times per day. Thus, in my opinion, the POSA would understand "single event dose" to mean the event during which the pulmonary hypertension patient inhales a dose of treprostinil in one sitting.

> While this reference does disclose a pre-aerosolized concentration for the treprostinil solution that is far higher than the continuous nebulizer concentration of Voswinckel JESC for inhalation over a specific number of breaths, it does not provide sufficient detail for a person of ordinary skill in the art to determine the precise dosage each patient received. A person of skill in the art would not be able to determine the "single event dose" delivered without knowing critical details of the pulsed Optineb device, including time between pulse generation and breath, volume of nebulized solution per breath, and features that allow the patient to inhale one pulse with each breath after it is generated, none of which are disclosed in this reference.

EX2001 (Waxman Decl.), ¶40.

52.    I agree with that opinion.  Voswinckel JAHA identifies only that patients received, by inhalation, a solution of treprostinil using a "pulsed OptiNeb® ultrasound nebulizer" in "3 single breaths" of a solution of 600 µg/mL treprostinil. Voswinckel JAHA does not disclose: the model number of the device used; how the patient was connected to the device (e.g., by mouthpiece or mask, and what types of tubing, if any, were used); any information on the pulses of the "pulsed … ultrasound nebulizer"; whether those pulses were synchronized to the patient's breath in any way (whether by patient discipline or by electronic monitoring); any description of the patient's breaths, such as if they were normal, shallow, or deep, and/or how long each breath was or the time in between breaths; or any information on any testing of the emitted dose, fine particle dose, or lung dose showing the dose actually delivered to the patients or their lungs.  Further, Voswinckel JAHA does not describe how

25

long or short the pulses were, providing yet further reason the POSA could not conclude that any particular dose was administered in the described study. *See also, e.g.*, ¶55, below (bullets listing information not disclosed). For all these reasons, the reference does not provide enough information for the POSA to understand Voswinckel JAHA as disclosing any particular dose delivered in a single event. *See, e.g.*, EX2075 (Brun) at 77 ("In practice, there exists a wide variation in the performance of different types of nebulizers … . Droplet size distribution and output rate are also influenced by the physical properties of the drug solution (suspension) and air flow rate from the compressor."). Dr. Gonda has admitted that many of these factors would affect the effectiveness of the delivery by the nebulizer. *E.g.*, EX2056 (Gonda Dep.) at 81:17-20 (stating a smooth hose could affect aerosol output), 81:22-82:1-11 (stating experimentation would be necessary to show different mouthpieces produce the same aerosol), 85:9-14 (stating the patients breathing would affect the amount of drug delivered by nebulizer device), 87:23-89:18 (admitting that baffle plates affect aerosol particle size, which in turn would affect effect in the patient).

### c) Voswinckel JESC Does Not Disclose Or Teach A Single Event Dose Of 15 To 90 Micrograms

53.    I have reviewed the Petitioner's arguments regarding the disclosures of Voswinckel JESC as well as the Petitioner's citations to the declarations of Drs. Hill

and Gonda. I disagree with Petitioner, Dr. Hill, and Dr. Gonda's assertions regarding the POSA's understanding upon reviewing Voswinckel JESC.

54.     In my opinion, the POSA would not interpret Voswinckel JESC as teaching a single event dose, delivered to the patient, from 15-90 μg. Voswinckel JESC does not provide enough information to arrive at that conclusion. Voswinckel JESC does not disclose any delivered doses. Instead, it states only that "treprostinil" was inhaled from an "OptiNeb ultrasound nebulizer" at concentrations of 16, 32, 48, and 64 μg/mL.

55.     Regarding the dose volume, the POSA would understand that the claimed dose of 15-90 μg means the dose delivered to the patient (as opposed to a quantity placed into a nebulizer, for example). Claim 1 of the '793 patent recites a "single event dose compris[ing] 15 micrograms to 90 micrograms … ***delivered in 1 to 3 breaths.***" EX1001, 18:27-31 (emphasis added). The word "delivered," used in connection with the number of breaths, demonstrates the claim is referring to a delivered dose, not nominal dose. The '793 patent also describes "biophysical characterization" of the OptiNeb device that allowed the inventors to ascertain the actual "total inhaled dose" for treprostinil using the OptiNeb device as the inventors

27

configured it. *Id.* at 13:46-50.[6] The POSA would understand the "total inhaled dose" as a dose delivered to the patient; the "total inhaled dose" would not be the dose merely placed into the reservoir of a nebulizer, as the very language used refers to a quantity that was actually inhaled. The total inhaled dose is described as 7.5 µg and 15 µg in Study i) (*id.* at 13:49-50); 30 µg, 60 µg, 90 µg, and 120 µg in Study ii); and 15 µg in Study iii). *Id.* at 13:57-61, 13:66-14:47. Those studies spanned the range from 15 µg, through 90 µg, up to 120 µg, but the study showed that gas exchange was affected, and arterial oxygen saturation was "significantly decreased" at a dose of 120 µg in three patients. *Id.* at 15:66-16:4. The '793 patent notes that "Further dose increments were omitted due to this side effect and severe headache in one patient." *Id.* at 16:2-4. The POSA would understand these doses in the specification, which include the doses claimed in claim 1 (15-90 µg), refer to delivered doses. Thus, the POSA would understand claim 1 as referring to a delivered dose. Voswinckel JESC provides no delivered dose information, however, and, in fact, provides:

- No details on the formulation, such as:

---

[6] As an example of device testing, EX1062 (Gessler) describes "Physical characterization" of devices and aerosols using a laser diffractometer to determine mass median aerodynamic diameter ("MMAD") and nebulizer output to the mouthpiece using TC99m tracing techniques. *Id.* at 2-3. Other types of testing include mass balance, dose uniformity, and cascade impactor studies.

IPR2021-00406
U.S. Patent No. 10,716,793 B2

- ○ What the treprostinil was dissolved in (note that Vos JESC describes the placebo as a "solvent solution," without disclosing the solvent)
  - ○ Whether the formulation comprised any excipients, and if so, which How the solution was prepared

- No details about the "OptiNeb" nebulizer itself, other that it was an ultrasound nebulizer

- No details about how the nebulizer was used, other than solution concentration:[7]
  - ○ No details on how much treprostinil solution was put into the nebulizer reservoir
  - ○ No details on how much treprostinil solution remained in the reservoir after 6 minutes[8]
  - ○ No details on which frequency the nebulizer's ultrasound generator operated
  - ○ No details on the MMAD aerosol size generated (i.e. what nebulizer baffle size may have been used)
  - ○ No details related to aerosol output rate (e.g. continuous, pulse, etc.)
  - ○ No details on the interface between the nebulizer and patient (e.g., mouthpiece, face mask, etc.)
  - ○ No details on the pathway the aerosol travels to the patient, such as the nebulizer interior geometry or tubing connected to the nebulizer

---

[7] EX2075 (Brun) at 6 ("drug concentration is directly related to the output rate, although the improvement that can be obtained by increasing the concentration is limited.").

[8] Notably, the concentration of a solution in a nebulizer can change over time. *See, e.g.*, EX2079 (Hess 1996) at 1 ("Reconcentration occurs because of evaporation owning to the low relative humidity of the gas powering the nebulizer. Nebulizer output should be determined more appropriate by measuring the amount of medication that remains after aerosol production is complete."). The amount of solution initially loaded can also affect the dead volume, as can the brand of nebulizer. *Id.* at 3 (Fig. 2).

29

- No details on whether the nebulizer was tapped to dislodge particles or droplets adhering inside the nebulizer[9]

- No details on patient factors[10]
    - No details on the number of breaths taken
    - No details on breathing rate
    - No details on breathing depth (shallow, deep, normal)
    - Whether the patient exhaled through the device or removed the mouthpiece, mask, or other interface to exhale

- No testing data on dose actually delivered to the patient

56.    Based on my experience and literature, the POSA would understand that all of the above factors could affect the nebulizer's output.  In fact, Dr. Gonda has admitted that many of these factors would affect the effectiveness of the delivery by the nebulizer.  EX2056 (Gonda Dep.) at 81:17-20 (the type of hose could affect aerosol output), 83:17-24 (frequency would have an effect on output that would require testing), 81:22-82:1-11 (experimentation would be necessary to show different mouthpieces produce the same aerosol), 85:9-14 (the patient's breathing would affect the amount of drug delivered by nebulizer device); 93:16-25 ("There is [possibility, in fact] a certainty[,] that some of the medication will … not leave the

---

[9] EX2076 (Kendrick) at 1 (nebulizer output is affected by "tapping of the nebuliser chamber during nebulisation").

[10] Notably, the undated Optineb-ir Manual cited by Dr. Hill and Petitioner explicitly recognizes that the inhalation time may vary based on "set ventilation parameters," "the respiratory rate" of the patient, and "the depth of respiration."  EX1037 at 18 (section 8.2.3).  *See also* EX2075 (Brun) at 7 ("[T]he breathing pattern through the nebulizer influences the actual inhaled dose[.]").

equipment."). Thus, the POSA would not be able to calculate a delivered dose with any confidence the calculation would be accurate.

57.     In fact, the POSA would recognize that determining the dose delivered to a patient (as opposed to the nominal dose merely loaded into a nebulizer reservoir) would require testing. Indeed, 2002 FDA Guidance states that "Inhalation solutions and suspensions are intended for delivery to the lungs by oral inhalation for local and/or systemic effects and are to be used with a specified nebulizer." EX2080 (FDA Guidance 2002) at 3. The Guidance further states that "For … inhalation solution … drug products, certain studies should be performed to characterize the performance properties of the drug product and to provide support in defining the optimal labeling statements regarding use (e.g., storage, cleaning, shaking)." *Id.* at 32. Further, "[f]or inhalation solution and suspension drug products, a study should be undertaken to determine the delivered dose and the particle/droplet size distribution as per the specified operating parameters and ranges for a given nebulizer." *Id.* at 36. That idea is consistent with my experience, and my opinion is that the POSA would understand that testing would have to be performed for a nebulizer like the OptiNeb device to understand the dose delivered to the patient.[11]

---

[11] Consistent with the requirement for testing, the '793 patent explains that the delivered doses in one of its examples were known because of "biophysical characterization of the ultrasonic device." EX1001 at 13:46-47. In this context, the

31

*See, e.g.*, EX2079 (Hess 1996) at 505 ("When nebulizers are used for research applications , the nebulizer characteristics must be evaluated and reported for the conditions used in the investigation.").

58.     Testing is required or appropriate because so many factors bear on the output and devices can have a wide variety of efficiencies, varying by about 10x (i.e., about 9 to 90%). *See, e.g.*, EX2077 (Rau 2004) at 5 (Table 1) (describing in vitro testing showing that, across five nebulizers, the total inhaled dose varied from about 9% to 39% of the nominal dose); EX1066 at 1(estimating the dose delivered to the mouthpiece of the nebulizer at 43% and 39% albuterol based on "in vitro conditions"); EX1083 (Ventavis® Label) at 10 (describing delivered dose as 2.5 mcg out of 10, which is 25%); EX1062 (Gessler) at 2-3 (describing delivered doses of 39% for a jet nebulizer by Nebu-Tec and 86% for a nebulize by Schill Company); EX2078 (Rau 2005) at Fig. 19 (showing in vitro albuterol dispositions varying from 13% to 34% across three devices); EX2075 (Brun) at 7 ("[A]verage lung deposition for nebulizer therapy of only 10% is rather poor.").

59.     Indeed, Dr. Gonda admitted at his deposition that if he were to compare the output of a device with a mouthpiece and a device connected to the patient with

---

POSA would understand that biophysical characterization refers to empirical study of the doses actually delivered, not mere mathematical calculations.

hoses, he would perform experiments to make the comparison. EX2056 at 81:21-82:11. He testified that, "Q. … [Y]ou would also have to go to the laboratory to compare with the face mask option we just looked at on the -- on page 22? A. Yes. I think that anything that you put downstream from the aerosol generator could potentially impact the outputs of the aerosol that's going into the patient." *Id.* at 82:12-19; *see also id.* at 83:20-24 (Dr. Gonda would want to test the impact of frequency on ultrasonic nebulizer output in the laboratory).

60.    In fact, there are so many variables that go into the dose delivered to the patient that testing should be done with the drug in question, not just any drug. Both the API used, and the formulation used, can affect the dose delivered. EX2079 (Hess 1996) at 7-8 ("it is important to evaluate nebulizers using a drug solution that is similar to that used in clinical practice" and "nebulizer performance is affected by the solution used").

61.    The AccuNeb label cited by Dr. Gonda is consistent with the need to perform testing. EX1004 (Gonda Decl.)., ¶56 n.4 (citing EX1066). The AccuNeb label describes the administration of albuterol sulfate by inhalation for "the relief of bronchospasm in patients 2 to 12 years of age with asthma." EX1066 at 1-2. The label provides for nominal doses of 1.25 mg/3 mL or 0.63 mg/3 mL, which would be 1.25 * 1000 / 3 = 416.7 µg/mL and 0.63 * 1000 / 3 = 210 µg/mL concentrations, respectively. The patient is supposed to breath "as calmly, deeply, and evenly as

33

possible" until the entire volume of solution is used up. *Id.* at 1 (left hand column). The AccuNeb label explicitly recognizes that, "for AccuNeb, ***like all other nebulized treatments***, the amount delivered to the lungs ***will depend on*** patient factors, the jet nebulizer utilized, and compressor performance." *Id.* (right hand column) (emphasis added).  The AccuNeb label estimates the dose delivered to the mouthpiece of the nebulizer at 43% and 39% albuterol, but it only offers those numbers based on "in vitro conditions," which the POSA would understand to refer to laboratory testing (i.e., "in vitro") of the delivered dose, not mere calculations based on only (1) the concentration and (2) a nebulization time of 5-15 minutes. *See id.* (left and middle columns).

62.    The Pulmozyme label cited by Dr. Gonda does not identify any delivered dose.  *See generally* EX1050. The "Description" section, second paragraph, describes that one ampule will "deliver" 2.5 mL of solution "to the nebulizer bowl." The POSA would understand this as referring to delivery into the nebulizer, not delivery to the patient's mouth or lungs. The Pulmozyme label, which describes an enzyme called rhDNase (at 37,000 daltons, a very large molecule relative to treprostinil, which is about 390 daltons[12]), recites a concentration of 1.0 mg/mL, ampule size of 2.5 mL, and the use of at least six different Jet Nebulizers.

---

[12] *See* EX2083 (https://pubchem.ncbi.nlm.nih.gov/compound/Treprostinil).

and a platinum mesh with ~7000 holes with an average diameter of 2 μm … ." *Id.*
at 5.  The POSA would not apply the description of the I-Neb or Prodose AAD
systems to the OptiNeb devices mentioned in Voswinckel JESC and JAHA (with
one standard and one "pulsed" device, respectively).  They are different devices,
with different manufacturers,[14] different geometries, different features, and were
filled with different formulations.

68.    For the foregoing reasons, it is my opinion that Voswinckel JESC does
not disclose a single event dose of 15-90 μg in general or one delivered in 1-3
breaths.

### d)     The POSA Would Not Assume That All Nebulizers Available In 2006 Used Volumes Of 1-5 mL

69.    I understand that Dr. Gonda's declaration states that "A POSA would
have known in May 2006 that nebulizers conventionally deliver between 1 and 5
mL."  EX1004, ¶56.  In support, he provides a footnote citing the AccuNeb,
Pulmozyme, and Ventavis labels as supporting evidence.  First, the AccuNeb label
(EX1066) describes a 3 mL ample being placed into the nebulizer reservoir.  *Id.*
(Instructions for Use, step 2).  Second, citing the Ventavis label, Dr. Gonda asserts
a 2.5-5.0 mL dose.  EX1004, ¶56 n.4.  However, the Ventavis label actually

---

[14]  EX1026 was written by authors from Phillips Respironics and describes
collaborations with Astra and Bayer Schering, but not with Nebutec out of Germany.
EX1026 at 1-2.

Appx4838

describes 2.5-5.0 μg delivered to the mouthpiece, *not* mL into the nebulizer. EX1029 at 9. Third, Dr. Gonda cites the Pulmozyme label, which describes placing 2.5 mL into the nebulizer.

70.    Later, Dr. Gonda provided a supplemental declaration. EX1082. There, he describes the error in his original declaration regarding the Ventavis label, admitting that it actually only discloses a 2 mL volume, not 2.5-5 mL. EX1082, ¶4. Dr. Gonda states that this error does not affect this opinion because 2 mL is still within the range of 1-5 mL. *Id.* ¶5.

71.    However, I note that Dr. Gonda's evidence, the three drug labels, only supports an alleged range of 2-3 mL (2 mL Ventavis, 3 mL AccuNeb, 2.5 mL Pulmozyme), and he provides one example for each alleged endpoint of that range. In addition to only supporting part of his claimed range, Dr. Gonda ignores that there are devices and nebulizers outside of the range he asserted (1-5 mL put into the nebulizer). *See, e.g.*, EX2081 (Newman 1996) (describing the Respimat device, which can dispense 15 μl); EX2082 (Dubus) at 2 (describing 0.5-ml volume for Aeroneb Professional Nebulizer); EX2076 (Kendrick) at 3 (describing nebulizers with maximum fill volumes ranging from 3 mL to 38 mL).

72.    If the three drug labels cited by Dr. Gonda were the basis for the claimed range of 1-5 mL, these additional labels undermine the asserted range and demonstrate that the POSA would not assume any particular quantity was used in

39

IPR2021-00406
U.S. Patent No. 10,716,793 B2

Voswinckel JESC. I also note that Dr. Gonda's three labels are for different drugs (not treprostinil), two of them treating very different indications (bronchospasm and cystic fibrosis patients), and all three labels using different nebulizers.

73. Lastly, it is important to note that the amounts put into the nebulizer reservoirs are not the amounts delivered to the mouthpiece, face mask, or however the aerosol is delivered to the patient. There are losses along the way. Thus, the amount *delivered* to the patient's mouth will always be less than the amount put into the nebulizer. Dr. Gonda specifically admitted this. EX2056 (Gonda Dep.) at 114:10-10 ("[I]t would be a smaller amount that would come out of the nebulizer than the amount you put in the nebulizer.").

### e)    Undated OptiNeb-ir Manual

74. The OptiNeb Manual does not bear a date for when it was written, copyrighted, or allegedly available. EX1037. I understand from counsel that Petitioner has not shown that the undated Optineb-ir Manual was publicly available before the priority date. As a result, I understand that it is not prior art. Despite those issues, I have been asked to assess the undated Optineb-ir Manual on the assumption the Board may consider it as a background reference.

75. Dr. Hill cites the undated Optineb-ir Manual, which appears to be for a device called the "OPTINEB®-ir." Although the name "Optineb" appears in Voswinckel JESC and JAHA, the nebulizer in Voswinckel JESC was not described

40

1              IPR2021-00406

2        U.S. Patent No. 10,716,793 B2

3     UNITED STATES PATENT AND TRADEMARK OFFICE

4      BEFORE THE PATENT TRIAL AND APPEAL BOARD

5           LIQUIDIA TECHNOLOGIES, Inc.,

6                  Petitioner,

7                      v.

8        UNITED THERAPEUTICS CORPORATION,

9                 Patent Owner.

10           _____

11              IPR2021-00406

12        U.S. Patent No. 10,716,793

13   --------------------------------------------------------

14       CONFIDENTIAL - ATTORNEYS' EYES ONLY

15      DEPOSITION OF NICHOLAS S. HILL, M.D.

16          SUNDAY, OCTOBER 17, 2021

17           7:00 a.m. - 12:43 p.m.

18

19     Reported Remotely through Videoconference

20

21   Reported by: Patricia Y. Schuler, CSR No. 11949

22   Job No. 10090045

23

24

25

1      Q.   We've been talking about a fair number of

2   documents today.  And I appreciate your patience

3   with the interface in terms of flipping through

4   things and so forth.

5           We've been talking a bit about the '212

6   patent that is Exhibit 1006.  Can you pull that up,

7   please, or turn to Exhibit 6 in your binder.

8      A.   I am there.

9      Q.   Thank you.  I'm going to turn to Page 24

10  of the document, Column 9.

11     A.   I am there.

12     Q.   And I think we referenced this before but

13  didn't expressly discuss it, and that is that much

14  of the data in the '212 patent is an animal model

15  where the animal is sheep, correct?

16     A.   Correct.

17     Q.   And at Column 9, starting at around

18  line 20, it says, "Sheep are also large enough to

19  allow direct aerosolization of substances into the

20  lung via tracheostomy" -- I'm sorry.

21  "Trachoestomy, thereby preventing swallowing of

22  drugs, and thus eliminating a possible secondary

23  route of administration of UT-15."

24          Do you see that?

25     A.   I do.  And it is tracheostomy.  That's

Nicholas S. Hill, M.D.

1    just a typo.

2         Q.   Oh, well.  Thank you, Doctor.

3              So if I understand this right, then, the

4    sheep were not sort of fitted with a nose cone, for

5    example, and aerosolized that way, correct?

6         A.   It would appear, yes.

7         Q.   Instead, they were -- a tracheotomy was

8    performed on them, and that tracheotomy was the

9    site for placing aerosolized UT-15 or Treprostinil

10   into the sheep, correct?

11        A.   Yes.

12        Q.   I apologize in advance for the stupid

13   question, or at least this stupid question, and

14   that is:  Treprostinil in humans is administered by

15   inhalation in a very different way, correct?

16        A.   Yes, it usually is.

17        Q.   There's no tracheotomy required for

18   administration of Treprostinil, right?

19        A.   That is correct.

20        Q.   Does that have any impact, in your mind

21   or in your opinion, on any of the conclusions that

22   a person of ordinary skill in the art might draw

23   from Exhibit 212 in terms of dosing?

24             MR. SUKDUANG:  Objection; form.

25             THE WITNESS:  I don't think so.

1   in the sections where this was -- this referred to

2   his document.

3          So you know, this was verbal.  I was

4   assured that these -- my referral to his

5   declaration was supported by what he said in there.

6      Q.   Let me make sure I understand.  In

7   connection with preparing Exhibit 1002, in the

8   instances where you cite to Dr. Gonda's

9   declaration, at the time that you signed your

10  declaration you hadn't seen any passages from

11  Dr. Gonda's declaration.  Rather you were relying

12  upon counsel explaining to you what Dr. Gonda was

13  saying; is that correct?

14     A.   That is my recollection, yes.

15     Q.   So in each instance where you say that

16  you agree with Dr. Gonda and incorporate his

17  opinions and analysis into this, your declaration,

18  Exhibit 1002, you are relying upon the verbal

19  statements, the oral statements of counsel in terms

20  of what Dr. Gonda was going to be saying in his

21  declaration, correct?

22     A.   Yes.

23     Q.   Did you keep any record of what counsel

24  told you Dr. Gonda was going to be saying in his

25  declaration?

1      Q.   The reason I ask is, going back to the

2    Footnote 4 from Dr. Gonda's declaration, he cites

3    to the AccuNeb label.  It's there on the screen if

4    you care to look along or if you want to use your

5    binder.  He then cites to the Iloprost, document

6    1029 that we looked at earlier.  And he also cites

7    to a Pulmozyme label at Exhibit 1050.

8           Do you know what Pulmozyme is?

9      A.   I do.

10      Q.   Do you have any experience using

11    Pulmozyme?

12      A.   Yes.  In fact --

13      Q.   I'm sorry.  Go ahead.

14      A.    In fact, it's used most often in CF

15    patients, but patients with chronic bronchiectasis

16    of a nonCF variety have very similar problems

17    compared to those with CF, and I have a number of

18    patients who take Pulmozyme who have chronic

19    bronchiectasis, even though it's not technically

20    CF.

21      Q.   Understood.  Do you know what the active

22    ingredient is in Pulmozyme?

23      A.   It is an enzyme that breaks up mucous.

24      Q.   So it's a biological material; it's not

25    small molecules; is that fair?

1      A.   Correct.

2      Q.   Were you aware at the time that you cited

3    this paragraph that Dr. Gonda was relying upon

4    these three particular medications -- AccuNeb,

5    Ventavis, and Pulmozyme -- to support his opinion?

6      A.   I don't think I was aware of those

7    specifically.

8      Q.   Let's go back to paragraph 65 of your

9    declaration.  That's Exhibit 1002, at Page 29 of

10   that document.  Let me know when you have it,

11   Doctor.

12     A.   I'm there.

13     Q.   In it you say in that first sentence,

14   "Sufficient volume of Treprostinil for a solution

15   for six minutes of delivery, which a POSA would

16   understand to be at least 1 milliliter."

17          Do you see that?

18     A.   Yes.

19     Q.   Are you saying there that you would

20   expect the patient to be putting 1 milliliter -- at

21   least 1 milliliter of solution into the nebulizer

22   device?

23     A.   Well, in 1007, yes, the solution would

24   have been placed in the device.

25     Q.   Right.  I understand that.  I'm asking:

1    Are you saying that -- you're saying at least what

2    your understanding of the Voswinckel JESC abstract

3    is that a person would put at least 1 milliliter

4    into the nebulizer device, correct?

5         A.   Yes.

6         Q.   Now, the Voswinckel JESC does not provide

7    a starting amount of solution that gets inserted

8    into the nebulizer device, does it?

9              MR. SUKDUANG:   Objection; form.

10             THE WITNESS:   The abstract doesn't

11   mention a starting volume.   Is that what you just

12   asked?

13   BY MR. CARSTEN:

14        Q.   Yes.   That's what I'm asking.

15        A.   It does not; that's correct.

16        Q.   Now, are you familiar with the term or

17   the expression "dead space" as it pertains to

18   nebulizers?

19        A.   I have not used that term specifically,

20   no.

21        Q.   Are you aware that -- well, is it your

22   experience -- are you familiar with the term "dead

23   volume" as it pertains to nebulizers?

24        A.   Yes, I've heard that term.

25        Q.   And correct me if I'm wrong, Doctor, but

1    that's the term that refers to the amount of

2    solution that you put into the nebulizer that

3    remains in the nebulizer at the end of whatever the

4    single-event dose is, correct?

5         A.   That's my understanding of it, yes.

6         Q.   Now, the Voswinckel JESC, Exhibit 1007 --

7    that doesn't tell what you the dead volume was

8    remaining in the nebulizer device either, correct?

9         A.   That's correct.

10        Q.   In your declaration at paragraph 65, you

11   say, "In my own practice, I prescribed volumes of

12   at least 1 milliliter for inhalation therapy using

13   nebulizers."

14             Do you see that?

15        A.   Are we still on paragraph 79?

16        Q.   Paragraph 65 of your Exhibit 1002.

17        A.   Okay.

18        Q.   And I can help direct you once you get to

19   that.  So if you turn in Exhibit 1002, your

20   declaration, to Page 29, I think you'll find it.

21        A.   Yes, I see it now.

22        Q.   I am looking at about five lines down.

23   The sentence starts, "In my own practice."

24        A.   Yes, I see that.

25        Q.   And you say in your own practice you

1    prescribed volumes of at least 1 milliliter for

2    inhalation using nebulizers.

3              Do you see that?

4        A.    I do.

5        Q.    What time period are you referring to

6    there in the past tense?

7        A.    Well, spanning back to the time in

8    question.

9        Q.    So back to 2006?

10       A.    Right.

11       Q.    And has --

12       A.    Or earlier.

13       Q.    I'm sorry.  And earlier, you said?

14       A.    Yes.

15       Q.    Thank you.

16             What products did you prescribe for use

17   in nebulizers before 2006 in volumes of at least

18   1 milliliter, if you recall?

19       A.    Well, certainly bronchodilators for

20   treatment of asthma or COPD, inhaled

21   corticosteroids, anticholinergics such as

22   Ipratropium.  I think that would be the main things

23   I would have nebulized.

24       Q.    And did you prescribe volumes of less

25   than 1 milliliter for any products in that pre-2006

Appx5030

Nicholas S. Hill, M.D.

1   time frame that were designed to be nebulized?

2        A.    No.

3        Q.    So -- and when we say "Prescribed

4   volumes" -- strike that.

5             When you say, "Prescribed volumes" -- I

6   didn't mean to put myself in there with you -- are

7   you talking about the volume for a single

8   inhalation dose?

9        A.    Well, most of these applications would

10  have been used with what's called a jet nebulizer,

11  and they have a little cup through which compressed

12  air or oxygen is blown through.  And it agitates

13  the liquid inside the cup and turns it into an

14  aerosol that then goes to the patient via mask or

15  mouthpiece to provide the medication.

16            In general, I order the medication, and

17  most of the time it's dissolved in a solution of

18  saline amounting to maybe two and a half mls.  But

19  most of the time I'm not writing a specific volume;

20  I'm writing for a certain dose of medication.  And

21  then it gets dissolved into the solvent.

22       Q.    So you're writing a specific dose for a

23  particular medication, and then from that known

24  dose that you're looking for, you can decide how

25  much volume you want to administer; is that right?

1       A.   Yes.

2       Q.   And so the starting point is the dose

3   that you want to administer of the medication.

4   Then you know the concentration, so you calculate

5   out the volume that you want to be nebulized?

6            MR. SUKDUANG:  Objection; form.

7            THE WITNESS:  Yes.

8   BY MR. CARSTEN:

9       Q.   Now, here we're doing it, in

10   paragraph 65.  It's a little bit backwards.  You're

11   saying, "Assuming at least 1 milliliter of volume

12   for delivery, a POSA, as of 2006, would thus

13   reasonably understand that Voswinckel JESC

14   delivered at least 16, 32, 48, or 64 micrograms of

15   inhaled Treprostinil to patients."

16            Do you see that?

17       A.   I'm sorry.  Is there a question?

18       Q.   I'm asking -- so the paragraph 65, I've

19   just read, I think properly, the last sentence in

20   paragraph 65.

21            Did I read that correctly?

22       A.   You did.

23       Q.   Now, in order to deliver the contents of

24   1 milliliter of volume for delivery, as of 2006,

25   because of the dead volume, you know you would have

1    to start in a nebulizer with a volume greater than

2    1 milliliter, correct?

3            MR. SUKDUANG:  Objection; form.

4            THE WITNESS:  Yeah, I think it would

5    depend on the nebulizer, but most nebulizers have

6    some dead volume at the end of administration.

7    BY MR. CARSTEN:

8        Q.   Are you aware of any nebulizer, as of

9    2006, that did not have a dead volume?

10       A.   No.  In fact, the OptiNeb has an

11   automatic stop if it gets down to .5 mls, so this

12   volume is not including the dead volume.

13       Q.   And when you refer to the OptiNeb having

14   a stop at 0.5 mls, you're referring to the undated

15   OptiNeb-IR document at 10037, correct?

16       A.   That's correct.

17       Q.   And so in order to deliver using the

18   Voswinckel JESC first lowest concentration of

19   16 micrograms per milliliter, if the dead volume

20   was 0.5 milliliters, then you would need to at

21   least put in 1.5 milliliters of solution to result

22   in 16 micrograms of material delivered to the

23   mouthpiece, correct?

24       A.   Yes.

25       Q.   And if the 0.6 milliliters per minute

1          UNITED STATES PATENT AND TRADEMARK OFFICE

2           BEFORE THE PATENT TRIAL AND APPEAL BOARD

3

4     LIQUIDIA TECHNOLOGIES, INC.,

5               Petitioner,

6                              IPR 2021-00406
               vs.            U.S. Patent No. 10,716,793

7     UNITED THERAPEUTICS CORPORATION,

8               Patent Owner.

9     _____

10

11

12

13      DEPOSITION REMOTELY TAKEN VIA ZOOM CONFERENCE OF

14                    IGOR GONDA, PH.D.

15              TUESDAY, OCTOBER 26, 2021

16

17

18

19

20

21

22

23    Reported by:
      Linda E. Marquette
24    RPR, CLR, CSR No. 11874

25    Job No. 10090261

```
1   at that time I was the CEO of Acrux in Melbourne.  I was
2   a member of the scientific advisory board at Aradigm but
3   I was not an employee at Aradigm.  So I'm not sure if I
4   did or did not have at the time a copy of the abstract,
5   no.  I don't remember.  But I did collect similar
6   abstracts in my collection, but I would not remember
7   specifically this one.
8   BY MR. DYKHUIS:
9       Q.    Continuing in that paragraph you say a POSA
10  interested in pulmonary hypertension, exercising
11  reasonable diligence -- you continue on and say -- the
12  POSA would have either been present when Voswinckel JESC
13  was presented -- and then it goes on about interested
14  and able to find it.
15          Do you see that text there, the last few lines
16  of the paragraph?
17      A.    Yes, I do.
18      Q.    Your report here doesn't cite any evidence
19  about specific people or attendees who were at the
20  conference associated with the article, correct?
21      A.    That is correct.
22          MS. KANNAPPAN:  Objection to form.
23  BY MR. DYKHUIS:
24      Q.    And did you not attend the conference?
25      A.    No, I did not.
```

1    work with a smooth hose, too, correct?

2            MS. KANNAPPAN:  Objection to form.

3        A.    I see that there's not a reason why a

4    nebulizer would not work with a smooth hose.

5    BY MR. DYKHUIS:

6        Q.    Right.

7        A.    Was that your question?

8        Q.    Yeah.

9        A.    Yeah, they could be a smooth hose, yes.

10       Q.    Okay.

11       A.    The performance would probably not be exactly

12   the same but it would operate.

13       Q.    Oh, because is the inside of the hose maybe

14   corrugated, too, just like the outside in that

15   circumstance?  Is that why you said that?

16       A.    That is correct.

17       Q.    And the surface inside the hose would affect

18   the aerosol traveling through it?

19           MS. KANNAPPAN:  Objection to form.

20       A.    It could possibly affect it, yes.

21   BY MR. DYKHUIS:

22       Q.    If we could actually go back, please, to the

23   cover.  Would the performance of the device be the same

24   or different if it was set up to deliver a drug with all

25   of the ventilator hoses on the right as compared to the

Appx5155

1   mouthpiece on the left?

2          MS. KANNAPPAN:  Objection to form.

3      A.    I would want to check whether the output is

4   similar or different so I would experiment to see

5   whether they are the same.  They could be different.

6   BY MR. DYKHUIS:

7      Q.    You said you would experiment?

8      A.    Yes.  I mean, if I wanted to know for sure

9   whether the device on the left and on the right were

10  producing the same aerosol, then I would go to the

11  laboratory and check out whether they are different.

12     Q.    And then I suppose you would also have to go

13  to the laboratory to compare with the face mask option

14  we just looked at on the -- on page 22?

15         MS. KANNAPPAN:  Objection to form.

16     A.    Yes.  I think that anything that you put

17  downstream from the aerosol generator could potentially

18  impact the outputs of the aerosol that's going into the

19  patient.

20  BY MR. DYKHUIS:

21     Q.    I want to just zoom in slightly on this device

22  on the right and you can see I'm reading -- there's a

23  front display and then there's, like, an upper panel

24  with a sticker on it that's got red and blue text.

25         Do you see that one?

1    A.    Yes, I do.

2    Q.    And so in blue I think it says "OPTINEB-ir"

3  and then in red do you see it states "2.4 megahertz"?

4    A.    I can see it.

5    Q.    And if we look at the device on left in that

6  same label or sticker in the upper left corner it says

7  "1.6 megahertz"?

8         MS. KANNAPPAN:   Objection to form.

9  BY MR. DYKHUIS:

10   Q.    Do you see that, Dr. Gonda?

11   A.    Yes, I do.

12   Q.    Do you know what those frequencies would refer

13 to?

14   A.    They would be the frequency of the ultrasound

15 that's closing the waves that break up the liquid that

16 causes the nebulization.

17   Q.    And would those frequencies have an effect on

18 performance of the device?

19   A.    It's possible.

20   Q.    And is that another area where to really do

21 the comparison you would want to go to the laboratory

22 and measure the output of each to be able to compare the

23 performance of 1.6 megahertz versus 2.4?

24   A.    Yes, I would.

25   Q.    In the setup on the left side of the cover of

1    of the patient in front of the inhaler.

2    BY MR. DYKHUIS:

3        Q.    And so one of -- a couple answers ago you

4    mentioned the aerosol provided by spontaneous breathing

5    of the patient to -- and the patient's breath taking the

6    aerosol out of the device.  Do you remember that

7    question from a few moments ago?

8        A.    Yes.  I do.

9        Q.    And so depending on how heavily or deeply the

10   patient was breathing, I guess, would pull either more

11   or less drug out of the device; is that correct?

12            MS. KANNAPPAN:  Objection to form.

13       A.    That is correct, unless the device itself is

14   metering the aerosol.

15   BY MR. DYKHUIS:

16       Q.    When a patient -- I'm looking again at the

17   device on the left.  A patient would put their mouth on

18   the blue mouthpiece and then they would breathe in.

19   That would be step one for breathing in the aerosol,

20   correct?

21       A.    That is correct.

22       Q.    And then when they have -- when the patient

23   exhales, what do they do?

24            MS. KANNAPPAN:  Objection to form.

25       A.    So as you probably know, I mean, just to --

1        MS. KANNAPPAN:  And I'll just note that I'm

2   not coaching the witness but trying to help with your

3   question.  But objection to form is fine.

4        MR. DYKHUIS:  I don't need your help, thank

5   you.

6        MS. KANNAPPAN:  Actually, you did earlier.

7        But sorry, Dr. Gonda, you can go ahead and

8   answer.

9        THE WITNESS:  That's all right.  You sort out

10  your stuff.  Thank you.

11  A.    So, yes, I -- you were right, the baffle would

12  cause return of some of the droplets back into the

13  nebulizer cup.  And potentially the sides of the setup

14  there, yes.

15  BY MR. DYKHUIS:

16  Q.    **As a result of that, if a patient turned off**

17  **the device, there could be medication solution left over**

18  **in the cup as well as condensed to some degree on the**

19  **baffle and the interior of the nebulizer in general --**

20       MS. KANNAPPAN:  Objection.

21  BY MR. DYKHUIS:

22  Q.    **-- is that correct?**

23  A.    That is correct.  There is a possibility, in

24  fact, a certainty that some of the medication will be --

25  will not leave the equipment, correct.

```
 1              (Exhibit 1066 marked for

 2              identification by the Certified

 3              Shorthand Reporter.)

 4              MR. DYKHUIS:  So as usual, Mr. Isaacs, if

 5    you're able to pull that up and give control to

 6    Dr. Gonda that would be great.  Thank you.

 7    BY MR. DYKHUIS:

 8       Q.    And, Dr. Gonda, do you have control?

 9       A.    Let me try.  Yes.

10       Q.    Great.

11       A.    At least I can make it bigger or smaller.

12       Q.    Well, there you go.

13             Do you recognize Exhibit 1066, Dr. Gonda?

14       A.    Yes, I do.

15       Q.    And this is instructions for use for AccuNeb

16    inhalation solution, correct?

17       A.    Yes, correct.

18       Q.    It recites albuterol which is used -- excuse

19    me.  The active ingredient is albuterol sulfate,

20    correct?

21       A.    Yes, correct.

22       Q.    And then if you look at page 2 right below the

23    graph the first bolded heading says "Indications and

24    Usage."  Do you see that?

25       A.    Yes, I do.
```

Igor Gonda, Ph.D.

1      Q.      "AccuNeb is indicated for the

2              relief of bronchospasm in patients 2

3              to 12 years of age with asthma."

4              Did I read that correctly?

5      A.      Yes, I do.

6      Q.      And as we previously might have touched on,

7    albuterol sulfate is not a treatment for pulmonary

8    hypertension?

9              MS. KANNAPPAN:   Objection to form.

10     A.      That is correct.   It is not indicated for the

11   treatment of pulmonary hypertension.

12   BY MR. DYKHUIS:

13     Q.      And then back on page 1, there is the largest

14   heading, "Patient's Instructions For Use" on the left.

15   There's some bold text.   It says "Storing your Medicine"

16   and then it says "Dose."   Do you see that?

17     A.      Uh-huh.

18     Q.      It says:

19              "AccuNeb is supplied as a

20              single-dose, ready-to-use vial

21              containing 3 milliliters of

22              solution."

23     A.      I can read that.

24     Q.      It goes on and mentions no mixing but then

25   also says:

Igor Gonda, Ph.D.

1              "Use one new vial with each

2          nebulizer treatment."

3          Do you see that as well, Dr. Gonda, same

4    paragraph?

5      A.    It says one new vial, I can see vial, with

6    each nebulizer treatment, correct.

7      Q.    So the 3-milliliter of solution is what is

8    added to the nebulizer reservoir, correct?

9      A.    Correct.

10      Q.    And then a smaller quantity is what would

11   actually make its way out of the device to the patient?

12          MS. KANNAPPAN:  Objection to form.

13   Foundation.

14      A.    It is by the law of --

15          (Court reporter clarification.)

16      A.    So I said that by law of conservation of mass,

17   you could never get a greater outcome out of a nebulizer

18   so it would be a smaller amount.  So it would be a

19   smaller amount that would come out of the nebulizer than

20   the amount that you put in the nebulizer.

21   BY MR. DYKHUIS:

22      Q.    Thank you.

23          And that smaller amount depends on the patient

24   and the exact nebulizer that's used and other factors,

25   correct?

Appx5188

1           MS. KANNAPPAN:  Objection to form.

2       A.    Yes.  In this particular type of device the

3    actual dose would depend, as you said, on whether the

4    patient is using it and the actual nebulizer and the

5    formulation that you are using in the nebulizer.

6           MR. DYKHUIS:  Let's turn next to Exhibit 1050.

7           (Exhibit 1050 marked for

8           identification by the Certified

9           Shorthand Reporter.)

10      A.    Yes.

11   BY MR. DYKHUIS:

12      Q.    Do you recognize that, Dr. Gonda?

13      A.    Yes, I do recognize this document, yes.

14      Q.    And this is the label or -- yeah, I guess the

15   label for Pulmozyme, correct?

16      A.    That is correct.

17      Q.    And here Pulmozyme -- under the first heading,

18   "Description," the second paragraph.  It starts with:

19           "Pulmozyme is administered by

20           inhalation of an aerosol mist

21           produced by a compressed air driven

22           nebulizer system."

23           Do you see that?

24      A.    That's correct.

25      Q.    And so is that -- excuse me.  So the

1    compressed air nebulizer, would that be something like a

2    jet nebulizer?

3          A.    Yes, that's correct.  It's a jet nebulizer.

4          Q.    **The second sentence in that paragraph states**

5    **that:**

6                  "Each Pulmozyme single-use ampule

7                  will deliver 2.5 milliliters of the

8                  solution to the nebulizer bowl."

9                  Do you see that?

10         A.    Yes.

11         Q.    **So the Pulmozyme 2.5 milliliters goes into the**

12   **nebulizer and then some lesser quantity will actually be**

13   **delivered to the patient, correct?**

14                MS. KANNAPPAN:  Objection to form.

15   Foundation.

16         A.    Yes.  You are right.  If you put two and a

17   half milliliters into the nebulizer, you'd expect that

18   less than that will be delivered to the mouthpiece for

19   the patient.

20                MR. DYKHUIS:  Let's go next to Exhibit 1029,

21   please.

22                (Exhibit 1029 marked for

23                identification by the Certified

24                Shorthand Reporter.)

25   ///

1   BY MR. DYKHUIS:

2       Q.    Do you recognize this Exhibit 1029, Dr. Gonda?

3       A.    Yes, I do.

4       Q.    And this is -- what is this, sir?

5       A.    Sorry, are you asking me?

6       Q.    Yes.  What is it, Dr. Gonda?  Thank you.

7       A.    It is the Ventavis package insert which

8   describes the product and its use.  And Ventavis is the

9   brand name for the iloprost inhalation solution.

10      Q.    Thank you.

11            Then let me direct you to the first paragraph

12  under "Description."  The one -- second sentence starts

13  with -- well, I'll back up.

14            The first sentence mentions the Prodose

15  Adaptive Aerosol Delivery System.  Do you see that?

16      A.    Yes, I do.

17      Q.    And then the second one states -- the second

18  sentence recites:

19                "Each single-use glass ampule

20            contains 2 milliliters of the

21            solution to be added to the Prodose

22            AAD System medication chamber."

23            Correct?

24      A.    Correct.

25      Q.    And so just like the previous two,

1    2 milliliters is the quantity of solution that goes into

2    this Prodose system and then the lesser amount is what

3    is actually delivered to the patient, correct?

4          MS. KANNAPPAN:  Objection to form.

5    Foundation.

6      A.    That -- that is correct.

7    BY MR. DYKHUIS:

8      Q.    And so this version of the Ventavis label

9    recites the single-use glass ampule of 2 milliliters,

10   correct?

11     A.    Yes.

12           MR. DYKHUIS:  Let us go next to Exhibit 1082.

13           (Exhibit 1082 marked for

14           identification by the Certified

15           Shorthand Reporter.)

16   BY MR. DYKHUIS:

17     Q.    And do you recognize Exhibit 1082, Dr. Gonda?

18     A.    Yes.  I do recognize it.

19     Q.    What is Exhibit 1082?

20     A.    It's the supplemental declaration that I

21   provided later.  I think that it was September.

22     Q.    What was the purpose, as you understood it, of

23   this supplemental declaration, Dr. Gonda?

24     A.    I think the purpose was twofold.  Somebody

25   with a really good eye discovered that I made a factual

1    mistake in my declaration.  And then I think that there

2    was also a question about the dating of the letter from

3    the Physician's Desk Reference and I found a copy of

4    that reference but there was no date on it.  And I think

5    that somebody, a librarian, actually found the same copy

6    of the -- of the Physician's Desk Reference which was

7    actually dated.

8        **Q.    Okay.  So let's go to just the first paragraph**

9    **of the supplemental declaration.  And paragraph 2 states**

10   **you've been asked to by counsel for Liquidia to submit a**

11   **supplemental declaration attesting to authenticity of**

12   **the Ventavis label submitted as Exhibit 1029.**

13       **Do you see that?**

14       A.    Yes, I do.

15       **Q.    And do you agree that there was any problems**

16   **with Exhibit 1029 as originally filed?**

17       MS. KANNAPPAN:  Objection to form.

18       A.    Well, as far as I understand, it is that there

19   was a subsequent label which appeared on the site which

20   I -- which I guess I had missed.  So the correct

21   official label was the label which is now attached to

22   this document.  And the changes were no great changes

23   but it was different.  I mean, the changes did not

24   materially modify my original declaration but there were

25   changes.

1          MR. DYKHUIS:  Okay.  And we can switch back to

2     Exhibit 1082, please.

3     BY MR. DYKHUIS:

4          Q.    And then I want to direct you to paragraph --

5     my sheets of paper got out of order here, Dr. Gonda.

6     Just one moment.

7          A.    That's all right.

8          Q.    It's on page -- well, it's -- in the bottom

9     right corner it says page 9.  And then Liquidia's

10    Exhibit 1082, page 9.  And there's footnote one there.

11    You talk about "the propositions for which Exhibit 1029

12    is relied upon in Exhibit 1002 are equally (if not

13    identically) supported by Exhibit 1083."

14          Do you see that language?

15          A.    Yes.  I mean, can you just refresh my memory.

16    So Exhibit 1002, what was that?

17          Q.    Dr. Hill's declaration.

18          A.    Okay.  I get it, yes.  Yes.

19          Q.    I just wanted to ask you in this footnote why

20    are you offering a declaration about the basis for the

21    opinions of Dr. Hill?

22          MS. KANNAPPAN:  Objection to form.

23          A.    Well, again if my memory is serving me well,

24    the question was:  What would be the usual fill of a

25    nebulizer, you know, how much volume of the liquids

Igor Gonda, Ph.D.

**Liquidia Technologies, Inc. vs.**
**United Therapeutics Corp.**

1    would one expect in a nebulizer.  And I provided the

2    information that in my experience based on the knowledge

3    that I had prior to 2006, the fill of a nebulizer would

4    typically be somewhere between 1 to 5 milliliters.

5    BY MR. DYKHUIS:

6        **Q.    And that was where you had cited -- that's**

7    **where you had cited the AccuNeb label and the Ventavis**

8    **label and the Pulmozyme labels, correct?**

9        A.    That is correct.

10       **Q.    Okay.**

11           MR. DYKHUIS:  Let's go off the record.

12           (Discussion off the record.)

13           MR. DYKHUIS:  Thank you.

14           Welcome back, Dr. Gonda.  I just wanted to

15    thank you for your time in answering my questions.  An

16    early morning for you.  So at this time I don't have

17    further questions and I would pass the witness.

18           MS. KANNAPPAN:  Dr. Gonda --

19           Actually, Counsel, can we take a few minutes

20    to figure out if we actually have any redirect

21    questions?  I figured that was what was happening when

22    you asked for a break but I didn't want to force you

23    so --

24           MR. DYKHUIS:  That's fine.

25           MS. KANNAPPAN:  So maybe we can meet at 55?

**Appx5199**

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

**WATSON LABORATORIES, INC.**
Petitioner

v.

**UNITED THERAPEUTICS CORP.**
Patent Owner

————————————

Cases[1] IPR2017-01621; Patent 9,358,240
IPR 2017-01622; Patent 9,339,507

————————————————————————————

**DECLARATION OF DR. ROBERT ROSCIGNO**

————————————

[1] The word-for-word identical paper is filed in each proceeding identified in the

heading.

UNITED THERAPEUTICS, EX. 2048
WATSON LABORATORIES v. UNITED THERAPEUTICS, IPR2017-01622

**IPR2021-00406**
**United Therapeutics EX2061**

I, Dr. Robert Roscigno, hereby declare as follows:

1.     I am a named inventor of U.S. Patent No. 9,358,240 and US Patent No. 9,399,507. My co-inventors on those patents include Horst Olschewski, Lewis Rubin, Thomas Schmehl, Werner Seeger, Carl Sterritt, and Robert Voswinckel.

2.     I am currently Senior Vice President, Product Development at Liquidia Technologies.

3.     I am a paid consultant for United Therapeutics Corporation ("United Therapeutics"), which I understand is the assignee of U.S. Patent No. 9,358,240 and US Patent No. 9,399,507, in connection with IPR2017-01621 and IPR2017-01622, respectively. My compensation does not depend on the content of this declaration, the substance of any other testimony that I may offer in connection with this proceeding or the disposition of this proceeding.

4.     From the time period of June 2005-June 2007, I was the President and COO of Lung Rx, Inc., a subsidiary of United Therapeutics. From 2002-June 2005 I was Senior Vice President of Lung Rx, Inc.

5.     Beginning by at least September 2003, I was tasked by United Therapeutics' CEO, Martine Rothblatt, with leading the company's development of an inhaled treprostinil treatment for pulmonary hypertension. I was the project leader for Lung Rx, Inc. for this development, which we termed TRIUMPH (Treprostinil Sodium Inhalation Used in the Management of Pulmonary Arterial

Hypertension) and was responsible for bringing what became Tyvaso® from early preclinical studies through Phase 3 development. Specifically, I was tasked with participating in the design of the protocols for clinical studies and coordinating the development of an inhaled program that formed the basis for Tyvaso®'s approval.

6.    On October 22, 2003, I attended a meeting with Dr. Rothblatt in Dr. Rothblatt's New York City apartment to kick off the project, along with Drs. Rubin and Seeger. A task list for that meeting is labelled Exhibit 2102. As reflected in that task list, my initial responsibilities included writing up drafts of the initial clinical studies and providing drug material to Giessen for the studies. The other individuals reflected on that list were Martine Rothblatt ("MR"), Carl Sterritt ("CS"), Werner Seeger ("WS"), Lewis Rubin ("LR"), and Horst Olschewski ("HO").

7.    All of the co-inventors had experience in and were focused in the project on the treatment of pulmonary hypertension. All of the inventors had critical roles and brought varied expertise to the project.

a. Carl Sterritt led United Therapeutics' Europe operations and engaged early with me and Drs. Seeger, Olschewski, Schmehl, and Voswinckel ("the Giessen researchers") and also contributed to the clinical protocol design and development due to his understanding and experience with Remodulin® and iloprost and his understanding of the potential for

2

inhalation of the treprostinil molecule. As with all of the co-inventors, he

reviewed and contributed to the ideas concerning dosage, timing,

formulation, and the device and engaged in much of the necessary work

to effect the planning of the group. As with all of the co-inventors, he

was involved in our discussions of the interpretation of data and the

conclusions that could be drawn from them for the iterative design of the

next set of experiments. Carl also directly interacted with Nebutec, the

Germany-based device manufacturer.

b. I had a similar role and worked closely with Carl Sterritt on his

involvement. I also engaged with our pharmacokinetic consultants and

experts and engaged in interpreting the pharmacokinetic data. Due to my

experience with clinical trial management and toxicology assessment, I

also closely ensured that all studies were consistent with the necessary

toxicology investigations and issues that would become important for

regulatory approval. I was heavily engaged in collaborating with the

investigators on study protocols and the necessary assessment and

writing of the study results.

c. Dr. Seeger was the head of the program at Giessen and employed the

expertise and contributions of Drs. Voswinckel, Schmehl, and

Olschewski, based on, for example, their prior expertise and experience

with iloprost and respective clinical expertise with pulmonary

hypertension. These investigators collectively executed the studies

designed in collaboration among all of the inventors.

d. Dr. Rubin was involved as the co-head (with Dr. Seeger) of the clinical

steering committee for TRIUMPH and engaged in similar tasks as

described above with each of us co-inventors. Later, he was also the lead

investigator on the early and late phase studies performed at UCSD.

8.     Together with Carl Sterritt and Drs. Rubin, Seeger, Voswinckel,

Schmehl, and Olschewski, we developed early protocols and methods for clinical

studies, including developing the appropriate dosing regimen, dose titration

strategies, drug product formulation, and device testing that resulted in the clinical

trials necessary to support the TRIUMPH program. Together, we developed and

implemented the strategy and details for moving forward with the clinical trials

and creating the clinical development plan that led to the development of Tyvaso®.

9.     As reflected in the October 22, 2003 meeting task list, this work began

in earnest by at least October of 2003 and continued through the completion of

Phase III trials. From October 2003 forward, I, and sometimes including Carl

Sterritt, met quarterly with the steering committee including Drs. Rubin and Seeger

to discuss progress and discuss and plan strategy for moving forward. The

advancement of the program was an iterative process and we had to regroup

regularly to assess our data and progress and plan the next steps. We met multiple times in Germany and North Carolina between October 2003 and June 2007, and additionally on an ad-hoc basis in other locations including Orlando, San Diego, Melbourne, Florida, Washington, DC, and London. We also worked with Nebutec, the manufacturer of the nebulizer, including in-person meetings at the Nebutec facilities, to discuss the sourcing, modification, performance testing, quality systems, programming, features and regulatory approval of the inhalation Optineb device.

10.     The initial studies, all performed at the University of Giessen or UCSD, included first acute and then longer term studies with varying doses and concentrations of treprostinil, increased and reduced inhalation times, and alternative drug formulations (including the removal of the metacresol preservative). The early studies were administered by inhalation with different device delivery modes, beginning in 2003, including delivering continuous ultrasonic nebulization and, later, pulsed ultrasonic nebulization. The design, interpretation, implementation, and modifications of these studies included the input of all of the co-inventors. Together, all of the co-inventors were responsible for developing the method described in claim 1 of the '240 patent and the kit described claim 1 of the '507 patent.

4819-7765-8701

11.    We faced several challenges in making modifications to the study protocols and none of them were easily overcome or were obvious.  One example is that the studies evolved from a rational starting point of using the continuous nebulization system initially employed for inhaled iloprost, discussing and developing various iterations and programming of the device (such as increasing and decreasing inhalation time and continuous ultrasonic nebulization vs pulsed ultrasonic nebulization.  Ultimately, we arrived at a method of using a modified Optineb pulsed ultrasonic nebulizer used in a pulsed mode that aerosolizes a fixed amount of treprostinil per pulse where the patient must synchronize each consecutive breath to each pulse of the device with the aid of an opto-acoustical trigger (as described in the patent).  Our motivation for these modifications was not to avoid wastage or to deliver precise doses, though these were side benefits, but to avoid the spillover effect into the systemic system (leading to intolerable prostacyclin side effects) seen with continuous nebulization of iloprost that occurred when the drug was administered too quickly and/or at high doses.  We discovered unexpectedly that we could deliver more treprostinil in a shorter period of time with fewer side effects (increasing the treprotinil dose more than 10-fold compared with iloprost)—this was not obvious to anyone.

12.    I have reviewed an English translation of the German language review article: Hossein Ardeschi Ghofrani *et al.* "Neue Therapieoptionen in der

6

Behandlung der pulmonalarteriellen Hypertonie,"[2] *Herz*, 30, 4 (June 2005): 296-

302 ("the Ghofrani article"). Ex. 1005. I am familiar with the work described in the

following excerpt:

> Initial trials in Giessen have shown proof of efficacy of *inhaled* treprostinil
> for the effective reduction of the pulmonary vascular resistance (PVR) [6].
> In this first study, 17 patients with severe pre-capillary pulmonary
> hypertension were administered inhaled treprostinil (15 mcg/inhalation).
> This led to a major reduction in pulmonary selective pressure and resistance
> with an overall duration of action of > 180 min. In direct comparison with
> inhaled iloprost, inhaled treprostinil showed a stronger pulmonary
> selectivity, so that it is possible to increase the dosage to up to 90 mcg
> (absolute inhaled dose per inhalation exercise) without adverse effects
> occurring [6]. Due to these unique properties (pronounced pulmonary
> selectivity and long duration of action after an individual inhalation), it is
> possible to reduce the number inhalations necessary to up to four per day;
> the inhalation period can be reduced to < 1 min. by selecting a suitable
> device. Additionally, the initial data shows that it is technically feasible for
> there to be only one to two breaths in an application. A multi-centric,
> placebo-controlled study shall now also study the efficacy of this new
> therapy during long-term use.

13.     This excerpt does not describe in any detail the thinking, design,

methods, or results that underlie the referenced "first study." In addition, while

these findings are all correct, they are not the conclusions of a single study. I

recognize the little that is described as reflecting my early work together with the

co-inventors. The work described in this excerpt was performed as part of the joint

---

[2] The title is translated as "New therapies in the treatment of pulmonary

hypertension" in Exhibit 1005.

cooperation of the several inventors and reflects the earliest aspects of our collective work described above. Even though not all of the inventors were identified as authors—which we wouldn't expect of a German review article coming out of Giessen—the excerpt above describes our work at a very high level.

14.    The earliest clinical studies included a series of seven investigator-sponsored studies with inhaled treprostinil, with six studies conducted at the University Hospital Giessen in 2003. The six Giessen studies were performed by the Giessen investigators, Seeger, Voswinckel, Schmehl, and Olschewski using the protocols, dosing, formulation, and device developed jointly by them, Dr. Rubin, Carl Sterritt, and myself. Labelled as Exhibit 2049 are true and correct copies of excerpts of the Tyvaso NDA Integrated Summary of Efficacy (ISE) reflecting these seven studies and indicating that the six Giessen studies occurred in 2003, which is a document that had to be submitted to the FDA as part of the process of obtaining regulatory approval to market Tyvaso® in the US.

15.    One of the studies performed at Giessen included Study LRX-INH-0004 in 2003. True and correct copies of excerpts of the Clinical Investigation Report Synopsis for that study are labelled as Exhibit 2050, which is also a document that had to be submitted to the FDA as part of the process of obtaining regulatory approval to market Tyvaso® in the US. That study included treatment with a pulsed ultrasonic nebulizer used in a pulsed mode, with a target dose of 15

mcg over 1 to 18 breaths, and concentrations ranging from 100 to 2,000 mcg/mL. Hemodynamics were observed over three hours. Study LRX-INH-0007, summarized in the Clinical Investigation Report for that study, a true and correct copy of which is labelled as Exhibit 2051, also included treatment with a pulsed ultrasonic nebulizer used in pulsed mode, target doses of 15 mcg and 30 mcg, a concentration of 600 mcg/mL, 3 or 6 breaths, and 5 mcg per pulse or breath. Exhibit 2051 also had to be submitted to the FDA as part of the process of obtaining regulatory approval to market Tyvaso® in the US. These studies are also discussed in the text of our patents.

16.    Therefore, even though this was not made public in any publication including the Ghofrani review article discussed above, by 2003,[3] me and my co-inventors had conceived of and performed in human pulmonary hypertension patients methods and kits with the following features:

a.  administering therapeutically effective amounts of treprostinil within a 200 to 1000 mcg/mL range;

b.  with a pulsed ultrasonic nebulizer used in pulsed mode that aerosolizes a fixed amount of treprostinil per pulse;

_____

[3] Certainly, these methods and kits had been performed before January 2004 when we had finalized the protocol for the Double Blind Placebo Controlled Clinical Investigation Into the Efficacy and Tolerability of Inhaled Treprostinil Sodium in Patients with Severe Pulmonary Arterial Hypertension (TRIUMPH I STUDY), LRX-TRIUMPH 001.

9

Declaration of Dr. Robert Roscigno

    c. and which has an opto-acoustical trigger allowing the patient to

      synchronize each breath to each pulse,

    d. with a single event dose between 15 mcg to 90 mcg of treprostinil

    e. delivered in 1 to 19 breaths.

    17.    These methods included not repeating a dose for at least 3 hours and the delivery of at least 5 µg of treprostinil per breath.

*[The remainder of this page is intentionally left blank]*

Declaration of Dr. Robert Roscigno

18.    I hereby declare that all statements made herein of my knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both under Section 1001 of Title 18 of the United States Code.

Date: 23 APRIL, 2018

Dr. Robert Roscigno

Atty. Dkt. No. 080618-0548
Appl. No. 11/748,205

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicant: | Horst OLSCHEWSKI et al. |
| Title: | TREPROSTINIL ADMINISTRATION USING A METERED DOSE INHALER |
| Appl. No.: | 11/748,205 |
| Filing Date: | 5/14/2007 |
| Examiner: | Weldon P. Phillips Jr. |
| Art Unit: | 4121 |
| Confirmation Number: | 6003 |

### DECLARATION UNDER 37 C.F.R. § 1.132

Assistant Commissioner for Patents
Washington, D.C. 20231

    Sir:

    I, Werner Seeger hereby declare and say that:

1. I am a citizen of Germany.

2. I am a co-inventor of the subject matter presently claimed in the above-captioned application.

3. I am able to read and understand the English language when it is written.

4. I am familiar with Voswinckel *et al.* "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension", Annals of Internal Medicine Vol. 144, pages 149-150, 2006 (hereafter "Voswinckel article"), that is cited in the Office Action mailed on April 15, 2009, and how the results described in the Voswinckel

IPR2021-00406
United Therapeutics EX2065

Atty. Dkt. No. 080618-0548
Appl. No. 11/748,205

article were generated. I am also familiar with the currently pending claims in the above-captioned application.

5. I understand that an inventor is one who contributes to conception of what is being claimed in the above-captioned application, which courts have paraphrased as "the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice." I further understand that a person who performs work to confirm someone else's idea is not an inventor, unless that person also contributed to the conception of the invention.

6. Hossein A. Ghofrani and Friedrich Grimminger, that are properly listed as co-authors on the Voswinckel article because of their contributions to the Voswinckel article, did not contribute to conception of the presently claimed invention, so they are not co-inventors of the present claims in this application.

7. I further declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent resulting therefrom.

_14/7/2009_
Date

_Werner Seeger_

-2-

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

**WATSON LABORATORIES, INC.**
Petitioner

v.

**UNITED THERAPEUTICS, INC.**
Patent Owner

Patent No. 9,358,240
Issue Date: June 7, 2016
Title: TREPROSTINIL ADMINISTRATION BY INHALATION

*Inter Partes* Review No. 2017-01621

**DECLARATION OF DR. WERNER SEEGER**

4819-7765-8701

IPR2021-00406
United Therapeutics EX2066

I, Dr. Werner Seeger, hereby declare as follows:

1.     I am a named inventor of U.S. Patent No. 9,358,240 and am the director of University of Giessen and Marburg Lung Center ("UGMLC"), a research center at the University Hospital Giessen studying pulmonary hypertension.

2.     I am a paid consultant for United Therapeutics Corporation, which I understand is the assignee of U.S. Patent No. 9,358,240, in connection with IPR2017-01621. My compensation does not depend on the content of this declaration, the substance of any other testimony that I may offer in connection with this proceeding or the disposition of this proceeding.

3.     I am a co-author of the German language article: Hossein Ardeschi Ghofrani *et al.* "Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie,"[1] *Herz*, 30, 4 (June 2005): 296-302 ("the Ghofrani article"). I understand that Watson Laboratories, Inc. ("Watson") submitted an English language translation of the Ghofrani article in this proceeding as Exhibit 1005, which I have reviewed.

4.     The Ghofrani article was an overview review article, drafted under my direction and control by members of my research center at University Hospital

_____

[1] The title is translated as "New therapies in the treatment of pulmonary hypertension" in Exhibit 1005.

Giessen. The intent of the article was to compile and review information, not to communicate primary data. Each of the listed authors was selected based on their expertise in particular areas covered in particular sections of the Ghofrani article.

5.    Dr. Hossein A. Ghofrani – the first listed author – has experience in the use of phosphodiesterase inhibitors for treatment of pulmonary hypertension. He drafted the section of the Ghofrani article relating to phosphodiesterase inhibitors. I know Dr. Ghofrani drafted this section of the Ghofrani article because I asked him to draft this section and communicated with him about it. In Exhibit 1005, this section begins at the bottom of page 3 and continues through page 5. Dr. Ghofrani was listed as a co-author on the Ghofrani article because he drafted this portion of the article and the other portions noted below.

6.    Drs. Frank Reichenberger and Friedrich Grimminger both have experience in the use of selective endothelin A receptor agonists for treating pulmonary hypertension. I know Drs. Reichenberger and Grimminger drafted this section of the Ghofrani article because I asked them to draft this section and communicated with them about it. Together they drafted the section of the Ghofrani article relating to selective endothelin A receptor agonists. In Exhibit 1005, this section is on page 3. Drs. Reichenberger and Grimminger were listed as a co-author on the Ghofrani article because they drafted this portion of the article.

2

4819-7765-8701

7.     Dr. Robert Voswinckel and I both have experience in the use of inhaled iloprost and inhaled treprostinil for treatment of pulmonary hypertension. Together, we drafted the sections of the Ghofrani article relating to inhaled iloprost and inhaled treprostinil.  In Exhibit 1005, this section begins at the bottom of page 2 and continues through page 3.  Although the bulk of the Ghofrani article is a review of prior literature, additional information not previously reported in the literature was contributed by Dr. Voswinckel and myself in the inhaled treprostinil section and is contained in the following excerpt:

> Initial trials in Giessen have shown proof of efficacy of inhaled treprostinil for the effective reduction of the pulmonary vascular resistance (PVR) [6]. In this first study, 17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil (15 mcg/inhalation). This led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min. In direct comparison with inhaled iloprost, inhaled treprostinil showed a stronger pulmonary selectivity, so that it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring [6]. Due to these unique properties (pronounced pulmonary selectivity and long duration of action after an individual inhalation), it is possible to reduce the number inhalations necessary to up to four per day; the inhalation period can be reduced to < 1 min. by selecting a suitable device. Additionally, the initial data shows that it is technically feasible for there to be only one to two breaths in an application.

The information in this excerpt was compiled and composed by Dr. Voswinckel and myself. The idea to perform the underlying work described in this section originated with Dr. Voswinckel and myself, in view of our work with other inventors listed on the '240 patent. The other authors listed in the Ghofrani article – Drs. Ghofrani, Reichenberger and Grimminger – did not contribute to this excerpt or the underlying work.

8.      The remaining sections on vasoactive therapy, inhaled iloprost, combination therapies, and treatment of early forms of treatment of pulmonary hypertension, as well as the introduction and compiled literature were drafted by Dr. Hossein A. Ghofrani and myself.

9.      Upon completion of the draft and prior to submission thereof, I reviewed and edited the Ghofrani article in my capacity as director of my research center. In addition to myself, the four members of my research center who had contributed to the aforementioned sections of the Ghofrani article were listed as authors.

10.     The selection of authors for the Ghofrani article fits with the normal practice in my research center. In general, when my research center submits abstracts to a conference or articles for publication, we include members of the research group who contributed in some way to the abstract or article as authors.

4819-7765-8701

Declaration of Dr. Werner Seeger

11.    For example, the abstract titled "Pulmonary Arterial Hypertension: New Therapies," which I understand was submitted by Watson as Exhibit 1003, lists as authors members of my research center who contributed by performing the administrative work supporting the trial, taking care of patients enrolled in the trial, and/or collecting data for the trial.  Drs. Ghofrani, Reichenberger, and Grimminger are among the authors who contributed to the trial in this manner.

*[The remainder of this page is intentionally left blank]*

4819-7765-8701

Declaration of Dr. Werner Seeger

12.    I hereby declare that all statements made herein of my knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both under Section 1001 of Title 18 of the United States Code.

Date: _5ᵗʰ Oktober_ , 2017

_____

Dr. Werner Seeger

# UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

**WATSON LABORATORIES, INC.**
Petitioner

v.

**UNITED THERAPEUTICS, INC.**
Patent Owner

Patent No. 9,358,240
Issue Date: June 7, 2016
Title: TREPROSTINIL ADMINISTRATION BY INHALATION

---

*Inter Partes* Review No. 2017-01621

---

## DECLARATION OF DR. HOSSEIN A. GHOFRANI

4810-7462-2542

Scanned by CamScanner

UNITED THERAPEUTICS, EX. 2026
WATSON LABORATORIES V. UNITED THERAPEUTICS, IPR2017-01621
Page 1 of 5

I, Dr. Hossein A. Ghofrani, hereby declare as follows:

1.    I am a member of University of Giessen and Marburg Lung Center ("UGMLC"), a research center at the University Hospital Giessen studying pulmonary hypertension.

2.    I am not a paid consultant for United Therapeutics Corporation, which I understand is the assignee of U.S. Patent No. 9,358,240, in connection with IPR2017-01621.

3.    I am a co-author of the German language article: Hossein Ardeschir Ghofrani *et al.* "Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie,"[1] *Herz*, 30, 4 (June 2005): 296-302 ("the Ghofrani article"). I understand that Watson Laboratories, Inc. ("Watson") submitted an English language translation of this article in this proceeding as Exhibit 1005, which I have reviewed.

4.    I have experience in the use of phosphodiesterase inhibitors for treatment of pulmonary hypertension. Therefore, I was asked by Dr. Werner Seeger to draft and, indeed, drafted the section of the Ghofrani article relating to phosphodiesterase inhibitors. In Exhibit 1005, this section begins at the bottom of page 3 and continues through page 5. Dr. Seeger and I also jointly drafted the

---

[1] The title is translated as "New therapies in the treatment of pulmonary hypertension" in Exhibit 1005.

Scanned by CamScanner

sections on vasoactive therapy, inhaled iloprost, combination therapies, and treatment of early forms of treatment of pulmonary hypertension, as well as the introduction. In line with the normal practice in the UGMLC research center, I was included as the first author on the Ghofrani article for these significant contributions.

5.      I did not make material contributions to any other section of the Ghofrani article, and I specifically did not contribute to the following excerpt:

> Initial trials in Giessen have shown proof of efficacy of inhaled treprostinil for the effective reduction of the pulmonary vascular resistance (PVR) [6]. In this first study, 17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil (15 mcg/inhalation). This led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min. In direct comparison with inhaled iloprost, inhaled treprostinil showed a stronger pulmonary selectivity, so that it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring [6]. Due to these unique properties (pronounced pulmonary selectivity and long duration of action after an individual inhalation), it is possible to reduce the number inhalations necessary to up to four per day; the inhalation period can be reduced to < 1 min. by selecting a suitable device. Additionally, the initial data shows that it is technically feasible for there to be only one to two breaths in an application.

Scanned by CamScanner

The information in this excerpt was compiled and composed by Dr. Robert

Voswinckel and Dr. Werner Seeger, and the idea to perform the underlying work

originated with them.

     6.    The section of the Ghofrani article relating to selective endothelin A

receptor agonists was drafted by Dr. Friedrich Grimminger and Dr. Frank

Reichenberger; both having experience in this field.  In Exhibit 1005, this section

is on page 3.

*[The remainder of this page is intentionally left blank]*

4819-7462-2542

Scanned by CamScanner

7.    I hereby declare that all statements made herein of my knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both under Section 1001 of Title 18 of the United States Code.


Date: _11 - OCT_ , 2017


                                                    Dr. Hossein A. Ghofrani

Scanned by CamScanner

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

WATSON LABORATORIES, INC.
Petitioner

v.

UNITED THERAPEUTICS, INC.
Patent Owner

Patent No. 9,358,240
Issue Date: June 7, 2016
Title: TREPROSTINIL ADMINISTRATION BY INHALATION

---

*Inter Partes* Review No. 2017-01621

---

DECLARATION OF DR. FRANK REICHENBERGER

4818-5875-5150

UNITED THERAPEUTICS, EX. 2027
WATSON LABORATORIES V. UNITED THERAPEUTICS, IPR2017-01621
Page 1 of 5

IPR2021-00406
United Therapeutics EX2068

I, Dr. Frank Reichenberger, hereby declare as follows:

1.      I was a member of University of Giessen and Marburg Lung Center ("UGMLC"), a research center at the University Hospital Giessen studying pulmonary hypertension.

2.      I am not a paid consultant for United Therapeutics Corporation, which I understand is the assignee of U.S. Patent No. 9,358,240, in connection with IPR2017-01621.

3.      I am a co-author of the German language article: Hossein Ardeschir Ghofrani et al. "Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie,"[1] Herz, 30, 4 (June 2005): 296-302 ("the Ghofrani article"). I understand that Watson Laboratories, Inc. ("Watson") submitted an English language translation of this article in this proceeding (Exhibit 1005), which I have reviewed.

4.      Dr. Friedrich Grimminger and I both have experience in the use of selective endothelin A receptor agonists for treatment pulmonary hypertension. Therefore, we were asked by Dr. Werner Seeger to draft the section of the Ghofrani article relating to selective endothelin A receptor agonists. And indeed, we did draft this section. In Exhibit 1005, this section is on page 3. In line with

---

[1] The title is translated as "New therapies in the treatment of pulmonary hypertension" in Exhibit 1005.

4818-5875-5150

the normal practice in the UGMLC research center, both Dr. Grimminger and I were listed as authors on the Ghofrani article for this contribution.

5.    I did not make material contributions to any other section of the Ghofrani article, and I specifically did not contribute to the following excerpt:

> Initial trials in Giessen have shown proof of efficacy of inhaled treprostinil for the effective reduction of the pulmonary vascular resistance (PVR) [6]. In this first study, 17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil (15 mcg/inhalation). This led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min. In direct comparison with inhaled iloprost, inhaled treprostinil showed a stronger pulmonary selectivity, so that it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring [6]. Due to these unique properties (pronounced pulmonary selectivity and long duration of action after an individual inhalation), it is possible to reduce the number inhalations necessary to up to four per day; the inhalation period can be reduced to < 1 min. by selecting a suitable device. Additionally, the initial data shows that it is technically feasible for there to be only one to two breaths in an application.

The information in this excerpt was compiled and composed by Dr. Robert Voswinckel and Dr. Werner Seeger, and the idea to perform the underlying work originated with them.

4818-5875-5150

6. Dr. Hossein A. Ghofrani – the first listed author – drafted the section of the Ghofrani article relating to phosphodiesterase inhibitors, and the remaining sections on vasoactive therapy, inhaled iloprost, combination therapies, and treatment of early forms of treatment of pulmonary hypertension, as well as the introduction were drafted by Dr. Hossein A. Ghofrani and Dr. Werner Seeger.

*[The remainder of this page is intentionally left blank]*

3

7.  I hereby declare that all statements made herein of my knowledge are true

and that all statements made on information and belief are believed to be true; and

further that these statements were made with the knowledge that willful false

statements and the like so made are punishable by fine or imprisonment, or both

under Section 1001 of Title 18 of the United States Code.


Date: ___10/10/___, 2017


                                            _____
                                            Dr. Frank Reichenberger

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

WATSON LABORATORIES, INC.
Petitioner

v.

UNITED THERAPEUTICS, INC.
Patent Owner

———————

Patent No. 9,358,240
Issue Date: June 7, 2016
Title: TREPROSTINIL ADMINISTRATION BY INHALATION

———————

*Inter Partes* Review No. 2017-01621

———————

**DECLARATION OF DR. FRIEDRICH GRIMMINGER**

4812-7351-8670

UNITED THERAPEUTICS, EX. 2028
WATSON LABORATORIES V. UNITED THERAPEUTICS. IPR2017-01621
Page 1 of 5

IPR2021-00406
United Therapeutics EX2069

IPR2017-01621                                   Declaration of Dr. Friedrich Grimminger

I, Dr. Friedrich Grimminger, hereby declare as follows:

1.     I am a member of University of Giessen and Marburg Lung Center ("UGMLC"), a research center at the University Hospital Giessen studying pulmonary hypertension.

2.     I am not a paid consultant for United Therapeutics Corporation, which I understand is the assignee of U.S. Patent No. 9,358,240, in connection with IPR2017-01621.

3.     I am a co-author of the German language article: Hossein Ardeschir Ghofrani *et al.* "Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie,"[1] *Herz*, 30, 4 (June 2005): 296-302 ("the Ghofrani article"). I understand that Watson Laboratories, Inc. ("Watson") submitted an English language translation of this article in this proceeding as Exhibit 1005, which I have reviewed.

4.     Dr. Frank Reichenberger and I both have experience in the use of selective endothelin A receptor agonists for treatment pulmonary hypertension. Therefore, we were asked by Dr. Werner Seeger to draft and, indeed, drafted the section of the Ghofrani article relating to selective endothelin A receptor agonists. In Exhibit 1005, this section is on page 3.  In line with the normal practice in the

---

[1] The title is translated as "New therapies in the treatment of pulmonary hypertension" in Exhibit 1005.

UGMLC research center, both Dr. Reichenberger and I were listed as authors on the Ghofrani article for this contribution.

5.     I did not make material contributions to any other section of the Ghofrani article, and I specifically did not contribute to the following excerpt:

> Initial trials in Giessen have shown proof of efficacy of inhaled treprostinil for the effective reduction of the pulmonary vascular resistance (PVR) [6]. In this first study, 17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil (15 mcg/inhalation). This led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min. In direct comparison with inhaled iloprost, inhaled treprostinil showed a stronger pulmonary selectivity, so that it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring [6]. Due to these unique properties (pronounced pulmonary selectivity and long duration of action after an individual inhalation), it is possible to reduce the number inhalations necessary to up to four per day; the inhalation period can be reduced to < 1 min. by selecting a suitable device. Additionally, the initial data shows that it is technically feasible for there to be only one to two breaths in an application.

The information in this excerpt was compiled and composed by Dr. Robert Voswinckel and Dr. Werner Seeger, and the idea to perform the underlying work originated with them.

2

4812-7351-8670

6.    Dr. Hossein A. Ghofrani – the first listed author –drafted the section of the Ghofrani article relating to phosphodiesterase inhibitors, and the remaining sections on vasoactive therapy, inhaled iloprost, combination therapies, and treatment of early forms of treatment of pulmonary hypertension, as well as the introduction were drafted by Dr. Hossein A. Ghofrani and Dr. Werner Seeger.

*[The remainder of this page is intentionally left blank]*

7.      I hereby declare that all statements made herein of my knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both under Section 1001 of Title 18 of the United States Code.

Date: _October 11_, 2017

_____

Dr. Friedrich Grimminger

Atty. Dkt. No. 080618-1156
Appl. No. 13/469,854

*IN THE UNITED STATES PATENT AND TRADEMARK OFFICE*

| | |
|---|---|
| Applicant: | Horst OLSCHEWSKI et al. |
| Title: | TREPROSTINIL ADMINISTRATION BY INHALATION |
| Appl. No.: | 13/469,854 |
| Filing Date: | 5/11/2012 |
| Examiner: | Sarah Elizabeth Townsley |
| Art Unit: | 1629 |
| Confirmation Number: | 9171 |

### DECLARATION UNDER 37 C.F.R. § 1.132

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

I, Werner Seeger hereby declare and say that:

1. I am a citizen of Germany.

2. I am a co-inventor of the subject matter presently claimed in the above-captioned application.

3. I am able to read and understand the English language when it is written.

4. I am familiar with Voswinckel *et al.* "Inhaled Treprostinil for Treatment of Chronic Pulmonary Arterial Hypertension", Annals of Internal Medicine Vol. 144, pages 149-150, 2006 (hereafter "Voswinckel article"), that is cited in the Office Action mailed on March

4835-6353-2837.1

UNITED THERAPEUTICS, EX. 2097
WATSON LABORATORIES v. UNITED THERAPEUTICS, IPR2017-01621
Page 1 of 2

IPR2021-00406
United Therapeutics EX2070

Atty. Dkt. No. 080618-1156
Appl. No. 13/469,854

13, 2015, and how the results described in the Voswinckel article were generated. I am also familiar with the currently pending claims in the above-captioned application.

5. I understand that an inventor is one who contributes to conception of what is being claimed in the above-captioned application, which courts have paraphrased as "the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice." I further understand that a person who performs work to confirm someone else's idea is not an inventor, unless that person also contributed to the conception of the invention.

6. Hossein A. Ghofrani and Friedrich Grimminger, that are properly listed as co-authors on the Voswinckel article because of their contributions to the Voswinckel article, did not contribute to conception of the presently claimed invention, so they are not co-inventors of the present claims in this application.

7. I further declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further, that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent resulting therefrom.

_____August 20, 2015_____
Date

_____
Werner Seeger

4835-6353-2837.1

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———————

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

———————

**WATSON LABORATORIES, INC.**
Petitioner

v.

**UNITED THERAPEUTICS CORP.**
Patent Owner

———————

Cases[1] IPR2017-01621; Patent 9,358,240
IPR 2017-01622; Patent 9,339,507

———————

**SECOND DECLARATION OF DR. WERNER SEEGER**

———————

[1] The word-for-word identical paper is filed in each proceeding identified in the

heading.

UNITED THERAPEUTICS, EX. 2098
WATSON LABORATORIES v. UNITED THERAPEUTICS, IPR2017-01621
Page 1 of 11

IPR2021-00406
United Therapeutics EX2071

IPR2017-01621; IPR2017-01622                  Declaration of Dr. Werner Seeger

I, Dr. Werner Seeger, hereby declare as follows:

1.     I am a named inventor of U.S. Patent No. 9,358,240 ("the '240 patent") and U.S. Patent No. 9,399,507 ("the '507 patent"), which are based upon U.S. provisional patent application No. 60/800,016 filed May 15, 2006 ("our patent application") (Ex. 2034). I am the director of University of Giessen and Marburg Lung Center ("UGMLC"), a research center at the University Hospital Giessen studying pulmonary hypertension.

2.     I am a paid consultant for United Therapeutics Corporation in connection with IPR2017-01621 and IPR2017-01622. My compensation does not depend on the content of this declaration, the substance of any other testimony that I may offer in connection with this proceeding, or the disposition of this proceeding.

3.     I am a co-author of the German language article: Hossein Ardeschi Ghofrani et al. "Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie,"[2] Herz, 30, 4 (June 2005): 296-302 ("the Ghofrani article") (Ex. 2103). I understand that Watson Laboratories, Inc. ("Watson") submitted an

---

[2] The title is translated as "New therapies in the treatment of pulmonary hypertension" in Exhibit 1005.

1

English language translation of the Ghofrani article in this proceeding as Exhibit 1005, which I have reviewed along with the original German article (Ex. 2103).

4.    As stated in my previous declaration (Ex. 2020), the Ghofrani article was an overview review article, drafted under my direction and control by members of my research center at University Hospital Giessen.  The intent of the article was to compile and review information regarding treatment of pulmonary hypertension, not to communicate primary data or to teach any specific therapeutic regimen.

5.    As detailed in my previous declaration, Dr. Voswinckel and I contributed the following inhaled treprostinil section of the Ghofrani article:

> Initial trials in Giessen have shown proof of efficacy of inhaled treprostinil for the effective reduction of the pulmonary vascular resistance (PVR) [6]. In this first study, 17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil (15 mcg/inhalation). This led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min. In direct comparison with inhaled iloprost, inhaled treprostinil showed a stronger pulmonary selectivity, so that it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring [6]. Due to these unique properties (pronounced pulmonary selectivity and long duration of action after an individual inhalation), it is possible to reduce the number inhalations necessary to up to four per day; the inhalation period can be reduced to < 1 min. by selecting a suitable device. Additionally, the initial data shows that it is technically feasible for there to be only one to two breaths in an application.

(Ex. 1005, p. 3).  Although the information in this excerpt for the article was compiled and composed by Dr. Voswinckel and myself, the individuals who

2

designed the underlying clinical studies with inhaled treprostinil are the same as the ones listed as inventors on the patents, as explained in more detail below. We of course performed the studies discussed in the Ghofrani article, wrote the excerpt quoted above, and submitted it for publication before it was published in June 2005 based upon our work together designing the clinical study.

6.     Regarding dosage of inhaled treprostinil, the above excerpt from the Ghofrani review article notes that patients were "administered inhaled treprostinil (15 mcg/inhalation)." The word "inhalation" in that sentence (in both German and English) does not mean "breath," but rather, refers to an inhalation event. This is clear under our typical use of that terminology and because the above excerpt is citing the reference of endnote "[6]" for support, which used an inhalation period of six minutes (reference [6] of Ex. 1005 is Ex. 1046, and p. 5 of Ex. 1046 states that "6 min" was used). An inhalation event of six minutes indicates that a continuous nebulizer was being used (without pulsing or an opto-acoustical trigger), as in the first two studies using Optineb discussed below.

7.     Although Ghofrani states that treprostinil showed a strong pulmonary selectivity "so that it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise)," it does not report that this dosage was applied in human pulmonary hypertension patients, which is evident from reviewing the cited reference, "[6]" (Ex. 1046), in which this this  dosage is not

3

reported. Rather, the Ghofrani review article states only that it "is possible"

("möglich ist" in Ex. 2103). This statement was intended to convey the idea that it

may be possible to increase the dosage to that level, not that the referenced study

actually performed that particular test. Similarly, the Ghofrani review article states

that due to certain unique properties of treprostinil, "it is possible ["ist es möglich"

in Ex. 2103] to reduce the number [of] inhalations necessary to up to four per day"

and that the inhalation period "can be" reduced ["lässt sich bei" in Ex. 2103] to < 1

min. and that it "is technically feasible ["technisch realisierbar sein wird" in Ex.

2103] for there to [sic] only one to two breaths in an application." These

statements of possibilities do not report any conclusion of studies performed,

which is evident from reviewing the cited reference, in which 6 min inhalation

time was reported "[6]" (Ex. 1046), but rather, suggest only future paths for

clinical studies.

8.    In sum, the Ghofrani review article does not explain or teach any

particular therapeutic regimen or necessary parameters. It merely provides a high-

level overview of early investigations into inhaled treprostinil and some

speculation for additional research. Similarly, the two Voswinckel references

provided by Watson as Ex. 1003 and 1046, both of which are abstracts and not

primary study reports, report only select and incomplete information of different

studies. Although the specific parameters used and particulars of the studies

4

performed by my group are not fully reported, any study that formed the basis of our discussion of inhaled treprostinil in these three references (Ex. 1005, 1003, and 1046) was performed by me in conjunction with my ongoing collaboration with Drs. Voswinckel, Olschewski, Rubin, Schmehl, Sterritt, and Roscigno. Indeed in both Voswinckel abstracts at Ex. 1003 and Ex. 1046 we note that the study was "supported by Lung Rx." In particular, as to any of these relevant inhalation studies with inhaled treprostinil, Drs. Voswinckel, Olschewski, Rubin, Schmehl, Sterritt, Roscigno, and I determined the dosage amounts of administered inhaled treprostinil to give to patients, determined the inhalation time and/or number of breaths employed, determined what equipment and administration devices and methods to use, and identified the spacing between inhalation events, as well as analyzed the hemodynamic and pharmacokinetic effects over time. The other authors listed in the Ghofrani review article – Drs. Ghofrani, Reichenberger, and Grimminger – did not participate in the design of any of the studies, did not select the dosing regimen, and did not conduct analysis of patient results discussed in the Ghofrani review article or the two Voswinckel abstracts.

9.     Drs. Ghofrani, Reichenberger, and Grimminger were named as co-authors because it was and continues to be the practice of our group, as an academic and research group, to include as co-authors all individuals working in our group that run the center, assist with trials, and engage in clinical routine management and

administration, even when that group is broader than the individuals actually involved in inventing methods or devices and designing the trials. More specifically, even though Ghofrani, Reichenberger, and Grimminger did not design the inhaled treprostinil clinical trials, they did perform support work including help with identifying potentially eligible patients out of the group of patients in our pulmonary hypertension clinic. Because patients with severe pulmonary hypertension have multiple needs beyond their participation in clinical trials, such as treatments involving their background medications (e.g. diuretics, anti-coagulation, other pulmonary hypertension targeted co-medications, antibiotics, etc.); and support for some general needs (e.g. administrative matters with insurance or helping with other family members, etc.), they also carried out this type of work. In still other cases, patients who discontinued clinical trials, require immediate transitioning back to their normal clinical care again, which was also part of their responsibilities.

10.    Dr. Voswinckel and my collaboration with Drs. Rubin and Olschewski and Lung Rx began in 2003. On September 30, 2003, I entered into a Services Agreement (Ex. 2101) with Lung Rx, Inc. under which I served as co-chair with Dr. Lewis Rubin for the development program for treprostinil inhalation. As reflected in the Services Agreement itself, work included developing the outline and timeline for the development program, and also

6

designing the pilot and pivotal trials. *Id.* I worked directly with Drs. Rubin, Voswinckel, Olschewski, Schmehl, Roscigno, and Sterritt on this collaboration, which resulted in the three clinical studies mentioned below that became the basis of our patent application leading to the '240 and '507 patents.

11.    In particular, I recall a meeting in New York in 2003, Oct 22nd, which included me, Dr. Rubin, and Dr. Olschewski, as well as participants from United Therapeutics, and together we discussed the design of clinical trials with inhaled treprostinil to treat pulmonary hypertension patients. A copy of the agenda from this meeting, which describes a detailed work plan, is attached. Ex. 2102. Certain action items indicated in this agenda involved me or my co-inventors as reflected by our initials ("LR" is Lewis Rubin, "WS" are my initials, "HO" is Horst Olschewski, "RR" is Robert Roscigno, and "CS" is Carl Sterritt).

12.    Following this initial meeting in New York, my co-inventors and I investigated various devices and alternatives to deliver inhaled treprostinil as described in our patent application. One possible method involved the use of a particular kind of metered dose inhaler (Ex. 2100, par. [0037] and [0047]-[0055]). A different, and unrelated, alternative was the use of an ultrasonic nebulizer (*id.* at [0066]). We began a series of studies with a particular ultrasonic nebulizer called the Optineb device, which are summarized in our patent application (*id.* at [0062]-[0089]). The first two studies initially used a 6 min. inhalation period, meaning

7

that patients breathed continuously while nebulization occurred over this time period, without pulsing of aerosol generation and without an opto-acoustical trigger (Ex. 2100, par. [0066], [0070], and [0071]).

13.    Unexpectedly, when we used treprostinil at a much higher dose in our second study with the Optineb ultrasonic nebulizer device, we discovered that treprostinil has a slower transpulmonary transit time (time of drug "spillover" into the blood to reach peak plasma concentration) of 10 to 15 minutes when administered to pulmonary hypertension patients (*id.* at Fig. 12), compared to iloprost (Ex. 1029, p. 1, "rapid entry of iloprost into the systemic circulation was noted, peaking immediately after termination of the inhalation maneuver"). This particular pharmacokinetic data is disclosed in our patent application (Ex. 2100 at Fig. 12), but is not reported in either of the Voswinckel abstracts (Ex. 1003 or 1046) or the Ghofrani publication (Ex. 1005). This slower time to reach peak plasma concentration is important. It obviously allows: a) to avoid major systemic side effects even when high total inhalation doses are used (nevertheless the high local concentrations in the lung already provide the desired therapeutic effect); b) to reduce the inhalation time to even a few breaths (made possible by switching to a pulsed ultrasonic nebulizer in the further course of the studies); and c) to increase the overall inhaled treprostinil dose more than one order of magnitude over the overall inhaled tolerable iloprost dose.

8

14.    In a subsequent trial, we modified the Optineb device to include both pulsing and an opto-acoustical trigger, while using a high enough concentration of pre-aerosolized treprostinil solution to permit high dosing in a small number of breaths coordinated with each of the aerosol pulses (Ex. 2100, par. [0072], [0079]-[0081] and [0088]), which dramatically shortened the overall time of each treatment session. Drs. Voswinckel, Olschewski, Schmehl and I were involved in guiding the design of these changes to the Optineb device and working to implement them into the treatment regimen. The co-inventors and I, therefore, had to work directly with Nebu-tec, the manufacturer of the Optineb device, to guide modifying the device to achieve all of the necessary features. Because we moved to such a high concentration of treprostinil in the aerosol, the opto-acoustical trigger to guide the patient's breathing and synchronize it to each pulse of aerosol was especially important. To my knowledge, the Optineb device we created was not one that was publicly available or otherwise publicly disclosed prior to our patent application. Although the Voswinckel publication references a "pulsed" Optineb nebulizer, it does not disclose any of the modifications we made, including the importance of the opto-acoustical trigger for coordinating each patient's breath with each pulse of aerosol at these high treprostinil concentrations.

15.    I hereby declare that all statements made herein of my knowledge are true and that all statements made on information and belief are believed to be true;

9

and further that these statements were made with the knowledge that willful false

statements and the like so made are punishable by fine or imprisonment, or both

under Section 1001 of Title 18 of the United States Code.

Date: _April 12th_, 2018

_____

Dr. Werner Seeger

10

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

WATSON LABORATORIES, INC.
Petitioner

v.

UNITED THERAPEUTICS CORP.
Patent Owner

_____

Cases[1] IPR2017-01621; Patent 9,358,240
IPR 2017-01622; Patent 9,339,507

_____

SECOND DECLARATION OF DR. HOSSEIN A. GHOFRANI

_____

[1] The word-for-word identical paper is filed in each proceeding identified in the

heading.

UNITED THERAPEUTICS, EX. 2099
v. UNITED THERAPEUTICS, IPR2017-01621
Page 1 of 7

IPR2021-00406
United Therapeutics EX2074

I, Dr. Hossein A. Ghofrani, hereby declare as follows:

     1.     I am a member of University of Giessen and Marburg Lung Center ("UGMLC"), a research center at the University Hospital Giessen studying pulmonary hypertension.

     2.     United Therapeutics Corporation is compensating me for my time spent in connection with IPR2017-01621 and IPR2017-01622 based on my standard hourly consulting rate.  My compensation does not depend on the content of this declaration, the substance of any other testimony that I may offer in connection with this proceeding, or the disposition of this proceeding.  I understand that United Therapeutics Corporation is the assignee of U.S. Patent No. 9,358,240 ("the '240 patent") and US Patent No. 9,399,507 ("the '507 patent").

     3.     I am a co-author of the German language article: Hossein Ardeschir Ghofrani *et al*. "Neue Therapieoptionen in der Behandlung der pulmonalarteriellen Hypertonie,"[2] *Herz*, 30, 4 (June 2005): 296-302 ("the Ghofrani article") (Ex. 2103).  I understand that Watson Laboratories, Inc. ("Watson") submitted an English language translation of this article in this proceeding as Exhibit 1005, which I have reviewed.

---

[2] The title is translated as "New therapies in the treatment of pulmonary hypertension" in Exhibit 1005.

4.      I am included as an author because I contributed to several sections of the article as I detailed in my first Declaration (Ex. 2026), including the sections on phosphodiesterase inhibitors, vasoactive therapy, inhaled iloprost, combination therapies, treatment of early forms of pulmonary hypertension, and the introduction.

5.      As stated in my previous declaration, I did not make material contributions to any section of the Ghofrani article other than those in paragraph 4, above. I specifically did not have the idea to design the patient study, to select the dosing regimen or type of inhalation device, nor did I otherwise contribute to the patient study described in the following excerpt:

> Initial trials in Giessen have shown proof of efficacy of inhaled treprostinil for the effective reduction of the pulmonary vascular resistance (PVR) [6]. In this first study, 17 patients with severe pre-capillary pulmonary hypertension were administered inhaled treprostinil (15 mcg/inhalation). This led to a major reduction in pulmonary selective pressure and resistance with an overall duration of action of > 180 min. In direct comparison with inhaled iloprost, inhaled treprostinil showed a stronger pulmonary selectivity, so that it is possible to increase the dosage to up to 90 mcg (absolute inhaled dose per inhalation exercise) without adverse effects occurring [6]. Due to these unique properties (pronounced pulmonary selectivity and long duration of action after an individual inhalation), it is possible to reduce the number inhalations necessary to up to four per day; the

2

inhalation period can be reduced to < 1 min. by selecting a suitable
device. Additionally, the initial data shows that it is technically
feasible for there to be only one to two breaths in an application.

The information in this excerpt was compiled and composed by Dr. Robert
Voswinckel and Dr. Werner Seeger, who jointly designed this patient study
together with contributions from Horst Olschewski, Robert Roscigno, Lewis
Rubin, Thomas Schmehl, and Carl Sterritt.

6.      Reference [6] referred to in this excerpt (Voswinckel R. Kohstall M.
Enge B, et al., Inhaled treprostinil is a potent pulmonary vasodilator in severe
pulmonary hypertension, Eur Heart J. 2004: 25:22 ("Voswinkel abstract")) (Ex.
1046), also lists me as a co-author. Although I did not design the study it describes,
I am listed as a co-author in recognition of my work as a member of the team that
carried out various tasks relating to the routine clinical care in addition to
identification of eligible patients for potential participation in trials, at the request
of other team members, such as Dr. Seeger. In the academic world, it is a common
practice to list as authors of abstracts and summary review articles the members
who helped carry out the work, not just those members who were directly
responsible for conceiving, analyzing, and designing a particular study. This is
typical of our group and is a valid publication practice for a research group like
ours.

3

7.     In the same way, with respect to the other Voswinckel abstract,

Robert Voswinckel, et al. *Inhaled Treprostinil Sodium (TRE) for the Treatment of*

*Pulmonary Hypertension*, Abstract #1414, CIRCULATION, 110, 17, SUPPLEMENT

(OCT. 2004): III-295 (Ex. 1003), I am listed as a co-author on that abstract because

we again included as authors of this abstract the members of our group who carried

out certain aspects of the trials, clinical routine management, or related parallel

studies, not just the members who were directly responsible for conceiving,

analyzing, and designing the particular study it describes.

8.     In the case of any studies of inhaled treprostinil described in these

articles, I was listed as a co-author because I assisted with the clinical

responsibilities of overseeing patients and was carrying out work related to the

treatment of pulmonary hypertension inside and outside the trials designed by the

inventors. I was not designing those studies or methods of treatment involving

inhaled treprostinil. I also agree that the other co-authors of these articles who are

not named as inventors of the '240 patent or the '507 patent were recognized as

authors for similar reasons. Even though we did not design the inhaled treprostinil

clinical trials, we did perform tasks relating to the trials such as identification of

potentially eligible patients out of the group of patients in our pulmonary

hypertension clinic. Moreover, patients with severe pulmonary hypertension have

multiple needs that are mostly not related to their participation in clinical trials,

such as: a) adjustments required to be made to their background medications (e.g. diuretics, anti-coagulation, other pulmonary hypertension targeted co-medications, antibiotics, etc.); and b) support of their socio-economic circumstances (e.g. negotiations with other health care providers, payers, child-care, etc.). Furthermore, patients discontinuing clinical trials (either scheduled or unscheduled) such as the above mentioned, require immediate transitioning into the routine clinical care again, which was also part of my responsibilities

9.     These three articles do not report on primary data where one is a review article (Ghofrani article, Ex. 1005) and two are abstracts (Voswinckel abstracts, Ex. 1003 and 1046). My involvement in any study by our group into inhaled treprostinil was limited to support and administrative tasks such as collecting data or checking on patients. I was not involved in the design or intent of the study such as selecting treprostinil for inhaled administration, the dosages or timing of administration, the protocols or devices used, or the selection of study parameters.

*[The remainder of this page is intentionally left blank]*

5

**Appx5352**

10.    I hereby declare that all statements made herein of my knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both under Section 1001 of Title 18 of the United States Code.

Date: _12 - April -_, 2018

_[signature]_

Dr. Hossein A. Ghofrani

6

S92

Thorax 1997;52(Suppl 2):S92–S101

# Selecting and using nebuliser equipment

A H Kendrick, E C Smith, R S E Wilson

## Aim of nebuliser therapy

The aim of nebuliser therapy is to deliver a therapeutic dose of the desired drug in the form of an aerosol of respirable particles within a fairly short period of time, usually 5–15 minutes. To achieve this, nebuliser systems should be expected to provide a drug output with about 50% of the particles below 5.0 μm mass median diameter. It is important to obtain an acceptable range of aerosol particle sizes because of the way in which these are deposited in the tracheobronchial tree.[1–5]

## Practical definitions

*Jet nebuliser*: a nebulising chamber where an aerosol is generated from a flow of gas from an electrical compressor or from a compressed gas supply (air or oxygen). The gas passes through a very small hole (the jet or Venturi) resulting in liquid being sucked up through the small hole from the chamber base and atomised. The resultant large particles then impact upon baffles to generate small respirable particles.[6]

*Ultrasonic nebuliser*: an electrically driven system whereby a rapidly vibrating piezoelectric crystal vibrates the drug solution and produces aerosol particles of a respirable size.[6]

*Flow rate through the nebuliser*: the flow rate of gas, whether from a compressed source or from a compressor, that actually drives the nebuliser chamber. It is not the same as the flow rate from the compressor which will often be considerably higher.[7] It is obtained by producing a pressure-flow rate curve for the nebuliser. Recordings of circuit pressure are made from zero flow (maximum pressure) to maximum flow (minimum pressure) using a rotameter, a compressor unit (or flow generator), and pressure measuring device. By substituting the nebuliser chamber for the rotameter the pressure in the circuit can be obtained with a constant flow rate from the flow generator. From the pressure-flow curve the flow rate at nebuliser can be obtained.[7]

*Volume output from the nebuliser*: the volume of solution leaving the nebuliser chamber. Whilst useful as a general guide to nebuliser performance, it does not give precise information about the actual drug output.[2]

*Drug output from the nebuliser*: the actual amount of drug that is released during nebulisation. Because of a variety of factors, including evaporation, a precise measure of drug output (as opposed to volume output) must be assessed using marker techniques.[8]

*Residual volume*: the volume of solution left in a nebuliser chamber once nebulisation has ceased and all of the aerosol particles have been generated and have left the nebuliser chamber. It is an important volume to take into account when determining the fill volume required to deliver a drug to a patient.[9]

*Fill volume*: the volume of drug solution initially put into the nebuliser chamber. It must exceed the residual volume by a sufficient amount to provide therapeutic benefit to the patient.[9] It is suggested that it should be at least twice the residual volume. It is important to be aware of the desirable fill volume when prescribing nebuliser drugs in prepackaged ampoules.

The definitions of aerosol output, respirable particles, mass median diameter (MMD), mass median aerodynamic diameter (MMAD), respirable output, and respirable fraction are given in the paper by O'Callaghan and Barry on page S35.

## Factors affecting nebuliser performance

The general term "nebuliser" usually implies the combination of the nebuliser chamber and the compressor. Jet nebulisers usually have a constant output, but to prevent wastage new breath-enhanced nebulisers are available where the output is enhanced in the inhalation phase. Ultrasonic nebulisers are effective but are less robust and more expensive than jet nebuliser systems and are generally not used for regular domiciliary therapy.

The major use of nebuliser systems is to deliver bronchodilator therapy. The specification of the nebuliser chamber for administering bronchodilators is different from that required to deliver other drugs such as antibiotics or pentamidine.

The output of a nebuliser is determined by a combination of factors which must be taken into account, and will depend on (1) the design of the nebuliser chamber,[9] (2) the flow of the driving gas and the performance characteristics of the compressor,[7,10,11] (3) the volume of solution (fill volume) of the drug at the start of nebulisation,[9,12] (4) the time taken to nebulise the solution of drug,[7,9] (5) the viscosity, surface tension, and concentration of the drug solution,[13] (6) the residual volume,[9] and (7) tapping of the nebuliser chamber during nebulisation.

The volume output and particle size of water, saline, salbutamol, terbutaline, and ipratropium bromide are similar.[14] For more viscous solutions the volume output is much slower (fig 1).[13,15] The output of steroids may be similar to salbutamol although the drug is a suspension. However, the volume output from a nebuliser is not directly related to the drug output,[8] and the drug output and its availability are different between bronchodilators, antibiotics, and steroids. Measuring volume output is simple and provides a guide to the performance of nebuliser/compressor combinations.[7,16]

Respiratory
Department,
Bristol Royal
Infirmary,
Bristol BS2 8HW, UK
A H Kendrick

Department of
Medicine,
c/o Respiratory
Department,
Bristol Royal
Infirmary,
Bristol BS2 8HW, UK
E C Smith

Department of
Respiratory Medicine,
Royal Shrewsbury
Hospitals NHS Trust,
Shrewsbury SY3 8XQ,
UK
R S E Wilson

Correspondence to:
Dr A H Kendrick

IPR2021-00406
United Therapeutics EX2076

Atty. Dkt. No. 080618-0716
Appl. No. 12/591,200

*IN THE UNITED STATES PATENT AND TRADEMARK OFFICE*

Applicant:     Horst OLSCHEWSKI et al.

Title:     TREPROSTINIL ADMINISTRATION BY INHALATION

Appl. No.:     12/591,200

Filing Date:     11/12/2009

Examiner:     Sara Elizabeth Townsley

Art Unit:     1629

Confirmation     4093
Number:

## DECLARATION UNDER 37 C.F.R. § 1.132 OF DR. ROHAM T. ZAMANIAN

I, Dr. Roham T. Zamanian, hereby declare:

1.     I received a Bachelor of Science and a Doctor of Medicine from the University of California, Irvine, where I also completed my internship, residency, and a fellowship in pulmonary medicine and critical care. I completed a second fellowship in pulmonary medicine and critical care at Stanford University Medical Center where I am now an Associate Professor of Medicine and Director of the Adult Pulmonary Hypertension Program.

2.     I am board certified in both internal and pulmonary medicine and have served as an investigator in a number of clinical trials of pulmonary hypertension drug trials, which are listed in the attached CV. See EXHIBIT 1.

3.     My research focuses on strategies for management of pulmonary hypertension, and I have a number of publications in these areas – listed in the attached CV. See EXHIBIT 1.

4828-2691-8182.1

29.   The results of the studies disclosed in the present application demonstrate that aerosolized terprostinil administered according to the instant claims has a dose dependent and longer pharmacokinetic effect than would be expected based on iloprost.

30.   As noted in paragraph [0081], while the maximum effect of aerosoloized iloprost and treprostinil on pulmonary vascular resistance (PVR) was comparable, treatment with treprostinil achieved this maximum effect much sooner and lasted for a longer duration compared to treatment with iloprost.  Further, while iloprost is known to reduce systemic arterial pressure (SAP), Figure 6C demonstrates that administration of treprostinil does not result in this same reduction of SAP.

31.   Regardless of pulse number in which dose was administered, administration of aerosolized treprostinil resulted in no significant effect on SAP.  Of particular clinical interest is the high reduction of PVR achieved in a three-pulse administration of 15 µg of treprostinil, which appears to have the most modest impact on SAP based on Figures 10 and 11.

32.   These data suggest that treprostinil is far more pulmonary selective than iloprost: a result that would have been unexpected as of May 15, 2006.  *See* Whittle Biochem. Pharmacol. 2012; 84:68-75 (a post-filing article describing potential mechanistic differences that may explain this difference in effect, EXHIBIT 7).

**IV.    Conclusion**

33.   Although not expected as of May 15, 2006, Tyvaso® is clinically superior to Ventavis® and preferred to Ventavis® for at least the above mentioned reasons.  Further, the claimed method employing inhaled treprostinil results in unexpected benefits for treatment of pulmonary hypertension.

34.   I further declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that

7

**REDACTED IN ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED THERAPEUTICS
CORPORATION,

*Plaintiff,*

v.

LIQUIDIA TECHNOLOGIES, INC.,

*Defendant.*

C.A. No. 1:20-cv-00755-RGA

███████████████████████

**EXPERT REPORT OF DR. IGOR GONDA**

IPR2021-00406
United Therapeutics EX2091

**Table of Contents**

**Page**

I.     INTRODUCTION ............................................................................ 1

II.    MATERIALS CONSIDERED ......................................................... 1

III.   BACKGROUND AND QUALIFICATIONS .................................. 1

IV.    LEGAL PRINCIPLES ................................................................... 3

     A.   Claim Construction ............................................................ 3

     B.   Level of Ordinary Skill in the Art ..................................... 4

     C.   Obviousness ....................................................................... 5

     D.   Anticipation ....................................................................... 6

     E.   Written Description ............................................................ 6

     F.   Enablement ......................................................................... 6

     G.   Indefiniteness ..................................................................... 7

V.     BACKGROUND TO THE ART ...................................................... 8

     A.   History of Inhalation Therapy ........................................... 8

     B.   Inhaled Treprostinil and Its Analogues ........................... 10

     C.   Well Known Considerations for Inhalation Therapies ..... 12

VI.    '793 PATENT ............................................................................... 16

     A.   The Specification .............................................................. 16

     B.   The Claims of the '793 Patent ......................................... 17

VII.   SUMMARY OF OPINIONS ......................................................... 18

VIII.  SUMMARY OF PRIOR ART ....................................................... 19

     A.   '212 Patent ........................................................................ 19

     B.   Voswinckel JESC ............................................................. 21

     C.   Voswinckel JAHA ............................................................ 22

     D.   Voswinckel 2006 .............................................................. 24

IX.    APPLICATION OF THE PRIOR ART TO THE CLAIMS ......... 24

     A.   Claims 1, 4, and 6-8 Are Obvious Over '212 Patent in Combination with
          Voswinckel JESC and Voswinckel JAHA ...................... 25

     B.   Claims 1-8 Are Obvious Over '212 Patent in Combination with
          Voswinckel JESC ............................................................. 29

     C.   Claims 1 and 8 Are Rendered Obvious by Voswinckel JAHA in
          Combination with Ghofrani .............................................. 29

D.    Claims 4 and 6-8 Are Obvious Over Voswinckel 2006 in Combination with the '212 Patent ............................................................... 30

E.    Objective Evidence of Non-Obviousness ........................................... 34

X.    THE DISCLOSURE OF THE '793 PATENT IS INSUFFICIENT ............................... 35

A.    A POSA Would Not Understand That the '793 Patent Inventors Were in Possession of a Treprostinil Powder Formulation of Suitable for Administration in a Dry Powder Inhaler ........................................... 35

XI.    THE ASSERTED '793 PATENT CLAIMS ARE NOT ENABLED ............................. 40

A.    The Specification of the '793 Patent Does Not Enable a Powder Formulation of Treprostinil or its Salt ................................................. 40

XII.    RESERVATION OF RIGHTS ........................................................................ 61

-ii-

## I.     INTRODUCTION

1.     My name is Igor Gonda and I have been retained by Liquidia Technologies Inc. ("Liquidia") as an expert in *United Therapeutics Corporation v. Liquidia Technologies Inc.*, Case No. 1:20-cv-00755-RGA in the District of Delaware.

2.     I reserve the right to prepare exhibits to summarize and demonstrate my testimony at trial.

3.     I have not testified as an expert in the past 4 years.

4.     I was paid my customary rate of $850 per hour for my study of this matter and for any time I might spend testifying.  My compensation is in no way dependent on the outcome of the case.

## II.     MATERIALS CONSIDERED

5.     In forming my opinions, I have considered the materials specifically cited in my report as well as the documents identified in **Attachment B**.[1]

## III.     BACKGROUND AND QUALIFICATIONS

6.     I am currently the founder and CEO of Respidex LLC, which has offered consulting services to pharmaceutical and medical device companies since 2018.  Before founding Respidex LLC, I held leadership positions at several pharmaceutical companies, including Aradigm Corporation, a company that focused on developing inhalation therapies for the prevention and treatment of serious respiratory and systemic diseases.

7.     In 1971, I received my Bachelor of Science in Chemistry from the University of Leeds.  In 1974, I received my Ph.D. in Physical Chemistry from the University of Leeds.  After

---

[1] I understand that counsel for UTC has not yet permitted Liquidia to take the deposition of Dr. Robert Roscigno, a named inventor on the '793 patent, and also a corporate deposition concerning the conception and reduction to practice of the invention claimed in the '793 patent.  I reserve the right to supplement my expert reports, if needed, to consider this information.

129.



## XI. THE ASSERTED '793 PATENT CLAIMS ARE NOT ENABLED

### A. The Specification of the '793 Patent Does Not Enable a Powder Formulation of Treprostinil or its Salt

130.    To the extent UTC contends that the asserted claims of the '793 Patent are not obvious, it is my opinion that the '793 Patent specification does not teach a POSA how to formulate a treprostinil (or a pharmaceutically acceptable salt of treprostinil) powder formulation suitable for

administration via dry powder inhaler (let alone one with particles less than 5 micrometers in diameter) or a dry powder inhaler capable of administering the treprostinil dry powder formulation as required by claims 1, 4, 6 and 7 of '793 Patent without undue or excessive experimentation.

131.    As discussed above in Paragraph 25, it is my understanding that the "full scope" of the '793 Patent claims must be enabled.  This would include a treprostinil dry powder formulation suitable for administration via a dry powder inhaler, as required by claims 1, 6, and 7 of the '793 Patent.  This would also include a dry powder inhaler suitable for delivery of the claimed treprostinil dry powder formulation, as required by claims 1 and 4.  I further understand that the "enablement" requirement requires that a skilled artisan assess several factors, including the breadth of the claim, the nature of the invention, the state of the prior art, the level of skill in the art, the level of predictability in the art, the amount of direction provided by the specification, the existence of working examples, and the quantity of experimentation needed to make and use the invention.  *See* ¶¶ 22-26, above.

132.    Here, claim 1 of the '793 Patent does not specify a specific type of formulation suitable for administration by inhalation and thus a POSA would understand the full scope of claim 1 to include both solutions and powder formulations of treprostinil or a pharmaceutically acceptable salt of treprostinil. Ex. 1 ('793 Patent) at claim 1.  Claim 4 recites a "method of claim 1, wherein the inhalation device is a dry powder inhaler." *Id*. at claim 4.  Claim 6 recites a "method of claim 4, wherein the formulation is a powder." *Id*. at claim 6.  Claim 7 recites a "method of claim 6, wherein the powder comprises particles less than 5 micrometers in diameter." *Id*. at claim 7.  The dependent claims of the '793 Patent confirm a POSA's understanding that the full scope of claim 1 includes powder formulations of treprostinil and its pharmaceutically acceptable salts.

-41-

> 1.     Applying the "Enablement" Factors, a POSA Would Have to Engage in Undue Experimentation to Formulate a Powder Treprostinil Formulation Suitable with an Appropriate Dry Powder Inhaler for Effective Administration in General and for the Treatment of PH in Particular

133.     Applying the "enablement" factors discussed above in Paragraph 24, it is my opinion that a POSA would have to engage in excessive (undue) experimentation to develop a treprostinil powder formulation and corresponding dry powder inhaler that achieve effective administration of treprostinil as required by claims 1, 4, 6, and 7 of the '793 Patent. The following is a summary of the factors a POSA considers for enablement and further discussion is provided in the paragraphs that follow.

a.   *Breadth of the Claim*:  As discussed in Paragraphs 118-119, claim 1 of the '793 Patent is broad and encompasses formulations of treprostinil or its pharmaceutically acceptable salt in solution and powder forms.  Moreover, claims 4, 6, and 7 specifically claim treprostinil powder formulations and use of dry powder inhalers. Additionally, the asserted claims of the '793 Patent encompass all treprostinil free acid and salt forms.  Accordingly, it is my opinion that the asserted claims of the '793 Patent are broad.

b.   *Existence of Working Examples*:  As described in greater detail below, the '793 Patent specification provides no working examples of dry powder treprostinil formulations or a dry powder inhaler, or a combination of the two for delivery of treprostinil or its salts.  With respect to the formulation, there is no method of preparation of such powders described in '793 Patent.  Further, the '793 Patent does not describe any excipients that can be used in dry powder formulations, and none of the Examples in the '793 Patent utilize a dry powder formulation of treprostinil or its salt. Ex. 1 ('793 Patent) at 8:58-18:11. The only guidance provided by the

-42-

'793 Patent as to the powder formulation is to a particle size of "less than 10 micrometers in diameter or less than 5 micrometers in diameter" (*id.* at 7:24-26), which was already well-known in the art as of May 15, 2006. Ex. 25 (Telko & Hickey 2005) at 1219; Ex. 7 (Clark) at 375 (Table 1).

c. ***Nature of the Invention***:  The nature of the invention is a "method' for treating pulmonary hypertension, but that method requires administration by inhalation of a "formulation" of treprostinil or its pharmaceutically acceptable salt using an "inhalation device." Ex. 1 ('793 Patent) at claim 1.  Further, that method requires from 15 micrograms to 90 micrograms of treprostinil or its pharmaceutically acceptable salt to be inhaled in 1-3 breaths. *Id.*  Thus, while the nature of the invention is treating pulmonary hypertension, that treatment must be accomplished by, among other things, a powder formulation of treprostinil or its salt and a specific dry powder inhaler, which operates in a much different manner than inhalers that administer solutions such as nebulizers, soft mist inhalers, or metered dose inhalers that use propellants to form aerosols containing treprostinil (these could be solutions or suspensions of treprostinil in the propellants).  Almost without an exception, dry powder inhalers use the energy of the patient's inspiration to elicit the drug from the device and disperse it into particles suitable for inhalation into the lungs. Ex. 24 (Atkins) at 1306-1307 ("Currently available DPIs are all passive systems, meaning that the patient must provide the energy to disperse the powder from the device.").  This differs from other types of inhalers where the device itself (e.g., using electricity or the energy of a compressed gas) generates the small particles or droplets.  Therefore, a POSA would need to identify a dry powder

-43-

inhaler that suits the needs of the specific patient population (i.e., PH). *Id*. at 1307-1308 ("[I]t is important that physicians recognize that these [DPI] devices will deliver different amounts of drugs to different patients, and the lung delivery depends on patient factors, such as inspiratory flow, patient inhalation technique, and device resistance.").

d.  Especially considering the PH population suffers from a severe lung disease, identifying a suitable dry powder inhaler and treprostinil powder formulation for the PH population would require substantial time and effort. Additionally, although several DPIs were available for the treatment of asthma and COPD, there was no experimental work reported on the use of DPIs in PH patients. For instance, a POSA would have to determine that a PH patient could inspire at a high enough inhalation rate and volume for the powder formulation to disperse and fully inhale an adequate dose. And conversely, a POSA would have to find the appropriate combination of DPI and formulation to effectively deliver treprostinil in a dry powder form to PH patients. It was well-known that different DPIs had different flow resistance and therefore required different inspiratory effort to be functional. *See* Ex. 54 (Clark & Hollingworth 1993) at 102; Ex. 24 (Atkins) at 1307 ("[T]here are important differences in resistance among the DPIs, and this difference in resistance causes differences in drug delivery efficiency between these devices.").

e.  ***Level of Unpredictability in the Art***: Considering the significant number of factors, discussed herein, involved in developing a dry powder formulation and suitable dry powder inhaler device, the level of unpredictability in the art was high. As explained below, powders present unique design challenges. Ex. 25 (Telko &

-44-

Hickey 2005) at 1211-1212 ("The aerodynamic behavior, which has a profound effect on the disposition of drug from a DPI, is particularly sensitive to powder properties."). Formulation of dry powders requires ensuring that the particle will not change in structure, crystallinity, size, or density during manufacture, storage, and administration. *See* ¶¶ 147-153 below. With especially potent drugs like treprostinil, moreover, a POSA would need to ensure that a consistent amount of active drug is delivered to the desired parts of the respiratory tract. *See* ¶ 139 below.

f.  ***State of the Prior Art***: While solutions of treprostinil and other prostacyclins like iloprost for inhalation were known by May 2006, no treprostinil powder formulation suitable for delivery using a dry powder inhaler had been developed or disclosed as of May 15, 2006. Accordingly, the state of the prior art as it pertains to powder formulations of prostacyclin and its analogs, including treprostinil, for delivery via a dry powder inhaler in general and for PH patients in particular as of May 15, 2006 was relatively minimal.

g.  ***Level of Skill in the Art***: The level of skill in the art was high. As I explained above in Paragraph 14, a POSA as of May 2006 with respect to inhaled formulations used in a method of treating pulmonary hypertension would be a Ph.D. in pharmaceutical science or a related discipline like chemistry or medicinal chemistry, plus two years of experience in pharmaceutical formulations, including inhaled products, or equivalent (*e.g.*, an M.S. in the same fields, plus 5 years of experience).

h.  ***Quantity of Experimentation***: As discussed herein, to formulate a powder formulation of treprostinil suitable for administration via a dry powder inhaler, a

-45-

POSA would have to engage in a significant amount of experimentation. Among other reasons, a POSA would need to test such formulations in suitable powder inhalers. Further, the combination of the inhaler device and the formulation would have to accommodate for variations in patients' ability to breathe correctly to ensure that the correct amount of active drug is delivered to the desired parts of the respiratory tract for each patient. *See* Ex. 54 (Clark & Hollingworth 1993) at 102. A POSA would have to ensure that the formulation was sufficiently stable to withstand storage and administration without altering the size, shape, and density and other properties, such as water content, that might affect the clinical performance (inhaled dose and its particle size distribution) of a dry powder inhaler product delivering treprostinil.

**2.    The '793 Patent Provides No Guidance or Working Examples as to How a POSA Would Formulate a Powder Formulation of Treprostinil**

134.    As discussed in Section X above, the '793 Patent only includes the use of solutions of treprostinil and its salts for inhalation. The only formulation details provided in the '793 Patent pertain to aqueous solutions (Ex. 1 ('793 Patent) at 7:39-46), and generally discloses the use of water, ethanol or a mixture thereof. There is no disclosure of any specific excipients that could be used to make a powder formulation of treprostinil suitable for a dry powder inhaler. In fact, the Examples of the '793 Patent provide no formulation details other than the fact that the treprostinil was administered as a solution with concentrations described in μg/ml. *Id*. at Examples 1 and 2.

135.    All of the Examples provided in the '793 Patent describe clinical studies involving the administration of treprostinil solutions via soft mist inhalers and pulsed nebulizers. *Id*. at 8:57-16:54. For instance, Example 1 describes a clinical study in which treprostinil solutions were administered to humans via a soft mist inhaler. *Id*. at 8:57-11:67. The '793 Patent explains that

"[t]he **solution** used for aerosol generation was prepared from treprostinil sodium salt . . . ." *Id*. at 10:23-25 (emphasis added). Similarly, Example 2 describes three clinical studies in which treprostinil solutions (in concentrations described in μg/mL) were administered to humans via pulsed ultrasonic nebulizers. *Id*. at 12:58-59 ("All inhalations were performed with the OPTINEB® **ultrasonic nebulizer** (Nebutec, Elsenfeld, Germany).") (emphasis added). As its manual makes clear, the OPTINEB® ultrasonic nebulizer is used for nebulization of solutions and cannot be used to administer dry powders. Ex. 49 (OPTINEB-ir Translation) at 30 (noting "[d]evice does not generate any aerosol" when "[n]o liquid (medication solution) in the medication cup").

136.    The sole sentence in the '793 Patent that discusses powder formulations provides no details as to the formulation other than particle size. *See* Ex. 1 ('793 Patent) at 7:22-26 ("The inhalation device can also be a dry powder inhaler. In such case, the respiratory drug is inhaled in solid formulation, usually in the form of a powder with particle size less than 10 micrometers in diameter or less than 5 micrometers in diameter."). As discussed further below, this bare-bones disclosure would be insufficient to teach a POSA to develop a treprostinil dry powder formulation and corresponding dry powder inhaler device. Such experimentation would have been challenging because of treprostinil's high potency and the need for precise dosing to match PH patients' needs with respect to efficacy and tolerability

### 3.    Without Guidance, Formulation of a Treprostinil Powder Suitable for Administration via a Dry Powder Inhaler Would Require Undue Experimentation

137.    Without guidance from the '793 Patent, a POSA would be unable to formulate a treprostinil powder suitable for administration via a dry powder inhaler for PH patients without excessive experimentation. First, it is well-accepted in the field that nebulized solutions like that disclosed in the '793 Patent are not compatible with dry powder inhalers. Conversely, a dry

-47-

powder inhaler cannot deliver solutions. Second, because treprostinil is highly potent, a POSA would need to formulate treprostinil with a compatible carrier to ensure that a precise amount of the active drug is delivered to the targeted areas of the respiratory tract. That experimentation would not be routine as the interaction of each type of carrier with each type of solid form of treprostinil or its salt used for these experiments would need to be undertaken, including the chemical and physical stability of such combinations during processing and storage. Third, a POSA would need to investigate the ability of the PH patients to breathe adequately through a dry powder inhaler and across the range of disease severity to ensure delivery of reproducible treprostinil doses to the lungs using the precise device-formulation combination. Furthermore, dose content uniformity for a highly potent drug like treprostinil is also challenging, i.e., making sure that the powder formulation in each inhaled dose contains the same amount of Treprostinil delivered to the lung. Fourth, a POSA would need to ensure that the formulation is sufficiently stable to prevent changes to the chemical composition and particles' size, shape, density, and water content, as they all have been found to impact the performance of dry powder inhalers in terms of the delivered dose and its reproducible dispersibility into particles suitable for deposition in the human respiratory tract. Again, such experimentation, even with the knowledge possessed by a POSA as of May 2006, would not have been routine.

138. *First*, nebulized solutions like that disclosed in the '793 Patent are not compatible with dry powder inhalers. I understand that named inventor Dr. Rubin testified:

Q. Could you use a solution in a dry powder inhaler?

A. No, ***they're completely different***. Solution is a formulation that includes liquid. The medication in this case is put into solution to create a solution of a certain amount on concentration to be used to deliver through a delivery vehicle that is designed to deliver particles in a mist, particles of a certain size delivered through a mist to the patient. So that could be a nebulizer. It could be a soft mist or a metered dose inhaler. They all would use the same principle of creating a breathable hydrated formulation of the drug.

-48-

> Dry powder inhaler has no water or other carrier solution. It is simply particles of drug that have been formulated such that the particles would contain a specified amount of drug and would be deliverable through a device directly to the lungs without requiring it to be put in any kind of solution whatsoever.

Ex. 50 (Rubin 2021 Dep. Tr.) at 97:13-98:12 (emphasis added). I agree with Dr. Rubin that formulation of dry powder formulations is completely different than formulation of nebulized solutions, and that devices for delivery of solutions are unsuitable for delivery of dry powder formulations and that devices for delivery of dry powders are unsuitable for delivery of solutions.

139. ***Second***, because treprostinil is a highly potent drug, I understand that the dry powder formulation needs to be such that a precise amount of treprostinil is delivered to a patient in each dose using a dry powder inhaler. Ex. 50 (Rubin 2021 Dep. Tr.) at 93:25-95:3 (testifying "unlike asthma drugs where you give a little more, you give a little less, it's not a big deal. These are were potent compounds and so the delivery has to be precise."); *see also* Ex. 1038 at 1310 ("The small dose size required for many of these potent drugs is a confounding factor in developing optimal DPIs."); Ex. 55 (Gonda 1991) at 109 ("[T]he drug has to be delivered in a precise amount into the dosage form during the manufacture, and out of it into the patient during inhalation."). Dosing a drug like treprostinil with relatively narrow margins of differences between the required dose for efficacy and a dose that causes adverse reactions such as treprostinil is more challenging than for drugs which were routinely delivered by inhalation pre-2006 in the form of dry powder inhalers such as asthma drugs, as noted also by Dr. Rubin. Ex. 50 (Rubin 2021 Dep. Tr.) at 93:9-95:3; *see also* Ex. 17 (Ventavis® Label); Ex. 38 (Voswinckel JESC). Such drugs require precise dosing, which, as described further below, would have been a challenge for delivery of treprostinil to PH patients using a dry powder inhaler.

140. To precisely dose a potent drug like treprostinil, it is necessary to mix the API with a carrier material to provide adequate bulk, so that the drug can be precisely metered. Ex. 25

-49-

(Telko & Hickey 2005) at 1221 ("Usually, no more than a few milligrams of drug need to be delivered, and [carriers] provide bulk, which improves handling, dispensing, and metering of the drug.").

141.    For nebulized solutions of treprostinil, like those discussed in Examples 1 and 2 of the '793 Patent, the carrier is water—a material of indisputable safety, particularly in the absence of additives like metacresol.  In addition to water, the qualitative and quantitative composition of excipients to make such solutions for inhalation safe and well tolerated was well understood.  *See generally* Ex. 1070.    Often sodium chloride and buffers well-known to be safe and tolerable are used.  The methods for testing the performance of nebulizers with solutions were well-understood and routine for a POSA to use.  *See* Ex. 56 (O'Callaghan & Barry 1997) at S35-S39; *see also* Ex. 73 (Cipolla 1994) at 51-61.    The methods of achieving precise dosing with nebulizers, including pulsed nebulization, were also described.  Ex. 72 (Denyer 2004).

142.    For dry powders, however, there were very few carriers available with proven tolerability and safety by inhalation as of May 2006.  Ex. 25 (Telko & Hickey 2005) at 1221 ("Currently, lactose is the only excipient used in DPIs marketed in the United States.").  As of September 2005, lactose was the only FDA-approved carrier used in dry powder formulations in the United States.  *Id.*  Nonetheless, selection of the correct carrier remains of crucial importance to effective drug administration via dry powder inhaler.  *Id.* ("Despite the apparent lack of choices, the [carrier] must be carefully selected; physicochemical properties such as size and morphology profoundly affect the performance of the formulation.").  And even after a non-toxic and tolerable carrier is identified, a POSA must ensure that the carrier does not react chemically with the API (i.e., treprostinil).  It is noteworthy that only two treprostinil dry powder inhaler products have

been developed and submitted to the FDA: MannKind and Liquidia.  *See* Ex. 50 (Rubin 2021 Dep. Tr.) at 167:7-22; *see also* ¶¶ 127-128 above.

143.     ***Third***, a POSA must ensure that delivery of the treprostinil powder formulation via a dry powder inhaler is reproducible.  Ex. 25 (Telko & Hickey 2005) at 1210 ("Dose uniformity is a challenge in the performance of DPIs.  This is a greater concern with powders than with liquids because of the size and discrete nature of the particulates."); *see also* Ex. 24 (Atkins) at 1311 ("[C]ommon to the development of all systems is an appreciation that one of the most important factors in pulmonary delivery from a DPI is the requirement for a good-quality aerosol (in terms of the aerodynamic particle size of the cloud generated) and its potential to consistently achieve the desired regional deposition in vivo.  This has been the goal of many scientists over many years and we are still short of that goal.").  Since at least 2005, it was well-known that powders present unique design challenges compared to liquid formulations because, among other reasons, they are 2-phase gas-solid systems.  Ex. 25 (Telko & Hickey 2005) at 1211-1212 ("The character of particulate systems is central to the performance of DPIs.  Powders present unique design challenges."); Ex. 7 (Clark) at 382 ("[I]n contrast to nebulizer formulations, or indeed to some extent pMDI formulations, the formulation of dry powders for use in DPIs is critically important for their effective performance.").  When static, powders behave as solids; when flowing, powders behave as liquids; and when dispersed in the air, powders behave as their carrier gas.  Ex. 25 (Telko & Hickey 2005) at 1212 ("As a consequence, equations describing the behavior of solids are less predictive than their fluid counterparts.").

144.     A significant challenge to reproducibility of drug delivery is that dry powder inhalers, unlike nebulizers, soft mist inhalers and pressurized-MDIs, use the patient's breathing effort to elicit the powder from the inhaler and disperse the powder in the device into respirable

-51-

particles of the correct size. *Id*. at 211 ("When a patient activates the DPI and inhales, airflow through the device creates shear and turbulence; air is introduced into the powder bed and the static powder blend is fluidized and enters the patient's airways."). Most common form of dry powder inhalation formulations, especially for potent drugs like treprostinil, was in the form of large carrier particles (at that time in USA only lactose carrier was in the approved products) onto which the small drug particles were adhered. When the dry powder is dispersed in the device and carried via the patient's mouth to enter the lungs, carrier particles must separate from the drug particles with the former impacting in the oropharynx while the drug particles are carried deeper into the lungs. *Id*. Variabilities in patient breath can cause inadequate and variable drug-carrier separations during inhalation. *Id*. at 1211 ("[D]eposition into the lungs is determined by the patient's variable inspiratory airflow."); Ex. 24 (Atkins) at 1307-1308 ("[L]ung delivery depends on patient factors, such as inspiratory flow, patient inhalation technique, and device resistance."); Ex. 7 (Clark) at 384-85 ("[D]elivery and dispersion performance, and hence the dose which [DPIs] deliver to the lung, is affected by a patient's ability to inhale a suitable high flow rate."). In contrast, nebulized inhaled solutions contain the drug dissolved uniformly in all droplets in a mist whose generation is afforded by the external energy (from electrical supply to a compressor or a compressed gas from a gas cylinder). The mist already includes droplets of the size suitable for deposition in the lung. Further, in the case of dry powder inhaler the drug enters as a "bolus" at the beginning of the inspiration. Therefore, the volume of air that the subject inhales during the inspiration is also important for reproducible dose delivery to ascertain efficacy. Consequently, the development of a dry powder inhaler product requires matching the compatibility of the device and the formulation also with the ability of the PH patients to inhale the formulation such that a reproducible precise dosing is possible. Different powder inhalers have different flow resistance. Ex. 54 (Clark &

-52-

Hollingworth 1993); Ex. 24 (Atkins) at 1307. These require different inspiratory efforts by patients, achieve different flow rates depending on the efforts and therefore the amount of energy required to disperse the powder bed as well as inhale sufficient volume of air to deliver the dose may differ. The ability of patients to use such inhalers therefore cannot be generalized, and neither can be adequate performance with one powder formulation with one device be a guarantee of success of the same formulation in another device (or vice versa, using the same device with a different population).

145. In addition to breath variations, treprostinil's high potency would make manufacturing the drug product with a uniform distribution of active drug more challenging because it is formulated in such a low concentration of drug to carrier. Ex. 25 (Telko & Hickey 2005) at 1221 ("When mixing powders with different properties, particle sizes, and ratios, as is the case with DPI formulations, inadequate mixing can cause poor dose uniformity. In many cases, inadequate mixing cannot be overcome simply by increasing mixing time."). For low concentration (drug-carrier ratio) blends like treprostinil, geometric dilutions are often necessary pre-blending steps. *Id*. at 1221. Furthermore, the decoupling of the treprostinil from a carrier using such a drug-carrier blend approach to form respirable particles must be done precisely to ensure that the correct amount of active drug is delivered to the desired parts of the respiratory tract.

146. Thus, in contrast to a solution, achieving uniform amount of a small quantity of drug in powder form is very challenging. For treprostinil, doses are in micrograms and, indeed, below the range of inhaled drugs approved for DPIs as of May 2006. Such small quantities are difficult to meter as a dry powder of the drug alone. For that reason, carriers (or "bulking agents") have to be used. The carriers are also required to achieve adequate powder flow as small particles

-53-

do not flow easily and are therefore difficult to process during manufacturing. For treprostinil, the dose content uniformity is important as this drug has a relatively narrow therapeutic index. Thus, achieving adequate accurate and precise dosing of a dry powder within the margins of tolerability/safety and efficacy of treprostinil in May 2006 would have been challenging. The alternative methods of forming a treprostinil dry powder for inhalation would have been using carrier particles of inhalable size and with good flow properties, with the drug within such particles being uniformly dispersed. The processes suitable for this purpose known to a POSA in May 2006 would have been spray drying and super critical fluid crystallization. *See* Ex. 25 (Telko & Hickey 2005) at 1220. These approaches would have presented another unique challenge to a POSA because the carrier material, in great excess to treprostinil, would have been also delivered to the lungs and therefore its tolerability and safety in the lung would have needed to be established.

147. ***Fourth***, a POSA would need to identify a chemically and physically stable form of treprostinil to ensure that the physical properties of the formulation do not change during manufacture, storage, and administration. *See* Ex. 24 (Atkins) at 1310 ("[T]he goal of de-aggregating highly cohesive powder for delivery to the lung in a powdered form is a challenging one."); Ex. 55 (Gonda 1991) at 95 ("Dry powder inhalers provide a challenge for pharmaceutical scientists because the fine particles required for successful inhalation delivery tend to be cohesive."), 109 ("Because of the cohesive and adhesive nature of such small particles, production of therapeutic aerosols from dry powders faces several problems."). The existence of multiple solid forms of the same chemical composition is problematic for pharmaceutical formulators, as they often have distinct physical properties that affect their physical behavior as powders. Here, as noted above, the claims of the '793 patent are not limited to a particular form of treprostinil, or a particular pharmaceutically acceptable salt of treprostinil. A POSA therefore would not have

known which, if any, of the forms of treprostinil or its salts would have been suitable for dry powder inhaler formulation.

148.    Crystallinity and polymorphism as well as the possibility of formation of different solvates (e.g., forms of treprostinil salts containing different number of water molecules), moreover, pose a unique challenge to powder formulations because changes in structure can result in changes to the size, shape, density and dispersibility of the drug powders.  By 2005, it was known that "[n]early one third of all drugs are known to display polymorphism, which is the ability of a solid to exist in more than one crystal form."  Ex. 25 (Telko & Hickey 2005) at 1212.  At least two polymorphic forms of one treprostinil salt form, treprostinil diethanolamine, were known by 2005.  Ex. 48 (Phares 2004) at 85.  A POSA would need to determine and analyze the different polymorphic forms of the treprostinil or treprostinil salt used before developing a dry powder because "[d]ifferent polymorphs are at different energy states and thus have different properties, including stability, solubility, and even bioavailability."  Ex. 25 (Telko & Hickey 2005) at 1212; *see also id*. at 1213 ("Polymorphs usually differ in density, melting point, solubility, and hygroscopicity.").  Because the size, shape, and density of the solid drug forms is important to a reproducible dry powder, a POSA would need to select the most stable polymorph to "reduce the risk of transformation during processing or storage." *Id*.

149.    In addition to polymorphism, various properties are important to dry powder inhaler performance that impact the delivered dose to the patient and its particle size distribution.  Ex. 25 (Telko & Hickey 2005) at 1211-212 ("The character of particulate systems is central to the performance of DPIs.  Powder present unique design challenges.").  The latter is usually described in the form of aerodynamic size distribution or fine particle fraction of the drug (the fraction of the inhaled dose that has high probability of deposition in the human lung).  The aerodynamic size

-55-

distribution and fine particle fraction in turn depend on the size, density, and shape of the particles containing the drug at the time when they are entering the patient's mouth. Powders with different physical properties such as adhesive forces between particles, shape, surface morphology affect their process properties during manufacture and dispersibility into respirable particles when inhaled by patients. *Id*. at 1212 ("Powder properties can vary widely. Powder features, such as the physicochemical properties and morphology of its constituent particles and the distribution of particle sizes, contribute to variability."). This dependence of the dry powder inhaler performance on physical properties of the formulation ultimately leads to variable delivery of the drug into the respiratory tract regions if such changes in physical properties occur.

150.    The known hygroscopicity of treprostinil diethanolamine and treprostinil sodium, moreover, would have further exacerbated the challenges faced by a POSA in developing a powder formulation suitable for administration via a dry powder inhaler. *See, e.g.*, Ex. 48 (Phares 2004) at 87 (treprostinil diethanolamine hygroscopic); Ex. 55 (Gonda 1991) at 110 ("The large surface area of fine powders makes them susceptible to uptake of moisture. There is often a complex relationship between the tensile strength of powders and their moisture content."). Hygroscopic materials, which are prone to taking on moisture from surroundings, present a greater risk of physical instability. Ex. 25 (Telko 2005) at 1213 ("Moisture uptake and loss due to changes in relative humidity can result in local dissolution and recrystallization, leading to irreversible aggregation through solid bridge formation, which can adversely affect . . . lung deposition. Hygroscopicity can also alter the adhesive and cohesive properties, or, in more extreme situations, substantially increase particle size."). Treprostinil sodium, in fact, is deliquescent, meaning that it quickly takes up water and dissolves. To overcome this property, treprostinil sodium is formed

-56-

"in situ" during preparation of the drug product. Ex. 74 (NDA No. 22-387 Chemistry Review) at 10.

151.    Identification of a chemically and physically stable treprostinil form is especially important for dry powder formulations because the crystals, or the amorphous form, must undergo processing to make them inhalable. Ex. 25 (Telko & Hickey 2005) at 1219 ("To create particles in the respirable size range (< 5 µm in diameter), the drug particle size must be reduced in a separate unit operation."). Micronization, the most common process of reducing particle size, can melt the crystalline structure of the powder and therefore result in solid-state transformations. Given the polymorphic nature of treprostinil, micronization may also result in a change of polymorphic form during processing.

152.    Treprostinil's low melting point, 126° C to 127° C, would have made it an unattractive candidate for micronization because the high temperatures involved with the process would risk melting of the crystalline structure. Ex. 57 (Moriarty 2005) at 1902 ("mp 126-127 °C"). Melting of the crystal structure initially causes transformation into an amorphous form of the surface layer of the material, i.e., formation of particles which are partially crystalline and partially amorphous. Over time, the amorphous layer can transform back into crystalline form—either the original crystalline form or a different form. Such a transformation is not only difficult to control at the time of manufacture but also can continue during storage. Here again, the known polymorphic nature of treprostinil further complicates the development of a powder formulation utilizing micronization to obtain a suitable particle size.

153.    In some cases, amorphous (or noncrystalline) materials are formulated into dry powders for inhalation via dry powder inhalers. Ex. 25 (Telko & Hickey 2005) at 1212. In general, crystalline materials have lower free energies than amorphous materials. *Id.* Over time,

-57-

amorphous materials gradually transition to crystalline states. *Id*. at 1212-1213. To avoid changing the size, shape, and density of an amorphous dry powder formulation, which are necessary to the effective delivery of a dry powder, a POSA would need to ensure that the transformation would not occur during storage or processing. *Id*. at 1213 ("Whether this [transformation] will occur at a timescale that need be of concern to the pharmaceutical scientist is governed by the chemical kinetics of the system.").

154. ***Fifth***, a POSA would need to judiciously experiment with different formulation-device combinations to ensure reproducible behavior of the dry powder inhaler and formulation when mass-produced. Nebulized formulations, such as Janssen's Ventavis® (iloprost) or Genentech's Pulmozyme® (recombinant DNase enzyme), can typically be delivered using several different types of nebulizers that will result in the same dose delivered, in the same droplet size distribution, with already proven safety and tolerability, as well as preservation of drug stability. *See, e.g.*, Ex. 58 (Ventavis® EU Summary of Product Characteristics) at 3-6 (describing three different nebulizers approved for use); Ex. 3 (Pulmozyme® Label) at 3 (listing five different jet nebulizers and one nebulizer approved for use).

155. To contrast, a unique interdependence exists between approved dry powder formulations and their dry powder inhalation devices. Ex. 24 (Atkins) at 1306 ("The performance of these [DPI] devices depends on both the formulation and the geometry of the air path of the device. Thus, frequently these delivery systems tend to be compound-specific and, without substantial re-formulation efforts, are not used to deliver other compounds."); Ex. 7 (Clark) at 384 ("In general successful DPI design relies as much on the powder formulation as it does on the device design."). Unlike nebulized solutions, dry powder inhalers are not interchangeable, requiring a POSA to experiment with various dry powder inhalers and formulations to achieve the

desired delivery of active drug to specific areas of the respiratory tract. A 2005 study compared the administration of the same asthma drug with two different dry powder inhalers: DISKHALER™ and ROTAHALER™. Ex. 60 (Thomas 2005) at 1. The study concluded that patients using the DISKHALER™ dry powder inhaler used "significantly less" of the asthma drug than those using the ROTAHALER™ dry powder inhaler. *Id.* ("This suggests a difference in the level of asthma control with the different devices, even when the same chemical entity is delivered."). Because "outcomes are not always the same with all dry powder inhalers," a POSA would need to engage in extensive experimentation with different device-formulation combinations. *Id.*

156. Exemplary of the amount of experimentation necessary to develop a dry powder formulation of treprostinil is the work Liquidia and Mannkind conducted independently to prepare dry powder formulations of treprostinil. As an initial matter, both Liquidia and MannKind utilized their own, proprietary powder formulation technologies, the PRINT technology and the Technosphere® technology, respectively. Ex. 61 (Q3 2018 Liquidia Earnings Call) at 2 ("LIQ861 is an inhaled dry powder formulation of treprostinil, utilizing our proprietary PRINT technology that is administered using a convenient disposable dry powder inhaler."); Ex. 62 (Stanton 2016). That is, neither company used routine or conventional technologies to develop their treprostinil powder formulations.

157. It is my understanding that using its proprietary PRINT® technology, Liquidia developed a "dry powder formulation of treprostinil, trehalose, and L-leucine . . . to enable administration of treprostinil from a capsule-based dry powder inhaler." Ex. 63 (Maynor 2018) (LIQ00737794-LIQ00737803) at 7. Liquidia's PRINT® technology offers precise control of particle properties, including primary particle geometry and composition. *Id.* at 8.

-59-

158.    Similarly, MannKind filed for patents describing the application of their Technosphere® technology to treprostinil.    Ex. 64 (WO 2019/237028); Ex. 75 (U.S. Patent No. 10,744,280).    MannKind is also using its own proprietary dry powder inhaler device for this product.    Ex. 59 (June 2021 MannKind Press Release).

159.    Further, it is my understanding that Liquidia filed an NDA for its dry powder formulation of treprostinil, not a generic ANDA.    Ex. 65 (LIQ861 NDA Submission Press Release) ("The NDA has been submitted under 505(b)(2) regulatory pathway and includes data from three clinical studies to establish the safety, tolerability, and pharmacokinetic profile of LIQ861.").

160.    Third-party MannKind announced that it was pursuing development of an inhaled treprostinil for pulmonary hypertension using its proprietary Technosphere® dry-powder formulation platform in January 2016.    Ex. 62 (Stanton 2016).    Before 2016, MannKind had successfully developed a dry-powder formulation technology referred to as Technosphere® for an inhaled insulin drug known as Alfrezza®.    Ex. 66 (Alfrezza® Label); Ex. 67 (ACS Technosphere® Press Release).    MannKind wanted to apply that dry powder technology to treprostinil, and during a Q1 2016 Earnings Call, MannKind announced that "[a] total of six formulations of treprostinil have been prepared and evaluated . . . , and four of those formulations are moving to PK profiling, with additional formulation development work on all four continuing through the quarter."    Ex. 68 (Q1 2016 MannKind Earnings Call) at 2-3.

161.    Later, in March 2018, MannKind announced open enrollment of a Phase 1 trial using its Treprostinil Technosphere® (TreT) dry-powder product.    Ex. 69 (Mar. 1, 2018 MannKind Press Release) at 1.    In June 2018, MannKind announced the successful completion of its Phase 1 study using the Treprostinil Technosphere® (Tret) dry-powder formulation.    Ex. 70 (June 7, 2018 MannKind Press Release).    Finally, in September 2018, MannKind announced that it had granted

UTC an exclusive license to its Treprostinil Technosphere® (Tret) dry-powder formulation and technology. Ex. 71 (Sept. 4, 2018 MannKind Press Release).

162.    For the reasons stated above, it is my opinion that a POSA would have to engage in excessive experimentation to formulate a powder formulation of treprostinil or its pharmaceutically acceptable salt and dry powder inhaler suitable to deliver the treprostinil powder formulation as required by the asserted claims of the '793 patent.

## XII.    RESERVATION OF RIGHTS

163.    This report is based on information currently available to me. I reserve the right to continue, update, and expand my investigation and analysis in a supplemental report if additional documents, deposition transcripts, or any other information is produced by UTC or its identified experts. I further reserve the right to supplement my opinions as permitted by any Court order.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 15, 2021

_____

Signed by: Dr. Igor Gonda

CONFIDENTIAL MATERIAL OMITTED

**CONFIDENTIAL MATERIAL OMITTED**

CONFIDENTIAL MATERIAL OMITTED

**CONFIDENTIAL MATERIAL OMITTED**

**CONFIDENTIAL MATERIAL OMITTED**

CONFIDENTIAL MATERIAL OMITTED

CONFIDENTIAL MATERIAL OMITTED

```
1        UNITED STATES PATENT AND TRADEMARK OFFICE
2         BEFORE THE PATENT TRIAL AND APPEAL BOARD
3
   LIQUIDIA TECHNOLOGIES, INC.,          )
4                                        )
                       Petitioner,       )
5                                        )
            vs.                          )
6                                        )
   UNITED THERAPEUTICS CORPORATION,      )
7                                        )
                       Patent Owner.     )
8
9               TELEPHONE CONFERENCE
          MARCH 1, 2022, 10:00 A.M. CST
10              CASE IPR2021-00406
          U.S. PATENT NO. 10,716,793 B2
11            ISSUE DATE:  July 21, 2020
12  BOARD:
          Mr. Christopher Kaiser
13        Ms. Erica Franklin
          Mr. David Cotta
14
   PETITIONER:
15        Cooley, LLP
          Ms. Deepa Kannappan
16        Mr. Jonathan Davies
          3175 Hanover Street
17        Palo Alto, California 94394-1130
          650-843-5673
18        Dkannappan@cooley.com
          Jdavies@cooley.com
19
   PATENT OWNER:
20        Foley & Lardner, LLP
          Mr. Michael R. Houston
21        Mr. Stephen B. Maebius
          321 North Clark Street, Suite 3000
22        Chicago, Illinois 60654
          312-832-4378
23        Mhouston@foley.com
          Smaebius@foley.com
24
```

IPR2021-00406
United Therapeutics EX2104

Appx6410

Page 6

1   ask me I won't go into that level of detail, but

2   they have new theories and new evidence

3   supporting those theories which we have just

4   simply not had a chance to respond to up until

5   now.

6       JUDGE KAISER:  Sure.  I mean, I guess public

7   accessibility seems to me like without going off

8   and doing a lot of legal research because

9   sometimes these are more complicated than they

10  seem at first glance.  It seems to me like an

11  issue of fact, right.  I mean, I'm confused and

12  maybe you could just tell me at a very high level

13  what was the initial legal theory for public

14  accessibility and what's the new one that they've

15  changed to.

16      MR. HOUSTON:  Sure, your Honor.  And also

17  just to be clear, I don't think they have

18  abandoned sort of the what they initially put in

19  the petition.  And so I just want to make clear

20  not that I think they have changed.  You used the

21  word change there and I just want to clarify.  So

22  they are keeping that theory, but adding a bunch

23  of new ones.

24          The new ones that they have added is

Page 7

1   now they have said that there should be a

2   presumption of public accessibility based on the

3   identity of the publishers.  That was not in the

4   petition.  They said that these abstracts should

5   be considered publicly available based on what

6   was presented and/or handed out physically at the

7   conference.  That was not in the petition.  They

8   said that now they have put in some evidence of

9   topic indexes and author indexes.  None of that

10  evidence was in the petition.  It wasn't -- in

11  other words, there was not an argument made in

12  the petition nor was the evidence in the

13  petition.

14          And then two more.  Now they are

15  saying that there should be public accessibility

16  found based on the theory of there being two,

17  quote, research aids.  So they have now cited two

18  new articles that cite the abstracts and have

19  argued that those should count as research aids

20  to establish public accessibility.

21          And then they have put in a bunch of

22  new date-stamp copies of the abstracts from

23  libraries that was the -- that was what we

24  pointed out in our Patent Owner response was not

Page 8

```
 1   part of the petition and that's why we felt like
 2   their argument failed in the petition and that
 3   was the subject of the their motion to submit
 4   supplemental information which the Board did not
 5   allow, but now they have put that evidence in as
 6   reply.
 7              So there is roughly five -- I broke it
 8   down into roughly five sort of categories of new
 9   arguments and evidence that they have submitted,
10   your Honor.
11        JUDGE KAISER:  Okay.  All right.  Thank you.
12   That helps front the issue a little bit.  I have
13   to confess, you know, the reply isn't something
14   that I've dug into very much at this point and so
15   I appreciate you giving me your side of the
16   rundown there.
17              I guess my other question then is the
18   new evidence that you would like to submit with
19   the sur-reply, what's the nature of that evidence
20   and what is it that it shows in the way of sort
21   of rebutting these new arguments if I can use
22   that phrase.
23        MR. HOUSTON:  Sure.  Well, your Honor, I
24   guess I have a couple responses to that.  First
```

1   is we are still scrambling.  We're still trying

2   to reach out to people who can provide relevant

3   information whether that's about the details of

4   this conference, whether that's about these

5   research aids that they have now cited to,

6   whether it's about the author and topic indexes.

7   You know, we are still very much actively trying

8   to figure out how to respond to this and it's

9   very challenging because of the short timeframe

10  we have.

11          Number two, I'm not sure quite how to

12  -- obviously I want this to be with very much all

13  due to respect to the Board, but I also feel a

14  little hesitant to go into a lot of detail of

15  what we're thinking.  I feel like that opens the

16  door to some of our work product which we, you

17  know, we're still formulating our ideas here.

18          But at a high level, at a high level,

19  your Honor, what I think I can say is we're -- we

20  think we should be able to respond to this in

21  full.  We don't think there should be limits on

22  how we are able to respond, but I'll tell you at

23  a high level the types of things we are thinking

24  of.

1          There could be just new documentary

2    evidence whether that's new documents or just,

3    you know, could just be all types.  There could

4    be some documents or testimony from the prior

5    proceeding that involve this issue.  And

6    certainly we think that would be fair because

7    Liquidia is well aware of that information.  They

8    cited some of the information from that prior

9    proceeding in their own papers.  So we think we

10   should be able to put in some of the

11   counter-argument and evidence from that

12   proceeding as appropriate.

13          Also, your Honor, there was some

14   depositions taken of the witnesses that are

15   already involved in this case.  They were taken

16   in the context of the litigation that the parties

17   are currently undergoing.  So there's a parallel

18   litigation there with a trial coming up in late

19   March.  So there were some depositions by

20   Liquidia of some of these witnesses where the

21   subject matter was not identical to what was

22   covered in the corresponding IPR depositions.  So

23   we think there may be instances where we would

24   like to be able to cite that deposition testimony

Page 11

1    or submit it and cite to it which again should

2    not be prejudicial to Liquidia since they were

3    the ones doing the deposing in the first place.

4              And then, your Honor, I think it

5    really should be up to and including fresh new

6    declarations from witnesses on our end.  Whether

7    it's to talk about what happened at the

8    conference.  Whether it's to talk about these

9    research aids.  The, you know, what the affect or

10   import is of all these new date-stamped copies of

11   the articles that they submitted.

12             You know, so I think, your Honor, our

13   request is to have sort of unfortunately just as

14   if this were the Patent Owner response.  I think

15   we should be able to submit whatever we might

16   have submitted in the Patent Owner response had

17   all this evidence been in the petition the way we

18   think it should have been.  So I think that

19   that's our request, your Honor.  Was that

20   responsive to your question?

21    JUDGE KAISER:  Yes, I think I understand

22   what you're getting at.  And I would like, you

23   know, an opportunity to kind of discuss those

24   things with the rest of the panel, but let me

# Patent Owner's Demonstratives

*United Therapeutics Corporation v. Liquidia Technologies, Inc.*

IPR2021-00406 – U.S. Patent No. 10,716,793

**May 13, 2022**

IPR2021-00406
United Therapeutics EX2109

1



Eur Respir J 2001; 17: 14–19
Printed in UK – all rights reserved

Copyright ©ERS Journals Ltd 2001
European Respiratory Journal
ISSN 0903-1936

# Ultrasonic *versus* jet nebulization of iloprost in severe pulmonary hypertension

T. Gessler*, T. Schmehl*, M.M. Hoeper#, F. Rose*, H.A. Ghofrani*, H. Olschewski*, F. Grimminger*, W. Seeger*

*Ultrasonic* versus *jet nebulization of iloprost in severe pulmonary hypertension. T. Gessler, T. Schmehl, M.M. Hoeper, F. Rose, H.A. Ghofrani, H. Olschewski, F. Grimminger, W. Seeger. ©ERS Journals Ltd 2001.*
**ABSTRACT: Inhalation of iloprost, a stable prostacyclin analogue, is a promising perspective in the treatment of pulmonary hypertension. In initial clinical studies, a conventional jet nebulizer system was successfully used to decrease pulmonary vascular resistance and pressure, requiring however, up to twelve inhalations of 12–15 min per day. The aim of this study was to investigate if the application of an equal dose of iloprost at a drastically reduced duration of inhalation with the use of a more efficient ultrasonic nebulizer, leads to comparable haemodynamic effects, without escalation of side effects.**

**The physical features of the jet nebulizer system (Ilo-Neb™) and the ultrasonic nebulizer (Multisonic Compact™) were characterized by laser diffractometry and a Tc99m-tracer technique. Mass median aerodynamic diameters were 3.2 μm for the jet and 3.9 μm for the ultrasonic nebulizer. Total output (mean±SD) was $60\pm7$ μL·min$^{-1}$ (jet) and $163\pm15$ μL·min$^{-1}$(ultrasonic), and efficiency of the devices was $39\pm3\%$ (jet) and $86\pm5\%$ (ultrasonic). Based on these data, a total inhalative dose of 2.8 μg iloprost was delivered by jet nebulization within 12 min and by ultrasonic nebulization within 4 min, in 18 patients with severe primary and secondary pulmonary hypertension (New York Heart Association class III and IV), in a randomized crossover design. Haemodynamics were assessed by right heart catheterization.**

**Inhalation with the ultrasonic device and jet nebulizer, reduced mean±SEM pulmonary artery pressure from $54.3\pm2.1$ to $47.1\pm2.0$ and from $53.5\pm2.2$ to $47.0\pm2.2$ mmHg, respectively, and mean±SEM pulmonary vascular resistance from $1073\pm109$ to $804\pm87$ and from $1069\pm125$ to $810\pm83$ dyn·s·cm$^{-5}$, respectively. Both modes of aerosolization were well tolerated.**

**In conclusion, due to the markedly higher efficiency and output of the ultrasonic device, wastage of drug is largely avoided and the duration of inhalation can be shortened to one-third, with comparable haemodynamic effects and without enforcing side effects.**
*Eur Respir J 2001; 17: 14–19.*

*Dept of Internal Medicine, Justus-Liebig-University of Giessen, Giessen, Germany, #Dept of Respiratory Medicine, Hannover Medical School, Hannover, Germany.

Correspondence: W. Seeger
Dept of Internal Medicine II
Justus-Liebig-University
Klinikstr. 36
Giessen
D-35392
Germany
Fax: 49 6419942359

Keywords: Iloprost
nebulization
pulmonary hypertension

Received: July 24 2000
Accepted after revision October 4 2000

Severe pulmonary hypertension is a life threatening disease, characterized by an increase in arterial pressure and vascular resistance in the pulmonary circulation [1]. Dyspnoea and reduced exercise capacity are the prominent clinical symptoms; death is most closely associated with an increase in right atrial pressure and a decrease in cardiac output due to right-sided heart failure [2]. Several investigations with intravenous administration of prostacyclin have demonstrated the vasodilatory capacity of this prostanoid in primary pulmonary hypertension (PPH) [3–5] as well as in forms of secondary pulmonary hypertension (SPH) [6, 7]. Moreover, in a controlled study continuous prostacyclin infusion was shown to improve exercise capacity and survival in patients suffering from severe PPH [8]. Disadvantages of this intravenous approach are the lack of pulmonary selectivity, giving way to systemic side effects, as well as infectious complications related to the long-term use of an intravenous catheter.

In a recent approach to overcome these shortcomings, aerosolization of the stable prostacyclin analogue iloprost was employed for pulmonary vasodilation in both PPH and severe SPH [9–13]. Preferential vasorelaxation in the pulmonary circulation was demonstrated with this approach, the maximum pulmonary vasodilatory potency corresponding to that of intravenous prostacyclin. At present, limited data on long-term clinical use of iloprost inhalation are available, indicating an improvement in exercise capacity and pulmonary haemodynamics after 12 months of iloprost aerosol therapy in 24 patients with PPH [14]. Phase II (randomized, parallel-group comparative clinical) as well as phase III (double-blind, randomized, placebo-controlled clinical) studies addressing the impact of iloprost nebulization on exercise capacity and mortality in PPH and severe secondary pulmonary hypertension are currently under way.

In all previous studies investigating short-term or long-term iloprost nebulization [9–14], a continuous output jet nebulizer with a reservoir and filter system was used. However, the limited output of this device requires long inhalation periods of 12–15 min for

Liquidia's Exhibit 1062
Page 1

delivery of an adequate iloprost dose for pulmonary vasodilation. Moreover, the therapeutic use of iloprost aerosolization in pulmonary hypertension demands multiple daily inhalation manoeuvres, since the pulmonary vasodilatory effect of each single inhalation levels off within ~1 h, thus resulting in a total duration of inhalation of up to 3 h per day. In addition, limited efficiency of the jet nebulizer system causes a notable waste of the drug. Therefore, a reduction of inhalation time with the use of a more efficient nebulizer system will markedly improve iloprost aerosol therapy. A recently developed ultrasonic nebulizer device might offer the possibility to overcome these limitations. However, no data on aerosol delivery of prostanoids with this different technical approach are presently available. The present study characterized the physical features of the ultrasonic nebulizer. Based on these data, a comparison of the haemodynamic effects of an equivalent dose of iloprost delivered in a crossover design by the jet nebulizer within 12 min and the ultrasonic device within 4 min during right heart catheter tests, was performed. Patients with severe primary and secondary pulmonary hypertension were used. It was investigated whether the iloprost application at a notably shorter duration of inhalation would result in comparable pulmonary vasodilatory effects without enforcing side effects.

## Methods

### Physical characterization of the devices

The following parameters of the devices were analysed: particle size distribution, total output of the nebulizer, effective output at the mouthpiece and aerosol loss in the different components of the device. Mass median aerodynamic diameter (MMAD) and geometric standard deviation (GSD) of the aerosol were determined using a laser diffractometer (Helos™; Sympatec, Clausthal, Germany) at room temperature and with a distance of 1 cm between mouthpiece and laser beam. The jet nebulizer system investigated in this study (Ilo-Neb™; Nebu-Tec company, Elsenfeld, Germany) consisted of a Bennett-Raindrop™ jet nebulizer, a reservoir, filters, valves and tubes and was driven by a Pari Boy™ compressor (Pari, Starnberg, Germany) at 80 kPa (fig. 1). For the ultrasonic nebulizer system (Multisonic Compact™; Schill company, Probstzella, Germany) with an operating ultrasound frequency of 1.7 MHz (fig. 2), an airflow of 40 L·min⁻¹ was applied for particle size measurements. The filled-in volume was 4 mL iloprost diluted in physiological saline for both devices.

The total output of the nebulizers and the output at the mouthpiece were quantified by a Tc⁹⁹ᵐ-tracer-technique with an additional filter at the mouthpiece of the system for aerosol trapping. To mimic aerosol inhalation in patients, a volunteer performed the inhalation manoeuvres through the filter at the mouthpiece (tidal volume ~1.5 L, breathing frequency ~11·min⁻¹, inspiration:expiration ratio ~1:1.8). After each inhalation period (12 min for the jet nebulizer, 4 min for the ultrasonic nebulizer), the systems were disassembled



Fig. 1. – Schematic depiction of a) the jet nebulizer device, with b) deposition fractions of a Tc⁹⁹ᵐ-labelled test aerosol in the different parts of the device being given as per cent of total output. In these experiments, the output at mouthpiece was captured in an additional filter mounted at this site. EF: expiration filter; EV: expiration valve; MP: mouthpiece; IV: inspiration valve; RF: reservoir filter; R: reservoir; JN: Bennett-Raindrop™ jet nebulizer; C: Pariboy™ Compressor.

and the activity deposited in the various parts of the nebulizer was determined using a gamma-counter. The efficiency, defined as the ratio of the output at the mouthpiece to total output of the nebulizer, was calculated from the activities in the components.

### Patients

A total of 18 patients with severe pulmonary hypertension was included in the investigation, all of whom were classified as New York Heart Association class III or IV. Seven patients suffered from primary pulmonary hypertension and 11 patients showed pulmonary hypertension related to thromboembolism (six patients), connective tissue disease (three patients), lung fibrosis (one patient) and portal hypertension (one patient) (diagnosis according to World Health Organization conference [1]). Diagnostic procedures included transthoracic or transoesophageal echocardiography, chest radiography, high resolution and spiral computer tomography of the lung, ventilation-perfusion scans, lung function testing including carbon monoxide-diffusion capacity, pulmonary angiograms and pulmonary artery catheter. Baseline values for mean±SEM pulmonary artery pressure at rest, and pulmonary vascular resistance were 54.1±2.2 mmHg and 1076±121 dyn·s·cm⁻⁵, respectively.

All patients gave written informed consent to the test trial, which was approved by the local institutional ethics committees of the participating centres.

Appx7363

Liquidia's Exhibit 1062
Page 2



Fig. 2. – Schematic depiction of a) the ultrasonic nebulizer device, with b) deposition fractions of a Tc$^{99m}$-labelled test aerosol in the different parts of the device being given as per cent of total output. In these experiments, the output at mouthpiece was captured in an additional filter mounted at this site. EF: expiration filter; EV: expiration valve; MP: mouthpiece; AC: aerosol chamber; DC: drug chamber; HA: hand apparatus; IV: inspiration valve; IF: inspiration filter; B: baffle; O: oscillator; MU: main unit.

*Catheter and inhalation protocol*

Before starting the device comparison with inhaled iloprost, a fibreoptic thermodilution pulmonary artery catheter was employed for measurement of pulmonary artery pressure (PAP), pulmonary artery wedge pressure (PAWP), central venous pressure (CVP) and cardiac output (CO). A femoral artery catheter was used to assess systemic arterial pressure (SAP). Based on these data, cardiac index (CI), pulmonary vascular resistance (PVR) and systemic vascular resistance (SVR) were calculated.

Each patient inhaled with both devices in a randomized order. The first inhalation was performed after achieving a stable baseline of haemodynamic variables; the second inhalation started 2 h after the end of the first inhalation. PAP, PAWP, CVP, CO and SAP were recorded before (baseline) and 0, 5, 15, 30 and 60 min after the end of each inhalation.

For inhalation manoeuvres with the jet nebulizer, iloprost was diluted in saline to a final concentration of 10 $\mu g \cdot mL^{-1}$, and 4 mL of the solution were placed in the nebulizer. The nebulizer was then driven with room air at a pressure of 80 kPa for an inhalation period of 12 min. For inhalation manoeuvres with the ultrasonic nebulizer system, iloprost was diluted in saline to a final concentration of 5 $\mu g \cdot mL^{-1}$ and 4 mL of the solution were introduced into the nebulizer. Patients then inhaled the nebulized drug for a period of 4 min. This procedure was based on the physical characterizations of the nebulizers, targeting to achieve an equivalent dose (2.8 $\mu g$) of the vasodilatory prostanoid at the mouthpiece with both systems.

*Statistics*

All values are presented as means±SEM unless otherwise noted. Statistical comparisons of haemodynamic parameters at 0, 5, 15, 30 min after inhalation *versus* baseline (pre inhalation) were performed for each device using paired t-tests. The exact Wilcoxon matched pair signed-rank test was used if data did not show normal distribution in Kolmogorov-Smirnov tests. For multiple testing, the Holm correction was applied [15].

To compare the influence of the different devices on haemodynamic parameters, the differences of post *versus* pre inhalation values for both devices were calculated. These differences were analysed with the same statistical procedures as described above.

**Results**

The physical parameters of both nebulizers are shown in table 1. In figure 1 and 2, the aerosol deposition in the different parts of the devices is depicted: 61% of the generated aerosol was lost within the jet nebulizer device, compared to only 14% in the ultrasonic device. Based on these data, the "standard" iloprost aerosol application, as investigated in previous clinical studies with employment of the currently tested jet nebulizer device, was calculated to result in a total iloprost dose at the mouthpiece of 2.8 $\mu g$ (12 min inhalation period, iloprost concentration 10 $\mu g \cdot mL^{-1}$). To achieve an equivalent dose when using the ultrasonic nebulizer device, the iloprost concentration was reduced to 5 $\mu g \cdot mL^{-1}$ and the inhalation time to 4 min to match the higher output at the mouthpiece of the ultrasonic nebulizer.

The kinetics of haemodynamic parameters pre-, and up to one hour postiloprost inhalation, for both devices are shown in figures 3 and 4. The iloprost inhalations with both devices were well tolerated. Side effects, such as cough or flush occurred in only few patients to very moderate degrees and never led to discontinuation of inhalation. The iloprost delivery *via* both devices resulted in a significant reduction of PAP, PVR and the PVR/SVR ratio, as well as in an increase of CI (figs 3 and 4; table 2). In addition, some minor and

Liquidia's Exhibit 1062
Page 3

Table 1. – Comparison of physical parameters of the nebulizer devices

|                                        | Jet nebulizer system | Ultrasonic nebulizer system |
|----------------------------------------|----------------------|-----------------------------|
| MMAD μm                                | 3.2±0.1              | 3.9±0.2                     |
| GSD                                    | 1.8±0.0              | 1.6±0.1                     |
| Total output of nebulizer μL·min⁻¹     | 60±7                 | 163±15                      |
| Output at mouthpiece μL·min⁻¹          | 23±3                 | 140±13                      |
| Efficiency %                           | 39±3                 | 86±5                        |

Data are presented as mean±SD; n=6. MMAD: mass median aerodynamic diameter; GSD: geometric standard deviation.

rapidly transient decrease in systemic arterial pressure was noted. All changes in haemodynamic variables largely levelled off within ~1 h. There was no statistically significant difference between responses to the jet and ultrasonic nebulization techniques, except for the CI, which increased more rapidly and more prominently when applying the iloprost dose in the ultrasonic nebulization manoeuvre, as compared to the standard jet nebulization protocol (increase in CI 0.44 $L·min^{-1}·m^{-2}$ *versus* 0.19 $L·min^{-1}·m^{-2}$ assessed 5 min after termination of inhalation manoeuvre; p<0.05).

## Discussion

The physical characterization of both the jet and ultrasonic nebulizers, demonstrated that particle sizes of both systems are within a range suitable for alveolar deposition [16–18]. Particle sizes of the presently investigated ultrasonic nebulizer (Multisonic Compact™) are dependent on the gas flow through the system; the applied flow of 40 $L·min^{-1}$ matches realistic mean inspiratory flow conditions, resulting in a MMAD of 3.9 μm.

The total output of the ultrasonic nebulizer (163 $μL·min^{-1}$) is 2.7 times higher than that of the jet nebulizer. The difference between the two systems is even more pronounced with regard to the output at mouthpiece: this parameter, describing the amount of aerosol delivered *de facto* to the inhaling patient, is more than six times higher in the ultrasonic nebulizer system as compared to the jet nebulizer. This is mainly

due to a notable aerosol loss at the inspiration valve of the jet nebulizer device (fig. 1), with preferential deposition of large particles. The design of the ultrasonic nebulizer device does not require any valve in the inspiratory aerosol flow, leading to a high efficiency of the device: 86% of the total aerosol output is available at the mouthpiece for inhalation. Moreover, the ultrasonic device offers, due to its compact construction, the advantage of an easy handling and maintenance, as compared to the jet nebulizer.

Both systems avoid drug contamination of the environment by the use of filters, thereby minimizing the risk of drug exposure to the medical staff. This is of particular importance when aerosolizing highly efficacious drugs, such as vasoactive agents or antibiotics, as demonstrated for pentamidine in recent studies [19, 20].

Based on the data of the physical characterization, the inhalation time for delivery of an equivalent iloprost dose at the mouthpiece (2.8 μg) was reduced from 12 min with the jet nebulizer system to 2 min with the ultrasonic nebulizer, when retaining the same concentration of the iloprost solution (10 $μg·mL^{-1}$). In preliminary catheter investigations, however, some increase in systemic side effects was observed when administering the total iloprost dose of 2.8 μg *via* the inhalation route for such a short time period. Therefore, we reduced the iloprost concentration from 10 $μg·mL^{-1}$ to 5 $μg·mL^{-1}$ when employing the ultrasonic nebulizer, and consequently doubled the inhalation time to 4 min with this device. This inhalation protocol was generally well tolerated. Furthermore, by diluting the prostanoid solution, drug waste in the dead space of the nebulizer was reduced.

When directly comparing the haemodynamic effects of equivalent iloprost doses delivered either by jet or ultrasonic nebulization in a crossover design, a marked pulmonary vasodilation with a decrease in pulmonary artery pressure and pulmonary vascular resistance, and increase in CI was noted in response to both modes of aerosol administration. Strength and time course of the iloprost effect were comparable for both devices. Thus, the total amount of inhaled iloprost and not the duration of the inhalation manoeuvre (4 *versus* 12 min) is obviously the main determinant for both the strength and the duration of the pulmonary vasodilation effect. This is also true for the systemic effects, as both modes of aerosol administration caused preferential pulmonary vasodilation (reflected by a decrease

Table 2. – Haemodynamic parameters pre- and postinhalation (greatest effects)

|                          | Jet nebulizer system | | Ultrasonic nebulizer system | |
|--------------------------|----------|----------|----------|----------|
|                          | Pre      | Post     | Pre      | Post     |
| mPAP mmHg                | 53.5±2.2 | 47.0±2.2 | 54.3±2.1 | 47.1±2.0 |
| PVR dyn·s·cm⁻⁵           | 1069±125 | 810±83   | 1073±109 | 804±87   |
| CI $L·min^{-1}·m^{-2}$   | 2.24±0.17| 2.48±0.15* | 2.22±0.17| 2.66±0.19* |
| PVR/SVR                  | 0.56±0.04| 0.49±0.04| 0.56±0.03| 0.50±0.03|
| mSAP mmHg                | 91.8±3.8 | 86.3±2.7 | 90.6±2.5 | 82.5±2.4 |
| SVR dyn·s·cm⁻⁵           | 1877±135 | 1612±100 | 1874±124 | 1462±113 |

mPAP: mean pulmonary artery pressure; PVR: pulmonary vascular resistance; CI: cardiac index; SVR: systemic vascular resistance; PVR/SVR: ratio of PVR tp SVR; mSAP: mean systemic artery pressure; Pre: pre-inhalation value; Post: extreme value up to 60 min postinhalation (all extreme values are minimums except those marked with * which are maximum). Values are given as mean±SEM for n=18 patients.

T. GESSLER ET AL.



Fig. 3. – Responses of mean pulmonary artery pressure (mPAP), pulmonary vascular resistance (PVR) and cardiac index (CI) to iloprost inhalation (2.8 µg) *via* jet nebulizer (12 min; □) and ultrasonic nebulizer (4 min; ■). To normalize for the different length of the inhalation period, time was set at zero at the end of the aerosolization manoeuvre for both techniques. Statistical differences between pre- and postaerosolization data are indicated for both approaches (*: p<0.05; **: p<0.01; ***: p<0.001 for ultrasonic nebulization; [+]: p<0.05; [++]: p<0.01; [+++]: p<0.001 for jet nebulization).

Fig. 4. – Responses of the ratio of pulmonary vascular resistance to systemic vascular resistance (PVR/SVR), mean systemic artery pressure (mSAP) and systemic vascular resistance (SVR) to iloprost inhalation (2.8 µg) *via* jet nebulizer (12 min; □) and ultrasonic nebulizer (4 min ■). To normalize for the different length of the inhalation period, time was set at zero at the end of the aerosolization manoeuvre for both techniques. Statistical differences between pre- and postaerosolization data are indicated for both approaches (*: p<0.05; **: p<0.01; ***: p<0.001 for ultrasonic nebulization; [+]: p<0.05; [++]: p<0.01; [+++]: p<0.001 for jet nebulization).

in the PVR/SVR ratio), with a very minor drop in systemic arterial pressure. Although not significantly different by statistical analysis (excepting CI increase), there was a tendency for a more prominent pulmonary and systemic vasodilatation potency (with corresponding cardiac output response) in the early postaerosolization period upon employment of the ultrasonic

nebulization manoeuvre. These observations might support the hypothesis of a spill-over to the systemic circulation and hence systemic vasodilatation acting as a driving force of increased cardiac output.

The pulmonary vasodilator effect levelled off within ~1 h, independent of the device used. Therefore, the inhalation frequency remains unchanged with up to 12

Liquidia's Exhibit 1062
Page 5

inhalations per day; the notably shorter duration of inhalation with the new device, however, may improve compliance and quality of life of the patients. Nevertheless, the long-term impact of iloprost aerosol therapy in pulmonary hypertension patients has still to be confirmed by the ongoing double-blind randomized studies.

The maximum decrease in pulmonary artery pressure and resistance in response to 2.8 μg iloprost delivered by jet or ultrasonic nebulization in the present study ranged somewhat lower than the maximum pulmonary vasodilator effect previously described for this approach in severe pulmonary hypertension [9–13]. However, these previous studies included mostly patients suffering from PPH or pulmonary hypertension associated to connective tissue disease. In contrast, the present investigation included more SPH than PPH patients, including six patients with severe pulmonary hypertension related to thromboembolism (classed as SPH patients). This fact may well explain the somewhat lower pulmonary vasodilator response in the present study as compared to the previous investigations with iloprost aerosol delivery.

In conclusion, ultrasonic nebulization is suitable for inhalation of iloprost in severe pulmonary hypertension, inducing preferential pulmonary vasodilation. Markedly higher efficiency and output of the currently investigated ultrasonic device, in comparison to a standard jet aerosolization technique, avoids wastage of drug and allows shortening of the inhalation time to ∼30%, with comparable haemodynamic effects. The delivery of a standard iloprost dose of 2.8 μg in the notably reduced inhalation time did not induce side effects and was well tolerated by all patients. Long-term use of the ultrasonic nebulization device, performed in selected patients beyond the scope of the present study, as yet has shown no technical drawbacks. Thus employment of ultrasonic aerosol generation offers more effective alveolar deposition of vasoactive drugs in severe pulmonary hypertension, as compared to conventional jet nebulization.

***Acknowledgements.*** The authors thank M. Hollenhorst for statistical assistance and R.L. Snipes for carefully reviewing the manuscript. Parts of T. Gessler's thesis are incorporated into this report.

### References

1.  Executive summary from the World Symposium on Primary Pulmonary Hypertension 1998. Rich S, Ed. Available from the World Health Organization at http://www.who.int/ncd/cvd/pph.html.
2.  D'Alonzo GE, Barst RJ, Ayres SM, *et al.* Survival in patients with primary pulmonary hypertension. Results from a national prospective registry. *Ann Intern Med* 1991; 115: 343–349.
3.  Higenbottam T, Wheeldon D, Wells F, Wallwork J. Long-term treatment of primary pulmonary hypertension with continuous intravenous epoprostenol (prostacyclin). *Lancet* 1984; 1: 1046–1047.
4.  Higenbottam T. The place of prostacyclin in the clinical management of primary pulmonary hypertension. *Am Rev Respir Dis* 1987; 136: 782–785.
5.  Rubin LJ, Mendoza J, Hood M, *et al.* Treatment of primary pulmonary hypertension with continuous intravenous prostacyclin (epoprostenol). Results of a randomized trial. *Ann Intern Med* 1990; 112: 485–491.
6.  Humbert M, Sanchez O, Fartoukh M, *et al.* Short-term and long-term epoprostenol (prostacyclin) therapy in pulmonary hypertension secondary to connective tissue diseases: results of a pilot study. *Eur Respir J* 1999; 13: 1351–1356.
7.  McLaughlin VV, Genthner DE, Panella MM, Hess DM, Rich S. Compassionate use of continuous prostacyclin in the management of secondary pulmonary hypertension: a case series. *Ann Intern Med* 1999; 130: 740–743.
8.  Barst RJ, Rubin LJ, Long WA, *et al.* A comparison of continuous intravenous epoprostenol (prostacyclin) with conventional therapy for primary pulmonary hypertension. *N Engl J Med* 1996; 334: 296–301.
9.  Olschewski H, Walmrath D, Schermuly R, Ghofrani HA, Grimminger F, Seeger W. Aerosolized prostacyclin and iloprost in severe pulmonary hypertension. *Ann Intern Med* 1996; 124: 820–824.
10. Olschewski H, Ghofrani HA, Walmrath D, Temmesfeld-Wollbrück B, Grimminger F, Seeger W. Recovery from circulatory shock in severe primary pulmonary hypertension (PPH) with aerosolization of iloprost. *Intensive Care Med* 1998; 24: 631–634.
11. Olschewski H, Ghofrani HA, Walmrath D, *et al.* Inhaled prostacyclin and iloprost in severe pulmonary hypertension secondary to lung fibrosis. *Am J Respir Crit Care Med* 1999; 160: 600–607.
12. Olschewski H, Ghofrani HA, Schmehl T, *et al.* Inhaled iloprost to treat severe pulmonary hypertension: an uncontrolled trial. *Ann Intern Med* 2000; 132: 435–443.
13. Hoeper MM, Olschewski H, Ghofrani HA, *et al.* A comparison of the acute haemodynamic effects of inhaled nitric oxide and aerosolized iloprost in primary pulmonary hypertension. *J Am Coll Cardiol* 2000; 35: 176–182.
14. Hoeper MM, Schwarze M, Ehlerding S, *et al.* Long-term treatment of primary pulmonary hypertension with aerosolized iloprost, a prostacyclin analogue. *N Engl J Med* 2000; 342: 1866–1870.
15. Holm S. A simple sequentially rejective multiple test procedure. *Scand J Statistics* 1979; 6: 65–70.
16. Morrow PE. Factors determining hygroscopic aerosol deposition in airways. *Physiol Rev* 1986; 66: 330–376.
17. Stahlhofen W, Gebhart J, Heyder J. Experimental determination of the regional deposition of aerosol particles in the human respiratory tract. *Am Ind Hyg Assoc J* 1980; 41: 385–398a.
18. Heyder J, Gebhart J, Stahlhofen W. Inhalation of aerosols: particle deposition and retention. *In:* Willeke K, ed. Generation of Aerosols and Facilities for Exposure Experiments. Ann Arbor, Ann Arbor Science, 1980; pp. 65–104.
19. O'Riordan TG, Smaldone GC. Exposure of health care workers to aerosolized pentamidine. *Chest* 1992; 101: 1494–1499.
20. Balmes JR, Estacio PL, Quinlan P, Kelly T, Corkery K, Blanc P. Respiratory effects of occupational exposure to aerosolized pentamidine. *J Occup Environ Med* 1995; 37: 145–150.



Volume 25   Abstract Supplement   August/September 2004   ISSN 0195-668X

EUROPEAN
SOCIETY OF
CARDIOLOGY

Q
EU88



# European Heart Journal

Journal of the European Society of Cardiology

## ESC Congress 2004
## 28 August – 1 September
## Munich, Germany

Editor-in-Chief: **Frans Van de Werf**

Deputy Editors: **Stefan Janssens**
**Frank Rademakers**

EBLING LIBRARY
UNIVERSITY OF WISCONSIN

OCT 1 5 2004.

750 Highland Avenue
Madison, WI 53705

WATSON LABORATORIES, INC. , Ex. 1046, p. 1 of 5



ELSEVIER

Liquidia's Exhibit 1090
Page 1

# ESC Congress 2004, Munich

*28 August – 1 September 2004*

EBLING LIBRARY
UNIVERSITY OF WISCONSIN

OCT 1 5 2004

750 Highland Avenue
Madison, WI 53705

**WATSON LABORATORIES, INC. , Ex. 1046, p. 2 of 5**

*European Heart Journal* (2004) **25** (Abstract Supplement), *iii–vi*

# Abstracts selected for presentation at the European Society of Cardiology Congress 28 August – 1 September 2004, Munich – Germany

One of the main missions of the Congress of the European Society of Cardiology (ESC) is the presentation of innovative research. This year again, a large number of abstracts were submitted for review (see Figure 1). This high number of submissions underscores the strength of basic, epidemiological and clinical sciences in Europe and abroad, as well as the attractiveness of the European Congress as a whole. Out of 8557 submitted abstracts this year, 5.1% came from Japan, 3.9% from the USA and 2.4% from Brazil, amongst other non-European countries. The abstracts covered all aspects of cardiovascular medicine, but the three main areas accounting for 10% or more of all abstracts were coronary artery disease, heart failure and myocardial function, arrhythmias and pacing. Since abstracts are now submitted as either "Bench" or "Bedside", the contribution of Basic Science is clearly identified and amounts to 16.3% of all submissions, an encouraging 2.3% increase compared to Vienna 2003.

## Figure 1. Abstracts submitted to the annual ESC Congress



This year we will again be holding four Award sessions, in which the best science from young investigators under the age of 36 will be competitively presented. These sessions will all take place on Sunday, 29 August 2004, from 12:40 to 13:55 and we are looking forward to a large audience. Attractive prizes for the winning abstracts in Basic, Population, Clinical Sciences and Thrombosis are given by the ESC at the Awards Ceremony.

In line with the general theme of the Congress, "Diabetes & the Heart", many abstract sessions will be devoted to basic and clinical aspects of this growing epidemic, not to mention the special EASD-ESC scholarship session, to be held on Tuesday, 31 August 2004, from 11:00 to 12:30. These outstanding contributions (half of which are selected by each organization) will be presented at both ESC and EASD meetings.

Abstract selection is based on expert and unbiased peer review, resulting in the final selection of 2680 abstracts to be included in one of the 124 oral sessions or 1449 poster presentations. Expert colleagues from Europe and abroad grade the abstracts on-line, with the help of customized web-based tools. The abstracts are blinded for the author's names, city and country of origin. The average grade given by these experts was used to select the best abstracts for further evaluation by members of the Congress Programme Committee. We would like to extend our sincere thanks to all the members of the

WATSON LABORATORIES, INC. , Ex. 1046, p. 3 of 5

Liquidia's Exhibit 1090
Page 3

Congress Programme Committee and to the 543 abstract graders for their dedication and enthusiastic work in reviewing the submissions.

It is important to note that selection of an abstract for oral or poster presentation does not reflect the grades this abstract received. Oral sessions are constructed by the Programme Committee to present related work covering one particular topic. Thus, the poster sessions feature some of the highest graded abstracts of the congress, in particular the Moderated Poster sessions. These posters will be presented and discussed in a specially designed and highlighted area of the poster hall. Using microphone support, scientists will have the opportunity to present and defend their findings in front of some of the most prestigious experts of our discipline.

In addition, this year we will introduce an entirely new concept, namely the e-Poster sessions, whereby the 464 posters selected for the topics Basic Science & Cardiac Imaging will be available in electronic format for the entire duration of the congress through a specially dedicated computer system (e-Poster lounge of 40 computers located in the Poster hall close to the FOCUS rooms). This technology has a lot to offer to stimulate interaction and maximize exposure of the data. Not only can you discuss with the poster presenter during his allotted timeslot, but any participant in the Congress can drop in whenever convenient and visualize any of the e-Posters, alone or in company. Facilities for presentation to small groups via projection on larger plasma screens can be made available. Computer facilities allow for the inclusion of video clips, movies or other animations in the material to be presented, and there are many other useful features to be discovered ... Look for all necessary information about this exciting new approach to scientific exchange on the ESC website, www.escardio.org.

To all organizers, participants and accompanying persons, we extend a warm welcome. We hope that you will enjoy the conference, both scientifically and socially.

WILLIAM WIJNS
*Chairman*
*ESC Congress Programme Committee*

JEAN-PIERRE BASSAND
*President*
*European Society of Cardiology*

WATSON LABORATORIES, INC. , Ex. 1046, p. 4 of 5

Liquidia's Exhibit 1090
Page 4

## 218  Inhaled treprostinil is a potent pulmonary vasodilator in severe pulmonary hypertension



R. Voswinckel, M.G. Kohstall, B. Enke, T. Gessler, F. Reichenberger, H.A. Ghofrani, W. Seeger, H. Olschewski. *Medical Clinic 2, Department of Internal Medicine, Giessen, Germany*

**Background:** Treprostinil has been approved for therapy of PAH (US and Canada) as continuous subcutaneous infusion. However, local pain at the infusion site is a major drawback. Inhaled therapy with another stable prostacyclin analogue (iloprost) has been approved for PPH (EMEA). In this study we investigated the acute hemodynamic response to inhaled treprostinil.

**Methods:** Open-label, single blind placebo-controlled clinical study. After placement of a Swan-Ganz catheter and a femoral artery line, patients inhaled solvent solution (placebo) (n=8) or treprostinil for 6 min (OptiNeb ultrasound nebulizer, Nebu-tec, Germany) in concentrations of 16, 32, 48, and 64 μg/ml (n=6, 6, 6, and 3 patients). Measurement was performed before and after 0, 15, 30, 60, 90, 120, 150 and 180 min. The mean area between the placebo and the treprostinil curves (ABC186) was calculated (baseline=100%).

**Results:** We investigated idiopathic PAH (n=10), collagen vascular disease (n=5), chronic thromboembolic disease (n=9), and pulmonary fibrosis (n=5), f/m = 19/10, age $56 \pm 3$ years, PAP, PAWP, and CVP $51.3 \pm 2.2$, $9.2 \pm 0.8$, and $6.6 \pm 0.6$ mmHg, CO $4.4 \pm 0.3$ l/min, SvO2 $62.3 \pm 1.2\%$, PVR $885 \pm 72$ dyn s cm$^{-5}$. At 16μg/ml there were no significant adverse events. Headache, cough or bronchoconstriction were observed in 2, 1, and 2 patients at 32, 48, and 64 μg/ml. These were mild and transient in all patients but one (64 μg/ml) who complained of major headache for 1 hour. Placebo inhalation was followed by slowly increasing PVR. Compared to this, the maximum treprostinil effect was reached after about 50 min and half-maximal effects at about 110 min. The ABC186 for PVR was −24.7 ± 4.4, -28.7 ± 4.9, and −29.0 ± 4.7%; PAP −14.4 ± 3.3, -13.5 ± 5.2, -13.1 ± 2.6%; SAP −5.1 ± 3.0, -6.0 ± 3.1, -3.8 ± 2.1% at 16, 32 and 48 μg/ml.

**Conclusion:** Treprostinil inhalation results in a significant long-lasting pulmonary vasodilation. With the applied technology, at a concentration of 16μg/ml, near maximal pulmonary vasodilatation is achieved without adverse effects. At higher doses, local and systemic side effects may occur, whereas pulmonary selectivity is preserved.

This study was supported by Lung Rx.

## 219  The endothelin-receptor antagonist bosentan for the treatment of pulmonary arterial hypertension associated with congenital heart defects



O. Sitbon[1], M. Beghetti[2], J. Petit[3], L. Iserin[4], M. Humbert[1], V. Gressin[5], G. Simonneau[1]. *[1]Hôpital Antoine Béclère, Clamart, France; [2]HUG, Pediatric Cardiology Unit, Geneva, Switzerland; [3]CMC Marie-Lannelongue, Le Plessis-Robinson, France; [4]Hôpital Necker, Paris, France; [5]Actelion Pharmaceuticals France, Paris, France*

**Background:** Treatment with the oral dual endothelin-receptor antagonist bosentan has been shown to be an effective alternative option to intravenous epoprostenol in functional class (FC) III idiopathic pulmonary arterial hypertension (PAH) patients. In patients with PAH associated with congenital heart defects (CHD), an improvement of exercise capacity and hemodynamics has been demonstrated with epoprostenol in one uncontrolled study (Rosenzweig et al. Circulation 1999; 99: 1858-65).

The aim of this retrospective study was to evaluate the efficacy and safety of bosentan in FC III-IV CHD-PAH patients.

Study population consisted in 24 patients (22 females, mean age $35 \pm 15$ years [8-68]) with CHD-PAH: atrial septal defect (ASD: 13), ventricular septal defect (VSD: 4), partial abnormal pulmonary venous return (3, associated with ASD in 2 and repaired common atrium in 1), patent ductus arteriosus (PDA: 2), VSD associated with PDA (1), aortopulmonary window (1). Four patients had undergone previous cardiac surgery.

Patients had deteriorated despite conventional therapy (including oral anticoagulants, oxygen, diuretics) and were treated with chronic oral bosentan.

**Results:** Before starting bosentan, 22 patients were in FC III and 2 in FC IV, with a resting O2 saturation (SaO2) of $89 \pm 9\%$. Mean 6-min walk distance (6MWD) was $288 \pm 94$ m and mean Borg index $3.0 \pm 1.9$. At last evaluation performed after $10 \pm 9$ months of bosentan treatment, 1 patient was in FC I, 8 were in FC II, 13 remained in FC III and 2 in FC IV. The mean 6MWD improved by 49 m ($349 \pm 85$ m, $p = 0.008$) with no change in Borg index ($3.0 \pm 1.8$) and resting SaO2 ($89 \pm 6\%$). There were no differences between pre and post-tricuspid shunt subgroups in terms of baseline characteristics and response to bosentan therapy. After $13 \pm 9$ months of follow-up, all patients are alive on bosentan, but 3 (1 ASD, 1 VSD, 1 aortopulmonary window) required combination therapy with intravenous epoprostenol after 5, 7 and 9 months on bosentan.

**Conclusion:** Chronic oral bosentan treatment improves exercise capacity in patients with PAH associated with CHD who deteriorated despite conventional therapy. Bosentan had no adverse effect on arterial oxygen saturation. As previously demonstrated in patients with idiopathic PAH, long term bosentan may be an important therapeutic option for patients with PAH associated with CHD.

## 220  Sildenafil in the treatment of primary pulmonary hypertension



A. Dharmadhikari[1], M. Kulkarni[2], V. Tzifos[3], F. Airoldi[4], I. Sheiban[5]. *[1]Nashik, India; [2]Rajebahadur Heart Foundation, Cardiology, Nashik, India; [3]Hospital Hunry Dunant, Interventional Cardiology, Athens, Greece; [4]Hospital San Raffaele, Interventional Cardiology, Milano, Italy; [5]University Hospital, Torino, Interventional Cardiology, Torino, Italy*

**Background:** The role of sildenafil as a pulmonary vasodilator is being extensively evaluated in the treatment of pulmonary hypertension.

**Aim:** This was a prospective study to assess the benefit of adding sildenafil in patients with high pulmonary artery pressures secondary to atrial septal defect (ASD), already receiving the conventional therapy.

**Methods:** Thirty consecutive patients with moderate to severe primary pulmonary hypertension were included in this study. All the patients were diagnosed previously and were receiving the conventional therapy with digoxin, diuretic and a calcium channel blocker. Sildenafil was added in the dose of 50 mg twice a day without changing the previous regimens. Changes in the New York Heart Association (NYHA) symptom class, distance covered during the six minute walk test and modified Borg dyspnea score were evaluated monthly. Acceptance of the new drug was assessed every week in the first month and then at the monthly follow up. Echocardiography and Doppler study was undertaken at baseline and every month for a period of six months. The parameters studied were the pulmonary artery systolic pressure (PASP) by tricuspid regurgitation (TR) jet and pulmonary artery diastolic pressure (PADP) by pulmonary regurgitation (PR) jet.

**Results:** Mean age of the subjects was $42.6\pm9.3$ years. Twenty seven (90%) were females and 3 (10%) were males. Sildenafil was well tolerated and there was no dropout because of undesireable effects of the drug. Changes in the heart rate and systemic blood pressure were not significant enough to warrant withdrawl of the drug. Two patients died during the follow-up period. At the beginning of the therapy, 22 (73.3%) patients were in NYHA Class III or IV while at the end of six months, only 8 patients remained in either of these classes (p<0.05). By the 6 min walk test, functional capacity improved from $181.5\pm122.4$ meters to $302.7\pm150.3$ meters p(<0.05). Modified Borg dyspnea score improved from $5.6\pm1.2$ to $3.3\pm1.1$ (p<0.05). PASP by TR jet (mmHg) was down from $81.3\pm14.7$ to $51.4\pm11.7$ (p<0.05). PADP by PR jet (mmHg) reduced from $56.2\pm11.7$ to $33.4\pm9.1$ (p<0.05).

**Conclusion:** Sildenafil is well tolerated, improves symptoms, and reduces the systolic and diastolic pulmonary artery pressures in patients with moderate to severe primary pulmonary arterial hypertension.

## REVISITING THE ELECTROCARDIOGRAM AND ELECTROPHYSIOLOGIC MARKERS OF ARRHYTHMIC EVENTS

## 221  Prevalence of brugada-type ecg in an apparently healthy european population



G. Forleo[1], F. Di Liberato[2], L. De Luca[2], G. Magliano[2], V. Morgia[2], F. Clementi[2], M.M. Gallagher[2], F. Romeo[2]. *[1]University of Rome, Department of Cardiology, Roma, Italy; [2]University of Tor Vergata, Department of Cardiology, Rome, Italy*

**Background:** The Brugada Syndrome ECG is characterized by ST-segment elevation in right precordial leads and elevated risk of lethal arrhythmias in absence of identifiable structural heart disease. Few data are available on the Brugada type ECG, especially in Europeans. No epidemiological study has applied the diagnostic criteria recently proposed by the Study Group of the Molecular Basis of Arrhythmias of the ESC.

**Methods:** We analysed the ECG and clinical data of apparently healthy European adults undergoing routine medical examinations for occupational reasons. At each examination subjects underwent a medical interview, physical examination, blood pressure measurement and 12-lead ECG. Enrolment was confined to persons without a history of heart disease at the time of first attendance in whom at least one 12-lead ECG of good quality was recorded. The ECG records of all 7483 subjects (89.6% male, age $29.5\pm10.8$ years at first attendance) were reviewed by three cardiologists. We reviewed $1,97\pm2,1$ ECGs for each subject. We considered a patient having a Brugada ECG pattern if 2 or more of the cardiologists judged that at least one of that persons ECGs fulfilled the criteria of the ESC Study Group.

**Results:** The Brugada pattern was present in 26 patients (0.35%), all male (table). In 17 cases (65.4%), information was available about the progress of the subject subsequent to the ECG on which the Brugada pattern was first recorded. No sudden death or cardiac arrhythmia was recorded among these patients in a follow-up of $5.2\pm4.6$ years (total follow-up 87.8 patient-years).

| | Total | Pattern 1 | Pattern 2 | Pattern 3 | Tot. Brugada |
|---|---|---|---|---|---|
| Pts (n) | 7383 | 2 | 21 | 3 | 26 |
| Male | 6618 | 2 | 21 | 3 | 26 |
| Female | 765 | 0 | 0 | 0 | 0 |
| Male prevalence (*10000) | – | 3,02 | 31,73 | 4,53 | 39,29 |
| Total Prevalence (*10000) | – | 2,71 | 28,44 | 4,06 | 35,22 |

This material may be protected by Copyright law (Title 17 U.S. Code)

WATSON LABORATORIES, INC. , Ex. 1046, p. 5 of 5

Liquidia's Exhibit 1090
Page 5



Liquidia's Exhibit 1091
Page 1

*European Heart Journal* (2004) **25** *(Abstract Supplement), xi–xvi*

# Contents

*Programme number (P = poster)*                           *Page*

**Abstract Selection** .................................................................................... iii

**Abstract Review Committee** ........................................................................... vii

**Abstracts** ............................................................................................. 1

### Day 2 — Sunday 29 August 2004

| | | |
|---|---|---|
| 117–122 | Trends and risk factors in cardiovascular disease | 3 |
| 123–128 | Risk factors management in prevention | 4 |
| 129–134 | Predictive factors in dilated cardiomyopathy | 6 |
| 135–140 | New applications of strain and strain rate imaging | 7 |
| 149–154 | From mice to men: lessons in myocardial protection and hypertrophy | 9 |
| 155–160 | Impact of non surgical treatment and physiological stress on the GUCH-heart | 10 |
| 161–166 | Vascular growth and collateral vessels: opportunities and drawbacks | 12 |
| 176–181 | Drug eluting stent in complex lesion subsets | 13 |
| 182–187 | Gene variants in hypertension, coronary artery disease and dilated cardiomyopathy | 15 |
| 188–193 | Markers of severity in hypertrophic cardiomyopathy | 16 |
| 199–204 | How to perfect coronary artery bypass grafting? | 18 |
| 209–214 | Intravascular ultrasound and plaque characterisation | 19 |
| 215–220 | Epidemiology and treatment of pulmonary arterial hypertension | 21 |
| 221–226 | Revisiting the electrocardiogram and electrophysiologic markers of arrhythmic events | 22 |
| 229–234 | Nursing aspects of acute cardiac care | 24 |
| 244–249 | Follow-up in the pacemaker and implantable cardioverter-defibrillator Era: old and new issues | 25 |
| 250–255 | Threatening complications with sophisticated devices | 27 |
| 256–261 | New risk markers of sudden death after acute myocardial infarction | 28 |
| 275–280 | Inotropic intervention: new mechanisms | 30 |
| 281–286 | Muscle wasting and cachexia in heart failure: ready for intervention | 31 |
| 304–309 | Percutaneous coronary intervention and beyond for ST-elevation acute myocardial infarction | 33 |
| 310–315 | IIb or not to be in acute myocardial infarction? | 34 |
| P356–P361 | Moderated e-Posters I: Cardiac dysfunction: new insights | 36 |
| P362–P377 | Atherosclerosis I – Basic Science | 37 |
| P378–P384 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 41 |
| P385–P386 | Computers in cardiology | 43 |
| P387–P401 | Echocardiography/Doppler | 44 |
| P402–P417 | Atherosclerosis I – Basic Science | 48 |
| P418–P424 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 52 |
| P425 | Computers in cardiology | 53 |
| P426–P441 | Echocardiography/Doppler | 54 |
| P442–P449 | Moderated Poster session I: Arterial hypertension | 58 |
| P450–P466 | Atrial fibrillation | 60 |
| P467–P498 | Mechanisms of arrhythmias | 64 |
| P499–P540 | Heart failure: clinical aspects | 71 |
| P541–P558 | Pulmonary circulation | 81 |
| P559–P606 | Thrombosis | 86 |
| P607–P623 | Coronary plaque imaging | 98 |
| P624–P652 | Endothelial function | 102 |
| P653–P682 | Myocardial disease | 109 |
| 683–686 | Computed tomography: Imaging of coronary arteries | 116 |
| 688–691 | Young Investigators' Award Session – Basic Science | 117 |
| 693–696 | Young Investigators' Award Session – Thrombosis | 118 |
| 698–701 | Young Investigators' Award Session – Population Sciences | 119 |
| 703–706 | Young Investigators' Award Session – Clinical Science | 120 |
| 729–734 | New prevention strategies | 121 |
| 735–740 | Women, men and cardiovascular disease | 123 |
| 741–746 | Multiple uses of myocardial deformation assessment by echocardiography | 124 |

Liquidia's Exhibit 1091
Page 2

| | | |
|---|---|---|
| 747–752 | Communication in vascular smooth muscle cells ............................................... | 126 |
| 767–772 | Oxidative stress and the endothelium ....................................................... | 127 |
| 794–799 | Improving risk stratification by nuclear cardiology ........................................... | 129 |
| 817–822 | Pathophysiological aspects of resynchronisation therapy ..................................... | 130 |
| 823–828 | Determinants and prevention of post myocardial infarction left ventricular remodelling ........ | 132 |
| 831–836 | Ablation of atrial fibrillation: from source to success ........................................ | 133 |
| 846–851 | Heart failure with preserved systolic function: whats new? .................................... | 135 |
| 852–857 | Diagnosis and evaluation of heart failure – still a challenge in the everyday clinical practice........ | 136 |
| 876–880 | Novel therapeutic strategies in chronic stable angina ......................................... | 138 |
| 913–918 | Dilated cardiomyopathy or viral myocarditis? ................................................ | 139 |
| P955–P960 | Moderated e-Posters II: Brugada syndrome .................................................. | 141 |
| P961–P976 | Atherosclerosis II – Basic Science ......................................................... | 142 |
| P977–P983 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology ......................... | 146 |
| P984–P985 | Computers in cardiology .................................................................. | 147 |
| P986–P1000 | Echocardiography/Doppler ................................................................ | 148 |
| P1001–P1016 | Atherosclerosis II – Basic Science ......................................................... | 152 |
| P1017–P1023 | Nuclear cardiology/magnetic resonance imaging and cardiac radiology ......................... | 156 |
| P1024–P1025 | Computers in cardiology .................................................................. | 157 |
| P1026–P1039 | Echocardiography/Doppler ................................................................ | 158 |
| P1040–P1047 | Moderated Poster session II: Exercise testing ............................................... | 161 |
| P1048–P1076 | Implantable cardioverter-defibrillator therapy ............................................... | 163 |
| P1077–P1096 | Ventricular tachycardia ................................................................... | 170 |
| P1097–P1148 | Heart failure: experimental aspects and risk of inflammation .................................. | 175 |
| P1149–P1196 | Ischaemia basic aspects .................................................................. | 188 |
| P1197–P1225 | Non-coronary interventions ............................................................... | 199 |
| P1226–P1254 | Hypertension ............................................................................ | 206 |
| P1255–P1276 | Valve surgery ........................................................................... | 213 |
| 1277–1280 | Aortic interventions ...................................................................... | 218 |

**Day 3 — Monday 30 August 2004**

| | | |
|---|---|---|
| 1300–1305 | Endothelial function, oxidative stress and nitric oxide ....................................... | 223 |
| 1306–1310 | Gene expression, contractile function and hypertrophy ....................................... | 224 |
| 1312–1317 | Physical fitness: correlations and determinants .............................................. | 225 |
| 1318–1323 | Percutaneous interventions in congenital heart disease ....................................... | 227 |
| 1337–1342 | Myocardial perfusion during acute ischaemia: the added value of myocardial contrast echocardiography (MCE) ....................................... | 228 |
| 1343–1348 | New aspects of endothelial function related to atherosclerosis ................................ | 230 |
| 1353–1358 | Markers and identification of the vulnerable plaque .......................................... | 231 |
| 1369–1374 | Protection against ischaemia and ischaemia-reperfusion injury ................................ | 233 |
| 1375–1380 | Frequent unwanted companions: hypertension and hyperlipidaemia ............................ | 234 |
| 1381–1386 | New horizons in risk stratification of unstable coronary syndromes ........................... | 236 |
| 1399–1403 | Resistance to antiplatelet agents .......................................................... | 237 |
| 1405–1410 | Intensive treatment for diabetes: key to improved prognosis................................... | 238 |
| 1411–1416 | Oral treatment in prevention of in-stent restenosis .......................................... | 240 |
| 1425–1430 | Atrial fibrillation – clinical presentation risk factors and prognosis ........................... | 242 |
| 1458–1463 | Risk stratification tools in the prediction of coronary events.................................. | 243 |
| 1469–1474 | Statins in heart failure: friend or foe?...................................................... | 244 |
| 1475–1480 | Betablockade: new aspects in chronic heart failure .......................................... | 246 |
| 1496–1501 | Primary percutaneous coronary intervention – special issues .................................. | 248 |
| 1502–1507 | Evolving concepts in the management of aortic stenosis ...................................... | 249 |
| 1512–1517 | Registries and guidelines in acute coronary syndromes ....................................... | 251 |
| P1544–P1559 | Angiogenic and stem cell therapy – Basic Science ........................................... | 252 |
| P1560–P1566 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology ......................... | 256 |
| P1567–P1568 | Computers in cardiology .................................................................. | 258 |
| P1569–P1583 | Echocardiography/Doppler ................................................................ | 258 |
| P1584–P1598 | Angiogenic and stem cell therapy – Basic Science ........................................... | 262 |
| P1599–P1606 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology ......................... | 266 |
| P1607–P1608 | Computers in cardiology .................................................................. | 268 |
| P1609–P1623 | Echocardiography/Doppler ................................................................ | 268 |
| P1624–P1631 | Moderated Poster session III: Catheter ablation ............................................. | 272 |
| P1632–P1665 | Catheter ablation ........................................................................ | 274 |

Liquidia's Exhibit 1091
Page 3

| | | |
|---|---|---|
| P1666–P1709 | Peptides and heart failure | 282 |
| P1710–P1766 | Acute coronary syndromes | 292 |
| P1767–P1811 | Percutaneous coronary intervention | 306 |
| P1812–P1826 | Nursing | 317 |
| P1827–P1844 | Exercise testing and rehabilitation | 321 |
| P1845–P1871 | Hypertension therapeutic aspects | 325 |
| 1872–1875 | Advanced cardiac imaging | 332 |
| 1929–1934 | Bio-markers of cardiovascular disease | 333 |
| 1935–1940 | Novel magnetic resonance techniques to assess coronary artery disease | 334 |
| 1941–1945 | Mechanisms underlying plaque instability | 336 |
| 1947–1952 | Hormones and cardiac function | 337 |
| 1961–1966 | Clinical and genetic aspects of arrhythmias | 339 |
| 1967–1972 | Recent advances in three-dimensional echocardiography | 340 |
| 1973–1978 | Ischaemia-reperfusion, slow flow and no reflow | 342 |
| 1989–1994 | Computer-based advances in cardiology | 343 |
| 1995–2000 | Vascular and myocardial damage and remodelling | 345 |
| 2001–2006 | Subclinical peripheral artery disease: a marker for severity of coronary artery disease | 346 |
| 2007–2012 | Stem cells in heart failure | 348 |
| 2026–2031 | Percutaneous interventions in unstable coronary syndromes | 349 |
| 2032–2037 | Neurally mediated syncope: a recurrent syndrome revisited | 351 |
| 2042–2047 | Novel pharmacological approaches for the treatment of atrial fibrillation | 352 |
| 2052–2057 | New developments in thrombolysis: fibrinolysis | 354 |
| 2087–2091 | A new era in the prognostic assessment of heart failure patients | 355 |
| 2097–2102 | New evidence for the beneficial effects of exercise training | 357 |
| 2107–2112 | Primary percutaneous coronary intervention in acute myocardial infarction | 358 |
| 2113–2117 | Many things to remember in CABG | 360 |
| 2119–2123 | Exercise testing in mitral valve disease | 361 |
| 2129–2134 | Drug eluting stents in diabetic patients | 362 |
| 2140–2145 | Bad and good habits | 364 |
| P2166–P2178 | Stress-induced myocardial damage and protective mechanisms – Basic Science | 365 |
| P2179–P2185 | Nuclear cardiology/MRI and cardiac radiology | 368 |
| P2186 | Computers in cardiology | 370 |
| P2187–P2201 | Echocardiography/Doppler | 370 |
| P2202–P2213 | Stress-induced myocardial damage and protective mechanisms | 374 |
| P2214–P2220 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 377 |
| P2221–P2222 | Computers in cardiology | 379 |
| P2223–P2237 | Echocardiography/Doppler | 379 |
| P2238–P2245 | Moderated Poster session IV: Inflammation and coronary artery disease | 383 |
| P2246–P2265 | Pacing | 385 |
| P2266–P2286 | Mechanisms of arrhythmias | 390 |
| P2287–P2341 | Resynchronisation therapy | 395 |
| P2342–P2409 | Acute myocardial infarction and reperfusion therapy | 408 |
| P2410–P2438 | Coronary circulation: functional evaluation | 425 |
| P2439–P2484 | Epidemiology | 432 |
| 2485–2488 | Databases and guidelines | 443 |

### Day 4 — Tuesday 31 August 2004

| | | |
|---|---|---|
| 2605–2609 | Congenital heart disease: secondary challenges after early "repair" | 447 |
| 2611–2616 | Experimental cell transplantation: preclinical and clinical developments | 448 |
| 2617–2622 | More fuel to inflammation | 449 |
| 2636–2641 | Chronic heart failure: new treatment options | 451 |
| 2642–2647 | Oral anticoagulation for atrial fibrillation – still unresolved | 452 |
| 2648–2653 | The diabetic vessel | 454 |
| 2667–2672 | Heart failure news from off the beaten track | 455 |
| 2673–2677 | Catheter ablation of ventricular tachycardia | 457 |
| 2709–2714 | Diabetes and the heart | 458 |
| 2725–2730 | Treatment and outcome of acute pulmonary embolism | 459 |
| 2768–2773 | Coronary artery disease and renal failure: prognostic aspects and prevention | 461 |
| 2774–2779 | Clopidogrel loading – 600 mg may be better | 462 |
| 2799–2804 | Mitral regurgitation: from prognosis to treatment | 464 |
| P2830–P2835 | Moderated e-Posters III: Drug therapy in cardiovascular disease | 465 |

Liquidia's Exhibit 1091
Page 4

| | | |
|---|---|---|
| P2836–P2851 | Endothelial function, vascular care and remodelling | 467 |
| P2852–P2858 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 467 |
| P2859 | Computers in cardiology | 471 |
| P2860–P2874 | Echocardiography/Doppler | 472 |
| P2875–P2887 | Ion channels and arrhythmias | 473 |
| P2888–P2894 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 476 |
| P2895–P2896 | Computers in cardiology | 479 |
| P2897–P2911 | Echocardiography/Doppler | 481 |
| P2912–P2919 | Moderated Poster session V: Trials in heart failure | 482 |
| P2920–P2950 | Atrial fibrillation | 485 |
| P2951–P2995 | Heart failure: clinical aspects | 488 |
| P2996–P3046 | Coronary artery disease in high-risk patients | 495 |
| P3047–P3079 | Restenosis and drug-eluting stents | 506 |
| P3080–P3123 | Risk factor | 519 |
| P3124–P3144 | Myocardial disease | 527 |
| 3145–3148 | Simulation and modelling | 537 |
| P3265–P3270 | Moderated e-Posters IV: Nurse-led interventions in patients with heart failure | 543 |
| P3271–P3284 | Cardiac hypertrophy and remodelling contractile function – Basic Science | 544 |
| P3285–P3291 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 545 |
| P3292–P3293 | Computers in cardiology | 548 |
| P3294–P3308 | Echocardiography/Doppler | 550 |
| P3309–P3323 | Cardiac hypertrophy and remodelling contractile function – Basic Science | 551 |
| P3324–P3330 | Nuclear cardiology/Magnetic resonance imaging and cardiac radiology | 554 |
| P3331–P3332 | Computers in cardiology | 558 |
| P3333–P3347 | Echocardiography/Doppler | 560 |
| P3348–P3354 | Moderated Poster session VI: In stent restenosis | 560 |
| P3355–P3374 | Electrocardiography | 564 |
| P3375–P3394 | Syncope | 566 |
| P3395–P3418 | Heart transplantation | 571 |
| P3419–P3444 | Heart failure – medical therapy | 575 |
| P3445–P3485 | Valvular disease | 581 |
| P3486–P3512 | Coronary artery disease: risk stratification and medical therapy | 588 |
| P3513–P3531 | Stroke | 597 |
| P3532–P3544 | Exercise testing and rehabilitation | 604 |
| P3545–P3577 | Grown-up and congenital heart disease | 608 |
| P3578–P3588 | Coronary artery bypass grafting | 611 |
| 3589–3592 | Databases | 620 |
| | | 622 |

**Day 5 — Wednesday 1 September 2004**

| | | |
|---|---|---|
| 3617–3622 | Pericarditis | 627 |
| 3627–3632 | Structure and function of cardiac ion channels | 627 |
| 3637–3642 | Lipid modulation in atherogenesis – beyond cholesterol | 628 |
| 3643–3648 | Pulse pressure, distensibility and cardiovascular risk | 630 |
| 3649–3654 | Fat, lean or active: all relevant for cardiovascular risk? | 631 |
| 3655–3660 | Conduction of the electrical impulse | 633 |
| 3661–3666 | Novel players in receptor-mediated signalling in cardiac myocytes | 634 |
| 3671–3676 | Nuclear cardiology – beyond the future | 636 |
| 3681–3686 | Challenges in aortic interventions | 637 |
| 3687–3692 | Stenting of supra-aortic extracranial arteries | 638 |
| 3693–3698 | New navigation and mapping techniques for targeting the arrhythmogenic substrate | 640 |
| 3703–3708 | Reducing thrombotic risk – old concepts, new therapies | 641 |
| 3713–3718 | Acute myocardial intervention and diabetes | 643 |
| 3723–3728 | Pacing mode and lead position: does it matter? | 644 |
| 3729–3734 | How important is abnormal respiration in heart failure? | 646 |
| 3735–3740 | New insights into native or repaired mitral valve dynamics | 647 |
| 3745–3750 | Renal dysfunction and anaemia – overlooked parts of the heart failure syndrome | 649 |
| 3751–3756 | Ablation of atrial fibrillation: new techniques | 650 |
| 3757–3762 | Management of acute heart failure | 652 |
| 3763–3768 | Multiple applications of cardiac computed tomography | 653 |
| 3778–3783 | Challenging issues after valve replacement | 654 |
| 3784–3789 | Clinical assessment of resynchronisation therapy | 656 |
| | | 658 |

Liquidia's Exhibit 1091
Page 5

3790–3795    Hypertension and heart failure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    660
3801–3806    Blood pressure reduction and cardiovascular risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    661
3811–3816    Heart economics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    663
3821–3826    Physical training and secondary prevention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    664
3827–3831    Percutaneous coronary interventions in diabetic patients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    666
3833–3838    Prognostic value of stress echocardiography . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    667
3839–3843    Restenosis following bare stents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    669
3845–3850    Drug eluting stent to treat in-stent restenosis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    670

**Author Index** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    673

**Index of Topics** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    717

Liquidia's Exhibit 1091
Page 6